**REYNOLDS, CARONIA, GIANELLI & LA PINTA, P.C.**
ATTORNEYS AT LAW
35 ARKAY DRIVE, SUITE 200
HAUPPAUGE, NEW YORK 11788-3756

____

(631) 231-1199
FAX: (631) 231-1344

March 21, 2014

The Honorable Joseph F. Bianco
United States District Judge
Eastern District of New York
924 Federal Plaza
Central Islip, NY 11722

      Re:    *United States v. Joseph Valerio*
              14-CR-094-JFB

Dear Judge Bianco:

      The defendant Joseph Valerio replies to the government's March 20 bail-opposition letter. The government relies on inapposite cases, ignores appropriate cases and fails to demonstrate that Valerio's proposed bail package would be insufficient to reasonably assure his appearance and the safety of other persons and the community.

      In his bail-application letter, Valerio stated:

> In denying [Valerio's first] bail application, the Court was unpersuaded that one security officer posted outside the house could enforce Valerio's activities inside the house. Valerio thus now proposes to supplement his proposal with the following: two security officers posted 24 hours a day, seven days a week, with one officer stationed inside the house and the other officer stationed either inside the house or outside in a car.

(Letter at 1.) Although the government has a transcript of the bail hearing (Government Opposition Letter at 1), it ignores the Court's inquiry about the security officers. The government also ignores *every* case that Valerio relied on in his original bail application. (ECF Doc. 16.) Instead, the government relies mainly on inapt organized-crime cases and on irrelevant civil cases.

      The government begins with *United States v. Orena*, 986 F.2d 628 (2d Cir. 1993). In *Orena*, however, "[the] evidence demonstrated that Orena [wa]s Acting Boss of the Colombo Family and that his efforts to become permanent head of the Family [we]re responsible for [a]

bloody, fratricidal war." The government also omits that Orena codefendant "Amato [wa]s Orena's 'right-hand man' and ha[d] served, at Orena's direction, as Acting Underboss of the Family" and "as a captain and [had] directed a crew that [had] engaged in specific crimes, alleged to include murder and loansharking." *Id.* at 631. Valerio is neither a boss, an acting boss nor a captain of an organized-crime family engaging in a "fratricidal war . . . [involving] over twenty shootings and the injury and deaths of innocent bystanders." *Id.* And the government ignores *United States v. Sabhnani*, 493 F.3d 63 (2d Cir. 2007), in which the Second Circuit distinguished its earlier decision in *Orena*. In *Sabhnani*, the Circuit stated:

> First, the crimes charged in *Orena* triggered a statutory presumption in favor of detention that the defendants were required to rebut. By contrast, in this case, the statutory presumption is in favor of release unless the government demonstrates that no conditions of release can be imposed to assure the defendants' appearance in court. Second, the home confinement proposed in this case is far more extensive than that in *Orena*. Notably, in this case, there will be on-site visual surveillance as well as electronic monitoring, minimizing the risk of circumvention noted in *Orena*. Third, defendants propose to pay all costs associated with their home confinement, thus avoiding the drain on limited government resources discussed in *Orena*. Fourth, the government itself has selected the private security firm that will conduct much of the on-site monitoring of defendants' home confinement. Thus, this is not a case in which government reservations about either the competency or integrity of a private security firm might give a court pause about the effectiveness of home confinement in deterring flight. Fifth, although the crimes at issue in this case and in *Orena* both involved alleged violence, the circumstances are not comparable. Defendants purportedly used violence in their home to secure the forced labor of two specific victims who are now in government protection. The government does not contend in this court that defendants' release poses a further threat to these victims or others. By contrast, the violence in *Orena* stemmed from a bloody crime-family war involving more than twenty street shootings in which a number of innocent bystanders were killed. It was in these circumstances that this court declined to approve defendants' home confinement as a condition adequate to ensure public safety. . . . Thus, there is no reason in this case to think that the proposed conditions of home confinement cannot reasonably mitigate any concerns about defendants' risk of flight.

*Id.* at 78.

Valerio concedes that, unlike the defendants in *Sabhnani*, there is a presumption in favor of detention. But the home confinement that Valerio proposes is far more extensive than that

proposed in *Sabhnani*, which was "far more extensive than that in *Orena*." And as in *Sabhnani*, Valerio "propose[s] to pay all costs associated with [his] home confinement, thus avoiding the drain on limited government resources discussed in *Orena*." Moreover, although the government "has [not] selected the private security firm that will conduct . . . the on-site monitoring of [Valerio's] home confinement, the government has not objected to the security firm that Valerio has selected. Lastly, "although the crimes at issue in this case . . . involved alleged violence, the circumstances are not comparable" to those in *Orena*": Valerio's release poses no threat to the alleged victims or to anyone else.[1]

The next case that the government relies on is *United States v. Banki*, 369 F. App'x 152 (2d Cir. 2010). According to the government, "In *Banki*, the Second Circuit rejected the defendant's argument that the district court erred by denying bail where the defendant proposed, as here, that his home confinement would be enforced by multiple private security guards financed at his own expense." (Government Letter at 2.) What the government disregards is that a grand jury had charged the defendant Banki with, among other crimes, a conspiracy to violate "The International Emergency Economic Powers Act, [which] . . . grants to the President of the United States a broad spectrum of powers necessary to 'deal with any unusual and extraordinary threat . . . to the national security, foreign policy, or economy of the United States.'" *United States v. Banki*, No. 10-Cr-008 (S.D.N.Y. Jan. 6, 2010) (Indictment paras. 1-18).

After depending on a mob-war case and on a terrorist case to buttress its argument, the government proceeds to a case in which "the indictment allege[d] that [the defendant]," a citizen *and* a resident of Mexico, "conspired to, and actually did, offer to pay $1.2 million to a United States District Judge in exchange for a reduced sentence for his father." *United States v. Colorado-Cebado*, 2013 WL 5852621, at *1 (W.D. Tex. Oct. 30, 2013). Of course, the government omits "the Mexico citizen, Mexico resident" facts from its discussion. (Government Letter at 2.) Instead, the government argues that "the mere fact that [Valerio] has proposed multiple guards be stationed inside and outside his home to ensure the safety of the community and that he does not flee[] suggests that any condition or combination of conditions short of detention is inappropriate." (Government Letter at 2.) In other words, the government implies, the greater the security measures that Valerio proposes, the greater the threat that he becomes. The government's illogic requires no rebuttal. But the government's misrepresentation of what the magistrate judge stated in *Colorado-Cebado* does require some response. According to the government, the magistrate judge stated, "When an armed guard with license to use that firearm is needed to ensure that a defendant does not flee, then conditions of release are simply not appropriate." (Government Letter at 2.) True, the magistrate judge did say this. But the defendant in *Colorado-Cebado* had ties to a violent gang, he "concede[d] that he present[ed] such a serious risk of flight that releasing him on anything approaching a more ordinary set of conditions . . . [would be in]adequate to reasonably assure his appearance," and the magistrate

---

[1] The government's reliance on *United States v. Agnello*, 101 F. Supp. 2d 108 (E.D.N.Y. 2000), and on *United States v. Bellomo*, 944 F. Supp. 1160 (S.D.N.Y. 1996), suffers from the same flaw as its reliance on *Orena*. In *Agnello*, the government alleged that "Agnello [wa]s a member of the Gambino organized crime family" and had "committed and participated in the commission of multiple acts of conspiracy and attempted and actual extortion and arson." *Agnello*, 101 F. Supp. 2d at 110. In *Bellomo*, the government asserted that the defendant was "the acting boss of the Genovese family" and charged him with, among other crimes, murder in aid of racketeering. *Bellomo*, 944 F. Supp. at 1162.

judge concluded from the evidence, not from the bail proposal, that the defendant "pose[d] such a risk of flight that, to prevent him from fleeing, he [had to] be locked up and detained by armed guards authorized to use force." 2013 WL 5852621, at *5.[2]

Toward the end of its letter, the government argues that in *Borodin v. Ashcroft*, 136 F. Supp. 2d 125 (E.D.N.Y. 2001), the court "observed that 'it is contrary to underlying principles of detention and release on bail that individuals otherwise ineligible for release should be able to buy their way out." (Government Letter at 2-3.)  The government neglects to inform the Court that, six years later, the Second Circuit, in *Sabhnani*, stated that it "ha[d] no occasion to consider whether it would be 'contrary to principles of detention and release on bail' to allow wealthy defendants 'to buy their way out by constructing a private jail.'" *Sabhnani*, 493 F.3d at 78 n.18 (quoting *Borodin*, 136 F. Supp. 2d at 134).  The government also ignores the still later case of *United States v. Dreier*, 596 F. Supp. 2d 831 (S.D.N.Y 2009), which Valerio heavily relied on in his first bail letter.  In *Dreier*, the court stated that a wealthy defendant's ability to hire private security personnel "is not a reason to deny a constitutional right to someone who, for whatever reason, can provide reasonable assurances against flight." *Id.* at 833.  "Indeed," the court stated, "[T]he State of New York, by statute, specifically provides for the licensing of 'bail enforcement agents' charged with precisely this kind of task," and "a provision of the Bail Reform Act . . . contemplates that a defendant may be released into 'the custody of a designated person[ ] who agrees to assume supervision . . . if the designated person is able reasonably to assure the judicial officer that the person will appear as required." *Id.* at 834 (internal quotation marks omitted).

The government need not concern itself with the prospect of Valerio suing security personnel who might attempt to prevent him from escaping or with Valerio presenting "a host of problems" arising from "possibilities [that] are endless."  (Government Letter at 2 n.1.)  Whatever problems might arise on an endless civil-liability horizon will not be the government's problems and have nothing to do with a risk of flight, a danger to other persons or to the community or with anything else in the Bail Reform Act.  As the court observed in *Dreier*, "To be sure, a private security guard could face liability for using excessive force to prevent a defendant's flight, but this is just as true of a policeman or [a] U.S. Marshal." *Id.*

Respectfully,

*Anthony M. La Pinta*
Anthony M. La Pinta

*Leonard Lato*
Leonard Lato

ec:   AUSAs Allen L. Bode & Ameet B. Kabrawala

---

[2]   *United States v. Minns*, 863 F. Supp. 360 (N.D. Tex. 1994), which the government also cites, involved an "immigration consultant who ha[d] lived abroad for the past 14 years," including "in Europe and [in] the Bahamas," and "ha[d] used at least 13 different names." *Id.* at 361.

4