UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK


| | |
|---|---|
| UNITED STATES OF AMERICA, | . Docket No. 14-CR-00094-JFB |
| | . |
| Vs. | . |
| | . 100 Federal Plaza |
| | . Central Islip, NY  11722 |
| JOSEPH VALERIO, | . |
| | . March 21, 2014 |
| . . . . . . . . . . . . . . . | |

FILED
CLERK

3/25/2014

U.S. DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
LONG ISLAND OFFICE

TRANSCRIPT OF BAIL HEARING
BEFORE HONORABLE JOSEPH F. BIANCO,
UNITED STATES DISTRICT JUDGE


APPEARANCES:

| | |
|---|---|
| For The USA: | UNITED STATES ATTORNEYS OFFICE<br>By:  ALLEN LEE BODE, ESQ.<br>610 Federal Plaza<br>Central Islip, NY  11722 |
| | UNITED STATES ATTORNEYS OFFICE<br>By:  AMEET B. KABRAWALA, ESQ.<br>271 Cadman Plaza East<br>Brooklyn, NY  11201 |
| For The Defendant: | REYNOLDS CARONIA GIANELLI HAGNEY<br>  LaPINTA & HARGRAVES<br>By:  ANTHONY M. LaPINTA, ESQ.<br>35 Arkay Drive, PO Box 11177<br>Hauppauge, NY  11788 |
| For The Defendant: | BY LEONARD LATO, ESQ.,<br>35 Arkay Drive<br>Hauppauge, NY  11788 |


Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

**TRACY GRIBBEN TRANSCRIPTION, LLC**
**27 Beach Road, Unit 4**
**Monmouth Beach, NJ  07750**
**800 603-6212**
**(732) 263-0044    Fax No. 732-865-7179**
www.tgribbentranscription.com

```
 1                          I N D E X

 2

 3

 4  MOTION                              PAGE

 5

 6      BY MR. LaPINTA                  4/19

 7      BY MR. BODE                      13

 8      BY MR. LATO                     8/19

 9

10  DECISION                            21

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

                              Colloquy                    3

1           COURT CLERK:  Calling case 14-cr-94, US v. Joseph

2    Valerio.   Please state your appearance for the record.

3           MR. KABRAWALA:   Assistant US Attorney Ameet Kabrawala

4    joined by AUSA Allen Bode.   Good afternoon, Your Honor.

5           THE COURT:  Good afternoon.

6           MR. LaPINTA:  Good afternoon, appearing for Joseph

7    Valerio, Anthony Lapinta and also Leonard Lato.

8           THE COURT:  Okay, good afternoon.  Defendant is

9    present as well.  Obviously, we scheduled this because

10   defendant has a renewed bail application based upon the March

11   20th letter which the Government responded to and I also had

12   reviewed the March 21st reply letter and I just see I'm being

13   handed up, hold on one second.

14          MR. BODE:  I handed up, Your Honor, a -- sorry, I'll

15   stand up -- an e-mail which I was going to refer to today in

16   some of my remarks.  I've given a copy to defense counsel as

17   well.  It's an e-mail that Mr. Valerio sent to the

18   co-conspirator in the Ukraine.

19          THE COURT:  Okay.  Let me just take a minute just to

20   look at it.

21          MR. BODE:  Thank you.

22          THE COURT:  I'll let the defense go first since this

23   is their application.

24          MR. LaPINTA:  I'm sorry, Your Honor.

25          THE COURT:  I said I'm going to let you go first

LaPinta/Argument                                    4

1   since this is your application, okay?

2          MR. LaPINTA:  Thank you.  Judge, would you mind if I

3   used the microphone?

4          THE COURT:  No, you can use that, just pull the mic

5   up.

6          MR. LaPINTA:  Thank you.  Yes, sir.  May it please

7   the Court and Your Honor, I guess the best way to describe this

8   application is a supplemental bail package.  When we were here

9   last and we made the extensive bail package application to the

10  Court, we took particular note to the reasons that you

11  carefully, prudently and properly articulated on the record in

12  denying the application.  What I mean by properly, I mean in

13  terms of developing a record.

14          You addressed a number of different issues that you

15  were concerned about insofar as a security guard being present

16  at the home being inadequate to assure one safety and two,

17  safety of the community and also two, his ability to flee.  You

18  articulated on the record that a security guard would not be

19  able to monitor him inside the house in the event that he would

20  cut off the ankle bracelet and flee by a back door, a window or

21  other exit areas of the house.

22          To address that concern, and to make in my estimation

23  as fool proof, error proof of a package as possible, we offer

24  the additional conditions.  A second security guard to be at

25  the location.  And the second security guard could be

1  positioned anywhere that you, the FBI, pretrial services, the

2  US attorney's office would feel appropriate to be including one

3  being outside, one being inside, two being outside, one in the

4  rear of the house, one in the front of the house.  One being

5  inside the house, one roving the outside of the house or even

6  supplementing and moving about in whatever areas of that

7  premises they feel is appropriate to provide the safest type of

8  secured environment possible.

9          The way that this house is structured, a layout of

10 the house lends itself to very, very thorough, comprehensive

11 surveillance of the occupants of the house.  The entrance of

12 the house could be monitored very easily.  The exits of the

13 house could be monitored very easily.  The bedroom of the house

14 where my client will be sleeping is actually in a location of

15 the house where there is only one way to enter and exit.  The

16 window is the type of window that cannot open to the degree

17 where someone, a human being could fit outside the window.

18         That is because it isn't typically a bedroom.  It's a

19 living room that has been made into a bedroom and there's a bay

20 window there that allows the windows to open in a way that

21 allows for perhaps an 8 to 10 inch gap of opening.  Over and

22 above two licensed professional security guards, this house as

23 you're aware has a recently installed camera system that is

24 surveillancing (sic) the perimeter of the outside perimeter of

25 the house that has a direct feed to the Government.  I'm not

LaPinta/Argument                                          6

1   going to go into every particular detail.  I'm sure you know of

2   them very well.

3           In addition to that security camera device, there's

4   also a security system device that the house has and has had

5   for years.  It's a device that is wired to all entrances, exits

6   and windows of the house.  It's an alarm system.  If a door is

7   opened, if a window is opened, that alarm goes off.  There's

8   one key pad that controls that alarm system.  That key pad is

9   programmable.  We have no problem at all having that program

10  set to a confidential password to engage and disengage the

11  system.

12          I can't think of any other conditions that could

13  satisfy what the Court articulated in denying this bail

14  application.  There are a number of cases that were cited by

15  the Government, all of them as you read from our submission

16  this morning in response to that, are all easily

17  distinguishable cases insofar as they involve organized crime

18  cases with active leaders of crime families.

19          This is not a conspiracy case of somebody who is, you

20  know, here accessible without having computer or phone access.

21  Mr. Valerio is in a situation where he would be in the solitude

22  sanctuary of his home, in a secure safe environment not only

23  for himself but also for the general public in terms of the

24  danger issue that you must consider here in this application.

25  If you want us to further our discussion of the applicable law

1    and how these cases are distinguishable, I'm happy to address

2    that.  I would ask Mr. Lato to answer those questions since he

3    authored that submission to the Court.

4            THE COURT:  Yes, I guess, I just wanted to talk about

5    those cases briefly so if Mr. Lato wants to address that.

6            MR. LaPINTA:  Sure.

7            THE COURT:  Essentially, I think, and I know

8    obviously you disagree with what I think the level of

9    dangerousness and flight is but essentially you're trying to

10   replicate a jail in his home and there's a back and forth in

11   the case law which you cite about whether or not some courts

12   have expressed, Judge Rakoff has stated that if someone has the

13   wealth to replicate a jail, that's what the Bail Reform Act

14   allows.  Other courts have disagreed with that and the

15   Government cites a Second Circuit case where they don't address

16   that issue but they say they're troubled, I think was the word

17   in the summary order, they were troubled by that prospect.

18           But in this case, to the extent that you're trying to

19   create that jail, there's two things that I think can't be

20   overlooked.  The first is that the jail is at the mercy of this

21   firm that's hired as well as the additional government

22   resources that would be necessary to monitor that security firm

23   to make sure that they're doing a good job even though the

24   defendant is paying for them.  And all the other conditions

25   that you are proposing that would require the Government to

1  conduct an unannounced search to check the surveillance system,

2  to monitor whatever other things that you're proposing that

3  they monitor.  That requires the Government to essentially make

4  sure that this private jail is running at the way it should be.

5  And I don't see anything in the bail reform or case law that

6  suggests that that should be what the Government needs to do.

7  I want you to address that aspect of replicating a jail as

8  opposed to the issue of wealth or not wealth because this is to

9  me a separate issue.

10          MR. LATO:  There's always going to be some Government

11  expense in anything that we do, even in this courtroom today.

12  If a person is in the MDC, there's a government expense there.

13  If a person is under house arrest, you have pretrial services

14  making visits unannounced.  We've had cases where the Judges

15  have allowed defendants out on bail where the FBI or the DEA

16  will also have the option of making an unannounced visit to the

17  house.  I had a case before Judge Seybert, it was a motorcycle

18  gang where one of the deciding factors in Judge Seybert

19  releasing, you know, my client was that we consented to random

20  searches not only by pretrial but by the ATF in that case.

21          Granted the ATF is not going to spend money going all

22  around but as I said, there's an expense in everything.  Now,

23  it's going to be a minimal expense and with respect to the

24  security firm, if of course the security firm based upon the

25  Government's investigation or the FBI's, when I say that, the

Lato/Argument                                                    9

1   US attorney's office and the FBI is unacceptable, then that's

2   it.  We have to come up with a different firm.  They would be

3   right.  But, but for that, there's no reason why this firm

4   would be presumptively no good to insure this.

5            THE COURT:  But when you say no good, the problem

6   with any private firm is that you're at the mercy not just of

7   the reputation of the firm generally, the Government may have

8   either favorable view or no view of the reputation of that

9   firm, but you're at the mercy of each individual person who is

10  sitting in the house on any particular day.  So you know every

11  single person who works with that firm, would be part of

12  replicating the jail is a potential weakness in the whole

13  proposal.  That's the whole problem with private jails.

14           We have jails, we don't have those issues and

15  obviously you could have people who work for the Bureau of

16  Prisons who might be problematic but there's a much more

17  elaborate system to guard against all the things that the Court

18  would be concerned about with someone in their home and you're

19  at the mercy of every aspect of that firm, not just its general

20  reputation of whether or not there's an FBI agent, former FBI

21  agent who runs the firm or who works at the firm.  I don't know

22  anything about this firm but.

23           MR. LATO:  But to address at least some of the

24  concerns of the Court is that the members of this Epic

25  Security, all right are retired law enforcement, some are NYPD.

Lato/Argument                                    10

1  Some are others.  It's not as if these are people who needed a

2  job and they became security officers.

3          THE COURT:  You're proposing that they would be armed

4  or not armed?

5          MR. LATO:  No, armed would be only if the Government

6  says it's okay.  We can have armed guards, but as I said in my

7  first letter, I don't know if Special Agent Troy and his

8  colleagues would want to have armed guards at the residence.

9  That's strictly up to the Government and the Court.  We have

10 the option.  We will pay for armed guards.  It's at the

11 discretion of the Court and the Government because that's

12 obviously a double edged sword is perhaps the wrong metaphor to

13 use here but does the FBI want anyone other than themselves

14 having guns?  But we can do that.

15         The thing is this.  There was one case I cited in my

16 opening brief that nothing will guarantee the safety of the

17 community or guarantee against the risk of flight.  But if the

18 adverb reasonably means anything, coupled with assure, will

19 this reasonably assure the safety of the community and other

20 persons and the defendant's appearance as required?  The

21 reality is this.  I could probably do a better job than most

22 anyone in escaping, but even I could not escape from this

23 place, all right.

24         The reality is this.  Where could Mr. Valerio go even

25 if he managed to climb out a window, down a set of towels?  He

1  will be found in moments.  He's not a member of La Cosa Nostra

2  where it's the Genevieves or the Gambinos where simply by

3  having a conversation he can order a hit in an ongoing war.

4  The reality is this.  He poses a danger to no one if he's in

5  that house.  There are no electronic devices.  He can't

6  reasonably get out of there.  Obviously, we have to consider

7  the fact that he was out for a week before the second complaint

8  was brought.

9          In that week, nothing went wrong.  So that is at

10 least a consideration.  Of course it's not dispositive but it's

11 a factor.  And the point is this.  This is about as

12 comprehensive a package as even the most creative defense

13 lawyers can come up with and I think I'm going to say something

14 today that has been unspoken but I think it's appropriate.

15 There's something about this case that I think gives people

16 unease.  If this were a drug case, or a typical violent crime

17 case, we have the same statutory presumptions of danger to the

18 community and risk of flight.  There is nothing in the Bail

19 Reform Act that makes it different for manufacture or child

20 pornography.

21         However, it makes everyone uneasy.  But unlike a lot

22 of the violent crime cases and the drug cases, there's no

23 conspiracy here and it's just speculation to believe that if

24 Mr. Valerio were to get out, he would somehow go on a child

25 porn manufacturing spree or run to who knows where.  There's

1  just something about the crime itself that makes people feel

2  uneasy they were not accustomed to and I think that's a big

3  factor why the Government and the Court as of course I am aware

4  of the Bail Reform Act is reluctant to release him.

5         But this is a huge package, several million dollars,

6  house arrest, private security.  This is the most I think

7  anyone can reasonably come up with and I know the Court stated

8  the last time you're not saying as a blanket rule no one can

9  get out in child manufacturing cases.  But we're coming pretty

10 close to that given the size of the package because even if we

11 had $10 million or 30 million instead of three we would still

12 be in the same place.  If we had 15 guards, we would still be

13 in the same place.

14        Helicopters, the same thing.  Because it's all

15 private.  The reality is this.  Presumably, unless there's

16 something wrong with Epic Security, these people will do their

17 job.  Agent Troy and his colleagues do not have to drive by the

18 house.  They'll have a good feeling very soon within a day or

19 two whether this is trustworthy and given the relationship, I

20 think that we have with the Government here, if there's even

21 something that makes the Government uneasy, even if it's not a

22 violation, we will address it right away.

23        The slightest thing that Special Agent Troy or

24 Special Agent Macinio (phonetic) or any other agent or Mr. Bode

25 or his colleague, I'm sorry, we've never met, says we don't

1  like this, we'll correct it.  The slightest thing we'll correct

2  it.  They don't like what the mother is wearing, we'll change

3  her outfit.  That's the best that we can do.  If there are any

4  other cases, Your Honor, that you want me to go through?

5          THE COURT:  No, that's okay.

6          MR. LATO:  But as you see in my letter, I don't think

7  any of the cases that the Government cites has any relevance.

8          MR. BODE:  Thank you, Your Honor.  Simply by having a

9  conversation online, Mr. Valerio can and has demonstrated in

10  the past that he can have a child molested in horrible,

11  horrible ways.  I handed up just a sample of an e-mail from

12  July 17th, 2012.  It demonstrates both the strengths of the

13  Government's case and the ease by which Mr. Valerio could with

14  an electronic device cause an immeasurable harm, I submit a

15  harm much greater than any drug case, although Mr. Lato does

16  not recognize those dangers obviously.

17          In the e-mail, you can see he's talking about the

18  video sent by cell phone camera that he needs, you've done a

19  terrific job with the cell phone camera.  I have a new cell

20  phone that allows me to transfer your video to my e-mail.  The

21  screen is bigger to view.  Plus you can have endless video time

22  per session with the cell phone.  He talks about specific acts,

23  very specific acts that he wants to have done with the three

24  year old.  He talks about how he wants her to be dressed in

25  pantyhose which I would note is also, there are also photos of

Bode/Argument                                    14

1   the six year old victim that he dressed up in a similar manner.

2          On page 2, he discussed very graphic sex acts that he

3   wants conducted on this child.  Towards the end of the e-mail

4   in all caps, he tells her get those videos done.  He talks

5   about how he wants her to, in addition to children, he wants

6   this woman to create videos in locker rooms, et cetera and he

7   says just turn your cell phone camera on.  Point it at your

8   subject.  Woman, teen or little girl.  Aim it as you pretend to

9   be speaking on your cell phone.  As you keep it filming with

10  the phone to the ear.

11         Very specific directions and I would note it shows

12  how easy it is for him to commit this crime.  The defense here,

13  Your Honor, is in essence trying to create a private jail.  But

14  even aside from the issues of whether a private jail would be

15  allowable, which the Second Circuit is troubled by in the <u>Banki</u>

16  case, they did a bad job, they're doing a bad job of it here in

17  not accounting for the online danger.  They can't account for

18  that online danger, I submit.

19         The online danger here can be established with you

20  know, a device as small as you know, two inches by three inches

21  which you could secrete anywhere in that house.  People coming

22  into that house could bring them in.  The defendant's mother

23  parks in an attached garage in that house.  They could come in

24  via her car.  There's a myriad of ways that a cell phone or an

25  electronic device could make its way into that house.  Based

1  upon the years that I've been here in the Eastern District,

2  they find cell phones at times in jails.  If a cell phone can

3  make its way into a jail facility and that has happened in the

4  past, how much easier is it that this device can make its way

5  into the home?  Especially where as the defense indicated at

6  the first arraignment on the superseding indictment before

7  Judge Brown, the defense conceded that the defendant's mother

8  had mental difficulty since having some medical issues arise.

9          I would note as well there's no, the resources here,

10 the defense is speaking with, in terms of a private security,

11 even if the Government were to authorize and we cannot

12 authorize, a private security to carry guns, we can't authorize

13 them to shoot Mr. Valerio if he flees.  These are issues that

14 are dealt with in the jail, properly dealt with at the jail

15 environment that can't be replicated in a private jail no

16 matter the resources.

17         And frankly with jail facilities, the guards are

18 trained for what they're doing.  Private security guards are

19 not federal agents.  They haven't gone through the same

20 training that federal agents have gone through specifically

21 agents involved in securing prisoners.  So it's the online

22 danger here which is dramatic.  But in terms of the danger of

23 flight as well.  If they can't shoot him, they can't tackle him

24 in leaving.  There's still nothing to stop him from snipping

25 off a monitor and going.  We'll know that he goes.  We'll get

1  maybe, maybe get a little more notice.

2          But in terms of the house, are they going to

3  accompany him into the bathroom?  Are they going to sit there

4  in the bathroom with him when he's in the bathroom?  When he's

5  sleeping, are they going to be in the room with him?  You know,

6  a jail environment is a very secure environment compared to the

7  home environment.  In terms of Mr. Valerio, one thing, just in

8  terms of a new piece of information that I happen to have

9  another proceeding today with the pretrial officer that

10 supervised Mr. Valerio during the brief time that he was out.

11 And she indicated that he was very difficult to supervise in

12 that she indicated she had never seen someone as controlling as

13 he was with the girlfriend that was in the office with her.

14         When Mr. Valerio was in the waiting room at pretrial

15 services with his mother, at one point he was screaming at his

16 mother so loudly, that the pretrial officer had to come from

17 the back where they are, all the way to the front lobby of the

18 pretrial services because he was screaming at his mother

19 regarding something to do with paying of attorneys.  I submit

20 Mr. Valerio's history shows his rage.

21         Mr. Lato indicated there was nothing, he was out for

22 about a week, I would note as we noted previously, he was out

23 for about a week and his immediate impulse was to lie to the

24 psychologist who was treating him.  He lied about the crime

25 that he, the very crime that he was charged with.

Bode/Argument                    17

1          In terms of, just a couple other matters that were

2    raised by the defense which I note and then I just want to say

3    a couple words about some of the cases.  It's not a matter of

4    unease about the crime, Your Honor.  This is a very serious

5    crime.  It's one of the most serious crimes in the federal

6    statute.  And the measure of harm here should Mr. Valerio

7    access an Internet device is incalculable.  The abuse of the

8    three year old which he directed and is described in the e-mail

9    was horrific abuse committed on a toddler.

10         So it's not an unease.  It's the measure of the harm

11   that can be incurred and the ease with which he can commit that

12   harm.  I would also note the defense keeps mentioning the 3

13   million figure and as we mentioned before, it's at best 2.2

14   million.  There's now a forfeiture count as to the defendant's

15   residence which was one of the items which was going into that

16   figure.

17         In terms of the cases, the Sabhnani case which the

18   defense cites is very easily distinguished.  As the defense

19   concedes, it's a presumption, this is a presumption case.

20   Sabhnani was not.  In Sabhnani, the Government proposed the

21   very conditions which the defense then accepted.  And Sabhnani

22   also doesn't account for the online danger.  Sabhnani was a

23   case where you couldn't commit the crime without hiding a

24   person.  It's not a crime that was able to be committed with a

25   small electronic device easily secreted.

Lato/Argument                              18

1          I would note in <u>Banki</u>, the Second Circuit directly

2    dealt with <u>Sabhnani</u>.  They actually, from <u>Banki</u>, they indicated

3    -- a moment here -- Mr. <u>Banki</u> contends that our decision in

4    <u>Sabhnani</u>, S A B H N A N I, entails a legal obligation on

5    District Courts to evaluate whether such privately financed

6    home confinement would suffice to secure a defendant's

7    attendance.  <u>Sabhnani</u> does not impose such a requirement.

8          And then they limit <u>Sabhnani</u>.  They indicate in that

9    case rather we concluded that the Government's argument that no

10   conditions release could prevent defendant's flight was

11   "undermined" by its own submission which argued only that the

12   defendant's proposal contained certain loopholes which the

13   defendants promptly agreed to close by accepting the

14   Government's proposed amendments to its plan.  And I would also

15   note in addition to <u>Banki</u>, the case of <u>Shelikhov</u>,

16   S H E L I K H O V which is 468 F. Appx. 54 which is an

17   unpublished case from March 19th, of 2012 which again the

18   Circuit noted that <u>Sabhnani</u>, the Government's argument was

19   drastically undermined because they had proposed the very

20   items, loopholes which the defense then closed.

21         There is no way to properly account for the online

22   danger which can be committed with a device as small as a cell

23   phone and frankly was committed that way in the past by Mr.

24   Valerio.  Jail environment where everything is regulated, food,

25   bathroom, visitors can sufficiently account for that danger.

1  Could I have just one moment, Your Honor?  That's it, Your

2  Honor, thank you.

3       MR. LATO:  In reply to Mr. Bode's argument, I have

4  the following to say.  With respect to <u>Banki</u>, B A N K I, that

5  case has no applicability here because there we're talking

6  about somebody doing business with the blacklisted country of

7  Iran violating an order of the President of the United States

8  under the International Emergency Economic Powers Act.  So what

9  we're really talking about in that case, and I don't need to go

10 through the whole history of the US foreign policy with Iran,

11 no one is getting out in that case and this case isn't even

12 remotely comparable to that.

13       In fact, Mr. Irina (phonetic) himself had a better

14 shot of getting out then Mr. Banki.  Now, with respect to Mr.

15 Bode saying if Mr. Valerio runs, it's not like the private

16 security firm can shoot him.  Well, based upon my understanding

17 of New York and federal law, neither can Special Agent Troy

18 under those circumstances.  There would probably be some

19 question of why they're shooting an unarmed man in the back.

20 But let's not engage in speculation here.

21       Now, in terms of Mr. Valerio supposedly lying to a

22 psychologist, well, if he did that, that's a bad thing.

23 However, it's not like he said, even according to the

24 Government, I was arrested for stealing a letter from the mail.

25 Some people are understandably reluctant to talk about what

Decision                                    20

1  they have done in terms of the severity.  Now, having said

2  that, he didn't run.  He didn't engage in acts of violence

3  against children or anyone else.  So although what he did to

4  the psychologist if it occurred or yelling at his mother, may

5  be behavior that one wouldn't approve of, it's not a violation

6  of the conditions of his release.

7           Now, Mr. Bode is saying that I don't understand the

8  difference here with respect to this case and say a drug case

9  and the ease with which Mr. Valerio could access an electronic

10 device and I thank Mr. Bode for explaining what I don't

11 understand but the reality is this.  It's one thing if a person

12 wants to get a cell phone or have a conversation to help

13 himself say kill someone to make his case better, although

14 under the Federal rules that wouldn't help him if he wants to

15 escape.

16          As the Court said in Madoff, to the extent that

17 anything occurred in the past, such as the crime that Mr.

18 Valerio or crimes he may have committed is relevant to bail

19 only looking forward.  So whatever e-mails Mr. Valerio sent if

20 they have no bearing on what he is likely to do, they are

21 irrelevant.  So I still have yet to hear anything other than

22 speculation why would Mr. Valerio based upon his history of all

23 things want to get his hands on a cell phone to send a text

24 message to some unknown person to manufacture child porn?

25 There's no evidence at all and it's only speculation to suggest

Decision                               21

1  that's likely to occur.

2          He can't get out of the house, when I say can't, I

3  mean reasonably.  There is no basis to believe reasonably he

4  could do any of this.  One final thing, with respect to the

5  bail package.  Mr. Bode states that the $3 million package is

6  really only $2.2 million.  He's wrong and here's why.  The

7  house that Mr. Valerio has put up, his own house that's worth

8  about $800,000, true, Mr. Valerio may lose that house.  But he

9  has only $200,000 in equity.  And I say that because when we

10  proposed the $3.2 million package, we took into account the

11  fact that he had only $200,000 in equity.

12          So the package is still in the $3 million range, not

13  2.2 million.  Hold on one second, please.  That's it, thank

14  you.

15          THE COURT:  Okay, thank you.  The Court has obviously

16  reviewed the additional bail proposal and letters related to

17  that as well as the argument of counsel and again, I looked at

18  the issue again de novo and I again find, I'm not going to

19  repeat all of the reasons that I gave previously, and I think

20  I'm going to issue a written decision on this in any event but

21  I again find that the Government independent of the presumption

22  has met by clear and convincing evidence its burden of

23  demonstrating that the defendant is a danger to community such

24  that no conditions or a combination of conditions can

25  reasonably assure the safety of the community as well as by a

Decision                            22

1  preponderance of the evidence that no combination of conditions

2  can assure his appearance in court.

3          And again, I rely on everything that I said

4  previously.  I'm just going to summarize a couple of things and

5  address the specific issues with respect to this proposal and

6  why I believe that these conditions or any combination of

7  conditions cannot beat the issues of danger and flight in this

8  case.I just emphasize again we have the most serious type of

9  crime here in which the defendant is charged with aiding and

10 abetting the sexual exploitation of a child and as Mr. Bode

11 noted, it's not just the extreme danger presented by those

12 charges.

13         And again, based upon what I said at the earlier

14 hearing that on the weight of the evidence factor that it is an

15 extremely strong case based upon the Government's proffer of

16 its evidence but it is not just the danger that's raised by

17 that crime but in combination with how that crime was alleged

18 to have taken place here which was the use of Internet devices,

19 was the crimes charged here relate to Mr. Valerio's home

20 including the second series of charging that were the subject

21 of the superseding indictment so you have extremely dangerous

22 conduct charge involving sexual abuse of a child through the

23 use of what can be extremely small Internet devices occurring

24 at least in part in the home.

25         And given, I'm speaking now to the issue of danger,

Decision                    23

1  given those, and I should add a proffer of the Government that

2  within that home that there were cameras secreted within walls

3  of the home, under those circumstances for the reasons I

4  outlined previously, it's my conclusion that the only

5  conditions that could reasonably assure the safety of the

6  community in this particular case not in every case where

7  someone is charged with child, possession of child pornography

8  or some other similar crime because there are defendants who

9  are before me who are on bail on home detention in some of

10 those cases.

11        But in this particular case, given these allegations

12 and charges and the evidence the Government has proffered, it

13 is my view the only conditions that could reasonably assure the

14 safety of the community would be replicating a jail.  And the

15 defense has done their best to try to replicate a jail in Mr.

16 Valerio's home.

17        I put aside the issue of whether or not assuming you

18 could replicate a jail that a defendant should be able to

19 replicate a private jail in his own, I don't need to decide

20 that issue.  The Second Circuit has decided that issue,

21 although I agree with the summary order that suggests that

22 that's troubling and I believe that to the extent that Mr. Lato

23 and some other courts have addressed that particular issue and

24 say the Bail Reform Act refers to if you can find conditions of

25 release that are sufficient that that should, that it's not

1  punitive and that's true.

2         But what we're talking about here are not really

3  conditions of release.  What we're talking about here are

4  really conditions of confinement by replicating a jail, these

5  aren't conditions of release where essentially trying to limit

6  the defendant's freedoms almost exactly in the same way they

7  would be as if he were in jail.  So what we are really talking

8  about here are simply conditions of confinement and I don't see

9  that the Bail Reform Act was seeking to address how once it's

10 determined that someone needs to be essentially in jail,

11 because of the danger or flight issue that then you should try

12 to create conditions of replicating that jail in a private

13 setting.  I just don't see that intended in the Bail Reform

14 Act.  I don't believe there's any constitutional right to

15 replicate a jail cell in your home.

16        But in any event, I need not decide that issue and I

17 think there's a reason that no court, at least Circuit Court

18 has had to decide that issue is because for all the reasons Mr.

19 Bode noted and some of the reasons I think I've indicated to my

20 questions when defendants including in this case try to

21 replicate that jail, it is an imperfect jail in almost every

22 situation including this one for two fundamental reasons.

23        First, the Government is at the, there are several

24 aspects to this package including the security firm, including

25 the monitoring of people in and out, that as for the reasons

Decision                                    25

1  Mr. Bode cited and I agree are highly imperfect when compared

2  to a jail.  The Government is at the mercy of the hiring, the

3  training of the security people who are utilized throughout the

4  period of monitoring.  You have issues about armed or unarmed

5  which again you don't have those issues in jail.

6         There are obviously problems with both having them

7  armed and having them unarmed but that's why jail is a more

8  perfect forum for addressing this type of danger.  And you have

9  training issues, legal authorization issues for all those

10 reasons, the Government and to the extent the Court would be

11 relying on a security firm or at the mercy of the firm itself,

12 which is not the equivalent of the system of security in a jail

13 both in terms of the guards and the other safeguards in a jail.

14        Secondly, the Court is at the mercy or all the people

15 that go in and out of there, even if they're approved people.

16 Again, because it's not a jail.  And even the jail is not

17 perfect, but it's much more prefect at regulating whose

18 bringing what into the jail versus a home especially when you

19 have relatives or other individuals who are coming in to visit

20 the defendant.

21        So I believe that to extent that the defendant has

22 tried to replicate a jail in his home in this case, it is

23 highly imperfect and does not address the issues of danger

24 created if a defendant has access to any type of Internet

25 device, in my view in this case, that poses a danger to the

Decision                                          26

1  community that should, the community should not have to face

2  and this is an imperfect attempt to right or make sure that

3  that does not happen.  Secondly, to the extent you could try to

4  replicate a jail with these conditions, it does have costs to

5  the Government.

6          Although he's paying for the security firm to the

7  extent that the Government again has to check into the security

8  firm, monitor the security firm or enforce other of these

9  provisions of release including viewing the surveillance system

10 that exists, conducting unauthorized searches of the house or

11 unannounced visits, all of those different things would require

12 diversion of Government resources and Government law

13 enforcement personnel from other activities and other cases and

14 there's nothing in the Bail Reform Act that suggests that if

15 the defendant wants to try to replicate a jail in his home,

16 that the Government should have to utilize law enforcement

17 agents to constantly verify that that private jail is running

18 in the way that it should be and for that reason, second reason

19 I believe that this is also an imperfect replication of a jail

20 that is not required under the Bail Reform Act.

21         So for those reasons, I continue to find that the

22 Government has met its burden by clear and convincing evidence

23 as to danger that these conditions as well as any other

24 combination of conditions would not reasonably assure the

25 safety of the community.  I also again believe that flight by a

1  preponderance of the evidence, the Government has demonstrated

2  that no conditions can reasonably assure his appearance in

3  court.  Again, I won't reiterate everything I said previously.

4        The defendant is looking at a substantial mandatory

5  minimum in the case with the guidelines that are much higher

6  than the mandatory minimum, in a case where the Government has

7  proffered extremely strong if not overwhelming evidence with

8  respect to the charges in the superseding indictment and that

9  creates an enormous risk of flight that I don't believe is

10  addressed by bracelet or trying to have armed guards follow

11  him, unarmed guards or armed guards try to follow him around

12  the house this package, although it certainly is substantial,

13  there's no indication what moral suasion the defendant's mother

14  or other family members have over the defendant at this point

15  given the situation that he is facing in terms of jail time and

16  the strength of the Government's case.

17        And I certainly am not reasonably assured in my mind

18  that he would not make some effort to try to avoid having to

19  face trial in this case and the potential penalties that are

20  confronting him in this situation.  So for all those reasons,

21  I'm detaining the defendant pending trial.  Are there any other

22  issues we have to discuss today?

23        MR. KABRAWALA:  Your Honor, the Government has

24  exchanged or served discovery.  I learned that it was not

25  received so defense counsel and I are going to go back down to

Decision                            28

1  my office and we'll turn over some of the discovery that we had

2  actually posted on Monday.  There may be --

3         COURT CLERK:  If you could just bring your mic a

4  little closer?  I'm sorry.

5         MR. KABRAWALA:  I'm sorry.  There may be discussions

6  with respect to the position of the case and you know, we'll

7  hear from the defense about that.  That's it for the moment,

8  Your Honor.

9         THE COURT:  I just, I did want to raise one, I don't

10 know, do you have an issue you want to raise or no?

11        MR. LaPINTA:  No, sir.

12        THE COURT:  Just with respect to the trial date.

13        MR. LaPINTA:  Yes.

14        THE COURT:  Which I think is May 12th.  Right now we

15 have scheduled another trial on that date with Mr. Barkat

16 (phonetic) and his client who's incarcerated which is supposed

17 to be I think three to four weeks.  So if your client does not

18 want to waive the speedy trial time, we may need to move that

19 date a little earlier.  So I wanted to give you a heads up on

20 that, that there's a problem.  I don't know if you have given

21 that some thought or what your intention is with respect to the

22 May 12th date.

23        MR. LaPINTA:  Well, I might as well address the

24 Court.  I wasn't going to because it may not be an issue but I

25 will in light of what you just told me.  We may appeal your

1    denial of bail.  I'm sure that's not a surprise to you.

2    However, we're not certain at this juncture if we're going to

3    do that.  Obviously --

4                 THE COURT:  Okay.  I do want to let you know I am

5    going to issue a written opinion.

6                 MR. LaPINTA:  Okay.

7                 THE COURT:  You can obviously appeal and if you want

8    me to issue a short order today, just denying the bail so that

9    you can start the appellate process, I'm willing to do that.  I

10   think the written opinion will be out in the next week but I'm

11   willing to, because you need an order to appeal off of.

12                MR. LaPINTA:  Why don't we do that, yes?

13                THE COURT:  Okay.  I'll just written opinion to

14   follow.

15                MR. LaPINTA:  We're going to need the transcripts as

16   well and that's going to take a little time.

17                THE COURT:  Okay.

18                MR. LaPINTA:  So obviously if we do decide to do

19   that, and we will decide that in short order, that's going to

20   stop the speedy trial clock in and of itself.  So I don't know

21   if that is going to mean anything to the Court insofar as

22   scheduling this trial.  Let's assume --

23                THE COURT:  I would just ask Mr. Bode that.  I'm not

24   aware of cases that say that the speedy trial clock is stopped

25   by a bail appeal.

1          MR. BODE:  We looked into this, Your Honor.  Mr.

2   Kabrawala is up on this.  I'm going to allow him to address

3   that if that's okay.

4          THE COURT:  Okay.

5          MR. KABRAWALA:  A speedy trial clock is excluded for

6   any delays resulting from "any interlocutory appeal".  That's

7   18 United States Code 3161(h)(1)(c).  There's a number of cases

8   on point.  The leading case actually happens to be out of the

9   Eleventh Circuit.  It's <u>United States versus Davenport</u>, 935 F.

10  2d 1223.  That's an Eleventh Circuit 1991 case.  But there are

11  a number of cases throughout the country, including within the

12  Second Circuit --

13         THE COURT:  Okay, that's helpful.

14         MR. KABRAWALA:  -- follow that same point.

15         THE COURT:  That's helpful, okay.  So go ahead.

16         MR. LaPINTA:  So let's just assume arguendo that we

17  will file this notice of appeal, obviously it's going to take

18  some time to perfect it, to argue it, for it to be decided.  I

19  would think and expect maybe erroneously that that will push

20  back the trial date.  Is that something that the Court would

21  consider in moving that date or are you interested in still

22  moving it sooner than later even given the appeal issue?

23         THE COURT:  Your client is in jail.  The appeal

24  issue, if you want to appeal that's fine but the sooner you

25  appeal it and it got filed in two weeks, and they came back

1  with you know, a ruling, I don't see, even though the time is

2  excluded, my goal is to get your client to trial as soon as

3  possible.

4            MR. LaPINTA:  I understand.

5            THE COURT:  And so I would still want to try to,

6  regardless of whether you appeal or the result of the appeal

7  is, obviously, I guess if they grant the appeal and say that he

8  should be released, and you may want more time to prepare.

9            MR. LaPINTA:  Right.

10            THE COURT:  But assuming that they don't do that, my

11  goal would be to try the case within, as quickly as possible.

12            MR. LaPINTA:  Okay.

13            THE COURT:  In the same timeframe even if we don't

14  have to.  So I'm just letting you know that if in fact he does

15  not want to waive the time, I think he should assume for at

16  least those purposes, that he's going to continue to be in

17  jail, then you should start thinking about trying to be ready,

18  how long is the trial, Mr. Bode?

19            MR. BODE:  I would estimate Your Honor, four or five

20  trial days at most.

21            THE COURT:  So maybe the week before, May 5th.

22            MR. BODE:  While Mr. LaPinta is on the spot, to put

23  him on the spot just slightly more, Your Honor, I don't know if

24  the defense is planning on trying to suppress the defendant's

25  statements.  If so, we should probably, you know, set a date

1  for them to get those motions in so that we keep, you know,

2  that may also as soon as either a motion is filed or a bail

3  appeal if it materializes is filed, the Government is going to

4  ask at that point that we have a status conference and then we

5  can talk about the date and figure out exactly when it is.  But

6  I would like to, if possible if the defense can do that decide

7  as to the suppression issue, sooner rather than later, given

8  the defendant is not waiving time.

9          THE COURT:  Well, do you want to have another

10  conference or you want to set a date to put in the letter?  I

11  don't want to set a briefing schedule unless you want to on a

12  motion to suppress at this point.

13          MR. LaPINTA:  If you don't mind, this is how I like

14  to approach it.  Let us decide what our next step is, okay?

15          THE COURT:  Okay.

16          MR. LaPINTA:  If for whatever reason the Circuit

17  Court of Appeals grants our application, that may change our

18  disposition in terms of waiving or not waiving any further.

19          THE COURT:  I know, but as you said, you're not going

20  to know for several weeks probably whether they're going to

21  grant the application or not.  I don't want to just waste that

22  time.

23          MR. LaPINTA:  I understand.

24          THE COURT:  I want to be preparing either to have it

25  on May 5th, having a suppression motion.  If you really want to

Decision                    33

1   go forward, I don't think we can sort of wait until they decide

2   it.

3          MR. LaPINTA:  Okay.  I understand.  With that said,

4   let's pick a status date if you're available within 10 days, in

5   10 days.

6          THE COURT:  Okay.  April 2nd, Wednesday at 1:15.

7          MR. KABRAWALA:  That works for us.

8          MR. LaPINTA:  Yes.  Thank you.

9          THE COURT:  Okay.

10          MR. LaPINTA:  Thank you, Your Honor.

11          THE COURT:  Okay.  So we'll issue a short order

12   either today or Monday morning and then the written opinion

13   will follow, okay?

14          MR. LaPINTA:  Yes, sir.

15          MR. KABRAWALA:  If I could ask Your Honor, just

16   because somebody it might be at issue.  I would ask that Your

17   Honor exclude from yesterday to today when the motion was

18   pending.  The defendant had a bail motion pending before Your

19   Honor as of yesterday when they filed.  I would ask that that

20   day be excluded.

21          THE COURT:  Well, that's automatically excluded.  I

22   don't have to make a finding but I agree with you that once you

23   file a motion it is excluded so that they would be excluded.

24          MR. KABRAWALA:  Thank you, Your Honor.

25          THE COURT:  I don't know, you can disagree with that

1 but.

2          MR. LaPINTA:  It doesn't really matter.

3          THE COURT:  Okay.

4          MR. KABRAWALA:  It might matter someday.  One day can

5 make a difference.

6          THE COURT:  All right.

7          MR. LaPINTA:  I don't anticipate it will.  Thank you.

8          THE COURT:  Thank you.

9                         * * * * *

10                  **C E R T I F I C A T I O N**

11          I, Tracy Gribben, court approved transcriber, certify

12 that the foregoing is a correct transcipt from the official

13 digital audio recording of the proceedings in the

14 above-entitled matter.

15

16 _____

17 /S/TRACY GRIBBEN

18 TRACY GRIBBEN TRANSCRIPTION, LLC SERVICE DATE:

19

20

21

22

23

24

25