UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

―――――――――――――――

Nº 14-CR-94 (JFB)

―――――――――――――――

UNITED STATES OF AMERICA,

versus

JOSEPH VALERIO,

Defendant.

―――――――――――――――

**MEMORANDUM AND ORDER**
April 1, 2014

―――――――――――――――

JOSEPH F. BIANCO, District Judge:

On March 5, 2014, a grand jury charged defendant Joseph Valerio ("defendant" or "Valerio") in a superseding indictment with three counts of sexually exploiting a child, in violation of 18 U.S.C. §§ 2251(a), 2251(c), and 2251(e); one count of transporting child pornography, in violation of 18 U.S.C. §§ 2252(a)(1) and 2252(b)(1); one count of receiving child pornography, in violation of 18 U.S.C. §§ 2252(a)(1) and 2252(b)(1); and one count of possessing child pornography, in violation of 18 U.S.C. §§ 2252(A)(4)(B) and 2252(b)(2). Defendant is in custody pursuant to an Order of Detention issued on February 28, 2014, after the grand jury first indicted Valerio on February 26, 2014.

Presently before the Court is defendant's second motion for release from custody, supplementing his original proposal—which this Court rejected following a hearing on March 6, 2014—with two security officers posted at his home 24 hours a day, seven days a week, with one officer stationed inside the house and the other officer stationed either inside the house or outside in a car. (Second Motion for Release From Custody ("Second Motion"), Docket No. 20.) Although styled as motions for bail, the Court considered the bail issue under a *de novo* standard, with the government bearing the burden, and the Court denied both applications for the reasons set forth in detail on the record. The Court now memorializes its reasons for the denial of both bail applications, which the Court denied orally on the record during the hearings on March 6 and March 21, 2014.

Specifically, as set forth below, the Court concludes that the government has met its burden to show, by clear and convincing evidence and by a preponderance of the evidence, respectively, and independent of the statutory presumption of detention in this case, that no condition or combination of conditions, even the ones proposed by defendant, will reasonably assure the safety of the

community or defendant's appearance in court. Accordingly, the Court orders that Valerio shall remain detained pending trial.

I. BACKGROUND

The charged crimes arise from defendant's alleged production of child pornography involving a then three-year old female victim in Ukraine, and his production of child pornography involving a then six-year old female victim at defendant's Smithtown, New York residence. The most serious of these charges carries a mandatory minimum of no less than 15 years imprisonment. *See* 18 U.S.C. § 2251(e). Defendant's estimated advisory Sentencing Guidelines range, as noted during the hearing on March 6, 2014, is at least approximately 292 to 365 months of incarceration.[1]

The defendant was arrested on January 28, 2014, and a criminal complaint was filed on that same day and sworn to by FBI Special Agent Steven Troyd. The complaint charged defendant with sexual exploitation of a child in violation of 18 U.S.C. §§ 2251(a) and 2252(a)(4)(B). According to the complaint, beginning on or about April 2012, defendant aided and abetted the production of child pornography by a woman in Ukraine. Specifically, the complaint asserts that the woman, at defendant's request and instruction, filmed herself with her three-year-old daughter (who will be referred to as "Jane Doe #1") doing various sexually explicit acts scripted by Valerio, and sent those videos to defendant through her mobile phone and parcel delivery service. According to the complaint, defendant and the woman also exchanged emails regarding the videos and sexually explicit acts. On January 28, 2014, the defendant was detained by Magistrate Judge William D. Wall, but with leave to reopen and present a bail package in the future.

After defendant's arrest and detention on January 28, 2014, Magistrate Judge A. Kathleen Tomlinson conducted a detention hearing, pursuant to 18 U.S.C. § 3142(f)(1)(E), on February 4, 2014. Over the government's objection, Magistrate Judge Tomlinson authorized the release of defendant on bail on a secured bond, subject to certain conditions. Those conditions included, *inter alia*, (1) confessions of judgment totaling $3 million and secured by real property owned by defendant's mother, (2) confinement at his mother's house, (3) installation of government-approved surveillance equipment to permit monitoring of persons entering and exiting the house, and (4) a prohibition on the use of a computer or cell phone. Following the installation of the surveillance equipment, defendant was released on bond on February 12, 2014.

Further, on January 28, 2014—the day Troyd filed the first complaint—the FBI executed a search warrant at defendant's residence. According to a second complaint filed by the government on February 25, 2014, a forensic expert recovered approximately twenty-two images of a young girl (who will be referred to as "Jane Doe #2"), approximately age six, that previously were deleted from the SD card of a camera. According to the second complaint, among the recovered images were nude photographs of Jane Doe #2 (summarized in the complaint), including a photograph of her genital area, which

---

[1] The government estimated the advisory Guidelines range to be 360 months to life imprisonment, while defense counsel estimated the range to be 292 to 365 months imprisonment. (03/06/14 Tr. at 14, 30.) This dispute is immaterial to the Court's decision, and the Court has assumed *arguendo* defense counsel's estimate to be the applicable advisory range upon conviction, for purposes of the bail issue.

2

appeared to be red. Special Agent Troyd stated, "Based upon my discussions with law enforcement personnel familiar with sexual abuse investigations who have examined these images, this is consistent with the sexual abuse of Jane Doe #2." (02/25/14 Compl. ¶ 4.) The complaint also noted that "[i]nvestigators present at the search of the residence of defendant JOSEPH VALERIO who viewed the child pornography images of Jane Doe #2 recognized the basement and couch from VALERIO's Smithtown residence and recognized Jane Doe #2 in the images." (*Id.* ¶ 6.) Finally, the complaint provided the following summary of the interview of Jane Doe #2:

> On February 24, 2014, Jane Doe #2 was interviewed. Jane Doe #2 confirmed that during sleepovers at the residence of JOSEPH VALERIO, she had been taken down into VALERIO's basement, where he took video of her in various outfits. Jane Doe #2 described the outfits, which matched the outfits in the recovered images. After describing these outfits, Jane Doe #2 was shown non-pornographic images from the series of recovered images and identified herself in the images. Although Jane Doe #2 denied that she had been touched by VALERIO or that he had taken naked pictures of her, she identified images in the same series of recovered images as the sexually explicit images described above. In addition, the child described the circumstances where the images were created (i.e. VALERIO's basement), indicated that VALERIO took video of her and described the outfits visible in the images (prior to these images being shown to her for identification). Based upon conversations with law enforcement personnel familiar with child abuse investigations of children the same age as Jane Doe #2, it is common for children who have been abused to initially be fearful of revealing such abuse to law enforcement as they have often been threatened or coached as to not revealing this information.

(*Id.* ¶ 7.). The photographs are alleged to have been taken in defendant's basement between September 2010 and January 2011.

On February 25, 2014, following the filing of the second criminal complaint, Magistrate Judge Gary R. Brown detained the defendant on grounds of danger to the community and risk of flight. On February 26, 2014, the grand jury returned an indictment against the defendant charging him with two counts of sexual exploitation of a child, one count of transportation of child pornography, as well as one count of possession of child pornography, in connection with Jane Doe #1.

On February 28, 2014, defendant was arraigned on the indictment and defense counsel stated that he wanted some additional time to present a bail package to the Court. Accordingly, on consent, the Court ordered the defendant detained without prejudice to a future bail application. On March 5, 2014, the grand jury returned a superseding indictment that added one count of sexual exploitation of a child in connection with Jane Doe #2.

On March 6, 2014, the defendant was arraigned on the superseding indictment, and he moved for release from custody based upon the following proposed bail package: (1) a $3 million dollar secured bond subject to a home confinement; (2) GPS electronic monitoring; (3) an outdoor video surveillance system to be accessed at will by the FBI; (4) government approval for any

persons entering the house; (5) one private security officer posted outside; (6) searches of all persons entering or exiting the home; (7) unannounced searches of the house and all persons therein; and (8) a prohibition on the possession of cell phones, computers, and the like. After a hearing on March 6, 2014, in a detailed ruling on the record, the Court found that the government had met its burden of demonstrating, by clear and convincing evidence on the issue of dangerousness, and by a preponderance of the evidence on the issue of risk of flight, that no condition or combination of conditions (including those proposed by the defendant) could reasonably assure the safety of the community or defendant's appearance in court.

Defendant renewed the application on March 20, 2014, supplementing it by proposing two security officers (rather than just one officer) posted 24/7, with one stationed inside the house and the other either inside the house or outside in a car. The government opposed (Opposition, Docket No. 21), and defendant replied (Reply, Docket No. 22). On March 20, 2014, for the reasons set forth on the record, the Court denied the renewed bail motion and adhered to its previous ruling.

## II. LEGAL STANDARD

Pursuant to the Bail Reform Act, if a court determines that release on an appearance bond is not sufficient, the court shall order pretrial release "subject to the least restrictive . . . condition, or combination of conditions, that [the court] determines will reasonably assure the appearance of the person as required and the safety of any other person and the community." 18 U.S.C. § 3142(c)(1)(B). The court, however, must order the detention of the accused pending trial where, following a hearing in accordance with § 3142(f), the court "finds that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community." *Id.* § 3142(e)(1); *see United States v. El-Hage*, 213 F.3d 74, 76 (2d Cir. 2000); *United States v. Gotti*, 358 F. Supp. 2d 280, 282 (S.D.N.Y. 2005).

In light of the charged conduct in this case, there is a statutory presumption that no such conditions exist. *See* 18 U.S.C. § 3142(e)(3)(B). A defendant may nevertheless rebut that presumption with evidence that she or he is not a danger to the community or a risk of flight. *See United States v. Mercedes*, 254 F.3d 433, 436 (2d Cir. 2001) ("In a presumption case . . ., a defendant bears a limited burden of production[—]not a burden of persuasion[—]to rebut that presumption by coming forward with evidence that he does not pose a danger to the community or a risk of flight."). If the defendant meets that burden of production, the presumption favoring detention is not eliminated but instead "remains a factor to be considered among those weighed by the district court." *Id.* "At all times, however, the government retains the ultimate burden of persuasion by clear and convincing evidence that the defendant presents a danger to the community, and by the lesser standard of a preponderance of the evidence that the defendant presents a risk of flight." *United States v. English*, 629 F.3d 311, 319 (2d Cir. 2011) (citation and internal quotation marks omitted).

To determine whether the presumptions of dangerousness and flight are rebutted, the district court must consider:

> (1) the nature and circumstances of the offense charged, including whether the offense is a crime of violence, a violation of section 1591, a Federal crime of terrorism, or

4

involves a minor victim or a controlled substance, firearm, explosive, or destructive device;

(2) the weight of the evidence against the person;

(3) the history and characteristics of the person, including—

(A) the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings; and

(B) whether, at the time of the current offense or arrest, the person was on probation, on parole, or on other release pending trial, sentencing, appeal, or completion of sentence for an offense under Federal, State, or local law; and

(4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release.

18 U.S.C. § 3142(g).

### III. DISCUSSION

The Court discusses the aforementioned factors in turn, taking into account defendant's proposed bail package and mindful that "it is only a limited group of offenders who should be denied bail pending trial." *Gotti*, 358 F. Supp. 2d at 283 (quoting *United States v. Shakur*, 817 F.2d 189, 195 (2d Cir. 1987)) (internal quotation marks omitted). In reaching its decision, the Court has carefully considered the record in this case, including the parties' written submissions, and the arguments made to the Court at the bail hearings before this Court on March 6 and 21, 2014.

#### A. Danger to the Community

As set forth below, the Court concludes that the government, independent of the statutory presumption of detention, has met its burden of showing by clear and convincing evidence that defendant poses a danger to the community, and no condition or combination of conditions will reasonably assure the safety of the community.

##### 1. Nature and Circumstance of the Offenses Charged

The superseding indictment contains extremely serious charges that bear directly on the issue of danger. The grand jury charged defendant with three counts of sexual exploitation of a child, involving two different minors, as well as with the transportation, receipt, and possession of child pornography. As noted above, the charged crimes arise from the defendant's alleged production of child pornography involving a then three-year-old female victim in Ukraine, and the alleged production of child pornography involving a then six-year-old female victim at defendant's Smithtown residence. Defendant does not dispute the seriousness of the charges, although his counsel discounts them somewhat because they allegedly occurred "[s]everal years ago."[2] (First Motion for Release From Custody ("First Motion"), Docket No. 16, at 10.)

As previously noted, there is a statutory presumption of detention in this instance. 18

---

[2] Certain events allegedly occurred from late 2010 to early 2011, while others occurred through late 2012. Law enforcement recovered the camera and memory card that housed the deleted digital images in 2014.

5

U.S.C. § 3142(e)(3)(B). The reason for this presumption is clear. "No one questions that child pornography is an insidious offense since it takes advantage of a particularly vulnerable segment of society, children." *United States v. Schenberger*, 498 F. Supp. 2d 738, 742 (D.N.J. 2007) (citing *United States v. MacEwan*, 445 F.3d 237, 250 (3d Cir. 2006)). As the Third Circuit has pointed out in connection with Congress's findings on Section 2251, which the court viewed as closely related to Section 2252A, "Congress found little distinction in the harm caused by a pedophile, be he a distributor or mere consumer in child pornography, because the mere 'existence of and traffic in child pornographic images creates the potential for many types of harm in the community and presents a clear and present danger to all children.'" *MacEwan*, 445 F.3d at 250 (citing the Child Pornography Prevention Act of 2006, Pub. L. No. 104-208 § 121, 110 Stat. at 3009, 3009–27 (1996)).

Here, defendant not only is charged with dangerous conduct involving the alleged transportation, receipt, and possession of child pornography, but he also is charged with participating in the sexual exploitation of two minors (ages three and six). Thus, based upon these charges and the proffered evidence relating to those charges, the Court concludes that the government has met its burden by clear and convincing evidence that defendant is an extreme danger to children and the community generally. As discussed in detail *infra*, that extreme danger is heightened because defendant is alleged to have committed the conduct with respect to Jane Doe #2 in his home, and is alleged to have committed the conduct with respect to Jane Doe #1, by email and telephonic communications with a woman in Ukraine, who allegedly sexually exploited her three-year-old daughter at defendant's request in order to send videos of the exploitation to defendant. Because of a person's ability to use his or her home, a computer, and/or a mobile phone to commit this type of alleged violent conduct, the ability to monitor, to detect, and to prevent such conduct from reoccurring on bail is extremely difficult.

2.  Weight of the Evidence

As the Court stated on the record, the Court views the weight of the evidence against the defendant as extremely strong.

With respect to the charges related to the minor from Ukraine, defense counsel suggests that the case is weak because it may be difficult for the government to procure the mother's cooperation and presence during trial. (*See* 03/06/14 Tr. at 17–18 ("Obtaining her to participate in this case, in light of the problems in the Ukraine, the civil war that is taking place, may be very problematic for the Government in sustaining their burden in going forward in this case.").) Counsel further speculated that the mother may not have sexually exploited the child in response to defendant's email requests, but rather already had the images of child pornography available in a "library of pictures" and, thus, "who is to say whether she has turned over pictures that she made for the defendant or she already had in her library." (*Id*. at 32–33.)

Notwithstanding counsel's attempts to undermine the government's evidence, the Court still concludes the government's evidence is extremely strong. Specifically, the government has proffered evidence that the sexually explicit acts depicted in the videos correspond to defendant's requests in emails, and defendant has made statements to law enforcement linking himself to the emails sent to and from the mother in Ukraine.[3] (*See, e.g., id*. at 32 (Assistant U.S.

---

[3] It is well settled that, in detention hearings, evidence may be supplied to the court by way of proffer. *See, e.g., United States v. Ferranti*, 66 F.3d

6

Attorney ("AUSA") Bode: "Your Honor, they are attached to emails. He says: Can you do this? She'll send back an email with the kid doing that.").) Moreover, as noted in the first criminal complaint, defendant allegedly confessed to the crimes involving Jane Doe #1 during an interview conducted at the time of a search of his residence. (*See* 01/28/14 Compl. ¶ 12 ("[D]uring an interview, the defendant VALERIO admitted that he directed [the mother] to make sexually explicit videos of her and [the daughter], and that these videos were sent from Kyiv, Ukraine to the defendant's residence on Long Island. Moreover, he identified his email address as JOEVAL5@optonline.net and acknowledged that he sent the July 17, 2012 email to [the mother] . . . ."").[4] Thus, even without the mother's testimony, the Court concludes that the evidence that defendant aided and abetted the exploitation of Jane Doe #1 is extremely strong.[5]

With respect to the evidence relating to the charges involving Jane Doe #2, the government has proffered evidence that the images of the six-year-old girl that form the basis of those charges were obtained from devices found in defendant's home and under his exclusive control, and that the images were taken in defendant's basement. Although the minor has stated that Valerio was not the person who shot the nude portions, the government has proffered evidence that those images are from the same series as others recovered from the camera, and argues that the minor refused to identify defendant because of fear or coaching. (*See* 03/06/14 Tr. at 33 (AUSA Bode: "The six-year-old victim identified the outfit, said the defendant took pictures of her. And talking about the nonchild pornography pick [sic], but they are in series. In the later pictures she's photographed nude."); *see also id.* at 35–36 (AUSA Bode: "It's a sequence of photos. In the beginning he took the video of her. She actually described the camera as well – same type that were used to create the images – and indicated that he had her dress up in the outfits. And after she described them, she was showed photos of the outfits found in the basement as well.").) Based upon the information in the second complaint (including the interview of Jane Doe #2 and images recovered) and the government's proffer, the Court concludes the evidence as to the charges involving Jane Doe #2 is extremely strong, notwithstanding the denial by Jane Doe #2 that defendant also took the nude photographs of her.

### 3. Defendant's History and Characteristics

The Court also carefully has considered defendant's history and characteristics. First, defendant has a prior misdemeanor conviction in 2006 for attempted forcible touching involving the groping of a

---

540, 542 (2d Cir. 1995) ("The rules of evidence do not apply in a detention hearing. . . . Further, the government may proceed by proffer." (citations omitted)).

[4] The complaint quotes an email thread from July 17, 2012, in which a person at defendant's email address sends an email to the mother's email address in which the sender states, *inter alia*, "[t]he videos you sent by cell phone camera are PERFECT and there is NO need for the expense of another camera, when you have done a terrific job with the cell phone camera," and then requests more sexual exploitation of the child in an extremely detailed manner. (01/28/14 Compl. ¶ 9.)

[5] The Court notes that, although defense counsel sought to undermine the sexual exploitation charges involving Jane Doe #1, counsel (in response to a question from the Court at the hearing) had no explanation as to any weaknesses in the government's proffered evidence with respect to the receipt and possession of child pornography by the defendant involving Jane Doe #1. (*See* 03/06/14 Tr. at 32 ("The Government has a strong case to that. There is no question with respect to the receipt of the images from Ukraine.").

woman's genitals at a water park in Riverhead, for which he received one year of probation.[6] Second, the government has proffered that, during the search of defendant's residence, agents discovered he had cameras hidden in the floor, ceiling, and the clock on the wall. (03/06/14 Tr. at 7.) Third, at the detention hearing, the government proffered: "Upon learning he was being rearrested for filming the six-year old, Mr. Valerio said in front of the FBI agents: I feel like killing myself. And he indicated: I don't have a family anymore." (*Id.* at 8.) These history and characteristics further heighten the issue of danger to the community.

The Court notes that defendant has ties to the community, including a close relationship with his mother and sister, and there is no evidence that defendant violated any conditions during his initial release pursuant to Magistrate Judge Tomlinson's order. Those facts notwithstanding, the Court concludes that the prior conviction and other negative history and characteristics, in combination with the other factors, warrant defendant being detained as a danger to the community. In sum, the Court concludes that any of the facts in defendant's favor on this factor are insufficient to undermine the finding of danger by clear and convincing evidence—a finding supported by the nature of the charges in this case and the other evidence of danger presented by the government.

4. Nature and Seriousness of the Danger to Any Person or the Community That Would Be Posed by Defendant's Release

As a threshold matter, with respect to the victims identified in the criminal complaints, the first is in Ukraine and thus beyond defendant's physical reach, and there is no evidence that defendant has had contact with the second victim since the images and videos were taken. Even assuming no future contact would be possible with these alleged victims, however, there is still a clear and compelling danger to the community posed by defendant's release that cannot be addressed by any combination of bail conditions.

Defense counsel have emphasized that bail conditions could be established, including home detention and the use of two guards, to prevent defendant from having any physical interaction with any children or any other unapproved visitors. Any such conditions, however, would not address the grave danger posed by defendant's access to electronic devices such as computers and mobile phones. Defendant is charged with

---

[6] At the March 6th hearing, the government submitted documents from the Suffolk County Probation Department related to defendant's probation supervision in 2006–2007 in connection with the prior conviction. One document contains entries in which it appears: (1) defendant admitted he had sexual encounters with a babysitter under eighteen years of age; (2) defendant admitted that "he filmed adolescent females because he was sexually aroused by this," "reports to have filmed such females during trip to beach in France and in home in Commack," and "admits these females to be 'mid teens'"; (3) an entry indicates that he "continues to lie and manipulate"; (4) defendant "admits to PO that he is 'sick' and needs help and that SOPTX is working to change his attitudes and behaviors"; and (5) "[d]ozens of pornographic tapes were found in basement boiler room. Additional porn DVDs found in basement crawlspace. Upon review of tapes 4th precinct Dt. Alesse was called to assist. Videocassette tapes appeared to be surveillance tapes of women be [sic] filmed in a bedroom w/o their consent. Dt. Alesse confirmed evidence yet . . . could not be charged due tapes being filmed over 5 years prior and unknown victims. Upon search of garage, 11 knives found along w/ dummy pistols and the hunting rifle along w/ ammo." The Court, however, has not considered this proffered information for purposes of bail because it concludes that, for the reasons set forth herein and on the record, the other information and arguments made by the government are sufficient to warrant detention.

8

receiving images and video of child pornography through electronic means. Moreover, as discussed *supra*, he is charged with producing images and video of the six-year-old girl in his basement, and actively encouraging (by electronic means, including email) the molestation of the three-year-old girl by her mother. Thus, by the click of a computer key or tap of a touchscreen on a mobile phone, defendant could cause the same type of extreme harm to children and the community that he is alleged to have committed in the instant case. In short, based on the nature of the charges, the proffered evidence involving those charges, and certain of defendant's history and characteristics, the Court concludes, *inter alia*, that, if defendant has any access to any internet capable devices and/or unmonitored telephone calls (including mobile phones), he is an extreme danger to the community. Thus, in the case, the Court concludes the only way to protect the community is to detain defendant pending trial.

In an effort to address this clear danger, defendant has sought to replicate a jail cell in his home through the use of, among other things, cameras that could be monitored by the government, unannounced searches by the government, and two guards hired by the defendant who would search and monitor visitors as well as defendant.

As a threshold matter, the Court notes that there is a debate within the judiciary over whether a defendant, if she is able to perfectly replicate a private jail in her own home at her own cost, has a right to do so under the Bail Reform Act and the United States Constitution. Some courts, while acknowledging the financial discrimination created by such a position, have concluded that the entry of these types of extraordinary bond conditions for those who can afford them is permissible, if not required. *See, e.g.*, *United States v. Dreier*, 596 F. Supp. 2d 831, 833 (S.D.N.Y. 2009) ("It cannot be gainsaid that many kinds of bail conditions favor the rich, and conversely, that there are many defendants who are too poor to afford even the most modest of bail bonds or financial conditions of release. This is a serious flaw in our system. But it is not a reason to deny a constitutional right to someone who, for whatever reason, can provide reasonable assurances against flight.").

Other courts, meanwhile, conclude that "it is contrary to underlying principles of detention and release on bail that individuals otherwise ineligible for release should be able to buy their way out by constructing a private jail, policed by security guards not trained or ultimately accountable to the government, even if carefully selected." *Borodin v. Ashcroft*, 136 F. Supp. 2d 125, 134 (E.D.N.Y. 2001); *see also United States v. Cilins*, No. 13 Cr. 315 (WHP), 2013 WL 3802012, at *3 (S.D.N.Y. July 19, 2013) ("Federal judges swear an oath . . . to 'administer justice without respect to persons, and do equal right to the poor and to the rich[.]' 28 U.S.C. § 453. That pledge is violated if a defendant, who is a serious risk of flight with every incentive to flee and the means to do so, is permitted to buy his way out of detention. This Court is not persuaded by the reasoning of other judges in this district who have approved private prisons."); *United States v. Agnello*, 101 F. Supp. 2d 108, 115 (E.D.N.Y. 2000) ("Nor do I think a wealthy defendant is entitled to greater consideration in the making of a bail decision than a defendant of modest means. Just as Congress provided in the Bail Reform Act that the court 'may not impose a financial condition that results in the pretrial detention of the person,' 18 U.S.C. § 3142(c), Congress did not intend that a dangerous individual should be released because that individual was sufficiently affluent to be able to pay the cost of

9

extravagant release conditions monitored by private security officers."); *United States v. Lee*, 79 F. Supp. 2d 1280, 1289 (D.N.M. 1999) ("[T]he concept advanced by the First Circuit's opinion in *Patriarca*—hat a defendant can buy his pretrial release if he has sufficient funds to finance the creation of a private jail at his home—is repugnant to a court's sense of justice." (citing *United States v. Patriarca*, 948 F.2d 789, 794 (1st Cir. 1991))). As one court explained, in denying a defendant's proposal that he be released on home detention with armed guards in an extended stay-type hotel or apartment:

> From the standpoint of ensuring the person's appearance, what is the difference between [the defendant's] release proposal and detention. [The defendant's] answer to this question is that because it is possible to create a "virtual jail" through a "combination of conditions," the Bail Reform Act mandates that his proposal be implemented in lieu of detention. This argument suggests that so long as a person possesses sufficient resources to propose a virtual jail, there would never be a situation in which detention is permitted. Indeed, I imagine that even Hannibal Lecter could propose adequate release arrangements to secure his appearance and the public's safety if he had the financial resources to do so. While it seems to me that neither the Constitution nor the Bail Reform Act demands such a result, courts are not in agreement on this point.

*United States v. Colorado-Cebado*, No. A-13-CR-458 DEW, 2013 WL 5852621, at *5 (W.D. Tex. Oct. 30, 2013) (footnote omitted).

The Second Circuit has never decided this precise issue. *See United States v. Sabhnani*, 493 F.3d 63, 78 n.18 (2d Cir. 2007) ("The government has not argued and, therefore, we have no occasion to consider whether it would be 'contrary to principles of detention and release on bail' to allow wealthy defendants 'to buy their way out by constructing a private jail.'" (citation omitted)). However, the Second Circuit has suggested, in a non-precedential summary order, that it is "troubled by [the] possibility" of wealthy defendants being able to construct their own private jail, noting that "such conditions might be best seen not as specific conditions of release, but simply as a less onerous form of detention available only to the wealthy." *United States v. Banki*, 369 F. App'x 152, 154 (2d Cir. 2010). This Court is troubled by that possibility as well. There is nothing in the Bail Reform Act that would suggest that a defendant (or even, hypothetically, a group of defendants with private funding) has a statutory right to replicate or construct a private jail in a home or some other location. The Bail Reform Act address conditions of *release*, not conditions of *detention*. Of course, the Act clearly allows for forms of home detention less restrictive than jail. However, once the home detention becomes so restrictive (including with the use of private security guards) that it simply replicates a jail, it is highly questionable whether the Bail Reform Act contemplates "release" in that context (especially because the government has to inspect, supervise, and monitor the efficacy of that private jail). *See, e.g.*, *United States v. Tortora*, 922 F.2d 880, 887 (1st Cir. 1990) ("[T]he Bail Reform Act . . . does not require release of a dangerous defendant if the only combination of conditions that would reasonably assure societal safety consists of heroic measures beyond those which can fairly be said to have been within Congress's

contemplation."). Moreover, with respect to the constitutional question, once a sufficient constitutional showing has been made to deprive a person of her freedom prior to trial to the point where she is permissibly confined and monitored by guards twenty-four hours per day in jail, it is unclear to this Court what constitutional provision would give that person the right to be confined in a private, homemade facility, rather than in a public jail. In any event, this Court need not decide this issue in this case because, as discussed *infra*, the defendant's proposal falls far short of replicating a private jail in his home that is as secure as a jail facility, such that it adequately addresses the issue of danger posed in this case by his release. In addition, his proposal also imposes substantial costs or burdens on the government and, thus, to the extent he argues that his attempt to replicate the jail does not impose substantial burdens on the government (including law enforcement), the Court disagrees.

As part of his bail package, defendant agrees to not possess, much less use or access, a computer or other internet-capable device, and agrees to unannounced searches of the house and all persons therein. Under the circumstances of this case, however, the Court finds these conditions are difficult, if not impossible, to enforce, and otherwise insufficient to assure the safety of the community. Even with the presence of a guard inside the home at all times and the taking of steps to prevent electronic devices from being in the house, there is no way to ensure the full monitoring of defendant's activities. Computers, mobile phones, tablets, etc.—the type of instrumentalities allegedly used to commit the crimes—are ubiquitous and easy to procure or hide, and increasingly even the lowest-level devices have internet functionality. Unlike in a jail, which provides greater layers of security to attempt to ensure that inmates do not possess contraband, the Court can conceive of several avenues through which defendant may procure or retain such devices on the premises, which heightens the risk of danger to the community. The Court is not convinced that defendant's mother, or even two guards, could ensure (to the same extent as jail) that defendant would not use such items. In other words, "it is difficult to conceive of measures that could confidently assure that defendant would not communicate with others and encourage the distribution of child pornography and related illicit activities." *Schenberger*, 498 F. Supp. 2d at 745; *accord United States v. Falcon*, CRIMINAL NO. 06-60080-01, 2007 U.S. Dist. LEXIS 44358, at *15–16 (W.D. La. June 18, 2007) ("It is not possible to formulate conditions of release which would completely deprive such a defendant of the ability to possess or attempt to possess additional child pornography, 'or to communicate and interact with (via email, internet, or phone) others involved in the possession, sale, and distribution of child pornography or other sexual abuse of children, which would also create a clear danger by facilitating the criminal and dangerous exploitation of children by other individuals.'" (quoting *United States v. Reiner*, 468 F. Supp. 2d 393, 397 (E.D.N.Y. 2006))). Thus, the Court concludes that the bail package, and particularly defendant's proposal to hire and to place private security guards inside and outside his residence, would "at best elaborately replicate a detention facility without the confidence of security such a facility instills." *United States v. Orena*, 986 F.2d 628, 632 (2d Cir. 1993) (internal quotation marks and citation omitted).

Moreover, the government will be at the mercy of a private company hired and paid for by defendant, which the government has not itself chosen and over which the government exercises no hiring, training, or

supervisory control. *See Sabhnani*, 493 F.3d at 78 (noting, in case not involving presumption in favor of detention, that government selected private security firm, and "[t]hus, this is not a case in which government reservations about either the competency or integrity of a private security firm might give a court pause about the effectiveness of home confinement in deterring flight"). As the Court noted during the hearing on March 20, the questions about the legal authorization for the private security firm to use force against defendant should he violate the terms of his release, and the questions over whether the guards can or should be armed, underscore the legal and practical uncertainties—indeed, the imperfections—of the private jail-like concept envisioned by defendant, as compared to the more secure option of an actual jail. *See Banki*, 369 F. App'x at 153–54 (rejecting argument that district court erred by denying bail where defendant proposed that home confinement would be enforced by private security guards financed by his own expense and noting that "issues regarding the nature of the security that would be provided by such an arrangement, and the additional costs to the government in supervising such an arrangement . . . persuade us that it is not legal error for a district court to decline to accept such a condition of release as a substitute for detention"); *see also Orena*, 986 F.2d at 632–33 ("Safety of the community will be assured only if the government provides trustworthy trained staff to carry out the extensive monitoring of homes, telephones, and travel that would be necessary to ensure compliance with the conditions of bail."); *Colorado-Cebado*, 2013 WL 5852621, at *6 ("What more compelling case for an order of detention is there than a case in which only an armed guard and the threat of deadly force is sufficient to assure the defendant's appearance? There are some conditions that are simply not appropriate to be contracted out, and detention under armed guard would seem to be one of those.").

In addition, the bail package and attempt to replicate a jail in defendant's home would place a burden on the government not contemplated by the Bail Reform Act.[7] It is true that defendant proposes to pay all costs associated with the cameras and security guards, thus limiting the drain on limited government resources as it relates to those expenses. *See Sabhnani*, 493 F.3d at 78. Other expenses and diversion of government resources, however, would be necessary to implement and ensure continuing compliance with these extraordinary efforts to create a private jail for defendant. Specifically, the government would have to divert law enforcement resources to, among other things, (1) review the hiring and training practices of the security firm; (2) continually review the performance and monitoring activities of the private security firm, including reviewing the footage from the security cameras; and (3) conduct unannounced searches of the residence. Thus, the government would have to expend resources above and beyond those it generally would spread across multiple individuals in a jail to access, check, and monitor the external surveillance system, and to approve persons permitted to enter the house. *See Borodin*, 136 F. Supp. 2d at 134 ("Even if the cost of surveillance is covered by Borodin, the government still incurs an added administrative burden in supervising the surveillance.").

In short, the Court concludes that defendant's attempt to replicate a jail in his home is insufficient to adequately address the issues of dangerousness raised by his

---

[7] The Court notes that the government has not specifically objected to Epic Security itself, but to the use of private guards in general.

release (and also would place unnecessary burdens on the government). Accordingly, neither the proposed combination of conditions, nor any other combination of conditions, can reasonably assure the safety of the community in this case. Other courts similarly have found home detention with guards insufficient to address severe issues of dangerousness and/or flight. *See, e.g.*, *Agnello*, 101 F. Supp. 2d at 114–15 (rejecting home detention, with electronic monitoring, video surveillance, and 24-hour guard posted outside home, and other restrictions, and noting that "[t]hese measures, albeit elaborate, do not assure the safety of other persons and the community in a manner remotely commensurate to pretrial detention in a government facility"); *United States v. Koltun*, No. 97-CR-83 (JG), 1998 WL 1033063, at *2 (E.D.N.Y. Oct. 19, 1998) ("I have considered the modifications of the conditions of release proposed by [the defendant]. In essence, he has proposed to turn a vacant apartment at 1213 Avenue Z in Brooklyn into a virtual prison, with an electronic bracelet, round-the-clock guards, and telephonic monitoring. The efficacy of such 'home detention centers,' . . . in assuring safety is dubious. Either the home must be equipped and staffed like a real prison, or the defendant must be trusted to obey the conditions of release. I am not required to do the former, . . . and I cannot trust [the defendant's] promise to leave his wife alone. Accordingly, he is remanded."); *United States v. Morrison*, No. 04-CR-899 (DRH) (S-2), 2009 WL 2973481, at *2–3, 6 (E.D.N.Y. Sept. 10, 2009) (collecting cases and noting that, "even if I accept the often disputed proposition that a defendant's willingness to replicate a jail within his home falls within the ambit of what the Congress intended in enacting Section 3142 and 3143, defendant has not assuaged my perception that he is one of the presumably few individuals capable, both by way of ability and mind-set, of defeating such replication measures.").

Finally, the Court disagrees with defendant's contention that the underlying crimes charged—and issues of dangerousness presented by those charges—are so distinguishable from those in *Orena* and *Banki* so as to justify the conclusion that the government has not carried its burden and that Valerio would pose no reasonable threat to the community if released. The Second Circuit's reasoning in *Orena*, where one of the defendants was the acting boss of the Colombo Family and his efforts to become the Family's permanent head led to a fratricidal war, does not imply that a relationship to organized crime is a distinguishing factor in the analysis. *See* 986 F.2d at 631–32. Relying on *Sabhnani*, defendant argues that an individual like him who allegedly produced, induced the production of, and possessed child pornography, could not reasonably pose any threat to the alleged victims or to anyone else given the nature of the crime itself. (*See* Reply, at 2 ("Lastly, 'although the crimes at issue in this case . . . involved alleged violence, the circumstances are not comparable' to those in Orena: Valerio's release poses no threat to the alleged victims or to anyone else." (internal quotation marks omitted)).) In *Sabhnani*, however, where the defendants purportedly used violence in their home to secure the forced labor of two specific victims who were then placed in government protection, the government did not argue dangerousness, and the detention was based only on risk of flight.[8] *See* 493 F.3d at 78 ("The government does not

---

[8] In fact, in *Sabhnani*, the Second Circuit emphasized: "In *United States v. Orena*, we expressed serious reservations about the adequacy of home confinement as a substitute for detention in cases involving violent crime. . . . We do not here retreat from those views." 493 F.3d at 77–78 (citations omitted).

13

contend in this court that defendants' release poses a further threat to these victims or others."). Here, unlike in *Sabhnani*, the government is seeking detention based on dangerousness, and some of the crimes at issue can be committed from the home (by electronic means) regardless of defendant's ability to interact with a specific victim. Thus, although the type of dangerousness in this case might be of a different type than *Orena* and *Banki*, the inability of home detention (even with guards) to address the particular type of danger raised by this case (including the danger created by the defendant's access to small computer devices and mobile phones) is just as pronounced.

To the extent defendant suggests that this Court's reasoning would require all defendants charged by child pornography offenses to be detained, the Court disagrees. Although the vulnerability of home detention to the use of electronic devices by defendants to commit illegal activities obviously carries across many types of violent activities, that vulnerability must be weighed in each individual case in conjunction with all of the other factors that the Court must consider under the Bail Reform Act. Thus, each situation is case-specific. In fact, this Court has released defendants who have been charged with child pornography offenses in other cases on strict bail conditions, including home detention. Therefore, it should be clear that the Court is not articulating, in theory or in practice, a categorical rule that home detention, or other strict bail conditions, will be insufficient to ensure the safety of the community in every single case charging child pornography offenses. Instead, it is the Court's determination, after carefully analyzing the applicable factors under the particular circumstances of the instant case, that those factors—including the nature of the particular charges here, the manner in which the offenses were allegedly carried out, the extremely strong evidence against defendant, and his history and characteristics (including the alleged use of his home to commit one of the crimes, as well as the use of alleged hidden electronic equipment in his home)—warrant detention in jail over the proposed home detention with a private security firm (or any other combination of conditions).

Accordingly, the Court holds that the government has met its burden of clear and convincing evidence, independent of the presumption of detention, that no condition or combination of conditions will reasonably assure the safety of any other person and the community.

### B. <u>Risk of Flight</u>

As to defendant's risk of flight, the Court concludes that the government has also met its burden of showing by a preponderance of the evidence that no conditions or combination of conditions could reasonably assure that defendant will not flee. First, defendant, who is forty-seven and has had serious health problems, faces a mandatory minimum sentence of 15 years' imprisonment and an estimated advisory Guidelines range of 292 to 365 months imprisonment, if convicted. Given the extremely strong evidence against him and the substantial penalties that he faces, the Court does not believe any condition or combination of conditions will reasonably assure his appearance in court. It is unclear what moral suasion his family, or the bail package they propose, will have over defendant under these circumstances.[9] In

---

[9] Although not dispositive on this issue, the government has also proffered that defendant recently made a statement that could suggest suicidal ideations, raising further questions about his state of mind and whether even the conditions imposed by his proposed bail package would deter him from fleeing.

14

addition, for some of the same reasons that home detention with two guards is an imperfect attempt to address the issue of dangerousness, it also does not adequately address the issues of flight. It is certainly possible that defendant could attempt to either overpower, or evade, one or both of the unarmed guards stationed inside or outside his house. Similarly, upon fleeing, an electronic bracelet could easily be cut off, thus preventing the government from locating defendant, and giving him a substantial head start in fleeing before the government could react to any notification that the device had been removed.

Accordingly, the Court concludes that the government has proven, by a preponderance of the evidence, that no condition or combination of conditions (including those proposed by the defendant) could reasonably assure defendant's appearance in court.

IV. CONCLUSION

For the foregoing reasons and the reasons set forth on the record, the Court denies defendant's motions for release from custody, and concludes (under a *de novo* standard of review) that the government has met its burden of demonstrating, by clear and convincing evidence on the issue of danger, and by a preponderance of the evidence on the issue of flight, that no condition or combination of conditions will reasonably assure the safety of the community or defendant's appearance in court. Accordingly, the Court orders that defendant shall remain detained pending trial.

SO ORDERED.

_____
JOSEPH F. BIANCO
United States District Judge

Dated: April 1, 2014
      Central Islip, NY

\* \* \*

The government is represented by Loretta E. Lynch, United States Attorney, Eastern District of New York, 271 Cadman Plaza East, Brooklyn, New York 11201, and 610 Federal Plaza, Central Islip, NY 11722, by Allen Lee Bode and Ameet B. Kabrawala. Defendant is represented by Anthony M. LaPinta, Reynolds, Caronia, Gianelli, Hagney, LaPinta & Hargraves, 35 Arkay Drive, Hauppauge, NY 11788; and Leonard Lato, 320 Carleton Avenue, Central Islip, NY 11722.