UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

    - against -                                    14-CR-94-JFB

JOSEPH VALERIO,

                Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X


## JOSEPH VALERIO'S SENTENCING MEMORANDUM


Leonard Lato, Esq.
200 Motor Parkway, Suite C-17
Hauppauge, NY 11788
Telephone:  (631) 655-5008
Email:  leonardlato@yahoo.com

Anthony M. La Pinta, Esq.
200 Motor Parkway, Suite C-17
Hauppauge, NY 11788
Telephone:  (631) 231-1199
Email: lapintaesq@aol.com

(Attorneys for Joseph Valerio)

## PRELIMINARY STATEMENT

Attorneys for the defendant Joseph Valerio write in connection with Valerio's sentencing, which is scheduled for 10:30 a.m. on May 4, 2017. We request that the Court sentence Valerio to 180 months' imprisonment and to lifetime supervised release.

## THE OFFENSE CONDUCT

Valerio went to trial. On November 13, 2014, a jury found him guilty of all counts in a 15-count superseding indictment.[1] (PSR ¶ 1.) Each of the 15 counts relates to the production of child pornography involving two minors, Jane Doe #1 and Jane Doe #2. (PSR ¶¶ 2-16.) With respect to Jane Doe #1, Valerio paid the girl's mother, Olena Kalichenko, to make videos of herself with the infant girl, while Kalichenko and the girl were in Ukraine. Kalichenko was Valerio's girlfriend, and she did as Valerio requested. (*See* PSR ¶¶ 28-33.)

On what appears to be one occasion, Valerio, in the basement of his house, photographed six-year-old Jane Doe #2, in various states of undress. No contact occurred. (*See* PSR ¶¶ 34-39.)

## OTHER ALLEGATIONS OF CRIMINAL CONDUCT

On July 25 and September 26, 2016, the Court held a *Fatico* hearing. The hearing's focus was not child pornography. Instead, the focus involved allegations

---

[1]    To prevent multiplicity, five "attempt" counts—nine through thirteen—will have to merge with substantive counts two and three, which cover the same time period.

that Valerio had engaged in criminal or otherwise inappropriate conduct toward three adult women:   Kalichenko, Angelique Davidse and Lucy Down, each of whom testified at the hearing.

**Olena Kalichenko**

Kalichenko met Valerio when she came to the United States in late June 2011.  They began a romantic relationship.  During the first ten days that they were together, Kalichenko observed, "[H]e would have changes in his mood." (*Fatico* Hr'g Tr. 95:23-101:6, 138:3-139:3, July 25, 2016.)  Kalichenko soon returned to Ukraine, but in September 2011, she reentered the United States and resumed her relationship with Valerio.  (*Fatico* Hr'g Tr. 102:25-103:11, 139:4-12, July 25, 2016.)  She was looking for an American many to marry:  "I was determined," she testified, "to build [a] serious relationship with this man[,] specifically for the marriage.  That's all that I was looking for." (*Fatico* Hr'g Tr. 103:25-104:5, July 25, 2016.)

Valerio's mood swings and "dual personality" continued.   According to Kalichenko, "I think that he has . . . a dual personality. . . . [H]e would be normal and . . . a caring person and a good person at one point.  But . . . something [would] happen[,] and he would completely change into [the] opposite person." (*Fatico* Hr'g Tr. 104:6-15, 140:5-8, July 25,2016.)

According to Kalichenko, Valerio assaulted her twice during September

2

2001.  She described the first incident:

> [H]e suddenly . . . became mad. . . . [N]o reason.  And he
> just told me . . . that he wanted me to leave his house.
>
> . . . .
>
> . . . I started to beg him if I could stay . . . .
>
> . . . .
>
> . . . [H]e pulled me out [from the kitchen] . . . to
> the . . . cinema room. . . . [H]e just took my clothes off
> and he forced me . . . to crawl on the floor . . . .
>
> . . . .
>
> . . . [H]e would call me . . . a dirty whore, a bitch,
> and . . . language like this. . . .
>
> And he wanted me to reply in the same way, so I
> had . . . to reply to him like:  *Yes, my master*. . . .
>
> . . . [H]e would slap me . . . .
>
> . . . .
>
> . . . And he would . . . insert [his hand] . . . inside
> of me.  And he would literally hurt me.  I ask[ed] him to
> stop it[,] but he just did it.

(*Fatico* Hr'g Tr. 106:17-110:24, July 25 Tr. 107-10.)

Kalichenko continued:

> [He asked for] my mouth to specifically perform on his,
> how do you, you know, the male organ. . . .
>
> . . . .

3

> I told him that it is disgusting and I told him that I
> don't want to do it . . . . But he would . . . force me . . . .
>
> . . . I told him it was disgusting for me.
>
> . . . .
>
> [But] I did [it].

(*Fatico* Hr'g Tr. 112:6-113:7, July 25, 2016.)

From an objective viewpoint, Kalichenko's credibility soon became suspect.

On cross-examination, the following exchange occurred:

> Q     Did [Valerio] want you to perform oral sex on
>       him?
>
> A     Yes, he wanted.
>
> Q     You did not do that at first, correct?
>
> A     During that incident he forced me to do it.
>
> Q     But you refused, right, you didn't want to?
>
> A     I didn't want, no.  I didn't want.
>
> Q     But . . . you performed oral sex on your infant
>       daughter, correct?
>
> A     I won't answer that.  I don't want to answer.  I
>       refuse to answer.
>
> . . . .
>
> THE COURT:     You can't answer yes or no?
>
> THE WITNESS:  I don't want to answer yes or no
> because it wouldn't be my answer to this question.

4

> THE COURT:     Okay. I think the government will concede that fact in any event based upon the evidence in the case.  Right?
>
> MR. KABRAWALA:     Your Honor, the videos certainly speak for themselves.

(*Fatico* Hr'g Tr. 142:13-143:13, July 25, 2016.)

According to Kalichenko, Valerio also raped her, causing her to "bleed[] . . . inside." (*Fatico* Hr'g Tr. 114:10-116:22, July 25, 2016.)  Distraught, Kalichenko "had to go somewhere."  She "contacted a person" "[she] just barely knew in Seattle," and that person "invited [her] to come and stay with his family." (*Fatico* Hr'g Tr. 117:3-13, July 25, 2016.)  But her testimony contradicted what she had stated a few minutes earlier about the beginning of the "cinema room" incident.  In her earlier testimony, Kalichenko said that, when Valerio demanded that she leave his house, she pleaded to stay, "because I didn't know no people in the US.  I had absolutely no funds. . . . I didn't even have a place to go." (*Fatico* Hr'g Tr. 107:1-14, July 25, 2016.)

From an objective viewpoint, Kalichenko's testimony about what came next is less than trustworthy.  According to Kalichenko:

> [H]e contacted me through the email.  He contacted me and he was completely in a different tone.  Completely like nothing happened . . . .  [H]e would ask me how am I doing, if I'm all right.  And he . . . [was] in a softer way, a nice way, a gentle way, and he would advise me to come back to him.

5

> And I decided to give it . . . a chance of building
> the family with him.

(*Fatico* Hr'g Tr. 121:2-13, July 25, 2016.)    Kalichenko explained, "I saw him as a

father to his own son and I saw his sincere concern to his daughter [Alexa] with . . .

Angelique [Davidse].  And he also told me [Angelique] had a son, which wasn't his

son, from [a] previous relationship . . . . [H]e would tell me that . . . he would see

no difference . . . between [that] boy and . . . his own daughter and . . . would

accept the son as his own one."  (*Fatico* Hr'g Tr. 120:9-16, July 25, 2016.)

And so Kalichenko returned to Valerio.  She took a flight to New York,

followed by a taxi to Central Park in Manhattan, where Valerio picked her up.  On

the ride to Long Island, Kalichenko testified, Valerio assaulted her.  (*Fatico* Hr'g

Tr. 121:14-124:9, July 25, 2016.)  On direct examination, Kalichenko testified:

> [H]e suddenly . . . pulled over. . . .
>
> . . . [H]e . . . attacked me, . . . using his hands.
>
> . . . .
>
> Using his hand, he would put it like under my
> clothes.  He wouldn't take [my] panty hose off.  He
> would just . . . go inside of it with his hands, through the
> clothes . . . .
>
> And it was very painful . . . . And he kept doing it
> till he . . . till he relieved himself.

(*Fatico* Hr'g Tr. 124:10-125:6, July 25, 2016.)

After "satisfying himself and after his discharge," Kalichenko testified on direct examination, "he turned to me and said that he was sorry." (*Fatico* Hr'g Tr. 126:25-127:6, July 25, 2016.)  So Kalichenko decided to give the relationship yet another chance, she testified on direct examination, and went to Valerio's house, where she "stayed till the end of October." (*Fatico* Hr'g Tr. 121:10-13, 128:19-21, July 25, 2016.)

The following exchange on cross-examination is one example of why Kalichenko lacked credibility:

> Q    [W]hen [Valerio] assaulted you [in the car,] it was with your pantyhose still on, correct?
>
> A    Yes.
>
> Q    And he actually put his hand through your pantyhose into your vagina, correct?
>
> A    Yes.
>
> Q    And it hurt, right?
>
> A    Yes.
>
> Q    Well at this point did you say, This is not the right guy for me.  I should get away from this guy?
>
> A    He apologized.  He said he was sorry.
>
> Q    Well, it's not like he spilled coffee on you, right?
>
> A    It's not.

> Q   . . . He actually shoved his hand into your vagina and said to you he was sorry after masturbating, and you were okay with that?
>
> A   I would prefer not to answer that question.

(*Fatico* Hr'g Tr. 143:16-144:10, July 25, 2016.)

Kalichenko also had no satisfactory explanation for "the contract" that she and Valerio entered into on October 18, 2011, some two weeks after "the pantyhose incident."  The contract, which Valerio authored and Kalichenko signed, reads in relevant part:

> [I, Olena, will] always obey [Joseph Valerio's] commands and provide the support for our strong partnership.  [Joseph] . . . promises to be a good man and a gentle man with his partner when not engaging in consensual rough sexual intercourse which I, [Olena], . . . also enjoy.  Therefore, in balanced harmony, Joseph will treat me as an equal when I'm obeying him thoroughly.

(*Fatico* Hr'g Tr. 130:23-131:15, 145:3-10, 147:21-148:8, July 25, 2016.)

On the same day, Kalichenko sent Valerio an email that contained language similar to the language contained in the contract:  "I, Olena Kalichenko promise to Joseph Valerio to enter into a multiple partner relationship where I, as being one of his partners, agree on having rough sex with him."  (*Fatico* Hr'g Tr. 145:11-146:13, July 25, 2016.)

From an objective standpoint, the contract between Valerio and Kalichenko, and Kalichenko's email, seem like role playing.

8

Some two months later, long after Kalichenko had returned to Ukraine, she sent Valerio an email in which she expressed a desire to move forward with their relationship. And it was only then that she started making videos of herself and her daughter. This conduct continued for many months. (*Fatico* Hr'g Tr. 149:1-150:17, July 25, 2016.) And when law enforcement became involved, she was hardly a victim, as the December 11, 2013, viber message that she sent Valerio demonstrates:

> Joseph, I now have eight different video I made for you, not counting the one sent through GHL. [The] FBI is asking me every single day . . . . I don't think you really understand how serious a matter it is. I'm asking you for the last time, would you like me to provide the police everything I have, or would you like to negotiate?

(*Fatico* Hr'g Tr. 152:6-14, July 25, 2016.)

Kalichenko attempted to conceal what was probably her primary motive for testifying: leniency at her own sentencing. The following exchange occurred on cross-examination:

> Q    Mr. Valerio asked you to make video[s] of you and your daughter?
>
> A    He was demanding . . . .
>
>      . . . .
>
> Q    . . . [Y]ou realize you're facing a mandatory minimum of 15 years imprisonment?
>
> A    I do.

9

Q    You hope for leniency?

A    Excuse me?

Q    Are you hoping for leniency from the judge?

A    What does that mean?

Q    Are you hoping to get as little time as possible?

A    No, I'm not.

Q    You're hoping to get as much time in jail as possible?

A    What?  I don't —

Q    Maybe you don't understand me.

     Are you trying to get the lowest sentence possible?

A    No, I'm not.

(*Fatico* Hr'g Tr. 149:17-19, 155:2-10, July 25, 2016.)

Prior to and during the *Fatico* hearing, Kalichenko was represented by Robert LaRusso, a former assistant United States attorney and an experienced defense attorney.  She and Mr. LaRusso must have discussed that, if she were to testify at the hearing, she would be helping herself at her own sentencing.

**Angelique Davidse**

As already stated in this memorandum, Kalichenko "saw [Valerio's] sincere concern to his daughter [Alexa]," who was "from [a] previous relationship [with

Angelique Davidse]," and that "[Valerio] accept[ed Davidse's] son as his own one." (*Fatico* Hr'g Tr. 120:9-16, July 25, 2016.)

Davidse testified that she is from "Johannesburg[,] in South Africa." (*Fatico* Hr'g Tr. 3:16-17, Sept. 26, 2016 .) She "met Joseph on line on a dating website . . . in "about July or August of '07[, when she] was seven months pregnant with [her] son." They "started communicating online," and "about when [her] son was 3 months old, [Valerio] asked [her] to come to the United States." (*Fatico* Hr'g Tr. 6:12-24, Sept. 26, 2016.) "In February of '08, [she] came to the United States for the first time[,] and that's when [she] met [Valerio] in person for the first time." Valerio paid for her plane ticket and met her and her infant son at the airport. (*Fatico* Hr'g Tr. 7:6-8, Sept. 26, 2016.) According to Davidse:

> [W]hen he fetched me from the airport he took me to his home in Water Mill[,] and I was thrilled to be here.
>
> He treated me very well. He greeted me with a beautiful bouquet of roses, went to the home, enormous box of chocolates, brought a beautiful gift to my son and made me feel very welcome and pleased that I was here, and looked forward to develop the relationship.

(*Fatico* Hr'g Tr. 7:20-8:1, Sept. 26, 2016.)

"In the beginning it was really good," Davidse testified. They "had a lot of fun, [he] treated [her] very, very well, [but] then he started to become a little angry." "[A] bad day . . . became two bad[] days," Davidse recalled, and a "bad week would [be]come a bad month." (*Fatico* Hr'g Tr. 8:4-8, Sept. 26, 2016.)

11

Davidse gave particulars about the "bad days."  According to Davidse:

> I was downstairs and I put my son in for a nap[,]
> and I we[n]t to fetch him a bottle of formula[,] he
> tripped me and started to laugh, and said to me you
> should be less clumsy. . . .  [But] I knew it was
> deliberate.  I didn't know how to respond. . . .
>
> After that I remember an incident where we'[d]
> been to the beach for the morning and . . . came back and
> [were] preparing lunch. . . . I thanked him for the trip,
> and I said I enjoyed my day[,] and he said he didn't like
> my response[,] the way I thanked him[, but] I couldn't
> understand what he me[an]t . . . .
>
> I remember he became quite irate[,] and he thr[ew]
> me down to the kitchen floor and started choking me and
> hitting me[,] and I screamed.

(*Fatico* Hr'g Tr. 8:10-25, Sept. 26, 2016.)

Davidse was a well-educated woman with a "[d]octora[te] in [c]ommerce" (*Fatico* Hr'g Tr. 4:6-13, Sept. 26, 2016), and she had only recently become involved with Valerio.  Nevertheless, she did not end the relationship.  She explained:

> In the beginning I felt that it was perhaps
> something that would disappear, perhaps I could do
> something more or do something better or change
> something to make the relationship better.  I thought I
> could fix it.  I thought it was something that would be
> mended somehow.

(*Fatico* Hr'g Tr. 11:21-25, Sept. 26, 2016.)

Davidse also testified—inexplicably from an objective viewpoint—that in

12

May 2008, which was only three months into the relationship, she asked Valerio if he would "please" allow her to go to South Africa to visit her mother.  (*Fatico* Hr'g Tr. 12:3-9, Sept. 26, 2016.)  She received permission and took her son to South Africa, where they stayed for a few weeks before, inexplicably, returning with her son to Valerio in Long Island.  (*Fatico* Hr'g Tr. 13:1-10, Sept. 26, 2016.)

Davidse testified that the day that she and her son returned, the following occurred:

> He grabbed me and he pushed me down on[to] a suede couch that he had in the lounge and pushed my face down in the pillow and started ripping my clothes off. Oh, you like attention?  I'll show you who is in charge. He very aggressively had his way with me and he tore my clothes[,] and when he was done with me he got up and walked away and he left me there.  I gathered my clothes and I was crying.
>
>      . . . I didn't know how to react, how to confront him, what to do.

(*Fatico* Hr'g Tr. 14:8-15, Sept. 26, 2016.)

On direct examination, the Government asked Davidse, "Did you tell anyone about this incident?" "No," she answered (*Fatico* Hr'g Tr. 14:22-25, Sept. 26, 2016), explaining:

> I'm supposed to be an educated woman who should know better.  If someone treats me badly, why wouldn't I leave, and I was embarrassed.  I felt embarrassed that I didn't make a proper decision, but I also didn't know what else to do.

> There's some things I can't explain, but I was
> ashamed to tell people what was happening to me.   I
> didn't want them to think badly of me[,] or [H]ow could
> she let this happen?   Why doesn't she leave?   I thought
> nobody would understand.

(*Fatico* Hr'g Tr. 15:4-13, Sept. 26, 2016.)

Indeed, it *is* difficult to understand.   Unless, of course, Davidse had an

ulterior motive for not "leav[ing]."

On cross-examination, Davidse denied that she was looking for an American

man.   (*Fatico* Hr'g Tr. 49:21-22, Sept. 26, 2016.)   But Valerio was the first

American man she met, and upon meeting him she moved in with him (*Fatico* Hr'g

Tr. 49:23-24, Sept. 26, 2016), an objectively risky course to take for a well-

educated woman.   And in "about July 2008, [she] fell pregnant" from the man who,

she alleged, had mistreated her.   (*Fatico* Hr'g Tr. 17:10-13, Sept. 26, 2016.)

A few months later, Davidse testified, she "asked [Valerio] if [she] could

please go see [her] mother again."   According to Davidse, Valerio "began to

complain, saying that "if [she] was missing [her] family, it was [her] tough luck."

(*Fatico* Hr'g Tr. 17:16-21, Sept. 26, 2016.)

"[E]ventually [Valerio] agreed," Davidse testified.   (*Fatico* Hr'g Tr. 17:22-

24 , Sept. 26, 2016.)   According to Davidse:

> He said to me I could go[,] but he made it very clear to
> me if I did not come back he was going to fetch me, send
> somebody after me and he would do me in, and I had to

14

make sure that I was going to come back or he was going
to hurt me.

(*Fatico* Hr'g Tr. 17:24-18:3, Sept. 26, 2016.)  Davidse went to South Africa, she
returned to Valerio's house in Long Island "before Christmas" of 2008, and gave
birth to Alexa "in April of 2009." (*Fatico* Hr'g Tr. 18:6-20, Sept. 26, 2016.)

After Davidse returned, "[She] found [that] . . . the abuse got worse."
According to Davidse, "[Valerio] would say things to me like why don't you get an
abortion, or why don't you fall downstairs and die."  (*Fatico* Hr'g Tr. 19:21-23,
Sept. 26, 2016.)  Davidse testified:

> I remember two incidents.  One was when I was
> seven months pregnant where he was sleeping in the
> spare room because I wasn't having sex with him and that
> frustrated him[,] and he came into the room one night and
> [ripped the] covers off and started to scream obscenities
> and went back to the spare room.  So I followed him to
> try to speak with him.  I got back into the room, and I
> don't recall what was said, but he got up and slapped me
> across the face[.]  I fell to the floor and I split the inside
> of my lip open . . . .
>
> There was an incident a month thereafter where I
> was sleeping[,] and he came into the room and . . .
> climbed on top of me and tried to force me to have sex
> with him[,] and I asked him to stop and I was crying,
> telling him to please stop[,] and he had his hand on my
> throat choking me and started punching me and hitting
> me.  I told him to stop and eventually he stopped and got
> off me and left the room.  *I didn't know what to do* about
> that.  I was scared.  So I just stayed in the room.

(*Fatico* Hr'g Sept. 26 Tr. 19:24-20:18, Sept, 26, 2016) (emphasis added).

Viewing things objectively, a well-educated woman like Davidse *would* have known what to do if what she said had happened actually had happened. Indeed, a few months after she gave birth to Alexa, as Davidse tried to sit in a chair, Valerio pulled the chair from under her, causing her to fall, after which she called 9-1-1" (*Fatico* Hr'g Tr. 22:9-23:6, Sept. 26, 2016.)

Two police officers responded. According to Davidse:

> I let the police into the door and I went into the kitchen with him, and Joe came into the kitchen. We were all standing there together.
>
> . . . [O]ne [officer] never said a word . . . . [T]he other one . . . did all the talking.
>
> He asked me what is the problem? . . . I said well, I was afraid that our argument was going to escalate into something worse, which it did.

(*Fatico* Hr'g Tr. 23:18-19:2, Sept. 26, 2016.)

According to Davidse, "[T]he policeman said you probably provoked it and did you make him do something that made him angry. I was stunned." (*Fatico* Hr'g Tr. 24:3-5, Sept. 26, 2016.)

Davidse's account is not credible. This was the year 2009, not 1909, and the Suffolk County police officers who responded to Davidse's 9-1-1 call are presumed to have acted professionally. And the Government's decision not to subpoena either of the officers supports the presumption that the officers did act professionally and that Davidse's testimony did not meet the preponderance

16

standard of proof that it must meet for the Court to accept that testimony as true.

Because Davidse thereafter went to a women's shelter for a "[c]ouple weeks at most" (*Fatico* Hr'g Tr. 27:1-28:16, Sept. 26, 2016), *something* did happen.  It just probably did not happen the way that she described in her testimony.

Davidse went back to South Africa.  She did not stay there.  Instead, she returned to Valerio, again, on what "was now [her] third trip." (*Fatico* Hr'g Tr. 24:23-25, Sept. 26, 2016.)  This time, according to Davidse, there was an occasion in which Valerio took her and Alexa for a drive, "pulled over into this dark parking area," and told her, "[T]his is a nice dark place to leave you.  Tonight you are going to die." (*Fatico* Hr'g Tr. 25:9-26:5, Sept. 26, 2016.)  According to Davidse:

> When he stopped the car I opened up my seat belt and jumped out.  I didn't know where I was going to run to but I had to leave.  I went to the back of the car to open the door for my daughter[,] and as I was doing that the front door of the car was open[,] and the car door knocked me over and I fell into the ground . . . . I stood up and I saw the car reverting towards me, and I looked over to my right[,] and I saw there was a car parked in the bushes and the back lights were very dim so I thought somebody was in the car and I started screaming for help.
>
> Joe came and he had put his hand on my mouth.  Just shut up, shut up.  He threw me in the front of the car, closed the door, and he got in the car and he drove off.

(*Fatico* Hr'g Tr. 26:7-21, Sept. 26, 2016.)

No one from the "car parked in the bushes" with the dim lights noticed.  Maybe that is because the incident, as Davidse described it, did not occur.

17

Davidse testified about two additional incidents. The first one, Davidse stated, had occurred en route to, and in, in a "beach area" parking lot. (*Fatico* Hr'g Tr. 31:8-32:12, Sept. 26, 2016.) According to Davidse:

> [W]hile we were driving there, . . . he grabbed my hair. I was wearing my hair down, and he grabbed a handful of my hair[,] and he was screaming at me and insulting me and smashing my head on the dashboard and wouldn't stop and pulled out hand[fuls] of my hair.
>
> When we got to the beach area he let go and came out and came around to my side of the car and ripped my dress to pieces. I was wear stockings at the time[,] and he ripped those and raped me. He was screaming at me as he was doing that. I was crying and when he was done I just gathered my dress and coat and scrambled back into the vehicle[,] and he went around to the front side of the car where the driver's side is and he just sat there for a good five minutes, said nothing. He started the car and we drove home.

(*Fatico* Hr'g Tr. 32:14-33:3, Sept. 26, 2016.)

And still the well-educated Davidse stayed with Valerio.

It would take yet another incident, Davidse testified, before she concluded that things weren't going to work out with Valerio. According to Davidse, the following occurred when she opened the door to Valerio's home office to bring him something to eat or to drink:

> [H]e put his hand around my throat and started choking me. I said you're choking me. He said something to me, and I remember saying you are behaving with an animal.

The next thing I remember I was . . . on the floor face down . . . . And he was sitting next to me saying, owe, God, what have I done.  What have I done.

. . . .

He [had] punched me in my face and I lost consciousness[,]  and I felt pain in my mouth. . . . He had punched my teeth into my mouth.  They were broken.

. . . .

The next morning, I said, please, I need to go to see a dentist.  He said okay.  He said to me, let me make it clear to you, if you tell somebody what happened and if I go to prison for what I did, I'll get out and I'll kill you.  He said . . . you will tell them that you were playing with the children in the house and somebody was waiting around the corner with a baseball bat and accidentally hit you in the face.  That's what I did.

. . . [T]he dentist . . . couldn't help me. . . .

So [the dentist] referred me to a surgeon . . . [,] and we went there, and Joe gave me a blank check and said to me, just get your teeth fixed.  So the surgeon helped, put some kind of brace on, pushed the teeth back in for me, and I went into the reception to write out the check and said it would cost $2,000.  So I told Joe, to let him know[,] and he said that's a lot of money, I'm not paying that to fix your face, and I wrote the check out anyway and I gave her the check, and then I went home.

. . . .

My teeth have never been the same. I'm been struggling with episodes where I would have to be on antibiotics medication and I've asked, you know, Joe and his mom to please help to fix my teeth properly because my dentist said I need root canals done and crowns on

19

> my teeth, otherwise the problem will never go away.  It
> was very expensive[,] and I never had that done.  That
> was the point I realized if I didn't leave I didn't know
> what would happen to me next.
>
> I had to think about my children.  If something
> happened to me, they will be left without a mother.
>
> . . . .
>
> I felt the best option was to go home with my
> child, which I did.

(*Fatico* Hr'g Tr. 33:20-36:23, Sept. 26, 2016.)

## Lucy Down

Lucy Down testified that she is an au pair and that she resides in England. She testified that there came a time when she communicated with Valerio, by email, about becoming an au pair in his household.   According to Down, in September 2012, she and Valerio spoke via Skype.  (*Fatico* Hr'g Tr. 8:5-6, 9:11-19, 10-21-25, 11:6-9, 14:3-10, July 25, 2016.)   In their Skype exchange, Down testified, the following took place:

> A    We discussed like my upbringing, where I live,
> regarding myself.
>
> I asked him questions regarding the
> daughter, the child care, what I would have to do,
> where he lives, information about the
> surroundings. . . .
>
> Q    You mentioned a daughter. Did Mr. Valerio tell
> you that he had a daughter?

A      Yes.

Q      What did Mr. Valerio say his daughter's name
       was?

A      Sylvia.

Q      Sylvia.  Did Mr. Valerio tell you what Sylvia's age
       was at that time?

A      I remember it being 8 years old.

(*Fatico* Hr'g Tr. 14:11-24, July 25, 2016.)

According to Down, Valerio also told her, "I would be looking after his

daughter.  Driving.  I would be able to drive the vehicle.  I would drive the vehicle

to various hobbies.  And weekends as well.  So I would be doing basic child care

for her."  (*Fatico* Hr'g Tr. 15:8-11, July 25, 2016.)

Down testified that she arrived at JFK Airport on October 22, 2012, after

which she went to the New Yorker hotel for a five-day orientation with other au

pairs.  (*Fatico* Hr'g Tr. 16:24-17:16, July 25, 2016.)   After the orientation period

ended, Valerio picked her up, in his car, from the hotel.  (*Fatico* Hr'g Tr. 18:2-5,

July 25, 2016.)  According to Down:

A      . . . [W]e were driving to get something to eat and
       he was asking about what I had done in the week
       regarding orientation.

       . . . .

Q      What . . . did Mr. Valerio tell you about Sylvia,
       during that car trip?

21

A      That she wasn't his child.

       . . . .

Q      And what did you say or how did you react to that?

A      I was shocked, because I was wondering why I was there for.

Q      Did you ask him that?

A      Yes.

Q      What did he say?

A      He said that he would explain further when we got back to, when we were done with our meal, but he needed someone at the house. . . .

(*Fatico* Hr'g Tr. 18:82-19:4, July 25, 2016.)

Down continued:

A      So we went back to his house. It was quite late at night, I remember. . . . Took my bags straight upstairs into, he showed me where my bedroom would be, and so I put my bags in there.

              He then offered me a drink.  So I went back downstairs, into a media room, I guess.

              . . . .

Q      What happened next?

A      So I went downstairs, got a drink, and I sat in the media room.  And then Mr. Valerio came in.

Q      How was he dressed?

22

> A    He was . . . in boxers and a wife beater tank top.
>
> Q    What happened after that?
>
> A    So he sat next to me. And I sat there for about five
>       minutes and then I wanted to go to bed.

(*Fatico* Hr'g Tr. 19:15-20, 21:17-22:7, July 25, 2016.)

In response to the government's question whether "Valerio [had] touched her in any way," Down answered, "Yes, like various trying to touch my hand. Just trying to, but just touched my hand." (*Fatico* Hr'g Tr. 22:1-4, July 25, 2016.)

Down went to her room and made plans to leave.  At one point, Valerio entered her room and asked her what was wrong.  Valerio found out that she was leaving.  "He was acting quite shocked and just asking questions and telling me to grow up, quite aggressively," Down testified, "[s]aying various things like I could offer you such a lot of money. He's going into this sort of thing.  Storming around the house." (*Fatico* Hr'g Tr. 24:13-15, 25:5-8, 25:17-22, July 25, 2016.)

An au pair agency representative, Jolene Leonardo, came to Valerio's house to get Down.  According to Down, "[Leonardo] tried to ask Mr. Valerio what went on . . . . And he said I'm not answering anything, and just slammed the door." (*Fatico* Hr'g Tr. 26:8-12, July 25, 2016.)

Valerio did not try to touch Down anywhere but on her hand.  Nor, after she went to bed, did he try to enter her room  (*Fatico* Hr'g Tr. 49:2-4, 49:13-14, 50:11-

15.)  In short, he did nothing illegal.

## THE SENTENCING MITIGATION HEARING

On March 6, 2017, the Court heard from two mental-health experts: Alexander Sasha Bardey, a forensic psychiatrist, and Maura Gordon, a psychotherapist.  Bardey's testimony focused on Valerio.  Gordon's testimony centered on Valerio's sister, Bernadette Imperiale.

### Dr. Bardey's Testimony

Dr. Bardey's testimony followed his December 7, 2016, report, "Forensic-Psychiatric Evaluation."  Valerio did not order the hearing transcript, but a copy of Dr. Bardey's report is attached to this memorandum as Exhibit 1.

Dr. Bardey "performed a psychiatric and psychosexual evaluation of Joseph Valerio as an aide in sentencing with a specific eye towards assessing what impact, if any, Mr. Valerio's childhood had on his emotional and psychological development, especially as it relates to the offense conduct."  Dr. Bardey examined Valerio at "the Metropolitan Detention Center . . . on December 3, 2014, February 2, 2915, March 20, 2015, June 5, 2015, June 25, 2015[,] and most recently November 9, 2016."  (Report 1.)  "In conducting this psychiatric examination, which consisted of a comprehensive psychiatric assessment, psychosexual evaluation, and a risk assessment, [Dr. Bardey] reviewed [Valerio's] personal, social, educational, vocation, sexual and psychiatric histories, and . . . [Valerio's]

understanding of the circumstances that led to his legal troubles.  [Dr. Bardey]

performed a mental status examination in order to assess [Valerio's] intelligence,

thought processes, cognitive functioning, memory, credibility, orientation,

judgment, insight, and impulse control."  (Report 1.)

In his earlier sessions with Valerio, Dr. Bardey said that Valerio . . .

discussed his involvement in the offense . . . with little shame or remorse," and that

Valerio was "attempting to minimize or lessen the severity of his actions or their

consequences."  But, Dr. Bardey notes, "Most recently, Mr. Valerio was apologetic

and tearful when discussing his offense conduct and became agitated, nearing

aggression, when discussing the details of his past abuse, evidencing the recent

linkage between the offense conduct and his past sexual and physical abuse."

(Report 13.)  Dr. Bardey writes:

> During my initial evaluations of Mr. Valerio he
> evidenced little insight into the maladaptive nature of his
> involvement in the instant offense[.  H]owever, more
> recently[,] he presents as an individual who is connecting
> the dots, so to speak, between his traumatic past and the
> influence on his deviant sexual behaviors.  He discussed
> more openly, with insight, the etiology of his distorted
> view of women and their relation to sex.

(Report 13.)

In the "Diagnosis and Formulation" portion of his report, Dr. Bardey opined

that Valerio suffers from "Voyeuristic Disorder," "Frotteuristic Disorder,

"Antisocial Personality Traits" and "Alcohol Use Disorder," which is in

25

"Institutional Remission," and "Cocaine Use Disorder," which is also in "Institutional Remission." (Report 13.)

*Valerio's Childhood—It Wasn't Good*

According to Dr. Bardey:

> Mr. Valerio is a 49-year-old Italian male with no significant prior psychiatric history. His early years are notable for having been raised in an abusive household. Significantly, he witnessed the physical abuse of his mother by his father, the sexual abuse of his sister by their father, and his own sexual victimization by his father, including repeated instances of anal rape, from the age of 5 until 11.

> As a direct result of this abuse, Mr. Valerio was sexualized at a very young age, impacting his psychosexual development; he ultimately grew to experience hypersexual feelings and behaviors as a direct result of the abuse he was victim of.

(Report 13.)

*History Repeats Itself*

According to Dr. Bardey, "The repeated abuse Mr. Valerio repeatedly experienced as a child molded his sexual behaviors as an adult. Various sexual behaviors, considered taboo to most individuals, became 'normal' for Mr. Valerio and thus propelled him into his past and current sexual behaviors." (Report 14.)

Dr. Bardey observes:

> It is not unusual for a young male, once abused and repeatedly sexualized by his father, to develop inappropriate and distorted outlooks on sexual behaviors.

26

> Mr. Valerio lacked the guiding, safe, nurturing, and
> consistent upbringing to develop normally emotionally,
> socially, and sexually.   Instead, he developed
> maladaptive sexual interests, though through no fault on
> his own.  He was raised by a very dictatorial, sexually
> depraved, misogynistic, and abusive father, who
> terrorized his family sexually, emotionally, and
> physically.  The father demanded his family's approval,
> fear, respect, and sexual subjugation.   Despite being
> abused, Mr. Valerio was forced to strive for his father's
> approval and acceptance for much of his childhood and
> young adulthood, fearing physical repercussions and
> abuse.

(Report 14.)

"As a result" of the above, Dr. Bardey observes, "Mr. Valerio grew angry,

resentful, and self-loathing.   His view of interpersonal relationship became

modeled on what he had seen his father do.  This fueled his desire to displace his

authority through acts of sexual aggression, thus repeating the cycle of abuse

perpetuated by his father.  Mr. Valerio unfortunately learned to use sexual and

aggressive behaviors as outlets for his negative feelings, as his father had before

him."  (Report 14.)

"In parallel," Dr. Bardey opines, "Mr. Valerio, as a child, grew to hate and

resent his mother for not protecting him from the abuse the father was wielding,"

an "anger [that] turned to rage as he grew older and the abuse persisted."  Sadly,

"[t]his rage then expanded to include all women and has thus colored his ongoing

relationships with important women in his life, something he now very much

27

regrets as he comes to terms with it." (Report 14.) According to Dr. Bardey:

> He recalled blaming his mother for the years of sexual abuse he endured at the hands of his own father, causing him feelings of abandonment and helplessness that he vowed never to experience again, resulting in his dominating personality in regards to his sexual activities. When this anger at women was then combined with the sexually depraved behavior his father had inculcated into him, he grew to believe that a woman was merely a sexual object. In the end, Mr. Valerio's interactions with women appear to be modeled after the hostile and tumultuous relationship between his parents, growing up believing it is acceptable, normal even, to physically and sexually abuse a significant other.

(Report 14.)

Dr. Bardey notes "the correlation between experiencing physical abuse as a child and continuing on to commit a sexual offense," and that "males who experience [only] physical abuse, as Mr. Valerio did, are at an increased risk to commit sexual offenses." (Report 14-15.) But, Dr. Bardey notes, "Mr. Valerio possessed another propensity to engage in sexual offenses[,] as cited in current research[—]the existence of childhood *sexual* abuse." In Dr. Bardey's opinion, "The presence, and persistence into adulthood, of symptoms of depression, anxiety, substance abuse and sexual dysfunction, all of which are well documented in Mr. Valerio's history, are associated with childhood sexual abuse." (Report 15.)

*Valerio Was Not Born This Way*

According to Dr. Bardey, "Mr. Valerio was not born with an antisocial

28

personality or characteristics that left him susceptible to commit such heinous sexual acts[.   O]n the contrary, Mr. Valerio was turned into a sexual offender through years of horrible acts of sexual and physical abuse at the hands of his father." (Report 15.)

*Alcohol and Cocaine Abuse*

"In addition to arrested and distorted psychosexual development," Dr. Bardey notes, "Mr. Valerio developed symptoms of anxiety and low self-esteem, which he self-medicated with various substances of abuse, usually alcohol and cocaine, which is not uncommon for victims of serial sexual abuse, as described previously in recent research."   Substance abuse, in turn, contributed to the "develop[ment of] deviant sexual behaviors along two lines."   (Report 15.) According to Dr. Bardey:

> [Valerio] developed and has engaged in repeated instances of Frottage, as evidenced by his prior arrest, but also by his self-reported interest in the activity.  He also developed an interest in Voyeurism, both in terms of viewing real females, but also through the videotaping of women without their knowledge, or by viewing videos that he had made during sexual activity, or as requested, as in the instant offense.

(Report 15.)

*Valerio is Not a Pedophile*

According to Dr. Bardey, "Mr. Valerio's psychosexual texting revealed that Mr. Valerio is sexually attracted to adolescent and adult women.  This profile, in

light of his history, does not support a diagnosis of pedophilia." "On the contrary," Dr. Bardey observes, "those categories of sexual interest are considered normal in adult, heterosexual males." (Report 15.) Thus, Dr. Bardey writes, "*In my opinion, Mr. Valerio is not a pedophile*." (Report 15) (emphasis added).

Notwithstanding Valerio's crimes, it is unsurprising that, according to Dr. Bardey, "[Valerio] does not have an interest in having sex with minors." (Report 15.) After all, this is not a case in which the defendant has accumulated or has traded hundreds or even thousands of pictures or videos involving child pornography. Instead, as Dr. Bardey notes, "[Valerio's] offense conduct was driven by his voyeuristic needs and his hypersexual nature, rather than a specific interest in having sex with minors." (Report 15.)

*Future Dangerousness*

The Court must protect the community. Thus, "[i]n assessing Mr. Valerio's risk of dangerousness to the community," Dr. Bardey "considered a number of psychological features and historical data." (Report 15.) According to Dr. Bardey:

> In Mr. Valerio's case, the presence of manipulative, impulsive, and antisocial personality traits place him in the moderate risk of dangerousness and risk of re-offending. In addition, the presence of a history of substance abuse, of legal entanglements, of impulsive acting-out, and of interpersonal chaos further aggravates his risk of endangering others. This finding is corroborated by the actuarial risk-assessment tools used.

(Report 15.)

30

"On the other hand," Dr. Bardey observes, "Mr. Valerio's capacity to sustain an intimate relationship with his family members, as well as his ability to sustain himself professionally[,] speak to his capacity and desire to maintain legitimate relationships, [and] are mitigating of his dangerousness." (Report 16.)

Valerio's evolution in his sessions with Dr. Bardey is also a positive sign. In the earlier sessions, Valerio's "behavior appeared *ego-syntonic,* i.e. not disturbing to himself. In other words, he was not deeply troubled by this aspect of his sexuality and was not motivated to deal with it." (Report 16.) But "[t]hat has evolved over time." According to Dr. Bardey:

> Presently, in my recent reevaluation of Mr. Valerio, he manifested significant remorse and guilt. As such, his offense conduct is becoming *ego-dystonic,* i.e. uncomfortable for him. This internal conflict heralds the presence of an internal motivation to change. This is a good prognostic factor in assessing Mr. Valerio's receptivity to sexual offender treatment. A successful bout of such treatment would decrease the chance of recidivism and increase the likelihood of success for treatment. As evidenced through his recent improvement of insight into his past behaviors, *Mr. Valerio is a good candidate for treatment in a sex offender program, as he has displayed awareness of the importance of overcoming the impact of his own past sexual victimization.*

(Report 16) (emphasis added).

*Dr. Bardey Sums it Up*

According to Dr. Bardey, "Though Mr. Valerio still has much therapeutic

31

work to do to truly understand the psychological underpinnings of his actions and his underlying personality and substance-abuse issues, the Court may choose to consider his difficult early life and specifically the years of brutal sexual abuse he suffered as a child during important formative years as mitigating factors in meting out an appropriate sentence for Mr. Valerio." Dr. Bardey notes, "Mr. Valerio did not choose to be victimized or to see his normal psychological and psychosexual development be derailed by a monstrous father. The sexual trauma he suffered had a significant impact on his sexual behavior and attitudes and impacted on the degree to which he could freely choose his sexual outlets." In Dr. Bardey's opinion, "[Valerio's] free will was influenced by his early experiences and should warrant consideration by the Court at sentencing." (Report 16.)

**Maura Gordon's Testimony**

Dr. Bardey included, in his report of Valerio, Maura Gordon's evaluation of Valerio's sister, Bernadette Imperiale. (Report 8-9.) Ms. Gordon noted that "Mr. Valerio's reported upbringing was corroborated in that Ms. Imperiale detailed the physical abuse Mr. Valerio was subjected to during his developmental years." (Report 8.) And Imperiale suffered at least as much as her brother did:

> Ms. Imperiale detailed the sexual abuse, beginning at age five and continued to age eight or nine years old. As indicated in the report, she stated that Mr. Valerio's father would enter her room late at night and began with penetrating her with his fingers and progressed to sexual intercourse. She described crying herself to sleep at

night as a result of the traumatic abuse. She added that her father began physically abusing her by hitting her in the back of her head, he was frequently "putting me down, he would tell me I was stupid."

(Report 8.)

## SENTENCING CONSIDERATIONS

### The 3553(a) Factors

These are the 3553(a) factors that the Court must consider:

(1)    the nature and circumstances of the offense and the history and characteristics of the defendant;

(2)    the need for the sentence imposed —

(A)  to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B)  to afford adequate deterrence . . . ;

(C)  to protect the public . . . ; and

(D)  to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment . . . ;

(3)    the kinds of sentences available;

(4)    the kinds of sentence and the sentencing range established for —

(A)  the applicable category of offense committed by the applicable category of defendant as set forth in the [sentencing] guidelines —

. . . .

33

(5)    any pertinent policy statement —

    (A)  issued by the Sentencing Commission . . . .

        . . . .

(6)    the need to avoid unwarranted sentence disparities among defendants with similar records.

18 U.S.C. § 3553(a).

**The History and Characteristics of the Defendant**

In the "diagnosis and formulation" section of his report, Dr. Bardey concluded that Valerio suffers from "voyeuristic disorder" and "frotteuristic disorder" and that Valerio has "antisocial personality traits."   (Report 13.) According to Dr. Bardey, "[Valerio's] early years are notable for having been raised in an abusive household.  Significantly, he witnessed the physical abuse of his mother by his father, the sexual abuse of his sister by their father, and his own sexual victimization by his father, including repeated instances of anal rape, from the age of 5 until 11."  (Report 13.)  "As a direct result of this abuse," Dr. Bardey states, "Valerio was sexualized at a very young age, impacting his psychosexual development; he ultimately grew to experience hypersexual feelings and behaviors as a direct result of the abuse he was victim of."  Dr. Bardey concludes, "The repeated abuse Mr. Valerio repeatedly experienced as a child molded his sexual behaviors as an adult.  Various sexual behaviors, considered taboo to most

34

individuals, became 'normal' for Mr. Valerio and thus propelled him into his past and current sexual behaviors." (Report 13-14.)

According to Dr. Bardey, Valerio's dysfunctional adult behavior was not something that Valerio was born with. Dr. Bardey observes:

> Mr. Valerio was not born with an antisocial personality or characteristics that left him susceptible to commit such heinous sexual acts[. O]n the contrary, Mr. Valerio was turned into a sexual offender through years of horrible acts of sexual and physical abuse at the hands of his father.

(Report 15.)

Dr. Bardey explains how the childhood abuse, and Valerio's failed attempts to deal with the abuse—self-medicating with alcohol and cocaine—affected him. Nevertheless, despite Valerio's having engaged in Frottage and developing an interest in Voyeurism, it is Dr. Bardey's opinion that Valerio is not a pedophile. According to Dr. Bardey, "[Valerio's] offense conduct was driven by his voyeuristic needs and his hypersexual nature, rather than a specific interest in having sex with minors." (Report 15.)

Valerio's mother, Frances Valerio, has written a letter to the Court. (*See* Ex. 2.) Frances is "lost" without her son, Joseph, who used to "take care of everything for [her.]." There is no one to take her son's place: "[Her] daughter is legally blind, her [daughter's] husband has to help her & his mom." (Ex. 2, at 1.) She hopes, probably unrealistically, that she will live to see him released from prison.

**The Need for the Sentence Imposed**
**(A) to Reflect the Seriousness of the Offense,**
**to Promote Respect for the Law, and to Provide**
**Just Punishment for the Offense; (B) to Afford**
**Adequate Deterrence . . . ; [and] (C)  to Protect the Public**

"In assessing Mr. Valerio's risk of dangerousness to the community," Dr. Bardey "considered a number of psychological features and historical data." According to Dr. Bardey, "[T]he presence of manipulative, impulsive, and antisocial personality traits place [Valerio] in the moderate risk of dangerousness and risk of re-offending.  In addition, the presence of a history of substance abuse, of legal entanglements, of impulsive acting-out, and of interpersonal chaos further aggravates his risk of endangering others." (Report 15.)

"On the other hand," Dr. Bardey opines, "Mr. Valerio's capacity to sustain an intimate relationship with his family members, as well as his ability to sustain himself professionally[,] speak to his capacity and desire to maintain legitimate relationships . . . [and] are mitigating of his dangerousness."    Dr. Bardey is also of the view that although Valerio initially did not appreciate the seriousness of his conduct, he has made progress, and he wants to change.  (Report at 16.)

**The Sentencing Guidelines**

Valerio's total-offense level is 47 (PSR ¶ 68), and his guideline-imprisonment "range" is life (PSR ¶ 118).  The probation department's sentencing

recommendation is 40 years.  (*See* Probation Dep't Sentencing Recommendation of Mar. 4, 2016, at 1.)

**The Need to Avoid Unwarranted Sentence Disparities Among Defendants With Similar Records**

Valerio committed serious crimes.  But so have other defendants who have been convicted in the Eastern District of New York.  The sentences that they received are instructive.

In *United States v. Wernick*, a jury convicted Wernick of "persuading, inducing and enticing minors to engage in sexual activity."  *United States v. Wernick*, 691 F.2d 108, 110 (2d Cir. 2012).  Specifically, in one episode "Wernick met a male 14-year-old online and eventually persuaded him to meet in person several times to engage in oral and anal sex," in another episode Wernick was "involv[ed with] a male 16-year-old," there were additional "instances of Wernick's sexual conduct with two male 15-year-olds and attempted sexual conduct with respect to another male teenager," and there was "evidence . . . documenting Wernick's efforts to molest four young children, all age five or younger."  *Id.* at 111.  United States District Judge Denis R. Hurley sentenced Wernick to 25 years' imprisonment, to be followed by a period of three years' supervised release.  Corrected Amended Judgment, *United States v. Wernick*, No. 03-CR-189 (May 27, 2015), ECF No. 231.

Recently, United States District Judge Pamela K. Chen sentenced Alberto Randazzo to 28 years' imprisonment, to be followed by eight years' supervised release.   Minute Entry, Sentencing of Alberto Randazzo, *United States v. Randazzo*, 14-CR-189 (Apr. 19, 2017).   In its sentencing letter, the government set forth the following:

> [Randazzo] pleaded guilty to two counts of conspiracy to sexually exploit a child and one count of receiving child pornography. . . .
>
> . . . His then-girlfriend discover[ed] text messages on the defendant's cell phone[,] in which he expressed a desire to have sex with a woman on her child's bed.  She had also discovered that the defendant's emails contained homemade child pornography, including images of a woman performing oral sex on a male infant and a woman performing oral sex on a female infant. . . . For example, he confessed to being sexually attracted to mothers performing sex acts on their children, and he told his girlfriend that an eight-year-old girl who was at a party they had attended together had aroused him by opening her mouth and flirting with him.  The defendant also told her that he wanted to have children with her who they could sexually abuse together.  For example he wrote, "Not only do I want to fuck you while you are breastfeeding our little girl.  I want to pull out and cum on your tits.  Then make her continue sucking with my cum on your nipples[,]" and "I want to teach our son how to fuck you with a dildo!"
>
> . . . [On] the defendant's computer and cellular telephones, law enforcement discovered child pornography images and videos and numerous communications with women in which Randazzo solicited them to sexually abuse children to whom they had access. . . .

38

. . . [T]he defendant was arraigned on state charges[,] including Promotion of a Sexual Performance by a Child Less Than 17[,] and was granted bail. . . . [W]hile he was out on bail, the defendant . . . was downloading child pornography . . . .

. . . There are sufficient facts to prove that at least five women went beyond having sexual conversations with the defendant and agreed to sexually abuse children for the defendant, either by performing sexual acts or simulating sexual acts:

> Keira Norton (co-conspirator in Count 1 of conviction)—. . . [T]he defendant and Norton began participating in Skype video calls in which Norton touched an infant sexually at the defendant's direction. The defendant taped those video calls with his iPhone . . . . On those videos Norton can be seen masturbating herself with the victim's body (while he was wearing only a diaper), displaying the victim's naked genitals to the defendant and simulating oral sex on the victim. Throughout the videos the defendant can be heard directing Norton to stroke the victim's penis, speak "dirty" to him and perform oral sex on him. Randazzo can also be heard masturbating on these calls and made clear he was filming. At one point he said, "When I'm ready to come, I'll put the camera down."

> Lori Bauer—. . . Bauer sent the defendant at least four videos in which she sexually abused a three-year-old at the defendant's direction. In one of the videos the victim is nude from the waist down and rubbing his genitals on Bauer's genitals, which are

39

covered only by underwear.  In two other videos, the victim's penis is visible and he rubs it on Bauer's buttocks. . . .

Jennie Lemay—. . . [T]he defendant and Lemay prearranged Skype video calls [in which] they planned to have Lemay sexually abuse an eight-year-old while the defendant watched.  Although the government is not in possession of videos of those calls, the defendant and Lemay engaged in a real-time exchange of messages while they were on some of the video calls.  These exchanges reveal that during at least one video session Lemay attempted to simulate performing oral sex on the victim using a popsicle.  When the victim refused to cooperate, the defendant got frustrated and wanted her to continue trying.  In a post-arrest statement, Lemay also confessed to simulating sexual intercourse with the victim over Skype and touching his penis over his underwear.  The defendant . . . also . . . discussed meeting in person. . . .

. . . [T]he defendant and Lemay met in a hotel room with the victim and gave him Ambien and alcohol so that Lemay could sexually abuse the victim while Randazzo filmed it.  Prior to the meeting the defendant and Lemay had discussed medicating him so that he would sleep through any sexual abuse.  In her post-arrest statement she acknowledged bringing the victim to the hotel and giving him Ambien and alcohol, and she also said that the defendant brought a camcorder to the hotel.  While Lemay currently maintains that no sexual abuse actually took place at the hotel, the victim has been forensically interviewed and

40

remembers going to a hotel room with Lemay and a man, being drugged and waking up wearing different pants than he had gone to sleep wearing.

Leigh Marcini (co-conspirator in Count 3 of conviction)—. . . [T]he defendant and Marcini engaged in sexually explicit chats discussing her sexual abuse of a two-year-old. Among other things, the defendant told Marcini that he wanted her to "suck his little cock." Throughout their exchanges, the defendant and Marcini discussed sexually explicit pictures she had taken of the victim and sexually explicit pictures she would try and take in the future. . . . [T]he defendant and Marcini discussed a plan to meet at a hotel with the victim. . . . Marcini has told the government that she did meet with the defendant in a hotel room and that she and the defendant had sexual intercourse while the victim was in the room and that she performed oral sex on the victim as well.

Andreana Winters—. . . [The] defendant solicited pictures and a video of Winters performing oral sex on an infant.

Government's Sentencing Letter in *United States v. Randazzo*, 1-5, No. 14-CR-189, Apr. 5, 2017, ECF No. 138.

What Valerio did was not good. What Wernick did was worse. What Randazzo did was a lot worse. And unlike Valerio, Randazzo, according to the government, "lived a privileged life." Government's Sentencing Letter in *United States v. Randazzo* 9.

41

## CONCLUSION

An imprisonment term of 28 years, which Randazzo received, would be too high.  An imprisonment term of 25 years, which Wernick received, would also be too high.  As advocates, counsel must ask for a sentence of 15 years.  But we do so while requesting a lifetime period of supervised release, which far exceeds the eight-year supervision period that Randazzo received or the three-year period that Wernick received.

Dated:       Hauppauge, New York
             April 25, 2017

                                              Respectfully,

                                              /s/
                                              Leonard Lato
                                              Anthony M. La Pinta

ec:    AUSAs Ameet B. Kabrawala & Allen L. Bode

       U.S.P.O. Lisa A. Langone