ALEXANDER SASHA BARDEY M.D.
FORENSIC AND CLINICAL PSYCHIATRY

# FORENSIC-PSYCHIATRIC EVALUATION

**JOSEPH VALERIO**
**Cr, No. 14-094 (S-2) (JFB))**

**December 7, 2016**

Anthony M. La Pinta, Esq.
Reynolds, Caronia, Gianelli & La Pinta, LLP.
35 Arkay Drive, Suite 200
Hauppauge, New York 11788

Dear Mr. La Pinta,

At your request, I performed a psychiatric and psychosexual evaluation of Joseph Valerio as an aide in sentencing with a specific eye towards assessing what impact, if any, Mr. Valerio's childhood had on his emotional and psychological development, especially as it relates to the offense conduct.

On November 2014, Mr. Valerio was found guilty at trial of all 15 counts he was charged with. Mr. Valerio was found guilty of inducing the production of child pornography, its transportation, its receipt, and of its possession.

Mr. Valerio was examined at the Metropolitan Detention Center located in Kings County, NY on December 3, 2014, February 2, 2915, March 20, 2015, June 5, 2015, June 25, 2015 and most recently November 9, 2016. In conducting this psychiatric examination, which consisted of a comprehensive psychiatric assessment, psychosexual evaluation, and a risk assessment, I reviewed his personal, social, educational, vocation, sexual and psychiatric histories, and I reviewed his understanding of the circumstances that led to his legal troubles. I performed a mental status examination in order to assess his intelligence, thought processes, cognitive functioning, memory, credibility, orientation, judgment, insight, and impulse control. The limits of confidentiality inherent to such an evaluation were explained to Mr. Valerio.

As part of my evaluation, I administered the *Abel Assessment for Sexual Interest-3* (AASI-3) for men, the STATIC-99R, the SVR-20, as well as completed the HCR-20. On May 27, 2015, I conducted a collateral interview with members of Mr. Valerio's family, including his sister, Bernadette Imperiale and his mother Frances Valerio, as

well as his uncle John Tusa, LCSW, and reviewed the following collateral sources of information in making my assessment:

1. The Criminal Complaint, dated 2/25/14
2. The Indictment, dated 2/26/14
3. The Superseding Indictment, dated 3/5/14
4. The Superseding Indictment, dated 4/9/15
5. Miscellaneous email correspondence
6. Records from Suffolk County Probation
7. MDC call log
8. Log of MDC money transfers
9. MDC visitor list
10. Affidavit in Support of Search Warrant, dated 1/27/14 and 2/10/14
11. Investigative Report (FD-302), dated 1/28/14
12. Grand Jury Transcript (redacted), dated 2/26/14
13. Presentence Investigation Report, dated 10/27/15
14. U.S. Probation Department Sentence Recommendation, dated 10/29/15
15. U.S. Probation Department Sentence Recommendation Revised, dated 3/4/16
16. U. S. District Court, Transcript of Proceedings, dated 7/25/16
17. U. S. District Court, Transcript of Fatico Hearing, dated 9/26/16
18. Psychological Examination of Bernadette Imperiale, dated 11/10/16

## PAST PERSONAL HISTORY

Mr. Joseph Valerio is a 50-year-old Italian-American male who was born on July 18, 1966 in New York. His father, Filippo Valerio, died in 2010 at the age of 74 as a result of complications secondary to his diabetes and cerebrovascular disease. His father was born in Italy and had immigrated to the U.S. in the 1920's. Mr. Valerio described his father as having come from poor conditions, "in the tenements on the lower east side," where life was difficult. He had been a diamond setter in Queens, New York, then worked as a jeweler in Massapequa, New York. He then was offered a partnership in a pizzeria in Long Island, New York where he worked long hours, often coming home at one or two o'clock in the morning. He added that his father experienced physical and verbal abuse from his own parents while growing up in Italy. Mr. Valerio characterized his father as "the dictator," in that he was physically, emotionally, and sexually abusive of his wife and children. He also reported that his father frequently abused alcohol.

His 71 year-old mother, Frances Valerio, currently resides in Massapequa, NY and is a homemaker. She is afflicted with various medical conditions, including hypertension, hyperlipidemia, end stage arthritis, and obesity. He indicated that his mother's role in their parents' relationship was a submissive one, compounded by not

only the physical abuse she was subjected to, but also the horrible sexual abuse her children experienced that she was powerless to stop.

Mr. Valerio has an older sister, Bernadette Imperiale, who is now 52 years old. She is married with two children and also resides in Massapequa, New York. Mr. Valerio described the relationship with his sister as close.

Mr. Valerio related that his mother was victim of both physical and emotional abuse at the hands of his father, Mr. Valerio, frequently witnessing his father yell and degrade his mother, and even being forced to witness his father physically abuse his mother. In addition to the abuse enacted on his mother, Mr. Valerio's father was sexually abusive towards both him and his sister. Mr. Valerio recounted, and his sister corroborated, that his father would return home from working at the pizzeria, enter one of his children's rooms, get into bed with them, and sodomize them. Mr. Valerio recalled his father speaking to him in Italian during these horrific events saying, "It's like a zucchini." The abuse started when he was about five years old and continued until he was 10 or 11, occurring almost weekly. He recalled at times his mother would try to enter the room to prevent the abuse from persisting, however, his father would scream at her, often "get out bitch." If she succeeded in entering the room he would become physically aggressive with her, slapping and pushing her, as she pleaded with her husband to stop. Such aggressive sexual assaults occurred almost weekly for years. In addition, Mr. Valerio reported, while he was in the shower, his father would inappropriately touch Mr. Valerio's genitals and would often also be naked at the time. The sexual abuse continued until Mr. Valerio grew strong enough to resist his father's inappropriate sexual advances. Following this, his father sought sexual satisfaction from Mr. Valerio's sister, as she then became the victim of his father's sexual assaults, something he continues to endorse guilt for.

In addition to experiencing such horrific abuse, he indicated that his father was very controlling in the actions of his family and often refused to allow his family to be independent of him. He frequently made decisions for them, often refusing to allow them to eat and wear what they wanted. His father often beat both Mr. Valerio and his sister with belts and threatened them. As his father aged, his health deteriorated as well as his hearing, which often resulted in louder verbal altercations. As a result of loud arguments, their neighbors, who heard the arguments, offered a refuge to Mr. Valerio and his sister.

Although Mr. Valerio became strong enough to fight off his father's sexual abuse as a youth, the emotional and verbal abuse persisted well into Mr. Valerio's twenties.

Likely a result of the ongoing trauma he was experiencing, Mr. Valerio manifested delays in various areas of his developing appropriate speech and learning capacity. As a result, Mr. Valerio was diagnosed with Dyslexia and was held back

multiple years in school, as he was falling behind.

Mr. Valerio moved with his family to Long Island, New York, where he attended the Alfred G. Lockhard Elementary School from first through sixth grades. Mr. Valerio recalled experiencing such a strong attachment to his mother, bordering on the inappropriate, that he often dreaded, or even feared leaving her. In retrospect, during my evaluation, he reflected that the knowing that his mother was likely to be abused in his absence caused him to complain of feeling too sick to attend school in order to protect her, even at an early age.

Mr. Valerio reported while in school his grades were barely adequate, often only passable. He described himself as social, with "lots of friends." He described developing an early interest, or obsession, with sexualized behaviors, as he began to masturbate at 11 years old, arguably triggered by his father's early sexualization of him. Early and repeated exposure to sexual behavior can cause a child to normalize the experience and prevent it from being considered "taboo," as it would a normally developed individual.

Mr. Valerio then attended Aimes Junior High School for seventh and eighth grades. There, he began to experiment with marijuana and his interest in music and girls blossomed, which resulted in his poor academic performance. By the age of 12, Mr. Valerio began engaging in odd sexual behavior with females, which only progressed with age and experience.

Mr. Valerio attended Alfred G. Burner High School, graduating in 1985 with a high school diploma. By graduation, Mr. Valerio was introduced to alcohol and barbiturates, and soon after, he began abusing cocaine. Mr. Valerio was driven by the hallucinations brought on by the use of barbiturates and believed the experience improved his music, as he utilized music as an outlet to escape the abuse at home.

Following his graduation from high school, Mr. Valerio was in a better position to stand up to his father, both physically and emotionally, however, his father remained taller and heavier than he, allowing for his father to continue the physical assaults on Mr. Valerio. To harness his anger and resentment for his father, Mr. Valerio participated in hockey, adding that he frequently got into fights during games as a form of release, as he was still not able to fully protect himself and his mother from his father's abuse. He recalled often intervening during instances his father was physically assaultive towards his mother; one example he reported was when his father held his mother's throat or threated her with a knife. As the abuse continued, Mr. Valerio, seeking alternate means to protect himself and his mother, purchased a BB gun.

Mr. Valerio, feeling compelled by his father to do so, entered the family tile and marble business, working as part of the sales and delivery teams. He remained

employed with his family's business for a number of years. In 1988, at the age of 22, Mr. Valerio was involved in a motor vehicle accident while riding in a taxi and sustained a whiplash injury as a result. He was prescribed medication to alleviate his pain, but due to his psychological fragility and ongoing substance abuse, he soon became addicted. He ceased employment with his family's company as a result of the injury and received Worker's Compensation. Mr. Valerio, out of work, and experiencing ongoing pain and the sequelae of emotional and physical abuse, began to abuse alcohol more heavily, and soon grew depressed. He sought "treatment" from his uncle, Mr. John Tusa, who is a psychotherapist. He reportedly saw Mr. Tusa on a weekly basis and, with Mr. Tusa's assistance, worked toward overcoming his addiction to both alcohol and his prescription pain medications.

As Mr. Valerio worked to overcome one addiction, another quickly took its place. After he was injured and subsequently spent many hours at home alone, he began viewing and masturbating to adult pornography for up to several hours a day. His interests evolved to include various fetishes, not surprisingly, "S & M," and "Bondage." The extensive history of sexual abuse and being witness to physical abuse towards his mother blurred the boundaries between sex, violence, and normal interpersonal behaviors. He had never developed the normal boundaries and established the expected taboos and self-restrictions that he should have.

Over time, as he recovered from his neck injury, Mr. Valerio started a "credit repair" business. As the business began to flourish, thus occupying much of his time, the time he spent watching pornography waned. Mr. Valerio was able to save some money made through his credit repair business and bought various rental properties. Mr. Valerio then focused on earning his income from his real estate ventures.

Through the time of his real estate business his use of pornography ebbed and flowed. Whenever he became depressed or stressed his use would escalate, as would his general interest in sexual outlets. Mr. Valerio began frequenting sex clubs and even began hiring prostitutes; typically this sexually deviant behavior occurred simultaneously with an increase in cocaine and alcohol use. By 1990, Mr. Valerio reported, he was "heavy into drugs," with his drugs of choice being alcohol, marijuana, and cocaine. He related that his credit assistance business often put him in contact with bar and nightclub owners, which, during meetings with these clients, Mr. Valerio would often be offered cocaine and alcohol. As explained previously, Mr. Valerio has a predisposition to seek out unhealthy ways to cope with his abusive past, the introduction to these substances merely acted as a gateway to his addictions. This paved the way for his cocaine addiction, which frequently led to hypersexual behavior and the experimentation with odd sexual activity, as Mr. Valerio recalled, "a lot of S&M, bondage, and threesomes. Kinky stuff."

The abuse of cocaine grew problematic for Mr. Valerio who suffered headaches, bloody noses, and an overall loss of functioning, he began to "steer away

from the scene" in 1991 as a result. He denied any legal problems resulting from his substance use, such as DWI's, at that time. Continued conversations with Mr. Tusa were helpful to aid in gaining some control over his substance abuse.

Mr. Valerio married his first wife in 1994 after having known her for two years. Their son, Andre, was born in April of 1995. Throughout his marriage, his interest in pornography remained, in fact he shared his interest with his wife, often viewing pornography together. His sexual perversions escalated, as he recalled they would engage in role-playing behaviors and various sexual fetishes. Child pornography was reportedly never an aspect of their sexual play. Mr. Valerio became interested in the "entertainment business" and decided to create and launch a "lifestyle" magazine in Long Island. He engaged in extramarital sex promising photographs and interviews to be published in his magazine. During this marriage, Mr. Valerio employed nannies to care for his son whom he would record to "keep an eye on them." He often caught these women undressing while recording and admitted to having inappropriate sexual relationships with at least three of them. Over the course of their marriage, Mr. Valerio explained, his wife grew more interested in her work, gained a lot of weight, and lost her sexual drive, "she was not meeting my sexual needs." The couple separated around 2001.

The years following his separation from his wife saw his addiction to cocaine and pornography continue to intensify. Mr. Valerio stated, "I was very, very deep into bondage, I wanted to go into the porn industry as an actor, but I was too old." In 2005, Mr. Valerio was arrested for inappropriately touching a female adult in a pool at a waterpark, he pled guilty to the charge and was required to a complete sex offender treatment program as part of the requirements for his supervised release.

He and his wife legally divorced in 2007, sharing custody of their son. Soon after he met his second wife, who was already pregnant when they met. He reported raising her son as his own, and within the next two years had a daughter with his second wife. He added that they had an "open relationship," and that the two engaged in sexual relationships with other people. The relationship ended amicably when she was forced to leave the country as her visa had expired. He added that he had little "grasp on things" following that period of his life because of his heavy drug and alcohol abuse.

One experience remains a point of distress for Mr. Valerio to this day. In 2008, Mr. Valerio disclosed that he initiated a sexual relationship with his distant cousin, and were "on and off" until her tragic death in 2011. Following her death, he found out she was pregnant when she died, sending Mr. Valerio "into a tailspin." He began to abuse food and gained a tremendous amount of weight.

Mr. Valerio's sexual interests continued to escalate and become more perverse in nature as time went on, eventually leading to his conduct resulting in the instant offense, described in detail in relevant legal documents.

## COLLATERAL SOURCES

### Mrs. Frances Valerio, Bernadette Imperiale and Mr. John Tusa

On May 27, 2015, Mr. Valerio's mother, sister and uncle were interviewed as collateral sources to corroborate much of Mr. Valerio's history and reports of events relating to the instant offense. Frances Valerio related that her late husband was born in Sicily and always had "a different way of thinking." He never could accept that Mrs. Valerio ever had previous boyfriends and that he felt cheated since he had found out only after they had already been married. As a result, she added, "he took [his anger] out on the children" and became emotionally, physically, and sexually abusive. He would repeatedly tell Mr. Valerio that he was not his own son, but rather a bastard. He regularly beat both of his children, hitting them with a belt and buckle. Mrs. Valerio characterized her late husband's abuse of Mr. Valerio as his receiving the "beatings of an animal." She first caught her husband in bed naked with their son when he was five. She recalled his threatening, "If you say anything, I'll kill you." On different occasions, she saw her husband in bed with her children with a zucchini in hand. Mrs. Valerio, with no money and nowhere to go, felt trapped and helpless to witness the abuse her husband was perpetuating. Mrs. Valerio corroborated that her son began to fight back as he got older and stronger. She recalled that on several occasions, when her husband was beating her, her son would interpose himself and say "why don't you hit me instead of hitting mom?" Regarding the ongoing sexual abuse of her son, Mrs. Valerio stated that she saw her husband go into her son's room, maybe once a month, sometimes staying the entire night. She commented, "I was too frightened, I didn't say anything." She added that because of her husband's old world upbringing, "you don't call the police and you don't get a divorce." The sexual abuse went on from the age of five to about 13.

Because of the abuse he endured, according to Mrs. Valerio, her son never wanted to be home. He would often sneak away to stay with neighbors or just ride off for hours on his bicycle. She confirmed that her son, as he grew into adolescence, began to harbor a great deal of anger which she too attributed to the years of abuse her son had endured. She added that she grew to believe that her son grew to not trust women and "maybe felt a woman was just a sexual object."

Bernadette Imperiale, Mr. Valerio's sister, corroborated her own history of having been physically, emotionally, and sexually abused by their father. She also gave a few anecdotes of her father abusing her brother in sexual and non-sexual ways. She remembered her father forcing her brother to walk home from work in the snow

because the two had argued over a trifle. She recalled books and various objects being thrown at her brother's head. She recalled that from the age of five to eight, her father came into her room, on a weekly basis, and force himself on her sexually. Her mother added that she would hear her children scream when they were being sexually assaulted.

**Psychological Examination of Bernadette Imperiale, dated November 10, 2016**

Mr. Valerio's sister, Ms. Imperiale, was evaluated by Ms. Maura Gordon as requested by his mother, Mrs. Valerio, as part of her treatment of her daughter. As indicated in the report, much of Mr. Valerio's reported upbringing was corroborated in that Ms. Imperiale detailed the physical abuse Mr. Valerio was subjected to during his developmental years. She described her brother as "very angry," and she reported "her father told both her and [Mr. Valerio] that his father hit him all the time because he loved them."[1] Further, Ms. Imperial related, despite a relationship of over a year with an engagement, she refrained from sexual activity for fear of repercussion from her father if she became pregnant. Once married and actively trying to become pregnant, she attributed her difficulty to becoming pregnant to her father's extensive sexual abuse.[2]

Ms. Imperiale detailed the sexual abuse, beginning at age five and continued to age eight or nine years old. As indicated in the report, she stated that Mr. Valerio's father would enter her room late at night and began with penetrating her with his fingers and progressed to sexual intercourse.[3] She described crying herself to sleep at night as a result of the traumatic abuse. She added that her father began physically abusing her by hitting her in the back of her head, he was frequently "putting me down, he would tell me I was stupid."[4]

Impacting Mrs. Valerio's relationship with both her husband and her children was her parents' relationship that was, as described in the report, extremely tumultuous. As indicated in the report, Mrs. Valerio's mother suffered from a mental illness, often was aggressive towards her children, and engaged in frequent extramarital affairs, one resulting in Mrs. Valerio's half-brother.[5] Further explained in the report was that Mr. Valerio's mother and father were second cousins and "share 25% of the same DNA."[6] His mother indicated that Mr. Valerio's father was a "very abusive and jealous man" from even the beginning of their relationship.[7] According to the report, his mother stated that Mr. Valerio's father controlled all aspects of her

[1] Psychological Examination of Bernadette Imperiale, dated 11/10/2016
[2] Psychological Examination of Bernadette Imperiale, dated 11/10/2016
[3] Psychological Examination of Bernadette Imperiale, dated 11/10/2016
[4] Psychological Examination of Bernadette Imperiale, dated 11/10/2016
[5] Psychological Examination of Bernadette Imperiale, dated 11/10/2016
[6] Psychological Examination of Bernadette Imperiale, dated 11/10/2016
[7] Psychological Examination of Bernadette Imperiale, dated 11/10/2016

life, finances included, and even refrained from speaking to another male for fear "her husband would assume she was going to have an affair."[8] As stated in the report, his mother disclosed both of her children witnessed Mr. Valerio's father hitting her.

Specifically regarding the sexual abuse that Mr. Valerio's father inflicted on both of his children, his mother recalled an occasion where his father was in Mr. Valerio's bed with him when he was approximately five years old. She stated that when she confronted his father about the situation he threatened, "if you tell anyone I will kill you," and as a result of genuine fear he would follow through with this threat, she laid witness to countless years of sexual abuse towards both Ms. Imperiale and Mr. Valerio.[9] Mr. Valerio's father appeared to maintain control over his family "using violence," as was described by both Ms. Imperiale and Mrs. Valerio, his mother.[10]

As opined in the report, Mr. Valerio's interactions with women are modeled after the hostile and tumultuous relationship between his parents, "watching the way his father treated his mother."[11] The childhood depicted by Mr. Valerio and his family clearly indicates a "very chaotic and violent upbringing," with the violence extending over multiple generations with a clear cultural component.[12]

## PSYCHO-SEXUAL TESTING

### *Personality Assessment Inventory (PAI)*

On April 10, 2014, Mr. Valerio was administered the *Personality Assessment Inventory* (PAI), authored by Leslie Morey, PhD. The *PAI* is a multi-scale pen and paper test of psychological functioning that assesses constructs relevant to personality and psychopathology evaluation in various contexts including psychotherapy, crisis/evaluation, and forensic assessment. The *PAI* has 22 non-overlapping scales, providing a comprehensive overview of psychopathology in adults. The PAI contains four kinds of scales, validity scales, which measure the respondent's approach to the test, including faking good or bad, exaggeration, or defensiveness; clinical scales, which correspond to psychiatric diagnostic categories; treatment consideration scales, which assess factors that may relate to treatment of clinical disorders or other risk factors but which are not captured in psychiatric diagnoses; and interpersonal scales, which provide indicators of interpersonal dimensions of personality functioning.

---

[8] Psychological Examination of Bernadette Imperiale, dated 11/10/2016
[9] Psychological Examination of Bernadette Imperiale, dated 11/10/2016
[10] Psychological Examination of Bernadette Imperiale, dated 11/10/2016
[11] Psychological Examination of Bernadette Imperiale, dated 11/10/2016
[12] Psychological Examination of Bernadette Imperiale, dated 11/10/2016

Mr. Valerio's results on the *PAI* confirmed that he attended to the assessment items appropriately and in a consistent fashion.[13]

Mr. Valerio's *PAI* clinical profile is marked by significant elevation on the mania (MAN) scale, indicating "that the content tapped by this scale may reflect a particular area of difficulty for the respondent." As such, the *PAI* Clinical Interpretative Report indicated Mr. Valerio is likely suffering from Relational Problem NOS (Family or Marital Problem) with a possible (rule-out) diagnosis of Bipolar I Disorder, Most Recent Episode Manic, Unspecified. Although a personality disorder was deferred, a rule-out diagnosis included Personality Disorder NOS (Mixed Personality Disorder with Borderline, Antisocial, Narcissistic, and Paranoid Features).

Mr. Valerio described having "significant problems frequently associated with aspects of a manic episode." According to the *PAI*, his clinical picture is characterized by grandiosity and a thought content marked by inflated self-esteem. The *PAI* predicted that others may see him as self-centered and narcissistic. He also reported difficulties consistent with "relatively mild or transient depressive symptomology," such as a change in physical functioning, disturbance in sleep pattern, and decrease in energy and level of sexual interest. He reported concerns about his physical functioning and health in general, likely related to his recent and ongoing health problems. According to the report, Mr. Valerio "describes himself as being more wary and sensitive in interpersonal relationships than the average adult."[14] He also reported a personality style "that involves a degree of adventurousness, risk-taking, and a tendency to be rather impulsive." As these problems are frequently associated with mania, as is substance abuse, the *PAI* report warned, "attention should be paid to the possibility of denial of problems with drinking or drug use." However, Mr. Valerio and his wife both reported limited involvement with substance abuse. Mr. Valerio's self-concept "appears to involve a generally positive, and, at times, perhaps uncritical self-evaluation."

The *PAI* report indicated that Mr. Valerio's interpersonal style is characterized as "pragmatic and independent." He is not likely to be perceived by others as "a warm and friendly person, although he is not necessarily lacking in social skills and he can be reasonably effective in social interactions." This may be, in part, because Mr. Valerio sees "relationships as a means to an end" and he allegedly does not believe his social relationships offer much support. Despite that, the report concluded that Mr. Valerio "views his environment as reasonably stable and predictable."[15]

Although Mr. Valerio endorsed "Critical Items" associated with traumatic stressors, it is not mentioned elsewhere in the report.

---

[13] Personality Assessment Inventory, Clinical Interpretive Report, administered 4/10/14, p. 6
[14] Personality Assessment Inventory, Clinical Interpretive Report, administered 4/10/14, p. 7
[15] Personality Assessment Inventory, Clinical Interpretive Report, administered 4/10/14, p. 8

***Abel Assessment for Sexual Interest-3*** **(AASI-3)**

On February 5, 2015, Mr. Valerio was administered the *Abel Assessment for Sexual Interest-3* (AASI-3) for males. The *Abel Assessment* is a psychological test designed to provide a self-report of a client's sexual arousal patterns as well as an objective measure of their sexual interests. While the subjective measure provides a summary of what the client wishes to tell you about his or her arousal patterns, the objective measure provides an independent assessment of the client's sexual interests that is obtained in a way that is beyond the client's awareness.

Results of the *AASI-3* show that Mr. Valerio obtained a Cognitive Distortion Score of 15%, indicating that he does not frequently use justifications for his illegal sexual behavior (0 to 25% is non-problematic). He obtained a Social Desirability Score of 65%, which is within the high range and indicates an unwillingness to admit to any violation of common social mores. However, it appears that Mr. Valerio was forthcoming and honest with the test as he did admit to several social norm violations, including having fantasies about sexual relationships with children.

Mr. Valerio, on the self-report section of the *AASI-3,* admitted to watching adult pornography since the age of 15 and Internet-based pornography since 29. He stated that he has engaged in Frottage (Rubbing up against or touching a stranger), on four occasions between the ages of 20 and 39, that he has engaged in Voyeurism (Secretly watching others) on 5 occasions between the ages of 19 and 46, that he has had 5 sexual affairs and that he has had sex with strangers on 6 occasions.

Mr. Valerio reported that he had been the victim of sexual abuse on 200 occasions between the ages of 5 and 11.

During the self-report section of the *AASI-3*, Mr. Valerio admitted to having "a few" sexual fantasies about Frottage, "a few" fantasies about Voyeurism, and "a few" fantasies about having affairs and having sex with strangers.

Mr. Valerio has not been accused of sexually abusing a child and denies that this behavior ever took place. He has never been investigated, arrested, or convicted for sexual or nonsexual crimes.

On the Emerick Sexual Victimization Scales (a measure of an individual's degree of Sexual Victimization Trauma, Mr. Valerio scored 83% on the trauma intrusive scale, indicating a high degree of intrusive thoughts about the child molestation he suffered. On the Trauma Symptomatology Scale, he scored a 78%, indicating also severe concerns and a tendency to have cognitive distortion about the abuse, justifications about violence, and faulty beliefs about the world in general.

Mr. Valerio admitted to finding the following behaviors "mildly arousing": using sexual magazines or movies excessively, becoming obsessively aroused by objects or parts of the body, and rubbing up against or touching strangers in a crowded place.

On the *AASI-3,* Mr. Valerio fit in the "Medium Risk Group" to re-offend, giving him a 4% actuarial risk of re-offending within the next 10 years.

The results of the *AASI-3* suggest that Mr. Valerio has a high sexual interest in Caucasian adolescents (fourteen to seventeen years old) and adult females. Of note, an attraction to adolescent females is not considered unusual in adult, heterosexual males so long as no actions are taken to satisfy that attraction. There was elevation of the Voyeurism S&M Adult White Male scales.

***HCR-20***

The HCR-20, a widely used actuarial tool to assess the risk of dangerousness was completed, using elements of Mr. Valerio's prior history and his current psychiatric presentation. The HCR-20 evaluates 20 different factors divided into three groups. These are Historical, Clinical, and Risk Management Items. Based on this tool, Mr. Valerio scored in the Moderate range of Final Risk Judgement.

***SVR-20***

The Sexual Violence Risk–20 (SVR-20) is a commonly used structured professional judgment guideline for sexual offender risk assessment and risk management planning. The SVR-20 assesses historical factors related to psychosocial adjustment, the specifics of the sexual offense, and the quality of future plans. Mr. Valerio also scored in the Moderate risk group.

***STATIC-99R***

The Static-99 is a ten-item actuarial assessment instrument created by R. Karl Hanson, Ph.D. and David Thornton, Ph.D. for use with adult male sexual offenders who are at least 18 year of age at time of release to the community. It is the most widely used sex offender risk assessment instrument in the world, and is extensively used in the United States, Canada, the United Kingdom, Australia, and many European nations. The STATIC-99R also placed Mr. Valerio in the moderate risk pool of re-offending.

## MENTAL STATUS EXAMINATION

Mr. Joseph Valerio is a 50-year-old Italian male of short stature, who presented for his evaluation appropriately dressed in prison garb and well groomed. Mr. Valerio was well-related and made good eye contact. He was cooperative and friendly. Mr. Valerio was forthcoming and honest and discussed his involvement in the offense conduct willingly, openly, and initially, with little shame or remorse. There was evidence that he was initially attempting to minimize or lessen the severity of his actions or their consequences. Most recently, Mr. Valerio was apologetic and tearful when discussing his offense conduct and became agitated, nearing aggression, when discussing the details of his past abuse, evidencing the recent linkage between the offense conduct and his past sexual and physical abuse.

Mr. Valerio's speech was clear, relevant, and coherent while his thought processes were logical and goal-directed. There was no evidence of any perceptual disturbances including hallucinations and delusions of any kind. There was no indication of suicidal or homicidal ideation. Mr. Valerio's mood was normal and his affect was appropriate and full in range. He was alert and oriented in all spheres and did not appear to be suffering from any cognitive deficits. Mr. Valerio appeared to be of average intelligence.

During my initial evaluations of Mr. Valerio he evidenced little insight into the maladaptive nature of his involvement in the instant offense, however, more recently he presents as an individual who is connecting the dots, so to speak, between his traumatic past and the influence on his deviant sexual behaviors. He discussed more openly, with insight, the etiology of his distorted view of women and their relation to sex.

## DIAGNOSIS AND FORMULATION

**Voyeuristic Disorder**
**Frotteuristic Disorder**
**Antisocial Personality Traits**
**Alcohol Use Disorder, In Institutional Remission**
**Cocaine Use Disorder, In Institutional Remission**

Mr. Valerio is a 49-year-old Italian male with no significant prior psychiatric history. His early years are notable for having been raised in an abusive household. Significantly, he witnessed the physical abuse of his mother by his father, the sexual abuse of his sister by their father, and his own sexual victimization by his father, including repeated instances of anal rape, from the age of 5 until 11.

As a direct result of this abuse, Mr. Valerio was sexualized at a very young age, impacting his psychosexual development; he ultimately grew to experience hypersexual feelings and behaviors as a direct result of the abuse he was victim of.

The repeated abuse Mr. Valerio repeatedly experienced as a child molded his sexual behaviors as an adult. Various sexual behaviors, considered taboo to most individuals, became "normal" for Mr. Valerio and thus propelled him into his past and current sexual behaviors.

It is not unusual for a young male, once abused and repeatedly sexualized by his father, to develop inappropriate and distorted outlooks on sexual behaviors. Mr. Valerio lacked the guiding, safe, nurturing, and consistent upbringing to develop normally emotionally, socially, and sexually. Instead, he developed maladaptive sexual interests, though through no fault on his own. He was raised by a very dictatorial, sexually depraved, misogynistic, and abusive father, who terrorized his family sexually, emotionally, and physically. The father demanded his family's approval, fear, respect, and sexual subjugation. Despite being abused, Mr. Valerio was forced to strive for his father's approval and acceptance for much of his childhood and young adulthood, fearing physical repercussions and abuse.

As a result, Mr. Valerio grew angry, resentful, and self-loathing. His view of interpersonal relationship became modeled on what he had seen his father do. This fueled his desire to displace his authority through acts of sexual aggression, thus repeating the cycle of abuse perpetuated by his father. Mr. Valerio unfortunately learned to use sexual and aggressive behaviors as outlets for his negative feelings, as his father had before him.

In parallel, Mr. Valerio, as a child, grew to hate and resent his mother for not protecting him from the abuse the father was wielding. This anger turned to rage as he grew older and the abuse persisted. This rage then expanded to include all women and has thus colored his ongoing relationships with important women in his life, something he now very much regrets as he comes to terms with it. He recalled blaming his mother for the years of sexual abuse he endured at the hands of his own father, causing him feelings of abandonment and helplessness that he vowed never to experience again, resulting in his dominating personality in regards to his sexual activities. When this anger at women was then combined with the sexually depraved behavior his father had inculcated into him, he grew to believe that a woman was merely a sexual object. In the end, Mr. Valerio's interactions with women appear to be modeled after the hostile and tumultuous relationship between his parents, growing up believing it is acceptable, normal even, to physically and sexually abuse a significant other.

Gathering from current research that examined the correlation between experiencing physical abuse as a child and continuing on to commit a sexual offense, males who experience physical abuse, as Mr. Valerio did, are at an increased risk to

commit sexual offenses.[16] Mr. Valerio possessed another propensity to engage in sexual offenses as cited in current research, the existence of childhood sexual abuse. The presence, and persistence into adulthood, of symptoms of depression, anxiety, substance abuse and sexual dysfunction, all of which are well documented in Mr. Valerio's history, are associated with childhood sexual abuse.[17] Mr. Valerio was not born with an antisocial personality or characteristics that left him susceptible to commit such heinous sexual acts, on the contrary, Mr. Valerio was turned into a sexual offender through years of horrible acts of sexual and physical abuse at the hands of his father.

In addition to arrested and distorted psychosexual development, Mr. Valerio developed symptoms of anxiety and low self-esteem, which he self-medicated with various substances of abuse, usually alcohol and cocaine, which is not uncommon for victims of serial sexual abuse, as described previously in recent research. He also developed deviant sexual behaviors along two lines. He developed and has engaged in repeated instances of Frottage, as evidenced by his prior arrest, but also by his self-reported interest in the activity. He also developed an interest in Voyeurism, both in terms of viewing real females, but also through the videotaping of women without their knowledge, or by viewing videos that he had made during sexual activity, or as requested, as in the instant offense.

Mr. Valerio's psychosexual texting revealed that Mr. Valerio is sexually attracted to adolescent and adult women. This profile, in light of his history, does not support a diagnosis of pedophilia. On the contrary, those categories of sexual interest are considered normal in adult, heterosexual males. In my opinion, Mr. Valerio is not a pedophile. He does not have an interest in having sex with minors. His offense conduct was driven by his voyeuristic needs and his hypersexual nature, rather than a specific interest in having sex with minors.

In assessing Mr. Valerio's risk of dangerousness to the community, I considered a number of psychological features and historical data. In Mr. Valerio's case, the presence of manipulative, impulsive, and antisocial personality traits place him in the moderate risk of dangerousness and risk of re-offending. In addition, the presence of a history of substance abuse, of legal entanglements, of impulsive acting-out, and of interpersonal chaos further aggravates his risk of endangering others. This finding is corroborated by the actuarial risk-assessment tools used.

---

[16] Widom CS, Massey C. A Prospective Examination of Whether Childhood Sexual Abuse Predicts Subsequent Sexual Offending. *JAMA Pediatr.* 2015;169(1):e143357. doi:10.1001/jamapediatrics.2014.3357.

[17] Blanco, L., Nydegger, L., Camarillo, G., Trinidad, D., Schramm, E., & Ames, S. (2015, October). Neurological changes in brain structure and functions among individuals with a history of childhood sexual abuse: A review. *Neuroscience and Biobehavioral Reviews, 57*, 63-69.

On the other hand, Mr. Valerio's capacity to sustain an intimate relationship with his family members, as well as his ability to sustain himself professionally speak to his capacity and desire to maintain legitimate relationships, which are mitigating of his dangerousness. The fact that he has not used weapons, threatened the lives of his victims, caused his victims physical harm, or manifested a recent escalation in the behaviors also mitigate his risk, and keeps him out of a higher risk level. In sum, there is evidence that Mr. Valerio is of moderate risk to the community at this time.

I found Mr. Valerio not to be deeply troubled by his offense conduct during my initial evaluations with him. His behavior appeared *ego-syntonic,* i.e. not disturbing to himself. In other words, he was not deeply troubled by this aspect of his sexuality and was not motivated to deal with it. That has evolved over time and through our repeated examinations. Presently, in my recent reevaluation of Mr. Valerio, he manifested significant remorse and guilt. As such, his offense conduct is becoming *ego-dystonic,* i.e. uncomfortable for him. This internal conflict heralds the presence of an internal motivation to change. This is a good prognostic factor in assessing Mr. Valerio's receptivity to sexual offender treatment. A successful bout of such treatment would decrease the chance of recidivism and increase the likelihood of success for treatment. As evidenced through his recent improvement of insight into his past behaviors, Mr. Valerio is a good candidate for treatment in a sex offender program, as he has displayed awareness of the importance of overcoming the impact of his own past sexual victimization.

Though Mr. Valerio still has much therapeutic work to do to truly understand the psychological underpinnings of his actions and his underlying personality and substance-abuse issues, the Court may choose to consider his difficult early life and specifically the years of brutal sexual abuse he suffered as a child during important formative years as mitigating factors in meting out an appropriate sentence for Mr. Valerio. Mr. Valerio did not choose to be victimized or to see his normal psychological and psychosexual development be derailed by a monstrous father. The sexual trauma he suffered had a significant impact on his sexual behavior and attitudes and impacted on the degree to which he could freely choose his sexual outlets. His free will was influenced by his early experiences and should warrant consideration by the Court at sentencing.

Respectfully submitted,

Alexander Sasha Bardey, M.D.
Diplomate in Psychiatry, American Board of Psychiatry and Neurology
Diplomate in Forensic Psychiatry, American Board of Psychiatry and Neurology
Clinical Faculty, Department of Psychiatry, New York University Medical Center
Adjunct Assistant Professor, Department of Psychiatry and Behavioral Sciences
The New York Medical College