# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF NEW YORK

_____

№ 14-CR-94 (JFB)
_____

UNITED STATES OF AMERICA,

versus

JOSEPH VALERIO,

Defendant.
_____

**MEMORANDUM AND ORDER**
June 1, 2017
_____

JOSEPH F. BIANCO, District Judge:

On November 13, 2014, a jury convicted defendant Joseph Valerio ("defendant" or "Valerio") of one count of conspiracy to sexually exploit a child, in violation of 18 U.S.C. § 2251(e); three counts of sexually exploiting a child, in violation of 18 U.S.C. §§ 2251(a), (c), and (e); seven counts of attempted sexual exploitation of a child, in violation of 18 U.S.C. § 2251(e); one count of transporting child pornography, in violation of 18 U.S.C. §§ 2252(a)(1) and (b)(1); one count of receiving child pornography, in violation of 18 U.S.C. §§ 2252(a)(2) and (b)(1); and one count of possessing child pornography, in violation of 18 U.S.C. §§ 2252(a)(4)(B) and (b)(2). (ECF No. 95.) Sentencing has been scheduled for June 6, 2017.

In March 2016, the Probation Department submitted an Addendum to the Presentence Report, advising the Court, *inter alia*, that the government had provided information about (1) a women (referred to herein by her initials "A.D.") who had advised the government that, during a romantic relationship that she had with the defendant, the defendant had physically and sexually assaulted her; and (2) another women who had been hired by the defendant as an au pair through an agency, only to learn when she arrived to the United States from England that there was no child in his home for whom to provide care. In addition, during the course of the proceedings involving co-conspirator Olena Kalichenko, the Court became aware that Ms. Kalichenko was asserting that the defendant sexually assaulted her during their relationship, which also involved Ms. Kalichenko producing child pornography of her daughter in the Ukraine at the defendant's request. *See, e.g.*, *United States v. Olena*

*Kalichenko*, March 17, 2011 Hearing, ECF No. 87, at 9.[1]

Although this alleged additional conduct by the defendant did not involve child pornography, the Court determined that this alleged uncharged violent conduct, which the defendant disputes, may constitute "relevant conduct" under Section 1B1.3 of the United States Sentencing Guidelines and/or would be facts that the Court in its discretion could consider as part of the statutory sentencing factors, including the defendant's history and characteristics and the need to protect the public from further crimes of the defendant, pursuant to 18 U.S.C. § 3553(a) ("Section 3553(a)"). Thus, the Court held a *Fatico* hearing on July 25 and September 26, 2016 (ECF Nos. 126, 129) regarding the disputed conduct. *See United States v. Fatico*, 579 F.2d 707 (2d Cir. 1978), *cert. denied*, 404 U.S. 910 (1979).

As set forth in more detail below, having conducted that evidentiary hearing, including an evaluation of the demeanor and credibility of the witnesses, the Court finds that the government has proven, by a preponderance of the evidence, that (1) the defendant physically and sexually assaulted Olena Kalichenko during the course of his relationship with her; (2) the defendant physically and sexually assaulted A.D. during his relationship with her; and (3) the defendant deceived another woman into believing that she was coming to his house from England to be an au pair, even though there was no child in his house. Although the Court has considered the various arguments in the defendant's written submission as to why the witnesses' testimony was not credible, the Court finds those arguments unpersuasive based upon the Court's own evaluation of the witnesses' credibility at the hearing. In addition, to the extent that there is any suggestion that the alleged violent acts recounted by the witnesses were consensual (based, for example, on a "contract" that Ms. Kalichenko signed), the Court similarly finds those suggestions unpersuasive in light of the credible testimony of the victims.

Accordingly, at sentencing, the Court intends to consider the defendant's physical and sexual assaults of Ms. Kalichenko and A.D. in connection with the Section 3553(a) factors—namely, the defendant's history of extremely dangerous and violent behavior towards other individuals, and the need to protect the public from further crimes by the defendant.[2] Finally, although the defendant's conduct towards the au pair was not violent and the Court does not consider it in that regard, the Court finds that the credible testimony regarding the circumstances

---

[1] In this Memorandum and Order, in an effort to protect the privacy of an alleged victim of a sexual assault, the Court refers to the witness "A.D." by her initials. However, given the unique status of Ms. Kalichenko as a charged co-conspirator with respect to the production of child pornography, any effort to protect her identity is futile and, thus, the Court has not redacted her name.

[2] The Court notes that the defendant's conduct towards Ms. Kalichenko is arguably "relevant conduct" because it could be viewed as being in preparation for, and inextricably intertwined with, his subsequent conspiracy with Ms. Kalichenko to sexually exploit her child in the Ukraine and to produce child pornography with her child at his direction. U.S.S.G. §§ 1B1.3(a)(1)(A), (3); *United States v. Wernick*, 691 F.3d 108, 115 (2d Cir. 2012); *see also United States v. Ahders*, 622 F.3d 115, 120 (2d Cir. 2010) (affirming finding that uncharged molestation of two minors was relevant to conviction for child pornography production because it " it occurred during the period that [the defendant] was producing pornographic images"). However, the Court concludes that the defendant's violent conduct towards Ms. Kalichenko, along with his violent conduct towards A.D., is more appropriately treated under the particular circumstances of this case as part of his "history and characteristics" under Section 3553(a)(1) and the need to protect the public from further crimes by the defendant under Section 3553(a)(2)(C).

surrounding the defendant's interactions with the au pair serves to corroborate the testimony of Ms. Kalichenko and A.D. regarding the deceptive and manipulative conduct by the defendant during their respective relationships with him.[3]

I. APPLICABLE LAW

Pursuant to 18 U.S.C. § 3661, Congress has made clear that "[n]o limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence." Thus, the Supreme Court has emphasized that, "[a]s a general proposition, a sentencing judge may appropriately conduct an inquiry broad in scope, largely unlimited either as to the kind of information he may consider, or the source from which in may come." *Witte v. United States*, 515 U.S. 389, 398 (1995) (citation omitted). The Second Circuit has further explained that "in the post-*Booker* advisory Guidelines regime, the Guidelines limitations on the use of factors to permit departures are no more binding on sentencing judges than the calculated Guidelines range themselves." *United States v. Thavaraja*, 740 F.3d 253, 262 (2d Cir. 2014). Consideration of a broad range of conduct may include uncharged or even acquitted conduct, *United States v. Reese*, 33 F.3d 166, 174 (2d Cir. 1994), as long as the government proves the conduct by a preponderance of the evidence, *United States v. Vaughn*, 430 F.3d 518, 526 (2d Cir. 2005). *See also United States v. Ulbricht*, --- F.3d ---, 2017 WL 2346566, at *38 (2d Cir. May 31, 2017) ("A district court may consider as part of its sentencing determination uncharged conduct proven by a preponderance of the evidence as long as that conduct does not increase either the statutory minimum or maximum available punishment.").

In light of this discretion, numerous courts have considered uncharged violent conduct by a defendant at sentencing in determining, *inter alia,* his "history and characteristics" and/or the degree to which there is a need "to protect the public from further crimes of the defendant" pursuant to 18 U.S.C. §§ 3553(a)(1) and (a)(2)(C). *See, e.g.*, *United States v. Robinson*, 520 F. App'x 20, 22-23 (2d Cir. 2013) (affirming, in a robbery case, the court's consideration at sentencing of the defendant's involvement in shooting death of a victim in an unrelated case); *United States v. Wilbers*, 442 F. App'x 491, 495 (11th Cir. 2011) (holding that district court did not abuse its discretion in considering the defendant's prior past domestic violence arrests in sentencing him for possession of ammunition by a convicted felon); *United States v. Jordan*, 435 F.3d 693, 697 (7th Cir. 2006) (affirming sentence where district court considered, among other things, the defendant's prior sexual abuse of his own daughter and the creation and possession of child pornography for which he was not charged); *United States v. Amirault*, 224 F.3d 9, 13-15 (1st Cir. 2000) (where a defendant was convicted of possessing child pornography, sentencing court could consider his sexual assaults against his two minor sisters-in-law twenty years earlier).

II. FINDINGS OF FACT

At the July 25, 2016 *Fatico* hearing, the government presented the testimony of Lucy Down ("Down"), an au pair who was hired to work for defendant; Jolene Leonardo ("Leonardo"), who worked for the au pair agency; and co-conspirator Olena

---

[3] In any event, even if the Court did not consider the interactions with the au pair at all, it would reach the same conclusions with respect to Ms. Kalichenko and A.D.

Kalichenko ("Kalichenko"). In addition, at the September 26, 2016 hearing, the government presented the testimony of A.D., the mother of Valerio's daughter. Defendant did not call any witnesses during the *Fatico* hearing. Having conducted the evidentiary hearing, including evaluating the credibility of the witnesses, the Court finds the testimony of the government's witnesses to be fully credible, and that the government has proven the facts summarized below by a preponderance of the evidence.

A. Down

At the time of her testimony, Down was 22-years old and living in the United Kingdom. (*United States v. Valerio*, 14-CR-94 (JFB), Tr. of July 25, 2016 Hr'g at 8.) In 2012, after finishing college at the age of 18, Down decided to travel to the United States and applied to an au pair company called GAP 360, which was known as InterExchange in the United States. (*Id*. at 9-10.) Valerio contacted Down through the company's database to interview her for an au pair position. (*Id*. at 10-11.) On or about September 17, 2012, Valerio interviewed Down remotely via Skype. (*Id*. at 13-14.) During that interview, Valerio told Down that he had a daughter named Sylvia who was 8-years old, and that Down would be responsible for caring for her. (*Id*. at 14-15.)

On or about October 22, 2012, Down traveled to the United States to begin work for Valerio as an au pair. (*Id*. at 17.) After an orientation and training program that lasted approximately five days, Valerio picked Down up in his car. (*Id*. at 17-18.) During the drive to Valerio's home, he informed Down that Sylvia was not actually his child, and when Down asked him why he needed an au pair, he said that he would explain everything later. (*Id*. at 17-18.) He also told her that he was planning to take her to a Halloween party and mentioned that he would like her to wear pantyhose with nothing else as a costume. (*Id*. at 20.)

Following a meal, Valerio took Down to his home on Long Island. (*Id*. at 19.) After Valerio showed Down her bedroom, he asked if she would like a drink. (*Id*. at 20-21.) While Down was sitting in the media room with a drink, Valerio entered wearing boxers and a tank top. (*Id*. at 21.) Valerio sat next to Down for a few minutes and touched her hand, and Down then went upstairs to her room to go to sleep. (*Id*. at 21-22, 57.) She awoke around 4 a.m. and contacted her father via e-mail. (*Id*. at 22-23.) They then spoke over Skype and Down explained what had happened with Valerio. (*Id*. at 23.) Down's father contacted GAP 360, and Down received a Skype call from an employee named Emma Larby, who told Down that someone would come to pick her up. (*Id*. at 23-24.)

After that conversation, Valerio entered Down's room and noticed that she had been crying. (*Id*. at 24.) Down told him that she was homesick, and he left. (*Id*.) Down collected her belongings, went downstairs, and informed Valerio that she was leaving. (*Id*. at 24-25.) Valerio expressed shock and told Down to grow up and that he could offer her a lot of money. (*Id*. at 25.) Down felt intimidated by his behavior. (*Id*.) After about 20 minutes, Leonardo arrived at Valerio's home to collect Down. (*Id*. at 26.) Valerio refused to answer Leonardo's questions about what had happened and closed the door to the house. (*Id*.) Down stayed at Leonardo's house for about a week and then returned to the United Kingdom. (*Id*.)

B. Leonardo

Leonardo used to be employed by an au pair company called InterExchange

4

Incorporated. (*Id*. at 59.) She served as a local coordinator in Suffolk County on Long Island and was responsible for liaising between au pairs and their host families. (*Id*.)

In 2012, Leonardo interviewed Valerio at his home after he applied to employ an au pair. (*Id*. at 60.) He told her that he and his wife shared joint custody of Valerio's daughter Sylvia, who he said was in school at the time of the interview. (*Id*. at 61-62.) Based on her discussion with Valerio, Leonardo characterized him as organized, easy-going, patient, and intellectual. (*Id*. at 69.) Leonardo also believed that Valerio's home reflected the typical living arrangement of an average family. (*Id*. at 69-70.) She had no doubts that Valerio and his home were suitable for an au pair, although she personally found him to be "creepy." (*Id*. at 71.) However, none of the paperwork that Leonardo completed following the interview indicated that she felt uncomfortable with Valerio. (*Id*. at 86.)

Following the interview and Down's placement with Valerio, Leonardo received a phone call from Down's international coordinator, who said that Down was very upset and wanted to leave Valerio's home. (*Id*. at 72.) Leonardo was also told that there was no child living in Valerio's home. (*Id*.) When Leonardo arrived at Valerio's house, Down was waiting at the door with her belongings. (*Id*. at 72-73.) Valerio was standing next to Down and closed the door behind her without explaining to Leonardo what had happened. (*Id*. at 73.) Leonardo never spoke to Valerio after that interaction. (*Id*. at 74.)

C. Kalichenko

Following Valerio's conviction, Kalichenko pled guilty to charges of conspiracy to sexually exploiting a child, sexual exploitation of a child, transportation of child pornography, and producing child pornography for importation into the United States. (*Id*. at 94-95; *see also United States v. Kalichenko*, 14-CR-95 (JFB), ECF No. 91.) Kalichenko first met Valerio through a web site called UkranianDate.com that matched couples seeking marriage. (Tr. of July 26, 2016 Hr'g at 96.) She was looking for a husband and someone who could be a father to her daughter. (*Id*.)

Kalichenko and Valerio met in person for the first time in or around June 2011 when she traveled to Long Island. (*Id*. at 97.) Valerio picked her up at the airport and paid for her flight from Dallas, Texas. (*Id*.) Kalichenko met Valerio's son and stayed at Valerio's house for about 10 days. (*Id*. at 99.) At that time, she thought he was an honest person, and he did not abuse her in any way; however, Kalichenko observed that Valerio seemed to have a temper. (*Id*. at 99-101.) While staying with Valerio, Kalichenko learned from her mother that she had placed Kalichenko's daughter in an orphanage in the Ukraine, which Kalichenko mentioned to Valerio. (*Id*. at 99.) After that visit, Kalichenko returned to the Ukraine in August 2011. (*Id*. at 101.) Valerio purchased her plane ticket and communicated with her while she was in the Ukraine, and he also sent Kalichenko money. (*Id*. at 101-02.)

Kalichenko returned to the United States on or around September 2, 2011 to continue her relationship with Valerio, whom she was determined to marry. (*Id*. at 103-04.) She stayed in the United States for approximately two months and spent part of that time at Valerio's house. (*Id*. at 105.) After three weeks of living with Valerio, Kalichenko departed his home for Seattle because he physically and sexually abused her. (*Id*. at 106.) During the first instance of abuse, Valerio unexpectedly told Kalichenko that

5

she had to leave his house. (*Id*. at 107.) When she did not do so, Valerio pulled Kalichenko's clothes off of her, forced her to crawl on the floor, and called her insulting names. (*Id*. at 108-09.) Valerio also repeatedly slapped and penetrated Kalichenko with his hand and pulled her hair; forced her to perform oral sex on him after she refused to do so; and forced Kalichenko to engage in sexual intercourse. (*Id*. at 109-13, 115-16.) Kalichenko felt humiliated and was in physical pain during this assault, which lasted approximately one to two hours. (*Id*. at 110-11, 115.) Afterwards, Kalichenko returned to her room and cried, and she then left Valerio's home. (*Id*. at 116.)

While in Seattle, Kalichenko stayed with a contact that she barely knew. (*Id*. at 117.) She chose not to report Valerio to the police because she still held out hope that he could be a good father to his daughter. (*Id*. at 119-20.) She eventually returned to Valerio's home in October 2011 after he contacted her via e-mail and asked her to come back. (*Id*. at 120-21.) Kalichenko decided to give Valerio a second chance and stayed with him for a few weeks. (*Id*. at 121.) Valerio paid for her flight from Seattle and told her that he would pick her up in Central Park in New York City, and he also instructed that she wear a mini dress or mini skirt and pantyhose without underwear. (*Id*. at 122.) Kalichenko dressed as directed, and Valerio picked her up in Central Park and drove her to Long Island. (*Id*. at 123.) After a few hours of driving, he pulled to the side of the road and sexually assaulted Kalichenko, tearing her clothes and causing her physical pain. (*Id*. at 124-26.) After Valerio finished, he told Kalichenko that he was sorry. (*Id*. at 127-28.) She decided not to contact the police because she still hoped that Valerio would prove to be a good father to her daughter. (*Id*. at 128.)

On or about October 18, 2011, near the end of Kalichenko's stay with Valerio, Kalichenko signed a written agreement with Valerio that he drafted stating that she was entering into a "multiple partner relationship" with him. (*Id*. at 130.) The agreement also said that Kalichenko promised to obey Valerio's commands, and that Valerio agreed to be gentle to her when not engaging in consensual rough sexual intercourse. (*Id*. at 131.) Notwithstanding that agreement, Kalichenko believed that Valerio's prior sexual assaults against her were non-consensual because, among other things, she begged him to stop.[4] (*Id*. at 131-32.) The agreement also said that Kalichenko would never mention the word "police" in Valerio's home, and Kalichenko believed that Valerio included this language because he feared that she would contact law enforcement about his assaults. (*Id*. at 132-33.) In addition, Valerio sent Kalichenko e-mails asking her to help him adopt a child from the Ukraine by posing with him as a couple in return for a commission. (*Id*. at 134-37.) Kalichenko did not assist Valerio and sent his correspondence to the American consulate to make sure that he could not adopt a child from the Ukraine or any other country. (*Id*. at 137.)

D. A.D.

A.D. was born and raised in South Africa. (*United States v. Valerio*, 14-CR-94 (JFB), Tr. of Sept. 26, 2016 Hr'g at 3.) She has a nine-year old son and a seven-year old daughter. (*Id*. at 4.) She has traveled to the United States several times from February to May 2008; June to October or November

---

[4] To the extent it is suggested that the agreement demonstrates these particular incidents were somehow consensual, the Court credits Kalichenko's testimony that these were non-consensual assaults. As discussed below, the Court also reaches the same conclusion regarding A.D.'s testimony.

6

2008; and December 2008 to March 2010. (*Id*. at 4-5.) During all of those visits, A.D. stayed on Long Island and lived in houses owned by Valerio. (*Id*. at 5.)

A.D. met Valerio through a dating web site named christiansingles.com in or around July or August of 2007 when she was pregnant with her son. (*Id*. at 6.) Valerio paid for her February 2008 flight to the United States, and she brought her son with her. (*Id*. at 7.) Valerio picked her up from the airport, gave her gifts, and treated her well at first. (*Id*. at 7-8.) Eventually, Valerio began losing his temper and, on one occasion, threw A.D. to the kitchen floor and choked and hit her while she screamed. (*Id*. at 8.) Valerio also began expressing his annoyance with her son and the amount of time A.D. spent caring for him. (*Id*. at 9.) A.D. returned to South Africa in May 2008 because she missed her mother. (*Id*. at 12.) In addition, Valerio had asked that she participate in some kind of fashion show during which she would wear nothing but pantyhose, and this made her uncomfortable, so she decided to leave the United States for the time-being. (*Id*.)

When A.D. returned in June 2008, Valerio picked her up at the airport. (*Id*. at 13.) Another man helped A.D. carry her bags from the plane to the airport exit, and when Valerio saw him assist her, he became angry and grabbed the luggage away from the man. (*Id*. at 13-14.) After Valerio and A.D. arrived at Valerio's home, Valerio grabbed A.D. and forced her onto a couch. (*Id*. 14.) He covered her face with a pillow and ripped her clothes off, telling her that he was in charge and leaving her in tears. (*Id*.) During this second visit, A.D. became pregnant from Valerio in or around July 2008, and returned to South Africa a few months later to see her mother. (*Id*. at 17.)

After A.D. came back to the United States for the third time, she gave birth to their daughter in April 2009, and Valerio refused to let her leave the country again despite the fact that her visa subsequently expired. (*Id*. at 18.) A.D. brought her son with her, but eventually asked her mother to come to the United States and bring him back to South Africa because A.D. believed that her son was not safe in Valerio's home. (*Id*. at 19.) While A.D. was pregnant with their daughter, Valerio's abuse worsened and he told her that she should get an abortion or fall down the stairs and die. (*Id*.) In addition, because A.D. was not having sex with him, Valerio slapped her on one occasion, causing A.D. to fall and split her lip. (*Id*. at 20.) He also attempted to force sexual intercourse on another occasion, choking A.D. while she begged him to stop, which he eventually did. (*Id*.)

After their daughter was born, Valerio's abuse of A.D. continued, and on another occasion, he tried to rape her and banged A.D.'s head against her bed's headboard while she held their daughter in her arms. (*Id*. at 21.) In addition, the sight of A.D. breastfeeding their daughter made Valerio angry, and he once threw a soda can at her head when he saw her doing so. (*Id*. at 20-21.) After a verbal argument during the summer of 2009, A.D. called the police, and when two officers arrived and A.D. explained what had happened, one of the officer told her that she had probably provoked Valerio. (*Id*. at 22-24.) This stunned A.D. and led her to believe that Valerio was correct when he told her that no one would help her if she reported his abuse, and she declined to complete a formal police statement. (*Id*. at 24, 57-58.) Valerio also repeatedly told A.D. that she could not leave the United States, and that if she did, he would send someone after her. (*Id*.) While A.D. lived with Valerio, he strictly monitored her interactions with other people and refused to let her socialize outside of the home, although he eventually bought her a cell phone to use. (*Id*. at 29-30.) When

7

Valerio left the house, he would lock A.D. inside and close the blinds. (*Id*. at 30-31.)

During the summer of 2009, Valerio physically assaulted A.D. on another occasion while he was driving her for an evening out. (*Id*. at 25.) After hitting her, Valerio stopped the car in a dark parking lot and told A.D. that she was going to die, and she jumped out of the car. (*Id*. at 25-26.) A.D. screamed for help, and Valerio grabbed her, put his hand over her mouth, and forced her back into the vehicle. (*Id*. at 26.) Due to these repeated incidents of abuse, A.D. left Valerio's home and went to a women's shelter called Brighter Tomorrows. (*Id*. at 27-28.) However, because the shelter was not comfortable and because Valerio convinced A.D. that conditions would improve if she returned, A.D. went back to live with Valerio. (*Id*. at 27.)

Two subsequent physical assaults caused A.D. to leave the United States for the third time. (*Id*. at 31.) The first incident occurred while Valerio was driving A.D. and was pulled over by two police officers for driving on the wrong side of the road. (*Id*. at 31-32.) This angered Valerio, and after the police left, he drove A.D. to a beach, smashed her head against the car's dashboard, pulled her hair back, and screamed insults at her. (*Id*. at 32.) He also ripped A.D.'s dress, and then drove her back to his house. (*Id*. at 32-33.) The second incident, which occurred in or around November 2009, happened when A.D. entered Valerio's home office. (*Id*. at 33.) He became angry and choked and punched her, causing A.D. to lose consciousness. (*Id*. at 34.) When A.D. awoke, she realized that her mouth was bloody and that Valerio had knocked some of her teeth loose. (*Id*.) Valerio allowed her to go to a dentist, but told A.D. that he would kill her if she told anyone about the assault. (*Id*. at 34-35.) The dentist referred A.D. to a surgeon, but despite the operation, which Valerio paid for, A.D.'s teeth have never returned to normal. (*Id*. at 35.)

Before A.D. returned to South Africa, she filed for custody of their daughter in a family court on Long Island. (*Id*. at 36-37.) Her custody petition documented Valerio's' abusive behavior. (*Id*. at 37.) After filing for custody, A.D. left the United States on or about March 9, 2010 with their daughter after promising Valerio that she would eventually return. (*Id*. at 37-38.) A.D. agreed to come back to the United States because she was fearful that Valerio would send someone to retrieve her or hurt her family if she did not do so. (*Id*. at 38.) On or about October 4, 2010, Valerio e-mailed A.D. saying that he was going to travel to South Africa and forcibly take her daughter from her. (*Id*. at 39-40.) This convinced A.D. that she had to return to the United States to protect her daughter from Valerio, which she did in January 2016. (*Id*. at 40.)

When A.D. arrived in the United States, Federal Bureau of Investigation Special Agent Steven Troyd met her at the airport. (*Id*. at 40.) A.D. spoke with Special Agent Troyd and provided him with several e-mails documenting, *inter alia*, her visits to the dentist and the oral surgeon. (*Id*. at 40-44.)

### III. CONCLUSION

Based on the foregoing findings of fact, the Court intends to consider at sentencing the defendant's physical and sexual assaults of Kalichenko and A.D. in connection with the Section 3553(a) factors—namely, the defendant's history of extremely dangerous and violent behavior towards other

8

individuals, and the need to protect the public from further crimes of the defendant.

SO ORDERED.

_____
JOSEPH F. BIANCO
United States District Judge

Dated: June 1, 2017
     Central Islip, NY

\* \* \*

The government is represented by Assistant United States Attorneys Allen Lee Bode and Ameet B. Kabrawala of the United States Attorney's Office for the Eastern District of New York, 271 Cadman Plaza East, Brooklyn, New York 11201 and 610 Federal Plaza, Central Islip, New York 11722. Defendant is represented by Anthony M. LaPinta of Reynolds, Caronia, Gianelli, Hagney, LaPinta & Hargraves, 200 Vanderbilt Motor Parkway, Hauppauge, New York 11788; and Leonard Lato, 200 Vanderbilt Motor Parkway, Hauppauge, New York 11788.