209

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------X

UNITED STATES OF AMERICA,        :        14 CR 0094

              v.                 :        U.S. Courthouse
                                          Central Islip, N.Y.
JOSEPH VALERIO,                  :
                                          TRANSCRIPT OF TRIAL
              Defendant.         :
                                          November 4, 2014
-------------------------------X        10:05 a.m.

BEFORE:

        HONORABLE JOSEPH F.  BIANCO, U.S.D.J.
                and a jury


APPEARANCES:

For the Government:   LORETTA E. LYNCH
                      United States Attorney
                      100 Federal Plaza
                      Central Islip, New York 11722
                      By:  AMEET B. KABRAWALA, ESQ.
                           ALLEN BODE, ESQ.
                           Assistants, U.S. Attorney


For the Defendant:    ANTHONY LaPINTA, ESQ.
                      LEONARD LATO, ESQ.
                      35 Arkay Drive - Suite 200
                      Hauppauge, New York 11788


Court Reporter:       HARRY RAPAPORT
                      OWEN M. WICKER
                      United States District Court
                      100 Federal Plaza
                      Central Islip, New York 11722
                      (631) 712-6105


Proceedings recorded by mechanical stenography.
Transcript produced by computer-assisted transcription.

**210**

1          M O R N I N G   S E S S I O N

2

3          THE CLERK:  Calling 14 CR 094, United States

4     against Joseph Valerio.

5          Please state your appearance for the record.

6          MR. KABRAWALA:  Ameet Kabrawala for the

7     government, joined by Allen Bode, and Special Agent Steven

8     Troyd.

9          Good morning.

10          THE COURT:  Good morning.

11          MR. LaPINTA:  Good morning, your Honor, Anthony

12     LaPinta and Leonard Lato, counsel for Mr. Valerio.

13          THE COURT:  Good morning, Mr. Valerio is present

14     as well.

15          The jurors are all here.

16          The first thing I wanted to do is my deputy

17     advised me that one juror came into the courtroom instead

18     of the jury room and she told me nothing was going on and

19     the defendant was not brought up yet, so none of the

20     jurors saw the defendant brought into the courtroom, and I

21     wanted to make sure both sides agree with that.

22          MR. LaPINTA:  Yes.

23          MR. KABRAWALA:  Agreed.

24          THE COURT:  As you know, we received a

25     correspondence from one juror, juror number 10,

**211**

1     Ms. Restituyo, and another juror brought in a doctor's

2     note today, Ms. Weiss.

3          First of all, Dr. Brenner, I believe, treats

4     members of my family, if it is the same Dr. Brenner, it

5     doesn't affect my ability to be fair and impartial on this

6     issue, but I wanted to know if anyone wanted to be heard

7     on that?

8          MR. KABRAWALA:  No, Judge.

9          MR. LaPINTA:  Nothing, your Honor.

10          THE COURT:  I don't know if it came up during

11     jury selection, I assume it didn't come up since it is a

12     big issue.

13          MR. LaPINTA:  No.

14          MR. KABRAWALA:  No.

15          THE COURT:  I will question her with regard to

16     it.  My inclination with respect to both of these jurors

17     is to excuse them, as long as we have the other jurors.

18     And I asked my deputy if anyone else is complaining and

19     she said no one else said anything to her.

20          We have four alternates and a short trial here.

21     We have two alternates still.  I don't think it is a big

22     situation if any juror is on the case that doesn't want to

23     serve.  And it is clear to me based on these notes that

24     they don't want to serve.

25          What I will do is, based on these letters, I

**212**

1     will talk to them a little more about it.

2          MR. LATO:  Your Honor, let me explain this to

3     Mr. Valerio and get right back to you, and I will take a

4     moment now to be able to do that?

5          THE COURT:  Sure.

6          (Mr. Valerio confers with defense counsel.)

7          MR. LATO:  Your Honor, Mr. Valerio agreed to us

8     that it is our suggestion to go along with your Honor's

9     suggestion to just excuse the jurors.  Given the number of

10     alternates, we are fine with the alternates without any

11     further inquiry from the Court.

12          THE COURT:  Is that correct, Mr. Valerio?

13          THE DEFENDANT:  Yes, your Honor.

14          THE COURT:  Government?

15          MR. KABRAWALA:  It is fine with the government.

16          THE COURT:  I think, and maybe you will remember

17     better than I, she is one of the jurors with a child care

18     issue?

19          MR. BODE:  Yes, Restituyo.

20          THE COURT:  She has -- I want to make sure she

21     is the one and we don't have another juror with respect to

22     that.

23          MR. KABRAWALA:  That is the one.

24          THE COURT:  I will bring them each out to tell

25     them they are excused and tell them not to go back into

**213**

1     the jury room.  I will put them in Judge Hurley's jury

2     room for a moment.  I don't want a parade.  I will await

3     the other jurors to come out and then they can get their

4     stuff.

5          I gave you a copy of my standard criminal

6     instructions that I give in criminal cases.

7          Any objections to those instructions from the

8     government?

9          MR. KABRAWALA:  No objection.

10          THE COURT:  From the defense?

11          MR. LaPINTA:  No.

12          THE COURT:  I will add -- I was thinking of

13     adding one issue with respect to don't read anything with

14     regard to the case.  I think I will instruct them not to

15     read Newsday during the trial.  I have seen publicity with

16     respect to the case in Newsday.  I don't see Mr. Kessler

17     in here now, but I will just tell them not to

18     inadvertently come across it by not reading Newsday.

19          Any objection?

20          MR. KABRAWALA:  No.

21          THE COURT:  I also warn jurors not to use social

22     media with respect to communicating about the case since

23     that has become an issue.

24          We will mark a copy of the preliminary

25     instructions as Court Exhibit A.  A copy of the redacted

214

1  juror notes as Court Exhibit B, that is Ms. Restituyo, and
2  Court Exhibit C will be the document from Dr. Brenner.
3       Any other issues you wish to address before the
4  opening statements?
5       MR. KABRAWALA:  There is one other issue.
6       On October 29th the government filed ECF number
7  81, the government's motion to dismiss count 14.  It is
8  tied to a December 12th, 2013 attempt.  The government
9  moves to dismiss that count from the indictment.
10      THE COURT:  On consent?
11      MR. LATO:  Yes, your Honor.
12      THE COURT:  Count 14 is dismissed on consent.
13      Any other issues?
14      MR. KABRAWALA:  Not from the government.
15      THE COURT:  Defense?
16      MR. LaPINTA:  Your Honor, with respect to the
17  openings and 404(b) potential problem.
18      As far as I understand the Court's ruling, the
19  government is not permitted without first warning the
20  Court with respect to any 404(b) evidence, and that will
21  include any mention of the hidden cameras in the basement.
22  I will not talk about the camera in the ceiling because
23  that is evidence of the crime, but any other hidden
24  camera, or anything like dummy pistols or knives in the
25  basement is all 404(b).  I want to make sure the

215

1  government is not going to mention it in opening.
2       MR. KABRAWALA:  The government will be talking
3  about hidden cameras found on the search on February 25th
4  of this year.  But we will not talk about other hidden
5  items previously found.
6       I think we talked about a probation officer
7  potentially coming in to testify, which is essentially
8  about his items found in the defendant's basement almost
9  ten years ago.  That is not coming in during our opening.
10  We will be talking about what evidence was found during a
11  search warrant in connection with this case.
12      THE COURT:  But not the weapons.  You will not
13  discuss the weapons?
14      MR. KABRAWALA:  We are not talking about the
15  weapons.  That is not germane to this case, your Honor.
16      THE COURT:  So you will discuss the camera in
17  the ceiling?
18      MR. KABRAWALA:  Yes, of course.
19      THE COURT:  And then these other cameras were
20  seized during the search?
21      MR. KABRAWALA:  Two other cameras found in
22  February of this year.  One a hidden camera in a wall
23  clock, and the other was on a stage, a kind of stage-like
24  platform with a camera pointing upwards.  That was also
25  found this year.

216

1       MR. LATO:  Objection to that.  When it was found
2  is irrelevant to 404(b).  The question is whether it is
3  evidence of this crime or some other crime.  As far as I
4  know, there is no evidence in this case that the camera in
5  the clock or the other cameras that Mr. Kabrawala
6  mentioned were used to produce child porn in this case.
7  It has to do with potentially having sex with other women.
8  It has nothing to do with the child porn.
9       The camera in the ceiling, yes, because the
10  government has evidence that that camera was used to
11  photograph one of the girls that is a subject of this
12  case.  That clearly comes in as direct evidence, but not
13  the other cameras.
14      THE COURT:  What is the government's evidence
15  with regard to the wall clock or the other camera with
16  respect to the charges in this case?
17      MR. KABRAWALA:  Judge, it relates to the fact --
18  there were hidden cameras found in the ceiling.  The other
19  two cameras tend to demonstrate that the defendant had
20  control over that camera in the ceiling, and he hid
21  cameras as a matter of his MO.
22      THE COURT:  The stage was in the same room with
23  the camera, and the camera in the ceiling?
24      MR. KABRAWALA:  Yes.
25      One second.

217

1       (Government counsel confer.)
2       MR. KABRAWALA:  The hidden camera in the clock
3  pointing at the same sofa where Jane Doe No. 2 was
4  sexually exploited, and the stage was found in the same
5  room in the basement where the hidden camera in the
6  ceiling was found.
7       THE COURT:  So there is a camera in the stage.
8       MR. KABRAWALA:  In the stage-like platform,
9  right over here, and there is a camera pointing upwards.
10      THE COURT:  And the photos of Jane Doe No. 2
11  were taken in the vicinity of that stage, in the same room
12  of that stage, or is the stage in a different room?
13      MR. KABRAWALA:  It is all in the basement where
14  the stage was found and the camera was found.
15      We are happy to have the defendant stipulate to
16  the existence of the cameras in the basement and the
17  defendant's control over them.  And if he wants to
18  stipulate that he hid a camera in the basement ceiling, we
19  will just talk about that.
20      MR. LATO:  Your Honor, this is the problem,
21  because we are talking about two children, Jane Doe 1,
22  Ukraine.  Obviously the cameras had nothing to do with
23  her.
24      Jane Doe No. 2, she is photographed, according
25  to the government's evidence, with one camera in the

**218**

1 ceiling, but not hooked up. That camera comes in as
2 direct evidence of the crime definitely.

3 The government wants to introduce other cameras,
4 including a clock camera and one on the stage that has
5 nothing to do with the production of the video of Jane Doe
6 No. 2. That is 404(b) evidence, not evidence of this
7 crime. And it is too early to tell whether it is
8 admissible.

9 THE COURT: They are suggesting it is going to
10 be admissible for them to try to show the defendant's
11 control over the camera in the ceiling, and whether or not
12 it is going to be an issue in the case or not.

13 MR. LaPINTA: Can I just add one point?

14 THE COURT: Yes.

15 MR. LaPINTA: The camera in the ceiling was not
16 set up to record in the ceiling. It was in a case
17 secreted, hidden in the ceiling. A different situation.

18 The other two cameras in the clock and on the
19 stage were set up to record.

20 The subject camcorder alleged to be recording
21 Jane Doe No. 2 was not set up to record in the basement,
22 it was hidden presumably, their argument, to avoid
23 detection by law enforcement.

24 THE COURT: The camera used to record was in the
25 ceiling?

**219**

1 MR. LaPINTA: Yes, but in a zipped case secreted
2 in the ceiling.

3 THE COURT: But the wall clock suggests it was
4 pointed at the same sofa at which the other images were
5 taken, correct?

6 MR. LaPINTA: Yes. But there is no allegation
7 that that camera recorded anything. The recording, the
8 central issue with Jane Doe 2 was the hand-held camcorder
9 secreted in its case.

10 THE COURT: If someone has multiple ways of
11 filming something, and they are only alleged to have used
12 one particular camera on the occasion, it doesn't mean
13 that other camera equipment is irrelevant. They are
14 trying to show how he produced this in terms of his
15 control and intent in terms of the images at issue in this
16 case.

17 MR. LaPINTA: Judge, it is not questionable that
18 the shooting of the video of Jane Doe No. 2 was intended
19 to record Jane Doe No. 2. It was a hand-held camcorder
20 taken feet away from her as she was dressed in costumes
21 and as she was naked. There is no allegation of a
22 surreptitious recording of Jane Doe No. 2.

23 You are adding into the equation surreptitious
24 recording not part of the allegations of Jane Doe No. 2.

25 MR. LATO: Your Honor, to add one thing.

**220**

1 If it was unclear which camera had been used to
2 record Jane Doe No. 2, I would agree that all the other
3 cameras that had a potential for recording would come in
4 as circumstantial evidence which camera was used.

5 But there is no question that the Jane Doe No. 2
6 was filmed with the camera that was hidden in the ceiling.
7 It was a hand-held camcorder and hidden from law
8 enforcement.

9 The other cameras had nothing to do with
10 recording any video in this case.

11 MR. KABRAWALA: May I be heard in this case?

12 Showing you what is marked as
13 Government's Exhibit 404.

14 There is a surreptitious nature in using this
15 camera.

16 Over the area where a recording light would be
17 projected there is black electrical tape.

18 There are images of Jane Doe No. 2, where she is
19 clearly unaware that she is being filmed. There is also
20 pictures of her where she is trying to block the camera,
21 where she must be aware there is a camera pointed at her.

22 The surreptitious nature of filming is germane
23 to this case. And as your Honor I think in this case
24 clearly understands, control over this camera is going to
25 be germane to this case as it relates to Jane Doe No. 2.

**221**

1 For those reasons the other cameras have to come
2 in.

3 MR. LaPINTA: One last thing. Sorry. But this
4 is so sensitive.

5 They met with Jane Doe No. 2. Jane Doe No. 2
6 agrees that there was recordings of her made. Never once
7 until now have we ever heard of any of -- in any of the
8 papers, complaints or anything, that the recordings of
9 Jane Doe No. 2 were secretly performed. The first time
10 ever.

11 MR. KABRAWALA: Your Honor, looking at the
12 picture, it is going to be up to the jury. Again, they
13 are going to be called upon to determine whether or not
14 this was lascivious or pornographic in nature, some of
15 these images.

16 But the flavor of the picture it is clear that
17 Jane Doe No. 2 doesn't know what is going on.

18 MR. LaPINTA: I saw the pictures and the stills
19 as well. I disagree with that.

20 You can't testify or explain about the mental
21 state of a nine year old or six year old girl taken in a
22 picture.

23 MR. KABRAWALA: There is a picture of her, just
24 her crotch, from the waist down.

25 THE COURT: Let me go back to this.

**222**

1    The government's, I guess, main argument is that
2  the use of the camera and the control of the camera is
3  going to be an issue in the case.
4    Is that in issue here?
5    MR. LaPINTA:  The control?  The ownership of the
6  camera?
7    THE COURT:  Not just ownership, that he was
8  using the camera.  Or is it going to be alleged that
9  someone else was using the camera to take the pictures?
10  Or is that not in dispute?
11    MR. LaPINTA:  That particular camera, the
12  argument would be that, yes, it is his camera.  There are
13  receipts for the camera found in the house.
14    But our position is he did not take those naked
15  photographs of her.
16    The subject form of Jane Doe No. 2 was not taken
17  by Joseph Valerio.
18    THE COURT:  What is the relevance of the stage
19  to the government's case?
20    MR. KABRAWALA:  The relevance of the stage and
21  the hidden camera in the stage shows control of the other
22  cameras, particularly the one in the ceiling, that it was
23  set up, and obviously fabricated as a makeshift stage.
24    It just shows that the defendant intended to
25  take pictures in the basement and controlled from the area

**223**

1  of the basement for the purposes of taking pictures there.
2  It shows dominion over that area, and essentially his MO.
3    MR. LATO:  Your Honor, may I just have the last
4  word on this?
5    THE COURT:  I don't know if it will be the last
6  word.
7    MR. LATO:  It may be.
8    It has to do with 403.
9    Whatever relevance it is under 401, we have a
10  403 problem here.
11    The jury may get the impression that there was a
12  production studio that Mr. Valerio was not charged with,
13  and all the hidden cameras under the stage, they may get
14  the feeling that he is setting up a studio.
15    It may be relevant at some point during the
16  trial, but in opening --
17    THE COURT:  I have a feeling it is relevant.
18  Because one of the key questions is who took the images in
19  issue, and certainly it will become highly probative if he
20  has some type of production capability to set up in his
21  basement.  It makes it more likely that the owner of the
22  camera took the photos than someone coming in with a
23  hand-held camera and secreting it somewhere in the
24  ceiling.  It becomes much more probative on that issue.
25    So I am considering 403, that is why I'm

**224**

1  spending time on this.
2    My key question is if there is a dispute as to
3  who took the images, it becoming highly probative that the
4  defendant's home was set up to record images in the
5  basement area where those other images were taken.
6    I don't know what more information I will have
7  other than that now.
8    MR. LATO:  None, your Honor.
9    I agree with Mr. LaPinta, what your Honor was
10  implying there, yes, we will deny that Mr. Valerio took
11  the video with the camcorder in the ceiling.
12    THE COURT:  All right.
13    I will then overrule the objection.  Obviously
14  it is preserved for the record.
15    On this issue I considered the 403 issue, which
16  is the issue apparently which will be the control over the
17  camera that took the images of Jane Doe 2 that are charged
18  in the indictment.  And the defendant is disputing that he
19  took those photos or videos.
20    Therefore, the control over that camera becomes
21  a critical issue in the case.
22    Certainly evidence that his basement area was
23  set up with other surreptitious equipment to video someone
24  becomes highly probative on that issue.  I don't think I
25  can underemphasize how important that evidence will be.

**225**

1    I have weighed the danger of unfair prejudice,
2  but I think it is not substantially outweighed by the
3  probative value under 403.
4    Going back to the other issue of the other
5  recordings, the government cannot suggest that that
6  equipment was used on other occasions with respect to
7  other potential victims.  He can only -- they can only
8  discuss this on the issue of control.
9    Understood?
10    MR. KABRAWALA:  That is understood, yes.
11    THE COURT:  Anything else before the jury comes
12  out?
13    MR. KABRAWALA:  No, sir.
14    MR. LATO:  No, your Honor.
15    THE COURT:  We will bring the jury out.
16    One by one, bring out Ms. Weiss first.
17    I know you have a discussion about the number of
18  images the government will lay to the jury during the
19  case.
20    Is that resolved or still ongoing?  I want to
21  make sure we don't have that issue in opening statement.
22  I assume it will not come up in opening statement.
23    MR. KABRAWALA:  We are generally going to say
24  that the jurors are going to have to look at images.  We
25  will not talk about the number or the specific dates.

**226**

1    MR. LaPINTA:  Your Honor, we had occasion to see
2  snippets of videos.  Those snippets are pieces of the full
3  length videos we originally saw.  We have no objection
4  with regard to the use of the snippets at this last page.
5         Now, your instruction with regard to Newsday, is
6  it an instruction you typically use, or are you planning to
7  use the one that the government proposed to you?
8         THE COURT:  I didn't see what they proposed to
9  me actually.
10        MR. KABRAWALA:  We proposed originally to Judge
11 Brown in connection with the jury selection, and that
12 was --
13        THE COURT:  What did Judge Brown tell them?  Did
14 he tell them that?
15        MR. KABRAWALA:  Judge Brown did not mention
16 Newsday specifically because it would have drawn their
17 attention specifically to Newsday.
18        I think we were going to discuss it with your
19 Honor.
20        THE COURT:  On page 6 where I say don't read or
21 listen to anything touching on this case in any way, I'm
22 going to say, and specifically I'm instructing you not to
23 read Newsday.  And I should say not to watch News 12 as
24 well.
25        I see Mr. Kessler in the courtroom now as well.

**227**

1  And I do expect there to be or suspect there to be
2  coverage on one or both of those media as well.
3         All right, let's bring in Ms. Weiss.  .
4         (Ms. Weiss enters the courtroom.)
5         THE COURT:  Good morning, Ms. Weiss, I'm Judge
6  Bianco.  I received the letter from your doctor with
7  regard to your medical condition, and I have discussed it
8  with the attorneys.  In light of that, I will excuse you
9  from service in this case.  I don't want you to have to
10 deal with jury service given your medical issues.  I
11 appreciate your willingness to otherwise serve.
12        A JUROR:  Thank you.
13        THE COURT:  There is another jury room, I will
14 ask you to sit there until we get all the other jurors in
15 here and then you can go back to get your stuff.
16        Thank you.
17        A JUROR:  Thank you.
18        (Ms. Weiss exits the courtroom.)
19        THE COURT:  Now get number 10; Ms. Restituyo,
20 R-E-S-T-I-T-U-Y-O.
21        (Ms. Restituyo enters the courtroom.)
22        THE COURT:  Good morning, Ms. Restituyo.
23        I'm Judge Bianco.  I received your letter and
24 your attached letter from a supervisor regarding the fact
25 that you will not be paid for your jury service.

**228**

1         In light of that, I will excuse you from this
2  case.  I understand that you probably didn't realize this
3  at the time of the jury selection.  And I don't want you
4  to have a financial hardship.
5         I will excuse you and just ask that you wait in
6  the other jury room.  I will bring the rest of the jurors
7  in.  If you have any stuff, you can go back and get it.
8         A JUROR:  I have my stuff here.
9         THE COURT:  And then you can leave from this
10 door.  Thank you.
11        (Ms. Restituyo exits the courtroom.)
12        THE COURT:  So I know who the alternates are,
13 alternate one?
14        MR. BODE:  I believe it is Ms. Raymond as
15 alternate one.
16        THE COURT:  She will become juror number three.
17        MR. BODE:  Erika DelRosario I have as the second
18 one.
19        THE COURT:  And she will become juror number
20 ten.
21        Who is giving the opening for the defense?
22        MR. LATO:  I will, your Honor.
23        THE COURT:  And the government?
24        MR. KABRAWALA:  I will, your Honor.
25        MR. BODE:  Mr. Kabrawala will be conducting the

**229**

1  whole case.  I am just second seat.
2         THE COURT:  All right.
3         (The jury enters the courtroom.)
4         THE COURT:  You should start filling the first
5  seat closest to me.
6         You should have seven and seven, right?
7         Everyone can be seated.
8         The two jurors here that are in the same order,
9  move to the front row next to juror number five.
10        Then everyone else in the back row, you can move
11 down.
12        Good morning, members of the jury.
13        I want to welcome you all back to the Eastern
14 District of New York.
15        I want to introduce myself since I didn't do the
16 jury selection.  Magistrate Judge Brown was gracious
17 enough to select the jury for me.
18        I am Judge Joseph Bianco, and I will preside
19 over the criminal trial to begin today.
20        I'm sure Magistrate Judge Brown did this weeks
21 ago, but I want to thank you for your willingness to serve
22 as jurors in this case.  I appreciate your willingness to
23 serve.  And I will do everything I can that assures you
24 are treated with professionalism and respect during the
25 course of the trial and the trial goes as efficiently as

230

1  it possibly can.

2        We did have to excuse two jurors for personal

3  reasons this morning.

4        Let me just go through -- I want to make sure

5  everyone who is seated here.

6        So juror number one is Ms. Alvarez.

7        Two is Ms. Dorgan.

8        Juror number three I had to excuse, so you are

9  Ms. Wedts.

10       I will ask everyone after to move down one seat,

11 because I will fill in that seat with another juror.

12       Ms. Wedts, if you can move down one seat.

13       I will ask alternate number one, Ms. Raymond, to

14 fill seat number three.

15       Juror number five, I can't read the handwriting

16 here, how do you spell your last name?

17       A JUROR:  C-S-A-N.

18       THE COURT:  Good morning.

19       A JUROR:  Good morning.

20       THE COURT:  Number six is Ms. Serieux-Girard.

21       Number seven is Ms. Cohen.

22       Eight is Ms. Jagan.

23       Juror number nine is Ms. Piurek.

24       I had to excuse juror number 10.  So if you can

25 move please.

231

1        Exactly.

2        New juror number 10 is Ms. DelRosario, if you

3  can move down there.

4        Number 11 is Mr. Hublal, H-U-B-L-A-L.

5        Good morning.

6        Number 12 is Ms. Salerno.

7        Alternate one is Ms. Cadle, and number two is

8  Mr. Bogeli, B-O-G-E-L-I.

9        All right.

10       I appreciate your patience this morning and I

11 apologize for the delay.

12       I had matters we needed to take care of this

13 morning.

14       The first order of business is for you to take

15 the oath as jurors in this case.

16       I will ask you to all please stand and take the

17 oath.

18       (A jury of 12 plus two alternates, previously

19 empaneled, are duly sworn.)

20       THE COURT:  Members of jury, now that you are

21 sworn I will give you some preliminary instructions to

22 guide you in your participation in the trial.

23       My full instructions to you of the law come at

24 the end of the case, after the trial is complete, and the

25 lawyers are given their -- giving their summations or

232

1  closing statements to you.  I have some preliminary

2  instructions, about ten minutes or so, to help guide you

3  as a juror in this case.

4        To begin with, you are here to administer

5  justice in this case according to the law and the

6  evidence.  You are to perform this task with complete

7  fairness and impartiality and without bias, prejudice or

8  sympathy for or against the government or the defendant.

9        It will be your duty to find from the evidence

10 what the facts are.  You and you alone will be the judges

11 of the facts.  You will then have to apply to those facts

12 the law as the Court will give it to you.  You must follow

13 that law whether you agree with it or not.

14       Nothing the Court may say or do during the

15 course of the trial is intended to indicate or should be

16 taken by you as indicating what your verdict should be.

17 That is entirely up to you.

18       The evidence from which you will find the facts

19 will consist of the testimony of witnesses, documents, and

20 other things received in the record as exhibits.  And any

21 facts that the lawyers agree to or stipulate to or that

22 the Court may instruct you to find.

23       Certain things are not evidence.  I will list

24 them for you now.

25       One.  Statements, arguments and questions by

233

1  lawyers are not evidence.

2        Two.  Objections to questions are not evidence.

3  Lawyers have an obligation to their clients to make

4  objections when they believe evidence being offered is

5  improper under the rules of evidence.  You should not be

6  influenced by the Court's ruling on it.  If the objection

7  is sustained, ignore the question.  If it is overruled,

8  treat the answer like any other.  If you are instructed

9  that some item of evidence is received for a limited

10 purpose only, you must follow that instruction.

11       Three.  Testimony that the Court excludes or

12 tells you to disregard is not evidence and must not be

13 considered.

14       Anything you see or hear outside the courtroom

15 is not evidence and must be disregarded.  You are to

16 decide the case solely on the evidence presented here in

17 the courtroom.

18       There are two kinds of evidence:  Direct and

19 circumstantial.

20       Direct evidence is direct proof of a fact, such

21 as testimony of an eyewitness.  Circumstantial evidence is

22 proof of facts from which you may infer or conclude that

23 other facts exist.  I will give you further instructions

24 on these as well as other matters at the end of the case.

25 But keep in mind that you may consider both kinds of

234

1  evidence.

2         It is up to you to decide which witnesses to

3  believe, which witnesses not to believe, and how much of

4  any witness' testimony to accept or reject.  I will give

5  you some guidelines for determining the credibility of

6  witnesses at the end of the case.

7         As you know, this is a criminal case.  There are

8  three basic rules about a criminal case that you must keep

9  in mind.

10        First, the defendant is presumed innocent until

11 proven guilty.  The indictment against the defendant

12 brought by the government is only an accusation, nothing

13 more.  It is not proof of guilt or anything else.  The

14 defendant therefore starts out with a clean slate.

15        Second, the burden of proof is on the government

16 at all times.  The defendant has no burden to prove his

17 innocence or to present any evidence, or to testify.

18 Since the defendant has the right to remain silent, the

19 law prohibits you from arriving at your verdict by

20 considering that the defendant may not have testified.

21        Third, the government must prove the defendant's

22 guilt beyond a reasonable doubt.  I will give you further

23 instructions on this point later.

24        Now, a few words about your conduct as jurors.

25        First, I instruct you that during the trial you

235

1  are not to discuss this case among yourselves or with

2  anyone else, including during any recesses or breaks.

3  Even as among yourselves, you see, it is important that

4  each of you keep an open mind until you heard all the

5  evidence, the attorneys' summations and my instructions on

6  the law, only then will you begin to exchange views among

7  yourselves and reach a verdict.  But until I tell you to

8  actually begin deliberating at the end of the case and at

9  the end of my instructions on the law, please do not

10 discuss this case at all among yourselves, with family

11 members or anyone else.

12        So when you are back in the jury room during a

13 break or waiting to come out here, you can't discuss the

14 case, you are not permitted to do that.

15        When you go home today or you call work and

16 people start asking you what the case is about, you have

17 to tell them that Judge Bianco told me not to discuss the

18 case.  When it is over you can discuss it with anyone you

19 want or no one else at all.  Not during the case.

20        I need to emphasize when I say not to discuss

21 it, it means the media as well, no texts or Facebook.  No

22 communications about anything about this case.

23        Second, do not permit any other person to

24 discuss this case in your presence.  If someone does so

25 despite you telling him or her not to, report the fact to

236

1  me.  Please do not, however, discuss with your fellow

2  jurors either that fact or any other fact that you feel

3  necessary to bring to my attention.  The reason is

4  obvious.

5         If something occurs that affects the ability of

6  a juror to continue to serve fairly and impartially, and

7  that juror communicates it to fellow jurors, more than one

8  of you may be affected.  So please just report to me if

9  you have any issues.

10        Third, please do not, while you are serving as

11 jurors in this case, have any conversations with the

12 parties, the attorneys, or any witnesses in this case,

13 whether in the courtroom, in the hallways, in the

14 elevator, cafeteria, outside or anywhere else.

15        By this I mean not only to avoid talking about

16 the case.  Do not talk at all, even to say good morning or

17 to acknowledge any of these people.  Someone seeing a

18 juror in conversation with a party, a lawyer or a witness,

19 might think that something improper was being discussed.

20 To avoid even the appearance of impropriety, then, have no

21 conversations or acknowledgements of any kind.  The

22 lawyers as officers of the court are particularly

23 sensitive to this.  So I can tell you when they pass you

24 in the halls and the cafeteria, without even acknowledging

25 your presence, and they turn away and start walking in the

237

1  other direction, they are not being rude.  They are simply

2  following this instruction, and you need to follow it as

3  well.

4         Fourth, do not read or listen to anything

5  touching on this case in any way.

6         And specifically, I don't know if there will be

7  publicity with respect to the case or not, but in an

8  abundance of caution I will instruct you not to read

9  Newsday or watch News 12 during the trial so you don't

10 inadvertently come across anything in the case if there is

11 publicity.  So don't watch News 12 or read Newsday, and

12 certainly avoid reading anything touching on the case in

13 any media.

14        Fifth, do not try to make any research or make

15 any investigation about the case on your own.

16        And let me just emphasize that point.  Jurors

17 are not allowed to do any outside research whatsoever.

18 And that would include visiting the location talked about

19 during the trial, as an example, or going home and

20 Googling something about the trial to try to find out more

21 information, or try to talk to a lawyer about some ruling

22 that I made.  No outside research of any kind is permitted

23 by you, a juror.  You are only allowed to decide the case

24 based upon the evidence in the courtroom, and no outside

25 research of any kind is permitted.  So, please, do not

**238**

1  that.

2  Finally, do not form any opinion until all the

3  evidence is in.

4  Keep an open mind until you start your

5  deliberations at the end of the case.

6  Sometimes jurors ask if they can take notes.

7  And I do permit the taking of notes. And Michelle, as you

8  see, has given each of you a pad and pen to write with if

9  you want to take notes. I have no view or opinion if a

10  juror wants to take notes. I need to give you some

11  instructions for those who wish to take notes.

12  The first is, if you take notes, leave them in

13  the jury room when you leave at night. Do not take them

14  home with you. They will be in the jury room when you

15  come back in the morning.

16  I want you to remember they are for your own

17  personal use.

18  Also, the notes are simply to help your memory.

19  I don't want you to place too much emphasis on a juror's

20  notes. As you know, a person's notes can be wrong.

21  At the conclusion of the case when you

22  deliberate, notes that any juror may take may not be given

23  any greater weight or influence in the determination of

24  the case than the recollection or impression of other

25  jurors whether from notes or memory with respect to the

**239**

1  evidence presented, or what conclusions, if any, should be

2  drawn from such evidence.

3  When you deliberate at the end of the case, any

4  difference between a juror's recollection and another

5  juror's notes is to be settled by asking the court

6  reporter to read back the testimony in question. It is

7  the court record rather than a juror's notes to be based

8  on the verdict.

9  You see we have a reporter here, Harry, taking

10  down the notes of everything said in the courtroom.

11  Anything will be read back to you at your request when you

12  deliberate. And that is true with respect to physical

13  evidence received during the trial. That is also

14  available to the jury upon request.

15  The trial will now begin.

16  First the government will make an opening

17  statement, which is simply an outline to help you

18  understand the evidence as it comes in.

19  Next, the defendant's attorney may, but does not

20  have to, make an opening statement. The defendant has no

21  burden of proof whatsoever. The government has the burden

22  of proof at all times. So defense counsel doesn't even

23  have to give an opening statement. But they are permitted

24  to do so if they wish.

25  Opening statements are not evidence. Rather,

**240**

1  you can consider the opening statement as a preview of

2  what each side expects the evidence in the case will show.

3  The government will then present its evidence

4  through testimony of witnesses.

5  Counsel for the defendant may, if he wishes,

6  cross-examine these witnesses.

7  There is also something called redirect and

8  recross. Sometimes the lawyers get up a second time to

9  ask followup questions of things covered during the cross.

10  There may be some of that as well.

11  Evidence may also be in the form of physical

12  items, exhibits, which are offered in evidence.

13  Following the government's case, the defendant

14  may, if he wishes, present evidence. But he is not

15  required to do so. The burden is always on the government

16  to prove every element of the offense charged beyond a

17  reasonable doubt. The law never imposes on the defendant

18  in a criminal case the burden of calling any witnesses or

19  introducing any evidence.

20  If the defendant puts on any evidence, the

21  government may or may not wish to put further evidence

22  before you to rebut what the defense has set forth.

23  After all the evidence has been presented, the

24  attorneys will have the opportunity to present a closing

25  argument or summation to you.

**241**

1  What is said in these arguments is not evidence.

2  Each party is simply presenting to you their view of what

3  the evidence has shown and suggesting to you the

4  inferences or conclusions you should draw from the

5  evidence, whether you find an argument sound and

6  persuasive or you may not.

7  Because the government has the burden of proof

8  in the case, they have the right to argue first in the

9  closing argument, followed by counsel for the defendant.

10  After which the government may give a short rebuttal

11  summation.

12  After you heard the closing arguments, I will

13  instruct you on the applicable law. You will then retire

14  to the jury room to deliberate on your verdict.

15  You have a tremendously important task as

16  jurors. It is to determine the facts. Our Constitution

17  gives a defendant a right to have you, who are members of

18  the community, find those facts. You, and not the Court,

19  are the sole judge of the facts.

20  Let me say to the alternate jurors that you

21  should listen just as carefully and conscientiously as the

22  other jurors. As you have seen already this morning, you

23  may very well be called upon prior to the conclusion of

24  the case to take the place of one of the jurors, and then

25  you will have to render a verdict. So please pay close

242

1  attention at all times.

2        That ends my preliminary instructions.

3        I just want to discuss with you scheduling.

4        As you know, we are sitting Monday through

5  Thursday.  We are not sitting on Friday this week.  The

6  typical trial day is 9:30 to 4:30.  We take a morning

7  break usually around 11:00, 11:15, at a convenient time,

8  for 15 or 20 minutes.

9        We break for lunch sometime between 12:30 and

10 1:00.  I handle other matters during the lunch break on

11 other cases.  Sometimes depending on when those are

12 scheduled or where we are in a particular witness, I may

13 break sometime closer to 1:00.  But at sometime close

14 between 12:30 and 1:00.

15       The afternoon, we take a mid-afternoon break

16 somewhere around 3:00, 3:15.  And then we continue to

17 4:30.

18       I know a lot of you have buses or trains to

19 catch, so we don't go beyond 4:30.  I will end every day

20 at 4:30.  Unless occasionally we have a witness who has

21 five minutes left, in order not to have the witness come

22 back I may ask you to stay five minutes or so if you can.

23 Other than that we will not go past 4:30.

24       As I said when I started, it is important to me

25 that you are treated with professionalism and respect, and

---

Opening Statement/Kabrawala

243

1  any issues you have you can bring to Michelle's attention.

2        I meet with the lawyers before the day begins,

3  lunchtime, at the end of the day, to try to make sure that

4  the trial is proceeding efficiently, to avoid the number

5  of sidebars that we have to have or to avoid you sitting

6  back in the jury room waiting to come out.

7        I can't promise you that that is not going to

8  happen because things come up during the trial and rulings

9  need to be made by me.  And despite our best efforts to

10 minimize that time, there may be some occasions where you

11 will need to wait.

12       I will just ask for your patience so I can

13 assure you we are doing everything we can to minimize the

14 amount of time you are not here in the courtroom hearing

15 the evidence.

16       So with that, we are now ready to proceed to the

17 opening statements.

18       The government goes first, Mr. Kabrawala.

19       MR. KABRAWALA:  The defendant, Joseph Valerio,

20 had a woman molest her young daughter on camera and send

21 him videos of the sexual abuse by email.  From his house

22 here at Long Island, the defendant sat at the computer and

23 emailed the young woman thousands of miles away scripting

24 out a sexually explicit scene for this woman to perform on

25 her young daughter, who is just a toddler.

---

Opening Statement/Kabrawala

244

1        He didn't do this just once, not just twice.

2  The defendant sent dozens of emails to this woman, his

3  co-conspirator, directing her to do exactly what he said.

4        The defendant and this woman had an arrangement.

5  The defendant demanded videos, the woman molesting her

6  young daughter on camera.  And the woman, she wanted

7  money.  And the defendant got exactly what he wanted from

8  this arrangement.  He got custom-made home videos of a

9  young girl, a toddler, being molested by her mother, sent

10 straight to his in box.

11       Now, you are going to learn that the defendant

12 didn't stop there.  You will learn that the defendant

13 himself sexually exploited another young girl, his own

14 ███, who was about six years old at the time.  He

15 dressed her up in costumes, a red, white and blue

16 cheerleader outfit, a blond wig, nothing but lace tights,

17 and he took sexually explicit pictures of her in his

18 basement.

19       It was in the basement of his house located in

20 Smithtown, just miles from this courthouse.

21       These two young girls, that is why we are here

22 today.  And it is because of these two young girls that

23 this man, the defendant Joseph Valerio, who sits now in

24 this courtroom before you.

25       Good morning.

---

Opening Statement/Kabrawala

245

1        My name is Ameek Kabrawala and I am an Assistant

2  U.S. Attorney here in the Eastern District of New York.

3        I'm joined by Assistant U.S. Attorney Allen Bode

4  and Special Agent Steven Troyd of the FBI.  Together we

5  represent the United States of America in this case.

6        So how did this all come about?

7        Well, you will learn that the defendant met a

8  woman named Olena Kalichenko on an internet dating site.

9  Kalichenko lived oversees in the Ukraine.  She had a young

10 daughter named ███.

11       Kalichenko even came to visit the defendant here

12 in Smithtown without her daughter.  For about two years

13 the defendant and Kalichenko exchanged emails, emails

14 about everyday things, like what was going on in their

15 lives.  And they emailed about Kalichenko and her daughter

16 coming to live in Smithtown with the defendant.

17       But shortly into their relationship the

18 defendant, he took things in another direction.  He

19 started asking Kalichenko to make sexually explicit videos

20 with her young daughter in email after email.  The

21 defendant demanded videos in which he directed Kalichenko

22 to perform very specific sex acts, such as performing oral

23 sex on her toddler, dressing the toddler up in tights.  In

24 exchange, Kalichenko, the defendant's co-conspirator,

25 asked the defendant for money.  And she got it.

Opening Statement/Kabrawala

246

1  Both got what they wanted.  The defendant got
2  videos of a young girl being molested and sexually
3  exploited by her mother, and Kalichenko got money.
4  So you will learn that over the course of a
5  six-month period in 2012, a six-month period in 2012, the
6  defendant requested and received dozens of videos,
7  numerous videos.
8  These videos show Kalichenko sexually abusing
9  her daughter, and following the defendant's script.
10  You will learn that based on an investigation by
11  the FBI, federal agents uncovered this arrangement between
12  the defendant and Kalichenko.  As a result of their
13  investigation, the FBI obtained a court ordered search
14  warrant to search the defendant's residence up in
15  Smithtown.  And in January of this year, 2014, the FBI,
16  together with the Suffolk County Police Department,
17  conducted a search of the defendant's residence, where he
18  lived with a female companion.
19  Now, you will learn that the defendant was home
20  at the time the search warrant was conducted, and he spoke
21  with law enforcement agents.
22  You are going to learn that the defendant
23  confessed to directing Kalichenko to produce child
24  pornography with her young daughter.  The defendant
25  admitted that he sent emails to Kalichenko asking for

Opening Statement/Kabrawala

247

1  videos of her sexually abusing her daughter.  The
2  defendant also admitted that he paid Kalichenko thousands
3  of dollars, and he wanted these videos in return.  He
4  confessed to receiving that child pornography by email.
5  In fact, agents showed the defendant two emails
6  from July 2012 in which he scripted out exactly what he
7  wanted to have Kalichenko do with her daughter.
8  You will see the defendant's exact words.  You
9  will see the emails.  In one of the emails the defendant
10  literally says, he tells Kalichenko to follow, quote
11  unquote, the script.  He told Kalichenko to videotape
12  herself performing oral sex on her daughter.
13  The defendant said he wanted the toddler to be
14  dressed up in, quote, pantyhose and tights, with long
15  blond hair.
16  The defendant even described what he wanted to
17  see Kalichenko do with the child's toys.
18  In one email the defendant said he would pay
19  Kalichenko, quote unquote, for her time making videos with
20  ███.
21  In one of the emails the defendant commands:
22  Get those videos done.
23  After reading the emails, do you know what he
24  did?  The defendant confessed that he sent them.
25  Now, while searching the defendant's house over

Opening Statement/Kabrawala

248

1  in Smithtown, the agents found a computer in the
2  defendant's home.  It was in the home office area.  Using
3  forensic tools and technology, agents recovered a number
4  of emails the defendant sent to Kalichenko where he
5  scripted out what he wanted her to do with the toddler.
6  Agents also found numerous sexually explicit
7  videos, all in the defendant's inbox, his email inbox in
8  his computer, right there at his house in Smithtown, and
9  in the same room where agents discovered his computer,
10  where they found a number of digital devices.
11  One of those devices is a Samsung memory card,
12  one of those tiny little memory cards you put in your
13  camera.
14  On that memory card agents made a very
15  disturbing discovery.  They found images of another young
16  girl, the defendant's very own ███, who was about six
17  years old at the time, taken using a Samsung digital
18  camera, a Samsung memory card and a Samsung digital video
19  camera.
20  Some of the pictures of the defendant's ███
21  she is dressed up in costume with nothing but a blond wig
22  and tights.  The camera focused only on her genitals.
23  These pictures are sexually explicit.  Child
24  pornography, ladies and gentlemen.
25  The agents also saw something they recognized.

Opening Statement/Kabrawala

249

1  They saw a number of things they recognized.  The
2  background, the furniture, the toys.  They have seen those
3  same things before when they were at the defendant's house
4  searching it.
5  They saw those same things in the defendant's
6  basement.
7  Based on that new information, federal agents
8  got a second Court ordered search warrant now that they
9  knew something had happened at the defendant's house, and
10  more specifically in his basement.
11  When they searched the defendant's house again,
12  what did they find?  They found things that looked very
13  familiar to them.
14  The pattern on the furniture.  They found the
15  red, white and blue cheerleader outfit.  They found the
16  blond wig.  They found the toys.  All of which can be seen
17  in the pictures.  And they found hidden cameras throughout
18  the basement.
19  They also found a wall clock with a hidden
20  camera in it.
21  They found a stage-like platform, a stage, with
22  a hidden camera in it.  Do you know where it was pointed?
23  Upwards.
24  And agents also found the Samsung digital video
25  camera that this defendant used to take sexually explicit

**250**

1  pictures of his ███

2  Do you know where they found that?  They found

3  that hidden in the ceiling above the basement ceiling.

4  Agents had to take apart the ceiling, and they found it

5  there.

6  Now, for his actions the defendant is charged in

7  a 15-count criminal indictment, as to ███, the toddler

8  in the Ukraine.  The defendant is charged with a

9  conspiracy to sexually exploit the child, transportation

10  of child pornography, receipt of child pornography and

11  also attempted sexual exploitation of a child for emails

12  that the defendant sent to the Ukraine to Kalichenko

13  directing the videos of Kalichenko molesting her daughter.

14  For the defendant's actions involving his ███

15  here in Smithtown, he is charged with sexually exploiting

16  a child.  And the defendant is also charged with

17  possessing child pornography.

18  Now, as the prosecution, we have the burden of

19  proving the defendant guilty beyond a reasonable doubt.

20  And we will meet that burden by presenting you with

21  evidence in the form of witnesses, documents and physical

22  evidence.

23  First and foremost, as you know from jury

24  selection, in order to decide the facts of this case it

25  will be necessary for you to see the images and the videos

**251**

1  that this defendant created or caused to be created.

2  Now, while it is troubling to view these images,

3  they speak for themselves.  You will see the videos that

4  the defendant created in response to his emails, following

5  his script, that Kalichenko created.  And you will see the

6  sexually explicit images of the defendant's young ███

7  taken in his basement.

8  You will also hear testimony from

9  Special Agent Steven Troyd who will testify about the two

10  searches and what his team found during the searches, and

11  where they found it.

12  You will see the computer that the defendant

13  used to communicate with Kalichenko.  You will see the

14  Samsung digital memory card.  You will see the Samsung

15  video camera that the defendant used to film his ███.

16  You will learn where it was found.  You will see the

17  basement.  You will see the basement ceiling panel tiles

18  taken off where the camera was found.  And you will see a

19  receipt showing that the defendant purchased the Samsung

20  video camera and digital memory card and that they were

21  shipped to him.

22  You will also see the hidden cameras, costumes,

23  costumes that the defendant dressed his ███ with.

24  Agent Troyd will recount for you the defendant's

25  confession, that he admitted directing Kalichenko to make

**252**

1  child pornography with her toddler, and he -- that he paid

2  her to do so.

3  You will also see the money trail in the form of

4  Western Union wire transfers showing the defendant paid

5  Kalichenko thousands of dollars, just like he admitted.

6  Now, ladies and gentlemen, the facts of this

7  case are clear.

8  At the end of the trial we will ask you to

9  return a verdict, the only verdict that is consistent with

10  those facts.  We will ask you to hold the defendant

11  accountable for his actions and find him guilty on all

12  counts.

13  Thank you.

14  THE COURT:  Members of the jury, as I said

15  before, the government has the burden of proof at all

16  times, therefore the defendant does not need to make an

17  opening statement.  But I am advised that the defendant

18  wishes to give an opening statement.

19  Mr. Lato, you may proceed.

20  MR. LATO:  Thank you, your Honor.

21  Good morning, ladies and gentlemen.

22  My name is Leonard Lato, as Judge Bianco has

23  already said.  And I will be trying this case with my

24  co-counsel, Anthony M. LaPinta, the taller of the two

25  gentlemen at the table.  And there is Mr. Joseph Valerio,

**253**

1  the defendant a couple of chairs away.

2  The question in this case is not what, but who.

3  A person produced child pornography videos with

4  a toddler.  Mr. Kabrawala said that, and the defense

5  agrees with that.  But that person, contrary to what

6  Mr. Kabrawala said, was not Joseph Valerio.  That person

7  may have been Olena Kalichenko.

8  If Olena Kalichenko, she produced the videos not

9  in the United States but in the Ukraine.

10  Joseph Valerio has never been to the Ukraine.

11  As Mr. Kabrawala stated, another video or other

12  videos were made of a young girl, Mr. Valerio's ███.  We

13  agree with that, meaning "we," the defense.

14  But that person, once again, was not Joseph

15  Valerio.  That person, once again, may have been Olena

16  Kalichenko.

17  Because as Mr. Valerio was never to the Ukraine,

18  Ms. Kalichenko has been to the United States and has been,

19  and has stayed in Mr. Valerio's house.

20  It is not Mr. Valerio, and it only may be

21  Ms. Kalichenko.

22  Why the uncertainty?

23  Because the government's investigation was

24  incomplete.

25  The government searched Mr. Valerio's house.

**254**

1  Mr. Kabrawala talked about that.  They searched it
2  extensively.  They seized all of Mr. Valerio's computers,
3  all of the hard drives, the CDs, the DVDs, memory cards,
4  all type of computer media the FBI seized.
5       And what of the videos of the toddler in the
6  Ukraine?  Not on any of the computers, any of the hard
7  drives, or any of the media.
8       If Mr. Valerio loved these videos, why weren't
9  they in his house?  Nowhere to be found.
10      Could they be on Olena Kalichenko's computer,
11  cell phone, external hard drives, back in the Ukraine?
12      It could be.  The FBI doesn't know.  They never
13  attempted to find out.
14      So for all we know there is a lot of evidence of
15  those videos of that toddler somewhere in the Ukraine.
16  And the government is not going to be able to produce
17  them.
18      Now, with respect to Mr. Valerio's ████, there
19  is one piece of physical evidence, and we will be up front
20  with you.  There is a memory card that was found in
21  Mr. Valerio's basement containing deleted images of
22  Mr. Valerio's ████ in one or two videos.
23      I say "deleted" because that is important.  Once
24  again, if Mr. Valerio likes child pornography, why doesn't
25  he have these videos in his basement?

**255**

1       Some of you may know just because something is
2  deleted doesn't mean it can't be restored from the recycle
3  bin on the computer.  That is not something that happened
4  here.
5       In fact, the government's computer expert had to
6  use special software available to law enforcement to
7  restore these deleted images on that memory card.  It
8  doesn't seem like something or someone who wanted child
9  porn would do, take an image and then delete it and
10  requiring special software to restore it.
11      Someone wanted the video of Mr. Valerio's ████
12  produced.  Someone who doesn't want the videos them
13  deleted, nullified, as if they never existed.
14      Who wanted them produced?  It could have been
15  Olena Kalichenko when she was in Mr. Valerio's house.
16      Who wanted them nullified as if they never
17  existed?  It could have been Mr. Valerio.  It could have
18  been also Olena Kalichenko after having made them.  It
19  could have been anyone.  It is just speculation.
20      Now, there will probably be two principal
21  government witnesses in this case.  FBI
22  Special Agent Steven Troyd sitting over there, who just
23  nodded to you, with the glasses.  And he will bring to
24  you, and his testimony, his incomplete investigation,
25  including his search and his unrecorded coercive

**256**

1  interrogations of Joseph Valerio.
2       There will also be a Suffolk County detective,
3  not an FBI agent.  There will be no FBI agent expert
4  before you, but a Suffolk County detective, Rory
5  Forrestal, who will testify, among other things, the lack
6  of videos of the toddler from the Ukraine on the machines
7  and the non-existed or deleted videos on the memory card.
8       Now, what happened to the children in this case
9  is certain.  Who made it happen is not.
10      Thank you.
11      THE COURT:  Members of the jury, that completes
12  the opening statement.  The government will begin the
13  presentation of its evidence.  But we will take our
14  morning break before we do that.
15      We will take a 15 or 20 minute break.
16      Do not discuss the case.
17      Thank you.
18      (Whereupon, at this time the jury leaves the
19  courtroom.)
20
21      (Whereupon, a recess was taken.)
22
23
24
25

**257**

1       THE COURT:  Please be seated.
2       Is the government ready?
3       MR. KABRAWALA:  Yes, Judge.
4       THE COURT:  Defense ready?
5       MR. LaPINTA:  Yes, Judge.
6       THE COURT:  Who is your first witness?
7       MR. KABRAWALA:  Special Agent Peter Angelini.
8  I should say Assistant Special Agent in Charge.
9       THE COURT:  All right, bring in the jury.
10      MR. LaPINTA:  Your Honor, would you mind if I
11  moved this monitor back a bit?
12      THE COURT:  You can move it anywhere you like.
13      MR. LaPINTA:  Thank you.
14      THE CLERK:  All rise.
15      (Whereupon, the jury at this time entered the
16  courtroom.)
17      THE COURT:  Please be seated.
18      Members of jury, as I said before the break, the
19  government will begin its presentation of the evidence.
20      Please call your first witness.
21      MR. KABRAWALA:  Judge, the United States calls
22  Peter Angelini.
23      THE CLERK:  Please remain standing and raise
24  your right hand.
25

Angelini-Direct/Kabrawala

258

1   P E T E R     A N G E L I N I,
2          called as a witness, having been first
3          duly sworn, was examined and testified
4          as follows:
5             THE CLERK:  Please state your name and spell it
6   for the record.
7             THE WITNESS:  Peter Angelini, P-E-T-E-R,
8   A-N-G-E-L-I-N-I.
9             THE COURT:  Please be seated.
10            I will just ask you to pull the microphone over
11   and pull your chair up so you can be very close to it.
12            THE WITNESS:  Yes, your Honor.
13
14   DIRECT EXAMINATION
15   BY MR. KABRAWALA:
16   Q    Good morning.
17   A    **Good morning.**
18   Q    Are you employed?
19   A    **Yes.**
20   Q    Where do you work?
21   A    **The FBI in Chicago.**
22   Q    The Federal Bureau of Investigation in Chicago?
23   A    **Yes.**
24   Q    Please describe your education background.
25   A    **I have an undergraduate degree from the University of**

Angelini-Direct/Kabrawala

259

1   **Michigan, and a law degree from the University of**
2   **Pittsburgh**
3   Q    Please speak up.
4   A    **An undergraduates degree from the University of**
5   **Michigan and a law degree from the University of**
6   **Pittsburgh**
7   Q    What is your job title with the FBI?
8   A    **Currently the Assistant Special Agent in Charge in**
9   **Chicago over the branch that has counterintelligence and**
10   **cyber investigation.**
11   Q    Assistant Special Agent in Charge, is that ASAC for
12   short?
13   A    **Yes.**
14   Q    How long have you been employed by the FBI?
15   A    **14 and a half years.**
16   Q    And where were you previously assigned before
17   becoming an ASAC in Chicago?
18   A    **To the U.S. Embassy in Kiev as the Assistant Legal**
19   **Attache for the FBI there.**
20   Q    You were an Assistant Legal Attache, is that referred
21   to as ALAT?
22   A    **Yes, ALAT.**
23   Q    How long were you stationed as Assistant Legal
24   Attache in Kiev, Ukraine?
25   A    **For two and a half years.**

Angelini-Direct/Kabrawala

260

1   Q    Generally speaking, what were your primary duties as
2   the Assistant Legal Attache stationed in Kiev?
3   A    **The FBI has offices all over the world.  We have our**
4   **people stationed in embassies and consulates all over the**
5   **countries.**
6          **Our responsibility is to liaison with the local**
7   **police, in my case with the MVD, the local police there,**
8   **as well as the SBU, which is the security service.**
9          **We work with them.  We gather information that**
10   **is requested for FBI cases in the United States, and when**
11   **the Ukrainians need investigative assistance perhaps in**
12   **the US for their cases, we would help them obtain that**
13   **information as well.**
14   Q    While you were stationed in the Ukraine, did you
15   participate in an investigation involving an individual
16   named Joseph Valerio?
17   A    **I did.**
18   Q    Now, without telling us what anyone told you, can you
19   briefly describe how Joseph Valerio came to your
20   attention.
21   A    **The Assistant Regional Security Officer, or RSO,**
22   **informed me that they had information that there was a**
23   **walk-in to the embassy that had a complaint, a criminal**
24   **complaint, that may have relevance to the US.**
25   Q    Let me stop you right there.  What do you mean by

Angelini-Direct/Kabrawala

261

1   walk-in?  Clarify.
2   A    **Very often people would just walk into the embassy**
3   **and say I have information, or I have a complaint, or**
4   **something relevant to US interests.**
5          **So depending what the matter is, it is**
6   **prescreened by the RSO, the Regional Security Officer.  If**
7   **it is criminal nature it comes to us, or if national**
8   **security it comes to us or other agencies.  That is what a**
9   **walk-in is.**
10   Q    All right.
11          Now, continue.  You were describing how Joseph
12   Valerio came to your attention.
13   A    **So I had information there was a walk-in complaint**
14   **with a potential criminal complaint, so myself and James**
15   **Bulin (ph) interviewed the complainant.**
16   Q    What was the complainant's name?
17   A    **Her name was Olena Kalichenko.**
18   Q    Spell it, please.
19   A    **First name O-L-E-N-A, last name K-A-L-I-C-H-E-N-K-O.**
20   Q    Are you familiar with any other spellings of that
21   name, the English version of that name?
22   A    **I have seen it in variations; Ms. Kalichenko used**
23   **Helena, H-E-L-E-N-A, or Elena, E-L-E-N-A, as well as**
24   **Olena.**
25   Q    Now, when was your initial meeting with Kalichenko?

Angelini-Direct/Kabrawala

262

1   A   The first time I met with her was on November 8th,
2   2013.
3   Q   Did you have more than one meeting, the first meeting
4   at the embassy?
5   A   I met with her a second time on November 19th.  I
6   also met her on one occasion I think in April, before I
7   was leaving to return to the US from the Ukraine.
8   Q   Now, let's talk about November, you said you met with
9   her twice on November 8th and 19th.
10           If I showed you a picture of Ms. Kalichenko, do
11   you think you would recognize her?
12   A   I would.
13   Q   All right.
14           MR. KABRAWALA:  May I approach, Judge?
15           THE COURT:  Yes.
16   Q   Showing you what is marked as Government's Exhibit 4
17   for Identification.
18           Take a look at that.  Do you recognize the
19   individual in that photograph?
20           (Handed to the witness.)
21   A   Yes.
22   Q   What is it?
23   A   A photograph of Olena Kalichenko.
24   Q   Generally speaking, is it a fair and actual depiction
25   of what Olena Kalichenko looked like when you saw her?

Angelini-Direct/Kabrawala

263

1   A   Yes.
2           MR. KABRAWALA:  Move to admit, Judge.
3           MR. LATO:  No objection.
4           THE COURT:  Government's Exhibit 4 is admitted.
5           (Whereupon, Government's Exhibit 4 was received
6   in evidence.)
7           MR. KABRAWALA:  I will publish it.
8           (Whereupon, the exhibit/exhibits were published
9   to the jury.)
10   Q   Now, you testified you met with Kalichenko.  Without
11   telling us what Kalichenko actually said to you, did she
12   provide you with any documents during the first meeting on
13   November 8th of 2013?
14   A   She did.
15           She provided me a number of documents.  One was,
16   I-believe, an email that got sent in.  She sent it into
17   the embassy detailing it as part of the complaint.  She
18   had a couple of emails purportedly from a person in the
19   US.  And then there were a couple of quasi legal documents
20   that were included in that packet as well.
21   Q   I want to draw your attention to one of the legal
22   documents that you obtained from Kalichenko showing you
23   what is marked as Government's Exhibit 3.
24           (Handed to the witness.)
25   Q   Do you recognize that document?

Angelini-Direct/Kabrawala

264

1   A   Yes.
2   Q   Is that a document that Ms. Kalichenko provided to
3   you -- withdrawn.
4           Is that a true and correct copy of a document
5   that Ms. Kalichenko provided to you during the first
6   meeting in November?
7   A   Yes.
8           MR. KABRAWALA:  Move to admit.
9           MR. LATO:  May I see it, your Honor?
10           THE COURT:  Yes.
11           MR. KABRAWALA:  Just for the record, a
12   pre-marked exhibit has been provided to the defendant
13   approximately a week ago.
14           MR. LATO:  One moment, please.
15           (Whereupon, at this time there was a pause in
16   the proceedings.)
17           MR. LATO:  Objection.  May we approach?
18           THE COURT:  Yes.
19
20           (Whereupon, at this time the following took
21   place at the sidebar.)
22           THE COURT:  What is the objection?
23           MR. LATO:  Two grounds.
24           One, a 403 problem.  It is highly inflammatory
25   and has nothing to do with this case.

Angelini-Direct/Kabrawala

265

1           Number two, it is hearsay.  And it is a Crawford
2   violation.
3           MR. KABRAWALA:  Judge, with respect to the first
4   point, it is no more inflammatory than the charges of this
5   case where the defendant is charged with creating and
6   scripting out child pornography.
7           THE COURT:  What is the second one?
8           MR. KABRAWALA:  Secondly, it lays the groundwork
9   for the conspiracy itself.
10           As you know, there is a conspiracy charged here.
11   It is intrinsic evidence of the crime that is inextricably
12   related.  This shows a sort of genesis of the conspiracy.
13   This is essentially a contract that is between
14   Ms. Kalichenko and the defendant whereby they have an
15   arrangement of some sort.
16           THE COURT:  Let me read it.
17           (Whereupon, at this time there was a pause in
18   the proceedings.)
19           THE COURT:  This is a co-conspirator statement?
20           MR. KABRAWALA:  It is both an admission and
21   co-conspirator statement.  It is not hearsay at all.
22           It is going to come in and you will see it will
23   also come in through the email, his email as well.  It is
24   his own statement and a co-conspirator statement.  And it
25   lays the groundwork for the conspiracy.

Angelini-Direct/Kabrawala

266

1    THE COURT:  You are not alleging he signed it?
2    MR. LATO:  It is not properly authenticated.
3  This witness can't properly authenticate this document.
4  Ms. Kalichenko is not here.
5    THE COURT:  Is the same email on his computer?
6    MR. KABRAWALA:  The email is, but not signed.
7    Actually, Judge, we can also have it come in
8  based on its effect on the listener, the witness.  Because
9  this email and other emails caused the witness to initiate
10  the investigation.
11    THE COURT:  Yes, but under 403 it wouldn't be
12  necessary for the details to come in to explain why he
13  initiated the investigation.  He can say I received
14  certain emails.  I will not let it in for that purpose
15  under 403.
16    I don't know how you can authenticate this
17  document through this witness.  You can offer it
18  through -- I guess you got this on his computer?
19    MR. KABRAWALA:  This was brought in.
20    THE COURT:  You can use that one and not this
21  one.
22    MR. KABRAWALA:  It is about to come up, your
23  Honor, but we are going to be discussing a number of
24  emails as well that Kalichenko provided.
25    THE COURT:  My ruling is under 403 that any

Angelini-Direct/Kabrawala

267

1  emails she provided him is hearsay.
2    MR. KABRAWALA:  All right.
3    THE COURT:  If you are offering it for him to
4  explain his actions, I don't think it is necessary given
5  that the other emails will come in to understand what the
6  genesis of the investigation was.  You can say he provided
7  emails and that is it.
8    MR. KABRAWALA:  What I will propose is we finish
9  up with this witness and call him.  Because the next
10  witness we will call is Cablevision, who will authenticate
11  the emails.
12    THE COURT:  Let me ask the defense.
13    Other than this one, do you object to him
14  referring to other emails that are going to come in?
15    MR. LATO:  If he is going to get into the
16  content, yes.  Because there may be other reasons to
17  object to the other emails.
18    At this juncture this document is objectionable
19  because of the inflammatory 403 nature.  We will consider
20  them one at a time.  Some may come in and others may not.
21    THE COURT:  You will have to recall him then.  I
22  don't want to do it backwards.
23    Have him stand by if you feel it is important
24  enough.
25    MR. KABRAWALA:  They are also doubly

Angelini-Direct/Kabrawala

268

1  authenticated.
2    THE COURT:  If you want him to identify the
3  exhibits by number, and we can see if it can come in
4  independent of him.  You can do that.
5    MR. LaPINTA:  This is concerning --
6    MR. KABRAWALA:  We have moved on from this.
7  They are five emails that will all come in anyway.
8    MR. LaPINTA:  They will come in once you
9  establish the Cablevision foundation.
10    MR. BODE:  Or his house.
11    THE COURT:  This is probably that document.
12  That document was not found on the computer.
13    MR. LATO:  That document is out.
14    MR. KABRAWALA:  Not the signed one, but the
15  email without the signatures.
16    MR. LaPINTA:  All right.  Thank you.
17
18    (Whereupon, at this time the following takes
19  place in open court.)
20
21  BY MR. KABRAWALA:
22  Q   I want to show you what is marked as
23  Government's Exhibit 2.  It is a packet of approximately
24  45 emails.  Withdrawn.
25    It is a packet of 45 documents.

Angelini-Direct/Kabrawala

269

1    (Handed to the witness.)
2  Q   Do you recognize that?
3  A   I do.
4  Q   What is that?
5  A   A number of emails that were sent to me by
6  Ms. Kalichenko in the approximate three or four days --
7  one of the three or four days subsequent to my first
8  interview with her.
9  Q   So you received those emails from Ms. Kalichenko?
10  A   I did.
11    During our first interview she said she had --
12    MR. LATO:  Objection.
13    THE COURT:  Sustained.
14  A   It was indicated that there was information she
15  wanted me to see.
16    So she sent me these items subsequent to the
17  interview.
18  Q   I wanted to show you a few more.
19    I will show you Exhibit 5, Exhibit 2-B, 2-D and
20  2-E.
21    (Handed to the witness.)
22  Q   Do you recognize those documents?
23  A   Yes, I recognize them.
24  Q   And just for the record, the last thing I brought up
25  to you, that packet, that is Government's Exhibit 2?

Angelini-Direct/Kabrawala

270

1  A   Yes, sir.

2  Q   Okay.

3       The exhibits that I handed you, 2-B, 2-D and 2-E

4  and 5 -- actually 5 has attachments to it that is marked

5  as 5-A.

6  A   Yes, sir.

7  Q   What do you recognize all those exhibits to be?

8  A   I recognize these exhibits to be among the emails

9  that Ms. Kalichenko forwarded to me after our first

10 interview.

11 Q   Is there an email address on those?

12 A   Yes, my FBI address as well as the State Department,

13 yes.

14 Q   Now, after you were provided all the emails that you

15 identified, did there come a time that Ms. Kalichenko

16 provided you with anything else?

17 A   Yes.

18      We interviewed her a few weeks later and she

19 provided me with a disk, a video disk.

20 Q   Showing you what is marked as Government's Exhibit 1.

21      (Handed to the witness.)

22 Q   Do you recognize that?

23 A   Yes.

24 Q   What is it?

25 A   It is the disk that Ms. Kalichenko gave to me in the

Angelini-Direct/Kabrawala

271

1  Ukraine.

2  Q   Please repeat that.

3  A   The disk that Ms. Kalichenko gave to me.

4  Q   How do you know it is the same disk?

5  A   I reviewed it yesterday and put my initials on it.

6       When I first got the disk from Ms. Kalichenko,

7  myself and our cyber ALAT, another agent like me who works

8  with computers.

9       We qued up the disk and we could not make the

10 video run, but we saw the first frames that they were

11 showing in the disk.

12      As I reviewed the disk yesterday it was the same

13 frames I have seen in Kiev.

14      MR. KABRAWALA:  Move to admit.

15      MR. LATO:  No objection.

16      THE COURT:  Exhibit 1 is admitted.

17      (Whereupon, Government's Exhibit 1 was received

18 in evidence.)

19 Q   Generally speaking, when you viewed this disk before

20 coming to court today, can you describe what you saw on

21 the disk?

22 A   The disk contains video, multiple snippets spliced

23 together of Ms. Kalichenko basically nude or dancing, and

24 posing for the camera, sometimes alone.  And then there is

25 also some videos of her with her daughter, purportedly her

Angelini-Direct/Kabrawala

272

1  daughter, a toddler about two or three years old.  And due

2  to -- she was fondling herself, trying to touch the child

3  and trying to get the child to touch her genitals.  That

4  is more or less of it.

5  Q   Showing you what is marked as

6  Government's Exhibit 1-A and 1-B.

7       (Handed to the witness.)

8  Q   Do you recognize those two exhibits?  If so, what is

9  it?

10 A   I recognize each of these.  I recognize them to be

11 still frame shots from the video, Exhibit 1.

12 Q   Do you recognize the still frame shots, true and

13 correct still frame shots from the video admitted as

14 Government's Exhibit 1?

15 A   Yes, sir.

16      MR. KABRAWALA:  Move to admit both of them.

17      MR. LATO:  No objection.

18      THE COURT:  1-A and 1-B are admitted.

19      (Whereupon, Government's Exhibits 1-A and 1-B

20 were received in evidence.)

21      MR. KABRAWALA:  I will publish them now.

22      (Whereupon, the exhibit/exhibits were published

23 to the jury.)

24 Q   Publishing 1-A.  And now publishing 1-B.

25      (Whereupon, at this time there was a pause in

Angelini-Direct/Kabrawala

273

1  the proceedings.)

2  Q   Now, referring to 1-A, what is depicted in this?

3  A   1-A is a picture of Ms. Olena Kalichenko, a facial

4  shot.

5  Q   And 1-B, what is depicted?

6  A   1-B is also Ms. Kalichenko, as well as the toddler

7  that was in the video I assumed to be her daughter.

8  Q   Now, following your meeting and interaction with

9  Kalichenko what, if anything, did you do with the

10 information and things that Ms. Kalichenko either

11 forwarded to you or had given to you?

12 A   The legal attache, the LEGAT office, L-E-G-A-T office

13 that we have all over the world, we don't typically

14 conduct our own investigation.  We work off of other

15 divisions of the FBI.

16      In this case the relevant division would have

17 been in New York.  So we sent -- I sent all the emails and

18 all the information I had back to New York.

19      Initially I sent, after the first meeting in

20 November, I made contact with the New York field office

21 and I sent them my report, which is the FD 302 and the

22 emails.  And then I received a request from them for

23 follow-up, including to request the disk from

24 Ms. Kalichenko.

25      After the second meeting with Ms. Kalichenko, I

**Angelini-Direct/Kabrawala**

274

1 obtained the disk and wrote another 302, report of
2 interview, and the disk we sent to New York also for
3 evaluation.
4 Q   Was there in New York a lead point in contacting or a
5 lead investigator that you primarily dealt with?
6 A   The case was ultimately assigned to
7 Special Agent Steven Troyd and that is who I had contact
8 with in this case.
9        MR. KABRAWALA:  Just one moment, Judge.
10        (Government counsel confer.)
11        MR. KABRAWALA:  There is nothing further at this
12 time, Judge.  We just ask permission to recall the witness
13 after the next witness testifies.
14        THE COURT:  Yes.
15        Cross-examination.
16        MR. LATO:  Yes, your Honor.
17        One moment, please, before I begin, to confer?
18        THE COURT:  Sure.
19        (Whereupon, at this time there was a pause in
20 the proceedings.)
21        MR. LATO:  Thank you for that moment, your
22 Honor.
23
24
25

**Angelini-Cross/Lato**

275

1        THE COURT:  Sure.
2
3 CROSS-EXAMINATION.
4 BY MR. LATO:
5 Q   Good afternoon, Special Agent Angelini.
6 A   Good afternoon.
7 Q   Did you ever search Ms. Kalichenko's person?
8 A   I did not.
9 Q   Did she have a cell phone with her that you saw?
10 A   She did have a cell phone.
11 Q   Did you search it?
12 A   I did not.
13 Q   Did you ever go to a place where she lived?
14 A   I never went to where she lived.
15 Q   Did you search any electronic device of hers?
16 A   There were discussions about that internally.  We did
17 discuss that internally.  I don't think that we ultimately
18 did search the phone because --
19 Q   Hold on, sir.  There is no question before you.  It
20 is just whether you did or did not.
21 A   I did not search her phone or electronics.
22 Q   To your knowledge did any one of the FBI conduct a
23 search of any of her electronic devices?
24 A   I don't know if they did in New York.  But I know in
25 Kiev we did not.

**Angelini-Cross/Lato**

276

1 Q   Does the FBI have jurisdiction to conduct searches in
2 Kiev, in the Ukraine?
3 A   If it is a consent search we could probably do it.
4 If it was off the embassy grounds we would have to
5 probably coordinate with the local police and they would
6 probably want to do it themselves.
7 Q   Did you ask Ms. Kalichenko for permission to search
8 any of her electronic devices, including her cell phone?
9 Yes or no, sir.
10 A   I don't think we did.
11 Q   In terms of the police in the Ukraine, are there
12 different types of police forces in Ukraine?
13 A   There is one national police.
14 Q   Is that the militsyia, M-I-L-I-T-S-Y-I-A.
15 A   Yes.
16 Q   Is that correct spelling, agent?
17 A   Probably.
18 Q   Does the militsyia have permission to conduct
19 searches?
20 A   Yes.
21 Q   Do you as an FBI agent work with the militsyia?
22 A   Yes.
23 Q   To your knowledge, did the militsyia conduct any
24 search of any of Ms. Kalichenko's electronic devices?
25 A   Not to my knowledge.

**Angelini-Cross/Lato**

277

1 Q   Did you receive a complaint from a church or some
2 other group that Ms. Kalichenko had sent that entity a
3 video?
4 A   I never did.
5 Q   Did Ms. Kalichenko send a video to a boyfriend other
6 than Mr. Valerio?
7 A   I only know based on what she told me.  And my
8 understanding is that she said she did.
9 Q   Now, the child in the picture we just showed to the
10 jury, you are assuming that it is Ms. Kalichenko's child;
11 is that correct?
12 A   Correct.
13        MR. LATO:  One moment.
14        (Defense counsel confer.)
15 Q   Did anyone from the FBI search Ms. Kalichenko's
16 residence or anyplace where she lived?
17 A   No.  No one did.  We didn't know where she lived.
18 Q   To your knowledge, did the militsyia conduct any such
19 search?
20 A   Not to my knowledge.
21        (Whereupon, at this time there was a pause in
22 the proceedings.)
23 Q   One last question, sir, I hope.
24        Did you ever actually see the child depicted in
25 the video?

Angelini-Redirect/Kabrawala

278

1    A    I never saw the child in person.
2         MR. LATO:  Nothing further.
3         MR. KABRAWALA:  Briefly, Judge.
4         THE COURT:  Yes.
5         Redirect?
6         MR. KABRAWALA:  Yes.
7
8    REDIRECT EXAMINATION
9    BY MR. KABRAWALA:
10   Q    On cross-examination, Agent, you were asked a number
11   of questions about searches that could have been done on
12   electronic devices of Ms. Kalichenko, or her house.
13        Can you tell us why you didn't conduct those
14   searches?
15        MR. LATO:  Objection.
16        THE COURT:  Why don't you approach.
17
18        (Whereupon, at this time the following took
19   place at the sidebar.)
20        THE COURT:  Do you know what the answer to the
21   question will be?
22        MR. KABRAWALA:  Yes.
23        THE COURT:  What is it?
24        MR. KABRAWALA:  She was under investigation
25   herself and she was going to be arrested, and they didn't

Angelini-Redirect/Kabrawala

279

1    want to alert her.
2         They blasted open the door on Kalichenko and --
3         THE COURT:  I don't want hearsay to come out.  I
4    don't know what the answer would be.
5         MR. KABRAWALA:  They wanted to arrest her.
6         THE COURT:  Who is "they"?
7         MR. KABRAWALA:  The FBI wanted to arrest her and
8    didn't want to tip her off in any way.
9         THE COURT:  You opened the door, and obviously
10   as to a number of things they didn't do.  And under 403 I
11   don't see a problem with him stating his reason.
12        MR. LATO:  Your Honor, but I had no idea with
13   that open ended, and he could have said a lot.
14        THE COURT:  All right.
15
16        (Whereupon, at this time the following takes
17   place in open court.)
18   Q    Is it fair to say that you didn't search her devices,
19   her home, because you didn't want to raise Kalichenko's
20   suspicion?
21   A    Umm, she made assertions to us as to what we would be
22   looking for.  And we felt that -- I mean it would -- we
23   didn't really contemplate alerting her suspicions or
24   anything.  She made assertions to us, and we normally --
25   if she made assertions to us as to what was there or not

Angelini-Redirect/Kabrawala

280

1    there -- she did.  And so, you know, she told us what she
2    said was there.  And whether it was agitating her, I don't
3    know.  But we did consider taking a look into the phones
4    anyhow.
5    Q    Let me put it this way:
6         Without telling us what you said to anyone in
7    New York, did you have a discussion about getting her to
8    come to New York because she was under indictment?
9    A    She was interested in travelling to the US.
10        During the discussions I had with her, it was
11   limited to maybe it was possible that you would help
12   through the legal process.  Not very much.
13   Q    Do you know whether Kalichenko ultimately voluntarily
14   came to the United States?
15   A    Sorry.  Can you repeat the question?
16   Q    To your knowledge -- withdrawn.
17        Did Kalichenko voluntarily come to the United
18   States, to your knowledge?
19        MR. LATO:  Objection.
20        THE COURT:  Sustained.
21   Q    Would you agree that searching her home would have
22   alerted Kalichenko that she was under suspicion in the US?
23        MR. LATO:  Objection to the form.
24        THE COURT:  Sustained.
25   Q    What if any effect would searching the defendant's

Angelini-Recross/Lato

281

1    home -- withdrawn.
2         What if any effect would searching Kalichenko's
3    home in the Ukraine have on an investigation concerning
4    Ms. Kalichenko?
5         MR. LATO:  Objection.
6         THE COURT:  Sustained.
7    Q    Do you know if Kalichenko had been arrested here in
8    the U?
9    A    I do know.  Yes, she has been.
10        MR. KABRAWALA:  Nothing further.
11        THE COURT:  Any recross?
12        MR. LATO:  Yes, your Honor.
13
14   RECROSS-EXAMINATION
15   BY MR. LATO:
16   Q    From the time that you met Ms. Kalichenko until
17   today, to your knowledge has the FBI or the militsiya ever
18   searched her residence or any of her devices in the
19   Ukraine?
20   A    No.  Not to my knowledge.
21        MR. LATO:  No further questions.
22        THE COURT:  Anything further?
23        MR. KABRAWALA:  Just one question.  Briefly,
24   Judge.
25

**282**

1   FURTHER REDIRECT EXAMINATION
2   BY MR. KABRAWALA:
3   Q    Do you know if the FBI searched her devices that she
4   brought to the US with her?
5   A    I don't know.
6         MR. KABRAWALA:  Nothing further.
7         THE COURT:  Mr. Lato?
8         MR. LATO:  Nothing, your Honor.
9         THE COURT:  All right.
10        You may step down.
11        (Whereupon, the witness leaves the witness
12   stand.)
13        THE COURT:  Next witness.
14        MR. KABRAWALA:  The government calls Robert
15   Egan.
16        THE COURT:  Please step up to the witness stand
17   and remain standing for the oath.
18        Please raise your right hand.
19
20   R O B E R T    E G A N,
21        called as a witness, having been first
22        duly sworn, was examined and testified
23        as follows:
24        THE COURT:  Please be seated.
25        Please state your name and spell your last name

**283**

1   for the record.
2         THE WITNESS:  It is Robert Egan, E-G-A-N.
3         THE COURT:  Mr. Egan, please lean forward so you
4   are close to the microphone so we can all hear you.
5         THE WITNESS:  Okay.
6
7   DIRECT EXAMINATION
8   BY MR. KABRAWALA:
9   Q    Good afternoon.
10  A    Good afternoon.
11  Q    Where do you work?
12  A    I work for Cablevision.
13  Q    How long have you worked for Cablevision?
14  A    18 years.
15  Q    Where is Cablevision based?
16  A    We are in Bethpage, New York.
17  Q    And what is your job title at Cablevision?
18  A    I'm a security manager.
19  Q    And what sort of company is Cablevision?
20  A    We are a cable company.  We provide television,
21  internet and telephone services.
22  Q    And with respect to the internet service that you
23  provide, is there a particular brand or name associated
24  with the product?
25  A    Yes.  Our internet product is called Optimum On Line.

**284**

1   Q    And what is the email address associated with Optimum
2   On Line customers?
3   A    I believe you are referring to our domain name.
4   Q    Yes.
5   A    It is optonline.net, and we also use optimum.com.
6   Q    Can you briefly describe what your duties and
7   responsibilities are in -- as a security manager with
8   Cablevision?
9   A    As a security manager I help the company with
10  technical matters involving what we call internet abuse,
11  internet security related matters.
12        In addition to that I also respond to legal
13  process, such as my appearance here today.
14  Q    So just to clarify, what made you come here today?
15  A    I received a subpoena.
16  Q    And in addition to a subpoena calling for your
17  testimony here today, were you required to produce any
18  information for a particular email address or a customer
19  on Optimum On Line?
20  A    Yes.
21  Q    And what kind of information were you subpoenaed to
22  testify about?
23  A    Subscriber information related to an email address.
24  Q    What is the email address?
25  A    It was joeval5@optonline.net.

**285**

1   Q    I will show you two exhibits, 200-A and 200-B.
2         (Handed to the witness.)
3   Q    Do you recognize those two items?
4   A    I do.
5   Q    And with respect to both of them, were they created
6   and maintained in the regular course of Cablevision's
7   business?
8   A    Yes.
9         MR. KABRAWALA:  Move to admit.
10        MR. LaPINTA:  No objection.
11        THE COURT:  They are admitted, 200-A and 200-B.
12  Q    I want to show you 200-B.
13        (Whereupon, Government's Exhibits 200-A and
14  200-B were received in evidence.)
15        (Whereupon, at this time there was a pause in
16  the proceedings.)
17  Q    Let's actually start with 200-A.
18        MR. LaPINTA:  Judge, may we approach briefly?
19
20        (Whereupon, at this time the following took
21  place at the sidebar.)
22        MR. LaPINTA:  I apologize.  I was a little
23  confused as to which documents were which exhibits.
24        The witness list I have just states in a blurb
25  what it is without much detail.

Egan-Direct/Kabrawala

**286**

1    I want to object -- I'm objecting to the
2    introduction of these two exhibits into evidence.
3    There has been case law in this Circuit
4    regarding this very issue of account information
5    regarding, in this case, Cellular One records, indicating
6    the name of an applicant and address and the service it is
7    from.  It has limited value in terms of what the
8    information -- the accuracy of the information, without
9    knowing who opened the account, whether false
10   identification was given.  There is room for inaccuracy
11   here.
12   Merely because an account was opened in
13   someone's name and address doesn't indicate that that
14   actual person was the person that opened the account?
15   MR. KABRAWALA:  Which case are you talking
16   about?
17   MR. LATO:  It is United States against McIntire,
18   a Tenth Circuit case from --
19   MR. BODE:  Do you have a copy of the case?
20   MR. LATO:  No.  I just have the blurb of the
21   case.
22   MR. KABRAWALA:  What I can proffer is, first of
23   all, the defense will be able to cross that.
24   And 200-B shows the account was paid for,
25   thousands of dollars.  And I will ask the witness about

Egan-Direct/Kabrawala

**287**

1    that.
2    If they want to cross and argue someone else was
3    paying the account for the last 12 years, let them.
4    MR. BODE:  Counsel didn't provide the case so we
5    are in a vacuum.  But I would be shocked if it is not a
6    case of free internet service.  This case was the internet
7    was provided to Mr. Valerio's house for 12 years.
8    THE COURT:  Overruled.
9    MR. LaPINTA:  Your Honor, there was an improper
10   foundation at this point in terms of developing the
11   procedure of opening the account.
12   THE COURT:  That is a different objection.
13   MR. KABRAWALA:  I will ask him how is this
14   information collected.
15   THE COURT:  All right.
16   You will have to lay the foundation how the
17   account is opened.  But the objection otherwise goes to
18   the weight notwithstanding the Tenth Circuit case that I'm
19   not familiar with.
20   I'm pretty confident the Second Circuit case on
21   this says if they can properly lay the foundation, that
22   your objection just goes to the weight.
23   MR. LaPINTA:  Thank you.
24   THE COURT:  Okay.
25

Egan-Direct/Kabrawala

**288**

1    (Whereupon, at this time the following takes
2    place in open court.)
3    BY MR. KABRAWALA:
4    **Q**    Referring to Government's Exhibits A and B -- sorry,
5    200-A and 200-B, do you know how long the account was
6    opened for?
7    **A    Yes.**
8    **Q**    Can you tell us?
9    **A    This Cablevision account was created 8/23/2002, on or**
10   **about.**
11   **Q**    And it was open for about 12 years; is that fair to
12   say?
13   **A    Yes.**
14   **Q**    And was it paid for?
15   **A    Yes, it was.**
16   **Q**    Is there a reason why Cablevision in the normal
17   course of its business would retain information about who
18   paid for the account and what physical address is
19   associated with the account?
20   **A    Yes.**
21   **Q**    Generally speaking, why would a company hold on to
22   that information?
23   **A    As far as physical address goes, we would always need**
24   **to know where we are supplying services.  One example is**
25   **where to send our technician to service the account if**

Egan-Direct/Kabrawala

**289**

1    **there was an issue.**
2    **Q**    Why would Cablevision care whether an account was
3    paid for 12 years?
4    **A    We are in the business to make money.**
5    **Q**    So is it fair to say -- withdrawn.
6    MR. KABRAWALA:  Move to admit.
7    MR. LaPINTA:  I renew my objection.
8    THE COURT:  Please approach again.
9    Sorry, members of the jury.
10
11   (Whereupon, at this time the following took
12   place at the sidebar.)
13   THE COURT:  The objection was to laying a
14   foundation for the procedure for someone supplying the
15   information to Cablevision.  I don't think you covered
16   that with him.  In other words, how do they get the
17   information from the customer?
18   MR. KABRAWALA:  All right.
19   THE COURT:  Also, there is an objection to the
20   actual business record foundation.
21   MR. LaPINTA:  Yes.
22   THE COURT:  You have to establish it is
23   contemporaneously recorded as well.
24   MR. KABRAWALA:  Thank you, Judge.
25

Egan-Direct/Kabrawala

290

1    (Whereupon, at this time the following takes
2    place in open court.)
3    Q    With respect to Government's Exhibit 200-A, referring
4    to that.
5    How was the information supplied for that
6    exhibit, that is the account number, subscriber name,
7    address and phone number?
8    **A    This document was produced as a result of the**
9    **subpoena that we have requested this information,**
10   **specifically for the email address which was collected**
11   **from our systems, kept in the normal course of business.**
12   Q    And Cablevision's systems, how do those systems
13   obtain the information that is provided in
14   Government's Exhibit 200-A?
15   **A    If you are referring to the subscriber information as**
16   **far as the name and address on the account, this**
17   **information is provided to us at the time the subscriber**
18   **signs up for service.**
19   Q    Who is it typically provided by?
20   **A    It is typically provided by the person whose name is**
21   **on the account.  It is always provided by the person whose**
22   **name is on the account.**
23   Q    Is it verified in any way, generally speaking?
24   **A    A physical check is done of the identification.**
25   Q    And is the information contained in

Egan-Direct/Kabrawala

291

1    Government's Exhibit 200-A -- you said that it was
2    recorded at the time of the transaction.  But is it
3    maintained in the regular course of business?
4    **A    It is.**
5    MR. KABRAWALA:  Move to admit 200-A.
6    MR. LaPINTA:  Renew the application -- sorry, my
7    objection.
8    THE COURT:  The objection is overruled for the
9    reasons I indicated at the sidebar.
10   200-A and 200-B are admitted.
11   (Whereupon, Government's Exhibits 200-A and
12   200-B were received in evidence.)
13   MR. KABRAWALA:  Thank you.
14   We will publish Government's Exhibit 200-A.
15   (Whereupon, the exhibit/exhibits were published
16   to the jury.)
17   Q    What is the email address set forth in 200-A?
18   **A    It is joeval5@optonline.net.**
19   Q    Can one or more person have the same email address
20   through optonline.net at a given time?
21   **A    We assign each instance of an email address to one**
22   **account only.**
23   Q    Why is that?
24   **A    That would allow us to provide email service to the**
25   **specific individual, a specific individual.**

Egan-Direct/Kabrawala

292

1    Q    I understand you testified you conducted a search of
2    Cablevision's records to determine the account and
3    subscriber information associated with the account
4    joeval5@optonline.net?
5    **A    Yes.**
6    Q    I want you to read aloud what that subscriber account
7    information is for the record, please.
8    **A    The account number?**
9    Q    Go ahead.
10   **A    07840-220293-04.  The subscriber on the account is**
11   **Joe Valerio.**
12   **Address is 3 High Gate Drive, Smithtown, New**
13   **York 11787.**
14   **We have a telephone number provided,**
15   **(631) 265-2379.**
16   Q    What are the dates of the subscriber -- withdrawn.
17   How long was this account active?
18   **A    It was approximately 12 years.**
19   Q    What dates?
20   **A    On or about August 23, 2002, through March 19th,**
21   **2014.**
22   Q    Referring to Government's Exhibit 200-B, which I will
23   publish.
24   (Whereupon, the exhibit/exhibits were published
25   to the jury.)

Egan-Direct/Kabrawala

293

1    Q    Do you recognize this document?
2    **A    I do.**
3    Q    Generally speaking, what is it?
4    **A    It is a basic form of payment used to pay for the**
5    **account, 7840-220293-4.**
6    Q    Was the account paid for?
7    **A    It was.**
8    Q    Fair to state that thousands of dollars were paid to
9    maintain this account?
10   **A    That is fair to say, yes.**
11   Q    All right.
12   Did there come a time that Cablevision received
13   a search warrant?
14   **A    Yes.**
15   Q    And did Cablevision review its records associated
16   with -- withdrawn.
17   Which email account was the search warrant for?
18   **A    It was for the same account as mentioned previously,**
19   **the joeval5@optonline.net account.**
20   Q    And did Cablevision produce a response to the search
21   warrant?
22   **A    Yes.**
23   Q    I'm showing you what is marked as
24   Government's Exhibit 200.
25   (Handed to the witness.)

Egan-Direct/Kabrawala

**294**

1  Q   Do you recognize that compact disk?

2  A   **Yes.**

3  Q   What is it?

4  A   **This disk contains email content as requested by the**

5  **search warrant, and an address book.**

6  Q   Does it contain any other information such as other

7  data associated with emails?

8  A   **There is actual email content, and the headers**

9  **associated with the email content.**

10  Q   What is a header?

11  A   **A header is data attached to email messages that kind**

12  **of describes where it was from and where it was sent to.**

13  Q   And is the information data email that are contained

14  in Government's Exhibit 200, are they captured at the time

15  that they are created?

16  A   **Yes.**

17  Q   And are they maintained in the regular course of

18  Cablevision's business?

19  A   **Yes.**

20      MR. KABRAWALA:  Move to admit.

21      THE COURT:  Any objection?

22      MR. LaPINTA:  One moment, please, your Honor.

23      (Whereupon, at this time there was a pause in

24  the proceedings.)

25      MR. LaPINTA:  Objection.

Egan-Direct/Kabrawala

**295**

1      May we approach?

2

3      (Whereupon, at this time the following took

4  place at the sidebar.)

5      MR. LaPINTA:  You are ready for the first part

6  of it?

7      MR. LATO:  Yes.

8      To admit the emails en masse creates several

9  potential problems.  Hearsay problems.  For instance, if

10  Kalichenko was saying things that is not in furtherance of

11  the conspiracy, we have potential 403 problems such as

12  what we objected to that contains inflammatory stuff that

13  has little or no probative value.

14      I think some of these may definitely come in,

15  but I think we have to go through one at a time.  We are

16  objecting to allowing all of the emails on this disk to

17  come in at this time.

18      THE COURT:  Why wasn't this done prior to trial?

19  I don't understand why we are having this conversation at

20  sidebar prior -- in the middle of trial.

21      MR. KABRAWALA:  We told the defense and provided

22  them copies of the specific emails we are going to be

23  using, there is no issue here.

24      MR. LaPINTA:  That is not all the specific

25  emails.

Egan-Direct/Kabrawala

**296**

1      MR. KABRAWALA:  The jury is not going to open

2  the disks.

3      We are going to be showing the jury very

4  specific emails, we can certainly evaluate the emails on a

5  case by case.

6      We already told the defense and provided copies

7  of those emails.

8      We want all the records to come in at this point

9  so later on when we introduce the emails there is not an

10  authenticity objection.

11      THE COURT:  You said all the emails?

12      MR. KABRAWALA:  Yes, all the emails preserved on

13  their server.

14      THE COURT:  If I admit this, whatever you are

15  going to use this for, the jury can say we want to see

16  every email and then there is a problem.

17      I understand you are laying a foundation by

18  introducing the individual emails.  But their objection is

19  to every email coming in.

20      MR. BODE:  They are objecting to authenticity

21  and every little device to --

22      THE COURT:  I didn't hear this to be an

23  authenticity objection.

24      MR. KABRAWALA:  As long as we are on the same

25  page that there is not going to be an authenticity

Egan-Direct/Kabrawala

**297**

1  objection later on --

2      THE COURT:  This is a 403 objection?

3      MR. LATO:  Yes, potential hearsay, not 901.

4      MR. KABRAWALA:  If there is, I don't want to

5  have to call the witness back.

6      THE COURT:  They just said they are not

7  objecting to authenticity.

8      MR. KABRAWALA:  We are not admitting every

9  email?

10      THE COURT:  That's right.  But there is no

11  objection that these are Cablevision's records of emails

12  on this account.

13      MR. LATO:  Correct.

14      MR. BODE:  Was there another piece?

15      MR. LaPINTA:  That is fine.  We will leave it at

16  that.  Thank you.

17

18      (Whereupon, at this time the following takes

19  place in open court.)

20  BY MR. KABRAWALA:

21  Q   I will now show you two exhibits, marked

22  Government's Exhibit 205-A, and 211-A.

23      (Handed to the witness.)

24  Q   Referring to Government's Exhibit 205-A, do you

25  recognize this document?

Egan-Direct/Kabrawala

**298**

1   **A   I do.**

2   **Q**   What is it?

3   **A   These are email headers.**

4   **Q**   So just to remind you, an email header is basically

5   data that is contained within the search warrant return

6   that is Government's Exhibit 200?

7   **A   Yes.**

8   **Q**   And if the information contained on

9   Government's Exhibit 205, was it created and maintained

10   within the regular course of Cablevision's business?

11   **A   Yes.**

12   MR. KABRAWALA:  Move to admit.

13   THE COURT:  Any objection?

14   MR. LaPINTA:  Just I renew my objection stated

15   at the sidebar.

16   THE COURT:  You are not objecting to the

17   foundation question, correct?

18   MR. LaPINTA:  I'm objecting to the foundation

19   question because I'm of the opinion --

20   MR. BODE:  Judge, can we approach, please?

21   THE COURT:  Yes.

22

23

24

25

Egan-Direct/Kabrawala

**299**

1   (Whereupon, at this time the following took

2   place at the sidebar.)

3   THE COURT:  I understood your objection that you

4   are objecting to the reliability of these kind of

5   exhibits.

6   MR. LaPinta:  That is one objection.  I have a

7   number of objections.

8   The other objection is you have allowed the

9   admission of these documents into evidence as a business

10   record.

11   THE COURT:  Correct.

12   MR. LaPINTA:  I objected, and you overruled my

13   objection.

14   There is no evidence at all that the information

15   obtained from a subscriber looking into the account is to

16   an employee of Cablevision.

17   We don't know who the employee is who took the

18   information.  All they know is that an ID is furnished.

19   That is what is in the record.

20   For a business record it has to be furnished to

21   an employee of Cablevision in the regular course of

22   business.

23   THE COURT:  Okay.

24   I don't want to have any sidebars over this.

25   The rule requires there to be established that

Egan-Direct/Kabrawala

**300**

1   it was kept in the course of the regularly conducted

2   business activity, and it was the regular practice of the

3   business activity to keep it, and it was made on or around

4   the time that it was provided, at the time the information

5   was provided.

6   So for each of these documents that is what you

7   need to establish.  I don't want to keep having sidebars.

8   MR. KABRAWALA:  If I establish that, which I

9   will, are we coming back to say that the content

10   information can't come in?

11   THE COURT:  I'm now saying any objection -- you

12   can make any objection for the record to preserve it.  But

13   any objection to the content coming in for the lack of the

14   reliability of the record goes to the weight.

15   But I thought he said that it came from

16   Cablevision.  You should establish each of these -- that

17   the information in each of these records, including the

18   ones previously admitted, are provided to someone at

19   Cablevision.  Or how does Cablevision -- he said provided

20   by the person opening the account.

21   MR. KABRAWALA:  It is in the regular course of

22   business.

23   MR. BODE:  That is fine, Judge.  We will go step

24   by step by step.

25   I will ask for all the objections to be made

Egan-Direct/Kabrawala

**301**

1   now.  They are just thinking of new ones as they go, I

2   think.

3   MR. LaPINTA:  It is not a new one.  I made it --

4   THE COURT:  You have to go through how they

5   receive it, who received it at Cablevision and how they

6   received this.

7   MR. LaPINTA:  I will not do this again, I

8   promise.  But my objection is 803(6) of the Federal Rules

9   of Evidence regarding the admissibility of these business

10   records for failure of the government to establish that

11   the opening of the account was made to an employee of

12   Cablevision, who the employee was, where they were

13   located, who opened the account?  There is nothing in the

14   record.

15   THE COURT:  You should establish, and this was

16   asked once, how they received -- who at Cablevision

17   receives that information to open the account.  Not the

18   name of the person.

19   MR. BODE:  There is no requirement for the name.

20   THE COURT:  Basically the procedure.

21   MR. BODE:  We will go step by step, Judge.

22   THE COURT:  All right.

23

24

25

1      (Whereupon, at this time the following takes

2  place in open court.)

3  Q    We will go back to talking about 200-A and 200-B,

4  what we were referring to earlier.

5      Let's say a customer comes to open an account,

6  would you generally describe what that customer has to do,

7  how they set up accounts with Cablevision.

8  A    **Generally they would contact either customer service**

9  **or our sales department.**

10     **From that point either of two things can happen.**

11     **The person can be directed to come into one of**

12 **our, what we call, Cablevision, Optimum walk-in centers**

13 **where they can sign up in person.  Or they may decide to**

14 **send a salesperson to the home to make the sale.**

15 Q    And the information that is obtained -- withdrawn.

16     Is there information obtained from the customer

17 at the initial stage?

18 A    **Yes.**

19 Q    Now, regardless of whether the potential customer

20 comes into a Cablevision sales office or whether

21 Cablevision sends someone out, do Cablevision employees

22 that are tasked to get new customers for Optimum On Line

23 accounts, do they receive any information from customers?

24 A    **Yes.**

25 Q    And is that information captured or retained --

1  captured, taken in -- in the regular course of

2  Cablevision's business?

3  A    **Yes.**

4  Q    Now, once a person creates an account, you mentioned

5  earlier that there is an ID check.

6      Within the regular course of Cablevision's

7  business, does the ID information and other customer

8  information, is that obtained?

9  A    **Yes.**

10     **We, at a very minimum, we store name and**

11 **address.**

12 Q    And is it in the regular course of business for

13 Cablevision to look at some ID that is provided by the

14 potential customer?

15 A    **Yes.**

16 Q    And all of this information, is it kept -- withdrawn.

17     Is it all -- all this information is collected

18 generally at the same time that the information is given

19 over to Cablevision by the customer?

20 A    **Sorry, would you repeat?**

21 Q    Sure.

22     All of this information provided by a customer,

23 is it taken in generally at the same time that the

24 customer gives the information, recorded simultaneously?

25 A    **Yes.**

1  Q    Or contemporaneously?

2  A    **It is essentially that a form is filled out.**

3  Q    Okay.

4      And the form, is that retained in the regular

5  course of business or -- withdrawn.

6      Is the information from the form put into

7  Cablevision's system?

8  A    **Yes.**

9  Q    And is that information retained in the regular

10 course of business?

11 A    **Yes.**

12     MR. KABRAWALA:  Judge, we renew our application

13 to admit Government's Exhibit 200-A and 200-B.

14     THE COURT:  The objection is reserved.

15     MR. KABRAWALA:  Okay.

16     THE COURT:  We were up to the same questions as

17 205-A and 211-A.

18     MR. KABRAWALA:  Well, with respect to

19 Government's Exhibit 200 --

20 Q    You testified that that is what Cablevision produced

21 with regard to a search warrant for the content of the

22 data; is that correct?

23 A    **That's correct.**

24 Q    And is that information that is on 200-A, is it

25 recorded around the same time, contemporaneously with what

1  is received?  That is, does the information -- is the

2  information captured around the same time it is received?

3  A    **In general, yes.  I would assume there is a slight**

4  **delay, maybe a day or two before the information -- if it**

5  **was by a sales field representative, there may be a lag of**

6  **a day or two until that information is put into our**

7  **systems, but in general, yes.**

8  Q    Which are you referring to?

9  A    **200-A.**

10 Q    Okay.

11     Let's go back.  I'm talking about 200, which is

12 the CD.

13 A    **Okay, sorry.**

14 Q    The question is:  Is the information and data

15 contained within that CD recorded about the same time when

16 it is created?

17 A    **These are email records.  This information is the**

18 **same with respect to our systems when emails are received**

19 **or sent.  That is to say that it is almost instantaneous.**

20 Q    Almost instantaneously recorded on Cablevision's

21 systems?

22 A    **Yes.**

23 Q    Is it kept and maintained within Cablevision's

24 systems?

25 A    **These emails, we save this data on our email servers,**

Egan-Direct/Kabrawala

306

1  so it would be available for our customers to view when
2  they decide to log in to view their email.
3       So, yes, it is kept as an ordinary part of our
4  email service business.
5       MR. KABRAWALA:  Move to admit again, Judge.
6       THE COURT:  Again, the objection preserved at
7  the sidebar is overruled.  And Government's Exhibit --
8  205-A is from 200 or separate documents?
9       MR. KABRAWALA:  Yes, 205-A and 211-A are
10  contained within 200.
11      THE COURT:  Is that correct, sir?
12      THE WITNESS:  Yes.
13      THE COURT:  They are admitted.
14      (Whereupon, Government's Exhibits 205-A and
15  211-A were received in evidence.)
16  Q  Take a look at 200-B for a moment, please.
17      That is essentially billing information?
18  A  Yes.
19      MR. KABRAWALA:  I will publish it.
20      (Whereupon, the exhibit/exhibits were published
21  to the jury.)
22      THE WITNESS:  Sorry?
23  Q  I'm just publishing it for the jury.
24  A  All right.
25  Q  Is the customer billed on a monthly basis?  How does

Egan-Direct/Kabrawala

307

1  that happen?
2  A  We charge on a monthly basis.  We bill on a monthly
3  basis.
4  Q  Okay.
5       And if the account -- if an account is paid for
6  the month in which there is a bill, is payment information
7  recorded contemporaneously to the payment?
8  A  Can you repeat one more time?
9  Q  Sure.
10      When someone pays an account -- a Cablevision
11  account holder pays for their monthly bill, is the fact of
12  the payment reported contemporaneously with their payment?
13  A  Yes.
14  Q  And is the payment record maintained within the
15  regular course of Cablevision's business?
16  A  Yes.
17  Q  And I think you testified that Cablevision generally
18  speaking wants to know whether their customers have paid
19  or not?
20  A  It is a general business practice, yes.
21  Q  They are a for-profit company?
22  A  That's correct.
23  Q  I want to just have you look at
24  Government's Exhibit 25-A, the email header information,
25  and you explained that an email header is basically

Egan-Direct/Kabrawala

308

1  associated with emails.
2       (At this time a document was exhibited on
3  courtroom screen.)
4  Q  According to the exhibits, when was the email sent?
5  A  So 205-A, the sent date --
6  Q  Do you see that?
7  A  Yes.  It was July 22nd, 2012.
8  Q  All right.
9       And do you see where it says email header?
10      It says received from.  And then there is a
11  series of numbers.
12      Do you recognize what those numbers are?
13  A  I do.
14  Q  What is that number?
15  A  It is what we call an IP address.
16  Q  IP address?
17  A  Yes.
18  Q  Is that also known as an internet protocol address?
19  A  Yes.
20  Q  What is an IP address, generally speaking?
21  A  In general, every computer connected to an internet
22  compatible network is assigned an IP address.
23  Q  Okay.
24      And when it says received from this IP address,
25  what does that mean?  Does that mean information is

Egan-Direct/Kabrawala

309

1  received from the IP address?
2  A  This is a stamp added by our web mail.
3  Q  When is the stamp added?
4  A  I'm sorry?
5  Q  When is the stamp added?
6  A  The stamp was July 22.
7  Q  So contemporaneously with the email, July 22, 2012?
8  A  Yes.
9  Q  All right.
10      What does it mean generally when it says
11  received from this IP address?
12  A  It is the IP address of the PC that is connected to
13  our web mail system and was used to send an email.
14  Q  So is it fair to say that the received from language
15  of the header basically means when Cablevision receives
16  the information about the email?
17  A  The date in the received line.
18  Q  All right.
19      I want you to read aloud the IP address
20  associated with this email.
21  A  69, dot, 118, dot, 191, dot, 98.
22  Q  Now, to your knowledge, is it an IP address that
23  exclusively controls -- only controlled by Cablevision?
24  A  It is.
25  Q  And where does Cablevision operate?  Where does it

310

1   have the IP address?

2   A   Cablevision -- we are a cable provider in the general

3   tri-state area.

4   Q   What do you mean by the tri-state area?

5   A   Portions of Connecticut, portions of all of Long

6   Island, a small section of New York City and New Jersey.

7   Q   All right.

8       So the tri-state area means New York,

9   Connecticut and New Jersey?

10  A   Yes.

11  Q   Do you have any IP addresses anywhere else?

12  A   No.

13  Q   And just for the record itself, can you please read

14  aloud the subject line according to this IP header, 205-A.

15  A   It is FW, colon, RE, colon, FWB; where's ▮▮▮▮

16  information and the other stuff, question mark, question

17  mark, question mark.  And Sveta's, Sveta's info.

18  Q   Who is the email from?

19  A   From joeval5@optonline.net.

20  Q   Who is it to?

21  A   I will have to spell the email address.

22  Q   Go ahead.

23  A   K-A-L-I-C-H-E-N-K-O-E-S, at mail.R-U.

24  Q   I will now show you what is admitted as

25  Government's Exhibit 211-A.

311

1       (At this time a document was exhibited on

2   courtroom screen.)

3   Q   What is this?

4   A   It is another set of email headers.

5   Q   And I see that there is another IP address there.

6   And it is not the same as the last one.

7   A   It is different.

8   Q   Read it, please.

9   A   24, dot, 186, dot, 38, dot, 241.

10  Q   And is this an IP address exclusively controlled by

11  Cablevision?

12  A   Yes.

13  Q   The same questions as the last time.

14      Cablevision operates in the tri-state area?

15  A   Yes.

16  Q   This IP address is maintained by Cablevision

17  somewhere in that tri-state area?

18  A   Yes.

19  Q   Read to me the to and the from of the message,

20  please.  Who is it from and who is it to?

21  A   From the email address joeval5@optonline.net.  And it

22  is to the email address K-A-L-I-C-H-E-N-K-O-E-S at

23  mail.R-U.

24  Q   All right.

25      What is the date of the email?

312

1   A   March 28, 2012.

2       THE COURT:  It is 1:00 o'clock.

3       MR. KABRAWALA:  I have a couple of more

4   questions.

5       THE COURT:  And is cross going to be more than

6   five minutes?

7       MR. LaPINTA:  Yes, your Honor.

8       THE COURT:  We will take the lunch break.

9       We will meet at 2:15.

10      Do not discuss the case.  And have a nice lunch.

11      (Whereupon, at this time the jury leaves the

12  courtroom.)

13      (Luncheon Recess.)

14

15

16

17

18

19

20

21

22

23

24

25

313

1       A F T E R N O O N   S E S S I O N

2

3       THE COURT:  Please be seated.  Before we bring

4   the jury out any issues we need to address?

5       MR. BODE:  Mr. Egan, the Cablevision witness,

6   the defendant's object to Government's Exhibit 200 coming

7   into evidence because it contains all the e-mail.  But

8   with respect to 200, the e-mails, how they were

9   established, established that they are business records

10  and that they are authentic in terms of search warrant

11  terms.  So at the end of Mr. Egan's testimony we've

12  established that defense can obviously still make 401 and

13  403 objections to those e-mails but I'd like a ruling from

14  the Court that we've established the authenticity of the

15  business records, any e-mails contained in Exhibit 200,

16  otherwise we'll have to keep Mr. Egan here throughout the

17  entire trial.

18      THE COURT:  I thought, correct me if I'm wrong,

19  I was a little confused, because I thought there weren't

20  any authentication arguments and Mr. LaPinta started

21  making some authentication arguments, on the issue of the

22  actual e-mails themselves, I think Mr. Lato said "we're

23  not raising an objection to that" at the sidebar.

24      MR. LATO:  Yes.

25      MR. KABRAWALA:  We put into evidence some emails

314

1  contained within 200.
2         THE COURT:  205.
3         MR. KABRAWALA:  THERE will not be an
4  authenticity or business record objection to those
5  e-mails.
6         MR. LATO:  Correct.  Your Honor ruled on the
7  business records, I had conceded the 901, so the only
8  question is 401 and 403.
9         MR. BODE:  Because the defense made other
10 e-mails that haven't not marked at this point based upon
11 what the defense has told me, so anything within 200.
12        THE COURT:  Yes.
13        The only issues reserved for Exhibit 200, are
14 the issues of relevance and 403.  All the other issues
15 have been either resolved or on consent or on ruling.
16        MR. KABRAWALA:  With that, we're ready to
17 proceed.
18        THE COURT:  What do you have.  A couple
19 questions?
20        MR. KABRAWALA:  Sorry, Judge?
21        THE COURT:  A couple more questions with regard
22 to direct?
23        MR. KABRAWALA:  Yes, your Honor.
24        (Whereupon, the jury at this time enters the
25 courtroom.)

Egan - Direct/Kabrawala

315

1         THE COURT:  Members of the jury, as you recall,
2  before the lunch break we were on direct examination with
3  Mr. Egan, and we'll continue at this point.
4  R O B E R T   E G A N,
5         having been previously sworn, resumed the stand
6         and testified further as follows:
7  DIRECT EXAMINATION
8  BY MR. KABRAWALA:  (Continued)
9  Q    Mr. Egan, before the lunch break you testified about
10 two particular internet protocol addresses identified in
11 Government's Exhibit 211-A and 205-A; is that fair to say?
12 A    Yes.
13 Q    I will show you those IP addresses again, and I'll
14 show you the e-mails addresses again.
15        211-A is the IP address 24.186.38.241.
16        205-A is the IP address 69.118.191.98.
17        Did I read that correctly?
18 A    Yes.
19 Q    All right.  And you testified you recognized these
20 two IP addresses as belonging to Cablevision in the
21 tristate area?
22 A    Yes.
23 Q    New York and New Jersey?
24 A    Yes.
25 Q    Is it possible that the computer that connected

Egan - Direct/Kabrawala

316

1  directly to Cablevision's server immediately before the
2  e-mails were sent was located outside the United States?
3         MR. LATO:  Objection.
4         THE COURT:  Lay a foundation for that.
5  BY MR. KABRAWALA:
6  Q    Well, you testified earlier that Cablevision operates
7  IP addresses only in the tristate area; is that correct?
8  A    Correct.
9  Q    Looking at the two IP addresses that we discussed,
10 the one starting with 24 and the one starting with 69 --
11 withdrawn.
12        How was the IP address information captured in
13 the header information on Government's Exhibit 205-A and
14 211-A?
15 A    In these particular examples, when the client that is
16 sending the e-mail through our web mail application, when
17 the e-mail client or the sender, the sending computer,
18 sends through our web mail server, it establishes the
19 connection directly to that server.
20 Q    Let me stop you right there.
21        What is a client?  What is an e-mail client?
22 A    An e-mail client is a program used to send e-mail.
23 Q    What is a server?
24 A    A server in general is a larger system that serves --
25 would provide the service to multiple clients.

Egan - Direct/Kabrawala

317

1  Q    All right.  So a server basically enables multiple
2  e-mail programs to connect to it?
3  A    Correct.
4  Q    Now, you mentioned the word "web mail."  What is
5  that?
6  A    Web mail is a particular form of access that we
7  provide to our customers to access and send their e-mail.
8  Q    Let me back up for a second.
9         When people check their mail through
10 Cablevision, generally speaking, do they have the option
11 of checking their e-mail on line?
12 A    Yes.
13 Q    Is that through web mail?
14 A    That's one way.
15 Q    What is another?
16 A    Via an external e-mail client, something that the
17 user or customer would install on a PC.
18 Q    Something like Outlook Express?
19 A    For example, yes.
20 Q    And generally speaking, what is Outlook Express?
21 A    Outlook Express is an e-mail client.
22 Q    What does that enable a customer of Cablevision to
23 do?
24 A    To send and receive e-mail.
25 Q    All right.  So you can check your e-mail through your

Egan - Direct/Kabrawala

318

1   computer using one of these programs like Outlook Express.

2        Alternatively, if you are not at the computer,

3   you can check your e-mail using the web mail program?

4   **A   Yes.**

5   Q   Using the two IP addresses we looked at set forth in

6   Government's Exhibit 205-A and 211-A, looking at those IP

7   addresses, is it possible that the computer that directly

8   connected with Cablevision's server immediately before

9   sending those 2-E-mails was located outside the United

10  States?

11        MR. LATO:   Objection.

12        THE COURT:   Overruled.

13  **A   No.**

14  Q   It's not possible that those e-mails were sent --

15  withdrawn.

16        Let me ask you this:   Does Cablevision

17  maintain -- withdrawn.

18        If a person has a Cablevision account and they

19  are able to check their e-mail through whatever means,

20  does Cablevision maintain the e-mails forever?

21  **A   No.**

22  Q   Why not?

23  **A   We hold the e-mail on our servers up until the point**

24  **that our customer chooses to delete the e-mail from our**

25  **server.**

Egan - Direct/Kabrawala

319

1   Q   So customers can delete their e-mails?

2   **A   Yes.**

3   Q   After they are deleted, are they maintained forever

4   and forever in your servers?

5   **A   After it is deleted, no.**

6   Q   You mentioned that the user customer can use Outlook

7   Express to retrieve e-mails.  Is it fair to say?

8   **A   Yes.**

9   Q   So basically Outlook Express can pull e-mails off the

10  server and put them on a user's computer?

11  **A   Yes.**

12  Q   You can send and receive e-mails from your home

13  computer using Outlook Express?

14  **A   Yes.**

15  Q   If someone uses Outlook Express to retrieve e-mails

16  from a Cablevision account, presuming they do not delete

17  or have their computers set to delete e-mails from

18  Cablevision servers, can the e-mail be in both places,

19  that is, the computer and also on the web mail?

20  **A   On the computer that the e-mail client is installed**

21  **on, yes.**

22  **If the user chooses to retain or save e-mails**

23  **after retrieving, it would live or reside in both**

24  **locations.**

25  Q   And if, let's say, a user uses -- withdrawn.

Egan - Direct/Kabrawala

320

1        Let's say someone who has a Cablevision account

2   uses Outlook Express to send and receive e-mails.  Would

3   those -- withdrawn.

4        MR. KABRAWALA:   Just one moment.

5   Q   Just one more question.

6        You testified that this e-mail account,

7   joeval5@optonline.net, has been an account with

8   Cablevision for approximately 12 years, correct?

9   **A   Yes.**

10  Q   And based on your review of records that actually had

11  been admitted in evidence --

12  **A   I'd like to make a correction.**

13  **A   Sure.**

14  **A   The Cablevision account has existed for approximately**

15  **12 years.**

16  Q   Who is the account holder?

17  **A   The name on the account was Joe Valerio.**

18  Q   That has been paid for the last 12 years?

19  **A   Yes.**

20  Q   Thousands of dollars have been paid to maintain that

21  account in the last 12 years in the name of Joe Valerio?

22  **A   Approximately.**

23        MR. KABRAWALA:   No further questions.

24        THE COURT:   Any cross-examination?

25        MR. LAPINTA:   Yes.

Egan - Cross/LaPinta

321

1   CROSS-EXAMINATION

2   BY MR. LAPINTA:

3   Q   Good afternoon, Mr. Egan.

4   **A   Good afternoon, sir.**

5   Q   My name is Anthony LaPinta.

6        I'll ask you a series of questions regarding

7   your direct examination from just now and earlier this

8   morning, okay?

9   **A   Okay.**

10  Q   Please listen to my questions and answer them as

11  thoroughly as possible.  If possible, answer it "yes" or

12  "no."  Okay?

13  **A   Yes.**

14  Q   Sir, you testified on direct examination that your

15  position at Cablevision, you have three roles there; is

16  that right?  Three different job roles?

17  **A   I mentioned that I'm security manager, I respond to**

18  **legal process, and I'm -- and I have an information**

19  **security role.**

20  Q   You are here today because you were served with a

21  subpoena, correct?

22  **A   Correct.**

23  Q   And you are here today in your capacity as a

24  custodian of records, correct?

25  **A   Correct.**

Egan - Cross/LaPinta

322

1  Q   You are not here today in your capacity as a security
2  personnel at Cablevision, right?
3  A   Correct.
4  Q   You are not here today in your position as any type
5  of security manager at all, correct?
6  A   Correct.
7  Q   In fact, before being issued this subpoena by the
8  Government, you did not have any direct information or
9  knowledge about this particular account; is that right?
10  A   No.
11  Q   Is that right?
12  A   That is correct.
13  Q   Now, in fact all of the information that you've given
14  in this courtroom is not based on your firsthand
15  information; isn't that right?
16  A   I don't understand the question.
17  Q   I'll rephrase it.
18       Everything that you've testified to here today
19  is regarding records that have been kept in the
20  Cablevision database; isn't that right?
21  A   Yes.
22  Q   You yourself, as an employee of Cablevision, did not
23  deal with any of these particular tasks or account
24  information set up that was involved here; is that right?
25  A   I did not participate in the creation of these

Egan - Cross/LaPinta

323

1  records.
2  Q   Very good.
3       Now, so your knowledge about this e-mail account
4  is based on records only, correct?
5  A   Correct.
6  Q   And to the extent of your knowledge, if it is in your
7  records, you would know of it, right?
8  A   Correct.
9  Q   And if it's not in your records, obviously, then, you
10  wouldn't know it, correct?
11  A   Correct.
12  Q   You do know that the account was opened on
13  October 23, 2012, correct -- August of 2002.  I'm sorry.
14  A   I'm sorry, you said several dates.
15  Q   Let me rephrase.
16  A   Okay.
17  Q   The account was opened in August of 2002; is that
18  right?
19  A   That's correct.
20  Q   Where was the account opened?
21  A   The account was created for the address 3 High Gate
22  Drive, Smithtown, New York.  That is the service and
23  billing address.
24  Q   Where was that account opened?
25       Was it opened at a Cablevision facility or

Egan - Cross/LaPinta

324

1  opened at that Smithtown address?
2  A   I don't know.
3  Q   That information is not contained in your database,
4  correct?
5  A   I don't know.
6  Q   You testified that it was opened by a Cablevision
7  employee; is that right?
8  A   I testified that there were two methods of
9  possibility.  Either a salesperson in person or perhaps a
10  direct sign-up in our -- one of our Cablevision Optimum
11  stores.
12  Q   Either method, it would require a Cablevision
13  employee, right?
14  A   Correct.
15  Q   Do you know who the Cablevision employee was that
16  opened this account?
17  A   I do not.
18  Q   Do you have any information whether that employee is
19  a verified employee of Cablevision?
20  A   I don't know.
21  Q   Are your service personnel, the people that perform
22  physical service to the cable lines, fixing cable boxes,
23  are they qualified to open accounts as well?
24  A   Can you repeat the question?
25  Q   Service personnel, people that run cable lines

Egan - Cross/LaPinta

325

1  outside, run cable lines to the house, are they qualified
2  Cablevision employees to open accounts?
3  A   I don't know.
4  Q   Do you know whether it was a serviceman that opened
5  this account or not?
6  A   I do not know.
7  Q   You testified on direct examination that to open a
8  Cablevision account requires identification, correct?
9  A   Correct.
10  Q   What form of identification was produced when this
11  account was opened?
12  A   For this particular situation --
13  Q   For this account, sir.
14  A   I don't have that information available.
15  Q   Do you know whether that identification -- well,
16  withdrawn.
17       Do you know whether, in fact, an identification
18  was produced when this account was opened?
19  A   I don't know.
20  Q   So if I understand you correctly, this account could
21  have been opened by a person that does not normally --
22  withdrawn.
23       This account could have been opened by a service
24  technician that is not qualified or has the responsibility
25  of opening accounts?

1   A   So in general --

2   Q   Yes?

3   A   -- that does not happen, but I cannot say yes or no.

4   Q   So it could happen?

5   A   I don't know.

6   Q   Well, it either could or it can't, right?

7   A   I don't know.

8   Q   Would your database involve information or include

9   information regarding the form of identification that was

10  presented upon the opening of the account?

11  A   It's a possibility.

12  Q   But again, you don't know?

13  A   Correct.

14  Q   The Assistant United States Attorney asked you

15  questions regarding the payment of this account.  Do you

16  recall that?

17  A   Yes.

18  Q   The thousands of dollars that have been paid; do you

19  remember that?

20  A   I do.

21  Q   Who made those payments?

22  A   (Perusing)  So the payments, according to our

23  records, were made from an electronic checking account.

24  Q   Who made the payments?

25  A   I don't know.

1   Q   You were then asked questions regarding the retrieval

2   of certain e-mails that were part of this account,

3   correct?

4   A   Correct.

5   Q   And we're speaking of, so we have no doubt, account

6   04840.  Those are the first five numbers?

7   A   Correct.

8   Q   You identified that account by that account number,

9   right?

10  A   Yes.

11  Q   You've identified this account by the information on

12  the account, right?  Name and address, correct?

13  A   Yes.

14  Q   Your database does not have information as to who

15  uses that e-mail account, correct?

16  A   That is correct.

17  Q   Your database does not have information as to who has

18  access to that e-mail account, correct?

19  A   That is correct.

20  Q   You are not able to identify who the user was of that

21  account for any of the e-mails that you have been

22  presented with here; is that right?  The identity of the

23  individual that accessed the account, correct?

24  A   Whomever has the account credentials, being the user

25  name and password, would have access to the account.

1   Q   And you certainly don't know who has that

2   information; is that right?

3   A   That's correct.

4   Q   In fact, there could be a number of people who have

5   that information, right?  Could be?

6   A   In this situation, I don't know.  In general, yes,

7   that could be the case.

8   Q   So if I understand you correctly, anyone with

9   knowledge of user name and password could access that

10  account, right?

11  A   That is correct.

12  Q   You've testified about these headers that are

13  included on the top of these e-mails, right?

14  A   Yes.

15  Q   And that is, for lack of a better expression,

16  computer language that identifies the sources of this

17  information, right?

18  A   Correct.

19  Q   And that information is very helpful to you in terms

20  of understanding where these e-mails came from, right?

21  A   Correct.

22  Q   But it is limited in that regard as well, isn't it?

23  A   I don't understand the question.

24  Q   Well, you can only determine what IP address is used

25  on those e-mails, right?

1   A   We can determine, or anyone, for that matter, can

2   determine IP address that was used to originate the

3   connection.

4       There is some other information contained within

5   this header, such as date and time the message was sent,

6   and also the method that was used to send the message.

7       In this case it is clear that the Laslow,

8   L-A-S-L-O-W, web mail client was used to send these

9   messages.

10  Q   That's your web database; is that right?

11  A   Yes.

12  Q   Now --

13      THE COURT:  Which exhibit were you referring to?

14      THE WITNESS:  Actually both of them.  The one

15  marked 21-A and the other marked 205-A.

16      THE COURT:  You mean 211-A?

17      THE WITNESS:  211-A and 205-A, yes.

18  Q   That information contained in the header does not

19  identify a particular computer that is used to either

20  develop or receive e-mail, correct?

21  A   The IP address --

22  Q   Can you answer it "yes" or "no," if you can?

23      Does it identify a particular computer used to

24  either develop the e-mail, create it, or receive it?

25  A   It is not a yes or no answer.

Egan - Cross/LaPinta

330

1 Q   Does it identify the computer that it goes to, not
2 the e-mail address used?
3 A   **It does not identify the computer that it goes to.**
4 **It does not identify the computer -- the person who is**
5 **receiving the message, if that's the question you are**
6 **asking.**
7 Q   Let's break it down.
8       It clearly identifies the e-mail addresses;
9 would you agree with me?
10 A   **It does.**
11 Q   It clearly identifies the IP addresses, correct?
12 A   **It does.**
13 Q   And it also identifies the date, time and methodology
14 used to either send it or receive it, correct?
15 A   **Correct.**
16 Q   It does not contain what particular device is used to
17 either send it or to receive it, correct?
18 A   **That is correct.**
19 Q   What I mean by "device," I mean either a computer --
20 right?  A computer is a device, right?
21 A   **Yes.**
22 Q   Or perhaps a cell phone is another device, correct?
23 A   **That is correct.**
24 Q   You don't know whether these e-mails were sent from
25 the computers, phones, or any other technology, correct?

Egan - Cross/LaPinta

331

1 A   **Correct.**
2 Q   Regarding the information on the header, you don't
3 know whether these e-mails were in fact opened or viewed;
4 isn't that right?
5 A   **That is correct.**
6 Q   You don't know whether these e-mails, if they
7 contained an attachment, whether the attachments were
8 opened or viewed; is that right?
9 A   **(Perusing.)**
10 Q   Not whether they were sent; whether they are viewed.
11 A   **I don't know.  That's right.**
12 Q   Let's take a step back.
13       When I use the word "attachment," are we in
14 agreement it could be either a document or video that is
15 made part of the e-mail?  Correct?
16 A   **Correct.**
17 Q   And it is very common for e-mails to obtain -- to
18 have attachments to it, correct?
19 A   **That is correct.**
20 Q   There is nothing that you can derive from your
21 database that could tell us whether video attachments were
22 in fact viewed, not sent, right?
23 A   **Correct.**
24 Q   The United States Attorney asked you questions about
25 IP addresses in particular.

Egan - Cross/LaPinta

332

1       Your IP address from your Cablevision account is
2 the address that starts with 69; is that right?
3 A   **My?**
4 Q   The address in question here, the e-mail address in
5 question here.  "Yours" meaning the Cablevision IP
6 address.
7 A   **So in 205-A, the 69 IP address, yes.**
8 Q   The other IP address is from the other person
9 involved in this dialogue, correct?
10 A   **I don't know.**
11 Q   Okay.  Is there a second IP address that is involved
12 in these e-mails that you've been shown?
13 A   **There are two IP addresses that I've been shown.**
14 Q   Okay.
15       Are both IP addresses Cablevision accounts?
16 A   **They are both IP addresses that are controlled by**
17 **Cablevision.**
18 Q   The headers that have been presented to you for your
19 analysis, they contain two different e-mail addresses,
20 correct?
21 A   **Each header contains two different e-mail addresses,**
22 **yes.**
23 Q   One is an Optimum e-mail account, right?
24 A   **Yes.**
25 Q   The other is not an Optimum e-mail account, correct?

Egan - Cross/LaPinta

333

1 A   **That's correct.**
2 Q   It is an e-mail account that is -- I'll say it --
3 I'll spell it.  K-A-L-I-C-H-E-N-K-O-E-S at mail, M-A-I-L,
4 dot R-U, correct?
5 A   **Correct.**
6 Q   As part of your subpoena, you have done no
7 investigation of any information regarding that e-mail,
8 correct?
9 A   **That is correct.**
10 Q   You don't know who the holder of that account is, do
11 you?
12 A   **I do not.**
13 Q   You don't know where the address of that account
14 emanates from, correct?
15 A   **I can infer --**
16 Q   The particular address, location; not country.
17 A   **No.**
18 Q   But you can derive from the RU at the tail of the
19 e-mail as to what country; is that right?
20 A   **That's correct.**
21 Q   And that is Ukraine?
22 A   **That is --**
23 Q   Europe?
24 A   **Yes.**
25 Q   So you cannot even tell us if it is Ukraine?

1    A    That's right.

2    Q    What countries -- you don't have to name them in

3    particular.  To the best of your understanding, how many

4    countries are involved in the tail e-mail dot RU?

5    A    I don't know.

6    Q    More than ten?

7    A    I don't know.

8    Q    More than 20?

9    A    I don't know.

10   Q    You don't know the sender of those e-mails are from

11   that RU address, you don't know, correct?

12   A    In these two exhibits, the sender.

13   Q    The identity of the person, not the e-mail address?

14   A    The sender of these messages was

15   joeval5@optonline.net.

16   Q    And the receiver was the e-mail address that I just

17   told you, the RU address?

18   A    That's correct.

19   Q    You were asked a question this afternoon after lunch

20   about e-mails referenced to you that were sent from

21   another country, and you said you had no knowledge of

22   that; is that right?

23        Yes or no?

24   A    That was not how the U.S. Attorney presented this to

25   me, so I'm not sure -- I'm unsure what the question is.

1    Q    Well, he asked you a question about these e-mails

2    being referenced to another country.  Do you remember?

3    A    Yes.  He asked me to describe or say the two

4    addresses, which I did, and I did not say if it was from a

5    country.  I don't believe that country was even a part of

6    that.

7    Q    But you don't know the country; is that correct?

8    A    That is correct.

9    Q    Now, this Optimum account that you have here, you

10   said that your database -- that the holder of the account

11   has the ability to delete e-mails, right?

12   A    Yes.

13   Q    From the information that you have before you, do you

14   have any information regarding whether e-mails from the

15   Optimum account were deleted.

16   A    I don't have details at one point if it existed, but

17   these messages were not deleted.

18   Q    But all the data that you've looked at and compiled

19   in these exhibits, you cannot tell these jurors whether

20   these e-mails or any e-mails from this particular account

21   were ever deleted; is that correct?

22   A    That's correct.

23        MR. LAPINTA:  Thank you, sir.  Nothing further.

24        THE COURT:  Redirect?

25        MR. KABRAWALA:  Briefly.

1    REDIRECT EXAMINATION

2    BY MR. KABRAWALA:

3    Q    The IP addresses, both of them that you've been

4    testifying about, the Cablevision IP addresses --

5    A    Yes.

6    Q    -- are IP addresses that are located in the tristate

7    area?

8    A    Yes.

9    Q    In both of the e-mail addresses, that is, the

10   exhibits we've been discussing, 205-A and 211-A, were

11   those e-mails sent from IP addresses controlled by

12   Cablevision in the tristate area?

13   A    Yes.

14   Q    Who sent them according to the IP address -- I mean

15   the e-mail address?  Which e-mail sent them?

16   A    The e-mail address that sent the messages was

17   joeval5@optonline.net.

18   Q    Is it possible that the IP address that -- withdrawn.

19        Is it possible that the two IP addresses that

20   are in those exhibits that I mentioned were generated by a

21   sender who was located outside of the United States?

22   A    These IP addresses cannot be used typically outside

23   of the United States.  They cannot be used physically

24   outside of our footprint.

25   Q    Your tristate area?

1    A    Our tristate area.

2    Q    Is it fair to say that service for the e-mail address

3    joeval5@optonline.net was paid for over a course of

4    approximately 12 years and that the registered address

5    associated with that account is 3 High Gate Drive in the

6    name of Joe Valerio?

7    A    That's how we captured these checking account

8    payments, the electronic checking account payments.  We

9    applied them to the account 7840220293-4.

10   Q    So that's fair to say based on your review of the

11   records?

12   A    Yes.

13        MR. KABRAWALA:  Nothing further.

14        THE COURT:  Mr. LaPinta, anything further?

15   RECROSS-EXAMINATION

16   BY MR. LAPINTA:

17   Q    Optimum online has a web page in existence, correct?

18   A    Yes.

19   Q    A person could access an e-mail account on that web

20   page, correct?

21   A    Yes.

22   Q    That web page could be accessed in the United States,

23   correct?

24   A    Yes.

25   Q    That web page could be accessed outside of the United

Egan - Recross/LaPinta

338

1   States, correct?

2   A   Correct.

3   Q   So anywhere in the world, that web page of yours

4   could be accessed, correct?

5   A   Yes.

6   Q   And if accessed anywhere in the world, any e-mail

7   account with Cablevision could likewise be accessed,

8   correct?

9   A   Correct.

10   Q   So it is untrue that an e-mail sent or received using

11   a Cablevision address could only have been sent in the

12   tristate area; is that right?

13   A   In this case, no.

14   Q   It's not right.

15   A   It's not right because we clearly see the originating

16   IP addresses stamped in the header.  So from these headers

17   we can tell that, one, someone used our web mail service,

18   which I think you are referring to as the Optimum web

19   page, to send these messages from the IP addresses that

20   you can see here from these exhibits.

21   Q   You are referring to the particular ones that are in

22   front of you, right?

23   A   211-A and Exhibit 205-A.

24   Q   And there are many other e-mails associated with this

25   account, correct?

Angelini - Direct/Kabrawala

339

1   A   I don't know.

2           MR. LAPINTA:  I'll leave it at that.

3           Thank you.

4           THE COURT:  Anything else?

5           MR. KABRAWALA:  No, Judge.  Thank you.

6           We recall Special Agent in Charge Peter

7   Angelini.

8           THE COURT:  Sir, if you can raise your right

9   hand again, please.

10   P E T E R   A N G E L I N I,

11       called as a witness, having been previously

12       duly sworn, was examined and testified

13       further as follows:

14           THE COURT:  Again, state your name for the

15   record for the reporter.

16           THE WITNESS:  My name is Peter Angelini,

17   A-N-G-E-L-I-N-I.

18           THE COURT:  Go ahead.

19   DIRECT EXAMINATION

20   BY MR. KABRAWALA:  (Continued)

21   Q   Before the break, you had mentioned that you met a

22   woman by the name of Olena Kalichenko as you were an

23   assistant legal cachet for the FBI in the Ukraine.

24   A   Yes.

25   Q   You mentioned that Kalichenko provided you with a

Angelini - Direct/Kabrawala

340

1   number of items, including a video disk that is already in

2   evidence; is that right?

3   A   Yes, sir.

4   Q   You also testified that she forwarded it to you, a

5   number of e-mails; is that right?

6   A   Yes.

7   Q   Let's go over some of those e-mails with you.

8           Showing you now what has been marked as

9   Government's Exhibit 2, some packets, Government's

10   Exhibit 2-B, and Government's Exhibit 2-D.

11           Just a moment.

12           Take a look at Government's Exhibit 2-B.

13   A   Yes.

14   Q   Is that a true and correct copy of an e-mail you

15   received from Ms. Kalichenko?

16   A   Yes, it is.

17           MR. KABRAWALA:  And the Government moves to

18   admit this at this time.

19           THE COURT:  This is one of the e-mails that is

20   on Government's Exhibit 200, from Cablevision?

21           MR. KABRAWALA:  The original message is -- this

22   is an e-mail that Special Agent Angelini received from

23   Kalichenko, the original e-mail, yes.

24           THE COURT:  The original e-mail.

25           MR. KABRAWALA:  Yes.  And it will come in later

Angelini - Direct/Kabrawala

341

1   on in this trial as well.

2           THE COURT:  Any objection?

3           MR. LAPINTA:  One moment, please.

4           MR. LATO:  No objection.

5           THE COURT:  2-B is admitted.

6           (Whereupon, Government Exhibit 2-B was received

7   in evidence.)

8   BY MR. KABRAWALA:

9   Q   All right.  Showing you now -- I'm actually going to

10   publish it.

11           Is it fair to say that this is the original

12   letter -- well, let me back up.

13           When did you get this message from Kalichenko.

14           What is that date that you got it on?

15   A   On the information it says it was e-mailed on

16   November 12th, so we received it probably the 12th.

17   Q   I'm asking you to look over here.  From Olena

18   Kalichenko, okay?

19   A   I'm sorry, November 8th.

20   Q   It's fair to say you got this following this meeting

21   with Kalichenko on November 8, 2013?

22   A   Yes.

23   Q   What is the original message header information?  Who

24   is that from?

25   A   It states it is from Joe Valerio.

Angelini - Direct/Kabrawala

342

1 Q What is the e-mail address mailed to?

2 A Mailed to joeval5@optonline.net.

3 Q What date was it sent from Joe Valerio?

4 A Tuesday, July 17, 2012.

5 Q Who was it sent to?

6 A Kalichenkoes@mail.ru.

7 Q What is the subject of the message?

8 A It said: Forward Anna's passport.

9 Q I want you to read from the beginning, "Helena, how

10 are you doing?" all the way to where it says "pantry."

11 A "Helena, how are you doing? I'm glad you are safe in

12 Kiev. And I had sent you a text message earlier today.

13 Did you get that? I got your videos, which were very

14 delicious. I just didn't see the rooms and bedroom,

15 especially when you stood in Turkey. Not a problem. I'm

16 trusting that you were clean in Turkey? Remember, it's

17 the man that delivers the disease and the woman

18 harbors-carries and stores the disease like food in the

19 pantry."

20 Q Now, I want to bring you down the page a little

21 further. I want you to read from where it says "enjoy" --

22 start reading from actually right down here where it says

23 "The videos you sent..."

24 A Where do you want me to finish?

25 Q Finish when you get to the next page where it says

---

Angelini - Direct/Kabrawala

343

1 "dripping like that."

2 Read it aloud.

3 A Beginning with "The videos you sent"?

4 Q Yes, please.

5 A "The videos you sent by cell phone camera are

6 perfect, and there is no need for the expense of another

7 camera when you have done a terrific job with the cell

8 phone camera. I have a new cell phone which allows me to

9 transfer your video to my e-mail, and the screen is bigger

10 to view. Plus, you can have endless video time per

11 session with the cell phone camera.

12 "As far as the script, do the same with our

13 little ▮▮▮▮ delicious little pussy, you know, in the

14 tub. The way you would eat her, so sweet, of course,

15 panty hose and tights, you 2 dance. Place toys inside

16 your pussy, and have our little ▮▮▮▮ pull them out of

17 your wet pussy, EMMM. Tell me how you loved when you eat

18 her little pussy and how wet your pussy was - correct?

19 "I told you how I can't wait to make hard luv to

20 you as you eat our little ▮▮▮▮'s delicious little pussy.

21 I can't wait to try it too. So no worries about a $600 to

22 $1300 camera. I will send you some cash Tuesday eve for

23 your time making videos with ▮▮▮▮ times at the pool

24 showers and dressing rooms, et cetera. Buy your mom a

25 special gift and little ▮▮▮▮ a big toy, doll or clothes.

---

Angelini - Direct/Kabrawala

344

1 I can't wait to see you as well in Miami. Yes,

2 absolutely.

3 "Our plans are on schedule for the end of July,

4 with the gratitude of your visa. The day before you do

5 the videos at the pool, dressing, then with ▮▮▮▮, let me

6 know, and I will instruct you how to do it.

7 "I want you to try to walk topless in a woman's

8 dressing room or pool changing room and shower, trying to

9 rub by accident your big luscious tits in a young lady's

10 face or back. IM. Your pussy is dripping, I bet."

11 Q All right. I'll show you what has been marked as

12 2-E.

13 Take a look at that.

14 Did you receive that e-mail from Kalichenko?

15 A Yes, I did.

16 Q And when did you receive that e-mail?

17 A I received it on November 8, 2013.

18 Q November 8th?

19 A Yes, sir.

20 Q So the same day that you had met with her the first

21 time?

22 A Yes.

23 MR. KABRAWALA: Just a moment. I'm looking for

24 an extra copy.

25 You know what I'll do, I'll take your copy back,

---

Angelini - Direct/Kabrawala

345

1 put it on the screen and read it from there.

2 I move to admit this exhibit.

3 THE COURT: Any objection?

4 MR. LATO: One moment, please.

5 I'm sorry, your Honor, may we have an extra

6 moment here?

7 MR. KABRAWALA: Can you read from there?

8 THE WITNESS: Sure, I can read when you put it

9 up.

10 MR. LATO: Your Honor, I have an objection to

11 portions of this, and I think we need a sidebar.

12 THE COURT: It's time to take the afternoon

13 break.

14 We'll take the afternoon break. Don't discuss

15 the case.

16 (Whereupon, at this time the jury exits the

17 courtroom.)

18 MR. LATO: Does your Honor have a copy?

19 THE COURT: Yes.

20 This is 2-E?

21 MR. LATO: Yes.

22 THE COURT: Okay. What is the portion?

23 MR. LATO: The 404(b) -- 404 portion. In other

24 words, I have no objection to the portion where

25 Mr. Valerio is asking for pictures of Kalichenko and her

---

Angelini - Direct/Kabrawala

346

1  daughter.  That is relevant to the Government's case.  But
2  the other portion, such as "Where the fuck are you
3  writing" e-mail is showing that Mr. Valerio is a bad guy,
4  that has no probative value with respect to the production
5  of the video and is entirely inflammatory under 403.
6       So I think portions of this, in fairness to the
7  Government, should come in, and other portions would be
8  unfavorably prejudicial and should not.
9       MR. KABRAWALA:  Judge, this is literally
10  inextricably intertwined with the portion that comes in.
11  It's part of the same e-mail.  The jury should see the
12  tone, the entire e-mail.  It's this tone that
13  characterizes the relationship between the defendant
14  Kalichenko, and it will be apparent in every single one of
15  the e-mails this is the tone the defendant used directing
16  her to make child pornography with a video -- with a
17  child.
18       So the portion "Where the F are you," it is all
19  part of this.  It has to come in.
20       THE COURT:  I'll overrule the objection.
21       Under 403, the nature of the relationship
22  between the defendant and Ms. Kalichenko establishes who
23  the authors of the e-mails are and the nature of the
24  relationship between them with respect to the alleged
25  criminal activity.

Angelini - Direct/Kabrawala

347

1       So the nature of that relationship, in my view,
2  is inextricably intertwined with the particular charges in
3  this case, and any concern about unfair prejudice with
4  respect to the tone, the language used, in my view, is
5  not -- the probative value is not substantially outweighed
6  by any unfair prejudice because of the nature of the tone
7  used in the e-mails.  Especially in light of the other
8  parts of the e-mails, that certainly comes into evidence
9  with respect to the child pornography itself.
10       So I'm overruling the objections.  If there is
11  any reference in these e-mails to asking for other things
12  to be done, that would be -- in my view would be a
13  different analysis.  This only relates to a portion of the
14  e-mail that relates to basically the nature of their
15  relationship with each other.
16       I'm overruling that objection.
17       Okay.  Are there other -- I want to try covering
18  any objections to any other ones to be used in aid.
19       MR. KABRAWALA:  Just a moment.
20       We'll be bringing in one more.  It is
21  Government's Exhibit 5.
22       THE COURT:  So you are not offering 2-D?
23       MR. KABRAWALA:  I'm sorry?
24       THE COURT:  2-D.
25       MR. KABRAWALA:  Honestly, Judge, they are all

Angelini - Direct/Kabrawala

348

1  contained within Exhibit 2, which comes in.  Exhibit 2
2  comes in.
3       But what we're doing here is first streamlining
4  it.  We're talking about a handful.
5       THE COURT:  All the e-mails in 2, the originals
6  are in the Cablevision disk?
7       MR. KABRAWALA:  They are, but of course not the
8  same exact words because these were forwarded to
9  Kalichenko.
10       THE COURT:  I understand --
11       MR. KABRAWALA:  I mean to Angelini.
12       THE COURT:  I mean, the substance is the same.
13       MR. KABRAWALA:  It is the same.  And one of
14  them, actually a number of them, are also on the
15  defendant's home computer, as you will see through our
16  forensic expert.
17       THE COURT:  So right now, the ones you'll use
18  today, I just want to ask the defense if there is an
19  objection to using 2-D, 5 and 5-A?
20       MR. KABRAWALA:  2-D, 5 and 5-A.  Those are the
21  only ones we'll discuss.
22       THE COURT:  What I'd like to give the defense to
23  do, to go through Government's Exhibit 2 and see if you
24  have any objection under 403 or 401 to any other e-mails,
25  other than these before the jury today, and let me know

Angelini - Direct/Kabrawala

349

1  before the morning.
2       MR. LAPINTA:  We'll do so.
3       The problem we have is this:  The exhibit list
4  we received references e-mail dates.  The problem with
5  that is that a lot of these dates have chain e-mails
6  including other dates.  So they are confusing to us which
7  e-mails we're speaking about.
8       So we'll meet with the Government, preview all
9  of their e-mails they intend to offer from now going
10  forward so we don't have to do this each time.
11       MR. KABRAWALA:  For the record, Judge, the
12  Government has provided a very clear exhibit list which
13  says "e-mail thread start dates," and it has the start
14  date.
15       We've also provided exhibit numbers as well as
16  marked exhibits.  So any dispute could be be raised awhile
17  ago.
18       MR. LAPINTA:  There's no problem --
19       THE COURT:  It's the first day of trial.  But in
20  the future, so we don't have any more sidebars today
21  looking at particular lines -- I don't want to do that
22  while the jury is here.
23       MR. LAPINTA:  That's why I mentioned that,
24  Judge.
25       THE COURT:  So right now, tell me -- 2-D, I've

Angelini - Direct/Kabrawala

350

1    overruled the objection.
2           And 2-D and 5 and 5-A?  Any objection to the
3    substance of those?
4           MR. LATO:  In two minutes I'll have an answer.
5           MR. BODE:  May we take a break and we'll have an
6    answer?
7           THE COURT:  Who is your next witness after this?
8           MR. KABRAWALA:  Sorry?
9           THE COURT:  Who is your next witness?
10          MR. KABRAWALA:  Western Union.  Cheryl Johnson.
11          (Whereupon, a recess was taken.)
12          THE COURT:  Everyone is present, including
13   Mr. Valerio.
14          So 2-D, 5 and 5-A, any objection?
15          MR. LATO:  No, your Honor.
16          THE COURT:  And then we're done with this
17   witness?
18          MR. KABRAWALA:  Yes.
19          Are they admitted?
20          THE COURT:  You will have to admit them in front
21   of the jury.
22          2-E I'll admit, and you'll admit the rest in
23   front of the jury.
24          MR. KABRAWALA:  Yes, your Honor.
25          THE COURT:  Bring in the jury, and we'll get

Angelini - Direct/Kabrawala

351

1    started.
2           (Whereupon, Government Exhibit 2-E was received
3    in evidence.)
4           (Whereupon, the jury at this time enters the
5    courtroom.)
6           THE COURT:  Please be seated.
7           Members of the jury, so I'm admitting
8    Government's Exhibit 2-E into evidence.
9           And you are offering other exhibits?
10          MR. KABRAWALA:  Yes, Judge.  We are offering
11   Government's Exhibit 2-D, as in delta, 5 and 5-A.
12          MR. LATO:  No objection.
13          THE COURT:  Government's Exhibit 2-D and 5 and
14   5-A are also admitted.
15          (Whereupon, Government Exhibits 2-D, 5 and 5-A
16   were received in evidence.)
17          THE COURT:  Go ahead.
18          MR. KABRAWALA:  Thank you.
19   BY MR. KABRAWALA:
20   Q    Referring to Government's Exhibit 2-E, it's fair to
21   say you received this e-mail from Kalichenko on
22   November 8, 2013?
23   A    Yes, sir.
24   Q    And the e-mail is from Joe Valerio at
25   joeval5@optonline.net?

Angelini - Direct/Kabrawala

352

1    A    Yes, sir.
2    Q    Sent on Thursday, September 27, 2012?
3    A    Yes, sir.
4    Q    To kalichenkoes@mail.ru?
5    A    Yes.
6    Q    No subject?
7    A    Correct.
8    Q    I want you to start reading from right where it says
9    "hey," all the way to where you get to this triple
10   exclamation mark.
11   A    The first paragraph there?
12   Q    Where it says, "Hey, you, listen," to where my pen is
13   pointing, the triple exclamation mark.
14   A    Okay.
15          "Hey, you, listen now or this will be the last
16   time ever...why the fuck are you writing mails at 9:30
17   p.m. when your daughter is supposed to be sick?  Are you
18   starting to be that sneaky bitch again?  If so, I will
19   drop you on your ass.  Better fucking explain.  First off,
20   I just gave you $1200 for your family, and you are going
21   to fucking work for it, not sit anywhere all fucking day,
22   sending out e-mails...I'm asking you now, what the fuck do
23   you do all day?  And you have produced nothing for me.
24          "I want an explanation for all of this now...
25   each morning and night you will send me a cell phone video

Angelini - Direct/Kabrawala

353

1    of you waking up with your daughter, with your tits in her
2    mouth, before you go to sleep and wake up.  If I don't see
3    this each day, I will drop you on your ass."
4    Q    Now I'll show you Government's Exhibit 2-D.
5           Is it fair to say you received this e-mail from
6    Olena Kalichenko on November 8, the same day you met with
7    her on 2013?
8    A    Yes.
9    Q    The original message is from Joe Valerio to
10   kalichenkoes@mail.ru dated September 19, 2012?
11   A    Yes, sir.
12   Q    The first sentence it says, "Hello there, Olena.  How
13   are you doing?  I hope ████ is doing much better now.  I
14   knew somehow she just had a cold.  I'm sure it is just a
15   change of temp."
16          Now, what I want you to do, Agent, I want you to
17   read this sentence where I'm pointing where it says, "I
18   need to see results," and it ends ████."  It is
19   misspelled.
20   A    "I need to see results.  And when your daughter is
21   fine and you're prepared, I need to see videos e-mailed to
22   me of you and ████."
23   Q    Who is it signed off by?
24   A    "Be safe.  Regards, Joseph."
25   Q    I want you to read the content of Exhibit 5.

Angelini - Direct/Kabrawala

**354**

1  **A   The entire?**
2  Q   No, I'm sorry.  I want you to read it to yourself.
3  And I'll describe it.
4       It appears to be an e-mail that Kalichenko sent
5  to you, Peter Angelini, on Friday, November 8, 2013.  And
6  it looks like there was a forwarded message where it says,
7  "P-R-I-V-I-T, my dear Joseph."
8       Do you know what "privit" means?
9  **A   It means hi.**
10  Q   What language?
11  **A   I'm sorry, Russian.  Hi, hello.**
12  Q   It appears the original e-mail was from Joe Valerio
13  sent to Kalichenko's e-mail address on May 11, 2012.there
14  is some e-mail content and then there is a forwarding
15  message.
16       So it appears the original message was from Joe
17  Valerio to some other e-mail address; is it fair to say?
18  **A   Yes.**
19  Q   I'll just read this aloud.  Tell me if I get it
20  wrong.
21       "Here is my photo.  It's not so good because it
22  is indoors with no lighting, and I looked tired in the
23  photo (smiling).  Not enough sleep, tired eyes (laughing).
24  I don't sleep too much.  I'm a very energetic man, and my
25  age is just a number.  I don't feel.  Lots of hugs,

Angelini - Direct/Kabrawala

**355**

1  Joseph."
2       There was an attachment?
3  **A   Yes.**
4  Q   Take a look at Government's Exhibit 5-A.
5  **A   Yes.**
6  Q   Is that the attachment?
7  **A   Yes, sir.**
8  Q   Can you see that picture?
9  **A   Yes.**
10  Q   Do you see that person sitting in the courtroom
11  today?
12  **A   Yes, sir.**
13  Q   Can you point him out, identifying an article of
14  clothing he's wearing?
15  **A   Seated at the defense table wearing a navy suit, or a**
16  **dark suit.**
17  Q   Speak up.
18  **A   Wearing a navy suit, dark suit, and seated at the far**
19  **end of the defense table.**
20       MR. KABRAWALA:  For the record, the witness has
21  identified the defendant, Joseph Valerio.
22       THE COURT:  Yes.
23       MR. KABRAWALA:  All right.  There's nothing
24  further at this time.
25       THE COURT:  Cross-examination?

Johnson - Direct/Kabrawala

**356**

1       MR. LATO:  One moment, please, your Honor.
2       No questions, your Honor.
3       THE COURT:  You may step down, sir.  Thank you.
4       THE WITNESS:  Thank you.
5       MR. KABRAWALA:  The United States calls Cheryl
6  Johnson.
7       THE COURT:  Ma'am, can you remain standing when
8  you get to the witness stand, once you get there.
9       THE CLERK:  Please raise your right hand.
10  **C H E R Y L   J O H N S O N,**
11  called as a witness, having been first
12  duly sworn, was examined and testified
13  as follows:
14       THE WITNESS:  Cheryl Denise Johnson, C-H-E-R-Y-L
15  D-E-N-I-S-E  J-O-H-N-S-O-N.
16       THE COURT:  You can be seated, Ms. Johnson.
17       I'll ask pull your chair all the way up to the
18  mike.
19  DIRECT EXAMINATION
20  BY MR. KABRAWALA:
21  Q   Ms. Johnson, good afternoon.
22  **A   Good afternoon.**
23  Q   Where do you work?
24  **A   Western Union.**
25  Q   Can you raise up the mike and speak directly into it?

Johnson - Direct/Kabrawala

**357**

1       Did you say Western Union?
2  **A   Yes.**
3  Q   Where is that headquartered?
4  **A   Englewood, Colorado.**
5  Q   Englewood, Colorado?
6  **A   Yes.**
7  Q   What do you do at Western Union?
8  **A   I'm a senior legal analyst.**
9  Q   Are you based out of Englewood as well?
10  **A   No.**
11  Q   Where are you based out of?
12  **A   Omaha, Nebraska.**
13  Q   Briefly describe your educational background.
14  **A   Systems administration in -- bachelor of business**
15  **administration, Iowa State University.  Paralegal**
16  **certification, Hamline University.  Master's of business**
17  **administration, Bellevue University.**
18  Q   What are your duties and responsibilities at Western
19  Union?
20  **A   I assist counsel in gathering documents and**
21  **information in response to subpoena requests.**
22  Q   Were you subpoenaed to testify here today?
23  **A   Yes.**
24  Q   Did Western Union receive a subpoena -- withdrawn.
25       Did Western Union receive a subpoena in

358

1  connection with a particular account or person?

2  A    Yes.

3  Q    Who was that person?

4  A    Joseph Valerio.

5  Q    All right.  I want to back up just a bit and ask you

6  generally about the nature of Western Union's business.

7       What is it in the business of doing?

8  A    Western Union's business is money transfer or money

9  services business.

10  Q    And generally speaking, how does that money

11  transmission work?  That is, how does a customer use

12  Western Union's services?

13  A    In most cases customers will go into a Western Union

14  location, fill out a form, pay over the moneys and fees to

15  send money, and then the information is entered into

16  Western Union's computer system.

17       A customer can also log into the company's

18  website and send money via an online transfer.

19  Q    In both of those scenarios, whether it is a walk-in

20  off the street or an online money transfer initiated

21  through Western Union's website itself, if the information

22  that is entered into Western Union's database -- is that

23  entered contemporaneously, that is, around the same time

24  as --

25  A    Yes --

359

1  Q    Let me finish the question.

2       -- as the information provided to Western Union?

3  A    Sorry.  Yes, that is correct.

4  Q    Now, when a customer conducts a transaction through

5  Western Union, is there any way of telling one transaction

6  from another?

7  A    Yes.  A confirmation number or a money transfer

8  control number is assigned to each transaction.

9  Q    A money transfer control number?

10  A    A money transfer control number.

11  Q    I'll abbreviate that as MTCN.

12       That's how you guys refer to it?

13  A    Yes.

14  Q    Is that a unique number?

15  A    Yes.

16  Q    Why is it a unique number?

17  A    Because it's a confirmation number.  Each MTCN is

18  assigned to each money transfer to identify that

19  particular transaction.

20  Q    I will show you what's been marked as Government's

21  Exhibit 10, and I'll bring up Government's Exhibit 322.

22       With respect to Government's Exhibit 10, what is

23  that?

24  A    This is a compact disk that I prepared.  It contains

25  two Excel spreadsheets and, I believe, a letter, a cover

360

1  letter, and a copy of a subpoena.  It is the information

2  that Western Union provided in response to the subpoena

3  request.

4  Q    And with respect to the transactions that are in the

5  Excel spreadsheets, that is, the data that was provided by

6  Western Union, I asked you this earlier:  The data that is

7  captured within that spreadsheet, is it entered into

8  Western Union's database around the same time as the

9  transaction?

10  A    Yes.

11  Q    Is it in Western Union's regular business activity to

12  capture and retain that sort of information?

13  A    Yes.

14  Q    And is making a record of transactions within the

15  course of Western Union's business activity?

16  A    Yes.

17       MR. KABRAWALA:  The Government offers Exhibit 10

18  at this time.

19       MR. LATO:  Objection.

20       THE COURT:  Why don't you approach.

21       (Whereupon, at this time the following took

22  place at the sidebar.)

23       (Continued.)

24

25

361

1       MR. LATO:  This is an improper foundation, and

2  here's why.  Rule 803(6), the business records rule

3  exception, does not permit the use of outsider

4  information.

5       What we have here is we have a witness who was

6  under an obligation to enter into this, but we have no

7  idea the information that she was given by whom.  In other

8  words, there is no independent evidence that Joseph

9  Valerio gave this information.

10       At best we have the following:  Consistent with

11  the Second Circuit's decision in United States v. Londano

12  and United States v. Lieberman, at best, this is

13  nonhearsay, which would require a limiting instruction to

14  show that somebody by the name of Joseph Valerio gave a

15  name, and then the Government could build on that.  Not

16  that it was this Joseph Valerio.

17       What I'm talking about, outsider statements,

18  there is a First Circuit case from 1999, United States

19  versus V-I-G-N-E-A-U, that talks about outsider statements

20  can't come in under 803(6).  However, there is no

21  firsthand information that Mr. Valerio did this.

22       Obviously, it would be an admission by

23  Mr. Valerio if we could establish somebody with firsthand

24  knowledge that he was there.  We don't know that.

25       That's my objection.

Johnson - Direct/Kabrawala

362

1          THE COURT:  Okay.
2          MR. KABRAWALA:  Judge, the information, that
3   goes to the weight, not the admissibility.  They can cross
4   this witness all they want about how this information is
5   recorded, you know, who gives that information to Western
6   Union, but it is admissible.
7          THE COURT:  Is it similar to the Cablevision
8   witnesses?
9          Is there any procedures in place like
10  Cablevision so they try to verify who the person is.
11         MR. KABRAWALA:  My understanding, anyone can
12  sign on to their website and claim to be anyone, I mean,
13  essentially claim to be anyone and do a money transfer.
14         What is unique about the situation here is that
15  many of the e-mails that came in through Cablevision have
16  the same exact tracking number that the defendant is
17  e-mailing out.
18         THE COURT:  What do you mean by "tracking"?
19         He makes reference to the Western Union tracking
20  number in the e-mail?
21         MR. KABRAWALA:  Dozens of them.  He says, I'm
22  sending you money.  Come in this date.  Here is the
23  number.
24         MR. LATO:  Your Honor, that would allow it to be
25  admissible.  The Government could build on it.

Johnson - Direct/Kabrawala

363

1          But in terms of statements of -- I still think a
2   limiting instruction should be it is admitted for the
3   truth of the matter asserted, that is, it's Joseph
4   Valerio.
5          It is outside 803(6) if it is somebody by the
6   name of Joseph Valerio that gave that name, that is
7   obviously nonhearsay.  803(6) is not implicated.
8          THE COURT:  These are being admitted as business
9   records of Western Union, and I'll say something along the
10  lines that obviously this witness is not able to verify
11  who the person was who was --
12         MR. KABRAWALA:  That's fine.
13         THE COURT:  -- who was making the request.
14         MR. KABRAWALA:  That's fine.
15         MR. LATO:  Yes.
16         (End of sidebar conference.)
17         (Continued.)
18
19
20
21
22
23
24
25

Johnson - Direct/Kabrawala

364

1          THE COURT:  Members of the jury, sometimes when
2   a piece of evidence comes in, you can only consider it for
3   a limited purpose, and I'll tell you what that purpose is.
4   You cannot consider it for any other purpose other than
5   the purpose that I'm instructing you on.
6          These records are coming in under the Federal
7   Rules of Evidence as business records of Western Union.  I
8   just want to make sure you understand that they are only
9   coming in as what Western Union recorded based upon the
10  information that they were provided.  However, Western
11  Union has no knowledge who the person is who made the
12  request based upon their records.
13         So it's not coming in for that purpose, to
14  establish the identity of the person.  They have to
15  establish that through other means in terms of who the
16  person was who made the request.
17         This is simply what they recorded in their
18  records when they made the records, and you are only to
19  acknowledge it for that purpose.
20         That is admitted as Plaintiff's Exhibit 10.
21         (Whereupon, Government Exhibit 10 was received
22  in evidence.)
23  BY MR. KABRAWALA:
24  Q   Before you came to court, were any money transfers
25  associated with this account conducted using Western

Johnson - Direct/Kabrawala

365

1   Union's website?
2   A   Yes.
3   Q   Approximately how many?
4   A   46.
5   Q   And I want you to take a look at Government's
6   Exhibit -- you know what?  Let me ask this.
7          Look at Government's Exhibit 322.
8          Have you seen that before?
9   A   I've seen the information on the exhibit before.
10  Q   Okay.  Is that a summary of some of the transactional
11  information between someone identified as Joseph Valerio
12  and someone identified as Olena Kalichenko?
13  A   Yes.
14         MR. KABRAWALA:  We move to admit the summary
15  chart.
16         THE COURT:  Any objection?
17         MR. LAPINTA:  No.  No objection.
18         THE COURT:  What is the number on the chart?
19         MR. KABRAWALA:  322.
20         THE COURT:  Government's Exhibit 322 is admitted
21  as a summary chart.
22         (Whereupon, Government Exhibit 322 was received
23  in evidence.)
24         MR. KABRAWALA:  One moment, your Honor.
25  BY MR. KABRAWALA:

Johnson - Direct/Kabrawala

366

1  Q   Showing you what has been marked as Government's
2  Exhibit 10-A -- let me just walk it over to the defense
3  table first.
4       Showing you what has been marked as Government's
5  Exhibit 10-A.
6       Do you recognize that document?
7  A   Yes.
8  Q   And generally speaking, is that some information that
9  is contained within Western Union's databases regarding
10  transactions between someone who is identified as Joseph
11  Valerio and someone who is identified as Olena Kalichenko?
12  A   The only name that appears on this sheet is the
13  sender name:  Joseph Valerio.
14  Q   Okay.  Did you prepare that summary?
15  A   Yes.
16       MR. KABRAWALA:  I move to admit.
17       MR. LATO:  No objection, consistent with your
18  Honor's limiting instruction.
19       THE COURT:  Yes, they apply to these charts as
20  well because they are based on Government 10.
21       So 10-A and 11 are admitted.
22       (Whereupon, Government Exhibits 10-A and 11 were
23  received in evidence.)
24  BY MR. KABRAWALA:
25  Q   I will first publish Government's Exhibit 322.

Johnson - Direct/Kabrawala

367

1       The information on Western Union's system
2  concerning the individual to whom this subpoena --
3  withdrawn.
4       I want you to look at the subpoena's sender's
5  name.  What does that mean to you based on your knowledge
6  of Western Union's records?
7  A   It means this is the person who purchased the money
8  transfer transaction.
9  Q   And the address that is listed at 3 High Gate Drive?
10  A   That would have been the street address, city, state,
11  he provided at the time of purchase.
12  Q   The city and state that someone provided at the time
13  of purchase?
14  A   Yes.
15  Q   And "payee name," what does that mean?
16  A   Who the sender identified as the recipient of the
17  funds.
18  Q   That is this individual Olena Kalichenko?
19  A   Yes.
20  Q   And "paying agent city"?
21  A   The city that the agent paid in -- that paid out the
22  money transfer.
23  Q   Is it fair to say that is physically where someone at
24  Western Union or an affiliate of Western Union paid out
25  cash money to the recipient?

Johnson - Direct/Kabrawala

368

1  A   Yes.
2  Q   And "recording agent country"?
3  A   The country of the paying agent.
4       I'm sorry, it is record agent, yes.  That would
5  be the country location of the payee agent.
6  Q   And then the "send description," that is money paid?
7  A   The currency, yes.
8  Q   What does that total say there?
9  A   12,350.
10  Q   I will very quickly show you 10-A.  The S-E-M-A-I-L,
11  what does that mean?
12  A   Sender's e-mail address.
13  Q   Why would a sender have to provide their e-mail
14  address?
15  A   For online transaction, the confirmation number is
16  sent back to the customer via e-mail.
17  Q   So the customer would presumably check their e-mail,
18  the MTCN number?
19  A   Would you say that again?
20  Q   If -- presumably if Western Union sends the
21  confirmation number to a customer -- withdrawn.
22       Western Union sends a customer that provided an
23  e-mail address their MTCN number?
24  A   Yes.
25  Q   That's a unique confirmation number?

Johnson - Cross/LaPinta

369

1  A   Yes.
2  Q   Used to pick up the money, right?
3  A   Yes.
4       MR. KABRAWALA:  There's nothing further from the
5  Government.
6       THE COURT:  Any cross-examination?
7  CROSS-EXAMINATION
8  BY MR. LAPINTA:
9  Q   Good afternoon, Ms. Johnson.
10  A   Good afternoon.
11  Q   My name is Anthony LaPinta.  I'll ask you a series of
12  questions.
13       Did you fly here from Nebraska?
14  A   Yes.
15  Q   Welcome to New York.
16  A   Thank you.
17  Q   Let me ask you a couple questions about the opening
18  or the development of a Western Union account, if I may.
19       You said there are two ways to develop an
20  account, is that correct, the first being in person, and
21  the second one being on the internet via your web page.
22  Correct?
23  A   Those are two methods to send a money transfer, yes.
24  Q   My question is regarding the opening of an account.
25       Is there an account here involved in these

Johnson - Cross/LaPinta

370

1 transactions that was previously opened or are they
2 individual transfers that are made independent of each
3 other?
4 **A   They are individual transfers.**
5 Q   Okay.  So if I understand you correctly, as it exists
6 in your database, there was never an account opened in the
7 name of Joseph Valerio; is that right?
8 **A   As it is commonly defined as an account, no.**
9 Q   So there are a number of transactions that reference
10 the name Joseph Valerio, correct?
11 **A   Yes.**
12 Q   All right.  And I believe you said on direct that
13 each and every one of those transfers was done on the
14 computer, correct?
15 **A   All but two were done on the computer.**
16 Q   Two out of the 46, right?
17 **A   Yes.**
18 Q   Now, let's talk about the 44 that were done on the
19 computer.
20 **A   I'm sorry, there are a total of 48 transfers.**
21 Q   48 or 46?
22 **A   A total of 48.  Two were done in person; 46 were done**
23 **online.**
24 Q   Let's talk about the 46 done on the computer, okay?
25       To access this web page, someone just needs to

Johnson - Cross/LaPinta

371

1 go on to your home page; is that right?
2 **A   Yes.**
3 Q   And from your home page they can navigate through a
4 number of prompts to do this, correct?
5 **A   Yes.**
6 Q   And the prompts involved in your web page have areas
7 to put in the name?
8 **A   Yes.**
9 Q   Address, right?
10 **A   Yes.**
11 Q   And amount to be transferred, right?
12 **A   Yes.**
13 Q   And recipient, correct?
14 **A   Yes.**
15 Q   And each time the transfer is made, that information
16 is entered, correct?
17 **A   Yes.**
18 Q   Now, you are referring to data that was entered via
19 your web page, correct, on the 46 transactions?
20 **A   Yes.**
21 Q   You don't know who the person was that actually
22 entered that information.  You only know the name that was
23 used in the transaction, correct?
24 **A   Yes.**
25 Q   And by the way your computer is configured, your web

Johnson - Cross/LaPinta

372

1 page is configured, there is no verification that the
2 person entering that information is in fact the name of
3 the person listed on the transfer, correct?
4 **A   Correct.**
5 Q   So conceivably if I were to access your web page
6 after court today, I could put in the name Marilyn Monroe,
7 but I would be the one that is forwarding the money,
8 correct?
9 **A   Correct.**
10 Q   So as you sit here today, you cannot in any way
11 identify Mr. Valerio as being the individual that actually
12 sent that money, correct?
13 **A   Only through the validation process that the company**
14 **uses to validate credit card information.**
15 Q   You don't have any banking information with you?
16 **A   No, sir.**
17 Q   You didn't bring any type of credit card information
18 regarding what was used in this account, correct?
19 **A   No.**
20 Q   You didn't furnish that as a product of the subpoena,
21 correct?
22 **A   No.**
23 Q   You don't have any personal involvement in these
24 transactions in terms of your involvement and when they
25 were made, right?

Johnson - Cross/LaPinta

373

1 **A   Correct.**
2 Q   And you are relying only on the data that is on your
3 database, correct?
4 **A   Correct.**
5 Q   Now, your prompts or data entry areas on your web
6 page doesn't include any type of reference as to the
7 purpose of the transfer, correct?
8 **A   No.**
9 Q   It doesn't have a subject area or an RE, colon, to
10 put in why the transfers are being made, correct?
11 **A   Correct.**
12 Q   So it could be for any reason, correct?
13 **A   Yes.**
14 Q   And it could be for the reason of sending money to
15 someone to buy furniture, for example?
16 **A   Yes.**
17 Q   Or to buy food?
18 **A   Yes.**
19 Q   Or to buy a car, right?
20 **A   Yes.**
21 Q   Or anything else, right?
22 **A   Yes.**
23 Q   You don't ask why the money is being transferred.
24 All you are looking for is information and a way of
25 getting paid, right?

Johnson - Redirect/Kabrawala

374

1   A   Yes.
2   Q   So the information on this -- these spreadsheets in
3   your CD there, you can't say what these amounts were used
4   for or the purpose of these transfers, right?
5   A   No, I cannot.
6       MR. LAPINTA:  Thank you.
7       THE COURT:  Any redirect?
8       MR. KABRAWALA:  Very quickly, Judge.
9   REDIRECT EXAMINATION
10  BY MR. KABRAWALA:
11  Q   You testified that there was a total of approximately
12  12,000 some-odd dollars associated with the e-mail address
13  joeval5@optonline.net that were sent out.  Is that fair to
14  say?
15  A   Yes.
16  Q   And those outgoing wire transfers from the person who
17  called themselves Joseph Valerio, those moneys were
18  received by a person who called themselves Olena
19  Kalichenko?
20  A   Yes.
21  Q   Money was paid out each time; isn't that correct?
22  A   Yes.
23  Q   And money was sent out each time, right?
24  A   Yes.
25  Q   Western Union is in the for-profit business.  It

Johnson - Redirect/Kabrawala

375

1   didn't give people money?
2   A   Correct.
3   Q   Someone has to send money and someone has to receive
4   the money, right?
5   A   Yes.
6   Q   And in this case that was done?
7   A   Yes.
8   Q   And an e-mail was sent to joeval5@optonline.net each
9   single time there was a transaction made by that e-mail
10  address as the sender, correct?
11  A   Yes.
12      MR. KABRAWALA:  Nothing further.
13      THE COURT:  Anything further, Mr. LaPinta?
14      MR. LAPINTA:  Nothing.
15      THE COURT:  You may step down, ma'am.
16      MR. KABRAWALA:  We have a very quick witness.
17      We understand from the defendant that they
18  should be very quick as well.
19      THE COURT:  Sir, if you can come up to the
20  witness stand and remain standing while the oath is being
21  administered here.
22  D E E P   C H O P R A,
23      called as a witness, having been first
24      duly sworn, was examined and testified
25      as follows:

Chopra - Direct/Kabrawala

376

1       THE WITNESS:  Deep, D-E-E-P, Chopra,
2   C-H-O-P-R-A.
3   DIRECT EXAMINATION
4   BY MR. KABRAWALA:
5   Q   Good afternoon.
6   A   Good afternoon.
7   Q   I see that you have a uniform on.
8       Who do you work for?
9   A   I work for U.S. Customs and Border Protection at the
10  US field office.
11  Q   Is that commonly referred to as CBP?
12  A   Yes.
13  Q   Homeland Security?
14  A   Yes.
15  Q   What is your job title?
16  A   I'm a CBP officer, program manager, at the New York
17  field office.
18  Q   In your official capacity -- does CBP maintain
19  databases that record the travel history of all persons,
20  regardless whether they are a citizen or not, entering and
21  leaving the United States?
22  A   Yes, it does.
23  Q   Is a record of a travel -- withdrawn.
24      Is a record of a person's travel into and out of
25  the United States made even if a person enters through an

Chopra - Direct/Kabrawala

377

1   airport, by car, land, water crossings or a seaport?
2   A   Yes.
3   Q   Is the information that is captured when a person
4   either enters or leaves the country, is that entered into
5   CBP databases at the same time or around the same time
6   that that occurs?
7   A   Yes, it is exactly entered at the same time.
8   Q   And is that information maintained in the regular
9   course of CBP's governmental business?
10  A   Yes, it is.
11  Q   Walking over to you what has been marked as
12  Government's Exhibits 11 through 20.
13      Have you seen those records before?
14  A   (Perusing)  Yes, I have.
15  Q   And are those records that are, as you just
16  testified -- withdrawn.
17      Are those records created simultaneously with
18  the information that is put in them?
19  A   Yes, they are created at the time of the event.
20  Q   And are they maintained in the regular course of
21  business?
22  A   Yes, they are.
23      MR. KABRAWALA:  We move to admit 11 through 20.
24      MR. LATO:  May I just see them quickly?
25      MR. KABRAWALA:  I'm sorry.

1    MR. LATO:  No objection.

2    THE COURT:  Government's Exhibits 11 through 20

3  are admitted.

4    (Whereupon, Government Exhibits 11 through 20

5  were received in evidence.)

6  Q    You've seen these before, right?

7  A    Yes.

8  Q    Based on your review of them, is it fair to say --

9  you know what?  Let me step back.

10    Who did these records concern?

11    Just describe what the records are generally.

12  A    I will read directly from the record.

13  Q    You don't necessarily need to go through each one.

14    To save time, give us a general description what

15  the records are.

16  A    These are crossings records in and out of the United

17  States for Kalichenko, last name, first name Olena.  Date

18  of birth, October 4, 1986.

19  Q    And based on your review of those records, was Olena

20  Kalichenko in the United States at any point from

21  approximately October 2011 to July 19, 2014?  October 2011

22  to July 19, 2014?

23  A    I see an arrival date for her on September 2, 2011,

24  into the United States.

25  Q    When was the next time she came to the United States

1  after that?

2  A    I don't see an entry until all the way July 11, 2014.

3  Q    July 11, 2014?

4  A    That's correct.

5  Q    Between those two dates, she couldn't have lawfully

6  been present in the United States without CBP being aware

7  of it?

8  A    I would not be able to comment if she was lawfully

9  present or not.  She would not lawfully have entered the

10  US those two dates without CBP reviewing them.

11  Q    Thank you for clarifying that.

12    I want to take back from you Government's

13  Exhibit 20.  I'll put it back on the screen so you can see

14  it, and I'll publish it for the jury.

15    Please describe this record.  Walk us through

16  it.  Walk us through.

17  A    This is an admission record for Ms. Kalichenko.

18  Q    What does that mean, "admission record"?

19  A    It's an entry showing the treasury enforcement

20  communication system, also known as TECS, indicated on the

21  record itself.

22  Q    What does this record show?

23  A    The arrival date, time, flight, and the person's

24  biographic information.

25  Q    With respect to the biographic information, the name,

1  date of birth, citizenship, how is that information

2  captured?

3  A    That information is captured at the time of the

4  event, when the subject arrives to board the flight.  And

5  the airline industry, pursuant to law, is required to take

6  that information into the system, which is the APIS,

7  advanced passenger information system, which transmits the

8  information directly to the Government TECS system.

9    If the airline industry fails to submit this on

10  a regular, timely basis, they are subject to fines.

11  Q    Are any governmental officials of the United States

12  government ever shown identification information such as a

13  passport when the person comes into the country?

14  A    At the time of entry, the subject is required to

15  present a valid identity document.

16  Q    What if they don't have a valid identity document, if

17  they just show up at the airport?

18  A    They will refuse entry or they will be processed.

19  Q    Skipping down to arrival information:  Airline, US

20  Aeroflot.

21    Is that the airline she came in?

22  A    Yes, that is the airline she used to arrive in the

23  US.

24  Q    She arrived on September 22, 2011?

25  A    Yes, that is correct.

1  Q    I see it says "US address street," and it provides a

2  street address, a city and state.

3    Who provides that information?

4  A    The passenger is supposed to disclose their

5  information on the I-94 form.

6  Q    I-94?

7  A    That's correct, which is also known as the

8  arrival-departure form, and that information is

9  transmitted into the system from the I-94 form that the

10  subject has filled out themselves.

11  Q    What if they don't fill out that information

12  correctly?

13  A    They will not be allowed to enter the USA.  It is a

14  requirement for them to fill out the IS-94 form completely

15  and correctly.

16  Q    Read the street address listed in Government's

17  Exhibit 20.

18  A    Street address linked here is 3 High Gate Drive;

19  city, Smithtown; state, New York.

20  Q    When does it say she departed?

21  A    As listed in this record, indicates the date is

22  October 26, 2011.

23  Q    Is it fair to say that you testified earlier the next

24  time she came back into the United States, according to

25  CBP records, is sometimes in July of 2014?

Chopra - Cross/Lato

382

1    A    One moment.
2         That is correct.  I have July 11, 2014.
3         MR. KABRAWALA:  Nothing further on direct.
4         THE COURT:  Cross?
5         MR. LATO:  Yes, your Honor.
6         May I have the exhibits?
7         May I have one moment to confer with counsel,
8    your Honor?
9         THE COURT:  Yes.
10        MR. LATO:  Your Honor, I know you wanted to
11   break at 4:30.  I need about four minutes to look at this,
12   and then I'll proceed.
13        THE COURT:  Four minutes.  Okay.
14        MR. LATO:  Thank you.
15        Permission to approach?
16        THE COURT:  Yes.
17   CROSS-EXAMINATION
18   BY MR. LATO:
19   Q    Good afternoon, sir.
20   A    Good afternoon.
21   Q    I'm showing you Government's Exhibits 16 and 17 in
22   evidence.
23        Looking at those two together, does that show
24   that a person who identified herself as Olena Kalichenko
25   entered the United States on one date and departed the

Chopra - Cross/Lato

383

1    United States on a later date?
2    A    Yes, it does.
3    Q    Would it be fair to say that one of those two
4    exhibits -- and please tell us which one -- that on
5    February 23, 2010, Olena Kalichenko traveled from Charles
6    de Gaulle Airport in France to CVG, which is the short
7    name of the Cincinnati/Northern Kentucky International
8    Airport?
9    A    I agree with the first part, but the second part,
10   CVG, I'm not aware if CVG is the airport called for
11   Cincinnati, Ohio, or Cincinnati --
12        MR. KABRAWALA:  Judge, we'll stipulate that it
13   is Cincinnati.
14        THE COURT:  Okay.
15   Q    Now, on March 14th, it appears that the same person
16   departed from John F. Kennedy International Airport to
17   KBP, for an airport in Ukraine?
18   A    Once again I agree with the departure point from
19   Kennedy, but KBP, I don't have any idea it is from
20   Ukraine.
21   Q    Fair to say that the person left the United States on
22   March 14, 2010?
23   A    Yes, that is correct.
24   Q    Do your records indicate where the person went when
25   that person was in the United States?

Chopra - Cross/Lato

384

1    A    We do not keep a record of internal travel for the
2    CBP.  Only when they travel in and out of the United
3    States.
4    Q    Showing you Government's Exhibit 15.
5         Would it be fair to say that record indicates
6    that on June 4, 2011, the person who identified herself as
7    Olena Kalichenko moved from Frankfort Airport in Germany
8    to DFW, Dallas-Fort Worth?
9    A    Yes.
10   Q    Do you have any information when that person left the
11   United States based upon records of Homeland Security?
12   A    I would have to see the records to find the next
13   departure date.
14   Q    I will show you all of the exhibits in evidence.
15        MR. BODE:  May we just have the numbers?
16        THE COURT:  11 through 20.
17        MR. BODE:  I want to make sure we have all of
18   them up there.
19        MR. LATO:  All that the Government has
20   introduced I have given to the witness, so that would be
21   11 through 20.
22   A    The next departure date after the arrival into the US
23   is as exhibited in number 19, indicating July 7, 2011,
24   departure out of John F. Kennedy, arriving in SVO on the
25   SU 316 flight.

Chopra - Cross/Lato

385

1    Q    Is that July 7th or July 11th?  I'm sorry.
2    A    I see July 7, 2011.
3         MR. LATO:  May I have this back?
4         THE COURT:  Sure.
5         MR. LATO:  I'm almost done, your Honor.
6    Q    I will show you Government's Exhibits 14 and 20.
7         With respect to Exhibit 14, does it show that
8    Olena Kalichenko left or arrived the United States?
9    A    That is an inbound record, indicating arrival into
10   the US.
11   Q    And that is from SVO airport, an international
12   airport --
13   A    That's correct.
14   Q    -- September 2nd of 2011.
15        Is that also the same trip from SVO to JFK?
16   A    Exhibit 14 indicates arrival into the US for
17   August 15, 2011, and Exhibit 20 indicates an arrival into
18   the US on September 2, 2011.
19   Q    So it's fair to say there are two arrival dates in
20   the United States, correct?
21   A    Yes, these are two arrival dates into the United
22   States.
23   Q    One on August 15th of 2011, and one 18 days later on
24   September 2nd of 2011?
25   A    Yes, that is correct.

Proceedings

386

1  Q   Where is the record of her having left the United
2  States in between those two dates?
3       Do you have that?
4       I will show you all of the exhibits.
5  A   **If the record is not in one of the records exhibited,**
6  **then our system does not have the record.**
7       MR. LATO:  Please take a look and see.
8       THE WITNESS:  (Perusing)  That is correct.
9  There is no departure record between those two dates.
10      MR. LATO:  One moment, please.
11      No further questions.
12      THE COURT:  Any redirect?
13      MR. KABRAWALA:  Nothing further.
14      THE COURT:  You may step down, Officer.
15      Ladies and gentlemen, we're 15 minutes late, but
16  we got this done.
17      Do not read anything in the newspapers or listen
18  to anything about this case.
19      We'll see you at 9:30 tomorrow morning.
20      Have a good night.
21      (Whereupon, at this time the jury exits the
22  courtroom.)
23      THE COURT:  You can be seated.
24      Tell me who the witnesses are tomorrow.  I want
25  to see who they are and see if there are any issues that

Proceedings

387

1  we can anticipate for tomorrow.
2       MR. KABRAWALA:  We have two witnesses that are
3  expected tomorrow:  Special Agent Steven Troyd, who is
4  seated right here, and the Government is calling the
5  mother of Jane Doe number two.
6       THE COURT:  Okay.  Any issues that defense is
7  aware of?
8       I want to try to avoid sidebars if we can.  If
9  there are any objections, either documentary or testimony,
10  let me know.
11      Anything that you know of now?
12      MR. LAPINTA:  No, there is nothing now.
13      And we'll meet with the Government when we end
14  here and go over other items introduced tomorrow to avoid
15  unnecessary down time.
16      THE COURT:  I appreciate that.
17      And you'll go through Exhibit 2, the e-mail
18  packet?
19      MR. LAPINTA:  Yes.
20      THE COURT:  Let me know if there is any
21  objections to that.
22      MR. LAPINTA:  Yes.
23      THE COURT:  Let's meet at 9:15 so we can deal
24  with that.
25      MR. LAPINTA:  One question, only because our

Proceedings

388

1  direct examination will include a computer expert that we
2  have on call, who is a very busy guy, and I believe that
3  the case is going in quicker than we expected.
4       THE COURT:  Is that true?  It is going in
5  quicker than you expected?
6       MR. KABRAWALA:  Actually, I was expecting to
7  call Agent Troyd this afternoon.
8       THE COURT:  Right now you have him scheduled to
9  come in when?
10      MR. LAPINTA:  We have him scheduled to come in
11  on Monday.
12      MR. KABRAWALA:  I'm sorry?
13      MR. LAPINTA:  Scheduled to come on Monday.
14      MR. KABRAWALA:  He should at least be on alert
15  on Thursday, because our next big witness is the
16  Government's forensic expert, Detective Rory, R-O-R-Y,
17  Forrestal.
18      THE COURT:  And you expect you will get to him
19  tomorrow?
20      MR. KABRAWALA:  Probably not.  On Thursday.
21      THE COURT:  How many witnesses do you have after
22  that?
23      MR. KABRAWALA:  We have one other witness, who
24  is a probation officer, where there is a 404(b) issue
25  raised previously, where there is dominion and control of

Proceedings

389

1  the camera in the ceiling; that the defendant was being
2  supervised on an unrelated matter, and as a result of that
3  she came to his house, searched it, and found things
4  hidden all over the basement.
5       THE COURT:  So based upon that, Mr. LaPinta, is
6  he available to testify Thursday afternoon if needed?
7       MR. LAPINTA:  I'll place a call tonight.  I'll
8  call him when we leave.
9       I want to understand one point.  There has not
10  been a ruling on that 403(b).
11      THE COURT:  No, there has not.
12      Have a good night.
13      (Whereupon, the proceedings were adjourned until
14  Wednesday, November 5, 2014, at 9:30 a.m.)

**390**

**I-N-D-E-X**

**W-I-T-N-E-S-S-E-S**

| | |
|---|---|
| P E T E R   A N G E L I N I | 258 |
| DIRECT EXAMINATION | 258 |
| BY MR. KABRAWALA | |
| CROSS-EXAMINATION | 275 |
| BY MR. LATO | |
| REDIRECT EXAMINATION | 278 |
| BY MR. KABRAWALA | |
| RECROSS-EXAMINATION | 281 |
| BY MR. LATO | |
| FURTHER REDIRECT EXAMINATION | 282 |
| BY MR. KABRAWALA | |
| R O B E R T   E G A N | 282 |
| DIRECT EXAMINATION | 283 |
| BY MR. KABRAWALA | |
| R O B E R T   E G A N | 315 |
| DIRECT EXAMINATION | 315 |
| BY MR. KABRAWALA | |
| CROSS-EXAMINATION | 321 |
| BY MR. LAPINTA | |
| REDIRECT EXAMINATION | 336 |
| BY MR. KABRAWALA | |
| RECROSS-EXAMINATION | 337 |
| | |
| BY MR. LAPINTA | |

**391**

| | |
|---|---|
| P E T E R   A N G E L I N I | 339 |
| DIRECT EXAMINATION | 339 |
| BY MR. KABRAWALA: | |
| C H E R Y L   J O H N S O N | 356 |
| DIRECT EXAMINATION | 356 |
| BY MR. KABRAWALA | |
| CROSS-EXAMINATION | 369 |
| BY MR. LAPINTA | |
| REDIRECT EXAMINATION | 374 |
| BY MR. KABRAWALA | |
| D E E P   C H O P R A | 375 |
| DIRECT EXAMINATION | 376 |
| BY MR. KABRAWALA | |
| CROSS-EXAMINATION | 382 |
| BY MR. LATO: | |

**E-X-H-I-B-I-T-S**

| | |
|---|---|
| Government's Exhibits 1-A and 1-B were received in evidence | 272 |
| Government's Exhibit 4 was received in evidence | 263 |
| Government's Exhibit 1 was received in evidence | 271 |

**392**

| | |
|---|---|
| Government's Exhibits 200-A and 200-B were received in evidence | 285 |
| Government's Exhibits 200-A and 200-B were received in evidence | 291 |
| Government's Exhibits 205-A and 211-A were received in evidence | 306 |
| Government Exhibit 2-B was received in evidence | 341 |
| Government Exhibit 2-E was received in evidence | 351 |
| Government Exhibits 2-D, 5 and 5-A were received in evidence | 351 |
| Government Exhibit 10 was received in evidence | 364 |
| Government Exhibit 322 was received in evidence | 365 |
| Government Exhibits 10-A and 11 were received in evidence | 366 |
| Government Exhibits 11 through 20 were received in evidence | 378 |

**$**

**$1200** [1] - 352:20
**$1300** [1] - 343:22
**$600** [1] - 343:21

**0**

**0094** [1] - 209:3
**04840** [1] - 327:6
**07840-220293-04** [1] - 292:10
**094** [1] - 210:3

**1**

**1** [7] - 217:21; 270:20; 271:16; 272:11, 14; 391:24
**1-A** [7] - 272:6, 18-19, 24; 273:2; 391:19
**1-B** [7] - 272:6, 18-19, 24; 273:5; 391:19
**10** [11] - 210:25; 227:19; 230:24; 231:2; 359:21; 360:17; 364:20; 366:20; 392:13
**10-A** [6] - 366:2, 5, 21-22; 368:10; 392:17
**100** [2] - 209:13, 21
**10:05** [1] - 209:7
**11** [15] - 231:4; 354:13; 366:21; 377:12, 23; 378:2, 4; 379:2; 382:2; 384:16, 21; 392:17, 19
**11722** [2] - 209:14, 22
**11787** [1] - 292:13
**11788** [1] - 209:18
**118** [1] - 309:21
**11:00** [1] - 242:7
**11:15** [1] - 242:7
**11th** [1] - 385:1
**12** [15] - 226:23; 231:6, 18; 237:9, 11; 287:3, 7; 288:11; 289:3; 292:18; 320:8, 15, 18, 21; 337:4
**12,000** [1] - 374:12
**12,350** [1] - 368:9
**12:30** [2] - 242:9, 14
**12th** [3] - 214:8; 341:16
**14** [9] - 209:3; 210:3; 214:7, 12; 259:15; 383:22; 385:6, 16
**14th** [1] - 383:15

**15** [5] - 242:8; 256:15; 384:4; 385:17; 386:15
**15-count** [1] - 250:7
**15th** [1] - 385:23
**16** [1] - 382:21
**17** [2] - 342:4; 382:21
**18** [2] - 283:14; 385:23
**186** [1] - 311:9
**19** [4] - 353:10; 378:21; 384:23
**191** [1] - 309:21
**1986** [1] - 378:18
**1999** [1] - 361:18
**19th** [3] - 262:5, 9; 292:20
**1:00** [4] - 242:10, 13-14; 312:2

**2**

**2** [31] - 217:3, 10, 24; 218:6, 21; 219:8, 18-19, 22, 24; 220:2, 5, 18, 25; 221:5, 9, 17; 222:16; 224:17; 268:23; 269:25; 340:9; 343:15; 348:1, 5, 23; 378:23; 385:18; 387:17
**2-B** [7] - 269:19; 270:3; 340:10, 12; 341:5; 392:7
**2-D** [15] - 269:19; 270:3; 340:10; 347:22, 24; 348:19; 349:25; 350:2, 14; 351:11, 13, 15; 353:4; 392:11
**2-E** [9] - 269:20; 270:3; 344:12; 345:20; 350:22; 351:2, 8, 20; 392:9
**2-E-mails** [1] - 318:9
**20** [14] - 242:8; 256:15; 334:8; 377:12, 23; 378:2, 4; 379:13; 381:17; 384:16, 21; 385:6, 17; 392:19
**200** [15] - 209:18; 293:24; 294:14; 298:6; 304:19; 305:11; 306:8, 10; 313:6, 8, 15; 314:1, 11, 13; 340:20
**200-A** [19] - 285:1, 11, 13, 17; 288:5; 290:3, 14; 291:1, 5, 10-11, 14, 17; 302:3; 304:13, 24; 305:9; 392:1, 3
**200-B** [14] - 285:1, 11-12, 14; 286:24;

**288**:5; 291:10, 12; 292:22; 302:3; 304:13; 306:16; 392:1, 3
**2002** [3] - 292:20; 323:13, 17
**2010** [2] - 383:5, 22
**2011** [13] - 378:21, 23; 380:24; 381:22; 384:6, 23; 385:2, 14, 17-18, 23
**2012** [10] - 246:5; 247:6; 308:7; 309:7; 312:1; 323:13; 342:4; 352:2; 353:10
**2012.there** [1] - 354:13
**2013** [8] - 214:8; 262:2; 263:13; 341:21; 344:17; 351:22; 353:7; 354:5
**2014** [10] - 209:7; 246:15; 292:21; 378:21; 379:2; 381:25; 382:2; 389:14
**205** [2] - 298:9; 314:2
**205-A** [18] - 297:22, 24; 304:17; 306:8, 14; 308:5; 310:14; 315:11, 16; 316:13; 318:6; 329:15, 17; 332:7; 336:10; 338:23; 392:5
**21-A** [1] - 329:15
**211-A** [14] - 297:22; 304:17; 306:9, 15; 310:25; 315:11, 15; 316:14; 318:6; 329:16; 336:10; 338:23; 392:5
**22** [3] - 309:6; 380:24
**22nd** [1] - 308:7
**23** [3] - 292:20; 323:13; 383:5
**24** [2] - 311:9; 316:10
**24.186.38.241** [1] - 315:15
**241** [1] - 311:9
**25-A** [1] - 307:24
**258** [2] - 390:3
**25th** [1] - 215:3
**26** [1] - 381:22
**263** [1] - 391:22
**265-2379** [1] - 292:15
**27** [1] - 352:2
**271** [1] - 391:24
**272** [1] - 391:19
**275** [1] - 390:6
**278** [1] - 390:8
**28** [1] - 312:1

**281** [1] - 390:10
**282** [2] - 390:12, 14
**283** [1] - 390:15
**285** [1] - 392:1       **1**
**291** [1] - 392:3
**29th** [1] - 214:6
**2:15** [1] - 312:9
**2nd** [2] - 385:14, 24

**3**

**3** [6] - 263:23; 292:12; 323:21; 337:5; 367:9; 381:18
**302** [2] - 273:21; 274:1
**306** [1] - 392:5
**315** [2] - 390:17
**316** [1] - 384:25
**321** [1] - 390:20
**322** [7] - 359:21; 365:7, 19-20, 22; 366:25; 392:15
**336** [1] - 390:22
**337** [1] - 390:24
**339** [2] - 391:1
**341** [1] - 392:7
**35** [1] - 209:18
**351** [2] - 392:9, 11
**356** [2] - 391:4
**364** [1] - 392:13
**365** [1] - 392:15
**366** [1] - 392:17
**369** [1] - 391:7
**374** [1] - 391:9
**375** [1] - 391:11
**376** [1] - 391:12
**378** [1] - 392:19
**38** [1] - 311:9
**382** [1] - 391:14
**3:00** [1] - 242:16
**3:15** [1] - 242:16

**4**

**4** [7] - 209:7; 262:16; 263:4; 378:18; 384:6; 391:22
**401** [4] - 223:9; 313:12; 314:8; 348:24
**403** [19] - 223:8, 10, 25; 224:15; 225:3; 264:24; 266:11, 15, 25; 267:19; 279:10; 295:11; 297:2; 313:13; 314:8, 14; 346:5, 21; 348:24
**403(b)** [1] - 389:10

**404** [2] - 220:13; 345:23

**404(b** [5] - 214:17, 20; 218:6; 345:23; 388:24

**404(b)** [2] - 214:25; 216:2

**44** [1] - 370:18

**45** [2] - 268:24

**46** [6] - 365:4; 370:16, 21-22, 24; 371:19

**48** [3] - 370:20

**4:30** [6] - 242:6, 17, 19-20, 23; 382:11

---

**5**

**5** [14] - 269:19; 270:4; 347:21; 348:19; 350:2, 14; 351:11, 13, 15; 353:25; 389:14; 392:11

**5-A** [10] - 270:5; 348:19; 350:2, 14; 351:11, 14-15; 355:4; 392:11

---

**6**

**6** [1] - 226:20

**631** [2] - 209:22; 292:15

**69** [4] - 309:21; 316:10; 332:2, 7

**69.118.191.98** [1] - 315:16

---

**7**

**7** [2] - 384:23; 385:2

**712-6105** [1] - 209:22

**7840-220293-4** [1] - 293:5

**7840220293-4** [1] - 337:9

**7th** [1] - 385:1

---

**8**

**8** [5] - 341:21; 344:17; 351:22; 353:6; 354:5

**8/23/2002** [1] - 288:9

**803(6** [4] - 301:8; 361:2; 363:5, 7

**803(6)** [1] - 361:20

**81** [1] - 214:7

**8th** [5] - 262:1, 9; 263:13; 341:19; 344:18

---

**9**

**901** [2] - 297:3; 314:7

**98** [1] - 309:21

**9:15** [1] - 387:23

**9:30** [4] - 242:6; 352:16; 386:19; 389:14

---

**A**

**A-N-G-E-L-I-N-I** [2] - 258:8; 339:17

**a.m** [2] - 209:7; 389:14

**abbreviate** [1] - 359:11

**ability** [3] - 211:5; 236:5; 335:11

**able** [7] - 212:4; 254:16; 286:23; 318:19; 327:20; 363:10; 379:8

**absolutely** [1] - 344:2

**abundance** [1] - 237:8

**abuse** [2] - 243:21; 284:10

**abusing** [1] - 246:8; 247:1

**accept** [1] - 234:4

**access** [8] - 317:6; 327:18, 25; 328:9; 337:19; 370:25; 372:5

**accessed** [6] - 327:23; 337:22, 25; 338:4, 6

**accident** [1] - 344:9

**according** [7] - 217:24; 232:5; 308:4; 310:14; 326:22; 336:14; 381:24

**account** [110] - 286:4, 9, 12, 14, 24; 287:3, 11, 17; 288:5, 9, 18-19, 25; 289:2; 290:6, 16, 21-22; 291:22; 292:2, 6, 8, 10, 17; 293:5, 9, 17-19; 297:12; 299:15; 300:20; 301:11, 13, 17; 302:5; 303:4; 307:5, 10-11; 318:18; 319:16; 320:1, 6-7, 14, 16-17, 21; 322:9, 23; 323:3, 12, 17, 20-21, 24; 324:16; 325:5, 8, 11, 13, 18, 20, 23; 326:10, 15, 23; 327:2, 5, 8, 11-12, 15, 18, 21, 23-25; 328:10; 332:1, 23, 25; 333:2, 10, 13; 335:9, 15, 20; 337:5,

**7-9, 19; 338:7, 25;** 358:1; 364:25; 369:18, 20, 24-25; 370:6, 8; 372:18

**accountable** [1] - 252:11

**accounts** [6] - 302:7, 23; 324:23; 325:2, 25; 332:15

**accuracy** [1] - 286:8

**accusation** [1] - 234:12

**acknowledge** [2] - 236:17; 364:19

**acknowledgements** [1] - 236:21

**acknowledging** [1] - 236:24

**actions** [4] - 250:6, 14; 252:11; 267:4

**active** [1] - 292:17

**activity** [5] - 300:2; 346:25; 360:11, 15

**acts** [1] - 245:22

**actual** [5] - 262:24; 286:14; 289:20; 294:8; 313:22

**add** [3] - 213:12; 218:13; 219:25

**added** [3] - 309:2, 5

**adding** [2] - 213:13; 219:23

**addition** [2] - 284:12, 16

**address** [86] - 214:3; 270:11; 284:1, 18, 23-24; 286:6, 13; 288:18, 23; 290:7, 10, 16; 291:17, 19, 21; 292:12; 294:5; 303:11; 308:15, 18, 20, 22, 24; 309:1, 11-12, 19, 22; 310:1, 21; 311:5, 10, 16, 21-22; 313:4; 315:15; 316:12; 323:21, 23; 324:1; 327:12; 328:24; 329:2, 21; 330:2; 332:1, 4, 6-8, 11; 333:13, 16; 334:11, 13, 16-17; 336:14-16, 18; 337:2, 4; 338:11; 342:1; 354:13, 17; 367:9; 368:12, 14, 23; 371:9; 374:12; 375:10; 381:1, 16, 18

**addresses** [27] - 310:11; 315:10, 13-14, 20; 316:7, 9; 318:5, 7;

**330:8, 11; 331:25;** 332:13, 15-16, 19, 21; 335:4; 336:3, 6, 9, 11, 19, 22; 338:16, 19

**adjourned** [1] - 389:13

**administer** [1] - 232:4

**administered** [1] - 375:21

**administration** [3] - 357:14, 17

**admissibility** [2] - 301:9; 362:3

**admissible** [4] - 218:8, 10; 362:6, 25

**admission** [5] - 265:20; 299:9; 361:22; 379:17

**admit** [21] - 263:2; 264:8; 271:14; 272:16; 285:9; 289:6; 291:5; 294:20; 295:8; 296:14; 298:12; 304:13; 306:5; 340:18; 345:2; 350:20, 22; 365:14; 366:16; 377:23

**admitted** [23] - 246:25; 247:2; 251:25; 252:5; 263:4; 271:16; 272:13, 18; 285:11; 291:10; 300:18; 306:13; 310:24; 320:11; 341:5; 350:19; 351:14; 363:2, 8; 364:20; 365:20; 366:21; 378:3

**admitting** [2] - 297:8; 351:7

**advanced** [1] - 380:7

**advised** [2] - 210:17; 252:17

**Aeroflot** [1] - 380:20

**affect** [1] - 211:5

**affected** [1] - 236:8

**affects** [1] - 236:5

**affiliate** [1] - 367:24

**afternoon** [21] - 242:15; 275:5; 283:9; 321:3; 334:19; 345:12, 14; 356:21; 369:9; 376:5; 382:19; 388:7; 389:6

**age** [1] - 354:25

**agencies** [1] - 261:8

**Agent** [16] - 210:7; 245:4; 251:9; 255:22; 257:7; 259:8, 11; 274:7; 275:5; 278:10; 339:6; 340:22; 353:16; 387:3; 388:7

**agent** [12] - 251:24; 256:3; 271:7; 276:16, 21; 367:20; 368:2

**agents** [12] - 246:11, 21; 247:5; 248:1, 3, 6, 9, 14, 25; 249:7, 24; 250:4

**agitating** [1] - 280:2

**ago** [4] - 215:9; 229:21; 264:13; 349:17

**agree** [10] - 210:21; 220:2; 224:9; 232:13, 21; 253:13; 280:21; 330:9; 383:9, 18

**agreed** [2] - 210:23; 212:7

**agreement** [1] - 331:14

**agrees** [2] - 221:6; 253:5

**ahead** [4] - 292:9; 310:22; 339:18; 351:17

**aid** [1] - 347:18

**airline** [5] - 380:5, 9, 19, 21

**airport** [6] - 377:1; 380:17; 383:10, 17; 385:11

**Airport** [4] - 383:6, 8, 16; 384:7

**ALAT** [3] - 259:21; 271:7

**alert** [2] - 279:1; 388:14

**alerted** [1] - 280:22

**alerting** [1] - 279:23

**allegation** [2] - 219:6, 21

**allegations** [1] - 219:24

**alleged** [4] - 218:20; 219:11; 222:8; 346:24

**alleging** [1] - 266:1

**ALLEN** [1] - 209:15

**Allen** [2] - 210:7; 245:3

**allow** [2] - 291:24; 362:24

**allowed** [4] - 237:17, 23; 299:8; 381:13

**allowing** [1] - 295:16

**allows** [1] - 343:8

**almost** [4] - 215:8; 305:19; 385:5

**alone** [2] - 232:10; 271:24

**aloud** [5] - 292:6; 309:19; 310:14; 343:2;

354:19

**Alternate** [1] - 231:7

**alternate** [4] - 228:13, 15; 230:13; 241:20

**alternates** [6] - 211:20; 212:10; 228:12; 231:18

**alternatively** [1] - 318:2

**Alvarez** [1] - 230:6

**Ameek** [1] - 245:1

**Ameet** [1] - 210:6

**AMEET** [1] - 209:14

**America** [1] - 245:5

**AMERICA** [1] - 209:3

**amount** [2] - 243:14; 371:11

**amounts** [1] - 374:3

**analysis** [2] - 332:19; 347:13

**analyst** [1] - 357:8

**Angelini** [9] - 257:7, 22; 258:7; 275:5; 339:7, 16; 340:22; 348:11; 354:5

**Anna's** [1] - 342:8

**answer** [8] - 233:8; 278:20; 279:4; 321:10; 329:22; 350:4, 6

**Anthony** [4] - 210:11; 252:24; 321:5; 369:11

**ANTHONY** [1] - 209:17

**anticipate** [1] - 387:1

**anyhow** [1] - 280:4

**anyplace** [1] - 277:16

**anyway** [1] - 268:7

**apart** [1] - 250:4

**APIS** [1] - 380:6

**apologize** [2] - 231:11; 285:22

**apparent** [1] - 346:14

**appearance** [3] - 210:5; 236:20; 284:13

**APPEARANCES** [1] - 209:11

**applicable** [1] - 241:13

**applicant** [1] - 286:6

**application** [3] - 291:6; 304:12; 316:16

**applied** [1] - 337:9

**apply** [2] - 232:11; 366:19

**appreciate** [4] - 227:11; 229:22; 231:10;

387:16

**approach** [9] - 262:14; 264:17; 278:16; 285:18; 289:8; 295:1; 298:20; 360:20; 382:15

**approximate** [1] - 269:6

**April** [1] - 262:6

**area** [19] - 220:16; 222:25; 223:2; 224:5, 22; 248:2; 310:3, 8; 311:14, 17; 315:21; 316:7; 336:7, 12, 25; 337:1; 338:12; 373:9

**areas** [2] - 371:6; 373:5

**argue** [2] - 241:8; 287:2

**argument** [6] - 218:22; 222:1, 12; 240:25; 241:5, 9

**arguments** [5] - 232:25; 241:1, 12; 313:20

**Arkay** [1] - 209:18

**arrangement** [4] - 244:4, 8; 246:11; 265:15

**arrest** [2] - 279:5, 7

**arrested** [2] - 278:25; 281:7

**arrival** [10] - 378:23; 379:23; 380:19; 381:8; 384:22; 385:9, 16-17, 19, 21

**arrival-departure** [1] - 381:8

**arrive** [1] - 380:22

**arrived** [2] - 380:24; 385:8

**arrives** [1] - 380:4

**arriving** [2] - 234:19; 384:24

**article** [1] - 355:13

**ASAC** [2] - 259:11, 17

**ass** [2] - 352:19; 353:3

**asserted** [1] - 363:3

**assertions** [3] - 279:21, 24

**assign** [1] - 291:21

**assigned** [5] - 259:16; 274:6; 308:22; 359:8, 18

**assist** [1] - 357:20

**assistance** [1] - 260:11

**Assistant** [10] -

245:1, 3; 257:8; 259:8, 18, 20, 23; 260:2, 21; 326:14

**assistant** [2] - 259:11; 339:23

**Assistants** [1] - 209:15

**assisted** [1] - 209:24

**associated** [13] - 283:23; 284:1; 288:19; 292:3; 293:15; 294:7, 9; 308:1; 309:20; 337:5; 338:24; 364:25; 374:12

**assume** [3] - 211:11; 225:22; 305:3

**assumed** [1] - 273:7

**assuming** [1] - 277:10

**assure** [1] - 243:13

**assures** [1] - 229:23

**attache** [1] - 273:12

**Attache** [2] - 259:19, 24; 260:2

**attached** [2] - 227:24; 294:11

**attachment** [4] - 331:7, 13; 355:2, 6

**attachments** [4] - 270:4; 331:7, 18, 21

**attempt** [1] - 214:8

**attempted** [2] - 250:11; 254:13

**attention** [7] - 226:17; 236:3; 242:1; 243:1; 260:20; 261:12; 263:21

**Attorney** [7] - 209:13, 15; 245:2; 326:14; 331:24; 334:24

**attorney** [1] - 239:19

**attorneys** [3] - 227:8; 236:12; 240:24

**attorneys'** [1] - 235:5

**August** [5] - 292:20; 323:13, 17; 385:17, 23

**authentic** [1] - 313:10

**authenticate** [3] - 266:3, 16; 267:10

**authenticated** [2] - 266:2; 268:1

**authentication** [2] - 313:20

**authenticity** [7] - 296:10, 20, 23, 25; 297:7; 313:14; 314:4

**authors** [1] - 346:23

**available** [5] -

**3**

239:14; 255:6; 306:1;
325:14; 389:6

**avoid** [8] - 218:22;
236:15, 20; 237:12;
243:4; 387:8, 14

**await** [1] - 213:2

**aware** [4] - 220:21;
379:6; 383:10; 387:7

**awhile** [1] - 349:16

## B

**B-O-G-E-L-I** [1] -
231:8

**bachelor** [1] - 357:14

**background** [3] -
249:2; 258:24; 357:13

**backwards** [1] - 267:22

**bad** [1] - 346:3

**banking** [1] - 372:15

**based** [24] - 211:23,
25; 237:24; 239:7;
246:10; 249:7; 266:8;
277:7; 283:15; 314:10;
320:10; 322:14; 323:4;
337:10; 357:9, 11;
364:9, 12; 366:20;
367:5; 378:8, 19;
384:11; 389:5

**basement** [25] -
214:21, 25; 215:8;
217:5, 13, 16, 18;
218:21; 222:25; 223:1,
21; 224:5, 22; 244:18;
249:6, 10, 18; 250:3;
251:7, 17; 254:21, 25;
389:4

**basic** [2] - 234:8;
293:4

**basis** [4] - 306:25;
307:2; 380:10

**become** [4] - 213:23;
223:19; 228:16, 19

**becomes** [3] - 223:24;
224:20, 24

**becoming** [2] - 224:3;
259:17

**bedroom** [1] - 342:14

**BEFORE** [1] - 209:8

**begin** [8] - 229:19;
232:4; 235:6, 8;
239:15; 256:12; 257:19;
274:17

**beginning** [2] - 342:9;
343:3

**begins** [1] - 243:2

**Bellevue** [1] - 357:17

**belonging** [1] - 315:20

**best** [4] - 243:9;
334:3; 361:10, 12

**bet** [1] - 344:10

**Bethpage** [1] - 283:16

**better** [4] - 212:17;
328:15; 352:19; 353:13

**between** [13] - 239:4;
242:9, 14; 246:11;
265:13; 346:13, 22, 24;
365:11; 366:10; 379:5;
386:2, 9

**beyond** [4] - 234:22;
240:16; 242:19; 250:19

**BIANCO** [1] - 209:9

**Bianco** [5] - 227:6, 23;
229:18; 235:17; 252:22

**bias** [1] - 232:7

**big** [5] - 211:12, 21;
343:25; 344:9; 388:15

**bigger** [1] - 343:9

**bill** [3] - 307:2, 6, 11

**billed** [1] - 306:25

**billing** [2] - 306:17;
323:23

**bin** [1] - 255:3

**biographic** [2] -
379:24

**birth** [2] - 378:18;
380:1

**bit** [2] - 257:11; 358:5

**bitch** [1] - 352:18

**black** [1] - 220:17

**blasted** [1] - 279:2

**block** [1] - 220:20

**blond** [4] - 244:16;
247:15; 248:21; 249:16

**blue** [2] - 244:15;
249:15

**blurb** [2] - 285:24;
286:20

**board** [1] - 380:4

**BODE** [19] - 209:15;
212:19; 228:14, 17, 25;
268:10; 286:19; 287:4;
296:20; 297:14; 298:20;
300:23; 301:19, 21;
313:5; 314:9; 350:5;
384:15, 17

**Bode** [2] - 210:7; 245:3

**Bogeli** [1] - 231:8

**book** [1] - 294:5

**Border** [1] - 376:9

**box** [1] - 244:10

**boxes** [1] - 324:22

**boyfriend** [1] - 277:5

**branch** [1] - 259:9

**brand** [1] - 283:23

**break** [18] - 235:13;
242:7, 9-10, 13, 15;
256:14; 257:18; 312:8;
315:2, 9; 330:7;
339:21; 345:13; 350:5;
382:11

**breaks** [1] - 235:2

**Brenner** [3] - 211:3;
214:2

**briefly** [7] - 260:19;
278:3; 281:23; 284:6;
285:18; 335:25; 357:13

**bring** [14] - 212:24;
225:15; 227:3; 228:6;
236:3; 243:1; 255:23;
257:9; 313:3; 342:20;
350:25; 359:21; 372:17

**bringing** [1] - 347:20

**brought** [7] - 210:19;
211:1; 234:12; 266:19;
269:24; 282:4

**Brown** [5] - 226:11, 13,
15; 229:16, 20

**build** [2] - 361:15;
362:25

**Bulin** [1] - 261:15

**burden** [10] - 234:15;
239:21; 240:15, 18;
241:7; 250:18, 20;
252:15

**Bureau** [1] - 258:22

**buses** [1] - 242:18

**business** [42] -
231:14; 285:7; 288:17;
289:4, 20; 290:11;
291:3; 294:18; 298:10;
299:9, 20, 22; 300:2,
22; 301:9; 303:2, 7,
12; 304:5, 10; 306:4;
307:15, 20; 313:9, 15;
314:4, 7; 357:14, 16;
358:6-9; 360:11, 15;
361:2; 363:8; 364:7;
374:25; 377:9, 21

**busy** [1] - 388:2

**buy** [4] - 343:24;
373:15, 17, 19

**BY** [41] - 258:15;
268:21; 275:4; 278:9;
281:15; 282:2; 283:8;
288:3; 297:20; 315:8;
316:5; 321:2; 336:2;
337:16; 339:20; 341:8;
351:19; 356:20; 364:23;
365:25; 366:24; 369:8;
374:10; 376:4; 382:18;
390:5, 7, 9, 11, 13,

16, 19, 21, 23, 25;
391:3, 6, 8, 10, 13, 15

## C

**C-H-O-P-R-A** [1] -
376:2

**C-S-A-N** [1] - 230:17

**cable** [6] - 283:20;
310:2; 324:22, 25;
325:1

**Cablevision** [78] -
267:10; 268:9; 283:12,
15, 17, 19; 284:8;
288:9, 16; 289:2, 15;
293:12, 15, 20; 299:16,
21; 300:16, 19; 301:5,
12, 16; 302:7, 12,
20-21; 303:13, 19;
304:20; 307:10, 17;
309:15, 23, 25; 310:2;
311:11, 14, 16; 313:5;
315:20; 316:6; 317:10,
22; 318:16, 18, 20;
319:16, 18; 320:1, 8,
14; 321:15; 322:2, 20,
22; 323:25; 324:6, 10,
12, 15, 19; 325:2, 8;
332:1, 5, 15, 17;
336:4, 12; 338:7, 11;
340:20; 348:6; 362:7,
10, 15

**Cablevision's** [14] -
285:6; 290:12; 292:2;
294:18; 297:11; 298:10;
303:2, 6; 304:7;
305:20, 23; 307:15;
316:1; 318:8

**cachet** [1] - 339:23

**Cadle** [1] - 231:7

**cafeteria** [2] -
236:14, 24

**camcorder** [5] -
218:20; 219:8, 19;
220:7; 224:11

**camera** [66] - 214:22,
24; 215:16, 22, 24;
216:4, 9-10, 15, 20,
23; 217:2, 5, 7, 9, 14,
18, 25; 218:1, 4, 11,
15, 24; 219:7, 12-13;
220:1, 4, 6, 15, 20-21,
24; 222:2, 6, 8-9,
11-13, 21; 223:22;
224:17, 20; 243:20;
244:6; 248:13, 18-19,
22; 249:20, 22, 25;
251:15, 18, 20; 271:24;
343:5, 7-8, 11, 22;

389:1

**cameras** [20] - 214:21; 215:3, 19, 21; 216:5, 13, 18-19, 21; 217:16, 22; 218:3, 18; 220:3, 9; 221:1; 222:22; 223:13; 249:17; 251:22

**cannot** [9] - 225:5; 326:3; 333:25; 335:19; 336:22; 364:4; 372:10; 374:5

**capability** [1] - 223:20

**capacity** [3] - 321:23; 322:1; 376:18

**capture** [1] - 360:12

**captured** [10] - 294:14; 302:25; 303:1; 305:2; 316:12; 337:7; 360:7; 377:3; 380:2

**car** [2] - 373:19; 377:1

**card** [10] - 248:11, 14, 18; 251:14, 20; 254:20; 255:7; 256:7; 372:14, 17

**cards** [2] - 248:12; 254:3

**care** [3] - 212:17; 231:12; 289:2

**carefully** [1] - 241:21

**carries** [1] - 342:18

**case** [103] - 211:22; 213:14, 16, 22; 215:11, 15; 216:4, 6, 12, 16; 218:12, 16; 219:1, 9, 16; 220:10, 23, 25; 222:3, 19; 224:21; 225:19; 226:21; 227:9; 228:2; 229:1, 22; 231:15, 24; 232:3, 5; 233:16, 24; 234:6-8; 235:1, 8, 10, 14, 16, 18-19, 22, 24; 236:11, 16; 237:5, 7, 10, 12, 15, 23; 238:5, 21, 24; 239:3; 240:2, 13, 18; 241:8, 24; 245:5; 250:24; 252:7, 23; 253:2; 255:21; 256:8, 16; 260:7; 264:25; 265:5; 273:16; 274:6, 8; 286:3, 5, 15, 18-19, 21; 287:4, 6, 18, 20; 296:5; 312:10; 328:7; 329:7; 338:13; 345:15; 346:1; 347:3; 361:18; 375:6; 386:18; 388:3

**cases** [5] - 213:6; 242:11; 260:10, 12;

358:13

**cash** [2] - 343:22; 367:25

**catch** [1] - 242:19

**caused** [2] - 251:1; 266:9

**caution** [1] - 237:8

**CBP** [8] - 376:11, 16, 18; 377:5; 379:6, 10; 381:25; 384:2

**CBP's** [1] - 377:9

**CD** [3] - 305:12, 15; 374:3

**CDs** [1] - 254:3

**ceiling** [24] - 214:22; 215:17; 216:9, 18, 20, 23; 217:6, 18; 218:1, 11, 15-17, 25; 219:2; 220:6; 222:22; 223:24; 224:11; 250:3; 251:17; 389:1

**cell** [10] - 254:11; 275:9; 276:8; 330:22; 343:5, 7-8, 11; 352:25

**Cellular** [1] - 286:5

**centers** [1] - 302:12

**Central** [3] - 209:5, 14, 22

**central** [1] - 219:8

**certain** [4] - 232:23; 256:9; 266:14; 327:2

**certainly** [6] - 223:19; 224:22; 237:12; 296:4; 328:1; 347:8

**certification** [1] - 357:16

**cetera** [1] - 343:24

**chain** [1] - 349:5

**chair** [2] - 258:11; 356:17

**chairs** [1] - 253:1

**change** [1] - 353:15

**changing** [1] - 344:8

**characterizes** [1] - 346:13

**charge** [1] - 307:2

**Charge** [4] - 257:8; 259:8, 11; 339:6

**charged** [9] - 223:12; 224:17; 240:16; 250:6, 8, 15-16; 265:5, 10

**charges** [3] - 216:16; 265:4; 347:2

**Charles** [1] - 383:5

**chart** [3] - 365:15, 18, 21

**charts** [1] - 366:19

**check** [7] - 290:24; 303:5; 317:9, 25; 318:3, 19; 368:17

**checking** [4] - 317:11; 326:23; 337:7

**cheerleader** [2] - 244:16; 249:15

**CHERYL** [1] - 356:14

**Cheryl** [3] - 350:10; 356:5, 14

**Chicago** [4] - 258:21; 259:9, 17

**child** [26] - 212:17; 216:6, 8; 246:23; 247:4; 248:23; 250:9-11, 16-17; 252:1; 253:3; 254:24; 255:8; 265:6; 272:2; 277:9, 24; 278:1; 346:16; 347:9

**child's** [1] - 247:17

**children** [2] - 217:21; 256:8

**chooses** [1] - 318:24; 319:22

**Chopra** [1] - 376:1

**church** [1] - 277:1

**Cincinnati** [3] - 383:11, 13

**Cincinnati/Northern** [1] - 383:7

**Circuit** [5] - 286:3, 18; 287:18, 20; 361:18

**Circuit's** [1] - 361:11

**circumstantial** [3] - 220:4; 233:19, 21

**citizen** [1] - 376:20

**citizenship** [1] - 380:1

**City** [1] - 310:6

**city** [6] - 367:10, 12, 20-21; 381:2, 19

**claim** [2] - 362:12

**clarify** [2] - 261:1; 284:14

**clarifying** [1] - 379:11

**clean** [2] - 234:14; 342:16

**clear** [5] - 211:23; 221:16; 252:7; 329:7; 349:12

**clearly** [6] - 216:12; 220:19, 24; 330:8, 11; 338:15

**CLERK** [5] - 210:3;

257:14, 23; 258:5; 356:9

**client** [9] - 316:15, 17, 21-22; 317:16, 21; 319:20; 329:8

**clients** [2] - 233:3; 316:25

**clock** [8] - 215:23; 216:5, 15; 217:2; 218:4, 18; 219:3; 249:19

**close** [4] - 241:25; 242:13; 258:11; 283:4

**closer** [1] - 242:13

**closest** [1] - 229:5

**closing** [4] - 232:1; 240:24; 241:9, 12

**clothes** [1] - 343:25

**clothing** [1] - 355:14

**co** [6] - 244:3; 245:24; 252:24; 265:19, 21, 24

**co-conspirator** [5] - 244:3; 245:24; 265:19, 21, 24

**co-counsel** [1] - 252:24

**coercive** [1] - 255:25

**Cohen** [1] - 230:21

**cold** [1] - 353:14

**collected** [3] - 287:14; 290:10; 303:17

**colon** [3] - 310:15; 373:9

**Colorado** [2] - 357:4

**coming** [12] - 215:7, 9; 223:22; 245:16; 271:20; 296:19; 300:9, 13; 313:6; 364:6, 9, 13

**commands** [1] - 247:21

**comment** [1] - 379:8

**common** [1] - 331:17

**commonly** [2] - 370:8; 376:11

**communicate** [1] - 251:13

**communicates** [1] - 236:7

**communicating** [1] - 213:22

**communication** [1] - 379:20

**communications** [1] - 235:22

**community** [1] - 241:18

**compact** [2] - 294:1; 359:24

5

**6**

**companion** [1] - 246:18

**company** [6] - 283:19; 284:9; 288:21; 307:21; 372:13

**company's** [1] - 358:17

**compatible** [1] - 308:22

**compiled** [1] - 335:18

**complainant** [1] - 261:15

**complainant's** [1] - 261:16

**complaining** [1] - 211:18

**complaint** [7] - 260:23; 261:3, 13-14; 263:17; 277:1

**complaints** [1] - 221:8

**complete** [2] - 231:24; 232:6

**completely** [1] - 381:14

**completes** [1] - 256:11

**computer** [39] - 209:24; 243:22; 248:1, 8-9; 251:12; 254:4, 10; 255:3, 5; 266:5, 18; 268:12; 308:21; 315:25; 316:17; 318:1, 7; 319:10, 13, 19-20; 328:16; 329:19, 23; 330:1, 3-4, 19-20; 348:15; 358:16; 370:14, 19, 24; 371:25; 388:1

**computer-assisted** [1] - 209:24

**computers** [5] - 254:2, 6; 271:8; 319:17; 330:25

**conceded** [1] - 314:7

**conceivably** [1] - 372:5

**concern** [2] - 347:3; 378:10

**concerning** [3] - 268:5; 281:3; 367:2

**conclude** [1] - 233:22

**conclusion** [2] - 238:21; 241:23

**conclusions** [2] - 239:1; 241:4

**condition** [1] - 227:7

**conduct** [8] - 234:24; 273:14; 275:22; 276:1, 18, 23; 277:18; 278:13

**conducted** [5] - 246:17, 20; 292:1;
300:1; 364:25

**conducting** [1] - 228:25

**conducts** [1] - 359:4

**confer** [5] - 217:1; 274:10, 17; 277:14; 382:7

**conference** [1] - 363:16

**confers** [1] - 212:6

**confessed** [3] - 246:23; 247:4, 24

**confession** [1] - 251:25

**confident** [1] - 287:20

**configured** [2] - 371:25; 372:1

**confirmation** [5] - 359:7, 17; 368:15, 21, 25

**confused** [2] - 285:23; 313:19

**confusing** [1] - 349:6

**connect** [1] - 317:2

**connected** [4] - 308:21; 309:12; 315:25; 318:8

**Connecticut** [2] - 310:5, 9

**connection** [5] - 215:11; 226:11; 316:19; 329:3; 358:1

**conscientiously** [1] - 241:21

**consent** [4] - 214:10, 12; 276:3; 314:15

**consider** [6] - 233:25; 240:1; 267:19; 280:3; 364:2, 4

**considered** [2] - 224:15; 233:13

**considering** [2] - 223:25; 234:20

**consist** [1] - 232:19

**consistent** [3] - 252:9; 361:10; 366:17

**conspiracy** [6] - 250:9; 265:9, 12, 25; 295:11

**conspirator** [5] - 244:3; 245:24; 265:19, 21, 24

**Constitution** [1] - 241:16

**consulates** [1] - 260:4

**contact** [3] - 273:20; 274:7; 302:8

**contacting** [1] - 274:4

**contain** [3] - 294:6; 330:16; 332:19

**contained** [14] - 290:25; 294:13; 298:5, 8; 305:15; 306:10; 313:15; 314:1; 324:3; 329:4, 18; 331:7; 348:1; 366:9

**containing** [1] - 254:21

**contains** [6] - 271:22; 294:4; 295:12; 313:7; 332:21; 359:24

**contemplate** [1] - 279:23

**contemporaneously** [7] - 289:23; 304:1, 25; 307:7, 12; 309:7; 358:23

**content** [9] - 267:16; 294:4, 8-9; 300:9, 13; 304:21; 353:25; 354:14

**continue** [4] - 236:6; 242:16; 261:11; 315:3

**Continued** [3] - 315:8; 360:23; 363:17

**continued** [1] - 339:20

**contract** [1] - 265:13

**contrary** [1] - 253:5

**control** [15] - 216:20; 217:17; 218:11; 219:15; 220:24; 222:2, 5, 21; 224:16, 20; 225:8; 359:8-10; 388:25

**controlled** [5] - 222:25; 309:23; 311:10; 332:16; 336:11

**controls** [1] - 309:23

**convenient** [1] - 242:7

**conversation** [2] - 236:18; 295:19

**conversations** [2] - 236:11, 21

**coordinate** [1] - 276:5

**copies** [2] - 295:22; 296:6

**copy** [10] - 213:5, 24-25; 264:4; 286:19; 340:14; 344:24; 345:18; 360:1

**correct** [133] - 212:12; 219:5; 264:4; 272:13; 276:16; 277:11; 297:13; 298:17; 299:11; 304:22; 306:11; 307:22; 313:18; 314:6; 316:7; 317:3;

320:8; 321:21, 24-25; 322:3, 5-6, 12; 323:4, 8, 10-11, 13, 19; 324:4, 14; 325:8; 326:13; 327:3, 7, 12, 15-16, 18-19, 23; 328:3, 11, 18, 21; 329:20; 330:11, 14-15, 17-18, 22-23, 25; 331:1, 5, 15-16, 18-19, 23; 332:9, 20, 25; 333:1, 4-5, 8-9, 14, 20; 334:11, 18; 335:7, 21-22; 337:17, 20, 23; 338:1, 4, 8-9, 25; 340:14; 343:18; 352:7; 359:3; 369:20, 22; 370:10, 14; 371:4, 13, 16, 19, 23; 372:3, 8-9, 12, 18, 21; 373:1, 3-4, 7, 10-12; 374:21; 375:2, 10; 379:4; 380:25; 381:7; 382:2; 383:23; 385:13, 20, 25; 386:8

**correction** [1] - 320:12

**correctly** [6] - 315:17; 325:20; 328:8; 370:5; 381:12, 15

**correspondence** [1] - 210:25

**costume** [1] - 248:21

**costumes** [4] - 219:20; 244:15; 251:22

**counsel** [12] - 210:12; 212:6; 217:1; 239:22; 240:5; 241:9; 252:24; 274:10; 277:14; 287:4; 357:20; 382:7

**count** [3] - 214:7, 9, 12

**counterintelligence** [1] - 259:9

**countries** [3] - 260:5; 334:2, 4

**country** [12] - 333:16, 19; 334:21; 335:2, 5, 7; 368:2, 5; 377:4; 380:13

**counts** [1] - 252:12

**County** [3] - 246:16; 256:2, 4

**couple** [7] - 253:1; 263:18; 312:3; 314:18, 21; 369:17

**course** [25] - 215:18; 229:25; 232:15; 246:4; 285:6; 288:17; 290:11;

291:3; 294:17; 298:10; 299:21; 300:1, 21; 303:1, 6, 12; 304:5, 10; 307:15; 337:3; 343:14; 348:7; 360:15; 377:9, 20

**court** [13] - 236:22; 239:5, 7; 246:13; 268:19; 271:20; 279:17; 288:2; 290:2; 297:19; 302:2; 364:24; 372:6

**COURT** [231] - 209:1; 210:10, 13, 24; 211:10, 15; 212:5, 12, 14, 16, 20, 24; 213:10, 12, 21; 214:10, 12, 15; 215:12, 16, 19; 216:14, 22; 217:7, 10; 218:9, 14, 24; 219:3, 10; 221:25; 222:7, 18; 223:5, 17; 224:12; 225:11, 15; 226:8, 13, 20; 227:5, 13, 19, 22; 228:9, 12, 16, 19, 23; 229:2, 4; 230:18, 20; 231:20; 252:14; 256:11; 257:1, 4, 6, 9, 12, 17; 258:9; 262:15; 263:4; 264:10, 18, 22; 265:7, 16, 19; 266:1, 5, 11, 20, 25; 267:3, 12, 21; 268:2, 11; 269:13; 271:16; 272:18; 274:14, 18; 275:1; 278:4, 16, 20, 23; 279:3, 6, 9, 14; 280:20, 24; 281:6, 11, 22; 282:7, 9, 13, 16, 24; 283:3; 285:11; 287:8, 12, 15, 24; 289:8, 13, 19, 22; 291:8; 294:21; 295:18; 296:11, 14, 22; 297:2, 6, 10; 298:13, 16, 21; 299:3, 11, 23; 300:11; 301:4, 15, 20, 22; 304:14, 16; 306:6, 11, 13; 312:2, 5, 8; 313:3, 18; 314:2, 12, 18, 21; 315:1; 316:4; 318:12; 320:24; 329:13, 16; 335:24; 337:14; 339:4, 8, 14, 18; 340:19, 24; 341:2, 5; 345:3, 12, 19, 22; 346:20; 347:22, 24; 348:5, 10, 12, 17, 22; 349:19, 25; 350:7, 9, 12, 16, 20, 25; 351:6, 13, 17; 355:22, 25; 356:3, 7, 16; 360:20; 362:1, 7, 18;

363:8, 13; 364:1; 365:16, 18, 20; 366:19; 369:6; 374:7; 375:13, 15, 19; 378:2; 382:4, 9, 13, 16; 383:14; 384:16; 385:4; 386:12, 14, 23; 387:6, 16, 20, 23; 388:4, 8, 18, 21; 389:5, 11

**Court** [14] - 209:20; 212:11; 213:25; 214:1, 20; 232:12, 14, 22; 233:11; 241:18; 249:8; 313:14

**Court's** [2] - 214:18; 233:6

**courthouse** [1] - 244:20

**Courthouse** [1] - 209:4

**courtroom** [26] - 210:17, 20; 226:25; 227:4, 18, 21; 228:11; 229:3; 233:14, 17; 236:13; 237:24; 239:10; 243:14; 244:24; 256:19; 257:16; 308:3; 311:2; 312:12; 314:25; 322:14; 345:17; 351:5; 355:10; 386:22

**cover** [1] - 359:25

**coverage** [1] - 227:2

**covered** [2] - 240:9; 289:15

**covering** [1] - 347:17

**CR** [2] - 209:3; 210:3

**Crawford** [1] - 265:1

**create** [1] - 329:24

**created** [12] - 251:1, 4-5; 285:5; 288:9; 294:15; 298:9; 305:16; 323:21; 377:17, 19

**creates** [2] - 295:8; 303:4

**creating** [1] - 265:5

**creation** [1] - 322:25

**credentials** [1] - 327:24

**credibility** [1] - 234:5

**credit** [2] - 372:14, 17

**crime** [6] - 214:23; 216:3; 218:2, 7; 265:11

**criminal** [11] - 213:5; 229:19; 234:7; 240:18; 250:7; 260:23; 261:7, 14; 346:25

**critical** [1] - 224:21

**CROSS** [8] - 275:3; 321:1; 369:7; 382:17; 390:6, 20; 391:7, 14

**cross** [12] - 240:6, 9; 274:15; 278:10; 286:23; 287:2; 312:5; 320:24; 355:25; 362:3; 369:6; 382:4

**cross-examination** [5] - 274:15; 278:10; 320:24; 355:25; 369:6

**CROSS-EXAMINATION** [8] - 275:3; 321:1; 369:7; 382:17; 390:6, 20; 391:7, 14

**cross-examine** [1] - 240:6

**crossings** [2] - 377:1; 378:16

**crotch** [1] - 221:24

**currency** [1] - 368:7

**custodian** [1] - 321:24

**custom** [1] - 244:8

**custom-made** [1] - 244:8

**customer** [24] - 284:18; 289:17; 302:5, 8, 16, 19; 303:7, 14, 19, 22, 24; 306:25; 317:17, 22; 318:24; 319:6; 358:11, 17; 359:4; 368:16, 21

**customers** [8] - 284:2; 302:22; 306:1; 307:18; 317:7; 319:1; 358:13

**Customs** [1] - 376:9

**CVG** [3] - 383:6, 10

**cyber** [2] - 259:10; 271:7

---

**D**

**Dallas** [1] - 384:8

**Dallas-Fort** [1] - 384:8

**dance** [1] - 343:15

**dancing** [1] - 271:23

**danger** [1] - 225:1

**dark** [2] - 355:16, 18

**data** [13] - 294:7, 11, 13; 298:5; 304:22; 305:14, 25; 335:18; 360:5; 371:18; 373:2, 5

**database** [12] - 322:20; 324:3; 326:8; 327:14, 17; 329:10; 331:21; 335:10; 358:22; 360:8; 370:6; 373:3

**databases** [3] - 366:9; 376:19; 377:5

**date** [18] - 308:5; 309:17; 311:25; 329:5; 330:13; 341:14; 342:3; 349:14; 362:22; 378:17, 23; 379:23; 380:1; 381:21; 382:25; 383:1; 384:13, 22

**dated** [1] - 353:10

**dates** [14] - 225:25; 292:16, 19; 323:14; 349:4-6, 13; 379:5, 10; 385:19, 21; 386:2, 9

**dating** [1] - 245:8

**daughter** [20] - 243:20, 25; 244:6; 245:10, 12, 15, 20; 246:9, 24; 247:1, 7, 12; 250:13; 271:25; 272:1; 273:7; 346:1; 352:17; 353:1, 20

**days** [3] - 269:6; 385:23

**de** [1] - 383:6

**deal** [3] - 227:10; 322:23; 387:23

**dealt** [1] - 274:5

**dear** [1] - 354:7

**December** [1] - 214:8

**decide** [6] - 233:16; 234:2; 237:23; 250:24; 302:13; 306:2

**decision** [1] - 361:11

**deep** [1] - 376:1

**DEEP** [1] - 376:1

**Defendant** [2] - 209:6, 17

**DEFENDANT** [1] - 212:13

**defendant** [78] - 210:19; 216:19; 217:15; 222:24; 224:18; 232:8; 234:10, 14, 16, 18, 20; 239:20; 240:5, 13, 17, 20; 241:9, 17; 243:19, 22; 244:2, 4-5, 7, 11-12, 23; 245:7, 11, 13, 16, 18, 21, 25; 246:1, 6, 12, 19, 22, 24; 247:2, 5, 9, 13, 16, 18, 21, 24; 248:4; 249:25; 250:6, 8, 12, 16, 19; 251:1, 4, 12, 15, 19, 23; 252:4, 10, 16-17; 253:1; 264:12; 265:5, 14; 346:13, 15, 22; 355:21; 362:16; 375:17; 389:1

**defendant's** [26] - 215:8; 217:17; 218:10; 224:4; 234:21; 239:19; 245:24; 246:9, 14, 17; 247:8, 25; 248:2, 7, 16, 20; 249:3, 5, 9, 11; 250:14; 251:6, 24; 280:25; 313:6; 348:15

**defense** [23] - 212:6; 213:10; 214:15; 228:21; 239:22; 240:22; 253:4, 13; 257:4; 267:12; 277:14; 286:23; 295:21; 296:6; 313:12; 314:9, 11; 348:18, 22; 355:15, 19; 366:2; 387:6

**defined** [1] - 370:8

**definitely** [2] - 218:2; 295:14

**degree** [4] - 258:25; 259:1, 4

**delay** [2] - 231:11; 305:4

**delete** [6] - 255:9; 318:24; 319:1, 16-17; 335:11

**deleted** [11] - 254:21, 23; 255:2, 7, 13; 256:7; 319:3, 5; 335:15, 17, 21

**deliberate** [4] - 238:22; 239:3, 12; 241:14

**deliberating** [1] - 235:8

**deliberations** [1] - 238:5

**delicious** [3] - 342:14; 343:13, 20

**delivers** [1] - 342:17

**DelRosario** [2] - 228:17; 231:2

**delta** [1] - 351:11

**demanded** [2] - 244:5; 245:21

**demonstrate** [1] - 216:19

**Denise** [1] - 356:14

**DENISE** [1] - 356:15

**deny** [1] - 224:10

**departed** [3] - 381:20; 382:25; 383:16

**Department** [2] - 246:16; 270:12

**department** [1] - 302:9

**departure** [6] - 381:8; 383:18; 384:13, 22, 24;

386:9

**depicted** [3] - 273:2, 5; 277:24

**depiction** [1] - 262:24

**deputy** [2] - 210:16; 211:18

**derive** [1] - 331:20; 333:18

**describe** [10] - 258:24; 260:19; 271:20; 284:6; 302:6; 335:3; 354:3; 357:13; 378:11; 379:15

**described** [1] - 247:16

**describes** [1] - 294:12

**describing** [1] - 261:11

**description** [2] - 368:6; 378:14

**despite** [2] - 235:25; 243:9

**detail** [1] - 285:25

**detailing** [1] - 263:17

**details** [2] - 266:12; 335:16

**detection** [1] - 218:23

**detective** [2] - 256:2, 4

**Detective** [1] - 388:16

**determination** [1] - 238:23

**determine** [6] - 221:13; 241:16; 292:2; 328:24; 329:1

**determining** [1] - 234:5

**develop** [3] - 329:20, 24; 369:19

**developing** [1] - 287:10

**development** [1] - 369:18

**device** [6] - 275:15; 296:21; 330:16, 19-20, 22

**devices** [9] - 248:10; 275:23; 276:8, 24; 278:12; 279:18; 281:18; 282:3

**DFW** [1] - 384:8

**dialogue** [1] - 332:9

**difference** [1] - 239:4

**different** [9] - 217:12; 218:17; 276:12; 287:12; 311:7; 321:16; 332:19, 21; 347:13

**digital** [6] - 248:10,

17-18; 249:24; 251:14, 20

**direct** [15] - 216:12; 218:2; 233:18, 20; 314:22; 315:2; 321:7, 14; 322:8; 324:10; 325:7; 370:12; 382:3; 388:1

**DIRECT** [12] - 258:14; 283:7; 315:7; 339:19; 356:19; 376:3; 390:4, 15, 18; 391:2, 5, 12

**directed** [2] - 245:21; 302:11

**directing** [5] - 244:3; 246:23; 250:13; 251:25; 346:15

**direction** [2] - 237:1; 245:18

**directly** [6] - 316:1, 19; 318:7; 356:25; 378:12; 380:8

**disagree** [1] - 221:19

**disclose** [1] - 381:4

**discovered** [1] - 248:9

**discovery** [1] - 248:15

**discuss** [18] - 215:13, 16; 225:8; 226:18; 235:1, 10, 13, 17-18, 20, 24; 236:1; 242:3; 256:16; 275:17; 312:10; 345:14; 348:21

**discussed** [3] - 227:7; 236:19; 316:9

**discussing** [2] - 266:23; 336:10

**discussion** [2] - 225:17; 280:7

**discussions** [2] - 275:16; 280:10

**disease** [2] - 342:17

**disk** [21] - 270:19, 25; 271:3, 6, 9, 11-12, 19, 21-22; 273:23; 274:1; 294:1, 4; 295:16; 340:1; 348:6; 359:24

**disks** [1] - 296:2

**dismiss** [2] - 214:7, 9

**dismissed** [1] - 214:12

**dispute** [3] - 222:10; 224:2; 349:16

**disputing** [1] - 224:18

**disregard** [1] - 233:12

**disregarded** [1] - 233:15

**DISTRICT** [2] - 209:1

**District** [3] - 209:21;

229:14; 245:2

**disturbing** [1] - 248:15

**division** [1] - 273:16

**divisions** [1] - 273:15

**doctor** [1] - 227:6

**doctor's** [1] - 211:1

**document** [19] - 214:2; 263:25; 264:2, 4; 266:3, 17; 267:18; 268:11-13; 290:8; 293:1; 297:25; 308:2; 311:1; 331:14; 366:6; 380:15

**documentary** [1] - 387:9

**documents** [13] - 232:19; 250:21; 263:12, 15, 19, 22; 268:25; 269:22; 285:23; 299:9; 300:6; 306:8; 357:20

**Doe** [22] - 217:3, 10, 21, 24; 218:5, 21; 219:8, 18-19, 22, 24; 220:2, 5, 18, 25; 221:5, 9, 17; 222:16; 224:17; 387:5

**doll** [1] - 343:25

**dollars** [7] - 247:3; 252:5; 286:25; 293:8; 320:20; 326:18; 374:12

**domain** [1] - 284:3

**dominion** [2] - 223:2; 388:25

**done** [17] - 247:22; 278:11; 290:24; 295:18; 333:6; 343:7; 347:12; 350:16; 370:13, 15, 18, 22, 24; 375:6; 385:5; 386:16

**door** [3] - 228:10; 279:2, 9

**Dorgan** [1] - 230:7

**dot** [8] - 309:21; 311:9; 333:4; 334:4

**doubly** [1] - 267:25

**doubt** [4] - 234:22; 240:17; 250:19; 327:5

**down** [15] - 221:24; 229:11; 230:10, 12; 231:3; 239:10; 282:10; 330:7; 342:20, 22; 356:3; 375:15; 380:19; 386:14; 387:15

**dozens** [3] - 244:2; 246:6; 362:21

**Dr** [3] - 211:3; 214:2

8

**draw** [2] - 241:4; 263:21

**drawn** [2] - 226:16; 239:2

**dressed** [5] - 219:20; 244:15; 247:14; 248:21; 251:23

**dressing** [4] - 245:23; 343:24; 344:5, 8

**dripping** [2] - 343:1; 344:10

**Drive** [6] - 209:18; 292:12; 323:22; 337:5; 367:9; 381:18

**drives** [3] - 254:3, 7, 11

**drop** [2] - 352:19; 353:3

**due** [1] - 272:1

**duly** [6] - 231:19; 258:3; 282:22; 339:12; 356:12; 375:24

**dummy** [1] - 214:24

**during** [24] - 211:10; 213:15; 215:9, 20; 223:15; 225:18; 229:24; 232:14; 234:25; 235:2, 12, 19; 237:9, 19; 239:13; 240:9; 242:10; 243:8; 251:10; 263:12; 264:5; 269:11; 280:10

**duties** [3] - 260:1; 284:6; 357:18

**duty** [1] - 232:9

**DVDs** [1] - 254:3

---

**E**

---

**E-G-A-N** [1] - 283:2

**e-mail** [79] - 313:7; 316:16, 21-22; 317:2, 7, 11, 16, 21, 24-25; 318:3, 19, 23-24; 319:18, 20; 320:6; 323:3; 327:15, 18; 329:20, 24; 330:2, 8; 331:15; 332:4, 19, 21, 23, 25; 333:2, 7, 19; 334:4, 13, 16; 336:9, 15-16; 337:2, 19; 338:6, 10; 340:14, 22-24; 342:1; 343:9; 344:14, 16; 346:3, 11-12; 347:14; 349:4, 13; 351:21, 24; 353:5; 354:4, 12-14, 17; 362:20; 368:12, 16-17, 23; 374:12; 375:8;

387:17

**e-mailed** [2] - 341:15; 353:21

**e-mailing** [1] - 362:17

**e-mails** [51] - 313:8, 13, 15, 22; 314:5, 10; 315:14; 316:2; 318:14, 20; 319:1, 7, 9, 12, 15, 17, 22; 320:2; 327:2, 21; 328:13, 20, 25; 330:24; 331:3, 6, 17; 332:12; 334:10, 20; 335:1, 11, 14, 20; 336:11; 338:24; 340:5, 7, 19; 346:15, 23; 347:7, 11; 348:5, 24; 349:5, 7, 9; 362:15

**e-mails...I'm** [1] - 352:22

**early** [1] - 218:7

**Eastern** [2] - 229:13; 245:2

**EASTERN** [1] - 209:1

**eat** [3] - 343:14, 17, 20

**ECF** [1] - 214:6

**education** [1] - 258:24

**educational** [1] - 357:13

**effect** [3] - 266:8; 280:25; 281:2

**efficiently** [2] - 229:25; 243:4

**efforts** [1] - 243:9

**Egan** [8] - 282:15; 283:2; 313:5, 16; 315:3, 9; 321:3

**Egan's** [1] - 313:11

**eight** [1] - 230:22

**either** [16] - 236:2; 273:10; 302:8, 10; 314:15; 324:9, 12; 326:6; 329:19, 24; 330:14, 17, 19; 331:14; 377:4; 387:9

**electrical** [1] - 220:17

**electronic** [7] - 275:15, 23; 276:8, 24; 278:12; 326:23; 337:8

**electronics** [1] - 275:21

**element** [1] - 240:16

**Elena** [1] - 261:23

**ELENA** [1] - 261:23

**elevator** [1] - 236:14

**email** [52] - 243:21;

245:20; 247:4, 18; 248:7; 263:16; 265:23; 266:5, 9; 268:15; 270:11; 284:1, 18, 23-24; 290:10; 291:17, 19, 21, 24; 293:17; 294:4, 8-9, 11, 13; 296:16, 19; 297:9; 298:3; 305:17, 25; 306:2, 4; 307:24; 308:4, 9; 309:7, 13, 16, 20; 310:18, 21; 311:4, 21-22, 25

**emailed** [2] - 243:23; 245:15

**emails** [47] - 244:2; 245:13; 246:25; 247:5, 9, 21, 23; 248:4; 250:11; 251:4; 263:18; 266:9, 14, 24; 267:1, 5, 7, 11, 14, 17; 268:7, 24; 269:5, 9; 270:8, 14; 273:17, 22; 294:7; 295:8, 16, 22, 25; 296:4, 7, 9, 11-12, 18; 297:11; 305:18, 25; 308:1; 313:25

**emanates** [1] - 333:14

**embassies** [1] - 260:4

**Embassy** [1] - 259:18

**embassy** [5] - 260:23; 261:2; 262:4; 263:17; 276:4

**EMMM** [1] - 343:17

**empaneled** [1] - 231:19

**emphasis** [1] - 238:19

**emphasize** [2] - 235:20; 237:16

**employed** [2] - 258:18; 259:14

**employee** [11] - 299:16, 21; 301:11; 322:22; 324:7, 13, 15, 18

**employees** [2] - 302:21; 325:2

**en** [1] - 295:8

**enable** [1] - 317:22

**enables** [1] - 317:1

**End** [1] - 363:16

**end** [14] - 231:24; 233:24; 234:6; 235:8; 238:5; 239:3; 242:19; 243:3; 252:8; 313:11; 344:3; 355:19; 387:13

**ended** [1] - 279:13

**endless** [1] - 343:10

**ends** [2] - 242:2;

353:18

**energetic** [1] - 354:24

**enforcement** [5] - 218:23; 220:8; 246:21; 255:6; 379:19

**Englewood** [3] - 357:4, 9

**English** [1] - 261:21

**enjoy** [1] - 342:21

**enter** [2] - 361:6; 381:13

**entered** [12] - 257:15; 358:15, 22-23; 360:7; 371:16, 18, 22; 377:4, 7; 379:9; 382:25

**entering** [2] - 372:2; 376:20

**enters** [7] - 227:4, 21; 229:3; 314:24; 351:4; 376:25; 377:4

**entire** [3] - 313:17; 346:12; 354:1

**entirely** [2] - 232:17; 346:5

**entity** [1] - 277:2

**entry** [5] - 373:5; 379:2, 19; 380:14, 18

**equation** [1] - 219:23

**equipment** [3] - 219:13; 224:23; 225:6

**Erika** [1] - 228:17

**especially** [2] - 342:15; 347:7

**ESQ** [4] - 209:14, 17

**essentially** [6] - 215:7; 223:2; 265:13; 304:2; 306:17; 362:13

**establish** [10] - 268:9; 289:22; 300:7, 16; 301:10, 15; 361:23; 364:14

**established** [5] - 299:25; 313:9, 12, 14

**establishes** [2] - 316:18; 346:22

**et** [1] - 343:24

**Europe** [1] - 333:23

**evaluate** [1] - 296:4

**evaluation** [1] - 274:3

**eve** [1] - 343:22

**event** [2] - 377:19; 380:4

**ever...why** [1] - 352:16

**everyday** [1] - 245:14

**Evidence** [2] - 301:9;

**9**

364:7

**evidence** [99] -
214:20, 23; 215:10;
216:3, 10, 12, 14;
217:25; 218:2, 6;
220:4; 224:22, 25;
232:6, 9, 18, 23;
233:1, 4-5, 9, 12,
15-16, 18, 20-21;
234:1, 17; 235:5;
237:24; 238:3; 239:1,
13, 18, 25; 240:2,
11-12, 14, 19-21, 23;
241:1, 3, 5; 243:15;
250:21; 254:14, 19;
256:13; 257:19; 263:6;
265:11; 271:18; 272:20;
285:14; 286:2; 291:12;
299:9, 14; 306:15;
313:7, 25; 320:11;
340:2; 341:7; 347:8;
351:3, 8, 16; 361:8;
364:2, 22; 365:23;
366:23; 378:5; 382:22;
384:14; 391:20, 23, 25;
392:2, 4, 6, 8, 10, 12,
14, 16, 18, 20

**exact** [3] - 247:8;
348:8; 362:16

**exactly** [5] - 231:1;
244:3, 7; 247:6; 377:7

**EXAMINATION** [32] -
258:14; 275:3; 278:8;
281:14; 282:1; 283:7;
315:7; 321:1; 336:1;
337:15; 339:19; 356:19;
369:7; 374:9; 376:3;
382:17; 390:4, 6, 8,
10, 12, 15, 18, 20, 22,
24; 391:2, 5, 7, 9, 12,
14

**examination** [10] -
274:15; 278:10; 315:2;
320:24; 321:7, 14;
325:7; 355:25; 369:6;
388:1

**examine** [1] - 240:6

**examined** [5] - 258:3;
282:22; 339:12; 356:12;
375:24

**example** [4] - 237:19;
288:24; 317:19; 373:15

**examples** [1] - 316:15

**Excel** [2] - 359:25;
360:5

**exception** [1] - 361:3

**exchange** [2] - 235:6;
245:24

**exchanged** [1] - 245:13

**exclamation** [2] -
352:10, 13

**excludes** [1] - 233:11

**exclusively** [2] -
309:23; 311:10

**excuse** [8] - 211:17;
212:9; 227:8; 228:1, 5;
230:2, 8, 24

**excused** [1] - 212:25

**Exhibit** [85] - 213:25;
214:1; 220:13; 262:16;
263:4, 23; 268:23;
269:19, 25; 270:20;
271:16; 272:6, 11, 14;
290:3, 14; 291:1, 14;
292:22; 293:24; 294:14;
297:22, 24; 298:6, 9;
304:13, 19; 306:7;
307:24; 310:25; 313:6,
15; 314:13; 315:11;
316:13; 318:6; 338:23;
340:9, 12, 20; 341:6;
347:21; 348:1, 23;
351:2, 8, 11, 13, 20;
353:4, 25; 355:4;
359:21; 360:17; 364:20;
365:6, 20, 22; 366:2,
5, 25; 379:13; 381:17;
384:4; 385:7, 16-17;
387:17; 391:22, 24;
392:7, 9, 13, 15

**exhibit** [8] - 264:12;
290:6; 329:13; 345:2;
349:3, 12, 15; 365:9

**exhibit/exhibits** [5]
- 263:8; 272:22;
291:15; 292:24; 306:20

**exhibited** [4] - 308:2;
311:1; 384:23; 386:5

**exhibits** [24] -
232:20; 240:12; 268:3;
270:3, 7-8; 272:8;
285:1, 23; 286:2;
297:21; 299:5; 308:4;
334:12; 335:19; 336:10,
20; 338:20; 349:16;
351:9; 382:6; 383:4;
384:14; 386:4

**EXHIBITS** [1] - 391:17

**Exhibits** [19] -
272:19; 285:13; 288:4;
291:11; 306:14; 351:15;
366:22; 377:12; 378:2,
4; 382:21; 385:6;
391:19; 392:1, 3, 5,
11, 17, 19

**exist** [1] - 233:23

**existed** [5] - 255:13,
17; 256:7; 320:14;

335:16

**existence** [2] -
217:16; 337:17

**exists** [1] - 370:5

**exits** [4] - 227:18;
228:11; 345:16; 386:21

**expect** [2] - 227:1;
388:18

**expected** [3] - 387:3;
388:3, 5

**expecting** [1] - 388:6

**expects** [1] - 240:2

**expense** [1] - 343:6

**expert** [5] - 255:5;
256:3; 348:16; 388:1,
16

**explain** [5] - 212:2;
221:20; 266:12; 267:4;
352:19

**explained** [1] - 307:25

**explanation** [1] -
352:24

**explicit** [7] - 243:24;
244:17; 245:19; 248:6,
23; 249:25; 251:6

**exploit** [1] - 250:9

**exploitation** [1] -
250:11

**exploited** [3] - 217:4;
244:13; 246:3

**exploiting** [1] -
250:15

**Express** [9] - 317:18,
20-21; 318:1; 319:7, 9,
13, 15; 320:2

**expression** [1] -
328:15

**extensively** [1] -
254:2

**extent** [1] - 323:6

**external** [2] - 254:11;
317:16

**extra** [2] - 344:24;
345:5

**eyes** [1] - 354:23

**eyewitness** [1] -
233:21

F

**fabricated** [1] -
222:23

**face** [1] - 344:10

**Facebook** [1] - 235:21

**facial** [1] - 273:3

**facility** [1] - 323:25

**fact** [16] - 216:17;

227:24; 233:20; 235:25;
236:2; 247:5; 255:5;
307:11; 322:7, 13;
325:17; 328:4; 331:3,
22; 372:2

**facts** [13] - 232:10,
18, 21; 233:22; 241:16,
18-19; 250:24; 252:6,
10

**fails** [1] - 380:9

**failure** [1] - 301:10

**fair** [25] - 211:5;
262:24; 279:18; 288:11;
289:5; 293:8, 10;
309:14; 315:11; 319:7;
337:2, 10; 341:11, 20;
351:20; 353:5; 354:17;
367:23; 374:13; 378:8;
381:23; 383:3, 21;
384:5; 385:19

**fairly** [1] - 236:6

**fairness** [2] - 232:7;
346:6

**false** [1] - 286:9

**familiar** [3] - 249:13;
261:20; 287:19

**family** [3] - 211:4;
235:10; 352:20

**far** [6] - 214:18;
216:3; 288:23; 290:16;
343:12; 355:18

**FBI** [25] - 245:4;
246:11, 13, 15; 254:4,
12; 255:21; 256:3;
258:21; 259:7, 14, 19;
260:3, 10; 270:12;
273:15; 275:22; 276:1,
21; 277:15; 279:7;
281:17; 282:3; 339:23

**FD** [1] - 273:21

**February** [3] - 215:3,
22; 383:5

**Federal** [5] - 209:13,
21; 258:22; 301:8;
364:6

**federal** [2] - 246:11;
249:7

**fees** [1] - 358:14

**feet** [1] - 219:20

**fellow** [2] - 236:1, 7

**felt** [1] - 279:22

**female** [1] - 246:18

**few** [3] - 234:24;
269:18; 270:18

**field** [4] - 273:20;
305:5; 376:10, 17

**fifth** [1] - 237:14

**filed** [1] - 214:6
**fill** [5] - 230:11, 14; 358:14; 381:11, 14
**filled** [2] - 304:2; 381:10
**filling** [1] - 229:4
**film** [1] - 251:15
**filmed** [2] - 220:6, 19
**filming** [1] - 219:11; 220:22
**finally** [1] - 238:2
**financial** [1] - 228:4
**fine** [7] - 212:10, 15; 297:15; 300:23; 353:21; 363:12, 14
**fines** [1] - 380:10
**finish** [4] - 267:8; 342:24; 359:1
**First** [1] - 361:18
**first** [46] - 210:16; 211:3; 214:19; 221:9; 225:16; 229:4; 231:14; 234:10, 25; 238:12; 239:16; 241:8; 243:18; 250:23; 257:6, 20; 258:2; 261:19; 262:1, 3; 263:12; 264:5; 265:3; 269:7, 11; 270:9; 271:6, 10; 273:19; 282:21; 286:22; 295:5; 327:6; 344:20; 348:3; 349:19; 352:11, 19; 353:12; 356:11; 366:3, 25; 369:20; 375:23; 378:17; 383:9
**firsthand** [3] - 322:14; 361:21, 23
**five** [7] - 229:9; 230:15; 242:21; 268:7; 312:6; 327:6
**fixing** [1] - 324:22
**flavor** [1] - 221:16
**flight** [3] - 379:23; 380:4; 384:25
**fly** [1] - 369:13
**focused** [1] - 248:22
**follow** [5] - 232:12; 233:10; 237:2; 247:10; 273:23
**follow-up** [1] - 273:23
**followed** [1] - 241:9
**following** [20] - 237:2; 240:13; 246:9; 251:4; 264:20; 268:18; 273:8; 278:18; 279:16; 285:20; 288:1; 289:11; 290:1; 295:3; 297:18;

299:1; 302:1; 341:20; 360:21; 361:10
**follows** [6] - 258:4; 282:23; 315:6; 339:13; 356:13; 375:25
**followup** [1] - 240:9
**fondling** [1] - 272:2
**food** [2] - 342:18; 373:17
**footprint** [1] - 336:24
**for-profit** [2] - 307:21; 374:25
**forces** [1] - 276:12
**foremost** [1] - 250:23
**forensic** [3] - 248:3; 348:16; 388:16
**forever** [3] - 318:20; 319:3
**form** [18] - 222:16; 238:2; 240:11; 250:21; 252:3; 280:23; 293:4; 304:2, 4, 6; 317:6; 325:10; 326:9; 358:14; 381:5, 8-9, 14
**Forrestal** [2] - 256:5; 388:17
**Fort** [1] - 384:8
**forth** [3] - 240:22; 291:17; 318:5
**forward** [3] - 283:3; 342:8; 349:10
**forwarded** [5] - 270:9; 273:11; 340:4; 348:8; 354:6
**forwarding** [2] - 354:14; 372:7
**foundation** [11] - 268:9; 287:10, 16, 21; 289:14, 20; 296:17; 298:17; 316:4; 361:1
**four** [5] - 211:20; 269:6; 382:11, 13
**fourth** [1] - 237:4
**frame** [3] - 272:11
**frames** [2] - 271:10, 13
**France** [1] - 383:6
**Frankfort** [1] - 384:7
**free** [1] - 287:6
**Friday** [2] - 242:5; 354:5
**front** [5] - 229:9; 254:19; 338:22; 350:20, 23
**fuck** [3] - 346:2; 352:16, 22
**fucking** [3] - 352:19, 21

**full** [2] - 226:2; 231:23
**funds** [1] - 367:17
**furnish** [1] - 372:20
**furnished** [2] - 299:18, 20
**furniture** [3] - 249:2, 14; 373:15
**FURTHER** [2] - 282:1; 390:12
**furtherance** [1] - 295:10
**future** [1] - 349:20
**FW** [1] - 310:15
**FWB** [1] - 310:15

**G**

**Gate** [5] - 292:12; 323:21; 337:5; 367:9; 381:18
**gather** [1] - 260:9
**gathering** [1] - 357:20
**Gaulle** [1] - 383:6
**general** [9] - 305:3, 7; 307:20; 308:21; 310:2; 316:24; 326:1; 328:6; 378:14
**generally** [20] - 225:23; 260:1; 262:24; 271:19; 288:21; 290:23; 293:3; 302:6, 8; 303:18, 23; 307:17; 308:20; 309:10; 317:10, 20; 358:6, 10; 366:8; 378:11
**generated** [1] - 336:20
**genesis** [2] - 265:12; 267:6
**genitals** [2] - 248:22; 272:3
**gentlemen** [5] - 248:24; 252:6, 21, 25; 386:15
**germane** [3] - 215:15; 220:22, 25
**Germany** [1] - 384:7
**gift** [1] - 343:25
**Girard** [1] - 230:20
**girl** [6] - 221:21; 244:9, 13; 246:2; 248:16; 253:12
**girls** [3] - 216:11; 244:21
**given** [13] - 212:9; 227:10; 231:25; 238:8, 22; 267:4; 273:11;

286:10; 291:20; 303:18; 322:13; 361:7; 384:20
**glad** [1] - 342:11
**glasses** [1] - 255:23 **11**
**Googling** [1] - 237:20
**Government** [29] - 209:12; 322:8; 340:17; 341:6; 346:7; 349:8, 12; 351:2, 15; 360:17; 361:15; 362:25; 364:21; 365:22; 366:20, 22; 369:5; 378:4; 380:8; 384:19; 387:4, 13; 392:7, 9, 11, 13, 15, 17, 19
**government** [40] - 210:7; 212:14; 213:8; 214:6, 8, 14, 19; 215:1; 216:10; 217:1; 218:3; 225:5, 18; 226:7; 228:23; 232:8; 234:12, 15, 21; 239:16, 21; 240:3, 15, 21; 241:7, 10; 243:18; 252:15; 253:25; 254:16; 255:21; 256:12; 257:2, 19; 274:10; 282:14; 301:10; 380:12
**government's** [8] - 214:7; 216:14; 217:25; 222:1, 19; 240:13; 253:23; 255:5
**Government's** [73] - 220:13; 262:16; 263:4, 23; 268:23; 269:25; 270:20; 271:17; 272:6, 14, 19; 285:13; 288:4; 290:3, 14; 291:1, 11, 14; 292:22; 293:24; 294:14; 297:22, 24; 298:6, 9; 304:13, 19; 306:7, 14; 307:24; 310:25; 313:6; 315:11; 316:13; 318:6; 340:9, 12, 20; 346:1; 347:21; 348:23; 351:8, 11, 13, 20; 353:4; 355:4; 359:20-22; 365:5, 7, 20; 366:1, 4, 25; 377:12; 378:2; 379:12; 381:16; 382:21; 384:4; 385:6; 388:16; 391:19, 22, 24; 392:1, 3, 5
**governmental** [2] - 377:9; 380:11
**gracious** [1] - 229:16
**gratitude** [1] - 344:4
**greater** [1] - 238:23
**grounds** [2] - 264:23;

276:4

**groundwork** [2] - 265:8, 25

**group** [1] - 277:2

**guess** [2] - 222:1; 266:18

**guide** [1] - 231:22; 232:2

**guidelines** [1] - 234:5

**guilt** [2] - 234:13, 22

**guilty** [3] - 234:11; 250:19; 252:11

**guy** [2] - 346:3; 388:2

**guys** [1] - 359:12

## H

**H-U-B-L-A-L** [1] - 231:4

**hair** [1] - 247:15

**half** [2] - 259:15, 25

**halls** [1] - 236:24

**hallways** [1] - 236:13

**Hamline** [1] - 357:16

**hand** [8] - 219:8, 19; 220:7; 223:23; 257:24; 282:18; 339:9; 356:9

**hand-held** [4] - 219:8, 19; 220:7; 223:23

**handed** [1] - 270:3

**Handed** [9] - 262:20; 263:24; 269:1, 21; 270:21; 272:7; 285:2; 293:25; 297:23

**handful** [1] - 348:4

**handle** [1] - 242:10

**handwriting** [1] - 230:15

**happy** [1] - 217:15

**harbors** [1] - 342:18

**harbors-carries** [1] - 342:18

**hard** [4] - 254:3, 6, 11; 343:19

**hardship** [1] - 228:4

**Harry** [1] - 239:9

**HARRY** [1] - 209:20

**Hauppauge** [1] - 209:18

**header** [15] - 294:10; 298:4; 307:24; 308:9; 309:15; 310:14; 316:13; 329:5, 18; 331:2; 332:21; 338:16; 341:23

**headers** [6] - 294:8; 298:3; 311:4; 328:12; 332:18; 338:16

**headquartered** [1] - 357:3

**hear** [4] - 233:14; 251:8; 283:4; 296:22

**heard** [5] - 211:6; 220:11; 221:7; 235:4; 241:12

**hearing** [1] - 243:14

**hearsay** [6] - 265:1, 21; 267:1; 279:3; 295:9; 297:3

**held** [4] - 219:8, 19; 220:7; 223:23

**Helena** [3] - 261:23; 342:9, 11

**HELENA** [1] - 261:23

**hello** [1] - 354:11

**Hello** [1] - 353:12

**help** [6] - 232:2; 238:18; 239:17; 260:12; 280:11; 284:9

**helpful** [1] - 328:19

**herself** [5] - 247:12; 272:2; 278:25; 382:24; 384:6

**hi** [2] - 354:9, 11

**hid** [2] - 216:20; 217:18

**hidden** [20] - 214:21, 23; 215:3, 22; 216:18; 217:2, 5; 218:17, 22; 220:6; 222:21; 223:13; 249:17, 19, 22; 250:3; 251:22; 389:4

**High** [5] - 292:12; 323:21; 337:5; 367:9; 381:18

**highly** [4] - 223:19; 224:3, 24; 264:24

**himself** [1] - 244:13

**history** [1] - 376:19

**hold** [4] - 252:10; 275:19; 288:21; 318:23

**holder** [4] - 307:11; 320:16; 333:10; 335:10

**home** [17] - 224:4; 235:15; 237:19; 238:14; 244:8; 246:19; 248:2; 279:19; 280:21; 281:1, 3; 302:14; 319:12; 348:15; 371:1, 3

**Homeland** [2] - 376:13; 384:11

**honestly** [1] - 347:25

**Honor** [48] - 210:11; 211:9; 212:2, 7, 13; 214:11, 16; 215:15;

217:20; 219:25; 220:23; 221:11; 223:3; 224:8; 225:14; 226:1, 19; 228:22, 24; 252:20; 257:10; 258:12; 264:9; 266:23; 274:16, 22; 279:12; 281:12; 282:8; 287:9; 294:22; 312:7; 314:6, 23; 345:5, 10, 18; 350:15, 24; 356:1; 362:24; 365:24; 382:5, 8, 10; 385:5

**Honor's** [2] - 212:8; 366:18

**HONORABLE** [1] - 209:9

**hooked** [1] - 218:1

**hope** [2] - 277:23; 353:13

**hose** [1] - 343:15

**house** [17] - 222:13; 243:21; 244:19; 247:25; 248:8; 249:3, 9, 11; 253:19, 25; 254:9; 255:15; 268:10; 278:12; 287:7; 325:1; 389:3

**Hublal** [1] - 231:4

**hugs** [1] - 354:25

**Hurley's** [1] - 213:1

## I

**I-94** [3] - 381:5, 9

**I-believe** [1] - 263:16

**ID** [4] - 299:18; 303:5, 7, 13

**idea** [3] - 279:12; 361:7; 383:19

**identification** [8] - 286:10; 290:24; 325:8, 10, 15, 17; 326:9; 380:12

**Identification** [1] - 262:17

**identified** [12] - 270:15; 315:10; 327:8, 11; 355:21; 365:11; 366:10; 367:16; 382:24; 384:6

**identifies** [4] - 328:16; 330:8, 11, 13

**identify** [9] - 268:2; 327:20; 329:19, 23; 330:1, 3-4; 359:18; 372:11

**identifying** [1] - 355:13

**identity** [5] - 327:22; 334:13; 364:14; 380:15

**ignore** [1] - 233:7

**IM** [1] - 344:10

**image** [1] - 255:9

**images** [17] - 219:4, 15; 220:18; 221:15; 223:18; 224:3-5, 17; 225:18, 24; 248:15; 250:25; 251:2, 6; 254:21; 255:7

**immediately** [2] - 316:1; 318:8

**impartial** [1] - 211:5

**impartiality** [1] - 232:7

**impartially** [1] - 236:6

**implicated** [1] - 363:7

**implying** [1] - 224:10

**important** [6] - 224:25; 235:3; 241:15; 242:24; 254:23; 267:23

**imposes** [1] - 240:17

**impression** [2] - 223:11; 238:24

**improper** [4] - 233:5; 236:19; 287:9; 361:1

**impropriety** [1] - 236:20

**inaccuracy** [1] - 286:10

**inadvertently** [2] - 213:18; 237:10

**inbound** [1] - 385:9

**inbox** [2] - 248:7

**inclination** [1] - 211:16

**include** [5] - 214:21; 237:18; 326:8; 373:6; 388:1

**included** [2] - 263:20; 328:13

**including** [9] - 218:4; 235:2; 255:25; 273:23; 276:8; 300:17; 340:1; 349:6; 350:12

**incomplete** [2] - 253:24; 255:24

**independent** [3] - 268:4; 361:8; 370:2

**INDEX** [1] - 390:1

**indicate** [3] - 232:15; 286:13; 383:24

**indicated** [3] - 269:14; 291:9; 379:20

**indicates** [4] - 381:21; 384:5; 385:16

**indicating** [4] -

**12**

**13**

232:16; 286:5; 384:23;
385:9

**indictment** [5] -
214:9; 224:18; 234:11;
250:7; 280:8

**individual** [11] -
260:15; 262:19; 291:25;
296:18; 327:23; 367:2,
18; 370:2, 4; 372:11

**indoors** [1] - 354:22

**industry** [2] - 380:5,
9

**inextricably** [3] -
265:11; 346:10; 347:2

**infer** [2] - 233:22;
333:15

**inferences** [1] - 241:4

**inflammatory** [5] -
264:24; 265:4; 267:19;
295:12; 346:5

**influence** [1] - 238:23

**influenced** [1] - 233:6

**info** [1] - 310:17

**information** [135] -
224:6; 237:21; 249:7;
260:9, 13, 22; 261:3,
13; 269:14; 273:10, 18;
284:18, 21, 23; 286:4,
8; 287:14; 288:17, 22;
289:15, 17; 290:5, 9,
13, 15, 17, 25; 292:3,
7; 294:6, 13; 298:8;
299:14, 18; 300:4, 10,
17; 301:17; 302:15, 23,
25; 303:7, 16-18, 22,
24; 304:6, 9, 24;
305:1, 4, 6, 14, 17;
306:17; 307:6, 24;
308:25; 309:16; 310:16;
316:12; 321:18; 322:8,
13, 15, 24; 324:3, 18;
325:14; 326:8; 327:11,
14, 17; 328:2, 5, 17,
19; 329:4, 18; 331:2;
333:7; 335:13; 341:15,
23; 357:21; 358:15, 21;
359:2; 360:1, 12;
361:4, 7, 9, 21; 362:2,
4-5; 364:10; 365:9, 11;
366:8; 367:1; 371:15,
22; 372:2, 14-15, 17;
373:24; 374:2; 377:3,
8, 18; 379:24; 380:1,
3, 6-8, 12, 19; 381:3,
5, 8, 11; 384:10

**informed** [1] - 260:22

**initial** [2] - 261:25;
302:17

**initials** [1] - 271:5

**initiate** [1] - 266:9

**initiated** [2] -
266:13; 358:20

**innocence** [1] - 234:17

**innocent** [1] - 234:10

**inquiry** [1] - 212:11

**inside** [1] - 343:15

**install** [1] - 317:17

**installed** [1] - 319:20

**instance** [2] - 291:21;
295:9

**instantaneous** [1] -
305:19

**instantaneously** [1] -
305:20

**instead** [1] - 210:17

**instruct** [6] - 213:14;
232:22; 234:25; 237:8;
241:13; 344:6

**instructed** [1] - 233:8

**instructing** [2] -
226:22; 364:5

**instruction** [7] -
226:5; 233:10; 237:2;
361:13; 363:2; 366:18

**instructions** [12] -
213:6, 25; 231:21, 23;
232:2; 233:23; 234:23;
235:5, 9; 238:11; 242:2

**intend** [1] - 349:9

**intended** [3] - 219:18;
222:24; 232:15

**intent** [1] - 219:15

**interaction** [1] -
273:8

**interested** [1] - 280:9

**interests** [1] - 261:4

**internal** [1] - 384:1

**internally** [1] -
275:16

**International** [2] -
383:7, 16

**international** [1] -
385:11

**internet** [12] - 245:8;
283:21, 25; 284:10;
287:6; 308:18, 21;
315:10; 369:21

**interrogations** [1] -
256:1

**intertwined** [2] -
346:10; 347:2

**interview** [5] - 269:8,
11, 17; 270:10; 274:2

**interviewed** [2] -
261:15; 270:18

**intrinsic** [1] - 265:11

**introduce** [3] - 218:3;
229:15; 296:9

**introduced** [2] -
384:20; 387:14

**introducing** [2] -
240:19; 296:18

**introduction** [1] -
286:2

**Investigation** [1] -
258:22

**investigation** [14] -
237:15; 246:10, 13;
253:23; 255:24; 259:10;
260:15; 266:10, 13;
267:6; 273:14; 278:24;
281:3; 333:7

**investigative** [1] -
260:11

**investigator** [1] -
274:5

**involve** [1] - 326:8

**involved** [6] - 322:24;
332:9, 11; 334:4;
369:25; 371:6

**involvement** [2] -
372:23

**involving** [3] -
250:14; 260:15; 284:10

**Iowa** [1] - 357:15

**IP** [48] - 308:15, 20,
22, 24; 309:1, 11-12,
19, 22; 310:1, 11, 14;
311:5, 10, 16; 315:13,
15-16, 20; 316:7, 9,
12; 318:5; 328:24;
329:2, 21; 330:11;
331:25; 332:1, 5, 7-8,
11, 13, 15-16; 336:3,
6, 11, 14, 18-19, 22;
338:16, 19

**irrelevant** [2] -
216:2; 219:13

**IS-94** [1] - 381:14

**Island** [2] - 243:22;
310:6

**Islip** [3] - 209:5, 14,
22

**issue** [26] - 211:6, 12;
212:18; 213:13, 23;
214:5; 218:12; 219:8,
15; 222:3; 223:19, 24;
224:15, 21, 24; 225:4,
8, 21; 286:4; 289:1;
295:23; 313:21; 388:24

**issued** [1] - 322:7

**issues** [11] - 214:3,
13; 227:10; 236:9;

243:1; 313:4; 314:13;
386:25; 387:6

**item** [1] - 233:9

**items** [7] - 215:5, 8;
240:12; 269:16; 285:3;
340:1; 387:14

**itself** [5] - 265:9;
310:13; 347:9; 358:21;
379:21

---

**J**

**J-O-H-N-S-O-N** [1] -
356:15

**Jagan** [1] - 230:22

**James** [1] - 261:14

**Jane** [22] - 217:3, 10,
21, 24; 218:5, 21;
219:8, 18-19, 22, 24;
220:2, 5, 18, 25;
221:5, 9, 17; 222:16;
224:17; 387:5

**January** [1] - 246:15

**Jersey** [3] - 310:6, 9;
315:23

**JFK** [1] - 385:15

**job** [5] - 259:7;
283:17; 321:16; 343:7;
376:15

**Joe** [10] - 292:11;
320:17, 21; 337:6;
341:25; 342:3; 351:24;
353:9; 354:12, 16

**joeval50@optonline.net**
[14] - 284:25; 291:18;
292:4; 293:19; 310:19;
311:21; 320:7; 334:15;
336:17; 337:3; 342:2;
351:25; 374:13; 375:8

**John** [2] - 383:16;
384:24

**Johnson** [6] - 350:10;
356:6, 14, 16, 21;
369:9

**joined** [2] - 210:7;
245:3

**JOSEPH** [2] - 209:5, 9

**Joseph** [29] - 210:4;
222:17; 229:18; 243:19;
244:23; 252:25; 253:6,
10, 14; 256:1; 260:16,
19; 261:11; 353:24;
354:7; 355:1, 21;
358:4; 361:8, 14, 16;
363:3, 6; 365:11;
366:10, 13; 370:7, 10;
374:17

**judge** [2] - 226:15;

241:19

**Judge** [41] - 211:8;
213:1; 216:17; 219:17;
226:10, 13; 227:5, 23;
229:16, 18, 20; 235:17;
252:22; 257:3, 5, 21;
262:14; 263:2; 265:3;
266:7; 274:9, 12;
278:3; 281:24; 285:18;
289:24; 298:20; 300:23;
301:21; 304:12; 306:5;
314:20; 339:5; 346:9;
347:25; 349:11, 24;
351:10; 362:2; 374:8;
383:12

**judges** [1] - 232:10

**July** [16] - 247:6;
308:7; 309:6; 342:4;
344:3; 378:21; 379:2;
381:25; 382:2; 384:23;
385:1

**juncture** [1] - 267:18

**June** [1] - 384:6

**jurisdiction** [1] -
276:1

**juror** [24] - 210:17,
25; 211:1, 22; 212:21;
214:1; 228:16, 19;
229:9; 230:6, 8, 11,
15, 23-24; 231:2;
232:3; 236:6, 18;
237:23; 238:10, 22

**JUROR** [5] - 227:12, 17;
228:8; 230:17, 19

**juror's** [4] - 238:19;
239:4, 7

**jurors** [27] - 210:15,
20; 211:16; 212:9, 17;
213:3, 21; 225:24;
227:14; 228:6; 229:8,
22; 230:2; 231:15;
234:24; 236:2, 7, 11;
237:16; 238:6, 25;
241:16, 20, 22, 24;
335:19

**jury** [62] - 209:10;
210:18; 211:11; 213:1;
221:12; 223:11; 225:11,
15, 18; 226:11; 227:10,
13, 25; 228:3, 6;
229:3, 12, 16-17;
231:18, 20; 235:12;
238:13; 239:14; 241:14;
243:6; 250:23; 252:14;
256:11, 18; 257:9, 15,
18; 263:9; 272:23;
277:10; 289:9; 291:16;
292:25; 296:1, 3, 15;
306:21, 23; 312:11;

313:4; 314:24; 315:1;
345:16; 346:11; 348:25;
349:22; 350:21, 23, 25;
351:4, 7; 364:1;
379:14; 386:21

**justice** [1] - 232:5

**K**

K-A-L-I-C-H-E-N-K-O
[1] - 261:19

**KABRAWALA** [178] -
209:14; 210:6, 23;
211:8, 14; 212:15, 23;
213:9, 20; 214:5, 14;
215:2, 14, 18, 21;
216:17, 24; 217:2, 8,
13; 220:11; 221:11, 23;
222:20; 225:10, 13, 23;
226:10, 15; 228:24;
243:19; 257:3, 7, 21;
258:15; 262:14; 263:2,
7; 264:8, 11; 265:3, 8,
20; 266:6, 19, 22;
267:2, 8, 25; 268:6,
14, 21; 271:14; 272:16,
21; 274:9, 11; 278:3,
6, 9, 22, 24; 279:5, 7;
281:10, 23; 282:2, 6,
14; 283:8; 285:9;
286:15, 22; 287:13;
288:3; 289:6, 18, 24;
291:5, 13; 294:20;
295:21; 296:1, 12, 24;
297:4, 8, 20; 298:12;
300:8, 21; 304:12, 15,
18; 306:5, 9, 19;
312:3; 313:25; 314:3,
16, 20, 23; 315:8;
316:5; 320:4, 23;
335:25; 336:2; 337:13;
339:5, 20; 340:17, 21,
25; 341:8; 344:23;
345:7; 346:9; 347:19,
23, 25; 348:7, 11, 13,
20; 349:11; 350:8, 10,
18, 24; 351:10, 18-19;
355:20, 23; 356:5, 20;
360:17; 362:2, 11, 21;
363:12, 14; 364:23;
365:14, 19, 24-25;
366:16, 24; 369:4;
374:8, 10; 375:12, 16;
376:4; 377:23, 25;
382:3; 383:12; 386:13;
387:2; 388:6, 12, 14,
20, 23; 390:5, 9, 13,
16, 19, 23; 391:3, 6,
10, 13

**Kabrawala** [9] - 210:6;

216:5; 228:25; 243:18;
245:1; 253:4, 6, 11;
254:1

**Kalichenko** [99] -
245:8, 11, 13, 15, 19,
21, 24; 246:3, 8, 12,
23, 25; 247:2, 7,
10-11, 17, 19; 248:4;
250:12; 251:5, 13, 25;
252:5; 253:7, 16, 18,
21; 255:15, 18; 261:17,
22, 25; 262:10, 23, 25;
263:10, 22; 264:2, 5;
265:14; 266:4, 24;
269:6, 9; 270:9, 15,
25; 271:3, 6, 23;
273:3, 6, 9-10, 24-25;
276:7; 277:2, 5;
278:12; 279:2; 280:13,
17, 22; 281:4, 7, 16;
295:10; 339:22, 25;
340:15, 23; 341:13, 18,
21; 344:14; 345:25;
346:14, 22; 348:9;
351:21; 353:6; 354:4;
365:12; 366:11; 367:18;
374:19; 378:17, 20;
379:17; 382:24; 383:5;
384:7; 385:8

**Kalichenko's** [8] -
254:10; 275:7; 276:24;
277:10, 15; 279:19;
281:2; 354:13

**KALICHENKOES** [3] -
310:23; 311:22; 333:3

**kalichenkoes@mail.ru**
[3] - 342:6; 352:4;
353:10

**KBP** [2] - 383:17, 19

**keep** [8] - 233:25;
234:8; 235:4; 238:4;
300:3, 7; 313:16; 384:1

**Kennedy** [3] - 383:16,
19; 384:24

**Kentucky** [1] - 383:7

**kept** [6] - 290:11;
300:1; 303:16; 305:23;
306:3; 322:19

**Kessler** [2] - 213:16;
226:25

**key** [2] - 223:18; 224:2

**Kiev** [7] - 259:18, 24;
260:2; 271:13; 275:25;
276:2; 342:12

**kind** [7] - 215:23;
236:21; 237:22, 25;
284:21; 294:11; 299:4

**kinds** [2] - 233:18, 25

**knives** [1] - 214:24

**knowing** [1] - 286:9

**knowledge** [18] -
275:22; 276:23, 25;
277:18, 20; 280:16, 18;
281:17, 20; 309:22;
322:9; 323:3, 6; 328:9;
334:21; 361:24; 364:11;
367:5

**known** [3] - 308:18;
379:20; 381:7

**L**

**lace** [1] - 244:16

**lack** [3] - 256:5;
300:13; 328:15

**ladies** [4] - 248:24;
252:6, 21; 386:15

**lady's** [1] - 344:9

**lag** [1] - 305:5

**land** [1] - 377:1

**language** [4] - 309:14;
328:16; 347:4; 354:10

**LAPINTA** [23] - 320:25;
321:2; 335:23; 337:16;
339:2; 341:3; 349:2,
18, 23; 365:17; 369:8;
374:6; 375:14; 387:12,
19, 22, 25; 388:10, 13;
389:7; 390:21, 25;
391:8

**LaPinta** [52] - 209:17;
210:11, 22; 211:9, 13;
213:11; 214:16; 218:13,
15; 219:1, 6, 17;
221:3, 18; 222:5, 11;
224:9; 226:1; 252:24;
257:5, 10, 13; 268:5,
8, 16; 285:10, 18, 22;
287:9, 23; 289:7, 21;
291:6; 294:22, 25;
295:5, 24; 297:15;
298:14, 18; 299:6, 12;
301:3, 7; 312:7;
313:20; 321:5; 337:14;
369:11; 375:13; 389:5

**larger** [1] - 316:24

**lascivious** [1] -
221:14

**Laslow** [1] - 329:7

**LASLOW** [1] - 329:8

**last** [16] - 221:3;
223:3, 5; 226:4;
230:16; 261:19; 269:24;
277:23; 282:25; 287:3;
311:6, 13; 320:18, 21;
352:15; 378:17

**late** [1] - 386:15

**15**

Lato [5] - 210:12; 252:19, 22; 282:7; 313:22

LATO [76] - 209:17; 212:2, 7; 214:11; 216:1; 217:20; 219:25; 223:3, 7; 224:8; 225:14; 228:22; 252:20; 263:3; 264:9, 14, 17, 23; 266:2; 267:15; 268:13; 269:12; 271:15; 272:17; 274:16, 21; 275:4; 277:13; 278:2, 15; 279:12; 280:19, 23; 281:5, 12, 15, 21; 282:8; 286:17, 20; 295:7; 297:3, 13; 313:24; 314:6; 316:3; 318:11; 341:4; 345:4, 10, 18, 21, 23; 350:4, 15; 351:12; 356:1; 360:19; 361:1; 362:24; 363:15; 366:17; 377:24; 378:1; 382:5, 10, 14, 18; 384:19; 385:3, 5; 386:7, 10; 390:7, 11; 391:15

laughing) [1] - 354:23

law [17] - 218:23; 220:7; 231:23; 232:5, 12-13; 234:19; 235:6, 9; 240:17; 241:13; 246:21; 255:6; 259:1, 5; 286:3; 380:5

lawfully [3] - 379:5, 8

lawyer [2] - 236:18; 237:21

lawyers [7] - 231:25; 232:21; 233:1, 3; 236:22; 240:8; 243:2

lay [4] - 225:18; 287:16, 21; 316:4

laying [2] - 289:13; 296:17

lays [2] - 265:8, 25

lead [2] - 274:4

lean [1] - 283:3

learn [8] - 244:11; 245:7; 246:4, 10, 19, 22; 251:16

least [1] - 388:14

leave [6] - 228:9; 238:12; 297:15; 339:2; 389:8

leaves [4] - 256:18; 282:11; 312:11; 377:4

leaving [2] - 262:7; 376:21

left [5] - 242:21; 383:21; 384:10; 385:8; 386:1

Legal [4] - 259:18, 20, 23; 260:2

legal [8] - 263:19, 21; 273:12; 280:12; 284:12; 321:18; 339:23; 357:8

LEGAT [2] - 273:12

length [1] - 226:3

LEONARD [1] - 209:17

Leonard [2] - 210:12; 252:22

less [1] - 272:4

letter [6] - 227:6, 23-24; 341:12; 359:25; 360:1

letters [1] - 211:25

liaison [1] - 260:6

Lieberman [1] - 361:12

light [4] - 220:16; 227:8; 228:1; 347:7

lighting [1] - 354:22

likely [1] - 223:21

likewise [1] - 338:7

limited [5] - 233:9; 280:11; 286:7; 328:22; 364:3

limiting [3] - 361:13; 363:2; 366:18

Line [4] - 283:25; 284:2, 19; 302:22

line [3] - 309:17; 310:14; 317:11

lines [5] - 324:22, 25; 325:1; 349:21; 363:10

linked [1] - 381:18

list [4] - 232:23; 285:24; 349:3, 12

listed [4] - 367:9; 372:3; 381:16, 21

listen [7] - 226:21; 237:4; 241:21; 321:10; 352:12, 15; 386:17

listener [1] - 266:8

literally [2] - 247:10; 346:9

live [2] - 245:16; 319:23

lived [6] - 245:9; 246:18; 275:13; 277:16

lives [1] - 245:15

local [3] - 260:6; 276:5

located [6] - 244:19;

301:13; 316:2; 318:9; 336:6, 21

location [4] - 237:18; 333:16; 358:14; 368:5

locations [1] - 319:24

log [2] - 306:2; 358:17

Londano [1] - 361:11

look [15] - 225:24; 262:18; 280:3; 303:13; 306:16; 307:23; 340:12; 341:17; 344:13; 355:4; 365:5, 7; 367:4; 382:11; 386:7

looked [5] - 249:12; 262:25; 318:5; 335:18; 354:22

looking [9] - 221:11; 279:22; 299:15; 316:9; 318:6; 344:23; 349:21; 373:24; 382:23

looks [1] - 354:6

LORETTA [1] - 209:12

loved [2] - 254:8; 343:17

lunch [7] - 242:9; 312:8, 10; 315:2, 9; 334:19

Luncheon [1] - 312:13

lunchtime [1] - 243:3

luscious [1] - 344:9

luv [1] - 343:19

LYNCH [1] - 209:12

**M**

M-I-L-I-T-S-Y-I-A [1] - 276:14

ma'am [2] - 356:7; 375:15

machines [1] - 256:6

Magistrate [2] - 229:16, 20

MAIL [1] - 333:3

mail [92] - 309:2, 13; 313:7; 316:16-18, 21-22; 317:2, 4, 6-7, 9, 11, 13, 16, 21, 24-25; 318:3, 19, 23-24; 319:18-20; 320:6; 323:3; 327:15, 18; 329:8, 20, 24; 330:2, 8; 331:15; 332:4, 19, 21, 23, 25; 333:2, 7, 19; 334:4, 13, 16; 336:9, 15-16; 337:2, 19; 338:6, 10, 17; 340:14, 22-24; 342:1; 343:9; 344:14,

16; 346:3, 11-12; 347:14; 349:4, 13; 351:21, 24; 353:5; 354:4, 12-14, 17; 362:20; 368:12, 16-17, 23; 374:12; 375:8; 387:17

mail.R [2] - 310:23; 311:23

mail.R-U [1] - 310:23; 311:23

mailed [4] - 341:15; 342:1; 353:21

mailing [1] - 362:17

mails [52] - 313:8, 13, 15, 22; 314:5, 10; 315:14; 316:2; 318:14, 20; 319:1, 7, 9, 12, 15, 17, 22; 320:2; 327:2, 21; 328:13, 20, 25; 330:24; 331:3, 6, 17; 332:12; 334:10, 20; 335:1, 11, 14, 20; 336:11; 338:24; 340:5, 7, 19; 346:15, 23; 347:7, 11; 348:5, 24; 349:5, 7, 9; 352:16; 362:15

mails...I'm [1] - 352:22

main [1] - 222:1

maintain [5] - 293:9; 318:17, 20; 320:20; 376:18

maintained [10] - 285:6; 291:3; 294:17; 298:9; 305:23; 307:14; 311:16; 319:3; 377:8, 20

makeshift [1] - 222:23

man [3] - 244:23; 342:17; 354:24

manager [6] - 283:18; 284:7, 9; 321:17; 322:5; 376:16

March [4] - 292:20; 312:1; 383:15, 22

Marilyn [1] - 372:6

mark [6] - 213:24; 310:16; 352:10, 13

marked [20] - 220:12; 262:16; 263:23; 264:12; 268:22; 270:4, 20; 272:5; 293:23; 297:21; 314:10; 329:15; 340:8; 344:11; 349:16; 359:20; 366:1, 4; 377:11

masse [1] - 295:8

**master's** [1] - 357:16

**matter** [5] - 216:21; 261:5; 329:1; 363:3; 389:2

**matters** [5] - 231:12; 233:24; 242:10; 284:10

**McIntire** [1] - 286:17

**mean** [21] - 219:12; 236:15; 255:2; 260:25; 279:22; 308:25; 309:10; 310:4; 329:16; 330:19; 336:14; 348:11; 362:12, 18; 367:5, 15; 368:11; 379:18

**meaning** [2] - 253:13; 332:5

**means** [8] - 235:21; 309:15; 310:8; 318:19; 354:8; 364:15; 367:7

**mechanical** [1] - 209:23

**media** [6] - 213:22; 227:2; 235:21; 237:13; 254:4, 7

**medical** [2] - 227:7, 10

**meet** [6] - 243:2; 250:20; 312:9; 349:8; 387:13, 23

**meeting** [9] - 261:25; 262:3; 263:12; 264:6; 273:8, 19, 25; 341:20

**members** [12] - 211:4; 229:12; 231:20; 235:11; 241:17; 252:14; 256:11; 257:18; 289:9; 315:1; 351:7; 364:1

**memory** [12] - 238:18, 25; 248:11, 14, 18; 251:14, 20; 254:3, 20; 255:7; 256:7

**mental** [1] - 221:20

**mention** [3] - 214:21; 215:1; 226:15

**mentioned** [10] - 216:6; 293:18; 303:4; 317:4; 319:6; 321:17; 336:20; 339:21, 25; 349:23

**merely** [1] - 286:12

**message** [13] - 311:19; 329:5; 330:5; 340:21; 341:13, 23; 342:7, 12; 353:9; 354:6, 15

**messages** [6] - 294:11; 329:9; 334:14; 335:17; 336:16; 338:19

**met** [11] - 221:5; 245:7; 262:1, 5-6, 8;

**method** [2] - 324:12; 329:6

**methodology** [1] - 330:13

**methods** [2] - 324:8; 369:23

**Miami** [1] - 344:1

**Michelle** [1] - 238:7

**Michelle's** [1] - 243:1

**Michigan** [2] - 259:1, 5

**microphone** [2] - 258:10; 283:4

**mid** [1] - 242:15

**mid-afternoon** [1] - 242:15

**middle** [1] - 295:20

**might** [1] - 236:19

**mike** [2] - 356:18, 25

**miles** [2] - 243:23; 244:20

**militsyia** [6] - 276:14, 18, 21, 23; 277:18; 281:17

**mind** [5] - 233:25; 234:9; 235:4; 238:4; 257:10

**minimize** [2] - 243:10, 13

**minimum** [1] - 303:10

**minute** [1] - 256:15

**minutes** [9] - 232:2; 242:8, 21-22; 312:6; 350:4; 382:11, 13; 386:15

**misspelled** [1] - 353:19

**MO** [2] - 216:21; 223:2

**molest** [1] - 243:20

**molested** [2] - 244:9; 246:2

**molesting** [2] - 244:5; 250:13

**mom** [1] - 343:24

**moment** [21] - 212:4; 213:2; 264:14; 274:9, 17, 21; 277:13; 294:22; 306:16; 320:4; 340:11; 341:3; 344:23; 345:4, 6; 347:19; 356:1; 365:24; 382:1, 7; 386:10

**Monday** [3] - 242:4; 388:11, 13

**money** [33] - 244:7;

**245**:25; 246:3; 252:3; 289:4; 358:8, 10, 15, 18, 20; 359:7, 9-10, 18; 362:13, 22; 364:24; 367:7, 22, 25; 368:6; 369:2, 23; 372:7, 12; 373:14, 23; 374:21, 23; 375:1, 3

**moneys** [2] - 358:14; 374:17

**monitor** [1] - 257:11

**Monroe** [1] - 372:6

**month** [3] - 246:5; 307:6

**monthly** [4] - 306:25; 307:2, 11

**morning** [26] - 210:9-11, 13; 227:5, 22; 229:12; 230:3, 18-19; 231:5, 10, 13; 236:16; 238:15; 241:22; 242:6; 244:25; 252:21; 256:14; 258:16; 321:8; 349:1; 352:25; 386:19

**most** [1] - 358:13

**mother** [3] - 244:9; 246:3; 387:5

**motion** [1] - 214:7

**mouth** [1] - 353:2

**move** [21] - 229:9; 230:10, 12, 25; 231:3; 257:12; 263:2; 264:8; 271:14; 272:16; 285:9; 289:6; 291:5; 294:20; 298:12; 306:5; 345:2; 365:14; 366:16; 377:23

**moved** [3] - 257:11; 268:6; 384:7

**moves** [2] - 214:9; 340:17

**MR** [335] - 210:6, 11, 22-23; 211:8, 13-14; 212:2, 7, 15, 19, 23; 213:9, 11, 20; 214:5, 11, 14, 16; 215:2, 14, 18, 21; 216:1, 17, 24; 217:2, 8, 13, 20; 218:13, 15; 219:1, 6, 17, 25; 220:11; 221:3, 11, 18, 23; 222:5, 11, 20; 223:3, 7; 224:8; 225:10, 13-14, 23; 226:1, 10, 15; 228:14, 17, 22, 24-25; 243:19; 252:20; 257:3, 5, 7, 10, 13, 21; 258:15; 262:14; 263:2, 7; 264:8, 11, 14, 17, 23; 265:3, 8, 20; 266:2, 6,

**19**, 22; 267:2, 8, 15, 25; 268:5, 8, 10, 13-14, 16, 21; 269:12; 271:14; 272:16, 21; 274:9, 11, 16, 21; 275:4; 277:13; 278:2, 6, 9, 15, 22, 24; 279:5, 7, 12; 280:19, 23; 281:5, 10, 12, 15, 21, 23; 282:2, 6, 8, 14; 283:8; 285:9, 18, 22; 286:15, 17, 19-20, 22; 287:4, 9, 13, 23; 288:3; 289:6, 18, 21, 24; 291:5, 13; 294:20, 22, 25; 295:5, 7, 21, 24; 296:1, 12, 20, 24; 297:3, 8, 13-15, 20; 298:12, 14, 18, 20; 299:6, 12; 300:8, 21, 23; 301:3, 7, 19, 21; 304:12, 15, 18; 306:5, 9, 19; 312:3, 7; 313:5, 24-25; 314:3, 6, 9, 16, 20, 23; 315:8; 316:3, 5; 318:11; 320:4, 23, 25; 321:2; 335:23, 25; 336:2; 337:13, 16; 339:2, 5, 20; 340:17, 21, 25; 341:3, 8; 344:23; 345:4, 7, 10, 18, 21, 23; 346:9; 347:19, 23, 25; 348:7, 11, 13, 20; 349:2, 11, 18, 23; 350:4, 8, 10, 15, 18, 24; 351:10, 12, 18-19; 355:20, 23; 356:1, 5, 20; 360:17, 19; 361:1; 362:2, 11, 21, 24; 363:12, 14-15; 364:23; 365:14, 17, 19, 24-25; 366:16, 24; 369:4, 8; 374:6, 8, 10; 375:12, 14, 16; 376:4; 377:23-25; 378:1; 382:3, 5, 10, 14, 18; 383:12; 384:15, 17, 19; 385:3, 5; 386:7, 10, 13; 387:2, 12, 19, 22, 25; 388:6, 10, 12-14, 20, 23; 389:7; 390:5, 7, 9, 11, 13, 16, 19, 21, 23, 25; 391:3, 6, 8, 10, 13, 15

**MTCN** [4] - 359:11, 17; 368:18, 23

**multiple** [4] - 219:10; 271:22; 316:25; 317:1

**must** [7] - 220:21; 232:12; 233:10, 12, 15;

234:8, 21
**MVD** [1] - 260:7

---

**N**

---

**N.Y** [1] - 209:5
**naked** [2] - 219:21;
222:14
**name** [53] - 230:16;
245:1; 252:22; 258:5;
261:16, 19, 21; 282:25;
283:23; 284:3; 286:6,
13; 290:6, 16, 20, 22;
301:18; 303:10; 320:17,
21; 321:5; 327:12, 25;
328:9; 334:2; 337:6;
339:14, 16, 22; 361:14;
363:6; 366:12; 367:5,
15; 369:11; 370:7, 10;
371:7, 22; 372:2, 6;
378:17; 379:25; 383:7
**named** [3] - 245:8, 10;
260:16
**national** [2] - 261:7;
276:13
**nature** [11] - 220:14,
22; 221:14; 261:7;
267:19; 346:21, 23;
347:1, 6, 14; 358:6
**navigate** [1] - 371:3
**navy** [2] - 355:15, 18
**Nebraska** [2] - 357:12;
369:13
**necessarily** [1] -
378:13
**necessary** [4] - 236:3;
250:25; 266:12; 267:4
**need** [17] - 235:20;
237:2; 238:10; 243:9,
11; 252:16; 260:11;
288:23; 300:7; 313:4;
343:6; 345:11; 353:18,
20-21; 378:13; 382:11
**needed** [2] - 231:12;
389:6
**needs** [1] - 370:25
**network** [1] - 308:22
**never** [11] - 221:6;
240:17; 253:10, 17;
254:12; 255:13, 16;
275:14; 277:4; 278:1;
370:6
**NEW** [1] - 209:1
**new** [6] - 231:2; 249:7;
301:1, 3; 302:22; 343:8
**New** [25] - 209:14, 18,
22; 229:14; 245:2;
273:17, 20; 274:2, 4;

275:24; 280:7; 283:16;
292:12; 310:6, 8-9;
315:23; 323:22; 369:15;
376:16; 381:19
**News** [3] - 226:23;
237:9, 11
**Newsday** [9] - 213:15,
18; 226:5, 16-17, 23;
237:9, 11
**newspapers** [1] -
386:17
**next** [13] - 229:9;
239:19; 267:9; 274:13;
282:13; 342:25; 350:7,
9; 378:25; 381:23;
384:12, 22; 388:15
**nice** [1] - 312:10
███████ [12] - 244:14;
248:16, 20; 250:1, 14;
251:6, 15, 23; 253:12;
254:18, 22; 255:11
**night** [4] - 238:13;
352:25; 386:20; 389:12
**nine** [2] - 221:21;
230:23
**non** [1] - 256:7
**non-existed** [1] -
256:7
**none** [2] - 210:19;
224:8
**nonhearsay** [2] -
361:13; 363:7
**normal** [2] - 288:16;
290:11
**normally** [2] - 279:24;
325:21
**note** [1] - 211:2
**notes** [16] - 211:23;
214:1; 238:6, 9-12, 18,
20, 22, 25; 239:5, 7,
10
**nothing** [28] - 210:18;
211:9; 216:8; 217:22;
218:5; 220:9; 232:14;
234:12; 244:16; 248:21;
264:25; 274:11; 278:2;
281:10; 282:6, 8;
301:13; 331:20; 335:23;
337:13; 352:23; 355:23;
369:4; 375:12, 14;
382:3; 386:13; 387:12
**notwithstanding** [1] -
287:18
**November** [17] - 209:7;
262:1, 5, 8-9; 263:13;
264:6; 273:20; 341:16,
19, 21; 344:17; 351:22;
353:6; 354:5; 389:14

now.. [1] - 352:24
**nowhere** [1] - 254:9
**nude** [1] - 271:23
**nullified** [2] -
255:13, 16
**number** [65] - 210:25;
212:9; 214:6; 225:17,
25; 227:19; 228:16, 19;
229:9; 230:6, 8, 13-15,
20-21, 23-24; 231:2, 4,
6-7; 243:4; 248:3, 10;
249:1; 263:15; 265:1;
266:23; 268:3; 269:5;
278:10; 279:10; 290:6;
292:8, 14; 299:7;
308:14; 327:8; 328:4;
340:1, 5; 348:14;
354:25; 359:7-10, 14,
16-17; 362:16, 20, 23;
365:18; 368:15, 18, 21,
23, 25; 370:9; 371:4;
384:23; 387:5
**numbers** [5] - 308:11;
327:6; 349:15; 384:15
**numerous** [2] - 246:7;
248:6

---

**O**

---

**o'clock** [1] - 312:2
**oath** [4] - 231:15, 17;
282:17; 375:20
**object** [4] - 267:13,
17; 286:1; 313:6
**objected** [2] - 295:12;
299:12
**objecting** [7] - 286:1;
295:16; 296:20; 297:7;
298:16, 18; 299:4
**objection** [68] -
213:9, 19; 216:1;
224:13; 226:3; 233:6;
263:3; 264:17, 22;
269:12; 271:15; 272:17;
278:15; 280:19, 23;
281:5; 285:10; 287:12,
17, 22; 289:7, 13, 19;
291:7; 294:21, 25;
296:10, 18, 23; 297:1,
11; 298:13; 299:3, 6,
8, 13; 300:11-13;
301:8; 304:14; 306:6;
313:23; 314:4; 316:3;
318:11; 341:2, 4;
345:3, 10, 24; 346:20;
347:16; 348:19, 24;
350:1, 14; 351:12;
360:19; 361:25; 365:16;
366:17; 378:1

**objectionable** [1] -
267:18
**objections** [10] -
213:7; 233:2, 4; 299:7; **17**
300:25; 313:13; 347:10,
18; 387:9, 21
**obligation** [2] -
233:3; 361:6
**obtain** [3] - 260:12;
290:13; 331:17
**obtained** [7] - 246:13;
263:22; 274:1; 299:15;
302:15; 303:8
**obvious** [1] - 236:4
**obviously** [9] -
217:22; 222:23; 224:13;
279:9; 313:12; 323:9;
361:22; 363:7, 10
**occasion** [3] - 219:12;
226:1; 262:6
**occasionally** [1] -
242:20
**occasions** [2] - 225:6;
243:10
**occurs** [2] - 236:5;
377:6
**October** [6] - 214:6;
323:13; 378:18, 21;
381:22
**odd** [1] - 374:12
**OF** [3] - 209:1, 3, 6
**offense** [1] - 240:16
**offer** [2] - 266:17;
349:9
**offered** [2] - 233:4;
240:12
**offering** [4] - 267:3;
347:22; 351:9
**offers** [1] - 360:17
**office** [7] - 248:2;
273:12, 20; 302:20;
376:10, 17
**Officer** [3] - 260:21;
261:6; 386:14
**officer** [3] - 215:6;
376:16; 388:24
**officers** [1] - 236:22
**offices** [1] - 260:3
**official** [1] - 376:18
**officials** [1] - 380:11
**often** [1] - 261:2
**Ohio** [1] - 383:11
**old** [5] - 221:21;
244:14; 248:17; 272:1
**OLENA** [1] - 261:19
**Olena** [26] - 245:8;

253:7, 15; 254:10; 255:15, 18; 261:17, 24; 262:23, 25; 273:3; 339:22; 341:17; 353:6, 12; 365:12; 366:11; 367:18; 374:18; 378:17, 19; 382:24; 383:5; 384:7; 385:8

**Omaha** [1] - 357:12

**once** [10] - 221:6; 244:1; 253:14; 254:23; 268:8; 301:16; 303:4; 356:8; 383:18

**one** [109] - 210:17, 25; 211:19; 212:17, 21, 23; 213:13; 214:5; 215:22; 216:11, 25; 217:25; 218:4, 13; 219:12, 25; 221:3; 222:22; 223:18; 225:16; 226:7; 227:2; 228:13, 15, 18; 230:6, 10, 12-13; 231:7; 232:25; 235:19; 236:7; 241:24; 247:9, 18, 21; 248:11; 254:19, 22; 262:3, 6; 263:15, 21; 264:14, 24; 265:7; 266:20; 267:13, 20; 268:14; 269:7; 274:9, 17; 275:22; 276:13; 277:13, 17, 23; 281:23; 288:24; 291:19, 21; 294:22; 295:15; 299:6; 301:3; 302:11; 307:8; 311:6; 316:10; 317:14; 318:1; 320:4; 324:10; 329:14; 332:23; 335:16; 338:17; 340:19; 341:3; 345:4; 346:14; 347:20; 348:13; 356:1; 359:5; 365:24; 369:21; 370:13; 372:7; 378:13; 382:1, 7, 25; 383:3; 385:23; 386:5, 10; 387:25; 388:23; 389:9

**One** [1] - 286:5

**ones** [6] - 300:18; 301:1; 338:21; 347:18; 348:17, 21

**ongoing** [1] - 225:20

**online** [5] - 337:17; 358:18, 20; 368:15; 370:23

**open** [17] - 235:4; 238:4; 268:19; 279:2, 13, 17; 288:2, 11; 290:2; 296:1; 297:19; 301:17; 302:2, 5; 324:23; 325:2, 7

**opened** [24] - 279:9; 286:9, 12, 14; 287:17; 288:6; 301:13; 323:12, 17, 20, 24-25; 324:1, 6, 16; 325:4, 11, 18, 21, 23; 331:3, 8; 370:1, 6

**opening** [23] - 214:4; 215:1, 9; 223:16; 225:21; 228:21; 239:16, 20, 23, 25; 240:1; 243:17; 252:17; 256:12; 287:11; 300:20; 301:11; 325:25; 326:10; 369:17, 24

**openings** [1] - 214:17

**operate** [1] - 309:25

**operates** [2] - 311:14; 316:6

**opinion** [3] - 238:2, 9; 298:19

**opportunity** [1] - 240:24

**Optimum** [12] - 283:25; 284:1, 19; 302:12, 22; 324:10; 332:23, 25; 335:9, 15; 337:17; 338:18

**optimum.com** [1] - 284:5

**option** [1] - 317:10

**optonline.net** [2] - 284:5; 291:20

**oral** [2] - 245:22; 247:12

**order** [4] - 229:8; 231:14; 242:21; 250:24

**ordered** [2] - 246:13; 249:8

**ordinary** [1] - 306:3

**original** [8] - 340:21, 23-24; 341:11, 23; 353:9; 354:12, 16

**originally** [2] - 226:3, 10

**originals** [1] - 348:5

**originate** [1] - 329:2

**originating** [1] - 338:15

**otherwise** [3] - 227:11; 287:17; 313:16

**outfit** [2] - 244:16; 249:15

**outgoing** [1] - 374:16

**outline** [1] - 239:17

**Outlook** [9] - 317:18, 20-21; 318:1; 319:6, 9,

13, 15; 320:2

**outside** [13] - 233:14; 236:14; 237:17, 22, 24; 316:2; 318:9; 325:1; 336:21, 24; 337:25; 363:5

**outsider** [3] - 361:3, 17, 19

**outweighed** [2] - 225:2; 347:5

**overrule** [2] - 224:13; 346:20

**overruled** [7] - 233:7; 287:8; 291:8; 299:12; 306:7; 318:12; 350:1

**overruling** [2] - 347:10, 16

**oversees** [1] - 245:9

**OWEN** [1] - 209:20

**own** [6] - 237:15; 238:16; 244:13; 248:16; 265:24; 273:14

**owner** [1] - 223:21

**ownership** [2] - 222:5, 7

**P**

**p.m** [1] - 352:17

**packet** [5] - 263:20; 268:23, 25; 269:25; 387:18

**packets** [1] - 340:9

**pad** [1] - 238:8

**page** [20] - 226:4, 20; 296:25; 337:17, 20, 22, 25; 338:3, 19; 342:20, 25; 369:21; 370:25; 371:1, 3, 6, 19; 372:1, 5; 373:6

**paid** [22] - 227:25; 247:2; 252:1, 4; 286:24; 288:14, 18; 289:3; 293:6, 8; 307:5, 18; 320:18, 20; 326:18; 337:3; 367:21, 24; 368:6; 373:25; 374:21

**panel** [1] - 251:17

**pantry** [2] - 342:10, 19

**panty** [1] - 343:15

**pantyhose** [1] - 247:14

**papers** [1] - 221:8

**parade** [1] - 213:2

**paragraph** [1] - 352:11

**paralegal** [1] - 357:15

**part** [12] - 219:24; 263:17; 295:5; 306:3;

327:2; 331:15; 333:6; 335:5; 346:11, 19; 383:9

**participate** [2] - 260:15; 322:25

**participation** [1] - 231:22

**particular** [23] - 219:12; 222:11; 242:12; 283:23; 284:18; 315:10; 316:15; 317:6; 322:9, 23; 325:12; 329:19, 23; 330:16; 331:25; 333:16; 334:3; 335:20; 338:21; 347:2; 349:21; 358:1; 359:19

**particularly** [2] - 222:22; 236:22

**parties** [1] - 236:12

**parts** [1] - 347:8

**party** [2] - 236:18; 241:2

**pass** [1] - 236:23

**passenger** [2] - 380:7; 381:4

**passport** [2] - 342:8; 380:13

**password** [2] - 327:25; 328:9

**past** [1] - 242:23

**patience** [2] - 231:10; 243:12

**pattern** [1] - 249:14

**pause** [7] - 264:15; 265:17; 272:25; 274:19; 277:21; 285:15; 294:23

**pay** [4] - 241:25; 247:18; 293:4; 358:14

**payee** [2] - 367:15; 368:5

**paying** [3] - 287:3; 367:20; 368:3

**payment** [7] - 293:4; 307:6, 12, 14; 326:15

**payments** [5] - 326:21, 24; 337:8

**pays** [2] - 307:10

**PC** [2] - 309:12; 317:17

**pen** [2] - 238:8; 352:12

**people** [9] - 235:16; 236:17; 260:4; 261:2; 317:9; 324:21, 25; 328:4; 375:1

**per** [1] - 343:10

**perfect** [1] - 343:6

**perform** [4] - 232:6; 243:24; 245:22; 324:21

**18**

**performed** [1] - 221:9
**performing** [2] - 245:22; 247:12
**perhaps** [3] - 260:11; 324:9; 330:22
**period** [2] - 246:5
**permission** [4] - 274:12; 276:7, 18; 382:15
**permit** [3] - 235:23; 238:7; 361:3
**permitted** [5] - 214:19; 235:14; 237:22, 25; 239:23
**person** [52] - 235:23; 253:3, 5-6, 14-15; 263:18; 275:7; 278:1; 286:14; 290:20; 291:19; 300:20; 301:18; 302:11, 13; 303:4; 318:18; 324:9; 325:21; 330:4; 332:8; 334:13; 337:19; 355:10; 358:1, 3; 362:10; 363:11; 364:11, 14, 16; 367:7; 369:20; 370:22; 371:21; 372:2; 374:16, 18; 376:25; 377:3; 380:13; 382:24; 383:15, 21, 24-25; 384:6, 10
**person's** [3] - 238:20; 376:24; 379:23
**personal** [3] - 230:2; 238:17; 372:23
**personnel** [3] - 322:2; 324:21, 25
**persons** [1] - 376:19
**persuasive** [1] - 241:6
**perusing** [1] - 386:8
**Perusing** [3] - 326:22; 331:9; 377:14
**Peter** [6] - 257:7, 22; 258:7; 339:6, 16; 354:5
**PETER** [1] - 258:7
**ph** [1] - 261:15
**phone** [13] - 254:11; 275:9, 18, 21; 276:8; 290:7; 330:22; 343:5, 8, 11; 352:25
**phones** [2] - 280:3; 330:25
**photo** [2] - 354:21, 23
**photograph** [3] - 216:11; 262:19, 23
**photographed** [1] - 217:24
**photographs** [1] -

222:15
**photos** [3] - 217:10; 223:22; 224:19
**physical** [8] - 239:12; 240:11; 250:21; 254:19; 288:18, 23; 290:24; 324:22
**physically** [2] - 336:23; 367:23
**pick** [1] - 369:2
**picture** [8] - 221:12, 16, 22-23; 262:10; 273:3; 277:9; 355:8
**pictures** [11] - 220:20; 221:18; 222:9, 25; 223:1; 244:17; 248:20, 23; 249:17; 250:1; 345:25
**piece** [3] - 254:19; 297:14; 364:2
**pieces** [1] - 226:2
**pistols** [1] - 214:24
**Pittsburgh** [2] - 259:2, 6
**Piurek** [1] - 230:23
**place** [19] - 238:19; 241:24; 264:21; 268:19; 275:13; 278:19; 279:17; 285:21; 288:2; 289:12; 290:2; 295:4; 297:19; 299:2; 302:2; 343:15; 360:22; 362:9; 389:7
**places** [1] - 319:18
**Plaintiff's** [1] - 364:20
**plans** [1] - 344:3
**platform** [3] - 215:24; 217:8; 249:21
**Plaza** [2] - 209:13, 21
**plus** [2] - 231:18; 343:10
**point** [17] - 218:13; 223:15; 234:23; 237:16; 265:4; 274:4; 287:10; 296:8; 302:10; 314:10; 315:3; 318:23; 335:16; 355:13; 378:20; 383:18; 389:9
**pointed** [3] - 219:4; 220:21; 249:22
**pointing** [5] - 215:24; 217:3, 9; 352:13; 353:17
**police** [6] - 260:7; 276:5, 11
**Police** [1] - 246:16
**pool** [3] - 343:23;

344:5, 8
**porn** [3] - 216:6, 8; 255:9
**pornographic** [1] - 221:14
**pornography** [12] - 246:24; 247:4; 248:24; 250:10, 17; 252:1; 253:3; 254:24; 265:6; 346:16; 347:9
**portion** [7] - 345:22-24; 346:2, 10, 18; 347:13
**portions** [5] - 310:5; 345:11; 346:6
**posing** [1] - 271:24
**position** [3] - 222:14; 321:15; 322:4
**possessing** [1] - 250:17
**possibility** [2] - 324:9; 326:11
**possible** [8] - 280:11; 315:25; 318:7, 14; 321:11; 336:18
**possibly** [1] - 230:1
**potential** [9] - 214:17; 220:3; 225:7; 261:14; 295:9, 11; 297:3; 302:19; 303:14
**potentially** [2] - 215:7; 216:7
**practice** [2] - 300:2; 307:20
**pre** [1] - 264:12
**pre-marked** [1] - 264:12
**prejudice** [4] - 225:1; 232:7; 347:3, 6
**prejudicial** [1] - 346:8
**preliminary** [4] - 213:24; 231:21; 232:1; 242:2
**prepare** [1] - 366:14
**prepared** [2] - 353:21; 359:24
**prescreened** [1] - 261:6
**presence** [2] - 235:24; 236:25
**present** [9] - 210:13; 234:17; 240:3, 14, 24; 350:12; 379:6, 9; 380:15
**presentation** [2] - 256:13; 257:19

**presented** [7] - 233:16; 239:1; 240:23; 326:10; 327:22; 332:18; 334:24
**presenting** [2] - 241:2; 250:20
**preserve** [1] - 300:12
**preserved** [3] - 224:14; 296:12; 306:6
**preside** [1] - 229:18
**presumably** [3] - 218:22; 368:17, 20
**presumed** [1] - 234:10
**presuming** [1] - 319:16
**pretty** [1] - 287:20
**preview** [2] - 240:1; 349:8
**previously** [9] - 215:5; 231:18; 259:16; 293:18; 300:18; 315:5; 339:11; 370:1; 388:25
**primarily** [1] - 274:5
**primary** [1] - 260:1
**principal** [1] - 255:20
**privit** [1] - 354:8
**PRIVIT** [1] - 354:7
**probation** [2] - 215:6; 388:24
**probative** [8] - 223:19, 24; 224:3, 24; 225:3; 295:13; 346:4; 347:5
**problem** [10] - 214:17; 217:20; 223:10; 264:24; 279:11; 296:16; 342:15; 349:3, 18
**problems** [3] - 295:9, 11
**procedure** [3] - 287:11; 289:14; 301:20
**procedures** [1] - 362:9
**proceed** [4] - 243:16; 252:19; 314:17; 382:12
**proceeding** [1] - 243:4
**proceedings** [8] - 264:16; 265:18; 273:1; 274:20; 277:22; 285:16; 294:24; 389:13
**Proceedings** [1] - 209:23
**process** [4] - 280:12; 284:13; 321:18; 372:13
**processed** [1] - 380:18
**produce** [5] - 216:6; 246:23; 254:16; 284:17; 293:20
**produced** [11] -

209:24; 219:14; 253:3, 8; 255:12, 14; 290:8; 304:20; 325:10, 18; 352:23

**product** [3] - 283:24; 372:20

**production** [4] - 218:5; 223:12, 20; 346:4

**professionalism** [2] - 229:24; 242:25

**proffer** [1] - 286:22

**profit** [2] - 307:21; 374:25

**program** [3] - 316:22; 318:3; 376:16

**programs** [2] - 317:2; 318:1

**prohibits** [1] - 234:19

**projected** [1] - 220:17

**promise** [2] - 243:7; 301:8

**prompts** [3] - 371:4, 6; 373:5

**proof** [8] - 233:20, 22; 234:13, 15; 239:21; 241:7; 252:15

**properly** [3] - 266:2; 287:21

**propose** [1] - 267:8

**proposed** [3] - 226:7, 10

**prosecution** [1] - 250:18

**Protection** [1] - 376:9

**protocol** [2] - 308:18; 315:10

**prove** [3] - 234:16, 21; 240:16

**proven** [1] - 234:11

**provide** [8] - 263:12; 283:20, 23; 287:4; 291:24; 316:25; 317:7; 368:13

**provided** [35] - 263:15; 264:2, 5, 12; 266:24; 267:1, 6; 270:14, 16, 19; 287:7; 290:13, 17, 19-21; 292:14; 295:21; 296:6; 300:4, 18-19; 303:13, 22; 339:25; 349:12, 15; 359:2; 360:2, 5; 364:10; 367:11; 368:22

**provider** [1] - 310:2

**provides** [2] - 381:1, 3

**proving** [1] - 250:19

**publicity** [3] - 213:15; 237:7, 11

**publish** [8] - 263:7; 272:21; 291:14; 292:23; 306:19; 341:10; 366:25; 379:14

**published** [5] - 263:8; 272:22; 291:15; 292:24; 306:20

**publishing** [3] - 272:24; 306:23

**pull** [5] - 258:10; 319:9; 343:16; 356:17

**purchase** [2] - 367:11, 13

**purchased** [2] - 251:19; 367:7

**purportedly** [2] - 263:18; 271:25

**purpose** [10] - 233:10; 266:14; 364:3-5, 13, 19; 373:7; 374:4

**purposes** [1] - 223:1

**pursuant** [1] - 380:5

**pussy** [7] - 343:13, 16-18, 20; 344:10

**put** [16] - 213:1; 240:21; 248:12; 271:5; 280:5; 304:6; 305:6; 313:25; 319:10; 345:1, 8; 371:7; 372:6; 373:10; 377:18; 379:13

**puts** [1] - 240:20

---

## Q

**qualified** [3] - 324:23; 325:1, 24

**quasi** [1] - 263:19

**qued** [1] - 271:9

**questionable** [1] - 219:17

**questions** [21] - 223:18; 232:25; 233:2; 240:9; 278:11; 281:21; 304:16; 311:13; 312:4; 314:19, 21; 320:23; 321:6, 10; 326:15; 327:1; 331:24; 356:2; 369:12, 17; 386:11

**quick** [2] - 375:16, 18

**quicker** [2] - 388:3, 5

**quickly** [3] - 368:10; 374:8; 377:24

**quote** [3] - 247:10, 14, 19

---

## R

**R-E-S-T-I-T-U-Y-O** [1] - 227:20

**raise** [6] - 257:23; 279:19; 282:18; 339:8; 356:9, 25

**raised** [2] - 349:16; 388:25

**raising** [1] - 313:23

**RAPAPORT** [1] - 209:20

**rather** [2] - 239:7, 25

**Raymond** [2] - 228:14; 230:13

**RE** [2] - 310:15; 373:9

**reach** [1] - 235:7

**read** [30] - 213:13, 15; 226:20, 23; 230:15; 237:4, 8, 11; 239:6, 11; 265:16; 292:6; 309:19; 310:13; 311:8, 19; 315:17; 342:9, 21; 343:2; 345:1, 7-8; 353:17, 25; 354:2, 19; 378:12; 381:16; 386:17

**reading** [5] - 213:18; 237:12; 247:23; 342:22; 352:8

**ready** [5] - 243:16; 257:2, 4; 295:5; 314:16

**realize** [1] - 228:2

**really** [1] - 279:23

**reason** [5] - 236:3; 279:11; 288:16; 373:12, 14

**reasonable** [3] - 234:22; 240:17; 250:19

**reasons** [4] - 221:1; 230:3; 267:16; 291:9

**rebut** [1] - 240:22

**rebuttal** [1] - 241:10

**receipt** [2] - 250:10; 251:19

**receipts** [1] - 222:13

**receive** [15] - 277:1; 301:5; 302:23; 317:24; 319:12; 320:2; 329:20, 24; 330:14, 17; 344:14, 16; 357:24; 375:3

**received** [59] - 210:24; 227:6, 23; 232:20; 233:9; 239:13; 246:6; 263:5; 266:13; 269:9; 271:17; 272:20; 273:22; 284:15; 285:14; 291:12; 293:12; 301:5, 16; 305:1, 18; 306:15;

308:10, 24; 309:1, 11, 14, 17; 338:10; 340:15, 22; 341:6, 16; 344:17; 349:4; 351:2, 16, 21; 353:5; 364:21; 365:22; 366:23; 374:18; 378:5; 391:20, 22, 24; 392:2, 4, 6-7, 9, 12-13, 15, 17, 20

**receiver** [1] - 334:16

**receives** [2] - 301:17; 309:15

**receiving** [2] - 247:4; 330:5

**recess** [2] - 256:21; 350:11

**Recess** [1] - 312:13

**recesses** [1] - 235:2

**recipient** [3] - 367:16, 25; 371:13

**recognize** [19] - 262:11, 18; 263:25; 269:2, 22-23; 270:7, 22; 272:8, 10, 12; 285:3; 293:1; 294:1; 297:25; 308:12; 366:6

**recognized** [3] - 248:25; 249:1; 315:19

**recollection** [2] - 238:24; 239:4

**record** [48] - 210:5; 218:16, 19, 21, 24; 219:19; 220:2; 224:4, 14; 232:20; 239:7; 258:6; 264:11; 269:24; 283:1; 289:20; 292:7; 299:10, 19-20; 300:12, 14; 301:14; 307:14; 310:13; 314:4; 339:15; 349:11; 355:20; 360:14; 368:4; 376:19, 23-24; 378:12; 379:15, 17-18, 21-22; 381:21; 384:1, 5; 385:9; 386:1, 5-6, 9

**recorded** [12] - 209:23; 219:7; 289:23; 291:2; 303:24; 304:25; 305:15, 20; 307:7; 362:5; 364:9, 17

**recording** [8] - 218:20; 219:7, 22, 24; 220:3, 10, 16; 368:2

**recordings** [3] - 221:6, 8; 225:5

**records** [41] - 286:5; 292:2; 293:15; 296:8; 297:11; 300:17; 301:10; 305:17; 313:9, 15; 314:7; 320:10; 321:24;

322:19; 323:1, 4, 7, 9;
326:23; 337:11; 361:2;
363:9; 364:6, 12, 18;
367:6; 377:13, 15, 17;
378:10, 15-16, 19;
381:25; 383:24; 384:11;
386:5

**recount** [1] - 251:24
**recovered** [1] - 248:3
**recross** [2] - 240:8;
281:11
**RECROSS** [4] - 281:14;
337:15; 390:10, 24
**RECROSS-EXAMINATION**
[4] - 281:14; 337:15;
390:10, 24
**recycle** [1] - 255:2
**red** [2] - 244:15;
249:15
**redacted** [1] - 213:25
**REDIRECT** [8] - 278:8;
282:1; 336:1; 374:9;
390:8, 12, 22; 391:9
**redirect** [5] - 240:7;
278:5; 335:24; 374:7;
386:12
**refer** [1] - 359:12
**reference** [4] -
347:11; 362:19; 370:9;
373:6
**referenced** [2] -
334:20; 335:2
**references** [1] - 349:4
**referred** [2] - 259:20;
376:11
**referring** [15] -
267:14; 273:2; 284:3;
288:4; 290:3, 15;
292:22; 297:24; 302:4;
305:8; 329:13; 338:18,
21; 351:20; 371:18
**refuse** [1] - 380:18
**regard** [9] - 211:15;
213:14; 216:15; 226:4;
227:7; 304:21; 314:21;
328:22
**regarding** [15] -
227:24; 286:4; 301:9;
321:6; 322:19; 326:9,
15; 327:1; 331:2;
333:7; 335:14; 366:9;
369:24; 372:18
**regardless** [2] -
302:19; 376:20
**regards** [1] - 353:24
**Regional** [2] - 260:21;
261:6

**registered** [1] - 337:4
**regular** [17] - 285:6;
291:3; 294:17; 298:10;
299:21; 300:2, 21;
303:1, 6, 12; 304:4, 9;
307:15; 360:11; 377:8,
20; 380:10
**regularly** [1] - 300:1
**reject** [1] - 234:4
**related** [3] - 265:12;
284:11, 23
**relates** [1] - 216:17;
220:25; 347:13
**relationship** [6] -
245:17; 346:13, 21, 24;
347:1, 15
**relevance** [5] -
222:18, 20; 223:9;
260:24; 314:14
**relevant** [5] - 223:15,
17; 261:4; 273:16;
346:1
**reliability** [2] -
299:4; 300:14
**relying** [1] - 373:2
**remain** [5] - 234:18;
257:23; 282:17; 356:7;
375:20
**remember** [5] - 212:16;
238:16; 326:19; 335:2;
342:16
**remind** [1] - 298:4
**render** [1] - 241:25
**renew** [4] - 289:7;
291:6; 298:14; 304:12
**repeat** [5] - 271:2;
280:15; 303:20; 307:8;
324:24
**rephrase** [2] - 322:17;
323:15
**report** [4] - 235:25;
236:8; 273:21; 274:1
**reported** [1] - 307:12
**Reporter** [1] - 209:20
**reporter** [3] - 239:6,
9; 339:15
**represent** [1] - 245:5
**representative** [1] -
305:5
**request** [8] - 239:11,
14; 273:22; 360:3;
363:13; 364:12, 16
**requested** [4] - 246:6;
260:10; 290:9; 294:4
**requests** [1] - 357:21
**require** [2] - 324:12;
361:13

**required** [4] - 240:15;
284:17; 380:5, 14
**requirement** [2] -
301:19; 381:14
**requires** [2] - 299:25;
325:8
**requiring** [1] - 255:10
**research** [4] - 237:14,
17, 22, 25
**reserved** [2] - 304:14;
314:13
**reside** [1] - 319:23
**residence** [4] -
246:14, 17; 277:16;
281:18
**resolved** [2] - 225:20;
314:15
**respect** [30] - 211:16;
212:21; 213:13, 16, 22;
214:16, 20; 216:16;
225:6; 229:24; 237:7;
238:25; 239:12; 242:25;
254:18; 265:3; 283:22;
285:5; 290:3; 304:18;
305:18; 313:8; 346:4,
24; 347:4, 9; 359:22;
360:4; 379:25; 385:7
**respond** [2] - 284:12;
321:17
**response** [4] - 251:4;
293:20; 357:21; 360:2
**responsibilities** [2]
- 284:7; 357:18
**responsibility** [2] -
260:6; 325:24
**rest** [2] - 228:6;
350:22
**Restituyo** [7] - 211:1;
212:19; 214:1; 227:19,
21-22; 228:11
**restore** [2] - 255:7, 10
**restored** [1] - 255:2
**result** [3] - 246:12;
290:8; 389:2
**results** [2] - 353:18,
20
**resumed** [1] - 315:5
**retain** [3] - 288:17;
319:22; 360:12
**retained** [3] - 302:25;
304:4, 9
**retire** [1] - 241:13
**retrieval** [1] - 327:1
**retrieve** [2] - 319:7,
15
**retrieving** [1] -
319:23

**return** [4] - 247:3;
252:9; 262:7; 298:5
**review** [5] - 293:15;
320:10; 337:10; 378:8,
19
**reviewed** [2] - 271:5,
12
**reviewing** [1] - 379:10
**rise** [1] - 257:14
**Robert** [2] - 282:14;
283:2
**role** [1] - 321:19
**roles** [2] - 321:15
**room** [18] - 210:18;
213:1; 216:22; 217:5,
11-12; 227:13; 228:6;
235:12; 238:13; 241:14;
243:6; 248:9; 286:10;
344:8
**rooms** [2] - 342:14;
343:24
**RORY** [1] - 388:16
**Rory** [2] - 256:4;
388:16
**row** [2] - 229:9
**RSO** [2] - 260:21; 261:6
**RU** [5] - 333:4, 18;
334:4, 11, 17
**rub** [1] - 344:9
**rude** [1] - 237:1
**Rule** [1] - 361:2
**rule** [2] - 299:25;
361:2
**ruled** [1] - 314:6
**rules** [2] - 233:5;
234:8
**Rules** [2] - 301:8;
364:7
**ruling** [7] - 214:18;
233:6; 237:21; 266:25;
313:13; 314:15; 389:10
**rulings** [1] - 243:8
**run** [3] - 271:10;
324:25; 325:1
**Russian** [1] - 354:11

**S**

**safe** [2] - 342:11;
353:24
**sale** [1] - 302:14
**Salerno** [1] - 231:6
**sales** [3] - 302:9, 20;
305:5
**salesperson** [2] -
302:14; 324:9
**Samsung** [8] - 248:11,

**21**

17-18; 249:24; 251:14, 19

**sat** [1] - 243:22

**save** [3] - 305:25; 319:22; 378:14

**saw** [11] - 210:20; 221:18; 226:3; 248:25; 249:1, 5; 262:25; 271:10, 20; 275:9; 278:1

**SBU** [1] - 260:8

**scenarios** [1] - 358:19

**scene** [1] - 243:24

**schedule** [1] - 344:3

**scheduled** [4] - 242:12; 388:8, 10, 13

**scheduling** [1] - 242:3

**screen** [5] - 308:3; 311:2; 343:9; 345:1; 379:13

**script** [4] - 246:9; 247:11; 251:5; 343:12

**scripted** [2] - 247:6; 248:5

**scripting** [2] - 243:23; 265:6

**seaport** [1] - 377:1

**search** [29] - 215:3, 11, 20; 246:13, 17, 20; 249:8; 255:25; 275:7, 11, 15, 18, 21, 23; 276:3, 7, 24; 277:15, 19; 279:18; 292:1; 293:13, 17, 20; 294:5; 298:5; 304:21; 313:10

**searched** [6] - 249:11; 253:25; 254:1; 281:18; 282:3; 389:3

**searches** [6] - 251:10; 276:1, 19; 278:11, 14

**searching** [5] - 247:25; 249:4; 280:21, 25; 281:2

**seat** [6] - 229:1, 5; 230:10-12, 14

**seated** [13] - 229:7; 230:5; 257:1, 17; 258:9; 282:24; 313:3; 351:6; 355:15, 18; 356:16; 386:23; 387:4

**second** [14] - 216:25; 228:17; 229:1; 234:15; 235:23; 240:8; 249:8; 262:5; 265:7; 273:25; 317:8; 332:11; 369:21; 383:9

**Second** [2] - 287:20; 361:11

**secondly** [1] - 265:8

**secreted** [3] - 218:17; 219:1, 9

**secreting** [1] - 223:23

**secretly** [1] - 221:9

**section** [1] - 310:6

**security** [10] - 260:8; 261:8; 283:18; 284:7, 9, 11; 321:17, 19; 322:1, 5

**Security** [4] - 260:21; 261:6; 376:13; 384:11

**see** [57] - 213:16; 226:1, 8, 25; 233:14; 235:3; 238:8; 239:9; 247:8, 17; 250:25; 251:3, 5, 12-14, 16-18, 22; 252:3; 264:9; 265:22; 268:3; 269:15; 277:24; 279:11; 296:15; 308:6, 9; 311:5; 338:15, 20; 342:14; 344:1; 346:11; 348:15, 23; 353:2, 18, 20-21; 355:8, 10; 376:7; 377:24; 378:23; 379:2, 13; 381:1; 384:12; 385:2; 386:7, 19, 25

**seeing** [1] - 236:17

**seem** [1] - 255:8

**seized** [3] - 215:20; 254:2, 4

**select** [1] - 229:17

**selection** [5] - 211:11; 226:11; 228:3; 229:16; 250:24

**SEMAIL** [1] - 368:10

**send** [22] - 243:20; 277:5; 288:25; 302:14; 309:13; 316:22; 317:7, 24; 319:12; 320:2; 329:6, 8; 330:14, 17; 338:19; 343:22; 352:25; 358:15, 18; 368:6; 369:23; 375:3

**sender** [9] - 316:17; 334:10, 12, 14; 336:21; 366:13; 367:16; 368:13; 375:10

**sender's** [2] - 367:4; 368:12

**sending** [6] - 316:16; 318:9; 352:22; 362:22; 373:14

**sends** [4] - 302:21; 316:18; 368:20, 22

**senior** [1] - 357:8

**sensitive** [2] - 221:4;

236:23

**sent** [46] - 244:2, 9; 246:25; 247:24; 248:4; 250:12; 263:16; 269:5, 16; 273:17, 19, 21; 274:2; 277:2; 294:12; 305:19; 308:4; 316:2; 318:14; 329:5; 330:24; 331:10, 22; 334:20; 336:11, 14-16; 338:10; 342:3, 5, 12; 343:3, 5; 352:2; 354:4, 13; 368:16; 372:12; 374:13, 23; 375:8

**sent..** [1] - 342:23

**sentence** [2] - 353:12, 17

**separate** [1] - 306:8

**September** [7] - 352:2; 353:10; 378:23; 380:24; 385:14, 18, 24

**series** [3] - 308:11; 321:6; 369:11

**Serieux** [1] - 230:20

**Serieux-Girard** [1] - 230:20

**serve** [6] - 211:23; 227:11; 229:21, 23; 236:6

**served** [1] - 321:20

**server** [10] - 296:13; 316:1, 18-19, 23-24; 317:1; 318:8, 25; 319:10

**servers** [4] - 305:25; 318:23; 319:4, 18

**serves** [1] - 316:24

**service** [20] - 227:9, 25; 260:8; 283:22; 286:6; 287:6; 288:25; 290:18; 291:24; 302:8; 306:4; 316:25; 323:22; 324:21, 25; 325:23; 337:2; 338:17

**serviceman** [1] - 325:4

**services** [4] - 283:21; 288:24; 358:9, 12

**serving** [1] - 236:10

**session** [1] - 343:11

**set** [14] - 218:16, 19, 21; 222:23; 223:20; 224:4, 23; 240:22; 291:17; 302:7; 311:4; 318:5; 319:17; 322:24

**setting** [1] - 223:14

**settled** [1] - 239:5

**seven** [3] - 229:6; 230:21

**several** [2] - 295:8; 323:14

**sex** [4] - 216:7; 245:22; 247:12

**sexual** [2] - 243:21; 250:11

**sexually** [14] - 217:4; 243:24; 244:13, 17; 245:19; 246:2, 8; 247:1; 248:6, 23; 249:25; 250:9, 15; 251:6

**sheet** [1] - 366:12

**shipped** [1] - 251:21

**shocked** [1] - 287:5

**shooting** [1] - 219:18

**short** [4] - 211:20; 241:10; 259:12; 383:6

**shortly** [1] - 245:17

**shot** [1] - 273:4

**shots** [3] - 272:11

**show** [25] - 218:10; 219:14; 240:2; 246:8; 268:22; 269:18; 285:1, 12; 297:21; 310:24; 315:13; 344:11; 353:4; 359:20; 361:14; 368:10; 379:22; 380:17; 382:23; 384:14; 385:6; 386:4

**showed** [3] - 247:5; 262:10; 277:9

**shower** [1] - 344:8

**showers** [1] - 343:24

**showing** [18] - 220:12; 251:19; 252:4; 262:16; 263:22; 270:20; 271:11; 272:5; 293:23; 296:3; 340:8; 341:9; 346:3; 366:1, 4; 379:19; 382:21; 384:4

**shown** [4] - 241:3; 332:12; 380:12

**shows** [5] - 222:21, 24; 223:2; 265:12; 286:24

**sick** [1] - 352:17

**side** [1] - 240:2

**sidebar** [14] - 264:21; 278:19; 285:21; 289:12; 291:9; 295:4, 20; 298:15; 299:2; 306:7; 313:23; 345:11; 360:22; 363:16

**sidebars** [5] - 243:5; 299:24; 300:7; 349:20; 387:8

**sides** [1] - 210:21

**sign** [3] - 302:13;

324:10; 362:12

**sign-up** [1] - 324:10

**signatures** [1] - 268:15

**signed** [4] - 266:1, 6; 268:14; 353:23

**signs** [1] - 290:18

**silent** [1] - 234:18

**similar** [1] - 362:7

**simply** [5] - 237:1; 238:18; 239:17; 241:2; 364:17

**simultaneously** [2] - 303:24; 377:17

**single** [2] - 346:14; 375:9

**sit** [3] - 227:14; 352:21; 372:10

**site** [1] - 245:8

**sits** [1] - 244:23

**sitting** [5] - 242:4; 243:5; 255:22; 355:10

**situation** [5] - 211:22; 218:17; 325:12; 328:6; 362:14

**six** [6] - 221:21; 230:20; 244:14; 246:5; 248:16

**six-month** [2] - 246:5

**skipping** [1] - 380:19

**slate** [1] - 234:14

**sleep** [3] - 353:2; 354:23

**slight** [1] - 305:3

**small** [1] - 310:6

**smiling)** [1] - 354:23

**Smithtown** [11] - 244:20; 245:12, 16; 246:15; 248:1, 8; 250:15; 292:12; 323:22; 324:1; 381:19

**sneaky** [1] - 352:18

**snippets** [4] - 226:2, 4; 271:22

**social** [1] - 213:21

**sofa** [2] - 217:3; 219:4

■■■■■ [10] - 245:10; 247:20; 250:7; 310:15; 343:16, 23, 25; 344:5; 353:13, 22

■■■■■ [2] - 343:13, 20

**software** [2] - 255:6; 10

**sole** [1] - 241:19

**solely** [1] - 233:16

**some-odd** [1] - 374:12

**someone** [27] - 219:10; 222:9; 223:22; 224:23; 235:24; 236:17; 255:8, 11-12; 287:2; 289:14; 300:18; 302:21; 307:10; 319:15; 320:1; 338:17; 365:11; 366:10; 367:12, 23; 370:25; 373:15; 375:3

**sometime** [3] - 242:9, 13

**sometimes** [6] - 238:6; 240:8; 242:11; 271:24; 364:1; 381:25

**somewhere** [4] - 223:23; 242:16; 254:15; 311:17

■■■■■ [1] - 353:18

**sorry** [24] - 221:3; 280:15; 288:4; 289:9; 291:6; 303:20; 305:13; 306:22; 309:4; 314:20; 323:13; 341:19; 345:5; 347:23; 350:8; 354:2, 11; 359:3; 368:4; 370:20; 377:25; 385:1; 388:12

**sort** [4] - 265:12, 15; 283:19; 360:12

**sound** [1] - 241:5

**sources** [1] - 328:16

**speaking** [14] - 260:1; 262:24; 271:19; 288:21; 290:23; 293:3; 307:18; 308:20; 317:10, 20; 327:5; 349:7; 358:10; 366:8

**Special** [13] - 210:7; 245:4; 251:9; 255:22; 257:7; 259:8, 11; 274:7; 275:5; 339:6; 340:22; 387:3

**special** [3] - 255:6, 10; 343:25

**specific** [7] - 225:25; 245:22; 291:25; 295:22, 24; 296:4

**specifically** [6] - 226:16, 22; 237:6; 249:10; 290:10

**speculation** [1] - 255:19

**spell** [6] - 230:16; 258:5; 261:18; 282:25; 310:21; 333:3

**spelling** [1] - 276:16

**spellings** [1] - 261:20

**spending** [1] - 224:1

**spliced** [1] - 271:22

**spreadsheet** [1] - 360:7

**spreadsheets** [3] - 359:25; 360:5; 374:2

**stage** [20] - 215:23; 216:22; 217:4, 7-8, 11-12, 14; 218:4, 19; 222:18, 20-21, 23; 223:13; 249:21; 302:17

**stage-like** [3] - 215:23; 217:8; 249:21

**stamp** [4] - 309:2, 5

**stamped** [1] - 338:16

**stand** [7] - 231:16; 267:23; 282:12, 16; 315:5; 356:8; 375:20

**standard** [1] - 213:5

**standing** [4] - 257:23; 282:17; 356:7; 375:20

**start** [9] - 229:4; 235:16; 236:25; 238:4; 285:17; 342:22; 349:13; 352:8

**started** [4] - 242:24; 245:19; 313:20; 351:1

**starting** [3] - 316:10; 352:18

**starts** [2] - 234:14; 332:2

**State** [2] - 270:12; 357:15

**state** [15] - 210:5; 221:21; 258:5; 282:25; 293:8; 310:3, 8; 311:14, 17; 339:14; 367:10, 12; 381:2, 19

**statement** [13] - 225:21; 239:17, 20, 23; 240:1; 252:17; 256:12; 265:19, 21, 24

**statements** [8] - 214:4; 232:1, 25; 239:25; 243:17; 361:17, 19; 363:1

**states** [2] - 285:24; 341:25

**STATES** [2] - 209:1, 3

**States** [42] - 209:13, 21; 210:3; 245:5; 253:9, 18; 257:21; 260:10; 280:14, 18; 286:17; 316:2; 318:10; 326:14; 331:24; 336:21, 23; 337:22; 338:1; 356:5; 361:11, 18; 376:21, 25; 378:17, 20,

24-25; 379:6; 380:11; 381:24; 382:25; 383:1, 21, 25; 384:3, 11; 385:8, 20, 22; 386:2

**stating** [1] - 279:11

**stationed** [4] - 259:23; 260:2, 4, 14

**stay** [1] - 242:22

**stayed** [1] - 253:19

**stenography** [1] - 209:23

**step** [12] - 282:10, 16; 300:23; 301:21; 331:12; 356:3; 375:15; 378:9; 386:14

**Steven** [6] - 210:7; 245:4; 251:9; 255:22; 274:7; 387:3

**still** [7] - 211:21; 225:20; 272:11-13; 313:12; 363:1

**stills** [1] - 221:18

**stipulate** [4] - 217:15, 18; 232:21; 383:12

**stood** [1] - 342:15

**stop** [3] - 244:12; 260:25; 316:20

**store** [1] - 303:10

**stores** [2] - 324:11; 342:18

**straight** [1] - 244:10

**streamlining** [1] - 348:3

**street** [6] - 358:20; 367:10; 381:1, 16, 18

**studio** [2] - 223:12, 14

**stuff** [6] - 213:4; 227:15; 228:7; 295:12; 310:16

**SU** [1] - 384:25

**subject** [11] - 216:11; 218:20; 222:16; 310:14; 342:7; 352:6; 373:9; 380:4, 10, 14; 381:10

**submit** [1] - 380:9

**subpoena** [13] - 284:15; 290:9; 321:21; 322:7; 333:6; 357:21, 24-25; 360:1; 367:2; 372:20

**subpoena's** [1] - 367:4

**subpoenaed** [2] - 284:21; 357:22

**subscriber** [9] - 284:23; 290:6, 15, 17; 292:3, 6, 10, 16;

299:15

**subsequent** [2] - 269:7, 16

**substance** [2] - 348:12; 350:3

**substantially** [2] - 225:2; 347:5

**Suffolk** [3] - 246:16; 256:2, 4

**suggest** [1] - 225:5

**suggesting** [2] - 218:9; 241:3

**suggestion** [2] - 212:8

**suggests** [1] - 219:3

**suit** [4] - 355:15, 18

**Suite** [1] - 209:18

**summary** [4] - 365:10, 14, 21; 366:14

**summation** [2] - 240:25; 241:11

**summations** [2] - 231:25; 235:5

**supervised** [1] - 389:2

**supervisor** [1] - 227:24

**supplied** [1] - 290:5

**supplying** [2] - 288:24; 289:14

**supposed** [2] - 352:17; 381:4

**surreptitious** [5] - 219:22; 220:14, 22; 224:23

**suspect** [1] - 227:1

**suspicion** [2] - 279:20; 280:22

**suspicions** [1] - 279:23

**sustained** [1] - 233:7

**Sustained** [4] - 269:13; 280:20, 24; 281:6

**Sveta's** [2] - 310:17

**SVO** [3] - 384:24; 385:11, 15

**sweet** [1] - 343:14

**sworn** [8] - 231:19, 21; 258:3; 282:22; 315:5; 339:12; 356:12; 375:24

**sympathy** [1] - 232:8

**system** [11] - 304:7; 309:13; 316:24; 358:16; 367:1; 379:20; 380:6-8; 381:9; 386:6

**systems** [8] - 290:11; 305:7, 18, 21, 24;

357:14

---

**T**

---

**table** [4] - 252:25; 355:15, 19; 366:3

**tail** [2] - 333:18; 334:4

**talks** [1] - 361:19

**taller** [1] - 252:24

**tape** [1] - 220:17

**task** [2] - 232:6; 241:15

**tasked** [1] - 302:22

**tasks** [1] - 322:23

**team** [1] - 251:10

**technical** [1] - 284:10

**technician** [2] - 288:25; 325:24

**technology** [2] - 248:3; 330:25

**TECS** [2] - 379:20; 380:8

**telephone** [2] - 283:21; 292:14

**television** [1] - 283:20

**temp** [1] - 353:15

**ten** [4] - 215:9; 228:20; 232:2; 334:6

**tend** [1] - 216:19

**Tenth** [2] - 286:18; 287:18

**terms** [11] - 219:14; 276:11; 286:7; 287:10; 313:10; 328:19; 363:1; 364:15; 372:24

**terrific** [1] - 343:7

**testified** [25] - 234:20; 258:3; 263:10; 282:22; 292:1; 304:20; 307:17; 315:6, 9, 19; 316:6; 320:6; 321:14; 322:18; 324:6, 8; 325:7; 328:12; 339:12; 340:4; 356:12; 374:11; 375:24; 377:16; 381:23

**testifies** [1] - 274:13

**testify** [8] - 215:7; 221:20; 234:17; 251:9; 256:5; 284:22; 357:22; 389:6

**testifying** [1] - 336:4

**testimony** [11] - 232:19; 233:11, 21; 234:4; 239:6; 240:4; 251:8; 255:24; 284:17;

313:11; 387:9

**text** [1] - 342:12

**texts** [1] - 235:21

**THE** [250] - 210:3, 10, 13, 24; 211:10, 15; 212:5, 12-14, 16, 20, 24; 213:10, 12, 21; 214:10, 12, 15; 215:12, 16, 19; 216:14, 22; 217:7, 10; 218:9, 14, 24; 219:3, 10; 221:25; 222:7, 18; 223:5, 17; 224:12; 225:11, 15; 226:8, 13, 20; 227:5, 13, 19, 22; 228:9, 12, 16, 19, 23; 229:2, 4; 230:18, 20; 231:20; 252:14; 256:11; 257:1, 4, 6, 9, 12, 14, 17, 23; 258:5, 7, 9, 12; 262:15; 263:4; 264:10, 18, 22; 265:7, 16, 19; 266:1, 5, 11, 20, 25; 267:3, 12, 21; 268:2, 11; 269:13; 271:16; 272:18; 274:14, 18; 275:1; 278:4, 16, 20, 23; 279:3, 6, 9, 14; 280:20, 24; 281:6, 11, 22; 282:7, 9, 13, 16, 24; 283:2, 5; 285:11; 287:8, 12, 15, 24; 289:8, 13, 19, 22; 291:8; 294:21; 295:18; 296:11, 14, 22; 297:2, 6, 10; 298:13, 16, 21; 299:3, 11, 23; 300:11; 301:4, 15, 20, 22; 304:14, 16; 306:6, 11-13, 22; 312:2, 5, 8; 313:3, 18; 314:2, 12, 18, 21; 315:1; 316:4; 318:12; 320:24; 329:13, 16-17; 335:24; 337:14; 339:4, 8, 14, 16, 18; 340:19, 24; 341:2, 5; 345:3, 8, 12, 19, 22; 346:20; 347:22, 24; 348:5, 10, 12, 17, 22; 349:19, 25; 350:7, 9, 12, 16, 20, 25; 351:6, 13, 17; 355:22, 25; 356:3, 7, 9, 14, 16; 360:20; 362:1, 7, 18; 363:8, 13; 364:1; 365:16, 18, 20; 366:19; 369:6; 374:7; 375:13, 15, 19; 376:1; 378:2; 382:4, 9, 13, 16; 383:14; 384:16; 385:4;

386:8, 12, 14, 23; 387:6, 16, 20, 23; 388:4, 8, 18, 21; 389:5, 11

**themselves** [6] - 251:3; 276:6; 313:22; 374:17; 381:10

**THERE** [1] - 314:3

**therefore** [3] - 224:20; 234:14; 252:16

**thinking** [2] - 213:12; 301:1

**third** [2] - 234:21; 236:10

**thoroughly** [1] - 321:11

**thousands** [7] - 243:23; 247:2; 252:5; 286:25; 293:8; 320:20; 326:18

**thread** [1] - 349:13

**three** [10] - 228:16; 230:8, 14; 233:11; 234:8; 269:6; 272:1; 321:15

**throughout** [2] - 249:17; 313:16

**Thursday** [5] - 242:5; 352:2; 388:15, 20; 389:6

**tied** [1] - 214:8

**tights** [5] - 244:16; 245:23; 247:14; 248:22; 343:15

**tiles** [1] - 251:17

**timely** [1] - 380:10

**tiny** [1] - 248:12

**tip** [1] - 279:8

**tired** [2] - 354:22

**title** [3] - 259:7; 283:17; 376:15

**tits** [2] - 344:9; 353:1

**today** [22] - 211:2; 229:19; 235:15; 244:22; 271:20; 281:17; 284:13, 17; 321:20, 23; 322:1, 4, 18; 342:12; 348:18, 25; 349:20; 355:11; 357:22; 372:6, 10

**toddler** [14] - 243:25; 244:9; 245:23; 247:13; 248:5; 250:7; 252:1; 253:4; 254:5, 15; 256:6; 272:1; 273:6

**together** [4] - 245:4; 246:16; 271:23; 382:23

**tomorrow** [6] - 386:19,

24; 387:1, 3, 14; 388:19

**tone** [5] - 346:12, 15; 347:4, 6

**tonight** [1] - 389:7

**took** [16] - 223:18, 22; 224:3, 10, 17, 19; 244:17; 245:18; 264:20; 278:18; 285:20; 289:11; 295:3; 299:1, 17; 360:21

**tools** [1] - 248:3

**top** [1] - 328:13

**topless** [1] - 344:7

**total** [4] - 368:8; 370:20, 22; 374:11

**touch** [2] - 272:2

**touching** [3] - 226:21; 237:5, 12

**toy** [1] - 343:25

**toys** [4] - 247:17; 249:2, 16; 343:15

**tracking** [3] - 362:16, 18

**trail** [1] - 252:3

**trains** [1] - 242:18

**transaction** [10] - 291:2; 359:4, 8, 19; 360:9; 367:8; 368:15; 371:23; 375:9

**transactional** [1] - 365:10

**transactions** [7] - 360:4, 14; 366:10; 370:1, 9; 371:19; 372:24

**transcript** [1] - 209:24

**TRANSCRIPT** [1] - 209:6

**transcription** [1] - 209:24

**transfer** [15] - 343:9; 358:8, 18, 20; 359:7, 9-10, 18; 362:13; 367:8, 22; 369:23; 371:15; 372:3; 373:7

**transferred** [2] - 371:11; 373:23

**transfers** [9] - 252:4; 364:24; 370:2, 4, 13, 20; 373:10; 374:4, 16

**transmission** [1] - 358:11

**transmits** [1] - 380:7

**transmitted** [1] - 381:9

**transportation** [1] -

250:9

**travel** [5] - 376:19, 23-24; 384:1

**traveled** [1] - 383:5

**travelling** [1] - 280:9

**treasury** [1] - 379:19

**treat** [1] - 233:8

**treated** [2] - 229:24; 242:25

**treats** [1] - 211:3

**tremendously** [1] - 241:15

**tri** [5] - 310:3, 8; 311:14, 17

**tri-state** [5] - 310:3, 8; 311:14, 17

**TRIAL** [1] - 209:6

**trial** [24] - 211:20; 213:15; 223:16; 229:19, 25; 231:22, 24; 232:15; 234:25; 237:9, 19-20; 239:13, 15; 242:6; 243:4, 8; 252:8; 295:18, 20; 313:17; 341:1; 349:19

**trip** [1] - 385:15

**triple** [2] - 352:9, 13

**tristate** [7] - 315:21; 316:7; 336:6, 12, 25; 337:1; 338:12

**troubling** [1] - 251:2

**Troyd** [8] - 210:8; 245:4; 251:9, 24; 255:22; 274:7; 387:3; 388:7

**true** [5] - 239:12; 264:4; 272:12; 340:14; 388:4

**trusting** [1] - 342:16

**truth** [1] - 363:3

**try** [10] - 218:10; 237:14, 20-21; 243:3; 343:21; 344:7; 347:17; 362:10; 387:8

**trying** [6] - 219:14; 220:20; 252:23; 272:2; 344:8

**tub** [1] - 343:14

**Tuesday** [2] - 342:4; 343:22

**Turkey** [1] - 342:15

**turn** [1] - 236:25

**twice** [2] - 244:1; 262:9

**two** [60] - 211:21; 215:21; 216:19; 217:21; 218:18; 229:8; 230:2,

7; 231:7, 18; 233:2, 18; 244:21; 245:12; 247:5; 251:9; 252:24; 254:22; 255:20; 259:25; 263:23; 265:1; 272:1, 8; 285:1, 3; 286:2; 297:21; 302:10; 305:4, 6; 315:10, 20; 316:9; 318:5; 324:8; 332:13, 19, 21; 334:12; 335:3; 336:19; 350:4; 359:25; 369:19, 23; 370:15, 22; 379:5, 10; 382:23; 383:3; 385:19, 21; 386:2, 9; 387:2, 5

**type** [5] - 223:20; 254:4; 322:4; 372:17; 373:6

**types** [1] - 276:12

**typical** [1] - 242:6

**typically** [5] - 226:6; 273:13; 290:19; 336:22

## U

**U.S** [7] - 209:4, 15; 245:2; 259:18; 334:24; 376:9

**U.S.D.J** [1] - 209:9

**Ukraine** [25] - 217:22; 245:9; 250:8, 12; 253:9, 17; 254:6, 11, 15; 256:6; 259:24; 260:14; 262:7; 271:1; 276:2, 11-12; 281:3, 19; 333:21, 25; 339:23; 383:17, 20

**Ukrainians** [1] - 260:11

**ultimately** [3] - 274:6; 275:17; 280:13

**umm** [1] - 279:21

**unaware** [1] - 220:19

**uncertainty** [1] - 253:22

**unclear** [1] - 220:1

**uncovered** [1] - 246:11

**under** [17] - 223:9, 13; 225:3; 233:5; 266:11, 15, 25; 278:24; 279:10; 280:8, 22; 346:5, 21; 348:24; 361:6, 20; 364:6

**underemphasize** [1] - 224:25

**undergraduate** [1] - 258:25

**undergraduates** [1] -

259:4

**understood** [3] - 225:9; 299:3

**unfair** [3] - 225:1; 347:3, 6

**unfavorably** [1] - 346:8

**uniform** [1] - 376:7

**Union** [25] - 252:4; 350:10; 356:24; 357:1, 7, 19, 24-25; 358:13; 359:2, 5; 360:2, 6; 362:6, 19; 363:9; 364:7, 9, 11; 367:24; 368:20, 22; 369:18; 374:25

**Union's** [13] - 358:6, 8, 12, 16, 21-22; 360:8, 11, 15; 365:1; 366:9; 367:1, 6

**unique** [4] - 359:14, 16; 362:14; 368:25

**UNITED** [2] - 209:1, 3

**United** [42] - 209:13, 21; 210:3; 245:5; 253:9, 18; 257:21; 260:10; 280:14, 17; 286:17; 316:2; 318:9; 326:14; 331:24; 336:21, 23; 337:22, 25; 356:5; 361:11, 18; 376:21, 25; 378:16, 20, 24-25; 379:6; 380:11; 381:24; 382:25; 383:1, 21, 25; 384:2, 11; 385:8, 20-21; 386:1

**University** [7] - 258:25; 259:1, 4-5; 357:15

**unless** [1] - 242:20

**unnecessary** [1] - 387:15

**unquote** [2] - 247:11, 19

**unrecorded** [1] - 255:25

**unrelated** [1] - 389:2

**unsure** [1] - 334:25

**untrue** [1] - 338:10

**up** [53] - 210:19; 211:10; 218:1, 16, 19, 21; 221:12; 222:23; 223:14, 20; 224:4, 23; 225:22; 232:17; 234:2; 240:8; 243:8; 244:15; 245:23; 246:14; 247:14; 248:21; 254:19; 258:11; 259:3; 266:22; 267:9;

269:24; 271:9; 273:23; 282:16; 290:18; 302:7, 13; 304:16; 317:8; 318:23; 322:24; 324:10; 341:12; 345:9; 353:1; 355:17; 356:17, 25; 358:5; 359:21; 369:2; 375:19; 380:17; 384:18

**upwards** [3] - 215:24; 217:9; 249:23

**US** [17] - 260:12, 24; 261:4; 262:7; 263:19; 280:9, 22; 282:4; 376:10; 379:10; 380:19, 23; 381:1; 384:22; 385:10, 16, 18

**USA** [1] - 381:13

**user** [7] - 317:17; 319:6, 22, 25; 327:20, 24; 328:9

**user's** [1] - 319:10

**uses** [5] - 319:15, 25; 320:2; 327:15; 372:14

---

**V**

**vacuum** [1] - 287:5

**Valerio** [55] - 210:4, 12-13; 212:3, 6-7, 12; 222:17; 223:12; 224:10; 243:19; 244:23; 252:25; 253:6, 10, 15, 17, 20; 254:8, 24; 255:17; 256:1; 260:16, 19; 261:12; 277:6; 292:11; 320:17, 21; 337:6; 341:25; 342:3; 345:25; 346:3; 350:13; 351:24; 353:9; 354:12, 17; 355:21; 358:4; 361:9, 14, 16, 21, 23; 363:4, 6; 365:11; 366:11, 13; 370:7, 10; 372:11; 374:17

**VALERIO** [1] - 209:5

**Valerio's** [10] - 253:12, 19, 25; 254:2, 18, 21-22; 255:11, 15; 287:7

**valid** [2] - 380:15

**validate** [1] - 372:14

**validation** [1] - 372:13

**value** [5] - 225:3; 286:7; 295:13; 346:4; 347:5

**variations** [1] - 261:22

**verdict** [8] - 232:16;

234:19; 235:7; 239:8; 241:14, 25; 252:9

**verification** [1] - 372:1

**verified** [2] - 290:23; 324:19

**verify** [2] - 362:10; 363:10

**version** [1] - 261:21

**versus** [1] - 361:19

**via** [5] - 317:16; 358:18; 368:16; 369:21; 371:18

**vicinity** [1] - 217:11

**victims** [1] - 225:7

**video** [28] - 218:5; 219:18; 220:10; 224:11, 23; 248:18; 249:24; 251:15, 20; 253:11; 255:11; 270:19; 271:10, 22; 272:11, 13; 273:7; 277:3, 5, 25; 331:14, 21; 340:1; 343:9; 346:5, 16; 352:25

**videos** [39] - 224:19; 226:2; 243:21; 244:5, 8; 245:19, 21; 246:2, 6-8; 247:1, 3, 19, 22; 248:7; 250:13, 25; 251:3; 253:3, 8, 12; 254:5, 8, 15, 22, 25; 255:12; 256:6; 271:25; 342:13, 23; 343:3, 5, 23; 344:5; 353:21

**videotape** [1] - 247:11

**view** [9] - 238:9; 241:2; 251:2; 306:1; 343:10; 347:1, 4, 12

**viewed** [5] - 271:19; 331:3, 8, 10, 22

**views** [1] - 235:6

**VIGNEAU** [1] - 361:19

**violation** [1] - 265:2

**visa** [1] - 344:4

**visit** [1] - 245:11

**visiting** [1] - 237:18

**voluntarily** [2] - 280:13, 17

---

**W**

**waist** [1] - 221:24

**wait** [5] - 228:5; 243:11; 343:19, 21; 344:1

**waiting** [2] - 235:13; 243:6

**wake** [1] - 353:2

**waking** [1] - 353:1

**walk** [11] - 260:23; 261:1, 9, 13; 302:12; 344:7; 358:19; 366:2; 379:15

**walk-in** [6] - 260:23; 261:1, 9, 13; 302:12; 358:19

**walking** [2] - 236:25; 377:11

**wall** [4] - 215:22; 216:15; 219:3; 249:19

**wants** [4] - 217:17; 218:3; 238:10; 307:18

**warn** [1] - 213:21

**warning** [1] - 214:19

**warrant** [11] - 215:11; 246:14, 20; 249:8; 293:13, 17, 21; 294:5; 298:5; 304:21; 313:10

**watch** [3] - 226:23; 237:9, 11

**water** [1] - 377:1

**ways** [2] - 219:10; 369:19

**weapons** [3] - 215:12, 15

**wearing** [1] - 355:14, 18

**web** [25] - 309:2, 13; 316:16, 18; 317:4, 6, 13; 318:3; 319:19; 329:8, 10; 337:17, 19, 22, 25; 338:3, 17-18; 369:21; 370:25; 371:6, 19, 25; 372:5; 373:3

**website** [4] - 358:18, 21; 362:12; 365:1

**Wednesday** [1] - 389:14

**Wedts** [2] - 230:9, 12

**week** [2] - 242:5; 264:13

**weeks** [2] - 229:20; 270:18

**weighed** [1] - 225:1

**weight** [5] - 238:23; 287:18, 22; 300:14; 362:3

**Weiss** [6] - 211:2; 225:16; 227:3-5, 18

**welcome** [2] - 229:13; 369:15

**Western** [38] - 252:4; 350:10; 356:24; 357:1, 7, 18, 24-25; 358:6, 8, 12-13, 16, 21-22; 359:2, 5; 360:2, 6, 8,

11, 15; 362:5, 19; 363:9; 364:7, 9-10, 25; 366:9; 367:1, 6, 24; 368:20, 22; 369:18; 374:25

**wet** [2] - 343:17

**whatsoever** [2] - 237:17; 239:21

**whereby** [1] - 265:14

**white** [2] - 244:15; 249:15

**whole** [1] - 229:1

**WICKER** [1] - 209:20

**wig** [3] - 244:16; 248:21; 249:16

**willingness** [3] - 227:11; 229:21

**wire** [2] - 252:4; 374:16

**wish** [4] - 214:3; 238:11; 239:24; 240:21

**wishes** [3] - 240:5, 14; 252:18

**withdrawn** [23] - 264:3; 268:24; 280:16; 281:1; 289:5; 292:16; 293:16; 302:15; 303:16; 304:5; 316:11; 318:15, 17; 319:25; 320:3; 325:16, 22; 336:18; 357:24; 367:3; 368:21; 376:23; 377:16

**WITNESS** [14] - 258:7, 12; 283:2, 5; 306:12, 22; 329:14, 17; 339:16; 345:8; 356:4, 14; 376:1; 386:8

**witness** [49] - 236:18; 242:12, 20-21; 257:6, 20; 258:2; 262:20; 263:24; 266:3, 8-9, 17; 267:9; 269:1, 21; 270:21; 272:7; 274:12; 282:11, 13, 16, 21; 285:2, 24; 286:25; 293:25; 297:5, 23; 313:5; 339:11; 350:7, 9, 17; 355:20; 356:8, 11; 361:5; 362:4; 363:10; 375:16, 20, 23; 384:20; 388:15, 23

**witness'** [1] - 234:4

**WITNESSES** [1] - 390:2

**witnesses** [14] - 232:19; 234:2, 6; 236:12; 240:4, 6, 18; 250:21; 255:21; 362:8; 386:24; 387:2; 388:21

Case 2:14-cr-00094-JMA   Document 148-1   Filed 06/16/17   Page 74 of 667 PageID #: 1139

**woman** [10] - 243:20, 23-24; 244:2, 4-6; 245:8; 339:22; 342:17

**woman's** [1] - 344:7

**women** [1] - 216:7

**word** [4] - 223:4, 6; 317:4; 331:13

**words** [6] - 234:24; 247:8; 289:16; 345:24; 348:8; 361:8

**works** [1] - 271:7

**world** [4] - 260:3; 273:13; 338:3, 6

**worries** [1] - 343:21

**Worth** [1] - 384:8

**write** [1] - 238:8

**writing** [2] - 346:3; 352:16

**wrote** [1] - 274:1

---

Y

---

**year** [6] - 215:4, 22, 25; 221:21; 246:15

**years** [18] - 215:9; 244:14; 245:12; 248:17; 259:15, 25; 272:1; 283:14; 287:3, 7; 288:11; 289:3; 292:18; 320:8, 15, 18, 21; 337:4

**yesterday** [2] - 271:5, 12

**YORK** [1] - 209:1

**York** [22] - 209:14, 18, 22; 229:14; 245:2; 273:17, 20; 274:2, 4; 275:24; 280:7; 283:16; 292:13; 310:6, 8; 315:23; 323:22; 369:15; 376:16; 381:19

**young** [16] - 243:20, 23, 25; 244:6, 9, 13, 21-22; 245:9, 20; 246:2, 24; 248:15; 251:6; 253:12; 344:9

**yourself** [2] - 322:22; 354:2

**yourselves** [4] - 235:1, 3, 7, 10

---

Z

---

**zipped** [1] - 219:1

393

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------X

UNITED STATES OF AMERICA,    :   14 CR 0094

       v.              :   U.S. Courthouse
                             Central Islip, N.Y.

JOSEPH VALERIO,         :

                           TRANSCRIPT OF TRIAL

            Defendant.   :

                           November 5, 2014

-------------------------------X   9:45 a.m.

BEFORE:

       HONORABLE JOSEPH F. BIANCO, U.S.D.J.
            and a jury


APPEARANCES:

For the Government:   LORETTA E. LYNCH
                  United States Attorney
                  100 Federal Plaza
                  Central Islip, New York 11722
                  By:  AMEET B. KABRAWALA, ESQ.
                      ALLEN BODE, ESQ.
                      Assistants, U.S. Attorney


For the Defendant:   ANTHONY LaPINTA, ESQ.
                  LEONARD LATO, ESQ.
                  35 Arkay Drive - Suite 200
                  Hauppauge, New York 11788


Court Reporter:      HARRY RAPAPORT
                  OWEN M. WICKER
                  United States District Court
                  100 Federal Plaza
                  Central Islip, New York 11722
                  (631) 712-6105


Proceedings recorded by mechanical stenography.
Transcript produced by computer-assisted transcription.

1          M O R N I N G   S E S S I O N

2

3          (Case called.)

4          (Appearances noted.)

5          THE COURT: The jurors are all here.

6          I just wanted to see if there are any issues you

7     wish to address before the jury comes out.

8          The first thing I want to mention with respect

9     to the jury instructions, we started to work on that. And

10    I will ask the government if you can email my clerk a copy

11    of your proposed instructions, and I will ask the defense

12    to do the same.

13         MR. KABRAWALA: We will take care of that, sure.

14         THE COURT: And the defense, are you submitting

15    special instructions or awaiting to see the Court's?

16         MR. LATO: Probably the latter, your Honor.

17         THE COURT: If you have any, try to have it in

18    by tomorrow.

19         MR. LATO: Understood, yes.

20         THE COURT: I wanted to address

21    Government's Exhibit 2. Has the defense had a chance to

22    go through that?

23         MR. LATO: Yes.

24         THE COURT: Are there other objections to other

25    emails in that packet?

1          MR. LaPINTA: No.

2          THE COURT: Okay.

3          The government then can offer Exhibit 2 when the

4     jury comes out.

5          I just wanted to make sure that I understand,

6     other than the ones in Government's Exhibit 2, are there

7     any emails that the government is offering that are on

8     that Cablevision disk? Or is the government --

9          MR. KABRAWALA: Your Honor, there are scores of

10    emails on the Cablevision return that are not on

11    Government's Exhibit 2.

12         THE COURT: I know. But I wanted to have a

13    clear understanding as to which -- which documents on the

14    Cablevision disk of Government's Exhibit 200 are being

15    admitted in evidence.

16         So other than the ones that are reflected in

17    Government's Exhibit 2, are there any other emails on

18    Government's Exhibit 200 that the government wants the

19    jury to have available to them? That is my question.

20    Because there are many irrelevant emails on

21    Government's Exhibit 200; is that right?

22         MR. KABRAWALA: Just to make sure I understand

23    the question, are there more subsets of

24    Government's Exhibit 2 that the government is going to --

25    Government's Exhibit 2 is a packet of emails that Angelini

1     received from Kalichenko.

2          THE COURT: Right.

3          Those are coming into evidence and obviously the

4     correspondence of emails on Government's Exhibit 200 are

5     also coming in evidence.

6          But my question is: Are there any other emails

7     on Government's Exhibit 200 that the government feels are

8     relevant to the case and should be presented to the jury

9     other than the ones that are Government's Exhibit 2?

10         MR. KABRAWALA: Yes, your Honor.

11         There are scores of emails. We have given the

12    defense over a week ago, they are all marked. They all

13    come from the Cablevision return. We will probably go

14    through about 30 or 40 today. The defense were given

15    another set of the same copies pre-marked that we gave

16    them last night, copies of what they had last week.

17         THE COURT: You have another subset of

18    Government's Exhibit 200 that you will present to the

19    jury?

20         MR. KABRAWALA: Yes, Judge.

21         We will walk them through one by one.

22         THE COURT: You say about 30 of them?

23         MR. KABRAWALA: I would say approximately 30 or

24    40 that we will go through today.

25         THE COURT: And some are in

1     Government's Exhibit 2 as well and some are not?

2          MR. KABRAWALA: They are all in

3     Government's Exhibit 2 --

4          MR. BODE: 200.

5          MR. KABRAWALA: No.

6          They are all in Government's Exhibit 2 because

7     Government's Exhibit 2 is really a subset of

8     Government's Exhibit 200.

9          MR. BODE: No.

10         MR. KABRAWALA: In some ways.

11         Judge, so I can clarify, the exhibits we are

12    going to be talking about today, they are only from

13    Government's Exhibit 200. We literally pulled them off

14    the Cablevision return, and we will be walking them

15    through the witness today.

16         MR. LaPINTA: Is that the list of what you gave

17    me yesterday?

18         MR. KABRAWALA: Yes.

19         MR. LaPINTA: Do you have the numbers of each

20    one?

21         MR. KABRAWALA: Yes.

22         They are all separately marked so we can

23    identify them all.

24         THE COURT: Okay.

25         MR. KABRAWALA: What we did is, say there is an

398

1  email from July 7, 2012 that was on the Cablevision
2  return, we pulled the entire email off, marked it
3  separately, and we will mark it and call it a separate
4  exhibit.  And I will make sure from the agent to make it
5  clear that it was actually pulled out of the Cablevision
6  return.
7          THE COURT:  All right.
8          Anything you wish to address, Mr. LaPinta,
9  before the jury comes out?
10         MR. LaPINTA:  Not at this time.
11         THE COURT:  Government?
12         MR. KABRAWALA:  No, Judge.
13         THE COURT:  All right.
14         You will offer Government's Exhibit 2 when they
15 come out?
16         MR. KABRAWALA:  Yes.
17         THE COURT:  And then we will deal with
18 Government's Exhibit 200.
19         MR. KABRAWALA:  We will go through them one by
20 one.  I will ask the witness whether this is an email that
21 was pulled from Cablevision's disk.
22         THE COURT:  You don't have to do it one by one.
23 You can introduce it as a group, and if you need to, you
24 can go through it one by one.  And that would save time.
25         MR. KABRAWALA:  With the Court's permission,

399

1  just to make it easier, is it possible to leave the entire
2  binder of the exhibits on the stand?  And I will
3  eventually go through them on the computer.
4          THE COURT:  Fine.
5          MR. KABRAWALA:  All right.
6          (Whereupon, the jury at this time entered the
7  courtroom.)
8          THE COURT:  Will everyone be seated.
9          Good morning, members of the jury.
10         ALL JURORS:  Good morning.
11         THE COURT:  Nice to see you this morning.  I
12 hope you had a good night.
13         We are ready to proceed with the trial, and I
14 will ask the government to proceed.
15         MR. KABRAWALA:  Before we get started, Judge,
16 the government moves to admit Exhibit 2 in evidence.
17         THE COURT:  Any objection to
18 Government's Exhibit 2?
19         MR. LATO:  No, your Honor.
20         THE COURT:  All right.
21         Government's Exhibit 2 is admitted.
22         (Whereupon, Government's Exhibit 2 was received
23 in evidence.)
24         THE COURT:  So the jury understands, portions of
25 Government's Exhibit 2 were already admitted separately as

400

1  2-B, 2-D, 2-E; is that right?
2          MR. KABRAWALA:  That's correct, Judge.
3          THE COURT:  And now we are admitting
4  Government's Exhibit 2 in its entirety.
5          Go ahead.
6          MR. KABRAWALA:  Thank you.
7          The United States calls Special Agent Steven
8  Troyd.
9          THE CLERK:  Please raise your right hand.
10
11 S T E V E N   T R O Y D,
12         called as a witness, having been first
13         duly sworn, was examined and testified
14         as follows:
15         THE CLERK:  Please state and spell your name for
16 the record.
17         THE WITNESS:  My name is Steven Troyd, first
18 name is S-T-E-V-E-N, last name is spelled T-R-O-Y-D.
19         THE COURT:  Please move closer to the
20 microphone.
21         THE WITNESS:  Yes, sir.
22
23
24
25

Troyd-Direct/Kabrawala

401

1  DIRECT EXAMINATION
2  BY MR. KABRAWALA:
3  Q   Good morning.
4  A   **Good morning.**
5  Q   Where are you employed?
6  A   **I'm employed with the Federal Bureau of**
7  **Investigation.**
8  Q   The FBI?
9  A   **Yes.**
10 Q   What is your job title?
11 A   **I'm a Special Agent.**
12 Q   How long have you been a Special Agent with the FBI?
13 A   **Approximately 20 years.**
14 Q   Are you currently assigned to any particular group or
15 squad or task force?
16 A   **Yes.**
17         **I'm assigned to Squad C41.**
18 Q   Where is that based?
19 A   **Based in Melville, Long Island.**
20 Q   Are you assigned to any particular task forces?
21 A   **Yes.**
22         **C41 consists of the Long Island Child**
23 **Exploitation Task Force, the Long Island Gang Force, and**
24 **the Violent Crimes Major Offender's Program.**
25 Q   And can you please briefly describe what kind of

**402**

1  crimes the Long Island Child Exploitation Task Force

2  investigates?

3  A    **The Long Island Child Exploitation Task Force**

4  **investigates crimes involving child pornography and child**

5  **prostitution.**

6  Q    And were you assigned to this task force in January

7  of this year, 2014?

8  A    **Yes, I was.**

9  Q    Were you also assigned to the task force starting in

10  the fall of last year?

11  A    **Yes.**

12  Q    Now, I want to change gears and ask you whether you

13  participated in an investigation involving an individual

14  named Joseph Valerio?

15  A    **Yes, I have.**

16  Q    And approximately when did you first come -- become

17  involved in the investigation of the defendant?

18  A    **November 8th, 2013.**

19  Q    Without telling us what anyone told you, how did you

20  become involved in the investigation of the defendant?

21  A    **I was contacted by Special Agent Angelini, who was**

22  **working in the LEGAT office in Kiev, Ukraine.  And he**

23  **provided me with copies of emails and a video containing**

24  **child pornography that was sent -- actually the emails**

25  **were sent by Joseph Valerio and the video was provided by**

**403**

1  **a woman named Olena Kalichenko.**

2  Q    You were here yesterday during

3  Special Agent Angelini's testimony, were you not?

4  A    **Yes, I was.**

5  Q    And you heard there was some testimony about

6  searching with respect to Olena Kalichenko's residence or

7  cell phone or computers, do you recall that testimony?

8  A    **Yes, I do.**

9  Q    Now, you were the lead investigator based on Long

10  Island with respect to this investigation, were you not?

11  A    **Yes.  I'm the case agent.**

12  Q    You are the case agent?

13  A    **Yes, sir.**

14  Q    And that means essentially lead investigator?

15  A    **Yes.  The investigation was assigned directly to me.**

16  Q    Did you ever ask in your role as the lead

17  investigator or case agent that Special Agent Angelini

18  obtain some legal process to search Olena Kalichenko's

19  home or places or cell phone or computer?

20  A    **No, I did not do that.**

21  Q    Is there a reason you did not ask

22  Special Agent Angelini to do that?

23        MR. LATO:  Objection.

24        THE COURT:  Why don't you approach.

25

**404**

1        (Whereupon, at this time the following took

2  place at the sidebar.)

3        THE COURT:  What is the answer going to be?

4        MR. KABRAWALA:  It is going to be that

5  Kalichenko was the subject of an investigation and there

6  was an arrest warrant for her, they didn't want to tip her

7  off.  They opened the door to that yesterday --

8        THE COURT:  I just wanted to be sure hearsay

9  will not come out.  I think you opened the door to this.

10        MR. LATO:  I don't know if it was the state of

11  mind.

12        MR. BODE:  We can lead to it if you don't

13  object.

14        THE COURT:  Do you want to have them lead

15  through it?

16        MR. LATO:  The unimportant stuff leading is

17  fine.

18

19        (Whereupon, at this time the following takes

20  place in open court.)

21  Q    Now, I will ask you whether as the lead investigator,

22  whether you had asked Angelini to conduct any searches on

23  Olena Kalichenko's home, computer devices.  And I believe

24  your answer was that you did not; is that correct?

25  A    **That's correct, I did not.**

**405**

1  Q    In your experience -- withdrawn.

2        Is there a reason -- is the reason you didn't do

3  that is because you didn't want to tip off Olena

4  Kalichenko as to your investigation of her?

5  A    **That's correct.**

6  Q    In fact, Olena Kalichenko was the subject of your

7  investigation?

8  A    **Yes, she is.**

9  Q    In fact, she was indicted in the Eastern District of

10  New York?

11  A    **Yes, she was.**

12  Q    And she was arrested ultimately when she got here; is

13  that correct?

14  A    **Yes, she was arrested.**

15  Q    To your knowledge, did the Ukraine have any sort of

16  agreement or extradition agreement whereby a subject of an

17  investigation in the United States could be extradited to

18  the United States?

19        MR. LATO:  Objection.

20        THE COURT:  Sustained.

21  Q    Now, you mentioned Special Agent Angelini provided

22  you with materials, emails and video containing child

23  pornography; is that correct?

24  A    **Yes, that's correct.**

25  Q    And based on your review of the emails what, if

Troyd-Direct/Kabrawala

**406**

1   anything, did you do then?

2   **A**   **After reviewing the emails, I subpoenaed the email**

3   **address from Cablevision.**

4   **Q**   What was the email address?

5   **A**   **Joeval5@optonline.net.**

6   **Q**   Did you ultimately obtain records from Cablevision

7   for that email address?

8   **A**   **Yes, I did.**

9   **Q**   In reviewing the records, did you determine whether

10   there was a physical address associated with the email

11   address joeval5@optonline.net?

12   **A**   **Yes.**

13   **Q**   And what was that address?

14   **A**   **It was 3 High Gate Drive in Smithtown, New York.**

15   **Q**   And with that information and the information that

16   you had on hand, what else did you do next?

17   **A**   **I applied for a search warrant in the Eastern**

18   **District of New York.**

19   **Q**   And was a search warrant issued?

20   **A**   **Yes, it was.**

21   **Q**   Why did you ask for a search warrant?

22   **A**   **Because I needed to conduct further investigation to**

23   **identify if there was in fact child pornography at that**

24   **residence.**

25   **Q**   And when was the search warrant issued?

---

Troyd-Direct/Kabrawala

**407**

1   **A**   **The search warrant was issued on January 27th, 2014.**

2   **Q**   So after obtaining the search warrant from this court

3   in the Eastern District of New York, did there come a time

4   that you actually executed the search warrant on 3 High

5   Gate Drive in Smithtown, New York?

6   **A**   **Yes.  The search warrant was executed on**

7   **January 28th, 2014.**

8   **Q**   January 28th, 2014?

9   **A**   **Yes, sir.**

10   **Q**   And what day of the week was that?

11   **A**   **That was a Tuesday.**

12   **Q**   And as to -- what kind of location is 3 High Gate

13   Drive?

14   **A**   **3 High Gate Drive is a two-story residential building**

15   **in a residential neighborhood in Smithtown, New York.**

16   **Q**   Approximately how many agents or officers were with

17   you that day during the search warrant?

18   **A**   **There were 12 of us.**

19   **Q**   12?

20   **A**   **Yes.**

21   **Q**   At some point did you approach the residence?

22   **A**   **Yes.  At 6:00 a.m. we approached the residence.**

23   **Q**   I know it was January of this year.

24         How were you dressed?

25   **A**   **It was a very cold morning.  I was wearing a raid**

---

Troyd-Direct/Kabrawala

**408**

1   **jacket over my warm winter jacket, as were other agents,**

2   **detectives, who were at the residence.**

3   **Q**   Is it fair to say that the folks with you were

4   similarly dressed?

5   **A**   **Yes.**

6   **Q**   You mentioned a raid jacket.

7         Just for the record, what is that?

8   **A**   **It is the jacket that has the FBI emblem on it to**

9   **identify us to the public.**

10   **Q**   Is there a reason you wear an insignia on your

11   clothes?

12   **A**   **Yes.**

13         **To let people know we are the FBI and that it is**

14   **not something else happening to them when we are**

15   **conducting arrest warrants or search warrants.  It takes**

16   **some of the anxiety out of a situation.**

17   **Q**   And I want you to turn to the binder in front of you

18   that the Judge kindly let us place there.  And I want you

19   to turn to the following exhibits, and they should be all

20   in a row:  300, 300-A, 300-B, 300-C, 300-D.

21   **A**   **I'm at 300.**

22   **Q**   Just look through them, would you.

23         (Whereupon, at this time there was a pause in

24   the proceedings.)

25   **A**   **Okay.**

---

Troyd-Direct/Kabrawala

**409**

1   **Q**   Now, with the exception of 300-A, B, C, D --

2   withdrawn.

3         Referring to Government's Exhibit 300, is that a

4   fair and accurate depiction of the front of the residence

5   on January 28th, 2014?

6   **A**   **Yes.**

7         THE COURT:  You said that was 300-A?

8         MR. KABRAWALA:  That was 300, sir.

9   **Q**   Now, with respect to 300-A through D, and that is

10   300-A, B, C, D, are those fair and accurate depictions of

11   the structure, the residence, 3 High Gate Drive, and I

12   understand they are not taken at the same time, but

13   generally speaking, does it fairly and accurately depict

14   the outside of 3 High Gate Drive?

15   **A**   **Yes.**

16   **Q**   Did you take the pictures?

17   **A**   **Yes, I did.**

18         MR. KABRAWALA:  Judge, I move to admit 300-A, B,

19   C, D.

20         MR. LATO:  No objection.

21         THE COURT:  300-A through D are admitted.

22         (Whereupon, Government's Exhibits 300-A, 300-B,

23   300-C and 300-D were received in evidence.)

24         MR. KABRAWALA:  Your Honor, may I publish those

25   exhibits?

Troyd-Direct/Kabrawala

**410**

1    THE COURT:  Yes.

2    MR. KABRAWALA:  From now on may I continue to

3  publish it assuming they are in evidence?

4    THE COURT:  Yes.  Just note for the record you

5  are publishing which exhibit.  All right?

6    MR. KABRAWALA:  Yes, sir.

7    (Whereupon, at this time there was a pause in

8  the proceedings.)

9    MR. KABRAWALA:  I'm now publishing 300-A.

10    Now I will publish 300-B.

11    300-C.

12    Now, 300-D.

13    (Whereupon, the exhibit/exhibits were published

14  to the jury.)

15  Q    Now, that is the front door of 3 High Gate Drive?

16  A    **Yes, it is.**

17  Q    Tell us what happened when you got to the door.

18  A    **We arrived at the door.  I contacted Mr., Valerio**

19  **while another agent knocked on the door, by telephone.  I**

20  **advised Mr. Valerio we are the FBI and he should come and**

21  **open the door.**

22  Q    Why did you call him?

23  A    **In a case like this I would call someone to let them**

24  **know who it is that is knocking at their door, to take the**

25  **anxiety and stress out of the situation and the**

Troyd-Direct/Kabrawala

**411**

1  **uncertainty.**

2  Q    And you mentioned this was about 6:00 in the morning?

3  A    **Yes.**

4  Q    Did anyone come to the door?

5  A    **Yes.**

6    **Mr. Valerio opened the door.**

7  Q    For the record, do you see the defendant Joseph

8  Valerio sitting in the courtroom today?

9  A    **Yes, I do.**

10  Q    Can you just please point him out by identifying an

11  article of clothing that he is wearing?

12  A    **Mr. Valerio is sitting to my left side in the gray**

13  **suit with the red tie.**

14    MR. KABRAWALA:  For the record, the witness has

15  identified the defendant.

16    THE COURT:  Yes.

17  Q    So what happened then after the defendant opened the

18  door?

19  A    **When Mr. Valerio opened the door, I told him we were**

20  **the FBI.  I explained to him that we were executing a**

21  **search warrant.**

22    **I walked with him to the edge of the hallway,**

23  **and the other members of the team entered the house.**

24  Q    How was the defendant dressed?

25  A    **He was wearing jeans and a T-shirt.**

Troyd-Direct/Kabrawala

**412**

1  Q    Now, do you know where other members of your team

2  went after he opened the door?

3  A    **Yes.**

4    **The other members of my team conducted a**

5  **protective sweep of the house, looking for other people**

6  **that might be hiding or unaware of our presence.**

7  Q    Is that standard practice?

8  A    **Yes.  We usually seize control of the house as part**

9  **of our search warrant.**

10  Q    Was anybody in the house other than the defendant?

11  A    **Yes.**

12  Q    Who was that?

13  A    **Jaramila, J-A-R-A-M-I-L-A, and the last name is**

14  **Berezovska, and I may have some letters at the end of that**

15  **transposed.**

16    MR. KABRAWALA:  We will spell it later.

17    MR. LaPINTA:  B-E-R-E-Z-O-V-S-K-A.

18    MR. KABRAWALA:  First name is J-A-R-M-I-L-A.

19  Q    Does that sound right?

20  A    **Yes.**

21  Q    All right.

22    Did there come a time that you had an

23  opportunity to speak with the defendant on that date,

24  January 28th, 2014?

25  A    **Yes.**

Troyd-Direct/Kabrawala

**413**

1  Q    Where did you speak with him?

2  A    **I spoke to him in the dining room of 3 High Gate**

3  **Drive.**

4  Q    So his dining room?

5  A    **Yes.**

6  Q    And could you please turn to

7  Government's Exhibit 302.

8    (Whereupon, at this time there was a pause in

9  the proceedings.)

10  Q    Do you recognize that picture?

11  A    **Yes, I do.**

12  Q    What is it?

13  A    **A picture of the area we interviewed Mr. Valerio.**

14  Q    The dining room of 3 High Gate Drive?

15  A    **Yes.**

16  Q    A fair and accurate picture of the dining room as you

17  visited on January 28th, 2014

18  A    **Yes.**

19    MR. KABRAWALA:  The government moves to admit.

20    MR. LaPINTA:  No objection.

21    THE COURT:  Government's Exhibit 302 is

22  admitted.

23    (Whereupon, Government's Exhibit 302 was

24  received in evidence.)

25    MR. KABRAWALA:  I'm now publishing

Troyd-Direct/Kabrawala

414

1  Government's Exhibit 302.

2          (Whereupon, the exhibit/exhibits were published

3  to the jury.)

4  Q    I want to talk about the room briefly.

5          You said this was a fair and accurate depiction

6  of the dining room itself.

7          Anybody else in the dining room with you other

8  than the defendant?

9  A    Yes.

10  Q   And would you please briefly describe where folks

11  were and who they were.

12  A   Yes.

13          I was seated on the far side of the table in

14  front of the curio cabinet.

15          Across from me is a chair with the jacket on it

16  was Detective Rory Forrestal.

17  Q   Just for the record, in the foreground there appears

18  to be two chairs, one on the right of the picture that has

19  what appears to be a jacket on it.

20          That is where Detective Rory Forrestal was

21  sitting?

22  A   Yes.

23  Q   And across from that there appears to be another set

24  of two chairs on the right-hand side.  And there is a

25  jacket on it, that is where you were sitting?

Troyd-Direct/Kabrawala

415

1  A   Yes.

2  Q   And was there anybody else in the room?

3  A   Yes.

4  Q   Who is that?

5  A   Special Agent Danielle Messineo, M-E-S-S-I-N-E-O.

6  She was seated to the left of Rory Forrestal closer to me

7  here.

8  Q   In the foreground on the chair in the left is where

9  Special Agent Danielle Messineo was seated?

10  A   Yes.

11  Q   Anybody else seated in the dining room?

12  A   Not seated, no.

13  Q   Was there anybody else there?

14  A   Yes.

15  Q   Who else?

16  A   Detective Badalucco with the Nassau County Police

17  Department.

18  Q   Where do you say Detective Badalucco was?

19  A   Standing by the chair out of the room, but closer to

20  Danielle Messineo here.

21  Q   And essentially to the left-hand side foreground area

22  of the chair?

23  A   Yes, correct.

24  Q   And was the defendant in the room?

25  A   Yes, he was.

Troyd-Direct/Kabrawala

416

1  Q   Where was he seated or standing?

2  A   He was seated at the head of the table, the

3  right-hand side.

4  Q   So it appears there is a chair on the right-hand side

5  of the table -- that there is a chair on the right-hand

6  side of the photograph, and it is what we refer to as the

7  head of the table.  Is that where the defendant was

8  sitting?

9  A   That's correct.

10  Q   Anybody standing behind him?

11  A   No.

12  Q   Anybody entering or leaving the room on a regular

13  basis?

14  A   No.

15  Q   Did there come a time you spoke to him?

16  A   Yes.

17  Q   And what if anything did the defendant admit during

18  that time?

19  A   I spoke to Mr. Valerio, and I explained to him we

20  were executing a search warrant on his residence, looking

21  for evidence of child pornography.

22          Mr. Valerio then advised me that he was actually

23  being extorted, that he had a relationship with a woman

24  named Olena Kalichenko, a Ukrainian woman he had met on

25  line.  He had -- the relationship had gone bad and she had

Troyd-Direct/Kabrawala

417

1  contacted him on a chat app called Viber.  And she was

2  telling him that he needed to negotiate or she was going

3  to expose him to the police.

4  Q   He claimed he was being extorted?

5  A   Yes.

6  Q   Did he tell you whether he told anyone about this

7  purported extortion?

8  A   Yes, he did.

9  Q   Can you briefly describe what the defendant said?

10  A   He said that he had gone and spoken to a lawyer named

11  Anthony LaPinta about this extortion attempt.

12  Q   Did the defendant ask to speak to attorney Anthony

13  LaPinta at that time?

14  A   No, he did not.

15  Q   Did the defendant ask to speak with any lawyer at

16  that time?

17  A   No, he did not.

18  Q   During the meeting with the defendant did you show

19  him anything?

20  A   Yes, I did.

21  Q   What did you show him?

22  A   I showed him an email and read him an excerpt from

23  it.

24  Q   I want you to turn to Government's Exhibit 303, it

25  should be the very next one.

Troyd-Direct/Kabrawala

418

1    Q    Do you see it?

2    A    Yes.

3    Q    Is that a true and correct copy of the email you just

4    referred to in your testimony?

5    A    Yes, it is.

6        MR. KABRAWALA:  The government moves to admit.

7        MR. LATO:  No objection.

8        THE COURT:  303 is admitted.

9        (Whereupon, Government's Exhibit 303 was

10   received in evidence.)

11       MR. KABRAWALA:  I will publish it.

12       (At this time a document was exhibited on

13   courtroom screen.)

14   Q    Would you describe what the message information is,

15   the from and the to and also the details.

16   A    Certainly.

17       The from portion of the email says Joe Valerio,

18   from joeval5@optonline.net, sent Sunday, July 22, 2012, at

19   10:28 p.m., to kalichenkoes@mail.ru.

20       The subject being forward, reference forward --

21   excuse me, forward, return forward.  Where's █████████

22   information and the other stuff and ████████████████

23   Q    You said you read a particular portion of the email.

24   Would you describe which portion you read to the defendant

25   during the interview with him in the dining room?

Troyd-Direct/Kabrawala

419

1    A    On the second page, the second paragraph.

2    Q    Okay.

3        Why don't you read aloud the portion that you

4    read for the defendant on that day.

5    A    I was actually able to see some girls come in their

6    pantyhose.  Speaking of which I want video of you and

7    ██████.  Get her to play or eat, just eat your pussy.

8    Q    Now, after you read that portion to the defendant,

9    what, if anything, did the defendant say?

10   A    I asked the defendant if he sent this email.

11       He said, yes, this was his email.

12       He further indicated that he had directed Olena

13   Kalichenko to produce child pornography, and that he had

14   in fact received that child pornography in the emails.

15   Q    Did the defendant say who was depicted in the email

16   that he received?

17   A    Yes.

18   Q    Who is that?

19   A    That was Olena Kalichenko and her daughter.

20   Q    Did the defendant admit to anything else aside from

21   admitting that he had directed the production of child

22   pornography and received it by email?

23   A    Yes.

24       I asked him if he received any disks via DHL.

25       He responded he had in fact received a package.

Troyd-Direct/Kabrawala

420

1    It did not contain a disk.  It only contained bubble wrap,

2    and he received it from Olena Kalichenko.

3    Q    He claimed the package that was sent by DHL -- DHL is

4    a courier like FedEx.

5    A    Yes.  Similar to UPS or FedEx.

6    Q    All right.

7        He claimed that he received the FedEx -- the DHL

8    from Olena Kalichenko and it only contained bubble wrap?

9    A    That's correct.

10   Q    Did there come a time you provided the defendant with

11   what is commonly referred to as the Miranda warnings?

12   A    Yes.

13   Q    And I want you to take a look at

14   Government's Exhibit 304.

15   A    Yes.

16   Q    Do you recognize that document?

17   A    Yes.

18   Q    What is it?

19   A    An advice of rights form commonly referred as FD 395.

20   Q    It is a standard form that you carry around with the

21   FBI?

22   A    Yes.

23   Q    And it is a form that essentially contains the

24   Miranda warnings, is that fair to say?

25   A    Yes.

Troyd-Direct/Kabrawala

421

1    Q    Is that a true and correct copy of the Miranda

2    warnings form that you read out to the defendant and

3    provided him in that dining room on January 28th, 2014?

4    A    Yes.

5        MR. KABRAWALA:  Move to admit, Judge.

6        MR. LATO:  No objection.

7        THE COURT:  304 is admitted.

8        (Whereupon, Government's Exhibit 304 was

9    received in evidence.)

10       MR. KABRAWALA:  I will now publish

11   Government's Exhibit 304.

12       (At this time a document was exhibited on

13   courtroom screen.)

14   Q    I want you to describe the form, and why don't you go

15   ahead and read the entire form aloud.  It is pretty short.

16   A    The entire form is advice of rights.  In the upper

17   right-hand corner it says place:  Smithtown, New York.

18       Date, January 28th, 2014.

19       Time is blank.

20       The subtitle is, your rights.

21       Then it goes to say, before we ask you any

22   questions, you must understand your rights.

23       You have the right to remain silent.

24       Anything you say can be used against you in

25   court.

Troyd-Direct/Kabrawala

422

1    You have the right to talk to a lawyer for
2  advice before we ask you any questions.
3    You have the right to have a lawyer with you
4  during questioning.
5    You -- if you cannot afford a lawyer, one will
6  be appointed for you before any questioning, if you wish.
7    If you decide to answer questions now without a
8  lawyer present, you have the right to stop answering at
9  any time.
10    I have read this statement of my rights and I
11  understand what my rights are.  At this time I am willing
12  to answer questions without a lawyer present.
13    Below is a line that says, signed.
14    It is signed by Mr. Valerio.
15    Witnessed by myself, and witnessed by Rory
16  Forrestal.
17    The time of the witnessing is at 7:55 a.m.
18  Q   After the defendant signed this form and indicated he
19  wanted to waive his rights, was he shown anything else?
20  A   Yes.  I showed him two emails which he then read.
21  Q   Do you recall the date of the emails that you showed
22  the defendant?
23  A   Yes, one was July 2nd, 2012 and the other was
24  July 17th, 2012.
25  Q   Now, I know you already testified about a July 17th,

Troyd-Direct/Kabrawala

423

1  2012 email that we actually published as
2  Government's Exhibit 303.
3    Is that the same email you showed him --
4  withdrawn.
5    You just testified about an email dated
6  July 17th, 2012 that was entered into evidence as
7  Government's Exhibit 303.
8    Is that the same email you showed the defendant
9  after you Mirandized him?
10  A   Yes.
11  Q   And did you show him another email as well, July 22,
12  2012 email?
13  A   Yes, I did.
14  Q   And you said you gave the defendant an opportunity to
15  read the entire email; is that correct?
16  A   That's correct.
17  Q   And based on your observation of the defendant, did
18  he appear to read both of them?
19  A   Yes, he did.
20  Q   I want you to look at Government's Exhibit 303-A.
21  A   Yes.
22  Q   Do you recognize that document?
23  A   Yes, I do.
24    It is an email from Joseph Valerio to Olena
25  Kalichenko.

Troyd-Direct/Kabrawala

424

1  Q   Is that one of the emails you obtained from
2  Special Agent Angelini by way of Kalichenko?
3  A   Yes, it is.
4  Q   And that is how you had it with you that day?
5  A   Yes, correct.
6  Q   And is that Exhibit 303-A a true and correct copy of
7  the exact email that you showed the defendant and that he
8  read on January 28th, 2014?
9  A   Yes, it is.
10    MR. KABRAWALA:  The government moves to admit.
11    MR. LATO:  No objection.
12    THE COURT:  303-A, admitted.
13    (Whereupon, Government's Exhibit 303-A was
14  received in evidence.)
15    MR. KABRAWALA:  I'm now publishing
16  Government's Exhibit 303-A.
17    (At this time a document was exhibited on
18  courtroom screen.)
19  Q   I will scroll down to the middle where it says -- do
20  you see where I'm pointing the cursor?
21  A   Yes.
22  Q   Is it fair to say that that email was sent from Olena
23  Kalichenko's email address to Peter Angelini at the FBI?
24  A   Yes, it was.
25  Q   And it was forwarded on or about -- on November 8th,

Troyd-Direct/Kabrawala

425

1  2013?
2  A   Yes.
3  Q   Now, I want you to look just below that at the
4  original message.
5    Who is it from?
6  A   This message is from Joe Valerio at
7  joeval5@optonline.net dated July 17th, 2012, to
8  kalichenkoes@mail.ru.
9    The subject is forward Anna's passport.
10  Q   All right.
11    This will probably sound familiar because you
12  were in the courtroom yesterday.
13    I want you to read aloud from Helena to where
14  the words pantry, exclamation mark.
15  A   Helena, how are you doing?
16    I'm glad you are safe in Kiev, and I had sent
17  you a text message earlier today.  Did you get that?
18    I got your videos which were very delicious.  I
19  just didn't see the rooms and bedroom, especially when you
20  stood in Turkey.  Not a problem.  I'm trusting that you
21  were clean in Turkey.
22    Remember, it is the man that delivers the
23  disease and the woman harbors and carries and stores the
24  disease, like food in the pantry.
25  Q   I will scroll down, and you can follow along with me.

1    I just want you to read from the beginning of

2   the next paragraph, starting with, the videos you sent by

3   cell phone camera are perfect, all the way down to -- stop

4   when you get to, instruct you to do it.

5   **A   Down to instruct you how to do it?**

6   Q   On the next page -- yes, I misspoke.

7   **A   The videos you sent by cell phone camera are perfect**

8   **and there is no need for the expense of another camera**

9   **when you have done a terrific job with the cell phone**

10  **camera.  I have a new cell phone which allows me to**

11  **transfer your video to my email and the screen is bigger**

12  **to view.  Plus, you can have endless video time per**

13  **session with a cell phone camera.  As far as the script,**

14  **do the same with our little ████s delicious little**

15  **pussy, you know, in the tub, the way you would eat her so**

16  **sweet, of course, pantyhose and tights as you two dance,**

17  **place toys inside your pussy, and have our little ████**

18  **pull them out of your wet pussy, emmm.  Tell me how you**

19  **love when you eat her little pussy and how wet your pussy**

20  **was, correct.**

21  **I told you how I can't wait to make hard love to**

22  **you as you eat our little ████ delicious little pussy.**

23  **I can't wait to try it, too.  So no worries about a six to**

24  **thirteen hundred dollar camera.**

25  **I will send you some cash Tuesday eve for the**

1   **time that you make videos with████, times at the pool**

2   **showers and dressing rooms, etcetera.  Buy your mom a**

3   **special gift and little ████ a big toy, doll or clothes.**

4   **I can't wait to see you as well in Miami.  Yes,**

5   **absolutely.  Our plans are on schedule for the end of July**

6   **with the gratitude of your visa.**

7   **The day before you do the videos at the pool,**

8   **dressing, then with████ let me know and I will**

9   **instruct you how to do it.**

10  Q   You testified you gave the defendant an opportunity

11  to read the emails, and he apparently had read them?

12  **A   Yes, he did.**

13  Q   Did the defendant admit sending that email?

14  **A   Sorry, what was that?**

15  Q   Did the defendant admit sending that email?

16  **A   Yes, he admitted to sending both the emails.**

17  Q   By both the emails, you mean the emails sent on

18  July 17th, 2012, and the one you just read out loud, the

19  portions from July 22, 2012?

20  **A   Yes.**

21  **I just -- the July 17th email.**

22  Q   But he admitted --

23  **A   He admitted to having sent both the July 17th and the**

24  **July 22 emails.**

25  Q   Did the defendant say why he wanted the videos?

1   **A   Yes.**

2   **He stated he had sent Olena Kalichenko thousands**

3   **of dollars, and that he wanted something in return for all**

4   **his money.**

5   **He also stated that he had provided her with**

6   **cash for an airline ticket which she had kept and never**

7   **purchased the ticket.**

8   Q   And he wanted something in return?

9   **A   He wanted something in return for the money he had**

10  **given her, the thousands of dollars.**

11  Q   After the defendant admitted to sending the email,

12  did you show him anything else?

13  **A   Yes.**

14  Q   What did you show him?

15  **A   I showed him a clip of the video that was sent to me**

16  **by Special Agent Angelini that he had received from Olena**

17  **Kalichenko.**

18  Q   So Special Agent Angelini sent you a disk with a

19  video on it?

20  **A   Yes.**

21  Q   A fairly lengthy video; is that fair to say?

22  **A   Yes.**

23  Q   And I'm not talking about the clip of the video, but

24  generally speaking -- withdrawn.

25  Did you view the entire video?

1   **A   Yes, I did.**

2   Q   Can you briefly describe what is on the video?

3   **A   There are sexually explicit scenes between Olena**

4   **Kalichenko and her daughter, where she is touching her**

5   **daughter's genitals and the daughter touching hers, and**

6   **there is the use of objects on Ms. Kalichenko that are**

7   **also touched by the child.  There is dancing and oral to**

8   **vaginal contact between the mother and the child.**

9   Q   Did you show the defendant the entire video?

10  **A   No, I did not.**

11  Q   Did you show him a clip?

12  **A   I showed him the clip that had very little sexual**

13  **explicit material in it for identification purposes only.**

14  Q   You just showed him a portion so he could identify

15  who was in the video, but you didn't show him actually any

16  oral to genital contact at that time?

17  **A   That's correct.**

18  Q   Take a look at Government's Exhibit 1-C.

19  MR. KABRAWALA:  May I approach, Judge?

20  THE COURT:  Yes.

21  (Counsel approaches the witness stand.)

22  Q   1-C.

23  It is a disk?

24  **A   Yes.**

25  Q   What is on the disk?

Troyd-Direct/Kabrawala

430

1  A   This is the segment that I showed Mr. Valerio.
2  Q   How do you know that that disk is the portion that
3  you showed Mr. Valerio?
4  A   Because it is initialed and signed by me -- I mean,
5  initialed and dated by me.
6  Q   And did you review the disk before coming to court
7  today?
8  A   Yes.
9  Q   And you initialed it with your initials on there?
10 A   Yes.
11 Q   Is that a true and correct copy of the clip portion
12 that you showed the defendant on January 28th, 2014?
13 A   Yes, it is.
14         MR. KABRAWALA:  The government moves to admit
15 Exhibit 1-C.
16         MR. LATO:  No objection.
17         THE COURT: 1-C is admitted.
18         (Whereupon, Government's Exhibit 1-C was
19 received in evidence.)
20 Q   What I will do is play the clip.
21         And this is not of a sexual nature?
22 A   It is the least sexual nature of the material.
23 Q   And you played it just for identification?
24 A   That's correct.
25         (Video viewed.)

Troyd-Direct/Kabrawala

431

1  Q   After you showed the clip to the defendant, what, if
2  anything, did he say?
3  A   He said he recognized Olena Kalichenko and the child.
4  But he did not recognize the background and he did not
5  believe he had seen this clip because that background did
6  not match the background in other videos he had seen.
7  Q   He recognized the two people in it?
8  A   Yes, he did.
9  Q   But he claimed not to have seen this particular video
10 because he didn't recognize the background?
11 A   That's correct.  It did not match the background of
12 previous videos he had viewed that was sent to him by
13 Olena Kalichenko.
14 Q   I want to turn your attention to the search itself.
15         You testified that you and your team was there
16 to execute the search warrant; is that fair to say?
17 A   Yes.
18 Q   And during that time the defendant spoke with you,
19 but there was a search going on?
20 A   Yes, there was.
21 Q   I want you to take a look at
22 Government's Exhibit 305.
23         Do you see it?
24 A   Yes.
25 Q   Do you recognize that picture?

Troyd-Direct/Kabrawala

432

1  A   Yes.
2  Q   Generally speaking, what is it a picture of?
3  A   This is a picture of the desk area in a second floor
4  bedroom that was being used as an office.
5         On the desk is a computer hard drive and screen.
6  Q   You saw that area; is that fair to say?
7  A   Yes.
8  Q   Does that picture, Government's Exhibit 305, fairly
9  and accurately depict the condition of what is depicted in
10 it as it existed on January 28th, 2014?
11 A   Yes, it does.
12         MR. KABRAWALA:  We move to admit, Judge.
13         MR. LATO:  No objection.
14         THE COURT:  305 is admitted.
15         (Whereupon, Government's Exhibit 305 was
16 received in evidence.)
17         MR. KABRAWALA:  I'm now publishing
18 Government's Exhibit 305.
19         (At this time a document was exhibited on
20 courtroom screen.)
21 Q   Did you seize any computers from that room?  If so,
22 point it out and describe it.
23 A   Yes.  We seized the computer hard drive located to
24 the right of the computer screen and next to a speaker,
25 and to the left of the lamp in the corner.

Troyd-Direct/Kabrawala

433

1  Q   When you say computer hard drive, do you mean
2  actually computer tower?
3  A   Yes, the tower.
4  Q   I want you to take a look at that.
5         (Handed to the witness.)
6         MR. KABRAWALA:  For the record, that is
7  Government's Exhibit 400.
8  Q   Do you recognize Government's Exhibit 400?
9  A   Yes, I do.
10 Q   What is it?
11 A   The computer tower seized from the second floor of
12 3 High Gate Drive on the date of --
13 Q   Did you seize it?
14 A   Yes.
15         MR. KABRAWALA:  The government moves to admit
16 Government's Exhibit 400, the tower computer in front of
17 the witness.
18         THE COURT:  Any objection?
19         MR. LATO:  No objection.
20         THE COURT:  Government's Exhibit 400 is
21 admitted.
22         (Whereupon, Government's Exhibit 400 was
23 received in evidence.)
24 Q   I will move it away from you so it doesn't obstruct
25 you.

Troyd-Direct/Kabrawala

434

1    I'm handing you what is marked as
2  Government's Exhibit 405 in a little plastic baggie, and
3  Government's Exhibit 402, a cell phone.
4    Were those two items seized from the defendant's
5  house pursuant to the search warrant on January 28th,
6  2014?
7  **A    Yes, they were.**
8    MR. KABRAWALA:  The government moves to admit
9  Exhibits 405 and 402.
10    MR. LATO:  No objection.
11    THE COURT:  They are admitted.
12    (Whereupon, Government's Exhibits 402 and 405
13  were received in evidence.)
14  **Q**  Now, was somebody tasked -- that is, was it their
15  task -- to forensically analyze the computer you were just
16  shown as Government's Exhibit 400, the cell phone and the
17  SD memory card that are sitting in front of you?
18  **A    Yes.**
19  **Q**  And who was that person?
20  **A    Detective Rory Forrestal from the Suffolk County**
21  **Police Department.**
22  **Q**  Did there come a time that you were shown images and
23  videos that were recovered from the computer,
24  Government's Exhibit 400, the hard drive from that
25  computer, and images recovered from the SD memory card,

Troyd-Direct/Kabrawala

435

1  Government's Exhibit 405?
2  **A    Yes, there were.**
3  **    (Handed to the witness.)**
4    MR. KABRAWALA:  The defense has a copy, your
5  Honor.
6  **Q**  Would you take a look at that.
7    Now, the government --
8    MR. KABRAWALA:  The government is not admitting
9  these at this time.  They are simply for identification.
10  And I will read out a number of exhibit numbers.
11    Exhibits 508, 509, 510, 511, 515, 516, 518, 519,
12  520, 521, 522, 523, 524, 525, 526, 528, 530, 532, 533,
13  534, 535, 536, 537, 538 and 539.
14    (Whereupon, at this time there was a pause in
15  the proceedings.)
16  **Q**  Now, do you recognize those exhibits, those images?
17  **A    Yes, I do.**
18  **Q**  How did you first come to see those images?
19  **A    I was provided with the pictures by Detective Rory**
20  **Forrestal.**
21  **Q**  Is that after he evaluated the computer items that
22  you just discussed?
23  **A    Yes.**
24  **Q**  At the time you saw those exhibits that are in front
25  of you, did you recognize the face of the child that is

Troyd-Direct/Kabrawala

436

1  depicted in some of the images?
2  **A    Yes, I did.**
3  **Q**  Without saying the child's last name, who did you
4  recognize the child to be?
5  **A    I recognized her as ████, Mr. Valerio's ████.**
6  **Q**  How did you know that the girl depicted in some of
7  the images was the defendant's ████?
8  **A    In the course of my investigation I had come across**
9  **pictures of her at various locations.**
10    **I had also seen her at one point in my**
11  **investigation.**
12  **Q**  Take a look at Government's Exhibit 307.
13  **A    Yes.**
14  **Q**  Do you see it?
15  **A    Yes, I do.**
16  **Q**  What is it?
17  **A    This is part of the basement of 3 High Gate Drive**
18  **with a couch, a leather type chair, a closet area above**
19  **the couch, and some storage space on the wall, some**
20  **shelving.**
21  **Q**  Is that a fair and accurate depiction of the portion
22  of the basement depicted as it existed on January 28th,
23  2014?
24  **A    Yes.**
25    MR. KABRAWALA:  The government moves to admit.

Troyd-Direct/Kabrawala

437

1    MR. LATO:  No objection.
2    THE COURT:  307 is admitted.
3    (Whereupon, Government's Exhibit 307 was
4  received in evidence.)
5    MR. KABRAWALA:  I'm now publishing
6  Government's Exhibit 307.
7    (At this time a document was exhibited on
8  courtroom screen.)
9  **Q**  You testified you see a sofa and a recliner type
10  chair; is that fair to say?
11  **A    Yes.**
12  **Q**  And there is some kind of wooden closet door or crawl
13  space type thing up here, and I'm pointing to essentially
14  the center of the picture of the Exhibit 307.
15    Fair to say?
16  **A    Yes, above the couch.**
17  **Q**  Did you recognize those things in the pictures that
18  you identified of the defendant's ████?
19  **A    Yes, I did.**
20  **Q**  Would you please briefly describe what you are
21  talking about.
22  **A    In the pictures of ████, we observed the couch, the**
23  **leather chair, that closet that is partially depicted in**
24  **one of the photos.  And in particular the design on the**
25  **pillow cushions is very distinct.**

Troyd-Direct/Kabrawala

438

1  Q   So it is fair to say you recognized some of the items
2  depicted in the picture that you observed during the
3  search warrant in some of the pictures of the defendant's
4  home?
5  A   That's correct.
6  Q   And with that information did you -- what, if
7  anything, did you do?
8  A   I obtained a search warrant from the Eastern District
9  of New York.
10 Q   Before you obtained the search warrant, I want to
11 draw your attention to February 24th of this year.
12 A   Yes.
13 Q   Did there come a time that you arrested the defendant
14 for a second time?
15 A   Yes, I did.
16 Q   And on that date when you arrested the defendant for
17 a second time, was it in relation to anything in
18 particular?
19 A   Yes.
20     It was in relation to the discovery of these
21 additional photographs from the search warrant on
22 January 28th.
23 Q   So this search warrant -- there were images recovered
24 from the forensic analysis, and you observed those images;
25 is that fair to say?

Troyd-Direct/Kabrawala

439

1  A   Yes, that's correct.
2  Q   And that led you to the second arrest, is that fair
3  to say?
4  A   That's correct.
5  Q   Now, at the time that you arrested the defendant for
6  the second time, as you did for the first time, did you
7  provide the defendant with the Miranda warnings?
8  A   Yes, I did.
9  Q   Take a look at Government's Exhibit 308.
10 A   Yes.
11 Q   What is this form?
12 A   This is the FD 395, the advice of rights form
13 executed on February 24th, 2014.
14 Q   Is it a true and correct copy of the FD -- withdrawn.
15     Is it a true and correct copy of the advice of
16 rights form that you provided the defendant on
17 February 24th, 2014?
18 A   Yes, it is.
19     MR. KABRAWALA:  Move to admit.
20     MR. LaPINTA:  No objection.
21     THE COURT:  308 is admitted.
22     (Whereupon, Government's Exhibit 308 was
23 received in evidence.)
24     MR. KABRAWALA:  I will publish it now.
25     (At this time a document was exhibited on

Troyd-Direct/Kabrawala

440

1  courtroom screen.)
2  Q   Is it fair to say it is the standard form, and
3  exactly the same as the -- other than what is filled in,
4  it is exactly the same as the other form that you earlier
5  described?
6  A   Yes, it is.
7  Q   There is no need to read it aloud then.
8      But why don't you tell us and describe for the
9  record the portions actually filled in.
10 A   On the top right-hand corner it says place, Melville,
11 New York.
12     Date, February 24th, 2014.
13     Time, 3:35 p.m.
14     At the bottom right-hand side where it is signed
15 by Joseph Valerio, it is witnessed by myself on the left
16 side, and Danielle Messineo.
17 Q   Now, at some point after Mirandizing the defendant,
18 providing him the rights in the rights of -- advice of
19 rights form, did you tell the defendant -- withdrawn.
20     After advising the defendant of his rights on
21 that date, the defendant -- did the defendant ask you why
22 he was being re-arrested?
23 A   Yes, he did.
24 Q   Did you tell him?
25 A   Yes, I did.

Troyd-Direct/Kabrawala

441

1  Q   What did you tell him?
2  A   I told him that the search warrant on January 28th, I
3  discovered pictures of his ████.
4  Q   What if anything did the defendant say in response to
5  this?
6  A   He said, I no longer have a family.  I want to kill
7  myself.
8  Q   I would like to draw your attention to the very next
9  day, February 25th, 2014.
10     You mentioned earlier that you obtained another
11 search warrant.
12     Is that the date you obtained the other search
13 warrant?
14 A   Yes, it is.
15 Q   The same search warrant for the same premises, 3 High
16 Gate Drive, Smithtown, New York?
17 A   Yes, it is.
18 Q   And you testified that this court, the Eastern
19 District of New York, issued the search warrant?
20 A   Yes.
21 Q   And --
22 A   It was issued by Magistrate Judge Gary Brown.
23 Q   Why did you get another search warrant?
24 A   Because we had seen items in those photos during the
25 January 28th search warrant that we did not seize because

Troyd-Direct/Kabrawala

442

1  at that time we didn't see their relevance.  And we wanted
2  to go in and acquire those items as evidence at that time.
3  Q   I want to show you -- actually it is in front of you,
4  but take a look at Government's Exhibit 320.
5  A   Yes.
6  Q   What is that a picture of?
7  A   That is a picture of the love seat that is part of
8  the couch in the basement of 3 High Gate Drive.  On there
9  are two pillows that have the distinct design that I
10  observed in one of the photos of his ███.
11  Q   And the photograph depicted in Exhibit 320, is that a
12  fair and accurate depiction of the sofa with the pillows
13  on February 25th, 2014?
14  A   Yes.
15      MR. KABRAWALA:  The government moves to admit.
16      MR. LATO:  No objection.
17      THE COURT:  320 is admitted.
18      (Whereupon, Government's Exhibit 320 was
19  received in evidence.)
20      MR. KABRAWALA:  I'm now publishing
21  Government's Exhibit 320.
22      (At this time a document was exhibited on
23  courtroom screen.)
24  Q   What I will do is come over with
25  Government's Exhibit 334 and 334-A and 334-B.

Troyd-Direct/Kabrawala

443

1      (Handed to the witness.)
2  Q   Do you recognize those?
3  A   Yes.
4      These were the pillows in the basement of 3 High
5  Gate Drive which were part of that couch.
6  Q   Did you seize those on February 25th, 2014 from the
7  defendant's residence at 3 High Gate Drive?
8  A   Yes, I did.
9      MR. KABRAWALA:  The government moves to admit.
10      MR. LATO:  No objection.
11      THE COURT:  334 to 3 -- and 334-A and B are
12  admitted.
13      (Whereupon, Government's Exhibits 334, 334-A and
14  334-B were received in evidence.)
15  Q   Take a look at Government's Exhibit 309, please.
16  A   Yes.
17  Q   Was that picture taken on February 25th, 2014 at the
18  defendant's residence at 3 High Gate Drive?
19  A   Yes, it was.
20  Q   Is it a fair and accurate depiction of a portion of
21  that house on that date?
22  A   Yes, it is.
23      MR. KABRAWALA:  The government moves to admit.
24      MR. LATO:  No objection.
25      THE COURT:  309 is admitted.

Troyd-Direct/Kabrawala

444

1      MR. KABRAWALA:  Publishing.
2      (Whereupon, Government's Exhibit 309 was
3  received in evidence.)
4      (At this time a document was exhibited on
5  courtroom screen.)
6  Q   What do you see in that picture that is of relevance?
7  A   The blue Spiderman ball.
8  Q   For the record, where is that?  What are you looking
9  at?
10  A   This is a closet in the basement.
11  Q   Now I will show you Government's Exhibit 332.
12      (Handed to the witness.)
13  Q   How does that exhibit relate to
14  Government's Exhibit 309?
15  A   This is the blue Spiderman ball depicted in the
16  photograph.
17  Q   All right.
18      Did you seize the ball that you are holding?
19  A   Yes.
20      MR. KABRAWALA:  Move to admit.
21      MR. LATO:  No objection.
22      THE COURT:  332 is admitted.
23      (Whereupon, Government's Exhibit 332 was
24  received in evidence.)
25  Q   I will show you what is marked as

Troyd-Direct/Kabrawala

445

1  Government's Exhibit 313.
2      (Handed to the witness.)
3  A   Yes.
4  Q   What is that a picture of, and when was it taken?
5  A   This is a picture of a Nerf gun taken in the basement
6  of 3 High Gate Drive.
7  Q   On the date of the search warrant, the second search
8  warrant?
9  A   Yes, sir.
10      MR. KABRAWALA:  The government moves to admit.
11      MR. LATO:  No objection.
12      THE COURT:  313 is admitted.
13      (Whereupon, Government's Exhibit 313 was
14  received in evidence.)
15      MR. KABRAWALA:  Publishing.
16      (At this time a document was exhibited on
17  courtroom screen.)
18  Q   Where is that picture taken?
19  A   In the basement of 3 High Gate Drive.
20  Q   Showing you Government's Exhibit 333.
21      (Handed to the witness.)
22  Q   Tell me how that object, Government's Exhibit 333,
23  relates to the picture, Government's Exhibit 313.
24  A   This is the same object that is depicted in the
25  photograph.

Troyd-Direct/Kabrawala

**446**

1  Q   The Nerf gun?
2  A   **Nerf gun.**
3        MR. KABRAWALA:  The government moves to admit.
4        MR. LATO:  No objection.
5        THE COURT:  313 is admitted.
6        (Whereupon, Government's Exhibit 313 was
7  received in evidence.)
8  Q   I want you to flip through the images of the child
9  that you identified.
10       Just for the record, can you say whether you see
11 this Nerf gun in any of those pictures.
12       Let me withdraw the question and do the ball
13 first.
14       Government's Exhibit 332, do you see this ball
15 in any of the pictures?
16 A   **Yes, I do.**
17 Q   For the record, which exhibits do you see it in?
18 A   **This is in Exhibit 511, which depicts Mr. Valerio's**
19 **███ sitting on the couch or sofa with one of the pillows**
20 **that were seized.**
21 Q   This one here?
22 A   **Yes, sir.**
23       **And next to her on the couch is that blue**
24 **Spiderman ball.**
25 Q   Was she doing anything with the ball?

Troyd-Direct/Kabrawala

**447**

1  A   **In this picture she is just leaning on it.**
2  Q   Leaning on it?
3  A   **Yes.**
4  Q   And do you see the ball anywhere else, in any of the
5  other pictures?
6        THE COURT:  What other exhibit are you holding
7  up?
8        MR. KABRAWALA:  Judge, it is 334.
9  A   **There is a picture in 532.  She is sitting on the**
10 **same sofa, and it is a wider angle photo, where she is**
11 **sitting with a blanket on her legs, and the pillows in the**
12 **same location as it is in the previous photo.**
13       **Those are the only two that I have.**
14 Q   Would you take a look at Government Exhibit 321 --
15 321.
16 A   **I think I'm missing Exhibit 321.**
17       **(Handed to the witness.)**
18 Q   Do you recognize that picture?
19 A   **Yes, I do.**
20 Q   Was that taken on February 25th -- from the
21 defendant's basement, and is it an accurate depiction of
22 what was seized from his house?
23 A   **Yes, it is.**
24       MR. KABRAWALA:  The government moves to admit.
25 Late no objection.

Troyd-Direct/Kabrawala

**448**

1        THE COURT:  321 is admitted.
2        (Whereupon, Government's Exhibit 321 was
3  received in evidence.)
4  Q   All right.
5        I will show you what is marked as
6  Government's Exhibit 338 and Government's Exhibit 324-A.
7        (Handed to the witness.)
8        MR. KABRAWALA:  I'm publishing 321.
9        (At this time a document was exhibited on
10 courtroom screen.)
11 Q   Do you see -- let's start with this box that is
12 324-A.
13       Do you see that anywhere in the picture?
14 A   **Yes, I do.**
15 Q   Is it fair to say that it is in the right-hand side
16 off at an angle?
17 A   **Yes, it is.**
18 Q   The same box?
19 A   **Yes, it is.**
20 Q   Was this box and the contents of the box which I will
21 now -- which is labeled 324, the box, 324-A, and the
22 contents of the box 324, were these seized from the
23 defendants house on February 14th, 2014?
24 A   **Yes.**
25       MR. KABRAWALA:  The government moves to admit

Troyd-Direct/Kabrawala

**449**

1  324 and 324-A.
2        MR. LATO:  No objection.
3        THE COURT:  They are admitted.
4        (Whereupon, Government's Exhibits 324 and 324-A
5  was received in evidence.)
6  Q   Read it aloud.  What is this product?
7  A   **This is a Wifi interference free wall clock hidden**
8  **camera kit.**
9  Q   Hidden camera kit?
10 A   **Yes.**
11 Q   Take a look at 324 itself.
12       I will hold it -- how far am I away from you
13 approximately?
14 A   **Five feet.**
15 Q   Do you see any cameras in it?
16 A   **No.**
17 Q   How far am I away from you now as I approach?
18 A   **Two feet.**
19 Q   Do you see a hidden camera in it?
20 A   **I see something that looks like a lens above the 6.**
21 Q   Okay.
22       Take a look at Government Exhibit 338.  It is in
23 a box.  We couldn't label the thing itself.
24       What is this box?
25 A   **It is a box containing a blond wig.**

Troyd-Direct/Kabrawala

450

1  Q   Was that seized from the defendant's house on
2  February 25th of this year?
3  A   **Yes, it was.**
4          MR. KABRAWALA:  The government moves to admit.
5          THE COURT:  Is that 338?
6          MR. KABRAWALA:  Yes, Judge.
7          MR. LATO:  No objection.
8          THE COURT:  338 is admitted.
9          (Whereupon, Government's Exhibit 338 was
10  received in evidence.)
11  Q   I will hold it up for you here.
12          This wig, this is what was seized?
13  A   **Yes, it was.**
14  Q   Did you see this wig in any of the pictures or what
15  resembles the wig in any of the pictures of what you
16  previously identified?
17  A   **Yes, I have.**
18          **Government's Exhibit 528 is an image of**
19  **Mr. Valerio's ▇▇▇ wearing that wig.**
20  Q   Describe the image.
21  A   **It is an image of a little girl, nude, wearing a wig,**
22  **standing next to the black chair, the black leather chair**
23  **in the basement of 3 High Gate Drive.**
24  Q   The black leather chair depicted earlier in the
25  basement?

Troyd-Direct/Kabrawala

451

1  A   **Yes, correct.**
2  Q   And completely nude, partially nude?
3  A   **She appears completely nude.**
4  Q   Aside from --
5  A   **Aside from wearing that wig in an skewed manner.**
6  Q   Awkwardly --
7  A   **Awkwardly placed on the top of her head.**
8  Q   For the record, do you see the wig box in
9  Government's Exhibit 321?
10          (At this time a document was exhibited on
11  courtroom screen.)
12  A   **Yes, I do.**
13  Q   Would you describe where it is in the picture.
14  A   **It is the -- the box that is holding the wig and some**
15  **other items.**
16  Q   It is like in the middle of the picture, would you
17  say?
18  A   **Yes.**
19  Q   Depicted to be in a box?
20  A   **Yes.**
21  Q   Is that fair to say?
22  A   **Yes, correct.**
23          THE COURT:  Why don't we take the morning break.
24          MR. KABRAWALA:  Just one question, Judge, I'm
25  sorry.

Troyd-Direct/Kabrawala

452

1  Q   Where was that box in the defendant's house?
2  A   **In the basement.**
3          MR. KABRAWALA:  Thank you.
4          THE COURT:  We will take the morning break.
5          Do not discuss the case, and we will reconvene
6  at 11:30.
7          (Whereupon, at this time the jury leaves the
8  courtroom.)
9
10          (Whereupon, a recess was taken.)
11
12          THE COURT:  Please be seated.
13          Get the jury.
14          THE CLERK:  Jury entering.
15          (Whereupon, the jury at this time entered the
16  courtroom.)
17          THE COURT:  Will everyone be seated.
18          MR. KABRAWALA:  Thank you, Judge.
19  BY MR. KABRAWALA:
20  Q   Agent Troyd, before the break you had testified about
21  seeing a number of the items, the physical items you were
22  discussing in the images of the ▇▇▇ is that fair to
23  say?
24  A   **Yes, that is fair.**
25  Q   Turning your attention to Government's Exhibit 539

Troyd-Direct/Kabrawala

453

1  for identification.
2  A   **Yes.**
3  Q   Do you see Government's Exhibit 333 in that?
4  A   **Yes, I do.**
5  Q   Can you briefly describe what the picture is?
6  A   **This is a picture of Mr. Valerio's ▇▇▇.  Next to**
7  **her, to her right side, is that object, the gun.  She is**
8  **sitting on the couch that we identified in the basement of**
9  **3 High Gate Drive.**
10          **She is either taking off or putting on a**
11  **costume.**
12  Q   Can you see any portion of Government's Exhibit 334,
13  334-A, or 334-B, which is the sofa cushion, or the general
14  area where it belongs to?
15  A   **Yes, behind her is one of those cushions behind that**
16  **sofa.**
17  Q   I want you to take a look at
18  Government's Exhibit 312.
19  A   **Yes.**
20  Q   What is that?
21  A   **This is a box that was found in the basement of**
22  **3 High Gate Drive, containing various costumes and other**
23  **items.**
24  Q   Did you find other costumes that were outside of that
25  box generally in the basement of 3 High Gate Drive?

Troyd-Direct/Kabrawala

454

1   A    Yes.

2   Q    And does that picture fairly and accurately depict

3   the box that was found in the defendant's basement on

4   February 25th, 2014?

5   A    Yes, it does.

6        MR. KABRAWALA:  Move to admit.

7        MR. LATO:  No objection.

8        THE COURT:  312 admitted.

9        (Whereupon, Government's Exhibit 312 was

10  received in evidence.)

11       MR. KABRAWALA:  Publishing

12  Government's Exhibit 312.

13       (At this time a document was exhibited on

14  courtroom screen.)

15  Q    Now, I'm going to show you some items.

16       MR. KABRAWALA:  With the Court's permission, may

17  I stand next to the witness for a few minutes?

18       THE COURT:  Yes.

19       (Counsel approaches the witness stand.)

20  Q    I would like to go through some of the items.

21       Government's Exhibit 359.

22       Is this something that was seized from the

23  defendant's house on or about February 25th, 2014?

24  A    Yes.

25  Q    And do you see this item, 359, in the picture that is

Troyd-Direct/Kabrawala

455

1   admitted as Government's Exhibit 312?

2   A    Yes, I do.

3        MR. KABRAWALA:  Move to admit

4   Government's Exhibit 359.

5        MR. LATO:  May I just look at it, please.

6        MR. KABRAWALA:  Sure.

7        (Handed to Mr. Lato.)

8        MR. LATO:  No objection.

9        THE COURT:  359 is admitted.

10       (Whereupon, Government's Exhibit 359 was

11  received in evidence.)

12  Q    Can you read the -- first of all, what is

13  Government's Exhibit 359?

14  A    It is a nurse's costume.

15  Q    Can you read the size of the costume?

16  A    It says size, child.  And then marked as medium, and

17  in parenthesis, 8 to 10.

18  Q    Now I'm showing you what is marked as

19  Government's Exhibit 343 for identification.

20       (Handed to the witness.)

21  Q    Where did you find that?

22  A    This was found in the basement of 3 High Gate Drive.

23  Q    During the second search warrant?

24  A    Yes.

25       MR. KABRAWALA:  The government moves to admit.

Troyd-Direct/Kabrawala

456

1        MR. LATO:  I would like to see it.

2        MR. KABRAWALA:  Of course.  I will do that.

3        MR. LaPINTA:  What number is that, sorry?

4        MR. KABRAWALA:  343.

5        (Handed to Mr. Lato.)

6   Q    While the defense is looking at it, I will just have

7   you look through the box.  Read out the exhibit number

8   that is noted, and just tell me where you found these

9   things.

10       MR. LATO:  No objection to 343, I believe.

11       THE COURT:  343 is admitted.

12       (Whereupon, Government's Exhibit 343 was

13  received in evidence.)

14  A    Is that for each object?

15  Q    Yes.

16       The exhibit number on the tag, please.

17  A    368.  Should I describe the items?

18  Q    Describe where you found these items.

19  A    These items were found in the basement of 3 High Gate

20  Drive.

21  Q    Generally speaking, what are they?

22  A    These are the packaging for various types of

23  pantyhose and tights and body stockings.

24  Q    Okay.

25       Do they appear to be children's or adults?

Troyd-Direct/Kabrawala

457

1   A    They appear to be adults.

2   Q    So it is fair to say that you found adult pantyhose

3   as well when at the defendant's residence?

4   A    Yes, that's correct.

5        MR. KABRAWALA:  We are not moving to admit it.

6   Q    Let's go through the box and we will talk about what

7   you found in the box.

8   A    These are items -- 336 and 335, these were also found

9   in the basement of 3 High Gate Drive.

10  Q    What are they?

11  A    Those are cheerleading pom-poms.

12       MR. KABRAWALA:  Move to admit.

13       MR. LATO:  No objection.

14       THE COURT:  335 and 336 are admitted.

15       (Whereupon, Government's Exhibits 335 and 336

16  were received in evidence.)

17       MR. KABRAWALA:  Just for the record, this was

18  admitted, Government's Exhibit 343.  And I will just hold

19  it up.

20  Q    Would you tell me what it is.

21       Would you actually hold one of these pieces for

22  me -- it is 342 and 343.

23       MR. KABRAWALA:  The government moves to admit

24  342.

25       MR. LATO:  May I?

Troyd-Direct/Kabrawala

458

1    MR. KABRAWALA:  It is the top portion of 343.

2    (Items handed to Mr. Lato.)

3    MR. LATO:  No objection.

4    THE COURT:  342 is admitted.

5  Q    I'm going to hold this skirt and you hold the shirt

6  portion.

7    Hold it up and show the jury.

8    (The witness complies.)

9  Q    You found this in the basement of 3 High Gate Drive?

10  A    **Yes, that's correct.**

11  Q    Red, white and blue; is that correct?

12  A    **Yes.**

13  Q    Describe what 347 is.

14  A    **347 is a packaging for children's tights and**

15  **children's stockings.**

16  Q    Children's tights and stockings?

17  A    **Yes.  This one says children's fishnet tights.**

18  Q    You found this in the basement of 3 High Gate Drive?

19  A    **Yes.**

20  Q    Did you seize it from there?

21  A    **Yes, I did.**

22    **(Item handed to defense counsel.)**

23    MR. LATO:  No objection.

24    THE COURT:  347 is admitted.

25    (Whereupon, Government's Exhibit 347 was

Troyd-Direct/Kabrawala

459

1  received in evidence.)

2  Q    A package containing children's tights and leggings,

3  I think you said fishnet stockings?

4  A    **Yes.**

5  Q    Is it fair to say they are for a girl?

6  A    **Yes.**

7  Q    Young girl?

8  A    **Yes, for a child.**

9  Q    Is it fair to say on one of them it is size small,

10  one size large, child's size large?

11  A    **Can I see?**

12  Q    Yes.

13    Child size large; is that fair to say?

14  A    **Yes.**

15  Q    Child size medium?

16  A    **Yes, 4 to 6.**

17  Q    Okay.

18    Various child stockings; is that correct?

19  A    **Yes, that's correct.**

20  Q    Did you observe any female children at 3 High Gate

21  Drive in both of your visits there?

22  A    **No.**

23  Q    What is Government Exhibit 325, and inside of which

24  is Government's Exhibit 326.  What are these items?

25  A    **325 is the -- is the box for the Samsung camcorder.**

Troyd-Direct/Kabrawala

460

1  **And 326 is the invoice received for the Samsung camcorder.**

2    MR. LATO:  No objection.

3    MR. KABRAWALA:  Move to admit.

4    THE COURT:  325 and 326 are admitted.

5    (Whereupon, Government's Exhibits 325 and 326

6  were received in evidence.)

7  Q    345, what is this?

8  A    **This is a children's costume.  It looks like a Wonder**

9  **Woman costume.**

10  Q    Wonder Woman?

11  A    **Yes.**

12    MR. KABRAWALA:  Move to admit.

13    MR. LATO:  Yes, it is Wonder Woman.  No

14  objection.

15    THE COURT:  345 is admitted.

16    (Whereupon, Government's Exhibit 345 was

17  received in evidence.)

18    MR. LATO:  Mr. Kabrawala, a portion fell out.

19  I'm sorry.

20    MR. KABRAWALA:  Thank you.

21  Q    329.  What is that?

22  A    **329 is a photograph of Mr. Valerio's** ████ ████

23  Q    Where did you find that?

24  A    **This was on the table in the hallway of 3 High Gate**

25  **Drive, in a frame.**

Troyd-Direct/Kabrawala

461

1  Q    You took it out of the frame?

2  A    **Yes, sir.**

3  Q    And you recognize that image to be ████ , the ████ ?

4  A    **Yes.**

5  Q    Did you find it in the defendant's residence during

6  the second search warrant?

7  A    **Yes.**

8    MR. KABRAWALA:  The government moves to admit.

9    MR. LATO:  One moment to confer with counsel,

10  please.

11    (Counsel confer.)

12    MR. LATO:  No objection.

13    THE COURT:  329 is admitted.

14    (Whereupon, Government's Exhibit 329 was

15  received in evidence.)

16    MR. KABRAWALA:  I will leave this stuff up here.

17  Q    You can come up and we will talk about it -- you

18  know, why don't we talk about the red, white and blue

19  cheerleader outfit, 323 -- 342, 343, 335 and 336.

20    Can you look through the exhibit of the ████

21  that we have been talking about.

22  A    **Yes.**

23  Q    And can you identify in which picture the outfit

24  and/or the pom-poms are depicted?

25  A    **There are three images that are from the exhibits**

Troyd-Direct/Kabrawala

462

1   that show the outfit and the pom-poms.

2   Q   Sorry, what was that?

3       Right. Which numbered exhibits?

4   A   The first is Government's Exhibit 519.

5       The second is Government's Exhibit 521.

6       And the third is Government's Exhibit 537.

7   Q   Can you please describe the picture.

8   A   All three photos or images are what we would call an

9   up skirt photo of a girl wearing fishnet stockings, the

10   bottom of the cheerleading outfit and holding one of the

11   red and blue pom-poms. The face of the child is not

12   visible.

13   Q   With respect to -- you know what, I will publish

14   Government's Exhibits 329 -- Exhibit 329.

15       (At this time a document was exhibited on

16   courtroom screen.)

17   Q   Is that the ██████?

18   A   Yes, sir.

19   Q   Now, you had mentioned the camcorder box and the

20   receipt contained therein.

21       By the way, was the receipt actually contained

22   within the box when you found it?

23   A   Yes, it was.

24   Q   Where was this box?

25   A   In the house at 3 High Gate Drive.

Troyd-Direct/Kabrawala

463

1   Q   Do you recall specifically where it was?

2   A   I believe it might have been in the second floor

3   office closet.

4   Q   Okay.

5       So it was in a closet in the house?

6   A   Yes.

7   Q   Now, I want to show you Government's Exhibit 323. It

8   is not in your binder.

9       MR. KABRAWALA: I will need a hand with that.

10       (Object brought before the witness.)

11   Q   Now, what is this?

12   A   A stage found in the basement of 3 High Gate Drive.

13       In the center of the stage is a light with a

14   housing that would direct the light upward. And next to

15   the light, which is only barely visible from the top, is a

16   camera lens.

17   Q   Did you find this in the defendant's house?

18   A   Yes, I did.

19   Q   Where was it?

20   A   It was in the basement.

21   Q   And did you find it in one of your searches?

22   A   Yes, on February 25th.

23   Q   2014?

24   A   Yes.

25       MR. KABRAWALA: The government moves to admit

Troyd-Direct/Kabrawala

464

1   this exhibit.

2       Would the defense like to look at it again?

3       MR. LATO: One moment, please.

4       (Whereupon, at this time there was a pause in

5   the proceedings.)

6       MR. LATO: Your Honor, may we have a 30 second

7   sidebar?

8

9       (Whereupon, at this time the following took

10   place at the sidebar.)

11       MR. LATO: Just to place my objection on the

12   record, based on the Court's earlier ruling that this is

13   admissible, I anticipate any objection I make will be

14   overruled.

15       I just wanted to have my objection preserved,

16   and I object to everything relating to the filming that

17   doesn't directly relate to this girl. That's all.

18       THE COURT: Your objection is preserved and

19   overruled for the reasons discussed.

20       MR. LATO: Thank you, your Honor.

21

22       (Whereupon, at this time the following takes

23   place in open court.)

24       MR. KABRAWALA: Move to admit.

25       THE COURT: Government's Exhibit 323 is

Troyd-Direct/Kabrawala

465

1   admitted.

2       (Whereupon, Government's Exhibit 323 was

3   received in evidence.)

4       MR. KABRAWALA: With Agent Troyd's assistance,

5   would the Court indulge Agent Troyd coming off the stand

6   for a minute and pointing out what he sees in this

7   exhibit?

8       THE COURT: Fine.

9   Q   Let's bring it over across the way to the jury.

10       What do you observe?

11   A   This is a carpeted stage, the center of which is

12   open, allowing for a light to shine upwards. And next to

13   that light is the lens of a video camera with closed

14   circuit television.

15   Q   I will turn it around.

16       What do you observe about the structure of the

17   exhibit?

18   A   This exhibit was hand-made by someone. And the light

19   and the video camera were attached to the wooden

20   structure. It is basically a frame which was covered with

21   carpeting to be used as a stage.

22   Q   This is fairly heavy; is that correct?

23   A   Yes.

24   Q   Probably is a little unwieldy?

25   A   Yes, it is.

Troyd-Direct/Kabrawala

466

1   Q   Was it hanging on the wall?

2   A   **No, it was not.**

3   Q   How was it facing when you found this in the

4   defendant's basement?

5   A   **It was on the floor facing carpet side up next to, I**

6   **believe, it was a pool table that Mr. Valerio had.**

7   Q   Thank you.

8       (The witness resumes the witness stand.)

9   Q   So far you have testified to two camera devices, one

10  being the one we just showed the jury, and the other one

11  being the wall clock device.

12      Is that fair to say?

13  A   **Yes, that's correct.**

14  Q   Was that the only camera -- withdrawn.

15      Were those the only two cameras that you found

16  in the basement of 3 High Gate Drive?

17  A   **No.**

18  Q   Did you find another camera?

19  A   **Yes.**

20  Q   Can you describe how -- where the other camera was?

21  A   **The other camera was placed in a suspended ceiling,**

22  **on a ceiling tile above the location where the videos or**

23  **the photo images of ████ had been taken.**

24  Q   I'm showing you what has been marked as

25  Government's Exhibit 311 on your screen.  And you can turn

Troyd-Direct/Kabrawala

467

1   to it in your book if you like.

2       What is that a picture of?

3   A   **This is a picture of where the Samsung camcorder was**

4   **found.  And if you look at the picture, you will see that**

5   **the case, the camcorder case that was located on the**

6   **ceiling tile here.**

7   Q   Now, is that picture a fair and accurate depiction of

8   the ceiling of 3 High Gate Drive's basement on

9   February 25th, 2014?

10  A   **Yes, it is.**

11      MR. KABRAWALA:  Move to admit.

12      THE COURT:  What number is that?

13      MR. KABRAWALA:  311, Judge.

14      MR. LaPINTA:  No objection.

15      THE COURT:  311 is admitted.

16      (Whereupon, Government's Exhibit 311 was

17  received in evidence.)

18      MR. KABRAWALA:  I'm now publishing

19  Government's Exhibit 311.

20      (At this time a document was exhibited on

21  courtroom screen.)

22  Q   Now I want you to very carefully tell us what we are

23  looking at.  And try to describe it, if you can.

24  A   **Okay.**

25      **What this is, it is the metal framework for a**

Troyd-Direct/Kabrawala

468

1   suspended ceiling.  Some of the tiles were removed which

2   revealed the flooring and I'm not sure if it is called the

3   joists of the basement.

4       When you see the one tile that is removed, and

5   next to it the tile is still in place next to the light,

6   you can see a black object which was where the camera --

7   this is the camera inside its case.  And that is where it

8   was located during the search warrant on February 25th.

9   Q   All right.

10      So to be clear, when agents were at the house on

11  February 25th, 2014, you went to the basement?

12  A   **Correct.**

13  Q   And was the basement ceiling exposed like this?

14  A   **No, it was not.**

15  Q   How did it look?

16  A   **All the panels were in place in the basement ceiling.**

17  Q   It is one of those panels where you sort of can lift

18  up the panel by itself?

19  A   **Yes.**

20  Q   What is it called, the kind of ceiling?

21  A   **It is a drop-ceiling.**

22  Q   A pretty standard type ceiling, you see it in

23  offices?

24  A   **Offices, basements, and older houses, they use it to**

25  **cover up damaged ceilings.**

Troyd-Direct/Kabrawala

469

1   Q   Are they heavy to move, the ceiling tile?

2   A   **Not at all.**

3   Q   What made you look above the ceiling?

4   A   **I have had previous experience where I discovered**

5   **guns, drugs, money, things hidden in suspended ceilings in**

6   **basements.**

7   Q   There were no guns or money or drugs in the ceiling

8   here?

9   A   **No.**

10  Q   But you did find something?

11  A   **Yes.**

12  Q   Now I'm showing you -- well, I want you to do this.

13  I want you to describe -- showing the jury 311, which

14  appears to be a picture of the ceiling as the agent has

15  described it.

16      What I'm doing now is, I'm zooming in to about

17  the third from the bottom of the picture, in the middle,

18  like a little black something there.

19      What is that?

20  A   **That is the camera case containing the Samsung**

21  **camcorder.**

22      **(Government counsel confer.)**

23  Q   I show you what is marked as

24  Government's Exhibit 404.

25      (Handed to the witness.)

---

Troyd-Direct/Kabrawala

470

1  Q   Can you describe what these two things are that both
2  comprise Exhibit 404.
3  A   404 consists of a camera bag marked as Samsung, with
4  a strap.  And also a Samsung full HD 1920 by 1080
5  camcorder.
6        MR. KABRAWALA:  Let me just walk it over to the
7  defense.
8        (Item handed to defense counsel.)
9        MR. KABRAWALA:  The government moves to admit
10  Exhibit 404, which is the bag and the camera itself.
11        MR. LATO:  Brief voir dire, your Honor.
12        THE COURT:  Sure.
13        Let me explain to the jury what a voir dire is.
14        When someone offers an exhibit into evidence,
15  the other side has the opportunity to what they call to
16  voir dire, question the witness, just with regard to that
17  item to see if they have an objection.
18        Mr. Lato will ask questions about that item, and
19  he can cross-examine more fully when the turn comes.
20        MR. LATO:  Thank you, your Honor.
21
22  VOIR DIRE EXAMINATION
23  BY MR. LATO:
24  Q   Agent Troyd, may I borrow that for a moment?
25  A   Yes, sir.

---

Troyd-Direct/Kabrawala

471

1  Q   Good afternoon, sir.
2  A   Good afternoon.
3  Q   With respect to Exhibit 404, the camera and the case,
4  did you find the camera inside the case in the ceiling?
5  A   That is your full question?
6  Q   Yes, sir.
7  A   Yes, sir.
8  Q   Was the camera case closed?
9  A   Yes, I believe it was.
10  Q   It looks like there is a piece of black electrical
11  tape near the lens of the camera.
12        Is that how it was when you found it?
13  A   Yes, it was.
14  Q   Does the camera now look about the same way as it did
15  when you found it in the ceiling tile?
16  A   Yes.
17        MR. LATO:  No objection.
18        THE COURT:  404 is admitted in evidence.
19        (Whereupon, Government's Exhibit 404 was
20  received in evidence.)
21  BY MR. KABRAWALA:
22  Q   Now, that was the question I was going to ask you
23  about this.
24        This is the camera bag as depicted in the
25  exhibit that is on the screen?

---

Troyd-Direct/Kabrawala

472

1  A   That's correct.
2  Q   Now, counsel mentioned there was a piece of
3  electrical tape on the front of it; is that correct?
4  A   Yes.
5  Q   Did you turn this camera over to anyone during the
6  course of your investigation?
7  A   Yes.
8  Q   Who was that?
9  A   Detective Rory Forrestal.
10  Q   Is that the same person you turned over the Samsung
11  memory card to?
12  A   Yes.
13  Q   Now, two of the items already admitted in evidence,
14  Government's Exhibit 325, and the receipt that is inside
15  of Government's Exhibit 325, and that is
16  Government's Exhibit 326, tell us how you found this,
17  these two items.
18        (Handed to the witness.)
19  A   This was found with the receipt and an instructional
20  booklet inside at 3 High Gate Drive.
21  Q   And I want you to just describe the box.  Describe
22  the box.
23  A   This is a Samsung box.  It lists items from Samsung
24  Electronics, designed by Samsung, assembled in China.  And
25  written on the box is joeval5 underlined with the word

---

Troyd-Direct/Kabrawala

473

1  password underlining it.  And also circled is the
2  www.Samsung.com.
3  Q   Look inside the box and pull out the invoice in the
4  box.
5  A   Yes.
6        Exhibit 326 is the invoice.
7  Q   Describe what the invoice says?
8  A   It has a QVC logo.
9  Q   Let me do it this way:  Can I have the exhibit?
10  A   Yes.
11  Q   I will publish it and you can read it from the
12  screen.
13        (At this time a document was exhibited on
14  courtroom screen.)
15  Q   All right.
16        Let's talk about this invoice.
17        And I will focus in on the top portion.
18        I want you to read it out loud or describe it.
19        The QVC logo you mentioned?
20  A   Yes.  The logo in the upper right-hand corner.
21        To the right of that it says sold to, it says
22  Joseph Valerio, 3 High Gate Drive, Smithtown, New York,
23  11787-1519.
24  Q   Who is it shipped to?
25  A   Shipped to Joseph Valerio, 3 High Gate Drive,

---

Troyd-Direct/Kabrawala

474

1   Smithtown, New York, 11787-1519.
2   Q   How was it shipped?
3   A   Shipped through UPS, United Postal Service.
4   Q   What is the invoice date?
5   A   The invoice date is May 7, 2010.
6       The customer number ends in 6187.  The order
7   number is 358501163.
8   Q   What is contained within the invoice?  What is the
9   item?
10  A   It says, the description of the item is a Samsung
11  1080P full HD camcorder with ten times optical zoom and
12  four gigabit SD card.
13  Q   How much was it?
14  A   $436.
15  Q   How much did it cost to ship and handle?
16  A   Shipping and handling was $10.44.
17  Q   And what was the total price?
18  A   $446.44.
19  Q   And how was it paid?
20  A   It was paid with a Visa.
21  Q   And was there tax?
22  A   Yes, $38.51 in tax.
23  Q   What was the total amount?
24  A   The total amount was $484.95.
25      Could you move it a little bit more.

Troyd-Direct/Kabrawala

475

1   Q   Where was it returned to?
2   A   QVC returned to 100 QVC Boulevard, Rocky Mount, North
3   Carolina 27815-0000.
4   Q   There is apparently one of those items with free
5   postage when you return the item on the back of
6   Government's Exhibit 326.  Fair to say?
7   A   Yes.
8   Q   What is the return address of the person sending the
9   package, whose name is it?
10  A   Joseph Valerio at 3 High Gate Drive, Smithtown, New
11  York 11787-1519.
12  Q   Item description, Samsung 1080P, etcetera.
13      So the record is very clear, is this box
14  apparently for that camera?
15  A   Yes.
16  Q   And is this camera a full HD 1080 Samsung camcorder?
17  A   Yes.
18  Q   By the way, where does it say it was made on the
19  camera itself for assembly?
20  A   It says designed by Samsung and assembled in China.
21  Q   And just so we are very clear, I will bring over this
22  box and put it under -- by the way, I don't know if I
23  asked you this, but this box and this camera are described
24  in this QVC receipt; is that correct?
25  A   Yes.

Troyd-Direct/Kabrawala

476

1   Q   And the receipt was found inside the box; is that
2   correct?
3   A   Yes.
4   Q   And just for the record, I will show the image
5   actually on the box itself.
6       I will open this up and looking at this camera
7   in my hand, Government's Exhibit 404, and looking at the
8   image on the box on the overhead, does it appear to be the
9   same camera?
10  A   Yes.
11      MR. KABRAWALA:  Judge, I will be going through a
12  number of emails at this point which will probably consume
13  the next hour at least?
14      THE COURT:  How about going to 12:45, 15
15  minutes.
16      MR. KABRAWALA:  All right.  Thank you.
17  Q   What I would like to do now is shift gears.
18      There was testimony yesterday by Robert Egan of
19  Cablevision.
20      Now, the testimony -- correct me if I'm wrong,
21  among other things Mr. Egan testified that Cablevision
22  produced emails in response to a search warrant.
23      MR. LATO:  Objection to the recitation.
24      THE COURT:  Just ask the question.
25      MR. KABRAWALA:  Okay.

Troyd-Direct/Kabrawala

477

1   Q   Did you receive a return for the search warrant?
2   A   Yes.
3   Q   And did Cablevision provide it to you?
4   A   Yes.
5   Q   For the email address joeval5@optonline.net?
6   A   Yes, correct.
7   Q   And I want to have you actually look at the exhibit
8   book in front of you.  And I will read off a number of
9   exhibits.
10      I have provided the list to the defense and I
11  will recite it now, and then what we will do is talk about
12  those exhibits.
13      203.
14      MR. KABRAWALA:  If I may, Judge, can I approach
15  so the witness can see my list?
16      THE COURT:  Yes.
17      (Counsel approaches the witness stand.)
18  Q   203, 205 -- don't take them out yet.
19  A   Yes.
20  Q   206?
21  A   Yes.
22  Q   208, all the way through 231.
23  A   Yes.
24  Q   235?
25  A   I have all those.  235.  Yes, I have it.

Troyd-Direct/Kabrawala

478

1  Q  238.
2  A  Yes, 238.
3  Q  238-A.
4  A  That I'm missing.
5  Q  I will get you a copy of 238-A.
6  A  Yes.
7  Q  241.
8  A  Okay.
9  Q  243.
10  A  Okay.
11  Q  244 and 245.
12  A  244 and 245, okay.
13  Q  245-A and B.
14  A  I'm missing 245-B.
15  Q  245-B now.
16     246 and 247.
17  A  I have those.
18  Q  I am handing you 238-A, and if you can place it where
19  it belongs.
20  A  Sure.
21
22     (Continued on the next page.)
23
24
25

Troyd - Direct/Kabrawala

479

1  DIRECT EXAMINATION
2  BY MR. KABRAWALA: (Continued)
3  Q  I'm showing you 245-B on the screen, the sixth page
4  in the e-mail.  Scroll through it.
5     Do you see it?
6  A  I don't see it yet.
7  Q  Do you see it now?
8  A  Yes.
9  Q  Keep scrolling.
10  A  Yes.
11  Q  Keep scrolling.
12  A  Yes.
13  Q  Okay.  All of those exhibits that I just read aloud
14  to you, where are those from?
15  A  These are from -- the exhibits that we just looked at
16  or identified were provided to me in the search warrant
17  return from Cablevision.
18  Q  From Government's Exhibit 200?
19  A  Yes.
20  Q  That's a disk from Cablevision?
21  A  Yes.
22     MR. KABRAWALA:  The Government moves to admit
23  all of those exhibits into evidence, Judge.
24     MR. LATO:  Just so I have the numbers again, can
25  you repeat them, Mr. Kabrawala?

Troyd - Direct/Kabrawala

480

1     MR. KABRAWALA:  203, 205, 206, 208 to 231.
2     MR. LATO:  No objection.
3     MR. KABRAWALA:  And 235, 238, 238-A, 241, 243,
4  244, 245, 255-A [sic]; 245-B, 246, 247.
5     MR. LATO:  I have objections to three of those
6  exhibits.
7     MR. KABRAWALA:  Which ones?
8     MR. LATO:  241, 244 and 245, and make it a
9  fourth, 245-B.
10     THE COURT:  So with the exceptions of those four
11  are admitted, and we'll discuss it after the lunch break.
12     MR. KABRAWALA:  That sounds fair.
13     (Whereupon, Government Exhibit 235, 238, 238-A,
14  243, 255-A, 246, and 247 were received in evidence.)
15  BY MR. KABRAWALA:
16  Q  Generally speaking, did you find e-mails between the
17  defendant and other people on the exhibits that were
18  shown?
19  A  Yes.
20  Q  Are all of them between the defendant and Kalichenko?
21  A  No.
22  Q  I want to talk about a couple of them that are not
23  between the defendant and Kalichenko.
24     Please turn to Government's Exhibit 238-A.
25  A  Yes.

Troyd - Direct/Kabrawala

481

1     MR. KABRAWALA:  I'm going to publish it.
2  Q  Is it fair to say this is from joeval5@optonline.net
3  to a person named Jarmila Berezovska at
4  jarmila.berezovska1@hotmail.com?
5  A  Yes.
6  Q  I will show you number 238-A first.
7  A  We're looking at 238 now.
8  Q  Look at 238-A.
9  A  A?
10  Q  Yes.
11  A  All right.
12  Q  I'll read aloud the message header information from
13  joeval5@optonline.net to Jarmila Berezovska, sent
14  December 7, 2013, at 7:38:22 p.m.
15     Subject:  Sister Bernadette and her "Imperiale"
16  family.
17     Did I read that correctly?
18  A  Yes.
19  Q  I'm going to just read aloud from the top, and then
20  you just tell me if I read it in correctly.  How is that?
21  A  Okay.
22  Q  Dear, here is some of the information for my sister
23  and family.
24     My sister's family, the Imperiale family,
25  married surname, Imperiale.  And it provides a street

Troyd - Direct/Kabrawala

482

1   address, city of Massapequa, state of New York.
2       Scrolling down.
3       My brother-in-law, my brother-in-law, paren, his
4   birth date.
5       Did I read that correctly?
6   **A**  **Yes.**
7   Q  It provides a date of birth, and it says in
8   parentheses, 50 years old?
9   **A**  **Correct.**
10  Q  Then it says:  My sister, your friend, Bernadette
11  Imperiale.  Correct?
12  **A**  **Correct.**
13  Q  Then it says, the next paragraph down, her birth
14  date.
15      And it is a year in 1963 is her birth date?
16  **A**  **Yes.**
17  Q  50 years old?
18  **A**  **Yes.**
19  Q  Then apparently it describes who this person, the
20  sister, Bernadette, is; is that fair to say?
21  **A**  **Yes.**
22  Q  Can you read aloud from where it says "stay-at-home
23  mother" all the way down to almost the last sentence where
24  it says "sister Bernadette and kids"?
25  **A**  **Stay-at-home mother.  How you know my sister?  If**

Troyd - Direct/Kabrawala

483

1   **Immigration asks you, you can say that you looked out for**
2   **her children, Mario and** ████ **to help her out at home**
3   **with the kids.  Bernadette has an eye disease called**
4   **glaucoma...it leaves a person part blind in their eye or**
5   **eyes.  So we could say a friend introduced you to her and**
6   **then you both became friends.  If the questions go further**
7   **and my name shows up on the system, we simply say we (me**
8   **and you) meet when you came in August to help out my**
9   **sister Bernadette and the kids.**
10      THE COURT:  All right.
11  Q  Scrolling down, the last sentence in that e-mail,
12  what does it say?
13  **A**  **They next e-mail for the kids.**
14  Q  And as a reminder, this e-mail was sent December 7,
15  2013, at 7:38 p.m.?
16  **A**  **Correct.**
17  Q  Now turning to Government's Exhibit 238, I described
18  that earlier.
19  **A**  **Yes.**
20  Q  And it is from joeval5@optonline.net.  It is to that
21  person, Jarmila Berezovska?
22  **A**  **Correct.**
23  Q  And you met Jarmila Berezovska during the first day
24  of the search warrant?
25  **A**  **Yes, I did.**

Troyd - Direct/Kabrawala

484

1   Q  Is it fair to say that this e-mail of December 7,
2  2013, was sent about 20 minutes later, at 7:58 p.m.?
3  **A**  **Yes.**
4   Q  And it says, subject line:  Children?
5  **A**  **Yes.**
6   Q  And the previous mail, that would be a forthcoming
7  e-mail?
8  **A**  **The next e-mail for the kids.**
9   Q  By the way, did the defendant say who Jarmila
10  Berezovska was when you spoke with him on January 28,
11  2014, during the first search warrant?
12  **A**  **Yes.**
13  Q  What did he say?
14  **A**  **That she was his girlfriend from Czechoslovakia.**
15  Q  All right.  I want you to read now -- I'll read it.
16      First paragraph.  My nephew:  Mario -- and it
17  provides the last name -- age:  Ten.  It provides the date
18  of birth and the year of 2003.
19      Read the parentheses that follow that.
20  **A**  **(He goes to elementary school in the fifth grade.)**
21  Q  Continue reading.
22  **A**  **He is active boy.  Enjoys being home most of the**
23  **time...TV, cartoons, movies, girlfriends, that stuff.**
24  Q  Next paragraph it says:  My ████:  ████ -- it
25  provides the last name -- age:  Eight.

Troyd - Direct/Kabrawala

485

1      By the way, age eight on the date of the e-mail
2  is in 2013?
3  **A**  **Yes.**
4   Q  It says, sometime in 2005.  It provides the month and
5  it says, 2005?
6  **A**  **Yes.**
7   Q  Why don't you read the rest of the paragraph for us.
8  **A**  **(She goes to elementary school in the third grade but**
9  **different school from Mario, her brother.)  She is active**
10  **in gymnastics after school...TV, cartoons, movies, girly**
11  **stuff.**
12  Q  All right.  Then it goes on to say:  They stay by
13  mother's home some days during the week.
14      Is that correct?
15  **A**  **Correct.**
16  Q  And it goes on in the next paragraph to say:  My
17  sister's home phone number.
18      And then it says:  They never pick up the phone
19  anyway.  That's good.
20  **A**  **Correct.**
21  Q  And it provides a phone number, an actual number?
22  **A**  **Yes.**
23  Q  A 516 area code?
24  **A**  **Yes.**
25  Q  Then it says --

Proceedings

486

1   **A   Correct.**

2   **Q**   And it says in the same paragraph, "mother's phone

3   number," and provides another 516 telephone number?

4        THE COURT:  Why don't we break for lunch.  We'll

5   reconvene at 2 o'clock.

6        Do not discuss the case.

7        (Whereupon, at this time the jury exits the

8   courtroom.)

9        THE COURT:  Okay.  If you can all be seated.

10        Mr. Lato, tell me what the nature of the

11   objections are for those exhibits so I can look at them

12   during the lunch break.

13        MR. LATO:  Exhibit 241 refers to Mr. Valerio's

14   prior offense at the wave pool and 404(b) evidence.  And

15   it looks like it just slipped through the -- the

16   Government acknowledged that when I brought it to their

17   attention, and we'll try to work on it to see if the

18   exhibit can be saved by redacting any reference to 404(b)

19   evidence.

20        MR. KABRAWALA:  Judge, to save time, the

21   Government will withdraw -- it will not seek to admit 241.

22        THE COURT:  That's out.

23        244?

24        MR. LATO:  I just wanted to bring it up, your

25   Honor.  One moment.

Proceedings

487

1        244 is an e-mail exchange between Mr. Valerio

2   and Jarmila Berezovska as opposed to Jarmila Berezovska

3   and Olena Kalichenko, and it already has a reduced

4   probative value by virtue of the fact it is between

5   Mr. Valerio and Ms. Berezovska.

6        There's a 403 problem in there.

7        Does your Honor have the exhibit?

8        THE COURT:  Yes, I'm looking at it.

9        MR. BODE:  Maybe we can short-circuit it.

10        We're willing on that one to redact out the

11   text; leave the headers.

12        It's relevant he's using joeval5@optonline.net

13   to his girlfriend because it shows dominion and control,

14   because we went over the account with Cablevision.  He's

15   talking to his girlfriend on it consistently.  So we'll

16   redact the text and leave the headers so it shows the

17   use of -- on the account.

18        MR. LATO:  I agree that solves the problem.

19        MR. BODE:  If she was to testify, all bets are

20   off, and we may need to go into the content of it at that

21   point.

22        THE COURT:  And the subject is out as well.

23        MR. BODE:  It's up to the defense.

24        MR. LATO:  Other than the fact that it shows he

25   used that e-mail account, so yes.

Proceedings

488

1        THE COURT:  So from the "to" to the "send."

2        MR. BODE:  We'll take out the text.  We'll put

3   in black so you can see there is something in there,

4   because otherwise it is weird they are sending e-mails

5   back and forth with no e-mail content.  But we'll black it

6   all out.

7        THE COURT:  And 245?

8        MR. LATO:  It looks like an e-mail between

9   Mr. Valerio and some unknown individual.

10        If I understand the relevance now, it is just to

11   show he's using the account.

12        MR. KABRAWALA:  Judge, it absolutely shows

13   dominion and control over the e-mail account.  An

14   individual, actually the defendant's son, talking about

15   the Islanders game and getting tickets.

16        There is another exhibit that related to it that

17   he's getting e-mails into his account, the same IP

18   address, the same address discussed yesterday.  It shows

19   dominion and control, and it's not prejudicial.  If

20   anything, it shows that -- withdrawn.

21        And it says, "My e-mail account is

22   joeval5@optonline.net."  I mean, it is very clear that it

23   shows dominion and control over the e-mail.

24        MR. LATO:  I agree.

25        Now I know what they will offer, I withdraw my

Proceedings

489

1   objection.

2        THE COURT:  That will be admitted.

3        MR. LATO:  245-B, I don't have a copy of that.

4        THE COURT:  I don't have that one either.

5        MR. KABRAWALA:  245-B, we don't have copies.

6   I'm sorry.

7        MR. BODE:  I think there is a set up there.

8        MR. KABRAWALA:  No, it's not up here.  I'll

9   actually pull it up on the screen.

10        It's an e-mail, a six-page e-mail, from

11   joeval5@optonline.net, and then it is essentially -- the

12   text that follows looks like promotional stuff from

13   Ticketmaster.  It's six pages of promotional e-mail.

14        MR. LATO:  I withdraw my objection because it

15   follows on the prior one.  Just used to show the account,

16   which is obviously probative.  There is no 403 problem.

17   I'll withdraw my objection.

18        THE COURT:  So 241 is out, and 244-B will be

19   redacted, and 245 and 245-B will be admitted.

20        MR. KABRAWALA:  Thank you, Judge.

21        THE COURT:  See you at 2:45.

22        (Recess taken.)

23

24

25

Proceedings

490

1          A F T E R N O O N   S E S S I O N
2          THE COURT:  The Government has redacted 244.
3     Is that acceptable to the defense?
4          MR. LATO:  One moment, please.
5          THE COURT:  Sure.
6          MR. LATO:  Yes.
7          THE COURT:  So I'll give an instruction to the
8     jury about redaction, that they should consider only
9     relevant material, not to speculate what has been
10    redacted.
11         And I'll say 241 has been withdrawn by the
12    Government, and I'll admit 245 and 245-B.
13         (Whereupon, Government Exhibits 245 and 245-B
14    were received in evidence.)
15         THE COURT:  Seat the jury.
16    **S T E V E N   T R O Y D,**
17         having been previously sworn, resumed the stand
18         and testified further as follows:
19         (Whereupon, the jury at this time enters the
20    courtroom.)
21         THE COURT:  All right.  Everyone be seated.
22         Members of the jury, before we continue, there
23    were four exhibits I had reserved a ruling on to discuss
24    with the lawyers during the lunch break.
25         As a result of that discussion, the Government

Troyd - Direct/Kabrawala

491

1     withdrew Exhibit 241.  They withdrew that exhibit.
2          Government's Exhibit 244, the Government is only
3     seeking to put in certain portions of that e-mail
4     exchange.  So the rest of the e-mail contained is
5     irrelevant information and has been redacted.  There is a
6     black box in it because the rest of it was not relevant.
7          I want to give you an instruction with respect
8     to redactions.
9          Anytime there is a redaction of the document,
10    you shouldn't speculate what is behind that material.  It
11    is simply irrelevant, and you are not to speculate and are
12    not to consider that in any way.
13         And 245 and 245-B are admitted in evidence.
14         So let's continue.
15         MR. KABRAWALA:  Thank you, Judge.
16         THE COURT:  And 244, the redacted version of
17    244, is also admitted.
18         (Whereupon, Government Exhibit 244 was received
19    in evidence.)
20         MR. KABRAWALA:  Thank you, Judge.
21    DIRECT EXAMINATION
22    BY MR. KABRAWALA:  (Continued)
23    Q    Before the lunch break, do you recall discussing an
24    e-mail between joeval5@optonline.net and an e-mail of
25    jarmila.berezovska1@hotmail.com?

Troyd - Direct/Kabrawala

492

1     A    Yes.
2     Q    I will show you another exhibit.  Take a look at
3     Government's Exhibit 244.
4     A    **Yes.**
5     Q    What is that e-mail?
6     A    **This is an e-mail from Joe Valerio at**
7     **joeval5@optonline.net to jarmila.berezovska1@hotmail.com,**
8     **sent on April 14, 2013.**
9          MR. KABRAWALA:  I'm publishing.
10    Q    Is it fair to say that this is a 15-page e-mail --
11    sorry -- exhibit?
12    A    **Yes, that's correct.**
13    Q    Is it also fair to say we refer to it as an e-mail
14    chain, that is, a series of sent and responded-to e-mails?
15    A    **Yes.**
16    Q    March 2013 to about 14, 2013, is that fair to say,
17    that that spans?
18    A    **Yes.**
19    Q    Your review of those e-mails, are they all between
20    joeval5@optonline.net and Ms. Berezovska?
21    A    **Yes.**
22    Q    And I think you mentioned who Ms. Berezovska was.
23    Remind us who she is, please.
24    A    **Jarmila Berezovska is Mr. Valerio's girlfriend from**
25    **Czechoslovakia.**

Troyd - Direct/Kabrawala

493

1     Q    I'm directing your attention to Government's
2     Exhibit 229-A.
3     A    **Yes.**
4          MR. KABRAWALA:  Publishing Government's
5     Exhibit 229-A.
6     Q    Can you just briefly describe what this e-mail is,
7     what the date is?
8     A    **This is an e-mail from Joe Valerio at**
9     **joeval5@optonline.net to kalichenkoes --**
10    Q    One moment.  We're not on the same page.
11         Look at the screen.  The screen is the one that
12    has been admitted.
13         Do you see the screen?
14         MR. KABRAWALA:  I'm sorry, I may have mismarked
15    it.  I'll change the exhibit number of the one before you.
16    Q    Do you see the one I'm looking at, being admitted as
17    229-A?
18    A    **Yes.**
19    Q    Let's talk about this one.
20         MR. LAPINTA:  Hold on.
21         Which one are you referring to?  Not the one on
22    the screen.  Which one?
23         MR. KABRAWALA:  The only one that has been
24    admitted is the one on the screen, 229-A.
25    Q    Let me describe the e-mail.  It appears to be from

Troyd - Direct/Kabrawala

494

1    joeval5@optonline.net, and it is forwarded to himself
2    eventually at joeval5@optonline.net?
3    A    Correct.
4    Q    And the "send" date is September 15, 2012; is that
5    right?
6    A    Yes.
7    Q    And the forwarded message, it's from "Ticketmaster,"
8    right?
9    A    Yes.
10    Q    Also from 7/15 -- I'm sorry, September 15, 2012?
11    A    Yes.
12    Q    The subject is:  Joseph, see it live.  Tickets on
13    sale and special offers this week?
14    A    Yes.
15    Q    In your review of this e-mail, approximately six
16    pages long, does it appear to be a promotional e-mail sent
17    by Ticketmaster to that address at joeval5@optonline.net?
18    A    Yes.
19    Q    Just review the e-mail.  Take a look at it.
20          And does the e-mail appear to be for promotional
21    items that are in the New York area?
22    A    Yes.
23    Q    Beacon Theatre.  Do you know where that is?
24    A    I'm not sure.  I think it is in Manhattan.
25    Q    Radio City Music Hall.  Do you know where that is?

Troyd - Direct/Kabrawala

495

1    A    Yes.
2    Q    Is that in New York City?
3    A    Yes, it is.
4    Q    Other items all from New York.  All New York venues,
5    right?
6    A    Yes.
7    Q    Can you turn to Government's Exhibit 245, please?
8    A    Yes.
9    Q    To make sure we're on the same page, the date of the
10    e-mail is 3/18/13.
11    A    Yes, this is the same.
12          MR. KABRAWALA:  I'm going to publish it now.
13    Q    So, this is an e-mail from -- that same e-mail we've
14    been talking about, joeval5@optonline.net.  It appears to
15    be addressed to an Andre P. Valerio at gmail.com, sent
16    March 18, 2013.
17          And it's a forward, isn't it?
18    A    Yes.
19    Q    Your Ticketmaster order, right?
20    A    Correct.
21    Q    Do you know who Andre Valerio is?
22    A    Andre Valerio is Mr. Valerio's son.
23    Q    The son?
24    A    Yes.
25    Q    Read the text of the message, the body of that

Troyd - Direct/Kabrawala

496

1    message.
2    A    Good seats.  Between last row in section 115 and
3    first row of section 200.  Good eye level and chance for
4    pucks...it is level with the blue line behind visitors,
5    the side where the Isles shoot twice.
6          Just click on to print your tickets or my
7    account.  Enter my e-mail, joeval5@optonline.net (could be
8    small case, try it), then my password: Joe Valerio,
9    J-O-E-V-A-L (it's small case), then print...I got the
10    Canon copier to work...but it needs new ink).
11    Q    My e-mail, joeval5@optonline.net?
12    A    I'm sorry?
13    Q    It says, "my e-mail joeval5@optonline.net," in the
14    message?
15    A    Yes.
16    Q    And it is from joeval5@optonline.net, right?
17    A    That's correct.
18    Q    To Andre Valerio, his son?
19    A    That's correct.
20    Q    And read further down for the sake of completeness
21    here.  This appears to be Ticketmaster.  You purchased two
22    tickets.
23          That's what it says, right?
24    A    Yes.
25    Q    The Islanders hosting the Canadians?

Troyd - Direct/Kabrawala

497

1    A    Yes.
2    Q    Someone named Joseph Valerio ordered those tickets,
3    it appears?
4    A    Yes.
5    Q    Paid $324.40 for those tickets, apparently.  A lot of
6    money?
7    A    Yes.
8    Q    Look at 245-A.
9    A    Yes.
10    Q    I'll publish it.
11          What do you recognize this document to be?
12    A    This is an e-mail from Joseph Valerio to Andre
13    Valerio.
14    Q    You were here yesterday when the Cablevision
15    representative, Robert Egan, testified, right?
16    A    Yes.
17    Q    And he had referred to --
18          MR. LATO:  Objection.
19          THE COURT:  Sustained.
20    Q    Had he referred to an IP address?
21    A    Yes.
22    Q    I want to show you 205-A that was admitted during
23    Mr. Egan's testimony.  Showing you what has been already
24    admitted as 205-A.
25          What is the IP address that Mr. Egan read into

Troyd - Direct/Kabrawala

**498**

1 the record yesterday on 205-A?

2 **A   That is 69.118.191.98.**

3 Q   Remember that number.

4       I'm telling you again now that was entered as

5 245-A.  Is that it?

6 **A   Yes.**

7 Q   Do you see that same number?

8 **A   Yes.**

9 Q   Read it aloud, would you?

10 **A   69.118.191.98.**

11 Q   Do you see the subject line written in the e-mail

12 header portion of 245-A?

13 **A   Yes.  "Forward:  Your Ticketmaster order."**

14 Q   What is the date of this header?

15 **A   March 18th, 2013.**

16 Q   Now, you just testified about Government's

17 Exhibit 245, didn't you?

18 **A   Yes, I did.**

19 Q   When was that e-mail sent, 245?

20 **A   March 18, 2013.**

21 Q   Same as the header, right?

22 **A   Yes.**

23 Q   "Forward:  Your Ticketmaster order" is the subject?

24 **A   That's correct.**

25 Q   All right.  And reviewing the search warrant --

Troyd - Direct/Kabrawala

**499**

1 withdrawn.

2       Reviewing the e-mails that were produced by

3 Cablevision in response to a search warrant, did you find

4 e-mails between joeval5@optonline.net and

5 kalichenkoes@mail.ru?

6 **A   Yes, I did.**

7 Q   I'd like to discuss with you some of those e-mails.

8       Take a look at Government's Exhibit 208 which is

9 in evidence.

10       MR. KABRAWALA:  I'll publish them.

11       THE WITNESS:  Okay.

12 Q   Is it fair to say it is between joeval5@optonline.net

13 to kalichenkoes@mail.ru?

14 **A   Yes.**

15 Q   Dated March 15, 2012, subject:  Forward:  Helena?

16 **A   Correct.**

17 Q   Read aloud starting from the second sentence of the

18 second paragraph where it says "When I looked" to where it

19 says "All that I ask you."

20       Showing you where it starts.

21       Why don't you start from the beginning of the

22 second paragraph.

23 **A   It was a nice reminder of those pics you took back a**

24 **few months ago and all the possibilities of all the**

25 **creative things we can do on video.  If and when you were**

Troyd - Direct/Kabrawala

**500**

1 to arrive here, when I look back at the videos you made of

2 **you and ▓▓▓ together, I said to myself, this can be**

3 **very good if she can comply to my demands and not**

4 **challenge them.  Helena, the bottom line is that you'll**

5 **have to do all I ask you to do.**

6 Q   Okay.

7       Now I'll have you turn to Government's

8 Exhibit 210 in evidence.

9 **A   Yes.**

10       MR. KABRAWALA:  I will publish it.

11 Q   Is it fair to say this is an e-mail from Joe Valerio

12 to Kalichenko sent on March 25, 2012?

13 **A   Yes.**

14 Q   Same subject line:  Forward:  Helena.

15       I want you to read about halfway down -- I'll

16 show the entire page first.

17       If you look about halfway down, the second

18 paragraph.  Please read aloud starting where it says

19 "Here, when and why" to where it says "kinky stuff on

20 video."

21       Do you see that?

22 **A   Yes.**

23 Q   To make it easier, read from "here."

24 **A   Here in NY, if you ever realistically get to NY, when**

25 **you can with the right visa, let me know, and I hope maybe**

Troyd - Direct/Kabrawala

**501**

1 to have room for you.  Again, I only see what's before me,

2 **as I'm only being honest with you so I don't hurt you.**

3 **The plus when you would have been your sweet tits and**

4 **having your daughter as well...for us to enjoy some kinky**

5 **stuff on video.  And quite frankly speaking, Helena, you**

6 **would be literally crawling around the carpet floor naked**

7 **or just in panty hose as my slave.**

8 Q   Please turn to Government's Exhibit 211.  It's in

9 evidence, and I'm going to publish it.

10       Just describe the e-mail, please.

11 **A   This is an e-mail from Joe Valerio at**

12 **joeval5@optonline.net to kalichenkoes@mail.ru, sent March**

13 **28, 2012, at 10:23 a.m.**

14 Q   Now starting about halfway down the page, there's a

15 sentence that begins, "It's good to see little ▓▓▓"

16       Do you see it?

17       Do you see where I'm circling right there?

18 **A   Yes, okay.  I see it.**

19 Q   Go ahead and read from there all the way down to

20 "hair dyed blonde."

21 **A   Yes, of course it is good to see little ▓▓▓**

22 **growing up, nice and firm, of course, being that I have**

23 **control over ▓▓▓.  I want to see her in long blonde**

24 **hair.  And as for you, right, of course, when you get that**

25 **visa to New York, I'll send you to the salon to get your**

Troyd - Direct/Kabrawala

**502**

1    hair dyed to blonde.

2    Q    Now, jump down the page and read that entire next

3    paragraph:  I'm picking up Julia from her relatives later

4    today...

5    A    I'm picking up Julia from her relatives later today.

6    I'm going to fuck her even harder now that I'm thinking

7    what I'll have you for and what you will be doing for me

8    on demand.  As my imagination and cock run hard, and while

9    for all my genius and creativity I'm truly blessed and God

10   has found me to leave me both with my grasp with strong

11   hands.  I'm sending out $100 to who and where you want me

12   to send it.  I want those pussy and tit videos, and be

13   very creative.  Helena, this depends what you show me in

14   writing and video if you want to continue to be part of my

15   circle.

16          Stay safe and clean.  Your body belongs to me,

17   your master.  Understand, clean.

18          MR. KABRAWALA:  For the record 211-A was

19   admitted yesterday through Mr. Egan from Cablevision, and

20   it will be published again.

21   Q    It's the same date of that e-mail, 3/28/12?

22   A    That's correct.

23   Q    There's an IP there.  24.186.38.241?

24   A    That's correct.

25   Q    That is one of the IP addresses that Mr. Egan

Troyd - Direct/Kabrawala

**503**

1    testified to about yesterday?

2    A    Yes.

3    Q    What do you recall about that?

4    A    That this address belonged to optonline in the

5    tristate area.

6    Q    213, please.

7    Q    213?

8    Q    Yes, sir.

9          Read the entire body.  I'll publish it now.

10         You know what?  Before you read it, is it

11   correct to say it is from Joe Valerio to

12   kalichenkoes@mail.ru?

13   A    Yes.

14   Q    Sent on April 12, 2012?

15   A    Yes.

16   Q    Read the entire body.

17   A    Okay, Helena.  Get to Moscow.  Show me what you got

18   in pics, video, and I'll get you back to the Ukraine.

19   Remember my words:  You will need to do all I ask you in

20   video with ███████ when you are with her.  This unique

21   situation separates you from the rest I have here.  I will

22   tell you what to buy and both wear for these videos on a

23   daily basis, like tights for both, panty hose, whatever I

24   tell you to both wear and do.  You will only go back to

25   Turkey to obtain your American visa and back to the

Troyd - Direct/Kabrawala

**504**

1    Ukraine and then back to the USA.  Do you now understand

2    what I'm telling you?  I see you really want this badly

3    and all that I will do with you.  So this is what you need

4    to do.  No more going back and forth to any country except

5    Turkey, just for your visa, and back to New York.  Do we

6    understand each other?

7    Q    All right.  I'll just remind you that this is an

8    e-mail from 4/12/2012, right?

9    A    Yes.

10   Q    Turn to Government's Exhibit 214.

11         MR. KABRAWALA:  I'll publish this, which has

12   already been entered into evidence as Government's

13   Exhibit 214.

14   Q    Just the top appears to be Joe Valerio forwarding it

15   to himself; is that fair to say?

16   A    Yes.

17   Q    It is dated 4/12/12, at 11:02:00 p.m.?

18   A    Yes.

19   Q    It says, "begin forwarded message"?

20   A    Yes.

21   Q    And the date is the same above, correct?

22   A    Yes.

23   Q    And what I'll do, I'll actually just scroll down and

24   show you right here where it says -- do you see where it

25   says, Thursday, 12 April 2012 at 15:38?

Troyd - Direct/Kabrawala

**505**

1          What is 15:38?

2    A    15:38 is 3:38 p.m.

3    Q    So it's the same exact time as the e-mail that you

4    just read, Government's Exhibit 213, right?

5    A    Correct.

6    Q    In fact, the entire text of Government's Exhibit 213

7    is well contained within Government's Exhibit 214?

8    A    Correct.

9    Q    So it appears to be some sort of a portion of an

10   e-mail in response?

11   A    Yes.

12   Q    And just the bottom of it, in Government's

13   Exhibit 213, the last line where it says "Do we understand

14   each other," do you see that?

15   A    Yes.

16   Q    I'll draw your attention to the e-mail where it says

17   "begin forwarded message."

18   A    Yes.

19   Q    Who is that from?

20   A    Elena Kalichenko at kalichenkoes@mail.ru.

21   Q    To?

22   A    To Joe Valerio at joeval5@optonline.net.

23   Q    I'll read this aloud, and tell me if I get it wrong.

24   A    Okay.

25   Q    Yes, Joseph -- this is in capitals now -- we do

Troyd - Direct/Kabrawala

506

1 understand each other, delivering you videos with █████

2 the exact way you request, and Turkey only for the visa

3 purpose.  I do understand...

4 　　　Did I read that correctly?

5 A   Yes.

6 Q   This is actually still Government's Exhibit 214,

7 right?

8 A   Yes.

9 Q   Now, I'm also going to read a portion starting about

10 halfway down:

11 　　　Joseph, could you please send me like from 75 to

12 $100 on my name here to Ankara, A-N-K-A-R-A, cause I

13 seriously have 250 left.  $200 I will pay for the text

14 tom, T-O-M, and $50 I need to pay for a taxi to get me

15 from the place where I stay to the airport so in Moscow.

16 　　　And it goes on to say:  I will use these money

17 to pay for taxi again to get from V-N-U-K-O-V-O airport.

18 This is the one I will arrive in S-L-O-B-O-D-A.

19 　　　Did I read that correctly?

20 A   Yes, you did.

21 Q   It appears she's asking for money, right?

22 A   Yes.

23 Q   This is the date of April 12, 2012, as a reminder,

24 correct?

25 A   Correct.

Troyd - Direct/Kabrawala

507

1 Q   By the way, where is Ankara?

2 A   In Turkey.

3 Q   A city in Turkey?

4 A   Yes.

5 Q   I will draw your attention to what has previously

6 been marked and admitted as Government's Exhibit 332.

7 　　　I'm sorry, 322.

8 　　　Do you have it?

9 A   Yes, I do.

10 Q   Do you remember what this is?

11 A   This is a chart that illustrates transactions that

12 were done through Western Union.

13 　　　MR. KABRAWALA:  I'm publishing what has been

14 admitted into evidence as Government's Exhibit 322.

15 Q   Look at the date.  Do you remember what that date was

16 of the last e-mail where Kalichenko is asking for money,

17 4/12/12?  Do you remember that?

18 A   Yes.

19 Q   What does it say happened on that date according to

20 Western Union records?

21 A   On 4/12/12, it says that Joseph Valerio from 3 High

22 Gate Drive in Smithtown, New York, sent $100 to Ankara,

23 Turkey, to the payee Kalichenko.

24 Q   $100 to Turkey?

25 A   Yes.

Troyd - Direct/Kabrawala

508

1 Q   Turn to Government's Exhibit 211.

2 　　　How much is being asked for?

3 A   75 to $100.

4 Q   Take a look at Government's Exhibit 215 which has

5 been admitted into evidence.

6 A   Yes.

7 Q   Are you there?

8 A   Yes.

9 Q   Okay.

10 　　　MR. KABRAWALA:  Let me publish 215.

11 Q   See halfway down it says:  I told you back in

12 Turkey...?

13 A   Yes.

14 Q   Read the sentence -- read where it says "I told you

15 back in Turkey" to "your daughter."

16 A   I told you back in Turkey, I need to see this

17 validation from you when you know I'm helping you and your

18 daughter...so this is what I want to see from you because

19 you are not here to show me this validation that Val,

20 V-A-L, and Julia give me in their own way.  So that means

21 I need to see all I'm asking of you that I feel will

22 warrant your arrival to New York some day.  Helena, get

23 over to that computer place today to send me those videos

24 on a computer format along with all those pics.  I will be

25 at my home office in a day or so, so I expect to see a lot

Troyd - Direct/Kabrawala

509

1 of action.  Then I'll review them all, and I might

2 consider your next request and move to get you home to

3 your family.  I'm be waiting to see your validation.

4 Q   This home office is being referred to in this

5 4/15/2012 e-mail?

6 A   Yes.

7 Q   Do you remember seeing a home office?

8 A   Yes, at 3 High Gate Drive, on the second floor.

9 Q   Is that where you found this (indicating)?

10 A   Yes, this is correct.

11 　　　THE COURT:  What exhibit is that?

12 　　　MR. KABRAWALA:  I'm sorry, good point.

13 Government's Exhibit 400.

14 A   Yes.

15 Q   You found this in the home office at the defendant's

16 house, right?

17 A   That's correct.

18 　　　MR. KABRAWALA:  Government's Exhibit 216,

19 please.

20 　　　I'm going to publish it.  216.

21 Q   Is it fair to say it is from joeval5@optonline.net to

22 kalichenkoes@mail.ru, the same month, April 16, 2012?

23 　　　Subject:  Forward:  Flight doesn't look good for

24 you.

25 　　　Can you just read the entire first paragraph?

**Troyd - Direct/Kabrawala**

510

1    Do you see that?

2    A   Sure.

3    Helena, I looked at your videos.  I'll give you

4    credit for some.  Like I suspected.  Why did you hurry

5    while doing them?  And why the hell were the videos done

6    just in the bathroom?  Whose place did you stay at?  If

7    you were alone, then you would not feel the sense of

8    rushing the video and the sense to hide in the bathroom

9    while someone else is in the other room...I know you

10   tried, but you can't fool me.  When is the last time you

11   had sex?

12   Q   Is it fair to say that the e-mail is riddled with

13   exclamation marks?

14   A   Yes.

15   Q   What does it mean when someone writes "based on your

16   experience," when someone writes in all capital letters?

17   MR. LATO:  Objection.

18   THE COURT:  Sustained.

19   Q   Take a look at Government's Exhibit 243.  This is

20   actually a ten-page exhibit.

21   A   Yes.

22   Q   Are you there?

23   A   I have it.

24   Q   Okay.

25   Turn to the seventh page, please.

---

**Troyd - Direct/Kabrawala**

511

1    Actually, before you do that, take a look at it

2    and let me know whether it looks like an -- essentially an

3    e-mail chain between two people, whether there were

4    responsive messages going out.

5    A   Yes, it is a chain.

6    Q   Who are those two people, or 2-E-mail addresses, I

7    should say?

8    A   I'm sorry, I didn't hear you.

9    Q   That was an unclear question.  I'm sorry.

10   Who are the 2-E-mail addresses -- withdrawn.

11   Who is the correspondence between, which e-mail

12   addresses?

13   A   Between Joseph Valerio at joeval5@optonline.net and

14   Kalichenko ES at kalichenkoes@mail.ru.

15   Q   Please turn to the seventh page.

16   A   Okay.

17   Q   I want you to read from -- see where it says -- I'm

18   sorry.

19   MR. KABRAWALA:  I'm publishing this, 243.

20   Q   See where it says, Tuesday, 26 June 2012, and there's

21   a number 23:07:14?

22   A   Yes.

23   Q   Appears to be 11:00 p.m., 11:07:00 p.m.?

24   A   Yes, that would be the right time.

25   Q   And it's Joe Valerio at joeval5@optonline.net?

---

**Troyd - Direct/Kabrawala**

512

1    A   Yes.

2    Q   I want you to read from where it says "Helena."

3    Do you see this?  The first word.

4    A   Yes.

5    Q   "Helena, what is the true purpose," all the way down,

6    five lines, to where it says, "When this is completed,

7    we'll talk money."

8    A   Helena, what is the true purpose of your inclination

9    to want choose solely Miami?  I will do this for you by

10   pushing the dates up one week and then meet you in Miami.

11   You will get over to the UKR and get me those videos I

12   asked for, the pool changing rooms, dressing rooms, et

13   cetera, and more of you and ██████.  You see this thing

14   with your daughter gives you some clout with me.  So I

15   need to see this.  When this is completed, we'll talk

16   money.

17   Q   Agent Troyd, are you aware that the defendant has a

18   daughter named A████, A-█████████?

19   A   Yes.

20   Q   I want you to just read -- I'll read it aloud.

21   No more traveling.  Only to bring your daughter

22   back.  I have included her already as a dependent and got

23   tax write-offs back in May.  A████ and her mom are just

24   here for visitation, that's it.  Are you kidding, her life

25   in my Hamptons home, she will return back to SA after

---

**Troyd - Direct/Kabrawala**

513

1    seeing her relatives?

2    Valerio, of course, lives in NYC.  That's

3    permanent.  But she travels like every two weeks for

4    modeling work.  You may stay a very long with me in NY.  I

5    got it all worked out...you need not ask, but listen to me

6    and you will be fine here with ██████.

7    To answer the birthday plans, she had it as a

8    surprise for me, and, yes, it's a party atmosphere in

9    Vegas.  It's a great place.

10   Be safe and keep clean.

11   Joseph.

12   Did I read that correctly?

13   A   Yes.

14   Q   Take a look at Government's Exhibit 219, please.

15   A   Yes.

16   MR. KABRAWALA:  I'm going to publish it.

17   Publishing 219 from joeval5@optonline.net to

18   kalichenkoes@mail.ru.  It is dated June 27, 2012.  The

19   subject is:  Forward: Re:2:forward, your mail.

20   I'll read portions of it, and tell me if I get

21   it wrong.

22   I'm starting from the top here.

23   A   Okay.

24   Q   Let's keep your destination for Miami, and like you

25   said, the 26th through the 29th, any of those days, which

---

Troyd - Direct/Kabrawala

514

1   gives me a week to get back from Vegas and then fly to
2   Miami to meet you.  So push up the dates to arrive in the
3   USA.  And, yes, I want you to spend two weeks with your
4   daughter.  Take care of her, groom her, let her hair grow.
5   Not short like a boy.  Then do the video again with
6   ▮▮▮▮.  Pool dressing rooms, changing rooms and more.
7   Lock in your arrival time like you indicated for the 29th
8   of July.
9           Did I read that correctly except for what is
10  corrected?
11  A   Yes, that is correct.
12  Q   Okay.  I'll continue reading.
13          I can squeeze in time with Chrissy and Natalia
14  and then have more time with you -- I'm sorry.  Then after
15  you will remain in New York...keep your sweet tits close
16  to my mouth, and they can -- you can just fly into UKR to
17  get ▮▮▮▮
18          Did I read that correctly?
19  A   Yes.
20  Q   What is UKR?
21  A   The symbol for Ukraine.
22  Q   The abbreviation?
23  A   Yes, the abbreviation.
24  Q   So continuing on.
25          With your B-visa, ▮▮▮▮ can come along with

Troyd - Direct/Kabrawala

515

1   you, no problem.  So begin the process, sweets, and work
2   on getting Anna possibly back with you or no problem at
3   all.  We can get her here when you arrive...that's fine
4   with me, as I will be set then waiting for you.
5           Thanks for asking about A▮▮▮.  She's gorgeous,
6   light brownish blonde hair...very light like mine in the
7   summer with -- and get this -- hazel green eyes.  Looks
8   more like Daniella, Valerio's sister.  You know you have
9   such beauty in ▮▮▮▮.  Like you are mine.  I see and know
10  this as I insert my power of protection from and to God
11  above to watch over you, ▮▮▮▮ and your mom.
12          Be safe and secure.
13          Did I read that correctly?
14  A   Yes.
15  Q   Will you turn to Government's Exhibit 243, please?
16  A   Yes, I have it.
17          MR. KABRAWALA:  I'll publish it.
18  Q   Same sender as the last one now?
19  A   Yes.
20  Q   Same addressee.  The "to" and the "from" are the
21  same?
22  A   Yes.
23  Q   When was this sent, July 5, 2012?
24  A   Yes.
25  Q   This was from Joe Valerio, joeval5@optonline.net,

Troyd - Direct/Kabrawala

516

1   subject:  Re:6:forward, 5:your mail?
2   A   Yes.
3   Q   Read from where it says -- from the top.  Read this
4   paragraph, the entire paragraph.
5   A   Before I go, where do you want the money wired to?  I
6   can do Western Union tonight from anywhere.  Glad to know
7   you are back safe and soon to be home in the UKR.
8   Certainly would like to see the pics of ▮▮▮▮ and of
9   course don't forget to take videos from you are
10  staying:  the room, place, you in the shower.  Soon I may
11  devour you all to myself.  Delicious.
12          Seems like all is falling into its rightful
13  order.  I have a good feel.  Just waiting, and I will be
14  leaving soon.  Just let me know if I'm clear to wire via
15  Western Union to Istanbul.
16          Be safe.  Kisses back all over.  PS.  Glad
17  everyone's safe.
18  Q   That's a July 5, 2012, e-mail; is that correct?
19  A   Yes.
20  Q   Showing you Government's Exhibit 222.
21          MR. KABRAWALA:  Government's Exhibit 222 is in
22  evidence.
23          I will publish it.
24  Q   Are you there?
25  A   I'm here.

Troyd - Direct/Kabrawala

517

1   Q   This appears to be from joeval5@optonline.net to
2   kalichenkoes@mail.ru.
3           What is the date there?
4   A   July 6, 2012.
5   Q   How does it relate to the last e-mail?
6   A   The day after.
7   Q   The next day, right?
8   A   The next day.
9   Q   Do you want to read it?
10          Helena, here is the wire number, MTCN, with the
11  number sign 1488978622.
12          Be safe, Joseph.
13          Did I read that correctly?
14  A   Yes, I did.
15  Q   Can you please look at Government's Exhibit 322.
16          I would just keep that out.
17  A   Okay.
18  Q   322 has been admitted.  You might recall that this is
19  the Western Union summary chart.
20          What does it say that happened on June 6,
21  2012, -- I'm sorry, July 6, 2012, if anything?
22  A   On July 6, 2012, the summary chart indicates that
23  Joseph Valerio sent Olena Kalichenko $200 to Ankara,
24  Turkey.
25  Q   Take a look at the MTCN number, that unique number

Troyd - Direct/Kabrawala

518

1  Q  that appears in Government's Exhibit 222.
2  A  **Yes.**
3  Q  And compare that number, that unique MTCN number, to
4  the other number for the entry for the same date, July 6,
5  2012.
6  A  **Both MTCN numbers are identical.**
7  Q  I missed that, I'm sorry.
8  A  **Both MTCN numbers are identical, the one on the**
9  **e-mail and the one on the summary chart.**
10  Q  Okay.  Can you next turn to Government's Exhibit 223?
11  It's in evidence.
12  A  **I have it.**
13  Q  Okay?
14        MR. KABRAWALA:  I'll publish it.
15        Publishing 223 in evidence.
16  Q  This is from joeval5@optonline.net to
17  kalichenkoes@mail.ru.
18        What is the date?
19  A  **July 12, 2012.**
20  Q  And the "to" and "from" that I just read out, did I
21  read it correctly?
22  A  **Yes.**
23  Q  What is the subject?
24  A  **"Lower your tone with me."**
25  Q  Read the entire e-mail.

Troyd - Direct/Kabrawala

520

1  Q  Scroll down about eight lines down the page.
2        Why don't you read starting from -- I'll read
3  it, and you let me know if I get it wrong.
4  A  **Okay.  Where are we starting?**
5  Q  I'll start right here where it starts "I closed on a
6  business..."
7        Do you see that?
8  A  **Yes.**
9  Q  I closed on a business deal like I had mentioned with
10  my cousins in Brooklyn, where now I can leverage a
11  warehouse deeded to me and my family for future
12  investments.  Having connections and property from
13  Manhattan, Brooklyn, just recently Nassau County, homes
14  and buildings, Suffolk County, where the Smithtown and
15  Hamptons homes are, along with the co-op jointly owned,
16  then time share out east in Montauk.  It's all of New
17  York.
18        Did I read that correctly?
19  A  **Yes.**
20  Q  Except for upstate, which is the cheapest, along with
21  Queens, Staten Island, which is less desirable.  I'm proud
22  to see how hard you are working with the translations.
23  It's quite an accomplishment.
24        Did I read that correctly?
25  A  **Yes.**

Troyd - Direct/Kabrawala

519

1  A  **Before we move further, we have you decided for your**
2  **mother to stay while you have ▇▇▇▇ and do the videos**
3  **with her along with the dressing rooms, showers?**
4        **You also remember there are still no guarantees**
5  **you will get your visa...but you will work for these**
6  **videos when you are in Kiev.**
7  Q  July 12, 2012, 10:14 a.m., is the time of this sent
8  e-mail, correct?
9  A  **That's correct.**
10  Q  July 12th.
11        Now, take a look at Government's Exhibit 225.
12  That's in evidence and has been admitted.
13  A  **Okay, I have it.**
14  Q  You are quicker than me.  My computer is slow.
15        MR. KABRAWALA:  I'm going to publish the
16  document so the jury sees it.
17  Q  It is a one-page exhibit; is that correct?
18  A  **Yes.**
19  Q  July 12, 2012, the same date as the last e-mail?
20  A  **3:38 p.m.**
21  Q  Who is it from and to whom?
22  A  **From joeval5@optonline.net, and it is**
23  **kalichenkoes@mail.ru.**
24  Q  The subject line, please?
25  A  **Subject is:  Forward:  Perfect dear.**

Troyd - Direct/Kabrawala

521

1  Q  Suffolk County, Nassau County, Manhattan, Brooklyn,
2  all are within the state of New York.  That's obvious.
3  A  **Yes.**
4  Q  All essentially Downstate?
5  A  **Yes.**
6  Q  Not in Ukraine?
7  A  **I'm sorry?**
8  Q  Not in the Ukraine?
9  A  **No, of course not.  No.**
10  Q  I'm going to continue to read.  I'm going to jump
11  down here where it says "arrive first."
12        This is at the right side of the page.
13  A  **Yes, I see it.**
14  Q  Arrive first safely, and I'll pray that you do.  Get
15  settled in Kiev.  We'll set your mother up so she can
16  relax, as do all those delicious -- I'm sorry, I lost my
17  place.
18        Would you mind reading where I lost my place --
19  I'm sorry.
20        Relax as well, and you get together with our
21  sweet little joy...so sweet.  I bet you can't wait to see
22  her.
23        Read to the end, please.
24  A  **Sure.**
25        **Do all those delicious things on video with**

Troyd - Direct/Kabrawala

522

1   ████, so sweet.  I can taste your nectar dripping wet on
2   my tongue, umm, da.  Yes, of course that camera is
3   perfect.  The one the agent used for Yaro, Y-A-R-O.  It
4   can easily be sent to my e-mail address after filming.
5   Ask that agent all specifics okay, babe?  We are set and
6   hopefully forever.  Your interview date, July 25th.
7           And I have a lawyer amongst others for the
8   adoption process, but you can still bring ████ in the
9   USA come October.  November, correct.  The rest is
10  understood.  Saturday will be in your departure from
11  Turkey.  Send me the flight details so I know when you
12  arrive safely.  I have kiss you so passionately.  So
13  dripping wet.
14  Q   That's fine.  Thanks.
15          Take a look at Government's Exhibit 226, the
16  very next one.  It has been admitted into evidence, and
17  I'll publish it now.
18  A   I have it.
19  Q   It's safe to say it is from joeval5@optonline.net to
20  kalichenkoes@mail.ru?
21  A   Yes.
22  Q   And it's a few days, six days, later, approximately,
23  from the last e-mail, July 18, 2012?
24  A   Yes, at 11:51 p.m.
25  Q   I'll read starting the last line -- I'll just read

Troyd - Direct/Kabrawala

523

1   it, starting the last line of the first paragraph.
2   A   Okay.
3   Q   Here is the money that I promised you and ████
4   MTCN 6554625309.
5           Off to a cabaret show now.  Both of you be safe
6   and enjoy your time together.  Joseph.
7   A   Yes, that is correct.
8   Q   Can you turn to Government's Exhibit 322, please?
9   A   Yes, I have it here.
10  Q   You have it ready, but I don't.
11          MR. KABRAWALA:  I'll publish it again, 322.
12  Q   According to Government's Exhibit 322, did anything
13  happen that day, July 18th, the date of that e-mail?
14  A   Yes.
15  Q   What happened?
16  A   On that date Joseph Valerio, at 3 High Gate Drive in
17  Smithtown, New York, sent $600 to Olena Kalichenko in
18  Kiev, Ukraine.
19  Q   Take a look at that tracking confirmation number.
20  A   Yes.
21  Q   Compare it to the MTCN number for Government's
22  Exhibit 226, that e-mail you read from.
23  A   Yes.
24  Q   Is there any difference in the numbers?
25  A   No.  The MTCN number in 226, which is the e-mail, is

Troyd - Direct/Kabrawala

524

1   identical to the MTCN number for the same date in the
2   summary chart from Western Union.
3   Q   Going back to an e-mail we've seen before,
4   Government's Exhibit 275.  Take a look at that.
5           That has already been admitted.
6   A   Okay, I have it.
7   Q   This is a six-page exhibit?
8   A   Yes.
9   Q   Turn to the fourth page, please, the very bottom.
10          Actually, look at the fifth page.
11          Is it from joeval5@optonline.net?
12          MR. LAPINTA:  I'm sorry, it is the fifth page.
13          MR. KABRAWALA:  I'm sorry.
14  A   At the bottom of the fourth page, it indicates the
15  text on the next page will be from joeval5@optonline.net.
16  Q   Is it fair to say it's the e-mail chain we've been
17  talking about?
18  A   Yes.
19  Q   Does this e-mail look familiar to you, the text of
20  it?
21  A   Yes.
22  Q   How so, sir?
23  A   This is the e-mail that I read, or a section of the
24  e-mail that I read, to Mr. Valerio at the January 28th
25  interview.

Troyd - Direct/Kabrawala

525

1           (Whereupon, the record was read back by the
2   reporter.)
3   Q   So you read this.
4           This is from Cablevision, right?
5   A   Yes.
6   Q   And the e-mail that you read to Mr. Valerio on
7   January 28, 2014, that was obtained -- how was it
8   obtained?
9   A   I received that e-mail from Special Agent Angelini,
10  who obtained that e-mail from Olena Kalichenko.
11  Q   So from both on the Cablevision --
12  A   Yes, both.  Both identical.
13  Q   I'll have you read this e-mail again, but I just want
14  to draw your attention to -- I'll just publish it.
15          I'm publishing 205, page 5, the middle
16  paragraph.
17          Read it to yourself.
18          Does that appear to be what you read to and had
19  the defendant read while you were speaking with him at his
20  house?
21  A   Yes.
22  Q   What did the defendant say about this e-mail?
23  A   That he did in fact send this e-mail to Olena
24  Kalichenko.
25  Q   Is it fair to say in this e-mail he's telling

1    Ms. Kalichenko to -- withdrawn.

2        Is it fair to say that he's telling Kalichenko

3    to essentially "follow the script"?

4    **A    Yes.**

5    Q    Is it also fair to say he describes what he wants

6    Kalichenko to do with the child?

7    **A    Yes.  He's directing the direction of the**

8    **pornography.**

9    Q    Is it also fair to say that he's telling Kalichenko

10   where the child should place toys?

11   **A    Yes.**

12   Q    Turn to the third page of this exhibit, page 3 of the

13   same exhibit, Government's Exhibit 205.

14   **A    Okay.**

15   Q    In this e-mail chain, is it fair to say that we're

16   now at a sent e-mail of July 21, 2012, 23:58:16?  That is

17   approximately 11:58 at night?

18   **A    That's correct.**

19   Q    From joeval5@optonline.net?

20   **A    Yes.**

21   Q    I'll read it, and tell me if I get it wrong.

22       Helena...yes, we are back safely and stood at

23   the apartment in NYC last night.  I'm back home today

24   resting up.  I got the videos of you and ███.  Of

25   course they are always a treat to receive and enjoy to see

1    you two both together.  That was very nice.  You can send

2    the rest to my e-mail, the pool, shower shots and changing

3    rooms, et cetera.  My e-mail, as you know by now, is the

4    best way to send all the videos...I guess you took a

5    shortcut this time on what you needed to do.

6        I'll scroll down the page.

7        MR. KABRAWALA:  For the record, I'm circling the

8    word "your" here to indicate where I am.

9    Q    Your now tell me about money you need by Monday to

10   show in your bank account.  Just sent you $600, plus I had

11   to reserve for your hotel in Miami and asked you what you

12   needed to cap your reserve.  And no answer.  You continue

13   to play by your own rules, and I'm not liking it, Helena.

14   You have spent six days in Kiev, a very big city, with a

15   rented apartment with just you and your daughter, and

16   that's all you produced?  That's not acceptable.

17       Did I read that correctly?

18   **A    Yes, I did.**

19       THE COURT:  We'll take the afternoon break.

20       Don't discuss the case.

21       (Whereupon, at this time the jury exits the

22   courtroom.)

23       THE COURT:  How much more do you have on direct?

24       MR. KABRAWALA:  Judge, I'm sorry?

25       THE COURT:  How much more do you have?

1        MR. KABRAWALA:  A half hour.

2        THE COURT:  Okay.

3        (Whereupon, a recess was taken.)

4        THE COURT:  Be seated.

5        MR. LAPINTA:  Real quick before the jury comes

6    out.

7        I've discussed the schedule on the remainder of

8    the case with counsel.  We'd like to propose a scheduling

9    situation with you.

10       Do you mind if we could call or start our case

11   on Monday, because we have an expert coming from New York

12   City, and he has to work his calendar to be here tomorrow

13   afternoon.

14       THE COURT:  That's fine.

15       MR. LAPINTA:  They are not even sure they'll be

16   finished tomorrow afternoon.

17       THE COURT:  That's fine.  We'll just end early.

18       MR. LAPINTA:  Thank you.

19       THE COURT:  Okay.

20       (Whereupon, the jury at this time enters the

21   courtroom.)

22       THE COURT:  Go ahead.

23   BY MR. KABRAWALA:

24   Q    Before the break we've been discussing Government's

25   Exhibit 205.  I'll now publish the first page of it, of

1    this six-page exhibit.

2    **A    Okay.**

3    Q    Does this look familiar to you, this exhibit?

4    **A    Yes.**

5    Q    How so?

6        This is the e-mail of 7/22/12?

7    **A    This is one of the e-mails I provided to Mr. Valerio**

8    **on January 28th which we read.**

9    Q    And he sent it?

10   **A    Yes.**

11   Q    I'll read portions of it, and tell me if I get it

12   wrong.

13       Again, for the record, it is July 22nd, 2012,

14   between Joe Valerio and Kalichenko.

15       The first paragraph is as follows:  First off,

16   my mistake above in the subject space.  It's Sveta's

17   information I needed, not ███  Yes, of course I want

18   to stay in pursuit of Sveta.  And why not?

19       I'll scroll down a bit.

20       Same paragraph.

21       The main reason I'm giving you a chance to come

22   and build a life here because you and ███ offer me

23   "something different" that my other girls don't have or

24   can't supply to me now.  So it's ███ and you that fit

25   that equation.  Got it?

Troyd - Direct/Kabrawala

530

1   Q   Now I'm going to scroll down.  I'll read the
2   last paragraph right before it says "speak to you
3   tomorrow, kisses," the last few lines which I'll not read.
4           Can you see that?
5   A   Where is that?
6   Q   The paragraph that starts at 15:  Interested?
7   A   Yes.
8   Q   Do you see "just wearing a top skirt and just panty
9   hose," and it continues on?
10          Is it fair to say -- withdrawn.
11          Is that portion of the e-mail -- withdrawn.
12          Is a portion of that remainder of that e-mail
13  what you read to the defendant aloud on January 28, 2014?
14  A   Yes, it is.
15  Q   And --
16  A   Yes, it is.
17  Q   Is it fair to say that it describes -- withdrawn.
18          Is it fair to say that it describes what the
19  defendant wants to see on videos involving █████
20          MR. LATO:  Objection.
21          THE COURT:  Sustained.
22  Q   Read it aloud.
23          So this is the text you read to the defendant
24  and he admitted sending?
25  A   That's correct.

Troyd - Direct/Kabrawala

531

1   Q   Oh, by the way, where does this e-mail come from?
2   A   The one in my hand or the one I read from?
3   Q   The one in your hand.
4   A   This came from Cablevision, and it was on the search
5   warrant.
6           MR. KABRAWALA:  Thanks.
7   Q   Please turn to Government's Exhibit 229.
8   A   Yes, I'm there.
9           MR. KABRAWALA:  I'm publishing it.
10  Q   229 is from joeval5@optonline.net to Kalichenko,
11  dated September 6, 2012, subject:  Forward, re:  Forward
12  to visa.
13          Why don't you read from -- without reading what
14  the MPCN number is, read above it.
15  A   Sounds good.  Just give me all the flight details to
16  follow through with so I know to check that you're safe.
17  Saturday, when you are settled in the city, send me the
18  usual videos of you and sweet █████, who will be so glad
19  to see you and explore your sweet tits and pussy by
20  putting a nice big toy in that sweet pussy of yours for
21  our █████ to pull out of your dripping wet pussy.
22          I want to see this and the blush of relief on
23  your face with a wet cum-dripping toy.  Speaking of which
24  I got a vibrating dong that I insert over my cock.  It's
25  an African Sicilian --

Troyd - Direct/Kabrawala

532

1   Q   It's okay.
2           There is an MTCN there, right?
3   A   Yes.
4   Q   In the e-mail -- I think you just read it -- it says:
5   Send me the usual videos of you and sweet █████.  Right?
6   A   Yes.
7   Q   The usual videos.
8           And the MTCN number for -- it's for $1,000?
9   A   I'm sorry?
10  Q   There is an MTCN.  What is that, to your
11  recollection?
12  A   The tracking number used by Western Union.
13  Q   For $1,000, right?
14  A   Yes, correct.
15  Q   September 6, 2012, e-mail, right?
16  A   Yes.
17  Q   Turn to the summary exhibit, Western Union summary
18  chart, 322, please.
19  A   I have it.
20  Q   September 6th, same MTCN number as the last e-mail?
21  A   Yes, it is.
22  Q   Who is it from and to?
23  A   Joseph Valerio in Smithtown, being sent to Olena
24  Kalichenko in Ankara, Turkey, for 1,000 US dollars.
25  Q   Just like in the e-mail, right?

Troyd - Direct/Kabrawala

533

1   A   That's correct.
2   Q   Government's Exhibit 230, please.  It is in evidence
3   like the last e-mail.  230.
4   A   230?
5   Q   Yes.
6           MR. KABRAWALA:  I'm going publish it.
7           I'm publishing 230.
8   Q   It's an e-mail from joeval5@optonline.net to
9   kalichenkoes@mail.ru, sent September 19, 2012, at
10  12:07 a.m.
11          Is that correct?
12  A   Yes, that is correct.
13  Q   I'm just going to read aloud the first couple of
14  sentences.  And I'm right here, sir.
15          Hello, there, Helena, how are you doing?  I hope
16  █████ is doing much better now.  I knew somehow she just
17  had a cold.  I'm sure it is just the change of temp,
18  T-E-M-P.
19          Did I read that correctly?
20  A   Yes, you did.
21  Q   Now I'll read from further on down, and circling it
22  on the screen.
23          Do you see that?
24  A   Yes.
25  Q   I need to see results and when your daughter is fine

Troyd - Direct/Kabrawala

534

1 and you're prepared. I need to see videos e-mailed to me
2 of you and ▓▓▓▓▓▓▓▓ I honestly have been in bed
3 all day with Val, et cetera.
4 Be safe, regards, Joseph.
5 Did I read that correctly?
6 A Yes, you did.
7 Q One more e-mail. 206.
8 A I have it.
9 MR. KABRAWALA: I'm publishing 206.
10 Q This is from joeval5@optonline.net to
11 kalichenkoes@mail.ru, sent 9/27/22 at 11:52 a.m.
12 Why don't you just read the first paragraph of
13 that e-mail.
14 A Hey, you listen now or this will be the last time
15 ever. Why the fuck are you writing mails at 9:30 p.m.
16 when your daughter is supposed to be sick? Are you
17 starting to be that sneaky bitch again? If so, I will
18 drop you on your ass. Better fucking explain.
19 First off, I just gave you $1200 for your
20 family, and you are going to fucking work for it. Not sit
21 anywhere all fucking day sending out e-mails. I'm asking
22 you now, what the fuck do you do all day and you have
23 produced nothing for me.
24 Q Okay. Continue to read the next paragraph until you
25 get to "I'll drop you on your ass" with a triple

Troyd - Direct/Lato

535

1 exclamation point.
2 A I wanted an explanation for all of this now. Each
3 morning and night you will send me a cell phone video of
4 you waking up with your daughter with your tits in her
5 mouth before you go to sleep and wake up. If I don't see
6 this each day, I will drop you on your ass.
7 Q Okay.
8 MR. KABRAWALA: Nothing further, your Honor.
9 THE COURT: Cross-examination?
10 MR. LATO: Yes.
11 Let me confer with co-counsel, please.
12 (Counsel confer.)
13 MR. LATO: Just a moment to get some exhibits,
14 Judge, and it will save some time.
15 THE COURT: Sure.
16 MR. LATO: Judge, may I just have a defendant's
17 exhibit sticker? I just need one.
18 Thank you.
19 CROSS-EXAMINATION
20 BY MR. LATO:
21 Q Special Agent Troyd, good afternoon.
22 A Good afternoon.
23 THE COURT: Please pull the microphone over.
24 MR. LATO: Yes, your Honor.
25 Q Would it be fair to say you and other law enforcement

Troyd - Direct/Lato

536

1 officers executed a search warrant at Mr. Valerio's house
2 on January 28th of this year?
3 A Yes, that is correct.
4 Q And is it true that approximately 12 law enforcement
5 officers, including yourself, were there to execute the
6 warrant?
7 A Yes, that's correct, sir.
8 Q Is it also fair to say that for a variety of reasons
9 the law enforcement officers were wearing raid jackets
10 that said "FBI"?
11 A Yes.
12 Q Is it also fair to say that you began the execution
13 of the warrant at or shortly after 6:00 a.m.?
14 A That's correct.
15 Q Is one of the reasons why the warrant was executed so
16 early is to have the element of surprise?
17 A For safety purposes, yes.
18 Q Did any of the officers or agents take pictures
19 inside the house or during the execution of the warrant?
20 A Yes.
21 Q Do you know who that person or persons were?
22 A Yes, I do.
23 Q Who was it?
24 A That would be Investigator George Davis, who is a
25 task force officer from the Nassau County Sheriff's

Troyd - Direct/Lato

537

1 Department. And I believe the log was maintained by
2 Special Agent Jim Lopez of the FBI.
3 Q Was this the SLR camera that took still photos?
4 A I'm not sure what you refer to when you say "SLR."
5 I'm not photography trained or anything. But it was a
6 still photo digital camera.
7 Q So it would be fair to say on January 28th, the FBI
8 had in its possession at least one camera?
9 A Yes.
10 Q Does the FBI, as far as you know, as early as
11 January 28th of this year, also have audio recording
12 devices?
13 A Yes.
14 Q As far as you know, on January 28th of this year did
15 the FBI also have access to camcorders to use if
16 necessary?
17 A Yes, we do.
18 Q Now, is it fair to say that when you and the other
19 officers first entered the house you did what is called a
20 protected sweep?
21 A Yes, that's correct.
22 Q During this protected sweep, were the occupants of
23 the house put in certain areas?
24 A Yes.
25 Q And is it fair to say that one of the first things

Troyd - Direct/Lato

538

1 that the officers did was to separate Mr. Valerio from
2 Jarmila?
3 **A    Yes.  I wouldn't say that we separated them, because**
4 **they were separated when we entered the house, but we had**
5 **Mr. Jarmila downstairs in what I would say was the family**
6 **room, because there was a couch there that was**
7 **comfortable.  And we left the supervisor of the squad,**
8 **Dawn Smallwood.**
9 Q    Is it fair to say that during the execution of the
10 warrant, Jarmila and Mr. Valerio were kept apart?
11 **A    Yes, they were.**
12 Q    Now, is it fair to say at some point you spoke to
13 Mr. Valerio?
14 **A    Yes, I did.**
15 Q    Would it be fair to say that occurred in the dining
16 room of his residence?
17 **A    Yes, it did.**
18         MR. LATO:  May I just have Exhibit 302 up on the
19 screen, please.
20 Q    Now, on the screen is Exhibit 302.
21     Do you see that, sir?
22 **A    Yes, I do.**
23 Q    And there's a table depicted in this picture,
24 correct?
25 **A    Yes, there is.**

Troyd - Direct/Lato

539

1 Q    And it was at this table or around this table, I
2 should say, that the interview occurred, correct?
3 **A    That is correct, sir.**
4 Q    It would be fair to say, Special Agent Troyd, as you
5 look at the picture, you were at the far end to the right?
6 **A    Well, I don't know what you mean by "far end."  I was**
7 **on the far side of the table to the right where the jacket**
8 **is on the chair.**
9 Q    Would it be fair to say that Detective Forrestal was
10 at the near side?  Correct?
11 **A    Correct.  In the chair that has the jacket on it.**
12 Q    Is it also fair to say Special Agent Messineo was
13 seated next to Detective Forrestal to his left?
14 **A    That's correct.**
15 Q    It would be fair to say that Detective Badalucco was
16 standing next to Detective Forrestal's right?
17 **A    No, he was standing to the left of Agent Forrestal,**
18 **closest to us.**
19 Q    It's fair to say in the middle between you and
20 Forrestal was Mr. Valerio, correct?
21 **A    Yes, sitting at the table to the right of Detective**
22 **Forrestal and to my left.**
23 Q    So is it fair to say that from Mr. Valerio's vantage
24 point there were detectives and agents to the left and an
25 agent to the right and he was stuck in the middle?

Troyd - Direct/Lato

540

1 **A    No, I don't believe he felt he was stuck in the**
2 **middle.**
3 Q    Was he in the middle, with an officer to the left and
4 an officer to the right?  Yes or no?
5 **A    He wasn't surrounded.**
6 Q    I didn't ask you that.
7 **A    But --**
8 Q    Sir, it's a simple question.  Are there officers to
9 the left of him?
10 **A    Yes.**
11 Q    Were you to his right?
12 **A    Yes, I was, sir.**
13 Q    Now at some point you administered Miranda warnings
14 or advice of rights to Mr. Valerio?
15 **A    Yes.**
16 Q    Is it fair to say it occurred at 7:55 a.m.?
17 **A    Yes, that's correct.**
18 Q    Approximately one hour and 55 minutes after the
19 search began; is that fair to say?
20 **A    Yes, that is correct.**
21 Q    Now, do you remember at some point subsequent to
22 Mr. Valerio's arrest, you and Agent Messineo arrested
23 Kalichenko?
24 **A    Yes.**
25 Q    When she was arrested, you brought her back to the

Troyd - Direct/Lato

541

1 FBI offices in Melville, correct?
2 **A    Yes, that's correct.**
3 Q    And you interviewed her, correct?
4 **A    Yes.**
5 Q    And that interview was both videotaped and audio
6 recorded?
7 **A    Yes, it was.**
8 Q    In the hour and 55 minutes from the time you entered
9 the house until the time you read the advice of rights,
10 did you audio record anything that happened between law
11 enforcement and Mr. Valerio?
12 **A    No.**
13 Q    Did you video record anything that transpired in that
14 hour and 55 minutes?
15 **A    No.**
16 Q    Your interview of Mr. Valerio, was any of that
17 recorded, audio or video?
18 **A    No, sir.**
19 Q    Is it fair to say that on direct examination earlier
20 today Mr. Valerio told you that he directed Ms. Kalichenko
21 to provide child pornography?
22 **A    Yes.**
23 Q    The words "child pornography," are those yours words
24 or his words?
25 **A    I would say those were my words, my interpretation of**

Troyd - Direct/Lato

542

1   what he was saying.

2   Q   Do you remember showing him a snippet of a video

3   during the interview?

4   A   Yes, I did.

5   Q   Would it be fair to say that during the snippet, the

6   child is dressed?

7   A   Half dressed.

8   Q   Is it fair to say that Ms. Kalichenko is naked or

9   mostly naked?

10   A   She was wearing panty hose.

11   Q   Is it fair to say that snippet was not child

12   pornography?

13   A   That snippet did not display any sexually explicit

14   material that was on the rest of the video.

15   Q   But Mr. Valerio, as far as you know, did not see the

16   rest of that video in your presence?

17   A   No, not in my presence, sir.

18   Q   So it would be fair to say what you showed

19   Mr. Valerio was not child pornography, the portion you

20   showed him?

21   A   The portion I showed was not.

22   Q   At any time that you were interviewing Mr. Valerio,

23   did you slam your hand on the table?

24   A   No, sir.

25   Q   Did you point a finger at him?

Troyd - Direct/Lato

543

1   A   No, sir.

2   Q   Were you still wearing a raid jacket?

3   A   No, sir.

4   Q   What about the other officers around the table, the

5   other four?  Were they jacketed or not jacketed?

6   A   I don't believe that Agent Messineo or Detective

7   Forrestal were wearing a raid jacket.  I don't recall

8   whether or not Detective Badalucco had removed his raid

9   jacket during the interview.

10   Q   Were you wearing a firearm that day?

11   A   Yes, I was.

12   Q   Was it a 40-caliber?

13   A   Yes, it is.

14   Q   Was it visible to Mr. Valerio?

15   A   No, it was not.

16   Q   Do you know whether the other officers around that

17   table were carrying firearms?

18   A   Yes, they were.

19   Q   Do you know whether their firearms were visible at

20   any time during the interview?

21   A   I don't believe they were, but I can't say for sure,

22   sir.

23   Q   That is because you weren't looking directly at them

24   the whole time; is that correct?

25   A   Correct, I was not watching the other officers the

Troyd - Direct/Lato

544

1   whole time.

2   Q   It's also fair to say that the table separated you

3   from the other officers?

4   A   Yes, it did.

5   Q   Now, at some point after executing the search

6   warrant, conducting the interview, did you memorialize in

7   writing the substance of what happened at the house?

8   A   Yes, I did.

9   Q   And is it fair to say that you typed what is known --

10   or had someone type a FBI 302?

11   A   Yes.

12   Q   And a FBI 302 is just a form that memorializes what

13   an agent did that day, correct?

14   A   That's correct.

15   Q   Now, sir, did you have any handwritten notes to work

16   off of when that was prepared, the typewritten version?

17   A   No.

18   Q   Do you remember the time lapse between your interview

19   of Mr. Valerio and your dictation or typing of the 302?

20   A   Not off the top of my head, no.

21   Q   Was it the same day?

22   A   Most likely not.

23   Q   If you looked at your FBI 302, would it refresh your

24   recollection?

25   A   Yes, it would.

Troyd - Direct/Lato

545

1       MR. LATO:  One moment, please, your Honor.

2       I apologize, your Honor.

3   Q   (Handing.)

4       Showing you Government's Exhibit 3500 ST-4 for

5   identification.  Please look at that and see if it

6   refreshes your recollection when you dictated or typed the

7   report.

8   A   It says that it was drafted --

9   Q   Sir, does it refresh your recollection?

10   A   Yes, it does.

11   Q   Please put it down, sir.

12       Is it fair to say that it was three days later

13   that you either dictated or typed this report?

14   A   It was three days later that I typed this report.

15   Q   Is it fair to say that you prepared this report based

16   solely on memory of events three days earlier?

17   A   Yes.

18       MR. LATO:  May I have it back, sir?

19       THE WITNESS:  Yes.

20       MR. LATO:  Thank you.

21       I apologize.

22   Q   Do you recall testifying on direct examination that

23   you showed Mr. Valerio one or more e-mails during your

24   interview of him?

25   A   Did you say one or more e-mails?

Troyd - Direct/Lato

546

1   Q   Was it one e-mail?
2   A   No, I showed him two e-mails at the interview.
3   Q   Right.  Did he read both of them?
4   A   Yes, he did.
5   Q   Did he read them to himself or out loud?
6   A   He read them to himself.
7   Q   Do you remember how long it took him to read them to
8   himself?
9   A   Just a couple of minutes.
10  Q   Is the amount of time it took him to read it in your
11  FBI 302?
12  A   No.
13  Q   So is it fair to say you are basing your recollection
14  solely -- I mean without notes?
15  A   Yes.
16  Q   So as you sit here today in November and you recall
17  that back in January, it was a couple of minutes?
18  A   Yes.
19  Q   Do you know whether he read the entire e-mail of each
20  of those two e-mails?
21  A   I believe he did, but I can't prove that.
22  Q   Did you ask him:  Have you read the entirety of each
23  of those e-mails?
24  A   No.
25  Q   Do you know whether he was -- well, did he appear

Troyd - Direct/Lato

547

1   nervous when he was reading them?
2   A   No, not really.
3   Q   When you say "not really" --
4   A   I would say he was not nervous.
5       MR. LATO:  May I have Exhibit 305, please.
6       MR. BODE:  It's right in front of you.
7       MR. LATO:  I'm sorry, you're right.
8   Q   I have Exhibit 305 up on the screen.
9       Do you see that, sir?
10  A   Yes.
11  Q   Would it be fair to say what is depicted, 305, are
12  some items that you saw on January 28th of this year?
13  A   Yes.
14  Q   Is it fair to say in this photograph, 305, you can
15  see a desktop tower and a monitor and what appears to be a
16  home office?
17  A   Yes.
18  Q   Do you see in this photo whether there was any child
19  porn on the walls or on the desk?
20  A   No, I do not.
21  Q   Based upon your recollection, was there any child
22  porn, photographs, out in the open for a person walking in
23  to see in that office?
24  A   No.
25  Q   Did you or anyone else from the FBI take fingerprints

Troyd - Direct/Lato

548

1   of anything in that office?
2   A   No.
3   Q   Did you or anyone else from the FBI or the Suffolk
4   County police take fingerprints of anything in that house
5   on that day?
6   A   No.
7   Q   Was there any DNA testing done in this case?
8   A   I took a DNA swab from Mr. Valerio at the time of his
9   arrest.
10  Q   Did you match his DNA or did anyone else match his
11  DNA to any other piece of evidence in this case?
12  A   I have not been advised of that.
13  Q   I want to show you Defendant's Exhibit A for
14  identification.
15      MR. BODE:  Do you have a copy?
16  Q   Agent Troyd, I'll show it to your colleagues because
17  maybe they have a color photograph.  So if I can have it
18  back for a moment, sir.
19  A   Certainly.
20  Q   I'm referring Defendant's Exhibit A for
21  identification to you, sir.
22  A   Yes.
23  Q   Let me know when you've had enough time to look at
24  it.
25  A   Okay.

Troyd - Direct/Lato

549

1   Q   Do you recognize what is depicted in Defendant's
2   Exhibit A?
3   A   Yes.
4   Q   Is it fair to say what is depicted in Defendant's
5   Exhibit A -- let me withdraw that.
6       Is Defendant's Exhibit A for identification a
7   photograph that was taken during the execution of the
8   search warrant on January 28th?
9   A   Yes, I believe it was.
10      MR. LATO:  Your Honor, I offer it as Defendant's
11  Exhibit A.
12      MR. KABRAWALA:  No objection.
13      THE COURT:  Defendant's Exhibit A is admitted.
14      (Whereupon, Defendant's Exhibit A was received
15  in evidence.)
16  BY MR. LATO:
17  Q   Now, Agent Troyd, do you recognize the general area
18  in the house depicted in this photograph?
19  A   Yes.  I believe this is the second-floor office.
20  Q   Is this the same office that was in a previous
21  photograph showing the computer and the monitor, 305?
22  A   Yes.
23  Q   Is it fair to say what is depicted in Defendant's
24  Exhibit A are papers and other objects?
25  A   Yes.

Troyd - Direct/Lato

550

1  Q   Do you see in Defendant's Exhibit A what appears to
2  be either a user name or a password?
3  A   **I see something that says "password."  It says**
4  **"pass," and then it is illegible after that.**
5  Q   Is it fair to say that when the FBI went through the
6  house, they made it a point to photograph the things that
7  were relevant to the investigation?
8  A   **Yes.**
9  Q   Is it fair to say that at least what is clear in this
10 photo is the user name shows Joeval?
11 A   **Yes.**
12 Q   Do you know whether this piece of paper with
13 Mr. Valerio's user name is depicted in the photograph or
14 whether it was placed there for photographing by an agent?
15 A   **I believe it was there when it was photographed.**
16 Q   Is it fair to say that the object containing the user
17 name is in open view to a person walking into the room?
18 A   **Yes.**
19 Q   May I have that back, sir?
20 A   **Sure.**
21 Q   Now, can you see, Special Agent Troyd -- if you look
22 at the screen, if you can just point out to the jury where
23 the user name is depicted, for their benefit.
24 A   **In the center of the screen there is some written**
25 **notes.  To the left, PAL 2013 sticker.**

Troyd - Direct/Lato

551

1          **To the left of that sticker it appears that says**
2  **Joe Val 66, and something below them that says "upper" and**
3  **then "lower" on the pad.**
4  Q   Special Agent Troyd, did the FBI recover from some
5  portion of the house a video or still photographs of
6  Mr. Valerio's ████ , █████
7  A   **Yes.**
8  Q   Did those pictures where -- the stills or videos come
9  off a computer?
10 A   **No.**
11 Q   Special Agent Troyd, did you arrest Mr. Valerio a
12 second time?
13 A   **Yes, I did.**
14 Q   Was that on February 24th of this year?
15 A   **Yes, it was.**
16 Q   Did you once again read him an advice of rights form?
17 A   **Yes, I did.**
18 Q   I'm putting up on the screen Government's
19 Exhibit 308.
20          Is that the advice of rights form you read to
21 him?
22 A   **Yes, it is.**
23 Q   Do you see, sir, in the upper right-hand corner there
24 is a time depicted?
25 A   **Yes, sir.**

Troyd - Direct/Lato

552

1  Q   Is it fair to say the time depicted was 3:35 p.m.?
2  A   **Yes, it is.**
3  Q   Is it fair to say, sir, that at the bottom of the
4  form, the last line, there is also a line for the time?
5  A   **Yes, there is.**
6  Q   So it's fair to say that the form has two possible
7  entries for the time, correct?
8  A   **Correct.**
9  Q   Is it fair to say at the bottom of the form there are
10 three signatures?  Correct?
11 A   **Two -- three, yes.**
12 Q   The first signature is Mr. Valerio's, correct?
13 A   **That's correct.**
14 Q   And the second is yours, correct?
15 A   **That's correct.**
16 Q   And the third is Special Agent Danielle Messineo?
17 A   **Yes.**
18 Q   Below Agent Messineo's name where the time is typed,
19 there is a blank, correct?
20 A   **Correct.**
21 Q   This interview, Special Agent Troyd, occurred at the
22 FBI offices in Melville, correct?
23 A   **That's correct.**
24 Q   It would be fair to say this was the same office
25 where Olena Kalichenko at a later date would be

Troyd - Direct/Lato

553

1  interviewed?
2  A   **That's correct, sir.**
3  Q   Special Agent Troyd, was this interview of
4  Mr. Valerio recorded with audio?
5  A   **No.**
6  Q   Was it video recorded?
7  A   **No.**
8  Q   On the day that Mr. Valerio was interviewed, did the
9  FBI have in its possession both audio and video recording
10 devices?
11 A   **Yes.**
12 Q   Special Agent Troyd, did you or any other agent
13 produce an FBI 302 of this arrest on February 24th?
14 A   **Yes.**
15          MR. LATO:  May I have a moment to confer with
16 counsel?
17          THE COURT:  Sure.
18 Q   Now, Special Agent Troyd, did you also make a
19 handwritten note in addition to the FBI 302?
20 A   **No.**
21 Q   Did Agent Messineo make a handwritten note as far as
22 you know?
23 A   **Yes, I believe she did.**
24 Q   Now, is it fair to say that it's your recollection
25 that Mr. Valerio said "I want to kill myself"?

Troyd - Direct/Lato

554

1   A   Yes.

2   Q   Is it also your recollection that he said, "I don't

3   have a family anymore"?

4   A   Yes, that's correct.

5   Q   Did you ask him to elaborate?

6   A   No, I did not.

7   Q   Did you ask him why he wanted to kill himself?

8   A   It was obvious.

9   Q   Yes or no?

10  A   No.

11  Q   Did you ask him why he didn't have a family anymore?

12  A   No, I did not.

13  Q   This window -- I'm sorry.

14      The office in which you interviewed Mr. Valerio,

15  how many law enforcement officers were present besides you

16  and Agent Messineo?

17  A   It was only Agent Messineo and myself.

18  Q   How large was the office?

19  A   It's -- the arrest processing area is where the

20  interview was conducted.  There are two smaller interview

21  rooms that are equipped with a handrail for handcuffing.

22  They fit probably the end of the table and not much

23  else --

24  Q   I'll cut you off and ask the question again.

25      The area in which you interviewed Mr. Valerio,

Troyd - Direct/Lato

555

1   how large was that area in feet, approximately?

2   A   8 by 12.

3   Q   Was there a door to that area?

4   A   Yes.

5   Q   Was the door opened or closed?

6   A   Opened.

7   Q   Were there any windows in this area?

8   A   There are no windows in the arrest processing area.

9   Q   Were you wearing your sidearm?

10  A   No.

11  Q   Was Agent Messineo, to your knowledge?

12  A   No.

13  Q   Now, Special Agent Troyd, are you familiar with a

14  camera clock, or a clock with a camera, that was seized

15  during the execution of the search?

16  A   Yes, I am.

17  Q   Is it fair to say that you are the case agent in this

18  case?

19  A   Yes, I am.

20  Q   As far as you know, were any videos taken with that

21  camera clock?

22  A   I do not know.

23      THE COURT:  Mr. Lato, it's about 4:30.  So if

24  this is a good point to break...

25      MR. LATO:  Yes, I still have about 15 minutes,

Proceedings

556

1   your Honor.

2       THE COURT:  That's fine.  We'll start at 9:45

3   instead of 9:30.

4       Don't discuss the case with anyone.  Do not read

5   anything regarding the case.

6       Have a good night.

7       THE JURY:  Thank you.

8       (Whereupon, at this time the jury exits the

9   courtroom.)

10      THE COURT:  If everyone can be seated.

11      You may step down.

12      THE WITNESS:  Thank you, your Honor.

13      THE COURT:  So, Mr. Lato, about another

14  15 minutes you have.

15      Are you going to call the woman you were going

16  to call today?  I forgot her name.

17      MR. KABRAWALA:  It's the mother of Jane Doe

18  number two.  She was actually here all day.  We sent her

19  home, and we'll be calling her back tomorrow morning.

20      THE COURT:  And you have an expert?

21      MR. KABRAWALA:  We have an expert, Judge.

22      THE COURT:  And that's it?

23      MR. KABRAWALA:  And we actually have one other

24  person, a probation officer, that has been briefed.

25      THE COURT:  So I'll see you in the morning.

Proceedings

557

1       Was that probation officer on the list -- what

2   do you want to elicit rather?

3       MR. KABRAWALA:  That the defendant was at the

4   time on probation for a misdemeanor, and as a result of

5   that, she was supervising him.  And in searching his

6   house, she found hidden items throughout the basement.

7       The defendant admitted he had items in the

8   basement.  We'll not say what was actually hidden.

9       There's also another portion that we requested

10  that the defendant -- during the probation search,

11  defendant admitted that he was aroused by the act of

12  filming female -- adolescent females.

13      THE COURT:  When you say she found the items in

14  the basement --

15      MR. KABRAWALA:  Yes, in the crawl space, yes.

16      THE COURT:  What did she find?

17      MR. KABRAWALA:  She found a lot of videotapes of

18  surreptitious filming of girls at beaches and of people

19  who apparently were changing in rooms in the house.

20      She found videos of people who apparently

21  being filmed with the defendant without their knowledge.

22      THE COURT:  Where were they found?

23      MR. KABRAWALA:  In the crawl space of the

24  basement.

25      THE COURT:  All right.

Proceedings

558

1    MR. KABRAWALA:  And the defendant admitted he
2  put them there.
3    MR. LATO:  Your Honor, we object.  This is
4  404(b) evidence, and this is the problem.
5    In terms of probative value, the closer in time,
6  the greater the probative value.  The greater the
7  similarity between the two offenses, the greater the
8  probative value.
9    Those videos, the probation officer would say,
10  were shot many years before the probation officer found
11  them, which means eight, ten, 12 years separates the
12  filming of those videos from the filming alleged in this
13  case.  So we have the remoteness in time.
14    We also have the dissimilarity.  This case, we
15  have the production of child pornography of, say, a
16  one-and-a-half to three-year old and a five-year old.
17    The video found in the crawl space are all much
18  older, meaning adolescents.  And we don't know how old --
19    THE COURT:  They just want to have testimony
20  that they were hidden videos, not the substance found in
21  the crawl space.  So whatever probative value would be
22  limited to that, not what is on the tapes.
23    MR. KABRAWALA:  We can say "hidden contraband."
24    MR. LATO:  What does that mean?
25    You are asking the jury to speculate.

Proceedings

559

1    What is in there?
2    So if the jury doesn't know what is in there, it
3  has no probative value.
4    MR. KABRAWALA:  Well, the Court can simply
5  address that by telling the jury they should not
6  speculate, and they can consider it or not with respect to
7  the defendant's control over that space.  It's very
8  simple.
9    If the Court wants, I'll lead the witness,
10  probably eight or ten minutes of testimony, half of which
11  would be --
12    THE COURT:  I'm precluding it.  Under 403 it is
13  not a close question.  The probative value, that he hid
14  something in the basement, not that he admits hiding the
15  camera used or any other item that was an instrumentality
16  of the crimes charged.
17    What we have here, in order for you to bring in
18  that he hid something in the basement, it would have to
19  come out as a misdemeanor, which obviously has some
20  prejudicial effect, which shows prior interaction with the
21  law.  And the Court, notwithstanding an instruction that
22  you speculate -- if you say "contraband," it could be all
23  kind of things.  And if you say "tapes," it raises a
24  specter in a case like this:  What was on the tapes.  And
25  to certainly go into the tapes is extremely prejudicial.

Proceedings

560

1    Whatever probative value it has of his control
2  in the basement is substantially outweighed by the unfair
3  prejudice that would result from that type of question.
4    So I'll not allow that testimony.
5    And your expert will be ready on Monday?
6    MR. LATO:  Yes.
7    MR. BODE:  With respect to the witness
8  Imperiale, your Honor, Mr. Kabrawala will lead her toward
9  the beginning of the examination.  She put up her home for
10  bail for the defendant.  Obviously, that goes to her bias
11  and how she views the defendant in this case.
12    We'll lead through that and ask her if she put
13  up her home as bail.
14    The defense --
15    THE COURT:  You anticipate she'll be a hostile
16  witness.  I don't understand.
17    MR. BODE:  She has refused to meet with him.
18  She will not speak with us.  However, we have wanted to
19  establish her position vis-à-vis her brother.
20    She put up the home where her, her child, her
21  husband, lives.  The jury will know about the two arrests
22  that were already out.  We'll not suggest he is
23  incarcerated.  In fact, asking if she put up her house for
24  bail for her brother does suggest he is out.
25    We want to alert the Court to that.

Proceedings

561

1    Mr. Kabrawala will lead through that.  But
2  obviously the fact that she was willing to put up her home
3  for him really does establish 305.
4    THE COURT:  I think that is fair.
5    Since you haven't met with her -- obviously,
6  there can't be any hearsay.
7    MR. BODE:  That's a good point.  Let me raise
8  that now so both sides are on notice about it.
9    She spoke to her daughter, whether or not her
10  daughter recalls pictures taken by the defendant.  We'll
11  not elicit that.  That is hearsay.  The defense will not
12  either, and we're putting them on notice of that.
13    THE COURT:  That may fall within the hearsay
14  exception, so both sides should be aware of that.
15    MR. LATO:  Yes, your Honor.
16    One thing, though, about the bail.  It's my
17  practice once I've argued it and the Court rules, I never
18  say another word.  However, I'd like an opportunity to be
19  heard of the bringing out of the bail.
20    THE COURT:  Sure.
21    MR. LATO:  Ms. Imperiale, the witness, may be
22  biased.  If so, the matter about bail would arguably
23  relevant.  That's her bias.
24    If in fact her answers do not show any bias,
25  there would be no reason to bring out the fact that she

Proceedings

**562**

1 put up bail.

2      The problem in terms of unfair prejudice to

3 Mr. Valerio is it puts the imprimatur of the Court to say

4 it is a high bond, that he's a risk.  There's really no

5 probative value to it unless she shows some bias.

6      If they simply ask her, is this your daughter,

7 and she says yes, and that's all they ask her, there is no

8 reason to bring out she put up her house for bail.

9      THE COURT:  Well, if they can impeach their own

10 witness, the rules allow that, whether they are hostile or

11 not.  But I didn't think about the issue with respect to

12 the amount.

13      MR. BODE:  I'll even dumb it down.  She sought

14 to be a suretor of bail for her brother.  We won't mention

15 they put up a house or anything like that.

16      MR. LAPINTA:  May I?

17      THE COURT:  Yes.

18      MR. LAPINTA:  May I offer a suggestion?

19      Why don't we craft a certain question that meets

20 their need to have this jury understand that she's biassed

21 but yet does not open the issue of bail.

22      Let me make a suggestion.  Why can't they just

23 elicit the following question:  Ms. Imperiale, isn't it a

24 fact that you support your brother, Joseph Valerio,

25 throughout this trial?  In fact, you are supporting his

Proceedings

**563**

1 defense in this case?

2      Why even mention bail?

3      MR. BODE:  That's different.  And with all due

4 respect to defense counsel, they don't get to write our

5 direct.

6      THE COURT:  Support can be moral support.  I

7 think there is a difference between financial support and

8 just support in general.

9      MR. LAPINTA:  Isn't it a fact that you are

10 willing to financially support your brother in this case?

11      Why mention bail, your Honor?

12      THE COURT:  That may be a good point.  By

13 mentioning the word "bail," it will not be a shock to the

14 jurors.

15      MR. BODE:  In fact, he was released at that

16 first time.  She put up the house and he was released.

17      THE COURT:  They have already heard that he was

18 out for the second arrest, so they know he got bail.  As

19 long as it doesn't go into the amount, it solves any 403

20 problem.

21      A juror wouldn't know what a suretor is.

22      MR. BODE:  We'll pick a different word, your

23 Honor.

24      THE COURT:  Willing to sign a bond for bail.

25      MR. BODE:  For bail.

**564**

1      MR. LATO:  Your Honor, we've been heard and you

2 ruled.

3      MR. BODE:  We'll lead, but we don't know what

4 she will say because we can't talk with her.

5      THE COURT:  Have a good night.

6      See you at 9:45.

7      (Whereupon, the proceedings were adjourned until

8 Thursday, November 6, 2014, at 9:45 a.m.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**565**

I-N-D-E-X

W-I-T-N-E-S-S-E-S

S T E V E N   T R O Y D                         400
DIRECT EXAMINATION                              401
BY MR. KABRAWALA
VOIR DIRE EXAMINATION                           470
BY MR. LATO
DIRECT EXAMINATION                              479
BY MR. KABRAWALA:
S T E V E N   T R O Y D (Cont'd)                490
DIRECT EXAMINATION                              491
BY MR. KABRAWALA
CROSS-EXAMINATION                               535
BY MR. LATO

**E-X-H-I-B-I-T-S**

Government's Exhibit 302 was received in evidence ... 413

Government's Exhibit 400 was received in evidence ... 433

Government's Exhibit 329 was received in evidence ... 461

Government's Exhibit 2 was received in evidence ... 399

Government's Exhibits 300-A, 300-B, 300-C and 300-D were received in evidence ... 409

Government's Exhibit 303 was received in evidence ... 418

Government's Exhibit 304 was received in evidence ... 421

Government's Exhibit 303-A was received in evidence ... 424

Government's Exhibit 1-C was received in evidence ... 430

Government's Exhibit 305 was received in evidence ... 432

Government's Exhibits 402 and 405 were received in evidence ... 434

Government's Exhibit 307 was received in evidence ... 437

Government's Exhibit 308 was received in evidence ... 439

Government's Exhibit 320 was received in evidence ... 442

Government's Exhibits 334, 334-A and 334-B were received in evidence ... 443

Government's Exhibit 309 was received in evidence ... 444

Government's Exhibit 332 was received in evidence ... 444

Government's Exhibit 313 was received in evidence ... 445

Government's Exhibit 313 was received in evidence ... 446

Government's Exhibit 321 was received in evidence ... 448

Government's Exhibits 324 and 324-A was received in evidence ... 449

Government's Exhibit 338 was received in evidence ... 450

Government's Exhibit 312 was received in evidence ... 454

Government's Exhibit 359 was received in evidence ... 455

Government's Exhibit 343 was received in evidence ... 456

Government's Exhibits 335 and 336 were received in evidence ... 457

Government's Exhibit 347 was received in evidence ... 458

Government's Exhibits 325 and 326 were received in evidence ... 460

Government's Exhibit 345 was received in evidence ... 460

Government's Exhibit 323 was received in evidence ... 465

Government's Exhibit 311 was received in evidence ... 467

Government's Exhibit 404 was received in evidence ... 471

Government Exhibit 235, 238, 238-A, 243, 255-A, 246, and 247 were received in evidence ... 480

Government's Exhibits 245 and 245-B were received in evidence ... 490

Government's Exhibit 244 was received in evidence ... 491

Defendant's Exhibit A was received in evidence ... 549

## $

**$1,000** [2] - 532:8, 13
**$10.44** [1] - 474:16
**$100** [5] - 502:11; 506:12; 507:22, 24; 508:3
**$1200** [1] - 534:19
**$200** [2] - 506:13; 517:23
**$324.40** [1] - 497:5
**$38.51** [1] - 474:22
**$436** [1] - 474:14
**$446.44** [1] - 474:18
**$484.95** [1] - 474:24
**$50** [1] - 506:14
**$600** [2] - 523:17; 527:10

## 0

**0094** [1] - 393:3

## 1

**1,000** [1] - 532:24
**1-C** [6] - 429:18, 22; 430:15, 17-18; 566:12
**10** [1] - 455:17
**100** [3] - 393:13, 21; 475:2
**1080** [2] - 470:4; 475:16
**1080P** [2] - 474:11; 475:12
**10:14** [1] - 519:7
**10:23** [1] - 501:13
**10:28** [1] - 418:19
**115** [1] - 496:2
**11722** [2] - 393:14, 22
**11787-1519** [3] - 473:23; 474:1; 475:11
**11788** [1] - 393:18
**11:00** [1] - 511:23
**11:02:00** [1] - 504:17
**11:07:00** [1] - 511:23
**11:30** [1] - 452:6
**11:51** [1] - 522:24
**11:52** [1] - 534:11
**11:58** [1] - 526:17
**12** [11] - 407:18; 503:14; 504:25; 506:23; 518:19; 519:7, 19; 536:4; 555:2; 558:11
**12:07** [1] - 533:10
**12:45** [1] - 476:14

**12th** [1] - 519:10
**14** [3] - 393:3; 492:8, 16
**1488978622** [1] - 517:11
**14th** [1] - 448:23
**15** [7] - 476:14; 494:4, 10; 499:15; 530:6; 555:25; 556:14
**15-page** [1] - 492:10
**15:38** [3] - 504:25; 505:1
**16** [1] - 509:22
**17th** [7] - 422:24; 423:6; 425:7; 427:18, 21, 23
**18** [3] - 495:16; 498:20; 522:23
**18th** [2] - 498:15; 523:13
**19** [1] - 533:9
**1920** [1] - 470:4
**1963** [1] - 482:15

## 2

**2** [21] - 394:21; 395:3, 6, 11, 17, 24-25; 396:9; 397:1, 3, 6-7; 398:14; 399:16, 18, 21-22, 25; 400:4; 486:5; 566:7
**2-B** [1] - 400:1
**2-D** [1] - 400:1
**2-E** [1] - 400:1
**2-E-mail** [2] - 511:6, 10
**20** [2] - 401:13; 484:2
**200** [13] - 393:18; 395:14, 18, 21; 396:4, 7, 18; 397:4, 8, 13; 398:18; 479:18; 496:3
**2003** [1] - 484:18
**2005** [2] - 485:4
**2010** [1] - 474:5
**2012** [37] - 398:1; 418:18; 422:23; 423:1, 6, 12; 425:7; 427:18; 494:4, 10; 499:15; 500:12; 501:13; 503:14; 504:25; 506:23; 509:22; 511:20; 513:18; 515:23; 516:18; 517:4, 21-22; 518:5, 19; 519:7, 19; 522:23; 526:16; 529:13; 531:11; 532:15; 533:9
**2013** [13] - 402:18;

425:1; 481:14; 483:15; 484:2; 485:2; 492:8, 16; 495:16; 498:15, 20; 550:25
**2014** [32] - 393:7; 402:7; 407:1, 7-8; 409:5; 412:24; 413:17; 421:3, 18; 424:8; 430:12; 432:10; 434:6; 436:23; 439:13, 17; 440:12; 441:9; 442:13; 443:6, 17; 448:23; 454:4, 23; 463:23; 467:9; 468:11; 484:11; 525:7; 530:13; 564:8
**203** [3] - 477:13, 18; 480:1
**205** [5] - 477:18; 480:1; 525:15; 526:13; 528:25
**205-A** [3] - 497:22, 24; 498:1
**206** [4] - 477:20; 480:1; 534:7, 9
**208** [3] - 477:22; 480:1; 499:8
**21** [1] - 526:16
**210** [1] - 500:8
**211** [2] - 501:8; 508:1
**211-A** [1] - 502:18
**213** [5] - 503:6; 505:4, 6, 13
**214** [4] - 504:10, 13; 505:7; 506:6
**215** [2] - 508:4, 10
**216** [2] - 509:18, 20
**219** [2] - 513:14, 17
**22** [4] - 418:18; 423:11; 427:19, 24
**222** [3] - 516:20; 518:1
**223** [2] - 518:10, 15
**225** [1] - 519:11
**226** [3] - 522:15; 523:22, 25
**229** [2] - 531:7, 10
**229-A** [4] - 493:2, 5, 17, 24
**22nd** [1] - 529:13
**230** [4] - 533:2-4, 7
**231** [2] - 477:22; 480:1
**235** [5] - 477:24; 480:3, 13; 567:11
**238** [7] - 478:1; 480:3, 13; 481:7; 483:17; 567:11
**238-A** [9] - 478:3, 5, 18; 480:3, 13, 24;

481:6, 8; 567:11
**23:07:14** [1] - 511:21
**23:58:16** [1] - 526:16
**24.186.38.241** [1] - 502:23
**241** [8] - 478:7; 480:3, 8; 486:13, 21; 489:18; 490:11; 491:1
**243** [7] - 478:9; 480:3, 14; 510:19; 511:19; 515:15; 567:11
**244** [13] - 478:11; 480:4, 8; 486:23; 487:1; 490:2; 491:2, 16-18; 492:3; 567:13
**244-B** [1] - 489:18
**245** [13] - 478:11; 480:4, 8; 488:7; 489:19; 490:12; 491:13; 495:7; 498:17, 19; 567:12
**245-A** [4] - 478:13; 497:8; 498:5, 12
**245-B** [12] - 478:14; 479:3; 480:4, 9; 489:3, 5, 19; 490:12; 491:13; 567:12
**246** [4] - 478:16; 480:4, 14; 567:12
**247** [4] - 478:16; 480:4, 14; 567:12
**24th** [6] - 438:11; 439:13, 17; 440:12; 551:14; 553:13
**25** [1] - 500:12
**250** [1] - 506:13
**255-A** [3] - 480:4, 14; 567:12
**25th** [13] - 441:9; 442:13; 443:6, 17; 447:20; 450:2; 454:4, 23; 463:22; 467:9; 468:8, 11; 522:6
**26** [1] - 511:20
**26th** [1] - 513:25
**27** [1] - 513:18
**275** [1] - 524:4
**27815-0000** [1] - 475:3
**27th** [1] - 407:1
**28** [4] - 484:10; 501:13; 525:7; 530:13
**28th** [23] - 407:7; 409:5; 412:24; 413:17; 421:3, 18; 424:8; 430:12; 432:10; 434:5; 436:22; 438:22; 441:2, 25; 524:24; 529:8;

**1**

536:2; 537:7, 11, 14;
547:12; 549:8

**29th** [2] - 513:25;
514:7

**2:45** [1] - 489:21
**2nd** [1] - 422:23

---

3

**3** [42] - 406:14; 407:4,
12, 14; 409:11, 14;
410:15; 413:2, 14;
433:12; 436:17; 441:15;
442:8; 443:4, 7, 11,
18; 445:6, 19; 450:23;
453:9, 22, 25; 455:22;
456:19; 457:9; 458:9,
18; 459:20; 460:24;
462:25; 463:12; 466:16;
467:8; 472:20; 473:22,
25; 475:10; 507:21;
509:8; 523:16; 526:12
**3/18/13** [1] - 495:10
**3/28/12** [1] - 502:21
**30** [4] - 396:14, 22-23;
464:6
**300** [4] - 408:20;
409:3, 8
**300-A** [10] - 408:20;
409:1, 7, 9-10, 18,
21-22; 410:9; 566:8
**300-B** [4] - 408:20;
409:22; 410:10; 566:8
**300-C** [4] - 408:20;
409:23; 410:11; 566:8
**300-D** [4] - 408:20;
409:23; 410:12; 566:8
**302** [14] - 413:7, 21,
23; 414:1; 538:18, 20;
544:10, 12, 19, 23;
546:11; 553:13, 19;
566:3
**303** [6] - 417:24;
418:8; 423:2, 7; 566:9
**303-A** [6] - 423:20;
424:6, 12-13, 16;
566:11
**304** [5] - 420:14;
421:7, 11; 566:10
**305** [12] - 431:22;
432:8, 14-15, 18;
547:5, 8, 11, 14;
549:21; 561:3; 566:13
**307** [6] - 436:12;
437:2, 6, 14; 566:15
**308** [5] - 439:9, 21-22;
551:19; 566:16
**309** [5] - 443:15, 25;

---

444:2, 14; 566:19
**311** [7] - 466:25;
467:13, 15-16, 19;
469:13; 567:9
**312** [6] - 453:18;
454:8, 12; 455:1; 567:1
**313** [8] - 445:1, 12-13,
23; 446:5; 566:21
**320** [6] - 442:4, 11,
17-18, 21; 566:17
**321** [8] - 447:14-16;
448:1, 8; 451:9; 566:23
**322** [8] - 507:7, 14;
517:15, 18; 523:8,
11-12; 532:18
**323** [5] - 461:19;
463:7; 464:25; 465:2;
567:8
**324** [6] - 448:21;
449:1, 4, 11; 566:24
**324-A** [6] - 448:6, 12,
21; 449:1, 4; 566:24
**325** [7] - 459:23, 25;
460:4; 472:14; 567:6
**326** [8] - 459:24;
460:1, 4-5; 472:16;
473:6; 475:6; 567:6
**329** [7] - 460:21;
461:13; 462:14; 566:5
**332** [6] - 444:11,
22-23; 446:14; 507:6;
566:20
**333** [3] - 445:20, 22;
453:3
**334** [6] - 442:25;
443:11, 13; 447:8;
453:12; 566:18
**334-A** [5] - 442:25;
443:11, 13; 453:13;
566:18
**334-B** [4] - 442:25;
443:14; 453:13; 566:18
**335** [5] - 457:8, 14-15;
461:19; 567:4
**336** [5] - 457:8, 14-15;
461:19; 567:4
**338** [6] - 448:6;
449:22; 450:5, 8-9;
566:25
**342** [4] - 457:22, 24;
458:4; 461:19
**343** [10] - 455:19;
456:4, 10-12; 457:18,
22; 458:1; 461:19;
567:3
**345** [4] - 460:7, 15-16;
567:7

---

**347** [5] - 458:13,
24-25; 567:5
**35** [1] - 393:18
**3500** [1] - 545:4
**358501163** [1] - 474:7
**359** [7] - 454:21, 25;
455:4, 9-10, 13; 567:2
**368** [1] - 456:17
**395** [2] - 420:19;
439:12
**399** [1] - 566:7
**3:35** [2] - 440:13;
552:1
**3:38** [2] - 505:2;
519:20

---

4

**4** [1] - 459:16
**4/12/12** [3] - 504:17;
507:17, 21
**4/12/2012** [1] - 504:8
**4/15/2012** [1] - 509:5
**40** [2] - 396:14, 24
**40-caliber** [1] -
543:12
**400** [10] - 433:7, 16,
20, 22; 434:16, 24;
509:13; 565:4; 566:4
**401** [1] - 565:5
**402** [4] - 434:3, 9, 12;
566:14
**403** [4] - 487:6;
489:16; 559:12; 563:19
**404** [9] - 469:24;
470:2, 10; 471:3,
18-19; 476:7; 567:10
**404(b** [3] - 486:14, 18;
558:4
**405** [5] - 434:2, 9, 12;
435:1; 566:14
**409** [1] - 566:8
**413** [1] - 566:3
**418** [1] - 566:9
**421** [1] - 566:10
**424** [1] - 566:11
**430** [1] - 566:12
**432** [1] - 566:13
**433** [1] - 566:4
**434** [1] - 566:14
**437** [1] - 566:15
**439** [1] - 566:16
**442** [1] - 566:17
**443** [1] - 566:18
**444** [2] - 566:19
**445** [1] - 566:21

---

**446** [1] - 566:22
**448** [1] - 566:23
**449** [1] - 566:24
**450** [1] - 566:25
**454** [1] - 567:1
**455** [1] - 567:2
**456** [1] - 567:3
**457** [1] - 567:4
**458** [1] - 567:5
**460** [2] - 567:6
**461** [1] - 566:5
**465** [1] - 567:8
**467** [1] - 567:9
**470** [1] - 565:7
**471** [1] - 567:10
**479** [1] - 565:9
**480** [1] - 567:11
**490** [2] - 565:11;
567:12
**491** [2] - 565:12;
567:13
**4:30** [1] - 555:23

---

5

**5** [4] - 393:7; 515:23;
516:18; 525:15
**50** [2] - 482:8, 17
**508** [1] - 435:11
**509** [1] - 435:11
**510** [1] - 435:11
**511** [2] - 435:11;
446:18
**515** [1] - 435:11
**516** [3] - 435:11;
485:23; 486:3
**518** [1] - 435:11
**519** [2] - 435:11; 462:4
**520** [1] - 435:12
**521** [2] - 435:12; 462:5
**522** [1] - 435:12
**523** [1] - 435:12
**524** [1] - 435:12
**525** [1] - 435:12
**526** [1] - 435:12
**528** [2] - 435:12;
450:18
**530** [1] - 435:12
**532** [2] - 435:12; 447:9
**533** [1] - 435:12
**534** [1] - 435:13
**535** [2] - 435:13;
565:14
**536** [1] - 435:13
**537** [2] - 435:13; 462:6

3

**538** [1] - 435:13
**539** [2] - 435:13;
452:25
**549** [1] - 567:15
**55** [3] - 540:18; 541:8,
14
**5:your** [1] - 516:1

## 6

**6** [10] - 449:20;
459:16; 517:4, 20-22;
518:4; 531:11; 532:15;
564:8
**6187** [1] - 474:6
**631** [1] - 393:22
**6554625309** [1] - 523:4
**66** [1] - 551:2
**69.118.191.98** [2] -
498:2, 10
**6:00** [3] - 407:22;
411:2; 536:13
**6th** [1] - 532:20

## 7

**7** [5] - 398:1; 474:5;
481:14; 483:14; 484:1
**7/15** [1] - 494:10
**7/22/12** [1] - 529:6
**712-6105** [1] - 393:22
**75** [2] - 506:11; 508:3
**7:38** [1] - 483:15
**7:38:22** [1] - 481:14
**7:55** [2] - 422:17;
540:16
**7:58** [1] - 484:2

## 8

**8** [2] - 455:17; 555:2
**8th** [2] - 402:18;
424:25

## 9

**9/27/22** [1] - 534:11
**9:30** [2] - 534:15;
556:3
**9:45** [4] - 393:7;
556:2; 564:6, 8

## A

**a.m** [10] - 393:7;
407:22; 422:17; 501:13;
519:7; 533:10; 534:11;
536:13; 540:16; 564:8

**abbreviation** [2] -
514:22
**able** [1] - 419:5
**absolutely** [2] -
427:5; 488:12
**acceptable** [2] -
490:3; 527:16
**access** [1] - 537:15
**accomplishment** [1] -
520:23
**according** [2] -
507:19; 523:12
**account** [10] - 487:14,
17, 25; 488:11, 13, 17,
21; 489:15; 496:7;
527:10
**accurate** [9] - 409:4,
10; 413:16; 414:5;
436:21; 442:12; 443:20;
447:21; 467:7
**accurately** [3] -
409:13; 432:9; 454:2
**acknowledged** [1] -
486:16
**acquire** [1] - 442:2
**act** [1] - 557:11
**action** [1] - 509:1
**active** [2] - 484:22;
485:9
**actual** [1] - 485:21
**addition** [1] - 553:19
**additional** [1] -
438:21
**address** [21] - 394:7,
20; 398:8; 406:3, 7,
10-11, 13; 424:23;
475:8; 477:5; 482:1;
488:18; 494:17; 497:20,
25; 503:4; 522:4; 559:5
**addressed** [1] - 495:15
**addressee** [1] - 515:20
**addresses** [4] -
502:25; 511:6, 10, 12
**adjourned** [1] - 564:7
**administered** [1] -
540:13
**admissible** [1] -
464:13
**admit** [41] - 399:16;
409:18; 413:19; 416:17;
418:6; 419:20; 421:5;
424:10; 427:13, 15;
430:14; 432:12; 433:15;
434:8; 436:25; 439:19;
442:15; 443:9, 23;
444:20; 445:10; 446:3;
447:24; 448:25; 450:4;

454:6; 455:3, 25;
457:5, 12, 23; 460:3,
12; 461:8; 463:25;
464:24; 467:11; 470:9;
479:22; 486:21; 490:12
**admits** [1] - 559:14
**admitted** [65] -
395:15; 399:21, 25;
409:21; 413:22; 418:8;
421:7; 424:12; 427:16,
22-23; 428:11; 430:17;
432:14; 433:21; 434:11;
437:2; 439:21; 442:17;
443:12, 25; 444:22;
445:12; 446:5; 448:1;
449:3; 450:8; 454:8;
455:1, 9; 456:11;
457:14, 18; 458:4, 24;
460:4, 15; 461:13;
465:1; 467:15; 471:18;
472:13; 480:11; 489:2,
19; 491:13, 17; 493:12,
16, 24; 497:22, 24;
502:19; 507:6, 14;
508:5; 517:18; 519:12;
522:16; 524:5; 530:24;
549:13; 557:7, 11;
558:1
**admitting** [3] - 400:3;
419:21; 435:8
**adolescent** [1] -
557:12
**adolescents** [1] -
558:18
**adoption** [1] - 522:8
**adult** [1] - 457:2
**adults** [2] - 456:25;
457:1
**advice** [10] - 420:19;
421:16; 422:2; 439:12,
15; 440:18; 540:14;
541:9; 551:16, 20
**advised** [3] - 410:20;
416:22; 548:12
**advising** [1] - 440:20
**afford** [1] - 422:5
**African** [1] - 531:25
**afternoon** [7] - 471:1;
527:19; 528:13, 16;
535:21
**age** [3] - 484:17, 25;
485:1
**Agent** [38] - 400:7;
401:11; 402:21; 403:3,
17, 22; 405:21; 415:5,
9; 424:2; 428:16, 18;
465:4; 525:9; 535:21;
537:2; 539:4, 12, 17;

540:22; 543:6; 549:17;
550:21; 551:4, 11;
552:16, 18, 21; 553:3,
12, 18, 21; 554:16;
555:11, 13
**agent** [17] - 398:4;
403:11, 17; 410:19;
452:20; 469:14; 470:24;
512:17; 522:3, 5;
539:25; 544:13; 548:16;
550:14; 553:12; 555:17
**agents** [5] - 407:16;
408:1; 468:10; 536:18;
539:24
**ago** [2] - 396:12;
499:24
**agree** [2] - 487:18;
488:24
**agreement** [2] - 405:16
**ahead** [4] - 400:5;
421:15; 501:19; 528:22
**airline** [1] - 428:6
**airport** [1] - 506:15,
17
**alert** [1] - 560:25
**A**█████ [3] - 512:18, 23;
515:5
**A**█████ [1] - 512:18
**ALL** [1] - 399:10
**alleged** [1] - 558:12
**ALLEN** [1] - 393:15
**allow** [2] - 560:4;
562:10
**allowing** [1] - 465:12
**allows** [1] - 426:10
**almost** [1] - 482:23
**alone** [1] - 510:7
**aloud** [17] - 419:3;
421:15; 425:13; 440:7;
449:6; 479:13; 481:12,
19; 482:22; 498:9;
499:17; 500:18; 505:23;
522:20; 530:13, 22;
533:13
**AMEET** [1] - 393:14
**AMERICA** [1] - 393:3
**American** [1] - 503:25
**amount** [5] - 474:23;
546:10; 562:12; 563:19
**analysis** [1] - 438:24
**analyze** [1] - 434:15
**Andre** [5] - 495:15,
21-22; 496:18; 497:12
**Angelini** [11] -
395:25; 402:21; 403:17,
22; 404:22; 405:21;
424:2, 23; 428:16, 18;

525:9

**Angelini's** [1] - 403:3

**angle** [2] - 447:10; 448:16

**Ankara** [5] - 506:12; 507:1, 22; 517:23; 532:24

**ANKARA** [1] - 506:12

**Anna** [1] - 515:2

**Anna's** [1] - 425:9

**answer** [6] - 404:3, 24; 422:7, 12; 513:7; 527:12

**answering** [1] - 422:8

**answers** [1] - 561:24

**ANTHONY** [1] - 393:17

**Anthony** [1] - 417:11

**anticipate** [2] - 464:13; 560:15

**anxiety** [2] - 408:16; 410:25

**anytime** [1] - 491:9

**anyway** [1] - 485:19

**apart** [1] - 538:10

**apartment** [2] - 526:23; 527:15

**apologize** [2] - 545:2, 21

**app** [1] - 417:1

**appear** [8] - 423:18; 456:25; 457:1; 476:8; 494:16, 20; 525:18; 546:25

**appearances** [1] - 394:4

**APPEARANCES** [1] - 393:11

**applied** [1] - 406:17

**appointed** [1] - 422:6

**approach** [5] - 403:24; 407:21; 429:19; 449:17; 477:14

**approached** [1] - 407:22

**approaches** [3] - 429:21; 454:19; 477:17

**April** [5] - 492:8; 503:14; 504:25; 506:23; 509:22

**area** [16] - 413:13; 415:21; 432:3, 6; 436:18; 453:14; 485:23; 494:21; 503:5; 549:17; 554:19, 25; 555:1, 3, 7

**areas** [1] - 537:23

**arguably** [1] - 561:22

---

**argued** [1] - 561:17

**Arkay** [1] - 393:18

**aroused** [1] - 557:11

**arrest** [10] - 404:6; 408:15; 439:2; 540:22; 548:9; 551:11; 553:13; 554:19; 555:8; 563:18

**arrested** [8] - 405:12, 14; 438:13, 16; 439:5; 440:22; 540:22, 25

**arrests** [1] - 560:21

**arrival** [2] - 508:22; 514:7

**arrive** [6] - 500:1; 506:18; 514:2; 521:11, 14; 522:12

**arrive...that's** [1] - 515:3

**arrived** [1] - 410:18

**article** [1] - 411:11

**aside** [3] - 419:20; 451:4

**ass** [3] - 534:18, 25; 535:6

**assembled** [2] - 472:24; 475:20

**assembly** [1] - 475:19

**assigned** [6] - 401:14, 17, 20; 402:6, 9; 403:15

**assistance** [1] - 465:4

**Assistants** [1] - 393:15

**assisted** [1] - 393:24

**associated** [1] - 406:10

**assuming** [1] - 410:3

**atmosphere** [1] - 513:8

**attached** [1] - 465:19

**attempt** [1] - 417:11

**attention** [9] - 431:14; 438:11; 441:8; 452:25; 486:17; 493:1; 505:16; 507:5; 525:14

**attorney** [1] - 417:12

**Attorney** [2] - 393:13, 15

**audio** [6] - 537:11; 541:5, 10, 17; 553:4, 9

**August** [1] - 483:8

**available** [1] - 395:19

**awaiting** [1] - 394:15

**aware** [2] - 512:17; 561:14

**awkwardly** [2] - 451:6

---

**B**

**B-E-R-E-Z-O-V-S-K-A** [1] - 412:17

**B-visa** [1] - 514:25

**babe** [1] - 522:5

**background** [5] - 431:4-6, 10

**bad** [1] - 416:25

**Badalucco** [4] - 415:16, 18; 539:15; 543:8

**badly** [1] - 504:2

**bag** [3] - 470:3, 10; 471:24

**baggie** [1] - 434:2

**bail** [16] - 560:10, 13, 24; 561:16, 19, 22; 562:1, 8, 14, 21; 563:2, 11, 13, 18, 24; 447:4

**ball** [8] - 444:7, 15, 18; 446:12, 14, 24-25; 447:4

**bank** [1] - 527:10

**barely** [1] - 463:15

**based** [9] - 401:18; 403:9; 405:25; 423:17; 464:12; 510:15; 545:15; 547:21

**basement** [36] - 436:17, 22; 442:8; 443:4; 444:10; 445:5, 19; 447:21; 450:23, 25; 452:2; 453:8, 21, 25; 454:3; 455:22; 456:19; 457:9; 458:9, 18; 463:12, 20; 466:4, 16; 467:8; 468:3, 11, 13, 16; 557:6, 8, 14, 24; 559:14, 18; 560:2

**basements** [2] - 468:24; 469:6

**basing** [1] - 546:13

**basis** [2] - 416:13; 503:23

**bathroom** [2] - 510:6, 8

**beaches** [1] - 557:18

**beacon** [1] - 494:23

**beauty** [1] - 515:9

**became** [1] - 483:6

**become** [2] - 402:16, 20

**bed** [1] - 534:2

**bedroom** [2] - 425:19; 432:4

**BEFORE** [1] - 393:8

**began** [2] - 536:12;

---

540:19

**begin** [3] - 504:19; 505:17; 515:1

**beginning** [3] - 426:1; 499:21; 560:9   **4**

**begins** [1] - 501:15

**behind** [5] - 416:10; 453:15; 491:10; 496:4

**belonged** [1] - 503:4

**belongs** [3] - 453:14; 478:19; 502:16

**below** [4] - 422:13; 425:3; 551:2; 552:18

**benefit** [1] - 550:23

**Berezovska** [12] - 412:14; 481:3, 13; 483:21, 23; 484:10; 487:2, 5; 492:20, 22, 24

**Bernadette** [6] - 481:15; 482:10, 20, 24; 483:3, 9

**best** [1] - 527:4

**bet** [1] - 521:21

**bets** [1] - 487:19

**better** [2] - 533:16; 534:18

**between** [22] - 429:3, 8; 480:16, 20, 23; 487:1, 4; 488:8; 491:24; 492:19; 496:2; 499:4, 12; 511:3, 11, 13; 529:14; 539:19; 541:10; 544:18; 558:7; 563:7

**BIANCO** [1] - 393:9

**bias** [4] - 560:10; 561:23; 562:5

**biased** [1] - 561:22

**biassed** [1] - 562:20

**big** [3] - 427:3; 527:14; 531:20

**bigger** [1] - 426:11

**binder** [3] - 399:2; 408:17; 463:8

**birth** [5] - 482:4, 7, 13, 15; 484:18

**birthday** [1] - 513:7

**bit** [2] - 474:25; 529:19

**bitch** [1] - 534:17

**black** [9] - 450:22, 24; 468:6; 469:18; 471:10; 488:3, 5; 491:6

**blank** [2] - 421:19; 552:19

**blanket** [1] - 447:11

**blessed** [1] - 502:9

**blind** [1] - 483:4

**blond** [1] - 449:25

**blonde** [4] - 501:20, 23; 502:1; 515:6

**blue** [7] - 444:7, 15; 446:23; 458:11; 461:18; 462:11; 496:4

**blush** [1] - 531:22

**BODE** [20] - 393:15; 397:4, 9; 404:12; 487:9, 19, 23; 488:2; 489:7; 547:6; 548:15; 560:7, 17; 561:7; 562:13; 563:3, 15, 22, 25; 564:3

**body** [5] - 456:23; 495:25; 502:16; 503:9, 16

**bond** [2] - 562:4; 563:24

**book** [2] - 467:1; 477:8

**booklet** [1] - 472:20

**borrow** [1] - 470:24

**bottom** [9] - 440:14; 462:10; 469:17; 500:4; 505:12; 524:9, 14; 552:3, 9

**Boulevard** [1] - 475:2

**box** [36] - 448:11, 18, 20-22; 449:23-25; 451:8, 14, 19; 452:1; 453:21, 25; 454:3; 456:7; 457:6; 459:25; 462:19, 22, 24; 472:21-23, 25; 473:3; 475:13, 22-23; 476:1, 5, 8; 491:6

**boy** [2] - 484:22; 514:5

**break** [10] - 451:23; 452:4, 20; 480:11; 486:4, 12; 490:24; 491:23; 527:19; 528:24

**break..** [1] - 555:24

**brief** [1] - 470:11

**briefed** [1] - 556:24

**briefly** [8] - 401:25; 414:4, 10; 417:9; 429:2; 437:20; 453:5; 493:6

**bring** [8] - 465:9; 475:21; 486:24; 512:21; 522:8; 559:17; 561:25; 562:8

**bringing** [1] - 561:19

**Brooklyn** [3] - 520:10, 13; 521:1

**brother** [8] - 482:3; 485:9; 560:19, 24; 562:14, 24; 563:10

**brother-in-law** [2] - 482:3

**brought** [3] - 463:10; 486:16; 540:25

**Brown** [1] - 441:22

**brownish** [1] - 515:6

**bubble** [2] - 420:1, 8

**build** [1] - 529:22

**building** [1] - 407:14

**buildings** [1] - 520:14

**Bureau** [1] - 401:6

**business** [1] - 520:9

**business..** [1] - 520:6

**buy** [2] - 427:2; 503:22

**BY** [15] - 401:2; 452:19; 470:23; 471:21; 479:2; 480:15; 491:22; 528:23; 535:20; 549:16; 565:6, 8, 10, 13, 15

---

**C**

**C41** [2] - 401:17, 22

**cabaret** [1] - 523:5

**cabinet** [1] - 414:14

**Cablevision** [21] - 395:8, 10, 14; 396:13; 397:14; 398:1, 5; 406:3, 6; 476:19, 21; 477:3; 479:17, 20; 487:14; 497:14; 499:3; 502:19; 525:4, 11; 531:4

**Cablevision's** [1] - 398:21

**calendar** [1] - 528:12

**camcorder** [9] - 459:25; 460:1; 462:19; 467:3, 5; 469:21; 470:5; 474:11; 475:16

**camcorders** [1] - 537:15

**camera** [43] - 426:3, 7-8, 10, 13, 24; 449:8, 19; 463:16; 465:13, 19; 466:9, 14, 18, 20-21; 468:6; 469:20; 470:3, 10; 471:3, 8, 11, 14, 24; 472:5; 475:14, 16, 19, 23; 476:6, 9; 522:2; 537:3, 6, 8; 555:14, 21; 559:15

**cameras** [2] - 449:15; 466:15

**Canadians** [1] - 496:25

**cannot** [1] - 422:5

**Canon** [1] - 496:10

**cap** [1] - 527:12

**capital** [1] - 510:16

**capitals** [1] - 505:25

**card** [4] - 434:17, 25; 472:11; 474:12

**care** [2] - 394:13; 514:4

**carefully** [1] - 467:22

**Carolina** [1] - 475:3

**carpet** [2] - 466:5; 501:6

**carpeted** [1] - 465:11

**carpeting** [1] - 465:21

**carries** [1] - 425:23

**carry** [1] - 420:20

**carrying** [1] - 543:17

**cartoons** [2] - 484:23; 485:10

**case** [32] - 394:3; 396:8; 403:11, 17; 410:23; 452:5; 467:5; 468:7; 469:20; 471:3, 8; 486:6; 496:8; 527:20; 528:8, 10; 548:7, 11; 555:17; 556:4; 558:13; 559:24; 560:11; 563:1, 10

**cash** [2] - 426:25; 428:6

**ceiling** [16] - 466:21; 467:6, 8; 468:1, 13, 16, 20-22; 469:1, 3, 7, 14; 471:4, 15

**ceilings** [2] - 468:25; 469:5

**cell** [10] - 403:7, 19; 426:3, 7, 9-10, 13; 434:3, 16; 535:3

**center** [4] - 437:14; 463:13; 465:11; 550:24

**Central** [3] - 393:5, 14, 22

**certain** [3] - 491:3; 537:23; 562:19

**certainly** [4] - 418:16; 516:8; 548:19; 559:25

**cetera** [3] - 512:13; 527:3; 534:3

**chain** [5] - 492:14; 511:3, 5; 524:16; 526:15

**chair** [14] - 414:15; 415:8, 19, 22; 416:4;

**436:18; 437:10, 23; 450:22, 24; 539:8, 11

**chairs** [2] - 414:18, 24

**challenge** [1] - 500:4     5

**chance** [3] - 394:21; 496:3; 529:21

**change** [3] - 402:12; 493:15; 533:17

**changing** [4] - 512:12; 514:6; 527:2; 557:19

**charged** [1] - 559:16

**chart** [6] - 507:11; 517:19, 22; 518:9; 524:2; 532:18

**chat** [1] - 417:1

**cheapest** [1] - 520:20

**check** [1] - 531:16

**cheerleader** [1] - 461:19

**cheerleading** [2] - 457:11; 462:19

**Child** [3] - 401:22; 402:1, 3

**child** [32] - 402:4, 24; 405:22; 406:23; 416:21; 419:13, 21; 429:7; 431:3; 435:25; 436:4; 446:8; 455:16; 459:8, 13, 15, 18; 462:11; 526:6, 10; 541:21, 23; 542:6, 11, 19; 547:18, 21; 558:15; 560:20

**child's** [2] - 436:3; 459:10

**children** [3] - 459:20; 483:2; 484:4

**children's** [7] - 456:25; 458:14-17; 459:2; 460:8

**China** [2] - 472:24; 475:20

**choose** [1] - 512:9

**Chrissy** [1] - 514:13

**circle** [1] - 502:15

**circled** [1] - 473:1

**circling** [3] - 501:17; 527:7; 533:21

**circuit** [2] - 465:14; 487:9

**city** [4] - 482:1; 507:3; 527:14; 531:17

**City** [3] - 494:25; 495:2; 528:12

**claimed** [4] - 417:4; 420:3, 7; 431:9

**clarify** [1] - 397:11

**clean** [4] - 425:21;

502:16; 513:10

**clear** [8] - 395:13; 398:5; 468:10; 475:13, 21; 488:22; 516:14; 550:9

**CLERK** [3] - 400:9, 15; 452:14

**clerk** [1] - 394:10

**click** [1] - 496:6

**clip** [8] - 428:15, 23; 429:11; 430:11, 20; 431:1, 5

**clock** [5] - 449:7; 466:11; 555:14, 21

**close** [2] - 514:15; 559:13

**closed** [5] - 465:13; 471:8; 520:5, 9; 555:5

**closer** [4] - 400:19; 415:6, 19; 558:5

**closest** [1] - 539:18

**closet** [6] - 436:18; 437:12, 23; 444:10; 463:3, 5

**clothes** [2] - 408:11; 427:3

**clothing** [1] - 411:11

**clout** [1] - 512:14

**co** [2] - 520:15; 535:11

**co-counsel** [1] - 535:11

**co-op** [1] - 520:15

**cock** [2] - 502:8; 531:24

**code** [1] - 485:23

**cold** [2] - 407:25; 533:17

**colleagues** [1] - 548:16

**color** [1] - 548:17

**comfortable** [1] - 538:7

**coming** [5] - 396:3, 5; 430:6; 465:5; 528:11

**commonly** [2] - 420:11, 19

**compare** [2] - 518:3; 523:21

**completed** [2] - 512:6, 15

**completely** [2] - 451:2

**completeness** [1] - 496:20

**complies** [1] - 458:8

**comply** [1] - 500:3

**comprise** [1] - 470:2

**computer** [20] - 393:24; 399:3; 403:19; 404:23; 432:5, 23-24; 433:1, 11, 16; 434:15, 23, 25; 435:21; 508:23; 519:14; 549:21; 551:9

**computer-assisted** [1] - 393:24

**computers** [2] - 403:7; 432:21

**condition** [1] - 432:9

**conduct** [2] - 404:22; 406:22

**conducted** [2] - 412:4; 554:20

**conducting** [2] - 408:15; 544:6

**confer** [6] - 461:9, 11; 469:22; 535:11; 553:15

**confirmation** [1] - 523:19

**connections** [1] - 520:12

**consider** [4] - 490:8; 491:12; 509:2; 559:6

**consistently** [1] - 487:15

**consists** [2] - 401:22; 470:3

**consume** [1] - 476:12

**Cont'd** [1] - 565:11

**contact** [2] - 429:8, 16

**contacted** [3] - 402:21; 410:18; 417:1

**contain** [1] - 420:1

**contained** [7] - 420:1, 8; 462:20; 474:8; 491:4; 505:7

**containing** [7] - 402:23; 405:22; 449:25; 453:22; 459:2; 469:20; 550:16

**contains** [1] - 420:23

**content** [1] - 487:20; 488:5

**contents** [2] - 448:20, 22

**continue** [9] - 410:2; 484:21; 490:22; 491:14; 502:14; 514:12; 521:10; 527:12; 534:24

**continued** [1] - 491:22

**Continued** [2] - 478:22; 479:2

**continues** [1] - 530:9

**continuing** [1] - 514:24

**contraband** [2] - 558:23; 559:22

**control** [8] - 412:8; 487:13; 488:13, 19, 23; 501:23; 559:7; 560:1

**copier** [1] - 496:10

**copies** [4] - 396:15; 402:23; 489:5

**copy** [11] - 394:10; 418:3; 421:1; 424:6; 430:11; 435:4; 439:14; 478:5; 489:3; 548:15

**corner** [5] - 421:17; 432:25; 440:10; 473:20; 551:23

**correct** [114] - 400:2; 404:24; 405:5, 13, 23-24; 415:23; 416:9; 418:3; 420:9; 421:1; 423:15; 424:5; 426:20; 429:17; 430:11, 24; 431:11; 438:5; 439:1, 4, 14-15; 451:1, 22; 457:4; 458:10; 459:18; 465:22; 466:13; 468:12; 472:1, 3; 475:24; 476:2, 20; 477:6; 482:9, 11-12; 483:16, 22; 485:14, 20; 486:1; 492:12; 494:3; 495:20; 496:17, 19; 498:24; 499:16; 502:22, 24; 503:11; 504:21; 505:5, 8; 506:24; 509:10, 17; 514:11; 516:18; 519:8, 17; 522:9; 523:7; 526:18; 530:25; 532:14; 533:1, 11-12; 536:3, 7, 14; 537:21; 538:24; 539:2, 10-11, 14, 20; 540:17, 20; 541:1-3; 543:24; 544:13; 552:7, 10, 12-15, 19-20, 22-23; 553:2; 554:4

**corrected** [1] - 514:10

**correctly** [16] - 481:17, 20; 482:5; 506:4, 19; 513:12; 514:9, 18; 515:13; 517:13; 518:21; 520:18, 24; 527:17; 533:19; 534:5

**correspondence** [2] - 396:4; 511:11

**cost** [1] - 474:15

**costume** [5] - 453:11; 455:14; 460:8

**costumes** [2] - 453:22, 24

**couch** [10] - 436:18; 437:16, 22; 442:8; 443:5; 446:19, 23; 453:8; 538:6

**counsel** [10] - 458:22; 461:9; 469:22; 470:8; 472:2; 528:8; 535:11; 553:16; 563:4

**Counsel** [4] - 429:21; 454:19; 461:11; 477:17

**country** [1] - 504:4

**County** [8] - 415:16; 434:20; 520:13; 521:1; 536:25; 548:4

**couple** [4] - 480:22; 533:13; 546:9, 17

**courier** [1] - 420:4

**course** [13] - 426:16; 436:8; 456:2; 472:6; 501:21, 24; 513:2; 516:9; 521:9; 522:2; 526:25; 529:17

**court** [6] - 404:20; 407:2; 421:25; 430:6; 441:18; 464:23

**COURT** [144] - 393:1; 394:5, 14, 17, 20, 24; 395:2, 12; 396:2, 17, 22, 25; 397:24; 398:7, 11, 13, 17, 22; 399:4, 8, 11, 17, 20, 24; 400:3, 19; 403:24; 404:3, 8, 14; 405:20; 409:7, 21; 410:1, 4; 411:16; 413:21; 418:8; 421:7; 424:12; 429:20; 430:17; 432:14; 433:18, 20; 434:11; 437:2; 439:21; 442:17; 443:11, 25; 444:22; 445:12; 446:5; 447:6; 448:1; 449:3; 450:5, 8; 451:23; 452:4, 12, 17; 454:8, 18; 455:9; 456:11; 457:14; 458:4, 24; 460:4, 15; 461:13; 464:18, 25; 465:8; 467:12, 15; 470:12; 471:18; 476:14, 24; 477:16; 480:10; 483:10; 486:4, 9, 22; 487:8, 22; 488:1, 7; 489:2, 4, 18, 21; 490:2, 5, 7, 15, 21; 491:16; 497:19; 509:11; 510:18; 527:19, 23, 25; 528:2, 4, 14, 17, 19, 22; 530:21; 535:9, 15, 23; 549:13; 553:17; 555:23; 556:2,

**6**

10, 13, 20, 22, 25;
557:13, 16, 22, 25;
558:19; 559:12; 560:15;
561:4, 13, 20; 562:9,
17; 563:6, 12, 17, 24;
564:5

**Court** [9] - 393:20;
465:5; 559:4, 9, 21;
560:25; 561:17; 562:3
**Court's** [4] - 394:15;
398:25; 454:16; 464:12
**Courthouse** [1] - 393:4
**courtroom** [25] -
399:7; 411:8; 418:13;
421:13; 424:18; 425:12;
432:20; 437:8; 440:1;
442:23; 444:5; 445:17;
448:10; 451:11; 452:8,
16; 454:14; 462:16;
467:21; 473:14; 486:8;
490:20; 527:22; 528:21;
556:9
**cousins** [1] - 520:10
**cover** [1] - 468:25
**covered** [1] - 465:20
**CR** [1] - 393:3
**craft** [1] - 562:19
**crawl** [5] - 437:12;
557:15, 23; 558:17, 21
**crawling** [1] - 501:6
**creative** [2] - 499:25;
502:13
**creativity** [1] - 502:9
**credit** [1] - 510:4
**Crimes** [1] - 401:24
**crimes** [3] - 402:1, 4;
559:16
**CROSS** [2] - 535:19;
565:14
**cross** [2] - 470:19;
535:9
**cross-examination** [1]
- 535:9
**CROSS-EXAMINATION** [2]
- 535:19; 565:14
**cross-examine** [1] -
470:19
**cum** [1] - 531:23
**cum-dripping** [1] -
531:23
**curio** [1] - 414:14
**cursor** [1] - 424:20
**cushion** [1] - 453:13
**cushions** [2] - 437:25;
453:15
**customer** [1] - 474:6
**cut** [1] - 554:24

**Czechoslovakia** [2] -
484:14; 492:25

---

**D**

**daily** [1] - 503:23
**damaged** [1] - 468:25
**dance** [1] - 426:16
**dancing** [1] - 429:7
**Daniella** [1] - 515:8
**Danielle** [5] - 415:5,
9, 20; 440:16; 552:16
**date** [37] - 412:23;
421:18; 422:21; 433:12;
438:16; 440:12, 21;
441:12; 443:21; 445:7;
474:4; 482:4, 7, 14-15;
484:17; 485:1; 493:7;
494:4; 495:9; 498:14;
502:21; 504:21; 506:23;
507:15, 19; 517:3;
518:4, 18; 519:19;
522:6; 523:13, 16;
524:1; 552:25
**dated** [7] - 423:5;
425:7; 430:5; 499:15;
504:17; 513:18; 531:11
**dates** [2] - 512:10;
514:2
**daughter** [16] -
419:19; 429:4; 501:4;
508:15; 512:14, 18, 21;
514:4; 527:15; 533:25;
534:16; 535:4; 561:9;
562:6
**daughter's** [1] - 429:5
**daughter...so** [1] -
508:18
**Davis** [1] - 536:24
**Dawn** [1] - 538:8
**days** [8] - 485:13;
513:25; 522:22; 527:14;
545:12, 14, 16
**deal** [2] - 398:17;
520:9
**dear** [2] - 481:22;
519:25
**December** [3] - 481:14;
483:14; 484:1
**decide** [1] - 422:7
**decided** [1] - 519:1
**deeded** [1] - 520:11
**defendant** [70] -
402:17, 20; 411:7, 15,
17, 24; 412:10, 23;
414:8; 415:24; 416:7,
17; 417:9, 12, 15, 18;
418:24; 419:4, 8-10,

15, 20; 420:10; 421:2;
422:18, 22; 423:8, 14,
17; 424:7; 427:10, 13,
15, 25; 428:11; 429:9;
430:12; 431:1, 18;
438:13, 16; 439:5, 7,
16; 440:17, 19-21;
441:4; 480:17, 20, 23;
484:9; 512:17; 525:19,
22; 530:13, 19, 23;
557:3, 7, 10-11, 21;
558:1; 560:10; 561:10
**Defendant** [2] - 393:4,
17
**Defendant's** [11] -
548:13, 20; 549:1, 4,
6, 10, 13-14, 23;
550:1; 567:15
**defendant's** [19] -
434:4; 436:7; 437:18;
438:3; 443:7, 18;
447:21; 450:1; 452:1;
454:3, 23; 457:3;
461:5; 463:17; 466:4;
488:14; 509:15; 535:16;
559:7
**defendants** [1] -
448:23
**defense** [18] - 394:11,
14, 21; 396:12, 14;
435:4; 456:6; 458:22;
464:2; 470:7; 477:10;
487:23; 490:3; 560:14;
561:11; 563:1, 4
**delicious** [6] -
425:18; 426:14, 22;
516:11; 521:16, 25
**delivering** [1] - 506:1
**delivers** [1] - 425:22
**demand** [1] - 502:8
**demands** [1] - 500:3
**Department** [3] -
415:17; 434:21; 537:1
**departure** [1] - 522:10
**dependent** [1] - 512:22
**depict** [3] - 409:13;
432:9; 454:2
**depicted** [24] -
419:15; 432:9; 436:1,
6, 22; 437:23; 438:2;
442:11; 444:15; 445:24;
450:24; 451:19; 461:24;
471:24; 538:23; 547:11;
549:1, 4, 18, 23;
550:13, 23; 551:24;
552:1
**depiction** [7] - 409:4;
414:5; 436:21; 442:12;

443:20; 447:21; 467:7
**depictions** [1] -
409:10
**depicts** [1] - 446:18
**describe** [28] -
401:25; 414:10; 417:9;
418:14, 24; 421:14;
429:2; 432:22; 437:20;
440:8; 450:20; 451:13;
453:5; 456:17; 458:13;
462:7; 466:20; 467:23;
469:13; 470:1; 472:21;
473:7, 18; 493:6, 25;
501:10
**described** [4] - 440:5;
469:15; 475:23; 483:17
**describes** [4] -
482:19; 526:5; 530:17
**description** [2] -
474:10; 475:12
**design** [2] - 437:24;
442:9
**designed** [2] - 472:24;
475:20
**desirable** [1] - 520:21
**desk** [3] - 432:3, 5;
547:19
**desktop** [1] - 547:15
**destination** [1] -
513:24
**details** [3] - 418:15;
522:11; 531:15
**Detective** [14] -
414:16, 20; 415:16, 18;
434:20; 435:19; 472:9;
539:9, 13, 15-16, 21;
543:6, 8
**detectives** [2] -
408:2; 539:24
**determine** [1] - 406:9
**device** [1] - 466:11
**devices** [4] - 404:23;
466:9; 537:12; 553:10
**devour** [1] - 516:11
**DHL** [4] - 419:24;
420:3, 7
**dictated** [2] - 545:6,
13
**dictation** [1] - 544:19
**difference** [2] -
523:24; 563:7
**different** [4] - 485:9;
529:23; 563:3, 22
**digital** [1] - 537:6
**dining** [10] - 413:2, 4,
14, 16; 414:6; 415:11;
418:25; 421:3; 538:15

7

dire [3] - 470:11, 13, 16

DIRE [2] - 470:22; 565:7

direct [5] - 463:14; 527:23; 541:19; 545:22; 563:5

DIRECT [6] - 401:1; 479:1; 491:21; 565:5, 9, 12

directed [3] - 419:12, 21; 541:20

directing [2] - 493:1; 526:7

direction [1] - 526:7

directly [3] - 403:15; 464:17; 543:23

discovered [2] - 441:3; 469:4

discovery [1] - 438:20

discuss [7] - 452:5; 480:11; 486:6; 490:23; 499:7; 527:20; 556:4

discussed [4] - 435:22; 464:19; 488:18; 528:7

discussing [3] - 452:22; 491:23; 528:24

discussion [1] - 490:25

disease [3] - 425:23; 483:3

disk [10] - 395:8, 14; 398:21; 420:1; 428:18; 429:23, 25; 430:2, 6; 479:20

disks [1] - 419:24

display [1] - 542:13

dissimilarity [1] - 558:14

distinct [2] - 437:25; 442:9

DISTRICT [2] - 393:1

District [6] - 393:21; 405:9; 406:18; 407:3; 438:8; 441:19

DNA [4] - 548:7, 10

document [20] - 418:12; 420:16; 421:12; 423:22; 424:17; 432:19; 437:7; 439:25; 442:22; 444:4; 445:16; 448:9; 451:10; 454:13; 462:15; 467:20; 473:13; 491:9; 497:11; 519:16

documents [1] - 395:13

Doe [1] - 556:17

doll [1] - 427:3

dollar [1] - 426:24

dollars [3] - 428:3, 10; 532:24

dominion [4] - 487:13; 488:13, 19, 23

done [4] - 426:9; 507:12; 510:5; 548:7

dong [1] - 531:24

door [16] - 404:7, 9; 410:15, 17-19, 21, 24; 411:4, 6, 18-19; 412:2; 437:12; 555:3, 5

down [28] - 424:19; 425:25; 426:3, 5; 482:2, 13, 23; 483:11; 496:20; 500:15, 17; 501:14, 19; 502:2; 504:23; 506:10; 508:11; 512:5; 520:1; 521:11; 527:6; 529:19; 530:1; 533:21; 545:11; 556:11; 562:13

downstairs [1] - 538:5

Downstate [1] - 521:4

drafted [1] - 545:8

draw [5] - 438:11; 441:8; 505:16; 507:5; 525:14

dressed [5] - 407:24; 408:4; 411:24; 542:6

dressing [5] - 427:2, 8; 512:12; 514:6; 519:3

dripping [4] - 522:1, 13; 531:21, 23

Drive [40] - 393:18; 406:14; 407:5, 13-14; 409:11, 14; 410:15; 413:3, 14; 433:12; 436:17; 441:16; 442:8; 443:5, 7, 18; 445:6, 19; 450:23; 453:9, 22, 25; 455:22; 456:20; 457:9; 458:9, 18; 459:21; 460:25; 462:25; 463:12; 466:16; 472:20; 473:22, 25; 475:10; 507:22; 509:8; 523:16

drive [4] - 432:5, 23; 433:1; 434:24

Drive's [1] - 467:8

drop [4] - 468:21; 534:18, 25; 535:6

drop-ceiling [1] - 468:21

drugs [2] - 469:5, 7

due [1] - 563:3

duly [1] - 400:13

dumb [1] - 562:13

during [30] - 403:2; 407:17; 416:17; 417:18; 418:25; 422:4; 431:18; 438:2; 441:24; 455:23; 461:5; 468:8; 472:5; 483:23; 484:11; 485:13; 486:12; 490:24; 497:22; 536:19; 537:22; 538:9; 542:3, 5; 543:9, 20; 545:23; 549:7; 555:15; 557:10

dyed [2] - 501:20; 502:1

## E

e-mail [96] - 479:4; 483:11, 13-14; 484:1, 7-8; 485:1; 487:1, 25; 488:5, 8, 13, 21, 23; 489:10, 13; 491:3, 24; 493:4, 6, 8, 13; 493:6, 8, 25; 494:15, 19-20; 495:10, 13; 496:7, 11, 13; 497:12; 498:11, 19; 500:11; 501:10; 502:21; 504:8; 505:3, 10, 16; 507:16; 509:5; 510:12; 511:3, 11; 516:18; 517:5; 518:9, 25; 519:8, 19; 522:4, 23; 523:13, 22, 25; 524:3, 16, 19, 23-24; 525:6, 9-10, 13, 22-23, 25; 526:15; 527:2; 529:6; 530:11; 531:1; 532:4, 15, 20, 25; 533:3, 8; 534:7, 13; 546:1, 19

e-mailed [1] - 534:1

e-mails [15] - 480:16; 488:4, 17; 492:14, 19; 499:2, 4, 7; 529:7; 534:21; 545:23, 25; 546:2, 20, 23

early [3] - 528:17; 536:16; 537:10

easier [2] - 399:1; 500:23

easily [1] - 522:4

east [1] - 520:16

Eastern [5] - 405:9; 406:17; 407:3; 438:8; 441:18

EASTERN [1] - 393:1

eat [5] - 419:7; 426:15, 19, 22

edge [1] - 411:22

effect [1] - 559:20

Egan [6] - 476:18, 21; 497:15, 25; 502:19, 25

Egan's [1] - 497:23

eight [5] - 484:25; 485:1; 520:1; 558:11; 559:10

either [5] - 453:10; 489:4; 545:13; 550:2; 561:12

elaborate [1] - 554:5

electrical [2] - 471:10; 472:3

Electronics [1] - 472:24

element [1] - 536:16

elementary [2] - 484:20; 485:8

Elena [1] - 505:20

elicit [3] - 557:2; 561:11; 562:23

email [33] - 394:10; 398:1, 20; 406:2, 4, 7, 10; 417:22; 418:3, 17, 23; 419:10, 15, 22; 423:1, 3, 5, 8, 11-12, 15, 24; 424:7, 22-23; 426:11; 427:13, 15, 21; 428:11; 477:5

emails [25] - 394:25; 395:7, 10, 17, 20, 25; 396:4, 6, 11; 402:23; 405:22, 25; 406:2; 419:14; 422:20; 424:1; 427:11, 16-17, 24; 476:12, 22

emblem [1] - 408:8

emmmm [1] - 426:18

employed [2] - 401:5

end [7] - 412:14; 427:5; 521:23; 528:17; 539:5; 554:22

endless [1] - 426:12

ends [1] - 474:6

enforcement [5] - 535:25; 536:4, 9; 541:11; 554:15

enjoy [3] - 501:4; 523:6; 526:25

enjoys [1] - 484:22

enter [1] - 496:7

entered [9] - 399:6; 411:23; 423:6; 452:15; 498:4; 502:12; 537:19; 538:4; 541:8

entering [2] - 416:12; 452:14

enters [2] - 490:19;
528:20

entire [16] - 398:2;
399:1; 421:15; 423:15;
428:25; 429:9; 500:16;
502:2; 503:9, 16;
505:6; 509:25; 516:4;
518:25; 546:19

entirety [2] - 400:4;
546:22

entries [1] - 552:7

entry [1] - 518:4

equation [1] - 529:25

equipped [1] - 554:21

ES [1] - 511:14

especially [1] -
425:19

ESQ [4] - 393:14, 17

essentially [8] -
403:14; 415:21; 420:23;
437:13; 489:11; 511:2;
521:4; 526:3

establish [2] -
560:19; 561:3

et [3] - 512:12; 527:3;
534:3

etcetera [2] - 427:2;
475:12

evaluated [1] - 435:21

eve [1] - 426:25

events [1] - 545:16

eventually [2] -
399:3; 494:2

evidence [101] -
395:15; 396:3, 5;
399:16, 23; 409:23;
410:3; 413:24; 416:21;
418:10; 421:9; 423:6;
424:14; 430:19; 432:16;
433:23; 434:13; 437:4;
439:23; 442:2, 19;
443:14; 444:3, 24;
445:14; 446:7; 448:3;
449:5; 450:10; 454:10;
455:11; 456:13; 457:16;
459:1; 460:6, 17;
461:15; 465:3; 467:17;
470:14; 471:18, 20;
472:13; 479:23; 480:14;
486:14, 19; 490:14;
491:13, 19; 499:9;
500:8; 501:9; 504:12;
507:14; 508:5; 516:22;
518:11, 15; 519:12;
522:16; 533:2; 548:11;
549:15; 558:4;
566:4-23, 25; 567:1

exact [3] - 424:7;
505:3; 506:2

exactly [2] - 440:3

examination [4] -
535:9; 541:19; 545:22;
560:9

EXAMINATION [10] -
401:1; 470:22; 479:1;
491:21; 535:19; 565:5,
7, 9, 12, 14

examine [1] - 470:19

examined [1] - 400:13

except [3] - 504:4;
514:9; 520:20

exception [2] - 409:1;
561:14

exceptions [1] -
480:10

excerpt [1] - 417:22

exchange [2] - 487:1;
491:4

exclamation [3] -
425:14; 510:13; 535:1

excuse [1] - 418:21

execute [2] - 431:16;
536:5

executed [5] - 407:4,
6; 439:13; 536:1, 15

executing [3] -
411:20; 416:20; 544:5

execution [5] -
536:12, 19; 538:9;
549:7; 555:15

Exhibit [225] - 394:21;
395:3, 6, 11, 14,
17-18, 21, 24-25;
396:4, 7, 9, 18; 397:1,
3, 6-8, 13; 398:14, 18;
399:16, 18, 21-22, 25;
400:4; 409:3; 413:7,
21, 23; 414:1; 417:24;
418:9; 420:14; 421:8,
11; 423:2, 7, 20;
424:6, 13, 16; 429:18;
430:15, 18; 431:22;
432:8, 15, 18; 433:7,
16, 20, 22; 434:2, 16,
24; 435:1; 436:12;
437:3, 6, 14; 439:9,
22; 442:4, 11, 18, 21,
25; 443:15; 444:2, 11,
14, 23; 445:1, 13, 20,
22-23; 446:6, 14, 18;
447:14, 16; 448:2, 6;
449:22; 450:9, 18;
451:9; 452:25; 453:3,
12, 18; 454:9, 12, 21;
455:1, 4, 10, 13, 19;
456:12; 457:18; 458:25;

459:23; 460:16; 461:14;
462:4-6, 14; 463:7;
464:25; 465:2; 466:25;
467:16, 19; 469:24;
470:2, 10; 471:3, 19;
472:14-16; 475:6;
476:7; 479:18; 480:13,
24; 483:17; 486:13;
491:1, 18; 492:3;
493:2, 5; 495:7;
498:17; 499:8; 500:8;
501:8; 504:10, 13;
505:4, 6-7, 13; 506:6;
507:6, 14; 508:1, 4;
509:13, 18; 510:19;
513:14; 515:15; 516:20;
517:15; 518:1, 10;
519:11; 522:15; 523:8,
12, 22; 524:4; 526:13;
528:25; 531:7; 533:2;
538:18, 20; 545:4;
547:5, 8; 548:13, 20;
549:2, 5-6, 11, 13-14,
24; 550:1; 551:19;
566:3-5, 7, 9-13,
15-17, 19-23, 25;
567:1-3, 5, 7-11, 13,
15

exhibit [34] - 398:4;
410:5; 435:10; 444:13;
447:6; 456:7, 16;
461:20; 464:1; 465:7,
17-18; 470:14; 471:25;
473:6, 9; 477:7;
486:18; 487:7; 488:16;
491:1; 492:2, 11;
493:15; 509:11; 510:20;
519:17; 524:7; 526:12;
529:1, 3; 532:17;
535:17

exhibit/exhibits [2]
- 410:13; 414:2

exhibited [15] -
418:12; 421:12; 424:17;
432:19; 437:7; 439:25;
442:22; 444:4; 445:16;
448:9; 451:10; 454:13;
462:15; 467:20; 473:13

EXHIBITS [1] - 566:1

exhibits [19] -
397:11; 399:2; 408:19;
409:25; 435:16, 24;
446:17; 461:25; 462:3;
477:9, 12; 479:13, 15,
23; 480:6, 17; 486:11;
490:23; 535:13

Exhibits [17] -
409:22; 434:9, 12;
435:11; 443:13; 449:4;
457:15; 460:5; 462:14;

490:13; 566:8, 14, 18,
24; 567:4, 6, 12

existed [2] - 432:10;
436:22

exits [3] - 486:7;
527:21; 556:8

expect [1] - 508:25

expense [1] - 426:8

experience [3] -
405:1; 469:4; 510:16

expert [4] - 528:11;
556:20; 560:5

explain [2] - 470:13;
534:18

explained [2] -
411:20; 416:19

explanation [1] -
535:2

explicit [3] - 429:3,
13; 542:13

Exploitation [3] -
401:23; 402:1, 3

explore [1] - 531:19

expose [1] - 417:3

exposed [1] - 468:13

extorted [2] - 416:23;
417:4

extortion [2] - 417:7,
11

extradited [1] -
405:17

extradition [1] -
405:16

extremely [1] - 559:25

eye [3] - 483:3; 496:3

eyes [2] - 483:5; 515:7

F

face [3] - 435:25;
462:11; 531:23

facing [2] - 466:3, 5

fact [17] - 405:6, 9;
406:23; 419:14, 25;
487:4, 24; 505:6;
525:23; 560:23; 561:2,
24-25; 562:24; 563:9,
15

fair [93] - 408:3;
409:4, 10; 413:16;
414:5; 420:24; 424:22;
428:21; 431:16; 432:6;
436:21; 437:10, 15;
438:1, 25; 439:2;
440:2; 442:12; 443:20;
448:15; 451:21; 452:22,
24; 457:2; 459:5, 9,

9

**10**

13; 466:12; 467:7; 475:6; 480:12; 481:2; 482:20; 484:1; 492:10, 13, 16; 499:12; 500:11; 504:15; 509:21; 510:12; 524:16; 525:25; 526:2, 5, 9, 15; 530:10, 17-18; 535:25; 536:8, 12; 537:7, 18, 25; 538:9, 12, 15; 539:4, 9, 12, 15, 19, 23; 540:16, 19; 541:19; 542:5, 8, 11, 18; 544:2, 9; 545:12, 15; 546:13; 547:11, 14; 549:4, 23; 550:5, 9, 16; 552:1, 3, 6, 9, 24; 553:24; 555:17; 561:4

**fairly** [5] - 409:13; 428:21; 432:8; 454:2; 465:22

**fall** [2] - 402:10; 561:13

**falling** [1] - 516:12

**familiar** [4] - 425:11; 524:19; 529:3; 555:13

**family** [11] - 441:6; 481:16, 23-24; 509:3; 520:11; 534:20; 538:5; 554:3, 11

**far** [13] - 414:13; 426:13; 449:12, 17; 466:9; 537:10, 14; 539:5-7; 542:15; 553:21; 555:20

**FBI** [26] - 401:8, 12; 408:8, 13; 410:20; 411:20; 420:21; 424:23; 536:10; 537:2, 7, 10, 15; 541:1; 544:10, 12, 23; 546:11; 547:25; 548:3; 550:5; 551:4; 552:22; 553:9, 13, 19

**FD** [3] - 420:19; 439:12, 14

**February** [19] - 438:11; 439:13, 17; 440:12; 441:9; 442:13; 443:6, 17; 447:20; 448:23; 450:2; 454:4, 23; 463:22; 467:9; 468:8, 11; 551:14; 553:13

**Federal** [3] - 393:13, 21; 401:6

**FedEx** [3] - 420:4, 7

**feet** [3] - 449:14, 18; 555:1

**fell** [1] - 460:18

**felt** [1] - 540:1

**female** [2] - 459:20; 557:12

**females** [1] - 557:12

**few** [4] - 454:17; 499:24; 522:22; 530:3

**fifth** [3] - 484:20; 524:10, 12

**filled** [2] - 440:3, 9

**filmed** [1] - 557:21

**filming** [6] - 464:16; 522:4; 557:12, 18; 558:12

**financial** [1] - 563:7

**financially** [1] - 563:10

**fine** [10] - 399:4; 404:17; 465:8; 513:6; 515:3; 522:14; 528:14, 17; 533:25; 556:2

**finger** [1] - 542:25

**fingerprints** [2] - 547:25; 548:4

**finished** [1] - 528:16

**firearm** [1] - 543:10

**firearms** [2] - 543:17, 19

**firm** [1] - 501:22

**first** [31] - 394:8; 400:12, 17; 402:16; 412:18; 435:18; 439:6; 446:13; 455:12; 462:4; 481:6; 483:23; 484:11, 16; 496:3; 500:16; 509:25; 512:3; 521:11, 14; 523:1; 528:25; 529:15; 533:13; 534:12, 19; 537:19, 25; 552:12; 563:16

**fishnet** [3] - 458:17; 459:3; 462:9

**fit** [2] - 529:24; 554:22

**five** [3] - 449:14; 512:6; 558:16

**five-year** [1] - 558:16

**flight** [3] - 509:23; 522:11; 531:15

**flip** [1] - 446:8

**floor** [7] - 432:3; 433:11; 463:2; 466:5; 501:6; 509:8; 549:19

**flooring** [1] - 468:2

**fly** [2] - 514:1, 16

**focus** [1] - 473:17

**folks** [2] - 408:3; 414:10

**follow** [4] - 425:25; 484:19; 526:3; 531:16

**following** [6] - 404:1, 19; 408:19; 464:9, 22; 562:23

**follows** [5] - 400:14; 489:12, 15; 490:18; 529:15

**food** [1] - 425:24

**fool** [1] - 510:10

**force** [4] - 401:15; 402:6, 9; 536:25

**Force** [2] - 401:23; 402:1, 3

**forces** [1] - 401:20

**foreground** [3] - 414:17; 415:8, 21

**forensic** [1] - 438:24

**forensically** [1] - 434:15

**forever** [1] - 522:6

**forget** [1] - 516:9

**forgot** [20] - 556:16

**form** [20] - 420:19, 23; 421:2, 14-16; 422:18; 439:11, 16; 440:2, 4, 19; 544:12; 551:16, 20; 552:4, 6, 9

**format** [1] - 508:24

**Forrestal** [13] - 414:16, 20; 415:6; 422:16; 434:20; 435:20; 472:9; 539:9, 13, 17, 20, 22; 543:7

**Forrestal's** [1] - 539:16

**forth** [2] - 488:5; 504:4

**forthcoming** [1] - 484:6

**forward** [15] - 418:20; 425:9; 495:17; 498:13, 23; 499:15; 500:14; 509:23; 513:19; 519:25; 531:11

**forwarded** [5] - 424:25; 494:1, 7; 504:19; 505:17

**forwarding** [1] - 504:14

**four** [4] - 474:12; 480:10; 490:23; 543:5

**fourth** [3] - 480:9; 524:9, 14

**frame** [3] - 460:25; 461:1; 465:20

**framework** [1] - 467:25

**frankly** [1] - 501:5

**free** [2] - 449:7; 475:4

**friend** [2] - 482:10; 483:5

**friends** [1] - 483:6

**front** [11] - 408:17; 409:4; 410:15; 414:14; 433:16; 434:17; 435:24; 442:3; 472:3; 477:8; 547:6

**fuck** [3] - 502:6; 534:15, 22

**fucking** [3] - 534:18, 20

**full** [4] - 470:4; 471:5; 474:11; 475:16

**fully** [1] - 470:19

**future** [1] - 520:11

**G**

**game** [1] - 488:15

**Gang** [1] - 401:23

**Gary** [1] - 441:22

**Gate** [40] - 406:14; 407:5, 12, 14; 409:11, 14; 410:15; 413:2, 14; 433:12; 436:17; 441:16; 442:8; 443:5, 7, 18; 445:6, 19; 450:23; 453:9, 22, 25; 455:22; 456:19; 457:9; 458:9, 18; 459:20; 460:24; 462:25; 463:12; 466:16; 467:8; 472:20; 473:22, 25; 475:10; 507:22; 509:8; 523:16

**gears** [2] - 402:12; 476:17

**general** [3] - 453:13; 549:17; 563:8

**generally** [6] - 409:13; 428:24; 432:2; 453:25; 456:21; 480:16

**genital** [1] - 429:16

**genitals** [1] - 429:5

**genius** [1] - 502:9

**George** [1] - 536:24

**gift** [1] - 427:3

**gigabit** [1] - 474:12

**girl** [6] - 436:6; 450:21; 459:5, 7; 462:9; 464:17

**girlfriend** [4] - 484:14; 487:13, 15; 492:24

**girlfriends** [1] -

**11**

484:23

**girls** [3] - 419:5; 529:23; 557:18

**girly** [1] - 485:10

**given** [3] - 396:11, 14; 428:10

**glad** [4] - 425:16; 516:6, 16; 531:18

**glaucoma...it** [1] - 483:4

**gmail.com** [1] - 495:15

**God** [2] - 502:9; 515:10

**gorgeous** [1] - 515:5

**Government** [15] - 393:12; 447:14; 449:22; 459:23; 479:22; 480:13; 486:16, 21; 490:2, 12-13, 25; 491:2, 18; 567:11

**government** [33] - 394:10; 395:3, 7-8, 18, 24; 396:7; 398:11; 399:14, 16; 413:19; 418:6; 424:10; 430:14; 433:15; 434:8; 435:7; 436:25; 442:15; 443:9, 23; 445:10; 446:3; 447:24; 448:25; 450:4; 455:25; 457:23; 461:8; 463:25; 469:22; 470:9

**Government's** [204] - 394:21; 395:6, 11, 14, 17-18, 21, 24-25; 396:4, 7, 9, 18; 397:1, 3, 6-8, 13; 398:14, 18; 399:18, 21-22, 25; 400:4; 409:3, 22; 413:7, 21, 23; 414:1; 417:24; 418:9; 420:14; 421:8, 11; 423:2, 7, 20; 424:13, 16; 429:18; 430:18; 431:22; 432:8, 15, 18; 433:7, 16, 20, 22; 434:2, 12, 16, 24; 435:1; 436:12; 437:3, 6; 439:9, 22; 442:4, 18, 21, 25; 443:13, 15; 444:2, 11, 14, 23; 445:1, 13, 20, 22-23; 446:6, 14; 448:2, 6; 449:4; 450:9, 18; 451:9; 452:25; 453:3, 12, 18; 454:9, 12, 21; 455:1, 4, 10, 13, 19; 456:12; 457:15, 18; 458:25; 459:24; 460:5, 16; 461:14; 462:4-6, 14; 463:7; 464:25; 465:2; 466:25; 467:16,

19; 469:24; 471:19; 472:14-16; 475:6; 476:7; 479:18; 480:24; 483:17; 491:2; 492:3; 493:1, 4; 495:7; 498:16; 499:8; 500:7; 501:8; 504:10, 12; 505:4, 6-7, 12; 506:6; 507:6, 14; 508:1, 4; 509:13, 18; 510:19; 513:14; 515:15; 516:20; 517:15; 518:1, 10; 519:11; 522:15; 523:8, 12, 21; 524:4; 526:13; 528:24; 531:7; 533:2; 545:4; 551:18; 566:3-5, 7-25; 567:1-10, 12

**grade** [2] - 484:20; 485:8

**grasp** [1] - 502:10

**gratitude** [1] - 427:6

**gray** [1] - 411:12

**great** [1] - 513:9

**greater** [3] - 558:6

**green** [1] - 515:7

**groom** [1] - 514:4

**group** [2] - 398:23; 401:14

**grow** [1] - 514:4

**growing** [1] - 501:22

**guarantees** [1] - 519:4

**guess** [1] - 527:4

**gun** [5] - 445:5; 446:1, 11; 453:7

**guns** [2] - 469:5, 7

**gymnastics** [1] - 485:10

---

**H**

---

**hair** [4] - 501:20, 24; 502:1; 514:4

**hair...very** [1] - 515:6

**half** [4] - 528:1; 542:7; 558:16; 559:10

**halfway** [5] - 500:15, 17; 501:14; 506:10; 508:11

**Hall** [1] - 494:25

**hallway** [2] - 411:22; 460:24

**Hamptons** [2] - 512:25; 520:15

**hand** [19] - 400:9; 406:16; 414:24; 415:21; 416:3-5; 421:17; 440:10, 14; 448:15;

463:9; 465:18; 473:20; 476:7; 531:2; 542:23; 551:23

**hand-made** [1] - 465:18

**handcuffing** [1] - 554:21

**Handed** [11] - 433:5; 435:3; 443:1; 444:12; 445:2, 21; 447:17; 448:7; 455:20; 469:25; 472:18

**handed** [5] - 455:7; 456:5; 458:2, 22; 470:8

**handing** [3] - 434:1; 478:18; 545:3

**handle** [1] - 474:15

**handling** [1] - 474:16

**handrail** [1] - 554:21

**hands** [1] - 502:11

**handwritten** [1] - 544:15; 553:19, 21

**hanging** [1] - 466:1

**harbors** [1] - 425:23

**hard** [7] - 426:21; 432:5, 23; 433:1; 434:24; 502:8; 520:22

**harder** [1] - 502:6

**HARRY** [1] - 393:20

**Hauppauge** [1] - 393:18

**hazel** [1] - 515:7

**HD** [3] - 470:4; 474:11; 475:16

**head** [4] - 416:2, 7; 451:7; 544:20

**header** [4] - 481:12; 498:12, 14, 21

**headers** [2] - 487:11, 16

**hear** [1] - 511:8

**heard** [4] - 403:5; 561:19; 563:17; 564:1

**hearsay** [4] - 404:8; 561:6, 11, 13

**heavy** [2] - 465:22; 469:1

**Helena** [16] - 425:13, 15; 499:15; 500:4, 14; 501:5; 502:13; 503:17; 508:22; 510:3; 512:2, 5, 8; 517:10; 527:13; 533:15

**Helena...yes** [1] - 526:22

**hell** [1] - 510:5

**hello** [1] - 533:15

**help** [2] - 483:2, 8

**helping** [1] - 508:17

**hid** [2] - 559:13, 18

**hidden** [8] - 449:7, 9, 19; 469:5; 557:6, 8; 558:20, 23

**hide** [1] - 510:8

**hiding** [2] - 412:6; 559:14

**High** [40] - 406:14; 407:4, 12, 14; 409:11, 14; 410:15; 413:2, 14; 433:12; 436:17; 441:15; 442:8; 443:4, 7, 18; 445:6, 19; 450:23; 453:9, 22, 25; 455:22; 456:19; 457:9; 458:9, 18; 459:20; 460:24; 462:25; 463:12; 466:16; 467:8; 472:20; 473:22, 25; 475:10; 507:21; 509:8; 523:16

**high** [1] - 562:4

**himself** [6] - 494:1; 504:15; 546:5, 8; 554:7

**hold** [8] - 449:12; 450:11; 457:18, 21; 458:5, 7; 493:20

**holding** [4] - 444:18; 447:6; 451:14; 462:10

**home** [23] - 403:19; 404:23; 438:4; 482:22, 25; 483:2; 484:22; 485:13, 17; 508:25; 509:2, 4, 7, 15; 512:25; 516:7; 526:23; 547:16; 556:19; 560:9, 13, 20; 561:2

**homes** [2] - 520:13, 15

**honest** [1] - 501:2

**honestly** [1] - 534:2

**Honor** [25] - 394:16; 395:9; 396:10; 399:19; 409:24; 435:5; 464:6, 20; 470:11, 20; 486:25; 487:7; 535:8, 24; 545:1; 549:10; 556:1, 12; 558:3; 560:8; 561:15; 563:11, 23; 564:1

**HONORABLE** [1] - 393:9

**hope** [3] - 399:12; 500:25; 533:15

**hopefully** [1] - 522:6

**hose** [4] - 501:7; 503:23; 530:9; 542:10

**hostile** [2] - 560:15; 562:10

**hosting** [1] - 496:25

---

**hotel** [1] - 527:11

**hour** [5] - 476:13; 528:1; 540:18; 541:8, 14

**house** [34] - 411:23; 412:5, 8, 10; 434:5; 443:21; 447:22; 448:23; 450:1; 452:1; 454:23; 462:25; 463:5, 17; 468:10; 509:16; 525:20; 536:1, 19; 537:19, 23; 538:4; 541:9; 544:7; 548:4; 549:18; 550:6; 551:5; 557:6, 19; 560:23; 562:8, 15; 563:16

**houses** [1] - 468:24

**housing** [1] - 463:14

**hundred** [1] - 426:24

**hurry** [1] - 510:4

**hurt** [1] - 501:2

**husband** [1] - 560:21

---

**I**

**identical** [4] - 518:6, 8; 524:1; 525:12

**identification** [9] - 429:13; 430:23; 435:9; 453:1; 455:19; 545:5; 548:14, 21; 549:6

**identified** [6] - 411:15; 437:18; 446:9; 450:16; 453:8; 479:16

**identify** [5] - 397:23; 406:23; 408:9; 429:14; 461:23

**identifying** [1] - 411:10

**illegible** [1] - 550:14

**illustrates** [1] - 507:11

**image** [6] - 450:18, 20-21; 461:3; 476:4, 8

**images** [13] - 434:22, 25; 435:16, 18; 436:1, 7; 438:23; 446:8; 452:22; 461:25; 462:8; 466:23

**imagination** [1] - 502:8

**Immigration** [1] - 483:1

**impeach** [1] - 562:9

**Imperiale** [7] - 481:15, 24-25; 482:11; 560:8; 561:21; 562:23

**imprimatur** [1] - 562:3

---

**incarcerated** [1] - 560:23

**inclination** [1] - 512:8

**included** [1] - 512:22

**including** [1] - 536:5

**INDEX** [1] - 565:1

**indicate** [1] - 527:8

**indicated** [3] - 419:12; 422:18; 514:7

**indicates** [2] - 517:22; 524:14

**indicating** [1] - 509:9

**indicted** [1] - 405:9

**individual** [3] - 402:13; 488:9, 14

**indulge** [1] - 465:5

**information** [9] - 406:15; 418:14, 22; 438:6; 481:12, 22; 491:5; 529:17

**initialed** [3] - 430:4, 9

**initials** [1] - 430:9

**ink)** [1] - 496:10

**insert** [2] - 515:10; 531:24

**inside** [9] - 426:17; 459:23; 468:7; 471:4; 472:14, 20; 473:3; 476:1; 536:19

**insignia** [1] - 408:10

**instead** [1] - 556:3

**instruct** [3] - 426:4; 427:9

**instruction** [3] - 490:7; 491:7; 559:21

**instructional** [1] - 472:19

**instructions** [3] - 394:9, 11, 15

**instrumentality** [1] - 559:15

**interaction** [1] - 559:20

**interested** [1] - 530:6

**interference** [1] - 449:7

**interpretation** [1] - 541:25

**interview** [17] - 418:25; 522:6; 524:25; 539:2; 541:5, 16; 542:3; 543:9, 20; 544:6, 18; 545:24; 546:2; 552:21; 553:3; 554:20

---

**interviewed** [6] - 413:13; 541:3; 553:1, 8; 554:14, 25

**interviewing** [1] - 542:22

**introduce** [1] - 398:23

**introduced** [1] - 483:5

**investigates** [2] - 402:2, 4

**Investigation** [1] - 401:7

**investigation** [14] - 402:13, 17, 20; 403:10, 15; 404:5; 405:4, 7, 17; 406:22; 436:8, 11; 472:6; 550:7

**investigator** [4] - 403:9, 14, 17; 404:21

**Investigator** [1] - 536:24

**investments** [1] - 520:12

**invoice** [8] - 460:1; 473:3, 6-7, 16; 474:4, 8

**involved** [2] - 402:17, 20

**involving** [3] - 402:4, 13; 530:19

**IP** [5] - 488:17; 497:20, 25; 502:23, 25

**irrelevant** [3] - 395:20; 491:5, 11

**Island** [7] - 401:19, 22-23; 402:1, 3; 403:10; 520:21

**Islanders** [2] - 488:15; 496:25

**Isles** [1] - 496:5

**Islip** [3] - 393:5, 14, 22

**issue** [2] - 562:11, 21

**issued** [5] - 406:19, 25; 407:1; 441:19, 22

**issues** [1] - 394:6

**Istanbul** [1] - 516:15

**item** [10] - 454:25; 458:22; 470:8, 17-18; 474:9; 475:5, 12; 559:15

**items** [27] - 434:4; 435:21; 438:1; 441:24; 442:2; 451:15; 452:21; 453:23; 454:15, 20; 456:17-19; 457:8; 458:2; 459:24; 472:13, 17, 23; 475:4; 494:21;

---

495:4; 547:12; 557:6, 13

**itself** [8] - 414:6; 431:14; 449:11, 23; 468:18; 470:10; 475:19; 476:5

---

**J**

**J-A-R-M-I-L-A** [1] - 412:18

**jacket** [12] - 408:1, 6, 8; 414:15, 19, 25; 539:7, 11; 543:2, 7, 9

**jacketed** [2] - 543:5

**jackets** [1] - 536:9

**Jane** [1] - 556:17

**January** [30] - 402:6; 407:1, 7-8, 23; 409:5; 412:24; 413:17; 421:3, 18; 424:8; 430:12; 432:10; 434:5; 436:22; 438:22; 441:2, 25; 484:10; 524:24; 525:7; 529:8; 530:13; 536:2; 537:7, 11, 14; 546:17; 547:12; 549:8

**Jaramila** [1] - 412:13

**JARAMILA** [1] - 412:13

**Jarmila** [11] - 481:3, 13; 483:21, 23; 484:9; 487:2; 492:24; 538:2, 5, 10

**jarmila.berezovska1@hotmail.com** [3] - 481:4; 491:25; 492:7

**jeans** [1] - 411:25

**Jim** [1] - 537:2

**job** [2] - 401:10; 426:9

**Joe** [14] - 418:17; 425:6; 492:6; 493:8; 496:8; 500:11; 501:11; 503:11; 504:14; 505:22; 511:25; 515:25; 529:14; 551:2

**Joeval** [1] - 550:10

**JOEVAL** [1] - 496:9

**joeval5** [1] - 472:25

**joeval5@optonline.net** [42] - 406:5, 11; 418:18; 425:7; 477:5; 481:2, 13; 483:20; 487:12; 488:22; 489:11; 491:24; 492:7, 20; 493:9; 494:1, 17; 495:14; 496:7, 11, 13, 16; 499:4, 12; 501:12; 505:22; 509:21; 511:13,

25; 513:17; 515:25;
517:1; 518:16; 519:22;
522:19; 524:11, 15;
526:19; 531:10; 533:8;
534:10

**jointly** [1] - 520:15

**joists** [1] - 468:3

**Joseph** [23] - 402:14,
25; 411:7; 423:24;
440:15; 473:22, 25;
475:10; 494:12; 497:2,
12; 505:25; 506:11;
507:21; 511:13; 513:11;
517:12, 23; 523:6, 16;
532:23; 534:4; 562:24

**JOSEPH** [2] - 393:5, 9

**joy...so** [1] - 521:21

**Judge** [28] - 396:20;
397:11; 398:12; 399:15;
400:2; 408:18; 409:18;
421:5; 429:19; 432:12;
441:22; 447:8; 450:6;
451:24; 452:18; 467:13;
476:11; 477:14; 479:23;
486:20; 488:12; 489:20;
491:15, 20; 527:24;
535:14, 16; 556:21

**Julia** [3] - 502:3, 5;
508:20

**July** [30] - 398:1;
418:18; 422:23-25;
423:6, 11; 425:7;
427:5, 18-19, 21,
23-24; 514:8; 515:23;
516:18; 517:4, 21-22;
518:4, 19; 519:7, 10,
19; 522:6, 23; 523:13;
526:16; 529:13

**jump** [2] - 502:2;
521:10

**June** [3] - 511:20;
513:18; 517:20

**juror** [1] - 563:21

**jurors** [2] - 394:5;
563:14

**JURORS** [1] - 399:10

**JURY** [1] - 556:7

**jury** [38] - 393:10;
394:7, 9; 395:4, 19;
396:8, 19; 398:9;
399:6, 9, 24; 410:14;
414:3; 452:7, 13-15;
458:7; 465:9; 466:10;
469:13; 470:13; 486:7;
490:8, 15, 19, 22;
519:16; 527:21; 528:5,
20; 550:22; 556:8;
558:25; 559:2, 5;
560:21; 562:20

## K

**Kabrawala** [4] -
460:18; 479:25; 560:8;
561:1

**KABRAWALA** [164] -
393:14; 394:13; 395:9,
22; 396:10, 20, 23;
397:2, 5, 10, 18, 21,
25; 398:12, 16, 19, 25;
399:5, 15; 400:2, 6;
401:2; 404:4; 409:8,
18, 24; 410:2, 6, 9;
411:14; 412:16, 18;
413:19, 25; 418:6, 11;
421:5, 10; 424:10, 15;
429:19; 430:14; 432:12,
17; 433:6, 15; 434:8;
435:4, 8; 436:25;
437:5; 439:19, 24;
442:15, 20; 443:9, 23;
444:1, 20; 445:10, 15;
446:3; 447:8, 24;
448:8, 25; 450:4, 6;
451:24; 452:3, 18-19;
454:6, 11, 16; 455:3,
6, 25; 456:2, 4; 457:5,
12, 17, 23; 458:1;
460:3, 12, 20; 461:8,
16; 463:9, 25; 464:24;
465:4; 467:11, 13, 18;
470:6, 9; 471:21;
476:11, 16, 25; 477:14;
479:2, 22; 480:1, 3, 7,
12, 15; 481:1; 486:20;
488:12; 489:5, 8, 20;
491:15, 20, 22; 492:9;
493:4, 14, 23; 495:12;
499:10; 500:10; 502:18;
504:11; 507:13; 508:10;
509:12, 18; 511:19;
513:16; 515:17; 516:21;
518:14; 519:15; 523:11;
524:13; 527:7, 24;
528:1, 23; 531:6, 9;
533:6; 534:9; 535:8;
549:12; 556:17, 21, 23;
557:3, 15, 17, 23;
558:1, 23; 559:4;
565:6, 10, 13

**Kalichenko** [41] -
396:1; 403:1; 404:5;
405:4, 6; 416:24;
419:13, 19; 420:2, 8;
423:25; 424:2; 428:2,
17; 429:4, 6; 431:3,
13; 480:20, 23; 487:3;
500:12; 505:20; 507:16,
23; 511:14; 517:23;
523:17; 525:10, 24;

526:1, 6, 9; 529:14;
531:10; 532:24; 540:23;
541:20; 542:8; 552:25

**Kalichenko's** [4] -
403:6, 18; 404:23;
424:23

**kalichenkoes** [1] -
493:9

**kalichenkoes@mail.ru**
[16] - 418:19; 425:8;
499:5, 13; 501:12;
503:12; 505:20; 509:22;
511:14; 513:18; 517:2;
518:17; 519:23; 522:20;
533:9; 534:11

**keep** [5] - 479:9, 11;
513:10, 24; 517:16

**kept** [2] - 428:6;
538:10

**kidding** [1] - 512:24

**kids** [5] - 482:24;
483:3, 9, 13; 484:8

**Kiev** [6] - 402:22;
425:16; 519:6; 521:15;
523:18; 527:14

**kill** [3] - 441:6;
553:25; 554:7

**kind** [5] - 401:25;
407:12; 437:12; 468:20;
559:23

**kindly** [1] - 408:18

**kinky** [2] - 500:19;
501:4

**kiss** [1] - 522:12

**kisses** [2] - 516:16;
530:3

**kit** [2] - 449:8

**knocked** [1] - 410:19

**knocking** [1] - 410:24

**knowledge** [3] -
405:15; 555:11; 557:21

**known** [1] - 544:9

## L

**label** [1] - 449:23

**labeled** [1] - 448:21

**lamp** [1] - 432:25

**LaPinta** [13] - 393:17;
395:1; 397:16, 19;
398:8, 10; 412:17;
413:20; 417:11, 13;
439:20; 456:3; 467:14

**LAPINTA** [8] - 493:20;
524:12; 528:5, 15, 18;
562:16, 18; 563:9

**lapse** [1] - 544:18

**large** [5] - 459:10, 13;
554:18; 555:1

**last** [27] - 396:16;
400:18; 402:10; 412:13; **13**
436:3; 482:23; 483:11;
484:17, 25; 496:2;
505:13; 507:16; 510:10;
515:18; 517:5; 519:19;
522:23, 25; 523:1;
526:23; 530:2; 532:20;
533:3; 534:14; 552:4

**late** [1] - 447:25

**LATO** [89] - 393:17;
394:16, 19, 23; 399:19;
403:23; 404:10, 16;
405:19; 409:20; 418:7;
421:6; 424:11; 430:16;
432:13; 433:19; 434:10;
437:1; 442:16; 443:10,
24; 444:21; 445:11;
446:4; 449:2; 450:7;
454:7; 455:5, 8; 456:1,
10; 457:13, 25; 458:3,
23; 460:2, 13, 18;
461:9, 12; 464:3, 6,
11, 20; 470:11, 20, 23;
471:17; 476:23; 479:24;
480:2, 5, 8; 486:13,
24; 487:18, 24; 488:8,
24; 489:3, 14; 490:4,
6; 497:18; 510:17;
530:20; 535:10, 13, 16,
20, 24; 538:18; 545:1,
18, 20; 547:5, 7;
549:10, 16; 553:15;
555:25; 558:3, 24;
560:6; 561:15, 21;
564:1; 565:8, 15

**Lato** [7] - 455:7;
456:5; 458:2; 470:18;
486:10; 555:23; 556:13

**latter** [1] - 394:16

**law** [8] - 482:3;
535:25; 536:4, 9;
541:10; 554:15; 559:21

**lawyer** [8] - 417:10,
15; 422:1, 3, 5, 8, 12;
522:7

**lawyers** [1] - 490:24

**lead** [11] - 403:9, 14,
16; 404:12, 14, 21;
559:9; 560:8, 12;
561:1; 564:3

**leading** [1] - 404:16

**leaning** [1] - 447:1

**least** [4] - 430:22;
476:13; 537:8; 550:9

**leather** [1] - 436:18;
437:23; 450:22, 24

**leave** [5] - 399:1; 461:16; 487:11, 16; 502:10

**leaves** [2] - 452:7; 483:4

**leaving** [2] - 416:12; 516:14

**led** [1] - 439:2

**left** [16] - 411:12; 415:6, 8, 21; 432:25; 440:15; 506:13; 538:7; 539:13, 17, 22, 24; 540:3, 9; 550:25; 551:1

**left-hand** [1] - 415:21

**legal** [1] - 403:18

**LEGAT** [1] - 402:22

**leggings** [1] - 459:2

**legs** [1] - 447:11

**lengthy** [1] - 428:21

**lens** [4] - 449:20; 463:16; 465:13; 471:11

**LEONARD** [1] - 393:17

**less** [1] - 520:21

**letters** [2] - 412:14; 510:16

**level** [2] - 496:3

**leverage** [1] - 520:10

**life** [2] - 512:24; 529:22

**lift** [1] - 468:17

**light** [9] - 463:13-15; 465:12, 18; 468:5; 515:6

**likely** [1] - 544:22

**limited** [1] - 558:22

**line** [13] - 416:25; 422:13; 484:4; 496:4; 498:11; 500:4, 14; 505:13; 519:24; 522:25; 523:1; 552:4

**lines** [3] - 512:6; 520:1; 530:3

**list** [4] - 397:16; 477:10, 15; 557:1

**listen** [2] - 513:5; 534:14

**lists** [1] - 472:23

**literally** [2] - 397:13; 501:6

**live** [1] - 494:12

**lives** [2] - 513:2; 560:21

**located** [3] - 432:23; 467:5; 468:8

**location** [3] - 407:12; 447:12; 466:22

**locations** [1] - 436:9

**lock** [1] - 514:7

**log** [1] - 537:1

**logo** [3] - 473:8, 19

**look** [54] - 408:22; 420:13; 423:20; 425:3; 429:18; 431:21; 433:4; 435:6; 436:12; 439:9; 442:4; 443:15; 447:14; 449:11, 22; 453:17; 455:5; 456:7; 461:20; 464:2; 467:4; 468:15; 469:3; 471:14; 473:3; 477:7; 481:8; 486:11; 492:2; 493:11; 494:19; 497:8; 499:8; 500:1, 17; 507:15; 508:4; 509:23; 510:19; 511:1; 513:14; 517:15, 25; 519:11; 522:15; 523:19; 524:4, 10, 19; 529:3; 539:5; 545:5; 548:23; 550:21

**looked** [5] - 479:15; 483:1; 499:18; 510:3; 544:23

**looking** [11] - 412:5; 416:20; 444:8; 456:6; 467:23; 476:6; 481:7; 487:8; 493:16; 543:23

**looks** [8] - 449:20; 460:8; 471:10; 486:15; 488:8; 489:12; 511:2; 515:7

**Lopez** [1] - 537:2

**LORETTA** [1] - 393:12

**lost** [2] - 521:16, 18

**loud** [3] - 427:18; 473:18; 546:5

**love** [3] - 426:19, 21; 442:7

**lower** [2] - 518:24; 551:3

**lunch** [5] - 480:11; 486:4, 12; 490:24; 491:23

**LYNCH** [1] - 393:12

**M**

**M-E-S-S-I-N-E-O** [1] - 415:5

**Magistrate** [1] - 441:22

**mail** [99] - 479:4; 483:11, 13-14; 484:1, 6-8; 485:1; 487:1, 25; 488:5, 8, 13, 21, 23; 489:10, 13; 491:3, 24; 492:5, 10, 13; 493:6, 8, 25; 494:15, 19-20; 495:10, 13; 496:7, 11, 13; 497:12; 498:11, 19; 500:11; 501:10; 502:21; 504:8; 505:3, 10, 16; 507:16; 509:5; 510:12; 511:3, 11; 513:19; 516:1, 18; 517:5; 518:9, 25; 519:8, 19; 522:4, 23; 523:13, 22, 25; 524:3, 16, 19, 23-24; 525:6, 9-10, 13, 22-23, 25; 526:15; 527:2; 529:6; 530:11; 531:1; 532:4, 15, 20, 25; 533:3, 8; 534:7, 13; 546:1, 19

**mailed** [1] - 534:1

**mails** [16] - 480:16; 488:4, 17; 492:14, 19; 499:2, 4, 7; 529:7; 534:15, 21; 545:23, 25; 546:2, 20, 23

**main** [1] - 529:21

**maintained** [1] - 537:1

**Major** [1] - 401:24

**man** [1] - 425:22

**Manhattan** [3] - 494:24; 520:13; 521:1

**manner** [1] - 451:5

**March** [7] - 492:16; 495:16; 498:15, 20; 499:15; 500:12; 501:12

**Mario** [3] - 483:2; 484:16; 485:9

**mark** [2] - 398:3; 425:14

**marked** [13] - 396:12, 15; 397:22; 398:2; 434:1; 444:25; 448:5; 455:16, 18; 466:24; 469:23; 470:3; 507:6

**marks** [1] - 510:13

**married** [1] - 481:25

**Massapequa** [1] - 482:1

**master** [1] - 502:17

**match** [4] - 431:6, 11; 548:10

**material** [5] - 429:13; 430:22; 490:9; 491:10; 542:14

**materials** [1] - 405:22

**matter** [1] - 561:22

**mean** [8] - 427:17; 430:4; 433:1; 488:22; 510:15; 539:6; 546:14;
558:24

**meaning** [1] - 558:18

**means** [3] - 403:14; 508:20; 558:11

**mechanical** [1] - 393:23

**medium** [2] - 455:16; 459:15

**meet** [4] - 483:8; 512:10; 514:2; 560:17

**meeting** [1] - 417:18

**meets** [1] - 562:19

**Melville** [4] - 401:19; 440:10; 541:1; 552:22

**members** [5] - 399:9; 411:23; 412:1, 4; 490:22

**memorialize** [1] - 544:6

**memorializes** [1] - 544:12

**memory** [4] - 434:17, 25; 472:11; 545:16

**mention** [4] - 394:8; 562:14; 563:2, 11

**mentioned** [9] - 405:21; 408:6; 411:2; 441:10; 462:19; 472:2; 473:19; 492:22; 520:9

**mentioning** [1] - 563:13

**message** [11] - 418:14; 425:4, 6, 17; 481:12; 494:7; 495:25; 496:1, 14; 504:19; 505:17

**messages** [1] - 511:4

**Messineo** [12] - 415:5, 9, 20; 440:16; 539:12; 540:22; 543:6; 552:16; 553:21; 554:16; 555:11

**Messineo's** [1] - 552:18

**met** [3] - 416:24; 483:23; 561:5

**metal** [1] - 467:25

**Miami** [6] - 427:4; 512:9; 513:24; 514:2; 527:11

**microphone** [2] - 400:20; 535:23

**middle** [8] - 424:19; 451:16; 469:17; 525:15; 539:19, 25; 540:2

**might** [4] - 412:6; 463:2; 509:1; 517:18

**mind** [3] - 404:11; 521:18; 528:10

**15**

**mine** [2] - 515:6, 9

**minute** [1] - 465:6

**minutes** [11] - 454:17; 476:15; 484:2; 540:18; 541:8, 14; 546:9, 17; 555:25; 556:14; 559:10

**Miranda** [5] - 420:11, 24; 421:1; 439:7; 540:13

**Mirandized** [1] - 423:9

**Mirandizing** [1] - 440:17

**misdemeanor** [2] - 557:4; 559:19

**mismarked** [1] - 493:14

**missed** [1] - 518:7

**missing** [3] - 447:16; 478:4, 14

**misspoke** [1] - 426:6

**mistake** [1] - 529:16

**modeling** [1] - 513:4

**mom** [3] - 427:2; 512:23; 515:11

**moment** [10] - 461:9; 464:3; 470:24; 486:25; 490:4; 493:10; 535:13; 545:1; 548:18; 553:15

**Monday** [3] - 527:9; 528:11; 560:5

**money** [13] - 428:4, 9; 469:5, 7; 497:6; 506:16, 21; 507:16; 512:7, 16; 516:5; 523:3; 527:9

**monitor** [2] - 547:15; 549:21

**Montauk** [1] - 520:16

**month** [2] - 485:4; 509:22

**months** [1] - 499:24

**moral** [1] - 563:6

**morning** [12] - 399:9-11; 401:3; 407:25; 411:2; 451:23; 452:4; 535:3; 556:19, 25

**Moscow** [2] - 503:17; 506:15

**most** [2] - 484:22; 544:22

**mostly** [1] - 542:9

**mother** [6] - 429:8; 482:23, 25; 519:2; 521:15; 556:17

**mother's** [2] - 485:13; 486:2

**mount** [1] - 475:2

**mouth** [2] - 514:16; 535:5

**move** [18] - 400:19; 409:18; 421:5; 432:12; 433:24; 439:19; 444:20; 454:6; 455:3; 457:12; 460:3, 12; 464:24; 467:11; 469:1; 474:25; 509:2; 519:1

**moves** [22] - 399:16; 413:19; 418:6; 424:10; 430:14; 433:15; 434:8; 436:25; 442:15; 443:9, 23; 445:10; 446:3; 447:24; 448:25; 450:4; 455:25; 457:23; 461:8; 463:25; 470:9; 479:22

**movies** [2] - 484:23; 485:10

**moving** [1] - 457:5

**MPCN** [1] - 531:14

**MR** [287] - 394:13, 16, 19, 23; 395:1, 9, 22; 396:10, 20, 23; 397:2, 4-5, 9-10, 16, 18-19, 21, 25; 398:10, 12, 16, 19, 25; 399:5, 15, 19; 400:2, 6; 401:2; 403:23; 404:4, 10, 12, 16; 405:19; 409:8, 18, 20, 24; 410:2, 6, 9; 411:14; 412:16-18; 413:19, 25; 418:6, 11; 421:5, 10; 424:10, 15; 429:19; 430:14, 16; 432:12, 17; 433:6, 15, 19; 434:8, 10; 435:4, 8; 436:25; 437:1, 5; 439:19, 24; 442:15, 20; 443:9, 23-24; 444:1, 20-21; 445:10, 15; 446:3; 447:8, 24; 448:8, 25; 449:2; 450:4, 6-7; 451:24; 452:3, 18-19; 454:6, 11, 16; 455:3, 5-6, 8, 25; 456:1-4, 10; 457:5, 12-13, 17, 23, 25; 458:1, 3, 23; 460:2, 12-13, 18, 20; 461:8, 12, 16; 463:9, 25; 464:3, 6, 11, 20, 24; 465:4; 467:11, 13-14, 18; 470:6, 9, 11, 20, 23; 471:17, 21; 476:11, 16, 23, 25; 477:14; 479:2, 22, 24; 480:1-3, 5, 7-8, 12, 15; 481:1; 486:13, 20, 24; 487:9, 18-19, 23-24; 488:2, 8,

12, 24; 489:3, 5, 7-8, 14, 20; 490:4, 6; 491:15, 20, 22; 492:9; 493:4, 14, 20, 23; 495:12; 497:18; 499:10; 500:10; 502:18; 504:11; 507:13; 508:10; 509:12, 18; 510:17; 511:19; 513:16; 515:17; 516:21; 518:14; 519:15; 523:11; 524:12; 527:7, 24; 528:1, 5, 15, 18, 23; 530:20; 531:6, 9; 533:6; 534:9; 535:8, 10, 13, 16, 20, 24; 538:18; 545:1, 18, 20; 547:5-7; 548:15; 549:10, 12, 16; 553:15; 555:25; 556:17, 21, 23; 557:3, 15, 17, 23; 558:1, 3, 23-24; 559:4; 560:6, 17; 561:7, 15, 21; 562:13, 16, 18; 563:3, 9, 15, 22, 25; 564:1, 3; 565:6, 8, 10, 13, 15

**MTCN** [13] - 517:10, 25; 518:3, 6, 8; 523:4, 21, 25; 524:1; 532:2, 8, 10, 20

**Music** [1] - 494:25

**must** [1] - 421:22

**N**

**N.Y** [1] - 393:5

**naked** [3] - 501:6; 542:8

**name** [19] - 400:15, 17-18; 412:13, 18; 436:3; 475:9; 483:7; 484:17, 25; 506:12; 550:2, 10, 13, 17, 23; 552:18; 556:16

**named** [7] - 402:14; 403:1; 416:24; 417:10; 481:3; 497:2; 512:18

**Nassau** [4] - 415:16; 520:13; 521:1; 536:25

**Natalia** [1] - 514:13

**nature** [3] - 430:21; 486:10

**near** [2] - 471:11; 539:10

**necessary** [1] - 537:16

**nectar** [1] - 522:1

**need** [17] - 398:23; 426:8; 440:7; 463:9; 487:20; 503:19; 504:3;

506:14; 508:16, 21; 512:15; 513:5; 527:9; 533:25; 534:1; 535:17; 562:20

**needed** [5] - 406:22; 417:2; 527:5, 12; 529:17

**needs** [1] - 496:10

**negotiate** [1] - 417:2

**neighborhood** [1] - 407:15

**nephew** [1] - 484:16

**Nerf** [4] - 445:5; 446:1, 11

**nervous** [2] - 547:1, 4

**never** [3] - 428:6; 485:18; 561:17

**NEW** [1] - 393:1

**new** [2] - 426:10; 496:10

**New** [31] - 393:14, 18, 22; 405:10; 406:14, 18; 407:3, 5, 15; 421:17; 438:9; 440:11; 441:16, 19; 473:22; 474:1; 475:10; 482:1; 494:21; 495:2, 4; 501:25; 504:5; 507:22; 508:22; 514:15; 520:16; 521:2; 523:17; 528:11

**next** [32] - 406:16; 417:25; 426:2, 6; 432:24; 441:8; 446:23; 450:22; 453:6; 454:17; 463:14; 465:12; 466:5; 468:5; 476:13; 478:22; 482:13; 483:13; 484:8, 24; 485:16; 502:2; 509:2; 517:7; 518:10; 522:16; 524:15; 534:24; 539:13, 16

**nice** [5] - 399:11; 499:23; 501:22; 527:1; 531:20

**████** [15] - 436:5, 7; 437:18; 441:3; 442:10; 446:19; 450:19; 452:22; 453:6; 460:22; 461:3, 20; 462:17; 484:24; 551:6

**night** [7] - 396:16; 399:12; 526:17, 23; 535:3; 556:6; 564:5

**North** [1] - 475:2

**note** [2] - 410:4; 553:19, 21

**noted** [2] - 394:4; 456:8

**notes** [3] - 544:15; 546:14; 550:25

**nothing** [1] - 534:23; 535:8

**notice** [2] - 561:8, 12

**notwithstanding** [1] - 559:21

**November** [6] - 393:7; 402:18; 424:25; 522:9; 546:16; 564:8

**nude** [4] - 450:21; 451:2

**number** [36] - 435:10; 452:21; 456:3, 7, 16; 467:12; 474:6; 476:12; 477:8; 481:6; 485:17, 21; 486:3; 493:15; 498:3, 7; 511:21; 517:10, 25; 518:3; 523:19, 21, 25; 524:1; 531:14; 532:8, 12, 20; 556:18

**numbered** [1] - 462:3

**numbers** [6] - 397:19; 435:10; 479:24; 518:6, 8; 523:24

**nurse's** [1] - 455:14

**NY** [3] - 500:24; 513:4

**NYC** [2] - 513:2; 526:23

---

**O**

**o'clock** [1] - 486:5

**object** [10] - 404:13; 445:22, 24; 453:7; 456:14; 463:10; 464:16; 468:6; 550:16; 558:3

**objection** [49] - 399:17; 403:23; 405:19; 409:20; 413:20; 418:7; 421:6; 424:11; 430:16; 432:13; 433:18; 434:10; 437:1; 439:20; 442:16; 443:10, 24; 444:21; 445:11; 446:4; 447:25; 449:2; 450:7; 454:7; 455:8; 456:10; 457:13; 458:3, 23; 460:2, 14; 461:12; 464:11, 13, 15, 18; 467:14; 470:17; 471:17; 476:23; 480:2; 489:1, 14, 17; 497:18; 510:17; 530:20; 549:12

**objections** [3] - 394:24; 480:5; 486:11

**objects** [2] - 429:6; 549:24

**observation** [1] - 423:17

**observe** [3] - 459:20; 465:10, 16

**observed** [4] - 437:22; 438:2, 24; 442:10

**obstruct** [1] - 433:24

**obtain** [3] - 403:18; 406:6; 503:25

**obtained** [8] - 424:1; 438:8, 10; 441:10, 12; 525:7, 10

**obtaining** [1] - 407:2

**obvious** [2] - 521:2; 554:8

**obviously** [6] - 396:3; 489:16; 559:19; 560:10; 561:2, 5

**occupants** [1] - 537:22

**occurred** [4] - 538:15; 539:2; 540:16; 552:21

**October** [1] - 522:9

**OF** [3] - 393:1, 3, 6

**Offender's** [1] - 401:24

**offense** [1] - 486:14

**offenses** [1] - 558:7

**offer** [6] - 395:3; 398:14; 488:25; 529:22; 549:10; 562:18

**offering** [1] - 395:7

**offers** [2] - 470:14; 494:13

**office** [15] - 402:22; 432:4; 463:3; 508:25; 509:4, 7, 15; 547:16, 23; 548:1; 549:19; 552:24; 554:14, 18

**officer** [7] - 536:25; 540:3; 556:24; 557:1; 558:9

**officers** [13] - 407:16; 536:1, 5, 9, 18; 537:19; 538:1; 540:8; 543:4, 16, 25; 544:3; 554:15

**offices** [4] - 468:23; 541:1; 552:22

**offs** [1] - 512:23

**old** [5] - 482:8, 17; 558:16, 18

**older** [2] - 468:24; 558:18

**Olena** [25] - 403:1, 6, 18; 404:23; 405:3, 6; 416:24; 419:12, 19; 420:2, 8; 423:24; 424:22; 428:2, 16;

**429:3**; 431:3, 13; 487:3; 517:23; 523:17; 525:10, 23; 532:23; 552:25

**once** [2] - 551:16; 561:17

**one** [77] - 396:21; 397:20; 398:19, 22, 24; 414:18; 417:25; 422:5, 23; 424:1; 427:18; 436:10; 437:24; 442:10; 446:19, 21; 451:24; 453:15; 457:21; 458:17; 459:9; 461:9; 462:10; 463:21; 464:3; 466:9; 468:4, 17; 475:4; 486:25; 487:10; 489:4, 15; 490:4; 493:10, 15-16, 19, 21-24; 502:25; 506:18; 512:10; 515:18; 518:8; 519:17; 522:3, 16; 529:7; 531:2; 534:7; 535:17; 536:15; 537:8, 25; 540:18; 545:1, 23, 25; 546:1; 556:23; 558:16; 561:16

**one-and-a-half** [1] - 558:16

**one-page** [1] - 519:17

**ones** [4] - 395:6, 16; 396:9; 480:7

**op** [1] - 520:15

**open** [8] - 404:20; 410:21; 464:23; 465:12; 476:6; 547:22; 550:17; 562:21

**opened** [8] - 404:7, 9; 411:6, 17, 19; 412:2; 555:5

**opportunity** [5] - 412:23; 423:14; 427:10; 470:15; 561:18

**opposed** [1] - 487:2

**optical** [1] - 474:11

**optonline** [1] - 503:4

**oral** [2] - 429:7, 16

**order** [6] - 474:6; 495:19; 498:13, 23; 516:13; 559:17

**ordered** [1] - 497:2

**original** [1] - 425:4

**otherwise** [1] - 488:4

**out...you** [1] - 513:5

**outfit** [4] - 461:19, 23; 462:1, 10

**outside** [2] - 409:14; 453:24

**outweighed** [1] - 560:2

**overhead** [1] - 476:8

**overruled** [2] - 464:14, 19

**OWEN** [1] - 393:20

**own** [3] - 508:20; 527:13; 562:9

**owned** [1] - 520:15

---

**P**

**p.m** [13] - 418:19; 440:13; 481:14; 483:15; 484:2; 504:17; 505:2; 511:23; 519:20; 522:24; 534:15; 552:1

**package** [4] - 419:25; 420:3; 459:2; 475:9

**packaging** [2] - 456:22; 458:14

**packet** [2] - 394:25; 395:25

**pad** [1] - 551:3

**page** [28] - 419:1; 426:6; 478:22; 479:3; 489:10; 493:10; 495:9; 500:16; 501:14; 502:2; 510:20, 25; 511:15; 519:17; 520:1; 521:12; 524:7, 9-10, 12, 14-15; 525:15; 526:12; 527:6; 528:25; 529:1

**pages** [2] - 489:13; 494:16

**paid** [3] - 474:19; 497:5

**PAL** [1] - 550:25

**panel** [1] - 468:18

**panels** [2] - 468:16

**pantry** [2] - 425:14, 24

**panty** [4] - 501:7; 503:23; 530:8; 542:10

**pantyhose** [4] - 419:6; 426:16; 456:23; 457:2

**paper** [1] - 550:12

**papers** [1] - 549:24

**paragraph** [23] - 419:1; 426:2; 482:13; 484:16, 24; 485:7, 16; 486:2; 499:18, 22; 500:18; 502:3; 509:25; 516:4; 523:1; 525:16; 529:15, 20; 530:2, 6; 534:12, 24

**paren** [1] - 482:3

**parentheses** [2] - 482:8; 484:19

**parenthesis** [1] - 455:17

**part** [6] - 412:8; 436:17; 442:7; 443:5; 483:4; 502:14

**partially** [2] - 437:23; 451:2

**participated** [1] - 402:13

**particular** [6] - 401:14, 20; 418:23; 431:9; 437:24; 438:18

**party** [1] - 513:8

**pass** [1] - 550:4

**passionately** [1] - 522:12

**passport** [1] - 425:9

**password** [4] - 473:1; 496:8; 550:2

**pause** [5] - 408:23; 410:7; 413:8; 435:14; 464:4

**pay** [3] - 506:13, 17

**payee** [1] - 507:23

**people** [8] - 408:13; 412:5; 431:7; 480:17; 511:3, 6; 557:18, 20

**per** [1] - 426:12

**perfect** [4] - 426:3, 7; 519:25; 522:3

**permanent** [1] - 513:3

**permission** [2] - 398:25; 454:16

**person** [11] - 434:19; 472:10; 475:8; 481:3; 482:19; 483:4, 21; 536:21; 547:22; 550:17; 556:24

**persons** [1] - 536:21

**Peter** [1] - 424:23

**phone** [14] - 403:7, 19; 426:3, 7, 9-10, 13; 434:3, 16; 485:17, 21; 486:2; 535:3

**photo** [7] - 447:10, 12; 462:9; 466:23; 537:6; 547:18; 550:10

**photograph** [12] - 416:6; 442:11; 444:16; 445:25; 460:22; 547:14; 548:17; 549:7, 18, 21; 550:6, 13

**photographed** [1] - 550:15

**photographing** [1] - 550:14

**photographs** [3] -

**photography** [1] - 537:5

**photos** [5] - 437:24; 441:24; 442:10; 462:8; 537:3

**physical** [2] - 406:10; 452:21

**pick** [2] - 485:18; 563:22

**picking** [2] - 502:3, 5

**pics** [4] - 499:23; 503:18; 508:24; 516:8

**picture** [38] - 413:10, 13, 16; 414:18; 431:25; 432:2, 8; 437:14; 438:2; 442:6; 443:17; 444:6; 445:4, 18, 23; 447:1, 9, 18; 448:13; 451:13, 16; 453:5; 454:2, 25; 461:23; 462:7; 467:2-4, 7; 469:14, 17; 538:23; 539:5

**pictures** [15] - 409:16; 435:19; 436:9; 437:17, 22; 438:3; 441:3; 446:11, 15; 447:5; 450:14; 536:18; 551:8; 561:10

**piece** [4] - 471:10; 472:2; 548:11; 550:12

**pieces** [1] - 457:21

**pillow** [1] - 437:25

**pillows** [5] - 442:9, 12; 443:4; 446:19; 447:11

**place** [20] - 404:2, 20; 408:18; 421:17; 426:17; 440:10; 464:10, 23; 468:5, 16; 478:18; 506:15; 508:23; 510:6; 513:9; 516:10; 521:17; 526:10

**placed** [3] - 451:7; 466:21; 550:14

**places** [1] - 403:19

**plans** [2] - 427:5; 513:7

**plastic** [1] - 434:2

**play** [3] - 419:7; 430:20; 527:13

**played** [1] - 430:23

**Plaza** [2] - 393:13, 21

**plus** [3] - 426:12; 501:3; 527:10

**point** [20] - 407:21; 411:10; 432:22; 436:10;

**438:21; 547:22; 551:5**

**440:17; 476:12; 487:21; 509:12; 535:1; 538:12; 539:24; 540:13, 21; 542:25; 544:5; 550:6, 22; 555:24; 561:7; 563:12**

**pointing** [3] - 424:20; 437:13; 465:6

**Police** [1] - 415:16; 434:21

**police** [2] - 417:3; 548:4

**pom** [4] - 457:11; 461:24; 462:1, 11

**pom-poms** [4] - 457:11; 461:24; 462:1, 11

**poms** [4] - 457:11; 461:24; 462:1, 11

**pool** [7] - 427:1, 7; 466:6; 486:14; 512:12; 514:6; 527:2

**porn** [2] - 547:19, 22

**pornography** [14] - 402:4, 24; 405:23; 406:23; 416:21; 419:13, 22; 526:8; 541:21, 23; 542:12, 19; 558:15

**portion** [24] - 418:17, 23-24; 419:3, 8; 429:14; 430:2, 11; 436:21; 443:20; 453:12; 458:1, 6; 460:18; 473:17; 498:12; 505:9; 506:9; 530:11; 542:19, 21; 551:5; 557:9

**portions** [6] - 399:24; 427:19; 440:9; 491:3; 513:20; 529:11

**position** [1] - 560:19

**possession** [2] - 537:8; 553:9

**possibilities** [1] - 499:24

**possible** [2] - 399:1; 552:6

**possibly** [1] - 515:2

**postage** [1] - 475:5

**Postal** [1] - 474:3

**power** [1] - 515:10

**practice** [2] - 412:7; 561:17

**pray** [1] - 521:14

**pre** [1] - 396:15

**pre-marked** [1] - 396:15

**precluding** [1] - 559:12

**prejudice** [2] - 560:3; 562:2

**prejudicial** [3] - 488:19; 559:20, 25

**premises** [1] - 441:15

**prepared** [3] - 534:1; 544:16; 545:15

**presence** [3] - 412:6; 542:16

**present** [4] - 396:18; 422:8, 12; 554:15

**presented** [1] - 396:8

**preserved** [2] - 464:15, 18

**pretty** [2] - 421:15; 468:22

**previous** [5] - 431:12; 447:12; 469:4; 484:6; 549:20

**previously** [3] - 450:16; 490:17; 507:5

**price** [1] - 474:17

**print** [1] - 496:6

**print...I** [1] - 496:9

**probation** [6] - 556:24; 557:1, 4, 10; 558:9

**probative** [10] - 487:4; 489:16; 558:5, 8, 21; 559:3, 13; 560:1; 562:5

**problem** [9] - 425:20; 487:6, 18; 489:16; 515:1; 558:4; 562:2; 563:20

**proceed** [2] - 399:13

**Proceedings** [1] - 393:23

**proceedings** [6] - 408:24; 410:8; 413:9; 435:15; 464:5; 564:7

**process** [3] - 403:18; 515:1; 522:8

**processing** [2] - 554:19; 555:8

**produce** [2] - 419:13; 553:13

**produced** [5] - 393:24; 476:22; 499:2; 527:16; 534:23

**product** [1] - 449:6

**production** [2] - 419:21; 558:15

**Program** [1] - 401:24

**promised** [1] - 523:3

**promotional** [4] - 489:12; 494:16, 20

**17**

**property** [1] - 520:12

**propose** [1] - 528:8

**proposed** [1] - 394:11

**prostitution** [1] - 402:5

**protected** [2] - 537:20, 22

**protection** [1] - 515:10

**protective** [1] - 412:5

**proud** [1] - 520:21

**prove** [1] - 546:21

**provide** [3] - 439:7; 477:3; 541:21

**provided** [11] - 402:23, 25; 405:21; 420:10; 421:3; 428:5; 435:19; 439:16; 477:10; 479:16; 529:7

**provides** [8] - 481:25; 482:7; 484:17, 25; 485:4, 21; 486:3

**providing** [1] - 440:18

**PS** [1] - 516:16

**public** [1] - 408:9

**publish** [28] - 409:24; 410:3, 10; 418:11; 421:10; 439:24; 462:13; 473:11; 481:1; 495:12; 497:10; 499:10; 500:10; 501:9; 503:9; 504:11; 508:10; 509:20; 513:16; 515:17; 516:23; 518:14; 519:15; 522:17; 523:11; 525:14; 528:25; 533:6

**published** [4] - 410:13; 414:2; 423:1; 502:20

**publishing** [22] - 410:5, 9; 413:25; 424:15; 432:17; 437:5; 442:20; 444:1; 445:15; 448:8; 454:11; 467:18; 492:9; 493:4; 507:13; 511:19; 513:17; 518:15; 525:15; 531:9; 533:7; 534:9

**pucks...it** [1] - 496:4

**pull** [5] - 426:18; 473:3; 489:9; 531:21; 535:23

**pulled** [4] - 397:13; 398:2, 5, 21

**purchased** [2] - 428:7; 496:21

**purported** [1] - 417:7

**purpose** [3] - 506:3;

512:5, 8

**purposes** [2] - 429:13; 536:17

**pursuant** [1] - 434:5

**pursuit** [1] - 529:18

**push** [1] - 514:2

**pushing** [1] - 512:10

**pussy** [11] - 419:7; 426:15, 17-19, 22; 502:12; 531:19

**put** [15] - 475:22; 488:2; 491:3; 537:23; 545:11; 558:2; 560:9, 12, 20, 23; 561:2; 562:1, 8, 15; 563:16

**puts** [1] - 562:3

**putting** [4] - 453:10; 531:20; 551:18; 561:12

### Q

**Queens** [1] - 520:21

**questioning** [2] - 422:4, 6

**questions** [6] - 421:22; 422:2, 7, 12; 470:18; 483:6

**quick** [1] - 528:5

**quicker** [1] - 519:14

**quite** [2] - 501:5; 520:23

**QVC** [5] - 473:8, 19; 475:2, 24

### R

**radio** [1] - 494:25

**raid** [6] - 407:25; 408:6; 536:9; 543:2, 7

**raise** [2] - 400:9; 561:7

**raises** [1] - 559:23

**RAPAPORT** [1] - 393:20

**rather** [1] - 557:2

**re** [2] - 440:22; 531:11

**re-arrested** [1] - 440:22

**re:2:forward** [1] - 513:19

**re:6:forward** [1] - 516:1

**read** [123] - 417:22; 418:23; 419:3, 8; 421:2, 15; 422:10, 20; 423:15, 18; 424:8; 425:13; 426:1; 427:11, 18; 435:10; 440:7;

449:6; 455:12, 15; 456:7; 473:11, 18; 477:8; 479:13; 481:12, 17, 19-20; 482:5, 22; 484:15, 19; 485:7; 495:25; 496:20; 497:25; 498:9; 499:17; 500:15, 18, 23; 501:19; 502:2; 503:9, 16; 505:4, 23; 506:4, 9, 19; 508:14; 509:25; 511:17; 512:2, 20; 513:12, 20; 514:9, 18; 515:13; 516:3; 517:9, 13; 518:20, 25; 520:2, 18, 24; 521:10, 23; 522:25; 523:22; 524:23; 525:1, 3, 6, 13, 17-19; 526:21; 527:17; 529:8, 11; 530:1, 3, 13, 22-23; 531:2, 13-14; 532:4; 533:13, 19, 21; 534:5, 12, 24; 541:9; 546:3, 5-7, 10, 19, 22; 551:16, 20; 556:4

**reading** [5] - 484:21; 514:12; 521:18; 531:13; 547:1

**ready** [3] - 399:13; 523:10; 560:5

**real** [1] - 528:5

**realistically** [1] - 500:24

**really** [6] - 397:7; 504:2; 547:2; 561:3; 562:4

**reason** [7] - 403:21; 405:2; 408:10; 529:21; 561:25; 562:8

**reasons** [3] - 464:19; 536:8, 15

**receipt** [6] - 462:20; 472:14, 19; 475:24; 476:1

**receive** [2] - 477:1; 526:25

**received** [83] - 396:1; 399:22; 409:23; 413:24; 418:10; 419:14, 16, 22, 24-25; 420:2, 7; 421:9; 424:14; 428:16; 430:19; 432:16; 433:23; 434:13; 437:4; 439:23; 442:19; 443:14; 444:3, 24; 445:14; 446:7; 448:3; 449:5; 450:10; 454:10; 455:11; 456:13; 457:16; 459:1; 460:1, 6, 17; 461:15; 465:3; 467:17;

471:20; 480:14; 490:14; 491:18; 525:9; 549:14; 566:3-5, 7-23, 25; 567:1-3, 5, 7-10, 12-13, 15

**recently** [1] - 520:13

**Recess** [1] - 489:22

**recess** [2] - 452:10; 528:3

**recitation** [1] - 476:23

**recite** [1] - 477:11

**recliner** [1] - 437:9

**recognize** [17] - 413:10; 420:16; 423:22; 431:4, 10, 25; 433:8; 435:16, 25; 436:4; 437:17; 443:2; 447:18; 461:3; 497:11; 549:1, 17

**recognized** [4] - 431:3, 7; 436:5; 438:1

**recollection** [8] - 532:11; 544:24; 545:6, 9; 546:13; 547:21; 553:24; 554:2

**reconvene** [2] - 452:5; 486:5

**record** [23] - 400:16; 408:7; 410:4; 411:7, 14; 414:17; 433:6; 440:9; 444:8; 446:10, 17; 451:8; 457:17; 464:12; 475:13; 476:4; 498:1; 502:18; 525:1; 527:7; 529:13; 541:10, 13

**recorded** [5] - 393:23; 541:6, 17; 553:4, 6

**recording** [2] - 537:11; 553:9

**records** [3] - 406:6, 9; 507:20

**recover** [1] - 551:4

**recovered** [3] - 434:23, 25; 438:23

**red** [4] - 411:13; 458:11; 461:18; 462:11

**redact** [2] - 487:10, 16

**redacted** [5] - 489:19; 490:2, 10; 491:5, 16

**redacting** [1] - 486:18

**redaction** [2] - 490:8; 491:9

**redactions** [1] - 491:8

**reduced** [1] - 487:3

**refer** [3] - 416:6;

492:13; 537:4

**reference** [2] - 418:20; 486:18

**referred** [6] - 418:4; 420:11, 19; 497:17, 20; 509:4

**referring** [3] - 409:3; 493:21; 548:20

**refers** [1] - 486:13

**reflected** [1] - 395:16

**refresh** [2] - 544:23; 545:9

**refreshes** [1] - 545:6

**refused** [1] - 560:17

**regard** [1] - 470:16

**regarding** [1] - 556:5

**regards** [1] - 534:4

**regular** [1] - 416:12

**relate** [3] - 444:13; 464:17; 517:5

**related** [1] - 488:16

**relates** [1] - 445:23

**relating** [1] - 464:16

**relation** [2] - 438:17, 20

**relationship** [2] - 416:23, 25

**relatives** [3] - 502:3, 5; 513:1

**relax** [2] - 521:16, 20

**released** [2] - 563:15

**relevance** [3] - 442:1; 444:6; 488:10

**relevant** [6] - 396:8; 487:12; 490:9; 491:6; 550:7; 561:23

**relief** [1] - 531:22

**remain** [2] - 421:23; 514:15

**remainder** [2] - 528:7; 530:12

**remember** [12] - 425:22; 498:3; 503:19; 507:10, 15, 17; 509:7; 519:4; 540:21; 542:2; 544:18; 546:7

**remind** [2] - 492:23; 504:7

**reminder** [3] - 483:14; 499:23; 506:23

**remoteness** [1] - 558:13

**removed** [3] - 468:1, 4; 543:8

**rented** [1] - 527:15

**repeat** [1] - 479:25

**report** [4] - 545:7, 13

**Reporter** [1] - 393:20

**reporter** [1] - 525:2

**representative** [1] - 497:15

**request** [2] - 506:2; 509:2

**requested** [1] - 557:9

**resembles** [1] - 450:15

**reserve** [2] - 527:11

**reserved** [1] - 490:23

**residence** [13] - 403:6; 406:24; 407:21; 408:2; 409:4, 11; 416:20; 443:7, 18; 457:3; 461:5; 538:16

**residential** [2] - 407:14

**respect** [11] - 394:8; 403:6, 10; 409:9; 462:13; 471:3; 491:7; 559:6; 560:7; 562:11; 563:4

**responded** [2] - 419:25; 492:14

**responded-to** [1] - 492:14

**response** [4] - 441:4; 476:22; 499:3; 505:10

**responsive** [1] - 511:4

**rest** [8] - 485:7; 491:4, 6; 503:21; 522:9; 527:2; 542:14, 16

**resting** [1] - 526:24

**result** [3] - 490:25; 557:4; 560:3

**results** [1] - 533:25

**resumed** [1] - 490:17

**resumes** [1] - 466:8

**return** [14] - 395:10; 396:13; 397:14; 398:2, 6; 418:21; 428:3, 8-9; 475:5, 8; 477:1; 479:17; 512:25

**returned** [2] - 475:1

**revealed** [1] - 468:2

**review** [6] - 405:25; 430:6; 492:19; 494:15, 19; 509:1

**reviewing** [4] - 406:2, 9; 498:25; 499:2

**riddled** [1] - 510:12

**right-hand** [10] - 414:24; 416:3-5; 421:17; 440:10, 14; 448:15; 473:20; 551:23

**rightful** [1] - 516:12

**rights** [17] - 420:19; 421:16, 20, 22; 422:10, 19; 439:12, 16; 440:18-20; 540:14; 541:9; 551:16, 20

**risk** [1] - 562:4

**Robert** [2] - 476:18; 477:9

**Rocky** [1] - 475:2

**role** [1] - 403:16

**room** [20] - 413:2, 4, 14, 16; 414:4, 6-7; 415:2, 11, 19, 24; 416:12; 418:25; 421:3; 432:21; 501:1; 516:10; 538:6, 16; 550:17

**room...I** [1] - 510:9

**rooms** [10] - 425:19; 427:2; 512:12; 514:6; 519:3; 527:3; 554:21; 557:19

**Rory** [7] - 414:16, 20; 415:6; 422:15; 434:20; 435:19; 472:9

**row** [3] - 408:20; 496:2

**ruled** [1] - 564:2

**rules** [3] - 527:13; 561:17; 562:10

**ruling** [2] - 464:12; 490:23

**run** [1] - 502:8

**rushing** [1] - 510:8

## S

**S-L-O-B-O-D-A** [1] - 506:18

**S-O-P-I-A** [1] - 534:2

**S-V-E-T-A-S** [1] - 418:22

**SA** [1] - 512:25

**safe** [12] - 425:16; 502:16; 513:10; 515:12; 516:7, 16-17; 517:12; 522:19; 523:5; 531:16; 534:4

**safely** [3] - 521:14; 522:12; 526:22

**safety** [1] - 536:17

**sake** [1] - 496:20

**sale** [1] - 494:13

**salon** [1] - 501:25

**Samsung** [14] - 459:25; 460:1; 467:3; 469:20; 470:3; 472:10, 23-24; 474:10; 475:12, 16, 20

**Saturday** [2] - 522:10; 531:17

**save** [3] - 398:24; 486:20; 535:14

**19**

**saved** [1] - 486:18

**saw** [3] - 432:6; 435:24; 547:12

**scenes** [1] - 429:3

**schedule** [2] - 427:5; 528:7

**scheduling** [1] - 528:8

**school** [3] - 484:20; 485:8

**school...TV** [1] - 485:10

**scores** [2] - 395:9; 396:11

**screen** [35] - 418:13; 421:13; 424:18; 426:11; 432:5, 20, 24; 437:8; 440:1; 442:23; 444:5; 445:17; 448:10; 451:11; 454:14; 462:16; 466:25; 467:21; 471:25; 473:12, 14; 479:3; 489:9; 493:11, 13, 22, 24; 533:22; 538:19; 547:8; 550:22, 24; 551:18

**script** [2] - 426:13; 526:3

**scroll** [8] - 424:19; 425:25; 479:4; 504:23; 520:1; 527:6; 529:19; 530:1

**scrolling** [4] - 479:9, 11; 482:2; 483:11

**SD** [3] - 434:17, 25; 474:12

**search** [49] - 403:18; 406:17, 19, 21, 25; 407:1, 4, 6, 17; 408:15; 411:21; 412:9; 416:20; 431:14, 16, 19; 434:5; 438:3, 8, 10, 21, 23; 441:2, 11-12, 15, 19, 23, 25; 445:7; 455:23; 461:6; 468:8; 476:22; 477:1; 479:16; 483:24; 484:11; 498:25; 499:3; 531:4; 536:1; 540:19; 544:5; 549:8; 555:15; 557:10

**searches** [2] - 404:22; 463:21

**searching** [2] - 403:6; 557:5

**seat** [2] - 442:7; 490:15

**seated** [15] - 399:8; 414:13; 415:6, 9, 11-12; 416:1; 452:12, 17; 486:9; 490:21; 528:4; 539:13; 556:10

**seats** [1] - 496:2

**second** [23] - 419:1; 432:3; 433:11; 438:14, 17; 439:2, 6; 445:7; 455:23; 461:6; 462:5; 463:2; 464:6; 499:17, 22; 500:17; 509:8; 549:19; 551:12; 552:14; 563:18

**second-floor** [1] - 549:19

**section** [3] - 496:2; 524:23

**secure** [1] - 515:12

**see** [100] - 394:6, 15; 399:11; 411:7; 418:1; 419:5; 424:20; 425:19; 427:4; 431:23; 435:18; 436:14; 437:9; 442:1; 444:6; 446:10, 14, 17; 447:4; 448:11, 13; 449:15, 19-20; 450:14; 451:8; 453:3, 12; 454:25; 456:1; 459:11; 467:4; 468:4, 6, 22; 470:17; 477:15; 479:5-7; 486:17; 488:3; 489:21; 493:13, 16; 494:12; 498:7, 11; 500:21; 501:1, 15-18, 21, 23; 504:2, 24; 505:14; 508:11, 16, 18, 21, 25; 509:3; 510:1; 511:17, 20; 512:3, 13, 15; 515:6; 516:8; 520:7, 22; 521:13, 21; 526:25; 530:4, 8, 19; 531:19, 22; 533:23, 25; 534:1; 535:5; 538:21; 542:15; 545:5; 547:9, 15, 18, 23; 550:1, 3, 21; 551:23; 556:25; 564:6

**seeing** [3] - 452:21; 509:7; 513:1

**seek** [1] - 486:21

**seeking** [1] - 491:3

**sees** [2] - 465:6; 519:16

**segment** [1] - 430:1

**seize** [7] - 412:8; 432:21; 433:13; 441:25; 443:6; 444:18; 458:20

**seized** [10] - 432:23;

433:11; 434:4; 446:20; 447:22; 448:22; 450:1, 12; 454:22; 555:14

**send** [14] - 426:25; 488:1; 494:4; 501:25; 502:12; 506:11; 508:23; 522:11; 525:23; 527:1, 4; 531:17; 532:5; 535:3

**sender** [1] - 515:18

**sending** [9] - 427:13, 15-16; 428:11; 475:8; 488:4; 502:11; 530:24; 534:21

**sense** [2] - 510:7

**sent** [39] - 402:24; 418:18; 419:10; 420:3; 424:22; 425:16; 426:2, 7; 427:17, 23; 428:2, 15, 18; 431:12; 481:13; 483:14; 484:2; 492:8, 14; 494:16; 495:15; 498:19; 500:12; 501:12; 503:14; 507:22; 515:23; 517:23; 519:7; 522:4; 523:17; 526:16; 527:10; 529:9; 532:23; 533:9; 534:11; 556:18

**sentence** [5] - 482:23; 483:11; 499:17; 501:15; 508:14

**sentences** [1] - 533:14

**separate** [2] - 398:3; 538:1

**separated** [3] - 538:3; 544:2

**separately** [3] - 397:22; 398:3; 399:25

**separates** [2] - 503:21; 558:11

**September** [6] - 494:4, 10; 531:11; 532:15, 20; 533:9

**series** [1] - 492:14

**seriously** [1] - 506:13

**Service** [1] - 474:3

**session** [1] - 426:13

**set** [6] - 396:15; 414:23; 489:7; 515:4; 521:15; 522:5

**settled** [2] - 521:15; 531:17

**seventh** [2] - 510:25; 511:15

**sex** [1] - 510:11

**sexual** [3] - 429:12; 430:21

**sexually** [2] - 429:3; 542:13

**share** [1] - 520:16

**shelving** [1] - 436:20

**Sheriff's** [1] - 536:25

**shift** [1] - 476:17

**shine** [1] - 465:12

**ship** [1] - 474:15

**shipped** [4] - 473:24; 474:2

**shipping** [1] - 474:16

**shirt** [2] - 411:25; 458:5

**shock** [1] - 563:13

**shoot** [1] - 496:5

**short** [3] - 421:15; 487:9; 514:5

**short-circuit** [1] - 487:9

**shortcut** [1] - 527:5

**shortly** [1] - 536:13

**shot** [1] - 558:10

**shots** [1] - 527:2

**show** [33] - 417:18, 21; 423:11; 428:12, 14; 429:9, 11, 15; 442:3; 444:11, 25; 448:5; 454:15; 458:7; 462:1; 463:7; 469:23; 476:4; 481:6; 488:11; 489:15; 492:2; 497:22; 500:16; 502:13; 503:17; 504:24; 508:19; 523:5; 527:10; 548:13, 16; 561:24

**showed** [19] - 417:22; 422:20; 423:3, 8; 424:7; 428:15; 429:12, 14; 430:1, 3, 12; 431:1; 466:10; 542:18, 20-21; 545:23; 546:2

**shower** [2] - 516:10; 527:2

**showers** [2] - 427:2; 519:3

**showing** [12] - 445:20; 455:18; 466:24; 469:12; 479:3; 497:23; 499:20; 516:20; 542:2; 545:4; 549:21

**shown** [4] - 422:19; 434:16, 22; 480:18

**shows** [11] - 483:7; 487:13, 16, 24; 488:12, 18, 20, 23; 550:10; 559:20; 562:5

**sic** [1] - 480:4

**Sicilian** [1] - 531:25

**sick** [1] - 534:16

**side** [17] - 411:12;

414:13, 24; 415:21; 416:3, 6; 440:14, 16; 448:15; 453:7; 466:5; 470:15; 496:5; 521:12; 539:7, 10

**sidearm** [1] - 555:9

**sidebar** [3] - 404:2; 464:7, 10

**sides** [2] - 561:8, 14

**sign** [2] - 517:11; 563:24

**signature** [1] - 552:12

**signatures** [1] - 552:10

**signed** [5] - 422:13, 18; 430:4; 440:14

**silent** [1] - 421:23

**similar** [1] - 420:5

**similarity** [1] - 558:7

**similarly** [1] - 408:4

**simple** [2] - 540:8; 559:8

**simply** [5] - 435:9; 483:7; 491:11; 559:4; 562:6

**sister** [8] - 481:15, 22; 482:10, 20, 24-25; 483:9; 515:8

**sister's** [2] - 481:24; 485:17

**sit** [2] - 534:20; 546:16

**sitting** [11] - 411:8, 12; 414:21, 25; 416:8; 434:17; 446:19; 447:9, 11; 453:8; 539:21

**situation** [4] - 408:16; 410:25; 503:21; 528:9

**six** [8] - 426:23; 489:10, 13; 494:15; 522:22; 524:7; 527:14; 529:1

**six-page** [3] - 489:10; 524:7; 529:1

**sixth** [1] - 479:3

**size** [7] - 455:15; 459:9, 13, 15

**skewed** [1] - 451:5

**skirt** [3] - 458:5; 462:9; 530:8

**slam** [1] - 542:23

**slave** [1] - 501:7

**sleep** [1] - 535:5

**slipped** [1] - 486:15

**slow** [1] - 519:14

**SLR** [2] - 537:3

**small** [3] - 459:9;
496:8
**smaller** [1] - 554:20
**Smallwood** [1] - 538:8
**Smithtown** [12] -
406:14; 407:5, 15;
421:17; 441:16; 473:22;
474:1; 475:10; 507:22;
520:14; 523:17; 532:23
**sneaky** [1] - 534:17
**snippet** [4] - 542:2, 5,
11, 13
**sofa** [6] - 437:9;
442:12; 446:19; 447:10;
453:13, 16
█████ [1] - 427:3
███'s [1] - 426:22
████ [30] - 418:21;
419:7; 427:1, 8; 500:2;
501:15, 21, 23; 503:20;
506:1; 512:13; 513:6;
514:6, 17, 25; 515:9,
11; 516:8; 519:2;
522:1, 8; 523:3;
526:24; 529:22, 24;
530:19; 531:18, 21;
532:5; 533:16
████'s [2] - 426:14;
529:17
**sold** [1] - 473:21
**solely** [3] - 512:9;
545:16; 546:14
**solves** [2] - 487:18;
563:19
**someone** [8] - 410:23;
465:18; 470:14; 497:2;
510:9, 15-16; 544:10
**sometime** [1] - 485:4
**son** [4] - 488:14;
495:22; 496:18
**soon** [3] - 516:7, 10,
14
████ [1] - 426:17
████ [1] - 534:2
**sorry** [27] - 427:14;
451:25; 456:3; 460:19;
462:2; 489:6; 492:11;
493:14; 494:10; 496:12;
507:7; 509:12; 511:8,
18; 514:14; 517:21;
518:7; 521:7, 16, 19;
524:12; 527:24; 532:9;
547:7; 554:13
**sort** [3] - 405:15;
468:17; 505:9
**sought** [1] - 562:13
**sound** [2] - 412:19;

425:11
**sounds** [2] - 480:12;
531:15
**space** [8] - 436:19;
437:13; 529:16; 557:15,
23; 558:17, 21; 559:7
**spans** [1] - 492:17
**speaker** [1] - 432:24
**speaking** [9] - 409:13;
419:6; 428:24; 432:2;
456:21; 480:16; 501:5;
525:19; 531:23
**Special** [27] - 400:7;
401:11; 402:21; 403:3,
17, 22; 405:21; 415:5,
9; 424:2; 428:16, 18;
525:9; 535:21; 537:2;
539:4, 12; 550:21;
551:4, 11; 552:16, 21;
553:3, 12, 18; 555:13
**special** [3] - 394:15;
427:3; 494:13
**specifically** [1] -
463:1
**specifics** [1] - 522:5
**specter** [1] - 559:24
**speculate** [6] - 490:9;
491:10; 558:25; 559:6,
22
**spell** [2] - 400:15;
412:16
**spelled** [1] - 400:18
**spend** [1] - 514:3
**spent** [1] - 527:14
**Spiderman** [3] - 444:7,
15; 446:24
**spoken** [1] - 417:10
**Squad** [1] - 401:17
**squad** [2] - 401:15;
538:7
**squeeze** [1] - 514:13
**ST-4** [1] - 545:4
**stage** [4] - 463:12;
465:11, 21
**stand** [8] - 399:2;
429:21; 454:17, 19;
465:5; 466:8; 477:17;
490:17
**standard** [4] - 412:7;
420:20; 440:2; 468:22
**standing** [6] - 415:19;
416:1, 10; 450:22;
539:16
**start** [5] - 448:11;
499:21; 520:5; 528:10;
556:2
**started** [2] - 394:9;

399:15
**starting** [12] - 402:9;
426:2; 499:17; 500:18;
501:14; 506:9; 513:22;
520:2, 4; 522:25;
523:1; 534:17
**starts** [3] - 499:20;
520:5; 530:6
**state** [4] - 400:15;
404:10; 482:1; 521:2
**statement** [1] - 422:10
**Staten** [1] - 520:21
**STATES** [2] - 393:1, 3
**States** [5] - 393:13,
21; 400:7; 405:17
**stay** [9] - 482:22, 25;
485:12; 502:16; 506:15;
510:6; 513:4; 519:2;
529:18
**stay-at-home** [2] -
482:22, 25
**staying** [1] - 516:10
**stenography** [1] -
393:23
**step** [1] - 556:11
**Steven** [2] - 400:7, 17
**STEVEN** [1] - 400:18
**sticker** [3] - 535:17;
550:25; 551:1
**still** [9] - 468:5;
506:6; 519:4; 522:8;
537:3, 6; 543:2; 551:5;
555:25
**stills** [1] - 551:8
**stockings** [6] -
456:23; 458:15; 459:3,
18; 462:9
**stood** [2] - 425:20;
526:22
**stop** [2] - 422:8; 426:3
**storage** [1] - 436:19
**stores** [1] - 425:23
**story** [1] - 407:14
**strap** [1] - 470:4
**street** [1] - 481:25
**stress** [1] - 410:25
**strong** [1] - 502:10
**structure** [3] -
409:11; 465:16, 20
**stuck** [2] - 539:25;
540:1
**stuff** [8] - 404:16;
418:22; 461:16; 484:23;
485:11; 489:12; 500:19;
501:5
**subject** [21] - 404:5;

405:6, 16; 418:20;
425:9; 481:15; 484:4;
487:22; 494:12; 498:11,
23; 499:15; 500:14;
509:23; 513:19; 516:1;
518:23; 519:24; 529:16;
531:11
**submitting** [1] -
394:14
**subpoenaed** [1] - 406:2
**subsequent** [1] -
540:21
**subset** [2] - 396:17;
397:7
**subsets** [1] - 395:23
**substance** [2] - 544:7;
558:20
**substantially** [1] -
560:2
**subtitle** [1] - 421:20
**Suffolk** [4] - 434:20;
520:14; 521:1; 548:3
**suggest** [2] - 560:22,
24
**suggestion** [2] -
562:18, 22
**suit** [1] - 411:13
**Suite** [1] - 393:18
**summary** [6] - 517:19,
22; 518:9; 524:2;
532:17
**summer** [1] - 515:7
**Sunday** [1] - 418:18
**supervising** [1] -
557:5
**supervisor** [1] - 538:7
**supply** [1] - 529:24
**support** [2] - 562:24;
563:6-8, 10
**supporting** [1] -
562:25
**supposed** [1] - 534:16
**suretor** [2] - 562:14;
563:21
**surname** [1] - 481:25
**surprise** [2] - 513:8;
536:16
**surreptitious** [1] -
557:18
**surrounded** [1] - 540:5
**suspected** [1] - 510:4
**suspended** [3] -
466:21; 468:1; 469:5
**sustained** [3] -
497:19; 510:18; 530:21
**Sustained** [1] - 405:20

**Sveta** [1] - 529:18

**Sveta's** [1] - 529:16

**Svetas** [1] - 418:22

**swab** [1] - 548:8

**sweep** [3] - 412:5; 537:20, 22

**sweet** [10] - 426:16; 501:3; 514:15; 521:1; 522:1; 531:18-20; 532:5

**sweets** [1] - 515:1

**sworn** [2] - 400:13; 490:17

■■■■■ [9] - 436:5, 7; 437:22; 460:22; 461:3; 466:23; 483:2; 484:24; 551:6

**symbol** [1] - 514:21

**system** [1] - 483:7

---

**T**

**T-E-M-P** [1] - 533:18

**T-R-O-Y-D** [1] - 400:18

**T-shirt** [1] - 411:25

**table** [16] - 414:13; 416:2, 5, 7; 460:24; 466:6; 538:23; 539:1, 7, 21; 542:23; 543:4, 17; 544:2; 554:22

**tag** [1] - 456:16

**tape** [2] - 471:11; 472:3

**tapes** [4] - 558:22; 559:23

**task** [6] - 401:15, 20; 402:6, 9; 434:15; 536:25

**Task** [3] - 401:23; 402:1, 3

**tasked** [1] - 434:14

**taste** [1] - 522:1

**tax** [3] - 474:21; 512:23

**taxi** [2] - 506:14, 17

**team** [4] - 411:23; 412:1, 4; 431:15

**telephone** [2] - 410:19; 486:3

**television** [1] - 465:14

**temp** [1] - 533:17

**ten** [5] - 474:11; 484:17; 510:20; 558:11; 559:10

**ten-page** [1] - 510:20

**terms** [2] - 558:5; 562:2

**terrific** [1] - 426:9

**testified** [14] - 400:13; 422:25; 423:5; 427:10; 431:15; 437:9; 441:18; 452:20; 466:9; 476:21; 490:18; 497:15; 498:16; 503:1

**testify** [1] - 487:19

**testifying** [1] - 545:22

**testimony** [10] - 403:3, 5, 7; 418:4; 476:18, 20; 497:23; 558:19; 559:10; 560:4

**testing** [1] - 548:7

**text** [11] - 425:17; 487:11, 16; 488:2; 489:12; 495:25; 505:6; 506:13; 524:15, 19; 530:23

**THE** [152] - 394:5, 14, 17, 20, 24; 395:2, 12; 396:2, 17, 22, 25; 397:24; 398:7, 11, 13, 17, 22; 399:4, 8, 11, 17, 20, 24; 400:3, 9, 15, 17, 19, 21; 403:24; 404:3, 8, 14; 405:20; 409:7, 21; 410:1, 4; 411:16; 413:21; 418:8; 421:7; 424:12; 429:20; 430:17; 432:14; 433:18, 20; 434:11; 437:2; 439:21; 442:17; 443:11, 25; 444:22; 445:12; 446:5; 447:6; 448:1; 449:3; 450:5, 8; 451:23; 452:4, 12, 14, 17; 454:8, 18; 455:9; 456:11; 457:14; 458:4, 24; 460:4, 15; 461:13; 464:18, 25; 465:8; 467:12, 15; 470:12; 471:18; 476:14, 24; 477:16; 480:10; 483:10; 486:4, 9, 22; 487:8, 22; 488:1, 7; 489:2, 4, 18, 21; 490:2, 5, 7, 15, 21; 491:16; 497:19; 499:11; 509:11; 510:18; 527:19, 23, 25; 528:2, 4, 14, 17, 19, 22; 530:21; 535:9, 15, 23; 545:19; 549:13; 553:17; 555:23; 556:2, 7, 10, 12-13, 20, 22, 25; 557:13, 16, 22, 25; 558:19; 559:12; 560:15; 561:4, 13, 20; 562:9,

17; 563:6, 12, 17, 24; 564:5

**Theatre** [1] - 494:23

**therein** [1] - 462:20

**thinking** [1] - 502:6

**third** [5] - 462:6; 469:17; 485:8; 526:12; 552:16

**thirteen** [1] - 426:24

**thousands** [2] - 428:2, 10

**three** [9] - 461:25; 462:8; 480:5; 545:12, 14, 16; 552:10; 558:16

**three-year** [1] - 558:16

**throughout** [2] - 557:6; 562:25

**Thursday** [2] - 504:25; 564:8

**ticket** [2] - 428:6

**Ticketmaster** [7] - 489:13; 494:7, 17; 495:19; 496:21; 498:13, 23

**tickets** [6] - 488:15; 494:12; 496:6, 22; 497:2, 5

**tie** [1] - 411:13

**tights** [7] - 426:16; 456:23; 458:14, 16-17; 459:2; 503:23

**tile** [6] - 466:22; 467:6; 468:4; 469:1; 471:15

**tiles** [1] - 468:1

**time...TV** [1] - 484:23

**tip** [2] - 404:6; 405:3

**tit** [1] - 502:12

**title** [1] - 401:10

**tits** [4] - 501:3; 514:15; 531:19; 535:4

**today** [13] - 396:14, 24; 397:12, 15; 411:8; 425:17; 430:7; 502:5; 508:23; 526:23; 541:20; 546:16; 556:16

**today..** [1] - 502:4

**together** [4] - 500:2; 521:20; 523:6; 527:1

**tom** [1] - 506:14

**TOM** [1] - 506:14

**tomorrow** [5] - 394:18; 528:12, 16; 530:3; 556:19

**tone** [1] - 518:24

**tongue** [1] - 522:2

**tonight** [1] - 516:6

**took** [9] - 404:1; 461:1; 464:9; 499:23; 527:4; 537:3; 546:7, 10; 548:8

**top** [11] - 440:10; 451:7; 458:1; 463:15; 473:17; 481:19; 504:14; 513:22; 516:3; 530:8; 544:20

**total** [3] - 474:17, 23

**touched** [1] - 429:7

**touching** [2] - 429:4

**toward** [1] - 560:8

**tower** [5] - 433:2, 11, 16; 547:15

**toy** [3] - 427:3; 531:20, 23

**toys** [2] - 426:17; 526:10

**tracking** [2] - 523:19; 532:12

**trained** [1] - 537:5

**transactions** [1] - 507:11

**TRANSCRIPT** [1] - 393:6

**transcript** [1] - 393:24

**transcription** [1] - 393:24

**transfer** [1] - 426:11

**translations** [1] - 520:22

**transpired** [1] - 541:13

**transposed** [1] - 412:15

**traveling** [1] - 512:21

**travels** [1] - 513:3

**treat** [1] - 526:25

**TRIAL** [1] - 393:6

**trial** [2] - 399:13; 562:25

**tried** [1] - 510:10

**triple** [1] - 534:25

**tristate** [1] - 503:5

**Troyd** [18] - 400:8, 17; 452:20; 465:5; 470:24; 512:17; 535:21; 539:4; 548:16; 549:17; 550:21; 551:4, 11; 552:21; 553:3, 12, 18; 555:13

**Troyd's** [1] - 465:4

**true** [9] - 418:3; 421:1; 424:6; 430:11; 439:14; 512:5, 8; 536:4

22

**truly** [1] - 502:9

**trusting** [1] - 425:20

**try** [5] - 394:17; 426:23; 467:23; 486:17; 496:8

**tub** [1] - 426:15

**Tuesday** [3] - 407:11; 426:25; 511:20

**turkey** [1] - 425:20

**Turkey** [13] - 425:21; 503:25; 504:5; 506:2; 507:2, 23-24; 508:15; 517:24; 522:11; 532:24

**Turkey..** [1] - 508:17

**turn** [24] - 408:17, 19; 413:6; 417:24; 431:14; 465:15; 466:25; 470:19; 472:5; 480:24; 495:7; 500:7; 501:8; 504:10; 508:1; 510:25; 511:15; 515:15; 518:10; 523:8; 524:9; 526:12; 531:7; 532:17

**turned** [1] - 472:10

**turning** [1] - 452:25; 483:17

**twice** [1] - 496:5

**two** [29] - 407:14; 414:18, 24; 422:20; 426:16; 431:7; 434:4; 442:9; 447:13; 449:18; 466:9, 15; 470:1; 472:13, 17; 496:21; 511:3, 6; 513:3; 514:3; 527:1; 546:2, 20; 552:6, 11; 554:20; 556:18; 558:7; 560:21

**two-story** [1] - 407:14

**type** [6] - 436:18; 437:9, 13; 468:22; 544:10; 560:3

**typed** [5] - 544:9; 545:6, 13-14; 552:18

**types** [1] - 456:22

**typewritten** [1] - 544:16

**typing** [1] - 544:19

---

**U**

**U.S** [2] - 393:4, 15

**U.S.D.J** [1] - 393:9

**UKR** [4] - 512:11; 514:16, 20; 516:7

**Ukraine** [8] - 402:22; 405:15; 503:18; 504:1; 514:21; 521:6, 8; 523:18

**Ukrainian** [1] - 416:24

**ultimately** [2] - 405:12; 406:6

**umm** [1] - 522:2

**unaware** [1] - 412:6

**uncertainty** [1] - 411:1

**unclear** [1] - 511:9

**under** [2] - 475:22; 559:12

**underlined** [1] - 472:25

**underlining** [1] - 473:1

**understand..** [1] - 506:3

**understood** [2] - 394:19; 522:10

**unfair** [2] - 560:2; 562:2

**unimportant** [1] - 404:19

**Union** [8] - 507:12, 20; 516:6, 15; 517:19; 524:2; 532:12, 17

**unique** [3] - 503:20; 517:25; 518:3

**UNITED** [1] - 393:1, 3

**United** [6] - 393:13, 21; 400:7; 405:17; 474:3

**unknown** [1] - 488:9

**unless** [1] - 562:5

**unwieldy** [1] - 465:24

**up** [40] - 437:13; 447:7; 450:11; 457:19; 458:7; 461:16; 462:9; 466:5; 468:18, 25; 476:6; 483:7; 485:18; 486:24; 487:23; 489:7-9; 501:22; 502:3, 5; 512:10; 514:2; 521:15; 526:24; 535:4; 538:18; 547:8; 551:18; 560:9, 13, 20, 23; 561:2; 562:1, 8, 15; 563:16

**upper** [4] - 421:16; 473:20; 551:2, 23

**UPS** [2] - 420:5; 474:3

**upstate** [1] - 520:20

**upward** [1] - 463:14

**upwards** [1] - 465:12

**US** [1] - 532:24

**USA** [3] - 504:1; 514:3; 522:9

**user** [5] - 550:2, 10,

---

13, 16, 23

**usual** [3] - 531:18; 532:5, 7

---

**V**

**vaginal** [1] - 429:8

**Val** [3] - 508:19; 534:3; 551:2

**VAL** [1] - 508:20

**Valerio** [75] - 402:14, 25; 410:18, 20; 411:6, 8, 12, 19; 413:13; 416:19, 22; 418:17; 422:14; 423:24; 425:6; 430:1, 3; 440:15; 466:6; 473:22, 25; 475:10; 487:1, 5; 488:9; 492:6; 493:8; 495:15, 21-22; 496:8, 18; 497:2, 12-13; 500:11; 501:11; 503:11; 504:14; 505:22; 507:21; 511:13, 25; 513:2; 515:25; 517:23; 523:16; 524:24; 525:6; 529:7, 14; 532:23; 538:1, 10, 13; 539:20; 540:14; 541:11, 16, 20; 542:15, 19, 22; 543:14; 544:19; 545:23; 548:8; 551:11; 553:4, 8, 25; 554:14, 25; 562:3, 24

**VALERIO** [1] - 393:5

**Valerio's** [15] - 436:5; 446:18; 450:19; 453:6; 460:22; 486:13; 492:24; 495:22; 515:8; 536:1; 539:23; 540:22; 550:13; 551:6; 552:12

**validation** [3] - 508:17, 19; 509:3

**value** [9] - 487:4; 558:5, 8, 21; 559:3, 13; 560:1; 562:5

**vantage** [1] - 539:23

**variety** [1] - 536:8

**various** [4] - 436:9; 453:22; 456:22; 459:18

**Vegas** [2] - 513:9; 514:1

**venues** [1] - 495:4

**version** [2] - 491:16; 544:16

**via** [2] - 419:24; 516:14

**Viber** [1] - 417:1

**vibrating** [1] - 531:24

---

**video** [37] - 402:23, 25; 405:22; 419:6; 426:11; 428:15, 19, 21, 23, 25; 429:2, 9, 15; 430:25; 431:9; 465:13, 19; 499:25; 500:20; 501:5; 502:14; 503:18, 20; 510:8; 514:5; 521:25; 535:3; 541:13, 17; 542:2, 14, 16; 551:5; 553:6, 9; 558:17

**videos** [33] - 425:18; 426:2, 7; 427:1, 7, 25; 431:6, 12; 434:23; 466:22; 500:1; 502:12; 503:22; 506:1; 508:23; 510:3, 5; 512:11; 516:9; 519:2, 6; 526:24; 530:19; 531:18; 532:5, 7; 534:1; 551:8; 555:20; 557:20; 558:9, 12, 20

**videos...I** [1] - 527:4

**videotaped** [1] - 541:5

**videotapes** [1] - 557:17

**view** [3] - 426:12; 428:25; 550:17

**viewed** [2] - 430:25; 431:12

**views** [1] - 560:11

**Violent** [1] - 401:24

**virtue** [1] - 487:4

**vis-à-vis** [1] - 560:19

**Visa** [1] - 474:20

**visa** [8] - 427:6; 500:25; 501:25; 503:25; 504:5; 506:2; 514:25; 531:12

**visa...but** [1] - 519:5

**visible** [4] - 462:12; 463:15; 543:14, 19

**visitation** [1] - 512:24

**visited** [1] - 413:17

**visitors** [1] - 496:4

**visits** [1] - 459:21

**VNUKOVO** [1] - 506:17

**voir** [3] - 470:11, 13, 16

**VOIR** [2] - 470:22; 565:7

---

**W**

**wait** [4] - 426:21, 23; 427:4; 521:21

**waiting** [3] - 509:3;

515:4; 516:13

**waive** [1] - 422:19

**wake** [1] - 535:5

**waking** [1] - 535:4

**walk** [2] - 396:21;
470:6

**walked** [1] - 411:22

**walking** [3] - 397:14;
547:22; 550:17

**wall** [4] - 436:19;
449:7; 466:1, 11

**walls** [1] - 547:19

**wants** [4] - 395:18;
526:5; 530:19; 559:9

**warehouse** [1] - 520:11

**warm** [1] - 408:1

**warnings** [5] - 420:11,
24; 421:2; 439:7;
540:13

**warrant** [49] - 404:6;
406:17, 19, 21, 25;
407:1, 4, 6, 17;
411:21; 412:9; 416:20;
431:16; 434:5; 438:3,
8, 10, 21, 23; 441:2,
11, 13, 15, 19, 23, 25;
445:7; 455:23; 461:6;
468:8; 476:22; 477:1;
479:16; 483:24; 484:11;
498:25; 499:3; 508:22;
531:5; 536:1, 6, 13,
15, 19; 538:10; 544:6;
549:8

**warrants** [2] - 408:15

**watch** [1] - 515:11

**watching** [1] - 543:25

**wave** [1] - 486:14

**ways** [1] - 397:10

**wear** [3] - 408:10;
503:22, 24

**wearing** [14] - 407:25;
411:11, 25; 450:19, 21;
451:5; 462:9; 530:8;
536:9; 542:10; 543:2,
7, 10; 555:9

**week** [7] - 396:12, 16;
407:10; 485:13; 494:13;
512:10; 514:1

**weeks** [2] - 513:3;
514:3

**weird** [1] - 488:4

**well...for** [1] - 501:4

**Western** [8] - 507:12,
20; 516:6, 15; 517:19;
524:2; 532:12, 17

**wet** [6] - 426:18;
522:1, 13; 531:21, 23

**whereby** [1] - 405:16

**white** [2] - 458:11;
461:18

**whole** [2] - 543:24;
544:1

**WICKER** [1] - 393:20

**wider** [1] - 447:10

**Wifi** [1] - 449:7

**wig** [9] - 449:25;
450:12, 14-15, 19, 21;
451:5, 8, 14

**willing** [5] - 422:11;
487:10; 561:2; 563:10,
24

**window** [1] - 554:13

**windows** [2] - 555:7

**winter** [1] - 408:1

**wire** [2] - 516:14;
517:10

**wired** [1] - 516:5

**wish** [3] - 394:7;
398:8; 422:6

**withdraw** [6] - 446:12;
486:21; 488:25; 489:14,
17; 549:5

**withdrawn** [15] -
405:1; 409:2; 423:4;
428:24; 439:14; 440:19;
466:14; 488:20; 490:11;
499:1; 511:10; 526:1;
530:10, 17

**withdrew** [2] - 491:1

**WITNESS** [5] - 400:17,
21; 499:11; 545:19;
556:12

**witness** [31] - 397:15;
398:20; 400:12; 411:14;
429:21; 433:5, 17;
435:3; 443:1; 444:12;
445:2, 21; 447:17;
448:7; 454:17, 19;
455:20; 458:8; 463:10;
466:8; 469:25; 470:16;
472:18; 477:15, 17;
559:9; 560:7, 16;
561:21; 562:10

**witnessed** [3] -
422:15; 440:15

**WITNESSES** [1] - 565:2

**witnessing** [1] -
422:17

**woman** [5] - 403:1;
416:23; 425:23; 556:15

**Woman** [3] - 460:9, 13

**Wonder** [2] - 460:8, 13

**wonder** [1] - 460:10

**wooden** [2] - 437:12;

465:19

**word** [6] - 472:25;
512:3; 527:8; 561:18;
563:13, 22

**words** [6] - 425:14;
503:19; 541:23

**work...but** [1] -
496:10

**worries** [1] - 426:23

**wrap** [2] - 420:1, 8

**write** [2] - 512:23;
563:4

**write-offs** [1] -
512:23

**writes** [2] - 510:15

**writing** [3] - 502:14;
534:15; 544:7

**written** [3] - 472:25;
498:11; 550:24

**www.Samsung.com** [1] -
473:2

### Y

**Y-A-R-O** [1] - 522:3

**Yaro** [1] - 522:3

**year** [14] - 402:7, 10;
407:23; 438:11; 450:2;
482:15; 484:18; 536:2;
537:11, 14; 547:12;
551:14; 558:16

**years** [5] - 401:13;
482:8, 17; 558:10

**yesterday** [10] -
397:17; 403:2; 404:7;
425:12; 476:18; 488:18;
497:14; 498:1; 502:19;
503:1

**YORK** [1] - 393:1

**York** [30] - 393:14, 18,
22; 405:10; 406:14, 18;
407:3, 5, 15; 421:17;
438:9; 440:11; 441:16,
19; 473:22; 474:1;
475:11; 482:1; 494:21;
495:2, 4; 501:25;
504:5; 507:22; 508:22;
520:17; 521:2; 523:17;
528:11

**York...keep** [1] -
514:15

**young** [1] - 459:7

**yourself** [2] - 525:17;
536:5

### Z

**zoom** [1] - 474:11

**zooming** [1] - 469:16

24

568

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------X

UNITED STATES OF AMERICA,          :     14 CR 0094

     v.                           :     U.S. Courthouse
                                 Central Islip, N.Y.
JOSEPH VALERIO,                     :
                                 TRANSCRIPT OF TRIAL
          Defendant.      :
                                 November 6, 2014
------------------------------X     9:30 a.m.

BEFORE:

       HONORABLE JOSEPH F. BIANCO, U.S.D.J.
               and a jury

APPEARANCES:

For the Government:   LORETTA E. LYNCH
                     United States Attorney
                     100 Federal Plaza
                     Central Islip, New York 11722
                     By:  AMEET B. KABRAWALA, ESQ.
                          ALLEN BODE, ESQ.
                          Assistants, U.S. Attorney


For the Defendant:    ANTHONY LaPINTA, ESQ.
                     LEONARD LATO, ESQ.
                     35 Arkay Drive - Suite 200
                     Hauppauge, New York 11788


Court Reporter:       HARRY RAPAPORT
                     OWEN M. WICKER
                     United States District Court
                     100 Federal Plaza
                     Central Islip, New York 11722
                     (631) 712-6105


Proceedings recorded by mechanical stenography.
Transcript produced by computer-assisted transcription.

569

```
 1              M O R N I N G   S E S S I O N

 2              (Case called.)

 3              (Appearances noted.)

 4              THE COURT:  Good morning.

 5              Mr. Valerio is present as well.

 6              The jurors are all here.

 7              Is there anything we need to address before we

 8    start?

 9              MR. LATO:  Not from the defense, your Honor.

10              MR. KABRAWALA:  Not from the Government, your

11    Honor.

12              THE COURT:  All right.

13              Bring the jury out.

14              (Whereupon, the jury at this time enters the

15    courtroom.)

16              THE COURT:  Please be seated.

17              Good morning, members of the jury.  I appreciate

18    you getting in on this rainy day.

19              As you recall, yesterday when we ended, Special

20    Agent Troyd was on cross-examination, so we'll continue

21    from that point.

22              Special Agent Troyd, I remind you, you are still

23    under oath.

24              Do you understand that?

25              THE WITNESS:  Yes, your Honor.
```

570

```
1        THE COURT:  Continue, Mr. Lato.
2   S T E V E N   T R O Y D,
3        called as a witness, having been previously
4        duly sworn, was examined and testified further
5        as follows:
6   CROSS-EXAMINATION
7   BY MR. LATO:  (Continued)
8   Q    In the Valerio-Kalichenko investigation, did you want
9   the investigation to be a thorough one?
10  A    Yes, sir.
11  Q    Is it fair to say that you wanted to gather all the
12  relevant evidence to the investigation?
13  A    Yes, sir.
14  Q    Is it fair to say that you wanted to speak to all
15  persons who may have had relevant information to give to
16  you in this investigation?
17  A    At different stages, yes.
18  Q    Did you or another agent or detective speak with
19  Mr. Valerio's mother, Frances?
20  A    Yes.
21  Q    Did you or another agent or a detective speak with
22  Mr. Valerio's sister, Bernadette?
23  A    Yes.
24  Q    Did you or another agent or detective speak with
25  Bernadette's husband, Angelo?
```

Troyd - Cross/Lato

571

```
1    A    Yes.

2    Q    Is it fair to say that some law enforcement officer

3    spoke with Bernadette and Angelo's daughter ███████

4    A    Yes.

5    Q    Is it fair to say that that person was a Detective

6    Kirk?

7    A    I'm not sure of the name.

8    Q    Was it a man or a woman?

9    A    I'm not sure.  Detective Rory Forrestal was present

10   for the interview.

11   Q    Is it fair to say in the search of Mr. Valerio's

12   house, the first search, you or other agents recovered

13   costumes from the basement?

14   A    Yes.

15   Q    Did you learn in your investigation that Mr. Valerio

16   has a daughter?

17   A    I'm sorry, it was the second search that recovered

18   costumes.

19            I'm sorry, what was the question?

20   Q    Did you learn in your investigation that Mr. Valerio

21   has a daughter?

22   A    Yes.

23   Q    And did you learn that the daughter's name is A████?

24   A    Yes.

25   Q    Is it fair to say that A████ is about five or six
```

Troyd - Cross/Lato

572

1   years old?

2   A    Yes.

3   Q    Did anyone at the FBI speak to A█████?

4   A    We attempted to.

5   Q    Do you know that Bernadette and Angela have another

6   child in addition to ████████?

7   A    Yes.

8   Q    Did anyone from law enforcement attempt to speak to

9   that child?

10  A    No.

11  Q    Do you recall how old that child was?

12  A    The Imperiale child?

13  Q    Yes, sir.

14  A    I think he's maybe a year or two older than ████████

15  Q    Is it fair to say that no one attempted to speak to

16  that child?

17  A    No, no one attempted to speak to that child.

18  Q    Did you learn that Mr. Valerio has a son named Andres

19  [sic]?

20  A    Yes.

21  Q    Did you learn that Andres is about 19 years old?

22  A    Yes, he's in college.

23  Q    Did anyone from law enforcement, as part of this

24  investigation, attempt to speak to Andres?

25  A    No.

Troyd - Cross/Lato

573

1   Q    During either of the searches of Mr. Valerio's home,

2   did you see guitars?

3   A    Yes.

4   Q    Did you also see sports memorabilia?

5   A    Yes.

6   Q    In fact, did you also come across a movie poster of

7   Arnold Schwarzenegger in Terminator 2?

8   A    I'm not sure.  I don't remember that directly.

9   Q    Did you learn in your investigation how much time

10  Andres spent at that house?

11  A    No.

12  Q    Did you speak to any of Andres' friends?

13  A    Definitely not.

14  Q    As you sit here, do you have any idea whether Andres

15  or anyone else saw Mr. Valerio's user name that was open

16  on his desk in the home office?

17  A    No, I don't have any information about that.

18  Q    Now, in the course of your career, have you seen

19  homes with video surveillance systems on the outside of

20  the house?

21  A    Yes.

22  Q    Is it fair to say that certain surveillance systems

23  are available for the inside of a house?

24  A    Yes.

25  Q    The clock in this case with the camera in it, where

Troyd - Cross/Lato

574

1   did you find that?

2   A    That was in the basement, on the wall above a

3   computer, facing the couch where the pictures were taken

4   of █████

5   Q    Was the camera clock operational at the time, meaning

6   was it on?

7   A    When I recovered the clock, it was no longer attached

8   to the computer because the computer had been seized on

9   January 28th.

10  Q    On January 28th, did you know whether the clock was

11  working that day, meaning hooked up?

12  A    Yes, it was.

13  Q    Is it fair to say that when it was working there was

14  no one in view of the camera when you entered the house?

15  A    No, it didn't cover the area of the entry of the

16  house.

17  Q    Is it fair to say that the camera was on all the time

18  even though no one was in front of it?

19  A    I couldn't tell you that.

20       MR. LATO:  One moment, please, your Honor.

21  Q    Special Agent Troyd, as the case agent in this case,

22  are you aware whether any recordings were recovered by law

23  enforcement from the clock camera?

24  A    The question was, were they recovered by law

25  enforcement?

575

1    Q    Yes.

2    A    I'm not aware of any.

3    Q    Special Agent Troyd, do you see on the screen

4    Government's Exhibit 311 in evidence?

5    A    Yes, sir.

6    Q    Is the location depicted in 311 the location where

7    the camcorder was found?

8    A    Yes.

9    Q    In fact, sir, at the lower portion of the photograph

10   on the left side, is that the camcorder in its case?

11   A    Yes.

12   Q    Was there a hole in one of the ceiling tiles

13   permitting the camera to look downward?

14   A    I'm not aware of one.

15   Q    Now, sir, is it fair to say that the camcorder was

16   not set up to record from the location where you found it?

17   A    It was not able to record in the condition we found

18   it.

19   Q    Now, during the search did you recover what has been

20   entered into evidence as Government's Exhibit 325, the

21   camera box?

22   A    Yes.

23   Q    And this was the camera box, the camcorder, found in

24   the ceiling; is that correct?

25   A    Yes.

Troyd - Cross/Lato

576

1  Q    Was the password to use that camcorder on the box?

2  A    There was a password written on the box.  I don't

3  believe that camcorders require passwords, but I may not

4  be correct in that.

5  Q    Would it be fair to say whatever that password was

6  needed for, was open on the face of the box?

7  A    Yes.

8  Q    Now, do you recall testifying on direct examination

9  that you spoke to Special Agent Angelini during the

10  investigation?

11  A    Yes.

12  Q    And is it fair to say that in substance you told

13  Agent Angelini not to tip off Kalichenko that she too was

14  a target of the investigation?

15  A    We discussed it, how to approach arresting

16  Ms. Kalichenko, in numerous scenarios because we're

17  dealing with foreign government, and they could decide not

18  to extradite one of their citizens, and that would have

19  basically made it impossible for us to arrest

20  Ms. Kalichenko.

21  Q    Would it be fair to say that she was a target of the

22  investigation?

23  A    Absolutely.

24  Q    Is it fair to say that when she was talking to

25  Special Agent Angelini, you didn't want Ms. Kalichenko to

Troyd - Cross/Lato

577

1   know that she in fact was a target?  Correct?

2   A    That's correct.

3   Q    Because if she knew she was a target, you were

4   concerned she could hide and destroy evidence; is that

5   correct?

6   A    I was more concerned that she would travel and we

7   wouldn't have access to her.  She had supplied us

8   evidence.  We had additional evidence:  We had developed

9   additional evidence, and it was beyond the point where her

10  destroying evidence could have helped herself.

11  Q    Did you say earlier this morning you wanted to gather

12  all the relevant evidence to the investigation?

13  A    Yes.

14  Q    Were you concerned, irrespective whether you thought

15  it would help her, that she could hide or destroy

16  evidence?  Yes or no.

17  A    It wasn't a concern because --

18  Q    Okay.  You answered it, sir.

19          At some point after Mr. Valerio was arrested,

20  did you ask Ms. Kalichenko to come to the United States?

21  A    No.

22  Q    Did another agent or law enforcement officer ask her

23  to come to the United States?

24  A    No.

25  Q    Did you or another law enforcement officer learn

Troyd - Cross/Lato

578

1    after Mr. Valerio was arrested that in fact Ms. Kalichenko

2    was on a plane to John F. Kennedy International Airport?

3    A    I'm sorry, can I have the question again?

4    Q    After Mr. Valerio was arrested, at some later date

5    did you learn that Ms. Kalichenko was in fact on a flight

6    from Ukraine to JFK International Airport?

7    A    Yes.

8    Q    When she arrived at the airport, did you or another

9    agent meet her there?

10   A    Yes.

11   Q    Did you make arrangements to meet her there?

12   A    Yes.

13   Q    Is it fair to say that you drove Ms. Kalichenko to

14   the FBI offices in Melville?

15   A    Yes.

16   Q    Is it fair to say at that point there was no danger

17   that Ms. Kalichenko could hide or destroy any evidence in

18   Ukraine?

19   A    No, that she possibly could still destroy evidence.

20   Q    While she was in your presence, is it your testimony

21   that she could destroy evidence on the other side of the

22   Atlantic?

23   A    She could have made arrangements in advance to

24   destroy evidence.

25   Q    I didn't ask you that, sir.

Troyd - Cross/Lato

579

1    While she's in your presence, did she have the

2    ability to destroy evidence?

3    A    She herself physically could not destroy evidence

4    when she was in my custody.

5    Q    Did you have some concern that she could still

6    destroy evidence?

7    A    No.

8    Q    Did you arrest her, in fact, after you interviewed

9    her at the FBI office in Melville?

10   A    I arrested her in JFK airport.

11   Q    So it would be fair to say she was in your custody,

12   correct?

13   A    Yes, she was handcuffed and transported to the

14   office.

15   Q    Is it fair to say that while in your custody she had

16   no opportunity to use a telephone or other electronic

17   device?

18   A    No, she did not.

19   Q    After you arrested her at John F. Kennedy airport,

20   did you contact Special Agent Angelini?

21   A    Not immediately.

22   Q    Did you contact any FBI officer or liaison in Ukraine

23   to try to gather Ms. Kalichenko's evidence in Ukraine?

24   A    No.

25   Q    After Ms. Kalichenko was in your custody, did you, as

Troyd - Cross/Lato

580

1    part of your investigation, make any effort to retrieve

2    e-mails from her account?

3    A    No.

4    Q    Did you make any effort, and by that I mean you or

5    any law enforcement officers, to retrieve any text

6    messages from Ms. Kalichenko's account?

7    A    No.

8    Q    Did you or any other law enforcement officer make any

9    effort to retrieve any tweets from Twitter in this case

10   from anyone's account?

11   A    No tweets.

12   Q    Did you attempt to retrieve Ms. Kalichenko's Facebook

13   page?

14   A    No.

15   Q    Did you ever see ███████, who was purported to be

16   Ms. Kalichenko's infant daughter?

17   A    Only in the images.

18   Q    Have you ever laid eyes on the child?

19   A    Not in person, no.

20   Q    Do you know whether any law enforcement officer in

21   this case, and by that I mean a federal law enforcement

22   officer, has ever seen the live child depicted in the

23   images in this case?

24   A    No.

25              MR. LATO:  One moment, please.

Troyd - Cross/Lato

581

```
1    Q    With respect to any other law enforcement officer, do

2    you know whether any Suffolk County detective or any other

3    American law enforcement officer has ever laid eyes on the

4    child depicted in the photographs?

5    A    Not to my knowledge, no.

6    Q    Do you know whether the militsaya, the police in

7    Ukraine, ever picked up the child?

8    A    No.

9    Q    Do you have any nonhearsay information that the

10   child, ███████, is in fact Ms. Kalichenko's daughter?

11              MR. KABRAWALA:  Objection, Judge.

12              THE COURT:  I'll allow that.  Overruled.

13   A    I have a copy of the birth certificate which

14   identifies her as the child of Olena Kalichenko.

15   Q    Is that birth certificate in evidence in this case,

16   sir?

17   A    I believe it is available.  I'm not sure if it has

18   been put into evidence yet.

19   Q    At some point did you indicate in your FBI 302s or in

20   some other official document that the child depicted in

21   the video is three years old?

22   A    Yes.

23   Q    Is it fair to say that the child depicted in the

24   video is probably closer to a year and a half or two years

25   old?
```

582

1   A    It's hard for me to identify the age of a child

2   precisely, but she was a toddler.

3          MR. LATO:  One moment, please.

4          (Counsel confer.)

5   Q    Special Agent Troyd, have you watched all of the

6   videos with the child ████ in it?

7   A    Yes, mostly in high speed.

8   Q    For those you watched in slower speed, is it fair to

9   say that the child appears to be making child noises as

10  opposed to speaking?

11  A    I haven't watched many with the sound on.

12  Q    Now, in your investigation, did you learn whether

13  Ms. Kalichenko sent videos or pictures of her and ████

14  to persons other than Mr. Valerio?

15  A    I'm sorry, is that in the course of my investigation?

16  Q    Yes, sir.

17  A    Oh, yes, there is an individual I'm aware of who

18  received, I guess, one of the videos from her by mistake.

19  Q    Well, without getting into "mistake," what is the

20  person's name who received the video?

21  A    It is unclear to me which individual it was.  If you

22  would like, I can explain further.

23  Q    I would not like, sir.  Thank you.

24  A    Okay.

25  Q    Is the person Alan Rothman?

Troyd - Cross/Lato

583

```
1    A    No, I don't believe so.

2    Q    Is the person Daniel Dittmeier?

3    A    Possibly.

4    Q    When you said a moment ago it was sent by mistake,

5    was that your mistake, sir?

6    A    No.

7    Q    Would it be fair to say that Ms. Kalichenko said it

8    was a mistake?

9    A    Yes.

10            MR. KABRAWALA:  Objection, Judge.

11            THE COURT:  Overruled.

12   Q    Do persons who commit crimes sometimes minimize their

13   role?

14   A    Absolutely.

15   Q    I'm putting Exhibit 208 on the screen.

16            Did you see that, sir?

17   A    Yes, I can.

18   Q    Did you ever entertain the possibility that there

19   could have been more than one ██████?

20   A    No.

21   Q    Is it fair to say in the e-mails ██████ is sometimes

22   spelled ████████ and sometimes with a -- sometimes

23   ████████████████

24   A    Yes, there are multiple spellings of her name.

25   Q    Do you see in Exhibit 208 in the final paragraph
```

Troyd - Cross/Lato

584

```
1    where it is written:  Then that's what I want to see or
2    when you get back to seeing ████████again?
3    A    Where is that?
4    Q    The second paragraph, toward the end of the
5    paragraph.
6              Do you see where my finger is, sir?
7    A    Yes.
8    Q    "Then that's what I want to see or when you get back
9    to seeing ████████ again."
10             Do you see that?
11   A    Yes.
12   Q    Is it your understanding that Ms. Kalichenko lived
13   with ████████?
14   A    Intermittently.
15   Q    Do you know where ████████ lived when she was not with
16   Ms. Kalichenko?
17   A    Yes.
18   Q    Showing you Government's Exhibit 213 in evidence.
19             Do you see that, sir?
20   A    Yes, sir.
21             MR. LATO:  One moment, please, your Honor.
22   Q    Do you see where I'm pointing, sir, beginning with
23   the words "I ask"?
24   A    Yes.
25   Q    This looks like an e-mail from Mr. Valerio to
```

585

1   Ms. Kalichenko, correct?

2   A    Yes.

3   Q    Is it fair to say that Mr. Valerio is writing:  All I

4   ask you in video with ███, when you are with her?

5   A    Yes.

6   Q    Is it still fair to say, as far as you are concerned,

7   there was only one ███?

8   A    Yes.

9   Q    I'm now putting Government's Exhibit 214 on the

10  screen.

11          Do you see that, sir?

12  A    Yes.

13  Q    Do you see where my finger is pointing, sir?

14  A    Yes.

15  Q    Is it fair to say that this appears to be an e-mail

16  from Ms. Kalichenko to Mr. Valerio?  Correct?

17  A    Yes.

18  Q    Is it fair to say that Ms. Kalichenko is writing to

19  Mr. Valerio:  You know that I will be seeing my mentor?

20  A    Yes.

21  Q    Is it fair to say that during your investigation you

22  learned that Ms. Kalichenko had a mentor?

23  A    Yes.

24          MR. LATO:  One moment, please.

25          (Counsel confer.)

Troyd - Cross/Lato

586

```
1   Q    Continuing in that sentence, sir -- and I'll start
2   from the beginning again:
3            You know that I will be seeing my mentor, and
4   she actually allowed myself to stay at the house that she
5   has outside of Moscow.  I can make pics of that.
6            Do you see that, sir?
7   A    Yes.
8   Q    Did you learn that the mentor was a female, or a
9   woman?
10  A    It appears from that e-mail that she is a woman.
11  Q    Does it appear from that e-mail what kind of pictures
12  Ms. Kalichenko was writing about?
13  A    No.
14           MR. LATO:  I have less than five minutes to go,
15  your Honor.
16           THE COURT:  Okay.
17  Q    I'm showing you Government's Exhibit 322 in evidence.
18           Do you see that, sir?
19  A    Yes, sir.
20  Q    Is it fair to say that this is a Western Union
21  summary chart?
22  A    Yes, it is.
23  Q    And is what is depicted in here wire transfers from
24  Joseph Valerio to Olena Kalichenko?
25  A    Yes.
```

587

1   Q    Actually, sir, what is depicted in here is someone

2   with the name Joseph Valerio is sending money to a person

3   who used the name Olena Kalichenko; is that correct?

4   A    Based on my investigation, I believe that it is

5   Mr. Valerio --

6   Q    I didn't ask you that.

7        Based on this exhibit, does this exhibit show

8   the name Joseph Valerio is associated with the transfer of

9   money to a person with the name Olena Kalichenko?

10  A    Yes, those names are associated --

11       MR. LATO:  That's it, sir.

12  Q    Now, how long have you been a special agent with the

13  FBI?

14  A    It will be 20 years on November 21st.

15  Q    Is it fair to say that you have seen some adult

16  fetishes in your investigation --

17       MR. KABRAWALA:  Objection, Judge.

18       THE COURT:  Sustained.

19  Q    I'm going to show you Government's Exhibit -- I'm

20  sorry, Defendant's Exhibit B, C and D for identification.

21       Please look at them, sir.

22  A    Yes.

23  Q    Do you recognize Defendant's Exhibit B, C and D for

24  identification?

25  A    Yes, I do.

Troyd - Cross/Lato

588

1   Q    Is it fair to say that these were seized from

2   Mr. Valerio's house during the execution of one of the

3   search warrants?

4   A    Yes, on February 25th.

5        MR. LATO:  Your Honor, I offer these as

6   Defendant's Exhibit B, C and D.

7        MR. KABRAWALA:  No objection, Judge.

8        THE COURT:  Defendant's Exhibit B, C and D are

9   admitted.

10       (Whereupon, Defendant's Exhibits B, C and D were

11  received in evidence.)

12  Q    Please pick up Defendant's Exhibit B, sir.

13  A    Yes.

14  Q    Is it fair to say that Defendant's Exhibit B is a

15  costume in a plastic bag?

16  A    Yes, it is.

17  Q    Is it fair to say that it appears to be an adult

18  costume in a plastic bag?

19  A    It's an adult-sized costume.

20  Q    Please pick up Defendant's Exhibit C in evidence.

21  A    Yes.

22  Q    Does that appear to be a costume in a plastic bag?

23  A    Yes, it is.

24  Q    Does it appear to be an adult costume in a plastic

25  bag?

Troyd - Cross/Lato

589

1   A    This is an adult-sized costume.

2   Q    Please pick up Defendant's Exhibit D in evidence.

3   A    Yes.

4   Q    Does that appear to be a costume in a plastic bag?

5   A    Yes, it is.

6   Q    Does it appear to be an adult costume in a plastic

7   bag?

8   A    This is an adult-sized costume.

9   Q    Special Agent Troyd, during the course of your

10  investigation, did you look at all the e-mails between

11  Mr. Valerio and Ms. Kalichenko?

12  A    I believe I have.

13  Q    Is it fair to say that in one or more of the e-mails

14  there's an exchange about master-slave-dominatrix and the

15  like?

16  A    Yes, there is some conversation like that.

17  Q    Although bizarre, if not involving minors, is that

18  legal?

19  A    There is no laws against that.

20        MR. LATO:  Just one moment.  I think I'm about

21  done.

22        Your Honor, I'm just going to retrieve the

23  costumes while I review something.

24        Nothing further, your Honor.

25        THE COURT:  Redirect?

590

1    MR. KABRAWALA:  Yes, your Honor.

2    REDIRECT EXAMINATION

3    BY MR. KABRAWALA:

4    Q    There were a number of costumes you were shown during

5    cross-examination.  Do you still have those out?

6    A    Yes.

7    Q    Showing you two items.  One has been marked as

8    Government's Exhibit 337; one has been marked Government's

9    Exhibit 339.

10    Did you seize those two items from the

11    defendant's home on February 25, 2014?

12    A    Yes.

13    MR. KABRAWALA:  Move to admit, Judge, both of

14    them.

15    MR. LATO:  No objection.

16    THE COURT:  337 and 339 are admitted.

17    (Whereupon, Government Exhibits 337 and 339 were

18    received in evidence.)

19    MR. KABRAWALA:  I will throw them on the

20    overhead.

21    BY MR. KABRAWALA:

22    Q    This is some sort of a receipt, an invoice.  They are

23    showing costumes?

24    A    Yes.

25    Q    This appears to be some invoice for some costumes?

591

1   A    Yes.

2   Q    Who is it from?

3   A    Celebrate Express, the best online party store since

4   1994, located at 16205 West Small Road, New Berlin,

5   Wisconsin, 53151.

6           1-800 BIRTHDAY.  www.celebrateexpress.com.

7   Q    Shipped to?

8   A    Joseph Valerio, 3 High Gate Drive, Smithtown, New

9   York, 11787.

10  Q    Someone named Joseph Valerio at that address?

11  A    That's correct, sir.

12  Q    Let's walk through some of these items.  Let's start

13  with of the first one.

14  A    The lighting on the overhead is not bright.

15  Q    I'll read it to you.

16          Opaque tights (black), child, (large 7/10).

17          Sailor girl child costume.

18          Tan tights, child.

19          What is the next one?

20  A    Fishnets, white, child, large.

21  Q    Large fishnet stockings for a child?

22  A    Yes.

23  Q    The next is adult costume or tights?

24  A    Yes.

25  Q    The next is adult panty hose?

Troyd - Redirect/Kabrawala

592

```
1    A    Yes, correct.

2    Q    Nude color?

3    A    Yes.

4    Q    And there's a body suit, child.  Medium sized?

5    A    Yes.

6    Q    What is this, lace footless tights?

7    A    Yes, white tights, medium.

8    Q    What is this?

9    A    Robin Hoodlum tween costume.

10   Q    Robin Hoodlum.  I think I saw that somewhere.

11   Government's Exhibit 340.

12              Was this found at the defendant's house in

13   February of this year?

14   A    Yes, it was.

15              MR. KABRAWALA:  Move to admit.

16              MR. LATO:  No objection.

17              THE COURT:  340 is admitted.

18              (Whereupon, Government Exhibit 340 was received

19   in evidence.)

20              MR. KABRAWALA:  I will publish the picture.

21   Q    Robin Hoodlum --

22   A    Yes.

23   Q    -- appears to be the same thing in the Celebrate

24   Express invoice appearing to be shipped to Joseph Valerio?

25   A    Yes.
```

**Troyd - Redirect/Kabrawala**

593

1   Q    Here's the books admitted in evidence, number 337.

2   Let read the details.

3            Who is this from and who is this purportedly to?

4   A    From Celebrate Express in New Berlin, Wisconsin, sold

5   to Joseph Valerio, 1-631-265-2379.

6            Joseph Valerio, 3 High Gate Drive, Smithtown,

7   New York.

8   Q    What is the phone number listed?

9   A    1-631-265-2379.

10  Q    Someone named Joseph Valerio appears to have received

11  a package at a phone number ending in 2379.  Is it fair to

12  say?

13  A    That's fair to say.

14  Q    And someone named Joseph -- withdrawn.

15           Showing you what has been marked in evidence as

16  Government's Exhibit 200.

17           If you recall, some account information that

18  someone named Joseph Valerio signed up for through

19  Cablevision and paid for for 12 years.

20           What is the phone number there?

21           MR. LAPINTA:  Objection to form.

22           THE COURT:  Sustained.

23           Just ask the question.

24  Q    What is the phone number listed on Government's

25  Exhibit 200-A?

594

1   A   631-265-2379.

2   Q   Does it appear to be the same phone number as was

3   listed on Government's Exhibit 337?

4   A   Yes.

5   Q   Same address?

6   A   Yes.

7   Q   And by the way, is that the same address, 3 High Gate

8   Drive, where the defendant lived?

9   A   Yes.

10   Q   That's where the search warrants were executed?

11   A   Yes, that's correct.

12   Q   You also -- you were also asked on cross-examination

13   about this Exhibit 322.  Is that fair to say?

14   A   Yes.

15   Q   That's the Western Union summary chart?

16   A   Yes, it is.

17   Q   That someone in the name of Joseph Valerio sent

18   approximately $12,350 over a number of wire transfers to

19   someone named Olena Kalichenko?

20   A   Yes.

21   Q   That someone named Joseph Valerio lived at 3 High

22   Gate Drive in Smithtown, New York, or at least purportedly

23   lived there?

24   A   Yes.

25   Q   3 High Gate Drive is the address of the defendant,

Troyd - Redirect/Kabrawala

595

1    isn't it?

2    A    Yes, it is.

3    Q    And someone who purported to be Olena Kalichenko,

4    where did she receive money, generally speaking?

5            MR. LAPINTA:  Objection.

6            Generally received money?

7            MR. KABRAWALA:  Okay.  I'll rephrase the

8    question.

9    Q    Is it fair to say that according to Government's

10   Exhibit 322, someone named Olena Kalichenko picked up

11   money in one of two countries:  Ukraine and Turkey?

12   A    Yes.

13   Q    Now, someone named Joseph Valerio sent approximately

14   $12,350 to a woman by the name of Olena Kalichenko.

15           According to Government's Exhibit 10-A, Western

16   Union records that has been admitted into evidence, what

17   did that person report as their e-mail address?

18   A    Joeval5@optonline.net.

19   Q    What is the e-mail address associated with the

20   defendant?

21   A    Joeval5@optonline.net.

22   Q    By the way, what is the telephone number?

23   A    631-265-2379.

24   Q    So it's fair to say the person who sent over $12,000

25   to a person named Olena Kalichenko reported, according to

Troyd - Redirect/Kabrawala

596

```
 1    Government's Exhibit 10-A, the same phone number as listed

 2    on everything that we've talked about today?

 3    A    Yes, sir.

 4    Q    You were asked about the defendant's January 28, 2014

 5    confession; is that correct?

 6    A    Yes.

 7             MR. LATO:  Objection to the characterization.

 8             THE COURT:  Sustained as to form.

 9    Q    You were asked about the defendant's statements on

10    January 28, 2014; is it fair to say?

11    A    Yes, I was.

12    Q    You were asked during your cross-examination whether

13    your interview with the defendant on that date,

14    January 28, 2014, was filmed.

15    A    Correct.

16    Q    To your knowledge, has it ever been, in the entire

17    history of the Federal Bureau of Investigation, a policy

18    that interviews with a suspect in a suspect's home must be

19    filmed?

20    A    That has never been the policy.

21    Q    The FBI has been around for a long time?

22             MR. LAPINTA:  Objection.

23             THE COURT:  Sustained as to form.

24    Q    Now, is it true that the FBI adopted a new policy --

25    A    Yes.
```

Troyd - Redirect/Kabrawala

597

1    Q    -- in July of 2014?

2    A    Yes.

3    Q    That requires the videotaping of certain kinds of

4    interviews at FBI or the Department of Justice facilities?

5    A    Even then, there would be exceptions to that.

6    Q    All right.

7         So in July of 2014 the FBI adopted a policy,

8    with many exceptions, which required filming of certain

9    kind of interviews that occur at FBI or Department of

10   Justice facilities?

11   A    Yes.

12   Q    And your interview with the defendant happened at his

13   house approximately six months earlier, in January of this

14   year?

15   A    That's correct.

16   Q    You were also asked during your cross-examination

17   about guns, the presence of firearms.  I think there was

18   even a reference to 40-caliber, something with 40-caliber,

19   at the defendant's house?

20   A    Yes.  That is the standard-issue caliber for FBI

21   agents.

22   Q    What is it, a shotgun?

23   A    No, it's a pistol.

24   Q    It's not a machine gun or anything, right?

25   A    No, a handgun.

598

```
 1    Q    By the way, are you even allowed to be in the field
 2    without guns?
 3    A    No.  When I'm on duty, I need to carry my weapon.
 4    Q    It's a policy that you have to carry a weapon, isn't
 5    it -- withdrawn.
 6              Now, you testified that to your knowledge no
 7    one's gun was visible while you were at the defendant's
 8    house that day.
 9    A    Yes.
10    Q    Did you see anyone, at any point on January 28, 2014,
11    draw their weapon?
12    A    No.
13    Q    Did anyone point a gun at the defendant at any point?
14    A    No.
15    Q    Now, you mentioned that you, Detective Forrestal,
16    Special Agent Danielle Messineo, were seated at a dining
17    room table?
18    A    Yes.
19    Q    Let me show you a picture of that.
20              I'm publishing 302.
21              There it is.
22              This is the dining room table that is depicted
23    in Government's Exhibit 302 that is now published,
24    correct?
25    A    That's correct.
```

**Troyd - Redirect/Kabrawala**

599

1  Q    Was the defendant handcuffed while -- during the

2  meeting?

3  A    No.

4  Q    Was he restrained in any way?

5  A    No.

6  Q    Did anyone raise their voice at him?

7  A    No.

8  Q    I'm going to look at this table in detail and try to

9  zoom in on it.

10        What is going on here?  Someone had coffee?

11 A    Yes, that's my large cup of coffee.

12 Q    What is that, a rainbow mug next to it?

13 A    Almost looks like Winnie the Pooh.

14 Q    Cupcake?

15 A    Looks like cupcake.

16 Q    Was the defendant drinking out of that cupcake or

17 Winnie the Pooh mug?

18 A    The defendant asked for water, and we provided it in

19 that mug.

20 Q    Defendant's Exhibit A was a black and white picture

21 of a detail of the desk/office area of the defendant's

22 house, in the second floor?

23 A    Yes.

24 Q    This is Defendant's Exhibit A.

25        Now I'm showing you Government's Exhibit 565.

600

1          Is there any difference in those pictures other

2     than the fact that 565 is a color version?

3     A     The detail is better on the color version.

4     Q     And 565, is that a fair and accurate depiction of the

5     area that is depicted on -- in the defendant's house on

6     January 28, 2014?

7     A     Yes.

8                MR. KABRAWALA:  The Government moves to admit.

9                MR. LATO:  No objection.

10               THE COURT:  565 is admitted.

11               (Whereupon, Government Exhibit 565 was received

12     in evidence.)

13    Q     So you were asked about essentially an e-mail address

14    and a password that were in plain view while you were in

15    the house; is that fair to say?

16    A     Yes.

17    Q     I want to zoom in on what you were being asked about.

18               Actually, did you next know what you were being

19    asked about, what piece of paper?  Can you describe where

20    it is?

21    A     It's the paper in the center of the screen of the

22    photo.  It was to the left of the PAL sticker.

23    Q     Is that the blue sticky note?

24    A     Actually, what I testified yesterday, I was reading

25    from the white page that the blue note is attached to.

601

1    Q    All right.  I'm just going to zoom in on that.

2         Can you see that?

3    A    Yes.

4    Q    Did you see that?  I'm going to zoom on it even more.

5         So in this white area in the center of the page

6    that appears to be in a notebook of some kind, written in

7    blue ink, joeval5@optonline.net, and it's kind of

8    underlined.

9    A    With the word "upper" under the word "joeval," and

10   "low" under the 66.

11   Q    That was in plain view for everyone to see?

12   A    Yes, sir.

13   Q    And some kind of password maybe?

14   A    Yes, maybe.

15   Q    Let's zoom in even more.

16        What does that say there on the blue note?

17   Joeval at what?

18   A    At gmail.

19   Q    At gmail, right?

20   A    Yes.

21   Q    And there's a password underneath it.  It says,

22   Joeval and there's a series of numbers?

23   A    Yes.

24   Q    What is the e-mail we've been discussing this entire

25   trial relating to Joseph Valerio?

602

| | | |
|---|---|---|
| 1 | A | Joeval5@optonline.net. |
| 2 | Q | Joeval5@optonline.net? |
| 3 | A | That's correct. |
| 4 | Q | Not joeval66@gmail? |
| 5 | A | That is correct. |

6  Q    By the way, you were asked about the defendant's

7  daughter, A███, today.  Do you remember?

8  A    Yes.

9  Q    To your knowledge, what country do A███ and her

10 mother live in?

11 A    I believe it was South Africa.

12 Q    South Africa?

13 A    Right.

14 Q    What is that, on the other side of the world?

15 A    Pretty much.

16 Q    Did Andre, the defendant's son went there, live there

17 when you went there twice?

18 A    I didn't see him on either occasion.

19 Q    He's in college?

20 A    Yes, sir.

21 Q    You were asked about the February 24, 2014, what

22 we've been calling the second arrest.

23       Do you remember that?

24 A    Yes.

25 Q    Now, defense counsel asked you whether the defendant

603

1   was Mirandized, and he actually went over the advice of

2   rights form that the defendant and agent completed that

3   day.

4          Do you remember that?

5   A   Yes.

6   Q   After the Miranda warnings were given, the defendant

7   was asked, according to your testimony on direct, why he

8   was being arrested.

9          And in response -- why don't you tell us what

10  you said.

11         MR. LAPINTA:  Objection.

12         THE COURT:  You said "on direct" and said "that

13  day."

14         MR. KABRAWALA:  All right.  Let me rephrase the

15  question.

16  Q   Is it fair to say that after the defendant was

17  advised why he was being arrested for a second time, he

18  said in sum and substance, I want to kill myself, and I

19  don't have a family anymore?

20  A   In reverse order, but he did say those things.

21  Q   At that point, I think on cross you had said you

22  brought him to the FBI's office in Long Island and you

23  processed him in a processing area?

24  A   Yes, we have an arrest processing area that is

25  excluded from the rest of the office for safety purposes.

604

1  Q    And at any point that day, did you actually sit down

2  and interview the defendant again?

3  A    No, other than pedigree information for the arrest

4  processing paperwork.

5  Q    Pedigree.  What is that?

6  A    Date of birth, associates, family members.  It's

7  essentially a U.S. Marshal's form required when we bring a

8  prisoner in, so should they need to locate him in the

9  future, they have it available.

10  Q    Essentially background information, name and address;

11  is that right?

12  A    That's correct.

13  Q    But you didn't sit down to interview him again?

14  A    No.

15  Q    Okay.

16       Defense counsel asked you -- he made reference

17  to a particular e-mail, Government's Exhibit 214 that I'm

18  now publishing.

19  A    Yes.

20  Q    Well, with respect to this e-mail of April 12, 2012,

21  from Kalichenko to joeval5@optonline.net, there is some

22  discussion in the e-mail of Ms. Kalichenko being away from

23  her daughter?

24  A    Yes.

25  Q    There was a suggestion that there are two ███████.

Troyd - Redirect/Kabrawala

605

1    MR. LATO:  Objection.

2    THE COURT:  Sustained as to form.

3  Q    There was a question about whether you believed there

4  might be two ███████ out there.

5  A    Yes.

6  Q    Well, what defense counsel didn't show you, I will

7  show you now.

8         At the bottom of this e-mail, while it appears

9  that Kalichenko is away from her daughter, just read the

10  last couple of lines in the e-mail starting "I really

11  missed..."

12  A    I really missed you, Joseph, and ██████, my daughter,

13  as well...kisses, Helena.

14    THE COURT:  How does she spell ██████ there?

15    THE WITNESS:  █████████.

16  Q    What does she call ██████?  "My daughter," right?

17  A    Yes.

18  Q    By the way, do you know if there are variations,

19  common variations, of the spelling of ██████, whether they

20  be English or Ukrainian?

21  A    Yes.

22  Q    One of the spellings sometimes could be ███████,

23  S█████████?

24  A    Yes.

25    MR. KABRAWALA:  Nothing further, Judge.

Troyd - Recross/Lato

606

```
 1              THE COURT:  Any recross?

 2              MR. LATO:  Yes, your Honor, about five minutes.

 3              THE COURT:  Go ahead.

 4              We'll take a break after that.

 5  RECROSS-EXAMINATION

 6  BY MR. LATO:

 7  Q     Special Agent Troyd.

 8  A     Yes, sir.

 9  Q     Do you see Government's Exhibit 339 on the screen?

10  A     Yes, I do.

11  Q     Do you see in the upper right-hand corner the order

12  date?

13  A     Yes.

14  Q     Is it fair to say the order date is March 23rd of

15  2011?

16  A     That's correct.

17  Q     Did you check the date stamp on the camcorder you

18  received from the ceiling in this case?

19  A     I did not, but other investigators have.

20  Q     Are you familiar with the dates of the recordings of

21  ███████?

22  A     Yes.

23  Q     Is it fair to say that one of the recordings was

24  September 10th of 2010?

25  A     I'm certain that it was 2010.
```

**Troyd - Recross/Lato**

607

1   Q    Is it fair to say that the other one was January 19th

2   of 2011?

3   A    I'm not sure on the second one.

4   Q    Is it fair to say that even if you are not sure, the

5   videos of ███████ precede the order date on this receipt?

6   A    I would say that is possible, yes.

7   Q    Do you recall being asked on redirect about the FBI

8   policy changing this year with respect to recording?

9   A    Yes.

10  Q    Prior to January of this year, did the FBI ever

11  attach cameras or audio devices to informants and

12  undercover officers?

13  A    Yes.

14  Q    As far as you knew in January when you interviewed

15  Mr. Valerio, it was lawful for you to record the

16  conversation?

17  A    It would be lawful.

18  Q    Now, do you recall being asked on redirect whether,

19  during your interview of Mr. Valerio on January 28th,

20  whether anyone pointed a gun at him?

21  A    Yes, I was asked that.

22  Q    Now, is it fair to say that Mr. Valerio's height and

23  weight are about the same today as they were on

24  January 28th of this year?

25  A    Yeah, approximately the same.

608

1   Q    Is it fair to say that your height and weight are

2   about the same today as you were on January 28th?

3   A    I've been up and down about 20 pounds, depending upon

4   the time.

5   Q    Is it fair to say in the interview room every person,

6   male person, was taller than Mr. Valerio?

7   A    Yeah, I would say that is true.

8   Q    About how tall is Detective Forrestal?

9   A    Probably the same height at me, 5-10, maybe.

10  Q    One of the other agents was Special Agent Messineo,

11  who is in the first row, correct?

12  A    Yes.

13  Q    And there was one other Suffolk County officer

14  standing in the room, correct?

15  A    Detective Badalucco from Nassau County.

16  Q    Was he about your height or taller back in about

17  January?

18  A    About the same size.

19  Q    Were you all armed?

20  A    I believe everyone was, but I didn't check.

21  Q    Did you really need that many officers to interview

22  Mr. Valerio?

23          MR. KABRAWALA:  Objection, Judge.

24          THE COURT:  Overruled.

25          You may answer.

609

1   A     No, actually --

2   Q     That's it.

3   A     Okay.

4   Q     Do you recall being asked on redirect whether

5   Mr. Valerio's son Andre was in college?

6   A     Yes.

7   Q     Does the FBI have the ability to interview persons in

8   college?

9   A     Yes.

10  Q     Did you have that ability throughout this

11  investigation?

12  A     Certainly.

13  Q     Is it fair to say that in this investigation the FBI

14  had the ability to interview persons in Ukraine?

15  A     Not unfettered access.

16  Q     So there was a fettered access?

17  A     Yeah, there was some --

18  Q     Okay.  Now, did law enforcement interview ███████, the

19  daughter, the young girl in this case?

20  A     She was interviewed.

21  Q     Would it be fair to say when she was interviewed, she

22  was not in college?

23  A     No, sir.

24  Q     But she was, however, in a public school?

25  A     I was not present for that interview.

610

```
 1   Q     Is it fair to say that ████ was interviewed at

 2   school?

 3   A     Contact with her may have been when she was at

 4   school, but I'm not sure where it proceeded from there.

 5   Q     Did the FBI have the ability to interview Andre at

 6   college?  Yes or no?

 7   A     Yes, they could have.

 8              MR. LATO:  Nothing further.

 9              THE COURT:  Mr. Kabrawala?

10              MR. KABRAWALA:  Very brief.

11   FURTHER REDIRECT EXAMINATION

12   BY MR. KABRAWALA:

13   Q     Sevastopol, Ukraine.  It's been in the news a lot?

14   A     Yes, it has.

15   Q     Didn't it go recently, within the last year, from

16   Ukrainian hands to Russian hands?

17              MR. LATO:  Objection.

18              THE COURT:  Sustained.

19   Q     There's a civil war going on there, right?

20              MR. LATO:  Objection.

21              THE COURT:  Sustained to form.

22              MR. KABRAWALA:  Nothing further.

23              THE COURT:  You may step down, sir.  Thank you.

24              All right.  We'll take the morning break.

25              Do not discuss the case.
```

611

1              (Whereupon, at this time the jury exits the

2     courtroom.)

3              (Whereupon, a recess was taken.)

4              THE COURT:  Please be seated.

5              Ready for the jury?

6              MR. BODE:  The next witness has glaucoma, so her

7     sight is limited --

8              THE COURT:  Wait until the jury comes in.

9              MR. BODE:  I don't want her to fall, Judge.

10             (Whereupon, the jury at this time enters the

11    courtroom.)

12             THE COURT:  Everyone be seated.

13             Call your next witness.

14             MR. KABRAWALA:  The United States calls

15    Bernadette Imperiale, Judge.

16             THE COURT:  Please remain standing for the oath,

17    Ms. Imperiale.

18    **B E R N A D E T T E   I M P E R I A L E,**

19          called as a witness, having been first

20          duly sworn, was examined and testified

21          as follows:

22             THE WITNESS:  My name is Bernadette,

23    B-E-R-N-A-D-E-T-T-E.  Last name is Imperiale,

24    I-M-P-E-R-I-A-L-E.

25             THE COURT:  Be seated, Ms. Imperiale.

Imperiale - Direct/Kabrawala

612

1        I'll ask my deputy to move the mike close to

2  you.  And please keep your voice up.

3        MR. KABRAWALA:  Your Honor, would the Court mind

4  moving the computer screen away from counsel?

5  DIRECT EXAMINATION

6  BY MR. KABRAWALA:

7  Q    Good morning, Mrs. Imperiale.  My name is Ameet

8  Kabrawala, and I'm an Assistant U.S. Attorney here, and

9  I'll be asking you some questions here today.

10 A    Okay.

11 Q    If you can't hear me or I haven't asked a clear

12 question, let me know, and I'll try to rephrase it and do

13 a better question.

14 A    Okay.

15 Q    It's a really big courtroom, so if you can keep your

16 voice up, I think everyone would appreciate that.

17 A    Okay.

18 Q    You are Joseph Valerio's sister, right?

19 A    Yes.

20 Q    Is that the gentleman I'm pointing out in the brown

21 suit over here to my right?

22        Is that your brother?

23 A    Yes.

24 Q    Do you have a daughter?

25 A    Yes.

613

```
1    Q    What is her name?

2    A    ████████████████      .

3    Q    By the way, you and I have never met, right?

4    A    No.

5    Q    What is your daughter's birthday?

6    A    ████████████████  .

7    Q    That's ██████████████████?

8    A    Yes.

9    Q    So she's nine?

10   A    Nine and a half.

11   Q    Nine and a half.

12            You and I have never met before until just now?

13   A    Yes.

14   Q    Are you aware that I asked to speak with you before

15   today's testimony?

16   A    Uhm, yes.

17   Q    And you didn't want to speak to me, right?

18   A    I'm sorry?

19   Q    You declined the invitation.  You didn't want to

20   speak to me, right, before today?

21   A    Before today, yes.

22   Q    When this case arose and your brother was arrested,

23   did you sign a bond, a bail bond, in this case?

24   A    Yes, I did.

25   Q    You support your brother, right?
```

614

```
1   A    Yes, I do.

2   Q    You love your brother?

3   A    Yes.

4   Q    He's your own flesh and blood?

5   A    Yes.

6   Q    I want to show you a picture.  I'll pull it up --

7   I'll bring you this picture, and I'll also put it up on

8   the screen for everybody else.

9           I'm just going to put it on the screen for

10  everybody else, and I'll bring you a printed copy of it.

11  I'll do it in reverse order.

12          Showing you what has been entered into evidence

13  as Government's Exhibit 300-B.

14          Can you see that?

15  A    Let me just put on my other glasses.

16          Yes.

17  Q    Do you recognize that picture, what's in it?

18  A    It looks to be my brother's home.

19  Q    Your brother's house?

20  A    Yes.

21  Q    By the way, do you know your brother's address off

22  the top of your head?

23  A    Yes.  3 High Gate.

24  Q    Is that H-I-G-H, G-A-T-E?

25  A    Yes.
```

Imperiale - Direct/Kabrawala

615

1   Q    What town is it in?

2   A    Smithtown.

3   Q    Is that Smithtown?

4   A    I don't know.

5   Q    Have you been to that house?

6   A    Yes.

7   Q    It's fair to say you've been there on a number of

8   occasions?

9   A    I would say yes.

10  Q    Did there come a time when your brother Joseph asked

11  you to have your daughter ████ model?

12  A    Yes.

13  Q    When was that, about?

14  A    It could have been -- I would probably say a few

15  years ago, something like that.

16  Q    How old was your daughter around that time when your

17  brother Joseph asked that ████ model?

18  A    I would say about six years old.

19  Q    About six?

20  A    About six, yes.

21  Q    So is it fair to say if she was born in 2005 -- so

22  somewhere around 2010 or 2011?

23  A    I would say yes.

24  Q    Did he say that models could make money?

25  A    Yes.

616

| 1 | Q | And did you say yes, that ███████ could model with |
| 2 | your brother? |
| 3 | A | Yes. |
| 4 | Q | Do you know where that modeling happened? |
| 5 | A | It was downstairs. |
| 6 | Q | Downstairs at 3 High Gate? |
| 7 | A | Yes. |

8       MR. LATO:  Your Honor, I will object without a

9  foundation how she knows this.

10       MR. KABRAWALA:  Okay.

11  Q   Did you ever go with ███████ -- did you bring her to

12  your brother's house to do the modeling?

13  A   I would go with my mom.

14  Q   With your mom?

15  A   Yes, because I don't drive.

16  Q   And would you accompany your daughter?  That is,

17  would you go with your daughter to your brother's house at

18  3 High Gate for the modeling?

19  A   Yes.

20  Q   And you said it was downstairs.

21       Was it the downstairs basement?

22  A   Yes.

23  Q   The basement?

24  A   Yes.

25  Q   Had you ever been in the basement while the modeling

617

1    was going on?

2    A    Couple of times.

3    Q    Couple of times?

4    A    Uh-huh.

5    Q    And would your daughter be dressed up in outfits?

6    A    Yes, costumes.

7    Q    What kind of costumes?

8    A    Like a fairy type of a costume.

9    Q    A fairy type of a costume?

10   A    Like a cheerleading type of costume.

11   Q    A cheerleading costume?

12   A    Yes.

13   Q    You had mentioned that you went down into the

14   basement a couple of times for some of the modeling

15   shoots.

16          Were there times that you were not in the

17   basement while the modeling was going on, to your

18   knowledge?

19              MR. LATO:  Objection.

20              THE COURT:  Yes, sustained.

21              You have to lay a foundation for that.

22              Why don't you approach.

23              (Whereupon, at this time the following took

24   place at the sidebar.)

25              (Continued.)

618

1          THE COURT:  What she can testify to is when she

2      was there or what Mr. Valerio told her.  So just don't ask

3      open-ended questions, things that your daughter may have

4      told you.

5          MR. KABRAWALA:  Thank you.

6          MR. BODE:  May we have some lead?

7          THE COURT:  You don't have to ask "from

8      conversations with your brother."

9          MR. BODE:  We've never talked to her, so we

10     don't know all the details.

11         THE COURT:  If you want, I'll tell her based on

12     what she saw or only what her brother told her, okay?

13         MR. KABRAWALA:  Yes, Judge.

14         (End of sidebar conference.)

15         (Continued.)

16         THE COURT:  Ms. Imperiale, they are asking about

17     things with respect to the questions regarding modeling.

18     You can only answer the questions based upon things that

19     you observed or that Mr. Valerio, your brother, told you.

20     They can't be based on anything else, that someone else

21     told you.

22         It has to be something you know because you were

23     there or something that your brother told you.  Okay?

24         THE WITNESS:  Right.

25         THE COURT:  Go ahead.

619

```
 1    BY MR. KABRAWALA:

 2    Q    Were there times -- did you ever dress ████ in any

 3    costumes?

 4    A    Yes, I did.  Yes, I did.

 5    Q    Where would you dress her?

 6    A    Upstairs.

 7    Q    Did you ever see her go into the basement without you

 8    dressed in a costume for the modeling shoots?

 9    A    No.

10    Q    Were there ever times that your brother said that he

11    was going to have her model in the basement?

12    A    Yes, he said it would be in the basement.

13    Q    Did your brother ever tell you that she would be

14    modeling without you there in the basement?

15    A    There were a couple of times.

16    Q    A couple of times.

17         When would you say that was, approximately?

18    A    I'm not really sure.  I'm not sure.

19    Q    I'm sorry, can you repeat that, please?

20    A    I'm not really sure.

21    Q    Thank you.

22         Were you ever shown any of the pictures from the

23    modeling session?

24    A    Just from -- just the agents.

25    Q    What do you mean by that?
```

620

| | | |
|---|---|---|
| 1 | A | They would -- came to my home and just shown me a |
| 2 | | couple of pictures, dressed in her costume. |
| 3 | Q | Approximately how many times did your daughter model |
| 4 | | in the basement?  And that is based on either what you saw |
| 5 | | or what the defendant told you? |
| 6 | A | I know it was either once or twice a year. |
| 7 | Q | Once or twice a year? |
| 8 | A | A year.  It could have been -- let's say a couple of |
| 9 | | years, I would say. |
| 10 | Q | It's fair to say in total about four times? |
| 11 | A | I would say, yeah, about three or four times. |
| 12 | Q | And you mentioned that ███ was dressed in fairy |
| 13 | | costumes, cheerleader costumes.  Is that fair to say? |
| 14 | A | Yes. |
| 15 | Q | I will show you some pictures, and I want you to |
| 16 | | identify whether you recognize the person depicted in |
| 17 | | them.  And these are all pictures where the child is |
| 18 | | clothed. |
| 19 | | I'm showing you just for identification |
| 20 | | Government's Exhibit 510. |
| 21 | | Do you recognize that child? |
| 22 | A | Yes. |
| 23 | Q | Who is that? |
| 24 | A | That's my daughter. |
| 25 | Q | Your daughter ███? |

621

1   A    Yes.

2   Q    Can you describe how she is dressed, like the color,

3   what kind of outfit?

4   A    I think it's some type of dress, I think.

5   Q    Like a blue dress?  Shiny?

6   A    Something like that.

7   Q    Are there wings, butterfly wings?

8   A    It's not too clear.

9   Q    It looks like you are having a hard time seeing.

10  A    I think the wings are here.  These are the wings over

11  here.

12  Q    Those are the wings?

13  A    Yes.

14  Q    I see you wear glasses.

15       Do you have a hard time seeing?

16  A    A little bit, yes.

17  Q    I will show you what has been marked for

18  identification as Government's Exhibit 511.

19       Do you recognize the child in that picture?

20  A    Yes.

21  Q    Who is that child?

22  A    That is my daughter ███████.

23  Q    Can you describe what you see?

24  A    I see like a picture here.

25  Q    What is that thing on the right there?  What does

Imperiale - Direct/Kabrawala

622

1    that appear to be, the blue thing?

2              Could it be this (indicating), showing

3    Government's Exhibit 332?

4    A    Yes.

5    Q    Now I'm going to show you Government's Exhibit 520

6    for identification.

7              Is this the same picture, just a smaller version

8    of it?

9    A    I would say yes.

10   Q    Who is depicted in the picture?

11   A    That's my daughter.

12   Q    Government's Exhibit 520, that's your daughter

13   ███████?

14   A    ███████.

15   Q    Government's Exhibit 538 for identification.

16             Who is depicted in that picture?

17   A    That I would probably say my daughter, my daughter

18   ███████.

19   Q    And I'll show you one more for now, Government's

20   Exhibit 539 for ID.

21             Who is depicted in that?

22   A    My daughter ███████.

23   Q    Do you see this thing in the picture?  It's like a

24   toy gun thing off to the side, to the left side.

25   A    Yes.

Imperiale - Direct/Kabrawala

623

| | |
|---|---|
| 1 | THE COURT:  What is that you are holding up? |
| 2 | MR. KABRAWALA:  Government's Exhibit 333. |
| 3 | THE WITNESS:  Yes. |
| 4 | Q    Does this gun appear to be in Government's |
| 5 | Exhibit 539? |
| 6 | A    Yes. |
| 7 | MR. KABRAWALA:  I'm going to take these back. |
| 8 | Q    At some point do you know -- withdrawn. |
| 9 | Did your brother ever tell you any of the |
| 10 | photographs of your daughter ████ were published in any |
| 11 | magazine or advertisement? |
| 12 | A    Could have been one magazine. |
| 13 | Q    Did your brother tell you what kind of magazine it |
| 14 | was? |
| 15 | A    That I don't know. |
| 16 | Q    Was it Halloween magazine? |
| 17 | A    Yes. |
| 18 | Q    It was a Halloween magazine? |
| 19 | A    Yes. |
| 20 | Q    And it was a costume in a Halloween magazine? |
| 21 | A    Yes. |
| 22 | Q    In fact, did you receive payment from your brother |
| 23 | for that modeling picture? |
| 24 | A    I did receive payments for my daughter, but I |
| 25 | never -- I didn't deposit it. |

Imperiale - Direct/Kabrawala

624

1  Q    It's a very big courtroom.  I'm standing far away.
2  Could you say that again?
3  A    I did receive payments for my daughter, but I never
4  deposited the money or anything like that.
5  Q    How much did you receive from your brother for
6  payment?
7  A    It could have been like $150, something like that.
8  Q    But you never deposited the $150?
9  A    No.
10  Q    How was it paid to you?  Cash?  Check?  Money order?
11  A    It was a money order.
12  Q    Do you have any pictures of the modeling shoots that
13  your brother did involving ████?
14  A    No, no, I don't.
15  Q    Never held on to them?
16  A    No, I didn't get any pictures.
17  Q    You didn't get any pictures?
18  A    No.
19  Q    You know, I want to show you one other picture.
20       I'm showing you what has been admitted into
21  evidence as 329.
22       Who is that?
23  A    That's my daughter ████.
24  Q    It's a school picture --
25  A    Yes.

Imperiale - Direct/Kabrawala

625

1   Q    -- of some kind, right?

2   A    Yes.

3   Q    A portrait?

4   A    Yes.

5   Q    Do you know how old she was in that picture?

6        What grade?

7   A    I would probably say -- probably say about six years

8   old.  She was in kindergarten at six years old.

9   Q    Thank you.

10       MR. KABRAWALA:  I will just publish it for the

11  record.

12  Q    When you brought ██████ to your brother's house, did

13  she ever sleep over?

14  A    By herself, do you mean?

15  Q    Either way.  By herself?

16  A    No.

17  Q    Did she ever sleep over with you?

18  A    Yes.

19  Q    Did you ever see any hidden cameras in the basement

20  of Mr. Valerio's home?

21  A    No.  No.

22  Q    I want to just show you a couple of things to see if

23  that might jog your memory.

24       Is that okay?

25  A    Sure.

626

1    Q    Showing 323.

2         Have you ever seen this before?

3    A    No.  Never saw that.

4    Q    Showing 324 and 324-A.

5         Have you ever seen this box before?

6    A    No.

7    Q    What about this clock?

8    A    That clock, no.

9    Q    No, never seen this?

10   A    No.

11   Q    Didn't see this in the basement in the big

12   contraption that I just showed you?

13   A    No.

14   Q    I will show you a few more items.

15        Showing you Government's Exhibit 338.

16        Do you know what this is?

17   A    Not exactly, no.

18   Q    What if I told you it was a wig?

19   A    A wig.

20   Q    Does it look like a wig?

21   A    Yes.

22   Q    Have you ever seen this wig before?

23   A    No.  No.

24   Q    You mentioned a cheerleader outfit?

25   A    Yes.

627

1    Q    I'm showing you Government's Exhibit 343 and 342.

2    A    Yes.

3    Q    Does that look familiar to you?

4    A    That is a cheerleader outfit.

5    Q    Where did you see this?

6    A    It was -- my daughter had it, and it was downstairs.

7    Q    In Mr. Valerio's house?

8    A    Yes.

9    Q    Showing Government's Exhibit 335 and 336.

10        Do you recognize what these are?

11   A    Yes, those are -- part of the cheerleading outfits,

12   the pompoms.

13   Q    Do you recognize these pompoms?

14   A    Yes.

15   Q    Where do you recognize them from?

16   A    From my brother's home.

17   Q    You saw these in your brother's house?

18   A    Yes.

19   Q    Did ██████ dress up with these pompoms?

20   A    Yes.

21   Q    You mentioned that ██████ had modeled for about two

22   years; is it fair to say?

23   A    About two years.

24   Q    At some point did she stop modeling for your brother?

25   A    Yes, uh-huh.

628

| | | |
|---|---|---|
| 1 | Q | Was it because she no longer wanted to do it? |
| 2 | A | It is because I had figured that her to do a modeling |
| 3 | | career, I really didn't want that for my daughter anymore, |
| 4 | | and I would prefer her to graduate high school and either |
| 5 | | become a nurse or a teacher, a professional job like that. |
| 6 | Q | Do you know if your brother Joseph has a son? |
| 7 | A | Yes. |
| 8 | Q | What is the son's name? |
| 9 | A | Andre. |
| 10 | Q | Andre? |
| 11 | A | Yes. |
| 12 | Q | A-N-D-R-E? |
| 13 | A | A-N-D-R-E. |
| 14 | Q | Who is A____? |
| 15 | A | A____ is my brother's daughter. |
| 16 | Q | She doesn't live in America, right? |
| 17 | A | No, she doesn't. |
| 18 | Q | She lives in South Africa? |
| 19 | A | Yes. |
| 20 | Q | With her mother? |
| 21 | A | With her mother. |
| 22 | Q | Have you ever met your brother Joseph's girlfriend |
| 23 | | named Jarmila Berezovska? |
| 24 | A | Yes. |
| 25 | Q | Who met Ms. Berezovska first, you or your brother? |

629

1    A    Jarmila, my brother.

2    Q    So it wouldn't be accurate to say that Jarmila came

3    to take care of your children and that's how she met

4    Joseph?

5              MR. LATO:  Objection to form.

6              THE COURT:  Sustained.

7    Q    Let me rephrase the question.

8              Did Jarmila come and take care of your kid, come

9    to this country to take care of your kids before she met

10   Joseph?

11   A    No.

12             MR. KABRAWALA:  One moment.

13             Nothing further at this time.

14             THE COURT:  Cross-examination?

15   CROSS-EXAMINATION

16   BY MR. LATO:

17   Q    Good afternoon, Ms. Imperiale.

18   A    Good afternoon.

19   Q    You have difficulty seeing?

20   A    Yes, I do.

21   Q    Do you have glaucoma?

22   A    Yes, I do.

23   Q    Are you receiving Social Security disability

24   benefits?

25   A    Yes, I am.

Imperiale - Cross/Lato

630

```
1   Q    Showing you Government's Exhibit 323.
2           Can you see what this is from where you are
3   sitting?
4   A    It looks like either a type of box or something like
5   that.
6   Q    Do you recall being asked a question by Mr. Kabrawala
7   whether you declined to speak with him prior to today?  Do
8   you recall being asked that?
9   A    Yes.
10  Q    Did you decline to speak with him prior to today?
11  A    Yes.
12  Q    Did you speak with some members from law enforcement
13  prior to today?
14  A    Yes.
15  Q    Did you speak with Special Agent Troyd and Special
16  Agent Messineo prior to today?
17  A    Yes.
18  Q    Was ████████ spoken to by law enforcement prior to
19  today?
20  A    Yes, uh-huh.
21  Q    Are you here because you have been subpoenaed to
22  testify?
23  A    Yes.
24  Q    Was ████████ subpoenaed to testify?
25  A    Yes.
```

631

```
1   Q    Had you ever seen Olena Kalichenko in your life?

2   A    Just once.

3   Q    Did you see her in Mr. Valerio's house?

4   A    One time.

5        MR. LATO:  No further questions.

6        THE COURT:  Any redirect?

7        MR. KABRAWALA:  Briefly, Judge.

8   REDIRECT EXAMINATION

9   BY MR. KABRAWALA:

10  Q    Olena Kalichenko.  Do you remember when you saw her

11  at Joseph's house, what year that was or how old ▮▮▮▮▮

12  was?

13  A    It could have been over the summer.  I would probably

14  say a few years ago.

15  Q    A few years ago?

16  A    Yes.

17  Q    2012?  2013?

18  A    I'm not really sure.  I'm not sure.

19  Q    And what were the circumstances of meeting her?

20  A    You know, he had met her and, you know, we got

21  together, you know, over my brother's house.  And then we

22  like spent time together, you know, with her.  And that

23  was it.

24       MR. KABRAWALA:  Just one moment.

25  Q    Did you ever see Olena Kalichenko take modeling
```

1   pictures with ███?

2   A    We did go downstairs, you know, all of us, and they

3   were taking pictures.  And we had went upstairs, and she

4   wanted to take more pictures.  And we went upstairs to get

5   something to eat.  And that's it.

6   Q    When was that -- you were asked about speaking with

7   Special Agent Troyd of the FBI.

8            Do you remember that?

9   A    Yeah.

10  Q    You met with Agent Troyd on February 28th of this

11  year; is that fair to say?

12  A    February 28th, I guess so, yes.

13  Q    It must have been cold out, February.

14  A    Yes.

15  Q    Do you remember ever telling him -- withdrawn.

16            Isn't it true that when you met with Special

17  Agent Troyd and Special Agent Danielle Messineo, you never

18  mentioned anything about Kalichenko taking pictures with

19  ███?

20  A    Yes.

21  Q    It's true, right?

22  A    Yes.

23  Q    The first time you are saying it is today?

24  A    Yes.

25  Q    You were asked about pictures involving ███,

633

1  right?

2  A    Yes.

3  Q    And you described everything you testified to today,

4  the modeling sessions, the Halloween magazine, the

5  payments of money, the costumes, the fairy outfit?

6  A    Yes.

7  Q    But not once did you ever mention the word

8  "Kalichenko," anything about Kalichenko taking pictures

9  with █████?

10  A    Well, I wasn't, you know, asked, you know, about that

11  at all.  I was just really asked about, you know, his wife

12  and Angelique.

13  Q    You were in court when your brother Joseph was first

14  arrested, right, when you came to sign the bail bond?

15  A    Yes.

16  Q    You heard the charges against him being read in

17  court?

18  A    Yes.

19  Q    At that time it never occurred to you, even though

20  you had spoken with agents, to tell anyone that Kalichenko

21  had taken pictures of █████?

22           MR. LATO:  Objection.

23           THE COURT:  Sustained as to form.

24  A    Well --

25           THE COURT:  You don't have to answer it,

634

1   Ms. Imperiale, when I sustain an objection.

2   BY MR. KABRAWALA:

3   Q    So what you are telling us today for the first time,

4   your story today is that Kalichenko, sometime in the

5   summer, took pictures of ██████?

6   A    Yes.

7           MR. LATO:  Objection to the characterization of

8   "story."  It's summation arguments.

9           THE COURT:  Overruled.

10  Q    I'm sorry, what was the answer to that?

11  A    Yes, it was one time, yes.

12  Q    In the summer?

13  A    Yes.

14  Q    Once?

15  A    Yes.

16  Q    And that was sometime -- withdrawn.

17          And that was the summer when Kalichenko was here

18  and you saw her here?

19  A    Yes.

20          MR. KABRAWALA:  Nothing further.

21  RECROSS-EXAMINATION

22  BY MR. LATO:

23  Q    Prior to today, did any law enforcement officer ever

24  ask you about Olena Kalichenko?

25  A    No.

Proceedings

635

1           MR. LATO:  No further questions.

2           THE COURT:  You can step down.

3           Anything further from the Government?

4           MR. KABRAWALA:  Nothing further.

5           THE COURT:  You may step down, Ms. Imperiale.

6           MR. BODE:  Your Honor, we need to set up for the

7    next witness.

8           THE COURT:  We'll take a lunch break now.

9           (Whereupon, at this time the jury exits the

10   courtroom.)

11          THE COURT:  With respect to your next witness,

12   it's the expert?

13          MR. KABRAWALA:  He's actually a quasi-fact

14   expert and --

15          MR. BODE:  Pardon me, your Honor.

16          MR. KABRAWALA:  Mr. Bode will address that.

17          MR. BODE:  Detective Forrestal is present --

18   actually, I'll wait for a moment, your Honor.

19          Your Honor, Detective Forrestal is -- your

20   Honor, was present at the scene of the search and present

21   for the interview.  He's into computer forensics here, so

22   he's testifying as to both a fact and expert witness.

23          We'll ask that your Honor give an instruction

24   when we do the changeover.  He will testify first about

25   factual matters, and he'll change over to the expert

**Proceedings**

636

1    testimony.

2          So the record is very clear and there is no

3    issue on appeal, we have a suggested instruction what the

4    Court may do at that transition time, and we'd ask the

5    Court at the time when he's deemed an expert to make very

6    clear to the jury that he'll now be testifying in an

7    expert capacity, as set forth in our suggested

8    instruction.

9          THE COURT:  What does the defense think of the

10   instruction?

11         MR. LATO:  One minor modification of the

12   request.

13         Since it is up to the jury to determine whether

14   Detective Forrestal is in fact an expert, we ask only that

15   you say he's now being offered as an expert as opposed to

16   the Court saying he is in fact an expert.

17         MR. BODE:  That's fine, your Honor.

18         THE COURT:  So I'll say he's now being offered

19   as an expert witness?

20         MR. LATO:  Yes.  Thank you.

21         THE COURT:  Okay.  So I'll give that

22   instruction.

23         Are there any other issues with respect to this

24   witness then?

25         MR. KABRAWALA:  No, Judge.

Proceedings

637

1          THE COURT:  Any exhibits coming in?

2          MR. KABRAWALA:  There will be a number of

3    exhibits that come through Detective Forrestal.  I believe

4    what they are are portions of a report that he prepared

5    after reviewing the cell phone that was seized from the

6    defendant.

7          Also, portions of a presentation, a PowerPoint

8    presentation exhibit, that he created in his capacity as

9    an expert to show where the images were located on the

10   computer that was seized from the defendant, and also

11   images that were recovered from the memory card that was

12   seized from the defendant's house.

13         So we've given those over to the defense.  We

14   have given that -- redacted copies to the Court, and we've

15   provided the defense and updated the Court's binder with

16   additional exhibits that we found last night.

17         THE COURT:  Does the defense expect any

18   objections to these exhibits?

19         MR. LAPINTA:  Let me address the issues

20   regarding the offer of the report.

21         Obviously, we have the report -- I'm sorry.  No

22   objection about anything.

23         THE COURT:  All right.  I'll see you at 1:30.

24         Have a good lunch.

25         (Whereupon, a recess was taken.)

Proceedings

638

1            A F T E R N O O N    S E S S I O N

2

3            (Whereupon, the following takes place in the

4    absence of the jury.)

5            THE COURT:  Please be seated.

6            Are we ready?

7            MR. KABRAWALA:  Yes, Judge.

8            THE COURT:  Bring the jury.

9            MR. KABRAWALA:  Your Honor, I have given defense

10   a copy of Government's Exhibit 270.  The copy your Honor

11   has is different from this exhibit.  And I want to give

12   the Court the updated copy that will be introduced.

13            (Handed to the Court.)

14            MR. KABRAWALA:  If you would like to discard or

15   recycle.

16            THE CLERK:  Jury is entering.

17            (Whereupon, the jury at this time entered the

18   courtroom.)

19            THE COURT:  Will everybody be seated.

20            I will ask the government to call its next

21   witness.

22            MR. KABRAWALA:  The United States calls Rory

23   Forrestal.

24            THE COURT:  Come up to the witness stand, sir,

25   and remain standing once you get there.

Forrestal-Direct/Kabrawala

639

1    THE CLERK:  Please raise your right hand.

2

3    R O R Y    F O R R E S T A L,

4            called as a witness, having been first

5            duly sworn, was examined and testified

6            as follows:

7    THE CLERK:  Please state and spell your name for

8    the record.

9    THE WITNESS:  My name is Detective Rory,

10   R-O-R-Y, F-O-R-R-E-S-T-A-L, and the shield is 884,

11   employed by the Suffolk County Police Department.

12   THE COURT:  Detective, as you are doing, lean

13   forward to keep your voice up.

14   Go ahead, Mr. Kabrawala.

15

16   DIRECT EXAMINATION

17   BY MR. KABRAWALA:

18   Q    Good afternoon.

19   A    Good afternoon.

20   Q    You mentioned where you work, but where do you work?

21   A    Yes.  I work for the Suffolk County Police

22   Department.

23   Q    How long have you worked at the Suffolk County Police

24   Department?

25   A    I have been employed by them for 30 years.

640

1    Q    30 years?

2    A    Yes.

3    Q    What is your current rank?

4    A    A detective.

5    Q    And can you please briefly describe the history of

6    your duties and responsibilities over the 30-year career

7    you have had with the Suffolk County Police Department?

8    A    Everybody in the police department kind of starts out

9    the same way.  I was hired as a patrolman.  You go through

10   the academy, and then I was assigned to the Fifth Precinct

11   as a patrol officer for five years.  I was recruited to

12   the narcotic section after those five years, and I served

13   there for an additional five years as an undercover

14   officer.  And I was partially recruited and I had some

15   computer experience in the military, and I helped them

16   install an intelligence database in the office.

17          Now, I served there for five years.  I made

18   detective while I was in narcotics.  And then I asked for

19   and was granted leave to join the Sixth Precinct detective

20   squad.  In a precinct the detectives is kind of basically

21   where you learn your craft.  You handle all kinds of

22   cases, evidence handling, taking statements from the

23   witnesses, you handle a complete spectrum of crimes,

24   robberies, rapes, murders, etcetera.

25          In 1991 I was serving in the seventh squad as a

641

1   detective, and I was recruited by the then chief of

2   detectives, Thomas Murphy, to come to the chief of

3   detective's office to explore the establishment of a

4   computer crimes unit.  There wasn't one yet established

5   inside the police department.  And he wanted me to do some

6   demonstration cases and some research to determine whether

7   we should establish one and what format it should take and

8   what-not.

9           I was transferred to his office and I worked

10  under the shield of the chief of detectives office for two

11  years, and the unit was formally established in 2001 as

12  the computer crimes unit.  I have served there coming on

13  15 years ever since.

14  Q    And the computer crime unit -- you mentioned it was

15  first founded.  But did it exist before you participated

16  in it?

17  A    There was a shell unit that they called the crime

18  analysis, and they did minor forensic jobs, forensic jobs,

19  and they didn't formally establish a computer crime unit,

20  one that encompassed all the areas it encompasses now.

21  Q    What role, if any, did you play in the establishment

22  of the computer crimes unit in the Suffolk County Police

23  Department?

24  A    Along with demonstration cases, I wrote a series of

25  proposals, visited other units, looked pretty much across

642

1    the country to determine what everybody else was doing,

2    and then made recommendations to the chief of detectives

3    about what format the unit should take.

4    Q    Are you currently assigned to the computer crimes

5    unit?

6    A    I am.

7    Q    How long have you been in that unit?

8    A    2001, at least 15 years.

9    Q    Are you cross-designated as an officer in any other

10   law enforcement agency?

11   A    Yes, a task force officer with the Long Island

12   Exploited Children's Task Force, run by the FBI.

13   Q    How long have you been employed by the Long Island

14   Exploited Children's Task Force with the FBI?

15   A    It has been in various forms over the last five years

16   formally.  Actually, informally I was doing the same

17   mission since 2005.

18   Q    What is the mission of the Long Island Child

19   Exploitation Task Force?

20   A    What the Long Island Exploited Children's Task Force

21   does is it brings officers from other agencies, together

22   with FBI agencies, it is a force multiply.  We have

23   different skills and assets that we bring to the table.

24   And the idea is basically to establish proactive

25   investigative cases involving child pornography, child sex

Forrestal-Direct/Kabrawala

643

1    trafficking, on-line offenders that might be approaching

2    children.  That sort of crime.

3    Q    As a detective in the computer crime unit, can you

4    generally describe your duties and responsibilities?

5    A    My department is a dual function part, world training

6    forensically, so we conduct forensic examinations on

7    seized computers, digital computer of any kind, hard

8    drive, camera, disk.

9           We also conduct general computer crime

10   investigations.  You might know it as hacking and that

11   sort of crime that are sometimes facilitated by the use of

12   a computer.

13          We also have as part of our mission statement

14   our task with proactively developing exploited children's

15   cases.  Again, we do on-line chats or on-line offenders.

16          We investigate crimes with actual victims rather

17   than the undercover mission, where adults may be

18   approaching children to engage in sexual acts and take

19   inappropriate pictures.

20   Q    You mentioned the term computer forensics.  What does

21   that mean?

22   A    Computer forensics is the discipline, or sometimes it

23   is said it is the science of extracting information or

24   data or evidence from various kinds of digital media,

25   computers, hard drives, even the little SD disk you might

Forrestal-Direct/Kabrawala

644

1   see in cameras and cell phones.  Any kind of digital media

2   at all.  And it is an established way of getting

3   information out of all these items in a way that is

4   acceptable to the Court.

5   Q    Have you over your many years and experience received

6   any training in the area of computers and, if so, please

7   generally describe the categories of training you received

8   in computers?

9   A    Everybody that comes of the computer forensics

10  business starting out, we all kind of start the same way.

11  We take a basic data and recovery analysis course which is

12  the very basic level of computer course and forensics that

13  is given by a group sponsored by the Department of Justice

14  called NW3C.

15  Q    That is a training course?

16  A    A training course, yes.  That is usually followed up

17  with advanced data in recovery analysis, which is another

18  week of training regarding seizure, proper seizure and

19  analysis of digital media.

20          I also took an FBI course called NNSI training.

21  Q    What is that?

22  A    National infrastructure of training in which they ran

23  a computer hacking training, I guess you call it, on how

24  to investigate network protrusions, hacking cases and that

25  kind of a spiraling case.

**645**

```
 1              Over the course of the years I have taken
 2   numerous courses in the various software we use in our
 3   office, and in particular EnCase training, which is a kind
 4   of forensic software we use in our office, and I have
 5   attended their trainings.
 6              We have attended FTK training, which is a
 7   Forensic Tool Kit, and that is another commercial vendor
 8   of software that also provides training in various areas
 9   of forensics.
10   Q    We will return to FTK and EnCase.
11              Have you ever taught any computer courses or the
12   like?
13   A    I don't do specifically forensic courses.  I give
14   continuing education training to the District Attorney's
15   Office, actually a number of bar association presentations
16   over the years over digital media and how it interfaces
17   with evidence.
18              I teach basic recruiting level, basic advanced
19   computer investigations training at the Police Academy.
20   And I have watched it pretty much all over the northeast
21   in the same subjects.
22   Q    Is it fair to say -- withdrawn.
23              Is it fair to say that you keep up-to-date with
24   the subject matter of computer forensics, and you
25   regularly attend courses?
```

Forrestal-Direct/Kabrawala

646

1    A    Usually once or twice a year we try to attend one of

2    the trainings.

3         Throughout the country there is a number of

4    organizations and task forces and what-not that host

5    five-day training seminars, and then you go for five days

6    and then you have various subjects you can select from.

7    And you attend them and attend or select a half a day or a

8    day training in a specific area that is either new or you

9    want to refresh in or new software being deployed.

10        We also belong to various Listserves, is what

11   they are called.

12        What they are is being involved in the forensic

13   areas, they are email groups, a large body of groups of

14   forensic people, computer crime investigators and

15   what-not.  And as new things are seen and questions arise,

16   you would post different items to the Listserve and it

17   keeps you up to speed in the industry.

18   Q    How long do you -- how often do you employ computer

19   forensics in your day-to-day practice in the computer

20   crime unit?

21   A    Computer and cell phone forensics, pretty much every

22   day.

23   Q    And is it fair to say that part of your job as a

24   detective in the computer crimes unit is to extract

25   information from computers, cell phones and the like, in

647

1    connection with criminal investigations?

2    A    Yes, it is.

3    Q    Approximately -- can you estimate approximately how

4    many computer devices -- when I say that, I also mean cell

5    phones, that forensically you examined during your law

6    enforcement career?

7    A    Just thinking about it, probably about 500 large

8    forensic jobs involving computers.

9         Cell phone is much more and smaller jobs but

10   just as important.  And I have probably done, since 2007,

11   eight to nine hundred cell phones at least.

12   Q    Now, before we talk about any involvement in this

13   case, I want to generally go over in context, generally

14   speaking, when you examine a computer, and we are

15   referring to a computer and not cell phones, what do you

16   do?  Can you generally walk us through what you do when

17   you receive a computer?

18   A    If we have already received a computer, we have a

19   general procedure for processing it into evidence in our

20   office.  We complete certain forms and then we log it or

21   lodge it into our computer crimes evidence room.

22   Whichever analyst has shelf area where they keep the

23   evidence.

24        When we do the analysis, we remove it to the --

25   from the room and take it to a workbench area and complete

Forrestal-Direct/Kabrawala

648

1    a hardware acquisition work sheet.

2            After that we take it to the workbench.  We

3    complete that form and note the model, the serial number,

4    the condition of the actual unit.

5            Then we actually dismantle it, take the sides

6    off of it and decide what storage is inside, storage media

7    inside, and analyze it.

8    Q    When you say storage media, what kind of example is

9    that?

10   A    Hard drive.  Generally speaking, when you are working

11   with a computer -- although anything is storage media,

12   little SD cards, whatever, and we generally speak of a

13   computer hard drive, which is storage media where the

14   information is kept.

15           We actually open up the case of the computer and

16   remove the hard drive.  We take the hard drive out and

17   note the condition.  We note where we took it from.  And

18   you actually take it to a copy machine and make a copy of

19   the face of it.  So we know the model, the hard drive, the

20   serial number and what-not.

21           That hard drive is then taken to our forensic

22   work station where we have a forensic computer that we

23   work with containing software and tools, and it has

24   different hardware that we use in conjunction with that.

25   And we attach it -- attach that hard drive to basically

Forrestal-Direct/Kabrawala

649

1   what is called a write block.

2           What a write block does is it prevents any

3   information whatsoever, even if you made a mistake from

4   data, from being written over that hard drive.  So that

5   way that original piece of evidence came out of the

6   computer always remains pristine.  Nothing is ever altered

7   or changed.  Even if you make a mistake, it couldn't --

8   because it is on a write block.

9           Then you do what is called making a forensic

10  image.  We use our forensic image attached to the write

11  block and we start the process called imaging.  And that

12  is software that we use.  There are a couple of different

13  things you can use.  It is software that is now going to

14  go to that hard drive and going to make a bit by bit,

15  every piece of information on that original hard drive,

16  and it is going to make an exact copy of it.  It is going

17  to put everything exactly where it was.  Whether it means

18  anything or not.  It is going to make an exact copy that

19  is called a forensic image.

20          The forensic image is what you are conducting an

21  examination of.  You don't conduct the examination of the

22  original.  You look at the copy, and that is where we

23  apply the forensic tools.

24  Q    How do you know that it is an exact copy of whatever

25  hard drive you were copying?

650

1    A    There is a concept in computer forensics called

2    hashing, and what a hash is, a numerical number, a

3    complicated mathematical formula.

4         The hard drive is made up of a bunch of storage

5    products that basically are made up of zeros and ones, and

6    you put those zeros and ones together in certain sequences

7    and it would make a color or a file or a word or a piece

8    of information.

9         What this hashing formula does is goes in and

10   adds up all the zeros and ones in a very complex formula

11   and divides all those numbers and multiplies in formulas

12   and comes up with what essentially is a digital

13   fingerprint, or digital DNA number for that hard drive,

14   all that information.

15        It now goes and does the same thing with the

16   image you made.  And if you get a match, it is a billion

17   to one -- actually, multibillions to one that there could

18   be some kind of image or match.

19        Basically it is saying this is a digital

20   fingerprint of that and if that number matches, it is

21   exact.

22   Q    Do you use different programs on different computers?

23   A    I do.

24   Q    Have you received any certification -- withdrawn.

25        Are you familiar with the -- well, you testified

651

1    about EnCase?

2    A    Yes.

3    Q    What is EnCase?

4    A    EnCase is a commercial suite of forensic tools

5    designed to let you conduct forensic examinations.  It is

6    a commercial company, guidance software.  And it has been

7    around for quite a while and used very widely in our

8    district.  It gives you tools to look at that information,

9    to organize the information.  You can search it for terms.

10   You can search it for files.  You can search it for

11   pictures.  It gives you all those tools to make the job

12   easier that we used to do manually.

13   Q    So EnCase is a commercially available product?

14   A    Yes.

15   Q    Is it only available to law enforcement?

16   A    No.  Also available commercially.  Throughout the

17   world it is used.

18   Q    Now, are you certified in EnCase?

19   A    No, I'm not.

20   Q    How do you become certified in EnCase or one become

21   certified in EnCase?

22   A    After you take the course and training, you are

23   offered the opportunity to actually pay a fee and take a

24   test and do additional training.  And I chose not to do

25   that.

Forrestal-Direct/Kabrawala

652

1   Q    And part of that certification process, would you

2   need to recertify and repay a fee?

3   A    Yes.

4        Of course, that is over the entire spectrum of

5   all the software you use.

6   Q    Fair to say you use a lot of software?

7   A    Yes.

8   Q    Who pays the initial fees in your case?

9   A    The Suffolk County Police Department.

10  Q    They would pay?

11  A    Yes.

12  Q    And who would pay the renewal fees in your case?

13  A    Sorry?

14  Q    Who would pay any renewal fees in your case?

15  A    We would hope the police department would do that,

16  but they don't.

17  Q    How long have you been using EnCase?

18  A    I have been using EnCase since it was initially

19  before the industry in roughly 2000 is the first variation

20  of the product.

21  Q    Can you describe how you first came to use EnCase?

22  A    Our office at the time, the industry was just kind of

23  being established.  Everybody was using different tools,

24  and forensics was just starting to be a big thing in the

25  computer world.  All of us were using all these little

Forrestal-Direct/Kabrawala

653

1    individualized tools that different investigators actually

2    made to be able to get to do these things.

3            Guidance Software came up and actually put a

4    suite of tools together in one place.  And we heard about

5    it through the Listserve and what-not.

6            We contacted the company and asked them for an

7    evaluation copy and they gave it to us.

8    Q    When you first started using EnCase, was it

9    commercially available?

10   A    It was just starting to be commercially deployed.

11   But it was basically out in a beta version it is called or

12   a test version.

13   Q    And you were one of the testers of the EnCase?

14   A    Yes.  We were one of the beta testers, members in our

15   office.

16   Q    And I note you are also a detective in addition to

17   having experience in the computer forensics.

18           Have you ever conducted any search warrants?

19   A    Yes.

20   Q    Approximately how many in your career?

21   A    It is well in excess -- my personal actual swearing

22   as to a search warrant, it has to be 200 plus.  And then

23   actually attending other individuals in our office who had

24   executed search warrants given to me by others, probably

25   about 150, 200.

654

1  Q    Have you conducted any search warrant in your career

2  in connection with child exploitation or child pornography

3  case?

4  A    The majority of warrants I have been involved with

5  are child pornography warrants.

6  Q    Have you ever taken statements from criminal

7  defendants in connection with your duties as a detective?

8  A    I have.

9  Q    Throughout your career?

10 A    Yes.

11 Q    You have?

12 A    Yes.

13 Q    How many would you say over your entire career?

14 A    It has to be in the hundreds for child pornography

15 alone, it has to be in the hundreds.

16 Q    I want to draw your attention to January 2012 --

17 2014, earlier this year.

18        Were you contacted by any law enforcement agency

19 or officers with whom you work generally?

20 A    Yes, I was.  I was contacted by Special Agent

21 Danielle Messineo and Special Agent Steven Troyd regarding

22 an investigation.

23 Q    Were you asked to help them conduct a search warrant?

24 A    Yes, I was.

25 Q    Did you in fact help them conduct the search warrant?

Forrestal-Direct/Kabrawala

655

1    A    I did.

2    Q    Was it your investigation that you helped them

3    conduct a search warrant on?

4    A    No.  I was not the lead in the investigation.

5    Q    Was it a Suffolk County Police Department case?

6    A    No.  It was an FBI case.

7    Q    Now, prior to the FBI agent contacting you, did you

8    know anything at all about that particular investigation?

9    A    I knew cursory amount of information, you know, just

10   the basic thumbnail sketch of what the investigation was

11   about.

12   Q    Before they contacted you?

13   A    No, not before.

14   Q    Before they contacted you, you had no idea?

15   A    No.

16   Q    So it wasn't your investigation?

17   A    Correct.

18   Q    I want to draw your attention now to later in the

19   month, to January 28th, 2014.

20        Did you in fact assist the FBI in conducting a

21   search warrant at 3 High Gate Drive in Smithtown, New

22   York?

23   A    I did.

24   Q    What was your goal that day?

25   A    I was to assist in the seizure -- evaluation, seizure

656

1    and then eventually the forensic analysis of the seized

2    and digital media taken from the location.

3    Q    Now, did there come a time you actually arrived at

4    the house?

5    A    Yes.

6    Q    Now, in connection with your role in evaluating and

7    seizing and then evaluating the computer equipment, what

8    did you do when you got to the house?  Did you go right to

9    the computer?

10   A    Yes.  I took a tour of the entire scene upstairs and

11   downstairs, just to see what computer equipment was

12   readily apparent.

13   Q    Did you enter immediately when other officers entered

14   initially into the house?

15   A    No.

16   Q    When did you come approximately?

17   A    We -- when we got the all secure sign that someone

18   came to the front door and we entered then.

19   Q    What do you mean by all secure?

20   A    Just they secured the residence, to search the

21   initial people through the door, and they advised that the

22   house was secure before we came in.

23   Q    Did you find any computers in the house?

24   A    There were numerous computers.

25   Q    Were they on or off?

657

1   A    All the ones I observed were off.

2   Q    Would it matter if they were on or off?

3   A    It would.

4   Q    Why is that?

5   A    If the computer is on it has to be handled in a

6   particular way.  If it is off you basically package it up

7   and bring it back to the office to do your evaluation.

8           If it is on, you have to evaluate other

9   important programs that are running.  Something displayed

10   on screen may need to be photographed.

11          Sometimes computers are very complex to be set

12   up, when you pull the power all the information on it

13   encrypts, so literally while it is powered up if you don't

14   make certain moves you will never come into the computer.

15   Q    Encrypts is like blocking?

16   A    It is basically a program called bit locking, which

17   is a Windows product which says basically you will never

18   get into it again.

19   Q    You said it sometimes happens in a complex scene.

20   Was this a complex scene?

21   A    From the perspective of the computers that were out

22   and visible, it was not complex, no.

23   Q    Now, at some point after you surveyed the computers

24   and seized them, did you participate in an interview of a

25   man by the name of Joseph Valerio?

**Forrestal-Direct/Kabrawala**

658

1   A    I did.

2   Q    By the way, do you see Joseph Valerio sitting here

3   today?

4   A    I do.

5   Q    Point him out, please.

6   A    The gentleman right here wearing a brown jacket and a

7   black pattern tie.

8           MR. KABRAWALA:  Let the record reflect that the

9   witness identified the defendant.

10          THE COURT:  Yes.

11  Q    Now, I'm showing you what is admitted as

12  Government's Exhibit 302.

13          MR. KABRAWALA:  Publishing.

14          (At this time a document was exhibited on the

15  courtroom screen.)

16  Q    Is this where you and other law enforcement officers

17  met with the defendant?

18  A    Yes.

19  Q    Was the defendant handcuffed?

20  A    No.

21  Q    Was he restrained in any way?

22  A    No.

23  Q    Did you see anyone at any point draw any weapons

24  while they were in the house?

25  A    No.

Forrestal-Direct/Kabrawala

659

1  Q    Did you see anyone draw weapons at the defendant?

2  A    No.

3  Q    Did anyone restrain the defendant, hold him down?

4  A    No.

5  Q    Did anyone raise their voices at the defendant?

6  A    No.

7  Q    Did you raise your voice at the defendant?

8  A    No.

9  Q    So did the defendant admit that he directed Olena

10 Kalichenko to produce child pornography with her daughter?

11 A    Yes.

12             MR. LaPINTA:  Objection.

13             THE COURT:  Sustained.  Sustained as to form.

14 Q    What, if anything, did the defendant admit?

15             MR. LaPINTA:  Objection.

16             THE COURT:  Sustained as to form.

17 Q    What, if anything, did the defendant say during the

18 interview in general to you?

19 A    In general he stated that Olena Kalichenko -- that he

20 directed her to reach out and make child pornography

21 images of her daughter.

22 Q    Did he say he received those images?

23 A    He did.

24 Q    What did he say?

25 A    Specifically, I don't remember specifically what he

660

1  said.  But I do remember him admitting that he received

2  the child pornographic videos from her.

3      And then the other thing I specifically recall

4  him saying is that he did receive a DHL, DVU, quote,

5  unquote.

6  Q    He claimed that the DHL package was empty?

7      MR. LaPINTA:  Objection to the form of the

8  question.

9      MR. KABRAWALA:  Withdrawn.

10      THE COURT:  Sustained.

11  Q    Do you recall the defendant being Mirandized, that

12  is, being advised of his rights?

13  A    I do.

14  Q    Showing you what is admitted as 304,

15  Government's Exhibit 304, do you recognize this document?

16      (At this time a document was exhibited on

17  courtroom screen.)

18  A    Yes.

19  Q    This is an advice of rights form?

20  A    It is.

21  Q    Is your signature on it?

22  A    It is.

23  Q    Did you witness this being signed by the defendant?

24  A    I did.

25  Q    Did he waive his rights and agree to speak to law

661

```
1   enforcement?

2               MR. LATO:  Objection.

3               THE COURT:  Sustained as to form.

4               MR. KABRAWALA:  I will move on.  The document is

5   in evidence.

6   Q    Now, you testified earlier about your experience in

7   computer forensics.

8               Have you previously been qualified as an expert

9   in computer forensics?

10  A    I have.

11  Q    What court?

12  A    In this court here, actually, the Eastern District,

13  in 2005 in U.S. v. Wernick.

14  Q    Which judge was that?

15  A    Judge Hurley.

16  Q    Down the hall?

17  A    Yes.

18               I was qualified in Brooklyn Federal Court, Judge

19  Weinstein.  And that was in, I think, 2009 or '10.

20               Across the bridge was qualified as an expert in

21  computer crimes investigations.

22  Q    Manhattan Federal Court?

23  A    Manhattan Federal Court.

24               Recently in April, State Court, the People of

25  the State of New York versus Sparagano.  And that was in
```

662

1  State Court in April.

2  Q    Recently?

3  A    Yes.  It was a child pornography trial.  Recently,

4  yes.

5        MR. KABRAWALA:  The government moves to qualify

6  detective Rory Forrestal as an expert in computer

7  forensics.

8        MR. LATO:  No objection to him giving an opinion

9  about his expertise and leaving it to the jury as to

10  whether in fact he is.

11        THE COURT:  Obviously the jury is tasked with

12  finding whether a witness is qualified with respect to

13  what is called expert testimony.  The Court allows him to

14  offer an opinion, but it is up to the jury to evaluate

15  that testimony.

16        I wish to give you an instruction, but I will

17  speak to the lawyers for a moment.

18

19        (Whereupon, at this time the following took

20  place at the sidebar.)

21        THE COURT:  The government had offered this

22  instruction.

23        I pulled up what I normally use and give at the

24  end of the case and propose to use this instead.  And I

25  will give you guys a chance to look at it.

Forrestal-Direct/Kabrawala

663

1          MR. KABRAWALA:  I will read over your shoulder.

2     That is good, that is fine.

3          MR. LaPINTA:  Good.

4          MR. KABRAWALA:  Thank you, Judge.

5          THE COURT:  Here is the second page.

6          MR. KABRAWALA:  Yes.

7          MR. LATO:  Agreed.

8          MR. KABRAWALA:  Thank you, Judge.

9

10          (Whereupon, at this time the following takes

11     place in open court.)

12          THE COURT:  Members of the jury, let me give you

13     an instruction regarding testimony that one goes with one

14     side offering expert testimony.  I will give you the

15     instruction at the end of the case, but I will give it to

16     you now so you can have it now as well.

17          Detective Rory Forrestal at this point has

18     testified as a fact witness.  He is now being offered as

19     an expert witness by the government.

20          Each of these types of testimony, fact witness

21     testimony and expert witness testimony, may be considered

22     by you.

23          I would like to give you an additional

24     instruction with regard to witnesses offered as expert

25     witnesses.

664

1              If scientific, technical or other specialized

2      knowledge will assist the jury in understanding evidence

3      which decides a disputed fact, a witness with a particular

4      knowledge, skill, experience, training or education may be

5      called to testify about such evidence or facts in issue in

6      the form of an opinion.

7              The rules of evidence ordinarily do not permit

8      witnesses to testify to opinions or conclusions.  And

9      exceptions of this rule exist to those being called as

10     quote, unquote, expert witnesses, who may state their

11     opinions and who may also state the reasons for their

12     opinions.

13             You should consider the witness' opinion

14     received in this case and give it such weight as you may

15     think it deserves.  You are not obligated to accept the

16     expert's testimony as truth.  If you should decide that

17     the opinion of the witness is not based on sufficient

18     education and experience, or that the reasons given in

19     support of the opinion is not sound or if the opinion is

20     outweighed by other evidence, you may disregard the

21     opinion entirely.

22             In sum, the expert witness is in all other

23     respects the same as any other witness.  You should

24     consider his or her qualifications, his or her experience,

25     his or her interest in the outcome of the case, if any,

Forrestal-Direct/Kabrawala

665

1  his or her demeanor, and all the other factors that at the

2  end of the case I will instruct you to consider in

3  assessing the credibility of other witnesses.

4  　　　　With that instruction we will now continue.

5  　　　　MR. KABRAWALA:  Thank you, your Honor.

6  Q　　While you were at the search on January 28th, 2014 of

7  the defendant's house, did you seize any computers or cell

8  phones?

9  A　　The agents found the computers in various rooms and

10  they were photographed and brought to me.  And I did a

11  complete tour of the scene to make sure that everything

12  was -- that had some sort of storage capacity and would

13  have been involved in a forensic case was actually taken.

14  Q　　Did you take custody of them?

15  A　　I did.

16  Q　　Did you bring them back to your laboratory?

17  A　　I did not.

18  Q　　Showing you what is in evidence as

19  Government's Exhibit 402, an LG My Touch T-Mobile cell

20  phone.

21  　　　　(Handed to the witness.)

22  Q　　Is that one of the items that you took custody of?

23  A　　Yes.

24  Q　　And did you conduct your forensic analysis on this

25  device?

666

1    A    We don't call it a cell phone analysis, forensic

2    analysis, we call it a cell phone extraction, which is a

3    different analysis.  We did extract the data.

4    Q    My apology.

5         How did you go about conducting that cell phone

6    extraction?

7    A    Cell phones work a little bit differently.  Although

8    we process them in our office the same, we complete a cell

9    phone worksheet, a cell phone worksheet that notes the

10   condition, the type, the make, the model, who is doing the

11   extraction on the unit.

12        We actually take the unit apart.

13        We remove the battery and note the details

14   inside.  I placed my initials on the inside.  That way I

15   can later identify the unit.

16        We take the unit and use what is called a

17   Cellebrite, C-E-L-L-E-B-R-I-T-E.

18   Q    So you take the battery cover off, if I can figure

19   out how to do it?

20   A    You go to the back like this and flip the battery

21   out.

22   Q    I want to take this back and put it on the projector.

23   A    Yes.

24   Q    It appears that there are in fact initials on it.

25        (At this time a document was exhibited on

Forrestal-Direct/Kabrawala

667

1    courtroom screen.)

2    Q    Are those your initials?

3    A    Yes.  They are.

4    Q    And that is how you know that this is the cell phone

5    in question?

6    A    Yes.

7    Q    By the way, where does it say that this was made?

8    A    It should say on the tag, and it does.  It says it

9    was made in Korea.

10   Q    Korea.

11        Where is this little battery made?

12   A    Made in China.

13   Q    China.

14        You mentioned Cellebrite.

15        What goes through the process of the Cellebrite

16   analysis?

17   A    The cell phone extraction tool is a box, which is

18   used in this particular case.  It is literally a miniature

19   computer that has software and hardware installed in it,

20   and it enables it to attach and extract all the data

21   stored inside this cell phone.

22        Also from the SIM card installed, there is a

23   little card inside that has data on it that the telephone

24   company uses.

25        Then if there was any small storage cards, they

Forrestal-Direct/Kabrawala

668

1   sometimes come with it and we also extract the data from

2   that.

3           Every one of these has a different connection.

4   It enables to connect to it in a different way.  They give

5   you a couple of hundred different cables you can attach to

6   it.  And it gives different selections on options on the

7   couple of different ways to extract data from these

8   things.  It gives you a couple of options to get the best

9   result.

10  Q    What kind of information is extracted from this cell

11  phone using Cellebrite?

12  A    From this specific unit I did a physical extraction

13  that gets all it can at that particular time that the

14  software allows.  It gets text messages, also known as SMS

15  messages; MMS messages, which are multisystem messages,

16  which contain pictures and what-not attached to it in a

17  text message format.  It has location data, stored

18  pictures, if there are any videos available.

19          Whatever you can see on the cell phone,

20  generally speaking, except a few categories, it will

21  catch.

22  Q    Did you find any child pornography images on that

23  cell phone?

24  A    No, I did not.

25  Q    Now, what is Cellebrite, this forensic tool, what

669

1  does it produce at the end of doing whatever it does?

2  A    Following the extraction process, you would bring it

3  back to your forensic computer.  And Cellebrite has

4  software you would then use which lets you open that

5  extraction, and it categorizes these different data pieces

6  that you have extracted from there, organizes them, and

7  then gives you the option to produce reports in different

8  formats.

9  Q    So can you see, for example, just all the photos that

10 were on the cell phone?

11 A    Correct.

12 Q    Can you see all the videos that were on the cell

13 phone?

14 A    Correct.

15 Q    Can you see an email on the cell phone?

16 A    In this particular case there weren't any emails

17 extracted.

18 Q    Did you see any cell phone text messages?

19 A    Yes.

20 Q    And was there a report generated?

21 A    Yes.

22 Q    And as part of that report, can you lay out

23 everything that happened in a timeline?

24 A    It automatically does it if you do a full report.

25 And you can basically select it specifically.  You can

670

1    just go out and select a timeline report if you want.

2    Q    Can you describe what a timeline is, since we have

3    not seen the report yet?

4    A    The timeline report basically gets all those

5    different categories.  When it organizes the information

6    to be analyzed, it actually separates it by text messages,

7    by call log, by location, by whatever.

8              What timeline does is, it takes all the

9    different categories and combines it in one spot and

10   organizes it chronologically.

11   Q    Showing you what is marked as

12   Government's Exhibit 270 -- withdrawn.

13             The report that it produces, or the report

14   produced for this phone, is it fair to say that it was a

15   couple of thousand pages?

16   A    About 2,200.

17   Q    2,200 pages?

18   A    Yes.

19   Q    I'm showing you ten pages which are collectively

20   Government's Exhibit 270.

21             (Handed to the witness.)

22   Q    Do you recognize that?

23   A    At the top of it is the bottom part of the

24   extraction.  It looks like the very beginning of the

25   timeline report and follows through.

**Forrestal-Direct/Kabrawala**

671

1  Q    And is it fair to say that those are selected pages

2  of this 2,200 page report?

3  A    Correct.

4  Q    Pages starting at -- withdrawn.

5         Did you produce the report using the forensic

6  tool Cellebrite?

7  A    I completed a complete report, the whole report.  I

8  used that, yes.

9  Q    You produced a complete report and this is a portion

10  of that complete report?

11  A    Right.

12         MR. KABRAWALA:  The government moves to admit

13  Exhibit 270.

14         MR. LATO:  No objection.

15         THE COURT:  270 is admitted.

16         (Whereupon, Government's Exhibit 270 was

17  received in evidence.)

18         MR. KABRAWALA:  And I'm going to publish the

19  first page of Government's Exhibit 270.

20         (At this time a document was exhibited on

21  courtroom screen.)

22  Q    Look at the first row where it says number one.  What

23  does that tell you, number one?  What does that row of

24  information tell you?

25  A    I have to talk loud, I'm moving away from there.

672

1          The first column is type.  And it shows what

2    type of entry it was, whether it was a text message, a

3    call log entry, and also a little arrow showing the

4    direction of incoming or outgoing.

5          The next column is time stamp.

6          The party indicating where it came from.

7          The description would be, if it was a text

8    message, we would have the text there.  If it was a call,

9    it would just say call.

10          Down here if it was a lat long, it would

11    indicate it there.  And then the next column if it was

12    deleted, it would indicate it was deleted.

13    Q    You can see deleted test messages?

14    A    Sometimes it gives deleted text messages.

15    Q    I want you to look at the time stamp associated with

16    number one.

17          January 28th, 2014.  That is the day of the

18    search warrant, right?

19    A    Right.

20    Q    That appears to be the final date of any texting

21    activity in the report; is that right?

22    A    Yes.

23    Q    Does it appear that this phone was in use on

24    January 28th, 2014?

25          MR. LaPINTA:  Objection.

Forrestal-Direct/Kabrawala

673

1    THE COURT:  Objection?

2    MR. LaPINTA:  Yes, as to the word "use."

3  Q    What, if anything, does the fact that there is a text

4  message on January 28th, 2014 tell you about the use of

5  this phone on that date?

6  A    It shows the cell phone was alive and actively being

7  used for communication.

8  Q    And does it appear to be an incoming text message

9  from someone named Andre, A-N-D-R-E?

10 A    It does.

11 Q    It says, if we don't go to the game tomorrow, which

12 is perfectly fine, let's watch it together in the movie

13 room and order food.

14         Did I read it correctly?

15 A    You did.

16 Q    Now I will kind of walk through the rest of the ten

17 pages.

18         Page 2, the entry that starts with number 54.

19         Is it fair to say that this is a sent message to

20 a person identified in the contact as Vinny?

21 A    Yes.

22 Q    And the text of the sent message from the cell phone

23 says, here's my email address if you need it:

24 Joeval5@optonline.net?

25 A    Correct, yes.

**Forrestal-Direct/Kabrawala**

674

```
1    Q    Page 3, if you go there, please.
2              Are you there?
3    A    Yes.
4    Q    There is an entry 550.
5    A    I see it.
6    Q    It looks to be an international number with a country
7    calling code of plus 38.
8    A    Yes.
9    Q    It is a sent message from that cell phone you have in
10   front of you, right?
11   A    Yes.
12   Q    That was seized from the defendant's house on
13   January 28th, 2014?
14   A    Yes.
15   Q    The sent message says:  Write me;
16   joeval5@optonline.net?
17   A    Correct.
18   Q    Just jump down to the next message, please.
19   A    Yes.
20   Q    Entry 551, which is on the same page, the very next
21   one?
22   A    It is.
23   Q    It appears to be a message a few minutes before the
24   message that you just read out loud; is that right?
25   A    Yes.
```

Forrestal-Direct/Kabrawala

675

```
1   Q    So it is a timeline in a reverse chronological order?

2   A    Yes.

3   Q    And the message that was sent, can you just read --

4   I'll read it.  I will read the message aloud and you tell

5   me if I get it wrong.

6            You are, my sweet.  I'm going out now, but I saw

7   your Skype message when I first -- when I finished Skype.

8   I don't have Skype messaging sweetie.  I will give you my

9   email address, Yara.  Helena is with some man.  She showed

10  me pics of her daughter ████ in Turkey or UKR.  I don't

11  know?  We just write each other so far.  We will find the

12  right time for you, the letter U, to come to NY.  Listen,

13  you have to go to an au pair meeting -- agency, then I

14  will bring you here to my home.  I have a personal

15  assistant, slash, au pair, coming to my home in July.  She

16  is from Spain.

17           Write me on my email is:  Joeval5@optonline.net.

18  A    That is all correct.

19  Q    Page 3, we are down the page, 556.

20  A    I see it.

21  Q    Sent message.  Hello Helena.  I'm out at Gurney's in

22  Montauk this weekend.  And it goes on to say, provide --

23  here is my email address in case you forgot.

24  A    Correct.

25  Q    Now, on page 4, on 278, and at the bottom it says
```

676

1    264, so this is 264 of that multi-page report.

2    A    I am on the page.

3    Q    Entry number 608, this is a sent message from that

4    cell phone to a person identified as a contact, Mike.

5          I will read it, and you let me know if I get it

6    wrong.

7          Hey Mike.  Okay.  Let's put in the starter and

8    battery.  I'm sure with a fresh battery secondhand starter

9    it will fire up.  Sounded like it wasn't an alternator

10   issue.  Let's do it this way we agreed.  My email is

11   joeval5@optonline.net.

12   A    All correct.

13   Q    Now we are on page 5.

14         This is the entry 284.

15   A    I have it.

16   Q    Again, the contact here is Vinny; is that correct?

17   A    Correct.

18   Q    Outgoing message.

19         It says.

20         Here's my email address if you need it.

21   Joeval5@optonline.net.

22   A    Correct.

23   Q    Page 6 now, the entry which starts 18,954.

24   A    I have it here.

25   Q    This appears to be an outgoing message from

677

1    October 7, 2013, to a person identified as Kevin

2    Hendrickson?

3    A    It is.

4    Q    Reading it aloud.

5         Hey man.  What old man dude?  That's the idea,

6    never to keep us down while we are still.  My email

7    address is joeval5@optonline.net.

8    A    Yes.

9    Q    I will not go through the rest.

10        Is it fair to say that after a review of the

11   report, there are a number of similar sent messages where

12   in sum and substance and in part it says my email address

13   is joeval5@optonline.net?

14            MR. LaPINTA:  Objection.

15            THE COURT:  Sustained as to form.

16   Q    All right.

17        Let's go through them.

18        Page 8, number 484.  Sent message to somebody

19   identified as Mike in the 631 area code.

20        Where is 631 located?  What is that area code

21   for?

22   A    It is generally Suffolk County.

23   Q    Suffolk, right?

24   A    Yes.

25   Q    Not Ukraine, is it?

678

```
 1    A     No.

 2    Q     July 18th, 2013, sent from the cell phone.  Contact

 3    Mike.

 4          The message says Mikey, dot dot dot, I gave the

 5    G-I-L-R Sue my email address letter by letter yesterday.

 6    I still don't have the invoice Bro.  My email address is

 7    joeval5@optonline.net.

 8    A     That is correct.

 9    Q     I'm on page 9 now.

10          Entry 497, and it appears to be a foreign

11    number.

12    A     I have it.

13          MR. LaPINTA:  Objection to what it appears to

14    be.

15    Q     Contact is Sana, S-A-N-A?

16    A     Yes.

17    Q     Sent July 12, 2013.

18          This is my email address sweetheart, okay.

19    Joeval5@optonline.net.

20    A     Yes, that is what it says.

21    Q     Entry 512 on page 9 of Exhibit 270.

22          Again to Mike, 631 area code, sent July 3, 2013.

23          Hey Mike, how are you, letter U, man.  Boat

24    looks dynamite.  I'll take it out next week.  Can you

25    email me the invoice.  My email add is
```

**Forrestal-Direct/Kabrawala**

679

1    joeval5@optonline.net.

2    A    That's correct.

3    Q    Next page, page 10.  And this is the final one.

4    Entry 526 to a person named Beth in the 631 area code,

5    7/1/2013, sent.

6              Message says, okay Beth -- let me start over.

7              Okay, thanks Beth.  You are the best.  My email

8    joeval5@optonline.net.

9    A    That's correct.

10   Q    Showing you what is marked as

11   Government's Exhibit 555, which is a redacted portion of

12   the report.  It is two pages.

13             (Handed to the witness.)

14   Q    Is that fair to say?

15   A    Yes.

16             (Whereupon, at this time there was a pause in

17   the proceedings.)

18             (Counsel confer.)

19             MR. KABRAWALA:  Move to admit.

20             (Counsel confer.)

21             THE COURT:  Any objection?

22             MR. LaPINTA:  No.

23             THE COURT:  555 is admitted.

24             (Whereupon, Government's Exhibit 555 was

25   received in evidence.)

Forrestal-Direct/Kabrawala

680

1   Q    Detective, what are we looking at here?

2   A    Excuse me.

3        This is a portion of the extraction report, and

4   specifically in regards to the phone number 380992256638.

5   Q    All right.

6        I want to go through some of these entries, line

7   by line.

8        The first message is from that number you

9   described; is that correct?

10  A    Yes.

11  Q    What is the date of it?

12  A    It is December 3rd, 2013, at 3:08 p.m.

13  Q    What is -- does the body say?

14  A    The body is:  Joseph, so what do you think about

15  property in Dubai as an investment opportunity, question

16  mark.

17  Q    What is the next message?  Go ahead and describe the

18  next message.  Same number?

19  A    Same number.

20       Again, December 3, 2013, at 8:55 p.m., UTC time.

21  And it is, you know, you are really damn.  You could have

22  negotiated with me before the criminal case against -- I

23  can't make up the letter, it is a little fussy on the

24  copy.

25       MR. BODE:   it is you up on the screen there.

681

1          THE WITNESS:  Let me read the entire thing, a

2    little blurry on the sheet.

3          You know, you are really damn.  You could have

4    negotiated with me before the criminal case against you

5    was being opened.

6    Q    All right.

7          Let's zoom out, and what is the next message?

8    What does it indicate to you that it is blank in the from

9    section?

10   A    The blank would mean it is being sent to the phone

11   number.

12   Q    Being sent from that phone?

13   A    Being sent from this phone to the phone number

14   38092995638.

15   Q    Okay.

16          So this is sent some two days approximately

17   after the first few messages we viewed; is that right?

18   A    Yes, on December 5th.

19   Q    Can you read the portion in all caps.

20   A    It is all caps.  It says:  Listen you crazy woman.  I

21   don't know who you are.  If you continue to harass me and

22   my family again I will go straight to the police.  They

23   have your cell phone number and photo.  Do not message me

24   here on Viber or anywhere else again.  Don't ever again.

25   Q    What is Viber?

Forrestal-Direct/Kabrawala

682

1  A    Viber is a cell phone app service that is very good

2  in facilitating international phone calls and text

3  messages.

4  Q    All right.

5        Let me put it back up now.

6        I will say -- summarize, from the same 38

7  number, line 4, it is a day after, approximately, the

8  message that you just previously read.

9        I want you to read the incoming message, what it

10 was.

11 A    You are really damn.  Yes, go to the police.  They

12 are waiting for you.

13 Q    Let me jump to the next incoming message, actually

14 line 6.

15       December 6th, 2013.

16       What is the incoming text?

17 A    It says NYPD already has all my info, data and more

18 and then enough pics and videos.

19 Q    The next message appears to be the same number, three

20 minutes later on the same day, exactly three minutes.

21       What is the text?

22 A    It says:  Have a nice sleep.

23 Q    And the next message after that, 8, 12/6/13, what

24 does it say there?

25 A    Capital letters.  Now I will be going to the police

Forrestal-Direct/Kabrawala

683

```
1   to put your ass in jail for harassment and stalking my

2   life.  You are a sick dangerous woman.  I warned you.

3   Q    That is an outgoing message?

4   A    An outgoing message.

5   Q    What is the next message after that?

6   A    The next message, December 6th, on 156.  Shall I give

7   you the exact names of the officers you must contact?

8   Q    All right.

9           Let's jump down.

10          Read the next one.

11  A    A few minutes later, please don't -- please do Joseph

12  go.

13  Q    All right.

14          Why don't you read line 18?

15  A    Line 18 is December 7, 2013.  At 6:45 p.m., UTC time.

16          It says okay, Joseph, I am fed up with you.  I

17  am sending all the videos I made for you with ████ to

18  the FBI.  That's the only piece needed to get a court to

19  arrest you.

20          THE COURT:  You misread one word.  Please read

21  it again.

22          THE WITNESS:  Okay Joseph, I am fed up with you,

23  I'm sending all the videos I made for you with ████ to

24  the FBI.  That's the only piece needed to get a court

25  order to arrest you.  No more mercy for you.
```

684

```
1   Q    Why don't you read the outgoing message, starting,
2   number 32.  It appears to be the same day as the message
3   you read.
4   A    It is December 7th, and it says:  I always offer
5   peace, especially during this blessed time of the year for
6   family.  But you want war.
7   Q    Go ahead and read the next one.
8   A    The next one is:  I helped you and your family.  Now
9   leave it like that.  Don't ever forget.
10  Q    Read the next one, please.
11  A    We shared a lot in our past.
12       The next line is peace be with you.
13  Q    What is the next entry there.
14  A    The next one says:  That's not what the FBI thinks
15  about you.  They think you are a predator.
16  Q    Let me stop you right there.
17       I want to have you read just one more, page 2 of
18  Government's Exhibit 555, line 44.
19  A    It is on 1/7/2014.  And it says Merry Christmas
20  Helena.
21  Q    What does the next one say?
22  A    The next one says, thank you Joseph -- it says thank
23  you Joseph.
24  Q    So the messages were between approximately -- the
25  messages that you just testified about, is it fair to say
```

685

1    that they started around December 3rd, 2013?

2    A    Yes.

3    Q    Line number two where there was an incoming text that

4    says, you could have negotiated with me for the criminal

5    case against you, etcetera?

6    A    Yes.

7    Q    When was the date of the search warrant?

8    A    It was January 28th, 2014.

9    Q    Is it fair to say that some number -- withdrawn.

10         Is it fair to say that the defendant's phone

11   received information about criminal investigation

12   concerning him some eight weeks prior to the search

13   warrant?

14   A    Approximately, yes.

15   Q    Are you able to say with certainty that all of the

16   devices that were seized at the defendant's house on

17   January 28th, 2014 are all the devices that he owned?

18              MR. LaPINTA:  Objection.

19              THE COURT:  Sustained as to form.

20   Q    Are you able to say with any certainty that the

21   defendant had any other devices, other than the ones that

22   you had seen there?

23              MR. LaPINTA:  Objection.

24              THE COURT:  Sustained as to form.

25   Q    Do you know what devices, if any, the defendant had

686

1    at his house on December 3rd, 2013?

2    A    No.

3    Q    Could you know that?

4    A    No.

5    Q    I will show you Government's Exhibit 303-A.  Just

6    look at your screen.

7              Government's Exhibit 303-A is an email in

8    evidence I'm publishing.

9              (At this time a document was exhibited on

10   courtroom screen.)

11   Q    It is the original message that has come up a number

12   of times.  And I will represent to you it came up a number

13   of times.

14             I want you to read where I'm circling, the

15   paragraph starting with, the videos you sent.

16             And end when you get to cell phone camera.

17   A    Okay.

18             The videos you sent by cell phone camera are

19   perfect.  And there is no need for the expense of another

20   camera.  When you have done a terrific job with the cell

21   phone camera.

22   Q    I meant the next reference to cell phone camera.

23   Continue reading until you get to the next reference of

24   cell phone camera.

25   A    Do you want me to restart the sentence?

687

```
 1    Q    You can go ahead and continue.

 2    A    I have a new cell phone which allows me to transfer

 3    your video to my email and the screen is bigger to view.

 4         Continue?

 5    Q    Yes.

 6    A    All right.

 7         Plus you can have endless video time per session

 8    with the cell phone camera.

 9    Q    You can stop there.

10         You testified you didn't find any child

11    pornography on Government's Exhibit 402, the cell phone?

12    A    No.

13    Q    But you testified that the defendant received

14    information as early as the first week of December that

15    there was a criminal investigation against him?

16    A    Yes.

17    Q    Could there be other devices out there that weren't

18    seized --

19              MR. LaPINTA:  Objection.

20              THE COURT:  Sustained.

21    Q    There was no child pornography on the cell phone.

22         Was there any child pornography that you found

23    on any of the computer devices?

24    A    There were.

25    Q    Showing you what is admitted in evidence as
```

Forrestal-Direct/Kabrawala

688

1    Government's Exhibit 400.

2              (Handed to the witness.)

3    Q    Do you recognize that.

4              (Counsel confer.)

5    Q    Do you recognize that?

6    A    Yes.

7    Q    Did you evaluate that?

8    A    Yes.

9    Q    Forensically?

10   A    Yes.

11   Q    How do you know it is the same device?

12   A    I documented it.  It has my initials on the top of

13   it.  I put the markings on.  I put the unique Suffolk

14   County case number there.

15   Q    I'm showing you what is marked as

16   Government's Exhibit 401.

17             (Handed to the witness.)

18   Q    What is this thing?

19   A    This is a computer hard drive that was installed

20   inside the computer evaluated.

21   Q    All right.

22             You have to walk us through this.

23             What is the difference between this computer

24   tower and that Government's Exhibit 401?

25   A    They work in conjunction with each other.  This is

**689**

```
1   the device, if you will, where the data is stored.  And it
2   works with the computer that was basically the mechanical
3   end of the disk that contains instructions on how to look
4   at this stuff essentially.
5   Q    Was this at some point inside that?
6   A    That was installed inside that, yes.
7   Q    So Government's Exhibit 401 was inside
8   Government's Exhibit 400?
9   A    Yes.
10  Q    You took it out?
11  A    Yes.
12  Q    I brought it over in a box.  Was it in a box?
13  A    No, stored in a bag.
14  Q    You put it in a box to protect it, right?
15  A    Yes.
16       MR. KABRAWALA:  The government moves to admit
17  Exhibit 401.
18       MR. LaPINTA:  No objection.
19       THE COURT:  401 is admitted.
20       (Whereupon, Government's Exhibit 401 was
21  received in evidence.)
22  Q    I will bring you over to the overhead for a minute
23  and I will publish this.
24       (Whereupon, the exhibit/exhibits were published
25  to the jury.)
```

Forrestal-Direct/Kabrawala

690

1   Q    Does it say where it is made?

2   A    Made in Malaysia.

3   Q    I will bring this back to you.

4        When you got Government's Exhibit 400, I think

5   you testified you took 401 out of there, right?

6   A    Yes.

7   Q    What did you do with Government's Exhibit 401, the

8   hard drive, once you obtained it?

9   A    Basically processed it as I previously testified.

10  Q    I can't hear you.  It is a big courtroom.  Sorry.

11  A    I applied the process that we discussed before.  I

12  brought it to my forensic work station.  I attached it to

13  a TABLU write block.

14  Q    When you -- you talked about a write block before,

15  and now you are talking about a TABLU write block.

16       Remind us what a write block does again.

17  A    The write block prevents basically the back wash of

18  data even accidently.  It keeps the original pristine.

19  Q    You made a forensic copy, which is a bit by bit copy

20  of the information on that hard drive; is that right?

21  A    Correct.

22  Q    And the TABLU hard drive -- I will hold up the hard

23  drive, Government's Exhibit 401, what did you do with it

24  physically?

25  A    Physically it gets attached using cables and a power

**Forrestal-Direct/Kabrawala**

691

1    supply to the write block.  And then the write block is

2    actually attached to the forensic computer.

3    Q    It is like a dam, isn't it?

4    A    Yes.

5    Q    And nothing can go from this side of the dam to here;

6    is that right?

7    A    Right.

8    Q    And this is in the exact same condition on the date

9    it was seized, January 24th, 2014?

10   A    The data, yes.

11   Q    No data whatsoever at all had been changed in any

12   way?

13   A    No.

14   Q    What did you do once you hooked up the TABLU write

15   block, what happened then?

16   A    I then used forensic images software, in this

17   particular case FTK, which is a Forensic Tool Kit.  They

18   have an imaging piece of software that I applied and

19   basically directed it to make the forensic image a lab

20   hard drive.

21   Q    What, if anything, happened to that specific forensic

22   image that you extracted from the hard drive?

23   A    That is attached to my forensic computer, and it lets

24   me use all the forensic tools I have installed on the

25   computer to examine the contents.

Forrestal-Direct/Kabrawala

692

1  Q    And did you do anything with that forensic bit by bit

2  image?

3  A    I did.

4        I examined it using EnCase, the forensic tools

5  we spoke about before.  Another tool -- Internet Evidence

6  Finder, IEF.

7  Q    Let me stop you right there.

8        The forensic image that you made, did you make

9  another forensic image at some point?

10 A    I did.

11 Q    Why?

12 A    The original image that I made on the particular web

13 hard drive, the hard drive actually failed, corrupted.

14 I'm not sure why.  It just didn't work anymore.  So I

15 reimaged the hard drive and in March -- next, I reimaged

16 all the media originally imaged in March.

17 Q    Now, you took the hard drive at some point and

18 connected the TABLU write block dam and made a forensic

19 image?

20 A    Yes.

21 Q    And you put that forensic image on your laboratory

22 computer?

23 A    The hard drive, yes.

24 Q    The hard drive on your laboratory computer?

25 A    Right.

**Forrestal-Direct/Kabrawala**

693

1   Q    And at some point the laboratory computer hard drive

2   failed?

3   A    Correct.

4   Q    So then you reinitiated the entire process?  You

5   walked back to the storage area presumably where you keep

6   that hard drive?

7   A    Correct.

8   Q    Let's go through that process again.

9            Then you reimaged it using what software?

10  A    FTK, or Forensic Tool Kit.

11  Q    And then you obtained that forensic image, correct?

12  A    Correct.

13  Q    And then what software did you use on that forensic

14  image ultimately?

15  A    Again, I used EnCase version 6.19, called Internet

16  Evidence Finder.  I also used portions of FTK, the

17  forensic tools, as opposed to the hard drive imaging

18  tools.  I used a whole series of tools to examine the

19  contents of the computer.

20  Q    And did you find an email on that computer?

21  A    I did.

22  Q    I will actually show you Government's Exhibit 506.

23           Do you see that?

24           (At this time a document was exhibited on

25  courtroom screen.)

Forrestal-Direct/Kabrawala

694

1    A    Yes.

2    Q    What is Government's Exhibit 506?

3    A    It is a PowerPoint slide that I put together showing

4    the directory image as I would see it during my forensic

5    examination.

6    Q    You put together Exhibit 506 to assist us today in

7    the court proceeding to see how you did your forensic

8    analysis?

9    A    Correct.

10         MR. KABRAWALA:  The government moves to admit

11   506.

12         MR. LATO:  No objection.

13         THE COURT:  506 is admitted.

14         (Whereupon, Government's Exhibit 506 was

15   received in evidence.)

16         MR. KABRAWALA:  I will publish it.

17   Q    Let's walk through what this exhibit shows.

18         And let me start with the left-hand side, the

19   first row, C1-HD-1.

20         What is that?

21   A    We give every piece of evidence media evidence

22   numbers so we can talk about it and refer to it.

23         So when I imaged the hard drive from this

24   computer, what I named it for processing purposes is

25   computer one, hard drive one.

1        If there was a second hard drive in there, we

2    would have a computer hard drive two.  This was the only

3    hard drive in there.

4    Q    That Government's Exhibit 400 only had one hard

5    drive?

6    A    Yes.

7    Q    How big is the hard drive?

8    A    A 20 gigabit hard drive.

9    Q    Relatively small?

10   A    Yes.

11   Q    And you named the hard drive for your forensic

12   purposes C1-HD-1?

13   A    Yes.

14   Q    And did you determine at some point whether there was

15   an operating system on the hard drive?

16   A    Yes.

17   Q    And what operating system was in use on that hard

18   drive?

19   A    It was Windows Millennium.

20   Q    Windows Millennium?

21        MR. LATO:  Objection to the echo.

22   Q    What is an operating system?

23   A    An operating system is software that is designed to

24   make everything work together.  It basically uses a set of

25   instructions for the different hardware pieces that

**696**

1    interact with each other.  It is a special way of data

2    being handled by a specific operating system.  In this

3    particular case Microsoft Windows was being used.  A lot

4    of people know Apple is the other one, and that has a

5    different operating system and they handle data just a

6    little differently.

7         Generally it is a set of instructions that makes

8    everything work and how it displays and how you see it.

9    Q    I see on the left-hand side of

10   Government's Exhibit 506, and a red circle, Windows, that

11   is the operating system?

12   A    That is the directory that the files involved with

13   the operating system reside.

14   Q    All right.

15        Let's walk through what is shown, if you can

16   just walk us through what is shown on

17   Government's Exhibit 506.

18   A    Right below the C1 hard drive one, it shows the hard

19   drive in this particular case.  And in Windows it is

20   always given a volume number or drive number.  In this

21   particular case the C represents the hard drive, the whole

22   hard drive in entirety.

23        Down below it are file directories.  This is a

24   standard file directory structure that you would see in a

25   Windows installation.

Forrestal-Direct/Kabrawala

697

1        A file directory is basically, the best way to

2    think about it is file cabinets inside your house.  There

3    has to be a way to organize, discuss things and find

4    things.

5        Basically it is a bunch of file cabinets or

6    directories that has similar information in them.  And

7    actually opening them up, there would be additional file

8    folders or cabinets, whatever, that would further organize

9    things by pictures, by videos, by documents, by all kinds

10   of different files.  It is an organization tool.

11   Q    Did you find anything in My Documents?

12   A    In My Documents there were pictures and documents,

13   quite a bit of information.

14   Q    What, if anything, did you do next after you -- after

15   you started forensically analyzing the hard drive?

16   A    Umm, you would start entering all these different

17   directories and you would use the various forensic tools

18   to examine what contents are immediately visible.

19   Q    Let's go to the right-hand side of

20   Government's Exhibit 506.

21        What does this show?  What does this directory

22   structure show?

23   A    This file directory structure is related to the

24   program Microsoft Express.  And what that does is in a new

25   Windows directory it creates a file directory in one of

698

1    the storage areas I told you about called identities and

2    then puts the Microsoft data all in one place.

3    Q    Let me just back you up a little bit.

4         There were programs on this computer?

5    A    Yes.

6    Q    And one of the programs was Microsoft Express?

7    A    Yes.

8    Q    What is that?

9    A    Microsoft Express, they call it an email client, or a

10   program you would use to look at, compose, send or

11   organize your email.

12   Q    Okay.

13        And that is a program that is on this computer?

14   A    Correct.

15   Q    Now, walk us through the right-hand side, the

16   directory that is for Microsoft Express.

17   A    Microsoft Express, depending on the options you

18   choose, it creates these different folders called DBX

19   folders.  It goes in and makes a folder or in box, or out

20   box, or deleted box.  All this is part of the process that

21   organizes this information and lets it be used.

22   Q    All right.

23        And did you in fact find a sent box?

24   A    I found a sent box, yes.

25   Q    And what did the DBX file in relation to the sent

699

1    box?

2    A    It would be sent -- sent DBX, I believe.

3    Q    They are maintained in a database in that folder?

4    A    It is in a database format, yes, DBX file.

5    Q    All right.

6              I will show you --

7              THE COURT:  Why don't we take a break before you

8    proceed.

9              We will take the afternoon break.

10             Do not discuss the case.

11             (Whereupon, at this time the jury left the

12    courtroom.)

13             THE COURT:  Everyone be seated.

14             I would like you to give me an estimate at the

15    end of the week where we stand.  They wonder sometimes if

16    the case is proceeding as quickly as we are anticipating.

17             I hope to be able to tell them at the end of the

18    day based on my discussion with the lawyers I anticipate

19    the presentation of the evidence will be completed

20    sometime on Monday, and we would have the summations on

21    Wednesday morning because Tuesday is the holiday.

22             Are both sides comfortable with that?

23             MR. LaPINTA:  Yes.

24             MR. KABRAWALA:  Yes, Judge.

25             THE COURT:  All right.  Thank you.

700

1

2                    (Whereupon, a recess was taken.)

3

4              THE COURT:  Please be seated.

5              Bring in the jury.

6              How much more do you have on direct?

7              MR. KABRAWALA:  About an hour and a half.

8              THE COURT:  Okay.

9              You are not going to finish?

10             MR. BODE:  We will be playing the videos.  They

11   are all loaded onto the machine.

12             THE COURT:  I wanted to ask about the 229-A.

13   There was some confusion yesterday with the two labels.

14   We should resolve it at some point to make sure what is or

15   is not in evidence.  Okay?

16             MR. KABRAWALA:  Yes.

17             (Whereupon, the jury at this time entered the

18   courtroom.)

19             THE COURT:  Everyone be seated.

20             Mr. Kabrawala.

21   BY MR. KABRAWALA:

22   Q    Detective, when we broke -- just before the break you

23   were testifying about Government's Exhibit 506, which is

24   an exhibit that you prepared to assist us to show where

25   you found emails on that machine; is it fair to say?

701

```
1    A    Yes.

2    Q    All right.

3         Did you in fact find emails?

4    A    I did.

5    Q    Where did you find the emails?

6    A    The emails were in all the boxes specific to the

7    case.  I found emails in inbox, parenthesis one, the DBX

8    and sent items, dot DBX.

9    Q    Are those the two items circled in red on the screen?

10   A    Yes.

11        MR. KABRAWALA:  The government moves to --

12   sorry.

13   Q    I'm showing you what is marked as

14   Government's Exhibit 550, a CD, and 550-A, another CD.

15        Do you recognize those items?  If so, describe

16   what they are.

17   A    I do.

18        These are disks that I created after I extracted

19   the emails from the hard drive.

20   Q    How do you know that you created the disks that you

21   are holding?

22   A    I created the disks and put it in the labelling

23   machine.  And then I initialed the disk and dated the disk

24   on the top.

25   Q    You signed them?
```

Forrestal-Direct/Kabrawala

702

1   A   I did.

2   Q   What is 550?

3   A   550 is all the emails from the inbox, parenthesis

4   one, dot DBX.

5   Q   Is that the one I'm -- I have circled here?

6   Extracted from that hard drive?

7   A   Yes, that's correct.

8   Q   And what is the other disk?

9   A   The other disk is all the emails I extracted from the

10   sent dot DBX.

11   Q   Again, the same question.

12         You extracted those items from that computer,

13   right?

14   A   Yes.

15   Q   That hard drive?

16   A   Yes.

17         MR. KABRAWALA:  The government moves to admit

18   those two exhibits.

19         MR. LaPINTA:  Can we approach, please?

20

21         (Whereupon, at this time the following took

22   place at the sidebar.)

23         MR. LaPINTA:  While we were on the break, I

24   proposed a stipulation regarding this particular exhibit.

25         This hard drive has over 12,000 emails.

**Forrestal-Direct/Kabrawala**

703

1          MR. KABRAWALA:   No.   The entire case has 12,000.

2     That only has about 2,000.

3          MR. LaPINTA:   Okay, 2,000.   The same.

4          2,000 emails on this.

5          I looked at them all.   But just as the one snuck

6     by me, my concern is that the jury, for whatever reason,

7     may want to see it, and some of the other emails, that we

8     both looked at them to make sure they are cleansed of any

9     problems.

10          I don't want to have a foundation for every

11     unrelated email to be developed.   But I will not agree for

12     every unrelated email to be published to the jury in the

13     unlikely event they want to see it.

14          MR. KABRAWALA:   Judge, this case is about the

15     control over the devices found in the defendant's house,

16     which are really germane to the defendant -- to the

17     government's case.   And we produced --

18          THE COURT:   I know.   But 2,000 emails is a lot

19     of emails, for purposes of cumulativeness, relevantness

20     and 404.

21          Obviously the ones you are playing for the jury

22     they can object or not.

23          But the ones you are not playing for the jury,

24     if the jury is to ask for all the emails on the disk that

25     they argue should be redacted in some way --

704

1          MR. LaPINTA:  That is what I said.

2          MR. KABRAWALA:  That is fair.

3          MR. BODE:  And the reason why we wanted to put

4     them all in, Judge, is their forensic expert is not on

5     yet, and it may be that he may find something else

6     relevant as well.

7          MR. LaPINTA:  I have no problem with that, it

8     comes in, but if they want to see it.

9          MR. BODE:  We agree.

10         MR. LATO:  It is resolved.

11         THE COURT:  All right.

12

13         (Whereupon, at this time the following takes

14    place in open court.)

15         THE COURT:  Based upon the discussion at the

16    sidebar, Government's Exhibit 550 and 550-A are admitted.

17         (Whereupon, Government's Exhibits 550 and 550-A

18    were received in evidence.)

19         MR. KABRAWALA:  Thank you.

20    Q    Did you find an email between joeval5@optonline.net

21    and kalichenkoes@mail.ru in the inbox?  Let's talk about

22    the inbox.

23    A    The inbox 1 dot DBX, yes.

24    Q    Thank you for the clarification.

25         I'm now showing you what is marked as

705

1    Government's Exhibit 557.

2              Do you recognize that?

3              (Handed to the witness.)

4    A    Yes.

5    Q    I will step back for a second.

6              Government's Exhibit 562, I will show you that.

7              (Handed to the witness.)

8    Q    Do you recognize this email?

9    A    I do.

10   Q    Did this come from the inbox dot DBX file CD that was

11   just admitted into evidence?

12   A    The inbox 1 dot DBX, yes.

13             MR. KABRAWALA:  Move to admit this particular

14   exhibit, 562.

15             MR. LaPINTA:  No objection.

16             THE COURT:  562 is admitted.

17             (Whereupon, Government's Exhibit 562 was

18   received in evidence.)

19             MR. KABRAWALA:  Publishing.

20             (At this time a document was exhibited on

21   courtroom screen.)

22   Q    What is the date of the email?

23   A    It is cut off.

24   Q    My goodness.

25   A    June 23, 2011.

Forrestal-Direct/Kabrawala

706

```
1   Q    June 23, 2011?

2   A    Yes.

3   Q    From Olena Kalichenko no joeval5@optonline.net, and

4   subject Helena?

5   A    Yes.

6   Q    I will read it.

7              Hello Joseph.

8              Thank you for your letter to me.  It was a great

9   pleasure to get it (sic)?

10             THE COURT:  No.

11             MR. KABRAWALA:  Sorry.

12             It was a pleasure to get it.

13             Do you want to read it?

14             MR. LaPINTA:  Can I read it?

15  Q    Go ahead, detective.

16  A    It says, Hello Joseph.

17             Thank you for your letter.  It was a pleasure to

18  get it -- no.  Thank you for your letter to me, it was a

19  pleasure to get it.

20             So, Joseph, what are your intentions, comma.  I

21  mean, what kind of relations are you looking for?  Are you

22  currently in New York City?  As for me, I am in Dallas

23  now.  What do you think about possible meeting?  What do

24  you do for a living?

25             You are more than welcome to ask me any
```

Forrestal-Direct/Kabrawala

707

```
 1    questions you want.

 2            Helena.

 3    Q    That is June 23, 2011; is that right?

 4    A    Yes.

 5    Q    Are you currently in NYC, that person is asking,

 6    right?

 7    A    Yes.

 8    Q    Now, I will show you seven months later, 557.

 9            Is Government's Exhibit 557 a portion of the

10    inbox 1 dot DBX that was entered into evidence?

11    A    If you can pull it down on the screen.

12            557, yes.

13            MR. KABRAWALA:  Yes.

14    A    Yes.

15            MR. KABRAWALA:  The government moves to admit.

16            MR. LATO:  One moment, if it please, your Honor.

17            (Whereupon, at this time there was a pause in

18    the proceedings.)

19            MR. LATO:  No objection.

20            THE COURT:  557 is admitted.

21            MR. KABRAWALA:  Thank you.

22            (Whereupon, Government's Exhibit 557 was

23    received in evidence.)

24    Q    First of all, this email was found on that computer?

25    A    Yes.
```

708

1   Q    From joeval5@optonline.net.

2            Sunday, January 22, 2012.

3            So some seven months after that initial email;

4   is that right?

5   A    Yes, approximately, yes.

6   Q    To Elena Kalichenko, spelled E-L-E-N-A?

7   A    Yes.

8   Q    Can you read where I'm pointing?

9            You see --

10  A    You see bitch, in all capital letters, 9:45 p.m.,

11  still at the internet place.  How is that possible?

12  Q    Continue reading on to right before it says as your

13  backup.

14  A    Can you pull it to the right just a little bit, and

15  put your pen where you want me to start.

16  Q    Start -- read from where you were reading to my pen.

17  (indicating).

18  A    Okay.

19            On my screen it is actually cutting off the

20  letter.

21            Thank you.

22            How is that possible?  That was another thing I

23  warned you about bitch.  But you are still there checking

24  your email -- your mail from other prospects, with my

25  money, you bitch.  Then you cry to me that you have no

709

1    more money.  But you are sitting there at my cost to write

2    to other dicks.

3    Q    Now, I will scroll down the page.

4         Read from here where it says your time is up.

5    All the way to where it says tonight.

6         So your time is up.  You see that?

7    A    Yes.

8    Q    To tonight.

9    A    Yes.

10        Your time is up, unless you want to be in the

11   street.  Get me more fucking video of your daughter on

12   your tits playing.  And put some of those toys on your

13   stomach, so she plays over by your pussy, using the cell

14   phone camera.  You won't see money bitch for a video

15   camera.  No fucking way.  Get me some really racy cell

16   phone video, you and your daughter, tonight, or I'll drop

17   you completely in the streets.

18   Q    That is fine.

19        Government's Exhibit 558, a portion of the inbox

20   1 dot DBX file that is entered in evidence, is that

21   correct?

22   A    Yes.

23             MR. KABRAWALA:  Move to admit.

24             MR. LATO:  No objection.

25             THE COURT:  558 is admitted.

Forrestal-Direct/Kabrawala

**710**

```
 1           (Whereupon, Government's Exhibit 558 was
 2   received in evidence.)
 3   Q    I will show this to you, from Joe Valerio -- sorry,
 4   joeval5@optonline.net, sent on January 23, 2012, from
 5   Olena Kalichenko, subject, FW, your mail.
 6           Do you see where my pen is pointed?
 7   A    Yes.
 8   Q    Start reading from there to where I stop you.
 9   A    Pull it in, please.
10           The videos are getting more and more creative by
11   you and          , and how you incorporate the toys in the --
12   in the -- and it has the and sign, NBP videos are very
13   creative.  Here in America breast feeding or just baby
14   sucking on tits is very popular.
15           So you keep up the good work each day and
16   experiment more with your tits with          and try to keep
17   her in-between your legs as she plays with her toys by
18   your pussy.  I'm sure you just -- the feel of the toys she
19   plays with just touches your pussy, and I'm sure you will
20   come.  Just keep her secure on the floor or couch, playing
21   in-between your legs, dash naked.  She is bound to touch
22   your pussy if you put the toys between your stomach and
23   your pussy.
24           Today I will send you some money.
25   Q    Stop right there.
```

711

```
1          Would you just re-read the last line.  You
2    misread it.
3          THE WITNESS:  Today I will send out some money.
4          MR. KABRAWALA:  Thank you.
5    Q    559 is the next exhibit.
6          Do you see that?
7    A    Yes.
8    Q    Government's Exhibit 559, is it a true and correct
9    portion of what is entered in evidence in the inbox 1 dot
10   DBX file?
11   A    Yes.
12         MR. KABRAWALA:  Move to admit.
13         MR. LaPINTA:  No objection.
14         THE COURT:  559 is admitted.
15         (Whereupon, Government's Exhibit 559 was
16   received in evidence.)
17   Q    This is from Joseph Valerio, joeval5@optonline.net,
18   sent Tuesday, January 24, 2012, 11:59 p.m.
19         Fair to say?
20   A    Yes.
21   Q    To Olena Kalichenko, cc Joseph Valerio.
22         Subject, this covers it, and here it begins.
23         Fair to say?
24   A    Yes.
25   Q    Start reading here, the next day you are able to go
```

712

1  to the internet place, just from there, and start reading

2  until I tell you to stop.

3  A    The next day you are able to go to the internet place

4  this Friday, are we clear on this?  Thursday you relax at

5  home with ███████, getting her to play more with you,

6  exploring your body more down below to your sweetness.

7  Remember, when ███████ comes to you and touches you, it is

8  really me who is touching you or in fantasy.  This little

9  beautiful creature who wants to probe you and touch a real

10  human being for the first time.  Close your eyes and let

11  her explore every crevice of your nipples and pussy.  Put

12  some juice on your nipples and make her suck those nice

13  tits as you lay there in deep emotional relaxation.  And

14  finally, this little beautiful creature has taken over

15  your body with oral pleasure.  Apply something sweet from

16  the store, sweet juice or candy on your nipples and your

17  sweet pussy to play with.  Get all this on video for

18  Thursday, relaxation day.  Don't hold back.  Remember,

19  it's me.  So let yourself go.

20       I have you in my mouth tomorrow to taste your

21  sweet nectar juice from your sweet pussy, it is me you

22  see.  It is me you hear.  This is -- excuse me.

23       It is me who touches you through ███████.

24       I will check on your Skype account dear.  Thank

25  you for sharing that with me.  And you are fully aware of

**Forrestal-Direct/Kabrawala**

713

1   who's in my life and when they come, stay or go.  You will

2   always know -- you will always, Audrey, I respect him, the

3   father of your child, and I will not interfere with that

4   contact.  -- sorry, I lost my place here.

5   Q    And I will not interfere with that.

6        You can stop there.

7   A    Okay.

8   Q    Do you see where it starts with the capital letters

9   again?

10  A    Yes.

11  Q    Start reading from there again.

12  A    For videos with ████, all with her, from many

13  angles, from your tits to your cute toes and every crevice

14  to be explored.  All videos, make this count, there are

15  the ones that will.  I kiss you all over for every inch

16  ████ explores and as she lands on your planet, Helena,

17  she will explore your valleys, mountains, curves and your

18  wet juicy bush, with ample fruit of nectar let her touch

19  those moist crevices.

20       Capital letter, E-M-M, and, D-A.  I'm so hard.

21       Here my sweet pussy slave is the MTCN number

22  836-142-4419.

23  Q    Let me stop you there.

24       Was this email found on that computer?

25  A    Yes.

714

1    Q    560.

2            Do you see that?

3    A    I do.

4    Q    Is that a true and correct portion of the inbox one

5    dot DBX?

6    A    Yes.

7            MR. KABRAWALA:  The government moves to admit

8    Government's Exhibit 560.

9            MR. LATO:  One moment, please.

10           (Whereupon, at this time there was a pause in

11   the proceedings.)

12           MR. LATO:  No objection.

13           THE COURT:  560 is admitted.

14           (Whereupon, Government's Exhibit 560 was

15   received in evidence.)

16           MR. KABRAWALA:  Publishing.

17           (At this time a document was exhibited on

18   courtroom screen.)

19   Q    From Joseph Valerio, joeval5@optonline.net, sent

20   Wednesday April 4, 2012, 1:27 p.m., to Olena Kalichenko,

21   cc Joseph Valerio, subject validation, exclamation mark.

22           Some four months after the prior email you just

23   read; is that correct?

24   A    Yes.

25   Q    Start with the capital letters.

715

```
1   A    It says:  You need to send me for the -- for the time

2   being, or email.  There is a price for everything.  And I

3   need validation from you.  So you send me those pics

4   for --

5   Q    I will stop you and I will read it out loud, and you

6   tell me -- I think you just skipped a line.

7   A    Sorry.

8   Q    You need to send me for the time being -- go ahead

9   and start reading from there.

10  A    Pictures of your tits in the shower and you fingering

11  your pussy from your phone or email.  There is a price for

12  everything.  And I need validation from you.

13  Q    You can stop there.

14        I will read, and tell me if I get it wrong.  I'm

15  pointing to it.

16        Do the videos with ████    the way that I want.

17  This is all the preparation you will need here in NY with

18  ████.  So it's best you get used to it.  Send me what

19  you can in pics for now, and that company information,

20  etcetera, etcetera.

21        So you show me what you got.

22        Take care.

23        Is that fair to say?

24  A    Yes.

25  Q    Showing you 5 61 -- let me show it to you.
```

716

```
1              (Handed to the witness.)

2    Q    Is this 561?

3    A    Yes.

4    Q    Is that a true and correct copy of the email taken

5    from inbox 1 dot DBX from that computer?

6    A    It is.

7              MR. KABRAWALA:  Move to admit.

8              MR. LATO:  One moment, please.

9              (Whereupon, at this time there was a pause in

10   the proceedings.)

11             MR. LATO:  No objection.

12             THE COURT:  561 is admitted.

13             (Whereupon, Government's Exhibit 561 was

14   received in evidence.)

15             MR. KABRAWALA:  I will not publish it at this

16   time.

17   Q    I will show you Government's Exhibit 566.

18             Again, is that a true and correct extraction of

19   an email from the inbox that has been entered into

20   evidence as Government's Exhibit 550?

21   A    Yes.

22             MR. KABRAWALA:  Move to admit 566.

23             MR. LaPINTA:  No objection.

24             THE COURT:  566 is admitted.

25             (Whereupon, Government's Exhibit 566 was
```

Forrestal-Direct/Kabrawala

717

1    received in evidence.)

2          MR. KABRAWALA:  I will publish it.  And I will

3    read it.

4          Joseph, I have just checked the package,

5    tracking number is -- and there is a package number ending

6    in 6006.  If you go to www.DHL.com.

7    Q    Is that fair to say that that is what it says?

8    A    Yes.

9    Q    By the way, that DHL number I just read, that was in

10   an email on that computer; is that right?

11   A    Yes, it was.

12         (Counsel confer.)

13         MR. KABRAWALA:  Can we have a sidebar, Judge?

14

15         (Whereupon, at this time the following took

16   place at the sidebar.)

17         MR. KABRAWALA:  We discussed at a pretrial

18   conference the admission of this, at which time this was

19   obviously provided with a certification from DHL.

20         There is nothing that has changed.  This should

21   come in as a self-authenticating document.

22         THE COURT:  I remember that conference.

23         MR. BODE:  I have the minutes if you need.

24         THE COURT:  I remember it.

25         MR. LATO:  There is no question that the bulk of

Forrestal-Direct/Kabrawala

718

1    the document should come in.  My only request is the

2    following:

3            With respect to the portion that says DVD disk,

4    we don't know if that was written by Ms. Kalichenko as a

5    co-conspirator statement made in the course of a

6    conspiracy, or if it was written by someone at DHL based

7    upon examination.

8            That is the only question I have.  Because if in

9    fact it was written by somebody from DHL based upon what

10   Olena Kalichenko said --

11           MR. KABRAWALA:  It doesn't matter because it is

12   taken in the regular course of business.

13           THE COURT:  The issue is whether or not it

14   should come in as a co-conspirator statement, I think

15   there is a sufficient basis to allow it.  You can make

16   that argument, but I will allow it.

17           MR. LATO:  As I was saying it, I think I agree,

18   anyway.  So that is myself saying I agree.

19

20           (Whereupon, at this time the following takes

21   place in open court.)

22           MR. KABRAWALA:  The government moves to admit

23   Government's Exhibit 201.

24           THE COURT:  Any objection?

25           MR. LATO:  No, your Honor.

Forrestal-Direct/Kabrawala

719

1           THE COURT:  201 is admitted.

2           (Whereupon, Government's Exhibit 201 was

3     received in evidence.)

4           MR. KABRAWALA:  Publishing it.

5           (At this time a document was exhibited on

6     courtroom screen.)

7     Q    This is a DHL bill of lading, the weigh bill.

8           Do you see the tracking number on top?

9     A    Yes.

10    Q    Is it the same tracking number as the tracking number

11    in the last email; is that right?

12    A    Yes.

13    Q    Contents?

14    A    DVD disk.

15    Q    Contact name, Kalichenko O.

16    A    That's correct.

17    Q    Delivery address?

18    A    3 High Gate Drive, Smithtown, New York.

19    Q    Contact name, Joseph Valerio?

20    A    Correct.

21    Q    Date is 26-04-12.

22          What does that tell you?

23    A    April 26th, 2012.

24    Q    They write things differently across the pond?

25    A    They do.

720

1    Q    All right.

2         Did you recover child pornography videos on that

3    hard drive?

4    A    I did.

5    Q    I was showing you what is marked as Government's

6    Exhibit 500, the disk.

7         (Handed to the witness.)

8    Q    What is that disk?

9    A    This is a disk I created that contained a number of

10   emails which contained attached videos that are child

11   pornographic in nature.

12   Q    And you extracted that from the inbox of this thing,

13   this hard drive, Government's Exhibit 401, that was in

14   this machine, Government's Exhibit 400, that was found at

15   that man's home (indicating)?

16   A    Yes.

17        MR. KABRAWALA:  The government moves to admit

18   the video.

19        MR. LaPINTA:  What number is that again?

20        MR. KABRAWALA:  Government's Exhibit 500.

21        MR. LaPINTA:  No objection.

22        THE COURT:  500 is admitted.

23   Q    Now, I will just bring over to you a binder, a binder

24   with a number of exhibits in it.

25        And I want you with the Court's permission to

Forrestal-Direct/Kabrawala

721

1    leaf through it as we go on.

2            Take a look at Government's Exhibit 501, 502,

3    503 and 504?

4            Are those merely portions of

5    Government's Exhibit 500?

6    A    Yes.

7    Q    Essentially they are videos you took from

8    Government's Exhibit 500 and you put them on a separate

9    disk?

10   A    Correct.

11   Q    How do you know that you did that?

12   A    We marked, or I marked, and I labeled it video disks.

13   I created the disk.  And after creating each one and

14   giving it an individual file name, I initialed them.

15           MR. KABRAWALA:  Move to admit all of those.

16           MR. LATO:  No objection.

17           THE COURT:  Government's Exhibit 501 through 504

18   are admitted.

19           (Whereupon, Government's Exhibits 501 through

20   504 were received in evidence.)

21   Q    By the way, there are emails, too, in the binder,

22   Government's Exhibit 501-D, 502-A, 503-G and 504-E.

23           How did those relate to those various disks?

24   A    The disks contained the files that have the video.

25   And the text portion of the actual video that the files

**Forrestal-Direct/Kabrawala**

722

1    were attached to, this is a printout of that email.

2              MR. KABRAWALA:  Move to admit

3    Government's Exhibit 501-D, 50 --

4              MR. LaPINTA:  No objection.

5              THE COURT:  All right.

6              Those exhibits are admitted, 501-D, 502-A, 503-G

7    and 504-E.

8              (Whereupon, Government's Exhibits 501-D, 502-A,

9    503-G and 504-E were received in evidence.)

10             MR. KABRAWALA:  I would like to publish 501-D.

11             (At this time a document was exhibited on

12   courtroom screen.)

13   Q    Is it fair to say that this is an email -- a two-page

14   email -- that was sent on July 23, 2012 to Joe Valerio at

15   joeval5@optonline.net from Olena Kalichenko at

16   kalichenkoes@mail.ru?

17   A    Yes.

18   Q    Is it fair to say?

19   A    Yes.

20   Q    And the preceding message says, from Joe Valerio:

21   Helena, I got all that info you sent me.  So far so good.

22   Again, I sent you a text MESG, but no reply for a MTCN.

23   So what's up with that?  You indicated that you have more

24   videos to send via email.

25             Did I read that correctly?

**Forrestal-Direct/Kabrawala**

723

1   A    Yes, you did.

2   Q    It looks like in the preceding message, like the

3   message from Olena, why is there no header message from

4   the to and from here?

5   A    It is a follow-on reply.  It is the way the forensic

6   software processes it.

7   Q    Is this a reply to that?

8   A    Yes.

9   Q    I'm sorry, does this message right here where it says

10  Joseph, I have composed --

11  A    Yes.

12  Q    Was that received by this email address as well at

13  joeval5@optonline.net?

14  A    Yes.

15  Q    By the way, it says Joseph, I have composed and send

16  you a letter regard ███████ adoption, spelled

17  ████████.

18       Her name in my passport is written exactly as I

19  spelled ███████████, ██████████████

20       Did I read that correctly?

21  A    You did.

22  Q    Now, I want to publish for the jury.

23       Actually, while I have this up,

24  Government's Exhibit 501-D.

25       There are attachments to this July 23, 2012

Forrestal-Direct/Kabrawala

724

1    email?

2    A    There are.

3    Q    There were a number of attachments.

4         There is one right there?

5    A    Correct.

6    Q    And there is three others?

7    A    There are.

8    Q    What were on those attachments?

9    A    Pardon me?

10   Q    What was on those attachments?

11   A    These had the attached video files attached to the

12   emails.

13   Q    What did those videos have on them?

14   A    They contained child pornographic content.

15   Q    Do you see how it is written in blue here and it says

16   untitled slash C, Windows application, what does that tell

17   you?  What does this stuff tell you?

18   A    This is the exact path, or the way of describing

19   exactly where the child pornographic file was restored.

20   Q    On this, Government's Exhibit 401?

21   A    Yes.

22   Q    Inside this box?

23   A    Correct.

24   Q    There were a number of videos.  You said there were

25   four attachments which were all videos; is that correct?

Forrestal-Direct/Kabrawala

725

 1    A    On this particular email, yes.

 2    Q    Government's Exhibit 501 is one of the entire videos;

 3    is that correct?

 4    A    Yes.

 5    Q    And Government's Exhibit 501 is total time, two

 6    minutes 33 seconds.

 7              We will not play the entire video.

 8              Did you make the clips of that video?

 9    A    I did.

10              MR. LaPINTA:  Objection to form.

11              THE COURT:  Sustained.

12    Q    Did you make the clip of Government's Exhibit 501,

13    the two minute and 33 second long video?

14    A    I did.

15    Q    Did you make a shorter clip of it?

16    A    I did, yes.

17              MR. KABRAWALA:  All clips are in evidence.

18    A    We have it as a disk identified as

19    Government's Exhibit 501, for the record.

20    Q    501-B, which is in evidence, is a 30 second clip of

21    Government's Exhibit 501?

22    A    Correct.

23    Q    You created that clip?

24    A    Yes.

25              MR. KABRAWALA:  I'm going to play it.

Forrestal-Direct/Kabrawala

726

```
 1              THE COURT:  Hold on -- did you say 501?

 2              MR. KABRAWALA:  B.

 3              MR. LaPINTA:  D, as in dog.

 4   Q    D is a piece of paper.

 5              The other --

 6              THE COURT:  Why don't you approach.

 7

 8              (Whereupon, at this time the following took

 9   place at the sidebar.)

10              THE COURT:  When did 501-B, as in boy, come in?

11              MR. KABRAWALA:  Judge, it is all contained -- I

12   see what you are saying.

13              THE COURT:  You can offer it.

14              MR. LaPINTA:  That is usually what happens.

15              MR. KABRAWALA:  That is fine, all right.

16

17              (Whereupon, at this time the following takes

18   place in open court.)

19   Q    Is Government's Exhibit 501-B, is that on the disk

20   identified and labeled Government Exhibit 501?

21   A    500 or 501?  Actually in both places.

22   Q    Both places?

23   A    Yes.

24   Q    When you created the disk, all the 501 series were

25   contained within the disk labeled 501?
```

727

```
1    A    Correct.
2              MR. KABRAWALA:  We move to admit 501-B and
3    501-C, contained within the disk labeled
4    Government's Exhibit 501.
5              THE COURT:  And 501-C --
6    Q    B is a clip found on the email, identified and
7    admitted as 501-D, as in delta?
8              MR. LaPINTA:  Objection.  I don't know what clip
9    is.
10             MR. KABRAWALA:  All right.  I will do it this
11   way.
12             Actually, I think 501-C is one of the entire
13   videos -- it is actually the entire video, 501-C is the
14   entire video --
15             MR. LaPINTA:  Objection.
16   Q    Is 501-C the entire video?
17   A    I believe so, yes.
18   Q    And I will publish that now.
19             (At this time a document was exhibited on
20   courtroom screen.)
21   Q    The last entry on Government's Exhibit 501 --
22             MR. LaPINTA:  D or C?
23             THE COURT:  Use the letters, say delta or bravo,
24   or say something, okay?
25   Q    501 delta, there are a number of files on it, right?
```

Forrestal-Direct/Kabrawala

728

1   A    Four attached files, yes.

2   Q    And is one of those files Government's Exhibit 501-C

3   as an entire video that is two minutes and one second

4   long?

5   A    I believe so, yes.

6           MR. KABRAWALA:  The government moves to admit

7   501-B and C.

8           (Whereupon, a pause takes place in the

9   proceedings.)

10           MR. LaPINTA:  No objection.

11           THE COURT:  501-C and 501-D are admitted and can

12   be played to the jury.

13           MR. KABRAWALA:  We will play 501-B first and

14   then 501-C.

15           (Video played.)

16           MR. KABRAWALA:  Now I will publish

17   Government's Exhibit 501-C, as in Charley.

18           (Video played.)

19   Q    I'm showing you what is marked as

20   Government's Exhibit 502-A.

21           MR. KABRAWALA:  Publishing 502-A.

22           (At this time a document was exhibited on

23   courtroom screen.)

24   A    I see it.

25   Q    Was the email also found on the defendant's computer,

Forrestal-Direct/Kabrawala

729

1    this one?

2    A    Yes.

3    Q    What is the date?

4    A    December 29th of 2012.

5    Q    And that is when it was sent to the defendant?

6    A    Yes.

7    Q    Who is it from?

8    A    It is from -- sorry, can you move it to the right

9    just a little bit, please.

10   Q    I will just read it.  It is Olena Kalichenko?

11   A    Yes.

12   Q    And were there attachments to this email?

13   A    There were.

14   Q    A number of attachments?

15   A    Yes.

16        There were four.

17   Q    All right, four attachments.

18        502 is in evidence.

19        THE COURT:  How long is this one?

20        MR. KABRAWALA:  One minute, 26 seconds.

21   Q    This is one of the videos in that attachment --

22   withdrawn.

23        One of the videos on that email was

24   September 29th is what we are about to see?

25   A    Yes.

730

```
 1   Q     File 3.3, that is a shortening for it.

 2               (Video played.)

 3               MR. KABRAWALA:  Government's 503.

 4               THE COURT:  Why don't we stop for today.

 5               As you know, we are not sitting tomorrow.  We

 6   will reconvene on Monday morning at 9:30.

 7               I like to give the jury an estimate of where we

 8   are at, given the estimate given at the jury selection

 9   which Judge Brown said two weeks.

10               We discussed with the lawyers, and we feel that

11   the presentation of the evidence will be complete at some

12   point on Monday.

13               What will happen is Tuesday is a holiday, so we

14   will not be sitting on Tuesday, Veterans Day, and on

15   Wednesday morning you will hear the summations and the

16   charge.

17               That is my estimate of what will happen next

18   week.

19               I will see you all Monday morning at 9:30.

20               Thank you.

21               Do not discuss the case or read anything with

22   regard to the case.

23               (Whereupon, at this time the jury leaves the

24   courtroom.)

25               THE COURT:  If everyone can be seated, please.
```

731

1      I just want to explain to you that the one 229-A

2  was some kind of ticket email --

3      MR. BODE:  Does the Court have a transcript, I

4  have it here.

5      229-A, the exhibit was admitted.  And the

6  witness indicates, and they talk about it, and let me

7  describe an email that appears to be from

8  joeval5@optonline.net, forwarded to himself

9  September 15th, 2012, Ticket Master -- September 15, 2012,

10  Ticket Master email.  That is admitted as 229-A, as in

11  alpha.

12      THE COURT:  That is what was admitted.  But in

13  the binder there is a different 229-A, and I want to make

14  sure that that one is not in evidence, the one in the

15  binder.

16      MR. BODE:  Yes, your Honor.

17      I know defense has the correct one at this

18  point, your Honor.  And as long as we all agree what it

19  is, we will make sure that the correct one stays in our

20  binder and that we don't somehow send the other one back.

21      THE COURT:  Okay.

22      MR. LaPINTA:  Judge, you may have an old exhibit

23  list that was changed, I think, once or twice, and there

24  may be a newer one around.

25      THE COURT:  All right.

732

1              The only reason -- 208 to 231 was admitted as a

2    range, I think.

3              MR. BODE:  208 --

4              THE COURT:  208 and 231 was admitted.

5              MR. BODE:  Yes.

6              THE COURT:  Are there any other -- within that,

7    are there subdivisions like A, B, and C, or something like

8    that?

9              MR. BODE:  Let me just double check, your Honor.

10             MR. KABRAWALA:  The only subdivision is --

11             THE COURT:  211-A.

12             MR. KABRAWALA:  Yes, which is already in

13   evidence.

14             THE COURT:  All right.

15             So we are on the same page then.

16             Any other issues before we break for the day?

17             MR. LATO:  Not from the defense, your Honor.

18             MR. KABRAWALA:  No, your Honor.

19             THE COURT:  I will see you all on Monday.

20             MR. LaPINTA:  9:15, Judge?

21             THE COURT:  9:30.

22             MR. LaPINTA:  9:30.  Thank you.

23             (Case on trial adjourned until 9:30 o'clock,

24   Monday, November nine, 2014.)

25

733

## I-N-D-E-X

### W-I-T-N-E-S-S-E-S

S T E V E N   T R O Y D                          570
CROSS-EXAMINATION                               570
BY MR. LATO
REDIRECT EXAMINATION                            590
BY MR. KABRAWALA
RECROSS-EXAMINATION                             606
BY MR. LATO
FURTHER REDIRECT EXAMINATION                    610
BY MR. KABRAWALA

B E R N A D E T T E   I M P E R I A L E         611
DIRECT EXAMINATION                              612
BY MR. KABRAWALA
CROSS-EXAMINATION                               629
BY MR. LATO
REDIRECT EXAMINATION                            631
BY MR. KABRAWALA
RECROSS-EXAMINATION                             634
BY MR. LATO

R O R Y   F O R R E S T A L                     639
DIRECT EXAMINATION                              639
BY MR. KABRAWALA

## E-X-H-I-B-I-T-S

Defendant's Exhibits B, C and D were received    588
in evidence


Government's Exhibit 506 was received in    694
evidence

Government Exhibits 337 and 339 were received    590
in evidence
Government Exhibit 340 was received in    592
evidence
Government Exhibit 565 was received in    600
evidence
Government's Exhibit 270 was received in    671
evidence
Government's Exhibit 555 was received in    679
evidence
Government's Exhibit 401 was received in    689
evidence
Government's Exhibits 550 and 550-A were    704
received in evidence
Government's Exhibit 562 was received in    705
evidence
Government's Exhibit 557 was received in    707
evidence
Government's Exhibit 558 was received in    710
evidence
Government's Exhibit 559 was received in    711
evidence
Government's Exhibit 560 was received in    714
evidence
Government's Exhibit 561 was received in    716
evidence
Government's Exhibit 566 was received in    716
evidence
Government's Exhibit 201 was received in    719
evidence
Government's Exhibits 501 through 504 were    721
received in evidence
Government's Exhibits 501-D, 502-A, 503-G and    722
504-E were received in evidence

**$**

**$12,000** [1] - 595:24
**$12,350** [2] - 594:18; 595:14
**$150** [2] - 624:7

**'**

**'10** [1] - 661:19

**0**

**0094** [1] - 568:3

**1**

**1** [6] - 704:23; 705:12; 707:10; 709:20; 711:9; 716:5
**1-631-265-2379** [2] - 593:5, 9
**1-800** [1] - 591:6
**1/7/2014** [1] - 684:19
**10** [1] - 679:3
**10-A** [2] - 595:15; 596:1
**100** [2] - 568:13, 21
**10th** [1] - 606:24
**11722** [2] - 568:14, 22
**11787** [1] - 591:9
**11788** [1] - 568:18
**11:59** [1] - 711:18
**12** [3] - 593:19; 604:20; 678:17
**12,000** [2] - 702:25; 703:1
**12/6/13** [1] - 682:23
**14** [1] - 568:3
**15** [3] - 641:13; 642:8; 731:9
**150** [1] - 653:25
**156** [1] - 683:6
**15th** [1] - 731:9
**16205** [1] - 591:4
**18** [4] - 613:6; 683:14
**18,954** [1] - 676:23
**18th** [1] - 678:2
**19** [1] - 572:21
**1991** [1] - 640:25
**1994** [1] - 591:4
**19th** [1] - 607:1
**1:27** [1] - 714:20
**1:30** [1] - 637:23

**2**

**2** [3] - 573:7; 673:18; 684:17
**2,000** [4] - 703:2-4, 18

**2,200** [3] - 670:16; 671:2
**20** [3] - 587:14; 608:3; 695:8
**200** [4] - 568:18; 593:16; 653:22, 25
**200-A** [1] - 593:25
**2000** [1] - 652:19
**2001** [2] - 641:11; 642:8
**2005** [5] - 613:6; 615:21; 642:17; 661:13
**2007** [1] - 647:10
**2009** [1] - 661:19
**201** [4] - 718:23; 719:1; 734:19
**2010** [3] - 606:24; 615:22
**2011** [6] - 606:15; 607:2; 615:22; 705:25; 706:1; 707:3
**2012** [13] - 604:20; 631:17; 654:16; 708:2; 710:4; 711:18; 714:20; 719:23; 722:14; 723:25; 729:4; 731:9
**2013** [11] - 631:17; 677:1; 678:2, 17, 22; 680:12, 20; 682:15; 683:15; 685:1; 686:1
**2014** [21] - 568:7; 590:11; 596:4, 10, 14; 597:1, 7; 598:10; 600:6; 602:21; 654:17; 655:19; 665:6; 672:17, 24; 673:4; 674:13; 685:8, 17; 691:9; 732:24
**208** [5] - 583:15, 25; 732:1, 3
**211-A** [1] - 732:11
**213** [1] - 584:18
**214** [2] - 585:9; 604:17
**21st** [1] - 587:14
**22** [1] - 708:2
**229-A** [5] - 700:12; 731:1, 5, 10, 13
**23** [6] - 705:25; 706:1; 707:3; 710:4; 722:14; 723:25
**231** [2] - 732:1, 4
**2379** [1] - 593:11
**23rd** [1] - 606:14
**24** [2] - 602:21; 711:18
**24th** [1] - 691:9
**25** [1] - 590:11
**25th** [1] - 588:4

**26** [1] - 729:20
**26-04-12** [1] - 719:21
**264** [2] - 676:1
**26th** [1] - 719:23
**270** [9] - 638:10; 670:12, 20; 671:13, 15-16, 19; 678:21; 734:8
**278** [1] - 675:25
**28** [5] - 596:4, 10, 14; 598:10; 600:6
**284** [1] - 676:14
**28th** [15] - 574:9; 607:19, 24; 608:2; 632:10, 12; 655:19; 665:6; 672:17, 24; 673:4; 674:13; 685:8, 17
**29th** [2] - 729:4, 24

**3**

**3** [14] - 591:8; 593:6; 594:7, 21, 25; 614:23; 616:6, 18; 655:21; 674:1; 675:19; 678:22; 680:20; 719:18
**3.3** [1] - 730:1
**30** [3] - 639:25; 640:1; 725:20
**30-year** [1] - 640:6
**300-B** [1] - 614:13
**302** [3] - 598:20, 23; 658:12
**302s** [1] - 581:19
**303-A** [2] - 686:5, 7
**304** [2] - 660:14
**311** [2] - 575:4, 6
**32** [1] - 684:2
**322** [3] - 586:17; 594:13; 595:10
**323** [2] - 626:1; 630:1
**324** [1] - 626:4
**324-A** [1] - 626:4
**325** [1] - 575:20
**329** [1] - 624:21
**33** [2] - 725:6, 13
**332** [1] - 622:3
**333** [1] - 623:2
**335** [1] - 627:9
**336** [1] - 627:9
**337** [6] - 590:8, 16-17; 593:1; 594:3; 734:5
**338** [1] - 626:15
**339** [5] - 590:9, 16-17; 606:9; 734:5
**340** [4] - 592:11,

17-18; 734:6
**342** [1] - 627:1
**343** [1] - 627:1
**35** [1] - 568:18
**38** [2] - 674:7; 682:6
**38092995638** [1] - 681:14
**380992256638** [1] - 680:4
**3:08** [1] - 680:12
**3rd** [3] - 680:12; 685:1; 686:1

**4**

**4** [3] - 675:25; 682:7; 714:20
**40-caliber** [2] - 597:18
**400** [5] - 688:1; 689:8; 690:4; 695:4; 720:14
**401** [12] - 688:16, 24; 689:7, 17, 19-20; 690:5, 7, 23; 720:13; 724:20; 734:10
**402** [2] - 665:19; 687:11
**404** [1] - 703:20
**44** [1] - 684:18
**484** [1] - 677:18
**497** [1] - 678:10

**5**

**5** [2] - 676:13; 715:25
**5-10** [1] - 608:9
**50** [1] - 722:3
**500** [7] - 647:7; 720:6, 20, 22; 721:5, 8; 726:21
**501** [17] - 721:2, 17, 19; 725:2, 5, 12, 19, 21; 726:1, 20-21, 24-25; 727:4, 21, 25; 734:20
**501-B** [6] - 725:20; 726:10, 19; 727:2; 728:7, 13
**501-C** [9] - 727:3, 5, 12-13, 16; 728:2, 11, 14, 17
**501-D** [9] - 721:22; 722:3, 6, 8, 10; 723:24; 727:7; 728:11; 734:21
**502** [2] - 721:2; 729:18
**502-A** [6] - 721:22; 722:6, 8; 728:20; 734:21

**503** [2] - 721:3; 730:3
**503-G** [4] - 721:22;
722:6, 9; 734:21
**504** [4] - 721:3, 17,
20; 734:20
**504-E** [4] - 721:22;
722:7, 9; 734:22
**506** [11] - 693:22;
694:2, 6, 11, 13-14;
696:10, 17; 697:20;
700:23; 734:4
**510** [1] - 620:20
**511** [1] - 621:18
**512** [1] - 678:21
**520** [2] - 622:5, 12
**526** [1] - 679:4
**53151** [1] - 591:5
**538** [1] - 622:15
**539** [2] - 622:20; 623:5
**54** [1] - 673:18
**550** [8] - 674:4;
701:14; 702:2; 704:16;
716:20; 734:11
**550-A** [4] - 701:14;
704:16; 734:11
**551** [1] - 674:20
**555** [5] - 679:11,
23-24; 684:18; 734:9
**556** [1] - 675:19
**557** [7] - 705:1; 707:8,
12, 20, 22; 734:13
**558** [4] - 709:19, 25;
710:1; 734:14
**559** [5] - 711:5, 8,
14-15; 734:15
**560** [5] - 714:1, 8,
13-14; 734:16
**561** [4] - 716:2, 12-13;
734:17
**562** [5] - 705:6, 14,
16-17; 734:12
**565** [6] - 599:25;
600:2, 4, 10-11; 734:7
**566** [5] - 716:17, 22,
24-25; 734:18
**570** [2] - 733:3
**588** [1] - 734:2
**590** [2] - 733:4; 734:5
**592** [1] - 734:6
**5th** [1] - 681:18

**6**

**6** [3] - 568:7; 676:23;
682:14
**6.19** [1] - 693:15
**600** [1] - 734:7

**6006** [1] - 717:6
**606** [1] - 733:5
**608** [1] - 676:3
**61** [1] - 715:25
**610** [1] - 733:6
**611** [1] - 733:8
**612** [1] - 733:8
**629** [1] - 733:9
**631** [6] - 568:22;
677:19; 678:22; 679:4;
733:10
**631-265-2379** [2] -
594:1; 595:23
**634** [1] - 733:11
**639** [2] - 733:13
**66** [1] - 601:10
**671** [1] - 734:8
**679** [1] - 734:9
**689** [1] - 734:10
**694** [1] - 734:4
**6:45** [1] - 683:15
**6th** [2] - 682:15; 683:6

**7**

**7** [2] - 677:1; 683:15
**7/1/2013** [1] - 679:5
**7/10)** [1] - 591:16
**704** [1] - 734:11
**705** [1] - 734:12
**707** [1] - 734:13
**710** [1] - 734:14
**711** [1] - 734:15
**712-6105** [1] - 568:22
**714** [1] - 734:16
**716** [2] - 734:17
**719** [1] - 734:19
**721** [1] - 734:20
**722** [1] - 734:21
**7th** [1] - 684:4

**8**

**8** [2] - 677:18; 682:23
**836-142-4419** [1] -
713:22
**884** [1] - 639:10
**8:55** [1] - 680:20

**9**

**9** [2] - 678:9, 21
**9:15** [1] - 732:20
**9:30** [6] - 568:7;
730:6, 19; 732:21
**9:45** [1] - 708:10

**A**

**A-N-D-R-E** [1] - 628:13
**a.m** [1] - 568:7
**ability** [5] - 579:2;
609:7, 10, 14; 610:5
**able** [7] - 575:17;
653:2; 685:15, 20;
699:17; 711:25; 712:3
**absence** [1] - 638:4
**absolutely** [2] -
576:23; 583:14
**Academy** [1] - 645:19
**academy** [1] - 640:10
**accept** [1] - 664:15
**acceptable** [1] - 644:4
**access** [3] - 577:7;
609:15
**accidently** [1] -
690:18
**accompany** [1] - 616:16
**according** [4] - 595:9,
15, 25; 603:7
**account** [5] - 580:2, 6,
10; 593:17; 712:24
**accurate** [2] - 600:4;
629:2
**acquisition** [1] -
648:1
**actively** [1] - 673:6
**activity** [1] - 672:21
**acts** [1] - 643:18
**actual** [4] - 643:16;
648:4; 653:21; 721:25
**add** [1] - 678:25
**addition** [2] - 572:6;
653:16
**additional** [7] -
577:8; 637:16; 640:13;
651:24; 663:23; 697:7
**address** [23] - 569:7;
591:10; 594:5, 7, 25;
595:17, 19; 600:13;
604:10; 614:21; 635:16;
637:19; 673:23; 675:9,
23; 676:20; 677:7, 12;
678:5, 18; 719:17;
723:12
**adds** [1] - 650:10
**adjourned** [1] - 732:23
**admission** [1] - 717:18
**admit** [23] - 590:13;
592:15; 600:8; 659:9,
14; 671:12; 679:19;
689:16; 694:10; 702:17;
705:13; 707:15; 709:23;
711:12; 714:7; 716:7,

**A**

**admitted** [34] - 588:9;
590:16; 592:17; 593:1;
595:16; 600:10; 624:20;
658:11; 660:14; 671:15;
679:23; 687:25; 689:19;
694:13; 704:16; 705:11,
16; 707:20; 709:25;
711:14; 714:13; 716:12,
24; 719:1; 720:22;
721:18; 722:6; 727:7;
728:11; 731:5, 10, 12;
732:1, 4
**admitting** [1] - 660:1
**adopted** [2] - 596:24;
597:7
**adoption** [1] - 723:16
**adult** [9] - 587:15;
588:17, 19, 24; 589:1,
6, 8; 591:23, 25
**adult-sized** [3] -
588:19; 589:1, 8
**adults** [1] - 643:17
**advance** [1] - 578:23
**advanced** [2] - 644:17;
645:18
**advertisement** [1] -
623:11
**advice** [2] - 603:1;
660:19
**advised** [3] - 603:17;
656:21; 660:12
**Africa** [3] - 602:11;
628:18
**afternoon** [5] -
629:17; 639:18; 699:9
**age** [1] - 582:1
**agencies** [2] - 642:21
**agency** [3] - 642:10;
654:18; 675:13
**Agent** [21] - 569:20,
22; 574:21; 575:3;
576:9, 13, 25; 579:20;
582:5; 589:9; 598:16;
606:7; 608:10; 630:15;
632:7, 10, 17; 654:20
**agent** [9] - 570:18, 21,
24; 574:21; 577:22;
578:9; 587:12; 603:2;
655:7
**agents** [6] - 571:12;
597:21; 608:10; 619:24;
633:20; 665:9
**ago** [4] - 583:4;
615:15; 631:14
**agree** [6] - 660:25;

703:11; 704:9; 718:17;
731:18
**agreed** [2] - 663:7;
676:10
**ahead** [8] - 606:3;
618:25; 639:14; 680:17;
684:7; 687:1; 706:15;
715:8
**Airport** [2] - 578:2, 6
**airport** [3] - 578:8;
579:10, 19
**Alan** [1] - 582:25
**A**▮ [7] - 571:23, 25;
572:3; 602:7, 9; 628:14
**alive** [1] - 673:6
**ALLEN** [1] - 568:15
**allow** [3] - 581:12;
718:15
**allowed** [2] - 586:4;
598:1
**allows** [3] - 662:13;
668:14; 687:2
**almost** [1] - 599:13
**alone** [1] - 654:15
**aloud** [2] - 675:4;
677:4
**alpha** [1] - 731:11
**altered** [1] - 649:6
**alternator** [1] - 676:9
**AMEET** [1] - 568:14
**Ameet** [1] - 612:7
**America** [2] - 628:16;
710:13
**AMERICA** [1] - 568:3
**American** [1] - 581:3
**amount** [1] - 655:9
**ample** [1] - 713:18
**analysis** [12] -
641:18; 644:11, 17, 19;
647:24; 656:1; 665:24;
666:1-3; 667:16; 694:8
**analyst** [1] - 647:22
**analyze** [1] - 648:7
**analyzed** [1] - 670:6
**analyzing** [1] - 697:15
**ANDRE** [2] - 628:12;
673:9
**Andre** [6] - 602:16;
609:5; 610:5; 628:9;
673:9
**Andres** [5] - 572:18,
21, 24; 573:10, 14
**Andres'** [1] - 573:12
**Angela** [1] - 572:5
**Angelini** [4] - 576:9,
13, 25; 579:20

**Angelique** [1] - 633:12
**Angelo** [1] - 570:25
**Angelo's** [1] - 571:3
**angles** [1] - 713:13
**answer** [4] - 608:25;
618:18; 633:25; 634:10
**answered** [1] - 577:18
**ANTHONY** [1] - 568:17
**anticipate** [1] -
699:18
**anticipating** [1] -
699:16
**anyway** [1] - 718:18
**apart** [1] - 666:12
**apology** [1] - 666:4
**app** [1] - 682:1
**apparent** [1] - 656:12
**appeal** [1] - 636:3
**appear** [10] - 586:11;
588:22, 24; 589:4, 6;
594:2; 622:1; 623:4;
672:23; 673:8
**appearances** [1] -
569:3
**APPEARANCES** [1] -
568:11
**appearing** [1] - 592:24
**apple** [1] - 696:4
**application** [1] -
724:16
**applied** [2] - 690:11;
691:18
**apply** [5] - 649:23;
712:15
**appreciate** [2] -
569:17; 612:16
**approach** [4] - 576:15;
617:22; 702:19; 726:6
**approaching** [2] -
643:1, 18
**April** [5] - 604:20;
661:24; 662:1; 714:20;
719:23
**area** [15] - 574:15;
599:21; 600:5; 601:5;
603:23; 644:6; 646:8;
647:22, 25; 677:19;
678:22; 679:4; 693:5
**areas** [4] - 641:20;
645:8; 646:13; 698:1
**argue** [1] - 703:25
**argument** [1] - 718:16
**arguments** [1] - 634:8
**arise** [1] - 646:15
**Arkay** [1] - 568:18
**armed** [1] - 608:19

**Arnold** [1] - 573:7
**arose** [1] - 613:22
**arrangements** [2] -
578:11, 23
**arrest** [7] - 576:19;
579:8; 602:22; 603:24;
604:3; 683:19, 25
**arrested** [9] - 577:19;
578:1, 4; 579:10, 19;
603:8, 17; 613:22;
633:14
**arresting** [1] - 576:15
**arrived** [2] - 578:8;
656:3
**arrow** [1] - 672:3
**ass** [1] - 683:1
**assessing** [1] - 665:3
**assets** [1] - 642:23
**assigned** [2] - 640:10;
642:4
**assist** [5] - 655:20,
25; 664:2; 694:6;
700:24
**assistant** [1] - 675:15
**Assistant** [1] - 612:8
**Assistants** [1] -
568:15
**assisted** [1] - 568:24
**associated** [4] -
587:8, 10; 595:19;
672:15
**associates** [1] - 604:6
**association** [1] -
645:15
**Atlantic** [1] - 578:22
**attach** [5] - 607:11;
648:25; 667:20; 668:5
**attached** [13] - 574:7;
600:25; 649:10; 668:16;
690:12, 25; 691:2, 23;
720:10; 722:1; 724:11;
728:1
**attachment** [1] -
729:21
**attachments** [8] -
723:25; 724:3, 8, 10,
25; 729:12, 14, 17
**attempt** [3] - 572:8,
24; 580:12
**attempted** [3] - 572:4,
15, 17
**attend** [4] - 645:25;
646:1, 7
**attended** [2] - 645:5
**attending** [1] - 653:23
**attention** [2] -
654:16; 655:18

**Attorney** [3] - 568:13,
15; 612:8
**Attorney's** [1] -
645:14
**au** [2] - 675:13, 15
**audio** [1] - 607:11
**Audrey** [1] - 713:2
**authenticating** [1] -
717:21
**automatically** [1] -
669:24
**available** [8] -
573:23; 581:17; 604:9;
651:13, 15-16; 653:9;
668:18
**aware** [6] - 574:22;
575:2, 14; 582:17;
613:14; 712:25

**B**

**B-E-R-N-A-D-E-T-T-E**
[1] - 611:23
**baby** [1] - 710:13
**background** [1] -
604:10
**backup** [1] - 708:13
**Badalucco** [1] - 608:15
**bag** [7] - 588:15, 18,
22, 25; 589:4, 7;
689:13
**bail** [2] - 613:23;
633:14
**bar** [1] - 645:15
**based** [11] - 587:4, 7;
618:11, 18, 20; 620:4;
664:17; 699:18; 704:15;
718:6, 9
**basement** [14] -
571:13; 574:2; 616:21,
23, 25; 617:14, 17;
619:7, 11-12, 14;
620:4; 625:19; 626:11
**basic** [5] - 644:11;
645:18; 655:10
**basis** [1] - 718:15
**battery** [6] - 666:13,
18, 20; 667:11; 676:8
**beautiful** [2] - 712:9,
14
**become** [3] - 628:5;
651:20
**BEFORE** [1] - 568:8
**beginning** [3] -
584:22; 586:2; 670:24
**begins** [1] - 711:22
**belong** [1] - 646:10
**below** [3] - 696:18, 23;

4

712:6

**benefits** [1] - 629:24
**Berezovska** [2] - 628:23, 25
**Berlin** [2] - 591:4; 593:4
**Bernadette** [5] - 570:22; 571:3; 572:5; 611:15, 22
**Bernadette's** [1] - 570:25
**best** [5] - 591:3; 668:8; 679:7; 697:1; 715:18
**beta** [2] - 653:11, 14
**Beth** [3] - 679:4, 6
**better** [2] - 600:3; 612:13
**between** [7] - 589:10; 684:24; 688:23; 704:20; 710:17, 21
**beyond** [1] - 577:9
**BIANCO** [1] - 568:9
**big** [6] - 612:15; 624:1; 626:11; 652:24; 690:10; 695:7
**bigger** [1] - 687:3
**bill** [2] - 719:7
**billion** [1] - 650:16
**binder** [7] - 637:15; 720:23; 721:21; 731:13, 15, 20
**birth** [3] - 581:13, 15; 604:6
**birthday** [1] - 613:5
**BIRTHDAY** [1] - 591:6
**bit** [13] - 621:16; 649:14; 657:16; 666:7; 690:19; 692:1; 697:13; 698:3; 708:14; 729:9
**bitch** [4] - 708:10, 23, 25; 709:14
**bizarre** [1] - 589:17
**black** [3] - 591:16; 599:20; 658:7
**blank** [2] - 681:8, 10
**blessed** [1] - 684:5
**block** [13] - 649:1, 8, 11; 690:13-17; 691:1, 15; 692:18
**blocking** [1] - 657:15
**blood** [1] - 614:4
**blue** [7] - 600:23, 25; 601:7, 16; 621:5; 622:1; 724:15
**blurry** [1] - 681:2

**boat** [1] - 678:23
**bode** [1] - 635:16
**BODE** [19] - 568:15; 611:6, 9; 618:6, 9; 635:6, 15, 17; 636:17; 680:25; 700:10; 704:3, 9; 717:23; 731:3, 16; 732:3, 5, 9
**body** [6] - 592:4; 646:13; 680:13; 712:6, 15
**bond** [3] - 613:23; 633:14
**books** [1] - 593:1
**born** [1] - 615:21
**bottom** [3] - 605:8; 670:23; 675:25
**bound** [1] - 710:21
**box** [18] - 575:21, 23; 576:1, 6; 626:5; 630:4; 667:17; 689:12, 14; 698:19, 23-24; 699:1; 724:22
**boxes** [1] - 701:6
**boy** [1] - 726:10
**bravo** [1] - 727:23
**break** [8] - 606:4; 610:24; 635:8; 699:7, 9; 700:22; 702:23; 732:16
**breast** [1] - 710:13
**bridge** [1] - 661:20
**brief** [1] - 610:10
**briefly** [2] - 631:7; 640:5
**bright** [1] - 591:14
**bring** [15] - 569:13; 604:7; 614:7, 10; 616:11; 638:8; 642:23; 657:7; 665:16; 669:2; 675:14; 689:22; 690:3; 700:5; 720:23
**brings** [1] - 642:21
**Bro** [1] - 678:6
**broke** [1] - 700:22
**Brooklyn** [1] - 661:18
**brother** [24] - 612:22; 613:22, 25; 614:2; 615:10, 17; 616:2; 618:8, 12, 19, 23; 619:10, 13; 623:9, 13, 22; 624:5, 13; 627:24; 628:6, 22, 25; 629:1; 633:13
**brother's** [10] - 614:18, 21; 616:12, 17; 625:12; 627:16; 628:15;

631:21
**brought** [5] - 603:22; 625:12; 665:10; 689:12; 690:12
**Brown** [1] - 730:9
**brown** [2] - 612:20; 658:6
**bulk** [1] - 717:25
**bunch** [2] - 650:4; 697:5
**Bureau** [1] - 596:17
**bush** [1] - 713:18
**business** [2] - 644:10; 718:12
**butterfly** [1] - 621:7
**BY** [22] - 570:7; 590:3, 21; 606:6; 610:12; 612:6; 619:1; 629:16; 631:9; 634:2, 22; 639:17; 700:21; 733:4-7, 9-12, 14

---

**C**

**C-E-L-L-E-B-R-I-T-E** [1] - 666:17
**C1** [1] - 696:18
**C1-HD-1** [2] - 694:19; 695:12
**cabinets** [3] - 697:2, 5, 8
**cables** [2] - 668:5; 690:25
**Cablevision** [1] - 593:19
**caliber** [1] - 597:20
**camcorder** [6] - 575:7, 10, 15, 23; 576:1; 606:17
**camcorders** [1] - 576:3
**camera** [18] - 573:25; 574:5, 14, 17, 23; 575:13, 21, 23; 643:8; 686:16, 18, 20-22, 24; 687:8; 709:14
**cameras** [3] - 607:11; 625:19; 644:1
**candy** [1] - 712:16
**capacity** [3] - 636:7; 637:8; 665:12
**capital** [5] - 682:25; 708:10; 713:8, 20; 714:25
**caps** [2] - 681:19
**card** [3] - 637:11; 667:22
**cards** [2] - 648:12; 667:25

**care** [4] - 629:3, 8-9; 715:22
**career** [8] - 573:18; 628:3; 640:6; 647:6; 653:20; 654:1, 9, 13
**carry** [2] - 598:3
**case** [49] - 569:2; 573:25; 574:21; 575:10; 580:9, 21, 23; 581:15; 606:18; 609:19; 610:25; 613:22; 644:25; 647:13; 648:15; 652:8, 12, 14; 654:3; 655:5; 662:24; 663:15; 664:14, 25; 665:2, 13; 667:18; 669:16; 675:23; 680:22; 681:4; 685:5; 688:14; 691:17; 696:3, 19, 21; 699:10, 16; 701:7; 703:1, 14, 17; 730:21; 732:23
**cases** [6] - 640:22; 641:6, 24; 642:25; 643:15; 644:24
**cash** [1] - 624:10
**catch** [1] - 668:21
**categories** [4] - 644:7; 668:20; 670:5, 9
**categorizes** [1] - 669:5
**cc** [2] - 711:21; 714:21
**CD** [3] - 701:14; 705:10
**ceiling** [3] - 575:12, 24; 606:18
**Celebrate** [3] - 591:3; 592:23; 593:4
**cell** [44] - 637:5; 644:1; 646:21, 25; 647:4, 9, 11, 15; 665:7, 19; 666:1, 5, 7-9; 667:4, 17, 21; 668:10, 19, 23; 669:10, 12, 15, 18; 673:6, 22; 674:9; 676:4; 678:2; 681:23; 682:1; 686:16, 18, 20, 22, 24; 687:2, 8, 11, 21; 709:13, 15
**Cellebrite** [7] - 666:17; 667:14; 668:11, 25; 669:3; 671:6
**center** [2] - 600:21; 601:5
**Central** [3] - 568:5, 14, 22
**certain** [7] - 573:22; 597:3, 8; 606:25; 647:20; 650:6; 657:14
**certainly** [1] - 609:12

**certainty** [2] - 685:15, 20

**certificate** [2] - 581:13, 15

**certification** [3] - 650:24; 652:1; 717:19

**certified** [3] - 651:18, 20

**chance** [1] - 662:25

**change** [1] - 635:25

**changed** [4] - 649:7; 691:11; 717:20; 731:23

**changeover** [1] - 635:24

**changing** [1] - 607:8

**characterization** [2] - 596:7; 634:7

**charge** [1] - 730:16

**charges** [1] - 633:16

**Charley** [1] - 728:17

**chart** [2] - 586:21; 594:15

**chats** [1] - 643:15

**check** [5] - 606:17; 608:20; 624:10; 712:24; 732:9

**checked** [1] - 717:4

**checking** [1] - 708:23

**cheerleader** [3] - 620:13; 626:24; 627:4

**cheerleading** [3] - 617:10; 627:11

**chief** [4] - 641:1, 10; 642:2

**child** [47] - 572:6, 9, 11-12, 16-17; 580:18, 22; 581:4, 7, 10, 14, 20, 23; 582:1, 6, 9; 592:4; 620:17, 21; 621:19, 21; 642:25; 654:2, 5, 14; 659:10, 20; 660:2; 662:3; 668:22; 687:10, 21-22; 713:3; 720:2, 10; 724:14, 19

**Child** [1] - 642:18

**children** [3] - 629:3; 643:2, 18

**children's** [1] - 643:14

**Children's** [3] - 642:12, 14, 20

**China** [2] - 667:12

**choose** [1] - 698:18

**chose** [1] - 651:24

**Christmas** [1] - 684:19

**chronological** [1] - 675:1

**chronologically** [1] - 670:10

**circle** [1] - 696:10

**circled** [2] - 701:9; 702:5

**circling** [1] - 686:14

**circumstances** [1] - 631:19

**citizens** [1] - 576:18

**City** [1] - 706:22

**civil** [1] - 610:19

**claimed** [1] - 660:6

**clarification** [1] - 704:24

**cleansed** [1] - 703:8

**clear** [5] - 612:11; 621:8; 636:2, 6; 712:4

**CLERK** [3] - 638:16; 639:1, 7

**client** [1] - 698:9

**clip** [6] - 725:12, 15, 20, 23; 727:6, 8

**clips** [2] - 725:8, 17

**clock** [7] - 573:25; 574:5, 7, 10, 23; 626:7

**close** [1] - 612:1; 712:10

**closer** [1] - 581:24

**clothed** [1] - 620:18

**co** [2] - 718:5, 14

**co-conspirator** [2] - 718:5, 14

**code** [5] - 674:7; 677:19; 678:22; 679:4

**coffee** [2] - 599:10

**cold** [1] - 632:13

**collectively** [1] - 670:19

**college** [6] - 572:22; 602:19; 609:5, 8, 22; 610:6

**color** [5] - 592:2; 600:2; 621:2; 650:7

**column** [3] - 672:1, 5, 11

**combines** [1] - 670:9

**comfortable** [1] - 699:22

**coming** [3] - 637:1; 641:12; 675:15

**comma** [1] - 706:20

**commercial** [3] - 645:7; 651:4, 6

**commercially** [4] -

651:13, 16; 653:9

**commit** [1] - 583:12

**common** [1] - 605:19

**communication** [1] - 673:7

**company** [4] - 651:6; 653:6; 667:24; 715:19

**complete** [10] - 640:23; 647:20, 25; 648:3; 665:11; 666:8; 671:7, 9-10; 730:11

**completed** [3] - 603:2; 671:7; 699:19

**completely** [1] - 709:17

**complex** [5] - 650:10; 657:11, 19-20, 22

**complicated** [1] - 650:3

**compose** [1] - 698:10

**composed** [2] - 723:10, 15

**computer** [80] - 568:24; 574:3, 8; 612:4; 635:21; 637:10; 640:15; 641:4, 12, 14, 19, 22; 642:4; 643:3, 7, 9, 12, 20, 22; 644:9, 12, 23; 645:11, 19, 24; 646:14, 18-19, 21, 24; 647:4, 14-15, 17-18, 21; 648:11, 13, 15, 22; 649:6; 650:1; 652:25; 653:17; 656:7, 9, 11; 657:5, 14; 661:7, 9, 21; 662:6; 667:19; 669:3; 687:23; 688:19, 23; 689:2; 691:2, 23, 25; 692:22, 24; 693:1, 19-20; 694:24; 695:2; 698:4, 13; 702:12; 707:24; 713:24; 716:5; 717:10; 728:25

**computer-assisted** [1] - 568:24

**computers** [14] - 643:7, 25; 644:6, 8; 646:25; 647:8; 650:22; 656:23; 657:11, 21, 23; 665:7, 9

**concept** [1] - 650:1

**concern** [3] - 577:17; 579:5; 703:6

**concerned** [4] - 577:4, 6, 14; 585:6

**concerning** [1] - 685:12

**conclusions** [1] - 664:8

**condition** [5] - 575:17; 648:4, 17; 666:10; 691:8

**conduct** [8] - 643:6, 9; 649:21; 651:5; 654:23, 25; 655:3; 665:24

**conducted** [2] - 653:18; 654:1

**conducting** [3] - 649:20; 655:20; 666:5

**confer** [6] - 582:4; 585:25; 679:18, 20; 688:4; 717:12

**conference** [3] - 618:14; 717:18, 22

**confession** [1] - 596:5

**confusion** [1] - 700:13

**conjunction** [2] - 648:24; 688:25

**connect** [1] - 668:4

**connected** [1] - 692:18

**connection** [5] - 647:1; 654:2, 7; 656:6; 668:3

**consider** [3] - 664:13, 24; 665:2

**considered** [1] - 663:21

**conspiracy** [1] - 718:6

**conspirator** [2] - 718:5, 14

**contact** [12] - 579:20, 22; 610:3; 673:20; 676:4, 16; 678:2, 15; 683:7; 713:4; 719:15, 19

**contacted** [5] - 653:6; 654:18, 20; 655:12, 14

**contacting** [1] - 655:7

**contain** [1] - 668:16

**contained** [7] - 720:9; 721:24; 724:14; 726:11, 25; 727:3

**containing** [1] - 648:23

**contains** [1] - 689:3

**content** [1] - 724:14

**contents** [4] - 691:25; 693:19; 697:18; 719:13

**context** [1] - 647:13

**continue** [8] - 569:20; 570:1; 665:4; 681:21; 686:23; 687:1, 4; 708:12

**Continued** [2] -

6

617:25; 618:15
**continued** [1] - 570:7
**continuing** [2] - 586:1; 645:14
**contraption** [1] - 626:12
**control** [1] - 703:15
**conversation** [2] - 589:16; 607:16
**conversations** [1] - 618:8
**copies** [1] - 637:14
**copy** [16] - 581:13; 614:10; 638:10, 12; 648:18; 649:16, 18, 22, 24; 653:7; 680:24; 690:19; 716:4
**copying** [1] - 649:25
**corner** [1] - 606:11
**correct** [64] - 575:24; 576:4; 577:1, 5; 579:12; 585:1, 16; 587:3; 591:11; 592:1; 594:11; 596:5, 15; 597:15; 598:24; 602:3, 5; 604:12; 606:16; 608:11, 14; 655:17; 669:11, 14; 671:3; 673:25; 674:17; 675:18, 24; 676:12, 16-17, 22; 678:8; 679:2, 9; 680:9; 690:21; 693:3, 7, 11-12; 694:9; 698:14; 702:7; 709:21; 711:8; 714:4, 23; 716:4, 18; 719:16, 20; 721:10; 724:5, 23, 25; 725:3, 22; 727:1; 731:17, 19
**correctly** [3] - 673:14; 722:25; 723:20
**corrupted** [1] - 692:13
**cost** [1] - 709:1
**costume** [19] - 588:15, 18-19, 22, 24; 589:1, 4, 6, 8; 591:17, 23; 592:9; 617:8-11; 619:8; 620:2; 623:20
**costumes** [12] - 571:13, 18; 589:23; 590:4, 23, 25; 617:6; 619:3; 620:13; 633:5
**couch** [2] - 574:3; 710:20
**Counsel** [4] - 679:18, 20; 688:4; 717:12
**counsel** [6] - 582:4; 585:25; 602:25; 604:16; 605:6; 612:4

**count** [1] - 713:14
**countries** [1] - 595:11
**country** [5] - 602:9; 629:9; 642:1; 646:3; 674:6
**County** [12] - 581:2; 608:13, 15; 639:11, 21, 23; 640:7; 641:22; 652:9; 655:5; 677:22; 688:14
**couple** [14] - 605:10; 617:2, 14; 619:15; 620:2, 8; 625:22; 649:12; 668:5, 7-8; 670:15
**course** [13] - 573:18; 582:15; 589:9; 644:11, 15-16, 20; 645:1; 651:22; 652:4; 718:5, 12
**courses** [4] - 645:2, 11, 13, 25
**court** [11] - 633:13, 17; 661:11; 663:11; 683:18, 24; 694:7; 704:14; 718:21; 726:18
**COURT** [126] - 568:1; 569:4, 11, 16; 570:1; 581:12; 583:11; 586:16; 587:18; 588:8; 589:25; 590:16; 592:17; 593:22; 596:8, 23; 600:10; 603:12; 605:2, 14; 606:1, 3; 608:24; 610:9, 18, 21, 23; 611:4, 8, 12, 16, 25; 617:20; 618:1, 7, 11, 16, 25; 623:1; 629:6, 14; 631:6; 633:23, 25; 634:9; 635:2, 5, 8, 11; 636:9, 18, 21; 637:1, 17, 23; 638:5, 8, 19, 24; 639:12; 658:10; 659:13, 16; 660:10; 661:3; 662:11, 21; 663:5, 12; 671:15; 673:1; 677:15; 679:21, 23; 683:20; 685:19, 24; 687:20; 689:19; 694:13; 699:7, 13, 25; 700:4, 8, 12, 19; 703:18; 704:11, 15; 705:16; 706:10; 707:20; 709:25; 711:14; 714:13; 716:12, 24; 717:22, 24; 718:13, 24; 719:1; 720:22; 721:17; 722:5; 725:11; 726:1, 6, 10, 13; 727:5, 23; 728:11;

729:19; 730:4, 25; 731:12, 21, 25; 732:4, 6, 11, 14, 19, 21
**Court** [17] - 568:20; 612:3; 636:4, 16; 637:14; 638:12; 644:4; 661:18, 22-24; 662:1, 13; 731:3
**Court's** [2] - 637:15; 720:25
**Courthouse** [1] - 568:4
**courtroom** [23] - 569:15; 611:2, 11; 612:15; 624:1; 635:10; 638:18; 658:15; 660:17; 667:1; 671:21; 686:10; 690:10; 693:25; 699:12; 700:18; 705:21; 714:18; 719:6; 722:12; 727:20; 728:23; 730:24
**cover** [2] - 574:15; 666:18
**covers** [1] - 711:22
**CR** [1] - 568:3
**craft** [1] - 640:21
**crazy** [1] - 681:20
**created** [8] - 637:8; 701:18, 20, 22; 720:9; 721:13; 725:23; 726:24
**creates** [2] - 697:25; 698:18
**creating** [1] - 721:13
**creative** [2] - 710:10, 13
**creature** [2] - 712:9, 14
**credibility** [1] - 665:3
**crevice** [2] - 712:11; 713:13
**crevices** [1] - 713:19
**crime** [9] - 641:14, 17, 19; 643:2, 9, 11; 646:14, 20
**crimes** [10] - 583:12; 640:23; 641:4, 12, 22; 642:4; 643:16; 646:24; 647:21; 661:21
**criminal** [7] - 647:1; 654:6; 680:22; 681:4; 685:4, 11; 687:15
**cross** [8] - 569:20; 590:5; 594:12; 596:12; 597:16; 603:21; 629:14; 642:9
**CROSS** [4] - 570:6; 629:15; 733:3, 9
**cross-designated** [1]

- 642:9
**cross-examination** [6] - 569:20; 590:5; 594:12; 596:12; 597:16; 629:14
**CROSS-EXAMINATION** [4] - 570:6; 629:15; 733:3, 9
**cry** [1] - 708:25
**cumulativeness** [1] - 703:19
**cup** [1] - 599:11
**cupcake** [3] - 599:14
**current** [1] - 640:3
**cursory** [1] - 655:9
**curves** [1] - 713:17
**custody** [6] - 579:4, 11, 15, 25; 665:14, 22
**cut** [1] - 705:23
**cute** [1] - 713:13
**cutting** [1] - 708:19

---

**D**

**D-A** [1] - 713:20
**Dallas** [1] - 706:22
**dam** [3] - 691:3, 5; 692:18
**damn** [3] - 680:21; 681:3; 682:11
**danger** [1] - 578:16
**dangerous** [1] - 683:2
**Daniel** [1] - 583:2
**Danielle** [3] - 598:16; 632:17; 654:21
**dash** [1] - 710:21
**data** [19] - 643:24; 644:11, 17; 649:4; 666:3; 667:20, 23; 668:1, 7, 17; 669:5; 682:17; 689:1; 690:18; 691:10; 696:1, 5; 698:2
**database** [3] - 640:16; 699:3
**date** [16] - 578:4; 596:13; 604:6; 606:12, 14, 17; 607:5; 645:23; 672:20; 673:5; 680:11; 685:7; 691:8; 705:22; 719:21; 729:3
**dated** [1] - 701:23
**dates** [1] - 606:20
**daughter** [39] - 571:3, 16, 21; 580:16; 581:10; 602:7; 604:23; 605:9, 12, 16; 609:19; 612:24; 615:11, 16; 616:16; 617:5; 618:3; 620:3,

24-25; 621:22; 622:11, 17, 22; 623:10, 24; 624:3, 23; 627:6; 628:3, 15; 659:10, 21; 675:10; 709:11, 16

**daughter's** [2] - 571:23; 613:5

**day-to-day** [1] - 646:19

**days** [2] - 646:5; 681:16

**DBX** [16] - 698:18, 25; 699:2, 4; 701:7; 702:4, 10; 704:23; 705:10, 12; 707:10; 709:20; 711:10; 714:5; 716:5

**dealing** [1] - 576:17

**dear** [1] - 712:24

**December** [11] - 680:12, 20; 681:18; 682:15; 683:6, 15; 684:4; 685:1; 686:1; 687:14; 729:4

**decide** [3] - 576:17; 648:6; 664:16

**decides** [1] - 664:3

**decline** [1] - 630:10

**declined** [2] - 613:19; 630:7

**deemed** [1] - 636:5

**deep** [1] - 712:13

**Defendant** [2] - 568:6, 17

**defendant** [34] - 594:8, 25; 595:20; 596:13; 597:12; 598:13; 599:1, 16, 18; 602:25; 603:2, 6, 16; 604:2; 620:5; 637:6, 10; 658:9, 17, 19; 659:1, 3, 5, 7, 9, 14, 17; 660:11, 23; 685:21, 25; 687:13; 703:16; 729:5

**Defendant's** [12] - 587:20, 23; 588:6, 8, 10, 12, 14, 20; 589:2; 599:20, 24; 734:2

**defendant's** [17] - 590:11; 592:12; 596:4, 9; 597:19; 598:7; 599:21; 600:5; 602:6, 16; 637:12; 665:7; 674:12; 685:10, 16; 703:15; 728:25

**defendants** [1] - 654:7

**defense** [11] - 569:9; 602:25; 604:16; 605:6; 636:9; 637:13, 15, 17;

638:9; 731:17; 732:17

**definitely** [1] - 573:13

**deleted** [5] - 672:12-14; 698:20

**delivery** [1] - 719:17

**delta** [3] - 727:7, 23, 25

**demeanor** [1] - 665:1

**demonstration** [2] - 641:6, 24

**department** [4] - 640:8; 641:5; 643:5; 652:15

**Department** [10] - 597:4, 9; 639:11, 22, 24; 640:7; 641:23; 644:13; 652:9; 655:5

**depicted** [13] - 575:6; 580:22; 581:4, 20, 23; 586:23; 587:1; 598:22; 600:5; 620:16; 622:10, 16, 21

**depiction** [1] - 600:4

**deployed** [2] - 646:9; 653:10

**deposit** [1] - 623:25

**deposited** [2] - 624:4, 8

**deputy** [1] - 612:1

**describe** [11] - 600:19; 621:2, 23; 640:5; 643:4; 644:7; 652:21; 670:2; 680:17; 701:15; 731:7

**described** [2] - 633:3; 680:9

**describing** [1] - 724:18

**description** [1] - 672:7

**deserves** [1] - 664:15

**designated** [1] - 642:9

**designed** [2] - 651:5; 695:23

**desk** [1] - 573:16

**desk/office** [1] - 599:21

**destroy** [9] - 577:4, 15; 578:17, 19, 21, 24; 579:2, 6

**destroying** [1] - 577:10

**detail** [3] - 599:8, 21; 600:3

**details** [3] - 593:2; 618:10; 666:13

**detective** [18] - 570:18, 21, 24; 581:2; 608:15; 639:12; 640:4, 18-19; 641:1; 643:3; 646:24; 653:16; 654:7; 662:6; 680:1; 700:22; 706:15

**Detective** [10] - 571:5, 9; 598:15; 608:8; 635:17, 19; 636:14; 637:3; 639:9; 663:17

**detective's** [1] - 641:3

**detectives** [4] - 640:20; 641:2, 10; 642:2

**determine** [4] - 636:13; 641:6; 642:1; 695:14

**developed** [2] - 577:8; 703:11

**developing** [1] - 643:14

**device** [4] - 579:17; 665:25; 688:11; 689:1

**devices** [9] - 607:11; 647:4; 685:16, 21, 25; 687:17, 23; 703:15

**DHL** [7] - 660:4, 6; 717:9, 19; 718:6, 9; 719:7

**dicks** [1] - 709:2

**difference** [2] - 600:1; 688:23

**different** [26] - 570:17; 638:11; 642:23; 646:16; 648:24; 649:12; 650:22; 652:23; 653:1; 666:3; 668:3-7; 669:5, 7; 670:5, 9; 695:25; 696:5; 697:10, 16; 698:18; 731:13

**differently** [3] - 666:7; 696:6; 719:24

**difficulty** [1] - 629:19

**digital** [9] - 643:7, 24; 644:1, 19; 645:16; 650:12, 19; 656:2

**dining** [2] - 598:16, 22

**direct** [4] - 576:8; 603:7, 12; 700:6

**DIRECT** [4] - 612:5; 639:16; 733:8, 13

**directed** [3] - 659:9, 20; 691:19

**direction** [1] - 672:4

**directly** [1] - 573:8

**directories** [3] - 696:23; 697:6, 17

**directory** [9] - 694:4; 696:12, 24; 697:1, 21, 23, 25; 698:16

**disability** [1] - 629:23

**discard** [1] - 638:14

**discipline** [1] - 643:22

**discuss** [4] - 610:25; 697:3; 699:10; 730:21

**discussed** [4] - 576:15; 690:11; 717:17; 730:10

**discussing** [1] - 601:24

**discussion** [3] - 604:22; 699:18; 704:15

**disk** [20] - 643:8, 25; 689:3; 701:23; 702:8; 703:24; 718:3; 719:14; 720:6, 8-9; 721:9, 13; 725:18; 726:19, 24-25; 727:3

**disks** [6] - 701:18, 20, 22; 721:12, 23

**dismantle** [1] - 648:5

**displayed** [1] - 657:9

**displays** [1] - 696:8

**disputed** [1] - 664:3

**disregard** [1] - 664:20

**District** [3] - 568:21; 645:14; 661:12

**DISTRICT** [2] - 568:1

**district** [1] - 651:8

**Dittmeier** [1] - 583:2

**divides** [1] - 650:11

**DNA** [1] - 650:13

**document** [17] - 581:20; 658:14; 660:15; 661:4; 666:25; 671:20; 686:9; 693:24; 705:20; 714:17; 717:21; 718:1; 719:5; 722:11; 727:19; 728:22

**documented** [1] - 688:12

**documents** [2] - 697:9, 12

**Documents** [2] - 697:11

**dog** [1] - 726:3

**dominatrix** [1] - 589:14

**done** [3] - 589:21; 647:10; 686:20

**door** [2] - 656:18, 21
**dot** [14] - 678:4; 701:8; 702:4, 10; 704:23; 705:10, 12; 707:10; 709:20; 711:9; 714:5; 716:5
**double** [2] - 723:19; 732:9
**down** [18] - 604:1, 13; 608:3; 610:23; 617:13; 635:2, 5; 659:3; 661:16; 672:10; 674:18; 675:19; 677:6; 683:9; 696:23; 707:11; 709:3; 712:6
**downstairs** [7] - 616:5, 20-21; 627:6; 632:2; 656:11
**downward** [1] - 575:13
**draw** [5] - 598:11; 654:16; 655:18; 658:23; 659:1
**dress** [5] - 619:2, 5; 621:4; 627:19
**dressed** [5] - 617:5; 619:8; 620:2, 12; 621:2
**drinking** [1] - 599:16
**Drive** [8] - 568:18; 591:8; 593:6; 594:8, 22, 25; 655:21; 719:18
**drive** [54] - 616:15; 643:8; 648:10, 13, 16, 19, 21, 25; 649:4, 14-15, 25; 650:4, 13; 688:19; 690:8, 20, 22-23; 691:20, 22; 692:13, 15, 17, 23-24; 693:1, 6, 17; 694:23, 25; 695:1-3, 5, 7-8, 11, 15, 18; 696:18-22; 697:15; 701:19; 702:6, 15, 25; 720:3, 13
**drives** [1] - 643:25
**drop** [1] - 709:16
**drove** [1] - 578:13
**dual** [1] - 643:5
**Dubai** [1] - 680:15
**dude** [1] - 677:5
**duly** [3] - 570:4; 611:20; 639:5
**during** [15] - 573:1; 575:19; 576:9; 585:21; 588:2; 589:9; 590:4; 596:12; 597:16; 599:1; 607:19; 647:5; 659:17; 684:5; 694:4
**duties** [3] - 640:6; 643:4; 654:7

**duty** [1] - 598:3
**DVD** [2] - 718:3; 719:14
**DVU** [1] - 660:4
**dynamite** [1] - 678:24

---

**E**

---

**e-mail** [13] - 584:25; 585:15; 586:10; 595:17, 19; 600:13; 601:24; 604:17, 20, 22; 605:8, 10
**e-mails** [4] - 580:2; 583:21; 589:10, 13
**early** [1] - 687:14
**easier** [1] - 651:12
**Eastern** [1] - 661:12
**EASTERN** [1] - 568:1
**eat** [1] - 632:5
**echo** [1] - 695:21
**education** [3] - 645:14; 664:4, 18
**effort** [3] - 580:1, 4, 9
**eight** [2] - 647:11; 685:12
**either** [8] - 573:1; 602:18; 620:4, 6; 625:15; 628:4; 630:4; 646:8
**electronic** [1] - 579:16
**Elena** [1] - 708:6
**ELENA** [1] - 708:6
**email** [51] - 646:13; 669:15; 673:23; 675:9, 17, 23; 676:10, 20; 677:6, 12; 678:5, 18, 25; 679:7; 686:7; 687:3; 693:20; 698:9, 11; 703:11; 704:20; 705:8, 22; 707:24; 708:3, 24; 713:24; 714:22; 715:2, 11; 716:4, 19; 717:10; 719:11; 722:1, 13-14, 24; 723:12; 724:1; 725:1; 727:6; 728:25; 729:12, 23; 731:2, 7, 10
**emails** [18] - 669:16; 700:25; 701:3, 5-7, 19; 702:3, 9, 25; 703:4, 7, 18-19, 24; 720:10; 721:21; 724:12
**EMM** [1] - 713:20
**emotional** [1] - 712:13
**employ** [1] - 646:18

**employed** [3] - 639:11, 25; 642:13
**empty** [1] - 660:6
**enables** [2] - 667:20; 668:4
**EnCase** [16] - 645:3, 10; 651:1, 3-4, 13, 18, 20-21; 652:17, 21; 653:8, 13; 692:4; 693:15
**encompassed** [1] - 641:20
**encompasses** [1] - 641:20
**encrypts** [2] - 657:13, 15
**End** [1] - 618:14
**end** [9] - 584:4; 662:24; 663:15; 665:2; 669:1; 686:16; 689:3; 699:15, 17
**ended** [2] - 569:19; 618:3
**ending** [2] - 593:11; 717:5
**endless** [1] - 687:7
**enforcement** [23] - 571:2; 572:8, 23; 574:23, 25; 577:22, 25; 580:5, 8, 20-21; 581:1, 3; 609:18; 630:12, 18; 634:23; 642:10; 647:6; 651:15; 654:18; 658:16; 661:1
**engage** [1] - 643:18
**English** [1] - 605:20
**enter** [1] - 656:13
**entered** [11] - 574:14; 575:20; 614:12; 638:17; 656:13, 18; 700:17; 707:10; 709:20; 711:9; 716:19
**entering** [2] - 638:16; 697:16
**enters** [2] - 569:14; 611:10
**entertain** [1] - 583:18
**entire** [15] - 596:16; 601:24; 652:4; 654:13; 656:10; 681:1; 693:4; 703:1; 725:2, 7; 727:12-14, 16; 728:3
**entirely** [1] - 664:21
**entirety** [1] - 696:22
**entries** [1] - 680:6
**entry** [14] - 574:15; 672:2; 673:18; 674:4,

20; 676:3, 14, 23; 678:10, 21; 679:4; 684:13; 727:21
**equipment** [2] - 656:7, 11
**especially** [1] - 684:5
**ESQ** [4] - 568:14, 17
**essentially** [6] - 600:13; 604:7, 10; 650:12; 689:4; 721:7
**establish** [3] - 641:7, 19; 642:24
**established** [4] - 641:4, 11; 644:2; 652:23
**establishment** [2] - 641:3, 21
**estimate** [5] - 647:3; 699:14; 730:7, 17
**etcetera** [4] - 640:24; 685:5; 715:20
**evaluate** [3] - 657:8; 662:14; 688:7
**evaluated** [1] - 688:20
**evaluating** [2] - 656:6
**evaluation** [3] - 653:7; 655:25; 657:7
**event** [1] - 703:13
**eventually** [1] - 656:1
**evidence** [97] - 570:12; 575:4, 20; 577:4, 8-10, 12, 16; 578:17, 19, 21, 24; 579:2, 6, 23; 581:15, 18; 584:18; 586:17; 588:11, 20; 589:2; 590:18; 592:19; 593:1, 15; 595:16; 600:12; 614:12; 624:21; 640:22; 643:24; 645:17; 647:19, 21, 23; 649:5; 661:5; 664:2, 5, 7, 20; 665:18; 671:17; 679:25; 686:8; 687:25; 689:21; 694:15, 21; 699:19; 700:15; 704:18; 705:11, 18; 707:10, 23; 709:20; 710:2; 711:9, 16; 714:15; 716:14, 20; 717:1; 719:3; 721:20; 722:9; 725:17, 20; 729:18; 730:11; 731:14; 732:13; 734:2, 4, 6
**Evidence** [2] - 692:5; 693:16
**exact** [7] - 649:16, 18, 24; 650:21; 683:7; 691:8; 724:18

**exactly** [5] - 626:17; 649:17; 682:20; 723:18; 724:19

**examination** [11] - 569:20; 576:8; 590:5; 594:12; 596:12; 597:16; 629:14; 649:21; 694:5; 718:7

**EXAMINATION** [18] - 570:6; 590:2; 606:5; 610:11; 612:5; 629:15; 631:8; 634:21; 639:16; 733:3-6, 8-11, 13

**examinations** [2] - 643:6; 651:5

**examine** [4] - 647:14; 691:25; 693:18; 697:18

**examined** [5] - 570:4; 611:20; 639:5; 647:5; 692:4

**example** [2] - 648:8; 669:9

**except** [1] - 668:20

**exceptions** [3] - 597:5, 8; 664:9

**excess** [1] - 653:21

**exchange** [1] - 589:14

**exclamation** [1] - 714:21

**excluded** [1] - 603:25

**excuse** [2] - 680:2; 712:22

**executed** [2] - 594:10; 653:24

**execution** [1] - 588:2

**Exhibit** [140] - 575:4, 20; 583:15, 25; 584:18; 585:9; 586:17; 587:19, 23; 588:6, 8, 12, 14, 20; 589:2; 590:8; 592:11, 18; 593:16, 25; 594:3, 13; 595:10, 15; 596:1; 598:23; 599:20, 24-25; 600:11; 604:17; 606:9; 614:13; 620:20; 621:18; 622:3, 5, 12, 15, 20; 623:2, 5; 626:15; 627:1, 9; 630:1; 638:10; 658:12; 660:15; 665:19; 670:12, 20; 671:13, 16, 19; 678:21; 679:11, 24; 684:18; 686:5, 7; 687:11; 688:1, 16, 24; 689:7, 17, 20; 690:4, 7, 23; 693:22; 694:2, 6, 14; 695:4; 696:10, 17; 697:20; 700:23;

701:14; 704:16; 705:1, 6, 17; 707:9, 22; 709:19; 710:1; 711:8, 15; 714:8, 14; 716:13, 17, 20, 25; 718:23; 719:2; 720:6, 13-14, 20; 721:2, 5, 8, 17, 22; 722:3; 723:24; 724:20; 725:2, 5, 12, 19, 21; 726:19; 727:4, 21; 728:2, 17, 20; 734:4, 6-10, 12

**exhibit** [11] - 587:7; 637:8; 638:11; 694:17; 700:24; 702:24; 705:14; 711:5; 731:5, 22

**exhibit/exhibits** [1] - 689:24

**exhibited** [12] - 658:14; 660:16; 666:25; 671:20; 686:9; 693:24; 705:20; 714:17; 719:5; 722:11; 727:19; 728:22

**Exhibits** [10] - 588:10; 590:17; 704:17; 721:19; 722:8; 734:2, 5, 11, 20

**EXHIBITS** [1] - 734:1

**exhibits** [7] - 637:1, 3, 16, 18; 702:18; 720:24; 722:6

**exist** [2] - 641:15; 664:9

**exits** [2] - 611:1; 635:9

**expect** [1] - 637:17

**expense** [1] - 686:19

**experience** [7] - 640:15; 644:5; 653:17; 661:6; 664:4, 18, 24

**experiment** [1] - 710:16

**expert** [22] - 635:12, 14, 22, 25; 636:5, 7, 14-16, 19; 637:9; 661:8, 20; 662:6, 13; 663:14, 19, 21, 24; 664:10, 22; 704:4

**expert's** [1] - 664:16

**expertise** [1] - 662:9

**explain** [2] - 582:22; 731:1

**Exploitation** [1] - 642:19

**exploitation** [1] - 654:2

**exploited** [1] - 643:14

**Exploited** [3] -

642:12, 14, 20

**explore** [3] - 641:3; 712:11; 713:17

**explored** [1] - 713:14

**explores** [1] - 713:16

**exploring** [1] - 712:6

**express** [3] - 697:24; 698:6, 9

**Express** [5] - 591:3; 592:24; 593:4; 698:16

**extract** [5] - 646:24; 666:3; 667:20; 668:1, 7

**extracted** [9] - 668:10; 669:6, 17; 691:22; 701:18; 702:6, 9, 12; 720:12

**extracting** [1] - 643:23

**extraction** [10] - 666:2, 6, 11; 667:17; 668:12; 669:2, 5; 670:24; 680:3; 716:18

**extradite** [1] - 576:18

**eyes** [3] - 580:18; 581:3; 712:10

**F**

**face** [2] - 576:6; 648:19

**Facebook** [1] - 580:12

**facilitated** [1] - 643:11

**facilitating** [1] - 682:2

**facilities** [2] - 597:4, 10

**facing** [1] - 574:3

**fact** [24] - 573:6; 575:9; 577:1; 578:1, 5; 579:8; 581:10; 600:2; 623:22; 635:13, 22; 636:14, 16; 654:25; 655:20; 662:10; 663:18, 20; 664:3; 666:24; 673:3; 698:23; 701:3; 718:9

**factors** [1] - 665:1

**facts** [1] - 664:5

**factual** [1] - 635:25

**failed** [2] - 692:13; 693:2

**fair** [79] - 570:11, 14; 571:2, 5, 11, 25; 572:15; 573:22; 574:13, 17; 575:15; 576:5, 12, 21, 24; 578:13, 16; 579:11, 15; 581:23;

582:8; 583:7, 21; 585:3, 6, 15, 18, 21; 586:20; 587:15; 588:1, 14, 17; 589:13; 593:11, 13; 594:13; 595:9, 24; 596:10; 600:4, 15; 603:16; 606:14, 23; 607:1, 4, 22; 608:1, 5; 609:13, 21; 610:1; 615:7, 21; 620:10, 13; 627:22; 632:11; 645:22; 646:23; 652:6; 670:14; 671:1; 673:19; 677:10; 679:14; 684:25; 685:9; 700:25; 704:2; 711:19, 23; 715:23; 717:7; 722:13, 18

**fairy** [4] - 617:8; 620:12; 633:5

**fall** [1] - 611:9

**familiar** [3] - 606:20; 627:3; 650:25

**family** [5] - 603:19; 604:6; 681:22; 684:6, 8

**fantasy** [1] - 712:8

**far** [5] - 585:6; 607:14; 624:1; 675:11; 722:21

**father** [1] - 713:3

**FBI** [28] - 572:3; 578:14; 579:9, 22; 581:19; 587:13; 596:21, 24; 597:4, 7, 9, 20; 607:7, 10; 609:7, 13; 610:5; 632:7; 642:12, 14, 22; 644:20; 655:6, 20; 683:18, 24; 684:14

**FBI's** [1] - 603:22

**February** [7] - 588:4; 590:11; 592:13; 602:21; 632:10, 12

**fed** [2] - 683:16, 22

**federal** [1] - 580:21

**Federal** [6] - 568:13, 21; 596:17; 661:18, 22

**fee** [2] - 651:23; 652:2

**feeding** [1] - 710:13

**fees** [3] - 652:8, 12, 14

**female** [1] - 586:8

**fetishes** [1] - 587:16

**fettered** [1] - 609:16

**few** [8] - 615:14; 626:14; 631:14; 668:20; 674:23; 681:17; 683:11

**field** [1] - 598:1

**Fifth** [1] - 640:10

**figure** [1] - 666:18

**figured** [1] - 628:2

**file** [17] - 650:7; 696:23; 697:1, 5, 7, 23, 25; 698:25; 699:4; 705:10; 709:20; 711:10; 721:14; 724:19; 730:1

**files** [9] - 651:10; 696:12; 697:10; 721:24; 724:11; 727:25; 728:1

**filmed** [2] - 596:14, 19

**filming** [1] - 597:8

**final** [3] - 583:25; 672:20; 679:3

**finally** [1] - 712:14

**Finder** [2] - 692:6; 693:16

**fine** [5] - 636:17; 663:2; 673:12; 709:18; 726:15

**finger** [2] - 584:6; 585:13

**fingering** [1] - 715:10

**fingerprint** [2] - 650:13, 20

**finish** [1] - 700:9

**finished** [1] - 675:7

**fire** [1] - 676:9

**firearms** [1] - 597:17

**first** [25] - 571:12; 591:13; 608:11; 611:19; 628:25; 632:23; 633:13; 634:3; 635:24; 639:4; 641:15; 652:19, 21; 653:8; 671:19, 22; 672:1; 675:7; 680:8; 681:17; 687:14; 694:19; 707:24; 712:10; 728:13

**fishnet** [1] - 591:21

**fishnets** [1] - 591:20

**five** [10] - 571:25; 586:14; 606:2; 640:11-13, 17; 642:15; 646:5

**five-day** [1] - 646:5

**flesh** [1] - 614:4

**flight** [1] - 578:5

**flip** [1] - 666:20

**floor** [2] - 599:22; 710:20

**folder** [2] - 698:19; 699:3

**folders** [3] - 697:8; 698:18

**follow** [1] - 723:5

**follow-on** [1] - 723:5

**followed** [1] - 644:16

**following** [12] -

617:23; 638:3; 662:19; 663:10; 669:2; 702:21; 704:13; 717:15; 718:2, 20; 726:8, 17

**follows** [4] - 570:5; 611:21; 639:6; 670:25

**food** [1] - 673:13

**footless** [1] - 592:6

**force** [2] - 642:11, 22

**Force** [4] - 642:12, 14, 19

**forces** [1] - 646:4

**foreign** [2] - 576:17; 678:10

**Forensic** [3] - 645:7; 691:17; 693:10

**forensic** [47] - 641:18; 643:6; 645:4, 13; 646:12, 14; 647:8; 648:21; 649:9, 19-20, 23; 651:4; 656:1; 665:13, 24; 666:1; 668:25; 669:3; 671:5; 690:12, 19; 691:2, 16, 19, 21, 23-24; 692:1, 4, 8-9, 18, 21; 693:11, 13, 17; 694:4, 7; 695:11; 697:17; 704:4; 723:5

**forensically** [4] - 643:6; 647:5; 688:9; 697:15

**forensics** [15] - 635:21; 643:20, 22; 644:9, 12; 645:9, 24; 646:19, 21; 650:1; 652:24; 653:17; 661:7, 9; 662:7

**forget** [1] - 684:9

**forgot** [1] - 675:23

**form** [20] - 593:21; 596:8, 23; 603:2; 604:7; 605:2; 610:21; 629:5; 633:23; 648:3; 659:13, 16; 660:7, 19; 661:3; 664:6; 677:15; 685:19, 24; 725:10

**formally** [3] - 641:11, 19; 642:16

**format** [4] - 641:7; 642:3; 668:17; 699:4

**formats** [1] - 669:8

**forms** [2] - 642:15; 647:20

**formula** [3] - 650:3, 9

**formulas** [1] - 650:11

**Forrestal** [10] - 571:9; 598:15; 608:8;

635:17, 19, 636:14; 637:3; 638:23; 662:6; 663:17

**FORRESTAL** [1] - 639:10

**forth** [1] - 636:7

**forward** [1] - 639:13

**forwarded** [1] - 731:8

**foundation** [3] - 616:9; 617:21; 703:10

**founded** [1] - 641:15

**four** [7] - 620:10; 714:22; 724:25; 728:1; 729:16

**Frances** [1] - 570:19

**fresh** [1] - 676:8

**Friday** [1] - 712:4

**friends** [1] - 573:12

**front** [3] - 574:18; 656:18; 674:10

**fruit** [1] - 713:18

**FTK** [5] - 645:6, 10; 691:17; 693:10, 16

**fucking** [2] - 709:11, 15

**full** [1] - 669:24

**fully** [1] - 712:25

**function** [1] - 643:5

**FURTHER** [2] - 610:11; 733:6

**fussy** [1] - 680:23

**future** [1] - 604:9

**FW** [1] - 710:5

### G

**game** [1] - 673:11

**Gate** [10] - 591:8; 593:6; 594:7, 22, 25; 614:23; 616:6, 18; 655:21; 719:18

**GATE** [1] - 614:24

**gather** [3] - 570:11; 577:11; 579:23

**general** [4] - 643:9; 647:19; 659:18

**generally** [13] - 595:4, 6; 643:4; 644:7; 647:13, 16; 648:10, 12; 654:19; 668:20; 677:22; 696:7

**generated** [1] - 669:20

**gentleman** [2] - 612:20; 658:6

**germane** [1] - 703:16

**gigabit** [1] - 695:8

**GILR** [1] - 678:5

**girl** [2] - 591:17;

609:19

**girlfriend** [1] - 628:22

**given** [10] - 603:6; 637:13; 638:9; 644:13; 653:24; 664:18; 696:20; 730:8

**glasses** [2] - 614:15; 621:14

**glaucoma** [2] - 611:6; 629:21

**gmail** [2] - 601:18

**goal** [1] - 655:24

**goodness** [1] - 705:24

**Government** [11] - 568:12; 569:10; 590:17; 592:18; 600:8, 11; 635:3; 726:20; 734:5

**government** [15] - 576:17; 638:20; 662:5, 21; 663:19; 671:12; 689:16; 694:10; 701:11; 702:17; 707:15; 714:7; 718:22; 720:17; 728:6

**government's** [2] - 703:17; 730:3

**Government's** [124] - 575:4, 20; 584:18; 585:9; 586:17; 587:19; 590:8; 592:11; 593:16, 24; 594:3; 595:9, 15; 596:1; 598:23; 599:25; 604:17; 606:9; 614:13; 620:20; 621:18; 622:3, 5, 12, 15, 19; 623:2, 4; 626:15; 627:1, 9; 630:1; 638:10; 658:12; 660:15; 665:19; 670:12, 20; 671:16, 19; 679:11, 24; 684:18; 686:5, 7; 687:11; 688:1, 16, 24; 689:7, 20; 690:4, 7, 23; 693:22; 694:2, 14; 695:4; 696:10, 17; 697:20; 700:23; 701:14; 704:16; 705:1, 6, 17; 707:9, 22; 709:19; 710:1; 711:8, 15; 714:8, 14; 716:13, 17, 20, 25; 718:23; 719:2; 720:5, 13-14, 20; 721:2, 5, 8, 17, 19, 22; 722:3, 8; 723:24; 724:20; 725:2, 5, 12, 19, 21; 726:19; 727:4, 21; 728:2, 17, 20; 734:4, 8

**grade** [1] - 625:6

**graduate** [1] - 628:4

10

granted [1] - 640:19
great [1] - 706:8
group [1] - 644:13
groups [2] - 646:13
guess [3] - 582:18;
632:12; 644:23
guidance [2] - 651:6;
653:3
guitars [1] - 573:2
gun [6] - 597:24;
598:7, 13; 607:20;
622:24; 623:4
guns [2] - 597:17;
598:2
Gurney's [1] - 675:21
guys [1] - 662:25

**H**

hacking [3] - 643:10;
644:23
half [5] - 581:24;
613:10; 646:7; 700:7
hall [1] - 661:16
Halloween [4] -
623:16, 18, 20; 633:4
hand [6] - 606:11;
639:1; 694:18; 696:9;
697:19; 698:15
handcuffed [3] -
579:13; 599:1; 658:19
Handed [10] - 638:13;
665:21; 670:21; 679:13;
688:2, 17; 705:3, 7;
716:1; 720:7
handgun [1] - 597:25
handle [3] - 640:21,
23; 696:5
handled [2] - 657:5;
696:2
handling [1] - 640:22
hands [2] - 610:16
harass [1] - 681:21
harassment [1] - 683:1
hard [57] - 582:1;
621:9, 15; 643:7, 25;
648:10, 13, 16, 19, 21,
25; 649:4, 14-15, 25;
650:4, 13; 688:19;
690:8, 20, 22; 691:20,
22; 692:13, 15, 17,
23-24; 693:1, 6, 17;
694:23, 25; 695:1-4,
7-8, 11, 15, 17;
696:18, 21-22; 697:15;
701:19; 702:6, 15, 25;
713:20; 720:3, 13
hardware [4] - 648:1,

24; 667:19; 695:25
HARRY [1] - 568:20
hash [1] - 650:2
hashing [2] - 650:2, 9
Hauppauge [1] - 568:18
head [1] - 614:22
header [1] - 723:3
hear [4] - 612:11;
690:10; 712:22; 730:15
heard [2] - 633:16;
653:4
height [4] - 607:22;
608:1, 9, 16
held [1] - 624:15
Helena [8] - 605:13;
675:9, 21; 684:20;
706:4; 707:2; 713:16;
722:21
hello [2] - 675:21;
706:7
Hello [1] - 706:16
help [3] - 577:15;
654:23, 25
helped [4] - 577:10;
640:15; 655:2; 684:8
Hendrickson [1] -
677:2
herself [4] - 577:10;
579:3; 625:14
hidden [1] - 625:19
hide [3] - 577:4, 15;
578:17
high [4] - 582:7; 628:4
High [10] - 591:8;
593:6; 594:7, 21, 25;
614:23; 616:6, 18;
655:21; 719:18
HIGH [1] - 614:24
himself [1] - 731:8
hired [1] - 640:9
history [2] - 596:17;
640:5
hold [4] - 659:3;
690:22; 712:18; 726:1
holding [2] - 623:1;
701:21
hole [1] - 575:12
holiday [2] - 699:21;
730:13
home [12] - 573:1, 16;
590:11; 596:18; 614:18;
620:1; 625:20; 627:16;
675:14; 712:5; 720:15
homes [1] - 573:19
Honor [30] - 569:9, 11,
25; 574:20; 584:21;

586:15; 588:5; 589:22,
24; 590:1; 606:2;
612:3; 616:8; 635:6,
15, 18-20, 23; 636:17;
638:9; 665:5; 707:16;
718:25; 731:16, 18;
732:9, 17
HONORABLE [1] - 568:9
Hoodlum [3] - 592:9, 21
hooked [2] - 574:11;
691:14
hope [2] - 652:15;
699:17
hose [1] - 591:25
host [1] - 646:4
hour [1] - 700:7
house [38] - 571:12;
573:10, 20, 23; 574:14,
16; 586:4; 588:2;
592:12; 597:13, 19;
598:8; 599:22; 600:5,
15; 614:19; 615:5;
616:12, 17; 625:12;
627:7, 17; 631:3, 11,
21; 637:12; 656:4, 8,
14, 22-23; 658:24;
665:7; 674:12; 685:16;
686:1; 697:2; 703:15
human [1] - 712:10
hundred [2] - 647:11;
668:5
hundreds [2] - 654:14
Hurley [1] - 661:15
husband [1] - 570:25

**I**

I-M-P-E-R-I-A-L-E [1]
- 611:24
ID [1] - 622:20
idea [4] - 573:14;
642:24; 655:14; 677:5
identification [6] -
587:20, 24; 620:19;
621:18; 622:6, 15
identified [8] -
658:9; 673:20; 676:4;
677:1, 19; 725:18;
726:20; 727:6
identifies [1] -
581:14
identify [3] - 582:1;
620:16; 666:15
identities [1] - 698:1
IEF [1] - 692:6
image [17] - 649:10,
19-20; 650:16, 18;
691:19, 22; 692:2, 8-9,

12, 19, 21; 693:11, 14;
694:4
imaged [2] - 692:16;
694:23
images [8] - 580:17,
23; 637:9, 11; 659:21;
668:22; 691:16
imaging [3] - 649:11;
691:18; 693:17
immediately [3] -
579:21; 656:13; 697:18
Imperiale [11] -
572:12; 611:15, 17, 23,
25; 612:7; 613:2;
618:16; 629:17; 634:1;
635:5
important [2] -
647:10; 657:9
impossible [1] -
576:19
in-between [2] -
710:17, 21
inappropriate [1] -
643:19
inbox [14] - 701:7;
702:3; 704:21-23;
705:10, 12; 707:10;
709:19; 711:9; 714:4;
716:5, 19; 720:12
inch [1] - 713:15
incoming [6] - 672:4;
673:8; 682:9, 13, 16;
685:3
incorporate [1] -
710:11
INDEX [1] - 733:1
indicate [4] - 581:19;
672:11; 681:8
indicated [1] - 722:23
indicates [1] - 731:6
indicating [3] -
622:2; 672:6; 720:15
indicating) [1] -
708:17
individual [3] -
582:17, 21; 721:14
individualized [1] -
653:1
individuals [1] -
653:23
industry [3] - 646:17;
652:19, 22
infant [1] - 580:16
info [2] - 682:17;
722:21
informally [1] -
642:16

**informants** [1] - 607:11

**information** [28] - 570:15; 573:17; 581:9; 593:17; 604:3, 10; 643:23; 644:3; 646:25; 648:14; 649:3, 15; 650:8, 14; 651:8; 655:9; 657:12; 668:10; 670:5; 671:24; 685:11; 687:14; 690:20; 697:6, 13; 698:21; 715:19

**infrastructure** [1] - 644:22

**initial** [3] - 652:8; 656:21; 708:3

**initialed** [2] - 701:23; 721:14

**initials** [4] - 666:14, 24; 667:2; 688:12

**ink** [1] - 601:7

**inside** [14] - 573:23; 641:5; 648:6; 666:14; 667:21, 23; 688:20; 689:5-7; 697:2; 724:22

**install** [1] - 640:16

**installation** [1] - 696:25

**installed** [5] - 667:19, 22; 688:19; 689:6; 691:24

**instead** [1] - 662:24

**instruct** [1] - 665:2

**instruction** [11] - 635:23; 636:3, 8, 10, 22; 662:16, 22; 663:13, 15, 24; 665:4

**instructions** [3] - 689:3; 695:25; 696:7

**intelligence** [1] - 640:16

**intentions** [1] - 706:20

**interact** [1] - 696:1

**interest** [1] - 664:25

**interfaces** [1] - 645:16

**interfere** [2] - 713:3, 5

**intermittently** [1] - 584:14

**International** [2] - 578:2, 6

**international** [2] - 674:6; 682:2

**internet** [3] - 708:11; 712:1, 3

**Internet** [2] - 692:5; 693:15

**interview** [16] - 571:10; 596:13; 597:12; 604:2, 13; 607:19; 608:5, 21; 609:7, 14, 18, 25; 610:5; 635:21; 657:24; 659:18

**interviewed** [5] - 579:8; 607:14; 609:20; 610:1

**interviews** [3] - 596:18; 597:4, 9

**introduced** [1] - 638:12

**investigate** [2] - 643:16; 644:24

**Investigation** [1] - 596:17

**investigation** [29] - 570:8, 12, 16; 571:15, 20; 572:24; 573:9; 576:10, 14, 22; 577:12; 580:1; 582:12, 15; 585:21; 587:4, 16; 589:10; 609:11, 13; 654:22; 655:2, 4, 8, 10, 16; 685:11; 687:15

**investigations** [4] - 643:10; 645:19; 647:1; 661:21

**investigative** [1] - 642:25

**investigators** [3] - 606:19; 646:14; 653:1

**investment** [1] - 680:15

**invitation** [1] - 613:19

**invoice** [5] - 590:22, 25; 592:24; 678:6, 25

**involved** [4] - 646:12; 654:4; 665:13; 696:12

**involvement** [1] - 647:12

**involving** [5] - 589:17; 624:13; 632:25; 642:25; 647:8

**irrespective** [1] - 577:14

**Island** [5] - 603:22; 642:11, 13, 18, 20

**Islip** [3] - 568:5, 14, 22

**issue** [5] - 597:20; 636:3; 664:5; 676:10; 718:13

**issues** [3] - 636:23;

637:19; 732:16

**items** [11] - 590:7, 10; 591:12; 626:14; 644:3; 646:16; 665:22; 701:8, 15; 702:12

**J**

**jacket** [1] - 658:6

**jail** [1] - 683:1

**January** [30] - 574:9; 596:4, 10, 14; 597:13; 598:10; 600:6; 607:1, 10, 14, 19, 24; 608:2, 17; 613:6; 654:16; 655:19; 665:6; 672:17, 24; 673:4; 674:13; 685:8, 17; 691:9; 708:2; 710:4; 711:18

**Jarmila** [4] - 628:23; 629:1, 8

**JFK** [2] - 578:6; 579:10

**job** [4] - 628:5; 646:23; 651:11; 686:20

**jobs** [4] - 641:18; 647:8

**Joe** [3] - 710:3; 722:14, 20

**joeval** [1] - 601:9

**Joeval** [2] - 601:17, 22

**joeval15@optonline.net** [26] - 595:18, 21; 601:7; 602:1; 604:21; 673:24; 674:16; 675:17; 676:11, 21; 677:7, 13; 678:7, 19; 679:1, 8; 704:20; 706:3; 708:1; 710:4; 711:17; 714:19; 722:15; 723:13; 731:8

**joeval66@gmail** [1] - 602:4

**jog** [1] - 625:23

**John** [2] - 578:2; 579:19

**join** [1] - 640:19

**Joseph** [42] - 586:24; 587:2, 8; 591:8, 10; 592:24; 593:5, 10, 14, 18; 594:17, 21; 595:13; 601:25; 605:12; 612:18; 615:10, 17; 628:6; 629:4, 10; 633:13; 657:25; 658:2; 680:14; 683:11, 16, 22; 684:22; 706:7, 16, 20; 711:17, 21; 714:19, 21; 717:4; 719:19; 723:10, 15

**JOSEPH** [2] - 568:5, 9

**Joseph's** [2] - 628:22;

631:11

**Judge** [25] - 581:11; 583:10; 587:17; 588:7; 590:13; 605:25; 608:23; 611:9, 15; 618:13; 631:7; 636:25; 638:7; 661:15, 18; 663:4, 8; 699:24; 703:14; 704:4; 717:13; 726:11; 730:9; 731:22; 732:20

**judge** [1] - 661:14

**juice** [3] - 712:12, 16, 21

**juicy** [1] - 713:18

**July** [8] - 597:1, 7; 675:15; 678:2, 17, 22; 722:14; 723:25

**jump** [3] - 674:18; 682:13; 683:9

**June** [3] - 705:25; 706:1; 707:3

**jurors** [1] - 569:6

**jury** [34] - 568:10; 569:13, 17; 611:1, 5, 8, 10; 635:9; 636:6, 13; 638:4, 8, 16-17; 662:9, 11, 14; 663:12; 664:2; 689:25; 699:11; 700:5, 17; 703:6, 12, 21, 23-24; 723:22; 728:12; 730:7, 23

**Justice** [3] - 597:4, 10; 644:13

**K**

**KABRAWALA** [119] - 568:14; 569:10; 581:11; 583:10; 587:17; 588:7; 590:1, 3, 13, 19, 21; 592:15, 20; 595:7; 600:8; 603:14; 605:25; 608:23; 610:10, 12, 22; 611:14; 612:3, 6; 616:10; 618:5, 13; 619:1; 623:2, 7; 625:10; 629:12; 631:7, 9, 24; 634:2, 20; 635:4, 13, 16; 636:25; 637:2; 638:7, 9, 14, 22; 639:17; 658:8, 13; 660:9; 661:4; 662:5; 663:1, 4, 6, 8; 665:5; 671:12, 18; 679:19; 689:16; 694:10, 16; 699:24; 700:7, 16, 21; 701:11; 702:17; 703:1, 14; 704:2, 19; 705:13, 19; 706:11; 707:13, 15, 21; 709:23; 711:4, 12;

714:7, 16; 716:7, 15,
22; 717:2, 13, 17;
718:11, 22; 719:4;
720:17, 20; 721:15;
722:2, 10; 725:17, 25;
726:2, 11, 15; 727:2,
10; 728:6, 13, 16, 21;
729:20; 730:3; 732:10,
12, 18; 733:5, 7, 9,
11, 14

**Kabrawala** [5] - 610:9;
612:8; 630:6; 639:14;
700:20

**Kalichenko** [55] -
570:8; 576:13, 16, 20,
25; 577:20; 578:1, 5,
13, 17; 579:25; 581:14;
582:13; 583:7; 584:12,
16; 585:1, 16, 18, 22;
586:12, 24; 587:3, 9;
589:11; 594:19; 595:3,
10, 14, 25; 604:21;
605:9; 631:1, 10, 25;
632:18; 633:8, 20;
634:4, 17, 24; 659:10,
19; 706:3; 708:6;
710:5; 711:21; 714:20;
718:4, 10; 719:15;
722:15; 729:10

**Kalichenko's** [5] -
579:23; 580:6, 12, 16;
581:10

**kalichenkoes@mail.ru**
[2] - 704:21; 722:16

**keep** [10] - 612:2, 15;
639:13; 645:23; 647:22;
677:6; 693:5; 710:15,
20

**keeps** [2] - 646:17;
690:18

**Kennedy** [2] - 578:2;
579:19

**kept** [1] - 648:14

**Kevin** [1] - 677:1

**kid** [1] - 629:8

**kids** [1] - 629:9

**kill** [1] - 603:18

**kind** [23] - 586:11;
597:9; 601:6, 13;
617:7; 621:3; 623:13;
625:1; 640:8, 20;
643:7; 644:1, 10, 25;
645:3; 648:8; 650:18;
652:22; 668:10; 673:16;
706:21; 731:2

**kindergarten** [1] -
625:8

**kinds** [4] - 597:3;
640:21; 643:24; 697:9

**Kirk** [1] - 571:6

**kiss** [1] - 713:15

**Kit** [3] - 645:7;
691:17; 693:10

**knowledge** [7] - 581:5;
596:16; 598:6; 602:9;
617:18; 664:2, 4

**known** [1] - 668:14

**knows** [1] - 616:9

**Korea** [2] - 667:9

---

**L**

**lab** [1] - 691:19

**labeled** [4] - 721:12;
726:20, 25; 727:3

**labelling** [1] - 701:22

**labels** [1] - 700:13

**laboratory** [4] -
665:16; 692:21, 24;
693:1

**lace** [1] - 592:6

**lading** [1] - 719:7

**laid** [2] - 580:18;
581:3

**lands** [1] - 713:16

**LaPINTA** [37] - 568:17;
659:12, 15; 660:7;
663:3; 672:25; 673:2;
677:14; 678:13; 679:22;
685:18, 23; 687:19;
689:18; 699:23; 702:19,
23; 703:3; 704:1, 7;
705:15; 706:14; 711:13;
716:23; 720:19, 21;
722:4; 725:10; 726:3,
14; 727:8, 15, 22;
728:10; 731:22; 732:20,
22

**LAPINTA** [5] - 593:21;
595:5; 596:22; 603:11;
637:19

**large** [6] - 591:16,
20-21; 599:11; 646:13;
647:7

**last** [8] - 605:10;
610:15; 611:23; 637:16;
642:15; 711:1; 719:11;
727:21

**lat** [1] - 672:10

**Lato** [1] - 570:1

**LATO** [56] - 568:17;
569:9; 570:7; 574:20;
580:25; 582:3; 584:21;
585:24; 586:14; 587:11;
588:5; 589:20; 590:15;
592:16; 596:7; 600:9;
605:1; 606:2, 6; 610:8,

17, 20; 616:8; 617:19;
629:5, 16; 631:5;
633:22; 634:7, 22;
635:1; 636:11, 20;
661:2; 662:8; 663:7;
671:14; 694:12; 695:21;
704:10; 707:16, 19;
709:24; 714:9, 12;
716:8, 11; 717:25;
718:17, 25; 721:16;
732:17; 733:4, 6, 10,
12

**law** [23] - 571:2;
572:8, 23; 574:22, 24;
577:22, 25; 580:5, 8,
20-21; 581:1, 3;
609:18; 630:12, 18;
634:23; 642:10; 647:5;
651:15; 654:18; 658:16;
660:25

**lawful** [2] - 607:15, 17

**laws** [1] - 589:19

**lawyers** [3] - 662:17;
699:18; 730:10

**lay** [3] - 617:21;
669:22; 712:13

**lead** [2] - 618:6; 655:4

**leaf** [1] - 721:1

**lean** [1] - 639:12

**learn** [5] - 571:15,
20, 23; 572:18, 21;
573:9; 577:25; 578:5;
582:12; 586:8; 640:21

**learned** [1] - 585:22

**least** [3] - 594:22;
642:8; 647:11

**leave** [2] - 640:19;
684:9

**leaves** [1] - 730:23

**leaving** [1] - 662:9

**left** [6] - 575:10;
600:22; 622:24; 694:18;
696:9; 699:11

**left-hand** [2] -
694:18; 696:9

**legal** [1] - 589:18

**legs** [2] - 710:17, 21

**LEONARD** [1] - 568:17

**less** [1] - 586:14

**letter** [11] - 675:12;
678:5, 23; 680:23;
706:8, 17-18; 708:20;
713:20; 723:16

**letters** [5] - 682:25;
708:10; 713:8; 714:25;
727:23

**level** [2] - 644:12;
645:18

**LG** [1] - 665:19

**liaison** [1] - 579:22

**life** [3] - 631:1;
683:2; 713:1

**lighting** [1] - 591:14

**limited** [1] - 611:7

**line** [14] - 643:1, 15;
680:6; 682:7, 14;
683:14; 684:12, 18;
685:3; 711:1; 715:6

**lines** [1] - 605:10

**list** [1] - 731:23

**listed** [4] - 593:8, 24;
594:3; 596:1

**listen** [2] - 675:12;
681:20

**Listserve** [2] -
646:16; 653:5

**Listserves** [1] -
646:10

**literally** [2] -
657:13; 667:18

**live** [4] - 580:22;
602:10, 16; 628:16

**lived** [5] - 584:12, 15;
594:8, 21, 23

**lives** [1] - 628:18

**living** [1] - 706:24

**loaded** [1] - 700:11

**locate** [1] - 604:8

**located** [3] - 591:4;
637:9; 677:20

**location** [6] - 575:6,
16; 656:2; 668:17;
670:7

**locking** [1] - 657:16

**lodge** [1] - 647:21

**log** [3] - 647:20;
670:7; 672:3

**look** [15] - 575:13;
587:21; 589:10; 599:8;
626:20; 627:3; 649:22;
651:8; 662:25; 671:22;
672:15; 686:6; 689:3;
698:10; 721:2

**looked** [3] - 641:25;
703:5, 8

**looking** [2] - 680:1;
706:21

**looks** [10] - 584:25;
599:13, 15; 614:18;
621:9; 630:4; 670:24;
674:6; 678:24; 723:2

**LORETTA** [1] - 568:12

**lost** [1] - 713:4

**loud** [3] - 671:25;
674:24; 715:5

**love** [1] - 614:2
**low** [1] - 601:10
**lower** [1] - 575:9
**lunch** [2] - 635:8;
637:24
**LYNCH** [1] - 568:12

---

M

**machine** [6] - 597:24;
648:18; 700:11, 25;
701:23; 720:14
**magazine** [7] -
623:11-13, 16, 18, 20;
633:4
**mail** [15] - 584:25;
585:15; 586:10; 595:17,
19; 600:13; 601:24;
604:17, 20, 22; 605:8,
10; 708:24; 710:5
**mails** [4] - 580:2;
583:21; 589:10, 13
**maintained** [1] - 699:3
**majority** [1] - 654:4
**Malaysia** [1] - 690:2
**male** [1] - 608:6
**man** [6] - 571:8;
657:25; 675:9; 677:5;
678:23
**man's** [1] - 720:15
**Manhattan** [2] - 661:22
**manually** [1] - 651:12
**March** [3] - 606:14;
692:15
**mark** [2] - 680:16;
714:21
**marked** [13] - 590:7;
593:15; 621:17; 670:11;
679:10; 688:15; 701:13;
704:25; 720:5; 721:12;
728:19
**markings** [1] - 688:13
**Marshal's** [1] - 604:7
**Master** [2] - 731:9
**master** [1] - 589:14
**master-slave-
dominatrix** [1] -
589:14
**match** [2] - 650:16, 18
**matches** [1] - 650:20
**mathematical** [1] -
650:3
**matter** [3] - 645:24;
657:2; 718:11
**matters** [1] - 635:25
**mean** [9] - 580:4, 21;
619:25; 625:14; 643:21;

647:4; 656:19; 681:10;
706:21
**meaning** [2] - 574:5, 11
**means** [1] - 649:17
**meant** [1] - 686:22
**mechanical** [2] -
568:23; 689:2
**media** [11] - 643:24;
644:1, 19; 645:16;
648:6, 8, 11, 13;
656:2; 692:16; 694:21
**medium** [2] - 592:4, 7
**meet** [2] - 578:9, 11
**meeting** [4] - 599:2;
631:19; 675:13; 706:23
**Melville** [2] - 578:14;
579:9
**members** [5] - 569:17;
604:6; 630:12; 653:14;
663:12
**memorabilia** [1] -
573:4
**memory** [2] - 625:23;
637:11
**mention** [1] - 633:7
**mentioned** [10] -
598:15; 617:13; 620:12;
626:24; 627:21; 632:18;
639:20; 641:14; 643:20;
667:14
**mentor** [4] - 585:19,
22; 586:3, 8
**mercy** [1] - 683:25
**merely** [1] - 721:4
**Merry** [1] - 684:19
**MESG** [1] - 722:22
**message** [44] - 668:17;
672:2, 8; 673:4, 8, 19,
22; 674:9, 15, 18,
23-24; 675:3, 7, 21;
676:3, 18, 25; 677:18;
678:4; 679:6; 680:8,
17-18; 681:7, 23;
682:8, 13, 19, 23;
683:3-6; 684:1; 686:11;
722:20; 723:2, 9
**messages** [14] - 580:6;
668:14; 669:18; 670:6;
672:13; 677:11; 681:17;
682:3; 684:24
**messaging** [1] - 675:8
**Messineo** [5] - 598:16;
608:10; 630:16; 632:17;
654:21
**met** [10] - 613:3, 12;
628:22, 25; 629:3, 9;
631:20; 632:10, 16;

658:17
**Microsoft** [7] - 696:3;
697:24; 698:2, 6, 9, 16
**might** [5] - 605:4;
625:23; 643:1, 10, 25
**Mike** [6] - 676:4, 7;
677:19; 678:3, 22
**mike** [1] - 612:1
**Mikey** [1] - 678:4
**military** [1] - 640:15
**militsaya** [1] - 581:6
**Millennium** [2] -
695:19
**mind** [1] - 612:3
**miniature** [1] - 667:18
**minimize** [1] - 583:12
**minor** [2] - 636:11;
641:18
**minors** [1] - 589:17
**minute** [3] - 689:22;
725:13; 729:20
**minutes** [9] - 586:14;
606:2; 674:23; 682:20;
683:11; 717:23; 725:6;
728:3
**Miranda** [1] - 603:6
**Mirandized** [2] -
603:1; 660:11
**misread** [2] - 683:20;
711:2
**missed** [1] - 605:12
**missed..** [1] - 605:11
**mission** [4] - 642:17;
643:13, 17
**mistake** [7] - 582:18;
583:4, 8; 649:3, 7
**MMS** [1] - 668:15
**Mobile** [1] - 665:19
**model** [8] - 615:11, 17;
616:1; 619:11; 620:3;
648:3, 19; 666:10
**modeled** [1] - 627:21
**modeling** [16] - 616:4,
12, 18, 25; 617:14, 17;
618:17; 619:8, 14, 23;
623:23; 624:12; 627:24;
628:2; 631:25; 633:4
**models** [1] - 615:24
**modification** [1] -
636:11
**moist** [1] - 713:19
**mom** [2] - 616:13
**moment** [14] - 574:20;
580:25; 582:3; 583:4;
584:21; 585:24; 589:20;
629:12; 631:24; 635:18;

662:17; 707:16; 714:9;
716:8
**Monday** [6] - 699:20;
730:6, 12, 19; 732:19,
24
**money** [15] - 587:2, 9;
595:4, 6, 11; 615:24;
624:4, 10-11; 633:5;
708:25; 709:1, 14;
710:24; 711:3
**Montauk** [1] - 675:22
**month** [1] - 655:19
**months** [4] - 597:13;
707:8; 708:3; 714:22
**morning** [9] - 569:4,
17; 577:11; 610:24;
612:7; 699:21; 730:6,
15, 19
**Moscow** [1] - 586:5
**mostly** [1] - 582:7
**mother** [4] - 570:19;
602:10; 628:20
**mountains** [1] - 713:17
**mouth** [1] - 712:20
**move** [14] - 590:13;
592:15; 612:1; 661:4;
679:19; 705:13; 709:23;
711:12; 716:7, 22;
721:15; 722:2; 727:2;
729:8
**moves** [13] - 600:8;
657:14; 662:5; 671:12;
689:16; 694:10; 701:11;
702:17; 707:15; 714:7;
718:22; 720:17; 728:6
**movie** [2] - 573:6;
673:12
**moving** [2] - 612:4;
671:25
**MR** [232] - 569:9;
570:7; 574:20; 580:25;
581:11; 582:3; 583:10;
584:21; 585:24; 586:14;
587:11, 17; 588:5, 7;
589:20; 590:1, 3, 13,
15, 19, 21; 592:15, 20;
593:21; 595:5, 7;
596:7, 22; 600:8;
603:11, 14; 605:1, 25;
606:2, 6; 608:23;
610:8, 10, 12, 17, 20,
22; 611:6, 9, 14;
612:3, 6; 616:8, 10;
617:19; 618:5, 9, 13;
619:1; 623:2, 7;
625:10; 629:5, 12, 16;
631:5, 7, 9, 24;
633:22; 634:2, 7, 20,

22; 635:1, 4, 6, 13, 15-17; 636:11, 17, 20, 25; 637:2, 19; 638:7, 9, 14, 22; 639:17; 658:8, 13; 659:12, 15; 660:7, 9; 661:2, 4; 662:5, 8; 663:1, 3-4, 6-8; 665:5; 671:12, 14, 18; 672:25; 673:2; 677:14; 678:13; 679:19, 22; 680:25; 685:18, 23; 687:19; 689:16, 18; 694:10, 12, 16; 695:21; 699:23; 700:7, 10, 16, 21; 701:11; 702:17, 19, 23; 703:1, 3, 14; 704:1-3, 7, 9-10, 19; 705:13, 15, 19; 706:11, 14; 707:13, 15-16, 19, 21; 709:23; 711:4, 12-13; 714:7, 9, 12, 16; 716:7, 11, 15, 22-23; 717:2, 13, 17, 23, 25; 718:11, 17, 22, 25; 719:4; 720:17, 19-21; 721:15; 722:2, 4, 10; 725:10, 17, 25; 726:2, 11, 14-15; 727:2, 8, 10, 15, 22; 728:6, 10, 13, 16, 21; 729:20; 730:3; 731:3, 16, 22; 732:3, 5, 9-10, 12, 17-18, 20, 22; 733:4-7, 9-12, 14

**MTCN** [2] - 713:21; 722:22
**mug** [3] - 599:12, 17, 19
**multi** [1] - 676:1
**multi-page** [1] - 676:1
**multibillions** [1] - 650:17
**multiple** [1] - 583:24
**multiplies** [1] - 650:11
**multiply** [1] - 642:22
**multisystem** [1] - 668:15
**murders** [1] - 640:24
**Murphy** [1] - 641:2
**must** [3] - 596:18; 632:13; 683:7

**N**

**N.Y** [1] - 568:5
**naked** [1] - 710:21
**name** [24] - 571:7, 23; 573:15; 582:20; 583:24;
587:2, 8-9; 594:17; 595:14; 604:10; 611:22; 612:7; 613:1; 628:8; 639:7, 9; 657:25; 719:15, 19; 721:14; 723:18
**named** [15] - 572:18; 591:10; 593:10, 14, 18; 594:19, 21; 595:10, 13, 25; 628:23; 673:9; 679:4; 694:24; 695:11
**names** [2] - 587:10; 683:7
**narcotic** [1] - 640:12
**narcotics** [1] - 640:18
**Nassau** [1] - 608:15
**national** [1] - 644:22
**nature** [1] - 720:11
**NBP** [1] - 710:12
**nectar** [2] - 712:21; 713:18
**need** [16] - 569:7; 598:3; 604:8; 608:21; 635:6; 652:2; 657:10; 673:23; 676:20; 686:19; 715:1, 3, 8, 12, 17; 717:23
**needed** [3] - 576:6; 683:18, 24
**negotiated** [3] - 680:22; 681:4; 685:4
**network** [1] - 644:24
**never** [15] - 596:20; 613:3, 12; 618:9; 623:25; 624:3, 8, 15; 626:3, 9; 632:17; 633:19; 657:14, 17; 677:6
**NEW** [1] - 568:1
**new** [6] - 596:24; 646:8, 15; 687:2; 697:24
**New** [12] - 568:14, 18, 22; 591:4, 8; 593:4, 7; 594:22; 655:21; 661:25; 706:22; 719:18
**newer** [1] - 731:24
**news** [1] - 610:13
**next** [41] - 591:19, 23, 25; 599:12; 600:18; 611:6, 13; 635:7, 11; 638:20; 672:5, 11; 674:18, 20; 678:24; 679:3; 680:17; 681:7; 682:13, 19, 23; 683:5, 10; 684:7, 10, 12-14, 21-22; 686:22; 692:15; 697:14; 711:5, 25;
712:3; 730:17
**nice** [2] - 682:22; 712:12
**night** [1] - 637:16
**nine** [5] - 613:9-11; 647:11; 732:24
**nipples** [3] - 712:11, 16
**NNSI** [1] - 644:20
**noises** [1] - 582:9
**nonhearsay** [1] - 581:9
**normally** [1] - 662:23
**northeast** [1] - 645:20
**note** [8] - 600:23, 25; 601:16; 648:3, 17; 653:16; 666:13
**notebook** [1] - 601:6
**noted** [1] - 569:3
**notes** [1] - 666:9
**nothing** [10] - 589:24; 605:25; 610:8, 22; 629:13; 634:20; 635:4; 649:6; 691:5; 717:20
**November** [3] - 568:7; 587:14; 732:24
**nude** [1] - 592:2
**number** [59] - 590:4; 593:1, 8, 11, 20, 24; 594:2, 18; 595:22; 596:1; 615:7; 637:2; 645:15; 646:3; 648:3, 20; 650:12, 13, 20; 671:22; 672:16; 673:18; 674:6; 676:3; 677:11, 18; 678:11; 680:4, 8, 18-19; 681:11, 13, 23; 682:7, 19; 684:2; 685:3, 9; 686:11; 688:14; 696:20; 713:21; 717:5, 9; 719:8, 10; 720:9, 19, 24; 724:3, 24; 727:25; 729:14
**numbers** [3] - 601:22; 650:11; 694:22
**numerical** [1] - 650:2
**numerous** [3] - 576:16; 645:2; 656:24
**nurse** [1] - 628:5
**NW3C** [1] - 644:14
**NY** [2] - 675:12; 715:17
**NYC** [1] - 707:5
**NYPD** [1] - 682:17

**O**

**o'clock** [1] - 732:23
**oath** [2] - 569:23; 611:16
**object** [2] - 616:8; 703:22
**objection** [54] - 581:11; 583:10; 587:17; 588:7; 590:15; 592:16; 593:21; 595:5; 596:7, 22; 600:9; 603:11; 605:1; 608:23; 610:17, 20; 617:19; 629:5; 633:22; 634:1, 7; 637:22; 659:12, 15; 660:7; 661:2; 662:8; 671:14; 672:25; 673:1; 677:14; 678:13; 679:21; 685:18, 23; 687:19; 689:18; 694:12; 695:21; 705:15; 707:19; 709:24; 711:13; 714:12; 716:11, 23; 718:24; 720:21; 721:16; 722:4; 725:10; 727:8, 15; 728:10
**objections** [1] - 637:18
**obligated** [1] - 664:15
**observed** [2] - 618:19; 657:1
**obtained** [2] - 690:8; 693:11
**obviously** [4] - 637:21; 662:11; 703:21; 717:19
**occasion** [1] - 602:18
**occasions** [1] - 615:8
**occur** [1] - 597:9
**occurred** [1] - 633:19
**October** [1] - 677:1
**OF** [3] - 568:1, 3, 6
**offenders** [2] - 643:1, 15
**offer** [5] - 588:5; 637:20; 662:14; 684:4; 726:13
**offered** [6] - 636:15, 18; 651:23; 662:21; 663:18, 24
**offering** [1] - 663:14
**Office** [1] - 645:15
**office** [17] - 573:16; 579:9, 14; 603:22, 25; 640:16; 641:3, 9-10; 645:3; 647:20; 652:22; 653:15, 23; 657:7; 666:8
**officer** [15] - 571:2; 577:22, 25; 579:22; 580:8, 20, 22; 581:1, 3; 608:13; 634:23; 640:11, 14; 642:9, 11

**officers** [8] - 580:5; 607:12; 608:21; 642:21; 654:19; 656:13; 658:16; 683:7

**offices** [1] - 578:14

**official** [1] - 581:20

**often** [1] - 646:18

**old** [13] - 572:1, 11, 21; 581:21, 25; 615:16, 18; 625:5, 8; 631:11; 677:5; 731:22

**older** [1] - 572:14

**Olena** [23] - 581:14; 586:24; 587:3, 9; 594:19; 595:3, 10, 14, 25; 631:1, 10, 25; 634:24; 659:9, 19; 706:3; 710:5; 711:21; 714:20; 718:10; 722:15; 723:3; 729:10

**on-line** [3] - 643:1, 15

**once** [10] - 620:6; 631:2; 633:7; 634:14; 638:25; 646:1; 690:8; 691:14; 731:23

**one** [101] - 570:9; 572:15, 17; 574:14, 18, 20; 575:12, 14; 576:18; 580:25; 582:3, 18; 583:19; 584:21; 585:7, 24; 588:2; 589:13, 20; 590:7; 591:13, 19; 595:11; 605:22; 606:23; 607:1, 3; 608:10, 13; 622:19; 623:12; 624:19; 629:12; 631:4, 24; 634:11; 636:11; 641:4, 7, 20; 646:1; 650:17; 651:20; 653:4, 13-14; 663:13; 665:22; 668:3; 670:9; 671:22; 672:16; 674:21; 679:3; 683:10, 20; 684:7, 10, 14, 17, 21-22; 694:25; 695:4; 696:4, 18; 697:25; 698:2, 6; 701:7; 702:4; 703:5; 707:16; 714:4, 9; 716:8; 721:13; 724:4; 725:2; 727:12; 728:2; 729:1, 19-21, 23; 731:1, 14, 17, 19-20, 24

**one's** [1] - 598:7

**ones** [8] - 650:5, 10; 657:1; 685:21; 703:21, 23; 713:15

**online** [1] - 591:3

**opaque** [1] - 591:16

**open** [9] - 573:15;

576:6; 618:3; 648:15; 663:11; 669:4; 704:14; 718:21; 726:18

**open-ended** [1] - 618:3

**opened** [1] - 681:5

**opening** [1] - 697:7

**operating** [8] - 695:15, 17, 22-23; 696:2, 5, 11, 13

**operational** [1] - 574:5

**opinion** [8] - 662:8, 14; 664:6, 13, 17, 19, 21

**opinions** [3] - 664:8, 11

**opportunity** [3] - 579:16; 651:23; 680:15

**opposed** [3] - 582:10; 636:15; 693:17

**option** [1] - 669:7

**options** [3] - 668:6, 8; 698:17

**oral** [1] - 712:15

**order** [10] - 603:20; 606:11, 14; 607:5; 614:11; 624:10; 673:13; 675:1; 683:25

**ordinarily** [1] - 664:7

**organization** [1] - 697:10

**organizations** [1] - 646:4

**organize** [4] - 651:9; 697:3, 8; 698:11

**organizes** [4] - 669:6; 670:5, 10; 698:21

**original** [6] - 649:5, 15, 22; 686:11; 690:18; 692:12

**originally** [1] - 692:16

**outcome** [1] - 664:25

**outfit** [4] - 621:3; 626:24; 627:4; 633:5

**outfits** [2] - 617:5; 627:11

**outgoing** [1] - 672:4; 676:18, 25; 683:3; 684:1

**outside** [2] - 573:19; 586:5

**outweighed** [1] - 664:20

**overhead** [3] - 590:20; 591:14; 689:22

**overruled** [4] -

581:12; 583:11; 608:24; 634:9

**OWEN** [1] - 568:20

**own** [1] - 614:4

**owned** [1] - 685:17

**P**

**p.m** [6] - 680:12, 20; 683:15; 708:10; 711:18; 714:20

**package** [5] - 593:11; 657:6; 660:6; 717:4

**page** [25] - 580:13; 600:25; 601:5; 663:5; 671:2, 19; 673:18; 674:1, 20; 675:19, 25; 676:1, 13, 23; 677:18; 678:9, 21; 679:3; 684:17; 709:3; 722:13; 732:15

**pages** [7] - 670:15, 17, 19; 671:1, 4; 673:17; 679:12

**paid** [2] - 593:19; 624:10

**pair** [2] - 675:13, 15

**PAL** [1] - 600:22

**panty** [1] - 591:25

**paper** [3] - 600:19, 21; 726:4

**paperwork** [1] - 604:4

**paragraph** [4] - 583:25; 584:4; 686:15

**pardon** [2] - 635:15; 724:9

**parenthesis** [2] - 701:7; 702:3

**part** [11] - 572:23; 580:1; 627:11; 643:5, 13; 646:23; 652:1; 669:22; 670:23; 677:12; 698:20

**partially** [1] - 640:14

**participate** [1] - 657:24

**participated** [1] - 641:15

**particular** [16] - 604:17; 645:3; 655:8; 657:6; 664:3; 667:18; 668:13; 669:16; 691:17; 692:12; 696:3, 19, 21; 702:24; 705:13; 725:1

**party** [2] - 591:3; 672:6

**passport** [1] - 723:18

**password** [6] - 576:1,

5; 600:14; 601:13, 21

**passwords** [1] - 576:3

**past** [1] - 684:11

**path** [1] - 724:18

**patrol** [1] - 640:11

**patrolman** [1] - 640:9

**pattern** [1] - 658:7

**pause** [5] - 679:16; 707:17; 714:10; 716:9; 728:8

**pay** [4] - 651:23; 652:10, 12, 14

**payment** [2] - 623:22; 624:6

**payments** [3] - 623:24; 624:3; 633:5

**pays** [1] - 652:8

**peace** [2] - 684:5, 12

**pedigree** [2] - 604:3, 5

**pen** [3] - 708:15; 710:6

**People** [1] - 661:24

**people** [3] - 646:14; 656:21; 696:4

**per** [1] - 687:7

**perfect** [1] - 686:19

**perfectly** [1] - 673:18

**permission** [1] - 720:25

**permit** [1] - 664:7

**permitting** [1] - 575:13

**person** [17] - 571:5; 580:19; 582:25; 583:2; 587:2, 9; 595:17, 24-25; 608:5; 620:16; 673:20; 676:4; 677:1; 679:4; 707:5

**person's** [1] - 582:20

**personal** [2] - 653:21; 675:14

**persons** [5] - 570:15; 582:14; 583:12; 609:7, 14

**perspective** [1] - 657:21

**phone** [54] - 593:8, 11, 20, 24; 594:2; 596:1; 637:5; 646:21; 647:9; 665:20; 666:1, 5, 9; 667:4, 17, 21; 668:11, 19, 23; 669:10, 13, 15, 18; 670:14; 672:23; 673:5, 22; 674:9; 676:4; 678:2; 680:4; 681:10, 12-13, 23; 682:1; 685:10; 686:16,

16

18, 21-22, 24; 687:2, 8, 11, 21; 709:14, 16; 715:11

**phones** [7] - 644:1; 646:25; 647:5, 11, 15; 665:8; 666:7

**photo** [2] - 600:22; 681:23

**photograph** [1] - 575:9

**photographed** [2] - 657:10; 665:10

**photographs** [2] - 581:4; 623:10

**photos** [1] - 669:9

**physical** [1] - 668:12

**physically** [3] - 579:3; 690:24

**pick** [3] - 588:12, 20; 589:2

**picked** [2] - 581:7; 595:10

**pics** [5] - 586:5; 675:10; 682:18; 715:3, 19

**picture** [16] - 592:20; 598:19; 599:20; 614:6, 17; 621:19, 24; 622:7, 10, 16, 23; 623:23; 624:19, 24; 625:5

**pictures** [26] - 574:3; 582:13; 586:11; 600:1; 619:22; 620:2, 15, 17; 624:12, 16-17; 632:1, 3-4, 18, 25; 633:8, 21; 634:5; 643:19; 651:11; 668:16, 18; 697:9, 12; 715:10

**piece** [9] - 600:19; 649:5, 15; 650:7; 683:18, 24; 691:18; 694:21; 726:4

**pieces** [2] - 669:5; 695:25

**pistol** [1] - 597:23

**place** [17] - 617:24; 638:3; 653:4; 662:20; 663:11; 698:2; 702:22; 704:14; 708:11; 712:1, 3; 713:4; 717:16; 718:21; 726:9, 18; 728:8

**placed** [1] - 666:14

**places** [2] - 726:21

**plain** [2] - 600:14; 601:11

**plane** [1] - 578:2

**planet** [1] - 713:16

**plastic** [6] - 588:15,

18, 22, 24; 589:4, 6

**play** [6] - 641:21; 712:5, 17; 725:7, 25; 728:13

**played** [4] - 728:12, 15, 18; 730:2

**playing** [5] - 700:10; 703:21, 23; 709:12; 710:20

**plays** [3] - 709:13; 710:17, 19

**Plaza** [2] - 568:13, 21

**pleasure** [5] - 706:9, 12, 17, 19; 712:15

**plus** [3] - 653:22; 674:7; 687:7

**point** [24] - 569:21; 577:9, 19; 578:16; 581:19; 598:10, 13; 603:21; 604:1; 623:8; 627:24; 657:23; 658:5, 23; 663:17; 689:5; 692:9, 17; 693:1; 695:14; 700:14; 730:12; 731:18

**pointed** [2] - 607:20; 710:6

**pointing** [5] - 584:22; 585:13; 612:20; 708:8; 715:15

**Police** [8] - 639:11, 21, 23; 640:7; 641:22; 645:19; 652:9; 655:5

**police** [7] - 581:6; 640:8; 641:5; 652:15; 681:22; 682:11, 25

**policy** [6] - 596:17, 20, 24; 597:7; 598:4; 607:8

**pompoms** [3] - 627:12, 19

**pond** [1] - 719:24

**Pooh** [2] - 599:13, 17

**popular** [1] - 710:14

**pornographic** [4] - 660:2; 720:11; 724:14, 19

**pornography** [12] - 642:25; 654:2, 5, 14; 659:10, 20; 662:3; 668:22; 687:11, 21-22; 720:2

**portion** [11] - 575:9; 671:9; 679:11; 680:3; 681:19; 707:9; 709:19; 711:9; 714:4; 718:3; 721:25

**portions** [4] - 637:4,

7; 693:16; 721:4

**portrait** [1] - 625:3

**possibility** [1] - 583:18

**possible** [4] - 607:6; 706:23; 708:11, 22

**possibly** [2] - 578:19; 583:3

**post** [1] - 646:16

**poster** [1] - 573:6

**pounds** [1] - 608:3

**power** [2] - 657:12; 690:25

**powered** [1] - 657:13

**PowerPoint** [2] - 637:7; 694:3

**practice** [1] - 646:19

**precede** [1] - 607:5

**preceding** [2] - 722:20; 723:2

**Precinct** [2] - 640:10, 19

**precinct** [1] - 640:20

**precisely** [1] - 582:2

**predator** [1] - 684:15

**prefer** [1] - 628:4

**preparation** [1] - 715:17

**prepared** [2] - 637:4; 700:24

**presence** [3] - 578:20; 579:1; 597:17

**present** [6] - 569:5; 571:9; 609:25; 635:17, 20

**presentation** [4] - 637:7; 699:19; 730:11

**presentations** [1] - 645:15

**presumably** [1] - 693:5

**pretrial** [1] - 717:17

**pretty** [4] - 602:15; 641:25; 645:20; 646:21

**prevents** [1] - 649:2; 690:17

**previously** [4] - 570:3; 661:8; 682:8; 690:9

**price** [2] - 715:2, 11

**printed** [1] - 614:10

**printout** [1] - 722:1

**prisoner** [1] - 604:8

**pristine** [2] - 649:6; 690:18

**proactive** [1] - 642:24

**proactively** [1] -

643:14

**probe** [1] - 712:9

**problem** [1] - 704:7

**problems** [1] - 703:9

**procedure** [1] - 647:19

**proceed** [1] - 699:8

**proceeded** [1] - 610:4

**proceeding** [2] - 694:7; 699:16

**Proceedings** [1] - 568:23

**proceedings** [5] - 679:17; 707:18; 714:11; 716:10; 728:9

**process** [9] - 649:11; 652:1; 666:8; 667:15; 669:2; 690:11; 693:4, 8; 698:20

**processed** [2] - 603:23; 690:9

**processes** [1] - 723:6

**processing** [5] - 603:23; 604:4; 647:19; 694:24

**produce** [4] - 659:10; 669:1, 7; 671:5

**produced** [4] - 568:24; 670:14; 671:9; 703:17

**produces** [1] - 670:13

**product** [3] - 651:13; 652:20; 657:17

**products** [1] - 650:5

**professional** [1] - 628:5

**program** [4] - 657:16; 697:24; 698:10, 13

**programs** [4] - 650:22; 657:9; 698:4, 6

**projector** [1] - 666:22

**proper** [1] - 644:18

**property** [1] - 680:15

**proposals** [1] - 641:25

**propose** [1] - 662:24

**proposed** [1] - 702:24

**prospects** [1] - 708:24

**protect** [1] - 689:14

**protrusions** [1] - 644:24

**provide** [1] - 675:22

**provided** [3] - 599:18; 637:15; 717:19

**provides** [1] - 645:8

**public** [1] - 609:24

**publish** [11] - 592:20; 625:10; 671:18; 689:23; 694:16; 716:15; 717:2;

722:10; 723:22; 727:18; 728:16

**published** [4] - 598:23; 623:10; 689:24; 703:12

**publishing** [8] - 598:20; 604:18; 658:13; 686:8; 705:19; 714:16; 719:4; 728:21

**pull** [5] - 614:6; 657:12; 707:11; 708:14; 710:9

**pulled** [1] - 662:23

**purported** [2] - 580:15; 595:3

**purportedly** [2] - 593:3; 594:22

**purposes** [4] - 603:25; 694:24; 695:12; 703:19

**pussy** [10] - 709:13; 710:18, 22-23; 712:11, 17, 21; 713:21; 715:11

**put** [24] - 581:18; 614:7, 9, 15; 649:17; 650:6; 653:3; 666:22; 676:7; 682:5; 683:1; 688:13; 689:14; 692:21; 694:3, 6; 701:22; 704:3; 708:15; 709:12; 710:22; 712:11; 721:8

**puts** [1] - 698:2

**putting** [2] - 583:15; 585:9

---

**Q**

**qualifications** [1] - 664:24

**qualified** [4] - 661:8, 18, 20; 662:12

**qualify** [1] - 662:5

**quasi** [1] - 635:13

**quasi-fact** [1] - 635:13

**questions** [8] - 612:9; 618:3, 17-18; 631:5; 635:1; 646:15; 707:1

**quickly** [1] - 699:16

**quite** [2] - 651:7; 697:13

**quote** [2] - 660:4; 664:10

---

**R**

**racy** [1] - 709:15

**rainbow** [1] - 599:12

**rainy** [1] - 569:18

**raise** [4] - 599:6;

639:1; 659:5, 7

**ran** [1] - 644:22

**range** [1] - 732:2

**rank** [1] - 640:3

**RAPAPORT** [1] - 568:20

**rapes** [1] - 640:24

**rather** [1] - 643:16

**re** [1] - 711:1

**re-read** [1] - 711:1

**reach** [1] - 659:20

**read** [40] - 591:15; 593:2; 605:9; 633:16; 663:1; 673:14; 674:24; 675:3; 676:5; 681:1, 19; 682:8; 683:10, 14, 20; 684:1, 3, 7, 10, 17; 686:14; 706:6, 13-14; 708:8, 16; 709:4; 711:1; 714:23; 715:5, 14; 717:3, 9; 722:25; 723:20; 729:10; 730:21

**readily** [1] - 656:12

**reading** [10] - 600:24; 677:4; 686:23; 708:12, 16; 710:8; 711:25; 712:1; 713:11; 715:9

**ready** [2] - 611:5; 638:6

**real** [1] - 712:9

**really** [15] - 605:10, 12; 608:21; 612:15; 619:18, 20; 628:3; 631:18; 633:11; 680:21; 681:3; 682:11; 703:16; 709:15; 712:8

**reason** [3] - 703:6; 704:3; 732:1

**reasons** [2] - 664:11, 18

**receipt** [2] - 590:22; 607:5

**receive** [7] - 595:4; 623:22, 24; 624:3, 5; 647:17; 660:4

**received** [53] - 582:18, 20; 588:11; 590:18; 592:18; 593:10; 595:6; 600:11; 606:18; 644:5, 7; 647:18; 650:24; 659:22; 660:1; 664:14; 671:17; 679:25; 685:11; 687:13; 689:21; 694:15; 704:18; 705:18; 707:23; 710:2; 711:16; 714:15; 716:14; 717:1; 719:3; 721:20; 722:9; 723:12; 734:2, 4-10,

12-19, 21

**receiving** [1] - 629:23

**recently** [4] - 610:15; 661:24; 662:2

**recertify** [1] - 652:2

**recess** [3] - 611:3; 637:25; 700:2

**recognize** [15] - 587:23; 614:17; 620:16, 21; 621:19; 627:10, 13, 15; 660:15; 670:22; 688:3, 5; 701:15; 705:2, 8

**recommendations** [1] - 642:2

**reconvene** [1] - 730:6

**record** [8] - 575:16; 607:15; 625:11; 636:2; 639:8; 658:8; 725:19

**recorded** [1] - 568:23

**recording** [1] - 607:8

**recordings** [3] - 574:22; 606:20, 23

**records** [1] - 595:16

**recover** [2] - 575:19; 720:2

**recovered** [6] - 571:12, 17; 574:7, 22, 24; 637:11

**recovery** [2] - 644:11, 17

**recross** [1] - 606:1

**RECROSS** [4] - 606:5; 634:21; 733:5, 11

**RECROSS-EXAMINATION** [4] - 606:5; 634:21; 733:5, 11

**recruited** [3] - 640:11, 14; 641:1

**recruiting** [1] - 645:18

**recycle** [1] - 638:15

**red** [2] - 696:10; 701:9

**redacted** [3] - 637:14; 679:11; 703:25

**redirect** [5] - 589:25; 607:7, 18; 609:4; 631:6

**REDIRECT** [6] - 590:2; 610:11; 631:8; 733:4, 6, 10

**refer** [1] - 694:22

**reference** [4] - 597:18; 604:16; 686:22

**referring** [1] - 647:15

**reflect** [1] - 658:8

**refresh** [1] - 646:9

**regard** [3] - 663:24;

**receiving** [1] - 629:23

**regarding** [6] - 618:17; 637:20; 644:18; 654:21; 663:13; 702:24

**regards** [1] - 680:4

**regular** [1] - 718:12

**regularly** [1] - 645:25

**reimaged** [3] - 692:15; 693:9

**reinitiated** [1] - 693:4

**relate** [1] - 721:23

**related** [1] - 697:23

**relating** [1] - 601:25

**relation** [1] - 698:25

**relations** [1] - 706:21

**relatively** [1] - 695:9

**relax** [1] - 712:4

**relaxation** [2] - 712:13, 18

**relevant** [4] - 570:12, 15; 577:12; 704:6

**relevantness** [1] - 703:19

**remain** [2] - 611:16; 638:25

**remains** [1] - 649:6

**remember** [13] - 573:8; 602:7, 23; 603:4; 631:10; 632:8, 15; 659:25; 660:1; 712:7, 18; 717:22, 24

**remind** [2] - 569:22; 690:16

**remove** [3] - 647:24; 648:16; 666:13

**renewal** [2] - 652:12, 14

**repay** [1] - 652:2

**repeat** [1] - 619:19

**rephrase** [4] - 595:7; 603:14; 612:12; 629:7

**reply** [3] - 722:22; 723:5, 7

**report** [24] - 595:17; 637:4, 20-21; 669:20, 22, 24; 670:1, 3-4, 13, 25; 671:2, 5, 7, 9-10; 672:21; 676:1; 677:11; 679:12; 680:3

**reported** [1] - 595:25

**Reporter** [1] - 568:20

**reports** [1] - 669:7

**represent** [1] - 686:12

**represents** [1] - 696:21

**request** [2] - 636:12; 718:1
**require** [1] - 576:3
**required** [2] - 597:8; 604:7
**requires** [1] - 597:3
**research** [1] - 641:6
**reside** [1] - 696:13
**residence** [1] - 656:20
**resolve** [1] - 700:14
**resolved** [1] - 704:10
**respect** [9] - 581:1; 604:20; 607:8; 618:17; 635:11; 636:23; 662:12; 713:2; 718:3
**respects** [1] - 664:23
**response** [1] - 603:9
**responsibilities** [2] - 640:6; 643:4
**rest** [3] - 603:25; 673:16; 677:9
**restart** [1] - 686:25
**restored** [1] - 724:19
**restrain** [1] - 659:3
**restrained** [2] - 599:4; 658:21
**result** [1] - 668:9
**retrieve** [5] - 580:1, 5, 9, 12; 589:22
**return** [1] - 645:10
**reverse** [3] - 603:20; 614:11; 675:1
**review** [2] - 589:23; 677:10
**reviewing** [1] - 637:5
**right-hand** [3] - 606:11; 697:19; 698:15
**rights** [4] - 603:2; 660:12, 19, 25
**Road** [1] - 591:4
**robberies** [1] - 640:24
**Robin** [3] - 592:9, 21
**role** [3] - 583:13; 641:21; 656:6
**room** [7] - 598:17, 22; 608:5, 14; 647:21, 25; 673:13
**rooms** [1] - 665:9
**Rory** [5] - 571:9; 638:22; 639:9; 662:6; 663:17
**RORY** [1] - 639:10
**Rothman** [1] - 582:25
**roughly** [1] - 652:19
**row** [4] - 608:11; 671:22; 694:19

**rule** [1] - 664:9
**rules** [1] - 664:7
**run** [1] - 642:12
**running** [1] - 657:9
**Russian** [1] - 610:16

**S**

**S-O-P-H-I-A** [1] - 605:15
**S-O-P-H-I-A-S** [1] - 723:17
**safety** [1] - 603:25
**sailor** [1] - 591:17
**Sana** [1] - 678:15
**SANA** [1] - 678:15
**saw** [9] - 573:15; 592:10; 618:12; 620:4; 626:3; 627:17; 631:10; 634:18; 675:6
**scenarios** [1] - 576:16
**scene** [5] - 635:20; 656:10; 657:19; 665:11
**school** [5] - 609:24; 610:2, 4; 624:24; 628:4
**Schwarzenegger** [1] - 573:7
**science** [1] - 643:23
**scientific** [1] - 664:1
**screen** [27] - 575:3; 583:15; 585:10; 600:21; 606:9; 612:4; 614:8; 657:10; 658:15; 660:17; 667:1; 671:21; 680:25; 686:6, 10; 687:3; 693:25; 701:9; 705:21; 707:11; 708:19; 714:18; 719:6; 722:12; 727:20; 728:23
**scroll** [1] - 709:3
**SD** [2] - 643:25; 648:12
**search** [23] - 571:11, 17; 575:19; 588:3; 594:10; 635:20; 651:9; 653:18, 22, 24; 654:1, 23, 25; 655:3, 21; 656:20; 665:6; 672:18; 685:7, 12
**searches** [1] - 573:1
**seated** [11] - 569:16; 598:16; 611:4, 12, 25; 638:5, 19; 699:13; 700:4, 19; 730:25
**second** [12] - 571:17; 584:4; 599:22; 602:22; 603:17; 607:3; 663:5; 695:1; 705:5; 725:13, 20; 728:3

**secondhand** [1] - 676:8
**seconds** [2] - 725:6; 729:20
**section** [2] - 640:12; 681:9
**secure** [4] - 656:17, 19, 22; 710:20
**secured** [1] - 656:20
**Security** [1] - 629:23
**see** [75] - 573:2, 4; 575:3; 580:15; 583:16, 25; 584:1, 6, 8, 10, 19, 22; 585:11, 13; 586:6, 18; 598:10; 601:2, 4, 11; 602:18; 606:9, 11; 614:14; 619:7; 621:14, 23-24; 622:23; 625:19, 22; 626:11; 627:5; 630:2; 631:3, 25; 637:23; 644:1; 656:11; 658:2, 23; 659:1; 668:19; 669:9, 12, 15, 18; 672:13; 674:5; 675:20; 693:23; 694:4, 7; 696:8, 24; 703:7, 13; 704:8; 708:9; 709:6, 14; 710:6; 711:6; 712:22; 713:8; 714:2; 719:8; 724:15; 726:12; 728:24; 729:24; 730:19; 732:19
**seeing** [7] - 584:2, 9; 585:19; 586:3; 621:9, 15; 629:19
**seize** [2] - 590:10; 665:7
**seized** [12] - 574:8; 588:1; 637:5, 10, 12; 643:7; 656:1; 657:24; 674:12; 685:16; 687:18; 691:9
**seizing** [1] - 656:7
**seizure** [4] - 644:18; 655:25
**select** [4] - 646:6; 669:25; 670:1
**selected** [1] - 671:1
**selection** [1] - 730:8
**selections** [1] - 668:6
**self** [1] - 717:21
**self-authenticating** [1] - 717:21
**seminars** [1] - 646:5
**send** [10] - 698:10; 710:24; 711:3; 715:1, 3, 8, 18; 722:24; 723:15; 731:20

**sending** [3] - 587:2; 683:17, 23
**sent** [38] - 582:13; 583:4; 594:17; 595:13, 24; 673:19, 22; 674:9, 15; 675:3, 21; 676:3; 677:11, 18; 678:2, 17, 22; 679:5; 681:10, 12-13, 16; 686:15, 18; 698:23-25; 699:2; 701:8; 702:10; 710:4; 711:18; 714:19; 722:14, 21-22; 729:5
**sentence** [2] - 586:1; 686:25
**separate** [1] - 721:8
**separates** [1] - 670:6
**September** [4] - 606:24; 729:24; 731:9
**sequences** [1] - 650:6
**serial** [2] - 648:3, 20
**series** [4] - 601:22; 641:24; 693:18; 726:24
**served** [3] - 640:12, 17; 641:12
**service** [1] - 682:1
**serving** [1] - 640:25
**session** [2] - 619:23; 687:7
**sessions** [1] - 633:4
**set** [6] - 575:16; 635:6; 636:7; 657:11; 695:24; 696:7
**sevastopol** [1] - 610:13
**seven** [2] - 707:8; 708:3
**seventh** [1] - 640:25
**sex** [1] - 642:25
**sexual** [1] - 643:18
**shall** [1] - 683:6
**shared** [1] - 684:11
**sharing** [1] - 712:25
**sheet** [2] - 648:1; 681:2
**shelf** [1] - 647:22
**shell** [1] - 641:17
**shield** [2] - 639:10; 641:10
**shiny** [1] - 621:5
**shipped** [2] - 591:7; 592:24
**shoots** [3] - 617:15; 619:8; 624:12
**shortening** [1] - 730:1
**shorter** [1] - 725:15

**shotgun** [1] - 597:22

**shoulder** [1] - 663:1

**show** [26] - 587:7, 19; 598:19; 605:6; 614:6; 620:15; 621:17; 622:5, 19; 624:19; 625:22; 626:14; 637:9; 686:5; 693:22; 697:21; 699:6; 700:24; 705:6; 707:8; 710:3; 715:21, 25; 716:17

**showed** [2] - 626:12; 675:9

**shower** [1] - 715:10

**showing** [31] - 584:18; 586:17; 590:7, 23; 593:15; 599:25; 614:12; 620:19; 622:2; 624:20; 626:1, 4, 15; 627:1, 9; 630:1; 658:11; 660:14; 665:18; 670:11, 19; 672:3; 679:10; 687:25; 688:15; 694:3; 701:13; 704:25; 715:25; 720:5; 728:19

**shown** [5] - 590:4; 619:22; 620:1; 696:15

**shows** [4] - 672:1; 673:6; 694:17; 696:18

**sic** [2] - 572:19; 706:9

**sick** [1] - 683:2

**side** [11] - 575:10; 578:21; 602:14; 622:24; 663:14; 691:5; 694:18; 696:9; 697:19; 698:15

**sidebar** [8] - 617:24; 618:14; 662:20; 702:22; 704:16; 717:13, 16; 726:9

**sides** [2] - 648:5; 699:22

**sight** [1] - 611:7

**sign** [4] - 613:23; 633:14; 656:17; 710:12

**signature** [1] - 660:21

**signed** [3] - 593:18; 660:23; 701:25

**SIM** [1] - 667:22

**similar** [2] - 677:11; 697:6

**sister** [2] - 570:22; 612:18

**sit** [3] - 573:14; 604:1, 13

**sitting** [5] - 630:3; 658:2; 709:1; 730:5, 14

**six** [7] - 571:25; 597:13; 615:18-20;

625:7

**Sixth** [1] - 640:19

**size** [1] - 608:18

**sized** [4] - 588:19; 589:1, 8; 592:4

**sketch** [1] - 655:10

**skill** [1] - 664:4

**skills** [1] - 642:23

**skipped** [1] - 715:6

**Skype** [4] - 675:7; 712:24

**slash** [1] - 675:15; 724:16

**slave** [1] - 589:14; 713:21

**sleep** [3] - 625:13, 17; 682:22

**slide** [1] - 694:3

**slower** [1] - 582:8

**small** [2] - 667:25; 695:9

**Small** [1] - 591:4

**smaller** [2] - 622:7; 647:9

**Smithtown** [7] - 591:8; 593:6; 594:22; 615:2; 655:21; 719:18

**SMS** [1] - 668:14

**snuck** [1] - 703:5

**Social** [1] - 629:23

⬛⬛⬛ [1] - 583:23

⬛⬛⬛ [29] - 580:15; 581:10; 582:6, 13; 583:19, 21; 584:2, 9, 13, 15; 585:4, 7; 605:12, 14, 16, 19; 675:10; 683:17, 23; 710:11, 16; 712:5, 7, 23; 713:12, 16; 715:16, 18; 723:19

⬛⬛⬛ [2] - 583:23; 723:19

⬛⬛**'s** [1] - 723:16

⬛⬛ [2] - 604:25; 605:4

**software** [20] - 645:2, 4, 8; 646:9; 648:23; 649:12; 651:6; 652:5; 653:3; 667:19; 668:14; 669:4; 691:16, 18; 693:9, 13; 695:23; 723:6

**sold** [1] - 593:4

**someone** [16] - 587:1; 591:10; 593:10, 14, 18; 594:17, 19, 21; 595:3, 10, 13; 599:10; 618:20;

656:17; 673:9; 718:6

**sometime** [3] - 634:4, 16; 699:20

**sometimes** [12] - 583:12, 21-22; 605:22; 643:11, 22; 657:11, 19; 668:1; 672:14; 699:15

**somewhere** [2] - 592:10; 615:22

**son** [4] - 572:18; 602:16; 609:5; 628:6

**son's** [1] - 628:8

⬛⬛ [1] - 583:22

⬛⬛ [1] - 605:22

⬛⬛ [1] - 605:23

**sorry** [18] - 571:17, 19; 578:3; 582:15; 587:20; 613:18; 619:19; 634:10; 637:21; 652:13; 690:10; 701:12; 706:11; 710:3; 713:4; 715:7; 723:9; 729:8

**sort** [4] - 590:22; 643:2, 11; 665:12

**sound** [2] - 582:11; 664:19

**sounded** [1] - 676:9

**South** [3] - 602:11; 628:18

**Spain** [1] - 675:16

**Sparagano** [1] - 661:25

**speaking** [6] - 582:10; 595:4; 632:6; 647:14; 648:10; 668:20

**Special** [3] - 569:19, 22; 574:21; 575:3; 576:9, 25; 579:20; 582:5; 589:9; 598:16; 608:10; 630:15; 632:7, 16-17; 654:20

**special** [3] - 587:12; 606:7; 696:1

**specialized** [1] - 664:1

**specific** [5] - 646:8; 668:12; 691:21; 696:2; 701:6

**specifically** [6] - 645:13; 659:25; 660:3; 669:25; 680:4

**spectrum** [2] - 640:23; 652:4

**speed** [3] - 582:7; 646:17

**spell** [2] - 605:14; 639:7

**spelled** [4] - 583:22;

708:6; 723:16, 19

**spelling** [1] - 605:19

**spellings** [2] - 583:24; 605:22

**spent** [2] - 573:10; 631:22

**spiraling** [1] - 644:25

**spoken** [2] - 630:18; 633:20

**sponsored** [1] - 644:13

**sports** [1] - 573:4

**spot** [1] - 670:9

**squad** [2] - 640:20, 25

**stages** [1] - 570:17

**stalking** [1] - 683:1

**stamp** [3] - 606:17; 672:5, 15

**stand** [2] - 638:24; 699:15

**standard** [2] - 597:20; 696:24

**standard-issue** [1] - 597:20

**standing** [4] - 608:14; 611:16; 624:1; 638:25

**start** [16] - 569:8; 586:1; 591:12; 644:10; 649:11; 679:6; 694:18; 697:16; 708:15; 710:8; 711:25; 712:1; 713:11; 714:25; 715:9

**started** [3] - 653:8; 685:1; 697:15

**starter** [2] - 676:7

**starting** [7] - 605:10; 644:10; 652:24; 653:10; 671:4; 684:1; 686:15

**starts** [4] - 640:8; 673:18; 676:23; 713:8

**State** [3] - 661:24; 662:1

**state** [3] - 639:7; 664:10

**statement** [3] - 643:13; 718:5, 14

**statements** [3] - 596:9; 640:22; 654:6

**STATES** [1] - 568:1, 3

**States** [6] - 568:13, 21; 577:20, 23; 611:14; 638:22

**station** [2] - 648:22; 690:12

**stay** [2] - 586:4; 713:1

**stays** [1] - 731:19

**stenography** [1] - 568:23

**step** [4] - 610:23; 635:2, 5; 705:5

**Steven** [1] - 654:21

**sticker** [1] - 600:22

**sticky** [1] - 600:23

**still** [9] - 569:22; 578:19; 579:5; 585:6; 590:5; 677:6; 678:6; 708:11, 23

**stipulation** [1] - 702:24

**stockings** [1] - 591:21

**stomach** [2] - 709:13; 710:22

**stop** [12] - 627:24; 684:16; 687:9; 692:7; 710:8, 25; 712:2; 713:6, 23; 715:5, 13; 730:4

**storage** [10] - 648:6, 8, 11, 13; 650:4; 665:12; 667:25; 693:5; 698:1

**store** [2] - 591:3; 712:16

**stored** [4] - 667:21; 668:17; 689:1, 13

**story** [2] - 634:4, 8

**straight** [1] - 681:22

**street** [1] - 709:11

**streets** [1] - 709:17

**structure** [3] - 696:24; 697:22

**stuff** [2] - 689:4; 724:17

**subdivision** [1] - 732:10

**subdivisions** [1] - 732:7

**subject** [5] - 645:24; 706:4; 710:5; 711:22; 714:21

**subjects** [2] - 645:21; 646:6

**subpoenaed** [2] - 630:21, 24

**substance** [3] - 576:12; 603:18; 677:12

**suck** [1] - 712:12

**sucking** [1] - 710:14

**Sue** [1] - 678:5

**sufficient** [2] - 664:17; 718:15

**Suffolk** [12] - 581:2; 608:13; 639:11, 21, 23; 640:7; 641:22; 652:9; 655:5; 677:22; 688:13

**suggested** [2] - 636:3, 7

**suggestion** [1] - 604:25

**suit** [2] - 592:4; 612:21

**Suite** [1] - 568:18

**suite** [2] - 651:4; 653:4

**sum** [3] - 603:18; 664:22; 677:12

**summarize** [1] - 682:6

**summary** [2] - 586:21; 594:15

**summation** [1] - 634:8

**summations** [2] - 699:20; 730:15

**summer** [4] - 631:13; 634:5, 12, 17

**Sunday** [1] - 708:2

**supplied** [1] - 577:7

**supply** [1] - 691:1

**support** [2] - 613:25; 664:19

**surveillance** [2] - 573:19, 22

**surveyed** [1] - 657:23

**suspect** [1] - 596:18

**suspect's** [1] - 596:18

**sustain** [1] - 634:1

**Sustained** [8] - 659:13, 16; 660:10; 661:3; 677:15; 685:19, 24; 687:20

**sustained** [12] - 587:18; 593:22; 596:8, 23; 605:2; 610:18, 21; 617:20; 629:6; 633:23; 659:13; 725:11

**swearing** [1] - 653:21

**sweet** [7] - 675:6; 712:15-17, 21; 713:21

**sweetheart** [1] - 678:18

**sweetie** [1] - 675:8

**sweetness** [1] - 712:6

**sworn** [3] - 570:4; 611:20; 639:5

███████ [36] - 571:3; 572:6, 14; 574:4; 606:21; 607:5; 609:18; 610:1; 613:2; 615:11, 17; 616:1, 11; 619:2; 620:12, 25; 621:22; 622:13, 18, 22; 623:10; 624:13, 23; 625:12; 627:19, 21; 630:18, 24;

631:11; 632:1, 19, 25; 633:9, 21; 634:5

**system** [8] - 695:15, 17, 22-23; 696:2, 5, 11, 13

**systems** [2] - 573:19, 22

---

**T**

**T-Mobile** [1] - 665:19

**table** [4] - 598:17, 22; 599:8; 642:23

**TABLU** [5] - 690:13, 15, 22; 691:14; 692:18

**tag** [1] - 667:8

**tall** [1] - 608:8

**taller** [2] - 608:6, 16

**tan** [1] - 591:18

**target** [4] - 576:14, 21; 577:1, 3

**task** [3] - 642:11; 643:14; 646:4

**Task** [4] - 642:12, 14, 19

**tasked** [1] - 662:11

**taste** [1] - 712:20

**taught** [1] - 645:11

**teach** [1] - 645:18

**teacher** [1] - 628:5

**technical** [1] - 664:1

**telephone** [3] - 579:16; 595:22; 667:23

**ten** [2] - 670:19; 673:16

**term** [1] - 643:20

**Terminator** [1] - 573:7

**terms** [1] - 651:9

**terrific** [1] - 686:20

**test** [3] - 651:24; 653:12; 672:13

**testers** [2] - 653:13

**testified** [14] - 570:4; 598:6; 600:24; 611:20; 633:3; 639:5; 650:25; 661:6; 663:18; 684:25; 687:10, 13; 690:5, 9

**testify** [6] - 618:1; 630:22, 24; 635:24; 664:5, 8

**testifying** [4] - 576:8; 635:22; 636:6; 700:23

**testimony** [12] - 578:20; 603:7; 613:15; 636:1; 662:13, 15; 663:13, 20-21; 664:16

**text** [18] - 580:5; 668:14, 17; 669:18; 670:6; 672:2, 7-8, 14; 673:3, 8, 22; 682:2, 16, 21; 685:3; 721:25; 722:22

**texting** [1] - 672:20

**THE** [137] - 569:4, 12, 16, 25; 570:1; 581:12; 583:11; 586:16; 587:18; 588:8; 589:25; 590:16; 592:17; 593:22; 596:8, 23; 600:10; 603:12; 605:2, 14-15; 606:1, 3; 608:24; 610:9, 18, 21, 23; 611:4, 8, 12, 16, 22, 25; 617:20; 618:1, 7, 11, 16, 24-25; 623:1, 3; 629:6, 14; 631:6; 633:23, 25; 634:9; 635:2, 5, 8, 11; 636:9, 18, 21; 637:1, 17, 23; 638:5, 8, 16, 19, 24; 639:1, 7, 9, 12; 658:10; 659:13, 16; 660:10; 661:3; 662:11, 21; 663:5, 12; 671:15; 673:1; 677:15; 679:21, 23; 681:1; 683:20, 22; 685:19, 24; 687:20; 689:19; 694:13; 699:7, 13, 25; 700:4, 8, 12, 19; 703:18; 704:11, 15; 705:16; 706:10; 707:20; 709:25; 711:3, 14; 714:13; 716:12, 24; 717:22, 24; 718:13, 24; 719:1; 720:22; 721:17; 722:5; 725:11; 726:1, 6, 10, 13; 727:5, 23; 728:11; 729:19; 730:4, 25; 731:12, 21, 25; 732:4, 6, 11, 14, 19, 21

**thinking** [1] - 647:7

**thinks** [1] - 684:14

**Thomas** [1] - 641:2

**thorough** [1] - 570:9

**thousand** [1] - 670:15

**three** [5] - 581:21; 620:11; 682:19; 724:6

**throughout** [4] - 609:10; 646:3; 651:16; 654:9

**throw** [1] - 590:19

**thumbnail** [1] - 655:10

**Thursday** [2] - 712:4, 18

**ticket** [1] - 731:2

**Ticket** [2] - 731:9

**tie** [1] - 658:7

**tights** [5] - 591:16, 18, 23; 592:6

**tiles** [1] - 575:12

**timeline** [7] - 669:23; 670:1, 4, 8, 25; 675:1

**tip** [1] - 576:13

**tits** [6] - 709:12; 710:14, 16; 712:13; 713:13; 715:10

**today** [22] - 596:2; 602:7; 607:23; 608:2; 612:9; 613:20; 630:7, 10, 13, 16, 19; 632:23; 633:3; 634:3, 23; 658:3; 694:6; 710:24; 711:3; 730:4

**today's** [1] - 613:15

**toddler** [1] - 582:2

**toes** [1] - 713:13

**together** [9] - 631:21; 642:21; 650:6; 653:4; 673:12; 694:3, 6; 695:24

**tomorrow** [3] - 673:11; 712:20; 730:5

**tonight** [3] - 709:5, 8, 16

**took** [14] - 617:23; 634:5; 644:20; 648:17; 656:10; 662:19; 665:22; 689:10; 690:5; 692:17; 702:21; 717:15; 721:7; 726:8

**Tool** [3] - 645:7; 691:17; 693:10

**tool** [5] - 667:17; 668:25; 671:6; 692:5; 697:10

**tools** [14] - 648:23; 649:23; 651:4, 8, 11; 652:23; 653:1, 4; 691:24; 692:4; 693:17; 697:17

**top** [5] - 614:22; 670:23; 688:12; 701:24; 719:8

**total** [2] - 620:10; 725:5

**touch** [4] - 665:19; 710:21; 712:9; 713:18

**touches** [3] - 710:19; 712:7, 23

**touching** [1] - 712:8

**tour** [2] - 656:10; 665:11

**toward** [1] - 584:4

**tower** [1] - 688:24

**town** [1] - 615:1

**toy** [1] - 622:24

**toys** [5] - 709:12; 710:11, 17-18, 22

**tracking** [4] - 717:5; 719:8, 10

**trafficking** [1] - 643:1

**training** [19] - 643:5; 644:6, 15-16, 18, 20, 22-23; 645:3, 6, 8, 14, 19; 646:5, 8; 651:22, 24; 664:4

**trainings** [2] - 645:5; 646:2

**TRANSCRIPT** [1] - 568:6

**transcript** [2] - 568:24; 731:3

**transcription** [1] - 568:24

**transfer** [2] - 587:8; 687:2

**transferred** [1] - 641:9

**transfers** [2] - 586:23; 594:18

**transition** [1] - 636:4

**transported** [1] - 579:13

**travel** [1] - 577:8

**TRIAL** [1] - 568:6

**trial** [3] - 601:25; 662:3; 732:23

**Troyd** [12] - 569:20, 22; 574:21; 575:3; 582:5; 589:9; 606:7; 630:15; 632:7, 10, 17; 654:21

**true** [8] - 596:24; 608:7; 632:16, 21; 711:8; 714:4; 716:4, 18

**truth** [1] - 664:16

**try** [5] - 579:23; 599:8; 612:12; 646:1; 710:16

**Tuesday** [4] - 699:21; 711:18; 730:13

**Turkey** [2] - 595:11; 675:10

**tween** [1] - 592:9

**tweets** [2] - 580:9, 11

**twice** [5] - 602:17; 620:6; 646:1; 731:23

**Twitter** [1] - 580:9

**two** [22] - 572:14;

581:24; 590:7, 10; 595:11; 604:25; 605:4; 627:21, 23; 641:10; 679:12; 681:16; 685:3; 695:2; 700:13; 701:9; 702:18; 722:13; 725:5, 13; 728:3; 730:9

**two-page** [1] - 722:13

**type** [8] - 617:8-10; 621:4; 630:4; 666:10; 672:1

**types** [1] - 663:20

**U**

**U.S** [5] - 568:4, 15; 604:7; 612:8; 661:13

**U.S.D.J** [1] - 568:9

**UKR** [1] - 675:10

**Ukraine** [9] - 578:6, 18; 579:22; 581:7; 595:11; 609:14; 610:13; 677:25

**Ukrainian** [2] - 605:20; 610:16

**ultimately** [1] - 693:14

**umm** [1] - 697:16

**unclear** [1] - 582:21

**under** [4] - 569:23; 601:9; 641:10

**undercover** [3] - 607:12; 640:13; 643:17

**underlined** [1] - 601:8

**underneath** [1] - 601:21

**unfettered** [1] - 609:15

**Union** [3] - 586:20; 594:15; 595:16

**unique** [1] - 688:13

**unit** [19] - 641:4, 11-12, 14, 17, 19, 22; 642:3, 5, 7; 643:3; 646:20, 24; 648:4; 666:11, 15-16; 668:12

**UNITED** [2] - 568:1, 3

**United** [6] - 568:13, 21; 577:20, 23; 611:14; 638:22

**units** [1] - 641:25

**unless** [1] - 709:10

**unlikely** [1] - 703:13

**unquote** [2] - 660:5; 664:10

**unrelated** [2] - 703:11

**untitled** [1] - 724:16

**up** [52] - 574:11;

575:16; 581:7; 588:12, 20; 589:2; 593:18; 595:10; 608:3; 612:2, 16; 614:6; 617:5; 623:1; 627:19; 635:6; 636:13; 638:24; 639:13; 644:16; 645:23; 646:17; 648:15; 650:4, 10, 12; 653:3; 657:6, 12-13; 662:14, 23; 676:9; 680:23, 25; 682:5; 683:16, 22; 686:11; 690:22; 691:14; 697:7; 698:3; 709:4, 6, 10; 710:15; 722:23; 723:23

**up-to-date** [1] - 645:23

**updated** [2] - 637:15; 638:12

**upper** [2] - 601:9; 606:11

**upstairs** [4] - 619:6; 632:3; 656:10

**user** [1] - 573:15

**uses** [2] - 667:24; 695:24

**UTC** [2] - 680:20; 683:15

**V**

**Valerio** [45] - 569:5; 570:8; 571:15, 20; 572:18; 577:19; 578:1, 4; 582:14; 584:25; 585:3, 16, 19; 586:24; 587:2, 5, 8; 589:11; 591:8, 10; 592:24; 593:5, 10, 18; 594:17, 21; 595:13; 601:25; 607:15, 19; 608:6, 22; 618:2, 19; 657:25; 658:2; 710:3; 711:17, 21; 714:19, 21; 719:19; 722:14, 20

**VALERIO** [1] - 568:5

**Valerio's** [12] - 570:19, 22; 571:11; 573:1, 15; 588:2; 607:22; 609:5; 612:18; 625:20; 627:7; 631:3

**Valerio-Kalichenko** [1] - 570:8

**validation** [3] - 714:21; 715:3, 12

**valleys** [1] - 713:17

**variation** [1] - 652:19

**variations** [2] - 605:18

**various** [9] - 642:15; 643:24; 645:2, 8; 646:6, 10; 665:9; 697:17; 721:23
**vendor** [1] - 645:7
**version** [6] - 600:2; 622:7; 653:11; 693:15
**versus** [1] - 661:25
**Veterans** [1] - 730:14
**via** [1] - 722:24
**Viber** [3] - 681:24; 682:1
**victims** [1] - 643:16
**video** [26] - 573:19; 581:21, 24; 582:20; 585:4; 687:3, 7; 709:11, 14, 16; 712:17; 720:18; 721:12, 24-25; 724:11; 725:7, 13; 727:13, 16; 728:3, 15, 18; 730:2
**videos** [30] - 582:6, 13, 18; 607:5; 660:2; 668:18; 669:12; 682:18; 683:17, 23; 686:15, 18; 697:9; 700:10; 710:10, 12; 713:12, 14; 715:16; 720:2, 10; 721:7; 722:24; 724:13, 24-25; 725:2; 727:13; 729:21, 23
**videotaping** [1] - 597:3
**view** [4] - 574:14; 600:14; 601:11; 687:3
**viewed** [1] - 681:17
**Vinny** [2] - 673:20; 676:16
**visible** [3] - 598:7; 657:22; 697:18
**visited** [1] - 641:25
**voice** [5] - 599:6; 612:2, 16; 639:13; 659:7
**voices** [1] - 659:5
**volume** [1] - 696:20

---

**W**

**wait** [2] - 611:8; 635:18
**waiting** [1] - 682:12
**waive** [1] - 660:25
**walk** [8] - 591:12; 647:16; 673:16; 688:22; 694:17; 696:15; 698:15
**walked** [1] - 693:5
**wall** [1] - 574:2

**wants** [1] - 712:9
**war** [2] - 610:19; 684:6
**warned** [2] - 683:2; 708:23
**warnings** [1] - 603:6
**warrant** [9] - 653:22; 654:1, 23, 25; 665:3, 21; 672:18; 685:7, 13
**warrants** [6] - 588:3; 594:10; 653:18, 24; 654:4
**wash** [1] - 690:17
**watch** [1] - 673:12
**watched** [4] - 582:5, 8, 11; 645:20
**water** [1] - 599:18
**ways** [1] - 668:7
**weapon** [3] - 598:3, 11
**weapons** [2] - 658:23; 659:1
**wear** [1] - 621:14
**wearing** [1] - 658:6
**web** [1] - 692:12
**Wednesday** [3] - 699:21; 714:20; 730:15
**week** [5] - 644:18; 678:24; 687:14; 699:15; 730:18
**weekend** [1] - 675:22
**weeks** [2] - 685:12; 730:9
**weigh** [1] - 719:7
**weight** [3] - 607:23; 608:1; 664:14
**Weinstein** [1] - 661:19
**welcome** [1] - 706:25
**well...kisses** [1] - 605:13
**Wernick** [1] - 661:13
**West** [1] - 591:4
**Western** [3] - 586:20; 594:15; 595:15
**wet** [1] - 713:18
**what-not** [6] - 641:8; 646:4, 15; 648:20; 653:5; 668:16
**whatsoever** [2] - 649:3; 691:11
**whichever** [1] - 647:22
**white** [5] - 591:20; 592:7; 599:20; 600:25; 601:5
**whole** [3] - 671:7; 693:18; 696:21
**WICKER** [1] - 568:20
**widely** [1] - 651:7

**wife** [1] - 633:11
**wig** [4] - 626:18-20, 22
**Windows** [6] - 657:17; 695:19; 696:10, 25; 697:25; 724:16
**windows** [3] - 695:20; 696:3, 19
**wings** [5] - 621:7, 10, 12
**Winnie** [2] - 599:13, 17
**wire** [2] - 586:23; 594:18
**Wisconsin** [2] - 591:5; 593:4
**wish** [1] - 662:16
**withdrawn** [12] - 593:14; 598:5; 623:8; 632:15; 634:16; 645:22; 650:24; 660:9; 670:12; 671:4; 685:9; 729:22
**WITNESS** [9] - 569:25; 605:15; 611:22; 618:24; 623:3; 639:9; 681:1; 683:22; 711:3
**witness** [33] - 570:3; 611:6, 13, 19; 635:7, 11, 22; 636:19, 24; 638:21, 24; 639:4; 658:9; 660:23; 662:12; 663:18-21; 664:3, 17, 22-23; 665:21; 670:21; 679:13; 688:2, 17; 705:3, 7; 716:1; 720:7; 731:6
**witness'** [1] - 664:13
**witnesses** [6] - 640:23; 663:24; 664:8, 10; 665:3
**WITNESSES** [1] - 733:2
**woman** [6] - 571:8; 586:9; 595:14; 681:20; 683:2
**wonder** [1] - 699:15
**word** [6] - 601:9; 633:7; 650:7; 673:2; 683:20
**words** [1] - 584:23
**workbench** [1] - 647:25; 648:2
**works** [1] - 689:2
**worksheet** [2] - 666:9
**world** [4] - 602:14; 643:5; 651:17; 652:25
**write** [18] - 649:1, 8, 10; 674:15; 675:11, 17; 690:13-17; 691:1, 14; 692:18; 709:1; 719:24

**writing** [3] - 585:3, 18; 586:12
**written** [9] - 576:2; 584:1; 601:6; 649:4; 718:4, 6, 9; 723:18; 724:15
**wrote** [1] - 641:24
**www.celebrateexpress. com** [1] - 591:6
**www.DHL.com** [1] - 717:6

---

**Y**

**Yara** [1] - 675:9
**year** [16] - 572:14; 581:24; 592:13; 597:14; 607:8, 10, 24; 610:15; 620:6-8; 631:11; 632:11; 646:1; 654:17; 684:5
**years** [28] - 572:1, 21; 581:21, 24; 587:14; 593:19; 615:15, 18; 620:9; 625:7; 627:22; 631:14; 639:25; 640:1, 11-13, 17; 641:11, 13; 642:8, 15; 644:5; 645:1, 16
**yesterday** [4] - 569:19; 600:24; 678:5; 700:13
**YORK** [1] - 568:1
**York** [10] - 568:14, 18, 22; 591:9; 593:7; 594:22; 655:22; 661:25; 706:22; 719:18
**young** [1] - 609:19
**yourself** [1] - 712:19

---

**Z**

**zeros** [3] - 650:5, 10
**zoom** [3] - 599:9; 600:17; 601:1, 4, 15; 681:7

735

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------X

UNITED STATES OF AMERICA,        :    14 CR 0094

     v.                          :    U.S. Courthouse
                                  Central Islip, N.Y.
JOSEPH VALERIO,                  :

                              TRANSCRIPT OF TRIAL
            Defendant.     :

                              November 10, 2014
-------------------------------X    9:30 a.m.

BEFORE:

        HONORABLE JOSEPH F.  BIANCO, U.S.D.J.
                and a jury


APPEARANCES:

For the Government:   LORETTA E. LYNCH
                     United States Attorney
                     100 Federal Plaza
                     Central Islip, New York 11722
                     By:  AMEET B. KABRAWALA, ESQ.
                         ALLEN BODE, ESQ.
                         Assistants, U.S. Attorney


For the Defendant:    ANTHONY LaPINTA, ESQ.
                     LEONARD LATO, ESQ.
                     35 Arkay Drive - Suite 200
                     Hauppauge, New York 11788


Court Reporter:       HARRY RAPAPORT
                     OWEN M. WICKER
                     United States District Court
                     100 Federal Plaza
                     Central Islip, New York 11722
                     (631) 712-6105


Proceedings recorded by mechanical stenography.
Transcript produced by computer-assisted transcription.

736

1

2              M O R N I N G    S E S S I O N

3              (Case called.)

4              (Appearances noted.)

5              THE COURT:  Good morning.

6              And Mr. Valerio is present.

7              Is there anything we need to discuss before the

8     jury comes out?

9              MR. LAPINTA:  No, your Honor.

10             MR. KABRAWALA:  No, Judge.

11             THE COURT:  Let's bring the jury in.

12             What is your last name, sir?  I forgot.

13             THE WITNESS:  Forrestal.

14             THE COURT:  Forrestal.

15             How much do you have of this witness?

16             MR. KABRAWALA:  Approximately an hour to an hour

17    and 30 minutes.

18             (Whereupon, the jury at this time enters the

19    courtroom.)

20             THE COURT:  If everyone could be seated.

21             Good morning, members of the jury.  We are ready

22    to continue with the trial.

23             As you recall, last Thursday when we ended,

24    Mr. Forestall was on direct examination, so we'll continue

25    from that point.

Forrestal - Direct/Kabrawala

737

1          I remind you, sir, you are still under oath.

2          Do you understand?

3          THE WITNESS:  Yes, sir.

4    R O R Y   F O R R E S T A L,

5          having been previously sworn, resumed the stand

6          and testified further as follows:

7    DIRECT EXAMINATION

8    BY MR. KABRAWALA: (Continue)

9    Q    You testified last Thursday among other things that

10   you conducted an analysis of a cell phone found in the

11   defendant's house.

12   A    I did.

13   Q    You testified that you found a number of text

14   messages.

15          Do you remember that testimony?

16   A    I to.

17   Q    You also testified that there was no child

18   pornography that was found on the cell phone.

19          Do you remember that?

20   A    I do.

21   Q    Did you find any images at all on the phone?

22   A    There were images on the phone.

23   Q    Exhibit 270-A as in alpha.

24          Do you see that image, sir?

25   A    I do.

Forrestal - Direct/Kabrawala

738

1    Q    It's Government's Exhibit 270-A as in alpha?

2    A    Correct.

3    Q    Did you recover that image from the defendant's cell

4    phone?

5    A    I did.

6            MR. KABRAWALA:  The Government moves to admit

7    Government's Exhibit  270 alpha.

8            MR. LAPINTA:  No objection.

9            THE COURT:  270-A is admitted.

10            (Whereupon, Government Exhibit 270-A was

11    received in evidence.)

12            MR. KABRAWALA:  Permission to publish?

13            THE COURT:  Yes.

14            MR. KABRAWALA:  Publishing Government 270-A.

15    BY MR. KABRAWALA:

16    Q    Is that a picture that you recovered from this cell

17    phone (indicating)?

18    A    Yes.

19    Q    I will show you Government's Exhibit 402, the cell

20    phone.

21            Look at the picture that is depicted in

22    Government's Exhibit 270-A.

23    A    I see it.

24    Q    Now I'm showing you Government's Exhibit 202.

25            Did that cell phone appear to be depicted in the

739

1    image you just saw?

2    A    It appears to be the same cell phone.

3    Q    Does this appear to be what they call a selfie?

4              MR. LAPINTA:  Objection.

5              THE COURT:  Sustained.

6              The jury will disregard that.

7    Q    What kind of image is it?

8    A    In the vernacular, they use a selfie.

9    Q    Selfie.

10             Showing you Government's Exhibit 270 bravo,

11   270-B.

12             Do you recognize that image?

13   A    Another one of the images I recovered from the cell

14   phone.

15   Q    From Government's 402, the cell phone?

16   A    Yes.

17             MR. KABRAWALA:  The Government moves to admit

18   Government's Exhibit 270-B as in bravo.

19             MR. LAPINTA:  No objection.

20             THE COURT:  270-B in evidence.

21             (Whereupon, Government Exhibit 270-B was

22   received in evidence.)

23             MR. KABRAWALA:  I will now publish it.

24   Q    What is 270-B as in bravo?

25   A    It's a selfie.

Forrestal - Direct/Kabrawala

740

1    Q    I'm going to bring you what has been marked as

2    Government's Exhibit 559-A as in alpha, and copies have

3    been provided to counsel and copies provided to the Court.

4           It's a two-page exhibit.

5           Do you recognize what that document is?

6    A    It is one of the recovered e-mails, recovered from

7    the hard drive.

8    Q    I'm sorry, I can't hear you.

9    A    It's one of the recovered e-mails that are recovered

10   from InBox 1.

11   Q    Could it have been from the "sent" folder?

12   A    "Sent" folder.

13   Q    Government 559-A was recovered from the defendant's

14   computer "sent" folder?

15   A    Yes.

16          MR. KABRAWALA:  Government moves to admit 559-A

17   as in alpha.

18          MR. LATO:  One moment, your Honor.

19          MR. LAPINTA:  No objection.

20          THE COURT:  559-A is admitted.

21          (Whereupon, Government Exhibit 559-A was

22   received in evidence.)

23          MR. KABRAWALA:  I'm publishing Government's

24   Exhibit 559-A as in alpha.

25   Q    Did this appear to be an e-mail from

Forrestal - Direct/Kabrawala

741

1    joeval5@optonline.net to Olena Kalichenko?

2    A    It does.

3    Q    What is the date of the sent e-mail, please?

4    A    January 24, 2012.

5    Q    I'm going to highlight a portion of it, and I'd like

6    for you to read the highlighted portion, please.

7    A    Try to resend those videos from yesterday, MOV 00042,

8    MV quote 46, MV quote 49, MV quote 52, MV quote 53, all of

9    them, again.  Seems there was too much memory at once to

10   handle for the phone --

11   Q    Let me stop you there.

12        If you could, based on your experience in

13   computer forensics, what's an MOV 0042?  What is that

14   referring to?

15        MR. LAPINTA:  Objection.

16        What is it referring to -- I object to it.

17        THE COURT:  Sustained to form.

18   Q    What is MOV 0042 as it is referred to in this e-mail?

19        MR. LAPINTA:  Objection.

20        (Whereupon, at this time the following took

21   place at the sidebar.)

22        (Continued.)

23

24

25

Forrestal - Direct/Kabrawala

742

1          THE COURT:  I don't know what that is.

2          Is that something that is a general type of

3    file?

4          MR. KABRAWALA:  It's a movie file.

5          THE COURT:  Based upon what?

6          MR. KABRAWALA:  The name convention.  The naming

7    convention is a movie file naming convention.

8          I can asked:  Based on your experiences as a

9    forensic -- in computer forensics, what is an MOV.  What

10   does MOV stand for.

11         THE COURT:  All right.

12         MR. LAPINTA:  All right.

13         (End of sidebar conference.)

14         (Continued.)

15

16

17

18

19

20

21

22

23

24

25

743

1  BY MR. KABRAWALA:

2  Q    Detective Forrestal, based on your experience in

3  computer forensics, what is MOV?

4  A    MOV is -- usually a file extension for the video-type

5  of files in computers.

6  Q    Continue reading, please.

7       You were asked?

8  A    Very nice ones with you and ███████  Great job.  You

9  see you are bonding very well with █████.  As you can see

10  my energy is flowing through █████ on to you.  Do you

11  feel it?  It's coming from me, as she touches and explores

12  your breasts then to touch you below.

13       As you keep her between your legs safely, with

14  your legs up around her, putting her toy down by your

15  sweet pussy, from your belly down to your pussy.  With you

16  and her securely on the couch, bed or floor, you can use

17  the cell phone camera with one hand, grabbing your tits

18  with the other, and from your eye view down to your sweet

19  pussy.  You will be recording █████ playing with your

20  sweetness below as she touches and explores you, as you

21  continue to insert the toys between your legs.  This will

22  be like a French short film.  We will work on a title my

23  sweeties.

24  Q    Thank you.

25       I am going to have you scroll down.

Forrestal - Direct/Kabrawala

744

```
1         I just highlighted a portion of Government's
2    Exhibit 559-A as in alpha.
3         Would you mind reading that highlighted portion,
4    please?
5    A    I think all I may need from you is ███████
6    information.  I have a copy of your passport, so I think
7    that is all for now.  Let me get to the Western Union
8    place later because apparently all transactions to the
9    Ukraine --
10   Q    I think you misread that.
11   A    By phone or online, they suspect high fraud activity
12   in the Ukraine.  So on my way back from the meeting I'll
13   have to stop at one of their locations.  Nothing is simple
14   in the Ukraine, I guess, these days.  So I will get the
15   money out to you later sometime.
16   Q    Thank you.
17        That was a January 24, 2012 e-mail, correct?
18   A    Correct.
19        MR. KABRAWALA:  I'm now publishing Government's
20   Exhibit 322 which is in evidence.
21   Q    This is a Western Union summary chart.
22        Is there an entry for January 24, 2012, the same
23   date as that e-mail?
24   A    It is.
25   Q    How much does it say -- I'm sorry.
```

745

```
 1          Does it say the sender name is Joseph Valerio,

 2   sent to a payee named Olena Kalichenko?

 3          THE COURT:  You say e-mail.

 4   Q    Withdrawn.

 5          Does it say a sender named Joseph Valerio sent

 6   money to a payee named Olena Kalichenko?

 7   A    It does.

 8   Q    Where does it say, according to the summary chart,

 9   the payee, Olena Kalichenko, was paid?  What country was

10   she paid in?

11   A    Ukraine.

12   Q    How much was paid on that date?

13   A    $150.

14   Q    On Thursday there was testimony about videos that

15   were found on the defendant's computer, Government's

16   Exhibit 400, and the hard drive within that computer.

17          Do you recall that testimony?

18   A    I do.

19   Q    Approximately how many videos in total were recovered

20   containing child pornography?

21   A    Approximately 30.

22   Q    Approximately 30?

23   A    Yes.

24   Q    We've seen a couple of those videos at this point.

25          I want to draw your attention to the CDs that
```

746

1    have been entered into evidence as Government's Exhibit --

2    withdrawn.

3            I want to draw your attention to the compact

4    disk entered into evidence as Government's Exhibit 503.

5            I'm also first going to draw your attention to

6    Government's Exhibit 503-G as in golf.

7            Do you see that e-mail in front of you?

8    A    I do.

9    Q    What is the date of that e-mail?

10   A    September 30, 2012.

11   Q    Where was that recovered from?

12   A    Recovered from the hard drive from the computer

13   seized at the residence of Joseph Valerio.

14   Q    Who was the e-mail from?

15   A    It's from Olena Kalichenko.

16   Q    And who was the e-mail to?

17   A    Joseph Valerio.

18   Q    It's dated September 30, 2012?

19   A    Yes.

20   Q    Were there attachments to that e-mail?

21   A    There were.

22   Q    And I showed you earlier what has been introduced in

23   evidence as Government's Exhibit 500, which were the

24   approximately 30 videos that you recovered from the

25   defendant's computer.

747

1    A    Yes.

2    Q    Does that contain 503-A, 503-B, 503-C, 503-D, 503-E?

3    A    Yes.

4    Q    Were those exhibits I just mentioned all contained

5    within Government's Exhibit 500 which is already in

6    evidence?

7              MR. KABRAWALA:  Government moves 503-A through

8    F.

9              MR. LAPINTA:  No objection.

10             THE COURT:  503-G is already in evidence?

11             MR. KABRAWALA:  Yes.

12             THE COURT:  503-A through F is admitted.

13             (Whereupon, Government Exhibits 503-A through

14   503-F were received in evidence.)

15   BY MR. KABRAWALA:

16   Q    Now, 503 contains shorter portions of the videos that

17   are already in evidence in Government's Exhibit 500; is

18   that fair to say?

19   A    Yes, it does.

20             MR. KABRAWALA:  I'm going to now publish

21   Government's Exhibit 503-B as in bravo.

22             For the record, 503-B is a 60-second clip.  The

23   original clip is one minute and 51 seconds.

24             (Video clip played.)

25   Q    Now I'll show Government's Exhibit 503-D as in delta.

Forrestal - Direct/Kabrawala

748

1     For the record, 503-D as in delta is a 60-second

2  clip of an original video that is three minutes and

3  11 seconds long.  This clip is 60 seconds.

4     (Video clip played.)

5  Q    Stopping it at 55 seconds.

6     Government's Exhibit 504 has been admitted --

7  withdrawn.

8     Showing you what has already been entered into

9  evidence as Government's Exhibit 503-E as in echo.

10     Can you please briefly describe what this e-mail

11  is?

12  A    This is an e-mail dated October 2, 2012, from Olena

13  Kalichenko to Joseph Valerio, and has a number of

14  attachment videos, I believe, if you scroll down.

15     MR. KABRAWALA:  I will scroll down.

16     THE WITNESS:  That's correct.

17  Q    Are there attachments?

18  A    There are.

19  Q    How do you know that you reviewed the attachments in

20  this particular e-mail that you recovered from the

21  defendant's computer?

22  A    I used the e-mail to create the CDs, the evidence CD,

23  and put my initials as I did and printed the e-mail.

24  Q    Appearing to show your initials on the right-hand

25  side of page 2?

Forrestal - Direct/Kabrawala

749

1        MR. LAPINTA:  Objection.

2        THE COURT:  Sustained as to form.

3   Q    Where did you place your initials?

4   A    I placed them on the second page on the right-hand

5   side, RFF, and the shield is 884.

6   Q    You said there were attachments to that particular

7   e-mail.

8        What kind of attachments were they?

9   A    They were video attachments.

10  Q    Were all the video attachments that were attached to

11  that e-mail already introduced as Government's

12  Exhibit 500, approximately 30 videos recovered from the

13  defendant's computer containing child pornography?

14  A    Yes.

15       MR. KABRAWALA:  The Government moves to admit

16  504-A, 504-B, 504-C and 504-D.

17       MR. LAPINTA:  One moment, please.

18       MR. LAPINTA:  No objection.

19       THE COURT:  504-A through D is admitted.

20       (Whereupon, Government Exhibits 504-A through

21  504-D were received in evidence.)

22       MR. KABRAWALA:  I will now publish Government's

23  Exhibit 504-B as in bravo.

24       For the record, it is a 30-second segment of a

25  larger video that is three minutes and five seconds long.

Forrestal - Direct/Kabrawala

750

```
1    The original is three minutes and five seconds long; this

2    clip is 30 seconds.

3              I will now publish 504-B as in bravo.

4              (Video clip played.)

5              MR. KABRAWALA:  I'll publish the last one.  That

6    is Government's Exhibit 504-D as in delta.

7              The original clip is -- withdrawn.

8              I will now publish Government's Exhibit 5 owe

9    four D as in delta.  The original video is two minutes

10   44 seconds long.  This portion is 60 seconds.

11             (Video clip played.)

12             MR. KABRAWALA:  I've published 30 second on that

13   clip.

14   BY MR. KABRAWALA:

15   Q    Did you also find other e-mails in the inbox of that

16   computer, Government's Exhibit 400, indicating that the

17   defendant communicated with someone named Olena

18   Kalichenko?

19   A    Yes.

20   Q    I'll pull up on your screen what's been marked as

21   Government's Exhibit 551.

22             Did you recover this document from the

23   defendant's computer?

24   A    I did.

25   Q    Which box was it in, the inbox or some other box?
```

751

1    A    InBox 1 (DBX).

2    Q    What is DBX?

3    A    That's a database file.

4          MR. KABRAWALA:  The Government moves to admit

5    Government's Exhibit 551.

6          MR. LATO:  No objection.

7          THE COURT:  551 is admitted.

8          (Whereupon, Government Exhibit 551 was received

9    in evidence.)

10          MR. KABRAWALA:  I'm now publishing Government's

11   Exhibit 551.

12   Q    What does this appear to be?

13   A    This is an e-mail sent September 7, 2012, from

14   Western Union response at westernunion.com to

15   joeval5@optonline.net, and the subject is:  Western Union:

16   Pickup.

17          It appears to be a notification that money had

18   been transferred, had been picked up by Olena Kalichenko.

19   Q    Just for the record, what was the to address, please?

20   A    The "to" was joeval5@optonline.net.

21   Q    Is it optonline.net?

22   A    Yes.

23   Q    Does it say:  Dear Joseph Valerio, thank you for

24   using the Western Union money transfer copyright simple

25   service.  Your money transfer has been picked up by the

752

1    receiver.  Following is a summary of your transaction.

2              Transaction details.

3              Money transfer control number, and there is a

4    number --

5    A    Correct.

6    Q    -- that ends in 53?

7    A    Yes.

8    Q    The order date is September 6, 2012?

9    A    It is.

10   Q    The amount sent is $1,000?

11   A    It is.

12   Q    Who is the receiver?

13   A    Olena Kalichenko.

14   Q    What is the status of the order?

15   A    Picked up.

16   Q    And again, this was recovered from an inbox, database

17   file inbox, on the defendant's computer, Government's

18   Exhibit 400?

19   A    Yes.

20   Q    Showing you Government's Exhibit 552.

21             Do you recognize this document, and if so, where

22   did you find it?

23   A    This is a document that I recovered -- or actually an

24   e-mail that I recovered from the computer hard drive that

25   we seized from the residence of Joseph Valerio.  It is

Forrestal - Direct/Kabrawala

753

1    from NYS, which is New York State --

2    Q    You don't have to read it just yet.

3            MR. KABRAWALA:  The Government moves to admit

4    Government's Exhibit 552.

5            MR. LATO:  No objection.

6            THE COURT:  552 is admitted.

7            (Whereupon, Government Exhibit 552 was received

8    in evidence.)

9            MR. KABRAWALA:  I am now publishing Government's

10   Exhibit 552.

11   Q    What does this e-mail appear to be?

12   A    It appears to be correspondence from New York State

13   DMV with joeval5@optonline.net.

14   Q    What is the date of the e-mail?

15   A    August 3, 2012.

16   Q    Does it appear to be a DMV transaction record?

17   A    It does.

18   Q    What is the name of the cardholder with respect to

19   the e-mail, Government's Exhibit 552?

20   A    Joseph Valerio.

21   Q    Was there an attachment to this e-mail?

22   A    Yes.

23   Q    Are you looking at it in your screen, 552-A as in

24   alpha?

25   A    Yes.

754

1       MR. KABRAWALA:  The Government moves to admit

2   Government's Exhibit 552-A.

3       MR. LATO:  No objection.

4       THE COURT:  552-A is admitted.

5       (Whereupon, Government Exhibit 552-A was

6   received in evidence.)

7       MR. KABRAWALA:  I'm publishing 552-A.

8   BY MR. KABRAWALA:

9   Q    What is the title of this attachment?

10  A    This is New York State Department of Motor Vehicles

11  Temporary Certificate of Registration.

12  Q    What is the expiration date of that certificate of

13  registration?

14  A    8/13/2012.

15  Q    When was the temporary certificate of registration

16  issued?

17  A    August 3, 2012.

18  Q    Showing you what has been marked as Government's

19  Exhibit 553.

20      Do you recognize this document, and if so, how?

21  A    I do.  This is an e-mail that I recovered from the

22  hard drive of the computer seized from the residence of

23  Joseph Valerio.

24      MR. KABRAWALA:  The government moves to admit

25  Exhibit 553.

755

```
 1              MR. LATO:  One moment, please.

 2              No objection.

 3              THE COURT:  553 is admitted.

 4              (Whereupon, Government Exhibit 553 was received

 5    in evidence.)

 6              MR. KABRAWALA:  I'm publishing this.

 7    BY MR. KABRAWALA:

 8    Q    Is this an e-mail from Olena Kalichenko to Joseph

 9    Valerio dated Sunday, April 29, 2012?

10    A    It is.

11    Q    I'm going to read the highlighted portion.  Tell me

12    if I get it wrong, please.

13              Joseph, I hope that you and Julia are fine.

14              Joseph, let me explain to you why I ran out of

15    cash so you won't be surprised.

16              Joseph, for two weeks, I have been living on

17    $250 and from that particular money I have spent $75 to

18    buy cloth for ▮▮▮▮▮▮▮ and the rest for food and credits for

19    my cell.

20              You really think it is a lot to feed three

21    people?  $100 I paid back to my mentor cause I borrowed

22    from her for taxi, you remember.  Then I bought a camera

23    for $350 and went to pay for an apartment when I was

24    making videos for you and 100 for DHL, you know that.

25    Joseph, I have done everything you asked --
```

756

1          THE COURT:  You misread that.

2          MR. KABRAWALA:  I'm sorry.

3          Joseph, I have done everything you asked me for.

4    I made you the videos and I was trying to send them to you

5    through internet, but it could work out.  Then I send you

6    them through DHL like you asked...I Also send you

7    everything by MMS, you asked me for spending enormous

8    amount of credits.

9          Other than the corrections that were noted, is

10   that what it says?

11   A    Yes.

12   Q    What is MMS?

13   A    That is multimessage system.

14   Q    What is that?

15   A    It's a text message with a file attached.  Usually

16   it's a little bit bigger than just a straight text

17   message, which is only text.

18   Q    I'm showing you what has been marked as Government's

19   Exhibit 554, and I'm going to scroll through and also show

20   you 554-A, 554-B, 554-C.

21         Were all of these documents recovered from the

22   defendant's computer?

23   A    They were.

24         MR. KABRAWALA:  The Government moves to admit

25   554, 554-B, 554-C.

757

 1            MR. LATO:  One moment, please, your Honor.

 2            MR. LATO:  No objection.

 3            THE COURT:  554, 554-B through C are admitted.

 4            (Whereupon, Government Exhibits 554, 554-B and

 5    554-C were received in evidence.)

 6    Q    Is that an e-mail from Olena Kalichenko dated

 7    October 16, 2012, to Joe Valerio, subject ████?

 8    A    It is.

 9    Q    Were there attachments to that e-mail?

10    A    Yes, there were.

11    Q    Were there three attachments?

12    A    Three attachments, yes.

13    Q    Showing you the attachments, 554-A, 554-C, 554-B.

14            I will bring this up to you since it is two

15    pages, a document marked 559-A.

16            You have a copy already.

17            Do you recognize that document, and if so, how?

18    A    I recognize the document.  It is an e-mail I

19    recovered from the hard drive of the computer I took from

20    Joseph Valerio's residence.

21            MR. KABRAWALA:  I'm sorry, it is in evidence

22    already.

23            THE WITNESS:  Yes.

24            MR. KABRAWALA:  Let me move on.

25    Q    Do you see what is up on your screen?

758

1    A    Yes.

2    Q    Government's Exhibit 567.

3    A    I do.

4    Q    Do you recognize that, and if so, how?

5    A    It's also a recovered e-mail from the hard drive of

6    the computer I seized from the residence of Joseph

7    Valerio.

8                MR. KABRAWALA:  The Government moves to admit

9    567.

10               MR. LATO:  May we have a minute, please, your

11   Honor?

12               THE COURT:  Fine.

13               (Counsel confer.)

14               MR. LATO:  No objection to 567.

15               THE COURT:  567 is admitted.

16               (Whereupon, Government Exhibit 567 was received

17   in evidence.)

18   Q    Showing you Government's Exhibit 567-A as in alpha.

19   Is this an attachment to 567?

20   A    It was.

21               MR. KABRAWALA:  Government moves to admit 567-A

22   as in alpha.

23               MR. LATO:  No objection.

24               THE COURT:  567-A is admitted.

25               (Whereupon, Government Exhibit 567-A was

Forrestal - Direct/Kabrawala

759

1    received in evidence.)

2    Q    I will show you what is marked as 567, and I'll

3    publish it as well.

4           What does this appear to be?

5           Please describe it.

6    A    This is an e-mail from Tom at

7    islandsfinestlandscaping@gmail.com, sent Wednesday,

8    April 25, 2012, to joeval5@optonline.net.  The subject is

9    an estimate number E 122 for:  Joe, 3 High Gate Drive.

10   Q    I'll try to read accurately the first couple of

11   sentences.

12          Hi, Joe.  It was a pleasure meeting with you

13   yesterday.  I have attached an estimate for all the work

14   that we had discussed.  One thing that I would like to

15   give my opinion about was I know you wanted to increase

16   the height of the stone wall in the front of the house

17   when you got towards the center.

18          Showing you what has been marked -- is there an

19   attachment to this e-mail?

20   A    There is.

21   Q    Is 567-A the attachment?

22   A    Yes.

23   Q    What does this attachment appear to be?

24   A    It appears to be an estimate for a backyard cleanup.

25   Q    Who is it to?

760

1    A    Joe, 3 High Gate Drive, Smithtown, New York.

2    Q    What is the telephone number?

3    A    Telephone number is (631) 265-2379.

4    Q    What is the project?

5    A    Lawn renovation, cleanup and garden wall.

6    Q    What does the estimate total?

7    A    $7,982.50.

8    Q    568 is before you.

9         Do you see that?

10   A    I do.

11   Q    Do you recognize that, and if so, how?

12   A    This is an e-mail that I recovered from the hard

13   drive which was taken from the computer I seized from the

14   residence of Joseph Valerio.

15        MR. KABRAWALA:  Government moves to admit

16   Government's Exhibit 568.

17        MR. LAPINTA:  No objection.

18        THE COURT:  568 is admitted.

19        (Whereupon, Government Exhibit 568 was received

20   in evidence.)

21        MR. KABRAWALA:  I'm now publishing the exhibit.

22   Q    Does this appear to be some sort of promotional

23   e-mail?

24   A    It is.

25   Q    Who is it from?

761

```
 1   A    Tallmensshoes.com.

 2   Q    When was the tallmensshoes e-mail sent?

 3   A    Sent September 27, 2012.

 4   Q    Who was it sent to?

 5   A    Joeval5@optonline.net.

 6   Q    Did you also find e-mails in the defendant's "sent"

 7   folder of the database file?

 8   A    I did.

 9   Q    And those are in evidence, aren't they?

10   A    They are.

11        MR. KABRAWALA:  For the record, they are in

12   evidence as Government's Exhibit 550-A as in alpha.

13   Q    I'm showing you what has been marked as Government's

14   Exhibit 550-A.  I'm not sure if it is in, actually.

15        What is this?

16   A    This is a disk that I created that contains all the

17   e-mails that I extracted from the sent .DBX.

18        MR. KABRAWALA:  Government moves to admit 550-A

19   as in alpha.

20        MR. LATO:  Your Honor, may we have a sidebar?

21        THE COURT:  Yes.

22        (Whereupon, at this time the following took

23   place at the sidebar.)

24        (Continued.)

25
```

**Forrestal - Direct/Kabrawala**

762

1          THE COURT:  By the way, I think I had this in on

2    Thursday.

3          MR. LATO:  The same understanding as before.

4    There could be 2,000 e-mails.

5          MR. KABRAWALA:  Only 300.

6          THE COURT:  Same understanding to the extent the

7    Government does not show them to the jury now, they ask

8    for the whole file during the deliberations, that it is

9    reserved under 401 and 403 objections.

10          MR. LATO:  Yes, your Honor.  Thank you.

11          MR. KABRAWALA:  Thank you.

12          (End of sidebar conference.)

13          (Continued.)

Forrestal - Direct/Kabrawala

763

1      MR. KABRAWALA:  The Government asks that 550-A

2  be admitted.

3      THE COURT:  Subject to the discussion at

4  sidebar, it is admitted.

5      (Whereupon, Government Exhibit 550-A was

6  received in evidence.)

7  BY MR. KABRAWALA:

8  Q    Showing you what has been marked as Government's

9  Exhibit 564, do you recognize this e-mail, and if so, how?

10 A    This is an e-mail I recovered from the hard drive of

11 the computer seized from the residence of Joseph Valerio.

12     MR. KABRAWALA:  The Government moves to admit

13 564.

14     MR. LATO:  No objection.

15     THE COURT:  564 is admitted.

16     (Whereupon, Government Exhibit 564 was received

17 in evidence.)

18     MR. KABRAWALA:  I'm now publishing Government's

19 Exhibit 564.

20 Q    Can you please briefly describe this e-mail?

21 A    This is an e-mail that was sent from Joseph Valerio,

22 an e-mail to joeval5@optonline.net.  It was sent April 6,

23 2012.  It is to Angelique Davidse -- I may have

24 mispronounced that name.  The subject -- to Joseph

25 Valerio.

Forrestal - Direct/Kabrawala

764

1        Subject:  Happy big third birthday, A███.

2   Woaw, yeah.

3   Q    Is it fair to say that it appears to be a birthday

4   greeting?

5        MR. LATO:  Objection.

6        THE COURT:  Sustained.

7   Q    Please read the e-mail.

8   A    Happy third birthday, A███.  Love and kisses always

9   from Dadda Valeria, sister █████, Andre, grandma, Aunt

10  Bernadette, Uncle Mike, cousins Mario and █████ and the

11  rest.  We love you.  See you soon.

12       MR. KABRAWALA:  Thank you.

13  Q    In addition to the computer, computer hard drive

14  specifically, and the cell phone you already testified

15  about, did you conduct any forensic analysis on any other

16  computer or computer-related device?

17  A    Yes.

18  Q    What other device?

19  A    I examined the SD card.

20  Q    SD?

21  A    Yes.

22  Q    What does SD stands for?

23  A    SD cards are storage data, and they are small cards

24  used in cameras, cell phones and other devices.

25  Q    Showing you what has been admitted in evidence as

Forrestal - Direct/Kabrawala

765

```
 1    Government's Exhibit 405.

 2           Is this an item that you conducted a forensic

 3    analysis on?

 4    A    It is.

 5    Q    And that's the memory card, the SD card?

 6    A    Yes.

 7    Q    Who is it made by?

 8    A    This is made by Samsung.

 9    Q    And you can take it out of the bag if you would like.

10           How do you know that you reviewed that exhibit

11    in particular?

12    A    I put my initials on the face of the SD card, "RFF."

13    Q    Turn it around and describe what it says.

14    A    This is a request for a set of glasses.  At the end

15    it says --

16           MR. LAPINTA:  Objection.

17           MR. KABRAWALA:  I'll take it and put it in the

18    overhead.

19           MR. LAPINTA:  I object to any reference what is

20    said or listed on the document.

21           THE COURT:  Do you want to approach?

22           (Whereupon, at this time the following took

23    place at the sidebar.)

24           (Continued.)

25
```

Forrestal - Direct/Kabrawala

766

1        MR. KABRAWALA:  (Handing.)

2        We had this discussion about trade encryptions

3   during the pretrial conference, and it was very clear that

4   counsel conceded it is appropriate for the witness to read

5   aloud what is on that document.

6        MR. LAPINTA:  Is it in evidence yet?

7        MR. KABRAWALA:  It is in evidence.

8        MR. LAPINTA:  You had him -- you asked him who

9   made the document.

10        MR. BODE:  No.

11        THE COURT:  Let's not argue about it.

12        You have no objection to him reading it?

13        MR. LAPINTA:  Right.

14        THE COURT:  Okay.

15        (End of sidebar conference.)

16        (Continued.)

17

18

19

20

21

22

23

24

25

767

1   BY MR. KABRAWALA:

2   Q    Is there a country written on that exhibit?

3   A    There is.

4   Q    What does it say?

5   A    It says Korea.

6            MR. KABRAWALA:  Thank you.

7            Your Honor, may we take a quick break?

8            THE COURT:  How long do you need, a minute or

9   two?  I would rather not take the morning break this

10  early.

11           MR. KABRAWALA:  Just one minute.

12           THE COURT:  How much longer do you have of this

13  witness?

14           MR. KABRAWALA:  30 minutes, 45 minutes.

15           THE COURT:  I just want to go to 11:15, so just

16  take a minute, and we'll just wait.

17           MR. KABRAWALA:  Fine.

18  Q    Handing you what is marked as Government's

19  Exhibit 507 through 539.

20           Whatever is not in the binder will be on this?

21  A    Yes.

22  Q    I'll show it to you on the screen as we proceed

23  through this.

24  A    Okay.

25  Q    Showing you what has been marked as Government's

768

1    Exhibit 505.

2    A    Yes.

3    Q    Do you recognize what that disk is?

4    A    Yes.

5    Q    What is it?

6    A    A disk that I created that contains a PowerPoint

7    presentation that I made for presentation here in court.

8    Q    Did you make that presentation to assist us and the

9    jury in understanding your testimony?

10   A    Yes.

11   Q    Does it contain images that you took from the memory

12   card that you just testified about, Government's

13   Exhibit 405?

14   A    Yes.

15   Q    And are the exhibits, Government's Exhibit 507

16   through 539, contained within the disk that you just

17   testified about?

18   A    Yes.

19         MR. KABRAWALA:  The Government moves to admit

20   Exhibits 507 through 539, as well as 505.

21         MR. LATO:  One moment, please.

22         No objection.

23         THE COURT:  505, 507 through 539, are all

24   admitted.

25         (Whereupon, Government Exhibits 505 and 507

Forrestal - Direct/Kabrawala

769

1   through 539 were received in evidence.)

2           MR. KABRAWALA:  I will now show you everything

3   just using the screen.

4           THE WITNESS:  All right.

5           MR. KABRAWALA:  I'm publishing Government's

6   Exhibit 507 -- withdrawn.

7           I'll actually take it down.

8   BY MR. KABRAWALA:

9   Q    What, if anything, did you do once you received the

10  SD card, memory card?

11  A    I ran a forensic analysis on the card.

12  Q    Walk us through that, please.

13  A    Somewhat similar to the other ways we examine digital

14  media.  In this case we take the SD card and put it in a

15  tool called -- it is called a write block.  This one is a

16  Digital Intelligence card reader write block.  We put it

17  in there and apply the same process creating an image, and

18  we add it to our forensic job that we're doing.

19  Q    Did you create a forensic image of the memory card?

20  A    Yes, I did.

21  Q    And it did an exact bit-by-bit copy of that memory

22  card, Government's Exhibit 402?

23  A    It did.

24  Q    Did you recover any images on that memory card?

25  A    I did.

Forrestal - Direct/Kabrawala

770

1   Q     How did you go about recovering imaging from

2   Government's Exhibit 402?

3   A     The forensic software EnCase, E-N-C-A-S-E,

4   automatically displays some images that are readily

5   apparent on the SD card.

6         We would then recover the videos.  There were

7   videos on this particular SD card, and we would attempt to

8   review them to see whether there were images within that

9   we could recover, directly visible.

10  Q     So you used software called EnCase?

11  A     Yes.

12  Q     Using that software, what, if anything, did you find?

13  A     I did.  I found a number of images that had been

14  deleted that contained videos, that when you played the

15  videos there was a frame of the picture left.

16  Q     You found videos but they were deleted, and all you

17  could see is a still frame of the video?

18  A     Correct.

19  Q     Was that the same with respect to still images, that

20  is, photographs?

21  A     I recovered a still image from the SD card that was

22  located on it, yes.

23  Q     And I think you testified about your experience using

24  EnCase earlier last week; is that true?

25  A     True.

771

1  Q    Now, I'm going to show you what has been admitted

2  into evidence as Government's Exhibit 507.

3         What are we looking at here?

4         Please describe first -- generally, what are we

5  looking at?

6  A    This is a screen shot that I took of what was being

7  displayed on my monitor as I conducted a forensic analysis

8  of the four gigabyte SD card.

9  Q    I see, generally speaking, two major columns.  There

10  is a column here on the left-hand side of the page with

11  home, entries, and what appear to be a book.

12         What is that?

13  A    The column below it, it's on the home selection.

14  What that displays is the file directory for the volume

15  you are looking at, or in this particular case the SD

16  card.

17  Q    What is a file directory?

18  A    The organizational structure for this particular

19  operating system.  Just a particular way of organizing

20  things.  They put stuff in places so they know where to

21  find it.

22         And in this particular case under volume C,

23  which is the SD card, they created a number of directories

24  to put information in.

25  Q    As part of that information, did you say you

772

1    recovered some images?

2          What are we looking at on the right-hand side

3    column where it says "name"?

4    A    This is the actual data that is contained in those

5    different file directories.  It shows you not only the

6    directory name, but it also shows you the files that were

7    either in there or that it was able to see immediately

8    that was deleted.

9    Q    All right.  So I see that there appears to be -- it

10   says, SD 2 space 4GB, Samsung?

11   A    Yes.

12   Q    Below that it C.  What is that?

13   A    The volume name or drive name it gave this particular

14   unit, in this case C.

15   Q    There appears to be a folder called DCIM.

16   A    Yes.

17   Q    Within that there is a subfolder called 100 photo?

18   A    Correct.

19   Q    Below that on line 5 there appears to be something

20   called cam_005.jpg?

21   A    Correct.

22   Q    Describe what that file is.

23   A    That file is a picture, a still picture, that was

24   recovered from the SD card.

25   Q    What does JPG stand for?

Forrestal - Direct/Kabrawala

773

1    A    J peg, or still picture file, as opposed to a video.

2    Q    I see there is a column named "is deleted."

3         Next to that is "last accessed."

4         What date was this cam_005.jpg image last

5    accessed?

6    A    January 19, 2011.

7    Q    1/19/2011?

8    A    Correct.

9    Q    What date was that file created?

10   A    It was created January 19, 2011.

11   Q    What date was that file last written?

12   A    January 19, 2011.

13   Q    What does "last written" mean?

14   A    Last written was the last time that the file was

15   actually written to the disk, or SD card in this

16   particular case.

17   Q    I see in line 12 there is video.tmp.  It says:

18   Describe, file, deleted, archive?

19   A    Yes.

20   Q    Then it says "is deleted," and there is a dot next to

21   it?

22   A    Yes.

23   Q    Last accessed July 27, 2013?

24   A    Correct.

25   Q    Do you see that?

774

1    A    I do.

2    Q    What does that mean to you, if anything?

3    A    That means that that particular video.tmp was

4    probably deleted on 7/27/2013, the last time it was

5    accessed.

6    Q    Video.tmp, is that some sort of file?

7    A    It is.

8    Q    What kind of file is it?

9    A    A temporary file created by the Windows file system.

10   Q    That was deleted sometime on July 27, 2013?

11   A    Correct.

12   Q    Is there any way for a file that is on the SD card to

13   simply delete itself?

14   A    No.

15   Q    What is required to delete an image or data off an SD

16   card?

17   A    User input of some fashion.

18   Q    User input?

19   A    Yes.

20   Q    What do you mean?

21   A    You have to go to a keyboard and put the SD card

22   actually in some device.  You would have to then use a

23   keyboard and the computer to delete it.

24   Q    So it wouldn't spontaneously delete itself?

25   A    No.

Forrestal - Direct/Kabrawala

775

1    Q    I'll show you what has been admitted as Government's

2    Exhibit 511.

3              Do you see that?

4    A    I do.

5    Q    What is the file name of that file?

6    A    The file name is cam_0005.jpg.

7    Q    Was that the file you just testified about?

8    A    Yes.

9    Q    The exact file?

10   A    Yes.

11   Q    When was that file created?

12   A    It was created on January 19, 2011.

13   Q    Now, take a look at that photograph.

14             I'm sorry.  What time, please?

15   A    The time was 6:20 p.m.

16   Q    6:20 p.m.?

17   A    Correct.

18   Q    Do you recognize Government's Exhibit 332 in that

19   image?

20   A    I do.

21   Q    Can you describe where you see Government's

22   Exhibit 322?

23             Is this a Spiderman ball?

24   A    It is.

25   Q    Where do you see it?

776

1   A    Right next to the child in the image.

2   Q    Do you see what appear to be Government's

3   Exhibit 334, 334-A and 334-B in the image itself?

4   A    I see one of the pillows, where the head is resting

5   on it, and it shows partially the symbol on there.

6   Q    Now, I'm going to show you what's been marked as

7   Government's Exhibit 513.

8        Is this information that relates to

9   cam_0005.jpg, the image that I just showed?

10  A    Yes.

11  Q    This is the same structure as was described before?

12  A    It is.

13  Q    Image dated January 19, 2011.

14       Now, there's a box on the bottom of this

15  exhibit.

16       What is this information?

17       Can you please describe this information?

18  A    It is a screen shot of me depicting the data that is

19  contained within the file, in this particular case the

20  metadata.

21  Q    What is metadata?

22  A    Metadata is data about data, an administrative part

23  of the file structure that records certain information

24  about the file.  In this particular case it is a picture,

25  and it went out, recorded administratively in the

777

1    background.  As you see, it was made on a Samsung

2    electronics -- gives the model number, in this case

3    HMX100, and then it imprints a date and time stamp very

4    often.

5    Q    Can you tell what, if any, digital device was used to

6    create the cam_0005.jpg file?

7    A    Samsung Electronics, HMX100.

8    Q    Did you recover any other files other than camera

9    files -- withdrawn.

10         Did you recover any files other than still image

11   J peg files from Government's Exhibit 402?

12   A    I did.

13   Q    What kind of files?

14   A    I recovered frames from within video files that were

15   deleted from the SD card.

16   Q    Can you describe what that is, a frame?

17   A    A frame.  Actually, a video is made up of a series of

18   frames.  It's seamless to you.  You see it as a video.

19   When you play the file, it has these frames.

20         When it is deleted, sometimes frames remain

21   behind of the file when it is not corrupted.

22   Q    When a user deletes something off of a computer,

23   let's say an SD card, is everything deleted from that SD

24   card?

25   A    No.

Forrestal - Direct/Kabrawala

778

| 1 | MR. LAPINTA:  Objection. |
| 2 | THE COURT:  Overruled. |
| 3 | You may answer. |
| 4 | A    No. |
| 5 | Q    Why is that? |
| 6 | A    Actually, the process of deleting something from any |
| 7 | kind of digital media at all, you are not making it really |
| 8 | disappear.  It administratively releases that area that |
| 9 | used to occupy whatever digital media piece it is to the |
| 10 | hard drive.  It gives you, A, opportunity to recover it, |
| 11 | and then, B, releases that area to be overwritten by |
| 12 | another file or some other media data. |
| 13 | Q    And this is not overwritten? |
| 14 | A    No. |
| 15 | Q    What happened if the data is not overwritten? |
| 16 | A    Then it can be recovered. |
| 17 | Q    It can be recovered? |
| 18 | A    Recovered.  Sometimes in full; sometimes just |
| 19 | partially. |
| 20 | Q    Showing you what has been admitted as Government's |
| 21 | Exhibit 508. |
| 22 | What is this? |
| 23 | A    This is a screen shot that I took of one of the |
| 24 | frames contained within the video HDV_00 -- |
| 25 | Q    Let me describe it.  HDV_0043.MP4. |

779

1      When was it created?

2   A    That file was created on September 10, 2010, at

3   3:39 p.m.

4   Q    Showing you what has been admitted as Government 509.

5        What is this?

6   A    This is a screen shot of one of the frames contained

7   within the file HDV_0044.MP4.

8   Q    Just showing you very briefly Government's

9   Exhibit 509.

10       Do you see Government's Exhibit 334-B in that

11  image?

12  A    I see one of the pillows with that symbol on it, yes.

13  Q    Showing Government's Exhibit 510.

14       Is this a deleted video file named HDV_0045.MP4?

15  A    Yes.

16  Q    At 3:47 p.m. it was created?

17  A    It is.

18  Q    Again, do you see Government's Exhibit 334-B, or what

19  appears to be the same color?

20  A    I see cushions that are of the same color, yes.

21  Q    You were at the defendant's house on January 28,

22  2014?

23  A    Yes.

24  Q    Do you recognize that sofa?

25  A    Yes.

Forrestal - Direct/Kabrawala

780

1   Q      Where do you recognize that from?

2   A      That was in the basement of Joseph Valerio's

3   residence.

4   Q      Showing Government's Exhibit 515.

5          What is the file name and when was it created?

6   A      File name is HDV_0048.MP4.  The file was created on

7   January 19, 2011, at 6:21 p.m.

8   Q      Showing Government's Exhibit 516.

9          Is the file name HDV_549.MP4?

10  A      It is.

11  Q      Created January 19, 2011, at 6:25 p.m.?

12  A      It is.

13  Q      Showing Government's Exhibit 518.

14         File name is HDV_0053.MP4, created January 19,

15  2011, at 6:53 p.m.?

16  A      Correct.

17  Q      Showing 519.

18         What kind of file was it?

19  A      This is HDV_00555, created January 19, 2011, at

20  6:59 p.m.

21  Q      Holding up Government's Exhibit 343, an article of

22  clothing, and Government's Exhibit 336, a pom-pom.

23         Do you see these two items depicted in the image

24  that you just described?

25  A      I do.

Forrestal - Direct/Kabrawala

781

1   Q    Showing you Government's Exhibit 520.  It looks like

2   we've seen this image before.

3        Can you explain the circumstances under which

4   you found this image again?

5   A    One of the things we do while doing the forensic

6   analysis, we use a function in the forensic software

7   called image or file recovery, and we direct it to recover

8   anything it recognizes as an image from the hard drive

9   that wasn't previously seen.

10  Q    So using this other method, you recovered additional

11  images?

12  A    I did.

13  Q    And some of them were duplicates?

14  A    Correct.

15  Q    Why did you use two methods to recover images, one

16  method being EnCase and the other method what you just

17  described?  Why two things?

18  A    That is part of the EnCase forensics suite of tools.

19  If you want to be complete, one tool will not get it when

20  the other tool will.  And the other we apply.

21            THE COURT:  Okay.  We'll take the morning break

22  now.

23            (Whereupon, at this time the jury exits the

24  courtroom.)

25            (Whereupon, a recess was taken.)

Forrestal - Direct/Kabrawala

782

1          THE COURT:  Please be seated.

2          Bring in the jury.

3          (Whereupon, the jury at this time enters the

4    courtroom.)

5          THE COURT:  Continue, please.

6    BY MR. KABRAWALA:

7    Q    Before the break you testified about a number of

8    files that were recovered, HDV files.

9    A    Yes.

10   Q    What were those files again?

11   A    Video files.

12   Q    Were those stills part of the video files?

13   A    The screen shots, yes.

14   Q    How do you know that those stills were part of

15   deleted videos?

16   A    They were actually displayed as deleted in my file

17   directory tool in the EnCase, and I played the videos,

18   recovered them, and saw the frames displayed.

19   Q    So, for example, if I were to show you Government's

20   Exhibit 507 -- I believe you testified about this earlier.

21   In the box where it is deleted, "is deleted," there's a

22   little dot there.

23   A    Yes.

24   Q    That's how you know it was deleted?

25   A    That and the little displayed symbol in red by the

783

1    file name, a circle with a cross through it.

2    Q    Showing you another image, Government's Exhibit 524.

3         Can you describe -- first of all, in

4    Government's Exhibit 524, can you describe how you

5    recovered that image?

6    A    That was recovered using the EnCase forensic tools

7    recovered files, and I directed it to recover anything it

8    could see on the SD that had the characteristics of a J

9    peg or image.  It recovered it from the unallocated space

10   of the SD card.

11   Q    Can you explain, please, what unallocated space is?

12   A    Almost just like it says:  that area of the digital

13   piece of storage media that isn't accounted for.  It may

14   contain data, but it is not specifically saved there or

15   archived there.

16   Q    Showing Exhibit 525.

17        Is this another such image in an unallocated

18   space?

19   A    Yes.

20        MR. LAPINTA:  What is that?

21        MR. KABRAWALA:  525.

22   Q    This image also was on the SD card that you examined,

23   correct?

24   A    Yes.

25   Q    Was this image also recovered in the unallocated

784

1  space?

2  A    It was.

3         THE COURT:  What number are you referring to?

4         MR. KABRAWALA:  Thank you for the reminder.

5         526.

6  Q    Now I'm showing you 527.  It appears to be a redacted

7  portion of 526; is that correct?

8  A    Yes.

9  Q    Again, do you see the pattern in that image, 526, do

10  you see the pattern depicted in Government's Exhibit 334?

11  A    Yes.

12  Q    Showing you 528, Government's Exhibit 528.

13         Was this also recovered from the SD card?

14  A    It was.

15  Q    Can you briefly describe this image, please?

16  A    An image of a child, a child wearing a wig, and the

17  child is naked, standing, looking out.

18  Q    All right.  I'm just going to show you 529, which is

19  a redacted version of 528.

20         Is that fair to say?

21  A    Yes.

22  Q    Now, do you recognize -- just remember that picture,

23  okay?

24  A    Yes.

25  Q    Do you recognize the sofa or the seat, the black seat

Forrestal - Direct/Kabrawala

785

1    that is depicted in Government's Exhibit 528?

2    A    Yes.

3    Q    I will show it to you one more time.

4              I'm showing you right now Government's

5    Exhibit 307, and there appears to be in the foreground

6    some sort of black seat.  Is it fair to say?

7    A    Yes, it is.

8    Q    Showing you again Government's Exhibit 528.

9              Showing you Government's Exhibit 530.

10             Was this image also on the SD card?

11   A    It was.

12   Q    Showing you 535.

13             Was this image also on the SD card?

14   A    It was.

15   Q    Were these -- was this unallocated image part of the

16   video or a still image before it was deleted?

17   A    I'm not sure.

18   Q    How come you are not sure?

19   A    It doesn't attach it to any particular file.  No one

20   knows.  It's on the unallocated space because that space

21   has been released to the operating system and overwritten.

22   So it wasn't assigned anywhere.

23   Q    Is it fair to say it's a fragment of data on the SD

24   card?

25   A    It wouldn't be a fragment of data.  It is complete

Forrestal - Direct/Kabrawala

786

1    enough to display as an image, so therefore it would not

2    be a fragment.  It would be able to show the files

3    attached to it.

4    Q    Showing you Government's Exhibit 539.

5         Can you describe this image, please?

6    A    This is an image of a child sitting on the couch that

7    we previously discussed.  You can see, I think it is a

8    Nerf gun, a toy gun off to the side.

9         Looks like she is wearing a piece of a costume.

10   Q    Showing you what has been introduced into evidence as

11   Government's Exhibit 533.

12        Do you see Government's Exhibit 533 in the image

13   that is being displayed?

14   A    Yes.

15   Q    Where do you see it in the photograph?

16   A    Off to her side on the couch, laying there.

17   Q    Showing you Government's Exhibit 514.

18        What is this an image of?

19   A    This is a slide I created.  I took screen shots while

20   using a forensic tool to examine the metadata one I

21   created using the SD card versus one I created using a

22   camera on a lab SD card.

23   Q    Which camera did you use?

24   A    I used the Samsung video camera I recovered from the

25   residence of Joseph Valerio.

Forrestal - Direct/Kabrawala

787

1   Q    Showing you Government's Exhibit 404.

2         Is this the camera you used?

3   A    It is.

4   Q    Walk us through what you are describing.  Tell us

5   what you did with that camera.

6   A    Essentially we took one of the video files that we

7   recovered that was deleted, and we examined it on a lab

8   forensic computer using a tool called Exif, a tool.  That

9   is a forensic tool, a little program you can run to

10  examine in further detail any metadata assigned to a

11  particular file.

12        I used that tool against one of the video files

13  I recovered.  This one is HDV_0053.MP4.

14  Q    So you have a file that you extracted from the SD

15  filed and that was called HDV 0043?

16  A    0053.

17  Q    I'm sorry.  0053?

18  A    Correct.

19  Q    And you took a separate SD card?

20  A    We took an SD card that we have in our office which

21  we use for examination purposes.  I wiped it completely

22  clean to make sure there was no data previously -- that

23  may have been previously on it.  I then used that SD card

24  in this camera and essentially took a video so I can

25  examine it and compare it to the one of the deleted file.

Forrestal - Direct/Kabrawala

788

1  Q   So when you took one of your SD cards from your

2  police lab and put it in that camera you are holding --

3  A   Correct.

4  Q   -- what, if anything, did that reveal?

5  A   Using the Exif tool that we discussed before, it

6  displayed that videos were made with the Samsung camera.

7  Didn't display a model, but all the characteristics of

8  that video file were exactly the same.

9  Q   Essentially you took a test image; is that fair to

10  say?

11  A   Correct.

12  Q   And the data from the test image matched the data on

13  the file that was recovered from the SD card seized from

14  the defendant's house?

15  A   Correct.

16  Q   Now, there's been some testimony about dates of

17  creation, I believe September 10, 2010, and January 19,

18  2011, the two dates that you testified about on which

19  various images or videos were created?

20  A   Yes.

21  Q   How do you know that those dates are accurate?

22  A   I tested the camera, examined the camera, powered it

23  up, examined the date that was in the camera.

24  Q   Walk us through what you did and when you did it.

25  A   Took the camera out of our evidence room, took the

789

1    power supplies we seized with the camera, plugged it in

2    and then powered the camera.

3         Then basically opened the display screen, used

4    the menu to get to the date and time function, and saw it

5    was creating the same date.  It matched.

6    Q    What date did you undertake that activity?

7    A    February 26, 2014.

8    Q    What was the date on the camera when you turned it

9    on?

10   A    February 26, 2014.

11   Q    Did you ever double-check that?

12   A    Yes, I did.

13   Q    When did you do that?

14   A    Last Wednesday.

15   Q    When you turned the camera on, did it reflect the

16   date of last Wednesday?

17   A    Yes.

18   Q    So you checked the date twice?

19   A    I did.

20   Q    And it was the same date both times?

21   A    It was.

22        MR. KABRAWALA:  One moment, Judge.

23        I have nothing further at this time, Judge.

24        Thank you.

25        THE COURT:  Cross-examination?

790

1      Go ahead, Mr. LaPinta.

2  CROSS-EXAMINATION

3  BY MR. LAPINTA:

4  Q    Good morning, Detective Forrestal.

5       How are you?

6  A    Fine, thank you.

7  Q    You are a detective for the Suffolk County Police

8  Department, correct?

9  A    Yes.

10  Q   You are not a special agent for the Federal Bureau of

11  Investigation; is that correct?

12  A    I'm a task force officer --

13  Q    You are not a special agent for the FBI?

14  A    Correct.

15  Q    You are not an employee of the United States of

16  America, correct?

17  A    Correct.

18  Q    As an employer?

19  A    As an employer.

20  Q    You are an employee of our local county, the County

21  of Suffolk, right?

22  A    Yes.

23  Q    You have worked with the Federal Bureau of

24  Investigations as a special agent?

25  A    Yes.

791

1   Q    And you've been cross-designated to work with them,

2   correct?

3   A    Correct.

4   Q    Prior to becoming a detective in our local police

5   department, you were a patrol officer, right?

6   A    Correct.

7   Q    You were stationed out of a local precinct in

8   Patchogue?

9   A    Yes.

10  Q    And your role was a patrol car officer?

11  A    Correct.

12  Q    You patrolled the streets of the Patchogue area in

13  Suffolk County?

14  A    Mastic-Shirley.

15  Q    In that general area?

16  A    General area.

17  Q    You have prepared a curriculum vitae that describes

18  your experience in law enforcement?

19  A    Yes.

20  Q    And you prepared that curriculum vitae?

21  A    Yes.

22  Q    Another word for curriculum vitae is a résumé?

23  A    Yes.

24  Q    It is an updated résumé?

25  A    Yes.

792

1   Q      It is a current résumé?

2   A      Pretty much so.

3   Q      It is an accurate résumé?

4   A      Yes.

5   Q      It is not a misleading résumé, correct?

6   A      Correct.

7   Q      Because you would not want to mislead the jury as to

8   any of your information in law enforcement?

9   A      Correct.

10  Q      There are numerous parts of your résumé that were

11  included in your CV?

12  A      Yes.

13  Q      One important part of that résumé lists a title

14  "court experience," right?

15  A      Correct.

16  Q      You wrote in your curriculum vitae about testifying

17  in various trials, didn't you?

18  A      Yes.

19  Q      And I believe on your direct examination you went

20  into, in fact, the name of a case, a number of cases, that

21  you testified in, right?

22  A      Yes.

23  Q      You wrote on your curriculum vitae that you testified

24  in a case by the name of United States v. Wernick?

25  A      Yes.

793

1    Q    You wrote on your curriculum vitae that it was a

2    three-week trial, right?

3    A    Correct.

4    Q    You didn't testify for three weeks, did you?

5    A    No, I didn't.

6    Q    On your résumé, you wrote that you testified in

7    United States v. Polizzi, correct?

8    A    Correct.

9    Q    On your résumé, you wrote that it was a three-week

10   trial that you testified, right?

11   A    Yes.

12   Q    You didn't testify for three weeks, did you?

13   A    No.

14   Q    You also mentioned a case by the name of Laurant

15   Gordon?

16   A    Correct.

17   Q    G-O-R-D-O-N?

18   A    Yes.

19   Q    You wrote in your court experience when you wrote

20   "testimony" that it was a five-day trial?

21   A    Correct.

22   Q    Once again, you did not testify for five days, right?

23   A    No.

24   Q    You also wrote down in your court experience on your

25   résumé:  "Other cases:  A court marshal in West Point."

794

1   A    Yes.

2   Q    You didn't testify?

3   A    I did.

4   Q    Did you state that you testified in that case on your

5   résumé?

6   A    I don't recall.

7   Q    Do you have a copy of that résumé with you?

8   A    I don't have it in front of me.

9   Q    If I showed you it --

10  A    I'm sure I didn't write it if you say so.

11  Q    Is it a fact you did not write on your résumé that

12  you did not testify?

13  A    I did.

14  Q    You didn't write on your résumé that you testified.

15       Let me hand you this.

16       MR. LAPINTA:  May I approach, your Honor?

17       THE COURT:  Yes.

18  Q    Look at the last page, please.

19  A    (Perusing.)  Okay.

20  Q    When you list the court-martial proceeding in West

21  Point, you didn't mention that you testified, right?

22  A    No, I didn't.

23  Q    Regarding your testimony in Wernick where you listed

24  the trial lasted three weeks, you only testified for a few

25  days, correct?

795

1    A    Correct.

2    Q    And also you testified in a state proceeding

3    Faragano?

4    A    Yes.

5    Q    You wrote on your résumé you didn't testify there,

6    right?

7    A    I didn't write "testimony" exactly.

8    Q    But you did write "five days"?

9    A    I did.

10   Q    You didn't testify in court for five days, did you?

11   A    No.

12   Q    You testified on your direct examination that you

13   were present at the first execution of a search warrant at

14   Mr. Valerio's Smithtown residence.

15        Do you recall that portion of your direct

16   testimony?

17   A    I do.

18   Q    And you would also testify that you had taken part in

19   hundreds of search warrants, correct?

20   A    Correct.

21   Q    Is it fair to say that in taking part in hundreds of

22   search warrants, that you've also taken part in many, if

23   not hundreds, of opportunities to question suspects when

24   you executed a search warrant?  Correct?

25   A    Depending on whether the affiant is on the search

796

1  warrant; if it's my case on the search warrant or not.

2  Q    If you are saying you are not the affiant on the

3  search warrant, you wouldn't participate in the

4  questioning of suspects?

5  A    I may or may not.

6  Q    You did in this case?

7  A    I participated in listening in on the interview.

8  Q    But you weren't the affiant?

9  A    No.

10 Q    You were at the table when the questioning took

11 place?

12 A    Correct.

13 Q    Now, that questioning took place in the dining room

14 of Mr. Valerio's residence, right?

15 A    Correct.

16 Q    He was seated at the dining room table, right?

17 A    He was.

18 Q    Across from him was a, would you agree, a five to

19 six-foot dining room table?

20 A    Approximately, yes.

21 Q    Even longer?  Seven, eight feet?

22 A    Approximately.

23 Q    In front of where he was sitting?

24 A    Yes.

25 Q    To the left of him was a special agent sitting next

797

1    to him, correct?

2    A    I think he was sitting at the other end.

3    Q    To the right of him --

4    A    Across from him.

5    Q    To the right of him was a law enforcement official?

6    A    Yes.

7    Q    To the left of him was a law enforcement official?

8    A    Yes.

9    Q    To the back of him was a wall, right?

10   A    I don't think it is a full wall.  It is open and goes

11   over to the kitchen.

12   Q    There was law enforcement where that opening -- where

13   it was in the kitchen?

14   A    Throughout the residence, yes.

15   Q    And also law enforcement in the kitchen that also

16   borders that room as well?

17   A    I didn't make any note who was there at any

18   particular time, but, yes, they were present.

19   Q    So is it fair to say that Mr. Valerio was surrounded

20   by law enforcement officials, officers, when he was

21   questioned?  Yes or no?

22   A    I wouldn't consider that surrounded.

23   Q    No?

24   A    No.

25   Q    To the left of him, back of him, to the right of him,

798

1    is not surrounded?

2    A    No.

3    Q    Well, after you participated or witnessed this

4    investigation, you took part in the search of that

5    premises, correct?

6    A    I did.

7    Q    Would you agree with me that you have great

8    experience conducting searches for electronic equipment

9    that you are looking for?  Right?

10   A    Correct.

11   Q    Hundreds of times you've done that, right?

12   A    I have.

13   Q    So when you began your search of that premises, you

14   looked in all the rooms, right?

15   A    I did.

16   Q    And you were careful and complete, right?

17   A    Yes.

18   Q    And to the best of your ability, you left no stone

19   unturned in that house, right?

20   A    Correct.

21   Q    And you found various electronic pieces of equipment,

22   right?

23   A    I did.

24   Q    Did you have an occasion to look at a property

25   receipt that was filled out by Agent Troyd at the time the

799

1    search warrant was issued -- was conducted?

2    A    I did.

3    Q    Would you agree there were 17 items of electronic

4    equipment that you felt relevant in this investigation to

5    seize?  Correct?

6    A    I don't remember the exact number.

7    Q    Well, do you have the property receipt with you?

8    A    I don't know if I do or I don't.

9    Q    If I show you the property receipt, would it refresh

10   your recollection?

11   A    Sure.

12        MR. LAPINTA:  May I approach, please?

13        THE COURT:  Yes.  You don't have to ask to

14   approach.

15        MR. LAPINTA:  Thank you.

16   Q    (Handing.)

17   A    Okay.

18   Q    Does that refresh your recollection that 17 different

19   items of what you deemed to be relevant electronic

20   equipment was seized from that home?  Correct?

21   A    They were listed on 17 lines, correct.

22   Q    Well, is that relevant to say there are 17 items,

23   sir?

24   A    On this list, yes.

25   Q    And the first item, a white Mac book Apple pro

Forrestal - Cross/LaPinta

800

1    computer, that was seized?

2    A    Correct.

3    Q    And there was nothing illegal on that computer,

4    right?

5    A    No.

6    Q    There was one Vivitar 370 camera, silver, in the

7    computer room.

8         Nothing illegal on that device, correct?

9    A    Not that I found.

10   Q    The Delstar camcorder, silver, you seized that as

11   well?

12   A    Yes.

13   Q    Nothing illegal?

14   A    No.

15   Q    The Nikon COOLPIX camera 30470042 found in the

16   computer room, nothing illegal on that device; is that

17   correct?

18   A    Yes.

19   Q    Item six, the property receipt, T-Mobile LG cell

20   phone, myTouch, found in the computer room.

21        Nothing illegal was found on that device,

22   correct?

23        MR. KABRAWALA:  Objection, Judge.  I think there

24   has been testimony with respect to that.

25        THE COURT:  Overruled.

801

```
 1   Q    Anything illegal found on that device?

 2   A    Evidence items that were recovered from that phone.

 3   Q    Anything of an illegal nature found on that phone?

 4   A    There were items referring to illegal activity, so

 5   that is evidence, and it refers back to that.

 6   Q    Various power cords, obviously, is self-explanatory.

 7        Lexar 16 gigabyte card.

 8        Nothing illegal on that?

 9   A    Yes.

10   Q    PNY 16 gigabyte card.

11        Nothing illegal on that?

12   A    Correct.

13   Q    Samsung cell phone.

14        Anything illegal on that?

15   A    No.

16   Q    Acer Aspire D 255 in the master bedroom.

17        Anything illegal on that?

18   A    No.

19   Q    Dell Dimension SPS tower computer.

20        Nothing illegal on that?

21   A    No.

22   Q    The Dell tower, the black one in the basement,

23   correct?

24   A    Yes.

25   Q    And the flash drive, correct?
```

802

1    A    The flash drive turned out to be a mouse.  It wasn't

2    a flash drive.

3    Q    Looked like a flash drive?

4    A    Yes.

5    Q    A mouse and flash drive look alike?

6    A    In this case.

7    Q    Optiplex silver black computer in the bedroom.

8         Nothing illegal on that?

9    A    Correct.

10   Q    One silver Dell Latitude DF600 laptop.

11        Nothing illegal on that, correct?

12   A    Correct.

13   Q    There came a point in time you retrieved all of these

14   items from the Smithtown residence to your police station

15   room, right?  Laboratory, I'll call it.  Right?

16   A    I took possession of them at the scene.

17   Q    And you took them to your police office, right?

18   A    I did.

19   Q    And you explained on direct examination that you used

20   a number of different types of investigative forensic

21   software.

22        Do you remember that?

23   A    Yes.

24   Q    And you've explained in detail your experience in

25   using this software, right?

**Forrestal - Cross/LaPinta**

803

1   A   Correct.

2   Q   It is software that is up to date, right?

3   A   Yes, sir.

4   Q   It is state of the art software that you used?

5   A   Yes.

6   Q   And when you used this software in the items I just

7   asked you, you came up with the conclusion that nothing of

8   an illegal nature was on the items?

9   A   On some of them.

10  Q   The ones I asked of you?

11  A   Not the ones you asked of me, no.

12  Q   Now, would you agree with me one of the most

13  important software programs you used as an investigator is

14  this EnCase program?  E-N-C-A-S-E, right?

15  A   Yes.

16  Q   You referred to it a number of times on your direct

17  examination, didn't you?

18  A   Correct.

19  Q   And you are not a certified user of that software;

20  isn't that right?

21  A   I'm trained -- not certification.  I have a

22  certificate in the software.

23  Q   My question is, you are not a certified user of that

24  software, correct?

25  A   Correct.

804

1    Q    Yes or no?

2    A    I'm authorized to use the software.  I don't have the

3    certification.

4    Q    I didn't ask you that.

5         I asked you:  Are you certified to use that

6    software?

7    A    You are using the term a little out of -- I'm trying

8    to answer you properly.

9    Q    If you can't answer it, let me know.

10   A    Not the way you asked it.

11   Q    Did you complete a certification program with the

12   EnCase manufacturer?

13   A    Yes.

14   Q    Did you obtain a certification from them when you

15   took that program?

16   A    I attained a certificate of training, not the

17   certification.

18   Q    My question to you:  The certification.  Are you a

19   certified EnCase evaluator?

20   A    No.

21   Q    You didn't take the certification program; isn't that

22   right?

23   A    No, I didn't.

24   Q    In fact, the Suffolk County Police Department offered

25   to pay for the initial class to obtain the certification;

805

1    isn't that right?

2    A     No.

3    Q     Okay.  You didn't take it because it cost too much

4    money?

5    A     No, that's not why.

6    Q     You didn't take it because you didn't feel it was

7    important?

8    A     Partially, yes.

9    Q     Okay.  But nevertheless they offered this

10   certification program that you did not take; is that

11   right?

12   A     Correct.

13   Q     You obtained a cell phone from Mr. Valerio's home,

14   right?

15   A     Correct.

16   Q     You made a reference to it minutes ago in your direct

17   examination.  That's the phone, right?

18   A     Yes.

19   Q     Who was the carrier of that phone?

20   A     T-Mobile.

21   Q     And you are familiar and experienced with obtaining

22   records from telephone companies, aren't you?

23   A     I am.

24   Q     And you've obtained cellular records from carriers

25   many times in the past in your duties as an investigator,

806

1   correct?

2   A    Correct.

3   Q    The number involved here is (970) 310-8942, correct?

4   A    Correct.

5   Q    You did not obtain any cell records from the carrier

6   in this investigation, correct?

7   A    I didn't personally obtain, no.

8   Q    The only records that you received from the cell

9   phone was what you obtained using your forensic software,

10  correct?

11  A    Correct.

12  Q    Information that is kept from the carrier of the cell

13  phone would provide for specific calls made from and to

14  that phone, correct?

15  A    They could, yes.

16  Q    Were you able to obtain all of the calls from and to

17  that phone from your forensic evaluation of that phone?

18  A    I don't believe so.

19  Q    Is it fair to say that you were limited in what calls

20  were placed out of that phone and what calls were placed

21  into that phone from your forensic evaluation?  Correct?

22  A    It appears so, yes.

23  Q    It appears so or it is so?

24  A    It's hard to tell.  The data wasn't there, so I

25  wasn't able to recover it.  I don't know what I was

807

1   missing.

2   Q    But you were able to subpoena that information from

3   the provider, weren't you?

4   A    That wouldn't be my responsibility, to subpoena the

5   information from the provider.  It would depend on what

6   the data was.

7   Q    Well, you have been involved in numerous

8   investigations involving cell phones, right?

9   A    Correct.

10  Q    And in some of those investigations, if not most, you

11  obtained subpoenas to retrieve data from the telephone

12  carriers, haven't you?

13  A    If there is data available, yes.

14  Q    Well, did you make an inquiry in this case as to

15  whether there was data available on that cell phone from

16  the carrier?

17  A    I'm sorry?

18  Q    From the carrier?

19  A    From the carrier, no, not me.  No.

20  Q    So you have never looked at data provided to you from

21  the carrier regarding the cell phone, right?

22  A    Not only the carrier --

23  Q    Just the carrier data?

24  A    Not the only calls available on the unit.

25  Q    I didn't ask you if those are the only calls.

Forrestal - Cross/LaPinta

808

1          I asked you if you received any data from the

2     actual phone carrier that provided a service to this

3     phone.

4     A     I didn't personally, no.

5               (Continued on the following page).

Forrestal-Cross/LaPinta

809

1   Q    You viewed records from this carrier before in other

2   cases, right?

3   A    Yes.

4   Q    And you read the records that you obtained from this

5   particular carrier before; is that correct?

6   A    Yes.

7   Q    And some of that information would include the dates

8   of phone calls; is that correct?

9   A    Correct.

10  Q    And it would include the times of the phone calls; is

11  that correct?

12  A    Correct.

13  Q    And it would include the number that was either

14  received or dialed out; is that correct?

15  A    Correct.

16  Q    And also the duration of the call; is that correct?

17  A    Correct.

18  Q    And when you obtain a phone number on a data -- on a

19  record from a provider, you could research who the person

20  is that holds that phone number; is that correct?

21  A    Potentially, yes.

22  Q    And none of that investigation was done in this case;

23  is that correct?

24  A    That is not my portion of the investigation.

25  Q    As far as you are concerned, did you perform this

810

1    investigation with this data from the cell provider?

2    A    I provided --

3    Q    Yes or no?

4    A    I can't answer that yes or no.

5    Q    Did you ask for any data from the cell phone provider

6    with regard to calls to and from that cell phone?

7    A    No.

8    Q    Did you direct anyone that you were working with to

9    obtain that data --

10   A    No.

11   Q    -- from the cell phone carrier?

12   A    No.

13   Q    And are there other computer experts, cell phone

14   experts besides you that were involved in this

15   investigation?

16   A    No.

17   Q    There were no emailed data on that phone that you

18   obtained; is that right?

19   A    Right.

20   Q    And there was text messages in the form of telephone

21   text messages with the provider; is that correct?

22   A    Correct.

23   Q    And also text messages from a service called Viber;

24   is that correct?

25   A    Correct.

811

1    Q    Detective Forrestal, you had occasion to make a

2    printout of the Viber text messages involved in that

3    phone; is that right?

4    A    Some of them, yes.

5    Q    And would you agree that some of those Viber text

6    messages found on that phone are relevant to this case?

7    A    They are.

8    Q    And they -- in that extraction report that you

9    developed on that LG My Touch phone, reveals the source of

10   where those texts come from, right?

11   A    Yes.

12   Q    And in the form of phone numbers?

13   A    In the form of what appears to be a phone number,

14   yes.

15   Q    And you also have a time stamp; is that correct?

16   A    Yes.

17   Q    Date stamp, right?

18   A    Yes.

19   Q    And a body of the message, correct?

20   A    Yes.

21   Q    You reviewed that extraction report?

22   A    Yes.

23   Q    And are you familiar with that extraction report?

24   A    I am.

25   Q    And are you aware that some of those messages were

Forrestal-Cross/LaPinta

812

1  from a person by the name of Helena; is that correct?

2  A    Correct.

3  Q    And from your review of that Viber data -- text

4  information, did you come to the understanding that Helena

5  was using the word "negotiate" with Mr. Valerio on

6  numerous text messages; is that correct?

7  A    Correct.

8  Q    Do you recall seeing the word negotiate from a source

9  that you know to be Helena's source?

10  A    I saw it in the text messages, yes.

11  Q    That very word was used a number of times; is that

12  correct?

13  A    Yes, it was.

14  Q    Three to be exact; is that correct?

15  A    Yes.

16  Q    And from reading that as a trained investigator, did

17  you come to the conclusion that Olena Kalichenko was

18  trying to extort Mr. Valerio?

19  A    It wouldn't be my place to decide if he was being

20  extorted or not.

21  Q    From what you read as a trained officer, a trained

22  officer, is it your opinion that Helena, by using the word

23  negotiate, was extorting Mr. Valerio?

24          MR. KABRAWALA:  Objection.

25          THE COURT:  Sustained.

813

1  Q    She held over Mr. Valerio's head her ability to

2  contact authorities; is that correct?

3  A    It is not my place to interpret that.

4  Q    Okay.

5        Do you recall a message on 12/3/2013, when the

6  body of the message read, you know, you really -- damn,

7  you could have negotiated with me before the criminal case

8  against you was being opened.

9        Do you remember that?

10 A    I do remember.

11 Q    12/9/13, do you recall the message from Helena, I see

12 you really don't want to recognize your mistakes and

13 negotiate.  Let's play hard ball then.

14       Do you remember that message?

15 A    I do.

16 Q    And there are other messages that have the word

17 "negotiate" as well; is that correct?

18 A    Correct.

19 Q    Let's turn your attention to the desktop computer

20 that you did an investigation of the VVTV computer.  You

21 recall that?

22 A    Yes.

23 Q    And that computer was found in an upstairs office,

24 right?

25 A    Yes.

Forrestal-Cross/LaPinta

814

1   Q      And when you brought that computer to your police

2   office, you examined the operating program on that

3   computer, didn't you?

4   A      The operating system?

5   Q      Yes.

6   A      Yes.

7   Q      And you used TABLU hardware write block?

8   A      Yes.

9   Q      And the EnCase program as well?

10  A      Yes.

11  Q      And you found that the operating system was an older

12  type system, right?  Would you agree with that?

13  A      Yes.

14  Q      Tell the jury what operating system you found.

15  A      Windows Millennium.

16  Q      Do you know the year that Windows Millennium was last

17  produced?

18  A      No, not specifically.

19  Q      Would you agree with me it was over five years ago?

20  A      Agreed.

21  Q      Over seven years ago?

22  A      Yes.

23  Q      Close to ten years ago; is that correct?

24  A      I don't know specifically.  But an older system.

25  Q      Of say in terms of modern technology, it wasn't the

Forrestal-Cross/LaPinta

815

1    most modern type of operating system out there; is that

2    correct?

3    A    That would be fair.

4    Q    Would you go as far as saying it was an ancient

5    system being used?

6    A    No, not necessarily.

7    Q    Well, the last time that that program was produced,

8    manufactured, technology has advanced considerably, would

9    you agree?

10   A    Yes.

11   Q    Video filming, recording, has advanced significantly;

12   is that correct?  Yes or no?

13   A    No.  I wouldn't agree with that.

14   Q    Well, isn't it true that that particular operating

15   program would have difficulty playing videos that were

16   part of this case a year ago when this case started?

17   A    No.

18   Q    It would not?

19   A    It wouldn't have a problem.

20   Q    It wouldn't have a problem?

21   A    No.

22   Q    So it is your expert opinion that that system, over

23   seven years old, or around seven years old, would not have

24   a problem playing the videos that we have seen here

25   involving child pornography; is that your testimony?

Forrestal-Cross/LaPinta

816

1    A    Yes, it is.

2    Q    Well, you had the occasion to look at these videos;

3    is that right?

4    A    Yes.

5    Q    The duration of these videos?

6    A    Yes.

7    Q    And would you say the longer a video is, the more

8    problematic it would be to showing on that old program?

9    A    Not necessarily.

10   Q    And the density of the video -- by the way, what is

11   density of the video?

12   A    I don't know what you are talking about.

13   Q    Okay.

14        The way the video is recorded, does that dictate

15   if it is playable on an operating system?

16   A    No, not necessarily, it depends on a large number of

17   factors, the memory installed, the hard drive, the speed

18   of the hard drive.

19   Q    What was the memory installed on his hard drive?

20   A    I don't recall.

21   Q    If I told you it was 20 megabit -- megahertz, is that

22   accurate?

23   A    I don't think so the way you stated.  It is 2.0

24   megahertz.

25   Q    Do you have anything written down about how big an

Forrestal-Cross/LaPinta

817

1   operating system it is?

2   A    It is not the size of the operating system.  The

3   operating system is the operating system.

4   Q    The size of the hard drive?

5   A    It is --

6   Q    How big is it?

7   A    20 gigabit.

8   Q    Is that big in your opinion?

9   A    No, small.

10  Q    And the size of the hard drive, the more problematic

11  it would be to play the video?

12  A    Not necessarily.

13  Q    It could be?

14  A    It could be, but not necessarily.

15  Q    Now, when you evaluated this computer you found child

16  pornography on it; is that correct?

17  A    I did.

18  Q    And that child pornography was found in what you

19  called to be an inbox; is that right?

20  A    Right.

21  Q    If child pornography videos were played on that

22  computer, wouldn't they have been found in other places

23  besides the inbox?

24  A    They should have been, yes.

25  Q    Tell the jury where else they should have been found,

Forrestal-Cross/LaPinta

818

1    if they were played.

2    A    They may have -- may have been observed in a media

3    file.  The program that is actually running the video,

4    there may be elements of it in unallocated places, and the

5    reference where it was filed, if it was filed, and if it

6    was archived.

7    Q    Anyplace else?

8    A    Not off the tip of my tongue.

9    Q    Did you find any of those pornography videos in any

10   media files?

11   A    No.

12   Q    Did you find any pornography graphic videos in

13   unallocated space on the computer?

14   A    No, I didn't.

15   Q    Did you find any pornographic videos, child

16   pornography, on any temporary files?

17   A    No.

18   Q    Is it fair to say that in light of the fact that

19   since there are no other sources of that video besides

20   that inbox, that there is a great likelihood that those

21   videos were never played on that computer, correct?

22   A    On that computer?

23   Q    Yes.

24   A    Just on that computer, yes.

25   Q    So as you sit here today, in your vast training as a

Forrestal-Cross/LaPinta

819

1  computer expert you can't tell this jury with any degree

2  of certainty that those videos of child pornography were

3  played on that particular computer; is that correct?

4  A    On that particular computer?

5  Q    Correct.

6  A    Right.

7  Q    Just because something was in an inbox doesn't mean

8  it was watched on that computer, correct?

9  A    We have reference to it being watched, so it was

10 watched somewhere.

11 Q    Viewed, viewed on that computer.

12 A    I have no evidence of it being viewed on that

13 computer.

14 Q    And because of the inbox, it means it was sent to an

15 email address that was used by that computer; is that

16 correct?

17 A    Used by the recipient of the email.

18 Q    On that computer, correct?

19 A    Correct.

20 Q    Let me turn your attention to the four FD storage

21 cards evaluation that you did on that.  Do you recall that

22 testimony before?

23 A    Yes.

24 Q    Three of the storage cards did not contain child

25 pornography; is that correct?

Forrestal-Cross/LaPinta

820

1   A    Yes.

2   Q    The card you did look at, if it contained, if I say

3   contraband, is that acceptable?

4   A    Yes.

5   Q    And contraband was found on the Samsung for the SD

6   device; is that correct?

7   A    Yes.

8   Q    And you developed a report with regard to your

9   findings of that particular storage card; is that right?

10  A    I did.

11  Q    You wrote that report?

12  A    I did.

13  Q    You wrote it after you were finished with your

14  investigation of this particular device?

15  A    Up to that point, yes.

16  Q    And did you look it over?

17  A    Yes, I did.

18  Q    And is it accurate?

19  A    I made a few typos on it.

20  Q    Let's talk about the mistakes.  There are mistakes on

21  those reports?

22  A    Typos.

23  Q    Typos are mistakes or not?

24  A    Typing mistakes, yes.

25  Q    You identified a file -- well, in the body of your

Forrestal-Cross/LaPinta

821

1    report you indicate that the cam bottom slash 0005.JPG

2    file was used by you; is that right?

3    A    Yes.

4    Q    And I will refer to it as the JPG file; is that okay?

5    A    Yes, sure.

6    Q    You said you found that JPG file; is that correct?

7    A    Yes.

8    Q    And that you determined that that file was recorded

9    on 1/19/11; is that correct?

10   A    Correct.

11   Q    And the time of that file being recorded in the body

12   of your report, you have it as 0620 hours; is that right?

13   A    Yes.

14   Q    Is 0620 hours military time; is that correct?

15   A    Generally, yes.

16   Q    You are familiar with military time because you are a

17   veteran, are you?

18   A    Yes.

19   Q    And tell the jury, what is 0620 hours?

20   A    0620 would be 6:20 a.m. in the morning.

21   Q    And in your report that you wrote, you have 0620

22   hours in the body of the report; is that correct?

23   A    I don't recall.  I have to see what I put afterward,

24   if I put p.m. or not.

25   Q    Do you have your report in front of you?

Forrestal-Cross/LaPinta

822

1   A    Not in front of me.

2         (Counsel confer.)

3   Q    I show you this document.  Does it help you refresh

4   your recollection as to the time you put down on your

5   report?

6   A    Yes.

7   Q    And look at the top portion of the report, sir.

8   A    I see it.

9   Q    Okay.

10        Do you reference that JPG video as being

11  recorded at 0620 hours?

12  A    0620 p.m., sir.

13  Q    Look at I, sir.  Not 1, but I.

14  A    Yes.  I see it.

15  Q    Do you refer to it as 0620 hours, yes or no?

16  A    I did, yes.

17  Q    When he described in more detail that file, you make

18  reference to it once again, don't you?

19  A    Yes.

20  Q    And that would be a number one under I; is that

21  right?  Or I-1?

22  A    The 6:20 is reference to item 2, A.

23  Q    Number two, yes, correct.

24        Now, the number one file -- let me take it one

25  step back, sorry.

Forrestal-Cross/LaPinta

823

1        You testified on direct examination as the time

2   found metadata on the card; is that correct?

3   A    Yes.

4   Q    And you went as far as to say that you checked the

5   date and the time on this metadata twice; is that right?

6   A    I did.

7   Q    And the date you found to be the accurate date when

8   you checked it; is that right?

9   A    Correct.

10  Q    And the time was not accurate; is that correct?

11  A    Correct.

12  Q    Did you say that on the direct examination?

13  A    I don't remember if I did or I didn't.

14  Q    Well, the time was off by an hour and 12 minutes, was

15  it?

16  A    Yes, it was.

17  Q    Now, when you obtained possession of this camcorder,

18  and you looked at the time, that time was set sometime

19  beforehand obviously; is that correct?

20  A    Correct.

21  Q    And as you sit here today, you don't know if it is

22  the same type of time entry, if it was in the same

23  camcorder, the same in the camcorder prior to the entry

24  being made; is that correct?

25  A    No, I don't.

Forrestal-Cross/LaPinta

824

1  Q    In other words, the time settings on that camcorder

2  could have been changed after these videos were made; is

3  that right?

4  A    It is a possibility.

5  Q    But you don't know if it was, right?

6  A    I don't.

7  Q    It could have happened, right?

8  A    It may have.

9  Q    So when you testified to the reliability of that date

10  stamp and time, you can't testify with certainty that that

11  was an accurate entry of date and time when it was set at

12  the time this video was taken; is that correct?

13  A    Based on my examination of that camera and my prior

14  knowledge of forensics on other cameras over the years, I

15  believe it to be accurate.

16  Q    Well, let's talk about the information on the disk,

17  on the card.

18        Does the data on the card indicate when the date

19  had been changed?

20  A    No, it doesn't.

21  Q    Does the data on the card indicate when the time was

22  changed?

23  A    No, it doesn't.

24  Q    You don't know whether that camera's date or time was

25  changed once or 20 times, right?

Forrestal-Cross/LaPinta

825

1    A    No.

2    Q    So it could have been changed a number of times

3    before those videos were made; is that right?

4    A    It could have.

5    Q    And it could have been changed a number of times

6    after the videos were made; is that right?

7    A    Perhaps.

8    Q    But yet your finding of that date and time in your

9    expert opinion is accurate; is that right?

10   A    Correct.

11   Q    Let's refer to the data you recovered that were

12   stills that were time stamped 9/10 of 10 --

13   September 10th, 2010.  All right?

14   A    Yes.

15   Q    And your report doesn't have that right date listed

16   first; is that right?

17   A    One of the typos.

18   Q    You wrote 9/10/14?

19   A    Yes.

20   Q    Clearly a mistake, right?

21   A    Yes.

22   Q    Is there anything else that is a mistake on that

23   entry -- withdrawn.

24   A    I believe there was another typo of the date and

25   time.

826

1    Q     Let me draw your attention to it.

2          Not only is there another typo on the date and

3    time, but you actually had a typo on the actual identity

4    of the file, don't you?

5    A     If you point it out to me.

6    Q     Look at your entry on I-1.

7    A     I see it.

8    Q     Under the mistaken date of 9/10/14, right?

9          Look at A.

10   A     I see it.

11   Q     You testified on direct examination that the file was

12   listed as HDV, underscore, 043 dot MP 4; is that correct?

13   A     Yes.

14   Q     And that is not the correct address; is that correct?

15   A     It should have been two zeros, zero zero four.

16   Q     You made a mistake in A by writing one zero, right?

17   A     Yes.

18   Q     You made a mistake in B by also misstating the

19   correct title to that; is that correct?

20   A     Right.

21   Q     And you also made a mistake in C; is that right?

22   A     Right.

23         MR. LaPINTA:  Now, counsel would stipulate that

24   the date of September 10th, 2010 is a Friday.

25         (Whereupon, at this time there was a pause in

827

1    the proceedings.)

2         MR. BODE:  It is a Jewish holiday.

3         MR. LaPINTA:  Yes.  And I presume you are Jewish

4    then; is that what you are saying?

5         (Counsel confer.)

6         MR. LaPINTA:  Would you testify and would you

7    agree that 9/10/10 is a Friday?

8         MR. BODE:  Yes.

9         MR. LaPINTA:  Would you stipulate that 1/19/11

10   is a Wednesday?

11        MR. BODE:  Yes.

12        THE COURT:  Let me explain to the jury what a

13   stipulation is.

14        A stipulation is when the parties agree that a

15   certain fact is true.  And you can accept those facts as

16   true.  But what weight you give to those facts is

17   obviously up to the jury.

18   Q    With regard to the videos you found on the camcorder,

19   there is no time stamp on the actual video when you see

20   it, right?

21        When you see the videos, is there a date of a

22   time stamp that you can visually see?

23   A    No.

24   Q    Now, when we speak of the dates you brought to our

25   attention, 9/10/10, the correct time if it was accurately

Forrestal-Cross/LaPinta

828

1    entered would be 2:27 p.m.; is that correct?

2    A    Yes.

3    Q    And when we speak of the date January 19th, 2011,

4    that is the -- if that is the accurate date, the accurate

5    time would be 5:08 p.m.; is that correct?

6    A    Yes.

7    Q    Now, when you did the search warrant of the house and

8    you found this camcorder, as an experienced detective in

9    computer crimes you are well aware of the numerous other

10   types of investigative forensic procedures that could be

11   used on evidence, aren't you?

12   A    I don't know what you are talking about.

13   Q    Well, you are an experienced detective in narcotics

14   as well; is that correct?

15   A    In the past, yes.

16   Q    And you know about crime labs that are around here?

17   A    Yes.

18   Q    Suffolk County has one, the FBI has one, right?

19   A    Yes.

20   Q    And they are capable, these crime labs, of doing a

21   fingerprint identification on objects; is that right?

22   A    Yes.

23   Q    In your scope of many years as a detective,

24   fingerprint examination can be a very useful form of

25   evidence that you can use against somebody; is that right?

Forrestal-Cross/LaPinta

829

1    A    Yes.

2    Q    And you know the difference between a latent print

3    and what the characteristics of a print are; is that

4    correct?

5    A    I do.

6    Q    And a fingerprint is unique to the person who has it,

7    right?

8    A    Correct.

9    Q    And there was no fingerprint evidence retrieved from

10   this camcorder; is that correct?

11   A    Not to my knowledge.

12   Q    Not on the bag that was carrying it; is that right?

13   A    I don't know if that would have supported

14   fingerprints.

15   Q    All right.

16        Not on the camcorder itself; is that right?

17   A    Right.

18   Q    And obviously you have to hold the camcorder to use

19   it, right?

20   A    Right.

21   Q    Would you agree, sir, there are other resources aside

22   from forensics that are useful to other investigators like

23   yourself, like cell phone records that we have already

24   discussed, right?

25   A    Yes.

830

1    Q    And how about bank records?

2         Is that relevant in the terms of purchases of

3    various electronic equipment?

4    A    Depending on the investigation.

5    Q    Obviously items retrieved here had to have been

6    purchased; is that right?

7    A    Theoretically.

8    Q    Well, didn't you find receipts here?

9    A    I didn't personally find receipts.

10   Q    Are you aware that receipts were found in this case?

11   A    I'm aware items were seized during the search

12   warrant, yes.

13   Q    Did you do any banking investigation as far as other

14   electronic equipment that may have been purchased by

15   Mr. Valerio that you did not seize?

16   A    That was not my part in this case.  It was forensics.

17   I was the forensic person in this case.

18   Q    But you are a member of this team, aren't you?

19   A    I am.

20   Q    And you get together with the other members of the

21   team to discuss the investigation; is that right?

22   A    I do.

23   Q    And you have a specialty, and Agent Troyd has a

24   specialty, and Agent Messineo has a specialty, and

25   together you discuss where this investigation is going to

831

1    go; is that right?

2    A    In this particular case that was not my place.

3    Q    Your place was limited here in your opinion to just

4    the forensic examination?

5    A    That is my part in this case, yes.

6    Q    And you were, however, present during the questioning

7    of the defendant; is that right?

8    A    Yes.

9    Q    And you were present during the execution of the

10   search warrant, weren't you?

11   A    I was.

12   Q    Are you aware in your experience in this

13   investigation whether any bank records of Mr. Valerio was

14   obtained anywhere?

15   A    I'm not aware.

16   Q    No bank records were obtained in the search of the

17   house that proved to be relevant to this investigation; is

18   that right?

19   A    Not that I recall.

20   Q    No credit card records were obtained in this case to

21   obtain relevant information in your investigation; is that

22   right?

23   A    There was a reference to telephone -- credit cards and

24   even banking information retrieved from the hard drive email.

25   Q    So you had the information available, didn't you?

Forrestal-Cross/LaPinta

832

1    A    From the emails, yes.

2    Q    And you retrieved those emails as the computer expert

3    in this case?

4    A    I did.

5    Q    So you had the name of the bank, correct?

6    A    In some cases, yes.

7    Q    And the bank account numbers; is that right?

8    A    There were account numbers, yes.

9    Q    So it would have been very easy, whether it is you or

10   Agent Troyd or Messineo, to obtain those records because

11   you had the information right there, right?

12   A    Again, it is not my part in this case.

13   Q    I'm not asking if it was.  But the information was

14   right there, right?

15   A    I had resolved emails, yes.

16   Q    You didn't have to search to find this information,

17   it was right in front of you in the data; is that correct?

18   A    It was in the emails recovered, yes.

19   Q    In trying to ascertain as to whether there were other

20   electronic devices that you did not seize, did you look

21   into any type of local computer stores to find out whether

22   Mr. Valerio purchased other items of electronics?

23   A    No.

24   Q    You issued subpoenas on other computer manufacturers

25   in the past?

Forrestal-Cross/LaPinta

833

1    A    Yes.

2    Q    And you are aware how to do that?

3    A    Yes.

4    Q    Effortless, correct?  Easy to do?

5    A    Not effortless.

6    Q    Easy to do with respect to other things you are

7    required to do; is that right?

8    A    Somewhat.

9    Q    There are a number of different phone carriers out

10   there, aren't there?

11   A    There are.

12   Q    And to avail yourself to the thoroughness of the

13   investigation to see whether there were other phones

14   involved besides the ones that you recovered, did you do

15   any investigation of other phone carriers?

16   A    That is not my position in this case.

17   Q    Did you recommend to do other investigation of other

18   phone carriers?

19   A    I did not.

20   Q    Do you know whether other agents in this case did

21   investigations of other phone carriers?

22   A    I don't know.

23   Q    There was a CD presumably mailed to Mr. Valerio.  Do

24   you remember that?

25   A    Yes.

834

1  Q    And I believe Special Agent Angelini received a copy

2  of that CD; is that correct?

3  A    Again, I don't know that.

4  Q    Did you ever have in your possession a CD that was

5  part of this investigation?

6  A    I have been given copies of CDs made during the

7  investigation.

8  Q    Did you conduct a forensic examination on those CDs?

9  A    On the ones provided by the Special Agent?

10 Q    The CD provided to Special Agent Angelini?

11 A    I did not.

12 Q    You never performed any forensic examination on that

13 CD; is that your testimony?

14 A    Yes.

15 Q    Well, in your experience in investigating and doing

16 forensic examinations on CDs, would CDs sometimes have a

17 date stamp on them?

18 A    The CD itself?

19 Q    The videos contained on the CDs, would they sometimes

20 have a date stamp on the videos?

21 A    Yes.

22 Q    You don't know if that took place?

23 A    No.

24 Q    Would they sometimes have a time stamp, in terms of

25 the time of the video?

Forrestal-Cross/LaPinta

835

1    A    Yes.

2    Q    And would they have any indication of perhaps where

3    they would be?

4    A    In some cases, yes.

5    Q    And none of that was done in this case; is that

6    right?

7    A    I received a copy of the CD.

8    Q    None of that evaluation was obtained from that CD?

9    A    I don't know what -- I have no knowledge of what was

10   done with that CD.

11   Q    Because you didn't do an investigation on it, right?

12   A    I received a copy of the CD.

13   Q    Detective, from the copy of the CD that you received,

14   did you do any forensic evaluation on the CD?  Yes or no?

15   A    No.

16   Q    There were a number of child pornography videos --

17            MR. LaPINTA:  Would you mind if I break?

18            THE COURT:  Yes.

19            I have other matters on, so we will adjourn

20   until 2:15.

21            So you will have an unusually longer lunch.

22            Do not discuss the case.

23            (Whereupon, at this time the jury leaves the

24   courtroom.)

25            (Luncheon Recess.)

836

837

1              A F T E R N O O N    S E S S I O N

2

3

4              (Whereupon, the following takes place in the

5       absence of the jury.)

6              THE COURT:  Please be seated.

7              Bring the jury in.

8              You have your expert waiting?

9              MR. LaPINTA:  Yes.

10             THE COURT:  All right.

11             MR. LaPINTA:  And the second witness as well.

12             THE COURT:  How long is your expert?

13             MR. LaPINTA:  Certainly not as long as Detective

14       Forrestal.  I would say a half an hour probably.

15             THE COURT:  All right.

16             (Whereupon, the jury at this time entered the

17       courtroom.)

18             THE COURT:  Please be seated.

19             Members of the jury, we are ready to continue.

20             Go ahead, Mr. LaPinta.

21             MR. LaPINTA:  Thank you, your Honor.

22       BY MR. LaPINTA:

23       Q    Good afternoon, Detective Forrestal.

24       A    Good afternoon, counsel.

25       Q    You left off with respect to your various activities

838

1    as the forensic tech involved in this investigation.

2              I now want to direct you to your role in

3    examining the emails and attachments that were obtained

4    via the Cablevision optonline subpoena.

5              Are you familiar with those materials?

6    A    I viewed them, yes.

7    Q    Would you say that you have a good working knowledge

8    of that material?

9    A    No.

10   Q    Would you say you took the time to review those

11   emails to learn about the facts of the case?

12   A    I reviewed them.

13   Q    Okay.

14   A    Just briefly.

15   Q    Okay.

16             You certainly viewed the images sent via

17   attachments to emails from the Kalichenko email address;

18   is that correct?

19   A    I did.

20   Q    In fact, those emails is what you used to compile the

21   images you showed to this jury; is that correct?

22   A    Yes.

23   Q    When you reviewed the emails of child pornography,

24   would you agree with me that the emails of child

25   pornography did not have on the email a time stamp?

839

1    A    Correct.

2    Q    Did not have a date stamp?

3    A    Did not have a metadata stamp.

4    Q    On the video could you see a time or date stamp?  Yes

5    or no?

6    A    No, not on the time, on the video itself.

7    Q    And by viewing the emails with the child pornography,

8    you could not determine where those videos were made; is

9    that correct?

10   A    Correct.

11   Q    And you could not determine only by viewing those

12   videos when those emails were made, correct?

13   A    Correct.

14   Q    You never met Olena Kalichenko; is that correct?

15   A    Correct.

16   Q    You never met the child in the video; is that

17   correct?

18   A    Yes.

19   Q    You have no first-hand knowledge whether the child in

20   the video is even related to Olena Kalichenko; is that

21   correct?  First-hand knowledge.

22   A    Through the document contained on the recovered

23   material, in viewing that, yes.

24   Q    Besides the information on the emails, do you know

25   that this child was related to Olena Kalichenko?

**Forrestal-Cross/LaPinta**

840

1    A     Well, that --

2    Q     Aside from that, sir?

3    A     Besides that, no.

4    Q     You have no first-hand knowledge besides the videos

5    that her name was ███████, is that correct?

6          The emails, sorry.

7    A     Aside from the email, no.

8    Q     Aside from the email you have no knowledge that the

9    child is ███████?

10   A     From the document related to the emails, yes.

11   Q     When I say the emails, I mean the document in the

12   emails.

13   A     There is a difference.  The attachments and the

14   emails, there are official records attached, and I would

15   say through those records I know the child to be ███████.

16   Q     Aside from the emails and attachments, do you know

17   her name to be ███████  ███████, or whatever her name is?

18   Do you know her to be ███████ aside from the attachments

19   and the video and the emails?

20   A     I know her to be ███████, yes.

21   Q     The subject child pornography videos were all

22   attached as attachments to emails, aside from the CD-ROM

23   that was evidently mailed; is that correct?

24   A     Correct.

25   Q     And an attachment to an email could be in the form of

841

1  a video or a document; is that right?

2  A    A document, yes.

3  Q    And it is not uncommon to send videos as attachments

4  to emails; is that correct?

5  A    Yes.

6  Q    And aside from the date that an email is sent, would

7  you agree that the date the email is sent isn't

8  necessarily the date that a document or email is created?

9  A    True.

10  Q    A document or video that is included in an email can

11  be made at any time before that email is sent; is that

12  correct?

13  A    True.

14  Q    It can be made a minute before or a day before; is

15  that correct?

16  A    Correct.

17  Q    And it could be made a month before or a year before,

18  correct?

19  A    Correct.

20  Q    In your report you state that the child is two years

21  of age.  Do you remember that?

22  A    I do.

23  Q    That fact which you state in your report is your

24  opinion; is that correct?

25  A    Correct.

Forrestal-Cross/LaPinta

842

1    Q    In working with Agent Troyd, are you aware that the

2    sworn document he filed with the Court, he wrote that the

3    child was three years old?  Are you aware of that?

4    A    No.

5    Q    Have you read the search warrant affidavits in this

6    case?

7    A    I have.

8    Q    Have you read the search warrant affidavits submitted

9    to the Court on January 27th, 2014?

10   A    I read it once, yes.

11   Q    Okay.

12         Do you know that that sworn affidavit by

13   Special Agent Troyd indicates that the child in the video

14   is three years old?  Do you know that?

15   A    I don't remember that.

16         MR. LaPINTA:  Bates stamp 135.

17         (Counsel confer.)

18         MR. LaPINTA:  You can do it on redirect.  Don't

19   tell me how to question the witness, okay?

20   Q    Showing you the document in front of you --

21         (Handed to the witness.)

22   A    I see what, sir?

23   Q    Looking at what is in front of you --

24   A    Yes.

25   Q    Bates stamp 135; is that right?

Forrestal-Cross/LaPinta

843

1   A    Yes.

2   Q    And does that refresh your recollection as far as

3   Agent Troyd stating the age of the child to be

4   approximately three years old; is that right?

5   A    Approximately.

6   Q    Three years old?

7   A    Approximately three years old is what he says.

8   Q    That is his language, approximately three years old?

9   A    Yes.

10  Q    And your language is she was approximately two years

11  old?

12  A    Yes.

13  Q    In fact, neither you nor Agent Troyd knows the age of

14  that child in the video?

15  A    Know the age of the child exactly, no.

16  Q    The following questions I'm going to ask you have to

17  do with your experience in being a child pornography

18  investigator.  And excuse the nature of this question,

19  please.

20         In your investigations of child pornography, you

21  come across a wide variety of child pornography; do you

22  agree?

23  A    Agreed.

24  Q    You found child pornography in a number of different

25  locations, haven't you?

Forrestal-Cross/LaPinta

844

1  A    Geographic locations you are talking about?

2  Q    Technology locations?

3  A    Yes.

4  Q    You found pictures of child pornography in people's

5  homes; is that right?

6  A    Yes.

7  Q    And you found pictures of child pornography on cell

8  phones?

9  A    Yes.

10  Q    Computers?

11  A    Yes.

12  Q    On laptops?

13  A    Yes.

14  Q    On towers?

15  A    Yes.

16  Q    On iPads?

17  A    Yes.

18  Q    Tablets, right?

19  A    Tablets, yes.

20  Q    And in the course of your investigation, you have

21  come across child pornography of a number of different

22  types?  And what I mean by types is, I mean different ages

23  of children; is that right?

24  A    Right.

25  Q    And children doing different acts in the videos; is

Forrestal-Cross/LaPinta

845

1    that correct?

2    A    Yes.

3    Q    Some of the photographs in the videos are merely

4    containing naked children; is that correct?

5    A    Sometimes, yes.

6    Q    And some of the images of videos contain sex acts

7    with children; is that correct?

8    A    Correct.

9    Q    As an experienced investigator, you also come across

10   many videos and photographs of oral sex acts with

11   children, haven't you?

12   A    I have.

13   Q    Would you say you come across quite a bit of it in

14   your experience?

15   A    Yes.

16   Q    Unfortunately?

17   A    Unfortunately.

18   Q    And this is certainly not the first time you have

19   come across that; is that right?

20   A    Right.

21   Q    And in reviewing these photos and videos of child

22   pornography, they have included unfortunately objects

23   during the sex acts, yes?

24   A    Yes.

25   Q    And sometimes the objects include toys, right?

846

1  A    Yes.

2  Q    Sometimes the objects include adult sex toys, right?

3  A    Yes.

4  Q    Sometimes the objects include common things people

5  use, such as hairbrushes, correct?

6  A    Right.

7  Q    And some of the video that you come across as an

8  investigator unfortunately also has included many times

9  oral sex on children; is that correct?

10  A    Correct.

11  Q    This is not the first time you have seen child

12  pornography in the setting of a shower; is that correct?

13  A    True.

14  Q    You have seen that many times before as well; is that

15  correct?

16  A    I have.

17  Q    So as far as the content of this child pornography in

18  this case, you have seen it happening over and over again

19  on other unrelated cases; is that correct?

20  A    I have viewed child pornography various times.

21  Q    Right.  Unfortunately viewed quite a bit of it; is

22  that correct?

23  A    Yes.

24  Q    And a lot of this stuff you have viewed in the past

25  besides this case; is that correct?

847

1    A    Yes.

2    Q    And let's talk about the scope of your investigation

3    as a computer forensic expert.

4              You would agree that there are a number of

5    different databases out there for you to conduct an

6    investigation, aren't there?

7    A    Type of?

8    Q    Well, there are email databases, right?

9    A    There is public record aggregators, yes.

10   Q    Like Cablevision is a database you can access?

11   A    They have records I can subpoena, yes.

12   Q    And there are also social media databases that you

13   can also investigate; is that right?

14   A    That's right.

15   Q    And in the course of your experience, you have used

16   information from social media sources, have you?

17   A    I have.

18   Q    And what are some of the social media sources that

19   you use?

20   A    Facebook, Instagram.

21   Q    What else?

22   A    As far as social media sites?

23   Q    Yes.

24   A    I have pretty much touched every one that is out

25   there.

Forrestal-Cross/LaPinta

848

1   Q    Have you ever looked at the Skype database?

2   A    I have conducted investigations in Skype, yes.

3   Q    Well, let's take Facebook.

4        Did you conduct any investigation into the

5   database of Facebook relating to Olena Kalichenko in this

6   case?

7   A    I did not.

8   Q    By the way, you are aware that Facebook is accessible

9   throughout the world, aren't you?

10  A    Yes.

11  Q    The United States in addition to overseas; is that

12  right?

13  A    Yes.

14  Q    In addition to the Ukraine; is that correct?

15  A    It is worldwide.

16  Q    Now, Instagram is the same thing, accessible in the

17  United States as well as overseas?

18  A    Yes.

19  Q    As well as Skype, right?

20  A    Yes.

21  Q    And did you now come to learn in the course of this

22  investigation that Helena Kalichenko used a Skype account?

23  A    Yes.

24  Q    Did you employ any investigative measures to obtain

25  information about Helena Kalichenko's Skype account?

849

1   A    No, not me.  That is not my position.

2   Q    And would you agree with me that if Skype were used

3   in this case, the database would include relevant

4   information regarding this investigation, correct?

5   A    Depending on the type of information sought, perhaps.

6   Q    Helena Kalichenko used predominantly one -- by the

7   way, did you know her to have a Facebook account?

8   A    Pardon me?

9   Q    Did you know Helena Kalichenko or Olena Kalichenko to

10  have a Facebook account?

11  A    I don't know.

12  Q    Did you look into it?

13  A    No.

14  Q    So she could, but you don't know if she does?

15  A    I didn't look into it.

16  Q    Regarding the majority of emails sent by Olena

17  Kalichenko, you are aware of that email address?

18  A    Yes.

19  Q    What is it?

20  A    I couldn't spell it out specifically in front of me.

21  It is a dot RU.

22  Q    And the dot RU indicates an email server database in

23  the Ukraine?

24  A    It is actually Russia.

25  Q    Russia?

Forrestal-Cross/LaPinta

850

1    A    Yes.

2    Q    And you didn't obtain, for whatever reasons, you

3    didn't obtain any information from that RU database, email

4    database, right?

5    A    No.

6    Q    Did you also come to learn in the course of your

7    investigation that Olena Kalichenko used a second email

8    address?  Yes or no?

9    A    No.

10   Q    Would today, just right now, be the first time that

11   you learned that Olena Kalichenko also used the address

12   Bright, B-R-I-G-H-T, Helena, H-E-L-E-N-A, 68@gmail.com?

13   A    This is the first time.

14   Q    Were you given any documents that Agent Angelini

15   received from Olena Kalichenko?

16   A    No.

17   Q    Did you inquire of your co-investigators, Agent

18   Troyd, Agent Messineo, Agent Angelini, whether Olena

19   Kalichenko used other emails besides the RU email?

20   A    I did not.

21   Q    Would you agree with me that if a second email was

22   used by Helena at or around the same time of this

23   investigation, that it would contain essentially useful

24   information for you?

25   A    It would depend.

851

1   Q    Well, it would depend on whether she used it, right?

2   A    Yes.

3   Q    It would depend upon whether you knew she would be

4   using that email, right?

5   A    It would depend if it was recovered in the case.

6   Q    Well, let me show you this document.  Just look at

7   it.

8            (Handed to the witness.)

9   Q    I will show you two documents.  Take a look at them

10  and do not comment on it.

11           (Handed to the witness.)

12           (Counsel confer.)

13  Q    Look up when you are finished.

14           Your prosecutors made reference to the fact that

15  these exhibits were introduced in evidence.

16           Is this the first time you have come to learn

17  that Olena Kalichenko used the email address

18  brighthelena68@gmail.com?

19  A    That I recall, yes.

20  Q    And you could have come cross that?

21  A    I don't remember, no.

22  Q    And just like you subpoenaed the Cablevision records

23  of Joseph Valerio, you could have subpoenaed the Gmail

24  records of Olena Kalichenko; is that correct?

25  A    As the forensic person in this case I wouldn't be

852

1    doing subpoenas.

2    Q    The team that you are working with, okay?  Somebody

3    subpoenaed these records, right?

4    A    Yes.

5    Q    Weren't you involved in this decision making as to

6    where this investigation goes?

7    A    I was not the lead investigator in this case.

8    Q    I'm not asking you if you were.

9         Were you involved in decision making as to where

10   this investigation goes?  Yes or no?

11   A    No.

12   Q    And no one told you about this Gmail account; is that

13   right?

14   A    Not that I recall.

15   Q    All right.

16        Would you agree with me that Gmail is a United

17   States company, right?

18   A    Gmail?

19   Q    Gmail.

20   A    Yes.

21   Q    And it is data -- that data from Gmail is obtained

22   initially by a subpoena; is that correct?

23   A    Correct.

24   Q    Just like you retrieved emails containing child

25   pornography on an email account, a Gmail account could

853

1    also contain child pornography?

2    A    Yes.

3    Q    And an email account of Olena Kalichenko may even

4    contain the same images of child pornography; is that

5    right?

6    A    It may or may not.

7    Q    And the dates that those emails could have been sent

8    would have been relevant to you, wouldn't they?

9    A    Yes.

10   Q    And would you agree with me that if those videos that

11   you retrieved from this Cablevision account were

12   previously sent to other people in the Gmail account, that

13   that is a big fact in this case?  Agreed

14   A    It could be.

15   Q    If those emails were sent out with attachments of

16   child pornography even before Olena Kalichenko knew

17   Mr. Valerio, it would be important information; is that

18   correct?

19   A    Yes.

20   Q    And it would be because those emails were made before

21   even meeting Joe?  Yes or no.

22   A    Repeat the question.

23   Q    Those videos, if they're attachments to the emails,

24   could have been made or sent before she even met Joe; is

25   that right?

854

1   A     Based on the age of the child I viewed, and the email

2   dates that I saw, I don't believe so.

3   Q     Okay.

4         So the age of the child could not have been a

5   factor in her sending child pornography with respect to

6   that email account?

7   A     No, that is not what I said.  Not what I said.

8   Q     So the point is she could have sent child pornography

9   with that child previous to even meeting Joseph Valerio;

10  is that correct?  Yes or no?

11  A     Yes.

12  Q     That data, if you would have subpoenaed the account,

13  could have identified other people that potentially were

14  sent child pornography; is that correct?

15  A     Again, counselor, it is not my position to

16  subpoena --

17  Q     You could have obtained that information if it

18  existed; is that correct?

19  A     Under the hypothetical, yes.

20  Q     Now, did you come across information that Olena

21  Kalichenko had admitted she sent child pornography to

22  other men?

23  A     I'm aware of that, yes.

24        Let me backtrack on that.  Not to other men, to

25  Joseph Valerio.

855

1    Q    Besides -- well, other men means other people aside

2    from Joseph Valerio; other men?

3    A    No.  I misheard.

4         I am aware she said she sent child pornography

5    to Joseph Valerio.

6    Q    Were you aware from Agent Troyd that child

7    pornography was sent by Helena Kalichenko to a man by the

8    name of Daniel Ditmeyer, yes or no?

9    A    No.

10   Q    You did not know that?

11   A    No.

12   Q    This is the first time you heard that name Daniel

13   Ditmeyer, yes?

14   A    Yes.

15   Q    So you conducted no investigation of a Daniel

16   Ditmeyer; is that fair?

17   A    Not specifically, no.

18   Q    No email account verification of a Daniel Ditmeyer?

19   A    Not in the data I recovered.

20   Q    Or any search of any home or electronics of his; is

21   that correct?

22   A    Correct.

23   Q    So you are unable to tell us whether Olena Kalichenko

24   sent emails of a child to a Daniel Ditmeyer?

25   A    I'm not able to tell you if Olena Kalichenko sent any

856

1   child pornography to anyone but the defendant.

2           MR. LaPINTA:  Thank you, detective.  Nothing

3   further.

4           THE COURT:  Redirect?

5           MR. KABRAWALA:  Yes, your Honor.

6

7   REDIRECT EXAMINATION

8   BY MR. KABRAWALA:

9   Q    Detective, you were questioned about whether you

10  reviewed emails that were obtained from Kalichenko by

11  Special Agent Angelini.

12          Do you recall that line of questioning?

13  A    Yes.

14  Q    I'm showing you the email -- one of the emails that

15  counsel was referring to.

16          (At this time a document was exhibited on the

17  courtroom screen.)

18          MR. KABRAWALA:  This is Government's Exhibit 2.

19  Q    Do you see that?

20          MR. KABRAWALA:  All of these emails are in

21  evidence.

22  A    I do.

23  Q    Who is it from?

24  A    This is from -- from this point here?

25  Q    Right here.

Forrestal-Redirect/Kabrawala

857

```
 1    A    It is from Helena Bright.

 2    Q    I'm sorry.

 3         Right before -- below where it says forwarded

 4    message.

 5    A    Yes.

 6    Q    Who is the email from?

 7    A    Joeval5@optonline.net.

 8    Q    Take a look at the email.  I will try to lay it flat.

 9         Why don't you read it.

10         (Whereupon, at this time there was a pause in

11    the proceedings.)

12         MR. KABRAWALA:  I will read it.  I will read

13    from right here.

14         Let me know if I get it wrong.

15         This is from joeval5@optonline.net.  It is dated

16    July 6, 2013.

17         To Helena Bright.  It is

18    brighthelena68@gmail.com.

19         I wanted to ask you if you would also help me

20    with an adoption of a child from your country.  Can you

21    help me?  Just by saying we are a couple looking to adopt?

22    I will give you a solid commission for your help, that you

23    know.

24         My son now is off to college upstate.  My

25    daughter is in South Africa, whom I seldom see, which I
```

Forrestal-Redirect/Kabrawala

858

1   want to challenge because I can afford to bring her up in

2   her life.  Etcetera, etcetera.

3          If our meeting is not possible, can you help me

4   with an adoption, Helena?

5          Does this appear to be about -- what does this

6   email appear to be about?

7   A   It is --

8          MR. LATO:  Objection.

9          THE COURT:  Sustained.

10  Q   Is it fair to say that nothing in this email refers

11  to sending images of child pornography back and forth?

12  A   No, it doesn't.

13  Q   I'm showing you now what is another portion of

14  Government's Exhibit 2.

15         (At this time a document was exhibited on

16  courtroom screen.)

17  Q   This is from joeval5@optonline.net, dated July 8th,

18  2013.  The subject is re, adoption process, to Helena

19  Bright, at brighthelena68@gmail.com.

20         I will just read it and you tell me I miss a

21  word or anything.

22         Thanks for the feedback.  Like I mentioned, I

23  presently have no children in my life now to enjoy at my

24  age.  I have the means, the home and the comforts for me

25  to raise a child.  I'm a great father and it seems now

Forrestal-Redirect/Kabrawala

859

1   that I'm just a provider, that's all.

2          I want to be able to teach my new daughter all

3   the talents I have passed on to my son and daughter.

4   There will be an au pair with me as well to tend to a

5   little girl's needs.

6          Do you know what an au pair is?

7   A    Yes.

8   Q    What is an au pair?

9   A    It is a live-in --

10         MR. LATO:  Objection.

11         MR. LaPINTA:  Objection.

12         THE COURT:  Sustained.

13  Q    I have a girl here now that's qualified.  If not her,

14  later on there will be some other qualified helper or

15  woman with me.  The won't (sic) only be for me to enjoy

16  and raise.  When I plan an action, I think it through.

17         MR. LaPINTA:  Objection.

18         Beyond the scope of the purpose that this email

19  was used to impeach.

20         THE COURT:  Why don't you approach.

21

22         (Whereupon, at this time the following took

23  place at the sidebar.)

24         THE COURT:  I don't think it is beyond the scope

25  in the sense that you suggested that there is some

Forrestal-Redirect/Kabrawala

860

1   evidentiary value to that account.  So I think it is fair

2   for the government to do that.

3          I don't think you need to read the whole email.

4   At some point this is argument you can do in summation.

5   You can go through one e-mail.  I don't want to waste time

6   going through all these emails.

7          MR. KABRAWALA:  Yes.

8          MR. LaPINTA:  Thank you.

9          THE COURT:  Let's move on.

10

11         (Whereupon, at this time the following took

12  place in open court.)

13  Q    Is it fair to say that this email that I just read

14  aloud doesn't concern the exchange of child pornographic

15  videos or emails?

16  A    Correct.

17  Q    And you testified on direct about a number of child

18  pornography emails or videos recovered from the

19  defendant's computer, and those were sent by a person

20  named Olena Kalichenko.  Do you recall that?

21  A    Yes.

22  Q    And they were sent in an email address that ended in

23  dot RU?

24  A    Yes.

25  Q    Do you recall that?

861

1    A    Yes.

2    Q    And did you find any emails on the defendant's

3    computer of child pornography that were sent from a Gmail

4    account?

5    A    No.

6    Q    You were asked on cross-examination about a number of

7    electronic devices seized from the defendant's house.  Do

8    you recall that?

9    A    Yes.

10   Q    And one with an Apple laptop computer?

11   A    Yes.

12   Q    And there was no child pornography found on that

13   device; correct?

14   A    Yes.

15   Q    And there was no child pornography found on certain

16   other devices; is that correct?

17   A    Correct.

18        MR. KABRAWALA:  I am publishing what is admitted

19   as Government's Exhibit 555, and directing your attention

20   to page -- to line 18.

21        This appears to be a Viber text message from

22   December 7th, 2013.

23        Please read aloud the contents of the message.

24   A    Referring to the 6:45:18?

25   Q    Yes.

Forrestal-Redirect/Kabrawala

862

1   A   Okay Joseph, I am fed up with you.  I am sending all

2   the videos I made for you with ████ to the FBI.  That's

3   the only piece needed to get a court order to arrest you.

4   No more mercy for you.

5   Q   I will go to the next page and I will be drawing your

6   attention to line 32.

7            A message from December 11th, 2013.

8            Would you please read out loud the message right

9   here at 9:22:31.

10  A   Joseph, I now have eight different videos I made for

11  you not counting the one I sent through DHL.  FBI is

12  asking me every single day either I am sending additional

13  evidence to them.  I don't think you really understand how

14  serious the matter is.  I am asking you for the last time

15  would you like me to provide to the police everything I

16  have or would you like to negotiate?

17  Q   Is it fair to say that based upon those two text

18  messages, that the defendant had approximately eight

19  weeks' notice that the FBI was coming for him?

20  A   Yes.

21            MR. LATO:  Objection.

22            THE COURT:  Sustained.

23            The jury is to disregard it.

24  Q   Is December 6th and December 11th, are those dates

25  approximately seven to eight weeks before January 28th,

863

1   2014?

2   A   Approximately, yes.

3   Q   And you also testified there wasn't computer

4   information showing the defendant viewed any child

5   pornography videos that were found on his computer; do you

6   recall that?

7   A   On that computer.

8   Q   Other than the videos itself, do you recall that

9   testimony?

10   A   I do.

11   Q   And I will just show you Government's Exhibit 559-A,

12   as in Apple.

13          (At this time a document was exhibited on

14   courtroom screen.)

15   Q   Was this an email recovered from the defendant's

16   computer?

17   A   Yes.

18   Q   And reading the highlighted portion, it says:  I see

19   you are bonding very well with ▮▮▮▮▮.

20          Do you see that?

21   A   Yes.

22   Q   And the image -- I will now show you

23   Government's Exhibit 303-A.

24          (At this time a document was exhibited on

25   courtroom screen.)

Forrestal-Redirect/Kabrawala

864

1   Q    I'm publishing what is admitted as 303 Alpha.

2            It says:  The videos you sent by cell phone

3   camera are perfect and there is no need for the expense of

4   another camera when you have done a terrific job with the

5   cell phone camera.

6            MR. LaPINTA:  Objection.

7            MR. KABRAWALA:  I'm sorry, with the cell phone

8   camera.

9            THE COURT:  What is the objection?

10           MR. LaPINTA:  The objection is the relevance of

11  this evidence coming in on redirect when it wasn't the

12  subject of cross.

13           THE COURT:  Overruled.

14           Again, it is for a very limited reason and I

15  will allow it.

16           MR. KABRAWALA:  That is the reading, and I will

17  read the next sentence.

18           I have a new cell phone which allows me to

19  transfer the video to my email and the screen is bigger to

20  view.

21  Q    Did I read that correctly?

22  A    Yes.

23  Q    Does it appear from this email that in fact the

24  defendant viewed the video sent to him?

25  A    Yes.

Forrestal-Redirect/Kabrawala

865

1   Q    You were asked about a couple of typos found in your

2   report; do you recall that?

3   A    Yes.

4   Q    And you were asked whether the file name HDV,

5   underscore 00043, had a typo in it.  Do you recall that?

6   A    Yes.

7   Q    And do you recall that you identified that file name

8   with one less zero?

9   A    Yes.

10  Q    Do you recall that?

11  A    Yes.

12  Q    Was the image -- was that image found on the Samsung

13  memory card in the defendant's house?

14  A    It was.

15  Q    And was it a fact that your report left out a zero,

16  and does it change the fact that a young girl was depicted

17  in there?

18  A    No.

19  Q    Does it change the fact --

20        MR. LaPINTA:  Objection.

21        THE COURT:  Sustained.

22  Q    What if any impact does a typo leaving off one zero

23  on the file name have on the approximate 30 videos found

24  on the defendant's computer?

25        MR. LaPINTA:  Objection.

Forrestal-Redirect/Kabrawala

866

1        THE COURT:  Sustained as to form.

2   Q    Now, you were asked about the camcorder in evidence,

3   Government's Exhibit 404.

4        You were asked if you did any fingerprint

5   analysis on that device.

6   A    Yes.

7   Q    And you were asked if any -- did you conduct a

8   physical examination of that camcorder?

9   A    I did.

10  Q    And what did you note about the physical condition of

11  that camcorder, if anything?

12  A    It is of reasonable good shape and it had black tape

13  put over the front lens of it.

14  Q    Above the lens area?

15  A    Yes.

16        MR. KABRAWALA:  Your Honor --

17        MR. LaPINTA:  Objection to the series of

18  questions regarding anything outside of fingerprints that

19  I cross-examined on.

20        THE COURT:  Why don't you approach now.

21

22

23

24

25

867

1           (Whereupon, at this time the following took

2  place at the sidebar.)

3           THE COURT:  Where are you going with this?

4           MR. KABRAWALA:  I want to show the jury that

5  there is a piece of tape on it, and there was a physical

6  examination done.

7           MR. LaPINTA:  Forensic examination.

8           MR. BODE:  Completeness of the investigation.

9           MR. KABRAWALA:  Completeness of the

10  investigation as to whether or not fingerprints were taken

11  off of it.  I want to know -- show there is tape on the

12  device.

13           MR. BODE:  It is blacked out as well.

14           THE COURT:  I will sustain the objection.

15           This witness, I understand, and certainly some

16  of this was done on cross-examination.  But these are

17  arguments you can make to the jury.

18           MR. BODE:  The only thing, we can't make the

19  argument now.  The tape covers the spot.  We need the

20  detective to talk to us about pulling off the tape and he

21  saw the LED tape was blacked out with a Sharpie and tape

22  placed over it.  We can't make that argument without the

23  testimony.

24           THE COURT:  He can describe what the camera is.

25  But you can't ask his conclusions or opinion about that.

Forrestal-Redirect/Kabrawala

868

1   That is argument.

2          MR. BODE:  We can ask about the condition and

3   that is what it is?

4          THE COURT:  Yes.

5          MR. KABRAWALA:  Can we have him stand up and

6   show the jury?

7          THE COURT:  Yes.

8          MR. KABRAWALA:  Thank you.

9

10         (Whereupon, at this time the following takes

11  place in open court.)

12  Q    You testified you conducted a physical examination of

13  the camcorder that is in front of you?

14  A    Yes.

15  Q    And that there is a piece of black tape on it?

16  A    Yes.

17  Q    Did you ever lift up the black tape?

18  A    I did.

19  Q    What if anything did you find?

20  A    There is an LED light on the camera.

21         MR. KABRAWALA:  Your Honor, with the Court's

22  permission, can I have the witness step off the witness

23  stand and to stand in front of the jury box to show it to

24  the jury?

25         THE COURT:  Yes.

869

1           What exhibit number is that?

2           THE WITNESS:  Sorry, sir?

3           THE COURT:  What is the exhibit number?

4           THE WITNESS:  This exhibit number is 404.

5   Q    You can go ahead and lift off the tape.

6   A    It is a little hard to see because it is dark on

7   dark.

8   Q    Why is it dark on dark?

9   A    It looks like it has been written over with maybe

10  magic marker.

11          MR. LaPINTA:  Objection.

12          THE COURT:  Sustained, sustained.

13          MR. LaPINTA:  Let the record reflect that the

14  witness is showing the camcorder to the members of the

15  jury.

16          THE COURT:  Yes.

17          THE WITNESS:  Do you see that?

18          THE COURT:  Don't say anything.  Just show it to

19  the jury.

20          (Whereupon, at this time there was a pause in

21  the proceedings.)

22  Q    You may step back on the witness stand.

23          (Witness resumes the witness stand.)

24  Q    Two more questions.

25          You said that the black tape was covering an LED

870

1    light?

2    A    Yes.

3    Q    Did you conduct an investigation into what that LED

4    light does, and if so, what did it reveal?

5    A    It revealed that it lights off -- it shows when the

6    recording is taking place.

7              MR. KABRAWALA:  Nothing further.

8              THE COURT:  Recross?

9              MR. LaPINTA:  No, thank you.

10             THE COURT:  All right.  You may step down.

11             THE WITNESS:  Thank you.

12             (Whereupon, the witness leaves the witness

13   stand.)

14             MR. KABRAWALA:  Your Honor, the government

15   rests.

16             THE COURT:  Members of the jury, you heard that

17   the government has rested its case.  And that means they

18   have completed their presentation of the evidence.

19             As I said in the beginning, I want to remind you

20   that the burden of proof is on the government at all

21   times.  The defendant does not have to call any witnesses

22   or put on any evidence whatsoever.  Obviously he has the

23   right to do so if he wishes.  And defense counsel

24   indicated they intend to present evidence to you.  So we

25   will take a break now and then begin that.  Okay?

871

1          Do not discuss the case.

2          (Whereupon, at this time the jury leaves the

3    courtroom.)

4          THE COURT:  Please be seated.

5          Is there a motion by the defense?

6          MR. LATO:  Yes, your Honor.

7          Your Honor, Rule 29, I'm making a general motion

8    for a judgment of acquittal based on the government's

9    failure to make out a case that would convince a

10   reasonable jury that the defendant is guilty of the crimes

11   charged in the indictment.

12         Specifically, though, I want to address some of

13   the other counts, and this has to do with the attempt

14   counts.

15         Counts 9 through 13 charge the attempted

16   exploitation of a child.  However, those attempt counts in

17   terms of the dates also fall within count two, which is

18   the actual sexual exploitation of the same child.

19         Count two lists a beginning date and a start

20   date.  It does not break out count two to an individual

21   date or individual acts of exploitation of a child.

22         However, what happened in counts 9 through 13,

23   it appears that what the government has done is that it is

24   arguing to the jury that count two, the actual

25   exploitation, occurred between April 1st, 2012 and

872

1   November 1st of 2012.  And then with respect to counts 9

2   through 13, cherry picking individual dates within that

3   same period as to four attempts.

4           It seems to me if it is unclear as to whether it

5   is an attempt and/or a complete count, the attempt should

6   caret the subsequent count.

7           Beyond that, counts six through eight, also the

8   attempt count with respect to the same child that fall

9   outside the date or the period alleged in count two.

10          This is what it really comes down to with

11  respect to an attempt.  There is a distinction between an

12  attempt and an overt act in furtherance of the conspiracy.

13          By all accounts it would seem that everything

14  that would qualify as an attempt would also qualify as an

15  overt act.  But not everything that qualifies as an overt

16  act would qualify as an attempt.

17          To be an attempt, your Honor, it has to have the

18  mens rea to complete the crime by the defendant, and a

19  substantial step to complete the crime.

20          With respect to the attempt counts, all of them,

21  is there a substantial step each time to commit the same

22  crime?  By way of an example, I think it is clear that

23  many videos were in fact made.  And the defense really

24  comes down to, is it really Joseph Valerio who had them

25  made?

873

1          By way of analogy, a person wants another person

2     to commit a bank robbery and sends the person to a bank on

3     five separate occasions, and for whatever reason the

4     person goes to the bank and doesn't do a robbery that day.

5     And each time the person goes to the bank it is certainly

6     an overt act in terms of the actual bank robbery.  But at

7     the end when the person commits a bank robbery, it would

8     seem unfair to categorize the five trips to the bank as

9     five separate attempts.  It is better to say attempt to a

10    bank robbery and leave it to the jury as to whether it was

11    one attempt or one completion of a crime.  And that

12    completes my presentation, your Honor.

13          MR. BODE:  Does your Honor wish to hear from us?

14          THE COURT:  Yes.

15          MR. BODE:  Your Honor, the defense argument is

16    insufficient for Rule 29.

17          The defense has clearly been hinting at arguing

18    that some of these images were pre-made by Ms. Kalichenko

19    prior to the defendant coming in contact with her, and as

20    such he could not have committed the crime of exploitation

21    because they were already made at that point.

22          Clearly, however, where he sends an email, each

23    one of those attempts count to a particular email that is

24    in evidence where he asks that specific acts be done to

25    the child.  He even calls it a script in one of the

874

1   emails, clearly providing a script for the child to be

2   used and asking the child to be abused would constitute as

3   an attempt at child pornography.

4          Moreover, here it is even stronger because he

5   receives videos and acknowledges in the emails he got them

6   and asks for more videos.

7          So clearly there is a substantial attempt.  The

8   email is a substantial step in an attempt, your Honor.

9          Bank robbery is a poor example, with due respect

10  to Mr. Lato.  If we wanted to use a bank robbery as an

11  example, because he obtained it over a period of time and

12  sent the emails over a period of time, it is more that he

13  robbed the bank on one day and got a thousand dollars, and

14  comes back a week later the for another thousand dollars

15  and a week later another.  I don't think that example

16  works in this case.

17         For all those reasons and the light most

18  favorable to the government, we believe the Rule 29 motion

19  should be denied.

20         MR. LATO:  Can I have the last word since it is

21  my motion, your Honor?

22         THE COURT:  Sure.  This is your reply.

23         MR. LaPINTA:  Because according to the

24  government's case, Mr. Valerio is going through an

25  intermediary, Ms. Kalichenko, who was the actual principal

875

1   doing the child pornography and Mr. Valerio sharing the

2   same mens rea, aiding and abetting and by supplying the

3   money and ordering it, and for Mr. Valerio to be guilty of

4   an attempt, I believe Ms. Kalichenko as an intermediary

5   must have the mens rea to complete the substantive crime.

6          There is no question that there is evidence here

7   that Ms. Kalichenko did intend to make videos.  My

8   objection is breaking everything up into individual

9   attempts.

10          Because if Ms. Kalichenko cannot be guilty of

11   individual attempts, I don't know that Mr. Valerio can

12   either.

13          THE COURT:  All right.

14          I will reserve decision and place the decision

15   on the record later.  I just want to get through your

16   witness today.  And I wanted to get that done.

17          Let's take a break and then get started.  All

18   right?

19

20          (Whereupon, a recess was taken.)

21

22

23

24

25

876

1       THE COURT:  Let's get the jury.

2       MR. BODE:  The defense disclosed to us, your

3  Honor, just a few moments ago, that their expert witness,

4  Mr. Gibbs, has they believe a 2000 adjournment in

5  contemplation of dismissal in a domestic violence case.

6  In 2006 he was charged with a felony regarding cocaine and

7  he pled it down to a misdemeanor possession.

8       We are just learning about it now.  I sent the

9  agent to get the rap sheet.  We are not in a position to

10  argue it yet.  But clearly the cocaine conviction is

11  relevant in terms of Mr. Gibbs.  But we have not had a

12  chance to formulate an argument yet.  It was literally as

13  your Honor was coming out, a couple of minutes before

14  that.

15       THE COURT:  When was the cocaine conviction?

16       MR. BODE:  2006.

17       THE COURT:  And it was pled down to a possession

18  of cocaine?

19       MR. BODE:  Yes, charged with a felony and pled

20  down to a possession.  Obviously drug cases can mean

21  different things.  It could be use.  Or it could be

22  perception.  Or if he was selling --

23       THE COURT:  Do you know any details of the

24  conviction or not?

25       MR. LATO:  I can answer that, because I actually

877

1    spoke to the witness about it.

2         THE COURT:  You can be seated.

3         MR. LATO:  In 2005 it was a traffic stop and he

4    had cocaine in the car and it was pled down.  He didn't

5    indicate if it was a sale or with intent to distribute or

6    not.  But it was pled down to a misdemeanor conviction for

7    possession of cocaine.  That is just it.

8         Now, I'm ready to make the argument if your

9    Honor is ready why it should not come in.

10        THE COURT:  No.  Based on what I was told it

11   would not come in.  But I want the government to have the

12   ability to look through it.

13        The government is precluded from making

14   reference to it at this point.

15        MR. BODE:   given the hour, we can always have

16   him back on Wednesday.

17        THE COURT:  If you were to come up with

18   something that is relevant, I will allow you to recall him

19   to impeach him.

20        MR. BODE:  I can't believe the defense just came

21   up with this five minutes ago.  If they learned about it

22   at lunch, we should have been told then to have a chance

23   to address this.

24        MR. LaPINTA:  I'm not aware of any obligation to

25   tell him this.  They have the guy's name or his CV.  I'm

878

1    not obliged to tell them about my witness' convictions.

2              THE COURT:  I made my ruling.  Let's bring the

3    witness in at this point.

4              (Whereupon, the jury at this time entered the

5    courtroom.)

6              THE COURT:  Everyone be seated, please.

7              Members of the jury, as I indicated before the

8    break, the government rested.  The government has the

9    burden of proof at all times.  And there is no obligation

10   on a defendant to present any evidence.  They have a right

11   to do so.  Counsel has indicated they wish to present

12   evidence, and I will ask they do so now.

13             MR. LaPINTA:  The defendant calls Scott Gibbs.

14

15   S C O T T   G I B B S,

16             called as a witness, having been first

17             duly sworn, was examined and testified

18             as follows:

19             THE CLERK:  State and spell your name for the

20   record.

21             THE WITNESS:  Scott Gibbs, S-C-O-T-T, G-I-B-B-S.

22             THE COURT:  Be seated, Mr. Gibbs.  You have to

23   be close to the microphone to keep your voice up.

24             Thank you.

25             MR. LaPINTA:  Thank you, your Honor.

879

1

2  DIRECT EXAMINATION

3  BY MR. LATO:

4  Q    Good afternoon, Mr. Gibbs.

5  A    Good afternoon.

6  Q    For whom are you employed?

7  A    We Recover Data.

8  Q    If you can just speak into the microphone, loud, slow

9  and clearly.  Okay?

10  A    Yes.

11  Q    What is We Recover Data?

12  A    We Recover Data is a data recovery and digital

13  forensics firm.

14  Q    What is your position at We Recover Data?

15  A    I am the director of digital forensics and

16  E discovery, electronic discovery.

17  Q    What is electronic data?

18  A    Electronic data is information that is stored on the

19  digital media or created by a computer or digital device.

20  Q    What is E discovery?

21  A    E discovery is the process by which electronic

22  information, or ESI, which is electronically stored

23  information, is discovered and made presentable or

24  litigation and for court proceedings.

25  Q    Describe what you do as an employee of We Recover

880

1   Data?

2   A    I perform digital forensic analysis of digital media

3   and digital devices.

4         I also run the electronic discovery, which is

5   the discovery or the presentation of the digital

6   information which is the result of the analysis for

7   litigations for the court proceedings.

8   Q    What clients in the past have you performed work for?

9   A    Umm, we have done work for a number of firms.  Some

10  of our clients are Stroock and Stroock, --

11  Q    What is Stroock and Stroock?

12  A    Stroock and Stroock is a law firm.

13  Q    Besides Stroock and Stroock, who else have you worked

14  for?

15  A    I have worked for Smart Data --

16  Q    Regarding your role as an employee of We Recover

17  Data?

18  A    We have also worked for Data For You, which is a

19  sequel database company.

20        We have also done work for TRI-AD.  They are a

21  digital surveillance distributor.

22  Q    What is your education?

23  A    I hold the ENCE, which is the digital forensics

24  certification.  I trained with Guidance Software.

25  Guidance Software is forensic training number one.

881

1   Q    Let me stop right there.

2            What is your education in terms of college?

3   A    I went to Clarke, Atlanta, University.

4   Q    That is in Atlanta, Georgia?

5   A    Yes, it is.

6   Q    Did you obtain a degree from Clarke?

7   A    I did not.

8   Q    Did you study computers in Clarke?

9   A    Yes.  I studied electrical engineering.

10  Q    Did you obtain any type of education in the area of

11  computer forensics?

12  A    Yes, I have.

13  Q    Explain that education, please.

14  A    I trained with Guidance Software, they are the maker

15  of EnCase forensic, which is a forensic software.  They

16  are the certifier of the ENCE, and training with Mile 2.

17  They offer forensic training.

18           I also trained -- I took the CCE, which is

19  the -- it is also a digital forensic certification.

20  Q    Is it fair to say that the training you explained has

21  to do with your analysis of data on computers?

22  A    Yes.

23  Q    And when we speak of analysis of data on computers,

24  do we speak of analyzing the source of that data?

25  A    Yes.

882

1   Q    Do you also analyze where it is contained in terms of

2   data on the machinery?

3   A    Yes.

4   Q    Are you also trained in terms of retrieving certain

5   data on computers?

6   A    Yes.

7   Q    And obviously retrieval is obtaining it from the

8   computer so you could view it, see it and know it; is that

9   right?

10  A    Yes.

11  Q    Do you have any certification concerning the analysis

12  of data on computers?

13  A    Yes.  I obtained the ENCE.

14  Q    Is that what you just described?

15  A    Yes.

16  Q    Okay.  Let's move on.

17        Prior to being employed by We Recover Data, what

18  other jobs have you had in the computer field?

19  A    I was the director of digital forensics for Advance

20  Discovery, an E discovery firm.  I was the director of

21  digital forensics for Smart Data.  I was also the director

22  of digital forensics and IT for LDSI.

23  Q    As the director of these various entities, did you

24  supervise other people?

25  A    Yes.

Gibbs-Direct/Lato

883

1    I supervised the IT department and also anyone

2  working with the collection of digital media.

3  Q    How many years have you been involved in the computer

4  technology field?

5  A    I was involved for more than eight years in computer

6  technology.

7  Q    Have you testified in the past as a computer expert

8  in the field of computer forensics?

9  A    Yes.

10  Q    Have you been qualified in any courts or tribunals as

11  an expert of computer forensics in the past?

12  A    Yes, I have.

13         MR. LaPINTA:  Your Honor, I move to qualify

14  Mr. Gibbs as an expert in computer forensics.

15         MR. KABRAWALA:  May I briefly, Judge?

16         THE COURT:  Yes.

17

18  VOIR DIRE EXAMINATION

19  BY MR. KABRAWALA:

20  Q    Good afternoon, Mr. Gibbs.

21  A    Good afternoon.

22  Q    My name is Ameet Kabrawala, I am an Assistant U.S.

23  Attorney.

24         I have some questions as to your qualifications.

25         You mentioned you were previously qualified.

884

1    A    Yes.

2    Q    Where were you qualified previously?

3    A    In New York.  I testified for an arbitration.

4    Q    In an arbitration?

5    A    Yes.

6    Q    Anything else?

7    A    No.

8    Q    You are certified in EnCase; is that correct?

9    A    Yes, the ENCE.

10   Q    And you are a certified computer examiner?

11   A    Yes.

12   Q    And you are also certified in computer hacking

13   forensics; is that correct?

14   A    That is correct, the CHFI.

15   Q    And there are ethical guidelines that control all

16   those various certifications; is that correct?

17   A    Yes.

18   Q    And you always complied with all of those guidelines;

19   is that correct?

20   A    Yes.

21            MR. KABRAWALA:  That's all.

22            THE COURT:  Any objection?

23            MR. KABRAWALA:  No objection.

24            THE COURT:  All right.

25            I will allow Mr. Gibbs to offer his expert

885

1   opinion in the area of computer forensics.

2           The same instruction I gave you with respect to

3   Detective Forrestal applies.  I don't have to repeat the

4   instructions to you, but it is the same instruction as to

5   the offering of expert testimony.

6           Go ahead, Mr. LaPinta.

7           MR. LaPINTA:  Thank you.

8   BY MR. LaPINTA:

9   Q    Mr. Gibbs, did there come a time you were hired on

10  behalf of Joseph Valerio to perform forensic computer

11  evaluation of technologies involved in this criminal

12  proceeding?

13  A    Yes.

14  Q    When were you hired?

15  A    In or about July of this year.

16  Q    2014?

17  A    Yes.

18  Q    Who hired you?

19  A    Umm, I was hired by yourself, Mr. LaPinta, and

20  Frances.

21  Q    Who paid you?

22  A    Frances Valerio.

23  Q    Who is Frances Valerio?

24  A    I think she is the mother of Mr. Valerio.

25  Q    Okay.

Gibbs-Direct/Lato

886

1    Did there come a time that you began an

2  evaluation of certain items of technology regarding this

3  investigation?

4  A    Yes.

5  Q    Did you begin an evaluation of a desktop computer of

6  the letters -- did there come a time when you evaluated,

7  investigated, reviewed a computer desktop of the brand

8  VVTV?

9  A    I analyzed a hard drive.

10 Q    And so you were not given access to the actual

11 computer; is that right?

12 A    No, I was not.

13 Q    You were given access to a copy of the hard drive of

14 that computer; is that right?

15 A    Yes.

16 Q    Do you know what size of the hard drive that was?

17 A    It was a 2.5 inch, it looked like an internal laptop

18 hard drive.

19 Q    Do you know how many gigabit the hard drive is?

20 A    The hard drive was approximately 20 gigabits.

21 Q    What is a gigabit?

22 A    It is 1,024 megabit.

23 Q    How is that relevant when evaluating a computer?

24 A    It would determine how much data can be stored on

25 that particular piece of media.

887

1   Q    Did you have an occasion to discover what kind of

2   operating system was in that computer?

3   A    Yes.  They had a Windows operating system.

4   Q    What is an operating system?

5   A    It is software that allows the computer or the mother

6   board to interface with or to be used by a user.

7   Q    It is basically the manner in which a computer

8   operates; is that right?

9   A    Yes.

10  Q    What is that program once again?

11  A    Windows, Microsoft Windows.

12  Q    How old of an operating program was it?

13  A    It was fairly old.  I would say at least 14 years,

14  give or take.

15  Q    You said 14 years old?

16  A    Yes.  Give or take, yes.

17  Q    And the operating system that you reviewed, would you

18  say that that is an outdated system?

19  A    Yes.

20  Q    That it is an antiquated system?

21  A    Yes.

22  Q    And that in the past 14 years technology regarding

23  computers has advanced significantly?

24  A    Yes.

25  Q    You used the forensic software to evaluate this

888

1   computer, right?

2   A    Yes.

3   Q    And that system that you used is called EnCase?

4   A    Yes.

5   Q    By the way, are you a certified EnCase technician?

6   A    Yes.

7   Q    Have you been recertified after being initially

8   certified?

9   A    I am in the process of being recertified now.

10  Q    Is it a process you go through every few years?

11  A    Yes, there are training requirements.

12  Q    Do you pay for that yourself?

13  A    Yes, I have.

14  Q    And did you have an occasion to search the hard drive

15  of that tower computer we were speaking of?

16  A    Yes.

17  Q    Did there come a time when you found videos in the

18  inbox of that computer?

19  A    Yes.

20  Q    What is an inbox?

21  A    It is a location where email data is stored.

22  Q    Is it fair to say that the emails that were in that

23  inbox were received by email; is that correct?

24  A    Yes.

25  Q    Were those videos containing contraband or child

889

1    pornography?

2    A    Yes.

3    Q    Were they found anywhere else on that hard drive

4    besides that inbox?

5    A    No.  Not anywhere on the hard drive other than that

6    location.

7    Q    What is the significance of having email videos only

8    contained in an inbox of a computer?

9    A    It would suggest that the data was not saved or

10   downloaded to the machine -- saved outside of the inbox.

11   Q    Does it also indicate that the videos contained in

12   the inbox were not opened on that computer?

13   A    Yes.  It would suggest it was not opened.

14   Q    When I use the word "opened," would you also adopt

15   the word "viewed"?

16   A    Yes.

17   Q    If those videos were opened in that computer, would

18   they be contained anywhere else on the hard drive besides

19   the inbox?

20   A    Yes.

21        Windows makes a copy of windows or data that are

22   attachments in a temporary storage location.

23   Q    What does the word "artifacts" mean in terms of

24   computer verification?

25   A    It means some kind of evidence or some type of

890

1    digital fingerprint, digital data.

2    Q    If videos found in an inbox were viewed or opened on

3    that computer, would there be artifacts of that video

4    contained elsewhere on that hard drive?

5    A    Yes.

6    Q    Did you find any other artifacts of those videos

7    contained anywhere else in that inbox?

8    A    I did not.

9    Q    Would you, therefore, conclude from your experience

10   and evaluation and training as a forensic computer

11   evaluator that the videos contained in that inbox, the

12   child pornography videos, were not viewed or opened in

13   that computer or not?

14   A    No.  I would say they were not viewed or saved to

15   that computer.

16   Q    Did your investigation turn after you completed the

17   computer evaluation, did your evaluation then turn to a

18   Samsung four gigabit SD storage card?

19   A    Yes.

20   Q    Did you use forensic software that you were trained

21   with to evaluate that storage card?

22   A    Yes.

23   Q    Did you find any child pornography/contraband files

24   on that Samsung storage card?

25   A    Yes.

Gibbs-Direct/Lato

891

1    Q    And I will draw your attention to a file that is

2    entitled cam, C-A-M, underscore, 0005.JPG.

3            Do you recall seeing that file in your

4    evaluation of this storage card?

5    A    Yes.

6    Q    I will hereafter refer to that file as the JPG file,

7    okay?

8    A    Yes.

9    Q    Did that JPG file contain child pornography?

10   A    Yes.

11   Q    Were you able to retrieve data or information

12   regarding that JPG file from the card?

13   A    Yes.

14   Q    Did that data include a date that that the card had

15   as when the data -- when the file, the JPG file, was made?

16   A    Yes, it had created a date.

17   Q    All right.

18           Do you know what that date is?

19   A    I do not recall.

20   Q    Do you have your report handy?

21   A    I have my report.

22   Q    Would that refresh your recollection, the report?

23   A    No.  I don't have the date on that -- for that

24   particular file, no.

25   Q    There were other files aside from the JPG file you

892

1   found on that card?

2   A    Yes.

3   Q    Were there three MP 4 files as well?

4   A    Yes.

5   Q    What is an MP 4 file?

6   A    It is a video file, a compressed video format.

7   Q    And they also contain contraband child pornography;

8   is that right?

9   A    Yes.

10  Q    Were there dates and times regarding those particular

11  files?

12  A    Yes.

13  Q    Now, regarding the accuracy of those dates and times,

14  do you have any experience in terms of understanding how

15  dates and times are made part of a storage card?

16  A    Yes.

17  Q    Explain how you know that.  How do you obtain dates

18  and times from a storage card?

19  A    A device's operating system typically writes

20  metadata, which is data to the file system on a particular

21  piece of media, whether a hard drive or SD card.

22  Q    Okay.

23       The date and time on these particular files,

24  could you testify as to the dates and times on that media

25  as to whether they are accurate dates or times?

Gibbs-Direct/Lato

893

1    A    I cannot, because metadata can be manipulated.

2    Q    What do you mean by the word "manipulated"?  Changed?

3    A    I mean if someone changes the date and time of a

4    system that is used to create that metadata, then the

5    dates and times reported to the media could be manipulated

6    or falsified.

7    Q    Is it fair to say whatever date and time was on that

8    video camcorder, as set there, is what was imbedded on

9    that storage device; is that correct?

10   A    Yes.

11   Q    Do you have any way of determining at the time the

12   video was created that the date and time were the correct

13   date and time?

14   A    I could not.

15   Q    Do you have any information from that card that you

16   evaluated whether the date and time on that camcorder was

17   changed after those files were recorded?

18   A    I could not; without a log I could not.

19   Q    Does that card contain a log to show when dates and

20   times are changed on that camcorder?

21   A    No.

22   Q    So if I understand you correctly, the evaluation of

23   the metadata on that card cannot indicate whether the date

24   and time, at the time of the recording, was actually

25   accurate; is that right?

Gibbs-Direct/Lato

894

1    A    That is correct.

2    Q    Did you come to learn in the course of your

3    evaluation of that data card whether those images were in

4    fact deleted from that card?

5    A    Yes.

6    Q    Were you able to determine that there were remnants

7    or pieces of that video that were in fact extracted from

8    that card?

9    A    Yes.

10   Q    Does the data on that card indicate when those images

11   were deleted?

12   A    It does not.

13   Q    Does it contain any information regarding date and/or

14   time when they were deleted?

15   A    It does not.

16          MR. LaPINTA:  That's all I have.

17          THE COURT:  Cross-examination?

18          MR. KABRAWALA:  Yes, your Honor.

19          May I approach the witness?

20          THE COURT:  Yes.

21          (Counsel approaches the witness stand.)

22

23

24

25

895

1   CROSS-EXAMINATION

2   BY MR. KABRAWALA:

3   Q    I would like to see what you were referring to during

4   your testimony, please.

5   A    Yes.

6           MR. KABRAWALA:  Your Honor, can we have a quick

7   recess, please?

8           THE COURT:  Yes.

9           We will take a few minute break.

10          Just go back to the jury room for a few minutes,

11   please.

12          (Whereupon, at this time the jury leaves the

13   courtroom.)

14          MR. BODE:  Your Honor, can I ask Mr. Gibbs to

15   be excused?

16          Can I ask his social security number on the

17   record -- it doesn't have to be on the record, but if he

18   can provide it to counsel, we need to check some things.

19          THE COURT:  All right.

20          You don't have to do it on the record, but

21   provide that information to defense counsel.

22          MR. BODE:  Thank you, your Honor.

23

24          (Whereupon, a recess was taken.)

25

Gibbs-Cross/Kabrawala

896

1      THE COURT:  I understand the government is

2  asking for a social security number, which Mr. Lato is

3  providing.

4      MR. BODE:  I would like to have his home

5  address, not for the record, but I would like to compare

6  if we are talking about the same person or not.

7      THE COURT:  All right.

8      Mr. Gibbs, would you just step outside for a

9  minute, please.  Thank you.

10      (The witness steps out.)

11      THE COURT:  What is the issue?

12      MR. BODE:  Your Honor, it is hard to read on the

13  Blackberry, but it appears he may have had an arrest as

14  recently as July of this year.  We are trying to figure

15  out what it is.  He clearly didn't report it to the

16  defense.  The picture matches, and it looks like the

17  social is the same social security number.  He didn't

18  disclose it and I would like to look into it.

19      THE COURT:  Do you have any knowledge of any

20  arrests this year?

21      MR. LATO:  No, but I will look into that right

22  now.

23      THE COURT:  Okay.

24      (Whereupon, at this time there was a pause in

25  the proceedings.)

Gibbs-Cross/Kabrawala

897

1           MR. LATO:  Your Honor, it is the same person.

2           He did not disclose this to us.  I asked him

3    why.

4           In any event, he thought it was only priors.

5           I will tell you what he just told me.

6           He was arrested for driving under the influence

7    of alcohol.  It was an intoxicated charge in Manhattan.

8           He said that the case has been lowered to an

9    impaired, which is a violation.  He said the reason he

10   didn't tell us, because he said it is not a crime.  It is

11   a violation, and it is ongoing.  That is where we are.

12          MR. BODE:  Obviously, your Honor, alcohol use,

13   and especially very recently, there is a perception issue.

14          What I would ask your Honor is that he come back

15   on Wednesday and give us a chance to look at the law in

16   this area.  We didn't get this --

17          THE COURT:  You had 20 minutes.  To go through

18   his background is 10 minutes.

19          You can correct me if I'm wrong, Mr. Bode, but

20   everything he testified to, your expert said the exact

21   same thing.

22          MR. BODE:  He did opine -- the difference is him

23   opining that this wasn't open, viewed or looked at.  That

24   is what he has indicated as to his opinion testimony.

25          THE COURT:  Your expert said he could verify

898

1   that it was opened and viewed on that computer?  I don't

2   remember him saying that.

3        Obviously if you look at this -- if you do

4   research with regard to this expert, and there is

5   something you believe admissible, I will have the defense

6   call him back on Wednesday.  But I'm skeptical as to

7   whether it is necessary.

8        MR. BODE:  There are two areas of

9   cross-examination, one is his perception issues relating

10  to alcohol abuse.  He has a prior drug case and an alcohol

11  case of this year.

12       And, two -- three, actually.

13       Two is his bias toward law enforcement.

14       Three, the fact that he didn't disclose it and

15  he is trying to pass this up is quite disturbing.

16       THE COURT:  My ruling is that they are not

17  matters you can go into on cross-examination.

18       We have 15 minutes to get this done.

19       MR. BODE:  We will get the cross done.  And we

20  are asking that he be brought back on Wednesday morning so

21  if necessary we can take it up with him at that time.

22       THE COURT:  We will discuss that at 4:30.

23       MR. BODE:  Okay.

24       (Whereupon, the jury at this time entered the

25  courtroom.)

899

1          THE COURT:  Will everyone be seated.

2          Mr. Kabrawala, go ahead.

3          MR. KABRAWALA:  Thank you, your Honor.

4    Q    You work at a company called We Recover Data?

5    A    Yes.

6    Q    And among other things you are certified as a hacking

7    forensics investigator?

8    A    Yes.

9    Q    And that includes detection of malware or spyware?

10   A    Yes.

11   Q    And malware or spyware with respect to computers?

12   A    Yes.

13   Q    And we can't see them, but they secretly send data to

14   others without us knowing; is that fair to say?

15   A    Spyware, yes.

16   Q    Basically they spy on the user?

17   A    Yes.

18   Q    And malware essentially is designed to do something

19   that the user does not intend; is that correct?

20   A    Yes.

21   Q    And malware can generate or gather information?

22   A    Yes.

23   Q    Gather information from the user or the computer?

24   A    Yes.

25   Q    Such as an IP address?

900

1    A    Yes.

2    Q    And it can also gain access to private computer data?

3    A    Some malware, yes.

4    Q    And/or sensitive government computer data, if malware

5    were on a government computer?

6    A    If malware had that ability on a government computer,

7    yes.

8    Q    You were hired by the defense; is that correct?

9    A    Yes.

10    Q    Hired to examine a hard drive?

11    A    Yes, and an SD card.

12    Q    And the hard drive was seized from the defendant's

13    house, to your knowledge?

14    A    I don't know how they came into possession of it.

15    Q    Did you have get to look at the hard drive itself?

16    A    I saw what appeared to be a clone of the drive in

17    question.

18    Q    You were hired to look for the presence of illegal

19    child pornography?

20    A    Yes.

21    Q    And determine the dates of or a video on a particular

22    memory card or SD card?

23    A    Yes.

24    Q    And you were provided a forensic copy of the hard

25    drive?

901

1    A    What appears to be, yes.

2    Q    You also saw child pornography on that hard drive?

3    A    In the inbox of the account on the drive.

4    Q    You also found child pornography on the hard drive?

5    Yes or no?

6    A    In the inbox, yes.

7    Q    It is a simple question and let me try it again.

8         Did you find child pornography on the hard

9    drive?

10   A    Yes.

11   Q    Did you find approximately 30 videos of child

12   pornography?

13   A    I don't have the exact number of how many.

14   Q    More than two dozen?

15   A    Umm, I would say -- I couldn't say how many.

16   Q    You found the child pornography video on the inbox of

17   the hard drive?

18   A    Yes.

19   Q    A Microsoft Outlook Express data file?

20   A    Yes.

21   Q    And that is an email program, Microsoft Outlook

22   Express; is that correct?

23   A    Yes.

24   Q    And the email program was on the hard drive; is that

25   correct?

Gibbs-Cross/Kabrawala

902

```
 1   A    Yes.

 2   Q    You found some emails as well, didn't you?

 3   A    Yes.

 4   Q    Did you review those emails?

 5   A    I reviewed -- yes, I reviewed the emails.

 6            MR. KABRAWALA:  One moment.

 7            (Government counsel confer.)

 8   Q    You examined a Samsung SD memory card; is that fair

 9   to say?

10   A    Yes.

11   Q    And you found images of a young girl depicted on that

12   memory card; is that correct?

13   A    Yes.

14   Q    A number of them?

15   A    Yes.

16   Q    And you also found data associated with those files

17   on the memory card; is that correct?

18   A    By data, would you clarify?

19   Q    Metadata?

20   A    Metadata, yes.

21   Q    And you also found metadata with respect to the

22   creation date of those images?

23   A    Yes.

24   Q    Some of the metadata indicates the date on which the

25   child pornography images were created?
```

903

1   A    I cannot say if it was exactly the case.  It is a

2   possibility that the metadata can be manipulated.

3           (Government counsel confer.)

4   Q    Mr. Gibbs, I will show you what is marked as

5   Government's Exhibit 509, 510, 515, 516 and 517.

6           (Handed to the witness.)

7   Q    Take a look at those images, please.

8           They are redacted copies of images.

9   A    Yes.

10  Q    The data on the images says that it was created on a

11  certain date; is that correct?  The date associated with

12  the images?

13  A    Yes.

14  Q    September 10th, 2010 being one of those dates; is

15  that correct?

16  A    One of the dates on the paper, yes.

17  Q    What is the other date?

18  A    January 19th, 2011.

19  Q    Did you inspect the video camera that gave those

20  images?

21  A    No, I did not.

22  Q    Those two dates that you testified to, those are the

23  dates that appeared as the creation date of the images; is

24  that correct?

25  A    That is the date on the papers, yes.

904

1   Q    And let me show you an exhibit that you created,

2   Government's Exhibit 102 for Identification.

3            (Handed to the witness.)

4   Q    This is a document you created.  I highlighted it.

5            According to that exhibit, the images that you

6   are looking at in front of you, what were the dates of

7   that creation, their creation?

8            MR. LaPINTA:  Objection.

9            THE COURT:  Ground?

10           MR. LaPINTA:  Foundation.

11           THE COURT:  I thought this is something he

12   created.

13   Q    Did you create Government Exhibit 102?

14   A    This is -- this appears to be a printout of a file

15   listing that I generated in the case.

16   Q    Okay.

17           According to your own file listing, what was the

18   dates of the creation of the images in front of you?  Just

19   according to the data you generated?

20   A    The images highlighted here are -- have a file

21   created entry of 9/10/2010 and 1/19, 2011.

22   Q    And the same as the exhibits, the photographs in

23   front of you, is that correct?

24   A    Yes.

25   Q    Have you ever seen this camera,

905

1    Government's Exhibit 404?

2    A    I have not.

3    Q    Have you ever held it before?

4    A    I have not.

5    Q    Ever turned it on?

6    A    I have not.

7    Q    You never confirmed the date on the camera, correct?

8    A    I was not presented with this camera.

9    Q    But it was available to you?

10        MR. LATO:  Objection.

11        MR. LaPINTA:  Objection.

12        THE COURT:  Sustained.

13   Q    Are you aware that the camera was available to the

14   defense for the last six months?

15        MR. LATO:  Objection.

16        THE COURT:  Please move on.

17   Q    You never looked at the date on this camera?

18   A    I have not.

19   Q    You are just saying that it could be possible that

20   the date could be different; is that fair to say?

21   A    Umm, sir, could you rephrase that?

22   Q    Sure.

23        You are just saying in your direct testimony

24   that it could be possible that the date is unreliable?

25   A    Yes.  It is possible that the date is unreliable.

906

```
1   Q    But you never turned this camera on to see what the
2   date is on the camera?
3   A    I was never presented --
4           MR. LATO:  Objection.
5           THE COURT:  You can answer it, sir.  What were
6   you saying?
7           THE WITNESS:  I was never presented with that
8   camera.
9   Q    So your testimony that the date could be unreliable
10  is really just a theory; is that correct?
11  A    No.  It is a fact that it could be unreliable.
12  Q    It is a fact that it could be reliable or unreliable
13  is a theory?
14          MR. LaPINTA:  Objection.
15          THE COURT:  Sustained.
16          I think we can move on.
17  Q    You are being paid to testify here today; is that
18  correct?
19  A    Yes.
20  Q    $750 an hour?
21  A    My company is getting paid $750 an hour.
22  Q    You are an owner of the company, part owner; is that
23  right?
24  A    I'm not part owner.
25  Q    You get a percentage, don't you?
```

907

1   A    I get a percentage.

2   Q    You are getting paid approximately $10,000 for this

3   case; is that correct?

4   A    No.  It is a little bit less.

5   Q    You are getting paid more than that?

6   A    I said it is less.

7   Q    You are getting paid a little less than $10,000?

8   A    Yes.

9   Q    How much are you getting paid?

10  A    Approximately $9,000 for all the analysis that was

11  performed.

12  Q    So $9,000 for all the analysis, and $750 an hour for

13  testimony?

14  A    No.  $9,000 includes all the analysis that I have

15  done, plus the testimony.

16  Q    Your company is being paid over $30,000 in relation

17  to this case?

18  A    Yes.

19  Q    The defense paid you to write a report in this case;

20  is that correct?

21  A    The defense paid to have the analysis done.  The

22  report is part of the services.

23  Q    I just want to show you what is marked as -- I will

24  show you what is marked as Government's Exhibit 1,000 for

25  identification.

908

1           Is that a copy of your report?

2           (Handed to the witness.)

3   A   Yes.

4   Q   It is a printed copy of your report; is that correct?

5   A   Yes.

6   Q   The original was a PDF?

7   A   Yes.

8   Q   And you provided this report in PDF to the defense;

9   is that correct?

10  A   Yes.

11  Q   Knowing that it would go to the government; is that

12  correct?

13  A   Yes.

14  Q   And PDF is a standard kind of digital file that

15  people commonly use to send and receive electronic

16  documents?

17  A   Yes.

18  Q   PDF, like other digital formats, store data?

19  A   Yes.

20  Q   And PDFs could contain spyware or malware; is that

21  correct?

22          MR. LaPINTA:  Objection to the relevance of his

23  opinion that was solicited on direct examination.

24          THE COURT:  We can have a sidebar.

25

909

1        (Whereupon, at this time the following took

2   place at the sidebar.)

3        THE COURT:  What is the relevance?

4        MR. KABRAWALA:  Your Honor, the witness

5   implanted spyware in the PDF himself to send him

6   notifications every time the report was opened, who opened

7   it, what their IP address is.  This was all sent to a

8   government computer.

9        MR. LaPINTA:  No, it is my computer, and I sent

10  it to you.

11       MR. KABRAWALA:  Knowing it was coming to the

12  government.

13       MR. BODE:  He sent spyware.

14       MR. KABRAWALA:  He said he is conducting it in

15  an ethical manner --

16       MR. LATO:  If I understand correctly, the

17  relevance under 401 is to show that he is attempting to

18  show a corrupt file or plant a virus on the government's

19  computer?

20       MR. KABRAWALA:  No, get information, unaccessed

21  information on the government's computer.

22       MR. LATO:  He is attempting to spy on the

23  government?

24       MR. KABRAWALA:  Yes.

25       MR. LATO:  Under 403, I believe this is out.

910

1    THE COURT:  You have two minutes to cover what

2    else you have to cover.

3         I'm precluding cross-examination on this.

4         MR. KABRAWALA:  Precluding on this?

5         THE COURT:  Yes.

6

7         (Whereupon, at this time the following takes

8    place in open court.)

9    BY MR. KABRAWALA:

10   Q    I will show you on the screen in front of you what is

11   admitted as Government's Exhibit 559-A, as in Apple, in

12   evidence.

13        Let me show you 303 first -- 303-A.

14        (Handed to the witness.)

15   Q    Do you see that document in front of you?  It is a

16   two-page PDF.

17        Do you see it?

18   A    Yes.

19   Q    I will just read a portion of it.

20        (At this time a document was exhibited on

21   courtroom screen.)

22   Q    I will start reading it, you tell me if I get it

23   wrong, starting from the videos.

24        Do you see that?

25   A    I see it.

Gibbs-Cross/Kabrawala

911

1  Q    The videos you sent by cell phone camera are perfect

2  and there is no need for the expense of another camera

3  when you have done a terrific job with the cell phone

4  camera.  I have a new cell phone which allows me to

5  transfer your video to my email and the screen is bigger

6  to view.  Plus you can have endless video time per session

7  with a cell phone camera.  As far as the script, etcetera,

8  etcetera.

9              MR. LATO:  Judge, what is the question?

10             MR. KABRAWALA:  Just a moment.

11             (Government counsel confer.)

12 Q    The portion that I read, would that change your

13 opinion as to whether or not the videos were actually

14 viewed?

15             MR. LATO:  Objection.

16             THE COURT:  Sustained as to form.

17             (Government counsel confer.)

18 Q    Now I'm showing you 559 Alpha.

19             MR. LaPINTA:  Same objection, your Honor.

20             THE COURT:  Objection sustained.

21 Q    I'm showing you what is entered in evidence as

22 Government's Exhibit 559-A, as in Alpha.

23             Did you review this email?

24             (At this time a document was exhibited on

25 courtroom screen.)

912

1   A    I did not read the email, no.

2   Q    Did you see this email in the defendant's computer?

3           MR. LaPINTA:  Objection.  Beyond the scope of

4   direct.

5           THE COURT:  Sustained.

6           This whole area I will sustain objection to.

7           Do you have any questions regarding his forensic

8   analysis, I will allow it.  Not as to the content of the

9   emails or what they say.

10  Q    You didn't review the content of any of the emails

11  found on the defendant's computer; is that correct?

12  A    I did not read the emails.

13  Q    But you did find child pornography emails on --

14          MR. LaPINTA:  Objection, your Honor.

15          THE COURT:  Sustained.  Asked and answered.

16          MR. KABRAWALA:  Nothing further.

17          THE COURT:  Any redirect?

18          MR. LaPINTA:  No, sir.

19          THE COURT:  You may step down.

20          (Whereupon, the witness leaves the witness

21  stand.)

22          THE COURT:  I will speak to the lawyers for a

23  minute.

24

25

1          (Whereupon, at this time the following took

2     place at the sidebar.)

3          THE COURT:  You have one short witness?

4          MR. LATO:  Yes.

5          MR. LaPINTA:  One short direct of the witness.

6          THE COURT:  Can that witness be here Wednesday

7     morning?

8          MR. LATO:  Yes.

9          THE COURT:  I will tell the jury there will be

10    some additional presentation of the evidence and then we

11    will proceed to summations.

12         MR. LaPINTA:  Yes.

13         MR. LATO:  Yes, your Honor.

14         THE COURT:  All right.

15

16         (Whereupon, at this time the following takes

17    place in open court.)

18         THE COURT:  Ladies and gentlemen, the defense

19    has advised me they have some additional evidence to

20    present on Wednesday morning.  I don't think it will take

21    longer than a small portion of the morning.

22         We will then proceed at that point to the

23    summations, and then depending on how long that takes, you

24    will get next my instructions on the law.  And I don't

25    know how long that takes.

914

1          You may or may not start your deliberations on

2     Wednesday.

3          Sometimes jurors ask if the schedule changes

4     during deliberation, and the schedule is exactly the same,

5     9:30 to 4:30.  So that is the schedule we will be

6     following once you start your deliberations.  And we will

7     see where we stand.

8          I need to speak to the lawyers about my

9     instructions on the law on Wednesday morning.  So why

10    don't you get here at 9:45 so you are not just sitting

11    back there.  And we will continue at that point.

12         We will not sit tomorrow.  I will see you 9:45

13    Wednesday morning.

14         Do not discuss the case.

15         (Whereupon, at this time the jury leaves the

16    courtroom.)

17         THE COURT:  With respect to this witness, I will

18    not order the defense to have him here Wednesday morning.

19    If the government comes up with anything between now and

20    Wednesday morning, you can submit a letter to me.  And the

21    defense should obviously watch the ECF over the next day

22    or so, and I will give you a chance to respond to anything

23    submitted.  But it is not at this point necessary to have

24    him available Wednesday morning.  My ruling is that this

25    is not sufficiently probative of his credibility to

915

1    warrant cross-examination under 403.

2         First of all, I don't think it goes to

3    credibility.  Unless government details anything with

4    regard to the conviction -- the current one is not even a

5    conviction; it is simply a pending charge.

6         So unless the government finds something that

7    goes directly to credibility, my ruling will be the same.

8         I will also again note that his testimony, I

9    don't think -- if I compare it in my head to what he said

10   to what Mr. LaPinta crossed Detective Forrestal on, I

11   don't see any material difference between what they said.

12        So my ruling is under 403, that the

13   cross-examination that the government is proposing is

14   substantially outweighed by the danger of unfair prejudice

15   with respect to the collateral issue of this witness'

16   background.

17        The issue of the spyware, again, under 403,

18   whatever it could be with respect to that, I believe it is

19   substantially outweighed by the danger of unfair prejudice

20   getting into whatever spyware existed in the PDF, as to

21   whether it was intentional or not, in the way of trying to

22   obtain information from the government through that

23   method.  And in light of the witness' testimony under 403,

24   it is not warranted.

25        MR. BODE:  If I may, your Honor, and I'm not

**916**

 1    arguing with the Court, but I want the record to be clear,

 2    and I know defense counsel wouldn't do this.

 3          The program the witness inserted in the PDF is

 4    called We Notify.  So he actually gets email notifications

 5    when the government opens the file.  If we forward it to

 6    someone else, he knows who we forward it to.  It violates

 7    the ethics of the organization he says he is certified by.

 8    I am just wanting to put it on the record, because that

 9    behavior --

10          THE COURT:  I don't want you to think by my

11    ruling I'm not troubled by the fact -- it is obviously

12    troubling that he coded the PDF.  I am troubled by it.

13    But I have to weigh it against Mr. Valerio on trial here.

14          MR. BODE:  We accept your ruling, I just wanted

15    it on the record.

16          THE COURT:  Who is your next witness?

17          MR. LATO:  Frances Valerio.

18          THE COURT:  Any issue here?

19          MR. BODE:  I asked for an offer of proof from

20    the defense.  We requested reciprocal discovery or witness

21    statement with respect to her.

22          And going back to the time of the bail hearing,

23    Mr. LaPinta said at that time he had -- she had mental

24    difficulties, his words, not mine.

25          I want an affirmation from the defense that they

917

1    believe she is swearable, or some offer of proof, and no

2    notes or anything whatsoever.

3            THE COURT:  What is the subject matter of

4    testimony?

5            MR. LATO:  She will overcome those difficulties

6    and testify that Olena Kalichenko was in the house, and

7    that -- we will try to show the jury the possibility that

8    it was Olena Kalichenko who took the pictures of ███████

9    That she was actually there and saw her.

10           THE COURT:  Okay.

11           Obviously the government is going to cross her

12   on whatever mental difficulties she may or may not have.

13           MR. LaPINTA:  Sure.

14           MR. LATO:  Yes.

15           Consistent with your Honor's ruling, we expect

16   the government may elicit or in fact we may elicit that

17   she posted bail for her son.

18           THE COURT:  Any other issues in light of the

19   offer of proof that you anticipate?

20           MR. BODE:  No.

21           We don't have an objection to her testimony.

22           THE COURT:  Not just an objection, but I'm

23   trying to minimize sidebars.  Any areas with regard to

24   impeachment or bias?

25           MR. BODE:  If that is the limit of her

918

1    testimony, no problem.  But if she goes further than that,

2    the doors may be opened.

3              Also, Mr. LaPinta and I were speaking at the

4    lunch break with regard to the defendant's testimony.  And

5    I wanted to have it on the record.

6              THE COURT:  It is my practice for the defendant

7    to allocute with respect to his decision.  And you can do

8    that now or Wednesday morning.

9              MR. LATO:  We will best do it Wednesday morning.

10   And in light of today's testimony, we would like to

11   address it one more time in light of your Honor's inquiry.

12             THE COURT:  All right.  That will be addressed

13   Wednesday morning.

14             In terms of when everybody gets here, I think

15   9:15 should be sufficient to have the charge conference by

16   9:45.

17             MR. LaPINTA:  Yes, sir.

18             MR. BODE:  Will we have a proposed charge in

19   advance of that, your Honor?

20             THE COURT:  Yes.  We will probably post it

21   tonight.  If not tonight, then tomorrow morning.

22             MR. BODE:  Fine.

23             THE COURT:  I didn't see a verdict sheet, I can

24   make it up, but I would prefer you draft one.

25             MR. BODE:  We will draft one.

919

1       THE COURT:  And block out trial 14, in order to

2  avoid the substantial prejudice, you should return what is

3  blocked out as one through 15, your Honor.

4       MR. BODE:  That is simple.  We can give a Word

5  version.  And we will take care of that.

6       THE COURT:  Also eliminate any references of the

7  forfeiture statutes that are often in there on the front

8  page.

9       MR. BODE:  You want that out of both places, out

10  of the end and out of the caption on the caption page?

11       THE COURT:  Right.

12       MR. BODE:  We will do that, your Honor.

13       I know the Court is already thinking about it,

14  obviously, but then we won't obviously since the jury

15  doesn't know, but knock on wood, the verdict comes back,

16  we will keep the jury, or release them.  And I think the

17  parties agreed that the evidence with respect to

18  forfeiture would be in and it is a matter of doing

19  forfeiture summation.

20       THE COURT:  If there is a conviction, you want

21  it before the jury or whatever?

22       MR. LATO:  We agreed there will be no additional

23  evidence, and we would want it before the jury.

24       THE COURT:  All right.

25       Are there instructions on it?

920

1     MR. BODE:  I believe they were filed already by

2     Mr. Kabrawala.

3     MR. KABRAWALA:  Yes.  I had sent them to

4     chambers.

5     THE COURT:  On ECF?

6     MR. KABRAWALA:  On ECF and a Word version with

7     chambers.

8     MR. LaPINTA:  Do you know when they were sent?

9     MR. KABRAWALA:  I copied you on the email.

10    (Counsel confer.)

11    THE COURT:  Anything else that we need to

12    discuss today?

13    The proposed charge will be posted probably in

14    an hour or so.  It is pretty much similar to the

15    government's charge, which I checked against Sand.  There

16    are some differences there between Judge Sand, and you

17    will see it, how I did it.  Have a good night.

18    MR. BODE:  Thank you.

19    THE COURT:  See you Wednesday at 9:15.

20    I will place the ruling on Wednesday -- in terms

21    of the Rule 29 motion, I want to go back to the emails

22    with regard to the attempt.  And I need to go back and

23    look at them.

24    (Case on trial adjourned until 9:15 clock,

25    Wednesday, November 12, 2014.

921

1                <u>I-N-D-E-X</u>

2  <u>W-I-T-N-E-S-S-E-S</u>

3  R O R Y    F O R R E S T A L            737

4  DIRECT EXAMINATION             737

5  BY MR. KABRAWALA

6  CROSS-EXAMINATION              790

7  BY MR. LAPINTA

8  REDIRECT EXAMINATION           856

9  BY MR. KABRAWALA

10

11  S C O T T    G I B B S             878

12  DIRECT EXAMINATION             879

13  BY MR. LATO

14  VOIR DIRE EXAMINATION          883

15  BY MR. KABRAWALA

16  CROSS-EXAMINATION              895

17  BY MR. KABRAWALA

18

19

20

21

**E-X-H-I-B-I-T-S**

Government Exhibit 270-A was received in evidence — 738

Government Exhibit 270-B was received in evidence — 739

Government Exhibit 559-A was received in evidence — 740

Government Exhibits 503-A through 503-F were received in evidence — 747

Government Exhibits 504-A through 504-D were received in evidence — 749

Government Exhibit 551 was received in evidence — 751

Government Exhibit 552 was received in evidence — 753

Government Exhibit 552-A was received in evidence — 754

Government Exhibit 553 was received in evidence — 755

Government Exhibits 554, 554-B and 554-C were received in evidence — 757

Government Exhibit 567 was received in evidence — 758

Government Exhibit 567-A was received in evidence — 758

Government Exhibit 568 was received in evidence — 760

Government Exhibit 550-A was received in evidence — 763

Government Exhibit 564 was received in evidence — 763

Government Exhibits 505 and 507 through 539 were received in evidence — 768

Case 2:14-cr-00094-JMA   Document 148-1   Filed 06/16/17   Page 522 of 667 PageID #: 1587

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------X

UNITED STATES OF AMERICA,          :     14 CR 0094

     v.                           :     U.S. Courthouse
                                    Central Islip, N.Y.
JOSEPH VALERIO,                     :

                                    TRANSCRIPT OF TRIAL
          Defendant.         :

                                    November 12, 2014
-------------------------------X     9:30 a.m.

BEFORE:

        HONORABLE JOSEPH F. BIANCO, U.S.D.J.
               and a jury


APPEARANCES:

For the Government:    LORETTA E. LYNCH
                     United States Attorney
                     100 Federal Plaza
                     Central Islip, New York 11722
                     By: AMEET B. KABRAWALA, ESQ.
                        ALLEN BODE, ESQ.
                        Assistants, U.S. Attorney


For the Defendant:     ANTHONY LaPINTA, ESQ.
                     LEONARD LATO, ESQ.
                     35 Arkay Drive - Suite 200
                     Hauppauge, New York 11788


Court Reporter:        HARRY RAPAPORT
                     OWEN M. WICKER
                     STEPHANIE PICOZZI
                     United States District Court
                     100 Federal Plaza
                     Central Islip, New York 11722
                     (631) 712-6105

Proceedings recorded by mechanical stenography.
Transcript produced by computer-assisted transcription.


*OWEN WICKER, RPR*
*OFFICIAL COURT REPORTER*

Proceedings

924

1       M O R N I N G   S E S S I O N
2       (Case called.)
3       (Appearances noted.)
4       THE COURT:  Good morning.  Mr. Valerio is
5   present as well.
6       Before we move to the charge conference, I
7   wanted to deal with two outstanding matters from last
8   week.
9       First, with respect to the Rule 29 motion, I did
10  reserve because I wanted to go back and look at the
11  e-mails which is part of the motion Mr. Lato made.
12      I'm denying the Rule 29 motions on the record,
13  and I'll do that later because we're running a little bit
14  behind on the schedule, but I wanted to note that on the
15  record.
16      I should say, and I'll explain later, I'm
17  denying the motion.  But there is a potential multiplicity
18  problem that I think is appropriately addressed if there
19  is a conviction on both the substantive sexual
20  exploitation count, Count 2, and all the attempts.
21      Because the way Mr. Lato noted, the way the
22  Government charged it, it could be sexual exploitation
23  charges covering a several-month period of time.
24      If the jury were to convict on that and all the
25  attempts, and the Court were to sentence the defendant on

OWEN WICKER, RPR
OFFICIAL COURT REPORTER

Proceedings

925

1   both, it would potentially be punishment for the same
2   offense, which is not permissible.  But the case law
3   suggests that would be.
4       They could find the defendant not guilty of the
5   sexual exploitation count with respect to number one but
6   guilty of the attempts.  So there is a reason for it to
7   have been charged that way.
8       I think it is appropriately charged, but it does
9   create a double -- multiplicity problem if there were a
10  conviction on the counts.
11      I wanted to allocute the defendant regarding his
12  right to testify.
13      Are you prepared to have that done?
14      MR. LATO:  Yes, your Honor.  I told him this
15  morning that your Honor would be inquiring, unlike the
16  other witnesses, that your Honor inquires of the
17  defendant whether he wishes to testify, and it is his
18  right.  And we've discussed this a few minutes ago.
19      THE COURT:  You've discussed this issue
20  thoroughly with him?
21      MR. LATO:  Yes, and we've each advised him he
22  has the right to testify.  It is our advice he should not
23  testify on his own behalf.  He agrees with that.
24      And we told him your Honor would personally
25  question him on the record.

OWEN WICKER, RPR
OFFICIAL COURT REPORTER

Proceedings

926

1       THE COURT:  Mr. Valerio, it is the practice of
2   the Court to address the defendant directly on this issue
3   to make sure the defendant understands what his right is,
4   so I'll reiterate what I think your lawyer has already
5   explained to you.
6       You have a constitutional right to testify in
7   your own defense if you wish to.  Although obviously your
8   lawyers may provide you with advice regarding that
9   decision, the decision is ultimately yours.  It is not
10  your lawyers' decision whether or not to exercise that
11  constitutional right; it is yours.
12      Your lawyers indicated that they have discussed
13  this issue thoroughly with you and it is your decision not
14  to testify; is that correct?
15      THE DEFENDANT:  Yes, your Honor.
16      THE COURT:  All right.
17      Why don't I do this.  Since it is 10 o'clock
18  already -- I don't want the jury sitting back there.
19      Do you think the charge conference will take ten
20  or 15 minutes?
21      MR. LATO:  15 minutes is sufficient.
22      THE COURT:  So we did post the proposed jury
23  instructions on Monday night.  I assume both sides
24  received it.
25      MR. BODE:  Yes, your Honor, we have.

OWEN WICKER, RPR
OFFICIAL COURT REPORTER

Proceedings

927

1       MR. LATO:  Yes, your Honor.
2       THE COURT:  Before I hear any objections or
3   requests, there are two things that I wanted to note
4   myself.
5       I did leave out an instruction which I think
6   should be in there.  It was one that the Government
7   proposed dealing with request number seven.  That deals
8   with the acts and declarations of coconspirators, a Judge
9   Sand instruction, that advises the jurors how they can
10  consider coconspirators' acts and statements.
11      So I think it is an accurate carriage, it's
12  appropriate, and unless the defense has an objection, I
13  was going to include that in the conspiracy instruction.
14      Any objection to that?
15      MR. LATO:  I'm just trying to think if there
16  were any coconspirator's statement we actually introduced.
17      No objection.
18      THE COURT:  That's what I was thinking too.
19      Technically, Ms. Kalichenko's statements and the
20  e-mails would be coconspirator's statements or always
21  admissible with respect to the defendant's e-mails.
22      But there is no objection to the instruction?
23      MR. LATO:  No, your Honor.
24      THE COURT:  So I will add that.
25      The second thing is, as you can see, there is no

OWEN WICKER, RPR
OFFICIAL COURT REPORTER

Proceedings

928

1  venue instruction.  Again, I wanted to confirm with
2  defense counsel and Mr. Valerio they are not seeking for
3  the Court to have the jury make a finding with respect to
4  venue.
5          If you haven't discussed this with Mr. Valerio,
6  please take a minute to explain that to him.
7          MR. LATO:  Yes, thank you.
8          (Counsel confers with defendant.)
9          MR. LATO:  Your Honor, I've explained it to
10  Mr. Valerio, and it has nothing to do with guilt or
11  innocence, the location.  And there really is no issue in
12  this case that there were e-mails in the inbox in his
13  computer in his house.  And also there is no question,
14  based on the summations we'll deliver, that pictures were
15  taken of ▮▮▮ on Long Island.
16          THE COURT:  So he's waiving any finding by the
17  jury on venue?
18          MR. LATO:  Yes, your Honor.
19          THE COURT:  Mr. Valerio, again, Mr. Lato has
20  explained to you you have the right to have the jury make
21  a finding as to whether or not there is venue for each of
22  these counts in this district, that the crimes took place
23  at least in part for each count in this district.
24          And your lawyer has indicated that you are
25  waiving that finding, that you are not challenging the

OWEN WICKER, RPR
OFFICIAL COURT REPORTER

Proceedings

929

1  issue of venue with respect to the counts in the
2  superseding indictment; is that correct?
3          THE DEFENDANT:  Yes, your Honor.
4          THE COURT:  All right.
5          So let's move to the instruction.
6          First, let's do it by part.
7          Part one, a series of standard instructions from
8  pages 1 through 31.
9          Any objections or issues from the Government?
10          MR. BODE:  No, your Honor.
11          THE COURT:  Defense?
12          MR. LATO:  No, your Honor.
13          THE COURT:  Moving to part two, the elements of
14  the charges, pages 32 to 76.
15          Any objections or issues from the Government?
16          MR. BODE:  No, your Honor.
17          MR. LATO:  No, your Honor.
18          THE COURT:  Part three, rules regarding
19  deliberations, pages 707 through 82.
20          Any issues or objections from the Government?
21          MR. BODE:  No, your Honor.
22          MR. LATO:  No, your Honor.
23          THE COURT:  Maybe I shouldn't have given them
24  15 minutes.
25          The verdict sheet I don't think the Government

OWEN WICKER, RPR
OFFICIAL COURT REPORTER

Proceedings

930

1  put on ECF.
2          Did you post it?
3          MR. BODE:  Well, your Honor --
4          THE COURT:  Did the Government give a verdict
5  sheet to the defense?
6          MR. BODE:  And we also gave the indictment.
7          THE COURT:  I'll let you review those.  Let me
8  know when you are ready.
9          MR. LATO:  Two minutes, please.
10          THE COURT:  Sure.
11          MR. LATO:  No objection, your Honor.
12          THE COURT:  There is no objection to the verdict
13  sheet?
14          MR. LATO:  Yes, your Honor.
15          THE COURT:  Okay.  So that's the verdict sheet
16  I'll use.
17          Then with respect to the forfeiture on the
18  instructions, any issues or objections by the Government?
19          MR. BODE:  No, your Honor.
20          MR. LATO:  No, your Honor.
21          And I just -- for Mr. Valerio's benefit, the
22  jury will not even see a special verdict form or consider
23  forfeiture unless and until they convict him of other
24  counts in the indictment.
25          THE COURT:  Correct.  And any issues with

OWEN WICKER, RPR
OFFICIAL COURT REPORTER

Proceedings

931

1  respect to the Government with respect to the special
2  verdict form or forfeiture?
3          MR. BODE:  No, your Honor.
4          THE COURT:  Defense?
5          MR. LATO:  No, your Honor.
6          THE COURT:  There is no reference.  They will
7  not receive the forfeiture instructions or the verdict
8  form.  They will not be told it is an issue until they
9  have reached a verdict with respect to the counts of the
10  indictment, to see whether or not that becomes applicable
11  with respect to the conviction.
12          Then the Government has provided another
13  redacted superseding indictment.  Just so I know -- I'll
14  not compare it, but basically you took out the count.
15          MR. BODE:  Took out 14 and renumbered 15 to the
16  end, and took out the forfeiture language from the end of
17  the indictment and the caption.
18          THE COURT:  Any objection to the redacted
19  superseding indictment?
20          MR. LATO:  No, your Honor.
21          THE COURT:  To be clear in terms of what my
22  practice is, the jury will go back simply with the verdict
23  form and the superseding indictment.  Nothing else.
24          I do tell them if they want a copy of my
25  instructions they can request it by note, so they are not

OWEN WICKER, RPR
OFFICIAL COURT REPORTER

932

1    frantically trying to scribble down on their notepad
2    everything I say.  So obviously they can request it.
3            And any exhibits they request, assuming they
4    could be sent back, will be sent back; otherwise, we'll
5    bring them back to the courtroom to have them review the
6    exhibit.
7            MR. BODE:  Does your Honor give them the exhibit
8    list so they can request specific exhibits?
9            THE COURT:  It's not my practice to give them a
10   specific list.  If both sides wanted that and have them
11   described, we can do that, but it's not my practice.
12           MR. BODE:  We made a list of all the admitted
13   items, took out the exhibits marked for identification,
14   and gave it to the defense.
15           THE COURT:  It's not my practice to give them
16   one, but I usually don't send it back in the first
17   instance.
18           MR. LATO:  We'll discuss it with Mr. Valerio at
19   the lunch break.  There is no point doing it now, your
20   Honor.
21           THE COURT:  So are there any other issues with
22   respect to the charge, the verdict sheet, or anything else
23   before we deal with the defense case?
24           MR. BODE:  No.
25           I understand the defendant's witness is the

933

1    defendant's mother; relatively short.  We just need ten
2    minutes after that with respect to the closings.
3            THE COURT:  Yes.  And the Government doesn't
4    have any rebuttal evidence?
5            MR. BODE:  Until we hear from Mrs. Valerio.  But
6    until we do, your Honor, I don't think we do.
7            THE COURT:  Anything else?
8            MR. LATO:  No, your Honor.
9            THE COURT:  It's ten after ten, so I guess we
10   have ten minutes.  I'll have my deputy check the jury to
11   see if they are back there.
12           (Short recess taken.)
13           THE COURT:  The jurors are all here, so we'll
14   bring in the jury.
15           (Whereupon, the jury at this time enters the
16   courtroom.)
17           THE COURT:  If you will all be seated.
18           Good morning, members of the jury.  Good to see
19   you this morning.
20           I hope you had a good Veterans Day.
21           As you recall, on Monday we were in the defense
22   case, the defense was presenting evidence, and we'll
23   continue from that point on.
24           The defense will call their next witness.
25           MR. LATO:  The defense will call Frances

934

1    Valerio.
2            May I just get her from the hallway?
3            THE CLERK:  Yes.
4            THE CLERK:  Please raise your right hand.
5    F R A N C E S   V A L E R I O,
6            called as a witness, having been first
7            duly sworn, was examined and testified
8            as follows:
9            THE WITNESS:  Frances Valerio, F-R-A-N-C-E-S,
10   V-A-L-E-R-I-O.
11           THE COURT:  Okay, Ms. Valerio, you may be
12   seated.
13           THE WITNESS:  Right here?
14           THE COURT:  Yes.
15           THE WITNESS:  Thank you.
16           THE COURT:  If you can just pull your chair all
17   the way up and pull the microphone very close to your
18   mouth so it picks up your voice.
19           THE WITNESS:  I can turn it?
20           THE COURT:  Yes.  Just keep your voice up.
21           THE WITNESS:  All right.
22   DIRECT EXAMINATION
23   BY MR. LATO:
24   Q    What is your relationship to Joseph Valerio?
25   A    I'm his mother.

935

1    Q    Do you have any other children?
2    A    Yes, I do.
3    Q    Do you have a daughter by the name of Bernadette?
4    A    Yes, I do.
5    Q    Do you have a granddaughter?
6    A    Yes, I do.
7    Q    What is your granddaughter's name?
8    A    ███████
9    Q    Have you ever been to your son Joseph's house?
10   A    Yes, I have.
11   Q    Where is his house located?
12   A    3 High Gate Drive in Smithtown.
13   Q    Based upon your personal knowledge, how long has your
14   son lived at that house?
15   A    I believe it was 2002, 2003.
16   Q    Have you ever been to the basement of that house?
17   A    Yes, I have.
18   Q    Did you ever see any toys in that basement?
19   A    Yes, I have.
20   Q    What kind of toys have you seen in the basement?
21   A    I've seen toy items, balls.  There was a large
22   Spiderman ball, Pokemon cards, building toys.
23   Q    Did you ever see any children playing with those
24   toys?
25   A    Yes, I have.

F. Valerio - Direct/Lato

936

1  Q   Which children have you seen playing with those boys?
2  A   There was a little boy by the name of L███ that was
3  living there. L███'s mom and Joseph, they were a family
4  together. Angelique is L███s mom. Joseph and Angelique
5  were involved together, and they were living together.
6  Q   When was this?
7  A   I believe it had to have been -- because they had a
8  child together in 2009, so it was around perhaps 2005,
9  2006 and on.
10 Q   Have you ever met a person by the name of Olena
11 Kalichenko?
12 A   Yes, I have.
13 Q   Have you ever seen Olena Kalichenko in your son's
14 house?
15 A   Yes, I have.
16 Q   About how many times?
17 A   I would say about three times.
18 Q   Do you remember which year other years this was?
19 A   The year that comes to my mind is 2011.
20 Q   Have you ever seen Olena Kalichenko in the basement
21 of your son's house?
22 A   Yes. Once.
23 Q   Could you please tell the jury what you remember
24 going on in the basement that one time?
25 A   Okay. We were all in my son's basement --

Owen M. Wicker, RPR
Official Court Reporter

F. Valerio - Direct/Lato

937

1  Q   Who are "we"?
2  A   My daughter Bernadette, myself, my son, Helena. My
3  grandson, Mario, was upstairs watching TV, and Joseph was
4  taking a video of ███ with the costume on. I believe
5  it was some sort of a fairy costume, with wings or
6  something, I remember. So we were taking these pictures.
7  They were being taken.
8          Then at a certain point we had either --
9  Q   Mrs. Valerio --
10 A   I'm sorry.
11 Q   I know you are trying to be helpful to Mr. Wicker.
12 Please address the jury.
13         So please continue with what happened.
14 A   We were all downstairs, and these videos were being
15 taken of my granddaughter.
16         Then I believe it was some sort of food arrived,
17 and we went upstairs to eat.
18 Q   Stop right there.
19 A   I'm sorry. I don't know when to stop. I've never
20 done this before.
21 Q   How many persons would have been in the basement left
22 to go upstairs?
23 A   Joe went upstairs, Bernadette went upstairs, and I
24 went upstairs.
25 Q   Who stayed downstairs in the basement?

Owen M. Wicker, RPR
Official Court Reporter

F. Valerio - Direct/Lato

938

1  A   Helena stayed downstairs with ███
2  Q   When you went upstairs with the others, where did you
3  go?
4  A   We went up to the kitchen to eat whatever arrived. I
5  don't remember exactly when it was.
6  Q   At some point did ███ and Helena join you in the
7  kitchen?
8  A   Yes, they came upstairs.
9  Q   About how much after you left the basement did ███
10 and Helena join you in the kitchen, approximately?
11 A   Could have been 15, 20 minutes, something like that.
12 I can't remember the exact time.
13 Q   Were you working in September of 2010?
14 A   Yes, I was.
15 Q   Who was your employer at that time?
16 A   Massapequa School District.
17 Q   What did you do for the Massapequa School District?
18 A   I worked in the kitchen, in the cafeteria.
19 Q   Were you working on September 10th of 2010?
20 A   I couldn't have been working because it was the
21 Jewish holidays.
22 Q   Are you a widow?
23 A   Yes, I am.
24 Q   When did your husband pass away?
25 A   October 24, 2010.

Owen M. Wicker, RPR
Official Court Reporter

F. Valerio - Cross/Kabrawala

939

1  Q   Did he die suddenly or after an illness?
2  A   No, I took care of him for a year and a half in a
3  hospital bed at home.
4  Q   On days that the children were off from school, the
5  grandchildren, did they spend a lot of time with him?
6  A   Yes. He knew he was dying and wanted to see his
7  grandchildren, whether they had school or not.
8  Q   About how much time on nonschool days did they spend
9  with him?
10 A   I would have to pick them up before the aids would
11 leave at 12 noon. They would stay over. And Angelo --
12 they called him Michael Imperiale -- my son-in-law, would
13 come home at night and then take everybody home after
14 work.
15 Q   So about how many hours would the grandchildren be
16 there?
17 A   Eight, nine hours, depending.
18 Q   So that grandchild includes ███ ?
19 A   Yes.
20         MR. LATO: One moment, please.
21         No further questions.
22         THE COURT: Any cross-examination?
23         MR. KABRAWALA: Yes, your Honor.
24 CROSS-EXAMINATION
25 BY MR. KABRAWALA:

Owen M. Wicker, RPR
Official Court Reporter

F. Valerio - Cross/Kabrawala

940

1  Q   Good morning.  My name is Ameet Kabrawala.  I'm the
2  federal prosecutor in this case.
3       I'll be asking you some questions.  If there is
4  something you don't understand or if my question is not
5  clear, let me know and I'll try to rephrase it.
6  A   Thanks.
7  Q   Joseph Valerio is your son?
8  A   Yes.
9  Q   You support your son?
10 A   Yes, I do.
11 Q   You love your son?
12 A   Yes, I do.
13 Q   He is your own flesh and blood?
14 A   He sure is.
15 Q   And you've been at his court appearances?
16 A   Not really.  I know I've been waiting outside.
17 Q   You signed the bail bonds for him?
18 A   Yes.
19 Q   You are paying most of his legal fees?
20 A   That's incorrect.
21       May I expand on that?  May I explain the
22 situation?
23 Q   No, that's okay.
24       You've met Olena Kalichenko?
25 A   Yes.

*Owen M. Wicker, RPR*
*Official Court Reporter*

F. Valerio - Cross/Kabrawala

941

1  Q   Your son introduced you two, right?
2  A   Yes.
3  Q   He had met her online?
4  A   I believe he did.
5  Q   Did you ever discuss with your son that ███
6  modeled for him?
7  A   Yes, because I was present.
8  Q   And you were aware that ███ was modeling for your
9  son?
10 A   I saw her in a children's magazine once.
11 Q   ███ appeared in a children's magazine once?
12 A   Yes.
13 Q   Dressed in a costume?
14 A   Yes.
15 Q   You testified that you saw Olena Kalichenko at your
16 son's house?
17 A   Yes.
18 Q   That was in the summer of 2011?
19 A   I don't remember exactly.  I don't want to lie to
20 you.  I don't remember the exact time, but I do remember
21 2011.
22 Q   When she was there, was she carrying a tool belt?
23 A   A tool belt?
24 Q   Yes.
25 A   I don't know what a tool belt is.

*Owen M. Wicker, RPR*
*Official Court Reporter*

F. Valerio - Cross/Kabrawala

942

1  Q   A belt that carries tools?
2  A   I don't remember anything about tools.
3  Q   Does she have a power saw?
4  A   A power saw?
5  Q   A power saw.
6  A   No.
7  Q   A power drill of any kind?
8  A   No.
9  Q   A nail gun?
10 A   No.
11 Q   And did you hear any construction noises coming from
12 the basement while she was there?
13 A   No.
14 Q   By the way, you've never read any e-mails between
15 your son and Kalichenko, have you?
16 A   No.
17 Q   You weren't part of those e-mails, were you?
18 A   No.
19 Q   Now, you are aware that your daughter, Bernadette,
20 testified last week in this case?
21 A   Yes.  I was sitting outside.
22 Q   You are aware that she said for the first time that
23 she saw Kalichenko in the basement?
24 A   Yes, I am.
25 Q   And were you aware that she told a similar story to

*Owen M. Wicker, RPR*
*Official Court Reporter*

F. Valerio - Cross/Kabrawala

943

1  yours?
2       MR. LATO:  Objection.
3       THE COURT:  Sustained as to form.
4  Q   Who drove Bernadette to court that day?
5  A   I drive because my daughter is legally blind, as you
6  know.
7  Q   You drove her to court that day?
8  A   Yes.
9  Q   For her testimony?
10 A   Yes.
11 Q   You've been in the basement of your son's home?
12 A   I have, yes.
13 Q   Have you ever seen any hidden cameras in the
14 basement?
15 A   No, sir.
16 Q   Have you seen a hidden wall clock camera?
17 A   No, sir.
18 Q   Did you see a hidden camera in a platform or a stage?
19 A   No, sir.
20 Q   Now if there were any hidden cameras, is it fair to
21 say that you weren't aware of them?
22       MR. LATO:  Objection.
23       THE COURT:  Sustained as to form.
24 Q   You weren't aware of any hidden cameras?
25 A   No.

*Owen M. Wicker, RPR*
*Official Court Reporter*

F. Valerio - Redirect/Lato

**944**

1  Q   You testified earlier that you support your son?

2  A   Yes.

3  Q   That you love him, etcetera, correct?

4  A   Yes, sir.

5  Q   ████ is your grand daughter, right?

6  A   Yes.

7         MR. KABRAWALA:  Nothing further.

8         THE COURT:  Any redirect?

9         MR. LATO:  Yes, your Honor.

10  REDIRECT EXAMINATION

11  BY MR. LATO:

12  Q   Do you recall testifying a couple minutes ago that

13  you saw ████ in a magazine?

14  A   Yes.

15  Q   You remember the name of the magazine?

16  A   **I don't remember the name of the magazine, but**

17  **somehow in my mind I remember something about perhaps a**

18  **Halloween costume, but I don't remember the name of the**

19  **magazine.**

20  Q   And the picture, do you remember the picture itself

21  that was in the magazine?

22  A   **I think she had some sort of a Halloween costume on,**

23  **if I'm correct.**

24         MR. LATO:  No further questions.

25         THE COURT:  Anything further?

*Owen M. Wicker, RPR*
*Official Court Reporter*

---

Proceedings

**945**

1         MR. KABRAWALA:  Just two questions.

2  RECROSS-EXAMINATION

3  BY MR. KABRAWALA:

4  Q   You saw ████ in a magazine?

5  A   Yes.

6  Q   You don't have a copy of it?

7  A   No.

8  Q   You don't have a copy of that magazine?

9  A   No.

10         THE COURT:  Anything further?

11         MR. LATO:  No, Judge.

12         THE COURT:  Thank you, Mrs. Valerio.  You are

13  excused.

14         Mr. Lato?

15         MR. LATO:  The defense rests.

16         THE COURT:  Okay.  As you heard, the defense has

17  rested its case.  We've completed the presentation of

18  evidence.

19         I'll ask the Government if there is any rebuttal

20  case.

21         MR. KABRAWALA:  No, Judge.

22         THE COURT:  So that completes the presentation

23  of evidence.

24         The next stage of the case are the summations,

25  or the closing statements, of the attorneys.  The

*Owen M. Wicker, RPR*
*Official Court Reporter*

---

Proceedings

**946**

1  attorneys just need five or ten minutes to set up for

2  that, so I'll ask you to take a short break.

3         Don't discuss the case.

4         We'll then proceed to summations.

5         Thank you.

6         (Whereupon, at this time the jury exits the

7  courtroom.)

8         THE COURT:  Please be seated.

9         Mr. Kabrawala, let me know when you are ready.

10         (Whereupon, a recess was taken.)

11         THE COURT:  Okay.  Please be seated.

12         How long do you expect to be?

13         MR. KABRAWALA:  One hour.

14         THE COURT:  Then we'll just take a short break.

15         MR. LATO:  Thank you, your Honor.

16         THE COURT:  Maybe we'll go to 1:00.

17         How long do you think you will be?

18         MR. LAPINTA:  Probably an hour as well.

19  Probably.  Less or more.

20         THE COURT:  Okay.

21         MR. BODE:  So the Court is aware, the only

22  images that are being shown have been redacted.

23         THE COURT:  Thank you.

24         (Whereupon, the jury at this time enters the

25  courtroom.)

*Owen M. Wicker, RPR*
*Official Court Reporter*

---

Proceedings

**947**

1         THE COURT:  Members of the jury, we'll proceed

2  to the closing statements, or summations.  Let me repeat

3  what I said at the beginning.

4         The Government goes first, followed by defense

5  counsel.  And then because the Government has the burden

6  of proof at all times, the Government gets to give what is

7  called a brief rebuttal summation where the Government is

8  allowed to get up again and give some brief summations.

9         I don't know if we'll be able to complete those

10  before the lunch break or not.

11         I want to give you a couple instructions with

12  respect to the closing statements.  Again, I said this at

13  the beginning of the case; I want to emphasize it to you

14  again.

15         The closing statements, or the summations, of

16  the attorneys are not evidence.  They are argument about

17  what the evidence does or does not show.  And you are free

18  to accept or reject those arguments as you see fit, but

19  they are not evidence.

20         Second, the attorneys, during their summations,

21  may refer to certain testimony or other evidence that was

22  admitted during the course of the trial.  I just want to

23  emphasize to you that if an attorney says that the

24  testimony was X and you don't remember it being that way,

25  you remember it being Y, it's what your recollection is of

*Owen M. Wicker, RPR*
*Official Court Reporter*

**Plaintiff's Closing Argument**

**948**

1  the evidence that controls, not what an attorney says the
2  evidence was.  And if you have any question about that
3  during deliberations, you can always send out a note for
4  an exhibit or ask for read-back of the testimony.
5  The third instruction I want to give you, I do
6  allow attorneys to make reference to the law during the
7  summations.  I've gone over with them my instructions on
8  the law this morning.
9  So they may say to you, for example, I
10  anticipate Judge Bianco will tell you X about the law.
11  They are allowed to do that.  But I want to remind you, if
12  they say something about the law in their summations, and
13  when you hear my instructions on the law and it is
14  different from what the attorneys said, it is what my
15  instruction is, not what the attorney says during his
16  summations.
17  With those instructions, we'll now proceed
18  starting with the Government.
19  MR. KABRAWALA:  Thank you, Judge.
20  - - -
21  MR. KABRAWALA:  At the time of this trial, we
22  said the facts of this case are clear.  Now that you've
23  seen the evidence and heard the testimony, those facts are
24  even clearer.
25  That man (indicating), the defendant, Joseph

*Owen M. Wicker, RPR*
*Official Court Reporter*

**Plaintiff's Closing Argument**

**949**

1  Valerio, had a woman named Olena Kalichenko, who was
2  located in the Ukraine, molest her daughter on video and
3  sent the defendant those videos by e-mail.  The defendant
4  has sent dozens of e-mails to Kalichenko, and they are all
5  in evidence.
6  When you go back to the jury room, you can
7  review all the e-mails again (indicating), dozens of
8  e-mails to Kalichenko directing her to do exactly what he
9  said.
10  The evidence you've seen this arrangement
11  that the defendant and Kalichenko came to is spelled out
12  in the e-mail.  The defendant wanted custom-made child
13  pornography videos involving Kalichenko's daughter,
14  ███, a toddler.
15  You've also seen evidence that the defendant
16  sexually exploited his own ███ a young girl who was six
17  years old at the time, named ███
18  You've seen the sexually explicit pictures of
19  ███ that were taken in the defendant's own basement,
20  just miles away in Smithtown.
21  As we said in our opening remarks, this case is
22  about those two young girls that were sexually exploited.
23  That's what this trial has been about.
24  Now the law requires the Government to establish
25  the defendant's guilt beyond a reasonable doubt, and this

*Owen M. Wicker, RPR*
*Official Court Reporter*

**Plaintiff's Closing Argument**

**950**

1  summation is our opportunity to go back through the
2  evidence and demonstrate how the Government has met that
3  burden.
4  In this summation, we will set forth a timeline
5  of events and then explain how the Government has met its
6  burden beyond a reasonable doubt.
7  Now, you've heard testimony and seen evidence
8  that even before the defendant had anything to do with
9  Olena Kalichenko, even before they met, which was in the
10  summer of 2011 -- the summer of 2011 was their initial
11  e-mail exchange -- the defendant took sexually explicit of
12  his ███ ███.  That was even before the defendant met
13  Kalichenko.  The pictures of the ███ they were taken in
14  September of 2010 and January of 2011.
15  You heard Bernadette Imperiale, ███ mother,
16  testify that around 2010 or 2011, her brother, the
17  defendant, Joseph Valerio, asked to have her daughter
18  ███ model.  She testified that ███ was born in
19  January of 2005.  She's nine and a half years old today.
20  The defendant said models could make money, so
21  Ms. Imperiale let her brother take pictures of ███.
22  The modeling took place in the basement of the defendant's
23  residence at 3 High Gate Drive in Smithtown.
24  We saw in Government's Exhibit 508 -- this is an
25  image recovered from a Samsung memory card that the agents

*Owen M. Wicker, RPR*
*Official Court Reporter*

**Plaintiff's Closing Argument**

**951**

1  found at the defendant's residence.  We heard from
2  Detective Rory Forrestal.  According to the date/time
3  stamp, the data associated with these images were taken --
4  that the images were taken September 27th of 2010, and
5  this one in particular at 3:39 p.m.
6  We not only heard that from Detective Forrestal,
7  but we also heard that from the defense's witness,
8  Mr. Gibbs, whom the defense paid to testify in this case.
9  Mr. Gibbs acknowledged the same time stamp reflected what
10  was indeed reflected in the pictures.  Mr. Gibbs also
11  conceded that he never turned the camera on, never saw the
12  date/time stamp, never saw that is matched the actual
13  date.
14  Detective Forrestal, by the way, turned the
15  camera on twice, and he twice saw that the date actually
16  matched the date that -- when he turned the camera on.
17  By the way, it is undisputed, there is no
18  dispute, that the Samsung camera that was found in the
19  defendant's home, this camera, Government's Exhibit 404,
20  you know, with the black tape over it covering the
21  indicator light, that this camera made those pictures.
22  You remember where this camera was found?  It
23  was found hiding in the basement ceiling, the dropped
24  ceiling.  The FBI literally had to take the ceiling down
25  to find this camera.

*Owen M. Wicker, RPR*
*Official Court Reporter*

**952**

1    You saw the camera.  That's where the agent
2  found it (indicating).  It was in this bag.  And they
3  found the camera in that bag the second time they searched
4  the defendant's home.  They didn't find it the first time.
5    And you know who bought that camera.  You saw
6  the receipt.  The receipt was in the box.  The box was in
7  the defendant's basement -- sorry, the box was in the
8  defendant's home.  And you saw that he bought it.  Very
9  clearly, he bought it on May 7, 2010, the date of the
10  invoice, sold by QVC, addressed to and sold to Joseph
11  Valerio.
12    Guess what address?  3 High Gate Drive,
13  Smithtown, New York, a Samsung 1080p Full HD camcorder
14  with a zoom feature and a 4 GB SD card.
15    You've also seen images of ████ that were
16  found on the SD card.  This is one of the pictures.  We've
17  redacted the picture, but you saw the original, the
18  picture that is focused on a young girl's genitals.
19    And you have seen the unique pattern of the
20  furniture.  It is this pattern (indicating) that's on
21  Government's Exhibit 334 (indicating).  It's the same
22  exact person.  This was taken from a basement sofa at the
23  defendant's house.  The cushions of the sofa.
24    Ms. Imperiale also testified, and you heard
25  today from Mrs. Valerio that ████ dressed up in

**953**

1  costumes.  Mrs. Imperiale said one of the costumes was a
2  fairy costume.
3    There is the fairy costume.  The date that image
4  was created, September 10, 2010, 3:47 p.m., minutes after
5  the other picture you saw.  That is Government's
6  Exhibit 510.
7    Mrs. Imperiale also said her daughter was
8  dressed up in a cheerleader outfit.  You've actually seen
9  the outfit and the pom-poms.  That's Government's
10  Exhibit 519.  And that was created in the winter of 2011,
11  January 19, 2011, right around the young girl's birthday.
12  Right around her sixth birthday.
13    And of course you've seen that photo,
14  Government's Exhibit 511.  That's the file called cam_ 0005.
15    We've seen the metadata, the data about data.
16  We saw the metadata that that file was created January 19,
17  2011, in the evening at 6:20 p.m.
18    You've seen the ball.  You don't need to see the
19  Spiderman ball again.  It is clearly in the pictures and
20  clearly in the defendant's basement.
21    You also saw a number of other pictures,
22  Government's Exhibit 524, Government's Exhibit 528.
23    Let walk through this one.
24    Government's Exhibit 528 was in the deleted
25  space of the Samsung memory card.  What do you see here in

**954**

1  Government's Exhibit 528?  You see a black recliner that
2  Agent Troyd testified about seeing.  That black recliner
3  is in Government's Exhibit 310.  There's a picture of it.
4    You also saw Government's Exhibit 321, and you
5  saw the blonde wig, the actual wig that was recovered from
6  the defendant's basement, Government's Exhibit 338.
7    This is a sexually explicit picture of a young
8  girl.  She is naked.  No clothes on except for a blonde
9  wig.
10    Now, we submit that the evidence has been
11  established that the defendant took those sexually
12  explicit pictures of his own ████, with a camera
13  that he owned and that he took and hid in the basement
14  ceiling.
15    You've also seen a number of other cameras.  You
16  saw the hidden camera in the clock.  An agent looking at
17  this from five feet away said he couldn't see the camera.
18  It was a hidden camera, that was pointed at the sofa in
19  the basement.
20    And you also saw this stage which is too heavy
21  to manipulate at this point, Government's Exhibit 323.
22  You saw the hidden camera in it.  It's a stage, ladies and
23  gentlemen.  It has an upward-pointing camera.
24    The evidence has proven that those images were
25  taken on September 10, 2010, and January 19, 2011.

**955**

1    Now, about six months after that -- right? --
2  this is the summer of 2011, what did we find in the
3  defendant's inbox?  This is an e-mail, Government's
4  Exhibit 562, dated June 23, 2011, just past midnight,
5  12:04:00 a.m.
6    It says:  Hello, Joseph.  What are your
7  intentions?  What kind of relations are you looking for?
8  Are you currently in NYC?
9    She talks about possibly meeting.
10    What do you do for a living?
11    She invites him to ask her questions.
12    Just read the e-mail.  This is an e-mail between
13  two people who have never met each other.  They are
14  meeting online for the first time, and they are asking
15  questions that you typically ask somebody when you meet
16  online.
17    What are you looking for?  Where do you live?
18  Where do you work?  What do you do for a living?  Do you
19  want to meet?
20    This is not an e-mail between people who know
21  each other or who know where each other live, for that
22  matter.
23    Then we saw Government's Exhibit 20.
24    Now, Government's Exhibit 562 is an e-mail from
25  June 23, 2011.

Plaintiff's Closing Argument

956

1    Government's Exhibit 20 is a travel record for
2  Olena Kalichenko.  And you heard the customs and border
3  protection officer testify about this.  It's a record of
4  anyone coming in and anyone leaving the United States.
5         What does it say?  It says:  Arrival date,
6  September 2, 2011.  So that's a few months after.  They
7  talk, they exchange e-mails, and then a few months later
8  she is coming to visit him.
9         Where does she stay?  She stays at his address,
10  3 High Great Drive, Smithtown, New York.  She spends over
11  a month with him, and she leaves on October 26, 2011.  She
12  is at his house presumably from September 22, 2011, for a
13  little over a month.  This is the fall of 2011.
14         When were the pictures of ██████ taken?  At this
15  point they were taken in September of 2010.  This is
16  almost a year later that she comes to his house.
17         Now, you see the e-mail.  She has visited him,
18  Kalichenko has visited the defendant, December 2, 2011.
19  This is Government's Exhibit 561.  I feel as well █████
20  baby age is good too, so we are past the torturous waking
21  up hours.
22         What are they talking about?  They are talking
23  about making a life together.  He says he wants to promise
24  her a ring.  He wants total devotion.  They are talking
25  about getting their lives together, potentially being a

*Owen M. Wicker, RPR*
*Official Court Reporter*

Plaintiff's Closing Argument

957

1  father to ████.  And he says, I'm a great father and man
2  who is very protective with love to my loved ones.  Not to
3  the point of control, no.
4         In the same e-mail -- this is December of
5  2011 -- what does he say at the end?  Sure would like to
6  see some pictures.
7         They start talking about pictures.
8         Now, by the next month the defendant takes
9  things in a very different direction.
10         January 22, 2012, right?  That's about a month
11  after of the e-mail we just saw, Government's Exhibit 557.
12  You can read this.  I don't need to read this again.  He's
13  directing her to do very specific things with her
14  daughter, telling her where the daughter should place the
15  kid's toys.  He's telling her if he doesn't see this
16  stuff, I'm going to drop you in the streets.  That's how
17  he's talking to this woman.
18         That is January.
19         The very next day, the defendant sent another
20  e-mail January 23rd.  It says:  I have plans for you over
21  here, seeing how sexually charged you are in those videos
22  with ████  He says:  The videos are getting more
23  creative by you with ████ and how you incorporate the
24  toys.
25         Then again he spells out exactly what he wants

*Owen M. Wicker, RPR*
*Official Court Reporter*

Plaintiff's Closing Argument

958

1  to see.  He says, I'll send out some money.
2         Now, ladies and gentlemen, this e-mail,
3  Government's Exhibit 558, January 23, 2013, is one of
4  eight attempt charges that the defendant is charged with.
5         The Judge will instruct you what an attempt is,
6  and the Judge's instructions control, as the Judge said.
7  Nothing I say should lead you to think otherwise.  I'm
8  simply offering some general explanation.  I'll simply
9  offer some general explanation on the law.
10         With respect to the attempted sexual
11  exploitation of a child charge, eight of them, that simply
12  means that the defendant took some substantial steps to
13  sexually exploit the child.  And we submit that the
14  substantial step was the e-mail where he scripts out
15  exactly what he wants to see.
16         Now the payment of money is not required as a
17  substantial step, but we submit that it is evidence that
18  he was serious about his intention.  He says, give me the
19  videos, and I'll send you some money (indicating), right?
20  That's a substantial step.
21         There are eight attempt charges in addition to
22  many other charges, and we'll talk about those later.  But
23  I wanted to flag that for you now because we'll be
24  discussing the attempt charges as we go through the
25  e-mails.

*Owen M. Wicker, RPR*
*Official Court Reporter*

Plaintiff's Closing Argument

959

1         Now, he says he'll send some money.  Of course,
2  January 24th, the same day, you see money go out from
3  Joseph Valerio to Kalichenko in Sevastopol, Ukraine, $150.
4         Government's Exhibit 559, January 24th, this is
5  just the same day now.
6         This is one of the particularly graphic e-mails,
7  right?  Again, he's scripting out what he wants to see,
8  but in this one he says:  It is me you see; it's me you
9  hear.  It's me who touches you through █████
10         Then he goes on.  He says how he wants her to
11  film it, as if he's a director, right?  He wants sort of
12  point-of-view images.  He says:  Film her from many
13  angles.  Let her explore.  Make it count.
14         Then he says -- this is the MTCN number.  We
15  know what that is.  You heard that from the Western Union
16  representative, Charlie Johnson, a unique tracking number
17  associated with each wire transfer done through Western
18  Union.
19         January 24th, again, another e-mail, all
20  recovered from the defendant's computer.  Try to resend
21  those videos from yesterday.
22         And he has movie file names.  And you heard from
23  Detective Forrestal that MOV is a movie file.  He says,
24  very nice one's with you and ████
25         He says, great job.  Right?

*Owen M. Wicker, RPR*
*Official Court Reporter*

**960**

1    And then he says:  You can use the cell phone
2 camera with one hand, grab your tits with the other, and
3 from your eye view down to your sweet pussy, you will be
4 recording ███.
5    He's showing her how to hold the camera, very
6 specific in his demands.
7    Then what does he say?  This will be like a
8 French short film.  We'll come up with a title.
9    All right.  So now we're up a couple months to
10 March 15, 2012.
11    He says -- Government's Exhibit 208:  When I
12 look back at the videos you made of you and ███
13 together, I said to myself, this can be very good if she
14 can comply to my demands and not challenge them.
15    Okay.  The bottom line is that you'll have to do
16 all I ask you to.
17    If he doesn't intend her to make videos, why
18 would he say that?  Why would he say, you have to do all I
19 ask you to?
20    He very clearly intends for these videos to be
21 made and e-mailed to him.
22    This is another e-mail.  It is also charged as
23 an attempt.  It is from March 28, 2012.  Again, you can
24 read the e-mail.  They are all in evidence.  You can ask
25 for them.

**961**

1    He says:  Yes, of course it is good to see
2 little ███ growing up nice and firm.  Of course, being
3 that I have control over ███, I want to see her in
4 blonde, long hair, and as for you.  Right?
5    Then he says -- describes what he wants.  I will
6 send out $100.  To who and where do you want me to send
7 it?
8    Now, in Government's Exhibit 211, Mr. Egan,
9 Robert Egan from Cablevision, testified about the IP
10 address, internet protocol address.  You remember what he
11 said.  This IP address beginning in 2004, that could only
12 have been sent from the tristate area.  Could not have
13 originated from abroad or even outside of the tristate
14 area.
15    And by the way, Government's Exhibit 211
16 mentions long blonde hair.  Does that sound familiar?
17    (Indicating.)
18    April 4, 2012, this is a few days later.  This
19 is another attempt to charge.  What does the defendant
20 say?
21    Listen, Helena, I'm glad to see the smile on
22 your daughter's face from the gift she got from the money
23 I sent.
24    Then he says what he wants to see on video
25 (indicating).  He says:  There is a price for everything.

**962**

1 Do the videos with ███ the way I want.  This is all the
2 preparation you will need here in NY with ███, so it's
3 best that you get used to it.
4    That's an attempt charge (indicating).
5    How do you know he's serious?  Look at his
6 language.  There it is, in all caps.
7    By the way, look at the date of that e-mail,
8 Government's Exhibit 560.  April 4, 2012, e-mail.  Right?
9    Look at the next e-mail, two days later,
10 Government's Exhibit 564.  This is to Angelique Davidse.
11 You heard about Angelique today.
12    What does the defendant say?  Happy third
13 birthday, Alexa.
14    She's the defendant's daughter who lives in
15 South Africa with her mother.  Love and kisses always from
16 daddy.
17    He calls ███ ███'s sister.  Grandma
18 Bernadette, cousins Mario and ███.
19    Does that sound familiar?  This is the
20 defendant's own e-mail account he's sending two days after
21 he sent Government's Exhibit 560.
22    Now, Government's Exhibit 216.  This is the same
23 month, April of 2012.  What does the defendant say?
24    Helena, I looked at your videos.  I'll give you
25 credit for some.

**963**

1    "I looked at your videos."  He's seen the
2 videos.  He asks for them; he gets them.  He asked for
3 more, gets more.  He paid money.
4    What does he do that day?
5    Government's Exhibit 332, the summary chart from
6 Western Union -- sorry, he doesn't do it that day.  Two
7 days later.
8    What does he do?  He sends money.
9    Now, later that month, Government's Exhibit 556,
10 this is an e-mail from Olena Kalichenko to the defendant.
11 Tracking number is -- this is in reference to a DHL
12 package, ends in 6006.
13    She says:  I have made a copy of the disk just
14 in case.
15    Then she talks about it in the next paragraph,
16 things that she wants to buy herself.  I want to buy
17 myself a new Nokia phone.  It's a better camera and can be
18 connected -- and it says:  I will be able to send you
19 videos from my new cell phone cam directly to your e-mail.
20 We'll make plenty of videos for you from the new phone.
21 Passionate kisses, Helena and ███.
22    DHL package tracking number that's in the
23 e-mail, it's right here (indicating).  That's April 27.
24 Well, you saw the packing slip.  It's the same tracking
25 number from Kalichenko, that's Olena Kalichenko, to

1    Sevastopol, Ukraine.  DVD disk, the contents.
2            Where is it addressed to?  Joseph Valerio,
3    3 High Gate drive, Smithtown, New York.
4            What is the date?  April 26, 2012.
5            Now, how do you know if this is the defendant's
6    e-mail?
7            How do you know that he's using his e-mail
8    account?
9            Well, you saw the e-mails from April that we
10   just went through.
11           What happens on April 25, 2012?
12           Government's Exhibit 567.  This is an estimate
13   for landscaping.  It starts off by saying:  Hi, Joe, it
14   was a pleasure meeting you yesterday.
15           And there's a landscaping bill.  You heard
16   testimony it was a landscaping estimate for over $7,000.
17   That's how you know the defendant is using his e-mail
18   account.
19           Of course you know it is an e-mail account that
20   is registered to the defendant, or at least somebody with
21   the same name and address as the defendant.
22           What does 200-A say?  That was introduced by
23   Mr. Egan.  Cablevision provided these records in response
24   to a subpoena from the Government.
25           200-A says:  Information for an e-mail address

1    joeval5@optonline.net.
2            Who is the subscriber?  Joe Valerio.
3            What is his address?  3 High Gate Drive,
4    Smithtown, New York.
5            There's even a phone number.
6            This was a Cablevision subscriber from August
7    23, 2002, to March 19, 2014, about 12 years.  And you also
8    heard that thousands of dollars were paid to maintain this
9    account over that 12-year period.
10           Now, if there is any doubt that this is the
11   defendant's e-mail address, you also saw records from
12   Western Union where each of the transactions -- that the
13   Western Union records say that the person with the same
14   exact name, home address, telephone number and e-mail
15   address sent over $12,000 to someone named Olena
16   Kalichenko in Ukraine and sometimes in Turkey.  These are
17   all joeval5@optonline.net.
18           Why?  Because the defendant asked for videos,
19   paid money for the videos, got videos and asked for more.
20           Now, how else do you know that it is the
21   defendant sending e-mails?
22           This is an e-mail from Joe Valerio to Elena
23   Kalichenko dated July 3, 2012.  What do they talk about?
24           He says he has a family time-share at Gurney's
25   out in Long Island; that he was in Brighton Beach; that

1    he'll think of Kalichenko.
2            What is the date of this?  July 3, 2012, the day
3    before Independence Day, the 4th of July.  That is
4    somebody who lives in the United States.  That's not
5    someone logging into his account in Ukraine.  That is
6    someone who is local, but you that you see that in
7    Government's Exhibit 225, a July 12, 2012 e-mail, you see
8    that the defendant -- he says:  You and I split our times
9    in Smithtown and the Hamptons, of course, and ███████
10           And he goes on to say:  I closed the business
11   deal.  He's talking about properties in Nassau County, in
12   Brooklyn, Suffolk County, homes and buildings.  He has
13   homes in Smithtown and Hamptons, jointly owned co-op, and
14   a time-share in Montauk.  All in New York.
15           He's so local and so plugged in that he knows
16   real estate values.  He's talking about real estate values
17   in Queens and Staten Island.  This isn't somebody who is
18   hacking into his account from overseas.  This is the
19   defendant writing these e-mails and talking about all his
20   properties.
21           And we submit the defendant is bragging about
22   everything he does and all of his business opportunities
23   and homes in the Hamptons and Smithtown and Montauk.  He's
24   bragging.
25           Why is he bragging?  Because he wants those

1    videos with ███████.  He wants to impress Kalichenko
2    because he's going to keep her tethered.  And he'll send
3    her money, and she'll make videos, and he'll ask for more.
4    He even says:  It can easily be sent to my e-mail address
5    after filming.
6            Now, again, these are all more e-mails showing
7    that the defendant lives in the United States, not abroad.
8    He's asking her in Government's Exhibit 210 -- telling
9    her, when you arrive in the US -- right?  He knows she's
10   abroad too.  Because when you arrive back in Istanbul,
11   Turkey.  Sending her money from New York to Turkey, to
12   Ukraine.
13           He says:  Where do you want the money wired to?
14   When you are back home in the Ukraine?
15           Now, that brings us back to Government's
16   Exhibit 205.  This is the July 16, 2012, e-mail.
17   Midsummer 2012.
18           Now, July 16th and July 22, 2012, they are all
19   contained within Government's Exhibit 205.  They are both
20   separately charged as attempts.
21           You heard from Special Agent Steven Troyd of the
22   FBI that the defendant confessed to sending both of these
23   e-mails when they met with him in his house.  Not only did
24   the defendant confess to sending those 2-E-mails in July
25   of 2012, but Detective Rory Forrestal conducted forensic

1  examinations of the defendant's computer, a computer that
2  was seized from the defendant's house, and he recovered
3  child pornography.  That's the computer that's in evidence
4  as Government's Exhibit 400.  And the hard drive found in
5  the computer is in evidence as Government's Exhibit 401.
6      Let's briefly talk about the July 16th e-mails
7  and why they are attempts.
8      In this one he literally says, literally says:
9  As far as the script, do the same with our ███
10  delicious little pussy, you know, in the tub, the way you
11 would eat her so sweet.  Of course panty hose and tights.
12     That's the same language that Agent Troyd read
13 to the defendant during his confession.  And we'll return
14 to that later on.  But that's the same exact language that
15 the defendant acknowledged that he sent.
16     He even talks about instructing Kalichenko on
17 what to do.
18     What does he say at the end of the e-mail?  Get
19 those videos done.
20     July 22nd, again -- this is Government's
21 Exhibit 205.  This is another e-mail that the defendant
22 admitted sending:  Do you actually think it is about the
23 videos you agreed to do with your daughter?  You are
24 crazy.  The main reason I'm giving you this chance to come
25 and build a life here is because you and ███ offered me

1  something different that my other girls don't have and
2  can't supply to me now.  So it is you that fits that
3  equation.
4      Later on in that e-mail, what does he say?  I
5  was actually able to see some girls come in their panty
6  hose.  Speaking of which, I want to see more of you and
7  ███.
8      Then he says what he wants ███ to do.  He
9  says he wants her to be dressed in tights.
10     Does that sound familiar?
11     You've seen the tights.
12     Try to get this all done -- sorry.  Try to get
13 this to me all by tomorrow.
14     Now, with respect to Government's Exhibit 205,
15 July 22, 2012, e-mail, you also saw an e-mail header.  You
16 remember what an e-mail header is, right?
17     Robert Egan of Cablevision said it is data that
18 is behind the e-mail.  Shows where it was sent from, the
19 IP address it was sent from.
20     What did Mr. Egan testify about this particular
21 e-mail header?  It was an IP address that started with 69.
22     Again, Mr. Egan testified that this e-mail could
23 only have been sent from the tristate area.  Couldn't have
24 been sent from abroad.
25     By the way, you also saw this e-mail.  It is

1  actually from March 18, 2013, Government's Exhibit 245.
2  This is -- this has nothing to do with Kalichenko.  This
3  is an e-mail from the defendant to his son Andre, talking
4  about Islanders tickets.  I believe they were hosting the
5  Canadians that night.  Order for Joseph Valerio.
6      Again, it is an order that was sold to
7  joeval5@optonline.net.  He even says to his son what his
8  e-mail address is, as if there were any questions that the
9  defendant's e-mail address is joeval5@optonline.net.
10     And remember the IP information for that e-mail?
11     Mr. Egan testified that the IP address for that
12 Ticketmaster e-mail is 69.118 IP address.
13     Guess what?  That's the same IP address as the
14 July 22, 2012, e-mail that the defendant scripted out and
15 sent to Kalichenko.  And he admitted that he sent it.
16 Same IP address.  A domestic IP address.  It's not only
17 that, but an IP address from the tristate area.  Because
18 Cablevision doesn't operate outside of the tristate area.
19 You heard that testimony.
20     That brings us to the videos.  We were
21 progressing through the summer of 2012.  You just heard
22 about the July 22, 2012 e-mail.
23     Well, July 23, 2012, this was an e-mail found on
24 the defendant's computer attached to which there was child
25 pornography videos of ███ and her mother.  Just like

1  the defendant asked, right?
2      (Indicating.)
3      In the e-mail from July 23rd, Joseph Valerio,
4  joeval5@optonline.net, is talking about an MTCN number.
5  He says:  You indicated that you have more videos to send
6  via e-mail.
7      Again, what is the MO, right?  Ask for; pay for;
8  get more.
9      By the way, you get the correct spelling of
10 ███ name in this e-mail.  Ms. Kalichenko says:
11 Regarding ███ adoption, make sure you spell her name
12 right.  ███.  And she says, ████
13 There's not two ███ just a misspelling of
14 her name.
15     Guess what?  The day that the defendant gets
16 these videos he's been asking for, he sends Kalichenko
17 $900, according to Government's Exhibit 322.  $900.  That
18 is the most that the defendant had paid Kalichenko to
19 date.
20     Why did he pay her so much?  You saw, he just
21 got the videos.
22     Progressing into the fall.  Again, gets the
23 videos; wants more.
24     Government's Exhibit 229, 9/6/12.  What does he
25 ask for?  More videos with you and ███.  He says:  Hmm,

**Plaintiff's Closing Argument**

**972**

1  I do enjoy, and soon you can bring her little more mature,
2  recognizing that she is a very young child.  She's a
3  toddler.  Soon she'll grow up, and you will continue to
4  make videos for me.
5  　　　　What does he say in the same e-mail,
6  Government's Exhibit 229?  He wants to see the "usual
7  videos of you and sweet ▇▇▇▇."  He wants her to do
8  certain things that is spelled out in the e-mail that I'll
9  not repeat.
10  　　　　What does he do that day?  An MTCN.  We know
11  what that means.  That's money.  How much?  $1,000.  That
12  e-mail, September 6th, is an attempt charge.
13  　　　　MR. LAPINTA:  Objection.
14  　　　　THE COURT:  Overruled.
15  　　　　MR. KABRAWALA:  What happens the very next day?
16  This is an e-mail found on the defendant's
17  computer.
18  　　　　What happens the very next day?  Western Union
19  pickup notification, Government's Exhibit 551.  Just like
20  the defendant said in his e-mail, Government's
21  Exhibit 229.  The very next day, money is sent.  How much?
22  The exact amount that is spelled out in the e-mail.
23  　　　　By the way, it is also the same MTCN number.
24  　　　　$1,000.  That was the most he had paid her to
25  date.  You saw her paid her 900 on July 23, 2012.  Well, he

*Owen M. Wicker, RPR*
*Official Court Reporter*

---

**Plaintiff's Closing Argument**

**973**

1  pays her more.
2  　　　　What happens in September?  Continues to send
3  her e-mails, Government's Exhibit 230.  How are you doing?
4  I hope ▇▇▇ is doing much better now.  I knew somehow
5  she just had a cold.  I'm sure it is just a change of
6  temp, T-E-M-P.
7  　　　　What does he say in the same e-mail?  I need to
8  see results.  And when your daughter is fine and you are
9  prepared, I need to see videos e-mailed to me of you and
10  ▇▇▇.
11  　　　　She's sick.  And when she's all better, make
12  sure you get me the e-mails, the videos.
13  　　　　September 27th.  Again, this is the fall of
14  2012.  What does he say?  Government's Exhibit 2.  This
15  was an e-mail that Kalichenko provided to Special Agent
16  Angelini while he was stationed in Kiev, Ukraine.
17  　　　　He says:  Your daughter is supposed to be sick.
18  He says:  Listen.  What are you doing e-mailing?  Why the
19  fuck are you writing mails at 9:30 when your daughter is
20  supposed to be sick?  Are you starting to be a sneaky
21  bitch again?  I'm asking you now, what the fuck do you do
22  all day?  And you have produced nothing for me.
23  　　　　He then goes on to say:  Each morning and night
24  you will send me a cell phone video of you waking up with
25  your daughter, with your tits in her mouth, etcetera,

*Owen M. Wicker, RPR*
*Official Court Reporter*

---

**Plaintiff's Closing Argument**

**974**

1  etcetera.  And if I don't see this each day, I will drop
2  you on your ass.
3  　　　　Does that sound familiar?
4  　　　　This is all caps.
5  　　　　September 22 is Government's Exhibit 2, right?
6  Very serious about his requests here.  Very clear
7  language.
8  　　　　What happens three days later?  He gets the
9  videos.  He asks for them; he gets them.
10  　　　　This was an e-mail of September 30, 2012,
11  Government's Exhibit 503-G as in golf.  Subject:  Videos.
12  Attachments.  We saw them.
13  　　　　What happens two days later?  More videos.
14  Again, found on the defendant's computer.
15  　　　　504-E as in echo.  These videos were found on
16  the defendant's computer.
17  　　　　Mr. Gibbs testified as much.  The defendant's
18  own witness.
19  　　　　I want to bring you back to the beginning of the
20  trial.
21  　　　　The defendant has no burden of proof whatsoever.
22  His counsel gave an opening statement, and the defendant
23  doesn't have to testify.  The Judge reminded you of that
24  several times.  But remember what defense counsel said.
25  　　　　They seized all of Mr. Valerio's computers, all

*Owen M. Wicker, RPR*
*Official Court Reporter*

---

**Plaintiff's Closing Argument**

**975**

1  the hard drives, the CD, DVD, imagery cards, all type of
2  memory media the FBI ceased.  And what of the toddler in
3  the video in the Ukraine?  It's highlighted.  Not on any
4  of the computers, any of the hard drives or any of the
5  media.
6  　　　　What did Mr. Gibbs say?  The defendant's own
7  witness?
8  　　　　Question:  Did you find child pornography on the
9  hard drive?
10  　　　　Answer:  Yes.
11  　　　　It's a very simple answer.
12  　　　　Now, the opening statement, and the actual
13  evidence (indicating).
14  　　　　Now when agents came to the defendant's house on
15  January 28, 2014, that was about eight weeks after
16  Kalichenko warned him in text messages, Viber text
17  messages, that the FBI was coming for him.
18  　　　　The defendant voluntarily gave a statement after
19  he was Mirandized, provided his rights.  Signed away his
20  rights, and he sat there and he told the agents, admitted
21  to the agents that he sent the e-mails, both of which he
22  is charged with crimes.  He scripts out how he wants
23  Kalichenko to molest this child on video.
24  　　　　He admitted he received those videos by e-mail,
25  and he offered an explanation as to why he did it.  He

*Owen M. Wicker, RPR*
*Official Court Reporter*

**Plaintiff's Closing Argument**

**976**

1 said:  I had paid Kalichenko thousands of dollars, and I
2 wanted something in return.  I want videos of child
3 pornography, of her molesting her daughter in return.
4 The evidence has shown both the defendant and
5 Kalichenko, his coconspirator, got exactly what they
6 wanted.  The defendant got videos, plenty of them, and he
7 paid for them.  Kalichenko got money.
8 Now let me turn to the charges.
9 As to ████, the Ukrainian toddler, the
10 defendant is charged for his conspiracy with Kalichenko to
11 sexually exploit the toddler.  He has been charged with
12 child exploitation, transportation of child pornography,
13 receipt of child pornography, and also the various attempt
14 charges.  The Judge will go over this again with you in
15 greater detail.
16 As I said, nothing I say about the law should
17 trump what the Judge says.  The Judge will instruct you
18 more specifically on the law, but I'll just offer some
19 general explanation about the charges.
20 Now with respect to the acts, the defendant's
21 acts involving his ████ he's charged with sexually
22 exploiting the child, and the defendant is also charged
23 with possessing child pornography involving both of the
24 young girls.
25 Let's talk for a minute what it means to

*Owen M. Wicker, RPR*
*Official Court Reporter*

**Plaintiff's Closing Argument**

**977**

1 sexually exploit a child under the law.
2 Stated simply, it is illegal to use a minor to
3 engage in sexually explicit conduct for the purpose of
4 providing a visual depiction of that conduct.  Let me say
5 it again.  It is illegal to use a minor to engage in
6 sexually explicit conduct for the purpose of making a
7 visual depiction of that conduct.
8 We submit that is exactly what the defendant has
9 done.  And that is exactly what he is guilty of.
10 With respect to the sexual exploitation of
11 ████, the Ukrainian toddler, the Government can meet its
12 burden of proof beyond a reasonable doubt by showing that
13 the defendants aided and abetted someone else.  In this
14 case, that someone else is Ms. Kalichenko.  And the
15 evidence against the defendant is overwhelming.
16 There are three major elements to prove that a
17 crime of sexual exploitation of a child has taken place.
18 I'll go over them generally and then in more detail.
19 First, the victims.  Here it is the Ukrainian
20 toddler name ████ and the child here name ████.
21 The Government must establish beyond a
22 reasonable doubt that those children are real children
23 under the age of 18 years old at the time of the offense.
24 Second, the Government must prove that the
25 defendant used a minor in a sexually explicit conduct for

*Owen M. Wicker, RPR*
*Official Court Reporter*

**Plaintiff's Closing Argument**

**978**

1 the purpose of producing a visual depiction of that
2 conduct.
3 Third, the Government must show there is a link
4 to interstate or foreign commerce.
5 Let's take each of these elements in turn.
6 With respect to the first element, there is
7 really no dispute that ████ is a real toddler.  You've
8 seen the videos and the pictures.  You've read the
9 e-mails.  The videos and the pics show a real person, and
10 that real person was a toddler, somewhere between the ages
11 of two and three.
12 Again, she is a minor, under 18.  She is
13 somewhere between two and three.  Whether she is two or
14 three, it's really academic at that point.  She's a
15 toddler.  You can see her in the pics.  You can hear her.
16 Now, you also know that ████ is a real child.
17 Her grandmother came and testified.  Her mother came and
18 testified.  This is a real person born in ████.
19 You've seen her pictures, and you've heard from Special
20 Agent Troyd from the FBI that he has actually seen ████.
21 Second, the Government must prove that the
22 defendant used these two minors to engage in sexually
23 explicit conduct for the purpose of producing a visual
24 depiction of that conduct.
25 I'll break that down.

*Owen M. Wicker, RPR*
*Official Court Reporter*

**Plaintiff's Closing Argument**

**979**

1 The Government has to prove that the defendant
2 used ████ and used ████ for the purpose of providing
3 or transmitting a visual depiction of them engaged in
4 sexually explicit conduct.
5 How do you know that the defendant acted with
6 this purpose?
7 Well, with respect to ████, you've seen the
8 dozens upon dozens of e-mails where the defendant scripts
9 out exactly what he wants Kalichenko to do with her young
10 daughter.  You've seen some of them again today, and they
11 are all available to you again in that big binder.  Just
12 ask for it if you want to read them again.
13 How do you know that the defendant acted with
14 this purpose with the defendant ████, the ████?
15 Look at how he dressed her up and how he
16 undressed her.  In some of the pictures the camera is
17 focused only on her genitals, and in some of the pictures
18 she's wearing lace tights, and she is shot from behind,
19 from the bottom down.  And in one of the pictures she's
20 dressed in a blonde wig and nothing else.
21 How do you know that the videos and images
22 you've seen are a minor engaged in sexually explicit
23 conduct?
24 Well, you'll hear the law and what the
25 definition is under the law what constitutes sexually

*Owen M. Wicker, RPR*
*Official Court Reporter*

Plaintiff's Closing Argument

**980**

1  explicit conduct.  And after hearing the Judge's
2  instructions in that regard, we submit to you that you
3  will find there is no doubt that the girls were engaged in
4  sexually explicit conduct.
5       One of the definitions of sexually explicit
6  conduct is actual or simulated sexual intercourse.  Sexual
7  intercourse, including oral to genital contact or
8  masturbation.
9       With respect to ███ the Ukrainian toddler,
10 you've seen the videos.  The videos show Kalichenko
11 actually performing oral sex on the toddler.  They also
12 show Kalichenko using the toddler's foot to masturbate
13 herself.
14      You also saw a video of Kalichenko -- you also
15 saw a video of the toddler using a toy to masturbate her
16 mother, Kalichenko, and a toy to masturbate herself.
17      So we submit to you that that is very clear
18 evidence of sexually explicit conduct.
19      What is another definition?  You'll hear the
20 Judge say this.  Sexually explicit conduct also includes
21 lascivious exhibition of the pubic area of a person.
22      Lascivious.  What does that mean?  That it shows
23 the genital or pubic area of a child in order to excite
24 lustfulness or sexual stimulation of the viewer, or where
25 the focal point is the child's genital or the child is

*Owen M. Wicker, RPR*
*Official Court Reporter*

---

Plaintiff's Closing Argument

**981**

1  depicted in a sexually suggestive manner.
2       Again, you've seen the images of ███  They
3  speak for themselves.  The focal point in one of the
4  images is just her vagina, just her genitals.  You've seen
5  her dressed up in a stocking and wig and shot from behind.
6       Is there any doubt that defendant's e-mails to
7  Kalichenko demonstrate his sexual interest in such things
8  as blonde hair and panty hose and tights and stockings?
9       Third, the Government has to show there is a
10 link to interstate commerce or foreign commerce.  The
11 Government can show this link in several different ways,
12 and you need only find proof beyond a reasonable doubt on
13 this element in one way.  You don't need to find it among
14 every single method of proving it.
15      With respect to ███, the simplest way you can
16 find the defendant guilty on this element is that the
17 images were transmitted through the internet, sent by
18 e-mail.  You've seen the e-mails found on the defendant's
19 computer.
20      Second, the device on which the images were
21 created or stored were manufactured outside of New York,
22 right, and the Government has proven that.
23      You saw the hard drive itself, this hard drive,
24 Government's Exhibit 401.  Where does it say it was made?
25 Do you remember that?  Malaysia.

*Owen M. Wicker, RPR*
*Official Court Reporter*

---

Plaintiff's Closing Argument

**982**

1       You saw with respect to ███ -- you've heard
2  testimony that the Samsung digital camera was assembled in
3  China, and you've also heard testimony that the SD card,
4  the Samsung memory card, was made in Korea.
5       So again, the Government has satisfied those
6  elements.
7       Based on all of the evidence, we submit that the
8  Government has proven Count 2, which is sexual
9  exploitation of the Ukrainian toddler ███, and Count
10 14, which is sexual exploitation of ███, the
11 defendant's ███.
12      Now, Count 3.  I want to talk about that very
13 briefly.
14      Count 3 charges sexual exploitation of a child
15 outside the United States.  It's a stand-alone charge
16 where a child is exploited outside the United States.
17      In addition to the three elements I just talked
18 to you about, the Government has to prove the fourth
19 element, and that fourth element is that the defendant
20 intended for the sexually explicit depiction to be
21 transported from a place outside of the United States to a
22 place inside the United States.
23      It is very clear that the Government has proven
24 that.  We've read all the e-mails.  On numerous occasions
25 the defendant mentioned that he wants Kalichenko to send

*Owen M. Wicker, RPR*
*Official Court Reporter*

---

Plaintiff's Closing Argument

**983**

1  him those videos from Ukraine; when she gets back to the
2  Ukraine; see her daughter in the Ukraine; send me those
3  videos.
4       Government 243 is a July 5, 2012, e-mail where
5  he specifically says he'll send money to Kalichenko in
6  Ukraine for the videos.
7       Speaking of money, how else do you know that the
8  defendant intended for the videos to come from abroad into
9  the United States?  Well, he sends her thousands of
10 dollars abroad.  He knows where she is when she's picking
11 the money up.  He gets the notification.  You've seen the
12 records; you know she's abroad.
13      Count 1.  I want to talk about that very
14 briefly.  It charges the defendant with the crime of
15 conspiring to sexually exploit ███  That's the
16 Ukrainian toddler.
17      Now, the Judge is going to -- again, he's going
18 to instruct you what it means to conspire with someone,
19 but it essentially means there is an agreement between two
20 people.  Conspiracy equals agreement, right?
21      And that agreement for purposes of convicting
22 the defendant doesn't require a written agreement.  It
23 doesn't have to be a contract of any kind.  It doesn't
24 have to have taken place in a boardroom or a conference
25 room or an office.

*Owen M. Wicker, RPR*
*Official Court Reporter*

**Plaintiff's Closing Argument**

**984**

1    Now, how do we know that the defendant agreed
2  with Kalichenko?
3    Well, even though the Government doesn't have to
4  show that the defendant agreed to anything in writing, we
5  have writings, we have the e-mails, the dozens of e-mails
6  that the defendant sent to Kalichenko, right?
7    We also have Government's Exhibit 214, April 12,
8  2012, e-mail.  Joeval5@optonline.net.  What does he say?
9    He says:  Remember my words.  You will need to
10  do all I ask you in video with ████ when you are with
11  her.  This unique situation separates you from the rest I
12  have here.
13    What does he say in capital letters?  "Do you
14  now understand what I'm telling you?"
15    How does he end the e-mail?  "Do we understand
16  each other?"
17    What does she write back to him?  What does
18  Kalichenko say in her April 12th reply from the same day?
19    Yes, Joseph, we do understand each other.
20  Delivering new videos of ████ the exact way you request.
21    Right, that's the agreement.  If there was any
22  doubt that there is an agreement, there's proof,
23  Government's Exhibit 214, which is in evidence.
24    Oh, and by the way, that same day the defendant
25  sent her money.  So if there was any doubt -- again, do we

Owen M. Wicker, RPR
Official Court Reporter

**Plaintiff's Closing Argument**

**985**

1  have an agreement?  I understand exactly what you are
2  saying.  And by the way, here's the money.
3    How else do we know that the defendant conspired
4  with Kalichenko?  Because she actually sends him the
5  videos, right, just as he demands it.
6    She didn't say, get lost.  She says, here's the
7  videos just like you asked for.
8    When he got the videos, again, what did he do?
9    We all know what he did.  He asks for more, and
10  he paid her.
11    We've also discussed attempts.  There's eight
12  separate attempts, all linked to specific e-mails that the
13  defendant sent to Kalichenko.  They are all very specific,
14  and they are all in evidence, and we reviewed all of them
15  today.  But needless to say, they speak loudly and clearly
16  what the defendant intends.
17    Transportation of child pornography, Count 4 of
18  the indictment.  And again, the indictment is just a
19  charge.  The defendant is charged with transporting child
20  pornography.
21    The Government can meet its burden of
22  establishing this charge by showing that the defendant
23  aided and abetted in the transportation of child
24  pornography.
25    In essence, you are required to determine

Owen M. Wicker, RPR
Official Court Reporter

**Plaintiff's Closing Argument**

**986**

1  whether he knowingly had a visual depiction of a minor
2  engaged in sexually explicit conduct shipped or
3  transported in interstate or foreign commerce.  Right.
4    And how do we know that he knew that sexually
5  explicit videos of ████ would be transported?  He asked
6  for them.  And he knew that ████ was a minor.  He wanted
7  very specific sex acts to be performed on her, and that's
8  what he got.  Got them all sent straight to his inbox via
9  the internet.
10    Receipt of child pornography.  This is the same
11  analysis as transportation but instead focuses whether the
12  defendant received it, knowingly received child
13  pornography images.
14    You know that he did.  It's undisputed that
15  there were child pornography videos on his computer, sent
16  to him by Kalichenko in response to his e-mail, the videos
17  he paid for.  This is the same analysis as I've already
18  discussed.
19    And how do you know that he possessed it?
20  Again, he asked for it; he got it; paid for it.  It was
21  all on the computer, and it was on the defendant's one on
22  January 28, 2014, the day of the first search warrant.
23  That's when the computer was taken.  That's what the
24  indictment says as the date that the defendant possessed
25  the child pornography involving both of the young girls.

Owen M. Wicker, RPR
Official Court Reporter

**Plaintiff's Closing Argument**

**987**

1    Now, in conclusion.  Based on all the evidence,
2  the Government submits to you it has proven the defendant
3  guilty beyond a reasonable doubt on all of the charges.
4    We want to thank you for your patience and
5  attention during these last two weeks.  I realize that
6  this has not been an easy trial, and it certainly is not
7  an easy trial to be selected as jurors on.
8    You've been asked to hear some deeply disturbing
9  e-mails and language and see some even more disturbing
10  videos and images.
11    So, again, we want to thank you for your
12  service.
13    We've gone through all of the evidence.  The
14  case and the facts are clear.
15    You were selected as jurors because of your
16  willingness to consider all of the evidence, to scrutinize
17  it, to hold the Government to its burden.  As you begin
18  your deliberations, we ask that you use your reason and
19  your common sense, that same common sense that guides you
20  every single day of your lives.
21    When you listen to the law that the Judge
22  explains and you use your common sense as it applies to
23  the facts, we believe that you will see that there's only
24  one reasonable conclusion that can be drawn from the
25  evidence, that is, that the defendant is guilty on each

Owen M. Wicker, RPR
Official Court Reporter

**988**

1  count beyond a reasonable doubt and that he should be held
2  accountable for his crimes, held accountable for his
3  crimes against children.
4      Thank you.
5      THE COURT:  Members of the jury, we'll take a
6  15-minute break.  I think we'll try to go until 1 o'clock
7  and then take a lunch break and see where we stand.
8      Don't discuss the case.
9      We'll resume at 12:15.
10      (Whereupon, at this time the jury exits the
11  courtroom.)
12      (A recess is taken.)
13
14
15
16
17
18
19
20
21
22
23
24
25

**989**

1      THE COURT:  It is almost 12:25.  I don't think
2  we will get this done before the lunch break
3      When you get to a convenient spot around 1:00
4  o'clock, just tell me.
5      MR. LaPINTA:  If you can do me this favor, in
6  the past I kind of get consumed doing this and lose track
7  of how long it is going.  If you give me a five minute
8  heads-up, please?
9      THE COURT:  I will tell you at five to 1:00 if
10  you get to a convenient spot we will break.
11      MR. LaPINTA:  Thank you.
12      THE COURT:  Okay.
13      (Whereupon, the jury at this time entered the
14  courtroom.)
15      THE COURT:  Everyone be seated.
16      We will now hear the summation of defense
17  counsel, Mr. LaPinta.
18      MR. LaPINTA:  May it please the Court, Judge
19  Bianco.
20      Mr. Kabrawala, Mr. Bode, Agent Troyd, Mr. Lato,
21  Mr. Valerio.
22      Ladies and gentlemen of the jury:
23      Up to now you have only heard me speak to others
24  in the form of questions.  But now I will have a chance to
25  speak directly to you.  And I relish this opportunity to

**990**

1  speak to you because I believe that my message is both
2  important and compelling.
3      Please give me the same attention that you have
4  given to Mr. Kabrawala.  Just because he went first and
5  will speak last doesn't mean that my message and my words
6  are less important than his.
7      I'm going to speak to you.  I'm not going to
8  pound my hands on this lectern to startle you or to try to
9  command your attention.
10      I hope that my words and my arguments alone will
11  deserve and earn your attention.
12      I'm not going to engage in theatrics to try to
13  bolster my arguments.  The facts I speak of will speak for
14  themselves.
15      I will certainly not point to anyone in this
16  courtroom with a finger and a fist.  I will point only to
17  the facts and the evidence that I strongly believe will
18  significantly undermine the government's case that you
19  have heard.
20      Obviously, the nature of this case has been
21  difficult for everyone in this courtroom.  It involves
22  children, children that we adore, children that we
23  nurture, children that we should all respect.
24      The child pornography that you have seen in this
25  case has no place in our society, either here in the

**991**

1  United States or anywhere in this world, including eastern
2  Europe.
3      And I say to you the following:  As a man
4  committed to my family, as a father committed to my young
5  daughter, as an officer of this court and a lawyer
6  committed to my client's best interest, there is no place
7  for child pornography in our society.  For me to say
8  otherwise would be outrageously wrong.
9      Now, just as we are a society here committed to
10  upholding our laws that protect our children, we are a
11  society here committed to upholding our laws that protect
12  and govern all other people as well.  Our laws involve
13  civil rights laws that give us rights here in the United
14  States.  There are laws that regulate and control our
15  government.  There are laws that regulate and guide our
16  justice system.  And there are laws that assure the
17  fairness of our criminal justice system when it comes to
18  evaluating guilt or innocence of an accused person.  We
19  have laws and rules that demand fairness in our criminal
20  justice system, and they are as equally as important as
21  our laws that protect our children.  And nobody in this
22  courtroom would disagree or argue with that.
23      In other words, ladies and gentlemen, you must
24  be equally devoted here to upholding our laws that protect
25    █████ and █████, and the laws that assure that

992

1  Mr. Valerio is given a fair trial.  Those two -- three
2  people are the essence of your consideration here and that
3  require your fair understanding and deliberation of these
4  facts.
5          Judge Bianco will soon instruct you on the law
6  that is involved in this case and the rules that will
7  govern your deliberations.  You must, must follow those
8  rules, even if you don't agree with them.  The rules he
9  will give you are the cornerstones of our criminal justice
10  system.  They are rules that are indispensable,
11  unavoidable, rules that you must adopt and follow.
12          The first rule is a rule that Mr. Valerio is
13  presumed an innocent man.  And just because he is sitting
14  there at that defense table doesn't mean that he is guilty
15  of anything.  He has been merely charged.  He has been
16  merely accused.
17          And while you may have an instinct that because
18  he is seated there at that table he must be guilty of
19  these offenses, you must rid yourself of that instinct
20  because there is no place for that instinct in this
21  courtroom.  He is presumed innocent until the prosecutor
22  proves his guilt to you.
23          The government, Mr. Kabrawala, has the burden of
24  proof in this case.  And it is only the government that
25  has the obligation and responsibility of proving facts to

993

1  you in this courtroom.  An accused -- a defendant or his
2  lawyers -- do not have to prove anything.  We don't have
3  to prove that he is innocent.
4          Mr. Valerio and the defense are not required to
5  prove or disprove a thing.
6          If you feel anyway that we should have to prove
7  his innocence, you must also rid yourself of those
8  feelings and instincts.  They have no room in this
9  courtroom.
10          Mr. Kabrawala, the government, not only has the
11  burden of proving evidence and guilt, but he must prove
12  that evidence to you beyond a reasonable doubt -- a very
13  high standard that Judge Bianco will instruct you on.  He
14  will tell you what reasonable doubt is.  He will tell you
15  the quantum of proof or the quality of proof that you need
16  to satisfy yourself of whether that burden has been proven
17  or not proven.
18          I submit to you that reasonable arguments here
19  will create reasonable doubt.
20          Also, one of these indispensable important rules
21  is that an accused need not testify on his behalf at this
22  trial.  And that is because he has no burden of proving
23  anything.  It is his right and his decision not to
24  testify.  And his failure to testify, or his decision to
25  testify or not testify, I should say, should not be held

994

1  against him in any way.
2          So if you feel that because Mr. Valerio has not
3  testified in this case and that he must be guilty because
4  he didn't testify, you must also cleanse yourself of that
5  feeling and those instincts.  There is no room for that
6  here in this trial.
7          And lastly, Mr. Valerio as an accused has a
8  right to a fair trial, a fair process, a due process right
9  to a fair trial.  He has the right for the uninfluenced
10  disciplined review of his evidence that has been offered
11  against him, that is guided only by the laws and rules
12  that Judge Bianco will give you.
13          Fairness is not being influenced by theatrics.
14  Fairness is not being influenced by loud comments at
15  counsel table that you heard or may have heard, and by
16  lawyers that point to people in this courtroom.  Fairness
17  is also not being influenced or dictated by your emotions.
18          You must set aside your strong emotions in this
19  case.  I know you have strong emotions about this case.
20  Everybody has strong emotions about this case in this
21  courtroom.  I watched you very closely when you first
22  became involved in this case two weeks ago as prospective
23  jurors.  I watched very closely.  Because when you were
24  told that this case involves child pornography, your
25  non-verbal cues, your appearances, spoke a lot to me.

995

1  Many of you looked down when you heard this was a child
2  pornography case.  Many of you looked away and frowned and
3  grimaced.  You bowed your head.
4          I again watched you in this courtroom when those
5  videos were shown.  And once again your non-verbal cues
6  spoke very loudly to me, your gestures, your facial
7  expressions, which were very clear.  Some of you looked
8  away and some of you even started to cry.
9          You must please put your emotions aside and
10  consider the evidence in this case objectively and fairly.
11  Emotions are poison to this process.  They will destroy
12  and shatter those four important rules that I just briefly
13  explained and that Judge Bianco will instruct you on very
14  shortly.
15          Look at it this way:  Be the type of juror that
16  you would want on your case if you were charged with a
17  serious crime, an emotional crime.  Be the type of juror
18  that you would want your father to have if he
19  unfortunately was charged with a serious offense, or your
20  brother, or your son.  Be as fair as you possibly can here
21  to be objective and not tainted by instincts or emotion.
22          Let me now take you through a careful,
23  unemotional review of the evidence in this case.  Let me
24  explain to you why I believe the government has failed to
25  meet its burden of proving Mr. Valerio guilty of the

1  crimes that he has been charged with.

2          Reasonable doubt follows reasonable arguments.

3          We started off the evidence in this case by

4  hearing from an Agent Angelini, a very good looking, tall

5  agent.  He attempted to set a stage for this trial by

6  explaining how he came to know Helena Kalichenko.

7          However, the stage that he tried to set was not

8  set too sturdily.  You first learned when you heard of

9  Ms. Kalichenko of the number of names that she goes by.

10  The name Helena, the name Olena, the name Elaina, and the

11  name Helena Bright and Helena Kalichenko.

12          All that should be the first red flag to you

13  that there is something up with this woman.  Because it is

14  not common for truthful people, people that don't deceive,

15  people that don't take advantage of others, people that

16  don't extort others, to use more than one name.

17          Aside from her very names, and her picture that

18  you were shown by the government, you weren't told of much

19  else by Mr. Kabrawala.  And that was not on accident.

20  They purposely did not tell you much about Olena

21  Kalichenko because they wanted to shield her of the type

22  of person she really is.

23          Let's make no mistake about this person, okay?

24  She is vile.  She is evil.  She is not worthy of any

25  credibility.

1          But during cross-examination the defense pointed

2  out a number of things about her, about how cold she is,

3  about how calculating she is, how depraved of an

4  opportunist and an extortionist she is.

5          I'm sure each and every one of you would agree

6  with me that Helena Kalichenko, or any of the other names

7  that she uses, is certainly not worthy of and not

8  deserving of holding the cherished title of mother.  As

9  such you should be careful in evaluating what she has said

10  in emails, why she has said what she said in emails, what

11  are her motives for saying what she said, and what are her

12  past actions.

13          Ladies and gentlemen, she is a scourge on our

14  society stemming across the world, from eastern Europe to

15  Smithtown, New York, and everywhere else she has been

16  in-between.  And we will get to where she has been

17  in-between.

18          Agent Angelini told you that Helena shared with

19  you certain emails in a CD, a CD containing child

20  pornography, and certain emails exchanged between she and

21  the email address joeval5@optonline.net.

22          Another red flag for you should have been that

23  when she is using two different emails, there is probably

24  good reason for it.  You know of two mails she used.

25  Kalichenkoes@mail.ru, a Russian email service, and a

1  domestic United States service, brighthelena68@gmail.com.

2          Besides that, you know nothing else.  You know

3  nothing else about those two accounts.  You know nothing

4  else of who she communicated with in those two accounts.

5  You know nothing else as far as if or when or how she

6  transported child pornography to other people on those

7  accounts, to other people that may have been given child

8  pornography before she even met Mr. Valerio.

9          But we do know something about her.  We know her

10  goal was to destroy Joseph Valerio.

11          Now, Agent Angelini was asked by Mr. Lato on

12  cross-examination, what steps did he take in this

13  investigation besides meeting with Olena Kalichenko.  And

14  he plainly, flatly told you, not much more.

15          For whatever reason they will have you say that

16  it was because Olena Kalichenko was a target, and they had

17  plans on arresting her and they didn't want to tip her

18  off.

19          I will suggest to you something, okay?  This is

20  not a dumb woman.  She may have done dumb things, but she

21  is not a dumb woman.

22          She knows that walking into the United States

23  Embassy in the Ukraine and showing them child pornography

24  involving her, she knows she is a target.  And she knows

25  the United States of America and the Federal Bureau of

1  Investigation would want her badly because of what is in

2  those videos.  But she was hiding under this cloak of

3  diplomacy and immunity.  And we know that because some of

4  the messages that you have heard and seen say that.

5          So to say that we didn't want to disturb her

6  because we didn't want to tip her off, not good enough for

7  me, especially when there came a time that you learned

8  that Mr. Lato -- he is over there -- told you that she was

9  arrested in July at JFK Airport.

10          So for whatever reasons, good, bad, stupid,

11  moronic, she made her way here to the United States and

12  she was apprehended.

13          Where is Helena?  Who is Helena?

14          Now, what is really important here in terms of

15  an investigation -- and he will have you understand and

16  believe that this was a really thorough investigation.

17          Ladies and gentlemen, this wasn't a thorough

18  investigation at all.  There were a lot of things here

19  that were not done that should have been done.  There was

20  no evaluation, no attempt being made by reaching the

21  authorities in the Ukraine or anywhere else to find out

22  about that email account.  They know, they know that it

23  contained child pornography.

24          What else is on that email account?  What other

25  children are on that email account?  When, if there is

**1000**

1    other child pornography, was that pornography sent out?
2    And if it was previously sent out before she met Joseph
3    Valerio, was it the same videos that you saw here in this
4    courtroom?
5            And I will get to that in a bit because there is
6    a lot to say about those videos.
7            But you may have been told by comment or
8    question about a civil war going on in the United
9    States -- in the Ukraine, and maybe that thwarted their
10   abilities to do any research or investigation.  But they
11   know of a second email account that is not impacted by any
12   war, that is not impacted by any civil right dispute going
13   on in the Ukraine.
14           They have a G-mail account that that woman used
15   to contact an FBI agent directly.  And they didn't even
16   bother to issue a judicial subpoena to find out anything
17   about that email account, the G-mail account.
18           Brighthelena68@gmail.com.  It is there for their
19   grabbing.  It is there for their evaluation, just as
20   easily as they found out and issued a subpoena about the
21   Cablevision email account, they could have done so that
22   easily with a G-mail account.
23           God knows what is on that G-mail account.  I
24   hope it doesn't have other child victims of pornography.
25   I hope.

**1001**

1            So I'm telling you, and use your common sense.
2    If he tells you in rebuttal how thorough this
3    investigation is, the FBI has done a disservice to
4    everybody involved in this case, to children, to
5    prosecutors and the defense.  Because there may have been
6    great mitigating evidence that would be relevant in this
7    case, evidence that would prove maybe that those videos
8    were not produced by these various emails that have been
9    brought to your attention.  There may be exculpatory
10   evidence, evidence tending to prove innocence on that
11   RU email from Russia, or that G-mail account in the United
12   States.
13           Not only was there nothing done regarding the
14   email accounts, but for whatever reason after she was
15   arrested there was no search done of her homes, wherever
16   she lives.  God knows where she lives.
17           They had her sitting inside the FBI office in
18   the United States Embassy in the Ukraine, and they didn't
19   find out where she lived, who she lived with.  They didn't
20   conduct any search of any of her premises, abode,
21   apartment house, wherever the hell she lives.  Who knows
22   what evidence is in those areas, those houses, whatever
23   they are?  She has to live somewhere.
24           Are there other CDs, videos, flash cards, flash
25   disks, whatever it may be?

**1002**

1            What else is there about child pornography?
2    Because as I will get to in a second, there is not one
3    bit, not one bit of forensic evidence in this case for you
4    to come to the conclusion that those horrible videos that
5    you saw here were produced as a result of the emails that
6    were sent to her from an optonline account.
7            They didn't search anything, her property, her
8    electronic devices, any cameras that she had, any cell
9    phones that she had, any computers that she had.
10           Now that you have heard the evidence in this
11   case -- and by virtue of two expert witnesses that you
12   have seen up there, computer forensic witnesses, you know
13   what metadata is.  And you know how powerful the evidence
14   is that involves metadata.  Okay?
15           There are things that touch on the reliability
16   of the metadata, and I will get to that later.  But
17   metadata is a tremendous resource for a child pornography
18   investigator.  Because the metadata on any kind of
19   electronic device would show when that video was recorded,
20   the month, the day, the time, the year.  Because as you
21   saw, unfortunately, on those videos, there is nothing on
22   those videos when you watch them to know when they were
23   recorded, nothing.
24           We know -- I'm not a big computer guy, but I
25   recorded events in my child's life, her birthday, her

**1003**

1    sweet 16, and there are oftentimes a date on there, a time
2    stamp or something to indicate when it was made if you
3    program it correctly and if you don't change it.
4            There is nothing here.
5            These videos are rather inconclusive.
6            Do they show child pornography?  Absolutely.
7    Horrible child pornography.
8            But let's look at those videos, not physically
9    but how they were sent, where they were sent and what
10   could we try to extrapolate from those videos that was not
11   extrapolated from -- with those tremendous resources that
12   they have that they didn't look into.
13           The email was sent through attachments.  And as
14   you know from your personal experience with computers, and
15   if not, from the two experts, that when an email is
16   attached -- sent with attachments, there is an IP address
17   and a whole slew of other things, letters, dashes, dots.
18   But the attachments does not mean that it is made, created
19   the same day that the email is sent.
20           To the contrary, Detective Forrestal was asked
21   the very question, and he answered, we don't know when an
22   attachment was made, whether a document attachment or a
23   video attachment.  You could attach a video that was made
24   a year ago, a day ago, two years ago, two days ago, three
25   years ago, and so on.  There is not one bit of proof in

1  this case to prove electronically, metadata-wise
2  testimonial, any other way, that those emails -- videos
3  were produced upon the request of those emails sent to
4  her.
5          Now, if you saw the videos, or listened to them,
6  there was sound on those videos.  The sound was nothing
7  that is of substantive evidentiary value.  Baby talk, for
8  lack of a better expression, is what you heard.  But you
9  didn't hear, Joe, wave to Joe, ███.  Joe, I hope you
10  like this.  This is for you.
11          Nothing on the sound of those videos indicate
12  that those videos were made for that joeval5@optonline.net
13  account, and those emails from joeval5@optonline.net.
14          The substance, however painful it was for me to
15  ask, I did -- but the substance of those videos as you
16  know from Detective Forrestal were common types of child
17  pornography that unfortunately is made throughout our
18  world.  It is child pornography involving oral sex, child
19  pornography filmed in showers, child pornography using
20  objects.  But if you reflect back on all of these emails
21  that you have seen, I remember one object in particular
22  that was used.  And I don't think I will ever forget it,
23  and you will not either.  A toothbrush.
24          Did any of these emails ask for a toothbrush to
25  be used?

1          I believe -- I believe, and I could be wrong --
2  that another, or maybe more than one email was using a
3  hairbrush, or the handle of a hairbrush.  You decide what
4  it is if you remember.  None of these emails asked for a
5  hairbrush (sic) to be used.  It is common child
6  pornography to be filmed in showers, as I said before.
7  But some of the emails requested certain locations.  Film
8  child pornography in a public bathroom, in a public place.
9          Did you see any videos about any public places
10  here?
11          Did you see any emails with attachments that
12  said, Joe, attached please find a pornography video of me
13  and ███  my daughter, that we made for you?
14          There is one text, the Viber text, that is done
15  months and months later, when she is now targeting Joe and
16  extorting him and threatening him and asking him to
17  negotiate, that makes reference to videos she produced.
18  But at that stage of the game, ladies and gentlemen, she
19  has made a determination that she is going to the
20  authorities.  And she wants Mr. Valerio arrested.  She
21  wants him prosecuted.  So she is going to do everything in
22  her power to achieve that.  And the language that was used
23  on that Viber message which she references -- where she
24  references emails and videos of her and ███ which she
25  made was designed to incriminate him.  Because she knew

1  that Agent Angelini would gain access to that Viber
2  account.
3          So I'm told that we are up to the lunch hour,
4  and I will leave you with a thought until after lunch.
5          When we deal with evidence in criminal trials,
6  when we hear prosecutors presenting evidence and arguing
7  to you, and you hear of lawyers that are attacking the
8  quality of evidence, it doesn't require any advanced
9  degrees.  It doesn't require any type of computer degrees,
10  or even significant unique life experiences.  It requires
11  you to use the common sense that you have used in your
12  jobs as teachers, in your jobs as nurses, in your jobs of
13  construction and so forth.
14          So I'm not asking you to employ hypertechnical
15  analysis of this evidence, or to hyper-evaluate what I'm
16  saying.  Use your common sense.
17          And when I continue after lunch, I will draw
18  more attention to a lot of other things in the
19  prosecution's case that are very worthy of your
20  consideration.
21          Just remember that reasonable arguments create
22  reasonable doubt.
23          Thank you.  I will be back.
24          THE COURT:  Members of the jury, we are going to
25  take the lunch break.  We will reconvene at 2:00 o'clock.

1          You can't discuss the case yet and I will see
2  you at 2:00 o'clock.
3          (Whereupon, at this time the jury leaves the
4  courtroom.)
5          (Luncheon Recess.)

1 　　　　A F T E R N O O N   S E S S I O N

2

3 　　　　THE COURT:  Mr. LaPinta, are you ready?

4 　　　　MR. LaPINTA:  Yes, your Honor.

5 　　　　THE COURT:  And is Mr. Lato outside?

6 　　　　MR. LaPINTA:  I will get him, your Honor.

7 　　　　THE COURT:  All right.

8 　　　　How much more do you have?

9 　　　　MR. LaPINTA:  20, 25 minutes.

10 　　　　THE COURT:  Then we will have the rebuttal.

11 　　　　MR. KABRAWALA:  Yes.

12 　　　　THE COURT:  All right.

13 　　　　Get the jury.

14 　　　　(Whereupon, the jury at this time entered the

15 courtroom.)

16 　　　　THE COURT:  Everyone, please be seated.

17 　　　　Members of the jury, we will now continue with

18 the defense summation by counsel for the defense.

19 　　　　Mr. LaPinta.

20 　　　　MR. LaPINTA:  Thank you, your Honor.

21 　　　　Welcome back.

22 　　　　The good thing about taking a break is that you

23 get to take a break and eat lunch.

24 　　　　The bad thing about taking a break and eating

25 lunch is after lunch you kind of get a little drowsy and a

1 little tired and what-not.  So try to keep as attentive as

2 we possibly can here, because I will get into some other

3 very, very critical evidence, and also to further my

4 argument to you that this investigation was drastically

5 inadequate and did not -- did not uncover facts that would

6 be very relevant here to your consideration.

7 　　　　I left off before lunch discussing the Viber

8 account.

9 　　　　You know that Viber -- one of the agents, and I

10 think it was Agent Forrestal -- said that it is a common

11 text methodology of communicating overseas.

12 　　　　In fact, there were text messages used on Viber

13 from those two particular email accounts and phone numbers

14 involved in this case.

15 　　　　As I brought out on cross-examination of

16 Detective Forrestal, it is clear and unequivocal, without

17 any question, that those Viber text messages were an

18 attempt to extort Mr. Valerio.

19 　　　　Let's have no questions about this.  When you

20 use the word "negotiate" and you threaten to contact the

21 FBI and the authorities -- if you don't negotiate, that is

22 extortion.  An extortion is trying to get something from

23 somebody.

24 　　　　Here my argument to you is that that something

25 is money.  Because all this going on is for Olena

1 Kalichenko to get money.

2 　　　　Whereas you have seen emails from those two

3 accounts that maybe describe Olena as a poverty stricken

4 young woman, this is a woman who is actually traveling

5 around the world.  You heard countries like France,

6 Turkey, Ukraine, the United States, who is going back and

7 forth -- I will touch on it in a bit regarding the

8 itinerary that we know she has traveled.  This is a woman

9 who is getting money from somewhere.  And it is not just

10 from this situation.  It is elsewhere as well.

11 　　　　This is, in my opinion, a small little piece to

12 what Olena Kalichenko or Helena Kalichenko or Elaina

13 Kalichenko or Helena Bright is all about.

14 　　　　So let there be no mistake that she is an

15 extortionist here, and her goal was to destroy Joseph

16 Valerio.  Look at the Viber messages that prove that.  And

17 also keep in mind, as I said before, that when she makes

18 reference to videos she has produced, she is well aware --

19 well aware because it is at the same time that she is

20 communicating with Agent Angelini in the Federal Bureau of

21 Investigation.

22 　　　　Let's switch focus here, and let's talk about

23 the tower computer in the upstairs office of the High Gate

24 premises, the tower computer that was the focus of

25 forensic evaluation by both Detective Forrestal and also

1 from our expert, Mr. Gibbs.

2 　　　　Now, typically when you have a criminal case

3 with experts from both sides, you usually have a battle of

4 the experts.  And here it is quite a unique situation,

5 because for the most part both experts agree on the same

6 thing.

7 　　　　Mr. Kabrawala will have you believe that because

8 Mr. Gibbs has agreed to certain questions that he has

9 asked, that this is a slam dunk case for him.  Okay?

10 　　　　Let me say this clearly and loudly, it is not.

11 And now I will tell you why.

12 　　　　Merely because videos are located in someone's

13 inbox in their operating system does not mean that those

14 videos were accessed or viewed.  Okay?

15 　　　　Because it merely indicates that they were sent

16 to an email address.  So I leave to you this argument:

17 There is no proof in this case, either electronically,

18 forensically, forensic computer-wise or otherwise, that

19 these videos were actually viewed, seen, by Mr. Valerio.

20 Nowhere do you have any forensic proof of that.  Not on

21 that computer and not on any of the other 13 devices that

22 they seized from that Smithtown residence.

23 　　　　Now, as I brought out on cross-examination, when

24 they executed the search warrant of that house, they were

25 on that premises.  Because that was one of hundreds of

1 search warrants that Detective Forrestal was involved in.
2 And to his -- to his word, he left no rock unturned, no
3 stone unturned.  I asked him that question.
4      There were no other electronic devices in that
5 house.  They got everything that was there.  And none of
6 those electronic devices show that those videos were
7 opened or viewed.
8      Now, if you think back closely to his direct
9 examination, questions that Mr. Kabrawala asked him, he
10 didn't tell you that.  He just said that the emails were
11 on the computer -- the videos were on the computer.  Okay?
12      And I suggest to you that that is misleading.
13 Because it wasn't until I asked him the pointed questions
14 on cross-examination that he then told you, right, it
15 doesn't mean that they were opened.  It doesn't mean that
16 they were viewed on that computer.
17      So I suggest to you that the testimony that you
18 heard from Detective Forrestal is not exactly thorough,
19 complete and open regarding facts that hurt their case.
20 The fact that they are in the inbox is only a small, small
21 piece of what this case is about.
22      In fact, all of the emails that are involved in
23 this case from that joeval5@optonline.net account, is a
24 small piece to this case.  Okay?  It is one dimension to
25 this case.  And the other dimensions have to do with -- as

1 I mentioned before -- the effect that the emails that were
2 sent from the optonline account had on Olena, and whether
3 the videos you saw here were produced by virtue of the
4 request on those emails.
5      Now, let me speak to you about that optonline
6 account and those emails.  Okay?
7      I'm not condoning those emails.  I'm not asking
8 you to condone those emails, okay?  Those are troubling
9 emails.
10      Now, I don't know why, or I don't know the
11 reason.  Perhaps it is some kind of misguided chivalry of
12 some sort.  I don't know.  I'm not a therapist.  But in
13 terms of evidentiary value, it is only a small piece.
14 Because you have to decide, ladies and gentlemen, whether
15 all those emails produced those videos.  That is the key
16 to that one exploitation charge involving Helena and
17 ▮▮▮▮▮.
18      Let's talk about ▮▮▮▮ for a second, okay?
19 I don't know if that is ▮▮▮▮ in the video.
20 Nobody knows that that is ▮▮▮▮ in the video.  Certainly
21 the name was referenced as ▮▮▮▮.
22      I don't know if it is Olena Kalichenko's
23 daughter or not.
24      You may feel it is not relevant if it is her
25 daughter or not.

1      I certainly agree that it is a young child,
2 obviously.  But nobody has seen that child.
3      You may ask why is it relevant that no one has
4 seen this child?  And I will answer it.
5      Because we don't know how old ▮▮▮▮ is now.
6 ▮▮▮▮ for all we know could be six, seven or eight years
7 old.  I don't know.  Because if somebody saw her when
8 Helena came forward, and the dating of the emails reflect
9 that those videos were sent maybe nine months, twelve
10 months, a year, a year and three months beforehand, then
11 maybe that child would be three and a half at the time.
12 But we don't know that.  And that is really important
13 here.  Because we don't know that, we don't know that
14 those videos were made when they were sent, or as a
15 product of when they were sent, or upon the emails being
16 received from Olena Kalichenko.
17      We don't know the age of this child right now,
18 because there was no investigation of that child.  That
19 child is someplace in the Ukraine, I would think.  And
20 even though Agent Angelini was here to testify, I assure
21 you that there is a legion of other FBI agents in the
22 Ukraine that could find that child and find out if she is
23 four years old, or around that age.  Because if she is --
24 or three and a half.  Because if she is, that certainly --
25 certainly that would strengthen their case quite a bit.

1 But if she is not, well -- if she is two now or two and a
2 half, or six or seven, guess what, that is not the child,
3 it is not the child.  We don't know.  That is the point
4 here, we don't know.
5      Well, we should know, because it involves a
6 child, even though the child was in the Ukraine.  That
7 child was victimized.  This investigation deserved for
8 that child to be approached by the FBI and investigated
9 more thoroughly.
10      So there are doubts about this child.  And I
11 hope that this child is in a safe place right now.  I
12 don't know.
13      Now, when we speak of those videos, and I will
14 not repeat myself because I think you heard me loud and
15 clearly, please think back when you deliberate, think back
16 of the items I asked you to pay particular attention to.
17 And more importantly, the items of information that we
18 don't know about those videos.
19      Let's talk about the images involving young
20 ▮▮▮▮.
21      Obviously, the images are of ▮▮▮▮, no doubt.
22      Obviously, the images were recorded of ▮▮▮▮ in
23 that Smithtown residence, clearly.
24      However, not clear is when those videos were
25 made.  Because that Samsung camcorder, the focus of the

1    █████ photographs, there is great doubt about the
2 reliability of those time stamps on the metadata.
3         Regardless of what Forrestal thinks they are
4 about the reliability, he can't tell you, nor could
5 anybody, not even my expert, whether the date/time stamp
6 programmed on that Samsung camcorder was an accurate
7 date/time stamp when it was recorded.  That is the key.
8 Okay?  We don't know.
9         Because if it wasn't accurate, if it was off a
10 few months or a few years, whatever it is, then that time
11 stamp is worthless to us.  And because nobody has the
12 ability to know what that time stamp was when that
13 recording was made, we are never going to know whether
14 that time stamp is accurate or not.  But the metadata
15 revealed two dates, September 10th, 2010, at 3:39 to
16 3:42 p.m.
17         But what we do know is that those times are not
18 even accurate.  Because Detective Forrestal on
19 cross-examination, and he didn't ask him on direct because
20 he didn't want to bring out the fact that the time was
21 wrong.  I brought that out to you on cross-examination.
22 Because in fact, ladies and gentlemen, the time stamp was
23 wrong.  It was wrong and off for an hour and 12 minutes.
24         So why then can't it be that maybe the date was
25 off as well, or the year was off as well?  I don't know.

1 And it is for both dates, for the September 10, 2010 date
2 and the January 19, 2011 date.
3         The computer experts agreed.  However, Forrestal
4 says, very reliable.
5         My expert says, I don't know if it's reliable.
6 And because I have uncertainty about it, it can't be
7 reliable because I don't know what it was programmed when
8 it was recorded.
9         Now, the significance of all this is that we
10 know, again undisputed, that Olena Kalichenko has been
11 here in the United States.  In fact, we know -- excuse
12 me -- that not only has she flown to the United States,
13 but she had flown to Germany, Turkey, France.  And within
14 the United States we know she has flown to JFK, Texas and
15 Cincinnati.  The poverty stricken Olena Kalichenko is
16 flying around the world.
17         And their witness, Agent Deep Chopra told you
18 that.  He told you that he knows from the itinerary, the
19 records of the Office of Custom and Border Patrol, that
20 she arrived in the United States September 5, 2011 and
21 stayed until December 2, 2011.
22         He also knows that she arrived again
23 February 23, 2011 -- excuse me, February 23, 2010 and left
24 March 14th, 2010, where Cincinnati, Ohio was involved.
25 And once again she arrived on June 4th, 2011 and left on

1 July 7th, 2011, when she flew into Fort Worth, Texas
2 airport.  We know she has been back and forth here.
3         But what is really troubling here, really
4 troubling is that our United States Custom and Border
5 Department could not account for her trip when she arrived
6 here.  Because there is no arrival date that corresponds
7 with a departure date that they know about.
8         The testimony of Mr. Chopra is available for you
9 to review.  It is clear.  It is there, and it is
10 unquestioned.
11         Now, why am I so troubled about the Border and
12 Custom Patrol not having the ability to account for her
13 travels?  Because in our post 9/11 era, that is a problem.
14 It is a big problem.  And it is especially a big problem
15 when you are dealing with a woman who is traveling a lot
16 around this world that is involved in child pornography.
17         So what you are dealing with here, ladies and
18 gentlemen, regarding the itinerary, the flights in and out
19 of this country, they are not just red flags that the FBI
20 should have picked up.  But they are red flags that are
21 slapping them in the face.  Something is up here.  This
22 woman is evading Customs and Border Patrol when she
23 travels.  It is actually shocking, shocking, that there is
24 an incomplete record of her travels in and out of this
25 country.

1         Both Frances Valerio, Joseph's mother, and
2 Bernadette Valerio, who testified here, and they both told
3 you that they support him, even when he is facing such
4 horrible charges involving their own flesh and blood.
5         I don't know, but we all have family members who
6 have different levels of acceptance and forgiveness, we
7 all do.  I have relatives who will stand by each other
8 through thick and thin, right or wrong, good and bad.
9         I have other relatives, if you do something
10 wrong, you are on your own.  You suffer the consequences.
11         So it is for you to decide whether those two
12 young -- well, two ladies -- were lying to you or not.
13 Okay?
14         I suggest to you that if they were lying, they
15 could have lied a lot better because Bernadette was very
16 honest in telling you she couldn't tell you the dates she
17 saw Olena Kalichenko at the Smithtown residence, nor could
18 the mother, Frances.
19         So if this was a script to protect their beloved
20 Joseph, son and brother, you would have gotten a lot more
21 detail out of these two people.  They would have given you
22 complete exculpatory alibis.
23         But because they were honest, it is clear proof
24 to you that the information they gave you was genuine and
25 truthful.

1    Now, they saw her at that house.  They saw her
2  in that basement.  They saw her when she was present, as
3  they were, when ▮▮▮ was being videotaped for modeling
4  purposes.  Okay?
5    Now, I'm not someone to judge, and you shouldn't
6  be, whether it is a good idea or a bad idea for a young
7  child to be in a modeling situation.  I don't know.  But
8  they knew of it.  It wasn't a secret thing.  And they were
9  actually present when she was being recorded.
10    In fact, as you know from today's testimony from
11  Frances, that they were successful in actually publishing
12  one of the model photographs of some sort, in a costume, I
13  think she said, a Halloween costume of some sort.
14    So I suggest to you that their testimony is
15  truthful.  And Olena Kalichenko did in fact stay at that
16  Smithtown residence.  Because look at Deep Chopra, his
17  testimony again.  Because the Customs and Border paperwork
18  states that she is living there at that Smithtown address.
19    She had a means and opportunity to film young
20  ▮▮▮ in the nude when the rest of that family went
21  upstairs and grabbed dinner or lunch, or whatever meal
22  they were having.  And she stayed behind.
23    Now, we know if you want to give credence to
24  this time stamp of some sort, we know that these time
25  stamps didn't take place over hours and hours of time.

1  They were actually a very short period of time when the
2  snippets of those videos were discovered.  Which is
3  consistent with the approximate timeframe that Frances
4  told you that that woman was downstairs in the basement
5  alone with that child.
6    Reasonable arguments create reasonable doubt,
7  ladies and gentlemen.
8    One other thing about ▮▮▮.  Where is ▮▮▮ a?
9  Okay?
10    Nobody, nobody would like for a young girl to be
11  involved in a trial for obvious reasons.  And to be
12  honest, I'm quite glad she wasn't involved.  But if ▮▮▮
13  has told people and the FBI that her uncle videotaped her
14  in the nude, perhaps that child would have been here to
15  tell you that.  She is not here.  Think about it.
16    Let's talk about the statements that the
17  government attributes, or the confessions that
18  Mr. Kabrawala has alluded to in the closing arguments.
19  And for you to have an understanding of the worthiness and
20  reliability from those statements, put yourself in this
21  situation:
22    You are sleeping at your home at 6:00 a.m. in
23  the morning, on a winter's morning, and unexpectedly five
24  to seven federal agents of the FBI and at least one
25  Suffolk County detective, wearing raid jackets, come into

1  your home, seclude you in a dining room, seclude your
2  significant other, boyfriend, girlfriend, mother, father,
3  whatever, come searching your house.
4    As Mr. Lato pointed out in his cross-examination
5  of Agent Troyd, there is a reason why they do it at
6  6:00 a.m.  Because of the element of surprise and shock.
7  Okay?
8    So continue to picture that you are now seated
9  in a dining room of your home, and in front of you is a
10  long dining room table, and unless you jump on it and get
11  away, you are not getting past it.
12    To the right of you is a law enforcement
13  officer.  To the left of you is a law enforcement officer,
14  and there are at least one or two others at that table.
15  There are others in other rooms of that house.
16    Agent Troyd said that there was someone in the
17  kitchen as well, as well as someone that was dealing with
18  Mr. Valerio's girlfriend, Jarmila, at the same time.
19    That is not a cozy setting.  That is high
20  stress.  You are scared.  You are worried.  You are
21  shocked.  You are surprised.
22    So you say those statements are a product of
23  free will or a product of perhaps a coercive type of
24  environment.
25    There is a second set of statements that are

1  being offered for your consideration, statements that were
2  told to Agent Troyd, the processing -- at the processing
3  of Mr. Valerio the second time after they discovered the
4  ▮▮▮ images on the metadata of the camera card.  And
5  those statements have something to do, to the effect that
6  I lost my family and I want to kill myself.
7    Well, guess what.  Picture being arrested and
8  for photographing a young child in your family.  Picture
9  the mere effect of being arrested on your family.  Let's
10  just assume that you are wrongfully arrested.  That is for
11  you to decide when you deliberate on this case.  And just
12  assume that you are wrongfully arrested.
13    Is it that outrageous for your emotional impact
14  when you are told to say, oh, my God, what is my family
15  going to think of me?  I'm going to lose my family.
16    How upsetting is it to you if it is a young
17  ▮▮▮ of yours.
18    The mere fact that you are being charged in
19  federal court for exploitation charges involving your
20  ▮▮▮, I suggest to you would have somebody consider
21  killing themselves, even if they are innocent of those
22  charges.  You gauge the reliability of those statements.
23  You gauge the consciousness of guilt that he is going to
24  argue to you is apparent from those statements.
25    I suggest that there is little value to those

1 statements.
2     There are two waiver of rights forms.  Okay?
3     Because our laws -- a side issue in this case
4 regarding the correct procedures or not that were used to
5 give those rights.  But you have the forms involved in
6 this case.
7     Both of those forms are missing times.  Okay?
8     You may say, you know what, LaPinta, he is a
9 little crazy.  He is kind of nutty when it comes to times
10 and numbers people write down.  And Forrestal miswrote a
11 file number and he misstated the military time.  He is
12 kind of nuts.  He is looking to trick us.
13     Well, I'm not looking to trick anybody.  Because
14 I will tell you something.
15     When you are in a federal courthouse, facing
16 exploitation of a child, you better make sure if you are
17 an investigator that the time you are writing down on the
18 report, the file you are putting down on the report is
19 accurately written, because if it is not accurate it could
20 be a different file.
21     So don't tell me, Detective Forrestal, it is a
22 typo, it is a mistake.  There is little room for a mistake
23 here when someone is fighting for their innocence.
24     You may say, who cares if that rights card or
25 rights statement is missing dates.

1     Well, you should care because it comes down to
2 when those rights are given to him.  And these rights are
3 gold for people being accused.  They are not coincidental
4 rights.  They are rights that are grounded in our
5 Constitution as citizens and members of our society.
6     I'm not picking on little ridiculous issues
7 here.  Please understand that.  But you decide how
8 important or unimportant they are.
9     Now, in the numerous, numerous emails that were
10 sent between those two accounts, joeval5@optonline.net and
11 kalichenkoes@mail.ru, there are other emails that address
12 other things that are terribly relevant here that he
13 hasn't told you about.  And maybe he is waiting for me to
14 tell you about it for him to sum up when he gets back here
15 again.  But as of right now he hasn't mentioned this to
16 you.
17     Ready?
18     There is language in this record from emails
19 that Helena has a mentor that she has been dealing with, a
20 woman.  Because the mentor is written in the emails.
21 Okay?
22     Now, I don't know who this mentor is.  One of
23 the emails states a name.  But when someone is dealing,
24 undoubtedly, and filming graphic child pornography, and
25 she states that she has a mentor, what is this woman a

1 part of?  What is this woman?  What is this mentor?
2     Is Olena Kalichenko, with all her aliases,
3 flying across the world, part of a bigger child
4 pornography ring?  I don't know.  Because if she is, there
5 is great reason to believe that there is a lot of other
6 videos involved here.  And maybe these videos were used on
7 numerous other occasions and sent to other unwitting or
8 waiting men.  Because, ladies and gentlemen, we know about
9 at least one other witting or unwitting man she sent child
10 pornography to, and his name is Daniel Ditmeyer.  And
11 Agent Troyd was asked particular questions about Daniel
12 Ditmeyer in his investigation.  He knew the name Daniel
13 Ditmeyer.  And he had reason to know that quite possibly
14 child pornography was sent to him.  Okay?
15     I didn't make this up.  It is in the record.
16     So wouldn't you think that a thorough
17 investigation involving child pornography would lend a
18 team of experienced agents to investigate a Daniel
19 Ditmeyer?
20     They have a reservoir of resources available to
21 them.  They can find out anything about anybody in this
22 world.
23     We don't know a thing about Daniel Ditmeyer.  We
24 don't know about any emails of Daniel Ditmeyer.  We don't
25 know of any social media of Daniel Ditmeyer.  And we don't

1 know if he was ever even reached.
2     Was Daniel Ditmeyer sent these very videos that
3 are part of this case?
4     And more relevant to that question, when, if
5 those videos were sent, were they sent?  Were they sent
6 prior to joeval5@optonline.net being involved with Olena
7 Kalichenko?  Because if they were, guess what.  This is
8 not a production of child pornography case.  Because in a
9 second I will go over the element -- and there is one that
10 you really should focus on -- that is the linchpin to this
11 exploitation charge that he is facing regarding Olena
12 Kalichenko and ███.
13     Thoroughly -- I agree that this investigation
14 was thorough.  It was thoroughly incomplete.  Red flags
15 galore.
16     Let me speak about the charges that Mr. Valerio
17 is facing.  I'm not going to go through all the elements,
18 because it is only a handful of them that really apply to
19 the evidence and the arguments that I'm making.  Okay?  I
20 will just address the ones I'm talking about.  The
21 evidence I'm talking about.
22     A necessary element of both exploitation of a
23 child charge here -- and there are two.  One involving
24 ███.  One involving
25     It is the fact that Mr. Valerio was involved in

**1028**

1  the production, the production of child pornography.
2      If you have reasonable doubt as to when those
3  horrible videos were made of ███, then you don't have
4  proof beyond a reasonable doubt regarding the production
5  of those videos.
6      The second exploitation of a child count
7  involves the videotaping of ███
8      If there is a question as to when those videos
9  were made, then you have in your opinion some worthy
10  testimony as to somebody else having an opportunity to
11  film ███.  Then there is doubt about whether those
12  images were filmed by Mr. Valerio or by Olena Kalichenko.
13  She was there.  No question she was at that house.
14      You determine if they satisfied their burden of
15  proving that beyond a reasonable doubt, or whether it is
16  reasonable to conclude that this horrible woman did that
17  to ███ as well.
18      Reasonable arguments create reasonable doubt.
19      Regarding the distribution and possession
20  counts, consider that the computer in question at the
21  office was not -- did not and was not used to show the
22  videos.  In other words, there is no proof in this record,
23  electronically or otherwise, by device or hard proof, that
24  those videos were even watched by Mr. Valerio.  Consider
25  that issue when you decide on the distribution and

*HARRY RAPAPORT, CERTIFIED REALTIME REPORTER*
*Official Court Reporter*

**1029**

1  possession counts that are involved in this indictment.
2      And when you consider the various attempt
3  charges, two words are going to be very relevant in that
4  statute.  Whether the acts of Mr. Valerio in requesting
5  pornography of a child were substantial steps that were
6  taken -- substantial steps.
7      And I argue to you that an email request of
8  anything -- an email request of anything -- could be an
9  insubstantial or a non-substantial step in producing child
10  pornography.  Because it is going to come back to the real
11  question -- really the big one -- whether those videos
12  have been proven to you beyond a reasonable doubt to have
13  been produced because of the emails that were sent to her.
14      I will offer you the following conclusions:
15  Olena Kalichenko is an evil opportunist that has been
16  extorting Mr. Valerio and may be extorting men around the
17  world.  Because there may be proof in the fact that she is
18  flying everywhere, that this woman really has a lot of
19  money.  I don't know.  Neither do they.
20      She may very well have many different videos
21  that we do not know about that were previously produced.
22  For all we know she may have a library of child
23  pornography in her home, in her apartment, or wherever she
24  is, on her computers or tablets or phone.  We don't know.
25      Incomplete investigation yields incomplete

*HARRY RAPAPORT, CERTIFIED REALTIME REPORTER*
*Official Court Reporter*

**1030**

1  evaluation.
2      Reasonable arguments create reasonable doubt.
3      The government has not proven to you that the
4  videos were produced as a product of the request sent from
5  joeval5@optonline.net.
6      The dates and times on that Samsung recorder are
7  not accurate or reliable dates and times.  And because
8  they are not accurate and reliable dates or times, it is
9  reasonable to suggest that Olena Kalichenko filmed ███
10  and that Joseph Valerio did not produce those awful videos
11  of his ███.
12      I have exhausted your patience and I will wind
13  this thing down.  But before I wind it down, let me leave
14  you with these last thoughts:
15      It is cases like this one, involving children --
16  not our children, but they are our children -- every child
17  in our society should be considered our children.  These
18  are our children.
19      When we deal with innocent helpless children, we
20  want to protect them.  We want to do the right thing for
21  our children.
22      As I told you earlier in my summation, that it
23  is okay to want to do the right thing for a child.  It is
24  actually the right thing to do.  We should all do the
25  right thing for our children.  But we also have to do the

*HARRY RAPAPORT, CERTIFIED REALTIME REPORTER*
*Official Court Reporter*

**1031**

1  right thing in following the rules and laws of this
2  federal court.  And it is incumbent upon us, just as much
3  as we want to protect the child, to protect the rights of
4  an accused and hold the government to their burden of
5  proving guilt beyond a reasonable doubt.
6      That finger that he used on his opening, and
7  again in his closing, that finger shouldn't be pointed to
8  Joseph Valerio.  If anyone is going to point the finger
9  here, the finger should be pointed to this table because
10  they are the ones that have the burden of proof here.
11  They are the ones that have to prove these elements of
12  these federal crimes to you beyond a reasonable doubt.
13      Please, please leave your emotions at the door
14  before you go in for your deliberations.  I know that is
15  not easy.  I know, I know that you really want to punish
16  people for doing something to those kids.  That is a human
17  instincts.  But you are not here to punish.  You are here
18  to find facts.  You are here for holding the government to
19  prove guilt beyond a reasonable doubt.
20      I argue to you, ladies and gentlemen, that they
21  failed to do that.  And there is only one verdict that you
22  must find in this case, and that verdict is not guilty.
23      Thank you.
24      THE COURT:  Members of the jury, as I mentioned
25  before, the government gets to give a brief rebuttal

*HARRY RAPAPORT, CERTIFIED REALTIME REPORTER*
*Official Court Reporter*

1032

1  summation and they will do that now.
2          Mr. Kabrawala.
3          MR. KABRAWALA:  Thank you.
4          Defense counsel got up here and talked about
5  everybody else who is at fault.
6          Olena Kalichenko, someone named Daniel Ditmeyer.
7          Counsel spoke at length about these people.
8          He didn't talk much about the defendant, though.
9          He spoke about what the government could have
10  done with Kalichenko's email, with her home.  He spoke
11  about searches and subpoenas that the government could
12  have issued to a Russian email account while Russia was at
13  civil war with the Ukraine.
14          But the government's investigation, that is not
15  on trial.  The defendant is on trial.  Joseph Valerio is
16  on trial.
17          What defense counsel failed to tell you, and
18  very importantly, is that you are going to hear that the
19  Judge -- the Judge is going to instruct you that the
20  government is not required to use any particular method of
21  investigation or call all of the potential witnesses who
22  are out there.  The Judge is going to tell you that.
23  Defense counsel never told you that.
24          If the evidence that is presented proves the
25  defendant guilty beyond a reasonable doubt, then that is

1033

1  sufficient.
2          So we heard all about Ms. Kalichenko.  But you
3  know what we didn't hear?  The defendant, and specifically
4  the content of the emails, they are all available to you.
5          Defense counsel said and would have you believe
6  that the emails were sent between two accounts without
7  getting into the substance.  Is there any dispute really
8  that the defendant didn't send the emails?  He sent emails
9  from two accounts to his son of Islander tickets that he
10  got from his landscaper.
11          Is there any dispute that joeval5@optonline.net
12  is the defendant's email account and he sent those emails?
13          They are his emails.  They are his words.  And
14  they are his conduct.
15          Do you know why defense counsel didn't go into
16  the content?  I think it is pretty clear.  The content of
17  the emails are extremely damaging to the defense.  It is
18  all there and all spelled out in the emails, who he is and
19  what he wants from Kalichenko.
20          Defense counsel made one comment about the
21  content of the emails.  And do you know what that comment
22  was?  It is almost not worth discussing.
23          The defense said that the emails were a
24  misguided chivalry.
25          Really?  Misguided chivalry?  That is what that

1034

1  is?
2          Counsel also said there is no forensic evidence
3  that Kalichenko produced the videos in response to those
4  many emails that the defendant sent her, that there was no
5  forensic evidence on the videos themselves.
6          All you need is the emails themselves.  That is
7  better than forensic evidence.  The defendant says, follow
8  the script.  Do exactly as I say.  He even says in one of
9  the emails, great job in those emails.  You saw the email
10  today.
11          Do you know why he said great job?  Because
12  Kalichenko followed his script.  She did what she was
13  told.
14          Is this some crazy misunderstanding?  What am I
15  missing here?  Is this some big coincidence that she did
16  exactly what she was told in the emails, and the email
17  just happened to come from an email address of
18  joeval5@optonline.net, even though you heard from
19  Cablevision that no two email addresses could be the same,
20  even though you saw the recording showing the defendant
21  owned that email account, that the account was open for 12
22  years, somebody paid thousands of dollars for the
23  Cablevision account.
24          Defense counsel also said, where is Helena?
25          Well, it is because of the FBI's investigation

1035

1  that she wasn't tipped off.  And it is because of the
2  FBI's investigation that she is under arrest.  That she
3  traveled to the United States and was arrested by Agent
4  Troyd and others.
5          That is the investigation.
6          Where is she?  Where is Kalichenko?  She is in
7  jail and she is facing charges.  And the government can't
8  call her to testify as a witness because there are active
9  charges against her.
10          MR. LATO:  Objection.
11          THE COURT:  Sustained.
12          The jury is to disregard that.
13          MR. KABRAWALA:  Counsel also said that she has a
14  cloak of immunity.
15          She is going to face justice.  She has her day
16  in court.  She has no cloak of immunity.
17          Another very important point about Kalichenko,
18  since we are on the topic.
19          The government didn't choose Kalichenko.  The
20  government didn't choose Kalichenko to make child
21  pornography videos with her daughter.  The defendant chose
22  Kalichenko to make child pornography videos.  Do you know
23  why he chose her?  Because she would follow the script and
24  she would do it for money.
25          Exactly what she did.  She exploited her child

**1036**

1  on video and sent those videos right to the defendant's
2  inbox.
3          Speaking of videos, the defense counsel said how
4  do you know it is videos she produced in response to those
5  emails?  That she had a library of child porn sending to
6  men all over the world.
7          As an example, defense counsel points out there
8  is a toothbrush in one of the videos.  You remember the
9  video.  I don't need to describe it again.
10         That is reasonable doubt?  That the kid is
11  masturbating herself with a toothbrush and toys as opposed
12  to just toys alone as per the defendant's email?
13         Defense counsel also suggests that the emails
14  were never viewed, never viewed; that the defendant sent
15  dozens of emails to this woman asking that very specific
16  sex acts be performed, and says good job, and pays her
17  money for them and never views them?
18         Oh, by the way, he also admitted, he confessed
19  that he directed Kalichenko to produce child pornography
20  and that he received the child pornography emails by
21  video.  So he never viewed them?
22         Take a look at the July 23, 2012 email.  That is
23  associated with the first video that you saw.  That email
24  contains attachments like all the other ones.  And there
25  are child -- they are child pornography videos.

**1038**

1  another country.  If she was such a super hacker, why
2  wouldn't she just rob him blind on the first go and get
3  all his credit card information?  Why would she come up
4  with an elaborate scheme that lasted two years that she
5  had to produce child pornography as a result of it, or she
6  is paid to, I should say?
7          She is not a saint.  She is a horrible person.
8  That is what she is.  She exploited her child for money,
9  and that the defendant had paid her.
10         Let's talk about another hypothetical.
11         You saw when the travel records indicated she
12  came into the country, right?  September 2nd, 2011.
13         She left October 26th, 2011.
14         When were the pictures of ▓▓▓▓ made, the
15  ▓▓▓▓?
16         September 2010, January 2011.
17         She is not in the country.  You saw the first
18  email between them, hey, how are you doing?  Do you want
19  to get to know each other?  What do you do?  Where do you
20  live?  Do you want to go out?
21         That is in the summer of 2011.  She is not even
22  here.  She gets here and visits him months after that
23  email.
24         Let's entertain the hypothetical possibility
25  that Kalichenko, the super hacker that she is, somehow

**1037**

1          The July 23 email.  On that date, do you
2  remember what happened after the defendant got his videos
3  that he asked for?  He sent Kalichenko $900, the most he
4  ever sent her before in one shot.
5          So he never saw the videos?  Of course he saw
6  the videos.
7          He saw the videos.  She followed the script.  He
8  sent her the most money that she was ever sent -- that he
9  ever sent her.
10         Now, about the email account,
11  joeval5@optonline.net, how do you know it is the
12  defendant?
13         We have gone through this.  It is somebody from
14  a local tri-state IP address.  You can see who is using
15  the account because he is talking about things that
16  happened in New York.
17         Kalichenko didn't hack into it.  She didn't
18  just -- let's go with this for a second.  If Kalichenko
19  hacked into his email account, so she sent herself dozen
20  of emails specifically directing child pornography to be
21  produced, and made the emails and emailed them to the
22  defendant, and somehow hacked into his computer, and put
23  them on his computer, and then asked him for money, right?
24  Let's go with this.  She asked him for money, and he sent
25  her money via Western Union.  And she picked it up in

**1039**

1  came to the defendant's house before they even met, a year
2  before she was even in the country at this time, staying
3  with the defendant, and she got some costumes.  She then
4  brought ▓▓▓▓ down to the basement, took a whole bunch of
5  pictures of her naked.  And somehow set the date of the
6  video camera to be two different years, right?  A few
7  months apart.  And she built this contraption with the
8  tool belt she was carrying and her power drill.  By the
9  way, this is all while everyone is eating upstairs, having
10  dinner, and she is building this thing that weighs a lot
11  and there is a secret camera in it.
12         After she is done building that, she dresses the
13  kids up, several costume changes.
14         And then she takes the camcorder and puts black
15  tape over it to hide the indicator light.  She hides this
16  expensive camera in the ceiling.  Nobody notices it for
17  three or four years that it is hidden in the ceiling.
18         Then she -- I guess what she must have done then
19  is, she goes back home to the Ukraine, gets a time
20  machine, and she goes back in time and resets the time on
21  the video camera to make it today's date.
22         Even if you were to believe that, and even if
23  that were somehow possible within the realm of reality,
24  what is the financial incentive?  Why would she make
25  videos, child pornography images of ▓▓▓▓

1040

1 You know her MO. She wants money. What is the
2 money in that, right? Why make these images of █████,
3 delete them, hide the camera -- by the way, take the
4 Samsung memory card and put it in the defendant's upstairs
5 office area, and this is all presuming that the defendant
6 doesn't know that he is missing a very expensive camera.
7 You know how the defendant gets in his emails if
8 he doesn't get what he wants, if he believes that
9 Kalichenko took the camera, we submit that you would have
10 seen a very angry email in all caps, where is my camera?
11 There is also -- take a look at Exhibit 205, the
12 second page.
13 Defense counsel argued where are the videos in
14 the changing rooms?
15 According to defendant's emails, he really
16 wanted to see sexually explicit emails of ████ in public
17 places.
18 Defense counsel made that argument. Take a look
19 at Government's Exhibit 205, right? The second page.
20 She says, Joseph, I went to the pool yesterday.
21 Phones are supposed to be left in the lockers and are not
22 allowed to take either in the changing room or the
23 swimming area. It is forbidden.
24 Then she goes later on and says, how can you
25 tell me that you don't need me and ████ anymore just

1042

1 What did you hear that the FBI did when they
2 arrived at the house at 6:00 a.m.? They called the
3 defendant. Hey, we are outside, would you let us in, we
4 have a search warrant, a court-ordered search warrant.
5 It was in his own dining room, sitting down,
6 drinking coffee out of mugs. You saw the rainbow mug.
7 There are no handcuffs, no restraints. No one yelling at
8 him. There are no guns drawn. Not even a raised voice.
9 Defense counsel also said that people could be
10 falsely charged and then say I want to kill myself because
11 the charges themselves are so weighty.
12 That is not what happened here. He was
13 confronted that there were videos of his █████ found. And
14 do you know what he said? I have no family anymore. Do
15 you know why? Because he knew he was caught. He knew we
16 got him.
17 Now, this is a very clear case. The proof is
18 overwhelming.
19 To believe the defendant's version of the
20 events, you would have to believe that the defendant is
21 really the unluckiest human being on the face of the
22 planet and that there is this grand conspiracy against
23 him.
24 You will have to believe that Kalichenko snuck
25 into the house even before she met him, redated the SD

1041

1 because I couldn't get you the pool videos?
2 She is telling the defendant she can't make the
3 public videos because she is not allowed to. They don't
4 allow cameras into the pool area.
5 That is why there are no videos of the changing
6 room.
7 Also, by the way, the defendant also had eight
8 weeks notice that the FBI was coming. You remember the
9 text messages. Joe, the FBI is coming for you.
10 Eight weeks notice.
11 Defense counsel also suggested that ████ might
12 have been too young to make the videos, that we don't know
13 her age.
14 It doesn't change the fact of the emails, the
15 attempt, the conspiracy.
16 What defense counsel didn't tell you was that
17 the government need not show that videos were actually
18 produced to establish an attempt or a conspiracy. That
19 is, the defendant can be convicted of conspiracy and
20 attempt even if there are no videos, so long as he
21 attempted to get the videos, so long as he conspired to
22 sexually exploit ████.
23 Now, defense counsel said, or suggested, argued
24 that the defendant's confession was coerced, a lot of
25 agents in the house.

1043

1 cards three times, snuck into his email account, all
2 without him noticing, and him sending emails to other
3 people in his life, like his landscaper and his son,
4 without noticing the other emails, and that someone else
5 with a New York IP address is sending the emails.
6 You would have to believe that
7 Special Agent Troyd and Detective Forrestal were lying
8 about the defendant's confession to credit the defendant's
9 story.
10 MR. LATO: Objection.
11 THE COURT: Overruled.
12 MR. KABRAWALA: Think about what is plausible,
13 what makes sense in your day-to-day common sense.
14 We submit to you that the defendant is guilty
15 and the overwhelming evidence proves that.
16 We ask that you at this point hold the defendant
17 accountable for his crimes and find him guilty on all
18 counts.
19 Thank you.
20 THE COURT: Members of the jury, that completes
21 the summations. The next phase of the case are my
22 instructions on the law.
23 We will take a break and we will begin that now.
24 I don't think I will finish my instructions on the law.
25 But we will go to 4:30 or somewhere around that time and I

Rebuttal Summation/Kabrawala

**1044**

1  will finish them tomorrow morning and then you can start
2  your deliberations.
3        You can't discuss the case yet though.
4        We will take a short break.
5        Thank you.
6        (Whereupon, at this time the jury left the
7  courtroom.)
8        THE COURT:  Will everyone be seated.
9        I think I will just read part one and then I
10  will stop.
11        Any objection to doing that?
12        MR. LATO:  No, your Honor.
13        MR. KABRAWALA:  No, your Honor.
14        MR. BODE:  No, your Honor.  I assumed we weren't
15  going to make it.
16        THE COURT:  That should take us to around 4:30.
17        Let's take a ten minute break and see if we have
18  enough time.
19        Thank you.
20
21        (Whereupon, a recess was taken.)
22
23
24
25

*STEPHANIE PICOZZI, CERTIFIED REALTIME REPORTER*
*Official Court Reporter*

CHARGE OF THE COURT

**1045**

1        THE COURT:  I'm marking the final copy of the
2  jury instructions as Court Exhibit D.  It's been provided
3  to both sides.
4        (Court Exhibit D received in evidence.)
5        We will bring in the jury.
6        (The jury enters the courtroom).
7        THE COURT:  Everyone can be seated.
8        Members of the jury, I will now give you my
9  instructions on the law.  I estimate it will take about
10  two hours.  I will not do the whole thing today.  We will
11  go to 4:30 then stop and then I will read you the rest
12  tomorrow morning.
13        I want to emphasize even though I'm dividing up
14  part of it to hear today and part of it tomorrow, you
15  should consider the instructions together as a whole.  The
16  fact I'm only doing part today and part tomorrow is of no
17  significance.  You can consider the instructions as a
18  whole.
19        The next thing I will tell you, you are free to
20  take notes during my instructions if you wish; it's up to
21  you.  I don't do this off the top of my head.  Everything
22  I am telling you is typed out here and written out.  The
23  law requires me to read it to you.
24        However, if you wanted a copy of my instructions
25  during deliberations, all you have to do is send a note

*Stephanie Picozzi, CRR,  RPR*
*Official Court Reporter*

CHARGE OF THE COURT

**1046**

1  requesting it and it will be sent back to you in the jury
2  room.
3        So let's begin.
4        Now that the evidence in this case has been
5  presented and the attorneys for the government and the
6  defendant have concluded their closing arguments, it is my
7  responsibility to instruct you as to the law that governs
8  this case.
9        My instructions will be in three parts:
10        First, I will instruct you regarding the general
11  rules that define and govern the duties of a jury in a
12  criminal case;
13        Second, I will instruct you as to the legal
14  elements of the crimes charged in the indictment, that is,
15  the specific elements that the government must prove
16  beyond a reasonable doubt to warrant a finding of guilt;
17        And third, I will give you some general rules
18  regarding your deliberations.
19        Part 1.
20        To begin with, it is your duty to find the facts
21  from all the evidence in this case.  You are the sole
22  judges of the facts and it is, therefore, for you and you
23  alone to pass upon the weight of the evidence and to draw
24  all inferences as you deem to be reasonable and warranted
25  from the evidence or lack of evidence in this case.

*Stephanie Picozzi, CRR,  RPR*
*Official Court Reporter*

CHARGE OF THE COURT

**1047**

1        With respect to any question concerning the
2  facts, it is your recollection of the evidence that
3  controls.  To the facts as you find them, you must apply
4  the law in accordance with my instructions.  While the
5  lawyers may have commented on some of these legal rules,
6  you must be guided only by what I instruct you about them.
7  You must follow all the rules as I explained them to you.
8  You may not follow some and ignore others.
9        The fact this prosecution is brought in the name
10  of the United States government does not entitle the
11  United States to any greater consideration than the
12  defendant is entitled to.  By the same token it is
13  entitled to no less consideration.  The parties, the
14  United States government and the defendant, are equal
15  before this Court and they are entitled to equal
16  consideration.  Neither the government nor the defendant
17  is entitled to any sympathy or favor.
18        Now I will give you instructions regarding the
19  presumption of innocence and burden of proof.
20        You must remember that the indictment in this
21  case is only an accusation.  It is not evidence.  The
22  defendant has pled not guilty to that indictment.
23        As a result of the defendant's plea of not
24  guilty, the burden is on the prosecution to prove guilt
25  beyond a reasonable doubt.  This burden never shifts to a

*Stephanie Picozzi, CRR,  RPR*
*Official Court Reporter*

CHARGE OF THE COURT

1048

1 defendant for the simple reason that the law never imposes
2 upon a defendant in a criminal case the burden or duty of
3 calling any witness or producing any evidence. The law
4 presumes the defendant to be innocent of the charge
5 against him. I, therefore, instruct you that the
6 defendant is to be presumed by you to be innocent
7 throughout your deliberations until such time, if ever,
8 you as a jury are satisfied that the government has proven
9 him guilty beyond a reasonable doubt.
10       The defendant begins the trial here with a clean
11 slate. This presumption of innocence alone is sufficient
12 to acquit a defendant unless you as jurors are unanimously
13 convinced beyond a reasonable doubt of his guilt after a
14 careful and impartial consideration of all of the evidence
15 in this case. If the government fails to sustain its
16 burden, you must find the defendant not guilty.
17       This presumption was with the defendant when the
18 trial began and remains with him even now as I speak to
19 you and will continue with the defendant into your
20 deliberations unless and until you are convinced that the
21 government has proven his guilt beyond a reasonable doubt.
22       I will now give you instruction regarding proof
23 beyond a reasonable doubt.
24       I have stated that the government must prove the
25 defendant guilty beyond a reasonable doubt. The question

Stephanie Picozzi, CRR, RPR
Official Court Reporter

CHARGE OF THE COURT

1050

1 evidence you are satisfied of the defendant's guilt beyond
2 a reasonable doubt, you should vote to convict.
3       I wish to instruct you now as to what is
4 evidence and how you should consider it.
5       The evidence upon which you are to decide what
6 the facts are comes in several forms:
7       1, sworn testimony of witnesses, both on direct
8 and cross-examination;
9       2, exhibits that have been received in evidence
10 by the Court;
11       And 3, facts or testimony to which the lawyers
12 have agreed or stipulated.
13       What is not evidence.
14       Certain things are not evidence and are to be
15 disregarded by you in deciding what the facts are. I will
16 list them for you now.
17       These things are not evidence:
18       1, the contents of the indictment are not
19 evidence.
20       2, arguments or statements by lawyers are not
21 evidence.
22       3, questions put to the witnesses are not
23 evidence.
24       4, objections to the questions or to offered
25 exhibits are not evidence.

Stephanie Picozzi, CRR, RPR
Official Court Reporter

CHARGE OF THE COURT

1049

1 naturally is what is a reasonable doubt? The words almost
2 define themselves. It is a doubt based upon reason and
3 common sense. It is a doubt that a reasonable person has
4 after carefully weighing all of the evidence. It is a
5 doubt which would cause a reasonable person to hesitate to
6 act in a matter of importance in his or her personal life.
7 Proof beyond a reasonable doubt must, therefore, be proof
8 of such a convincing character that a reasonable person
9 would not hesitate to rely and act upon it in the most
10 important of his own affairs. A reasonable doubt is not a
11 caprice or whim. It is not a speculation or suspicion.
12 It is not an excuse to avoid the performance of an
13 unpleasant duty and it is not sympathy.
14       In a criminal case, the burden is at all times
15 upon the government to prove guilt beyond a reasonable
16 doubt. The law does not require that the government prove
17 guilt beyond all possible doubt. Proof beyond a
18 reasonable doubt is sufficient to convict. This burden
19 never shifts to the defendant which means that it is
20 always the government's burden to prove each of the
21 elements of the crimes charged beyond a reasonable doubt.
22       If, after fair and impartial consideration of
23 all of the evidence you have a reasonable doubt, it is
24 your duty to acquit the defendant. On the other hand, if
25 after a fair and impartial consideration of all of the

Stephanie Picozzi, CRR, RPR
Official Court Reporter

CHARGE OF THE COURT

1051

1       In this regard, attorneys have a duty to their
2 clients to object when they believe evidence should not be
3 received. You should not be influenced by the objection
4 or by the Court's ruling on it. If the objection was
5 sustained, ignore the question. If the objection was
6 overruled, treat the answer like any other answer. If I
7 told you to disregard certain testimony or sustained a
8 lawyer's request to disregard or strike certain testimony,
9 you are to disregard the testimony.
10       5, what I say in these instructions is not
11 evidence.
12       6, if evidence has been received for a limited
13 purpose, you must consider that evidence for that limited
14 purpose only.
15       7, obviously, anything you may have seen or
16 heard outside the courtroom is not evidence.
17       Your verdict must be based solely upon the
18 evidence developed at trial or the lack of evidence.
19       It would be improper for you to consider in
20 reaching your decision as to whether the government
21 sustained its burden of proof any personal feelings you
22 may have about the defendant's race, religion, national
23 origin, ethnic background, sex or age. All persons are
24 entitled to the presumption of innocence and the
25 government has the same burden of proof regardless of who

Stephanie Picozzi, CRR, RPR
Official Court Reporter

CHARGE OF THE COURT

1052

1 the defendant is.
2     In addition, it would be equally improper for
3 you to allow any feelings you might have about the nature
4 of the crimes charged to interfere with your
5 decision-making process. To repeat, your verdict must be
6 based exclusively upon the evidence or lack of evidence in
7 the case.
8     I told you that evidence comes in various forms
9 such as the sworn testimony of witnesses, exhibits and
10 stipulations. There are in addition different kinds of
11 evidence, direct and circumstantial.
12     Direct evidence is the communication of a fact
13 by a witness who testifies to the knowledge of that fact
14 as having been obtained through one of the five senses.
15 So for example, a witness who testifies to knowledge of a
16 fact because he saw it, heard it, smelled it, tasted it or
17 touched it is giving evidence which is direct. What
18 remains is your responsibility to pass upon the
19 credibility of that witness.
20     Circumstantial evidence is evidence which tends
21 to prove a fact in issue by proof of other facts from
22 which the fact in issue may be inferred.
23     The word "infer" or the expression "to draw an
24 inference" means to find that a fact exists from proof of
25 another fact. For example, if a fact in issue is whether

Stephanie Picozzi, CRR,  RPR
Official Court Reporter

CHARGE OF THE COURT

1053

1 it is raining at the moment, neither of us can testify
2 directly to that fact sitting as we are in this windowless
3 courtroom. Assume, however, that as we are sitting here,
4 a person walks into the courtroom wearing a raincoat that
5 is soaking wet and carrying an umbrella dripping water, we
6 may infer that it is raining outside. In other words, the
7 fact of rain is an inference that could be drawn from the
8 wet raincoat and the dripping umbrella. An inference is
9 to be drawn only if it is logical and reasonable to do so.
10 In deciding whether to draw an inference, you must look at
11 and consider all of the facts in the light of reason,
12 common sense and experience. Whether a given inference is
13 or is not to be drawn is entirely a matter for you, the
14 jury, to decide. Please bear in mind, however, that an
15 inference is not to be drawn by guesswork or speculation.
16     I remind you once again that you may not convict
17 the defendant unless you are satisfied of his guilt beyond
18 a reasonable doubt, whether based on direct evidence,
19 circumstantial evidence or the logical inferences to be
20 drawn from such evidence.
21     Circumstantial evidence does not necessarily
22 prove less than direct evidence nor does it necessarily
23 prove more. You are to consider all the evidence in the
24 case, direct and circumstantial, in determining what the
25 facts are and in arriving at your verdict.

Stephanie Picozzi, CRR,  RPR
Official Court Reporter

CHARGE OF THE COURT

1054

1     The fact one party called more witnesses and
2 introduced more evidence than the other does not mean that
3 you should necessarily find the facts in favor of the side
4 offering the most witnesses. By the same token, you do
5 not have to accept the testimony of any witness who has
6 not been contradicted or impeached if you find the witness
7 not to be credible. You also have to decide which
8 witnesses to believe and which facts are true. To do this
9 you must look at all the evidence drawing upon your own
10 common sense and personal experience. After examining all
11 the evidence, you may decide that the party calling the
12 most witnesses has not persuaded you because you do not
13 believe its witnesses or because you do believe the fewer
14 witnesses called by the other side.
15     In a moment I will discuss the criteria for
16 evaluating credibility. For the moment, however, you
17 should keep in mind that the burden of proof is always on
18 the government and the defendant is not required to call
19 any witnesses or offer any evidence since he is presumed
20 to be innocent.
21     My next instruction relates to the rulings and
22 statements that I made during the course of this trial. I
23 hereby instruct you that nothing that I said during the
24 course of the trial, no question that I have asked, no
25 ruling that I have made, no statement that I may make in

Stephanie Picozzi, CRR,  RPR
Official Court Reporter

CHARGE OF THE COURT

1055

1 this charge should be interpreted in any way whatsoever as
2 a suggestion of what decision I believe you should make.
3 You should understand that I have no opinion as to the
4 decision you should make in this case.
5     You will remember that at various times
6 throughout the trial I have been called upon to make
7 rulings on various questions of law. I have sustained
8 objections and I have overruled objections. Please do not
9 concern yourself with my reasons for making the rulings
10 that I made. These are purely legal matters and must not
11 affect your deliberation on the factual matters in this
12 case. Nor are you to draw any inferences for or against a
13 party because that party raised objections during the
14 course of the case. It is the duty of the attorneys on
15 each side of the case to object when the other side offers
16 testimony or other evidence which the attorney believes is
17 not properly admissible. You should not hold against an
18 attorney or the defendant either because the attorney has
19 made objections or because some of those objections may
20 have been overruled by me.
21     When the Court has sustained an objection to a
22 piece of evidence or a question addressed to a witness,
23 you must disregard it entirely and may draw no inference
24 from it or speculate as to what the witness would have
25 said if he or she had been permitted to answer the

Stephanie Picozzi, CRR,  RPR
Official Court Reporter

CHARGE OF THE COURT

1056

1  question.  Similarly, if after a question was asked and an
2  answer given the answer was ordered stricken from the
3  record, you must disregard both the answer and the
4  question.  You are further instructed that with respect to
5  every situation where testimony has been stricken, the
6  reason for that ruling relates to a matter of law which is
7  of no concern of yours and not for your consideration.
8  Once stricken, such testimony must be disregarded and
9  ignored.  The reasons for my striking such testimony
10  should not be discussed among you nor should you speculate
11  or guess about the basis for my ruling.  By the same token
12  where I allowed testimony or exhibits to be received into
13  evidence over the objection of counsel, this was not an
14  indication that I have any opinion as to the weight or
15  effect of such evidence.  That is for you to decide.
16          In reaching your verdict, you also are not to
17  concern yourselves in any way with the conferences which
18  sometimes took place at the sidebar between the Court and
19  counsel for the parties nor are you to draw any inferences
20  for or against any parties because that party may have
21  requested such a conference.  You also must not draw any
22  conclusion whatsoever from the fact that from time to time
23  I may have asked questions of witnesses.  This was solely
24  to elicit facts which may or may not be material to your
25  determination.

Stephanie Picozzi, CRR,  RPR
Official Court Reporter

CHARGE OF THE COURT

1057

1          Remember that in making your determination as to
2  the facts, you should rely upon your own recollection of
3  the evidence.  What I said from time to time during the
4  course of the trial or what I say in the charge that I am
5  now giving you should not be taken in place of your own
6  recollection of the evidence in this case.
7          I will now give you an instruction regarding
8  witness credibility.
9          You have had an opportunity to observe all of
10  the witnesses.  It is now your job to decide how
11  believable each witness was in his or her testimony.  You
12  are the sole judges of the credibility of each witness and
13  of the importance of his or her testimony.  It must be
14  clear to you by now that you are being called upon to
15  resolve various factual issues under the counts of the
16  indictment in the face of the very different pictures
17  painted by the government and the defense which cannot be
18  reconciled.  You will now have to decide where the truth
19  lies, and an important part of that decision will involve
20  making judgments about the testimony of the witnesses you
21  have listened to and observed.  In making those judgments,
22  you should carefully scrutinize all of the testimony of
23  each witness, the circumstances under which each witness
24  testified and any other matters in evidence which may help
25  you to decide the truth and the importance of each

Stephanie Picozzi, CRR,  RPR
Official Court Reporter

CHARGE OF THE COURT

1058

1  witness' testimony.
2          Your decision whether or not to believe a
3  witness may depend on how that witness impressed you.  Was
4  the witness candid, frank and forthright?  Or did the
5  witness seem as if he or she was hiding something, being
6  evasive or suspect in some way?  How did the way the
7  witness testified on direct examination compare with how
8  the witness testified on cross-examination?  Was the
9  witness consistent in his or her testimony or did he or
10  she contradict himself or herself?  Did the witness appear
11  to know what he or she was talking about and did the
12  witness strike you as someone who was trying to report his
13  or her knowledge accurately?
14          How much you choose to believe a witness may be
15  influenced by the witness' bias.  Does the witness have a
16  relationship with the government or the defendant which
17  may affect how he or she testified?  Does the witness have
18  some incentive, loyalty or motive that might cause him or
19  her to shade the truth or does the witness have some bias,
20  prejudice or hostility that may have caused the witness
21  consciously or not to give you something other than a
22  completely accurate account of the facts he or she
23  testified to?
24          Even if the witness was impartial, you should
25  consider whether the witness had an opportunity to observe

Stephanie Picozzi, CRR,  RPR
Official Court Reporter

CHARGE OF THE COURT

1059

1  the facts he or she testified about and you should also
2  consider the witness' ability to express himself or
3  herself.  Ask yourselves whether the witness' recollection
4  of the facts stands up in light of all other evidence.
5  In other words, what you must try to do in deciding
6  credibility is to size a person up in light of his or her
7  demeanor, the explanations given and in light of all the
8  other evidence in the case, just as you would in any
9  important matter where you are trying to decide if a
10  person is truthful, straightforward and accurate in his or
11  her recollection.
12          In deciding the question of credibility,
13  remember that you should use your common sense, your good
14  judgment and your experience.
15          In evaluating credibility of the witnesses, you
16  should take into account any evidence that the witness who
17  testified may benefit in some way from the outcome of this
18  case.  Such an interest in the outcome creates a motive to
19  testify falsely and may sway the witness to testify in a
20  way that advances his or her own interests.  Therefore, if
21  you find that any witness whose testimony you are
22  considering may have an interest in the outcome of this
23  trial, then you should bear that factor in mind when
24  evaluating the credibility of his or her testimony and
25  accept it with great care.

Stephanie Picozzi, CRR,  RPR
Official Court Reporter

CHARGE OF THE COURT

1060

1  This is not to suggest that every witness who
2  has an interest in the outcome of a case will testify
3  falsely.  It is for you to decide to what extent, if at
4  all, the witness' interest has affected or colored his or
5  her testimony.
6  You have heard evidence that a witness made a
7  statement on an earlier occasion which counsel argues is
8  inconsistent with the witness' trial testimony.  Evidence
9  of the prior inconsistent statement was placed before you
10  for the limited purpose of helping you decide whether to
11  believe the trial testimony of the witness who
12  contradicted himself.  If you find that the witness made
13  an earlier statement that conflicts with this trial
14  testimony, you may consider that fact in deciding how much
15  of his trial testimony, if any, to believe.
16  In making this determination, you may consider
17  whether the witness purposely made a false statement or
18  whether it was an innocent mistake, whether the
19  inconsistency concerns an important factor, whether it had
20  to do with a small detail, whether the witness had an
21  explanation for the inconsistency, and whether that
22  explanation appealed to your common sense.
23  It is exclusively your duty, based upon all the
24  evidence and your own good judgment, to determine whether
25  the prior statement was inconsistent and if so how much,

Stephanie Picozzi, CRR, RPR
Official Court Reporter

CHARGE OF THE COURT

1061

1  if any, weight to be given to the inconsistent statement
2  in determining whether to believe all or part or none of
3  the witness' testimony.
4  I gave you instruction regarding expert
5  testimony during the trial.  I will repeat that to you
6  now.
7  You have heard during the course of this trial
8  the testimony of individuals referred to as experts in
9  their fields.  If scientific, technical or other
10  specialized knowledge will assist the jury to understand
11  the evidence or to decide a disputed fact, a witness with
12  a particular knowledge, skill, experience, training or
13  education may be called to testify about such evidence or
14  facts in issue in the form of an opinion.
15  The rules of evidence ordinarily do not permit
16  witnesses to testify to opinions or conclusions.  An
17  exception to this rule exists for those we call expert
18  witnesses who may state their opinions and who may also
19  state the reasons for their opinion.
20  You should consider the witness' opinion
21  received in this case and give it such weight as you may
22  think it deserves.  If you should decide that the opinion
23  of the witness is not based upon sufficient education and
24  experience, or that the reasons given in support of the
25  opinion are not sound or that the opinion is outweighed by

Stephanie Picozzi, CRR, RPR
Official Court Reporter

CHARGE OF THE COURT

1062

1  other evidence, you may disregard the opinion entirely.
2  In sum, the expert witness is in all other
3  respects the same as any other witness.  You should
4  consider his or her qualifications, his or her experience,
5  his or her interest in the outcome of the case, if any,
6  his or her demeanor and all the other factors you have
7  been instructed to consider in assessing the credibility
8  of other witnesses.
9  You have heard testimony of witnesses who work
10  for law enforcement and the government.  The fact that a
11  witness may work for law enforcement or the government
12  does not mean that his or her testimony is necessarily
13  deserving of more or less consideration or greater or
14  lesser weight than that of an ordinary witness.
15  At the same time, it is quite legitimate for
16  defense counsel to try to attack the credibility of a law
17  enforcement or a government employee witness on the
18  grounds that his or her testimony may be colored by a
19  personal or professional interest in the outcome of the
20  case.
21  It is your decision, after reviewing all the
22  evidence, whether to accept the testimony of the law
23  enforcement and the government employee witnesses and to
24  give to that testimony whatever weight, if any, you find
25  it deserves.

Stephanie Picozzi, CRR, RPR
Official Court Reporter

CHARGE OF THE COURT

1063

1  I will now give you an instruction regarding
2  defendant's right not to testify.
3  The defendant did not testify in this case.
4  Under our Constitution, a defendant has no obligation to
5  testify or to present any evidence because it is the
6  government's burden to prove the defendant's guilt beyond
7  a reasonable doubt.  That burden remains with the
8  government throughout the entire trial and never shifts to
9  a defendant.  A defendant is never required to prove that
10  he or she is innocent.
11  You may not attach any significance to the fact
12  that the defendant did not testify.  No adverse inference
13  against him may be drawn by you because he did not take
14  the witness stand.  You may not consider this against the
15  defendant in any way in your deliberations in the jury
16  room.
17  You have heard testimony about evidence seized
18  from the defendant during searches at the defendant's
19  house.  Evidence obtained from these searches was properly
20  admitted in this case and may be considered by you.
21  Whether you approve or disapprove of how it was obtained
22  should not enter into your deliberations because I now
23  instruct you that the government's use of this evidence is
24  entirely lawful.
25  You must, therefore, regardless of your personal

Stephanie Picozzi, CRR, RPR
Official Court Reporter

CHARGE OF THE COURT

1064

1  opinions give this evidence full consideration along with
2  all the other evidence in the case in determining whether
3  the government has proved the defendant's guilt beyond a
4  reasonable doubt.
5          There has been evidence that the defendant made
6  certain statements in which the government claims he
7  admitted certain facts charged in the indictment.
8          In deciding what weight to give the defendant's
9  statements, you should first examine with great care
10 whether each statement was made and whether in fact it was
11 voluntarily and understandingly made.  I instruct you that
12 you are to give the statements such weight as you feel
13 they deserve in light of all the evidence.  However, if
14 you find that the statement was either involuntary or not
15 knowingly made, you may not consider it in any way.
16         The law does not require any party to call as
17 witnesses all persons who may have been present at any
18 time or place involved in the case or who may appear to
19 have some knowledge of the matter in issue at this trial.
20 Nor does the law require any party to produce as exhibits
21 all papers and things mentioned during the course of the
22 trial.
23         There is no legal requirement that the
24 government prove its case through any particular means.
25 While you are to carefully consider the evidence adduced

Stephanie Picozzi, CRR, RPR
Official Court Reporter

CHARGE OF THE COURT

1066

1          During the course of the trial, you may have
2  heard testimony that attorneys interviewed witnesses when
3  preparing for and during this trial.  You must not draw
4  any unfavorable inference from that fact.  On the contrary
5  attorneys are obliged to prepare their case as thoroughly
6  as possible and in the discharge of that responsibility
7  interview witnesses in preparation for the trial and from
8  time to time as may be required during the course of the
9  trial.
10         The attorneys for the United States and the
11 attorneys for the defendant have entered into stipulations
12 concerning certain facts that are relevant to this case.
13 A stipulation of fact is simply an agreement among the
14 parties that a certain fact is true.  You should regard
15 such agreed facts as true.  However, what weight to give
16 those facts is entirely up to you.  You are the sole
17 judges of the facts and you decide what weight to give
18 those facts.
19         That concludes Part 1.  Even though it's only a
20 little after 4:10, I don't want to start Part 2 and break
21 it up.  I want to give you that piece together.
22         We will adjourn for the day, start tomorrow at
23 9:30.  I probably have another hour and a half of
24 instructions to you, then you will begin your
25 deliberations.

Stephanie Picozzi, CRR, RPR
Official Court Reporter

CHARGE OF THE COURT

1065

1  by the government, you not to speculate as to why agents
2  used the techniques they did or why they did not use other
3  techniques.  The government is not on trial.  Law
4  enforcement techniques are not your concern.  Your concern
5  is to determine whether or not, on the evidence or lack of
6  evidence, the defendant's guilt has been proved beyond a
7  reasonable doubt.
8          In alleging dates, the indictment charges "on or
9  about" certain dates.  The proof need not establish with
10 certainty the exact date of an alleged offense.  The law
11 only requires the evidence establish beyond a reasonable
12 doubt that the dates alleged in the indictment and the
13 dates established by the testimony or exhibits are
14 substantially similar.
15         You have heard evidence about the involvement of
16 another person in some of the events referred to in the
17 indictment.  You may not draw any inference favorable or
18 unfavorable towards the government or the defendant from
19 the fact that certain persons are not on trial before you
20 or are not named as defendants in this particular case.
21 That this individual is not on trial before you or is not
22 named as the defendant in this case is not your concern.
23 You should neither speculate as to the reason people are
24 not on trial before you nor allow their absence as parties
25 to influence in any way your deliberation in this case.

Stephanie Picozzi, CRR, RPR
Official Court Reporter

CHARGE OF THE COURT

1067

1          As I said, the schedule is the same, 9:30 to
2  430.  One difference, during deliberation, you are
3  provided with lunch.  So when you come in in the morning,
4  Michelle will have a menu from a local deli in the jury
5  room.  You will check what you would like to have for
6  lunch and it will be brought to the jury, the jury room,
7  during your deliberations.
8          So that's the schedule we will follow tomorrow.
9          I want to emphasize a couple of things to you.
10 One is don't discuss the case among yourselves or with
11 anyone else and I want to emphasize this because tomorrow
12 morning before I bring you out at 9:30, you will be back
13 there in the jury room, you are not allowed to start
14 discussing the case yet.  I haven't given you the full
15 instructions on the law.  You will have plenty of time to
16 discuss the case.  Please wait until I have completed my
17 instructions and I tell to you start deliberating.
18         Don't read or listen to anything regarding the
19 case.  And that's all the instructions that I have for
20 today at least.
21         So have a good night and I will see you tomorrow
22 morning at 9:30.
23         (The jury leaves the courtroom.)
24         THE COURT:  Everyone can be seated.
25         Just give me two minutes.  I want to grab some

Stephanie Picozzi, CRR, RPR
Official Court Reporter

**1068**

1    notes.  I was going start to put my Rule 29 ruling on the
2    record.  I may finish that tomorrow.
3              (Pause)
4              THE COURT:  I will put at least part of the
5    Court's ruling on the record.  If I don't finish in the
6    next 15 minutes or so, I will complete it tomorrow while
7    the jury is deliberating.
8              As I said before, I am denying the Rule 29
9    motion and I want to state the reasons for
10   that now.
11             First, with respect to the motion, the standard
12   is well settled for Rule 29 the Court should grant the
13   motion if it concludes that no rational trier of fact will
14   find the defendant guilt beyond a reasonable doubt based
15   on the evidence presented at the trial.  It's in the rule
16   itself as well as United States v. Jackson, 335 F. 3d,
17   170, page 180, Second Circuit 2003.  And the standard for
18   evaluating that conviction must be upheld under Rule 29 or
19   allowed to go to the jury after viewing the evidence in
20   the light most favorable to the government and drawing all
21   reasonable inferences in its favor, any rationale trier of
22   fact could have found the essential element of the crime
23   beyond a reasonable doubt; United States v. Medina, 944 F.
24   2d, 60, page 66, Second Circuit 1991.
25             Quoting in Supreme Court:

**1069**

1              In analyzing the efforts, the Second Circuit
2    emphasizes, pieces of evidence must be viewed not in
3    isolation but in conjunction and the jury's verdict may be
4    based on circumstantial evidence; United States v.
5    D'Amato, 39 F.3d, 1249, at page 1256, Second Circuit 1954.
6    And also Second Circuit emphasized, credibility of
7    witnesses with the jury rather than the Court to
8    determine; United States v. Strauss, 999, F.2d 692, page
9    696, Second Circuit 1993.
10             That is the standard the Court has applied here
11   and concludes that for each of the counts of the
12   indictment, there is more than sufficient evidence for the
13   jury, if the government's evidence is credited and all
14   reasonable inferences are drawn in favor of the government
15   from that evidence, to rationally convict the defendant on
16   each and every count of the indictment.
17             I won't go through all the details of the
18   evidence.  In summary, the two searches of the defendant's
19   home, including the SD card in the computer hard drive,
20   the Western Union records, the e-mails and defendant's
21   statements to law enforcement in terms of the major
22   categories of proof that the government offered are
23   sufficient if the jury credits that evidence for the jury
24   to rationally find that the defendant possessed child
25   pornography on his computer and on the SD card and that

**1070**

1    they were his.  They could rationally find e-mails were
2    sent to him, to Ms. Kalichenko and that the child
3    pornography involving ▆▆▆ was received by him.  They
4    could similarly conclude based upon that evidence that as
5    was noted by the government in the summation, specific
6    e-mail conspiracy issues, that there is an agreement
7    between Kalichenko and the defendant that she would
8    exploit, sexually exploit, ▆▆▆ in videotapes sent to
9    the defendant in exchange for money.
10             The jury can also rationally find based on
11   e-mails and other evidence in the case that by paying for
12   the videos and providing the script for the videos that he
13   aided and abetted the exploitation of ▆▆▆ in the
14   Ukraine outside the United States.  The issue obviously
15   that was raised by the defense with respect to whether or
16   not the videos were preexisting, again, if the evidence is
17   construed most favorably to the government in terms of
18   what was being requested in the e-mails, what was received
19   back in those e-mails in therms of the videos, the timing
20   of the videos, all the evidence, the circumstantial
21   evidence viewed most favorably to the government can
22   support a rational finding those videos were not
23   preexisting but were made only after the defendant made
24   the request for the videos to be produced.
25             In terms of the charge involving the ▆▆▆ , the

**1071**

1    jury could rationally find based upon the location of the
2    images and the control over the house, the camera and the
3    other circumstantial evidence presented with respect to
4    that, the circumstance surrounding the image, the
5    testimony of the sister, not the images themselves but
6    defendant's involvement for filming the daughter for
7    modeling purposes, if all that circumstantial evidence is
8    taken together, the jury viewed those favorably to the
9    government, the jury can certainly rationally find Mr.
10   Valerio sexually exploited his ▆▆▆ and produced the
11   images found on the SD card and adduced the ▆▆▆ to
12   engage in sexually-explicit conduct and can rationally
13   find in the government's favor on that count as well.
14             I want to focus more particular on Mr. Lato's
15   specific argument as relates to whether or not there is
16   sufficient proof for each of the attempt counts
17   constituting an attempt and whether or not those counts
18   are multiplicitous of a sexual exploitation count which I
19   understand is your argument.
20             MR. LATO:  Yes, your Honor.
21             THE COURT:  First I want to focus on whether or
22   not there is sufficient proof of attempt, sufficient proof
23   on each charge for there to be attempt as that is defined
24   under the law.
25             And I spent some time yesterday going through

1072

1  each e-mail that is the subject of a separate count to
2  review it, to see whether or not a jury could rationally
3  conclude that each e-mail constituted a separate attempt
4  to commit the crime.  And my conclusion is that they
5  could.
6        Just with respect to the standard for attempt, I
7  read the instruction to the jury and, obviously, that is
8  the law but let me state there are two cases that I
9  reviewed in particular on this issue that set out what the
10  law requires in the Second Circuit for attempt.  One is
11  United States v. Desposito, 704, F.3d 221, Second Circuit,
12  2013.  In summary, the government has to show that the
13  defendant took a substantial step toward committing the
14  crime that was strongly corroborative, firmness of the
15  defendant's criminal intent.  And that case cites to
16  another case, a terrorism case, United States v. Farhane,
17  634, F.3d 127, Second Circuit 2011, which is a very long
18  discussion about the substantial step requirement for
19  attempt.
20        Again, I will not repeat it here.  I want the
21  record clear I have reviewed that standard in applying it
22  to the evidence presented before me.
23        I also note there are a number of cases out
24  there that discuss, not in this circuit, but informative
25  on this issue of whether or not a solicitation to commit a

Stephanie Picozzi, CRR, RPR
Official Court Reporter

1073

1  crime itself can be an attempt.  There are two cases that
2  discuss this and conclude that it can -- don't conclude
3  always an attempt but they certainly conclude that a
4  solicitation under certain circumstances can itself
5  constitute an attempt.  One is United States v. American
6  Airlines, Inc. which was an anti-trust case, 743 F.2d
7  1114, Fifth Circuit, 1984, and United States v. Rovetuso,
8  768, F.2d 809, Seventh Circuit, 1985, which discusses the
9  fact a solicitation depending upon the circumstances can
10  constitute in and of itself an attempt.
11        Here, I want to make clear although I cited the
12  case of the e-mails that I reviewed in connection with
13  each of those counts, it's more than just a solicitation
14  where, for example, an e-mail said could you send me child
15  pornography, as the government pointed out during
16  summations or trial.  Each of those e-mails give specific
17  direction.  One e-mail refers to a script.  So it's a
18  solicitation combined with specific directions on how it
19  is to be carried out, often when it should be carried out
20  and in many instances providing money in the form of MTCN
21  number references, money that is provided, has been
22  provided, will be provided.  So many of these also include
23  an element of payment or promise of payment.
24        I conclude that each one of these e-mails
25  separately could constitute an attempt because a

Stephanie Picozzi, CRR, RPR
Official Court Reporter

1074

1  substantial step could be found by the jury with respect
2  to each one of these e-mails to assist in the exploitation
3  of the child in the Ukraine, sexual exploitation of the
4  child in the Ukraine and the e-mails are strongly
5  corroborative of criminal intent based on the details of
6  what is to be done and the discussion of money and other
7  things that will be provided or not be provided depending
8  on whether the instructions are followed.
9        I want to make clear also this is not multiple
10  discussions about one video being produced and there is
11  multiple discussions about directions regarding that
12  video.  If the evidence is construed most favorably to the
13  government, the jury could find certainly that a number of
14  videos are being created as a result of the direction and
15  then more directions being given for additional videos to
16  be done.  And there are numerous references in the videos
17  to having received the videos, wanting more videos.  And
18  as I will go through tomorrow, there are a couple of
19  instances that I looked at very carefully because the
20  e-mails were in one instance a day apart, in another
21  instance six or seven days apart.  I wanted to ensure that
22  the two e-mails didn't relate to the same request for some
23  type of exploitation to be done.  And I think, again, when
24  those e-mails are construed most favorably to the
25  government, the jury could find even in one of those is

Stephanie Picozzi, CRR, RPR
Official Court Reporter

1075

1  miles away, even the ones close together the defendant was
2  seeking additional new videos of ████, not one that he
3  previously requested in a prior e-mail that's the subject
4  of a separate count.
5        I will briefly go through that tomorrow and I
6  will deal with the multiplicity issue, if there are
7  convictions on each count; that can be dealt with at
8  sentencing.
9        Why don't we stop for now it's 4:30 and we will
10  get started at 9:30.  I did want to mention a couple of
11  objections during the summation.  One I sustained because
12  the government made reference to Ms. Kalichenko not being
13  able to testify.  I sustained that objection because I
14  don't think that's something that the jury should
15  speculate about or should be commented on by the
16  government.  The other two I overruled.  One Mr. LaPinta
17  made early on to the government referring to e-mails,
18  that's an attempt charge.  There was an objection I
19  overruled.  The government can argue whether an e-mail
20  constitutes an attempt.  And one in the rebuttal the
21  government suggested to -- I believe what the defense said
22  you have to believe the agents -- law enforcement
23  witnesses were lying.  It is true that certainly Mr.
24  LaPinta focused on aspects if you believe what was said
25  suggests other things -- claim other things they had done

Stephanie Picozzi, CRR, RPR
Official Court Reporter

1078

1076

1  that they had not admitted to.  At least during the
2  cross-examination I believe based on the fact no notes
3  were taken at the time of the interview that was done many
4  days later certainly there could be implication
5  potentially, I guess, the agents made up at least maybe
6  not the second statement regarding the █████ but that made
7  up the admission regarding the admission -- admitting that
8  the e-mails were sent by Mr. Valerio.  I think, obviously,
9  I told the jury it's all argument whether or not the
10 evidence would support that or whether or not that was
11 exactly what the defense was arguing is up to the jury to
12 decide.
13       I think the government objected to something.
14 You objected and it was overruled.
15       Anything else we need to address then today?
16       MR. BODE:  No, your Honor.
17       THE COURT:  I do want to compliment both sides
18 regardless of the verdict.  I believe the lawyers on both
19 sides did an excellent job for their clients, very
20 civilized in dealing with the Court trying to make the
21 trial run smoothly.  I appreciate that.
22       MR. LATO:  Before you leave, your Honor, with
23 respect to the multiplicity that you touched upon, if
24 there is a conviction, from the defense standpoint, we
25 don't need to go into tit; assuming conviction on the

Stephanie Picozzi, CRR,  RPR
Official Court Reporter

1078

**I-N-D-E-X**

**W-I-T-N-E-S-S-E-S**

| | |
|---|---|
| F R A N C E S  V A L E R I O | 934 |
| DIRECT EXAMINATION | 934 |
| BY MR. LATO | |
| CROSS-EXAMINATION | 939 |
| BY MR. KABRAWALA | |
| REDIRECT EXAMINATION | 944 |
| BY MR. LATO: | |
| RECROSS-EXAMINATION | 945 |
| BY MR. KABRAWALA | |

**E-X-H-I-B-I-T-S**

| | |
|---|---|
| Court Exhibit D received in evidence | 1045 |

Stephanie Picozzi, CRR,  RPR
Official Court Reporter

1077

1  substantive counts, the attempts occur within the same
2  time frame would have to be merged at sentencing.  No
3  reason to go into that.
4        THE COURT:  The theory would be if he was
5  convicted of the substantive count and the attempt counts,
6  I would not be sentencing on attempts, just the
7  substantive.  There is actually -- I have to look at it
8  more carefully.  I didn't mean to deal with it yesterday.
9  Some Courts suggest vacating attempt convictions.  Some
10 say as long as you don't sentence, you don't have to
11 vacate.
12        MR. LATO:  They talk about merging.  There is no
13 merge mechanism.  What it means, I assume, to vacate some
14 of the counts but the reality is if there is conviction on
15 the substantive counts, the attempts in the same time
16 period are superfluous and the government I guess won't
17 object at that point because if the Second Circuit were to
18 reverse with respect to the substantive, they could
19 restore the counts.
20        THE COURT:  I agree but we will address that if
21 we need to.
22        Have a good night.
23        (The trial was adjourned to Thursday, November
24 13, 2013 at 9:30 a.m.)
25

Stephanie Picozzi, CRR,  RPR
Official Court Reporter

## $

**$1,000** [2] - 972:11, 24
**$100** [1] - 961:6
**$12,000** [1] - 965:15
**$150** [1] - 959:3
**$7,000** [1] - 964:16
**$900** [3] - 971:17;
1037:3

## 0

**0005** [1] - 953:14
**0094** [1] - 923:3

## 1

**1** [7] - 929:8; 983:13;
988:6; 1046:19; 1050:7,
18; 1066:19
**10** [4] - 926:17; 953:4;
954:25; 1017:1
**100** [2] - 923:13, 22
**1045** [1] - 1078:18
**1080p** [1] - 952:13
**10th** [2] - 938:19;
1016:15
**1114** [1] - 1073:7
**11722** [2] - 923:14, 22
**11788** [1] - 923:18
**12** [7] - 923:7; 939:11;
965:7; 966:7; 984:7;
1016:23; 1034:21
**12-year** [1] - 965:9
**1249** [1] - 1069:5
**1256** [1] - 1069:5
**127** [1] - 1072:17
**12:04:00** [1] - 955:5
**12:15** [1] - 988:9
**12:25** [1] - 989:1
**12th** [1] - 984:18
**13** [2] - 1011:21;
1077:24
**14** [3] - 923:3; 931:15;
982:10
**14th** [1] - 1017:24
**15** [7] - 926:20;
929:24; 931:15; 938:11;
960:10; 1068:6
**15-minute** [1] - 988:6
**16** [2] - 967:16; 1003:1
**16th** [2] - 967:18;
968:6
**170** [1] - 1068:17
**18** [3] - 970:1; 977:23;
978:12
**180** [1] - 1068:17
**19** [5] - 953:11, 16;

954:25; 965:7; 1017:2
**1954** [1] - 1069:5
**1984** [1] - 1073:7
**1985** [1] - 1073:8
**1991** [1] - 1068:24
**1993** [1] - 1069:9
**1:00** [3] - 946:16;
989:3, 9

## 2

**2** [10] - 924:20; 956:6,
18; 973:14; 974:5;
982:8; 1017:21; 1050:9,
20; 1066:20
**2-E-mails** [1] - 967:24
**20** [4] - 938:11;
955:23; 956:1; 1008:9
**200** [1] - 923:18
**200-A** [2] - 964:22, 25
**2002** [2] - 935:15;
965:7
**2003** [2] - 935:15;
1068:17
**2004** [1] - 961:11
**2005** [3] - 936:8;
950:19; 978:18
**2006** [1] - 936:9
**2009** [1] - 936:8
**2010** [15] - 938:13, 19,
25; 950:14, 16; 951:4;
952:9; 953:4; 954:25;
956:15; 1016:15;
1017:1, 23-24; 1038:16
**2011** [31] - 936:19;
941:18, 21; 950:10, 14,
16; 953:10, 17; 954:25;
955:2, 4, 25; 956:6,
11-13, 18; 957:5;
1017:2, 20-21, 23, 25;
1018:1; 1038:12, 16,
21; 1072:17
**2012** [26] - 957:10;
960:10, 23; 961:18;
962:8, 23; 964:4, 11;
965:23; 966:2, 7;
967:16-18, 25; 969:15;
970:14, 21-23; 972:25;
973:14; 974:10; 983:4;
984:8; 1036:22
**2013** [4] - 958:3;
970:1; 1072:12; 1077:24
**2014** [4] - 923:7;
965:7; 975:15; 986:22
**205** [6] - 967:16, 19;
968:21; 969:14;
1040:11, 19
**208** [1] - 960:11

**210** [1] - 967:8
**211** [2] - 961:8, 15
**214** [2] - 984:7, 23
**216** [1] - 962:22
**22** [7] - 956:12;
957:10; 967:18; 969:15;
970:14, 22; 974:5
**221** [1] - 1072:11
**225** [1] - 966:7
**229** [3] - 971:24;
972:6, 21
**22nd** [1] - 968:20
**23** [10] - 955:4, 25;
958:3; 965:7; 970:23;
972:25; 1017:23;
1036:22; 1037:1
**230** [1] - 973:3
**23rd** [2] - 957:20;
971:3
**24** [1] - 938:25
**243** [1] - 983:4
**245** [1] - 970:1
**24th** [3] - 959:2, 4, 19
**25** [2] - 964:11; 1008:9
**26** [2] - 956:11; 964:4
**26th** [1] - 1038:13
**27** [1] - 963:23
**27th** [2] - 951:4;
973:13
**28** [3] - 960:23;
975:15; 986:22
**29** [6] - 924:9, 12;
1068:1, 8, 12, 18
**2:00** [2] - 1006:25;
1007:2
**2d** [1] - 1068:24
**2nd** [1] - 1038:12

## 3

**3** [12] - 935:12;
950:23; 952:12; 956:10;
964:3; 965:3, 23;
966:2; 982:12, 14;
1050:11, 22
**30** [1] - 974:10
**31** [1] - 929:8
**310** [1] - 954:3
**32** [1] - 929:14
**321** [1] - 954:4
**322** [1] - 971:17
**323** [1] - 954:21
**332** [1] - 963:5
**334** [1] - 952:21
**335** [1] - 1068:16
**338** [1] - 954:6

**35** [1] - 923:18
**39** [1] - 1069:5
**3:39** [2] - 951:5;
1016:15
**3:42** [1] - 1016:16
**3:47** [1] - 953:4
**3d** [1] - 1068:16

## 4

**4** [5] - 952:14; 961:18;
962:8; 985:17; 1050:24
**400** [1] - 968:4
**401** [2] - 968:5; 981:24
**404** [1] - 951:19
**430** [1] - 1067:2
**4:10** [1] - 1066:20
**4:30** [4] - 1043:25;
1044:16; 1045:11;
1075:9
**4th** [2] - 966:3;
1017:25

## 5

**5** [3] - 983:4; 1017:20;
1051:10
**503-G** [1] - 974:11
**504-E** [1] - 974:15
**508** [1] - 950:24
**510** [1] - 953:6
**511** [1] - 953:14
**519** [1] - 953:10
**524** [1] - 953:22
**528** [3] - 953:22, 24;
954:1
**551** [1] - 972:19
**556** [1] - 963:9
**557** [1] - 957:11
**558** [1] - 958:3
**559** [1] - 959:4
**560** [2] - 962:8, 21
**561** [1] - 956:19
**562** [2] - 955:4, 24
**564** [1] - 962:10
**567** [1] - 964:12

## 6

**6** [1] - 1051:12
**60** [1] - 1068:24
**6006** [1] - 963:12
**631** [1] - 923:23
**634** [1] - 1072:17
**66** [1] - 1068:24
**69** [1] - 969:21
**69.118** [1] - 970:12
**692** [1] - 1069:8

**696** [1] - 1069:9

**6:00** [3] - 1021:22; 1022:6; 1042:2

**6:20** [1] - 953:17

**6th** [1] - 972:12

---

**7**

**7** [2] - 952:9; 1051:15

**704** [1] - 1072:11

**707** [1] - 929:19

**712-6105** [1] - 923:23

**743** [1] - 1073:6

**76** [1] - 929:14

**768** [1] - 1073:8

**7th** [1] - 1018:1

---

**8**

**809** [1] - 1073:8

**82** [1] - 929:19

---

**9**

**9/11** [1] - 1018:13

**9/6/12** [1] - 971:24

**900** [1] - 972:25

**934** [2] - 1078:3

**939** [1] - 1078:6

**944** [2] - 1068:23; 1078:8

**945** [1] - 1078:10

**999** [1] - 1069:8

**9:30** [8] - 923:7; 973:19; 1066:23; 1067:1, 12, 22; 1075:10; 1077:24

---

**A**

**a.m** [6] - 923:7; 955:5; 1021:22; 1022:6; 1042:2; 1077:24

**abetted** [3] - 977:13; 985:23; 1070:13

**abilities** [1] - 1000:10

**ability** [3] - 1016:12; 1018:12; 1059:2

**able** [4] - 947:9; 963:18; 969:5; 1075:13

**abode** [1] - 1001:20

**abroad** [7] - 961:13; 967:7, 10; 969:24; 983:8, 10, 12

**absence** [1] - 1065:24

**absolutely** [1] - 1003:6

**academic** [1] - 978:14

**accept** [4] - 947:18;

1054:5; 1059:25; 1062:22

**acceptance** [1] - 1019:6

**access** [1] - 1006:1

**accessed** [1] - 1011:14

**accident** [1] - 996:19

**accordance** [1] - 1047:4

**according** [3] - 951:2; 971:17; 1040:15

**account** [38] - 962:20; 964:8, 18-19; 965:9; 966:5, 18; 999:22, 24-25; 1000:11, 14, 17, 21-23; 1001:11; 1002:6; 1004:13; 1006:2; 1009:8; 1012:23; 1013:2, 6; 1018:5, 12; 1032:12; 1033:12; 1034:21, 23; 1037:10, 15, 19; 1043:1; 1058:22; 1059:16

**accountable** [3] - 988:2; 1043:17

**accounts** [9] - 998:3, 7; 1001:14; 1009:13; 1010:3; 1025:10; 1033:6, 9

**accurate** [10] - 927:11; 1016:6, 9, 14, 18; 1024:19; 1030:7; 1058:22; 1059:10

**accurately** [2] - 1024:19; 1058:13

**accusation** [1] - 1047:21

**accused** [7] - 991:18; 992:16; 993:1, 21; 994:7; 1025:3; 1031:4

**achieve** [1] - 1005:22

**acknowledged** [2] - 951:9; 968:15

**acquit** [2] - 1048:12; 1049:24

**act** [2] - 1049:6, 9

**acted** [2] - 979:5, 13

**actions** [1] - 997:12

**active** [1] - 1035:8

**acts** [7] - 927:8, 10; 976:20; 986:7; 1029:4; 1036:16

**actual** [4] - 951:12; 954:5; 975:12; 980:6

**add** [1] - 927:24

**addition** [4] - 958:21; 982:17; 1052:2, 10

**additional** [2] - 1074:15; 1075:2

**address** [35] - 926:2; 937:12; 952:12; 956:9; 961:10; 964:21, 25; 965:3, 11, 14-15; 967:4; 969:19, 21; 970:8, 11-13, 16-17; 997:21; 1003:16; 1011:16; 1020:18; 1025:11; 1027:20; 1034:17; 1037:14; 1043:5; 1076:15; 1077:20

**addressed** [4] - 924:18; 952:10; 964:2; 1055:22

**addresses** [1] - 1034:19

**adduced** [2] - 1064:25; 1071:11

**adjourn** [1] - 1066:22

**adjourned** [1] - 1077:23

**admissible** [2] - 927:21; 1055:17

**admission** [2] - 1076:7

**admitted** [10] - 932:12; 947:22; 968:22; 970:15; 975:20, 24; 1036:18; 1063:20; 1064:7; 1076:1

**admitting** [1] - 1076:7

**adopt** [1] - 992:11

**adoption** [1] - 971:11

**adore** [1] - 990:22

**advanced** [1] - 1006:8

**advances** [1] - 1059:20

**advantage** [1] - 996:15

**adverse** [1] - 1063:12

**advice** [2] - 925:22; 926:8

**advised** [1] - 925:21

**advises** [1] - 927:9

**affairs** [1] - 1049:10

**affect** [2] - 1055:11; 1058:17

**affected** [1] - 1060:4

**Africa** [1] - 962:15

**age** [6] - 956:20; 977:23; 1014:17, 23; 1041:13; 1051:23

**Agent** [19] - 954:2; 967:21; 968:12; 973:15; 978:20; 989:20; 996:4; 998:11; 1006:1; 1009:10; 1010:20;

1014:20; 1017:17; 1022:5, 16; 1023:2; 1026:11; 1035:3; 1043:7

**agent** [5] - 952:1; 954:16; 996:5; 997:18; 1000:15

**agents** [12] - 950:25; 975:14, 20-21; 1009:9; 1014:21; 1021:24; 1026:18; 1041:25; 1065:1; 1075:22; 1076:5

**ages** [1] - 978:10

**ago** [8] - 925:18; 944:12; 994:22; 1003:24

**agree** [6] - 992:8; 997:5; 1011:5; 1014:1; 1027:13; 1077:20

**agreed** [7] - 968:23; 984:1, 4; 1011:8; 1017:3; 1050:12; 1066:15

**agreement** [9] - 983:19-22; 984:21; 985:1; 1066:13; 1070:6

**agrees** [1] - 925:23

**aided** [3] - 977:13; 985:23; 1070:13

**aids** [1] - 939:10

**Airlines** [1] - 1073:6

**airport** [2] - 999:9; 1018:2

**A⬛** [1] - 962:13

**A⬛'s** [1] - 962:17

**aliases** [1] - 1026:2

**alibis** [1] - 1019:22

**alleged** [2] - 1065:10, 12

**alleging** [1] - 1065:8

**ALLEN** [1] - 923:15

**allocute** [1] - 925:11

**allow** [4] - 948:6; 1041:4; 1052:3; 1065:24

**allowed** [7] - 947:8; 948:11; 1040:22; 1041:3; 1056:12; 1067:13; 1068:19

**alluded** [1] - 1021:18

**almost** [4] - 956:16; 989:1; 1033:22; 1049:1

**alone** [6] - 982:15; 990:10; 1021:5; 1036:12; 1046:23; 1048:11

**Ameet** [1] - 940:1

**AMEET** [1] - 923:14

**America** [1] - 998:25

**AMERICA** [1] - 923:3

**American** [1] - 1073:5

**amount** [1] - 972:22

**analysis** [3] - 986:11, 17; 1006:15

**analyzing** [1] - 1069:1

**Andre** [1] - 970:3

**Angelini** [7] - 973:16; 996:4; 997:18; 998:11; 1006:1; 1010:20; 1014:20

**Angelique** [4] - 936:4; 962:10

**Angelo** [1] - 939:11

**angles** [1] - 959:13

**angry** [1] - 1040:10

**Answer** [1] - 975:10

**answer** [8] - 975:11; 1014:4; 1051:6; 1055:25; 1056:2

**answered** [1] - 1003:21

**ANTHONY** [1] - 923:17

**anti** [1] - 1073:6

**anti-trust** [1] - 1073:6

**anticipate** [1] - 948:10

**anyway** [1] - 993:6

**apart** [3] - 1039:7; 1074:20

**apartment** [2] - 1001:21; 1029:23

**apparent** [1] - 1023:24

**appealed** [1] - 1060:12

**appear** [2] - 1058:10; 1064:18

**APPEARANCES** [1] - 923:11

**appearances** [3] - 924:3; 940:15; 994:25

**appeared** [1] - 941:11

**applicable** [1] - 931:10

**applied** [1] - 1069:10

**applies** [1] - 987:22

**apply** [2] - 1027:18; 1047:3

**applying** [1] - 1072:21

**appreciate** [1] - 1076:21

**apprehended** [1] - 999:12

**approached** [1] - 1015:8

**appropriate** [1] - 927:12

**appropriately** [2] -

924:18; 925:8

**approve** [1] - 1063:21

**approximate** [1] - 1021:3

**April** [9] - 961:18; 962:8, 23; 963:23; 964:4, 9, 11; 984:7, 18

**area** [10] - 961:12, 14; 969:23; 970:17; 980:21, 23; 1040:5, 23; 1041:4

**areas** [1] - 1001:22

**argue** [5] - 991:22; 1023:24; 1029:7; 1031:20; 1075:19

**argued** [2] - 1040:13; 1041:23

**argues** [1] - 1060:7

**arguing** [2] - 1006:6; 1076:11

**argument** [8] - 947:18; 1009:4, 24; 1011:16; 1040:18; 1071:15, 19; 1076:9

**arguments** [13] - 947:18; 990:10, 13; 993:18; 996:2; 1006:21; 1021:6, 18; 1027:19; 1028:18; 1030:2; 1046:6; 1050:20

**Arkay** [1] - 923:18

**arrangement** [1] - 949:10

**arrest** [1] - 1035:2

**arrested** [8] - 999:9; 1001:15; 1005:20; 1023:7, 9-10, 12; 1035:3

**arresting** [1] - 998:17

**arrival** [2] - 956:5; 1018:6

**arrive** [1] - 967:9

**arrived** [7] - 937:16; 938:4; 1017:20, 22, 25; 1018:5; 1042:2

**arriving** [1] - 1053:25

**aside** [3] - 994:18; 995:9; 996:17

**aspects** [1] - 1075:24

**ass** [1] - 974:2

**assembled** [1] - 982:2

**assessing** [1] - 1062:7

**assist** [2] - 1061:10; 1074:2

**Assistants** [1] - 923:15

**assisted** [1] - 923:24

**associated** [3] -

951:3; 959:17; 1036:23

**assume** [5] - 926:23; 1023:10, 12; 1053:3; 1077:13

**assumed** [1] - 1044:14

**assuming** [2] - 932:3; 1076:25

**assure** [3] - 991:16, 25; 1014:20

**attach** [2] - 1003:23; 1063:11

**attached** [3] - 970:24; 1003:16; 1005:12

**attachment** [3] - 1003:22

**attachments** [6] - 974:12; 1003:13, 16, 18; 1005:11; 1036:24

**attack** [1] - 1062:16

**attacking** [1] - 1006:7

**attempt** [32] - 958:4, 21, 24; 960:23; 961:19; 962:4; 972:12; 976:13; 999:20; 1009:18; 1029:2; 1041:15, 18, 20; 1071:16, 22-23; 1072:3, 6, 10, 19; 1073:1, 3, 5, 10, 25; 1075:18, 20; 1077:5, 9

**attempted** [3] - 958:10; 996:5; 1041:21

**attempts** [10] - 924:20, 25; 925:6; 967:20; 968:7; 985:11; 1077:1, 6, 15

**attention** [7] - 987:5; 990:3, 9, 11; 1001:9; 1006:18; 1015:16

**attentive** [1] - 1009:1

**Attorney** [2] - 923:13, 15

**attorney** [6] - 947:23; 948:1, 15; 1055:16, 18

**attorneys** [13] - 945:25; 946:1; 947:16, 20; 948:6, 14; 1046:5; 1051:1; 1055:14; 1066:2, 5, 10

**attributes** [1] - 1021:17

**August** [1] - 965:6

**authorities** [3] - 999:21; 1005:20; 1009:21

**available** [4] - 979:11; 1018:8; 1026:20; 1033:4

**avoid** [1] - 1049:12

**aware** [9] - 941:8; 942:19, 22, 25; 943:21, 24; 946:21; 1010:18

**awful** [1] - 1030:10

---

**B**

**baby** [2] - 956:20; 1004:7

**background** [1] - 1051:23

**bad** [4] - 999:10; 1008:24; 1019:8; 1020:6

**badly** [1] - 999:1

**bag** [2] - 952:2

**bail** [1] - 940:17

**ball** [3] - 935:22; 953:18

**balls** [1] - 935:21

**based** [17] - 928:14; 935:13; 982:7; 987:1; 1049:2; 1051:17; 1052:6; 1053:18; 1060:23; 1061:23; 1068:14; 1069:4; 1070:4, 10; 1071:1; 1074:5; 1076:2

**basement** [25] - 935:16, 18, 20; 936:20, 24-25; 937:21, 25; 938:9; 942:12, 23; 943:11, 14; 949:19; 950:22; 951:23; 952:7, 22; 953:20; 954:6, 13, 19; 1020:2; 1021:4; 1039:4

**basis** [1] - 1056:11

**bathroom** [1] - 1005:8

**battle** [1] - 1011:3

**Beach** [1] - 965:25

**bear** [2] - 1053:14; 1059:23

**became** [1] - 994:22

**becomes** [1] - 931:10

**bed** [1] - 939:3

**BEFORE** [1] - 923:8

**beforehand** [1] - 1014:10

**began** [1] - 1048:18

**begin** [5] - 987:17; 1043:23; 1046:3, 20; 1066:24

**beginning** [4] - 947:3, 13; 961:11; 974:19

**begins** [1] - 1048:10

**behalf** [2] - 925:23; 993:21

**behind** [5] - 924:14;

4

969:18; 979:18; 981:5;
1020:22

**believable** [1] -
1057:11

**believes** [2] - 1040:8;
1055:16

**beloved** [1] - 1019:19

**belt** [5] - 941:22, 25;
942:1; 1039:8

**benefit** [2] - 930:21;
1059:17

**Bernadette** [9] -
935:3; 937:2, 23;
942:19; 943:4; 950:15;
962:18; 1019:2, 15

**best** [2] - 962:3; 991:6

**better** [7] - 963:17;
973:4, 11; 1004:8;
1019:15; 1024:16;
1034:7

**between** [14] - 942:14;
955:12, 20; 978:10, 13;
983:19; 997:16, 20;
1025:10; 1033:6;
1038:18; 1056:18;
1070:7

**beyond** [35] - 949:25;
950:6; 977:12, 21;
981:12; 987:3; 988:1;
993:12; 1028:4, 15,
19; 1032:25; 1046:16;
1047:25; 1048:9, 13,
21, 23, 25; 1049:7, 15,
17, 21; 1050:1;
1053:17; 1063:6;
1064:3; 1065:6, 11;
1068:14, 23

**BIANCO** [1] - 923:9

**Bianco** [6] - 948:10;
989:19; 992:5; 993:13;
994:12; 995:13

**bias** [2] - 1058:15, 19

**big** [6] - 979:11;
1002:24; 1018:14;
1029:11; 1034:15

**bigger** [1] - 1026:3

**bill** [1] - 964:15

**binder** [1] - 979:11

**birthday** [4] - 953:11;
962:13; 1002:25

**bit** [7] - 924:13;
1000:5; 1002:3;
1003:25; 1010:7;
1014:25

**bitch** [1] - 973:21

**black** [4] - 951:20;
954:1; 1039:14

**blind** [2] - 943:5;
1038:2

**blonde** [6] - 954:5, 8;
961:4, 16; 979:20;
981:8

**blood** [2] - 940:13;
1019:4

**boardroom** [1] - 983:24

**BODE** [17] - 923:15;
926:25; 929:10, 16, 21;
930:3, 6, 19; 931:3,
15; 932:7, 12, 24;
933:5; 946:21; 1044:14;
1076:16

**Bode** [1] - 989:20

**bolster** [1] - 990:13

**bonds** [1] - 940:17

**Border** [5] - 1017:19;
1018:4, 11, 22; 1020:17

**border** [1] - 956:2

**born** [2] - 950:18;
978:18

**bother** [1] - 1000:16

**bottom** [2] - 960:15;
979:19

**bought** [3] - 952:5, 8

**bowed** [1] - 995:3

**box** [3] - 952:6

**boy** [1] - 936:2

**boyfriend** [1] - 1022:2

**boys** [1] - 936:1

**bragging** [3] - 966:21,
24

**break** [17] - 932:19;
946:2, 14; 947:10;
978:25; 988:6; 989:2,
10; 1006:25;
1008:22-24; 1043:23;
1044:4, 17; 1066:20

**brief** [3] - 947:7;
1031:25

**briefly** [5] - 968:6;
982:13; 983:14; 995:12;
1075:5

**bright** [2] - 996:11;
1010:13

**brighthelena68@gmail.
com** [2] - 998:1;
1000:18

**Brighton** [1] - 965:25

**bring** [7] - 932:5;
933:14; 972:1; 974:19;
1016:20; 1045:5;
1067:12

**brings** [2] - 967:15;
970:20

**Brooklyn** [1] - 966:12

**brother** [4] - 950:16,
21; 995:20; 1019:20

**brought** [7] - 1001:9;
1009:15; 1011:23;
1016:21; 1039:4;
1047:9; 1067:6

**build** [1] - 968:25

**building** [3] - 935:22;
1039:10, 12

**buildings** [1] - 966:12

**built** [1] - 1039:7

**bunch** [1] - 1039:4

**burden** [28] - 947:5;
950:3, 6; 974:21;
977:12; 985:21; 987:17;
992:23; 993:11, 16, 22;
995:25; 1028:14;
1031:4, 10; 1047:19,
24-25; 1048:2, 16;
1049:14, 18, 20;
1051:21, 25; 1054:17;
1063:6

**Bureau** [2] - 998:25;
1010:20

**business** [2] - 966:10,
22

**buy** [2] - 963:16

**BY** [8] - 934:23;
939:25; 944:11; 945:3;
1078:5, 7, 9, 11

**C**

**Cablevision** [8] -
961:9; 964:23; 965:6;
969:17; 970:18;
1000:21; 1034:19, 23

**cafeteria** [1] - 938:18

**calculating** [1] -
997:3

**cam** [2] - 953:14;
963:19

**camcorder** [4] -
952:13; 1015:25;
1016:6; 1039:14

**camera** [34] - 943:16,
18; 951:11, 15-16,
18-19, 21-22, 25;
952:1, 3, 5; 954:12,
16-18, 22-23; 960:2, 5;
963:17; 979:16; 982:2;
1023:4; 1039:6, 11, 16,
21; 1040:3, 6, 9-10;
1071:2

**cameras** [6] - 943:13,
20, 24; 954:15; 1002:8;
1041:4

**Canadians** [1] - 970:5

**candid** [1] - 1058:4

**cannot** [1] - 1057:17

**capital** [1] - 984:13

**caprice** [1] - 1049:11

**caps** [3] - 962:6;
974:4; 1040:10

**caption** [1] - 931:17

**card** [13] - 950:25;
952:14, 16; 953:25;
982:3; 1023:4; 1024:24;
1038:3; 1040:4;
1069:19, 25; 1071:11

**cards** [4] - 935:22;
975:1; 1001:24; 1043:1

**care** [4] - 939:2;
1025:1; 1059:25; 1064:9

**careful** [3] - 995:22;
997:9; 1048:14

**carefully** [5] -
1049:4; 1057:22;
1064:25; 1074:19;
1077:8

**cares** [1] - 1024:24

**carriage** [1] - 927:11

**carried** [2] - 1073:19

**carries** [1] - 942:1

**carrying** [3] - 941:22;
1039:8; 1053:5

**case** [103] - 924:2;
925:2; 928:12; 932:23;
933:22; 940:2; 942:20;
945:17, 20, 24; 946:3;
947:13; 948:22; 949:21;
951:8; 963:14; 977:14;
987:14; 988:8; 990:18,
20, 25; 992:6, 24;
994:3, 19-20, 22, 24;
995:2, 10, 16, 23;
996:3; 1001:4, 7;
1002:3, 11; 1004:1;
1006:19; 1007:1;
1009:14; 1011:2, 9, 17;
1012:19, 21, 23-25;
1014:25; 1023:11;
1024:3, 6; 1027:3, 8;
1031:22; 1042:17;
1043:21; 1044:3;
1046:4, 8, 12, 21, 25;
1047:21; 1048:2, 15;
1049:14; 1052:7;
1053:24; 1055:4, 12,
14-15; 1057:6; 1059:8,
18; 1060:2; 1061:21;
1062:5, 20; 1063:3, 20;
1064:2, 18, 24;
1065:20, 22, 25;
1066:5, 12; 1067:10,
14, 16, 19; 1070:11;
1072:15; 1073:6, 12

29

**cases** [4] - 1030:15; 1072:8, 23; 1073:1

**categories** [1] - 1069:22

**caught** [1] - 1042:15

**caused** [1] - 1058:20

**CD** [3] - 975:1; 997:19

**CDs** [1] - 1001:24

**ceased** [1] - 975:2

**ceiling** [6] - 951:23; 954:14; 1039:16

**cell** [4] - 960:1; 963:19; 973:24; 1002:8

**Central** [3] - 923:5, 14, 22

**certain** [17] - 937:8; 947:21; 972:8; 997:19; 1005:7; 1011:8; 1050:14; 1051:7; 1064:6; 1065:9, 19; 1066:12, 14; 1073:4

**certainly** [12] - 987:6; 990:15; 997:7; 1013:20; 1014:1, 24-25; 1071:9; 1073:3; 1074:13; 1075:23; 1076:4

**certainty** [1] - 1065:10

**chair** [1] - 934:16

**challenge** [1] - 960:14

**challenging** [1] - 928:25

**chance** [2] - 968:24; 989:24

**change** [3] - 973:5; 1003:3; 1041:14

**changes** [1] - 1039:13

**changing** [3] - 1040:14, 22; 1041:5

**character** [1] - 1049:8

**charge** [19] - 924:6; 926:19; 932:22; 958:11; 961:19; 962:4; 972:12; 982:15; 985:19, 22; 1013:16; 1027:11, 23; 1048:4; 1055:1; 1057:4; 1070:25; 1071:23; 1075:18

**charged** [23] - 924:22; 925:7; 957:21; 958:4; 960:22; 967:20; 975:22; 976:10, 21-22; 985:19; 992:15; 995:16, 19; 996:1; 1023:18; 1042:10; 1046:14; 1049:21; 1052:4; 1064:7

**charges** [21] - 924:23; 929:14; 958:4, 21-22, 24; 976:8, 14, 19; 982:14; 983:14; 987:3; 1019:4; 1023:19, 22; 1027:16; 1029:3; 1035:7, 9; 1042:11; 1065:8

**Charlie** [1] - 959:16

**chart** [1] - 963:5

**check** [2] - 933:10; 1067:5

**cheerleader** [1] - 953:8

**cherished** [1] - 997:8

**child** [105] - 936:8; 949:12; 958:11, 13; 968:3; 970:24; 972:2; 975:8, 23; 976:2, 12-13, 22-23; 977:1, 17, 20; 978:16; 980:23, 25; 982:14, 16; 985:17, 19, 23; 986:10, 12, 15, 25; 990:24; 991:7; 994:24; 995:1; 997:19; 998:6, 23; 999:23; 1000:1, 24; 1002:1, 17; 1003:6; 1004:16, 18-19; 1005:5, 8; 1014:1, 4, 11, 17-19, 22; 1015:2, 6-8, 10-11; 1018:16; 1020:7; 1021:5, 14; 1023:8; 1024:16; 1025:24; 1026:3, 9, 14, 17; 1027:8, 23; 1028:1, 6; 1029:5, 9, 22; 1030:16, 23; 1031:3; 1035:20, 22, 25; 1036:5, 19-20, 25; 1037:20; 1038:5, 8; 1039:25; 1069:24; 1070:2; 1073:14; 1074:3

**child's** [2] - 980:25; 1002:25

**children** [23] - 935:1, 23; 936:1; 939:4; 977:22; 988:3; 990:22; 991:10, 21; 999:25; 1001:4; 1030:15-19, 21, 25

**children's** [2] - 941:10

**China** [1] - 982:3

**chivalry** [3] - 1013:11; 1033:24

**choose** [3] - 1035:19; 1058:14

**Chopra** [3] - 1017:17; 1018:8; 1020:16

**chose** [2] - 1035:21, 23

**Cincinnati** [2] - 1017:15, 24

**circuit** [1] - 1072:24

**Circuit** [12] - 1068:17, 24; 1069:1, 5-6, 9; 1072:10, 17; 1073:7; 1077:17

**circumstance** [1] - 1071:4

**circumstances** [3] - 1057:23; 1073:4, 9

**circumstantial** [9] - 1052:11, 20; 1053:19, 21, 24; 1069:4; 1070:20; 1071:3, 7

**cited** [1] - 1073:11

**cites** [1] - 1072:15

**citizens** [1] - 1025:5

**civil** [4] - 991:13; 1000:8, 12; 1032:13

**civilized** [1] - 1076:20

**claim** [1] - 1075:25

**claims** [1] - 1064:6

**clean** [1] - 1048:10

**cleanse** [1] - 994:4

**clear** [18] - 931:21; 940:5; 948:22; 974:6; 980:17; 982:23; 987:14; 995:7; 1009:16; 1015:24; 1018:9; 1019:23; 1033:16; 1042:17; 1057:14; 1072:21; 1073:11; 1074:9

**clearer** [1] - 948:24

**clearly** [8] - 952:9; 953:19; 960:20; 985:15; 1011:10; 1015:15, 23

**CLERK** [1] - 934:4

**client's** [1] - 991:6

**clients** [2] - 1051:2; 1076:19

**cloak** [3] - 999:2; 1035:14, 16

**clock** [2] - 943:16; 954:16

**close** [2] - 934:17; 1075:1

**closed** [1] - 966:10

**closely** [3] - 994:21, 23; 1012:8

**closing** [7] - 945:25; 947:2, 12, 15; 1021:18; 1031:7; 1046:6

**closings** [1] - 933:2

**clothes** [1] - 954:8

**co** [1] - 966:13

**co-op** [1] - 966:13

**coconspirator** [1] - 976:5

**coconspirator's** [2] - 927:16, 20

**coconspirators** [1] - 927:8

**coconspirators'** [1] - 927:10

**coerced** [1] - 1041:24

**coercive** [1] - 1022:23

**coffee** [1] - 1042:6

**coincidence** [1] - 1034:15

**coincidental** [1] - 1025:3

**cold** [2] - 973:5; 997:2

**colored** [2] - 1060:4; 1062:18

**combined** [1] - 1073:18

**coming** [6] - 942:11; 956:4, 8; 975:17; 1041:8

**command** [1] - 990:9

**comment** [3] - 1000:7; 1033:20

**commented** [2] - 1047:5; 1075:15

**comments** [1] - 994:14

**commerce** [4] - 978:4; 981:10; 986:3

**commit** [2] - 1072:4, 25

**committed** [5] - 991:4, 6, 9, 11

**committing** [1] - 1072:13

**common** [16] - 987:19, 22; 996:14; 1001:1; 1004:16; 1005:5; 1006:11, 16; 1009:10; 1043:13; 1049:3; 1053:12; 1054:10; 1059:13; 1060:22

**communicated** [1] - 998:4

**communicating** [2] - 1009:11; 1010:20

**communication** [1] - 1052:12

**compare** [2] - 931:14; 1058:7

**compelling** [1] - 990:2

**complete** [4] - 947:9; 1012:19; 1019:22; 1068:6

**completed** [2] -
945:17; 1067:16

**completely** [1] -
1058:22

**completes** [2] -
945:22; 1043:20

**compliment** [1] -
1076:17

**comply** [1] - 960:14

**computer** [31] -
923:24; 928:13; 959:20;
968:1, 3, 5; 970:24;
972:17; 974:14, 16;
981:19; 986:15, 21, 23;
1002:12, 24; 1006:9;
1010:23; 1011:18, 21;
1012:11, 16; 1017:3;
1028:20; 1037:22;
1069:19, 25

**computer-assisted** [1]
- 923:24

**computer-wise** [1] -
1011:18

**computers** [5] -
974:25; 975:4; 1002:9;
1003:14; 1029:24

**conceded** [1] - 951:11

**concern** [6] - 1055:9;
1056:7, 17; 1065:4, 22

**concerning** [2] -
1047:1; 1066:12

**concerns** [1] - 1060:19

**conclude** [7] -
1028:16; 1070:4;
1072:3; 1073:2, 24

**concluded** [1] - 1046:6

**concludes** [3] -
1066:19; 1068:13;
1069:11

**conclusion** [5] -
987:1, 24; 1002:4;
1056:22; 1072:4

**conclusions** [2] -
1029:14; 1061:16

**condone** [1] - 1013:8

**condoning** [1] - 1013:7

**conduct** [19] - 977:3,
6-7, 25; 978:2, 23-24;
979:4, 23; 980:1, 4, 6,
18, 20; 986:2; 1001:20;
1033:14; 1071:12

**conducted** [1] - 967:25

**conference** [4] -
924:6; 926:19; 983:24;
1056:21

**conferences** [1] -
1056:17

**confers** [1] - 928:8

**confess** [1] - 967:24

**confessed** [2] -
967:22; 1036:18

**confession** [3] -
968:13; 1041:24; 1043:8

**confessions** [1] -
1021:17

**confirm** [1] - 928:1

**conflicts** [1] -
1060:13

**confronted** [1] -
1042:13

**conjunction** [1] -
1069:3

**connected** [1] - 963:18

**connection** [1] -
1073:12

**consciously** [1] -
1058:21

**consciousness** [1] -
1023:23

**consequences** [1] -
1019:10

**consider** [25] -
927:10; 930:22; 987:16;
995:10; 1023:20;
1028:20, 24; 1029:2;
1045:15, 17; 1050:4;
1051:13, 19; 1053:11,
23; 1058:25; 1059:2;
1060:14, 16; 1061:20;
1062:4, 7; 1063:14;
1064:15, 25

**consideration** [13] -
992:2; 1006:20; 1009:6;
1023:1; 1047:11, 13,
16; 1048:14; 1049:22,
25; 1056:7; 1062:13;
1064:1

**considered** [2] -
1030:17; 1063:20

**considering** [1] -
1059:22

**consistent** [2] -
1021:3; 1058:9

**conspiracy** [8] -
927:13; 976:10; 983:20;
1041:15, 18-19;
1042:22; 1070:6

**conspire** [1] - 983:18

**conspired** [2] - 985:3;
1041:21

**conspiring** [1] -
983:15

**constitute** [3] -
1073:5, 10, 25

**constituted** [1] -
1072:3

**constitutes** [2] -
979:25; 1075:20

**constituting** [1] -
1071:17

**Constitution** [2] -
1025:5; 1063:4

**constitutional** [2] -
926:6, 11

**construction** [2] -
942:11; 1006:13

**construed** [3] -
1070:17; 1074:12, 24

**consumed** [1] - 989:6

**contact** [2] - 980:7;
1000:15; 1009:20

**contained** [2] -
967:19; 999:23

**containing** [1] -
997:19

**contains** [1] - 1036:24

**content** [4] - 1033:4,
16, 21

**contents** [2] - 964:1;
1050:18

**continue** [7] - 933:23;
937:13; 972:3; 1006:17;
1008:17; 1022:8;
1048:19

**continues** [1] - 973:2

**contract** [1] - 983:23

**contradict** [1] -
1058:10

**contradicted** [2] -
1054:6; 1060:12

**contraption** [1] -
1039:7

**contrary** [2] -
1003:20; 1066:4

**control** [5] - 957:3;
958:6; 961:3; 991:14;
1071:2

**controls** [2] - 948:1;
1047:3

**convenient** [2] -
989:3, 10

**convict** [6] - 924:24;
930:23; 1049:18;
1050:2; 1053:16;
1069:15

**convicted** [2] -
1041:19; 1077:5

**convicting** [1] -
983:21

**conviction** [7] -
924:19; 925:10; 931:11;
1068:18; 1076:24;
1077:14

**convictions** [2] -
1075:7; 1077:9

**convinced** [2] -
1048:13, 20

**convincing** [1] -
1049:8

**copy** [6] - 931:24;
945:6, 8; 963:13;
1045:1, 24

**cornerstones** [1] -
992:9

**correct** [7] - 926:14;
929:2; 930:25; 944:3,
23; 971:9; 1024:4

**correctly** [1] - 1003:3

**corresponds** [1] -
1018:6

**corroborative** [2] -
1072:14; 1074:5

**costume** [10] - 937:4;
941:13; 944:18, 22;
953:2; 1020:12; 1039:13

**costumes** [3] - 953:1;
1039:3

**counsel** [31] - 928:2,
8; 947:5; 974:22, 24;
989:17; 994:15;
1008:18; 1032:4, 7, 17,
23; 1033:5, 15, 20;
1034:2, 24; 1035:13;
1036:3, 7, 13; 1040:13,
18; 1041:11, 16, 23;
1042:9; 1056:13, 19;
1060:7; 1062:16

**count** [15] - 924:20;
925:5; 928:23; 931:14;
959:13; 982:14; 988:1;
1028:6; 1069:16;
1071:13, 18; 1072:1;
1075:4, 7; 1077:5

**Count** [6] - 924:20;
982:8, 12; 983:13;
985:17

**countries** [1] - 1010:5

**country** [6] - 1018:19,
25; 1038:1, 12, 17;
1039:2

**counts** [18] - 925:10;
928:22; 929:1; 930:24;
931:9; 1028:20; 1029:1;
1043:18; 1057:15;
1069:11; 1071:16;
1073:13; 1077:1, 5,
14-15, 19

**County** [3] - 966:11;
1021:25

29

**couple** [6] - 944:12; 947:11; 960:9; 1067:9; 1074:18; 1075:10

**course** [17] - 947:22; 953:13; 959:1; 961:1; 964:19; 966:9; 968:11; 1037:5; 1054:22, 24; 1055:14; 1057:4; 1061:7; 1064:21; 1066:1, 8

**court** [8] - 940:15; 943:4, 7; 991:5; 1023:19; 1031:2; 1035:16; 1042:4

**COURT** [82] - 923:1; 924:4; 925:19; 926:1, 16, 22; 927:2, 18, 24; 928:16, 19; 929:4, 11, 13, 18, 23; 930:4, 7, 10, 12, 15, 25; 931:4, 6, 18, 21; 932:9, 15, 21; 933:3, 7, 9, 13, 17; 934:3, 11, 14, 16, 20; 939:22; 943:3, 23; 944:8, 25; 945:10, 12, 16, 22; 946:8, 11, 14, 16, 20, 23; 947:1; 972:14; 988:5; 989:1, 9, 12, 15; 1006:24; 1008:3, 5, 7, 10, 12, 16; 1031:24; 1035:11; 1043:11, 20; 1044:8, 16; 1045:1, 7; 1067:24; 1068:4; 1071:21; 1076:17; 1077:4, 20

**Court** [19] - 923:20; 924:25; 926:2; 928:3; 946:21; 989:18; 1045:2, 4; 1047:15; 1050:10; 1055:21; 1056:18; 1068:12, 25; 1069:7, 10; 1076:20; 1078:18

**Court's** [2] - 1051:4; 1068:5

**court-ordered** [1] - 1042:4

**Courthouse** [1] - 923:4

**courthouse** [1] - 1024:15

**courtroom** [23] - 932:5; 933:16; 946:7, 25; 988:11; 989:14; 990:16, 21; 991:22; 992:21; 993:1, 9; 994:16, 21; 995:4; 1000:4; 1007:4; 1008:15; 1044:7; 1051:16; 1053:3; 1067:23

**courtroom)** [1] - 1045:6

**Courts** [1] - 1077:9

**cousins** [1] - 962:18

**covering** [2] - 924:23; 951:20

**cozy** [1] - 1022:19

**CR** [1] - 923:3

**crazy** [3] - 968:24; 1024:9; 1034:14

**create** [6] - 925:9; 993:19; 1006:21; 1021:6; 1028:18; 1030:2

**created** [6] - 953:4, 10, 16; 981:21; 1003:18; 1074:14

**creates** [1] - 1059:18

**creative** [1] - 957:23

**credence** [1] - 1020:23

**credibility** [12] - 996:25; 1052:19; 1054:16; 1057:8, 12; 1059:6, 12, 15, 24; 1062:7, 16; 1069:6

**credible** [1] - 1054:7

**credit** [3] - 962:25; 1038:3; 1043:8

**credited** [1] - 1069:13

**credits** [1] - 1069:23

**crime** [8] - 977:17; 983:14; 995:17; 1068:22; 1072:4, 14; 1073:1

**crimes** [10] - 928:22; 975:22; 988:2; 996:1; 1031:12; 1043:17; 1046:14; 1049:21; 1052:4

**criminal** [10] - 991:17, 19; 992:9; 1006:5; 1011:2; 1046:12; 1048:2; 1049:14; 1072:15; 1074:5

**criteria** [1] - 1054:15

**critical** [1] - 1009:3

**cross** [12] - 939:22; 997:1; 998:12; 1009:15; 1011:23; 1012:14; 1016:19, 21; 1022:4; 1050:8; 1058:8; 1076:2

**CROSS** [2] - 939:24; 1078:6

**cross-examination** [12] - 939:22; 997:1; 998:12; 1009:15; 1011:23; 1012:14;

1016:19, 21; 1022:4; 1050:8; 1058:8; 1076:2

**CROSS-EXAMINATION** [2] - 939:24; 1078:6

**cry** [1] - 995:8

**cues** [2] - 994:25; 995:5

**cushions** [1] - 952:23

**Custom** [3] - 1017:19; 1018:4, 12

**custom** [1] - 949:12

**custom-made** [1] - 949:12

**Customs** [2] - 1018:22; 1020:17

**customs** [1] - 956:2

## D

**D'Amato** [1] - 1069:5

**daddy** [1] - 962:16

**damaging** [1] - 1033:17

**Daniel** [9] - 1026:10-12, 18, 23-25; 1027:2; 1032:6

**dashes** [1] - 1003:17

**data** [4] - 951:3; 953:15; 969:17

**date** [22] - 951:13, 15-16; 952:9; 953:3; 956:5; 962:7; 964:4; 966:2; 971:19; 972:25; 986:24; 1003:1; 1016:24; 1017:1; 1018:6; 1037:1; 1039:5, 21; 1065:10

**date/time** [4] - 951:2, 12; 1016:5, 7

**dated** [2] - 955:4; 965:23

**dates** [11] - 1016:15; 1017:1; 1019:16; 1024:25; 1030:6-8; 1065:8, 12

**dating** [1] - 1014:8

**daughter** [26] - 935:3; 937:2; 942:19; 943:5; 944:5; 949:2, 13; 950:17; 953:7; 957:14; 962:14; 968:23; 973:8, 17, 19, 25; 976:3; 979:10; 983:2; 991:5; 1005:13; 1013:23, 25; 1035:21; 1071:6

**daughter's** [1] - 961:22

**Davidse** [1] - 962:10

**day-to-day** [1] -

1043:13

**days** [11] - 939:4, 8; 961:18; 962:9, 20; 963:7; 974:8, 13; 1003:24; 1074:21; 1076:4

**deal** [7] - 924:7; 932:23; 966:11; 1006:5; 1030:19; 1075:6; 1077:8

**dealing** [7] - 927:7; 1018:15, 17; 1022:17; 1025:19, 23; 1076:20

**deals** [1] - 927:7

**dealt** [1] - 1075:7

**deceive** [1] - 996:14

**December** [3] - 956:18; 957:4; 1017:21

**decide** [21] - 1005:3; 1013:14; 1019:11; 1023:11; 1025:7; 1028:25; 1050:5; 1053:14; 1054:7, 11; 1056:15; 1057:10, 18, 25; 1059:9; 1060:3, 10; 1061:11, 22; 1066:17; 1076:12

**deciding** [6] - 1050:15; 1053:10; 1059:5, 12; 1060:14; 1064:8

**decision** [13] - 926:9, 13; 993:23; 1051:20; 1052:5; 1055:2, 4; 1057:19; 1058:2; 1062:21

**decision-making** [1] - 1052:5

**declarations** [1] - 927:8

**deem** [1] - 1046:24

**Deep** [1] - 1017:17

**deep** [1] - 1020:16

**deeply** [1] - 987:8

**Defendant** [2] - 923:6, 17

**DEFENDANT** [2] - 926:15; 929:3

**defendant** [149] - 924:25; 925:4, 11, 17; 926:2; 928:8; 948:25; 949:3, 11-12, 15; 950:8, 11-12, 17, 20; 954:11; 956:18; 957:8, 19; 958:4, 12; 961:19; 962:12, 23; 963:10; 964:17, 20-21; 965:18, 21; 966:8, 19, 21; 967:7, 22, 24; 968:13,

15, 21; 970:3, 14; 971:1, 15, 18; 972:20; 974:21; 975:18; 976:4, 6, 10, 22; 977:8, 15, 25; 978:22; 979:1, 5, 8, 13-14; 981:16; 982:19, 25; 983:8, 14, 22; 984:1, 4, 6, 24; 985:3, 13, 16, 19, 22; 986:12, 24; 987:2, 25; 993:1; 1032:8, 15, 25; 1033:3, 8; 1034:4, 7, 20; 1035:21; 1036:14; 1037:2, 12, 22; 1038:9; 1039:3; 1040:5, 7; 1041:2, 7, 19; 1042:3, 20; 1043:14, 16; 1046:6; 1047:12, 14, 16, 22; 1048:1, 4, 6, 10, 12, 16-17, 19, 25; 1049:19, 24; 1052:1; 1053:17; 1054:18; 1055:18; 1058:16; 1063:3, 9, 12, 15, 18; 1064:5; 1065:18, 22; 1066:11; 1068:14; 1069:15, 24; 1070:7, 9, 23; 1072:13; 1075:1

**defendant's** [58] - 927:21; 932:25; 933:1; 949:19, 25; 950:22; 951:1, 19; 952:4, 7-8, 23; 953:20; 954:6; 955:3; 959:20; 962:14, 20; 964:5; 965:11; 968:1; 970:9, 24; 972:16; 974:14, 16-17; 975:6, 14; 976:20; 981:6, 18; 982:11; 986:21; 1033:12; 1036:1, 12; 1039:1; 1040:4, 15; 1041:24; 1042:19; 1043:8; 1047:23; 1050:1; 1051:22; 1063:2, 6, 18; 1064:3, 8; 1065:6; 1069:18, 20; 1071:6; 1072:15

**defendants** [2] - 977:13; 1065:20

**defense** [49] - 926:7; 927:12; 928:2; 929:11; 930:5; 931:4; 932:14, 23; 933:21, 24-25; 945:15; 947:4; 951:8; 974:24; 989:16; 992:14; 993:4; 997:1; 1001:5; 1008:18; 1032:4, 17, 23; 1033:5, 15, 17, 20, 23; 1034:24; 1036:3, 7,

13; 1040:13, 18; 1041:11, 16, 23; 1042:9; 1057:17; 1062:16; 1068:9; 1070:15; 1075:21; 1076:11, 24

**defense's** [1] - 951:7

**define** [2] - 1046:11; 1049:2

**defined** [1] - 1071:23

**definition** [2] - 979:25; 980:19

**definitions** [1] - 980:5

**degrees** [2] - 1006:9

**delete** [1] - 1040:3

**deleted** [1] - 953:24

**deli** [1] - 1067:4

**deliberate** [2] - 1015:15; 1023:11

**deliberating** [2] - 1067:17; 1068:7

**deliberation** [4] - 992:3; 1055:11; 1065:25; 1067:2

**deliberations** [14] - 929:19; 948:3; 987:18; 992:7; 1031:14; 1044:2; 1045:25; 1046:18; 1048:7, 20; 1063:15, 22; 1066:25; 1067:7

**delicious** [1] - 968:10

**deliver** [1] - 928:14

**delivering** [1] - 984:20

**demand** [1] - 991:19

**demands** [3] - 960:6, 14; 985:5

**demeanor** [2] - 1059:7; 1062:6

**demonstrate** [2] - 950:2; 981:7

**denying** [3] - 924:12, 17; 1068:8

**Department** [1] - 1018:5

**departure** [1] - 1018:7

**depicted** [1] - 981:1

**depiction** [7] - 977:4, 7; 978:1, 24; 979:3; 982:20; 986:1

**depraved** [1] - 997:3

**deputy** [1] - 933:10

**describe** [2] - 1010:3; 1036:9

**described** [1] - 932:11

**describes** [1] - 961:5

**deserve** [2] - 990:11; 1064:13

**deserved** [1] - 1015:7

**deserves** [2] - 1061:22; 1062:25

**deserving** [2] - 997:8; 1062:13

**designed** [1] - 1005:25

**Desposito** [1] - 1072:11

**destroy** [3] - 995:11; 998:10; 1010:15

**detail** [4] - 976:15; 977:18; 1019:21; 1060:20

**details** [2] - 1069:17; 1074:5

**Detective** [14] - 951:2, 6, 14; 959:23; 967:25; 1003:20; 1004:16; 1009:16; 1010:25; 1012:1, 18; 1016:18; 1024:21; 1043:7

**detective** [1] - 1021:25

**determination** [4] - 1005:19; 1056:25; 1057:1; 1060:16

**determine** [5] - 985:25; 1028:14; 1060:24; 1065:5; 1069:8

**determining** [3] - 1053:24; 1061:2; 1064:2

**developed** [1] - 1051:18

**device** [3] - 981:20; 1002:19; 1028:23

**devices** [4] - 1002:8; 1011:21; 1012:4, 6

**devoted** [1] - 991:24

**devotion** [1] - 956:24

**DHL** [2] - 963:11, 22

**dictated** [1] - 994:17

**die** [1] - 939:1

**difference** [1] - 1067:2

**different** [11] - 948:14; 957:9; 969:1; 981:11; 997:23; 1019:6; 1024:20; 1029:20; 1039:6; 1052:10; 1057:16

**difficult** [1] - 990:21

**digital** [1] - 982:2

**dimension** [1] - 1012:24

**dimensions** [1] - 1012:25

**dining** [4] - 1022:1, 9-10; 1042:5

**dinner** [2] - 1020:21; 1039:10

**diplomacy** [1] - 999:3

**direct** [10] - 1012:8; 1016:19; 1050:7; 1052:11, 17; 1053:18, 22, 24; 1058:7

**DIRECT** [2] - 934:22; 1078:4

**directed** [1] - 1036:19

**directing** [3] - 949:8; 957:13; 1037:20

**direction** [3] - 957:9; 1073:17; 1074:14

**directions** [3] - 1073:18; 1074:11, 15

**directly** [5] - 926:2; 963:19; 989:25; 1000:15; 1053:2

**director** [1] - 959:11

**disagree** [1] - 991:22

**disapprove** [1] - 1063:21

**discharge** [1] - 1066:6

**disciplined** [1] - 994:10

**discovered** [2] - 1021:2; 1023:3

**discuss** [11] - 932:18; 941:5; 946:3; 988:8; 1007:1; 1044:3; 1054:15; 1067:10, 16; 1072:24; 1073:2

**discussed** [7] - 925:18; 926:12; 928:5; 985:11; 986:18; 1056:10

**discusses** [1] - 1073:8

**discussing** [4] - 958:24; 1009:7; 1033:22; 1067:14

**discussion** [2] - 1072:18; 1074:6

**discussions** [2] - 1074:10

**disk** [2] - 963:13; 964:1

**disks** [1] - 1001:25

**disprove** [1] - 993:5

**dispute** [5] - 951:18; 978:7; 1000:12; 1033:7, 11

**disputed** [1] - 1061:11

**disregard** [7] -

8

1035:12; 1051:7-9;
1055:23; 1056:3; 1062:1
**disregarded** [2] -
1050:15; 1056:8
**disservice** [1] -
1001:3
**distribution** [2] -
1028:19, 25
**District** [3] - 923:21;
938:16
**district** [2] - 928:22
**DISTRICT** [2] - 923:1
**disturb** [1] - 999:5
**disturbing** [2] - 987:8
**Ditmeyer** [9] -
1026:10, 12-13, 19,
23-25; 1027:2; 1032:6
**dividing** [1] - 1045:13
**document** [1] - 1003:22
**dollars** [4] - 965:8;
976:1; 983:10; 1034:22
**domestic** [2] - 970:16;
998:1
**done** [23] - 925:13;
937:20; 959:17; 968:19;
969:12; 977:9; 989:2;
998:20; 999:19;
1000:21; 1001:3, 13,
15; 1005:14; 1032:10;
1039:12, 18; 1074:6,
16, 23; 1075:25; 1076:3
**door** [1] - 1031:13
**dots** [1] - 1003:17
**double** [2] - 925:9;
971:12
**doubt** [58] - 949:25;
950:6; 965:10; 977:12,
22; 980:3; 981:6, 12;
984:22, 25; 987:3;
988:1; 993:12, 14, 19;
996:2; 1006:22;
1015:21; 1016:1;
1021:6; 1028:2, 4, 11,
15, 18; 1029:12;
1030:2; 1031:5, 12, 19;
1032:25; 1036:10;
1046:16; 1047:25;
1048:9, 13, 21, 23, 25;
1049:1-3, 5, 7, 10,
16-18, 21, 23; 1050:2;
1053:18; 1063:7;
1064:4; 1065:7, 12;
1068:14, 23
**doubts** [1] - 1015:10
**down** [14] - 932:1;
951:24; 960:3; 978:25;
979:19; 995:1; 1024:10,
17-18; 1025:1; 1030:13;

1039:4; 1042:5
**downstairs** [4] -
937:14, 25; 938:1;
1021:4
**dozen** [1] - 1037:19
**dozens** [6] - 949:4, 7;
979:8; 984:5; 1036:15
**drastically** [1] -
1009:4
**draw** [10] - 1006:17;
1046:23; 1052:23;
1053:10; 1055:12, 23;
1056:19, 21; 1065:17;
1066:3
**drawing** [2] - 1054:9;
1068:20
**drawn** [9] - 987:24;
1042:8; 1053:7, 9, 13,
15, 20; 1063:13;
1069:14
**dressed** [7] - 941:13;
952:25; 953:8; 969:9;
979:15, 20; 981:5
**dresses** [1] - 1039:12
**drill** [2] - 942:7;
1039:8
**drinking** [1] - 1042:6
**dripping** [2] - 1053:5,
8
**drive** [7] - 943:5;
964:3; 968:4; 975:9;
981:23; 1069:19
**Drive** [6] - 923:18;
935:12; 950:23; 952:12;
956:10; 965:3
**drives** [2] - 975:1, 4
**drop** [2] - 957:16;
974:1
**dropped** [1] - 951:23
**drove** [2] - 943:4, 7
**drowsy** [1] - 1008:25
**due** [1] - 994:8
**duly** [1] - 934:7
**dumb** [3] - 998:20
**dunk** [1] - 1011:9
**during** [26] - 947:20,
22; 948:3, 6, 15;
968:13; 987:5; 997:1;
1045:20, 25; 1054:22;
1055:13; 1057:3;
1061:5, 7; 1063:18;
1064:21; 1066:1, 3, 8;
1067:2, 7; 1073:15;
1075:11; 1076:1
**duties** [1] - 1046:11
**duty** [7] - 1046:20;
1048:2; 1049:13, 24;

1051:1; 1055:14;
1060:23
**DVD** [2] - 964:1; 975:1
**dying** [1] - 939:6

---

**E**

**e-mail** [78] - 949:3,
12; 950:11; 955:3, 12,
20, 24; 956:17; 957:4,
11, 20; 958:2, 14;
959:19; 960:22, 24;
962:7-9, 20; 963:10,
19, 23; 964:6, 17, 19,
25; 965:11, 14, 22;
966:7; 967:4, 16;
968:18, 21; 969:4,
15-16, 18, 21-22, 25;
970:3, 8-10, 12, 14,
22-23; 971:3, 6, 10;
972:5, 8, 12, 16, 20,
22; 973:7, 15; 974:10;
975:24; 981:18; 983:4;
984:8, 15; 986:16;
1070:6; 1072:1, 3;
1073:14, 17; 1075:3, 19
**e-mailed** [2] - 960:21;
973:9
**e-mailing** [1] - 973:18
**e-mails** [45] - 924:11;
927:20; 928:12; 942:14,
17; 949:4, 7-8; 956:7;
958:25; 959:6; 964:9;
965:21; 966:19; 967:6,
23; 968:6; 973:3, 12;
975:21; 978:9; 979:8;
981:6, 18; 982:24;
984:5; 985:12; 987:9;
1069:20; 1070:1, 11,
18-19; 1073:12, 16, 24;
1074:2, 4, 20, 22, 24;
1075:17; 1076:8
**early** [1] - 1075:17
**earn** [1] - 990:11
**easily** [3] - 967:4;
1000:20, 22
**eastern** [2] - 991:1;
997:14
**EASTERN** [1] - 923:1
**easy** [3] - 987:6;
1031:15
**eat** [4] - 937:17;
938:4; 968:11; 1008:23
**eating** [2] - 1008:24;
1039:9
**ECF** [1] - 930:1
**echo** [1] - 974:15
**education** [2] -
1061:13, 23

**effect** [4] - 1013:1;
1023:5, 9; 1056:15
**efforts** [1] - 1069:1
**Egan** [7] - 961:8;
964:23; 969:17, 20, 22;
970:11
**eight** [9] - 939:17;
958:4, 11, 21; 975:15;
985:11; 1014:6; 1041:7,
10
**either** [7] - 937:8;
990:25; 1004:23;
1011:17; 1040:22;
1055:18; 1064:14
**elaborate** [1] - 1038:4
**Elaina** [2] - 996:10;
1010:12
**electronic** [4] -
1002:8, 19; 1012:4, 6
**electronically** [3] -
1004:1; 1011:17;
1028:23
**element** [10] - 978:6;
981:13, 16; 982:19;
1022:6; 1027:9, 22;
1068:22; 1073:23
**elements** [10] -
929:13; 977:16; 978:5;
982:6, 17; 1027:17;
1031:11; 1046:14;
1049:21
**Elena** [1] - 965:22
**elicit** [1] - 1056:24
**elsewhere** [1] -
1010:10
**email** [36] - 997:21,
25; 999:22, 24-25;
1000:11, 17, 21;
1001:11, 14; 1003:13,
15, 19; 1005:2;
1009:13; 1011:16;
1029:7; 1032:10, 12;
1033:12; 1034:9, 16-17,
19, 21; 1036:12, 22-23;
1037:1, 10, 19;
1038:18, 23; 1040:10;
1043:1
**emailed** [1] - 1037:21
**emails** [63] - 997:10,
19-20, 23; 1001:8;
1002:5; 1004:2, 13, 20,
24; 1005:4, 7, 11, 24;
1010:2; 1012:10, 22;
1013:1, 4, 6-9, 15;
1014:8, 15; 1025:9, 11,
18, 20, 23; 1026:24;
1029:13; 1033:4, 6, 8,
12-13, 17-18, 21, 23;

1034:4, 6, 9, 16;
1036:5, 13, 15, 20;
1037:20; 1040:7, 15-16;
1041:14; 1043:2, 4
**Embassy** [2] - 998:23;
1001:18
**emotion** [1] - 995:21
**emotional** [2] -
995:17; 1023:13
**emotions** [7] -
994:17-20; 995:9, 11;
1031:13
**emphasize** [5] -
947:13, 23; 1045:13;
1067:9, 11
**emphasized** [1] -
1069:6
**emphasizes** [1] -
1069:2
**employ** [1] - 1006:14
**employee** [2] -
1062:17, 23
**employer** [1] - 938:15
**end** [5] - 931:16;
957:5; 968:18; 984:15
**ends** [1] - 963:12
**enforcement** [9] -
1022:12; 1062:10, 17,
23; 1065:4; 1069:21;
1075:22
**engage** [5] - 977:3, 5;
978:22; 990:12; 1071:12
**engaged** [4] - 979:3,
22; 980:3; 986:2
**enjoy** [1] - 972:1
**ensure** [1] - 1074:21
**enter** [1] - 1063:22
**entered** [3] - 989:13;
1008:14; 1066:11
**enters** [3] - 933:15;
946:24; 1045:6
**entertain** [1] -
1038:24
**entire** [1] - 1063:8
**entirely** [5] -
1053:13; 1055:23;
1062:1; 1063:24;
1066:16
**entitle** [1] - 1047:10
**entitled** [5] -
1047:12, 15, 17;
1051:24
**environment** [1] -
1022:24
**equal** [2] - 1047:14
**equally** [3] - 991:20,
24; 1052:2

**equals** [1] - 983:20
**equation** [1] - 969:3
**era** [1] - 1018:13
**especially** [2] -
999:7; 1018:14
**ESQ** [4] - 923:14, 17
**essence** [2] - 985:25;
992:2
**essential** [1] -
1068:22
**essentially** [1] -
983:19
**establish** [5] -
949:24; 977:21;
1041:18; 1065:9, 11
**established** [2] -
954:11; 1065:13
**establishing** [1] -
985:22
**estate** [2] - 966:16
**estimate** [3] - 964:12,
16; 1045:9
**etcetera** [3] - 944:3;
973:25; 974:1
**ethnic** [1] - 1051:23
**Europe** [2] - 991:2;
997:14
**evading** [1] - 1018:22
**evaluate** [1] - 1006:15
**evaluating** [6] -
991:18; 997:9; 1054:16;
1059:15, 24; 1068:18
**evaluation** [4] -
999:20; 1000:19;
1010:25; 1030:1
**evasive** [1] - 1058:6
**evening** [1] - 953:17
**events** [4] - 950:5;
1002:25; 1042:20;
1065:16
**everywhere** [2] -
997:15; 1029:18
**evidence** [159] -
933:4, 22; 945:18, 23;
947:16, 19, 21; 948:1,
23; 949:5, 10, 15;
950:2, 7; 954:10, 24;
958:17; 960:24; 968:3,
5; 975:13; 976:4;
977:15; 980:18; 982:7;
984:23; 985:14; 987:1,
13, 16, 25; 990:17;
993:11; 994:10; 995:10,
23; 996:3; 1001:6, 10,
22; 1002:3, 10, 13;
1006:5, 8, 15; 1009:3;
1027:19, 21; 1032:24;

1034:2, 5, 7; 1043:15;
1045:4; 1046:4, 21, 23,
25; 1047:2, 21; 1048:3,
14; 1049:4, 23; 1050:1,
4-5, 9, 13-14, 17, 19,
21, 23, 25; 1051:2,
11-13, 16, 18; 1052:6,
8, 11-12, 17, 20;
1053:18-23; 1054:2, 9,
11, 19; 1055:16, 22;
1056:13, 15; 1057:3, 6,
24; 1059:4, 8, 16;
1060:6, 8, 24; 1061:11,
13, 15; 1062:1, 22;
1063:5, 17, 19, 23;
1064:1, 5, 13, 25;
1065:5, 11, 15;
1068:15, 19; 1069:2, 4,
12-13, 15, 18, 23;
1070:4, 11, 16, 20-21;
1071:3, 7; 1072:22;
1074:12; 1076:10;
1078:18
**evidentiary** [2] -
1004:7; 1013:13
**evil** [2] - 996:24;
1029:15
**exact** [8] - 938:12;
941:20; 952:22; 965:14;
1044:12; 972:22; 984:20;
1065:10
**exactly** [15] - 938:5;
941:19; 949:8; 957:25;
958:15; 976:5; 977:8;
979:9; 985:1; 1012:18;
1034:8, 16; 1035:25;
1076:11
**EXAMINATION** [8] -
934:22; 939:24; 944:10;
945:2; 1078:4, 6, 8, 10
**examination** [14] -
939:22; 997:1; 998:12;
1009:15; 1011:23;
1012:9, 14; 1016:19,
21; 1022:4; 1050:8;
1058:7; 1076:2
**examinations** [1] -
968:1
**examine** [1] - 1064:9
**examined** [1] - 934:7
**examining** [1] -
1054:10
**example** [5] - 948:9;
1036:7; 1052:15, 25;
1073:14
**excellent** [1] -
1076:19
**except** [1] - 954:8
**exception** [1] -

1061:17
**exchange** [3] - 950:11;
956:7; 1070:9
**exchanged** [1] - 997:20
**excite** [1] - 980:23
**exclusively** [2] -
1052:6; 1060:23
**exculpatory** [2] -
1001:9; 1019:22
**excuse** [3] - 1017:11,
23; 1049:12
**excused** [1] - 945:13
**executed** [1] - 1011:24
**exercise** [1] - 926:10
**exhausted** [1] -
1030:12
**Exhibit** [58] - 950:24;
951:19; 952:21; 953:6,
10, 14, 22, 24; 954:1,
3-4, 6, 21; 955:4,
23-24; 956:1, 19;
957:11; 958:3; 959:4;
960:11; 961:8, 15;
962:8, 10, 21-22;
963:5, 9; 964:12;
966:7; 967:8, 16, 19;
968:4, 21; 969:14;
970:1; 971:17, 24;
972:6, 19, 21; 973:3,
14; 974:5, 11; 981:24;
984:7, 23; 1040:11, 19;
1045:2, 4; 1078:18
**exhibit** [3] - 932:6;
948:4
**exhibition** [1] -
980:21
**EXHIBITS** [1] - 1078:17
**exhibits** [9] - 932:3,
8, 13; 1050:9, 25;
1052:9; 1056:12;
1064:20; 1065:13
**exists** [2] - 1052:24;
1061:17
**exits** [2] - 946:6;
988:10
**expand** [1] - 940:21
**expect** [1] - 946:12
**expensive** [2] -
1039:16; 1040:6
**experience** [7] -
1003:14; 1053:12;
1054:10; 1059:14;
1061:12, 24; 1062:4
**experienced** [1] -
1026:18
**experiences** [1] -
1006:10

**expert** [7] - 1002:11; 1011:1; 1016:5; 1017:5; 1061:4, 17; 1062:7

**experts** [6] - 1003:15; 1011:3-5; 1017:3; 1061:8

**explain** [5] - 924:16; 928:6; 940:21; 950:5; 995:24

**explained** [5] - 926:5; 928:9, 20; 995:13; 1047:7

**explaining** [1] - 996:6

**explains** [1] - 987:22

**explanation** [6] - 958:8; 975:25; 976:19; 1060:21

**explanations** [1] - 1059:7

**explicit** [20] - 949:18; 950:11; 954:7, 12; 977:3, 6, 25; 978:23; 979:4, 22; 980:1, 4-5, 18, 20; 982:20; 986:2, 5; 1040:16; 1071:12

**exploit** [7] - 958:13; 976:11; 977:1; 983:15; 1041:22; 1070:8

**exploitation** [21] - 924:20, 22; 925:5; 958:11; 976:12; 977:10, 17; 982:9, 14; 1013:16; 1023:19; 1024:16; 1027:11, 22; 1028:6; 1070:13; 1071:18; 1074:2, 23

**exploited** [6] - 949:16, 22; 982:16; 1035:25; 1038:8; 1071:10

**exploiting** [1] - 976:22

**explore** [1] - 959:13

**express** [1] - 1059:2

**expression** [2] - 1004:8; 1052:23

**expressions** [1] - 995:7

**extent** [1] - 1060:3

**extort** [2] - 996:16; 1009:18

**extorting** [3] - 1005:16; 1029:16

**extortion** [2] - 1009:22

**extortionist** [2] - 997:4; 1010:15

**extrapolate** [1] - 1003:10

**extrapolated** [1] - 1003:11

**extremely** [1] - 1033:17

**eye** [1] - 960:3

---

## F

**F.2d** [3] - 1069:8; 1073:6, 8

**F.3d** [3] - 1069:5; 1072:11, 17

**face** [5] - 961:22; 1018:21; 1035:15; 1042:21; 1057:16

**facial** [1] - 995:6

**facing** [5] - 1019:3; 1024:15; 1027:11, 17; 1035:7

**fact** [39] - 1009:12; 1012:20, 22; 1016:20, 22; 1017:11; 1020:10, 15; 1023:18; 1027:25; 1029:17; 1041:14; 1045:16; 1047:9; 1052:12, 16, 21-22, 24-25; 1053:2, 7; 1054:1; 1056:22; 1060:14; 1061:11; 1062:10; 1063:11; 1064:10; 1065:19; 1066:4, 13-14; 1068:13, 22; 1073:9; 1076:2

**factor** [2] - 1059:23; 1060:19

**factors** [1] - 1062:6

**facts** [35] - 948:22; 987:14, 23; 990:13, 17; 992:4, 25; 1009:5; 1012:19; 1031:18; 1046:20, 22; 1047:2; 1050:6, 11, 15; 1052:21; 1053:11, 25; 1054:3, 8; 1056:24; 1057:2; 1058:22; 1059:1, 4; 1061:14; 1064:7; 1066:12, 15

**factual** [2] - 1055:11; 1057:15

**failed** [3] - 995:24; 1031:21; 1032:17

**fails** [1] - 1048:15

**failure** [1] - 993:24

**fair** [9] - 943:20; 992:1, 3; 994:8; 995:20; 1049:22, 25

**fairly** [1] - 995:10

**fairness** [5] - 991:17, 19; 994:13, 16

**fairy** [3] - 937:5; 953:2

**fall** [3] - 956:13; 971:22; 973:13

**false** [1] - 1060:17

**falsely** [3] - 1042:10; 1059:19; 1060:3

**familiar** [4] - 961:16; 962:19; 969:10; 974:3

**family** [11] - 936:3; 965:24; 991:4; 1019:5; 1020:20; 1023:6, 8-9, 14-15; 1042:14

**far** [2] - 968:9; 998:5

**Farhane** [1] - 1072:16

**father** [5] - 957:1; 991:4; 995:18; 1022:2

**fault** [1] - 1032:5

**favor** [6] - 989:5; 1047:17; 1054:3; 1068:21; 1069:14; 1071:13

**favorable** [2] - 1065:17; 1068:20

**favorably** [5] - 1070:17, 21; 1071:8; 1074:12, 24

**FBI** [17] - 951:24; 967:22; 975:2, 17; 978:20; 1000:15; 1001:3, 17; 1009:21; 1014:21; 1015:8; 1018:19; 1021:13, 24; 1041:8; 1042:1

**FBI's** [2] - 1034:25; 1035:2

**feature** [1] - 952:14

**February** [2] - 1017:23

**federal** [6] - 940:2; 1021:24; 1023:19; 1024:15; 1031:2, 12

**Federal** [4] - 923:13, 22; 998:25; 1010:20

**feelings** [3] - 993:8; 1051:21; 1052:3

**fees** [1] - 940:19

**feet** [1] - 954:17

**few** [7] - 925:18; 956:6; 961:18; 1016:10; 1039:6

**fewer** [1] - 1054:13

**fields** [1] - 1061:9

**Fifth** [1] - 1073:7

**fighting** [1] - 1024:23

**file** [7] - 953:14, 16;

959:22; 1024:11, 18, 20

**film** [6] - 959:11; 960:8; 1005:7; 1020:19; 1028:11

**filmed** [4] - 1004:19; 1005:6; 1028:12; 1030:9

**filming** [3] - 967:5; 1025:24; 1071:6

**final** [1] - 1045:1

**financial** [1] - 1039:24

**fine** [1] - 973:8

**finger** [5] - 990:16; 1031:6

**finish** [4] - 1043:24; 1044:1; 1068:2, 5

**firm** [1] - 961:2

**firmness** [1] - 1072:14

**first** [23] - 924:9; 929:6; 932:16; 934:6; 942:22; 947:4; 952:4; 955:14; 977:19; 978:6; 986:2; 990:4; 992:12; 994:21; 996:8, 12; 1036:23; 1038:2, 17; 1046:10; 1064:9; 1068:11; 1071:21

**fist** [1] - 990:16

**fit** [1] - 947:18

**fits** [1] - 969:2

**five** [6] - 946:1; 954:17; 989:7, 9; 1021:23; 1052:14

**flag** [3] - 958:23; 996:12; 997:22

**flags** [3] - 1018:19; 1027:14

**flash** [2] - 1001:24

**flatly** [1] - 998:14

**flesh** [2] - 940:13; 1019:4

**flew** [1] - 1018:1

**flights** [1] - 1018:18

**flown** [1] - 1017:12

**flying** [3] - 1017:16; 1026:3; 1029:18

**focal** [2] - 980:25; 981:3

**focus** [6] - 1010:22, 24; 1015:25; 1027:10; 1071:14, 21

**focused** [3] - 952:18; 979:17; 1075:24

**focuses** [1] - 986:11

**follow** [7] - 992:7, 11; 1034:7; 1035:23; 1047:7; 1067:8

11

29

**followed** [4] - 947:4; 1034:12; 1037:7; 1074:8

**following** [3] - 991:3; 1029:14; 1031:1

**follows** [2] - 934:8; 996:2

**food** [1] - 937:16

**foot** [1] - 980:12

**forbidden** [1] - 1040:23

**foreign** [3] - 978:4; 981:10; 986:3

**forensic** [9] - 967:25; 1002:3, 12; 1010:25; 1011:18, 20; 1034:2, 5, 7

**forensically** [1] - 1011:18

**forfeiture** [5] - 930:17, 23; 931:2, 7, 16

**forget** [1] - 1004:22

**forgiveness** [1] - 1019:6

**form** [9] - 930:22; 931:2, 8, 23; 943:3, 23; 989:24; 1061:14; 1073:20

**forms** [5] - 1024:2, 5, 7; 1050:6; 1052:8

**Forrestal** [18] - 951:2, 6, 14; 959:23; 967:25; 1003:20; 1004:16; 1009:10, 16; 1010:25; 1012:1, 18; 1016:3, 18; 1017:3; 1024:10, 21; 1043:7

**fort** [1] - 1018:1

**forth** [4] - 950:4; 1006:13; 1010:7; 1018:2

**forthright** [1] - 1058:4

**forward** [1] - 1014:8

**four** [3] - 995:12; 1014:23; 1039:17

**fourth** [2] - 982:18

**frame** [1] - 1077:2

**France** [2] - 1010:5; 1017:13

**Frances** [6] - 933:25; 934:9; 1019:1, 18; 1020:11; 1021:3

**FRANCES** [1] - 934:9

**frank** [1] - 1058:4

**frantically** [1] - 932:1

**free** [3] - 947:17;

1022:23; 1045:19

**French** [1] - 960:8

**front** [1] - 1022:9

**frowned** [1] - 995:2

**fuck** [2] - 973:19, 21

**Full** [1] - 952:13

**full** [1] - 1064:1; 1067:14

**furniture** [1] - 952:20

## G

**G-mail** [5] - 1000:14, 17, 22-23; 1001:11

**gain** [1] - 1006:1

**galore** [1] - 1027:15

**game** [1] - 1005:18

**Gate** [6] - 935:12; 950:23; 952:12; 964:3; 965:3; 1010:23

**gauge** [2] - 1023:22

**GB** [1] - 952:14

**general** [5] - 958:8; 976:19; 1046:10, 17

**generally** [1] - 977:18

**genital** [3] - 980:7, 23, 25

**genitals** [3] - 952:18; 979:17; 981:4

**gentlemen** [13] - 954:23; 958:2; 989:22; 991:23; 997:13; 999:17; 1005:18; 1013:14; 1016:22; 1018:18; 1021:7; 1026:8; 1031:20

**genuine** [1] - 1019:24

**Germany** [1] - 1017:13

**gestures** [1] - 995:6

**Gibbs** [7] - 951:8-10; 974:17; 975:6; 1011:1, 8

**gift** [1] - 961:22

**girl** [3] - 949:16; 954:8; 1021:10

**girl's** [2] - 952:18; 953:11

**girlfriend** [2] - 1022:2, 18

**girls** [6] - 949:22; 969:1, 5; 976:24; 980:3; 986:25

**given** [13] - 929:23; 990:4; 992:1; 998:7; 1019:21; 1025:2; 1053:12; 1056:2; 1059:7; 1061:1, 24; 1067:14; 1074:15

**glad** [2] - 961:21;

1021:12

**goal** [2] - 998:10; 1010:15

**god** [1] - 1000:23

**God** [2] - 1001:16; 1023:14

**gold** [1] - 1025:3

**golf** [1] - 974:11

**govern** [3] - 991:12; 992:7; 1046:11

**government** [64] - 983:4; 991:15; 992:23; 993:10; 995:24; 996:18; 1021:17; 1030:3; 1031:4, 18, 25; 1032:9, 11, 20; 1035:7, 19-20; 1041:17; 1046:5, 15; 1047:10, 14, 16; 1048:8, 15, 21, 24; 1049:15; 1051:20, 25; 1054:18; 1057:17; 1058:16; 1062:10, 17, 23; 1063:8; 1064:3, 6, 24; 1065:1, 3, 18; 1068:20; 1069:14, 22; 1070:5, 17, 21; 1071:9; 1072:12; 1073:15; 1074:13, 25; 1075:12, 16-17, 19, 21; 1076:13; 1077:16

**Government** [39] - 923:12; 924:22; 927:6; 929:9, 15, 20, 25; 930:4, 18; 931:1, 12; 933:3; 945:19; 947:4-7; 948:18; 949:24; 950:2, 5; 964:24; 977:11, 21, 24; 978:3, 21; 979:1; 981:9, 11, 22; 982:5, 8, 18, 23; 984:3; 985:21; 987:2, 17

**Government's** [54] - 950:24; 951:19; 952:21; 953:5, 9, 14, 22, 24; 954:1, 3-4, 6, 21; 955:3, 23-24; 956:1, 19; 957:11; 958:3; 959:4; 960:11; 961:8, 15; 962:8, 10, 21-22; 963:5, 9; 964:12; 966:7; 967:8, 15, 19; 968:4, 20; 969:14; 970:1; 971:17, 24; 972:6, 19-20; 973:3, 14; 974:5, 11; 981:24; 984:7, 23; 1040:19

**government's** [7] - 990:18; 1032:14; 1049:20; 1063:6, 23;

1069:13; 1071:13

**governs** [1] - 1046:7

**grab** [2] - 960:2; 1067:25

**grabbed** [1] - 1020:21

**grabbing** [1] - 1000:19

**grand** [2] - 944:5; 1042:22

**grandchild** [1] - 939:18

**grandchildren** [3] - 939:5, 7, 15

**granddaughter** [2] - 935:5; 937:15

**granddaughter's** [1] - 935:7

**grandma** [1] - 962:17

**grandmother** [1] - 978:17

**grandson** [1] - 937:3

**grant** [1] - 1068:12

**graphic** [2] - 959:6; 1025:24

**Great** [1] - 956:10

**great** [9] - 957:1; 959:25; 1001:6; 1016:1; 1026:5; 1034:9, 11; 1059:25; 1064:9

**greater** [3] - 976:15; 1047:11; 1062:13

**grimaced** [1] - 995:3

**grounded** [1] - 1025:4

**grounds** [1] - 1062:18

**grow** [1] - 972:3

**growing** [1] - 961:2

**guess** [11] - 933:9; 952:12; 970:13; 971:15; 1015:2; 1023:7; 1027:7; 1039:18; 1056:11; 1076:5; 1077:16

**guesswork** [1] - 1053:15

**guide** [1] - 991:15

**guided** [2] - 994:11; 1047:6

**guides** [1] - 987:19

**guilt** [20] - 928:10; 949:25; 991:18; 992:22; 993:11; 1023:23; 1031:5, 19; 1046:16; 1047:24; 1048:13, 21; 1049:15, 17; 1050:1; 1053:17; 1063:6; 1064:3; 1065:6; 1068:14

**guilty** [19] - 925:4, 6; 977:9; 981:16; 987:3, 25; 992:14, 18; 994:3;

12

995:25; 1031:22;
1032:25; 1043:14, 17;
1047:22, 24; 1048:9,
16, 25

**gun** [1] - 942:9

**guns** [1] - 1042:8

**Gurney's** [1] - 965:24

**guy** [1] - 1002:24

---

**H**

**hack** [1] - 1037:17

**hacked** [2] - 1037:19, 22

**hacker** [2] - 1038:1, 25

**hacking** [1] - 966:18

**hair** [3] - 961:4, 16; 981:8

**hairbrush** [3] - 1005:3, 5

**half** [6] - 939:2; 950:19; 1014:11, 24; 1015:2; 1066:23

**Halloween** [3] - 944:18, 22; 1020:13

**hallway** [1] - 934:2

**Hamptons** [3] - 966:9, 13, 23

**hand** [3] - 934:4; 960:2; 1049:24

**handcuffs** [1] - 1042:7

**handful** [1] - 1027:18

**handle** [1] - 1005:3

**hands** [1] - 990:8

**happy** [1] - 962:12

**hard** [8] - 968:4; 975:1, 4, 9; 981:23; 1028:23; 1069:19

**HARRY** [1] - 923:20

**Hauppauge** [1] - 923:18

**HD** [1] - 952:13

**head** [3] - 995:3; 1045:21

**header** [3] - 969:15, 21

**heads** [1] - 989:8

**heads-up** [1] - 989:8

**hear** [17] - 927:2; 933:5; 942:11; 948:13; 959:9; 978:15; 979:24; 980:19; 987:8; 989:16; 1004:9; 1006:6; 1032:18; 1033:3; 1042:1; 1045:14

**heard** [42] - 945:16; 948:23; 950:7, 15; 951:1, 6-7; 952:24; 956:22; 959:15, 22; 962:11; 964:15; 965:8;

967:21; 970:19, 21; 978:19; 982:1, 3; 989:23; 990:19; 994:15; 995:1; 996:8; 999:4; 1002:10; 1004:8; 1010:5; 1012:18; 1015:14; 1033:2; 1034:18; 1051:16; 1052:16; 1060:6; 1061:7; 1062:9; 1063:17; 1065:15; 1066:2

**hearing** [2] - 980:1; 996:4

**heavy** [1] - 954:20

**held** [3] - 988:1; 993:25

**Helena** [21] - 937:2; 938:1, 6, 10; 961:21; 962:24; 963:21; 996:6, 10-11; 997:6, 18; 999:13; 1010:12; 1013:16; 1014:8; 1025:19; 1034:24

**hell** [1] - 1001:21

**hello** [1] - 955:6

**help** [1] - 1057:24

**helpful** [1] - 937:11

**helping** [1] - 1060:10

**helpless** [1] - 1030:19

**hereby** [1] - 1054:23

**herself** [7] - 963:16; 980:13, 16; 1036:11; 1037:19; 1058:10; 1059:3

**hesitate** [2] - 1049:5, 9

**hi** [1] - 964:13

**hid** [1] - 954:13

**hidden** [9] - 943:13, 16, 18, 20, 24; 954:16, 18, 22; 1039:17

**hide** [2] - 1039:15; 1040:3

**hides** [1] - 1039:15

**hiding** [3] - 951:23; 999:2; 1058:5

**high** [2] - 993:13; 1022:19

**High** [7] - 935:12; 950:23; 952:12; 956:10; 964:3; 965:3; 1010:23

**highlighted** [1] - 975:3

**himself** [3] - 1058:10; 1059:2; 1060:12

**hmm** [1] - 971:25

**hold** [5] - 960:5; 987:17; 1031:4; 1043:16; 1055:17

**holding** [2] - 997:8; 1031:18

**holidays** [1] - 938:21

**home** [16] - 939:3, 13; 943:11; 951:19; 952:4, 8; 965:14; 967:14; 1021:22; 1022:1, 9; 1029:23; 1032:10; 1039:19; 1069:19

**homes** [4] - 966:12, 23; 1001:15

**honest** [3] - 1019:16, 23; 1021:12

**Honor** [41] - 925:14-16, 24; 926:15, 25; 927:1, 23; 928:9, 18; 929:3, 10, 12, 16-17, 21-22; 930:3, 11, 14, 19-20; 931:3, 5, 20; 932:7, 20; 933:6, 8; 939:23; 944:9; 946:15; 1008:4, 6, 20; 1044:12-14; 1071:20; 1076:16, 22

**HONORABLE** [1] - 923:9

**hope** [7] - 933:20; 973:4; 990:10; 1000:24; 1004:9; 1015:11

**horrible** [6] - 1002:4; 1003:7; 1019:4; 1028:3, 16; 1038:7

**hose** [3] - 968:11; 969:6; 981:8

**hospital** [1] - 939:3

**hostility** [1] - 1058:20

**hosting** [1] - 970:4

**hour** [5] - 946:13, 18; 1006:3; 1016:23; 1066:23

**hours** [6] - 939:15, 17; 956:21; 1020:25; 1045:10

**house** [27] - 928:13; 935:9, 11, 14, 16; 936:14, 21; 941:16; 952:23; 956:12, 16; 967:23; 968:2; 975:14; 1001:21; 1011:24; 1012:5; 1020:1; 1022:3, 15; 1028:13; 1039:1; 1041:25; 1042:2, 25; 1063:19; 1071:2

**houses** [1] - 1001:22

**human** [2] - 1031:16; 1042:21

**hundreds** [1] - 1011:25

**hurt** [1] - 1012:19

**husband** [1] - 938:24

**hyper** [1] - 1006:15

**hyper-evaluate** [1] - 1006:15

**hypertechnical** [1] - 1006:14

**hypothetical** [2] - 1038:10, 24

---

**I**

**idea** [2] - 1020:6

**identification** [1] - 932:13

**ignore** [2] - 1047:8; 1051:5

**ignored** [1] - 1056:9

**illegal** [2] - 977:2, 5

**illness** [1] - 939:1

**image** [3] - 950:25; 953:3; 1071:4

**imagery** [1] - 975:1

**images** [23] - 946:22; 951:3; 952:15; 954:24; 959:12; 979:21; 981:2, 4, 17, 20; 986:13; 987:10; 1015:19, 21-22; 1023:4; 1028:12; 1039:25; 1040:2; 1071:2, 5, 11

**immunity** [3] - 999:3; 1035:14, 16

**impact** [1] - 1023:13

**impacted** [2] - 1000:11

**impartial** [4] - 1048:14; 1049:22, 25; 1058:24

**impeached** [1] - 1054:6

**Imperiale** [6] - 939:12; 950:15, 21; 952:24; 953:1, 7

**implication** [1] - 1076:4

**importance** [3] - 1049:6; 1057:13, 25

**important** [13] - 990:2, 6; 991:20; 993:20; 995:12; 999:14; 1014:12; 1025:8; 1035:17; 1049:10; 1057:19; 1059:9; 1060:19

**importantly** [2] - 1015:17; 1032:18

**imposes** [1] - 1048:1

**impress** [1] - 967:1

13

**impressed** [1] - 1058:3

**improper** [2] - 1051:19; 1052:2

**in-between** [2] - 997:16

**inadequate** [1] - 1009:5

**inbox** [6] - 928:12; 955:3; 986:8; 1011:13; 1012:20; 1036:2

**Inc** [1] - 1073:6

**incentive** [2] - 1039:24; 1058:18

**include** [2] - 927:13; 1073:22

**includes** [2] - 939:18; 980:20

**including** [3] - 980:7; 991:1; 1069:19

**incomplete** [4] - 1018:24; 1027:14; 1029:25

**inconclusive** [1] - 1003:5

**inconsistency** [2] - 1060:19, 21

**inconsistent** [4] - 1060:8, 25; 1061:1

**incorporate** [1] - 957:23

**incorrect** [1] - 940:20

**incriminate** [1] - 1005:25

**incumbent** [1] - 1031:2

**indeed** [1] - 951:10

**Independence** [1] - 966:3

**INDEX** [1] - 1078:1

**indicate** [2] - 1003:2; 1004:11

**indicated** [4] - 926:12; 928:24; 971:5; 1038:11

**indicates** [1] - 1011:15

**indicating** [6] - 948:25; 949:7; 952:20; 958:19; 961:17; 971:2

**indicating)** [6] - 952:2, 21; 961:25; 962:4; 963:23; 975:13

**indication** [1] - 1056:14

**indicator** [2] - 951:21; 1039:15

**indictment** [23] - 929:2; 930:6, 24;

931:10, 13, 17, 19, 23; 985:18; 986:24; 1029:1; 1046:14; 1047:20, 22; 1050:18; 1057:16; 1064:7; 1065:8, 12, 17; 1069:12, 16

**indispensable** [2] - 992:10; 993:20

**individual** [1] - 1065:21

**individuals** [1] - 1061:8

**infer** [2] - 1052:23; 1053:6

**inference** [10] - 1052:24; 1053:7, 10, 12, 15; 1055:23; 1063:12; 1065:17; 1066:4

**inferences** [6] - 1046:24; 1053:19; 1055:12; 1056:19; 1068:21; 1069:14

**inferred** [1] - 1052:22

**influence** [1] - 1065:25

**influenced** [5] - 994:13, 17; 1051:3; 1058:15

**information** [5] - 964:25; 970:10; 1015:17; 1019:24; 1038:3

**informative** [1] - 1072:24

**initial** [1] - 950:10

**innocence** [8] - 928:11; 991:18; 993:7; 1001:10; 1024:23; 1047:19; 1048:11; 1051:24

**innocent** [10] - 992:13, 21; 993:3; 1023:21; 1030:19; 1048:4, 6; 1054:20; 1060:18; 1063:10

**inquires** [1] - 925:16

**inquiring** [1] - 925:15

**inside** [2] - 982:22; 1001:17

**instance** [3] - 932:17; 1074:20

**instances** [2] - 1073:20; 1074:19

**instead** [1] - 986:11

**instinct** [3] - 992:17, 19

**instincts** [4] - 993:8;

994:5; 995:21; 1031:17

**instruct** [16] - 958:5; 976:17; 983:18; 992:5; 993:13; 995:13; 1032:19; 1046:7, 10, 13; 1047:6; 1048:5; 1050:3; 1054:23; 1063:23; 1064:11

**instructed** [2] - 1056:4; 1062:7

**instructing** [1] - 968:16

**instruction** [14] - 927:5, 9, 13, 22; 928:1; 929:5; 948:5, 15; 1048:22; 1054:21; 1057:7; 1061:4; 1063:1; 1072:7

**instructions** [28] - 926:23; 929:7; 930:18; 931:7, 25; 947:11; 948:7, 13, 17; 958:6; 980:2; 1043:22, 24; 1045:2, 9, 15, 17, 20, 24; 1046:9; 1047:4, 18; 1051:10; 1066:24; 1067:15, 17, 19; 1074:8

**insubstantial** [1] - 1029:9

**intend** [1] - 960:17

**intended** [2] - 982:20; 983:8

**intends** [2] - 960:20; 985:16

**intent** [2] - 1072:15; 1074:5

**intention** [1] - 958:18

**intentions** [1] - 955:7

**intercourse** [2] - 980:6

**interest** [8] - 981:7; 991:6; 1059:18, 22; 1060:2, 4; 1062:5, 19

**interests** [1] - 1059:20

**interfere** [1] - 1052:4

**internet** [3] - 961:10; 981:17; 986:9

**interpreted** [1] - 1055:1

**interstate** [3] - 978:4; 981:10; 986:3

**interview** [2] - 1066:7; 1076:3

**interviewed** [1] - 1066:2

**introduced** [4] - 927:16; 941:1; 964:22;

1054:2

**investigate** [1] - 1026:18

**investigated** [1] - 1015:8

**investigation** [18] - 998:13; 999:15, 18; 1000:10; 1001:3; 1009:4; 1014:18; 1015:7; 1026:12, 17; 1027:13; 1029:25; 1032:14, 21; 1034:25; 1035:2, 5

**Investigation** [2] - 999:1; 1010:21

**investigator** [1] - 1002:18; 1024:17

**invites** [1] - 955:11

**invoice** [1] - 952:10

**involuntary** [1] - 1064:14

**involve** [2] - 991:12; 1057:19

**involved** [17] - 936:5; 992:6; 994:22; 1001:4; 1009:14; 1012:1, 22; 1017:24; 1018:16; 1021:11; 1024:5; 1026:6; 1027:6, 25; 1029:1; 1064:18

**involvement** [2] - 1065:15; 1071:6

**involves** [5] - 990:21; 994:24; 1002:14; 1015:5; 1028:7

**involving** [16] - 949:13; 976:21, 23; 986:25; 998:24; 1004:18; 1013:16; 1015:19; 1019:4; 1023:19; 1026:17; 1027:23; 1030:15; 1070:3, 25

**IP** [14] - 961:9, 11; 969:19, 21; 970:10-13, 16-17; 1003:16; 1037:14; 1043:5

**Island** [3] - 928:15; 965:25; 966:17

**Islander** [1] - 1033:9

**Islanders** [1] - 970:4

**Islip** [3] - 923:5, 14, 22

**isolation** [1] - 1069:3

**issue** [18] - 925:19; 926:2, 13; 928:11; 929:1; 931:8; 1000:16; 1024:3; 1028:25;

1052:21, 25; 1061:14;
1064:19; 1070:14;
1072:9, 25; 1075:6
**issued** [2] - 1000:20;
1032:12
**issues** [9] - 929:9, 15,
20; 930:18, 25; 932:21;
1025:6; 1057:15; 1070:6
**Istanbul** [1] - 967:10
**items** [4] - 932:13;
935:21; 1015:16
**itinerary** [3] -
1010:8; 1017:18;
1018:18
**itself** [6] - 944:20;
981:23; 1068:16;
1073:1, 4, 10

---

**J**

**jackets** [1] - 1021:25
**Jackson** [1] - 1068:16
**jail** [1] - 1035:7
**January** [17] - 950:14,
19; 953:11, 16; 954:25;
957:10, 18, 20; 958:3;
959:2, 4, 19; 975:15;
978:18; 986:22; 1017:2;
1038:16
**Jarmila** [1] - 1022:18
**Jewish** [1] - 938:21
**JFK** [2] - 999:9;
1017:14
**job** [6] - 959:25;
1034:9, 11; 1036:16;
1057:10; 1076:19
**jobs** [3] - 1006:12
**Joe** [10] - 937:23;
964:13; 965:2, 22;
1004:9; 1005:12, 15;
1041:9
**joeval15@optonline.net**
[16] - 965:1, 17;
970:7, 9; 971:4; 984:8;
997:21; 1004:12;
1012:23; 1025:10;
1027:6; 1030:5;
1033:11; 1034:18;
1037:11
**Johnson** [1] - 959:16
**join** [2] - 938:6, 10
**jointly** [1] - 966:13
**Joseph** [22] - 934:24;
936:3; 937:3; 940:7;
948:25; 950:17; 952:10;
955:6; 959:3; 964:2;
970:5; 971:3; 984:19;
998:10; 1000:2;
1010:15; 1019:20;

1030:10; 1031:8;
1032:15; 1040:20
**JOSEPH** [2] - 923:5, 9
**Joseph's** [2] - 935:9;
1019:1
**Judge** [22] - 927:8;
945:11, 21; 948:10, 19;
958:5; 974:23; 976:14,
17; 980:20; 983:17;
987:21; 989:18; 992:5;
993:13; 994:12; 995:13;
1032:19, 22
**judge** [1] - 1020:5
**Judge's** [2] - 958:6;
980:1
**judges** [3] - 1046:22;
1057:12; 1066:17
**judgment** [2] -
1059:14; 1060:24
**judgments** [2] -
1057:20
**judicial** [1] - 1000:16
**July** [21] - 965:23;
966:2, 7; 967:16, 18,
24; 968:6, 20; 969:15;
970:14, 22-23; 971:3;
972:25; 983:4; 999:9;
1018:1; 1036:22; 1037:1
**jump** [1] - 1022:10
**June** [3] - 955:4, 25;
1017:25
**juror** [2] - 995:15, 17
**jurors** [6] - 927:9;
933:13; 987:7, 15;
994:23; 1048:12
**jury** [65] - 923:10;
924:24; 926:18, 22;
928:3, 17, 20; 930:22;
931:22; 933:10, 14-15,
18; 936:23; 937:12;
946:6, 24; 947:1;
949:6; 988:5, 10;
989:13, 22; 1006:24;
1007:3; 1008:13, 17;
1031:24; 1035:12;
1043:20; 1044:6;
1045:2, 5-6, 8; 1046:1,
11; 1048:8; 1053:14;
1061:10; 1063:15;
1067:4, 6, 13, 23;
1068:7, 19; 1069:7, 13,
23; 1070:10; 1071:1,
8-9; 1072:2, 7; 1074:1,
13, 25; 1075:14;
1076:9, 11
**jury's** [1] - 1069:3
**justice** [5] - 991:16,
20; 992:9; 1035:15

---

**K**

**Kabrawala** [11] -
940:1; 946:9; 989:20;
990:4; 992:23; 993:10;
996:19; 1011:7; 1012:9;
1021:18; 1032:2
**KABRAWALA** [18] -
923:14; 939:23, 25;
944:7; 945:1, 3, 21;
946:13; 948:19, 21;
972:15; 1008:11;
1032:3; 1035:13;
1043:12; 1044:13;
1078:7, 11
**Kalichenko** [93] -
936:11, 13, 20; 940:24;
941:15; 942:15, 23;
949:1, 4, 8, 11; 950:9,
13; 956:2, 18; 959:3;
963:10, 25; 965:16, 23;
966:1; 967:1; 968:16;
970:2, 15; 971:10, 16,
18; 973:15; 975:16, 23;
976:1, 5, 7, 10;
977:14; 979:9; 980:10,
12, 14, 16; 981:7;
982:25; 983:5; 984:2,
6, 18; 985:4, 13;
986:16; 996:6, 9, 11,
21; 997:6; 998:13, 16;
1010:1, 12-13; 1014:16;
1017:10, 15; 1019:17;
1020:15; 1026:2;
1027:7, 12; 1028:12;
1029:15; 1030:9;
1032:6; 1033:2, 19;
1034:3, 12; 1035:6, 17,
19-20, 22; 1036:16, 19;
1037:3, 17-18; 1038:25;
1040:9; 1042:24;
1070:2, 7; 1075:12
**Kalichenko's** [4] -
927:19; 949:13;
1013:22; 1032:10
**kalichenkoes@mail.ru**
[2] - 997:25; 1025:11
**keep** [5] - 934:20;
967:2; 1009:1; 1010:17;
1054:17
**key** [2] - 1013:15;
1016:7
**kid** [1] - 1036:10
**kid's** [1] - 957:15
**kids** [2] - 1031:16;
1039:13
**Kiev** [1] - 973:16
**kill** [2] - 1023:6;
1042:10

**killing** [1] - 1023:21
**kind** [10] - 935:20;
942:7; 955:7; 983:23;
989:6; 1002:18;
1008:25; 1013:11;
1024:9, 12
**kinds** [1] - 1052:10
**kisses** [2] - 962:15;
963:21
**kitchen** [5] - 938:4, 7,
10, 18; 1022:17
**knowingly** [3] - 986:1,
12; 1064:15
**knowledge** [7] -
935:13; 1052:13, 15;
1058:13; 1061:10, 12;
1064:19
**knows** [12] - 966:15;
967:9; 983:10; 998:22,
24; 1000:23; 1001:16,
21; 1013:20; 1017:18,
22
**Korea** [1] - 982:4

---

**L**

**lace** [1] - 979:18
**lack** [5] - 1004:8;
1046:25; 1051:18;
1052:6; 1065:5
**ladies** [14] - 954:22;
958:2; 989:22; 991:23;
997:13; 999:17;
1005:18; 1013:14;
1016:22; 1018:17;
1019:12; 1021:7;
1026:8; 1031:20
**landscaper** [2] -
1033:10; 1043:3
**landscaping** [3] -
964:13, 15
**language** [8] - 931:16;
962:6; 968:12, 14;
974:7; 987:9; 1005:22;
1025:18
**LaPinta** [14] - 923:17;
989:5, 11, 17-18;
1008:3, 6, 9, 19-20;
1024:8; 1075:16, 24
**LAPINTA** [2] - 946:18;
972:13
**large** [1] - 935:21
**lascivious** [2] -
980:21
**last** [5] - 924:7;
942:20; 987:5; 990:5;
1030:14
**lasted** [1] - 1038:4
**lastly** [1] - 994:7

**Lato** [9] - 924:11, 21; 928:19; 945:14; 989:20; 998:11; 999:8; 1008:5; 1022:4

**LATO** [40] - 923:17; 925:14, 21; 926:21; 927:1, 15, 23; 928:7, 9, 18; 929:12, 17, 22; 930:9, 11, 14, 20; 931:5, 20; 932:18; 933:8, 25; 934:23; 939:20; 943:2, 22; 944:9, 11, 24; 945:11, 15; 946:15; 1035:10; 1043:10; 1044:12; 1071:20; 1076:22; 1077:12; 1078:5, 9

**Lato's** [1] - 1071:14

**law** [43] - 925:2; 939:12; 948:6, 8, 10, 12-13; 949:24; 958:9; 976:16, 18; 977:1; 979:24; 987:21; 992:5; 1022:12; 1043:22, 24; 1045:9, 23; 1046:7; 1047:4; 1048:1, 3; 1049:16; 1055:7; 1056:6; 1062:10, 16, 22; 1064:16, 20; 1065:3, 10; 1067:15; 1069:21; 1071:24; 1072:8, 10; 1075:22

**lawful** [1] - 1063:24

**laws** [14] - 991:10-16, 19, 21, 24-25; 994:11; 1024:3; 1031:1

**lawyer** [3] - 926:4; 928:24; 991:5

**lawyer's** [1] - 1051:8

**lawyers** [9] - 926:8, 12; 993:2; 994:16; 1006:7; 1047:5; 1050:11, 20; 1076:18

**lawyers'** [1] - 926:10

**lead** [1] - 958:7

**learned** [2] - 996:8; 999:7

**least** [9] - 928:23; 964:20; 1021:24; 1022:14; 1026:9; 1067:20; 1068:4; 1076:1, 5

**leave** [7] - 927:5; 939:11; 1006:4; 1011:16; 1030:13; 1031:13; 1076:22

**leaves** [3] - 956:11; 1007:3; 1067:23

**leaving** [1] - 956:4

**lectern** [1] - 990:8

**left** [10] - 937:21; 938:9; 1009:7; 1012:2; 1017:23, 25; 1022:13; 1038:13; 1040:21; 1044:6

**legal** [5] - 940:19; 1046:13; 1047:5; 1055:10; 1064:23

**legally** [1] - 943:5

**legion** [1] - 1014:21

**legitimate** [1] - 1062:15

**lend** [1] - 1026:17

**length** [1] - 1032:7

**LEONARD** [1] - 923:17

**less** [5] - 946:19; 990:6; 1047:13; 1053:22; 1062:13

**lesser** [1] - 1062:14

**letters** [2] - 984:13; 1003:17

**levels** [1] - 1019:6

**L**■ [1] - 936:2

**L**■**'s** [2] - 936:3

**library** [2] - 1029:22; 1036:5

**lie** [1] - 941:19

**lied** [1] - 1019:15

**lies** [1] - 1057:19

**life** [6] - 956:23; 968:25; 1002:25; 1006:10; 1043:3; 1049:6

**light** [8] - 951:21; 1039:15; 1053:11; 1059:4, 6-7; 1064:13; 1068:20

**limited** [3] - 1051:12; 1060:10

**linchpin** [1] - 1027:10

**line** [1] - 960:15

**link** [3] - 978:3; 981:10

**linked** [1] - 985:12

**list** [4] - 932:8, 10, 12; 1050:16

**listen** [4] - 961:21; 973:18; 987:21; 1067:18

**listened** [2] - 1004:5; 1057:21

**literally** [3] - 951:24; 968:8

**live** [4] - 955:17, 21; 1001:23; 1038:20

**lived** [3] - 935:14;

1001:19

**lives** [8] - 956:25; 962:14; 966:4; 967:7; 987:20; 1001:16, 21

**living** [5] - 936:3, 5; 955:10, 18; 1020:18

**local** [2] - 966:6, 15; 1037:14; 1067:4

**located** [3] - 935:11; 949:2; 1011:12

**location** [2] - 928:11; 1071:1

**locations** [1] - 1005:7

**lockers** [1] - 1040:21

**logging** [1] - 966:5

**logical** [2] - 1053:9, 19

**look** [17] - 924:10; 960:12; 962:5, 7, 9; 979:15; 995:15; 1003:8, 12; 1010:16; 1020:16; 1036:22; 1040:11, 18; 1053:10; 1054:9; 1077:7

**looked** [6] - 962:24; 963:1; 995:1, 7; 1074:19

**looking** [6] - 954:16; 955:7, 17; 996:4; 1024:12

**LORETTA** [1] - 923:12

**lose** [2] - 989:6; 1023:15

**lost** [2] - 985:6; 1023:6

**loud** [2] - 994:14; 1015:14

**loudly** [3] - 985:15; 995:6; 1011:10

**love** [4] - 940:11; 944:3; 957:2; 962:15

**loved** [1] - 957:2

**loyalty** [1] - 1058:18

**lunch** [15] - 932:19; 947:10; 988:7; 989:2; 1006:3, 17, 25; 1008:23, 25; 1009:7; 1020:21; 1067:3, 6

**Luncheon** [1] - 1007:5

**lustfulness** [1] - 980:24

**lying** [4] - 1019:12, 14; 1043:7; 1075:23

**LYNCH** [1] - 923:12

---

**M**

**machine** [1] - 1039:20

**magazine** [9] - 941:10;

944:13, 15-16, 19, 21; 945:4, 8

**mail** [83] - 949:3, 12; 950:11; 955:3, 12, 20, 24; 956:17; 957:4, 11, 20; 958:2, 14; 959:19; 960:22, 24; 962:7-9, 20; 963:10, 19, 23; 964:6, 17, 19, 25; 965:11, 14, 22; 966:7; 967:4, 16; 968:18, 21; 969:4, 15-16, 18, 21-22, 25; 970:3, 8-10, 12, 14, 22-23; 971:3, 6, 10; 972:5, 8, 12, 16, 20, 22; 973:7, 15; 974:10; 975:24; 981:18; 983:4; 984:8, 15; 986:16; 1000:14, 17, 22-23; 1001:11; 1070:6; 1072:1, 3; 1073:14, 17; 1075:3, 19

**mailed** [2] - 960:21; 973:9

**mailing** [1] - 973:18

**mails** [47] - 924:11; 927:20; 928:12; 942:14, 17; 949:4, 7-8; 956:7; 958:25; 959:6; 964:9; 965:21; 966:19; 967:6, 23; 968:6; 973:3, 12, 19; 975:21; 978:9; 979:8; 981:6, 18; 982:24; 984:5; 985:12; 987:9; 997:24; 1069:20; 1070:1, 11, 18-19; 1073:12, 16, 24; 1074:2, 4, 20, 22, 24; 1075:17; 1076:8

**main** [1] - 968:24

**maintain** [1] - 965:8

**major** [2] - 977:16; 1069:21

**Malaysia** [1] - 981:25

**man** [5] - 948:25; 957:1; 991:3; 992:13; 1026:9

**manipulate** [1] - 954:21

**manner** [1] - 981:1

**manufactured** [1] - 981:21

**March** [5] - 960:10, 23; 965:7; 970:1; 1017:24

**Mario** [2] - 937:3; 962:18

**marked** [1] - 932:13

**marking** [1] - 1045:1

**Massapequa** [2] - 938:16

**masturbate** [3] - 980:12, 15

**masturbating** [1] - 1036:11

**masturbation** [1] - 980:8

**matched** [2] - 951:12, 16

**material** [1] - 1056:24

**matter** [6] - 955:22; 1049:6; 1053:13; 1056:6; 1059:9; 1064:19

**matters** [4] - 924:7; 1055:10; 1057:24

**mature** [1] - 972:1

**meal** [1] - 1020:21

**mean** [10] - 980:22; 990:5; 992:14; 1003:18; 1011:13; 1012:15; 1054:2; 1062:12; 1077:8

**means** [10] - 958:12; 972:11; 976:25; 983:18; 1020:19; 1049:19; 1052:24; 1064:24; 1077:13

**mechanical** [1] - 923:24

**mechanism** [1] - 1077:13

**media** [3] - 975:2, 5; 1026:25

**Medina** [1] - 1068:23

**meet** [5] - 955:15, 19; 977:11; 985:21; 995:25

**meeting** [4] - 955:9, 14; 964:14; 998:13

**members** [10] - 933:18; 947:1; 988:5; 1006:24; 1008:17; 1019:5; 1025:5; 1031:24; 1043:20; 1045:8

**memory** [5] - 950:25; 953:24; 975:2; 982:4; 1040:4

**men** [3] - 1026:8; 1029:16; 1036:6

**mention** [1] - 1075:10

**mentioned** [5] - 982:25; 1013:1; 1025:15; 1031:24; 1064:21

**mentions** [1] - 961:16

**mentor** [5] - 1025:19, 22, 25; 1026:1

**menu** [1] - 1067:4

**mere** [2] - 1023:9, 18

**merely** [4] - 992:15; 1011:12, 15

**merge** [1] - 1077:13

**merged** [1] - 1077:2

**merging** [1] - 1077:12

**message** [3] - 990:1, 5; 1005:23

**messages** [7] - 975:16; 999:4; 1009:12, 17; 1010:16; 1041:9

**met** [13] - 936:10; 940:24; 941:3; 950:2, 5, 9, 12; 955:13; 967:23; 998:8; 1000:2; 1039:1; 1042:25

**metadata** [11] - 953:15; 1002:13, 16-19; 1004:1; 1016:2, 14; 1023:4

**metadata-wise** [1] - 1004:1

**method** [2] - 981:14; 1032:20

**methodology** [1] - 1009:11

**Michael** [1] - 939:12

**Michelle** [1] - 1067:4

**microphone** [1] - 934:17

**midnight** [1] - 955:4

**midsummer** [1] - 967:17

**might** [3] - 1041:11; 1052:3; 1058:18

**miles** [2] - 949:20; 1075:1

**military** [1] - 1024:11

**mind** [6] - 936:19; 944:17; 1010:17; 1053:14; 1054:17; 1059:23

**minor** [7] - 977:2, 5, 25; 978:12; 979:22; 986:1, 6

**minors** [1] - 978:22

**minute** [4] - 928:6; 976:25; 989:7; 1044:17

**minutes** [15] - 925:18; 926:20; 929:24; 930:9; 933:2, 10; 938:11; 944:12; 946:1; 953:4; 1008:9; 1016:23; 1067:25; 1068:6

**Mirandized** [1] - 975:19

**misguided** [3] - 1013:11; 1033:24

**misleading** [1] - 1012:12

**missing** [4] - 1024:7, 25; 1034:15; 1040:6

**misspelling** [1] - 971:13

**misstated** [1] - 1024:11

**mistake** [5] - 996:23; 1010:14; 1024:22; 1060:18

**misunderstanding** [1] - 1034:14

**miswrote** [1] - 1024:10

**mitigating** [1] - 1001:6

**MO** [2] - 971:7; 1040:1

**model** [2] - 950:18; 1020:12

**modeled** [1] - 941:6

**modeling** [5] - 941:8; 950:22; 1020:3, 7; 1071:7

**models** [1] - 950:20

**molest** [2] - 949:2; 975:23

**molesting** [1] - 976:3

**mom** [2] - 936:3

**moment** [4] - 939:20; 1053:1; 1054:15

**Monday** [2] - 926:23; 933:21

**money** [38] - 950:20; 958:1, 16, 19; 959:1; 961:22; 963:3, 8; 965:19; 967:3, 11, 13; 972:11, 21; 976:7; 983:5, 7, 11; 984:25; 985:2; 1009:25; 1010:1, 9; 1029:19; 1035:24; 1036:17; 1037:8, 23-25; 1038:8; 1040:1; 1070:9; 1073:20; 1074:6

**Montauk** [2] - 966:14, 23

**month** [8] - 924:23; 956:11, 13; 957:8, 10; 962:23; 963:9; 1002:20

**months** [12] - 955:1; 956:6; 960:9; 1005:15; 1014:9; 1016:10; 1038:22; 1039:7

**morning** [14] - 924:4; 925:15; 933:18; 940:1; 948:8; 973:23; 1021:23; 1044:1; 1045:12; 1067:3, 12, 22

**moronic** [1] - 999:11

**most** [14] - 940:19; 971:18; 972:24; 1011:5; 1037:3, 8; 1049:9; 1054:4, 12; 1068:20; 1070:17, 21; 1074:12, 24

**mother** [11] - 933:1; 934:25; 950:15; 962:15; 970:25; 978:17; 980:16; 997:8; 1019:1, 18; 1022:2

**motion** [6] - 924:9, 11, 17; 1068:9, 11, 13

**motions** [1] - 924:12

**motive** [2] - 1058:18; 1059:18

**motives** [1] - 997:11

**mouth** [2] - 934:18; 973:25

**MOV** [1] - 959:23

**move** [2] - 924:6; 929:5

**movie** [2] - 959:22

**moving** [1] - 929:13

**MR** [81] - 925:14, 21; 926:21, 25; 927:1, 15, 23; 928:7, 9, 18; 929:10, 12, 16-17, 21-22; 930:3, 6, 9, 11, 14, 19-20; 931:3, 5, 15, 20; 932:7, 12, 18, 24; 933:5, 8, 25; 934:23; 939:20, 23, 25; 943:2, 22; 944:7, 9, 11, 24; 945:1, 3, 11, 15, 21; 946:13, 15, 18, 21; 948:19, 21; 972:13, 15; 989:5, 11, 18; 1008:4, 6, 9, 11, 20; 1032:3; 1035:10, 13; 1043:10, 12; 1044:12-14; 1071:20; 1076:16, 22; 1077:12; 1078:5, 7, 9, 11

**MTCN** [5] - 959:14; 971:4; 972:10, 23; 1073:20

**mug** [1] - 1042:6

**mugs** [1] - 1042:6

**multiple** [2] - 1074:9, 11

**multiplicitous** [1] - 1071:18

**multiplicity** [4] - 924:17; 925:9; 1075:6; 1076:23

**must** [42] - 977:21, 24; 978:3, 21; 991:23;

992:7, 11, 18-19;
993:7, 11; 994:3, 18;
995:9; 1031:22;
1039:18; 1046:15;
1047:3, 6-7, 20;
1048:16, 24; 1049:7;
1051:13, 17; 1052:5;
1053:10; 1054:9;
1055:10, 23; 1056:3, 8,
21; 1057:13; 1059:5;
1063:25; 1066:3;
1068:18; 1069:2

## N

**N.Y** [1] - 923:5
**nail** [1] - 942:9
**naked** [2] - 954:8;
1039:5
**name** [25] - 935:3, 7;
936:2, 10; 940:1;
944:15, 18; 964:21;
965:14; 971:10, 14;
977:20; 996:10, 16;
1013:21; 1025:23;
1026:10, 12; 1047:9
**named** [6] - 949:1, 17;
965:15; 1032:6;
1065:20, 22
**names** [4] - 959:22;
996:9, 17; 997:6
**Nassau** [1] - 966:11
**national** [1] - 1051:22
**naturally** [1] - 1049:1
**nature** [2] - 990:20;
1052:3
**necessarily** [4] -
1053:21; 1054:3;
1062:12
**necessary** [1] -
1027:22
**need** [20] - 933:1;
946:1; 953:18; 957:12;
962:2; 973:7, 9;
981:12; 984:9; 993:15,
21; 1034:6; 1036:9;
1040:25; 1041:17;
1065:9; 1076:15, 25;
1077:21
**needless** [1] - 985:15
**negotiate** [3] -
1005:17; 1009:20
**never** [18] - 937:19;
942:14; 951:11; 955:13;
1016:13; 1032:23;
1036:14, 17, 21;
1037:5; 1047:25;
1048:1; 1049:19; 1063:8
**NEW** [1] - 923:1

**new** [5] - 963:17,
19-20; 984:20; 1075:2
**New** [13] - 923:14, 18,
22; 952:13; 956:10;
964:3; 965:4; 966:14;
967:11; 981:21; 997:15;
1037:16; 1043:5
**next** [13] - 933:24;
945:24; 957:8, 19;
962:9; 963:15; 972:15,
18, 21; 1043:21;
1045:19; 1054:21;
1068:6
**nice** [2] - 959:24;
961:2
**▬▬▬** [16] - 949:16;
950:12; 954:12; 976:21;
979:14; 982:11;
1023:17, 20; 1030:11;
1038:15; 1042:13;
1070:25; 1071:10;
1076:6
**night** [6] - 926:23;
939:13; 970:5; 973:23;
1067:21; 1077:22
**nine** [3] - 939:17;
950:19; 1014:9
**nobody** [7] - 991:21;
1013:20; 1014:2;
1016:11; 1021:10;
1039:16
**noises** [1] - 942:11
**Nokia** [1] - 963:17
**non** [3] - 994:25;
995:5; 1029:9
**non-substantial** [1] -
1029:9
**non-verbal** [2] -
994:25; 995:5
**none** [3] - 1005:4;
1012:5; 1061:2
**nonschool** [1] - 939:8
**noon** [1] - 939:11
**note** [6] - 924:14;
927:3; 931:25; 948:3;
1045:25; 1072:23
**noted** [3] - 924:3, 21;
1070:5
**notepad** [1] - 932:1
**notes** [3] - 1045:20;
1068:1; 1076:2
**nothing** [19] - 928:10;
931:23; 944:7; 958:7;
970:2; 973:22; 976:16;
979:20; 998:2, 5;
1001:13; 1002:21, 23;
1003:4; 1004:6, 11;
1054:23

**notice** [2] - 1041:8, 10
**notices** [1] - 1039:16
**noticing** [2] - 1043:2,
4
**notification** [2] -
972:19; 983:11
**November** [2] - 923:7;
1077:23
**nowhere** [1] - 1011:20
**nude** [2] - 1020:20;
1021:14
**number** [19] - 925:5;
927:7; 953:21; 954:15;
959:14, 16; 963:11, 22,
25; 965:5, 14; 971:4;
972:23; 996:9; 997:2;
1024:11; 1072:23;
1073:21; 1074:13
**numbers** [2] - 1009:13;
1024:10
**numerous** [5] - 982:24;
1025:9; 1026:7; 1074:16
**nurses** [1] - 1006:12
**nurture** [1] - 990:23
**nuts** [1] - 1024:12
**nutty** [1] - 1024:9
**NY** [1] - 962:2
**NYC** [1] - 955:8

## O

**o'clock** [5] - 926:17;
988:6; 989:4; 1006:25;
1007:2
**object** [4] - 1004:21;
1051:2; 1055:15;
1077:17
**objected** [2] - 1076:13
**objection** [20] -
927:12, 14, 17, 22;
930:11; 931:18; 943:2,
22; 972:13; 1035:10;
1043:10; 1044:11;
1051:3-5; 1055:21;
1056:13; 1075:13, 18
**objections** [12] -
927:2; 929:9, 15, 20;
930:18; 1050:24;
1055:8, 13, 19; 1075:11
**objective** [1] - 995:21
**objectively** [1] -
995:10
**objects** [1] - 1004:20
**obligation** [2] -
992:25; 1063:4
**obliged** [1] - 1066:5
**observe** [2] - 1057:9;
1058:25

**observed** [1] - 1057:21
**obtained** [3] -
1052:14; 1063:19, 21
**obvious** [1] - 1021:11
**obviously** [10] -
926:7; 932:2; 990:20;
1014:2; 1015:21;
1051:15; 1070:14;
1072:7; 1076:8
**occasion** [1] - 1060:7
**occasions** [2] -
982:24; 1026:7
**occur** [1] - 1077:1
**October** [3] - 938:25;
956:11; 1038:13
**OF** [3] - 923:1, 3, 6
**offense** [4] - 925:2;
977:23; 995:19; 1065:10
**offenses** [1] - 992:19
**offer** [4] - 958:9;
976:18; 1029:14;
1054:19
**offered** [6] - 968:25;
975:25; 994:10; 1023:1;
1050:24; 1069:22
**offering** [2] - 958:8;
1054:4
**offers** [1] - 1055:15
**Office** [1] - 1017:19
**office** [5] - 983:25;
1001:17; 1010:23;
1028:21; 1040:5
**officer** [4] - 956:3;
991:5; 1022:13
**often** [1] - 1073:19
**oftentimes** [1] -
1003:1
**Ohio** [1] - 1017:24
**old** [6] - 949:17;
950:19; 977:23; 1014:5,
7, 23
**Olena** [32] - 936:10,
13, 20; 940:24; 941:15;
949:1; 950:9; 956:2;
963:10, 25; 965:15;
996:10, 20; 998:13, 16;
1009:25; 1010:3, 12;
1013:2, 22; 1014:16;
1017:10, 15; 1019:17;
1020:15; 1026:2;
1027:6, 11; 1028:12;
1029:15; 1030:9; 1032:6
**once** [7] - 936:22;
941:10; 995:5; 1017:25;
1053:16; 1056:8
**one** [70] - 925:5;
927:6; 929:7; 932:16;

936:24; 939:20; 946:13; 951:5; 952:16; 953:1, 23; 958:3; 959:6, 8; 960:2; 968:8; 979:19; 980:5; 981:3, 13; 986:21; 987:24; 993:20; 996:16; 997:5; 1002:2; 1003:25; 1004:21; 1005:2, 14; 1009:9; 1011:25; 1012:24; 1013:16; 1014:3; 1020:12; 1021:8, 24; 1022:14; 1025:22; 1026:9; 1027:9, 23-24; 1029:11; 1030:15; 1031:21; 1033:20; 1034:8; 1036:8; 1037:4; 1042:7; 1044:9; 1052:14; 1054:1; 1067:2, 10; 1072:10; 1073:5, 17, 24; 1074:2, 10, 20, 25; 1075:2, 11, 16, 20

**one's** [1] - 959:24

**ones** [6] - 957:2; 1027:20; 1031:10; 1036:24; 1075:1

**online** [3] - 941:3; 955:14, 16

**op** [1] - 966:13

**open** [2] - 1012:19; 1034:21

**opened** [2] - 1012:7, 15

**opening** [4] - 949:21; 974:22; 975:12; 1031:6

**operate** [1] - 970:18

**operating** [1] - 1011:13

**opinion** [11] - 1010:11; 1028:9; 1055:3; 1056:14; 1061:14, 19-20, 22, 25; 1062:1

**opinions** [3] - 1061:16, 18; 1064:1

**opportunist** [2] - 997:4; 1029:15

**opportunities** [1] - 966:22

**opportunity** [6] - 950:1; 989:25; 1020:19; 1028:10; 1057:9; 1058:25

**opposed** [1] - 1036:11

**optonline** [3] - 1002:6; 1013:2, 5

**oral** [3] - 980:7, 11; 1004:18

**order** [3] - 970:5;

980:23

**ordered** [2] - 1042:4; 1056:2

**ordinarily** [1] - 1061:15

**ordinary** [1] - 1062:14

**origin** [1] - 1051:23

**original** [1] - 952:17

**originated** [1] - 961:13

**otherwise** [5] - 932:4; 958:7; 991:8; 1011:18; 1028:23

**outcome** [6] - 1059:17, 22; 1060:2; 1062:5, 19

**outfit** [2] - 953:8

**outrageous** [1] - 1023:13

**outrageously** [1] - 991:8

**outside** [13] - 940:16; 942:21; 961:13; 970:18; 981:21; 982:15, 21; 1008:5; 1042:3; 1051:16; 1053:6; 1070:14

**outstanding** [1] - 924:7

**outweighed** [1] - 1061:25

**overruled** [8] - 972:14; 1043:11; 1051:6; 1055:8, 20; 1075:16, 19; 1076:14

**overseas** [2] - 966:18; 1009:11

**overwhelming** [3] - 977:15; 1042:18; 1043:15

**OWEN** [1] - 923:20

**own** [18] - 925:23; 926:7; 940:13; 949:16, 19; 954:12; 962:20; 974:18; 975:6; 1019:4, 10; 1042:5; 1049:10; 1054:9; 1057:2, 5; 1059:20; 1060:24

**owned** [3] - 954:13; 966:13; 1034:21

---

## P

**p.m** [4] - 951:5; 953:4, 17; 1016:16

**package** [2] - 963:12, 22

**packing** [1] - 963:24

**page** [6] - 1040:12, 19;

1068:17, 24; 1069:5, 8

**pages** [3] - 929:8, 14, 19

**paid** [15] - 951:8; 963:3; 965:8, 19; 971:18; 972:24; 976:1, 7; 985:10; 986:17, 20; 1034:22; 1038:6, 9

**painful** [1] - 1004:14

**painted** [1] - 1057:17

**panty** [3] - 968:11; 969:5; 981:8

**papers** [1] - 1064:21

**paperwork** [1] - 1020:17

**paragraph** [1] - 963:15

**part** [20] - 924:11; 928:23; 929:6, 13, 18; 942:17; 1011:5; 1026:1, 3; 1027:3; 1044:9; 1045:14, 16; 1046:19; 1057:19; 1061:2; 1068:4

**Part** [2] - 1066:19

**particular** [12] - 951:5; 969:20; 1004:21; 1009:13; 1015:16; 1026:11; 1032:20; 1061:12; 1064:24; 1065:20; 1071:14; 1072:9

**particularly** [1] - 959:6

**parties** [5] - 1047:13; 1056:19; 1065:24; 1066:14

**parts** [1] - 1046:9

**party** [7] - 1054:1, 11; 1055:13; 1056:20; 1064:16, 20

**pass** [3] - 938:24; 1046:23; 1052:18

**passionate** [1] - 963:21

**past** [5] - 955:4; 956:20; 989:6; 997:12; 1022:11

**patience** [2] - 987:4; 1030:12

**Patrol** [3] - 1017:19; 1018:12, 22

**pattern** [2] - 952:19

**pause** [1] - 1068:3

**pay** [3] - 971:7, 20; 1015:16

**paying** [2] - 940:19; 1070:11

**payment** [3] - 958:16;

1073:23

**pays** [2] - 973:1; 1036:16

**people** [21] - 955:13, 20; 983:20; 991:12; 992:2; 994:16; 996:14; 998:6; 1019:21; 1021:13; 1024:10; 1025:3; 1031:16; 1032:7; 1042:9; 1043:3; 1065:23

**per** [1] - 1036:12

**performance** [1] - 1049:12

**performed** [2] - 986:7; 1036:16

**performing** [1] - 980:11

**perhaps** [5] - 936:8; 944:17; 1013:11; 1021:14; 1022:23

**period** [4] - 924:23; 965:9; 1021:1; 1077:16

**permissible** [1] - 925:2

**permit** [1] - 1061:15

**permitted** [1] - 1055:25

**person** [18] - 936:10; 952:22; 965:13; 978:9, 18; 980:21; 991:18; 996:22; 1038:7; 1049:3, 5, 8; 1053:4; 1059:6, 10; 1065:16

**personal** [7] - 935:13; 1046:6; 1051:21; 1054:10; 1062:19; 1063:25

**personally** [1] - 925:24

**persons** [4] - 937:21; 1051:23; 1064:17; 1065:19

**persuaded** [1] - 1054:12

**phase** [1] - 1043:21

**phone** [8] - 960:1; 963:17, 19-20; 965:5; 973:24; 1009:13; 1029:24

**phones** [2] - 1002:9; 1040:21

**photo** [1] - 953:13

**photographing** [1] - 1023:8

**photographs** [2] - 1016:1; 1020:12

**physically** [1] -

1003:8

**pick** [1] - 939:10
**picked** [2] - 1018:20; 1037:25
**picking** [2] - 983:10; 1025:6
**picks** [1] - 934:18
**pickup** [1] - 972:19
**PICOZZI** [1] - 923:21
**pics** [2] - 978:9, 15
**picture** [11] - 944:20; 952:17; 953:5; 954:3, 7; 996:17; 1022:8; 1023:7
**pictures** [22] - 928:14; 937:6; 949:18; 950:13, 21; 951:10, 21; 952:16; 953:19, 21; 954:12; 956:14; 957:6; 978:8, 19; 979:16, 19; 1038:14; 1039:5; 1057:16
**piece** [6] - 1010:11; 1012:21, 24; 1013:13; 1055:22; 1066:21
**pieces** [1] - 1069:2
**place** [16] - 928:22; 950:22; 957:14; 977:17; 982:21; 983:24; 990:25; 991:6; 992:20; 1005:8; 1015:11; 1020:25; 1056:18; 1057:5; 1064:18
**placed** [1] - 1060:9
**places** [2] - 1005:9; 1040:17
**plainly** [1] - 998:14
**planet** [1] - 1042:22
**plans** [2] - 957:20; 998:17
**platform** [1] - 943:18
**plausible** [1] - 1043:12
**playing** [2] - 935:23; 936:1
**Plaza** [2] - 923:13, 22
**plea** [1] - 1047:23
**pleasure** [1] - 964:14
**pled** [1] - 1047:22
**plenty** [3] - 963:20; 976:6; 1067:15
**plugged** [1] - 966:15
**point** [19] - 932:19; 933:23; 937:8; 938:6; 954:21; 956:15; 957:3; 959:12; 978:14; 980:25; 981:3; 990:15; 994:16;

1015:3; 1031:8; 1035:17; 1043:16; 1077:17
**point-of-view** [1] - 959:12
**pointed** [7] - 954:18; 997:1; 1012:13; 1022:4; 1031:7, 9; 1073:15
**pointing** [1] - 954:23
**points** [1] - 1036:7
**poison** [1] - 995:11
**Pokemon** [1] - 935:22
**pom** [1] - 953:9
**pom-poms** [1] - 953:9
**poms** [1] - 953:9
**pool** [3] - 1040:20; 1041:1, 4
**porn** [1] - 1036:5
**pornography** [60] - 949:13; 968:3; 970:25; 975:8; 976:3, 12-13, 23; 985:17, 20, 24; 986:10, 13, 15, 25; 990:24; 991:7; 994:24; 995:2; 997:20; 998:6, 8, 23; 999:23; 1000:1, 24; 1002:1, 17; 1003:6; 1004:17-19; 1005:6, 8, 12; 1018:16; 1025:24; 1026:4, 10, 14, 17; 1027:8; 1028:1; 1029:5, 10, 23; 1035:21; 1036:19, 25; 1037:20; 1038:5; 1039:25; 1069:25; 1070:3; 1073:15
**possessed** [3] - 986:19, 24; 1069:24
**possessing** [1] - 976:23
**possession** [2] - 1028:19; 1029:1
**possibility** [1] - 1038:24
**possible** [3] - 1039:23; 1049:17; 1066:6
**possibly** [4] - 955:9; 995:20; 1009:2; 1026:13
**post** [3] - 926:22; 930:2; 1018:13
**potential** [2] - 924:17; 1032:21
**potentially** [3] - 925:1; 956:25; 1076:5
**pound** [1] - 990:8
**poverty** [2] - 1010:3; 1017:15

**power** [6] - 942:3-5, 7; 1005:22; 1039:8
**powerful** [1] - 1002:13
**practice** [5] - 926:1; 931:22; 932:9, 11, 15
**preexisting** [2] - 1070:16, 23
**prejudice** [1] - 1058:20
**premises** [3] - 1001:20; 1010:24; 1011:25
**preparation** [2] - 962:2; 1066:7
**prepare** [1] - 1066:5
**prepared** [2] - 925:13; 973:9
**preparing** [1] - 1066:3
**present** [6] - 924:5; 941:7; 1020:2, 9; 1063:5; 1064:17
**presentation** [2] - 945:17, 22
**presented** [5] - 1032:24; 1046:5; 1068:15; 1071:3; 1072:22
**presenting** [2] - 933:22; 1006:6
**presumably** [1] - 956:12
**presumed** [4] - 992:13, 21; 1048:6; 1054:19
**presumes** [1] - 1048:4
**presuming** [1] - 1040:5
**presumption** [4] - 1047:19; 1048:11, 17; 1051:24
**pretty** [1] - 1033:16
**previously** [3] - 1000:2; 1029:21; 1075:3
**price** [1] - 961:25
**problem** [5] - 924:18; 925:9; 1018:13
**procedures** [1] - 1024:4
**proceed** [3] - 946:4; 947:1; 948:17
**Proceedings** [1] - 923:24
**process** [4] - 994:8; 995:11; 1052:5
**processing** [2] - 1023:2
**produce** [4] - 1030:10; 1036:19; 1038:5; 1064:20

**produced** [19] - 923:24; 973:22; 1001:8; 1002:5; 1004:3; 1005:17; 1010:18; 1013:3, 15; 1029:13, 21; 1030:4; 1034:3; 1036:4; 1037:21; 1041:18; 1070:24; 1071:10; 1074:10
**producing** [4] - 978:1, 23; 1029:9; 1048:3
**product** [4] - 1014:15; 1022:22; 1030:4
**production** [4] - 1027:8; 1028:1, 4
**professional** [1] - 1062:19
**program** [1] - 1003:3
**programmed** [2] - 1016:6; 1017:7
**progressing** [2] - 970:21; 971:22
**promise** [2] - 956:23; 1073:23
**proof** [33] - 947:6; 974:21; 977:12; 981:12; 984:22; 992:24; 993:15; 1003:25; 1011:17, 20; 1019:23; 1028:4, 22-23; 1029:17; 1031:10; 1042:17; 1047:19; 1048:22; 1049:7, 17; 1051:21, 25; 1052:21, 24; 1054:17; 1065:9; 1069:22; 1071:16, 22
**properly** [2] - 1055:17; 1063:19
**properties** [2] - 966:11, 20
**property** [1] - 1002:7
**proposed** [2] - 926:22; 927:7
**prosecuted** [1] - 1005:21
**prosecution** [2] - 1047:9, 24
**prosecution's** [1] - 1006:19
**prosecutor** [2] - 940:2; 992:21
**prosecutors** [2] - 1001:5; 1006:6
**prospective** [1] - 994:22
**protect** [8] - 991:10, 21, 24; 1019:19; 1030:20; 1031:3
**protection** [1] - 956:3

**protective** [1] - 957:2

**protocol** [1] - 961:10

**prove** [28] - 977:16, 24; 978:21; 979:1; 982:18; 993:2, 5-6, 11; 1001:7, 10; 1004:1; 1010:16; 1031:11, 19; 1046:15; 1047:24; 1048:24; 1049:15, 20; 1052:21; 1053:22; 1063:6, 9; 1064:24

**proved** [2] - 1064:3; 1065:6

**proven** [11] - 954:24; 981:22; 982:8, 23; 987:2; 993:16; 1029:12; 1030:3; 1048:8, 21

**proves** [3] - 992:22; 1032:24; 1043:15

**provide** [1] - 926:8

**provided** [11] - 931:12; 964:23; 973:15; 975:19; 1045:2; 1067:3; 1073:21; 1074:7

**providing** [4] - 977:4; 979:2; 1070:12; 1073:20

**proving** [7] - 981:14; 992:25; 993:11, 22; 995:25; 1028:15; 1031:5

**pubic** [2] - 980:21, 23

**public** [5] - 1005:8; 1040:16; 1041:3

**publishing** [1] - 1020:11

**pull** [2] - 934:16

**punish** [2] - 1031:15, 17

**punishment** [1] - 925:1

**purely** [1] - 1055:10

**purpose** [10] - 977:3, 6; 978:1, 23; 979:2, 6, 14; 1051:13; 1060:10

**purposely** [2] - 996:20; 1060:17

**purposes** [3] - 983:21; 1020:4; 1071:7

**pussy** [2] - 960:3; 968:10

**put** [8] - 930:1; 995:9; 1021:20; 1037:22; 1040:4; 1050:22; 1068:1, 4

**puts** [1] - 1039:14

**putting** [1] - 1024:18

## Q

**qualifications** [1] -

1062:4

**quality** [2] - 993:15; 1006:8

**quantum** [1] - 993:15

**Queens** [1] - 966:17

**questions** [17] - 939:21; 940:3; 944:24; 945:1; 955:11, 15; 970:8; 989:24; 1009:19; 1011:8; 1012:9, 13; 1026:11; 1050:22, 24; 1055:7; 1056:23

**quite** [5] - 1011:4; 1014:25; 1021:12; 1026:13; 1062:15

**quoting** [1] - 1068:25

**QVC** [1] - 952:10

## R

**race** [1] - 1051:22

**raid** [1] - 1021:25

**rain** [1] - 1053:7

**rainbow** [1] - 1042:6

**raincoat** [2] - 1053:4, 8

**raining** [2] - 1053:1, 6

**raise** [1] - 934:4

**raised** [3] - 1042:8; 1055:13; 1070:15

**RAPAPORT** [1] - 923:20

**rather** [2] - 1003:5; 1069:7

**rational** [2] - 1068:13; 1070:22

**rationale** [1] - 1068:21

**rationally** [8] - 1069:15, 24; 1070:1, 10; 1071:1, 9, 12; 1072:2

**reached** [2] - 931:9; 1027:1

**reaching** [3] - 999:20; 1051:20; 1056:16

**read** [15] - 942:14; 948:4; 955:12; 957:12; 960:24; 968:12; 978:8; 979:12; 982:24; 1044:9; 1045:11, 23; 1067:18; 1072:7

**read-back** [1] - 948:4

**ready** [4] - 930:8; 946:9; 1008:3; 1025:17

**real** [9] - 966:16; 977:22; 978:7, 9-10, 16, 18; 1029:10

**reality** [2] - 1039:23;

1077:14

**realize** [1] - 987:5

**really** [19] - 928:11; 940:16; 978:7, 14; 996:22; 999:14, 16; 1014:12; 1018:3; 1027:10, 18; 1029:11, 18; 1031:15; 1033:7, 25; 1040:15; 1042:21

**realm** [1] - 1039:23

**reason** [16] - 925:6; 968:24; 987:18; 997:24; 998:15; 1001:14; 1013:11; 1022:5; 1026:5, 13; 1048:1; 1049:2; 1053:11; 1056:6; 1065:23; 1077:3

**reasonable** [62] - 949:25; 950:6; 977:12, 22; 981:12; 987:3, 24; 988:1; 993:12, 14, 18-19; 996:2; 1006:21; 1021:6; 1028:2, 4, 15-16, 18; 1029:12; 1030:2, 9; 1031:5, 12, 19; 1032:25; 1036:10; 1046:16, 24; 1047:25; 1048:9, 13, 21, 23, 25; 1049:1, 3, 5, 7-8, 10, 15, 18, 21, 23; 1050:2; 1053:9, 18; 1063:7; 1064:4; 1065:7, 11; 1068:14, 21, 23; 1069:14

**reasons** [7] - 999:10; 1021:11; 1055:9; 1056:9; 1061:19, 24; 1068:9

**rebuttal** [7] - 933:4; 945:19; 947:7; 1001:2; 1008:10; 1031:25; 1075:20

**receipt** [4] - 952:6; 976:13; 986:10

**receive** [1] - 931:7

**received** [16] - 926:24; 975:24; 986:12; 1014:16; 1036:20; 1045:4; 1050:9; 1051:3, 12; 1056:12; 1061:21; 1070:3, 18; 1074:17; 1078:18

**Recess** [1] - 1007:5

**recess** [4] - 933:12; 946:10; 988:12; 1044:21

**recliner** [2] - 954:1

**recognizing** [1] - 972:2

**recollection** [6] -

947:25; 1047:2; 1057:2, 6; 1059:3, 11

**reconciled** [1] - 1057:18

**reconvene** [1] - 1006:25

**record** [13] - 924:12, 15; 925:25; 956:1, 3; 1018:24; 1025:18; 1026:15; 1028:22; 1056:3; 1068:2, 5; 1072:21

**recorded** [8] - 923:24; 1002:19, 23, 25; 1015:22; 1016:7; 1017:8; 1020:9

**recorder** [1] - 1030:6

**recording** [3] - 960:4; 1016:13; 1034:20

**records** [7] - 964:23; 965:11, 13; 983:12; 1017:19; 1038:11; 1069:20

**recovered** [4] - 950:25; 954:5; 959:20; 968:2

**RECROSS** [2] - 945:2; 1078:10

**RECROSS-EXAMINATION** [2] - 945:2; 1078:10

**red** [5] - 996:12; 997:22; 1018:19; 1027:14

**redacted** [4] - 931:13, 18; 946:22; 952:17

**redated** [1] - 1042:25

**redirect** [1] - 944:8

**REDIRECT** [2] - 944:10; 1078:8

**refer** [1] - 947:21

**reference** [6] - 931:6; 948:6; 963:11; 1005:17; 1010:18; 1075:12

**referenced** [1] - 1013:21

**references** [4] - 1005:23; 1073:21; 1074:16

**referred** [2] - 1061:8; 1065:16

**referring** [1] - 1075:17

**refers** [1] - 1073:17

**reflect** [2] - 1004:20; 1014:8

**reflected** [2] - 951:9; 1014:8

**regard** [3] - 980:2;

**regarding** [23] -
925:11; 926:8; 929:18;
971:11; 1001:13;
1010:7; 1012:19;
1018:18; 1024:4;
1027:11; 1028:4, 19;
1046:10, 18; 1047:18;
1048:22; 1057:7;
1061:4; 1063:1;
1067:18; 1074:11;
1076:6

**regardless** [4] -
1016:3; 1051:25;
1063:25; 1076:18

**registered** [1] -
964:20

**regulate** [2] - 991:14

**reiterate** [1] - 926:4

**reject** [1] - 947:18

**relate** [1] - 1074:22

**relates** [3] - 1054:21;
1056:6; 1071:15

**relations** [1] - 955:7

**relationship** [2] -
934:24; 1058:16

**relatively** [1] - 933:1

**relatives** [2] -
1019:7, 9

**relevant** [8] - 1001:6;
1009:6; 1013:24;
1014:3; 1025:12;
1027:4; 1029:3; 1066:12

**reliability** [5] -
1002:15; 1016:2, 4;
1021:20; 1023:22

**reliable** [5] - 1017:4,
7; 1030:7

**religion** [1] - 1051:22

**relish** [1] - 989:25

**rely** [2] - 1049:9;
1057:2

**remains** [3] - 1048:18;
1052:18; 1063:7

**remarks** [1] - 949:21

**remember** [33] -
936:18, 23; 937:6;
938:5, 12; 941:19;
942:2; 944:15-18, 20;
947:24; 951:22; 961:10;
969:16; 970:10; 974:24;
981:25; 984:9; 1004:21;
1005:4; 1006:21;
1036:8; 1037:2; 1041:8;
1047:20; 1055:5;
1057:1; 1059:13

**remind** [2] - 948:11;
1053:16

**reminded** [1] - 974:23

**renumbered** [1] -
931:15

**repeat** [6] - 947:2;
972:9; 1015:14; 1052:5;
1061:5; 1072:20

**rephrase** [1] - 940:5

**reply** [1] - 984:18

**report** [3] - 1024:18;
1058:12

**Reporter** [1] - 923:20

**representative** [1] -
959:16

**request** [14] - 927:7;
931:25; 932:2, 8;
984:20; 1004:3; 1013:4;
1029:7; 1030:4; 1051:8;
1070:24; 1074:22

**requested** [4] -
1005:7; 1056:21;
1070:18; 1075:3

**requesting** [2] -
1029:4; 1046:1

**requests** [2] - 927:3;
974:6

**require** [7] - 983:22;
992:3; 1006:8; 1049:16;
1064:16, 20

**required** [7] - 958:16;
985:25; 993:4; 1032:20;
1054:18; 1063:9; 1066:8

**requirement** [2] -
1064:23; 1072:18

**requires** [5] - 949:24;
1006:10; 1045:23;
1065:11; 1072:10

**research** [1] - 1000:10

**resend** [1] - 959:20

**reserve** [1] - 924:10

**reservoir** [1] -
1026:20

**resets** [1] - 1039:20

**residence** [6] -
950:23; 951:1; 1011:22;
1015:23; 1019:17;
1020:16

**resolve** [1] - 1057:15

**resource** [1] - 1002:17

**resources** [2] -
1003:11; 1026:20

**respect** [32] - 924:9;
925:5; 927:21; 928:3;
929:1; 930:17; 931:1,
9, 11; 932:22; 933:2;
947:12; 958:10; 969:14;
976:20; 977:10; 978:6;
979:7; 980:9; 981:15;

982:1; 990:23; 1047:1;
1056:4; 1068:11;
1070:15; 1071:3;
1072:6; 1074:1;
1076:23; 1077:18

**respects** [1] - 1062:3

**response** [4] - 964:23;
986:16; 1034:3; 1036:4

**responsibility** [4] -
992:25; 1046:7;
1052:18; 1066:6

**rest** [3] - 984:11;
1020:20; 1045:11

**rested** [1] - 945:17

**restore** [1] - 1077:19

**restraints** [1] -
1042:7

**rests** [1] - 945:15

**result** [4] - 1002:5;
1038:5; 1047:23;
1074:14

**results** [1] - 973:8

**resume** [1] - 988:9

**return** [3] - 968:13;
976:2

**revealed** [1] - 1016:15

**reverse** [1] - 1077:18

**review** [7] - 930:7;
932:5; 949:7; 994:10;
995:23; 1018:9; 1072:2

**reviewed** [4] - 985:14;
1072:9, 21; 1073:12

**reviewing** [1] -
1062:21

**rid** [2] - 992:19; 993:7

**ridiculous** [1] -
1025:6

**rights** [13] - 975:19;
991:13; 1024:2, 5,
24-25; 1025:2, 4;
1031:3

**ring** [2] - 956:24;
1026:4

**rob** [1] - 1038:2

**Robert** [2] - 961:9;
969:17

**rock** [1] - 1012:2

**room** [16] - 949:6;
983:25; 993:8; 994:5;
1022:1, 9-10; 1024:22;
1040:22; 1041:6;
1042:5; 1046:2;
1063:16; 1067:5, 13

**rooms** [2] - 1022:15;
1040:14

**Rory** [2] - 951:2;
967:25

**Rovetuso** [1] - 1073:7

**RU** [1] - 1001:11

**Rule** [6] - 924:9, 12;
1068:1, 8, 12, 18

**rule** [4] - 992:12;
1061:17; 1068:15

**rules** [16] - 929:18;
991:19; 992:6, 8,
10-11; 993:20; 994:11;
995:12; 1031:1;
1046:11, 17; 1047:5, 7;
1061:15

**ruling** [6] - 1051:4;
1054:25; 1056:6, 11;
1068:1, 5

**rulings** [3] - 1054:21;
1055:7, 9

**run** [1] - 1076:21

**running** [1] - 924:13

**Russia** [2] - 1001:11;
1032:12

**Russian** [2] - 997:25;
1032:12

### S

**S-O-F-I-I-A** [1] -
971:12

**safe** [1] - 1015:11

**saint** [1] - 1038:7

**Samsung** [10] - 950:25;
951:18; 952:13; 953:25;
982:2, 4; 1015:25;
1016:6; 1030:6; 1040:4

**Sand** [1] - 927:9

**sat** [1] - 975:20

**satisfied** [5] - 982:5;
1028:14; 1048:8;
1050:1; 1053:17

**satisfy** [1] - 993:16

**saw** [58] - 941:10, 15;
942:3-5, 23; 944:13;
945:4; 950:24; 951:11,
15; 952:1, 5, 8, 17;
953:5, 16, 21; 954:4,
16, 20, 22; 955:23;
957:11; 963:24; 964:9;
965:11; 969:15, 25;
971:20; 972:25; 974:12;
980:14; 981:23; 982:1;
1000:3; 1002:5, 21;
1004:5; 1013:3; 1014:7;
1019:17; 1020:1;
1034:9, 20; 1036:23;
1037:5, 7; 1038:11, 17;
1042:6; 1052:16

**scared** [1] - 1022:20

**schedule** [3] - 924:14;
1067:1, 8

**scheme** [1] - 1038:4

**School** [2] - 938:16

**school** [2] - 939:4, 7

**scientific** [1] - 1061:9

**scourge** [1] - 997:13

**scribble** [1] - 932:1

**script** [8] - 968:9; 1019:19; 1034:8, 12; 1035:23; 1037:7; 1070:12; 1073:17

**scripted** [1] - 970:14

**scripting** [1] - 959:7

**scripts** [3] - 958:14; 975:22; 979:8

**scrutinize** [2] - 987:16; 1057:22

**SD** [7] - 952:14, 16; 982:3; 1042:25; 1069:19, 25; 1071:11

**search** [8] - 986:22; 1001:15, 20; 1002:7; 1011:24; 1012:1; 1042:4

**searched** [1] - 952:3

**searches** [4] - 1032:11; 1063:18; 1069:18

**searching** [1] - 1022:3

**seated** [11] - 933:17; 934:12; 946:8, 11; 989:15; 992:18; 1008:16; 1022:8; 1044:8; 1045:7; 1067:24

**seclude** [2] - 1022:1

**second** [18] - 927:25; 947:20; 952:3; 977:24; 978:21; 981:20; 1000:11; 1002:2; 1013:18; 1022:25; 1023:3; 1027:9; 1028:6; 1037:18; 1040:12, 19; 1046:13; 1076:6

**Second** [10] - 1068:17, 24; 1069:1, 5-6, 9; 1072:10, 17; 1077:17

**secret** [2] - 1020:8; 1039:11

**see** [47] - 927:25; 930:22; 931:10; 933:11, 18; 935:18, 23; 939:6; 943:18; 947:18; 953:18, 25; 954:1, 17; 956:17; 957:6, 15; 958:1, 15; 959:2, 7-8; 961:1, 3, 21, 24; 966:6; 969:5; 972:6; 973:8; 974:1; 978:15; 983:2; 987:9, 23; 988:7; 1005:9, 11;

1007:1; 1037:14; 1040:16; 1044:17; 1067:21; 1072:2

**seeing** [2] - 954:2; 957:21

**seeking** [2] - 928:2; 1075:2

**seem** [1] - 1058:5

**seized** [4] - 968:2; 974:25; 1011:22; 1063:17

**selected** [2] - 987:7, 15

**send** [18] - 932:16; 948:3; 958:1, 19; 959:1; 961:6; 963:18; 967:2; 971:5; 973:2, 24; 982:25; 983:2, 5; 1033:8; 1045:25; 1073:14

**sending** [9] - 962:20; 965:21; 967:11, 22, 24; 968:22; 1036:5; 1043:2, 5

**sends** [4] - 963:8; 971:16; 983:9; 985:4

**sense** [13] - 987:19, 22; 1001:1; 1006:11, 16; 1043:13; 1049:3; 1053:12; 1054:10; 1059:13; 1060:22

**senses** [1] - 1052:14

**sent** [66] - 932:4; 949:3; 957:19; 961:12, 23; 962:21; 965:15; 967:4; 968:15; 969:18, 23-24; 970:15; 972:21; 975:21; 981:17; 984:6, 25; 985:13; 986:8, 15; 1000:1; 1002:6; 1003:9, 13, 16, 19; 1004:3; 1011:15; 1013:2; 1014:9, 14-15; 1025:10; 1026:7, 9, 14; 1027:2, 5; 1029:13; 1030:4; 1033:6, 8, 12; 1034:4; 1036:1, 14; 1037:3, 8-9, 19, 24; 1046:1; 1070:2, 8; 1076:8

**sentence** [2] - 924:25; 1077:10

**sentencing** [3] - 1075:8; 1077:2, 6

**separate** [4] - 985:12; 1072:1, 3; 1075:4

**separately** [2] - 967:20; 1073:25

**separates** [1] - 984:11

**September** [19] - 938:13, 19; 950:14; 951:4; 953:4; 954:25; 956:6, 12, 15; 972:12; 973:2, 13; 974:5, 10; 1016:15; 1017:1, 20; 1038:12, 16

**series** [1] - 929:7

**serious** [5] - 958:18; 962:5; 974:6; 995:17, 19

**service** [3] - 987:12; 997:25; 998:1

**set** [9] - 946:1; 950:4; 994:18; 996:5, 7-8; 1022:25; 1039:5; 1072:9

**setting** [1] - 1022:19

**settled** [1] - 1068:12

**Sevastopol** [2] - 959:3; 964:1

**seven** [5] - 927:7; 1014:6; 1015:2; 1021:24; 1074:21

**Seventh** [1] - 1073:8

**several** [5] - 924:23; 974:24; 981:11; 1039:13; 1050:6

**several-month** [1] - 924:23

**sex** [5] - 980:11; 986:7; 1004:18; 1036:16; 1051:23

**sexual** [15] - 924:19, 22; 925:5; 958:10; 977:10, 17; 980:6, 24; 981:7; 982:8, 10, 14; 1071:18; 1074:3

**sexually** [32] - 949:16, 18, 22; 950:11; 954:7, 11; 957:21; 958:13; 976:11, 21; 977:1, 3, 6, 25; 978:22; 979:4, 22, 25; 980:4, 18, 20; 981:1; 982:20; 983:15; 986:2, 4; 1040:16; 1041:22; 1070:8; 1071:10, 12

**sexually-explicit** [1] - 1071:12

**shade** [1] - 1058:19

**share** [2] - 965:24; 966:14

**shared** [1] - 997:18

**shatter** [1] - 995:12

**sheet** [5] - 929:25; 930:5, 13, 15; 932:22

**shield** [1] - 996:21

**shifts** [3] - 1047:25;

1049:19; 1063:8

**shipped** [1] - 986:2

**shock** [1] - 1022:6

**shocked** [1] - 1022:21

**shocking** [2] - 1018:23

**short** [7] - 933:1, 12; 946:2, 14; 960:8; 1021:1; 1044:4

**shortly** [1] - 995:14

**shot** [3] - 979:18; 981:5; 1037:4

**show** [14] - 947:17; 978:3, 9; 980:10, 12; 981:9, 11; 984:4; 1002:19; 1003:6; 1012:6; 1028:21; 1041:17; 1072:12

**showers** [2] - 1004:19; 1005:6

**showing** [6] - 960:5; 967:6; 977:12; 985:22; 998:23; 1034:20

**shown** [4] - 946:22; 976:4; 995:5; 996:18

**shows** [2] - 969:18; 980:22

**sic** [1] - 1005:5

**sick** [3] - 973:11, 17, 20

**side** [5] - 1024:3; 1054:3, 14; 1055:15

**sidebar** [1] - 1056:18

**sides** [6] - 926:23; 932:10; 1011:3; 1045:3; 1076:17, 19

**signed** [2] - 940:17; 975:19

**significance** [3] - 1017:9; 1045:17; 1063:11

**significant** [2] - 1006:10; 1022:2

**significantly** [1] - 990:18

**similar** [2] - 942:25; 1065:14

**similarly** [2] - 1056:1; 1070:4

**simple** [2] - 975:11; 1048:1

**simplest** [1] - 981:15

**simply** [6] - 931:22; 958:8, 11; 977:2; 1066:13

**simulated** [1] - 980:6

**single** [2] - 981:14; 987:20

**sister** [2] - 962:17; 1071:5

**sitting** [7] - 926:18; 942:21; 992:13; 1001:17; 1042:5; 1053:2

**situation** [7] - 940:22; 984:11; 1010:10; 1011:4; 1020:7; 1021:21; 1056:5

**six** [5] - 949:16; 955:1; 1014:6; 1015:2; 1074:21

**sixth** [1] - 953:12

**size** [1] - 1059:6

**skill** [1] - 1061:12

**slam** [1] - 1011:9

**slapping** [1] - 1018:21

**slate** [1] - 1048:11

**sleeping** [1] - 1021:22

**slew** [1] - 1003:17

**slip** [1] - 963:24

**small** [6] - 1010:11; 1012:20, 24; 1013:13; 1060:20

**smelled** [1] - 1052:16

**smile** [1] - 961:21

**Smithtown** [16] - 935:12; 949:20; 950:23; 952:13; 956:10; 964:3; 965:4; 966:9, 13, 23; 997:15; 1011:22; 1015:23; 1019:17; 1020:16, 18

**smoothly** [1] - 1076:21

**sneaky** [1] - 973:20

**snippets** [1] - 1021:2

**snuck** [2] - 1042:24; 1043:1

**soaking** [1] - 1053:5

**social** [1] - 1026:25

**society** [7] - 990:25; 991:7, 9, 11; 997:14; 1025:5; 1030:17

**sofa** [3] - 952:22; 954:18

**████** [56] - 949:14; 957:1, 22-23; 959:9, 24; 960:4, 12; 961:2; 962:1, 17; 963:21; 966:9; 967:1; 968:25; 969:7; 970:25; 971:25; 972:7; 973:4, 10; 976:9; 977:11, 20; 978:7; 979:2, 7; 980:9; 981:15; 982:9; 983:15; 984:10, 20; 986:5; 991:25; 1004:9;

1005:13, 24; 1013:17-21; 1014:5; 1027:12, 24; 1028:3; 1040:16, 25; 1041:11, 22

**████s** [5] - 956:19; 968:9; 971:10, 13

**sold** [3] - 952:10; 970:6

**sole** [3] - 1046:21; 1057:12; 1066:16

**solely** [2] - 1051:17; 1056:23

**solicitation** [5] - 1072:25; 1073:4, 9, 13, 18

**someone** [14] - 965:15; 966:5; 977:13; 983:18; 1020:5; 1022:16; 1024:23; 1025:23; 1032:6; 1043:4; 1058:12

**someplace** [1] - 1014:19

**sometimes** [2] - 965:16; 1056:18

**somewhere** [5] - 978:10, 13; 1001:23; 1010:9; 1043:25

**son** [18] - 935:9, 14; 937:2; 939:12; 940:7, 9, 11; 941:1, 5, 9; 942:15; 944:1; 970:3, 7; 995:20; 1019:20; 1033:9; 1043:3

**son's** [5] - 936:13, 21, 25; 941:16; 943:11

**son-in-law** [1] - 939:12

**soon** [3] - 972:1, 3; 992:5

**████** [4] - 1070:3, 8, 13; 1075:2

**sorry** [5] - 937:10, 19; 952:7; 963:6; 969:12

**sort** [8] - 937:5, 16; 944:22; 959:11; 1013:12; 1020:12, 24

**sound** [8] - 961:16; 962:19; 969:10; 974:3; 1004:6, 11; 1061:25

**South** [1] - 962:15

**space** [1] - 953:25

**speaking** [3] - 969:6; 983:7; 1036:3

**special** [2] - 930:22; 931:1

**Special** [4] - 967:21; 973:15; 978:19; 1043:7

**specialized** [1] - 1061:10

**specific** [13] - 932:8, 10; 957:13; 960:6; 985:12; 986:7; 1036:15; 1046:15; 1070:5; 1071:15; 1073:16, 18

**specifically** [4] - 976:18; 983:5; 1033:3; 1037:20

**speculate** [5] - 1055:24; 1056:10; 1065:1, 23; 1075:15

**speculation** [2] - 1049:11; 1053:15

**spell** [1] - 971:11

**spelled** [4] - 949:11; 972:8, 22; 1033:18

**spelling** [1] - 971:9

**spells** [1] - 957:25

**spend** [2] - 939:5, 8

**spends** [1] - 956:10

**spent** [1] - 1071:25

**Spiderman** [2] - 935:22; 953:19

**split** [1] - 966:8

**spot** [2] - 989:3, 10

**stage** [7] - 943:18; 945:24; 954:20, 22; 996:5, 7; 1005:18

**stamp** [11] - 951:3, 9, 12; 1003:2; 1016:5, 7, 11-12, 14, 22; 1020:24

**stamps** [2] - 1016:2; 1020:25

**stand** [4] - 982:15; 988:7; 1019:7; 1063:14

**stand-alone** [1] - 982:15

**standard** [7] - 929:7; 993:13; 1068:11, 17; 1069:10; 1072:6, 21

**standpoint** [1] - 1076:24

**stands** [1] - 1059:4

**start** [7] - 957:7; 1044:1; 1066:20, 22; 1067:13, 17; 1068:1

**started** [4] - 969:21; 995:8; 996:3; 1075:10

**starting** [2] - 948:18; 973:20

**startle** [1] - 990:8

**starts** [1] - 964:13

**state** [5] - 1037:14; 1061:18; 1068:9; 1072:8

**statement** [15] -

927:16; 974:22; 975:12, 18; 1024:25; 1054:25; 1060:7, 9, 13, 17, 25; 1061:1; 1064:10, 14; 1076:6

**statements** [22] - 927:10, 19-20; 945:25; 947:2, 12, 15; 1021:16, 20; 1022:22, 25; 1023:1, 5, 22, 24; 1024:1; 1050:20; 1054:22; 1064:6, 9, 12; 1069:21

**Staten** [1] - 966:17

**STATES** [2] - 923:1, 3

**states** [3] - 1020:18; 1025:23, 25

**States** [39] - 923:13, 21; 956:4; 966:4; 967:7; 982:15, 21-22; 983:9; 991:1, 14; 998:1, 22, 25; 999:11; 1000:9; 1001:12, 18; 1010:6; 1017:11, 14, 20; 1018:4; 1035:3; 1047:10, 14; 1066:10; 1068:16, 23; 1069:4, 8; 1070:14; 1072:11, 16; 1073:5, 7

**stationed** [1] - 973:16

**statute** [1] - 1029:4

**stay** [3] - 939:11; 956:9; 1020:15

**stayed** [4] - 937:25; 938:1; 1017:21; 1020:22

**staying** [1] - 1039:2

**stays** [1] - 956:9

**stemming** [1] - 997:14

**stenography** [1] - 923:24

**step** [7] - 958:14, 17, 20; 1029:9; 1072:13, 18; 1074:1

**STEPHANIE** [1] - 923:21

**steps** [4] - 958:12; 998:12; 1029:5

**Steven** [1] - 967:21

**stimulation** [1] - 980:24

**stipulated** [1] - 1050:12

**stipulation** [1] - 1066:13

**stipulations** [2] - 1052:10; 1066:11

**stocking** [1] - 981:5

**stockings** [1] - 981:8

**stone** [1] - 1012:3

**stop** [5] - 937:18; 1044:10; 1045:11; 1075:9

**stored** [1] - 981:21

**story** [2] - 942:25; 1043:9

**straight** [1] - 986:8

**straightforward** [1] - 1059:10

**Strauss** [1] - 1069:8

**streets** [1] - 957:16

**strengthen** [1] - 1014:25

**stress** [1] - 1022:20

**stricken** [5] - 1010:3; 1017:15; 1056:2, 5, 8

**strike** [2] - 1051:8; 1058:12

**striking** [1] - 1056:9

**strong** [3] - 994:18

**strongly** [3] - 990:17; 1072:14; 1074:4

**stuff** [1] - 957:16

**stupid** [1] - 999:10

**sturdily** [1] - 996:8

**subject** [3] - 974:11; 1072:1; 1075:3

**submit** [11] - 954:10; 958:13, 17; 966:21; 977:8; 980:2, 17; 982:7; 993:18; 1040:9; 1043:14

**submits** [1] - 987:2

**subpoena** [3] - 964:24; 1000:16, 20

**subpoenas** [1] - 1032:11

**subscriber** [2] - 965:2, 6

**substance** [3] - 1004:14; 1033:7

**substantial** [10] - 958:12, 14, 17, 20; 1029:5, 9; 1072:13, 18; 1074:1

**substantially** [1] - 1065:14

**substantive** [7] - 924:19; 1004:7; 1077:1, 5, 7, 15, 18

**successful** [1] - 1020:11

**suddenly** [1] - 939:1

**suffer** [1] - 1019:10

**sufficient** [10] -

926:21; 1033:1; 1048:11; 1049:18; 1061:23; 1069:12, 23; 1071:16, 22

**Suffolk** [2] - 966:12; 1021:25

**suggest** [10] - 998:19; 1012:12, 17; 1019:14; 1020:14; 1023:20, 25; 1030:9; 1060:1; 1077:9

**suggested** [3] - 1041:11, 23; 1075:21

**suggestion** [1] - 1055:2

**suggestive** [1] - 981:1

**suggests** [3] - 925:3; 1036:13; 1075:25

**Suite** [1] - 923:18

**sum** [2] - 1025:14; 1062:2

**summary** [3] - 963:5; 1069:18; 1072:12

**summation** [9] - 947:7; 950:1, 4; 989:16; 1008:18; 1030:22; 1032:1; 1070:5; 1075:11

**summations** [12] - 928:14; 945:24; 946:4; 947:2, 8, 15, 20; 948:7, 12, 16; 1043:21; 1073:16

**summer** [6] - 941:18; 950:10; 955:2; 970:21; 1038:21

**super** [2] - 1038:1, 25

**superfluous** [1] - 1077:16

**superseding** [4] - 929:2; 931:13, 19, 23

**supply** [1] - 969:2

**support** [6] - 940:9; 944:1; 1019:3; 1061:24; 1070:22; 1076:10

**supposed** [3] - 973:17, 20; 1040:21

**Supreme** [1] - 1068:25

**surprise** [1] - 1022:6

**surprised** [1] - 1022:21

**surrounding** [1] - 1071:4

**suspect** [1] - 1058:6

**suspicion** [1] - 1049:11

**sustain** [1] - 1048:15

**sustained** [9] - 943:3, 23; 1051:5, 7, 21;

1055:7, 21; 1075:11, 13

**Sustained** [1] - 1035:11

**sway** [1] - 1059:19

**sweet** [4] - 960:3; 968:11; 972:7; 1003:1

**swimming** [1] - 1040:23

**switch** [1] - 1010:22

**sworn** [3] - 934:7; 1050:7; 1052:9

█████ [52] - 928:15; 935:8; 937:4; 938:1, 6, 9; 939:18; 941:5, 8, 11; 944:5, 13; 945:4; 949:17, 19; 950:12, 18, 21; 952:15, 25; 954:12; 956:14; 962:18; 977:20; 978:16, 20; 979:2, 14; 981:2; 982:1, 10; 991:25; 1015:20-22; 1016:1; 1020:3, 20; 1021:8, 12; 1023:4; 1027:24; 1028:7, 11, 17; 1030:9; 1038:14; 1039:4, 25; 1040:2

████ s [1] - 950:15

**sympathy** [2] - 1047:17; 1049:13

**system** [5] - 991:16, 20; 992:10; 1011:13

## T

**T-E-M-P** [1] - 973:6

**table** [6] - 992:14, 18; 994:15; 1022:10, 14; 1031:9

**tablets** [1] - 1029:24

**tainted** [1] - 995:21

**talks** [3] - 955:9; 963:15; 968:16

**tall** [1] - 996:4

**tape** [2] - 951:20; 1039:15

**target** [2] - 998:16, 24

**targeting** [1] - 1005:15

**tasted** [1] - 1052:16

**teachers** [1] - 1006:12

**team** [1] - 1026:18

**technical** [1] - 1061:9

**technically** [1] - 927:19

**techniques** [3] - 1065:2

**telephone** [1] - 965:14

**temp** [1] - 973:6

**ten** [7] - 926:19;

933:1, 9-10; 946:1; 1044:17

**tending** [1] - 1001:10

**tends** [1] - 1052:20

**terms** [6] - 931:21; 999:14; 1013:13; 1069:21; 1070:17, 25

**terribly** [1] - 1025:12

**terrorism** [1] - 1072:16

**testified** [22] - 934:7; 941:15; 942:20; 944:1; 950:18; 952:24; 954:2; 961:9; 969:22; 970:11; 974:17; 978:17; 994:3; 1019:2; 1057:24; 1058:7, 17, 23; 1059:1, 17

**testifies** [2] - 1052:13, 15

**testify** [30] - 925:12, 17, 22-23; 926:6, 14; 950:16; 951:8; 956:3; 969:20; 974:23; 993:21, 24-25; 994:4; 1014:20; 1035:8; 1053:1; 1059:19; 1060:2; 1061:13, 16; 1063:2, 5, 12; 1075:13

**testifying** [1] - 944:12

**testimonial** [1] - 1004:2

**testimony** [53] - 943:9; 947:21, 24; 948:4, 23; 950:7; 964:16; 970:19; 982:2; 1012:17; 1018:8; 1020:10, 14, 17; 1028:10; 1050:7, 11; 1051:7-9; 1052:9; 1054:5; 1055:16; 1056:5, 8-9, 12; 1057:11, 13, 20, 22; 1058:1, 9; 1059:21, 24; 1060:5, 8, 11, 14-15; 1061:3, 5, 8; 1062:9, 12, 18, 22, 24; 1063:17; 1065:13; 1066:2; 1071:5

**tethered** [1] - 967:2

**Texas** [2] - 1017:14; 1018:1

**text** [8] - 975:16; 1005:14; 1009:11, 17; 1041:9

**THE** [89] - 924:4; 925:19; 926:1, 15-16, 22; 927:2, 18, 24;

928:16, 19; 929:3, 11, 13, 18, 23; 930:4, 7, 10, 12, 15, 25; 931:4, 6, 18, 21; 932:9, 15, 21; 933:3, 7, 9, 13, 17; 934:3, 9, 11, 13-16, 19-21; 939:22; 943:3, 23; 944:8, 25; 945:10, 12, 16, 22; 946:8, 11, 14, 16, 20, 23; 947:1; 972:14; 988:5; 989:1, 9, 12, 15; 1006:24; 1008:3, 5, 7, 10, 12, 16; 1031:24; 1035:11; 1043:11, 20; 1044:8, 16; 1045:1, 7; 1067:24; 1068:4; 1071:21; 1076:17; 1077:4, 20

**theatrics** [2] - 990:12; 994:13

**themselves** [8] - 981:3; 990:14; 1023:21; 1034:5; 1042:11; 1049:2; 1071:5

**theory** [1] - 1077:4

**therapist** [1] - 1013:12

**therefore** [5] - 1046:22; 1048:5; 1049:7; 1059:20; 1063:25

**therms** [1] - 1070:19

**thick** [1] - 1019:8

**thin** [1] - 1019:8

**thinking** [1] - 927:18

**thinks** [1] - 1016:3

**third** [5] - 948:5; 962:12; 978:3; 981:9; 1046:17

**thorough** [6] - 999:16; 1001:2; 1012:18; 1026:16; 1027:14

**thoroughly** [6] - 925:20; 926:13; 1015:9; 1027:13; 1066:5

**thoughts** [1] - 1030:14

**thousands** [4] - 965:8; 976:1; 983:9; 1034:22

**threaten** [1] - 1009:20

**threatening** [1] - 1005:16

**three** [16] - 929:18; 936:17; 974:8; 977:16; 978:11, 13-14; 982:17; 992:1; 1003:24; 1014:10, 24; 1039:17; 1043:1; 1046:9

**throughout** [4] - 1004:17; 1048:7; 1055:6; 1063:8

**Thursday** [1] - 1077:23

**thwarted** [1] - 1000:9

**Ticketmaster** [1] - 970:12

**tickets** [2] - 970:4; 1033:9

**tights** [5] - 968:11; 969:9, 11; 979:18; 981:8

**time-share** [2] - 965:24; 966:14

**timeframe** [1] - 1021:3

**timeline** [1] - 950:4

**timing** [1] - 1070:19

**tip** [2] - 998:17; 999:6

**tipped** [1] - 1035:1

**tired** [1] - 1009:1

**tit** [1] - 1076:25

**title** [2] - 960:8; 997:8

**tits** [2] - 960:2; 973:25

**today** [11] - 950:19; 952:25; 962:11; 979:10; 985:15; 1034:10; 1045:10, 14, 16; 1067:20; 1076:15

**today's** [2] - 1020:10; 1039:21

**toddler** [15] - 949:14; 972:3; 975:2; 976:9, 11; 977:11, 20; 978:7, 10, 15; 980:9, 11, 15; 982:9; 983:16

**toddler's** [1] - 980:12

**together** [11] - 936:4, 8; 956:23, 25; 960:13; 1045:15; 1066:21; 1071:8; 1075:1

**token** [3] - 1047:12; 1054:4; 1056:11

**tomorrow** [13] - 969:13; 1044:1; 1045:12, 14, 16; 1066:22; 1067:8, 11, 21; 1068:2, 6; 1074:18; 1075:5

**took** [15] - 928:22; 931:14-16; 932:13; 939:2; 950:11, 22; 954:11, 13; 958:12; 1039:4; 1040:9; 1056:18; 1072:13

**tool** [4] - 941:22, 25;

1039:8

**tools** [2] - 942:1

**toothbrush** [4] - 1004:23; 1036:8, 11

**top** [1] - 1045:21

**topic** [1] - 1035:18

**torturous** [1] - 956:20

**total** [1] - 956:24

**touch** [2] - 1002:15; 1010:7

**touched** [2] - 1052:17; 1076:23

**touches** [1] - 959:9

**toward** [1] - 1072:13

**towards** [1] - 1065:18

**tower** [2] - 1010:23

**toy** [3] - 935:21; 980:15

**toys** [8] - 935:18, 20, 22, 24; 957:15, 24; 1036:11

**track** [1] - 989:6

**tracking** [4] - 959:16; 963:11, 22, 24

**training** [1] - 1061:12

**transactions** [1] - 965:12

**TRANSCRIPT** [1] - 923:6

**transcript** [1] - 923:24

**transcription** [1] - 923:24

**transfer** [1] - 959:17

**transmitted** [1] - 981:17

**transmitting** [1] - 979:3

**transportation** [4] - 976:12; 985:17, 23; 986:11

**transported** [4] - 982:21; 986:3, 5; 998:6

**transporting** [1] - 985:19

**travel** [2] - 956:1; 1038:11

**traveled** [2] - 1010:8; 1035:3

**traveling** [2] - 1010:4; 1018:15

**travels** [3] - 1018:13, 23

**treat** [1] - 1051:6

**tremendous** [2] - 1002:17; 1003:11

**tri** [1] - 1037:14

**tri-state** [1] - 1037:14

**TRIAL** [1] - 923:6

**trial** [45] - 947:22; 948:21; 949:23; 974:20; 987:6; 992:1; 993:22; 994:6, 8-9; 996:5; 1021:11; 1032:15; 1048:10, 18; 1051:18; 1054:22, 24; 1055:6; 1057:4; 1059:23; 1060:8, 11, 13, 15; 1061:5, 7; 1063:8; 1064:19, 22; 1065:3, 19, 21, 24; 1066:1, 3, 7, 9; 1068:15; 1073:16; 1076:21; 1077:23

**trials** [1] - 1006:5

**trick** [2] - 1024:12

**tried** [1] - 996:7

**trier** [2] - 1068:13, 21

**trip** [1] - 1018:5

**tristate** [1] - 961:12; 969:23; 970:17

**troubled** [1] - 1018:11

**troubling** [3] - 1013:8; 1018:3

**Troyd** [11] - 954:2; 967:21; 968:12; 978:20; 989:20; 1022:5, 16; 1023:2; 1026:11; 1035:4; 1043:7

**true** [4] - 1054:8; 1066:14; 1075:23

**trump** [1] - 976:17

**trust** [1] - 1073:6

**truth** [3] - 1057:18, 25; 1058:19

**truthful** [4] - 996:14; 1019:25; 1020:15; 1059:10

**try** [11] - 940:5; 959:20; 969:12; 988:6; 990:8, 12; 1003:10; 1009:1; 1059:5; 1062:16

**trying** [7] - 927:15; 932:1; 937:11; 1009:22; 1058:12; 1059:9; 1076:20

**tub** [1] - 968:10

**turkey** [1] - 1017:13

**Turkey** [4] - 965:16; 967:11; 1010:6

**turn** [3] - 934:19; 976:8; 978:5

**turned** [3] - 951:11, 14, 16

**TV** [1] - 937:3

**twelve** [1] - 1014:9

**twice** [2] - 951:15

**two** [53] - 924:7; 927:3; 929:13; 930:9; 941:1; 945:1; 949:22; 955:13; 962:9, 20; 963:6; 971:13; 974:13; 978:11, 13, 22; 983:19; 987:5; 992:1; 994:22; 997:23; 998:3; 1002:11; 1003:15, 24; 1009:13; 1010:2; 1015:1; 1016:15; 1019:11, 21; 1022:14; 1024:2; 1025:10; 1027:23; 1029:3; 1033:6; 1034:19; 1038:4; 1039:6; 1045:10; 1067:25; 1069:18; 1072:8; 1073:1; 1074:22; 1075:16

**type** [7] - 975:1; 995:15, 17; 996:21; 1006:9; 1022:23; 1074:23

**typed** [1] - 1045:22

**types** [1] - 1004:16

**typically** [2] - 955:15; 1011:2

**typo** [1] - 1024:22

---

**U**

**U.S** [2] - 923:4, 15

**U.S.D.J** [1] - 923:9

**Ukraine** [27] - 949:2; 959:3; 964:1; 965:16; 966:5; 967:12, 14; 973:16; 975:3; 983:1, 6; 998:23; 999:21; 1000:9, 13; 1001:18; 1010:6; 1014:19, 22; 1015:6; 1032:13; 1039:19; 1070:14; 1074:3

**Ukrainian** [6] - 976:9; 977:11, 19; 980:9; 982:9; 983:16

**ultimately** [1] - 926:9

**umbrella** [2] - 1053:5, 8

**unanimously** [1] - 1048:12

**unavoidable** [1] - 992:11

**uncertainty** [1] - 1017:6

**uncle** [1] - 1021:13

---

**uncover** [1] - 1009:5

**under** [12] - 977:1, 23; 978:12; 979:25; 999:2; 1035:2; 1057:15, 23; 1063:4; 1068:18; 1071:24; 1073:4

**undermine** [1] - 990:18

**understandingly** [1] - 1064:11

**undisputed** [3] - 951:17; 986:14; 1017:10

**undoubtedly** [1] - 1025:24

**undressed** [1] - 979:16

**unemotional** [1] - 995:23

**unequivocal** [1] - 1009:16

**unexpectedly** [1] - 1021:23

**unfavorable** [2] - 1065:18; 1066:4

**unfortunately** [3] - 995:19; 1002:21; 1004:17

**unimportant** [1] - 1025:8

**uninfluenced** [1] - 994:9

**Union** [8] - 959:15, 18; 963:6; 965:12; 972:18; 1037:25; 1069:20

**unique** [5] - 952:19; 959:16; 984:11; 1006:10; 1011:4

**UNITED** [2] - 923:1, 3

**United** [39] - 923:13, 21; 956:4; 966:4; 967:7; 982:15, 21-22; 983:9; 991:1, 13; 998:1, 22, 25; 999:11; 1000:8; 1001:11, 18; 1010:6; 1017:11, 14, 20; 1018:4; 1035:3; 1047:10, 14; 1066:10; 1068:16, 23; 1069:4, 8; 1070:14; 1072:11, 16; 1073:5, 7

**unless** [6] - 927:12; 930:23; 1022:10; 1048:12, 20; 1053:17

**unlike** [1] - 925:15

**unluckiest** [1] - 1042:21

**unpleasant** [1] - 1049:13

**unquestioned** [1] - 1018:10

---

**unturned** [2] - 1012:2

**unwitting** [2] - 1026:7, 9

**up** [40] - 934:17, 20; 938:4; 939:10; 946:1; 947:8; 952:25; 953:8; 956:21; 960:8; 961:2; 972:3; 973:24; 979:15; 981:5; 983:11; 989:8, 23; 996:13; 1002:12; 1006:3; 1018:20; 1025:14; 1026:15; 1032:4; 1037:25; 1038:3; 1039:13; 1045:13, 20; 1059:4, 6; 1066:16, 21; 1076:5, 7, 11

**upheld** [1] - 1068:18

**upholding** [3] - 991:10, 24

**upsetting** [1] - 1023:16

**upstairs** [12] - 937:3, 17, 22-24; 938:2, 8; 1010:23; 1020:21; 1039:9; 1040:4

**upward** [1] - 954:23

**upward-pointing** [1] - 954:23

**US** [1] - 967:9

**uses** [1] - 997:7

**usual** [1] - 972:6

---

**V**

**V-A-L-E-R-I-O** [1] - 934:10

**vacate** [2] - 1077:11, 13

**vacating** [1] - 1077:9

**vagina** [1] - 981:4

**Valerio** [53] - 924:4; 926:1; 928:2, 5, 10, 19; 932:18; 933:5; 934:1, 9, 11, 24; 937:9; 940:7; 945:12; 949:1; 950:17; 952:11, 25; 959:3; 964:2; 965:2, 22; 970:5; 971:3; 989:21; 992:1, 12; 993:4; 994:2, 7; 995:25; 998:8, 10; 1000:3; 1005:20; 1009:18; 1010:16; 1011:19; 1019:1; 1023:3; 1027:16, 25; 1028:12, 24; 1029:4, 16; 1030:10; 1031:8; 1032:15; 1071:10;

---

1076:8

**VALERIO** [1] - 923:5

**Valerio's** [3] - 930:21; 974:25; 1022:18

**value** [3] - 1004:7; 1013:13; 1023:25

**values** [2] - 966:16

**various** [7] - 976:13; 1001:8; 1029:2; 1052:8; 1055:5, 7; 1057:15

**venue** [5] - 928:1, 4, 17, 21; 929:1

**verbal** [2] - 994:25; 995:5

**verdict** [18] - 929:25; 930:4, 12, 15, 22; 931:2, 7, 9, 22; 932:22; 1031:21; 1051:17; 1052:5; 1053:25; 1056:16; 1069:3; 1076:18

**version** [1] - 1042:19

**Veterans** [1] - 933:20

**via** [3] - 971:6; 986:8; 1037:25

**Viber** [9] - 975:16; 1005:14, 23; 1006:1; 1009:7, 9, 12, 17; 1010:16

**victimized** [1] - 1015:7

**victims** [2] - 977:19; 1000:24

**video** [23] - 937:4; 949:2; 961:24; 973:24; 975:3, 23; 980:14; 984:10; 1002:19; 1003:23; 1005:12; 1013:19; 1036:1, 9, 21, 23; 1039:6, 21; 1074:10, 12

**videos** [142] - 937:14; 949:3, 13; 957:21; 958:19; 959:21; 960:12, 17, 20; 962:1, 24; 963:1, 19-20; 965:18; 967:1, 3; 968:19, 23; 970:20, 25; 971:5, 16, 21, 23, 25; 972:4, 7; 973:9, 12; 974:9, 11, 13, 15; 975:24; 976:2, 6; 978:8; 979:21; 980:10; 983:1, 3, 6, 8; 984:20; 985:5, 7-8; 986:5, 15-16; 987:10; 995:5; 999:2; 1000:3, 6; 1001:7, 24; 1002:4, 21-22; 1003:5, 8, 10;

29

1004:2, 5-6, 11-12, 15;
1005:9, 17, 24;
1010:18; 1011:12, 14,
19; 1012:6, 11; 1013:3,
15; 1014:9, 14;
1015:13, 18, 24;
1021:2; 1026:6; 1027:2,
5; 1028:3, 5, 8, 22,
24; 1029:11, 20;
1030:4, 10; 1034:3, 5;
1035:21; 1036:1, 3-4,
8, 25; 1037:2, 5-7;
1039:25; 1040:13;
1041:1, 3, 5, 12, 17,
20-21; 1042:13;
1070:12, 16, 19-20, 22,
24; 1074:14-17; 1075:2

**videotaped** [2] -
1020:3; 1021:13

**videotapes** [1] -
1070:8

**videotaping** [1] -
1028:7

**view** [2] - 959:12;
960:3

**viewed** [10] - 1011:14,
19; 1012:7, 16;
1036:14, 21; 1069:2;
1070:21; 1071:8

**viewer** [1] - 980:24

**viewing** [1] - 1068:19

**views** [1] - 1036:17

**vile** [1] - 996:24

**virtue** [2] - 1002:11;
1013:3

**visit** [1] - 956:8

**visited** [2] - 956:17

**visits** [1] - 1038:22

**visual** [6] - 977:4, 7;
978:1, 23; 979:3; 986:1

**voice** [3] - 934:18, 20;
1042:8

**voluntarily** [2] -
975:18; 1064:11

**vote** [1] - 1050:2

---

| W |
|---|

**wait** [1] - 1067:16

**waiting** [3] - 940:16;
1025:13; 1026:8

**waiver** [1] - 1024:2

**waiving** [2] - 928:16,
25

**waking** [2] - 956:20;
973:24

**walk** [1] - 953:23

**walking** [1] - 998:22

**walks** [1] - 1053:4

**wall** [1] - 943:16

**wants** [25] - 956:23;
957:25; 958:15; 959:7,
10-11; 961:5, 24;
963:16; 966:25; 967:1;
969:8; 971:23; 972:6;
975:22; 979:9; 982:25;
1005:20; 1033:19;
1040:1, 8

**war** [3] - 1000:8, 12;
1032:13

**warned** [1] - 975:16

**warrant** [5] - 986:22;
1011:24; 1042:4;
1046:16

**warranted** [1] -
1046:24

**warrants** [1] - 1012:1

**watch** [1] - 1002:22

**watched** [4] - 994:21,
23; 995:4; 1028:24

**watching** [1] - 937:3

**water** [1] - 1053:5

**wave** [1] - 1004:9

**ways** [1] - 981:11

**wearing** [3] - 979:18;
1021:25; 1053:4

**week** [2] - 924:8;
942:20

**weeks** [5] - 975:15;
987:5; 994:22; 1041:8,
10

**weighing** [1] - 1049:4

**weighs** [1] - 1039:10

**weight** [10] - 1046:23;
1056:14; 1061:1, 21;
1062:14, 24; 1064:8,
12; 1066:15, 17

**weighty** [1] - 1042:11

**welcome** [1] - 1008:21

**Western** [8] - 959:15,
17; 963:6; 965:12;
972:18; 1037:25;
1069:20

**wet** [2] - 1053:5, 8

**what-not** [1] - 1009:1

**whatsoever** [3] -
974:21; 1055:1; 1056:22

**whereas** [1] - 1010:2

**whim** [1] - 1049:11

**whole** [5] - 1003:17;
1039:4; 1045:10, 15, 18

**WICKER** [1] - 923:20

**Wicker** [1] - 937:11

**widow** [1] - 938:22

**wig** [5] - 954:5, 9;
979:20; 981:5

**willingness** [1] -
987:16

**wind** [2] - 1030:12

**windowless** [1] -
1053:2

**wings** [1] - 937:5

**winter** [1] - 953:10

**winter's** [1] - 1021:23

**wire** [1] - 959:17

**wired** [1] - 967:13

**wise** [2] - 1004:1;
1011:18

**wish** [3] - 926:7;
1045:20; 1050:3

**wishes** [1] - 925:17

**witness** [54] - 932:25;
933:24; 934:6; 951:7;
974:18; 975:7; 1017:17;
1035:8; 1048:3;
1052:13, 15, 19;
1054:5; 1055:22, 24;
1057:8, 11-12, 23;
1058:3-5, 7-10, 12,
14-15, 17, 19-20,
24-25; 1059:16, 19, 21;
1060:1, 6, 11-12, 17,
20; 1061:11, 23;
1062:2, 11, 14, 17;
1063:14

**WITNESS** [5] - 934:9,
13, 15, 19, 21

**witness'** [8] - 1058:1,
15; 1059:2; 1060:4, 8;
1061:3, 20

**witnesses** [28] -
925:16; 1002:11;
1032:21; 1050:7, 22;
1052:9; 1054:1, 4, 8,
12-14, 19; 1056:23;
1057:10, 20; 1059:15;
1061:16, 18; 1062:8,
23; 1064:17; 1066:2, 7;
1069:7; 1075:23

**WITNESSES** [1] - 1078:2

**witting** [1] - 1026:9

**woman** [18] - 949:1;
957:17; 996:13; 998:20;
1000:14; 1010:4, 8;
1018:15, 22; 1021:4;
1025:20, 25; 1026:1;
1028:16; 1029:18;
1036:15

**word** [3] - 1009:20;
1012:2; 1052:23

**words** [10] - 984:9;
990:5, 10; 991:23;

1028:2; 1029:3;
1033:13; 1049:1;
1053:6; 1059:5

**world** [10] - 991:1;
997:14; 1004:18;
1010:5; 1017:16;
1018:16; 1026:3, 22;
1029:17; 1036:6

**worried** [1] - 1022:20

**Worth** [1] - 1018:1

**worth** [1] - 1033:22

**worthiness** [1] -
1021:19

**worthless** [1] -
1016:11

**worthy** [4] - 996:24;
997:7; 1006:19; 1028:9

**write** [2] - 984:17;
1024:10

**writing** [4] - 966:19;
973:19; 984:4; 1024:17

**writings** [1] - 984:5

**written** [4] - 983:22;
1024:19; 1025:20;
1045:22

**wrongfully** [2] -
1023:10, 12

---

| Y |
|---|

**year** [10] - 936:18;
939:2; 956:16; 1002:20;
1003:24; 1014:10;
1016:25; 1039:1

**years** [14] - 936:18;
949:17; 950:19; 965:7;
977:23; 1003:24;
1014:6, 23; 1016:10;
1034:22; 1038:4;
1039:6, 17

**yelling** [1] - 1042:7

**yesterday** [5] -
959:21; 964:14;
1040:20; 1071:25;
1077:8

**yields** [1] - 1029:25

**YORK** [1] - 923:1

**York** [13] - 923:14, 18,
22; 952:13; 956:10;
964:3; 965:4; 966:14;
967:11; 981:21; 997:15;
1037:16; 1043:5

**young** [20] - 949:16,
22; 952:18; 953:11;
954:7; 972:2; 976:24;
979:9; 986:25; 991:4;
1010:4; 1014:1;
1015:19; 1019:12;
1020:6, 19; 1021:10;

1023:8, 16; 1041:12

**yourself** [6] - 992:19;
993:7, 16; 994:4;
1021:20; 1055:9

**yourselves** [3] -
1056:17; 1059:3;
1067:10

---

| Z |
|:---:|

**zoom** [1] - 952:14

1079

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------X

UNITED STATES OF AMERICA,      :   14 CR 0094

            v.                 :   U.S. Courthouse
                                   Central Islip, N.Y.
JOSEPH VALERIO,                :
                                   TRANSCRIPT OF TRIAL
            Defendant.         :
                                   November 13, 2014
-------------------------------X   9:30 a.m.

BEFORE:

          HONORABLE JOSEPH F. BIANCO, U.S.D.J.
                   and a jury


APPEARANCES:

For the Government:   LORETTA E. LYNCH
                      United States Attorney
                      100 Federal Plaza
                      Central Islip, New York 11722
                      By:  AMEET B. KABRAWALA, ESQ.
                           ALLEN BODE, ESQ.
                           Assistants, U.S. Attorney


For the Defendant:    ANTHONY LaPINTA, ESQ.
                      LEONARD LATO, ESQ.
                      35 Arkay Drive - Suite 200
                      Hauppauge, New York 11788


Court Reporter:       HARRY RAPAPORT
                      OWEN M. WICKER
                      United States District Court
                      100 Federal Plaza
                      Central Islip, New York 11722
                      (631) 712-6105

Proceedings recorded by mechanical stenography.
Transcript produced by computer-assisted transcription.

## Jury Charge

**1080**

1     (Case called.)

2     (Appearances noted.)

3     THE COURT:  Good morning.  All right.  All the

4 jurors are here.  So are we ready to proceed with the

5 instructions.

6     MR. KABRAWALA:  Yes, Judge.

7     MR. LAPINTA:  Yes, your Honor.

8     THE COURT:  Let's bring them in.

9     My practice with the alternates is to tell them

10 to go home and continue with their lives and not to

11 discuss the case with anyone and not read anything about

12 the case.

13     MR. KABRAWALA:  That is acceptable to us, your

14 Honor.

15     MR. LATO:  That is acceptable to us, your Honor.

16     (Whereupon, the jury at this time enters the

17 courtroom.)

18     THE COURT:  Good morning, members of the jury.

19 We, as you know will now continue with my instructions to

20 you on the law and then you will begin your deliberations.

21     As you will recall I gave you part one.  I'm now

22 going go to part two.  As I said yesterday even though I

23 divided it up yesterday in two parts, obviously you are to

24 consider it as a whole together.  I'm estimating it will

25 take an hour-and-a-half.  If you need a break at any point

## Jury Charge

**1081**

1 I'll stop and I'll give everybody a break.  Maybe I'll

2 give the court reporter a break if I think it is going on

3 too long.

4     Part two.  The legal elements of the charged

5 crimes.

6     I will now turn to the second part of this

7 charge, and I will as I indicated at the outset, and

8 instruct you as to the legal elements of the crimes

9 charged in the indictment.  That is to say I will now

10 instruct you as to the specific elements of the crimes

11 charged, each of which the Government must prove beyond a

12 reasonable doubt to warrant a finding of guilt.

13     In order to place my instructions in context, I

14 will start by giving you a summary of the crimes charged.

15 They are stated in the indictment.  The indictment is not

16 evidence; rather, it is simply the instrument by which the

17 charges are brought.  It is an accusation.  It may not be

18 considered by you as any evidence of the guilt of the

19 defendant.  To the contrary, the defendant is presumed

20 innocent until proven guilty beyond a reasonable doubt.  I

21 am permitting you to have the indictment solely as a

22 reference during your deliberations.

23     After summarizing the charges, I will instruct

24 you in detail as to the law for you to apply to each

25 charge in the indictment.  And finally I will tell you

## Jury Charge

**1082**

1 some further rules with respect to your deliberations.

2     First, the summary of the indictment.  The

3 indictment in this case contains 15 counts, or separate

4 charges or offenses.

5     Count 1 carriages the defendant with conspiracy

6 to sexually exploit a child, namely, Jane Doe #1, who has

7 been identified during this trial as having the initials

8 SK.

9     Counts Two and Three charge the defendant with

10 sexual exploitation of a child, namely, Jane Doe #1.

11     Count Four charges the defendant with

12 transportation of child pornography, namely, images

13 depicting Jane Doe #1.

14     Count Five charges the defendant with receipt of

15 child pornography, namely, images depicting Jane Doe #1.

16     Count Six through Thirteen charge the defendant

17 with attempted sexual exploitation of a child, namely,

18 Jane Doe #1, on specific dates in 2012.

19     Count Fourteen charges the defendant with sexual

20 exploitation of a child, namely, Jane Doe #2, who has been

21 identified in this trial as having the initials SI.

22     Count Fifteen charges the defendant with

23 possession of child pornography.

24     You must consider each count separately and

25 return a verdict based only upon the evidence as it

## Jury Charge

**1083**

1 relates to that specific count.  Whether you find the

2 defendant not guilty or guilty as to one offense should

3 not affect your verdict as to any other offense charged.

4 Your verdict as to each count must be unanimous.

5     I have summarized the counts in the indictment

6 simply to give you an overview of the charges.  In your

7 deliberations as to each count you should refer to the

8 exact text of the indictment bearing in mind at all times

9 the indictment is merely an accusation and not evidence

10 against the defendant.

11     I will now explain to you the law that applies

12 to each of the counts in the indictment, beginning with

13 Counts Two and Fourteen, and then addressing the other

14 charges in the indictment.

15     As you will hear in a moment, I will discuss

16 certain counts together, because certain counts charge the

17 defendant with violations of the same statute, but allege

18 the violation occurred on different dates, or, with

19 respect to Count Fourteen, with respect to different

20 victims.  However, I caution you that you must consider

21 each count separately.

22     So I will start with Counts Two and Fourteen:

23 Sexual exploitation of a child.

24     Counts Two and Fourteen of the indictment charge

25 the defendant with sexual exploitation of a child.

## Jury Charge

**1084**

1  Count Two of the indictment reads as follows:
2  Reading from the indictment.
3  On or about and between April 1, 2012, and
4  November 1, 2012, both dates being approximate and
5  inclusive, within the Eastern District of New York and
6  elsewhere, the defendant Joseph Valerio, together with
7  others did knowingly and intentionally, employ, use,
8  persuade, induce, entice and coerce a minor, to wit, Jane
9  Doe #1 to engage in sexually explicit conduct for the
10  purpose of producing one or more visual depictions of such
11  conduct, knowing and having reason to know that such
12  visual depictions would be transported and transmitted
13  using a means and facility of interstate and foreign
14  commerce and which were in and affecting interstate and
15  foreign commence which visual depictions were produced and
16  transmitted using materials that had been mailed, shipped
17  and transported in and affecting interstate and foreign
18  commerce by any means, to wit, one or more mobile
19  telephones, digital cameras and digital media disks, and
20  such visual depictions were actually transported and
21  transmitted using a means and facility of interstate and
22  foreign commerce and which were in and affecting
23  interstate and foreign commerce.
24  Count Fourteen of the indictment reads as
25  follows:

## Jury Charge

**1085**

1  On or about and between September 10, 2010 and
2  January 19, 2011, both dates being approximate and
3  inclusive, within the Eastern District of New York and
4  elsewhere, the defendant Joseph Valerio did knowingly and
5  intentionally employ, use, persuade, induce, entice and
6  coerce a minor, to wit, Jane Doe #2, an individual whose
7  identity is known to the grand jury, to engage in sexually
8  explicit conduct, for the purpose of producing one or more
9  visual depictions of such conduct which visual depictions
10  were produced and transmitted using materials that had
11  been mailed, shipped and transported in and affecting
12  interstate and foreign commerce by any means, to with: One
13  or more digital cameras, memory cards and computer
14  equipment, and such visual depictions were actually
15  transported and transmitted using a means and facility of
16  interstate and foreign commerce and which were in and
17  affecting interstate and foreign commerce.
18  Counts Two and Fourteen of the indictment charge
19  the defendant with violating section 2251(a) of Title 18
20  of the United States Code.  That section provides in
21  relevant part, now quoting from the statute, any person
22  would employs, uses, persuades, induces, entices or
23  coerces any minor to engage in any sexually explicit
24  conduct for the purpose of producing any visual depiction
25  of such conduct or for the purpose of transmitting a live

## Jury Charge

**1086**

1  visual depiction of such conduct shall be guilty of a
2  crime if such person knows or has reason to know that such
3  visual depiction will be transported or transmitted, in or
4  affecting interstate or foreign commerce or mailed, if
5  that visual depiction was produced or transmitted using
6  materials that have been mailed, shipped or transported in
7  or affecting interstate or foreign commerce by any means,
8  including by computer, or if such visual depiction has
9  actually been transported or transmitted in or affecting
10  interstate or foreign commerce or mailed, end quote.
11  I'll move to the elements of the offense.
12  In order to prove the defendant guilty of
13  sexually exploiting a child the Government must prove each
14  of the following three elements beyond a reasonable doubt.
15  First:  That the individual with the initials SK
16  who is identified as Jane Doe #1 in Count Two of the
17  indictment and the individual with the initials SI who is
18  identified as Jane Doe #2 in Count 14 of the indictment,
19  were under the age of 18 when the visual depictions were
20  made;
21  Second:  That the defendant used or employed or
22  persuaded or induced or enticed or coerced SK and SI to
23  take part in sexually explicit conduct for the purpose of
24  producing or transmitting a visual depiction of that
25  conduct, and.

## Jury Charge

**1087**

1  Third:  That the visual depiction was mailed or
2  actually transported or transmitted in or affecting
3  interstate or foreign commerce or that the defendant knew
4  or had reason to know that the visual depiction would be
5  mailed or transported or transmitted in or affecting
6  interstate or foreign commerce or that the visual
7  depiction was produced using materials that had been
8  mailed or transported in or affecting interstate or
9  foreign commerce.  I will explain each of the elements in
10  more detail.
11  First element of sexual exploitation of a child:
12  Age of minor.
13  The first element of Count Two that the
14  Government must prove beyond a reasonable doubt is that SK
15  was less than 18 years of age at the time of the acts
16  alleged in the indictment.  And with respect to Count
17  Fourteen, the Government must prove beyond a reasonable
18  doubt that SI was less than 18 years old at the time of
19  the acts alleged in the indictment.
20  Second element of sexual exploitation of a
21  child:  Visual depiction of sexually explicit conduct.
22  The second element of Count 2 that the
23  Government must prove beyond a reasonable doubt that the
24  defendant, together with others, used or employed or
25  persuaded or induced or enticed or coerced SK to take part

Jury Charge

**1088**

1  in sexually explicit conduct for the purpose of producing
2  or transmitting a visual depiction of that conduct.
3  　　　As I will explain in greater detail in a few
4  moments, the Government can meet its burden of proof on
5  Count 2 by proving that the defendant did the acts charged
6  himself, or by proving that he aided and abetted another
7  person to sexually exploit SK.
8  　　　As to Count 14 the Government must prove beyond
9  a reasonable doubt that the defendant used or employed or
10  persuaded or induced or enticed or coerced SI to take part
11  in sexually explicit conduct for the purpose of producing
12  or transmitting a visual depiction of that conduct.
13  　　　The words "used" and "employed" are words of
14  common usage, and I instruct you to interpret these words
15  by using your common sense.  The words persuade, induce
16  and entice are in effect synonyms, which convey the idea
17  of leading or moving another by persuasion or influence,
18  as to some action, state of mind, etc., or to bring about,
19  produce or cause.
20  　　　The word "induce" also means to stimulate the
21  occurrence of or cause.
22  　　　The word "coerce" means to compel by force,
23  intimidation or authority, without regard for individual
24  desire or volition.
25  　　　The word "producing" in this context means

Jury Charge

**1089**

1  producing, directing, manufacturing, issuing, publishing,
2  or advertising.
3  　　　A "visual depiction" includes any photograph,
4  film, video or picture, including undeveloped film and
5  videotape, and data stored on computer disk or by
6  electronic means which is capable of conversion into a
7  visual image.
8  　　　A "visual depiction" includes videos and images
9  transmitted via live web cam even where such images are
10  not stored permanently.
11  　　　You may consider all of the evidence concerning
12  the defendant's conduct when deciding whether the
13  Government has proven that the defendant acted for the
14  purpose of producing or transmitting a visual depiction of
15  the sexually explicit conduct, or aiding and abetting
16  another person to do so, as the case may be for Count 2.
17  　　　Definition of sexually explicit.
18  　　　Sexual explicit conduct means actual or
19  simulated sexual intercourse, including genital-genital,
20  oral-genital, digital-genital, anal-genital, or oral-anal,
21  whether between persons of the same or opposite sex;
22  bestiality; masturbation; sadistic; or masochistic abuse
23  or lascivious exhibition or the genitals or pubic area of
24  any person.
25  　　　The term "lascivious exhibition" means a

Jury Charge

**1090**

1  depiction which displays or brings to view to attract
2  notice to the genitals or pubic area of children in order
3  to excite lustfulness or sexual stimulation in the viewer.
4  Not every exposure of the genital or pubic area
5  constitutes a lascivious exhibition.  You should consider
6  the following questions:
7  　　　A.  Whether the focal point of the visual
8  depiction is on the child's genitals or pubic area or
9  whether there is some other focal area;
10  　　　B.  Whether the setting of the visual depiction
11  makes it appears to be sexually suggestive, for example,
12  in a place or pose generally associated with sexual
13  activity;
14  　　　C.  Whether the child is displayed in an
15  unnatural pose, or in inappropriate attire, considering
16  the age of the child;
17  　　　D. Whether the child is fully or partially
18  clothed, or nude, although nudity is not in and of itself
19  lascivious;
20  　　　E. Whether the visual depiction suggests sexual
21  coyness or a willingness to engage in sexual activity.
22  　　　F.  Whether the visual depiction is intended or
23  designed to elicit a sexual response in the viewer.
24  　　　Of course in order for a visual depiction to be
25  lascivious all six factors need to the to be present and

Jury Charge

**1091**

1  the list of factors is not mandatory, exclusive or
2  exhaustive.  Instead, you must determine whether the
3  visual depiction is lascivious based on its overall
4  content, taking into account the age of the minor.  It is
5  for you to decide the weight or lack of weight to be given
6  to these or any other factors you find relevant.
7  　　　In deciding whether the Government has proven
8  that the defendant acted for the purpose of producing or
9  transmitting a visual depiction of the sexually explicit
10  conduct, you may consider all of the evidence concerning
11  his conduct.  While the Government must prove that he
12  acted with the purpose of producing a visual depiction of
13  sexually explicit conduct, it is not required that the
14  Government prove that the visual depiction of that conduct
15  was actually produced.
16  　　　The third element of sexual exploitation of a
17  child:  Effect on interstate commerce.
18  　　　The third element of sexual exploitation of a
19  child that the Government must prove beyond a reasonable
20  doubt is that the visual depiction was transported or
21  transmitted in or affecting interstate or foreign commerce
22  or using a facility of interstate and foreign commerce or
23  that the defendant knew or had reason to know that the
24  visual depiction would be mailed or transported in or
25  affecting interstate or foreign commerce, or that the

## Jury Charge

**1092**

1  visual depiction was produced using materials that had
2  been mailed, shipped and transported in and affecting
3  interstate and foreign commerce.
4      Simply stated, the phrase "transported or
5  transmitted in or affecting interstate or foreign
6  commerce" means that the materials used to produce the
7  visual depiction had previously moved from one state to
8  another or between the United States and another country.
9      I instruct you that transmissions of photographs
10  or video by means of the internet constitutes
11  transportation in interstate commerce.  However, you must
12  find beyond a reasonable doubt that the specific depiction
13  in question was actually transmitted by means of the
14  internet, or that the defendant knew or had reason to know
15  that the visual depiction would be transmitted by the
16  internet.
17      Additionally, if a visual depiction of sexually
18  explicit conduct as I have defined that term, is stored on
19  a digital camera, other type of recording device or
20  digital media disk, and the camera, recording device or
21  digital media disk crosses from one state to another, that
22  is sufficient to satisfy the interstate commerce element.
23      Furthermore, it is sufficient to satisfy the
24  interstate or foreign commerce element if the visual
25  depiction of sexually explicit conduct is recorded or

## Jury Charge

**1093**

1  stored on a device that was made either outside of the
2  State of New York or in a foreign country.
3      I'm now moving to Count 3.  Sexual exploitation
4  of a child outside the United States.
5      Count 3 of the indictment charges the defendant
6  with sexual exploitation of a child, namely Jane Doe #1,
7  occurring outside of the United States.
8      Count 3 of the indictment reads as follows.
9      Reading from the indictment.
10      On or about and between April 1, 2012, and
11  November 1, 2012, both dates being approximate and
12  inclusive, within the Eastern District of it New York and
13  elsewhere, the defendant Joseph Valerio together with
14  others, did knowingly and intentionally employ, use,
15  persuade, induce, entice, and coerce a minor, to wit, Jane
16  Doe #1 to engage in sexually explicit conduct outside of
17  the United States, its territories and possessions, for
18  the purpose of producing one or more visual depictions of
19  such conduct intending that such visual depictions would
20  be transmitted and transmitted to the United States, its
21  territories and possessions, using a means and facility of
22  interstate and foreign commerce and mail, and which visual
23  depictions were actually transported and transmitted to
24  the United States, its territories and possessions, using
25  a means and facility of interstate and foreign commerce

## Jury Charge

**1094**

1  and mail.
2      Count 3 of the indictment charges the defendant
3  with violating section 2251(c) of Title 18 of the United
4  States Code.  That section provides in relevant part,
5  quoting the statute.
6      Any persons who employs, uses, persuades,
7  induces, entices or coerces any minor to engage in or who
8  has a minor assist any other person to engage in, any
9  sexually explicit conduct outside the United States, its
10  territories or possessions for the purpose of producing
11  any visual depiction of such conduct, intending such
12  visual depiction to be transported to the United States,
13  its territories or possessions, by any means, including by
14  using any means or facility of interstate or foreign
15  commerce or mail, or transporting such visual depiction to
16  the United States, its territories or possessions, by any
17  means, including by using any means or facility of
18  interstate or foreign commerce or mail shall be guilty of
19  a crime.
20      In order to prove the defendant guilty of
21  sexually exploiting a child, the Government must prove
22  each of the follow four elements beyond a reasonable
23  doubt.
24      First that the individual with the initials SK
25  who was identified in the indictment as Jane Doe #1 was

## Jury Charge

**1095**

1  under the age of 18 years at the time of the acts alleged
2  in the indictment.
3      Second, that the defendant, together with other
4  person, either employed, used, persuaded, induced,
5  enticed, or coerced S.K. to engage in sexually explicit
6  conduct outside the United States, its territories or
7  possessions as I've already defined those materials to
8  you, or (b), had S.K. assist another person or persons to
9  engage in sexually explicit conduct outside the United
10  States, its territories, or possessions;
11      Third, that the defendant did so for the purpose
12  of producing a visual depiction of such conduct, as I
13  already defined the term "visual depiction" and;
14      Fourth, that the defendant, (a) intended such
15  visual depiction to be transported to the United States,
16  its territories, or possessions by any means, including by
17  using mail or by any means or facility of interstate or
18  foreign commerce or (b) the defendant did transport or
19  aided and abetted another person in transporting such
20  visual depiction to the United States, its territories or
21  possessions by any means, including by using mail or any
22  means of facility of interstate or foreign commerce, as I
23  have already defined those terms for you.
24      As I mentioned earlier and as I will explain in
25  greater detail momentarily, the Government can meet its

Jury Charge

**1096**

1  burden of proof on Count 3 by proving that the defendant
2  did the acts charged himself, or by proving that he aided
3  and abetted another person to carry out such acts.
4       If you find from your consideration of all the
5  evidence that the Government as proved each of these
6  elements beyond a reasonable doubt as to Count 3, then you
7  should find the defendant guilty of that charge.
8       If, on the other hand, you find from your
9  consideration of all the evidence that the Government has
10  failed to prove any one of these elements beyond a
11  reasonable doubt as to Count 3, then you should find the
12  defendant not guilty of that charge.
13       I will now give you an instruction regarding
14  aiding and abetting.
15       With respect to certain counts in the
16  indictment, I instruct you that the Government can meet
17  its burden of proof either by proving that the defendant
18  did the acts charged himself or by proving that he aided
19  and abetted another person in carrying out the acts
20  charged:  those counts are Counts 2 and 3, charging the
21  defendant with sexual exploitation of a child; Count 4,
22  charging the defendant with transportation of child
23  pornography; and Count 5, charging the defendant with
24  receipt of child pornography.
25       I have already instructed you on Counts 2 and 3

Jury Charge

**1097**

1  and I will instruct you on Counts 4 and 5 in a moment.
2       Let me now take time now to explain to you the
3  law concerning aiding and abetting.
4       The Government is relying on aiding and abetting
5  under section 2(a) of Title 18 of the United States Code
6  which provides that, reading from the statute, whoever
7  commits an offense against the United States or aids,
8  abets, counsels, commands, induces or procures its
9  commission, is punishable as a principal, end of quote.
10       Accordingly, even if the defendant did not
11  personally do every act constituting an offense you may
12  find that he committed that offense if the Government
13  proves beyond a reasonable doubt that he aided and abetted
14  the offense.  This means that if you find that the
15  defendant knowingly and willfully aided and abetted
16  another person in the commission of a crime, he is as
17  guilt as if he personally committed it.
18       Under the aiding and abetting statute, it is not
19  necessary for the Government to show that a defendant
20  himself physically committed the crime with which he is
21  charged in order for the Government to sustain its burden
22  of proof.
23       A person who aids or abets another to commit an
24  offense is just as guilty of that offense as if he
25  committed it himself.  The essence of aiding and abetting

Jury Charge

**1098**

1  is the intentionally and knowing participation in the
2  unlawful act by furthering it in some way.
3       Before you can convict a defendant on the ground
4  that he aided and abetted the commission of the crimes
5  charged, you must first find beyond a reasonable doubt
6  that another person committed that crime.
7       In order to aid or abet another to commit a
8  crime, it is necessary that the defendant willfully and
9  knowingly associate himself in some way with the criminal
10  venture, that he participate in it out of a desire to make
11  the crime succeed, that is, a defendant must have the
12  specific intent of furthering the criminal offense through
13  some action on his part.
14       The mere presence of a defendant where a crime
15  is being committed, even coupled with knowledge that a
16  crime is being committed or the mere acquiescence by the
17  defendant in the criminal conduct of others, even with
18  guilty knowledge, is not sufficient to establish aiding
19  and abetting.  An aider and abetter must have some
20  interest in the criminal venture.  That interest need not
21  be a financial one, but you may consider the presence or
22  absence of a financial interest in making your
23  determination.
24       In other words, if one, fully aware of what he
25  is doing, plays a significant role in facilitating a

Jury Charge

**1099**

1  transaction prohibited by law, he is equally guilty with
2  the person who directly performs the illegal acts, even
3  though the latter played a much greater or major part in
4  the preparation of the crime.
5       To determine whether the defendant aided and
6  abetted the commission of the crime charged, ask
7  yourselves these questions.
8       Did he participate in the crime charged as
9  something he wished to bring about?
10       Did he associate himself with the criminal
11  venture knowingly and willfully?
12       Did he seek by his actions to make the criminal
13  venture succeed?
14       If your answer to each of these questions is
15  "yes" then the defendant is an aider and abettor and
16  therefore guilty of the crime charged just as if he
17  himself had actually committed it.
18       If on the other hand your answer as to any of
19  these questions is "no," then the defendant is not an
20  aider and abettor under 18 USC section 2(a), and you must
21  find him guilty of the crime under consideration as an
22  aider and abettor under section 2(a).
23       I'm now moving to Counts 6, 7, 8, 9, 10, 11, 12,
24  and 13:  Attempted sexual exploitation of a child.
25       I will now explain to you the law that applies

Jury Charge

**1100**

1 to each of the Counts 6 through 13 of the indictment, each
2 of which charges the defendant with attempted sexual
3 exploitation of a child, namely, Jane Doe #1, on a
4 particular date.  Count 6 of the indictment reads as
5 follows:
6        On or about January 23, 2012, within the Eastern
7 District of New York and elsewhere, the defendant Joseph
8 Valerio, together with others, did knowingly and
9 intentionally attempt to employ, use, persuade, induce,
10 entice, and coerce a minor, to wit, Jane Doe #1, to engage
11 in sexually explicit conduct for the purpose of producing
12 one or more visual depictions of such conduct, knowing and
13 having reason to know that such visual depictions would be
14 transported and transmitted using a means and facility of
15 interstate and foreign commerce and which were in and
16 affecting interstate and foreign commerce, which visual
17 depictions were produced and transmitted using materials
18 that had been mailed, shipped and transported and
19 affecting interstate and foreign commerce by any means,
20 including by one or more mobile telephones, digital
21 cameras, digital media disks and computer and such visual
22 depictions were actually transported and transmitted using
23 a means and facility of interstate and foreign commerce
24 and which were in and affecting interstate and foreign
25 commerce contrary to Title 18 U.S. Code Section 2251(a),

Jury Charge

**1101**

1 end quote.
2        Counts 7 through 13 are identical to Count 6,
3 except each count charges the defendant with attempted
4 sexual exploitation of a child on a separate date.  So
5 I'll not read the language for each of those counts.  I'll
6 tell you what each count corresponds to, the date, I'll
7 give you the count and the approximate date as alleged in
8 the indictment with respect to the sexual exploitation of
9 a child.
10        Count 7, January 24, 2012.
11        Count 8, March 28, 2012.
12        Count 9, April 4, 2012.
13        Count 10, July 16, 2012.
14        Count 11, July 22, 2012.
15        Count 12, September 6, 2012.
16        Count 13, September 27, 2012.
17        Counts 6 through 13 of the indictment charge the
18 defendant with violating section 2251(e) of Title 18 of
19 the United States Code.  That section provides, in
20 relevant part:  Any individual who attempts to violate 18
21 U.S.C. Section 2251(a) which makes it a crime to sexually
22 exploit a minor shall be guilty of a crime, end of quote.
23        In order to prove that the defendant attempted
24 to exploit a child, the Government must prove beyond a
25 reasonable doubt the following two elements:

Jury Charge

**1102**

1        First:  That the defendant intended to commit
2 the crime of sexual exploitation of a child, namely, the
3 individual identified as Jane Doe #1.
4        I have already instructed you on the elements of
5 the offense of sexual exploitation of a child and those
6 instructions apply equally here to these counts.
7        Second:  That the defendant willfully took some
8 action that was a substantial step in an effort to bring
9 about or accomplish the crime.
10        Mere intention to commit a specific crime does
11 not amount to an attempt.  In order to convict the
12 defendant of an attempt, you must find beyond a reasonable
13 doubt that the defendant intended to commit the crime
14 charged and that he took some action which was a
15 substantial step toward the commission of crime.
16        In determining whether a defendant's actions
17 amounted to a substantial step toward the commission of
18 the crime, it is necessary to distinguish between mere
19 preparation on the one hand and the actual doing of the
20 criminal deed on the other.
21        Mere preparation which may consist of planning
22 the offense or devising, obtaining, or arranging a
23 means for its commission is not an attempt, although some
24 preparations may amount to an attempt.  The acts of a
25 person who intends to commit a crime will constitute an

Jury Charge

**1103**

1 attempt where the acts themselves clearly indicate an
2 intent to willfully commit the crime, and where the acts
3 are a substantial step in a course of conduct planned to
4 culminate in the commission of the crime.
5        Factual or legal impossibility is not a defense
6 to a charge of attempting to commit a crime if the crime
7 could have been committed, had the relevant factual or
8 legal circumstances been as the defendant believed them to
9 be.
10        In other words, a person is guilty of an attempt
11 to commit a crime if, acting with the kind of culpability
12 otherwise required for the commission of the crime, he
13 intentionally engages in conduct which would constitute
14 the crime if the relevant factual and legal circumstances
15 were as he believed them to be.
16        To prove that the defendant attempted to
17 sexually exploit a child, the Government does not need to
18 prove that a visual depiction of sexually explicit
19 conduct, terms I've already defined for you was actually
20 produced or transmitted.
21        Nor does the Government have to prove that the
22 visual depiction was actually transported or transmitted
23 in or affecting interstate commerce.  It is sufficient for
24 the Government to prove that the defendant intended that
25 the visual depiction would be transported or transmitted

Jury Charge

**1104**

1  in or affecting interstate or foreign commerce or that the
2  defendant had reason to know that this transmission could
3  occur because it was reasonably foreseeable that the
4  defendant's activities would result in the depiction's
5  transmission in or affecting interstate commerce or that
6  the defendant intended to produce the visual depiction
7  using a device or digital media disk that had traveled in
8  interstate or foreign commerce; that is, a device or
9  digital media disk produced somewhere other than the state
10  in which it was to be used or which was transported across
11  state lines or an international border.
12      I'm now moving to Count 1, conspiracy to
13  sexually exploit a child.
14      Count 1 of the indictment charges the defendant
15  with conspiracy to sexually exploit a child, namely, Jane
16  Doe #1.  Count 1 of the indictment reads as follows.
17  Quoting from the indictment.
18      On or about and between April 1, 2012 and
19  November 1, 2012, both dates being approximate and
20  inclusive, within the Eastern District of New York and
21  elsewhere, the defendant Joseph Valerio together with
22  others, did knowingly and intentionally conspire to
23  employ, use, persuade, induce, entice and coerce a minor,
24  to wit, Jane Doe #1, an individual whose identity is known
25  to the grand jury, to engage in sexually explicit conduct

Jury Charge

**1105**

1  for the purpose of producing one or more visual depictions
2  of such conduct, knowing and having reason to know that
3  such visual depictions would be transported and
4  transmitted using a means and facility of interstate and
5  foreign commerce and which were in and affecting
6  interstate and foreign commerce, which visual depictions
7  were produced and transmitted using materials that had
8  been mailed, shipped and transported in and affecting
9  interstate and foreign commerce by any means, to wit: One
10  or more mobile telephones, digital cameras and digital
11  media disks, and such visual depictions were actually
12  transported and transmitted using a means and facility of
13  interstate and foreign commerce and which were in and
14  affecting interstate and foreign commerce, contrary to
15  Title 18, United States Code, Section 2251(a), end quote.
16      Count 1 of the indictment charges the defendant
17  with violating section 2251(e) of Title 18 of the United
18  States Code, that section provides in relevant part:
19  Quoting the statute.  Any individual who conspires to
20  violate this section, 18 U.S.C. 2251(a), which makes it a
21  crime to sexually exploit a minor shall be guilty of a
22  crime, end quote.
23      I have already instructed you on the elements of
24  the offense of sexual exploitation of a child and those
25  instructions equally apply here even though I will not

Jury Charge

**1106**

1  repeat them now.
2      The essence of the charge of conspiracy is an
3  understanding or agreement between or among two or more
4  persons that they will act together to accomplish a common
5  objective that they know is unlawful.
6      You should understand that a conspiracy is an
7  offense separate from the commission of any offense that
8  may have been committed pursuant to the conspiracy.  That
9  is because the formation of a conspiracy, of a partnership
10  for criminal purposes, is in and of itself a crime.  Thus,
11  if a conspiracy exists, even if it should fail in
12  achieving its purpose, it is still punishable as a crime.
13  Also, you may find the defendant guilty of the crime of
14  conspiracy even if the substantive crime that was the
15  object of that conspiracy  -- here, sexual exploitation
16  of a child -- was not actually committed.
17      There are two elements of the crime of
18  conspiracy and the Government must prove each of the
19  following two elements beyond a reasonable doubt.
20      First:  That two or more persons entered the
21  unlawful agreement charged in the indictment  -- in this
22  case, the sexual exploitation of a child.
23      Second:  That the defendant became a member of
24  the conspiracy with knowledge of its criminal goal or
25  goals and with the intent to help the conspiracy achieve

Jury Charge

**1107**

1  its criminal goals by his own actions.
2      Let me start with the first element.  A
3  conspiracy is a combination or agreement of two or more
4  persons to accomplish an unlawful purpose.
5      In order for the Government to satisfy this
6  element, you need not find that the alleged members of the
7  conspiracy met together and entered into any express or
8  formal agreement to sexually exploit a child.  Similarly
9  you need not find that the alleged conspirators stated in
10  words or writing what the scheme was, its object or
11  purpose, or every precise detail of the crime or the means
12  by which its object or purpose was to be accomplished.  In
13  addition, the Government need not prove that the defendant
14  actually committed sexual exploitation of a child.
15      The Government must, however, prove that there
16  was a mutual understanding either spoken or unspoken
17  between two or more people to cooperate with each other to
18  accomplish an unlawful act, specifically sexual
19  exploitation of a child.
20      Since conspiracy is by its nature characterized
21  by secrecy, direct proof may not be available.  You may,
22  therefore, infer the existence of the conspiracy from the
23  circumstances of this case and in the conduct of the
24  parties involved. In a very real sense, then, in the
25  context of conspiracy cases, actions often speak louder

1 than words. In this regard, you may, in determining
2 whether an agreement existed here, consider the actions
3 and statements of all those who are found to be
4 participants as proof that a common design existed on the
5 part of the persons charged to act together to accomplish
6 an unlawful purpose.
7 The second element the Government must prove
8 beyond a reasonable doubt is that a defendant became a
9 member of the charged conspiracy with knowledge of its
10 goal or goals and intended by his actions to help it
11 succeed. The key question is whether the defendant joined
12 the conspiracy with an awareness of at least some of the
13 basic aims and purposes of the unlawful agreement.
14 Whether the defendant acted knowingly and willfully may be
15 proven by the defendant's conduct and by all of the facts
16 and circumstances surrounding the case.
17 You may ask yourselves whether the defendant
18 participated in the conspiracy with knowledge of its
19 unlawful purpose and with the specific intent of
20 furthering its objective. In that regard it has been said
21 for a defendant to be deemed a participant in a conspiracy
22 he must have had some stake in the outcome. It is
23 important for you to note that a defendant's participation
24 in the conspiracy may be established by independent
25 evidence of his or her own acts or statements, as well as

1 is not required that a person be a member of the
2 conspiracy from its very start.
3 I want to caution you that the defendant's mere
4 presence at the scene of an alleged crime does not by
5 itself make him a member of the conspiracy.
6 Similarly, mere association with one or more
7 members of the conspiracy does not automatically make the
8 defendant a member. A person may know or be friendly with
9 a criminal without being a criminal himself or herself.
10 I also want to caution you that mere knowledge
11 or acquiescence without participation in the unlawful plan
12 is not sufficient. The fact that the acts of a defendant
13 without knowledge merely happened to further the purpose
14 or objectives of the conspiracy does not make the
15 defendant a member of the conspiracy. More is required
16 under the law. What what is necessary is that the
17 defendant must have participated with knowledge of at
18 least some of the purposes or objectives of the
19 conspiracy, and with the intention of aiding in the
20 accomplishment of those unlawful ends.
21 In sum, a defendant with an understanding of the
22 unlawful character of the conspiracy must have
23 intentionally engaged, advised or assisted in it for the
24 purpose of furthering the illegal undertaking. He thereby
25 becomes a knowing and willing participant in the unlawful

1 those of other alleged co-conspirators, and the reasonable
2 inferences which may be drawn from them.
3 The defendant's knowledge is a matter of
4 inference from the facts proved. In that connection, I
5 instruct you that to become a member of the conspiracy,
6 the defendant need not have known the identities of each
7 and every other member of the conspiracy, nor need he have
8 been apprised of all of their activities. Moreover, the
9 defendant does not need to have been informed of all the
10 details or the scope of the conspiracy in order to justify
11 an inference of knowledge on his part.
12 Furthermore, the defendant need not have joined
13 in all of the conspiracy's unlawful objectives.
14 The extent or duration of the defendant's
15 participation has no bearing on the issue of the
16 defendant's guilt. Indeed, each member may perform
17 separate and distinct acts and may perform them at
18 different times. Some conspirators play major roles,
19 while others play minor parts in the scheme. An equal
20 role is not what the law requires. In fact, even a single
21 act may be sufficient to draw the defendant within the
22 ambit of the conspiracy. If you find that the conspiracy
23 existed and if you further find that the defendant
24 participated in it knowingly and willfully, the extent or
25 degree of his participation is not material. Moreover, it

1 agreement -- that is to say, a conspirator.
2 If you find that the government has proven each
3 of the two elements of the crime alleged in Count 1 --
4 conspiracy to exploit a child -- beyond a reasonable
5 doubt, you should find the defendant guilty on Count 1.
6 If the Government fails to prove any one element, you must
7 find the defendant not guilty as to Count 1.
8 I have admitted into evidence against the
9 defendant the acts and statements of others because these
10 acts and statements were committed by persons who the
11 government charges were also confederates or
12 co-conspirators of the defendant in the conspiracy charged
13 in Count 1.
14 The reason for allowing this evidence to be
15 received against the defendant has to do with nature of
16 the crime of conspiracy. A conspiracy is often referred
17 to as a partnership in crime. Thus, as in other types of
18 partnerships, when people enter into a conspiracy to
19 accomplish an unlawful end, each and every member becomes
20 an agent for the other co-conspirators in carrying out the
21 conspiracy.
22 Accordingly, the reasonably foreseeable acts,
23 declarations, statements, and omissions of any member of
24 the conspiracy and in furtherance of the common purpose of
25 the conspiracy are deemed, under the law, to be the acts

**Jury Charge**

**1112**

1  of all of the members, and all of the members of the
2  conspiracy are deemed responsible for such acts,
3  declarations, statements, and omissions.
4      If you find beyond a reasonable doubt that the
5  defendant was a member of a conspiracy charged in the
6  indictment then any reasonably foreseeable acts done or
7  statements made in furtherance of the conspiracy by
8  persons also found by you to have been members of that
9  conspiracy, may be considered against the defendant.
10     This is so even if such acts were done and such
11 statements were made in the defendant's absence and
12 without his knowledge.  However, before you may find that
13 the statements or acts of a co-conspirator should be
14 considered as tending to show the defendant's guilt you
15 must first determine that the acts and statements were
16 made during the existence and in furtherance of the
17 conspiracy.
18     Let me give you an instruction regarding
19 "consent not a defense to sexual exploitation of a child."
20     Whether or not the minor consented to engaging
21 in sexually explicit conduct is irrelevant, as as the
22 consent or voluntary participation of the minor is not a
23 defense to the charge.
24     Moving to Count 4, transportation of child
25 pornography.

**Jury Charge**

**1113**

1      Count 4 of the indictment charges the defendant
2  with transportation of child pornography, namely, images
3  depicting Jane Doe #1.  Count 4 of the indictment reads as
4  follows:
5      "On or about and between April 1, 2012 and
6  November 1, 2012, both dates being approximate and
7  inclusive, within the Eastern District of New York and
8  elsewhere, the defendant Joseph Valerio together with
9  others did knowingly and intentionally transport and ship,
10 using a means and facility of interstate and foreign
11 commerce, and in and affecting interstate and foreign
12 commerce, one or more visual depictions, to wit, images
13 depicting Jane Doe #1 engaged in sexually explicit
14 conduct, the production of such visual depictions having
15 involved the use of a minor engaging in sexually explicit
16 conduct, and such visual depictions were of such conduct.
17     Count 4 of the indictment charges the defendant
18 with violating section 2252(a)(1) of Title 18 of the
19 United States Code.  That section provides in relevant
20 part.  Reading from the statute:  Any person who knowingly
21 transports or ships using any means other facility of
22 interstate or foreign commerce or in or affecting
23 interstate or foreign commerce by any means including by
24 computer or mails, any visual depiction, if, (A), the
25 producing of such visual depiction involves the use of a

**Jury Charge**

**1114**

1  minor engaging in sexually explicit conduct, and, (B),
2  such visual depiction is of such conduct, shall be guilty
3  of a crime end of quote.
4      In order to prove the defendant guilty of
5  transporting child pornography, the Government must prove
6  each of the following elements beyond a reasonable doubt.
7      First, that the defendant together with others,
8  knowingly transported a visual depiction.  You have
9  already been instructed on the meaning of the term "visual
10 depiction" and those instructions apply equally here.
11     Second, that the visual depiction was
12 transported in interstate or foreign commerce or the
13 visual depiction was produced using materials that had
14 been transported in interstate or foreign commerce or that
15 the offense was committed in the special maritime and
16 territorial jurisdiction of the United States.
17     I have already instructed you what it means for
18 a visual depiction to be actually transported in
19 interstate or foreign commerce and they apply equally
20 here.
21     Third, that the production of the visual
22 depiction involved the use of a minor engaging in sexually
23 explicit conduct, as I've already explained that term to
24 you and portrays that minor engaged in that conduct.
25     Fourth, that the defendant knew that the

**Jury Charge**

**1115**

1  production of that visual depiction involved the use of a
2  minor engaging in sexually explicit conduct and portrayed
3  a minor engaged in that conduct.
4      As I will explain to you in just a moment, an
5  act is done knowingly when it is done voluntarily and
6  intentionally and not because of accident, mistake or some
7  other innocent reason.
8      In this case, the term "knowingly" refers to an
9  awareness of the sexually explicit nature of the material
10 and to the knowledge that the visual depictions were in
11 fact of an actual minor engaged in that sexually explicit
12 conduct.
13     The Government must show that the defendant had
14 knowledge of the general nature of the contents of the
15 material.  The defendant need not have specific knowledge
16 as to the identity or actually age of the minor depicted,
17 but the defendant must have knowledge -- excuse me, but
18 the defendant must have knowledge other an awareness that
19 the material contained a visual depiction of a minor
20 engaging in sexually explicit conduct.  Such knowledge may
21 be shown by direct or circumstantial evidence or both.
22     Eyewitness testimony of the defendant's viewing
23 of the material is not necessary to prove her awareness of
24 its contents, his or her awareness of its contents; the
25 circumstances may warrant an inference that he was aware

**Jury Charge**

**1116**

1 of what the material depicts.  Furthermore, the
2 defendant's belief as to the legality or illegality of the
3 material is irrelevant.
4     I just want to emphasize, although I've given
5 you this instruction regarding this count, this definition
6 of "knowingly" that I've given you applies to all counts
7 as that term is used.
8     I remind you that the Government can meet its
9 burden of proof on Count 4 by proving that the defendant
10 did the acts charged himself, or by proving that he aided
11 and abetted another person to transport child pornography.
12     Count 5, receipt of child pornography.
13     Count 5 of the indictment charges the defendant
14 with receipt of child pornography, namely, images
15 depicting Jane Doe #1.
16     Count 5 of the indictment reads as follows:
17 Quoting.  On or about and between April 1, 2012, and
18 November 1, 2012, both dates being approximate and
19 inclusive, within the Eastern District of New York and
20 elsewhere, the defendant Joseph Valerio, together with
21 others, did knowingly and intentionally receive one or
22 more visual depictions, to wit, images depicting Jane Doe
23 #1 engaged in sexually explicit conduct using a means and
24 facility of interstate and foreign commerce and which
25 visual depictions had been mailed and shipped and

**Jury Charge**

**1117**

1 transported in and affecting interstate and foreign
2 commerce, the, the production of such visual depictions
3 having involved the use of one or more minors engaging in
4 sexually explicit conduct and such visual depictions were
5 of such conduct, end quote.
6     Count 5 of the indictment charges the defendant
7 with violating section 2252(a)(2) of Title 18 of the
8 United States Code.  That section provides in relevant
9 part.  Quoting from the statute.
10     Any person who knowingly receives, or
11 distributes any visual depiction, using any means or
12 facility of interstate or foreign commerce or that has
13 been mailed or has been shipped or transported in or
14 affecting interstate or foreign commerce or which contains
15 materials which have been mailed or so shipped or
16 transported by any means including by computer, or
17 knowingly reproduces any visual depiction for distrubution
18 using any means or facility of interstate or foreign
19 commerce or in or affecting interstate or foreign commerce
20 or through the mails, if (A) the producing of such visual
21 depiction involved the use of a minor engaging in sexually
22 explicit conduct and (B) such visual depiction is of such
23 conduct, shall be guilty of a crime.
24     (Continued)
25

**Jury Charge**

**1118**

1     In order to prove the defendant guilty of
2 receiving child pornography, the government must prove
3 each of the following four elements beyond a reasonable
4 doubt:
5     First, that the defendant received a visual
6 depiction, which term I have already defined for you and
7 applies equally here.
8     Second, that the visual depiction was
9 transported in or affecting interstate or foreign
10 commerce.
11     Third, that the production of the visual
12 depiction involved the use of a minor engaging in sexually
13 explicit conduct, and portrayed that minor engaged in that
14 conduct.
15     Fourth, that the defendant knew that the
16 production of the visual depiction involved the use of a
17 minor engaged in sexually explicit conduct, and portrayed
18 a minor engaged in that conduct.
19     I remind you that the government can meet its
20 burden of proof of count five by proving that the
21 defendant did the acts charged himself, or by proving that
22 he aided and abetted another person to receive child
23 pornography.
24     The first element of receipt of child
25 pornography, receiving.

**Jury Charge**

**1119**

1     The first element of count five that the
2 government must prove beyond a reasonable doubt that the
3 defendant knowingly received a visual depiction.
4     You have already been instructed on the meaning
5 of the term visual depiction, and that instruction applies
6 equally here.
7     To receive a visual depiction means to take
8 possession of it.  This includes the knowing acceptance of
9 a depiction previously requested.  Receiving includes the
10 downloading of a photograph or video by means of the
11 internet.
12     The government must prove that the defendant
13 received the depiction knowingly.  An act is done
14 knowingly when it is done voluntarily and intentionally
15 and not because of accident, mistake or some other
16 innocent reason.
17     Second element of receipt of child pornography:
18 In or affecting interstate or foreign commerce.
19     The second element of count five that the
20 government must prove beyond a reasonable doubt is that
21 the visual depiction was mailed or transported in or
22 affecting interstate or foreign commerce or was produced
23 using materials that had been transported in or affecting
24 interstate or foreign commerce.
25     The indictment alleges that the visual depiction

Jury Charge

**1120**

1  was actually transported in interstate or foreign
2  commerce.  I have already instructed you on what it means
3  for a visual depiction to be actually transported in
4  interstate or foreign commerce or produced using materials
5  that had been transported in or affecting interstate or
6  foreign commerce.
7      Third element of receipt of child pornography:
8  Visual depiction of sexually explicit conduct.
9      The third element of count five that the
10  government must prove beyond a reasonable doubt is that
11  the production of the visual depiction involved the use of
12  a minor engaging in sexually explicit conduct, as I have
13  already explained that term to you, and portrays that
14  minor engaged in that conduct.
15      I have already instructed you that the visual
16  depiction must be a real person under the age of 18
17  engaging in sexually explicit conduct.  I reiterate that
18  the government does not have to prove the identity of the
19  minor or the exact age of the minor.  You may consider all
20  the evidence in determining whether the depiction
21  portrayed an actual person under the age of 18 engaging in
22  sexually explicit conduct.
23      Fourth element of receipt of child pornography:
24  The defendant acted knowingly.
25      The fourth element of count five that the

Jury Charge

**1122**

1  that he or she was aware of the material -- what the
2  material depicts.  Furthermore, the defendant's belief as
3  to the legality or illegality of the material is
4  irrelevant.
5      Before you can find that the defendant acted
6  intentionally, you must be satisfied beyond a reasonable
7  doubt that the defendant acted deliberately and
8  purposefully.  That is, that the defendant's acts must
9  have been the product of the defendant's conscious
10  objective rather than the product of a mistake or
11  accident.  The intent with which an act is done is more
12  often shown by the act itself or by a series of acts than
13  by statements made long after its occurrence.  Frequently
14  the acts of individuals speak their intentions more
15  clearly than do their words.  The adage, actions speak
16  louder than words, applies here.  Accordingly, knowledge
17  and intent are usually established by surrounding facts
18  and circumstances as of the time the acts in question
19  occurred, or the events took place, and the reasonable
20  inferences to be drawn from them.
21      Again, the definition of intentional applies to
22  all counts of the indictment in which it is referred to.
23      Count 15, possession of child pornography.
24      Count 15 of the indictment charges the defendant
25  with possession of child pornography.  Count 15 of the

Jury Charge

**1121**

1  government must prove beyond a reasonable doubt is that
2  the defendant knew both that the production of the visual
3  depiction involved the use of a minor engaging in sexually
4  explicit conduct, and that it portrayed a minor engaged in
5  that conduct.
6      As I stated before, an act is done knowingly
7  when it is done voluntarily and intentionally, and not
8  because of accident, mistake or some other innocent
9  reason.
10      In this case, the term knowingly refers to an
11  awareness of the sexually explicit nature of the material
12  and to the knowledge that the visual depiction was in fact
13  an act -- of an actual minor engaged in that sexually
14  explicit conduct.
15      The government must show that the defendant had
16  knowledge of the general nature of the contents of the
17  material.  The defendant need not have specific knowledge
18  of the identity or the actual age of the minor depicted,
19  but the defendant must have knowledge or an awareness that
20  the material contained a visual depiction of a minor
21  engaging in sexually explicit conduct.  Such knowledge may
22  be shown by direct or circumstantial evidence, or both.
23  Eyewitnesses testimony of the defendant's viewing of the
24  material is not necessary to prove his or her awareness of
25  its contents.  The circumstances may warrant an inference

Jury Charge

**1123**

1  indictment reads as follows.
2      From the indictment now.
3      Quote, on or about January 28, 2014, within the
4  Eastern District of New York, the defendant Joseph Valerio
5  did knowingly and intentionally possess matter containing
6  one or more visual depictions, to wit:  images in digital
7  files, in and affecting interstate and foreign commerce,
8  and which visual depictions had been mailed and shipped
9  and transported using a means and facility of interstate
10  and foreign commerce, and which were produced using
11  materials which had been mailed and shipped and
12  transported, the production of such visual depictions
13  having involved the use of one or more minors engaging in
14  sexually explicit conduct, and such visual depictions were
15  of such conduct.  End quote.
16      Count 15.
17      Count 15 of the indictment charges the defendant
18  with Section 2252(a)(4)(B) of Title 18 of the United
19  States Code.  That section provides, in relevant part:
20      Now quoting the statute.
21      Any person who knowingly possesses or knowingly
22  accesses with intent to view one or more books, magazines,
23  periodicals, films, videotapes or other matter which
24  contain any visual depiction that has been mailed or has
25  been shipped or transported using any means or facility of

1 interstate or foreign commerce, or in or affecting
2 interstate or foreign commerce, or which was produced
3 using materials which have been mailed or so shipped or
4 transported, by any means, including by computer, if, one,
5 the producing of such visual depiction involves the use of
6 a minor engaging in sexually explicit conduct; and, two,
7 such visual depiction is of such conduct shall be guilty
8 of a crime, end of quote.
9        In order to prove that the defendant possessed
10 child pornography, it is necessary that the evidence
11 establish beyond a reasonable doubt -- obviously the
12 government has the burden of proof beyond a reasonable
13 doubt as to each of these elements.
14        First, that the defendant knowingly possessed a
15 visual depiction, as I have already explained that term to
16 you.
17        Second, that the visual depiction was
18 transported in or affecting interstate or foreign
19 commerce, or the visual depiction was produced using
20 materials that had been transported in interstate or
21 foreign commerce.
22        Third, that the production of the visual
23 depiction involved the use of a minor engaging in sexually
24 explicit conduct and portrays that minor engaged in that
25 conduct.

1        And, fourth, that the defendant knew that the
2 production of the visual depiction involved the use of a
3 minor engaging in sexually explicit conduct and portrayed
4 a minor engaged in that conduct.
5        The first element that the government must prove
6 beyond a reasonable doubt is that the defendant knowingly
7 and intentionally possessed a visual depiction.  I have
8 already defined the terms knowingly, intentionally and
9 visual depiction, and you should apply those definitions
10 and instructions here.
11        To possess something means to have it within a
12 person's control.  This does not necessarily mean that the
13 person must hold it physically, that is, have actual
14 possession of it.  As long as the visual depiction was
15 within the defendant's control, he possesses it.  If you
16 find that the defendant either had actual possession of
17 the depiction or that he had power and intention to
18 exercise control over it, even though it was not in his
19 physical possession, you may find that the government has
20 proven possession.
21        The law also recognizes that possession may be
22 sole or joint.  If one person alone possesses it, that is
23 sole possession.  However, it is possible that more than
24 one person may have the power and intention to exercise
25 control over the visual depiction.  This is called joint

1 possession.
2        If you find that the defendant has such power
3 and intention, then he possessed the depiction even if he
4 possessed it jointly with another person.
5        The second element of count 15 that the
6 government must prove beyond a reasonable doubt is that
7 the visual depiction was mailed or transported in or
8 affecting interstate or foreign commerce.  The indictment
9 alleges that the particular visual depictions were
10 transported in or affecting interstate or foreign
11 commerce, or produced using materials that had been
12 transported in interstate or foreign commerce.
13        Transmission of photographs or video by means of
14 the internet constitutes transported in or affecting
15 interstate commerce.  However, you must find beyond a
16 reasonable doubt that the specific depiction in question
17 was actually transmitted by means of the internet.
18        The third element of count 15 that the
19 government must prove beyond a reasonable doubt is that
20 the production of the visual depiction involved in the use
21 of an actual minor engaged in sexually explicit conduct,
22 as I have already explained that term to you, and portrays
23 that minor engaged in that conduct.
24        The visual depiction must be of a real person
25 under the age of 18 engaging in sexually explicit conduct,

1 the government does not have to prove the identity of the
2 minor or the exact age of the minor.  You may consider all
3 the evidence, including your viewing of the depiction, in
4 determining whether the depiction portrayed an actual
5 person under the age of 18 engaging in sexually explicit
6 conduct.  I have already defined the term sexually
7 explicit conduct, you should apply that definition here.
8        The fourth element of count 15 that the
9 government must prove beyond a reasonable doubt is that
10 the defendant knew both that the production of the visual
11 depiction involved the use of a minor engaging in sexually
12 explicit conduct and that it portrayed a minor engaged in
13 that conduct.
14        As I stated before, an act is done knowingly
15 when it is done voluntarily and intentionally and not
16 because of accident, mistake or some other innocent
17 reason.  In this case, the term knowingly refers to an
18 awareness of the sexually explicit nature of the material,
19 and to the knowledge that the visual depictions were in
20 fact of actual minors engaged in that sexually explicit
21 conduct.
22        The government must show that the defendant had
23 knowledge of the general nature of the contents of the
24 material.  The defendant need not have specific knowledge
25 as to the identity or actual age of the underage

Jury Charge

**1128**

1  performer, but the defendant must have knowledge or an
2  awareness that the material contained a visual depiction
3  of a minor engaging in sexually explicit conduct.
4  　　Such knowledge may be shown by direct or
5  circumstantial evidence or both.  Eyewitness testimony of
6  the defendant's viewing of the material is not necessary
7  to prove his awareness of its contents; but the
8  circumstances may warrant an inference that he was aware
9  of the -- what the material depicts, furthermore, the
10 defendant's belief as to the legality or illegality of the
11 material is irrelevant.
12 　　That ends part two.  You will be happy to note
13 part three is shorter.  There is about ten minutes to go.
14 Everyone okay?
15 　　Part three are my rules regarding deliberations.
16 　　Finally, a few closing remarks.
17 　　Keep in mind that nothing I have said in these
18 instructions is intended to suggest to you in any way what
19 I think your verdict should be.  That is entirely for you
20 to decide.
21 　　By way of reminder, I charge you once again that
22 it is your responsibility to judge the facts in this case
23 only from the evidence presented during the trial and to
24 apply the law as I have given it to you to the facts as
25 you find them from the evidence.

Jury Charge

**1129**

1  　　I instruct you that the decision you reach as to
2  each element for each charge in the indictment must be
3  unanimous; that is, all 12 of you must agree on every
4  element in every count.  I also instruct you to consider
5  each count of the indictment separately.  Again, the
6  verdict on each element and each count must be unanimous.
7  　　When you retire, it is your duty to discuss the
8  case for the purpose of reaching a verdict.  Each of you
9  must decide the case for yourself.  But you should only do
10 so after considering all the evidence, listening to the
11 views of your fellow jurors and discussing it fully.
12 　　It is important that you reach a verdict, if you
13 can do so conscientiously.  You should not hesitate to
14 reconsider your opinions from time to time and to change
15 them if you are convinced that they are wrong.
16 　　However, do not surrender an honest conviction
17 as to weight and effect of the evidence simply to arrive
18 at a verdict.
19 　　Remember also that your verdict must be based
20 solely on the evidence in the case and the law as the
21 Court has given it to you, not on anything else.  Opening
22 statements, closing arguments, or other statements or
23 arguments of counsel are not evidence.  If your
24 recollection of the facts differs from the way counsel has
25 stated the facts to be, then your recollection controls.

Jury Charge

**1130**

1  　　And, finally, bear in mind that the government
2  has the burden of proof and that you must be convinced of
3  the defendant's guilt beyond a reasonable doubt to return
4  a guilty verdict.  If you find that this burden has not
5  been met, you must return a verdict of not guilty
6  　　The question of possible punishment of the
7  defendant is of no concern to the jury and should not, in
8  any sense, enter into or influence your deliberations.
9  The duty of imposing sentence rests exclusively upon the
10 Court.  Your function is to weigh the evidence in the case
11 and to determine whether or not the defendant is guilty
12 beyond a reasonable doubt, solely upon the basis of such
13 evidence.  Under your oath as jurors, you cannot allow a
14 consideration of the punishment which may be imposed upon
15 the defendant if he is convicted to influence your verdict
16 in any way or in any sense enter into your deliberations.
17 　　Under your oath as jurors, you are not to be
18 swayed by sympathy for one side or the other.  You are to
19 be guided solely by the evidence in this case, and the
20 crucial question that you must ask yourselves as you sift
21 through the evidence is:  Has the government proven the
22 guilt of the defendant beyond a reasonable doubt?
23 　　It is for you alone to decide whether the
24 government has proven that the defendant is guilty of the
25 crimes charged solely on the basis of the evidence and

Jury Charge

**1131**

1  subject to the law as I charge you.  It must be clear to
2  you that once you let fear, prejudice, bias or sympathy
3  interfere with your thinking, there is a risk you will not
4  arrive at a true and just verdict.
5  　　If you have a reasonable doubt as to the
6  defendant's guilt, you must find a verdict of acquittal.
7  But, on the other hand, if you should find that the
8  government has met its burden of proving the defendant's
9  guilt beyond a reasonable doubt, you should not hesitate
10 because of sympathy or any other reason to render a
11 verdict of guilty.
12 　　When you get into the jury room before you begin
13 your deliberations, your first act will be to select one
14 of you to be a foreperson.  The foreperson will be
15 responsible for signing all communications to the Court
16 and for handing it to the court security officer during
17 your deliberations.  But, of course, his or her vote is
18 entitled to no greater weight than any other juror.
19 　　During the trial I permitted the taking of notes
20 by those of you who wished to do so.  At that time I
21 pointed out that while you could take notes, there is no
22 need for you doing so because the court reporter takes
23 down everything said in the courtroom.  And during
24 deliberations the court reporter will read back to you any
25 portion of the transcript you may ask for.

Jury Charge

**1132**

For those of you who did take notes during the trial, I point out to you and your fellow jurors that your notes are simply an aid to memory for the particular juror who takes the notes. You are instructed that your notes are only a tool to aid your own individual memory and you should not compare your notes with other jurors in your deliberations. Jurors who did not take notes should not be influenced by the fact that other jurors have taken notes. Your notes are not evidence. They may be inaccurate and are by no means a complete recording of the trial testimony. Any difference between a juror's recollection and the other juror's notes should be settled by asking to have the court reporter read back the transcript, for it is the court record rather than any juror's notes upon which the jury must base its determination of the facts and its verdict.

It is very important that you are not to communicate with anyone outside the jury room about your deliberations or about anything touching this case. There is only one exception to this rule.

If it becomes necessary during the deliberations to communicate with me, you may send a note, through the court security officer, signed by your foreperson or by one or more members of the jury. No member of the jury should ever attempt to communicate with me except by a

**1133**

signed writing, and I will never communicate with any member of the jury on any subject touching the merits of the case other than in writing or orally here in open court. If you send any notes to the Court, do not disclose anything about your deliberations. Specifically, do not disclose to anyone, not even to me, how the jury stands numerically or otherwise on the question of the guilt or innocence of the defendant until after you have reached a unanimous verdict or have been discharged.

If during your deliberations you want to see any of the exhibits, they will be sent to you in the jury room upon written request. If you want any of the testimony read back, that can also be done. But please remember that it is not always easy to locate what you might want, so be as specific as you possibly can in requesting exhibits or portions of testimony which you may want. If you request a readback of testimony, please be patient, as it may take some time to locate and agree upon the specific testimony required.

I want to emphasize that point. If you send a note requesting readback of testimony and I don't bring you out immediately, it doesn't mean I didn't get the note. I have to consult with the lawyers and the court reporters as to what it is you are requesting. As soon as the portion is isolated, we will bring you back for the

**1134**

readback.

I have prepared a verdict sheet which will be given to you in a moment. The verdict sheet is given to you to record your verdict after you have reached a verdict as to all counts in the indictment.

When you have reached a decision, have the foreperson sign the verdict form and put the date on, and notify the marshal by note that you have reached a verdict.

I reiterate that any verdict you reach must be unanimous.

Your oath sums up your duty, and that is without fear or favor to any person, you will well and truly try the issues in this case according to the evidence given to you in court and the laws of the United States.

This concludes my instructions. I want to thank you for your close and careful attention.

In a moment, members of the jury, you will retire to deliberate after I swear in the marshal. I do ask as your first order of business you elect a foreperson and send me a note dated and timed, identifying that foreperson.

So you are going to go back into the jury room with two documents.

The first document we will mark Court Exhibit E,

**1135**

as in Edward, is a copy of the superseding indictment.

Again, this is only given to you so you will have a reference when you are going through each count on the verdict sheet. That is the only purpose of this. It is merely an accusation and nothing more.

And I will give you a copy of the verdict form to record your verdict on, which we will mark as Court Exhibit F.

The verdict form is self-explanatory. Again, your verdict on each count must be unanimous and you must consider each count separately.

I will just have my law clerk give those two documents to juror number one.

I will now give the oath to the court security officer.

Please raise your right hand.

(Court security officer is sworn to attend to the jury.)

THE COURT: A couple of other things.

First, when you are in the jury room, you can only deliberate when all 12 of you are present.

If someone uses the restroom, and sometimes there are jurors who are smokers and you need to have a smoke break, the court security officer will take those jurors outside and you have to stop until all 12 of you

Jury Charge

**1136**

1  are again present.  That is very important.

2  Next I need to discharge the alternate jurors in

3  this case, and I will give you some instructions with

4  respect to that.

5  I will ask you not to discuss the case with

6  anyone, and you are not to read or listen to anything with

7  regard to the case until you get a call from Michelle or

8  the jury department that the case is over.

9  The reason for that is if for some reason one of

10  the 12 jurors could not continue the deliberations, and as

11  long as you continue to follow my instructions, we can

12  call you up and ask you to come back to continue in the

13  deliberations.

14  Please follow that instruction until the case is

15  over.  Obviously you don't have to sit by the telephone.

16  You can go about your normal lives.

17  I just want to thank the alternates for their

18  service as jurors in this case.  And I will ask the court

19  security officer to escort both of you back to the jury

20  room to get your stuff.  And the 12 should remain here and

21  the two alternates may do that now, and the 12 will

22  proceed to the jury room after the two alternates have

23  left.

24  Thank you.

25  (The alternate jurors are excused.)

Jury Charge

**1137**

1  THE COURT:  Let me speak to the lawyers at the

2  sidebar for a moment.

3

4  (Whereupon, at this time the following took

5  place at the sidebar.)

6  THE COURT:  Any issues with the charge?

7  MR. LATO:  No, your Honor.

8  MR. LaPINTA:  No.

9  MR. BODE:  No.

10  MR. LaPINTA:  No.

11  THE COURT:  Thank you.

12

13  (Whereupon, at this time the following takes

14  place in open court.)

15  THE COURT:  The lunches should be arriving

16  sometime around 12:15.

17  Obviously you can continue to deliberate as you

18  eat your lunch, or if you wish to take a break as you eat

19  the lunch, it is up to you to decide.

20  We will just wait until we hear that the

21  alternates are out.

22  (Whereupon, at this time there was a pause in

23  the proceedings.)

24  THE COURT:  All right, members of the jury,

25  please retire to the jury room to begin your

**1138**

1  deliberations.

2  Thank you.

3  (The jury exits the courtroom at 11:23 a.m.)

4  THE COURT:  Everyone can be seated.

5  If you can just hang around for a few minutes,

6  because a lot of times notes come around in the beginning.

7  You don't have to stay by the courtroom, as long as

8  Michelle has your cell phone number, you can go down to

9  the cafeteria or wherever you want to go.

10  I assume all the exhibits are ready to go.

11  MR. KABRAWALA:  We will go through that right

12  now and have counsel agree that they are the right ones.

13  THE COURT:  All right.

14  Why don't you do that now.  Thank you.

15

16  (Whereupon, a recess was taken.

17

18  (The following takes place at 12:08 p.m.)

19  THE COURT:  We did receive two notes.  The first

20  one is just identifying the foreperson as Mr. Raymond.

21  And that has been given to both sides.

22  The second note, Court Exhibit 2, requests in

23  writing the Judge's instructions, and from the prosecution

24  the binder containing the evidence in email form.

25  Obviously I have the instructions here, which

**1139**

1  has been marked as Court Exhibit D.

2  Any objection to that going back?

3  MR. BODE:  No, your Honor.

4  MR. LATO:  No, your Honor.

5  THE COURT:  And then with respect to the emails,

6  is there agreement as to what those exhibits are?

7  MR. LATO:  Yes, your Honor.

8  I think but for the parenthetical at the end of

9  the note would be clear.  But when they put the

10  parenthetical, in email form, does it become -- it becomes

11  unclear.  Do they want just the emails?  That is the

12  problem.

13  THE COURT:  I assume when they say the binder

14  containing the evidence in email form, he held up that

15  binder in summation and I assume that that is what they

16  are referring to.

17  MR. LATO:  I do as well, your Honor, feel that.

18  But I would ask that you make inquiry as to what they

19  want.  Do they want the entire binder?  We have obviously

20  taken out the CD, your Honor.

21  THE COURT:  There are other things in the

22  binder?

23  MR. BODE:  There are photos in evidence, and

24  like the DHL receipts and other evidentiary items.

25  THE COURT:  I will bring them out and let them

**1140**

1 know how I'm interpreting the note. If that is okay?

2 MR. LATO: Yes, your Honor.

3 THE COURT: Why not have a record of what

4 exhibit numbers are going back. What exhibit numbers are

5 they?

6 MR. BODE: We will pull out all the pictures and

7 only include the emails, and I will put it on the record.

8 THE COURT: Okay.

9 MR. BODE: If we could, Mr. Lato is going to ask

10 something before I keep pulling things out.

11 MR. LATO: May we have a moment to confer with

12 Mr. Valerio? He has some comment, and before I speak

13 again let me get his position.

14 THE COURT: Sure.

15 (Defense counsel confer with the defendant.)

16 MR. LATO: Your Honor, because in my estimation

17 there are at least some reason to question as to whether

18 the jury wants only the emails, as opposed to the emails

19 and the other things, and because it is Mr. Valerio's

20 position that the jury should see everything, I'm asking

21 your Honor out of an abundance of caution just to ask the

22 jury whether they want only the emails or the other items

23 as well.

24 THE COURT: What is the government's position on

25 that?

**1141**

1 MR. BODE: I think the note is clear, Judge.

2 But I don't have any objection to asking them.

3 THE COURT: Okay.

4 What I will say to them is that the binder

5 contains other exhibits aside from the emails. And I want

6 them to send me another note indicating as to whether they

7 want all the exhibits in the binder or just the email

8 exhibits.

9 MR. LATO: Yes, your Honor. Minus the CDs.

10 That they cannot have. They can, of course, listen to it

11 in the courtroom.

12 THE COURT: As I understand it, other than the

13 CDs, is the binder then every document in the case?

14 MR. BODE: Every documentary exhibit, yes, your

15 Honor. And it includes the PowerPoint with the child

16 pornography images, and obviously not the CDs. Also the

17 redacted images as well. All the photographs from the

18 search scene, your Honor.

19 MR. LATO: Yes, your Honor.

20 THE COURT: At least confirm with Mr. Valerio --

21 or I will confirm with him.

22 Mr. Valerio, I want to make sure that your

23 lawyers are following your request.

24 The government has a binder of all the

25 documentary evidence that they have submitted into

**1142**

1 evidence in the case, which includes emails and all the

2 documents they have submitted.

3 You want me to ask the jury whether they want

4 the binder of all the documentary evidence or just the

5 emails. Do you want me to clarify that? Is that what you

6 want?

7 Or I can bring them out and say I'm interpreting

8 your note to only requesting the emails. If you want all

9 the documents, then you can let me know.

10 MR. LATO: Your Honor, after further

11 consultation while I was addressing the Court, Mr. LaPinta

12 was speaking to Mr. Valerio, it is now his request, and

13 ours as well, that your Honor just give them the emails.

14 THE COURT: Is that correct, Mr. Valerio?

15 THE DEFENDANT: Yes, your Honor.

16 THE COURT: You don't want me to bring them out?

17 Just send the emails back?

18 MR. LATO: Yes, your Honor. And if that is not

19 sufficient, I assume we will get another note from them.

20 THE COURT: I was willing to do that if it was

21 the defense's request so there is no issue. But I think

22 the note is clear, the binder containing the evidence in

23 email form. That is all they want. So I believe this is

24 the appropriate response.

25 MR. BODE: In terms of our interpretation,

**1143**

1 Judge, we are interpreting emails as including their

2 attachments as well, if there is an attachment to the

3 email, but obviously not the child pornography.

4 THE COURT: Yes. It goes to the attachments

5 other than the child pornography.

6 MR. BODE: Yes.

7 Like, there is an email with Mr. Valerio's

8 picture attached to it, and that is obviously part of the

9 email.

10 THE COURT: Yes.

11 Do you agree that it should include attachments?

12 MR. LATO: Yes, your Honor.

13 THE COURT: All right.

14 MR. BODE: and headers for emails. I assume

15 that that is part of an email?

16 THE COURT: Yes.

17 (Whereupon, at this time there was a pause in

18 the proceedings.)

19 MR. BODE: We are handing up and we agree

20 this -- these are the correct exhibits, and we can read

21 into the record the exhibit numbers, and this can go to

22 the jury.

23 THE COURT: Agreed?

24 MR. LaPINTA: Yes.

25 MR. BODE: 2, 2-B, 2-D, 2-E, 5 --

**1144**

1    THE COURT: Why don't you read them right out of
2  the book, and that would be better.
3    MR. BODE: Yes.
4    MR. LaPINTA: 2, 2-B, 2-D, 2-D, 5, 5-A, 203,
5  205, 205-A, 206, 208, 209, 210, 211, 211-A, 212, 213, 214,
6  215, 216, 217, 218, 219, 220, 221, 222, 223, 224, 225,
7  226, 227, 228, 229, 229-A, 230, 231, 235, 238, 238-A, 243,
8  244, 245, 245-A, 245-B, 246, 247, 303, 303-A, 501-D, as in
9  dog, 502-A, 503-G, 504-E, 551, 552, 552-A, 553, 554,
10  554-A, 554-B, 554-C, 556, 557, 558, 559, 559-A, 560, 561,
11  562, 564, 567, 567-A, 568.
12    That's it.
13    THE COURT: All right.
14    So the record should reflect that Mr. LaPinta
15  read the exhibits that are in the binder going back to the
16  jury, along with my instructions, which is Court
17  Exhibit D, as in David.
18    MR. LaPINTA: Thank you.
19    THE COURT: You can all take a lunch break if
20  you wish to go now.
21    MR. LATO: Before your Honor leaves the bench, I
22  was conferring with Mr. Valerio while everyone was
23  reciting the exhibit numbers, and I would like to confer
24  with Mr. LaPinta so we don't have to come back.
25    THE COURT: Something to do with these exhibits?

**1145**

1    MR. LATO: Correct.
2    (Defense counsel confer.)
3    MR. LATO: Your Honor, it is Mr. Valerio's
4  position, as distinct from the opinion of Mr. LaPinta and
5  myself, that the jury should also get the text messages.
6    Mr. LaPinta and I have explained to Mr. Valerio
7  that the email doesn't ask for text messages.
8    THE COURT: You said the email. You mean the
9  note.
10    MR. LATO: Yes, the note, your Honor, does not
11  refer to text messages.
12    In addition, Mr. LaPinta and I are in agreement
13  that the text messages have devastating evidence against
14  Mr. Valerio. And unless the jury specifically requests
15  that in a note, it is our position that that note should
16  not be shown -- I'm sorry, it is our position that the
17  text messages should not be given without a specific
18  request.
19    THE COURT: I agree.
20    I want the record to be perfectly clear at this
21  point that the note refers to the following: The
22  binder -- from the prosecution the binder containing the
23  evidence, paren, in email form.
24    This is one of the situations where not only is
25  the note clear, but they want the evidence in email form,

**1146**

1  which is a very distinct category of evidence.
2    But it is consistent with what happened during
3  the summation. Mr. Kabrawala during the summations made
4  reference to all the emails, and had a PowerPoint and
5  invited them by showing them a binder and saying the
6  emails are all in here if you wish to review them.
7    That is why I was confused when the parties
8  suggested a binder containing all the evidence in the
9  case, because I didn't understand the binder to have all
10  the evidence -- evidence in the case when Mr. Kabrawala
11  was holding it. They referred to only emails and that is
12  what they ask for.
13    Text messages are different from email messages.
14  And I don't think a response as to that, independent as to
15  whether it is devastating to Mr. Valerio, the note is not
16  requesting that. And I will not send back the text
17  messages because it is not responsive to the note. And
18  obviously if they start paging through the emails and see
19  that there are no text messages, they are certainly more
20  than capable to write me another note saying they also
21  wanted a text message or messages.
22    If memory serves me correctly, they are all
23  contained in one document, the text messages?
24    MR. BODE: Two documents, there are two
25  different types of texts. And they are in two documents.

**1147**

1    THE COURT: Yes.
2    It is not responsive to the note to send text
3  messages, especially in response to the government's
4  summation.
5    All right.
6    Let's take a lunch break.
7    (A luncheon recess is taken at 12:27 p.m.)

Jury Charge

**1148**

In order to prove the defendant guilty of receiving child pornography, the government must prove each of the following four elements beyond a reasonable doubt:

First, that the defendant received a visual depiction, which term I have already defined for you and applies equally here.

Second, that the visual depiction was transported in or affecting interstate or foreign commerce.

Third, that the production of the visual depiction involved the use of a minor engaging in sexually explicit conduct, and portrayed that minor engaged in that conduct.

Fourth, that the defendant knew that the production of the visual depiction involved the use of a minor engaged in sexually explicit conduct, and portrayed a minor engaged in that conduct.

I remind you that the government can meet its burden of proof of count five by proving that the defendant did the acts charged himself, or by proving that he aided and abetted another person to receive child pornography.

The first element of receipt of child pornography, receiving.

Jury Charge

**1149**

The first element of count five that the government must prove beyond a reasonable doubt that the defendant knowingly received a visual depiction.

You have already been instructed on the meaning of the term visual depiction, and that instruction applies equally here.

To receive a visual depiction means to take possession of it.  This includes the knowing acceptance of a depiction previously requested.  Receiving includes the downloading of a photograph or video by means of the internet.

The government must prove that the defendant received the depiction knowingly.  An act is done knowingly when it is done voluntarily and intentionally and not because of accident, mistake or some other innocent reason.

Second element of receipt of child pornography: In or affecting interstate or foreign commerce.

The second element of count five that the government must prove beyond a reasonable doubt is that the visual depiction was mailed or transported in or affecting interstate or foreign commerce or was produced using materials that had been transported in or affecting interstate or foreign commerce.

The indictment alleges that the visual depiction

Jury Charge

**1150**

was actually transported in interstate or foreign commerce.  I have already instructed you on what it means for a visual depiction to be actually transported in interstate or foreign commerce or produced using materials that had been transported in or affecting interstate or foreign commerce.

Third element of receipt of child pornography: Visual depiction of sexually explicit conduct.

The third element of count five that the government must prove beyond a reasonable doubt is that the production of the visual depiction involved the use of a minor engaging in sexually explicit conduct, as I have already explained that term to you, and portrays that minor engaged in that conduct.

I have already instructed you that the visual depiction must be a real person under the age of 18 engaging in sexually explicit conduct.  I reiterate that the government does not have to prove the identity of the minor or the exact age of the minor.  You may consider all the evidence in determining whether the depiction portrayed an actual person under the age of 18 engaging in sexually explicit conduct.

Fourth element of receipt of child pornography: The defendant acted knowingly.

The fourth element of count five that the

Jury Charge

**1151**

government must prove beyond a reasonable doubt is that the defendant knew both that the production of the visual depiction involved the use of a minor engaging in sexually explicit conduct, and that it portrayed a minor engaged in that conduct.

As I stated before, an act is done knowingly when it is done voluntarily and intentionally, and not because of accident, mistake or some other innocent reason.

In this case, the term knowingly refers to an awareness of the sexually explicit nature of the material and to the knowledge that the visual depiction was in fact an act -- of an actual minor engaged in that sexually explicit conduct.

The government must show that the defendant had knowledge of the general nature of the contents of the material.  The defendant need not have specific knowledge of the identity or the actual age of the minor depicted, but the defendant must have knowledge or an awareness that the material contained a visual depiction of a minor engaging in sexually explicit conduct.  Such knowledge may be shown by direct or circumstantial evidence, or both.  Eyewitnesses testimony of the defendant's viewing of the material is not necessary to prove his or her awareness of its contents.  The circumstances may warrant an inference

Jury Charge

**1152**

1   that he or she was aware of the material -- what the
2   material depicts.  Furthermore, the defendant's belief as
3   to the legality or illegality of the material is
4   irrelevant.
5          Before you can find that the defendant acted
6   intentionally, you must be satisfied beyond a reasonable
7   doubt that the defendant acted deliberately and
8   purposefully.  That is, that the defendant's acts must
9   have been the product of the defendant's conscious
10  objective rather than the product of a mistake or
11  accident.  The intent with which an act is done is more
12  often shown by the act itself or by a series of acts than
13  by statements made long after its occurrence.  Frequently
14  the acts of individuals speak their intentions more
15  clearly than do their words.  The adage, actions speak
16  louder than words, applies here.  Accordingly, knowledge
17  and intent are usually established by surrounding facts
18  and circumstances as of the time the acts in question
19  occurred, or the events took place, and the reasonable
20  inferences to be drawn from them.
21         Again, the definition of intentional applies to
22  all counts of the indictment in which it is referred to.
23         Count 15, possession of child pornography.
24         Count 15 of the indictment charges the defendant
25  with possession of child pornography.  Count 15 of the

Jury Charge

**1153**

1   indictment reads as follows.
2          From the indictment now.
3          Quote, on or about January 28, 2014, within the
4   Eastern District of New York, the defendant Joseph Valerio
5   did knowingly and intentionally possess matter containing
6   one or more visual depictions, to wit:  images in digital
7   files, in and affecting interstate and foreign commerce,
8   and which visual depictions had been mailed and shipped
9   and transported using a means and facility of interstate
10  and foreign commerce, and which were produced using
11  materials which had been mailed and shipped and
12  transported, the production of such visual depictions
13  having involved the use of one or more minors engaging in
14  sexually explicit conduct, and such visual depictions were
15  of such conduct.  End quote.
16         Count 15.
17         Count 15 of the indictment charges the defendant
18  with Section 2252(a)(4)(B) of Title 18 of the United
19  States Code.  That section provides, in relevant part:
20         Now quoting the statute.
21         Any person who knowingly possesses or knowingly
22  accesses with intent to view one or more books, magazines,
23  periodicals, films, videotapes or other matter which
24  contain any visual depiction that has been mailed or has
25  been shipped or transported using any means or facility of

Jury Charge

**1154**

1   interstate or foreign commerce, or in or affecting
2   interstate or foreign commerce, or which was produced
3   using materials which have been mailed or so shipped or
4   transported, by any means, including by computer, if, one,
5   the producing of such visual depiction involves the use of
6   a minor engaging in sexually explicit conduct; and, two,
7   such visual depiction is of such conduct shall be guilty
8   of a crime, end of quote.
9          In order to prove that the defendant possessed
10  child pornography, it is necessary that the evidence
11  establish beyond a reasonable doubt -- obviously the
12  government has the burden of proof beyond a reasonable
13  doubt as to each of these elements.
14         First, that the defendant knowingly possessed a
15  visual depiction, as I have already explained that term to
16  you.
17         Second, that the visual depiction was
18  transported in or affecting interstate or foreign
19  commerce, or the visual depiction was produced using
20  materials that had been transported in interstate or
21  foreign commerce.
22         Third, that the production of the visual
23  depiction involved the use of a minor engaging in sexually
24  explicit conduct and portrays that minor engaged in that
25  conduct.

Jury Charge

**1155**

1          And, fourth, that the defendant knew that the
2   production of the visual depiction involved the use of a
3   minor engaging in sexually explicit conduct and portrayed
4   a minor engaged in that conduct.
5          The first element that the government must prove
6   beyond a reasonable doubt is that the defendant knowingly
7   and intentionally possessed a visual depiction.  I have
8   already defined the terms knowingly, intentionally and
9   visual depiction, and you should apply those definitions
10  and instructions here.
11         To possess something means to have it within a
12  person's control.  This does not necessarily mean that the
13  person must hold it physically, that is, have actual
14  possession of it.  As long as the visual depiction was
15  within the defendant's control, he possesses it.  If you
16  find that the defendant either had actual possession of
17  the depiction or that he had power and intention to
18  exercise control over it, even though it was not in his
19  physical possession, you may find that the government has
20  proven possession.
21         The law also recognizes that possession may be
22  sole or joint.  If one person alone possesses it, that is
23  sole possession.  However, it is possible that more than
24  one person may have the power and intention to exercise
25  control over the visual depiction.  This is called joint

Jury Charge

**1156**

1 possession.
2        If you find that the defendant has such power
3 and intention, then he possessed the depiction even if he
4 possessed it jointly with another person.
5        The second element of count 15 that the
6 government must prove beyond a reasonable doubt is that
7 the visual depiction was mailed or transported in or
8 affecting interstate or foreign commerce.  The indictment
9 alleges that the particular visual depictions were
10 transported in or affecting interstate or foreign
11 commerce, or produced using materials that had been
12 transported in interstate or foreign commerce.
13        Transmission of photographs or video by means of
14 the internet constitutes transported in or affecting
15 interstate commerce.  However, you must find beyond a
16 reasonable doubt that the specific depiction in question
17 was actually transmitted by means of the internet.
18        The third element of count 15 that the
19 government must prove beyond a reasonable doubt is that
20 the production of the visual depiction involved in the use
21 of an actual minor engaged in sexually explicit conduct,
22 as I have already explained that term to you, and portrays
23 that minor engaged in that conduct.
24        The visual depiction must be of a real person
25 under the age of 18 engaging in sexually explicit conduct,

Jury Charge

**1157**

1 the government does not have to prove the identity of the
2 minor or the exact age of the minor.  You may consider all
3 the evidence, including your viewing of the depiction, in
4 determining whether the depiction portrayed an actual
5 person under the age of 18 engaging in sexually explicit
6 conduct.  I have already defined the term sexually
7 explicit conduct, you should apply that definition here.
8        The fourth element of count 15 that the
9 government must prove beyond a reasonable doubt is that
10 the defendant knew both that the production of the visual
11 depiction involved the use of a minor engaging in sexually
12 explicit conduct and that it portrayed a minor engaged in
13 that conduct.
14        As I stated before, an act is done knowingly
15 when it is done voluntarily and intentionally and not
16 because of accident, mistake or some other innocent
17 reason.  In this case, the term knowingly refers to an
18 awareness of the sexually explicit nature of the material,
19 and to the knowledge that the visual depictions were in
20 fact of actual minors engaged in that sexually explicit
21 conduct.
22        The government must show that the defendant had
23 knowledge of the general nature of the contents of the
24 material.  The defendant need not have specific knowledge
25 as to the identity or actual age of the underage

Jury Charge

**1158**

1 performer, but the defendant must have knowledge or an
2 awareness that the material contained a visual depiction
3 of a minor engaging in sexually explicit conduct.
4        Such knowledge may be shown by direct or
5 circumstantial evidence or both.  Eyewitness testimony of
6 the defendant's viewing of the material is not necessary
7 to prove his awareness of its contents; but the
8 circumstances may warrant an inference that he was aware
9 of the -- what the material depicts, furthermore, the
10 defendant's belief as to the legality or illegality of the
11 material is irrelevant.
12        That ends part two.  You will be happy to note
13 part three is shorter.  There is about ten minutes to go.
14 Everyone okay?
15        Part three are my rules regarding deliberations.
16        Finally, a few closing remarks.
17        Keep in mind that nothing I have said in these
18 instructions is intended to suggest to you in any way what
19 I think your verdict should be.  That is entirely for you
20 to decide.
21        By way of reminder, I charge you once again that
22 it is your responsibility to judge the facts in this case
23 only from the evidence presented during the trial and to
24 apply the law as I have given it to you to the facts as
25 you find them from the evidence.

Jury Charge

**1159**

1        I instruct you that the decision you reach as to
2 each element for each charge in the indictment must be
3 unanimous; that is, all 12 of you must agree on every
4 element in every count.  I also instruct you to consider
5 each count of the indictment separately.  Again, the
6 verdict on each element and each count must be unanimous.
7        When you retire, it is your duty to discuss the
8 case for the purpose of reaching a verdict.  Each of you
9 must decide the case for yourself.  But you should only do
10 so after considering all the evidence, listening to the
11 views of your fellow jurors and discussing it fully.
12        It is important that you reach a verdict, if you
13 can do so conscientiously.  You should not hesitate to
14 reconsider your opinions from time to time and to change
15 them if you are convinced that they are wrong.
16        However, do not surrender an honest conviction
17 as to weight and effect of the evidence simply to arrive
18 at a verdict.
19        Remember also that your verdict must be based
20 solely on the evidence in the case and the law as the
21 Court has given it to you, not on anything else.  Opening
22 statements, closing arguments, or other statements or
23 arguments of counsel are not evidence.  If your
24 recollection of the facts differs from the way counsel has
25 stated the facts to be, then your recollection controls.

Jury Charge

**1160**

1   And, finally, bear in mind that the government
2   has the burden of proof and that you must be convinced of
3   the defendant's guilt beyond a reasonable doubt to return
4   a guilty verdict.  If you find that this burden has not
5   been met, you must return a verdict of not guilty
6        The question of possible punishment of the
7   defendant is of no concern to the jury and should not, in
8   any sense, enter into or influence your deliberations.
9   The duty of imposing sentence rests exclusively upon the
10  Court.  Your function is to weigh the evidence in the case
11  and to determine whether or not the defendant is guilty
12  beyond a reasonable doubt, solely upon the basis of such
13  evidence.  Under your oath as jurors, you cannot allow a
14  consideration of the punishment which may be imposed upon
15  the defendant if he is convicted to influence your verdict
16  in any way or in any sense enter into your deliberations.
17       Under your oath as jurors, you are not to
18  swayed by sympathy for one side or the other.  You are to
19  be guided solely by the evidence in this case, and the
20  crucial question that you must ask yourselves as you sift
21  through the evidence is:  Has the government proven the
22  guilt of the defendant beyond a reasonable doubt?
23       It is for you alone to decide whether the
24  government has proven that the defendant is guilty of the
25  crimes charged solely on the basis of the evidence and

Jury Charge

**1161**

1   subject to the law as I charge you.  It must be clear to
2   you that once you let fear, prejudice, bias or sympathy
3   interfere with your thinking, there is a risk you will not
4   arrive at a true and just verdict.
5        If you have a reasonable doubt as to the
6   defendant's guilt, you must find a verdict of acquittal.
7   But, on the other hand, if you should find that the
8   government has met its burden of proving the defendant's
9   guilt beyond a reasonable doubt, you should not hesitate
10  because of sympathy or any other reason to render a
11  verdict of guilty.
12       When you get into the jury room before you begin
13  your deliberations, your first act will be to select one
14  of you to be a foreperson.  The foreperson will be
15  responsible for signing all communications to the Court
16  and for handing it to the court security officer during
17  your deliberations.  But, of course, his or her vote is
18  entitled to no greater weight than any other juror.
19       During the trial I permitted the taking of notes
20  by those of you who wished to do so.  At that time I
21  pointed out that while you could take notes, there is no
22  need for you doing so because the court reporter takes
23  down everything said in the courtroom.  And during
24  deliberations the court reporter will read back to you any
25  portion of the transcript you may ask for.

Jury Charge

**1162**

1        For those of you who did take notes during the
2   trial, I point out to you and your fellow jurors that your
3   notes are simply an aid to memory for the particular juror
4   who takes the notes.  You are instructed that your notes
5   are only a tool to aid your own individual memory and you
6   should not compare your notes with other jurors in your
7   deliberations.  Jurors who did not take notes should not
8   be influenced by the fact that other jurors have taken
9   notes.  Your notes are not evidence.  They may be
10  inaccurate and are by no means a complete recording of the
11  trial testimony.  Any difference between a juror's
12  recollection and the other juror's notes should be settled
13  by asking to have the court reporter read back the
14  transcript, for it is the court record rather than any
15  juror's notes upon which the jury must base its
16  determination of the facts and its verdict.
17       It is very important that you are not to
18  communicate with anyone outside the jury room about your
19  deliberations or about anything touching this case.  There
20  is only one exception to this rule.
21       If it becomes necessary during the deliberations
22  to communicate with me, you may send a note, through the
23  court security officer, signed by your foreperson or by
24  one or more members of the jury.  No member of the jury
25  should ever attempt to communicate with me except by a

Jury Charge

**1163**

1   signed writing, and I will never communicate with any
2   member of the jury on any subject touching the merits of
3   the case other than in writing or orally here in open
4   court.  If you send any notes to the Court, do not
5   disclose anything about your deliberations.  Specifically,
6   do not disclose to anyone, not even to me, how the jury
7   stands numerically or otherwise on the question of the
8   guilt or innocence of the defendant until after you have
9   reached a unanimous verdict or have been discharged.
10       If during your deliberations you want to see any
11  of the exhibits, they will be sent to you in the jury room
12  upon written request.  If you want any of the testimony
13  read back, that can also be done.  But please remember
14  that it is not always easy to locate what you might want,
15  so be as specific as you possibly can in requesting
16  exhibits or portions of testimony which you may want.  If
17  you request a readback of testimony, please be patient, as
18  it may take some time to locate and agree upon the
19  specific testimony required.
20       I want to emphasize that point.  If you send a
21  note requesting readback of testimony and I don't bring
22  you out immediately, it doesn't mean I didn't get the
23  note.  I have to consult with the lawyers and the court
24  reporters as to what it is you are requesting.  As soon as
25  the portion is isolated, we will bring you back for the

Jury Charge

**1164**

1   readback.

2       I have prepared a verdict sheet which will be

3   given to you in a moment.  The verdict sheet is given to

4   you to record your verdict after you have reached a

5   verdict as to all counts in the indictment.

6       When you have reached a decision, have the

7   foreperson sign the verdict form and put the date on, and

8   notify the marshal by note that you have reached a

9   verdict.

10      I reiterate that any verdict you reach must be

11  unanimous.

12      Your oath sums up your duty, and that is without

13  fear or favor to any person, you will well and truly try

14  the issues in this case according to the evidence given to

15  you in court and the laws of the United States.

16      This concludes my instructions.  I want to thank

17  you for your close and careful attention.

18      In a moment, members of the jury, you will

19  retire to deliberate after I swear in the marshal.  I do

20  ask as your first order of business you elect a foreperson

21  and send me a note dated and timed, identifying that

22  foreperson.

23      So you are going to go back into the jury room

24  with two documents.

25      The first document we will mark Court Exhibit E,

Jury Charge

**1165**

1   as in Edward, is a copy of the superseding indictment.

2       Again, this is only given to you so you will

3   have a reference when you are going through each count on

4   the verdict sheet.  That is the only purpose of this.  It

5   is merely an accusation and nothing more.

6       And I will give you a copy of the verdict form

7   to record your verdict on, which we will mark as Court

8   Exhibit F.

9       The verdict form is self-explanatory.  Again,

10  your verdict on each count must be unanimous and you must

11  consider each count separately.

12      I will just have my law clerk give those two

13  documents to juror number one.

14      I will now give the oath to the court security

15  officer.

16      Please raise your right hand.

17      (Court security officer is sworn to attend to

18  the jury.)

19      THE COURT:  A couple of other things.

20      First, when you are in the jury room, you can

21  only deliberate when all 12 of you are present.

22      If someone uses the restroom, and sometimes

23  there are jurors who are smokers and you need to have a

24  smoke break, the court security officer will take those

25  jurors outside and you have to stop until all 12 of you

Jury Charge

**1166**

1   are again present.  That is very important.

2       Next I need to discharge the alternate jurors in

3   this case, and I will give you some instructions with

4   respect to that.

5       I will ask you not to discuss the case with

6   anyone, and you are not to read or listen to anything with

7   regard to the case until you get a call from Michelle or

8   the jury department that the case is over.

9       The reason for that is if for some reason one of

10  the 12 jurors could not continue the deliberations, and as

11  long as you continue to follow my instructions, we can

12  call you up and ask you to come back to continue in the

13  deliberations.

14      Please follow that instruction until the case is

15  over.  Obviously you don't have to sit by the telephone.

16  You can go about your normal lives.

17      I just want to thank the alternates for their

18  service as jurors in this case.  And I will ask the court

19  security officer to escort both of you back to the jury

20  room to get your stuff.  And the 12 should remain here and

21  the two alternates may do that now, and the 12 will

22  proceed to the jury room after the two alternates have

23  left.

24      Thank you.

25      (The alternate jurors are excused.)

Jury Charge

**1167**

1       THE COURT:  Let me speak to the lawyers at the

2   sidebar for a moment.

3

4       (Whereupon, at this time the following took

5   place at the sidebar.)

6       THE COURT:  Any issues with the charge?

7       MR. LATO:  No, your Honor.

8       MR. LaPINTA:  No.

9       MR. BODE:  No.

10      MR. LaPINTA:  No.

11      THE COURT:  Thank you.

12

13      (Whereupon, at this time the following takes

14  place in open court.)

15      THE COURT:  The lunches should be arriving

16  sometime around 12:15.

17      Obviously you can continue to deliberate as you

18  eat your lunch, or if you wish to take a break as you eat

19  the lunch, it is up to you to decide.

20      We will just wait until we hear that the

21  alternates are out.

22      (Whereupon, at this time there was a pause in

23  the proceedings.)

24      THE COURT:  All right, members of the jury,

25  please retire to the jury room to begin your

**1168**

1  deliberations.

2       Thank you.

3       (The jury exits the courtroom at 11:23 a.m.)

4       THE COURT:  Everyone can be seated.

5       If you can just hang around for a few minutes,

6  because a lot of times notes come around in the beginning.

7  You don't have to stay by the courtroom, as long as

8  Michelle has your cell phone number, you can go down to

9  the cafeteria or wherever you want to go.

10      I assume all the exhibits are ready to go.

11      MR. KABRAWALA:  We will go through that right

12 now and have counsel agree that they are the right ones.

13      THE COURT:  All right.

14      Why don't you do that now.  Thank you.

15

16      (Whereupon, a recess was taken.

17

18      (The following takes place at 12:08 p.m.)

19      THE COURT:  We did receive two notes.  The first

20 one is just identifying the foreperson as Mr. Raymond.

21 And that has been given to both sides.

22      The second note, Court Exhibit 2, requests in

23 writing the Judge's instructions, and from the prosecution

24 the binder containing the evidence in email form.

25      Obviously I have the instructions here, which

**1169**

1  has been marked as Court Exhibit D.

2       Any objection to that going back?

3       MR. BODE:  No, your Honor.

4       MR. LATO:  No, your Honor.

5       THE COURT:  And then with respect to the emails,

6  is there agreement as to what those exhibits are?

7       MR. LATO:  Yes, your Honor.

8       I think but for the parenthetical at the end of

9  the note would be clear.  But when they put the

10 parenthetical, in email form, does it become -- it becomes

11 unclear.  Do they want just the emails?  That is the

12 problem.

13      THE COURT:  I assume when they say the binder

14 containing the evidence in email form, he held up that

15 binder in summation and I assume that that is what they

16 are referring to.

17      MR. LATO:  I do as well, your Honor, feel that.

18 But I would ask that you make inquiry as to what they

19 want.  Do they want the entire binder?  We have obviously

20 taken out the CD, your Honor.

21      THE COURT:  There are other things in the

22 binder?

23      MR. BODE:  There are photos in evidence, and

24 like the DHL receipts and other evidentiary items.

25      THE COURT:  I will bring them out and let them

**1170**

1  know how I'm interpreting the note.  If that is okay?

2       MR. LATO:  Yes, your Honor.

3       THE COURT:  Why not have a record of what

4  exhibit numbers are going back.  What exhibit numbers are

5  they?

6       MR. BODE:  We will pull out all the pictures and

7  only include the emails, and I will put it on the record.

8       THE COURT:  Okay.

9       MR. BODE:  If we could, Mr. Lato is going to ask

10 something before I keep pulling things out.

11      MR. LATO:  May we have a moment to confer with

12 Mr. Valerio?  He has some comment, and before I speak

13 again let me get his position.

14      THE COURT:  Sure.

15      (Defense counsel confer with the defendant.)

16      MR. LATO:  Your Honor, because in my estimation

17 there are at least some reason to question as to whether

18 the jury wants only the emails, as opposed to the emails

19 and the other things, and because it is Mr. Valerio's

20 position that the jury should see everything, I'm asking

21 your Honor out of an abundance of caution just to ask the

22 jury whether they want only the emails or the other items

23 as well.

24      THE COURT:  What is the government's position on

25 that?

**1171**

1       MR. BODE:  I think the note is clear, Judge.

2  But I don't have any objection to asking them.

3       THE COURT:  Okay.

4       What I will say to them is that the binder

5  contains other exhibits aside from the emails.  And I want

6  them to send me another note indicating as to whether they

7  want all the exhibits in the binder or just the email

8  exhibits.

9       MR. LATO:  Yes, your Honor.  Minus the CDs.

10 That they cannot have.  They can, of course, listen to it

11 in the courtroom.

12      THE COURT:  As I understand it, other than the

13 CDs, is the binder then every document in the case?

14      MR. BODE:  Every documentary exhibit, yes, your

15 Honor.  And it includes the PowerPoint with the child

16 pornography images, and obviously not the CDs.  Also the

17 redacted images as well.  All the photographs from the

18 search scene, your Honor.

19      MR. LATO:  Yes, your Honor.

20      THE COURT:  At least confirm with Mr. Valerio --

21 or I will confirm with him.

22      Mr. Valerio, I want to make sure that your

23 lawyers are following your request.

24      The government has a binder of all the

25 documentary evidence that they have submitted into

**1172**

1  evidence in the case, which includes emails and all the
2  documents they have submitted.
3      You want me to ask the jury whether they want
4  the binder of all the documentary evidence or just the
5  emails.  Do you want me to clarify that?  Is that what you
6  want?
7      Or I can bring them out and say I'm interpreting
8  your note to only requesting the emails.  If you want all
9  the documents, then you can let me know.
10     MR. LATO:  Your Honor, after further
11  consultation while I was addressing the Court, Mr. LaPinta
12  was speaking to Mr. Valerio, it is now his request, and
13  ours as well, that your Honor just give them the emails.
14     THE COURT:  Is that correct, Mr. Valerio?
15     THE DEFENDANT:  Yes, your Honor.
16     THE COURT:  You don't want me to bring them out?
17  Just send the emails back?
18     MR. LATO:  Yes, your Honor.  And if that is not
19  sufficient, I assume we will get another note from them.
20     THE COURT:  I was willing to do that if it was
21  a defense's request so there is no issue.  But I think
22  the note is clear, the binder containing the evidence in
23  email form.  That is all they want.  So I believe this is
24  the appropriate response.
25     MR. BODE:  In terms of our interpretation,

**1173**

1  Judge, we are interpreting emails as including their
2  attachments as well, if there is an attachment to the
3  email, but obviously not the child pornography.
4      THE COURT:  Yes.  It goes to the attachments
5  other than the child pornography.
6      MR. BODE:  Yes.
7      Like, there is an email with Mr. Valerio's
8  picture attached to it, and that is obviously part of the
9  email.
10     THE COURT:  Yes.
11     Do you agree that it should include attachments?
12     MR. LATO:  Yes, your Honor.
13     THE COURT:  All right.
14     MR. BODE:   and headers for emails.  I assume
15  that that is part of an email?
16     THE COURT:  Yes.
17     (Whereupon, at this time there was a pause in
18  the proceedings.)
19     MR. BODE:  We are handing up and we agree
20  this -- these are the correct exhibits, and we can read
21  into the record the exhibit numbers, and this can go to
22  the jury.
23     THE COURT:  Agreed?
24     MR. LaPINTA:  Yes.
25     MR. BODE:  2, 2-B, 2-D, 2-E, 5 --

**1174**

1      THE COURT:  Why don't you read them right out of
2  the book, and that would be better.
3      MR. BODE:  Yes.
4      MR. LaPINTA:  2, 2-B, 2-D, 2-D, 5, 5-A, 203,
5  205, 205-A, 206, 208, 209, 210, 211, 211-A, 212, 213, 214,
6  215, 216, 217, 218, 219, 220, 221, 222, 223, 224, 225,
7  226, 227, 228, 229, 229-A, 230, 231, 235, 238, 238-A, 243,
8  244, 245, 245-A, 245-B, 246, 247, 303, 303-A, 501-D, as in
9  dog, 502-A, 503-G, 504-E, 551, 552, 552-A, 553, 554,
10  554-A, 554-B, 554-C, 556, 557, 558, 559, 559-A, 560, 561,
11  562, 564, 567, 567-A, 568.
12     That's it.
13     THE COURT:  All right.
14     So the record should reflect that Mr. LaPinta
15  read the exhibits that are in the binder going back to the
16  jury, along with my instructions, which is Court
17  Exhibit D, as in David.
18     MR. LaPINTA:  Thank you.
19     THE COURT:  You can all take a lunch break if
20  you wish to go now.
21     MR. LATO:  Before your Honor leaves the bench, I
22  was conferring with Mr. Valerio while everyone was
23  reciting the exhibit numbers, and I would like to confer
24  with Mr. LaPinta so we don't have to come back.
25     THE COURT:  Something to do with these exhibits?

**1175**

1      MR. LATO:  Correct.
2      (Defense counsel confer.)
3      MR. LATO:  Your Honor, it is Mr. Valerio's
4  position, as distinct from the opinion of Mr. LaPinta and
5  myself, that the jury should also get the text messages.
6      Mr. LaPinta and I have explained to Mr. Valerio
7  that the email doesn't ask for text messages.
8      THE COURT:  You said the email.  You mean the
9  note.
10     MR. LATO:  Yes, the note, your Honor, does not
11  refer to text messages.
12     In addition, Mr. LaPinta and I are in agreement
13  that the text messages have devastating evidence against
14  Mr. Valerio.  And unless the jury specifically requests
15  that in a note, it is our position that that note should
16  not be shown -- I'm sorry, it is our position that the
17  text messages should not be given without a specific
18  request.
19     THE COURT:  I agree.
20     I want the record to be perfectly clear at this
21  point that the note refers to the following:  The
22  binder -- from the prosecution the binder containing the
23  evidence, paren, in email form.
24     This is one of the situations where not only is
25  the note clear, but they want the evidence in email form,

**1176**

1  which is a very distinct category of evidence.

2  But it is consistent with what happened during

3  the summation.  Mr. Kabrawala during the summations made

4  reference to all the emails, and had a PowerPoint and

5  invited them by showing them a binder and saying the

6  emails are all in here if you wish to review them.

7  That is why I was confused when the parties

8  suggested a binder containing all the evidence in the

9  case, because I didn't understand the binder to have all

10  the evidence -- evidence in the case when Mr. Kabrawala

11  was holding it.  They referred to only emails and that is

12  what they ask for.

13  Text messages are different from email messages.

14  And I don't think a response as to that, independent as to

15  whether it is devastating to Mr. Valerio, the note is not

16  requesting that.  And I will not send back the text

17  messages because it is not responsive to the note.  And

18  obviously if they start paging through the emails and see

19  that there are no text messages, they are certainly more

20  than capable to write me another note saying they also

21  wanted a text message or messages.

22  If memory serves me correctly, they are all

23  contained in one document, the text messages?

24  MR. BODE:  Two documents, there are two

25  different types of texts.  And they are in two documents.

**1177**

1  THE COURT:  Yes.

2  It is not responsive to the note to send text

3  messages, especially in response to the government's

4  summation.

5  All right.

6  Let's take a lunch break.

7  (A luncheon recess is taken at 12:27 p.m.)

**Jury Charge**

**1178**

1  In order to prove the defendant guilty of

2  receiving child pornography, the government must prove

3  each of the following four elements beyond a reasonable

4  doubt:

5  First, that the defendant received a visual

6  depiction, which term I have already defined for you and

7  applies equally here.

8  Second, that the visual depiction was

9  transported in or affecting interstate or foreign

10  commerce.

11  Third, that the production of the visual

12  depiction involved the use of a minor engaging in sexually

13  explicit conduct, and portrayed that minor engaged in that

14  conduct.

15  Fourth, that the defendant knew that the

16  production of the visual depiction involved the use of a

17  minor engaged in sexually explicit conduct, and portrayed

18  a minor engaged in that conduct.

19  I remind you that the government can meet its

20  burden of proof of count five by proving that the

21  defendant did the acts charged himself, or by proving that

22  he aided and abetted another person to receive child

23  pornography.

24  The first element of receipt of child

25  pornography, receiving.

**Jury Charge**

**1179**

1  The first element of count five that the

2  government must prove beyond a reasonable doubt that the

3  defendant knowingly received a visual depiction.

4  You have already been instructed on the meaning

5  of the term visual depiction, and that instruction applies

6  equally here.

7  To receive a visual depiction means to take

8  possession of it.  This includes the knowing acceptance of

9  a depiction previously requested.  Receiving includes the

10  downloading of a photograph or video by means of the

11  internet.

12  The government must prove that the defendant

13  received the depiction knowingly.  An act is done

14  knowingly when it is done voluntarily and intentionally

15  and not because of accident, mistake or some other

16  innocent reason.

17  Second element of receipt of child pornography:

18  In or affecting interstate or foreign commerce.

19  The second element of count five that the

20  government must prove beyond a reasonable doubt is that

21  the visual depiction was mailed or transported in or

22  affecting interstate or foreign commerce or was produced

23  using materials that had been transported in or affecting

24  interstate or foreign commerce.

25  The indictment alleges that the visual depiction

1 was actually transported in interstate or foreign
2 commerce.  I have already instructed you on what it means
3 for a visual depiction to be actually transported in
4 interstate or foreign commerce or produced using materials
5 that had been transported in or affecting interstate or
6 foreign commerce.
7 　　　　Third element of receipt of child pornography:
8 Visual depiction of sexually explicit conduct.
9 　　　　The third element of count five that the
10 government must prove beyond a reasonable doubt is that
11 the production of the visual depiction involved the use of
12 a minor engaging in sexually explicit conduct, as I have
13 already explained that term to you, and portrays that
14 minor engaged in that conduct.
15 　　　　I have already instructed you that the visual
16 depiction must be a real person under the age of 18
17 engaging in sexually explicit conduct.  I reiterate that
18 the government does not have to prove the identity of the
19 minor or the exact age of the minor.  You may consider all
20 the evidence in determining whether the depiction
21 portrayed an actual person under the age of 18 engaging in
22 sexually explicit conduct.
23 　　　　Fourth element of receipt of child pornography:
24 The defendant acted knowingly.
25 　　　　The fourth element of count five that the

1 government must prove beyond a reasonable doubt is that
2 the defendant knew both that the production of the visual
3 depiction involved the use of a minor engaging in sexually
4 explicit conduct, and that it portrayed a minor engaged in
5 that conduct.
6 　　　　As I stated before, an act is done knowingly
7 when it is done voluntarily and intentionally, and not
8 because of accident, mistake or some other innocent
9 reason.
10 　　　　In this case, the term knowingly refers to an
11 awareness of the sexually explicit nature of the material
12 and to the knowledge that the visual depiction was in fact
13 an act -- of an actual minor engaged in that sexually
14 explicit conduct.
15 　　　　The government must show that the defendant had
16 knowledge of the general nature of the contents of the
17 material.  The defendant need not have specific knowledge
18 of the identity or the actual age of the minor depicted,
19 but the defendant must have knowledge or an awareness that
20 the material contained a visual depiction of a minor
21 engaging in sexually explicit conduct.  Such knowledge may
22 be shown by direct or circumstantial evidence, or both.
23 Eyewitnesses testimony of the defendant's viewing of the
24 material is not necessary to prove his or her awareness of
25 its contents.  The circumstances may warrant an inference

1 that he or she was aware of the material -- what the
2 material depicts.  Furthermore, the defendant's belief as
3 to the legality or illegality of the material is
4 irrelevant.
5 　　　　Before you can find that the defendant acted
6 intentionally, you must be satisfied beyond a reasonable
7 doubt that the defendant acted deliberately and
8 purposefully.  That is, that the defendant's acts must
9 have been the product of the defendant's conscious
10 objective rather than the product of a mistake or
11 accident.  The intent with which an act is done is more
12 often shown by the act itself or by a series of acts than
13 by statements made long after its occurrence.  Frequently
14 the acts of individuals speak their intentions more
15 clearly than do their words.  The adage, actions speak
16 louder than words, applies here.  Accordingly, knowledge
17 and intent are usually established by surrounding facts
18 and circumstances as of the time the acts in question
19 occurred, or the events took place, and the reasonable
20 inferences to be drawn from them.
21 　　　　Again, the definition of intentional applies to
22 all counts of the indictment in which it is referred to.
23 　　　　Count 15, possession of child pornography.
24 　　　　Count 15 of the indictment charges the defendant
25 with possession of child pornography.  Count 15 of the

1 indictment reads as follows.
2 　　　　From the indictment now.
3 　　　　Quote, on or about January 28, 2014, within the
4 Eastern District of New York, the defendant Joseph Valerio
5 did knowingly and intentionally possess matter containing
6 one or more visual depictions, to wit:  images in digital
7 files, in and affecting interstate and foreign commerce,
8 and which visual depictions had been mailed and shipped
9 and transported using a means and facility of interstate
10 and foreign commerce, and which were produced using
11 materials which had been mailed and shipped and
12 transported, the production of such visual depictions
13 having involved the use of one or more minors engaging in
14 sexually explicit conduct, and such visual depictions were
15 of such conduct.  End quote.
16 　　　　Count 15.
17 　　　　Count 15 of the indictment charges the defendant
18 with Section 2252(a)(4)(B) of Title 18 of the United
19 States Code.  That section provides, in relevant part:
20 　　　　Now quoting the statute.
21 　　　　Any person who knowingly possesses or knowingly
22 accesses with intent to view one or more books, magazines,
23 periodicals, films, videotapes or other matter which
24 contain any visual depiction that has been mailed or has
25 been shipped or transported using any means or facility of

1 interstate or foreign commerce, or in or affecting
2 interstate or foreign commerce, or which was produced
3 using materials which have been mailed or so shipped or
4 transported, by any means, including by computer, if, one,
5 the producing of such visual depiction involves the use of
6 a minor engaging in sexually explicit conduct; and, two,
7 such visual depiction is of such conduct shall be guilty
8 of a crime, end of quote.
9       In order to prove that the defendant possessed
10 child pornography, it is necessary that the evidence
11 establish beyond a reasonable doubt -- obviously the
12 government has the burden of proof beyond a reasonable
13 doubt as to each of these elements.
14       First, that the defendant knowingly possessed a
15 visual depiction, as I have already explained that term to
16 you.
17       Second, that the visual depiction was
18 transported in or affecting interstate or foreign
19 commerce, or the visual depiction was produced using
20 materials that had been transported in interstate or
21 foreign commerce.
22       Third, that the production of the visual
23 depiction involved the use of a minor engaging in sexually
24 explicit conduct and portrays that minor engaged in that
25 conduct.

1 possession.
2       If you find that the defendant has such power
3 and intention, then he possessed the depiction even if he
4 possessed it jointly with another person.
5       The second element of count 15 that the
6 government must prove beyond a reasonable doubt is that
7 the visual depiction was mailed or transported in or
8 affecting interstate or foreign commerce.  The indictment
9 alleges that the particular visual depictions were
10 transported in or affecting interstate or foreign
11 commerce, or produced using materials that had been
12 transported in interstate or foreign commerce.
13       Transmission of photographs or video by means of
14 the internet constitutes transported in or affecting
15 interstate commerce.  However, you must find beyond a
16 reasonable doubt that the specific depiction in question
17 was actually transmitted by means of the internet.
18       The third element of count 15 that the
19 government must prove beyond a reasonable doubt is that
20 the production of the visual depiction involved in the use
21 of an actual minor engaged in sexually explicit conduct,
22 as I have already explained that term to you, and portrays
23 that minor engaged in that conduct.
24       The visual depiction must be of a real person
25 under the age of 18 engaging in sexually explicit conduct,

1       And, fourth, that the defendant knew that the
2 production of the visual depiction involved the use of a
3 minor engaging in sexually explicit conduct and portrayed
4 a minor engaged in that conduct.
5       The first element that the government must prove
6 beyond a reasonable doubt is that the defendant knowingly
7 and intentionally possessed a visual depiction.  I have
8 already defined the terms knowingly, intentionally and
9 visual depiction, and you should apply those definitions
10 and instructions here.
11       To possess something means to have it within a
12 person's control.  This does not necessarily mean that the
13 person must hold it physically, that is, have actual
14 possession of it.  As long as the visual depiction was
15 within the defendant's control, he possesses it.  If you
16 find that the defendant either had actual possession of
17 the depiction or that he had power and intention to
18 exercise control over it, even though it was not in his
19 physical possession, you may find that the government has
20 proven possession.
21       The law also recognizes that possession may be
22 sole or joint.  If one person alone possesses it, that is
23 sole possession.  However, it is possible that more than
24 one person may have the power and intention to exercise
25 control over the visual depiction.  This is called joint

1 the government does not have to prove the identity of the
2 minor or the exact age of the minor.  You may consider all
3 the evidence, including your viewing of the depiction, in
4 determining whether the depiction portrayed an actual
5 person under the age of 18 engaging in sexually explicit
6 conduct.  I have already defined the term sexually
7 explicit conduct, you should apply that definition here.
8       The fourth element of count 15 that the
9 government must prove beyond a reasonable doubt is that
10 the defendant knew both that the production of the visual
11 depiction involved the use of a minor engaging in sexually
12 explicit conduct and that it portrayed a minor engaged in
13 that conduct.
14       As I stated before, an act is done knowingly
15 when it is done voluntarily and intentionally and not
16 because of accident, mistake or some other innocent
17 reason.  In this case, the term knowingly refers to an
18 awareness of the sexually explicit nature of the material,
19 and to the knowledge that the visual depictions were in
20 fact of actual minors engaged in that sexually explicit
21 conduct.
22       The government must show that the defendant had
23 knowledge of the general nature of the contents of the
24 material.  The defendant need not have specific knowledge
25 as to the identity or actual age of the underage

Jury Charge

**1188**

1 performer, but the defendant must have knowledge or an
2 awareness that the material contained a visual depiction
3 of a minor engaging in sexually explicit conduct.
4      Such knowledge may be shown by direct or
5 circumstantial evidence or both.  Eyewitness testimony of
6 the defendant's viewing of the material is not necessary
7 to prove his awareness of its contents; but the
8 circumstances may warrant an inference that he was aware
9 of the -- what the material depicts, furthermore, the
10 defendant's belief as to the legality or illegality of the
11 material is irrelevant.
12      That ends part two.  You will be happy to note
13 part three is shorter.  There is about ten minutes to go.
14 Everyone okay?
15      Part three are my rules regarding deliberations.
16      Finally, a few closing remarks.
17      Keep in mind that nothing I have said in these
18 instructions is intended to suggest to you in any way what
19 I think your verdict should be.  That is entirely for you
20 to decide.
21      By way of reminder, I charge you once again that
22 it is your responsibility to judge the facts in this case
23 only from the evidence presented during the trial and to
24 apply the law as I have given it to you to the facts as
25 you find them from the evidence.

Jury Charge

**1189**

1      I instruct you that the decision you reach as to
2 each element for each charge in the indictment must be
3 unanimous; that is, all 12 of you must agree on every
4 element in every count.  I also instruct you to consider
5 each count of the indictment separately.  Again, the
6 verdict on each element and each count must be unanimous.
7      When you retire, it is your duty to discuss the
8 case for the purpose of reaching a verdict.  Each of you
9 must decide the case for yourself.  But you should only do
10 so after considering all the evidence, listening to the
11 views of your fellow jurors and discussing it fully.
12      It is important that you reach a verdict, if you
13 can do so conscientiously.  You should not hesitate to
14 reconsider your opinions from time to time and to change
15 them if you are convinced that they are wrong.
16      However, do not surrender an honest conviction
17 as to weight and effect of the evidence simply to arrive
18 at a verdict.
19      Remember also that your verdict must be based
20 solely on the evidence in the case and the law as the
21 Court has given it to you, not on anything else.  Opening
22 statements, closing arguments, or other statements or
23 arguments of counsel are not evidence.  If your
24 recollection of the facts differs from the way counsel has
25 stated the facts to be, then your recollection controls.

Jury Charge

**1190**

1      And, finally, bear in mind that the government
2 has the burden of proof and that you must be convinced of
3 the defendant's guilt beyond a reasonable doubt to return
4 a guilty verdict.  If you find that this burden has not
5 been met, you must return a verdict of not guilty
6      The question of possible punishment of the
7 defendant is of no concern to the jury and should not, in
8 any sense, enter into or influence your deliberations.
9 The duty of imposing sentence rests exclusively upon the
10 Court.  Your function is to weigh the evidence in the case
11 and to determine whether or not the defendant is guilty
12 beyond a reasonable doubt, solely upon the basis of such
13 evidence.  Under your oath as jurors, you cannot allow a
14 consideration of the punishment which may be imposed upon
15 the defendant if he is convicted to influence your verdict
16 in any way or in any sense enter into your deliberations.
17      Under your oath as jurors, you are not to be
18 swayed by sympathy for one side or the other.  You are to
19 be guided solely by the evidence in this case, and the
20 crucial question that you must ask yourselves as you sift
21 through the evidence is:  Has the government proven the
22 guilt of the defendant beyond a reasonable doubt?
23      It is for you alone to decide whether the
24 government has proven that the defendant is guilty of the
25 crimes charged solely on the basis of the evidence and

Jury Charge

**1191**

1 subject to the law as I charge you.  It must be clear to
2 you that once you let fear, prejudice, bias or sympathy
3 interfere with your thinking, there is a risk you will not
4 arrive at a true and just verdict.
5      If you have a reasonable doubt as to the
6 defendant's guilt, you must find a verdict of acquittal.
7 But, on the other hand, if you should find that the
8 government has met its burden of proving the defendant's
9 guilt beyond a reasonable doubt, you should not hesitate
10 because of sympathy or any other reason to render a
11 verdict of guilty.
12      When you get into the jury room before you begin
13 your deliberations, your first act will be to select one
14 of you to be a foreperson.  The foreperson will be
15 responsible for signing all communications to the Court
16 and for handing it to the court security officer during
17 your deliberations.  But, of course, his or her vote is
18 entitled to no greater weight than any other juror.
19      During the trial I permitted the taking of notes
20 by those of you who wished to do so.  At that time I
21 pointed out that while you could take notes, there is no
22 need for you doing so because the court reporter takes
23 down everything said in the courtroom.  And during
24 deliberations the court reporter will read back to you any
25 portion of the transcript you may ask for.

Jury Charge

**1192**

1    For those of you who did take notes during the
2  trial, I point out to you and your fellow jurors that your
3  notes are simply an aid to memory for the particular juror
4  who takes the notes.  You are instructed that your notes
5  are only a tool to aid your own individual memory and you
6  should not compare your notes with other jurors in your
7  deliberations.  Jurors who did not take notes should not
8  be influenced by the fact that other jurors have taken
9  notes.  Your notes are not evidence.  They may be
10  inaccurate and are by no means a complete recording of the
11  trial testimony.  Any difference between a juror's
12  recollection and the other juror's notes should be settled
13  by asking to have the court reporter read back the
14  transcript, for it is the court record rather than any
15  juror's notes upon which the jury must base its
16  determination of the facts and its verdict.
17    It is very important that you are not to
18  communicate with anyone outside the jury room about your
19  deliberations or about anything touching this case.  There
20  is only one exception to this rule.
21    If it becomes necessary during the deliberations
22  to communicate with me, you may send a note, through the
23  court security officer, signed by your foreperson or by
24  one or more members of the jury.  No member of the jury
25  should ever attempt to communicate with me except by a

Jury Charge

**1193**

1  signed writing, and I will never communicate with any
2  member of the jury on any subject touching the merits of
3  the case other than in writing or orally here in open
4  court.  If you send any notes to the Court, do not
5  disclose anything about your deliberations.  Specifically,
6  do not disclose to anyone, not even to me, how the jury
7  stands numerically or otherwise on the question of the
8  guilt or innocence of the defendant until after you have
9  reached a unanimous verdict or have been discharged.
10    If during your deliberations you want to see any
11  of the exhibits, they will be sent to you in the jury room
12  upon written request.  If you want any of the testimony
13  read back, that can also be done.  But please remember
14  that it is not always easy to locate what you might want,
15  so be as specific as you possibly can in requesting
16  exhibits or portions of testimony which you may want.  If
17  you request a readback of testimony, please be patient, as
18  it may take some time to locate and agree upon the
19  specific testimony required.
20    I want to emphasize that point.  If you send a
21  note requesting readback of testimony and I don't bring
22  you out immediately, it doesn't mean I didn't get the
23  note.  I have to consult with the lawyers and the court
24  reporters as to what it is you are requesting.  As soon as
25  the portion is isolated, we will bring you back for the

Jury Charge

**1194**

1  readback.
2    I have prepared a verdict sheet which will be
3  given to you in a moment.  The verdict sheet is given to
4  you to record your verdict after you have reached a
5  verdict as to all counts in the indictment.
6    When you have reached a decision, have the
7  foreperson sign the verdict form and put the date on, and
8  notify the marshal by note that you have reached a
9  verdict.
10    I reiterate that any verdict you reach must be
11  unanimous.
12    Your oath sums up your duty, and that is without
13  fear or favor to any person, you will well and truly try
14  the issues in this case according to the evidence given to
15  you in court and the laws of the United States.
16    This concludes my instructions.  I want to thank
17  you for your close and careful attention.
18    In a moment, members of the jury, you will
19  retire to deliberate after I swear in the marshal.  I do
20  ask as your first order of business you elect a foreperson
21  and send me a note dated and timed, identifying that
22  foreperson.
23    So you are going to go back into the jury room
24  with two documents.
25    The first document we will mark Court Exhibit E,

Jury Charge

**1195**

1  as in Edward, is a copy of the superseding indictment.
2    Again, this is only given to you so you will
3  have a reference when you are going through each count on
4  the verdict sheet.  That is the only purpose of this.  It
5  is merely an accusation and nothing more.
6    And I will give you a copy of the verdict form
7  to record your verdict on, which we will mark as Court
8  Exhibit F.
9    The verdict form is self-explanatory.  Again,
10  your verdict on each count must be unanimous and you must
11  consider each count separately.
12    I will just have my law clerk give those two
13  documents to juror number one.
14    I will now give the oath to the court security
15  officer.
16    Please raise your right hand.
17    (Court security officer is sworn to attend to
18  the jury.)
19    THE COURT:  A couple of other things.
20    First, when you are in the jury room, you can
21  only deliberate when all 12 of you are present.
22    If someone uses the restroom, and sometimes
23  there are jurors who are smokers and you need to have a
24  smoke break, the court security officer will take those
25  jurors outside and you have to stop until all 12 of you

**Jury Charge**

**1196**

1  are again present. That is very important.

2  Next I need to discharge the alternate jurors in

3  this case, and I will give you some instructions with

4  respect to that.

5  I will ask you not to discuss the case with

6  anyone, and you are not to read or listen to anything with

7  regard to the case until you get a call from Michelle or

8  the jury department that the case is over.

9  The reason for that is if for some reason one of

10  the 12 jurors could not continue the deliberations, and as

11  long as you continue to follow my instructions, we can

12  call you up and ask you to come back to continue in the

13  deliberations.

14  Please follow that instruction until the case is

15  over. Obviously you don't have to sit by the telephone.

16  You can go about your normal lives.

17  I just want to thank the alternates for their

18  service as jurors in this case. And I will ask the court

19  security officer to escort both of you back to the jury

20  room to get your stuff. And the 12 should remain here and

21  the two alternates may do that now, and the 12 will

22  proceed to the jury room after the two alternates have

23  left.

24  Thank you.

25  (The alternate jurors are excused.)

**Jury Charge**

**1197**

1  THE COURT: Let me speak to the lawyers at the

2  sidebar for a moment.

3

4  (Whereupon, at this time the following took

5  place at the sidebar.)

6  THE COURT: Any issues with the charge?

7  MR. LATO: No, your Honor.

8  MR. LaPINTA: No.

9  MR. BODE: No.

10  MR. LaPINTA: No.

11  THE COURT: Thank you.

12

13  (Whereupon, at this time the following takes

14  place in open court.)

15  THE COURT: The lunches should be arriving

16  sometime around 12:15.

17  Obviously you can continue to deliberate as you

18  eat your lunch, or if you wish to take a break as you eat

19  the lunch, it is up to you to decide.

20  We will just wait until we hear that the

21  alternates are out.

22  (Whereupon, at this time there was a pause in

23  the proceedings.)

24  THE COURT: All right, members of the jury,

25  please retire to the jury room to begin your

**1198**

1  deliberations.

2  Thank you.

3  (The jury exits the courtroom at 11:23 a.m.)

4  THE COURT: Everyone can be seated.

5  If you can just hang around for a few minutes,

6  because a lot of times notes come around in the beginning.

7  You don't have to stay by the courtroom, as long as

8  Michelle has your cell phone number, you can go down to

9  the cafeteria or wherever you want to go.

10  I assume all the exhibits are ready to go.

11  MR. KABRAWALA: We will go through that right

12  now and have counsel agree that they are the right ones.

13  THE COURT: All right.

14  Why don't you do that now. Thank you.

15

16  (Whereupon, a recess was taken.

17

18  (The following takes place at 12:08 p.m.)

19  THE COURT: We did receive two notes. The first

20  one is just identifying the foreperson as Mr. Raymond.

21  And that has been given to both sides.

22  The second note, Court Exhibit 2, requests in

23  writing the Judge's instructions, and from the prosecution

24  the binder containing the evidence in email form.

25  Obviously I have the instructions here, which

**1199**

1  has been marked as Court Exhibit D.

2  Any objection to that going back?

3  MR. BODE: No, your Honor.

4  MR. LATO: No, your Honor.

5  THE COURT: And then with respect to the emails,

6  is there agreement as to what those exhibits are?

7  MR. LATO: Yes, your Honor.

8  I think but for the parenthetical at the end of

9  the note would be clear. But when they put the

10  parenthetical, in email form, does it become -- it becomes

11  unclear. Do they want just the emails? That is the

12  problem.

13  THE COURT: I assume when they say the binder

14  containing the evidence in email form, he held up that

15  binder in summation and I assume that that is what they

16  are referring to.

17  MR. LATO: I do as well, your Honor, feel that.

18  But I would ask that you make inquiry as to what they

19  want. Do they want the entire binder? We have obviously

20  taken out the CD, your Honor.

21  THE COURT: There are other things in the

22  binder?

23  MR. BODE: There are photos in evidence, and

24  like the DHL receipts and other evidentiary items.

25  THE COURT: I will bring them out and let them

**1200**

1  know how I'm interpreting the note.  If that is okay?

2       MR. LATO:  Yes, your Honor.

3       THE COURT:  Why not have a record of what

4  exhibit numbers are going back.  What exhibit numbers are

5  they?

6       MR. BODE:  We will pull out all the pictures and

7  only include the emails, and I will put it on the record.

8       THE COURT:  Okay.

9       MR. BODE:  If we could, Mr. Lato is going to ask

10  something before I keep pulling things out.

11       MR. LATO:  May we have a moment to confer with

12  Mr. Valerio?  He has some comment, and before I speak

13  again let me get his position.

14       THE COURT:  Sure.

15       (Defense counsel confer with the defendant.)

16       MR. LATO:  Your Honor, because in my estimation

17  there are at least some reason to question as to whether

18  the jury wants only the emails, as opposed to the emails

19  and the other things, and because it is Mr. Valerio's

20  position that the jury should see everything, I'm asking

21  your Honor out of an abundance of caution just to ask the

22  jury whether they want only the emails or the other items

23  as well.

24       THE COURT:  What is the government's position on

25  that?

**1201**

1       MR. BODE:  I think the note is clear, Judge.

2  But I don't have any objection to asking them.

3       THE COURT:  Okay.

4       What I will say to them is that the binder

5  contains other exhibits aside from the emails.  And I want

6  them to send me another note indicating as to whether they

7  want all the exhibits in the binder or just the email

8  exhibits.

9       MR. LATO:  Yes, your Honor.  Minus the CDs.

10  That they cannot have.  They can, of course, listen to it

11  in the courtroom.

12       THE COURT:  As I understand it, other than the

13  CDs, is the binder then every document in the case?

14       MR. BODE:  Every documentary exhibit, yes, your

15  Honor.  And it includes the PowerPoint with the child

16  pornography images, and obviously not the CDs.  Also the

17  redacted images as well.  All the photographs from the

18  search scene, your Honor.

19       MR. LATO:  Yes, your Honor.

20       THE COURT:  At least confirm with Mr. Valerio --

21  or I will confirm with him.

22       Mr. Valerio, I want to make sure that your

23  lawyers are following your request.

24       The government has a binder of all the

25  documentary evidence that they have submitted into

**1202**

1  evidence in the case, which includes emails and all the

2  documents they have submitted.

3       You want me to ask the jury whether they want

4  the binder of all the documentary evidence or just the

5  emails.  Do you want me to clarify that?  Is that what you

6  want?

7       Or I can bring them out and say I'm interpreting

8  your note to only requesting the emails.  If you want all

9  the documents, then you can let me know.

10       MR. LATO:  Your Honor, after further

11  consultation while I was addressing the Court, Mr. LaPinta

12  was speaking to Mr. Valerio, it is now his request, and

13  ours as well, that your Honor just give them the emails.

14       THE COURT:  Is that correct, Mr. Valerio?

15       THE DEFENDANT:  Yes, your Honor.

16       THE COURT:  You don't want me to bring them out?

17  Just send the emails back?

18       MR. LATO:  Yes, your Honor.  And if that is not

19  sufficient, I assume we will get another note from them.

20       THE COURT:  I was willing to do that if it was

21  the defense's request so there is no issue.  But I think

22  the note is clear, the binder containing the evidence in

23  email form.  That is all they want.  So I believe this is

24  the appropriate response.

25       MR. BODE:  In terms of our interpretation,

**1203**

1  Judge, we are interpreting emails as including their

2  attachments as well, if there is an attachment to the

3  email, but obviously not the child pornography.

4       THE COURT:  Yes.  It goes to the attachments

5  other than the child pornography.

6       MR. BODE:  Yes.

7       Like, there is an email with Mr. Valerio's

8  picture attached to it, and that is obviously part of the

9  email.

10       THE COURT:  Yes.

11       Do you agree that it should include attachments?

12       MR. LATO:  Yes, your Honor.

13       THE COURT:  All right.

14       MR. BODE:   and headers for emails.  I assume

15  that that is part of an email?

16       THE COURT:  Yes.

17       (Whereupon, at this time there was a pause in

18  the proceedings.)

19       MR. BODE:  We are handing up and we agree

20  this -- these are the correct exhibits, and we can read

21  into the record the exhibit numbers, and this can go to

22  the jury.

23       THE COURT:  Agreed?

24       MR. LaPINTA:  Yes.

25       MR. BODE:  2, 2-B, 2-D, 2-E, 5 --

**1204**

1    THE COURT:  Why don't you read them right out of
2    the book, and that would be better.
3    MR. BODE:  Yes.
4    MR. LaPINTA:  2, 2-B, 2-D, 2-D, 5, 5-A, 203,
5    205, 205-A, 206, 208, 209, 210, 211, 211-A, 212, 213, 214,
6    215, 216, 217, 218, 219, 220, 221, 222, 223, 224, 225,
7    226, 227, 228, 229, 229-A, 230, 231, 235, 238, 238-A, 243,
8    244, 245, 245-A, 245-B, 246, 247, 303, 303-A, 501-D, as in
9    dog, 502-A, 503-G, 504-E, 551, 552, 552-A, 553, 554,
10   554-A, 554-B, 554-C, 556, 557, 558, 559, 559-A, 560, 561,
11   562, 564, 567, 567-A, 568.
12   That's it.
13   THE COURT:  All right.
14   So the record should reflect that Mr. LaPinta
15   read the exhibits that are in the binder going back to the
16   jury, along with my instructions, which is Court
17   Exhibit D, as in David.
18   MR. LaPINTA:  Thank you.
19   THE COURT:  You can all take a lunch break if
20   you wish to go now.
21   MR. LATO:  Before your Honor leaves the bench, I
22   was conferring with Mr. Valerio while everyone was
23   reciting the exhibit numbers, and I would like to confer
24   with Mr. LaPinta so we don't have to come back.
25   THE COURT:  Something to do with these exhibits?

**1205**

1    MR. LATO:  Correct.
2    (Defense counsel confer.)
3    MR. LATO:  Your Honor, it is Mr. Valerio's
4    position, as distinct from the opinion of Mr. LaPinta and
5    myself, that the jury should also get the text messages.
6    Mr. LaPinta and I have explained to Mr. Valerio
7    that the email doesn't ask for text messages.
8    THE COURT:  You said the email.  You mean the
9    note.
10   MR. LATO:  Yes, the note, your Honor, does not
11   refer to text messages.
12   In addition, Mr. LaPinta and I are in agreement
13   that the text messages have devastating evidence against
14   Mr. Valerio.  And unless the jury specifically requests
15   that in a note, it is our position that that note should
16   not be shown -- I'm sorry, it is our position that the
17   text messages should not be given without a specific
18   request.
19   THE COURT:  I agree.
20   I want the record to be perfectly clear at this
21   point that the note refers to the following:  The
22   binder -- from the prosecution the binder containing the
23   evidence, paren, in email form.
24   This is one of the situations where not only is
25   the note clear, but they want the evidence in email form,

**1206**

1    which is a very distinct category of evidence.
2    But it is consistent with what happened during
3    the summation.  Mr. Kabrawala during the summations made
4    reference to all the emails, and had a PowerPoint and
5    invited them by showing them a binder and saying the
6    emails are all in here if you wish to review them.
7    That is why I was confused when the parties
8    suggested a binder containing all the evidence in the
9    case, because I didn't understand the binder to have all
10   the evidence -- evidence in the case when Mr. Kabrawala
11   was holding it.  They referred to only emails and that is
12   what they ask for.
13   Text messages are different from email messages.
14   And I don't think a response as to that, independent as to
15   whether it is devastating to Mr. Valerio, the note is not
16   requesting that.  And I will not send back the text
17   messages because it is not responsive to the note.  And
18   obviously if they start paging through the emails and see
19   that there are no text messages, they are certainly more
20   than capable to write me another note saying they also
21   wanted a text message or messages.
22   If memory serves me correctly, they are all
23   contained in one document, the text messages?
24   MR. BODE:  Two documents, there are two
25   different types of texts.  And they are in two documents.

**1207**

1    THE COURT:  Yes.
2    It is not responsive to the note to send text
3    messages, especially in response to the government's
4    summation.
5    All right.
6    Let's take a lunch break.
7    (A luncheon recess is taken at 12:27 p.m.)

Proceedings

**1208**

A F T E R N O O N   S E S S I O N

THE COURT:  While the jury is deliberating, the record should reflect the lawyers and Mr. Valerio are present.

I want to complete the Rule 29 ruling and place a couple of other rulings, to supplement other rulings with respect to the cases.

To supplement the Rule 29 ruling, I was discussing why each e-mail constitute a separate attempt in the light most favorable to the Government.

With respect to the solicitation and itself being an attempt, the trial I have a few years ago Abdallah, 528 Fed appx. 79 (2nd Cir. 2013).  In that case one of the attempted wire fraud charges was the defendant calling up somebody and placing a buy order with respect to a stock sale and I ruled and the Second Circuit affirmed that that act of calling up and asking someone else to place an order through an intermediary constituted in light of the prior dealings and the circumstances surrounding it a substantial step toward the commission of fraud.

And I think it is analogous to the circumstances that we have here for the reasons already indicated.

I did go through each of the e-mails each and of

Proceedings

**1209**

themselves could be separate attempts and weren't connected in a way that made them merge.  I'll go through the details but very briefly.

Count 6, and I believe it is Exhibit 558, January 23, 2012, a discussion in that e-mail about videos with ███ specific sex acts with ███ referenced to sending some money.  Today I will send out some money, you will follow these steps.

That certainly would be sufficient.

There's a discussion that popped up in there.

Count 7, January 24, 2012, Exhibit 559, again, references to specific sex acts with ███, references to picking up money on Wednesday.  The MTCN number is provided in that one, and again on this issue of the fact of Count 6 or 7 are one day apart.  If you actually look at the e-mails, Count 6 was on Monday, Count 7 was on Tuesday.

On Tuesday there is a reference to Wednesday on the e-mail and the January 23rd e-mail.  This is not word-for-word, you only go to the internet place Monday, Wednesday, Friday.  When you're there you start with an e-mail to there and when you leave before dark you send me one when you leave.

And there is a discussion on certain acts of ███ each night before bed -- there's an earlier e-mail

Proceedings

**1210**

that day referenced being one hour on the internet a day.  There's reference to give me some really racy cell phone videos with your daughter tonight:

The jury certainly concluded based on the substance of the e-mails an attempt was made on January 23 that Kalichenko received that and whether or not, you know, whether or not the videos were on the shelf already, or that she had the videos, she sent them.

And then on the 24th, Count 7, more requests are being made.  So even though they are a day apart they are referencing future action and it is also referencing something will be done on a multiday basis.

Count 8, March 28, 2012, Exhibit 211-A, again there is a direction on specific sex acts, reference to money, I'll send out $100.  To who and where do you want me to send it?

So that can constitute a separate attempt.

Count 1, April 4, 2012, Exhibit 560, reference to seeking pictures of ███ .  And there's a reference to sending Kalichenko from Turkey to Moscow.  That could constitute a separate attempt.

Count 10, July 16, 2012, Exhibit 205, referenced the videos you sent me, perfect.  That's the one that references a script and requests specific sex acts.

And there's reference to money.  Tomorrow I'll

Proceedings

**1211**

wire you more cash in the day.  Especially in the context of all the other e-mails can constitute an attempt.

Count 11, July 22, 2012, Exhibit 205.

July 22nd, as I said, it seems to be an inquiry to a July 16th memo by Kalichenko referencing having made five other videos for you.  We'll send the videos today.  References going to the pool.  I think this is in the context of July 21st e-mail from the joeval5@optonline.net saying I got the videos of you and ███ send the rest to my e-mail.

You didn't follow my instruction directions.

Didn't get to the pool, shower, etcetera.

Although Count 10 was July 16th, Count 11 is July 22nd, the jury could certainly find that additional video in the July 16th was an attempt to create some videos or obtain some videos, in this situation to create videos, and having received some videos in the interim, Count 11, July 22nd, is an attempt to receive and have more videos created.

Count 12, September 6, 2012, Exhibit 229, send me the usual videos of you and sweet███, and then again specific sex acts are requested where $1,000 is provided.  That e-mail could certainly constitute a separate attempt.

Finally Count 13, Exhibit 206, referencing

Proceedings

**1212**

1  having given $1200, produced nothing for me, and this one,
2  again, consistent with the other e-mails request each
3  morning and night you will send me a cell phone video of
4  you waking up with your daughter and there are references
5  to sexual acts.  "If I don't see this each day," and he
6  makes certain comments.
7      So it's clear based upon the e-mail the jury can
8  rationalize this, there are ongoing videos being requested
9  and attempts for additional videos on each and every one
10  of these counts.  So I don't believe the counts are
11  multiplicitas between each other.
12     On the final issue that we've already discussed,
13  and again I'll put the case law on the record of whether
14  or not these counts, the attempt counts are multiplicitas
15  and overlap with Count 2, the sexual exploitation count.
16     This argument -- there is nothing improper about
17  charging the way Count 3 is charged with multiple --
18  excuse me, Count 2, that basically even though the
19  Government is alleging there are multiple acts of sexual
20  exploitation during that period they charge it as one
21  substantive count.
22     In the case of United States versus Anson, 304
23  Fed.Appx. 1 (2d Cir. 2008) made clear, and this is called
24  duplicitous counts, counts that join two or more distinct
25  crimes in a single count.  In this case it's a child

Proceedings

**1213**

1  pornography case and that criminal charges may aggravate
2  multiple individual actions that otherwise could be
3  charged as discrete offenses as long as all the actions
4  are a part of a single scheme.  Citing U.S. v. Maloney,
5  287 F.34d 282, Second Circuit 2002.  Here certainly the
6  Government's proof could support a finding this is one
7  single scheme creating multiple child pornography videos
8  involving ▇▇▇ and, therefore, the sexual exploitation
9  charge could be charged in the aggregate even though the
10  Government is alleging there are multiple acts of sexual
11  exploitation during that time period so there is no
12  duplicitous.
13     In terms of Mr. Lato's objection to
14  multiplicity, first it is not waived because it was not
15  raised as part of the trial, that defects in the
16  indictment, US v. Chacko, 169 F.3d 140, Second Circuit
17  1999, said that if you don't assert at all at the district
18  court level, there's a double jeopardy exception which
19  essentially is what it is.  If you don't raise it all at
20  the district court level it could be waived, but it
21  doesn't have to be necessarily a pretrial motion.  That
22  case was made after the jury rendered its verdict.
23     The circuits held it was not waived here, it was
24  made at the end of the Government's case but certainly was
25  not waived.  But on the substantive issue, first as I

Proceedings

**1214**

1  noted, the Government is allowed all theories in the case
2  because the evidence could support one theory and not the
3  other if the jury concluded that Ms. Kalichenko had the
4  videos already made, they could find attempts for each of
5  those counts without finding any sexual exploitation of
6  ▇▇▇
7      So there is evidence that supports both
8  theories.
9      In terms how you deal with that, there's a case
10  called U.S. v. Zvi, 168 F.3d 49 (2d Cir. 1999) and in that
11  case the Second Circuit discusses this in detail and says
12  ordinarily the appropriate remedy, if you have that
13  situation, that's with respect to a money laundering case,
14  but if there is this multiplicitas issue, the appropriate
15  remedy to remand the multiplicitas counts and to adjust
16  the sentence accordingly.
17     Certainly I think Mr. Lato is correct, the
18  Government might even concede this if there were a
19  conviction on the sexual exploitation counts.  Certainly
20  an attempt to commit a crime and a completed crime would
21  create a double jeopardy problem if someone was sentenced
22  on both.  If there is any doubt on that, U.S. v. Rust,
23  Eighth Circuit case, 650 F.2d, a 1981 case, where they
24  said it is also clear that defendant may not be convicted
25  in both the attempt and the completed crime because all

Proceedings

**1215**

1  the elements of the attempt were included in the completed
2  offense and a dual conviction would amount to double
3  jeopardy.
4      Based upon the Second Circuit decision in Zvi, I
5  think the appropriate remedy here if there were a
6  conviction on both the substantive crimes and the
7  attempted counts would be to vacate the attempted accounts
8  to avoids a double jeopardy problem but we'll deal with
9  that if that occurs.
10     That's the Court's ruling with respect to the
11  Rule 29 motion.  I did want to place some cases on the
12  record.
13     Mr. LaPinta did an expert sidebar and came up
14  with a 10th Circuit case.
15     MR. LAPINTA:  9th.
16     THE COURT:  I'm talking about the subscriber
17  issue.
18     MR. LAPINTA:  Foundation.
19     THE COURT:  I thought it was a 10th Circuit.  I
20  did look it up and I looked at Second Circuit case law on
21  that issue and I think the rulings that I made -- your
22  objection was correct to some extent and the rulings I
23  made are completely consistent with the Second Circuit
24  cases.
25     So, there were two objections.  The first one

Proceedings

1216

1  was to the Cablevision subscriber information.  And the

2  case in the Second Circuit that addresses this issue

3  whether it was a hotel guest card, the case is United

4  States v. Lieberman, 637 F.2d 95 (2d Cir. 1980), and in

5  that case the circuit made clear if someone is filling out

6  information such as a hotel guest card it would not fall

7  within the business records exception because it would

8  contain unreliable hearsay within the record itself.

9        However, the Second Circuit made clear in that

10  case that if a person were required to prove, provide

11  identification, that would change the analysis.  So there

12  is reference if there was a way to verify by examining a

13  driver's license or other form of identification that

14  would be a different analysis.  "If such verification is

15  obtained by the employee we see no reason why the guest

16  card would be filled in by the guest himself, would not be

17  qualified as a business record and not be admissible for

18  truth of the statement. "

19        With respect to the Cablevision records, it is

20  consistent with that opinion because there were testimony,

21  certainly while they didn't maintain a copy of the

22  identification, that was a business practice to require

23  identification be shown, and also because of the nature of

24  Cablevision in and of itself, you are having service

25  provided to a particular location, it would make sense

Proceedings

1217

1  that it would be reliable because otherwise as the witness

2  said we would need to verify the house or location that we

3  were providing the service to.

4        In any event the request for identification is

5  sufficient to come within the business records requirement

6  as articulated in Lieberman.

7        The Western Union records, however, we would

8  have a problem because it was clear from the

9  cross-examination that no verification whatsoever is done.

10  In fact someone can go on line and put any name in and

11  have money wired to someone else under any name.  So that

12  certainly, those Western Union documents could not come in

13  as business records for the truth of the identity of the

14  person whose name is reflected in the records.  And this

15  is discussed in a Southern District case, United States v.

16  Zapata, 356 F.Supp.2d 323 (S.D.N.Y. 2005) and the Court in

17  that case goes through a whole bunch of cases in the

18  country and says that although it can't come in as a

19  business record it can come in for the nonhearsay purpose

20  of establishing that somebody put that name on a record

21  and sent money, but you have to give a limiting

22  instruction to the jury to make sure they understand that

23  is not being offered for the truth but simply that money

24  was sent with someone putting that name on there and the

25  Government had to prove through independent evidence who

Proceedings

1218

1  that person is, and that is exactly what the defense

2  requested and what that is, exactly what I did, I gave an

3  instruction to the jury that Western Union records, the

4  names on those records cannot be used for the truth, the

5  Government had to prove who sent them through other means.

6  So I managed to get that one read.

7        MR. BODE:  We did that with the e-mails with the

8  MTCN numbers reflected in the records that were in his

9  house.

10        THE COURT:  And there was an objection with

11  respect to the opening statement, there was certain

12  language in the e-mail --

13        (Jury note handed to the Court.)

14        THE COURT:  We have another note.  We'll mark

15  the note as Court Exhibit 3.  Show it to the lawyers.  It

16  indicates that the jury has reached a verdict.

17        MR. KABRAWALA:  Do you have a blank verdict form

18  so we can follow along?

19        (Clerk distributes copies of requested verdict

20  forms.)

21        THE COURT:  Both sides have been provided with a

22  copy of the blank verdict form so they can follow the

23  verdict.

24        Let's bring in the jury so we can take the

25  verdict.

Proceedings

1219

1        (Whereupon, the jury at this time enters the

2  courtroom.)

3        (Time noted 2:30 p.m.)

4        THE COURT:  I received your court note,

5  Exhibit 3:  The jury has reached a verdict. Ms. Raymond,

6  has the jury reached a verdict as to each count?

7        THE FOREPERSON:  Yes, your Honor.

8        THE COURT:  Ms. Raymond, please remain standing

9  for the reading of the verdict.

10        As to Count 1, Conspiracy to Sexually Exploit a

11  Child.

12        How do you find the defendant?  Is the jury's

13  unanimous verdict guilty or not guilty?

14        THE FOREPEERSON:  Guilty.

15        THE COURT:  Count 2, Sexual Exploitation of a

16  Child.

17        How do you find the defendant?  Is the jury's

18  unanimous verdict guilty or not guilty?

19        THE FOREPERSON: Guilty.

20        THE COURT:  As to Count 3, Sexual Exploitation

21  of a Child, how do you find the defendant?  Is the jury's

22  unanimous verdict guilty or not guilty?

23        THE FOREPERSON:  Guilty.

24        THE COURT:  As to Count 4, Transportation of

25  Child Pornography.  How do you find the defendant?  Is the

Proceedings

**1220**

1  jury's unanimous verdict guilty or not guilty.

2  THE FOREPERSON:  Guilty.

3  THE COURT:  As to Count 5, Receipt of Child
4  Pornography.  How do you find the defendant?  Is the
5  jury's unanimous verdict guilty or not guilty?

6  THE FOREPERSON:  Guilty.

7  THE COURT:  As to Count 6, Attempted Sexual
8  Exploitation of a Child, January 23, 2012, how do you find
9  the defendant?  Is the jury's unanimous verdict guilty or
10  not guilty?

11  THE FOREPERSON:  Guilty.

12  THE COURT: As to Count 7, Attempted Sexual
13  Exploitation of a Child, January 24, 2012, how do you find
14  the defendant?  Is the jury's unanimous verdict guilty or
15  not guilty?

16  THE FOREPERSON: Guilty

17  THE COURT:  Count 8, Attempted Sexual
18  Exploitation of a Child, March 28, 2012, how do you find
19  the defendant?

20  Is the jury's unanimous verdict guilty or not
21  guilty?

22  THE FOREPERSON:  Guilty.

23  THE COURT: Count 9, Attempted Sexual
24  Exploitation of a Child, April 4, 2012.  How do you find
25  the defendant?

Proceedings

**1222**

1  Is the jury's unanimous verdict guilty or not
2  guilty?

3  THE FOREPERSON:  Guilty

4  THE COURT:  Count 14, Sexual Exploitation of a
5  Child.  How do you find the defendant.

6  Is the jury's unanimous verdict guilty or not
7  guilty?

8  THE FOREPERSON:  Guilty

9  THE COURT: Count 15, Possession of Child
10  Pornography.  How do you find the defendant?

11  Is the jury's unanimous verdict guilty or not
12  guilty?

13  THE FOREPERSON:  Guilty

14  THE COURT:  You may be seated, Ms. Raymond.

15  Please listen to the verdicts as recorded by the
16  Court.

17  Count 1, Conspiracy to Sexually Exploit a Child.
18  How do you find the defendant?  The jury's unanimous
19  verdict is guilty.

20  Count 2, Sexual Exploitation of a Child.  How do
21  you find the defendant?

22  The jury's unanimous verdict is guilty.

23  Count 3, Sexual Exploitation of a Child.  How do
24  you find the defendant?  The jury's unanimous verdict,
25  guilty.

Proceedings

**1221**

1  Is the jury's unanimous verdict guilty or not
2  guilty?

3

4  THE FOREPERSON:  Guilty.

5  THE COURT: Count 10, Attempted Sexual
6  Exploitation of a Child, July 16, 2012.  How do you find
7  the defendant?

8  Is the jury's unanimous verdict guilty or not
9  guilty?

10  THE FOREPERSON:  Guilty.

11  THE COURT:  Count 11, Attempted Sexual
12  Exploitation of a Child, July 22, 2012. How do you find
13  the defendant?

14  Is the jury's unanimous verdict guilty or not
15  guilty?

16  THE FOREPERSON:  Guilty

17  THE COURT:  Count 12, Attempted Sexual
18  Exploitation of a Child, September 6, 2012.  How do you
19  find the defendant?

20  Is the jury's unanimous verdict guilty or not
21  guilty?

22  THE FOREPERSON:  Guilty

23  THE COURT: County 13, Attempted Sexual
24  Exploitation of a Child, September 27, 2012.  How do you
25  find the defendant?

Proceedings

**1223**

1  As to Count 4, Transportation of Child
2  Pornography.  How do you find the defendant?  The jury's
3  unanimous verdict is guilty.

4  As to Count 5, Receipt of Child Pornography.
5  How do you find the defendant?  The jury's unanimous
6  verdict is guilty.

7  As to Count 6, Attempted Sexual Exploitation of
8  a Child, January 23, 2012.  How do you find the defendant?
9  The jury's unanimous verdict is guilty.

10  As to Count 7, Attempted Sexual Exploitation of
11  a Child, January 24, 2012.  How do you find the defendant?
12  The jury's unanimous verdict is guilty.

13  Count 8, Attempted Sexual Exploitation of a
14  Child, March 28, 2012.  How do you find the defendant?

15  The jury's unanimous verdict is guilty.

16  THE COURT:  Count 9, Attempted Sexual
17  Exploitation of a Child, April 4, 2012.  How do you find
18  the defendant?

19  The jury's unanimous verdict is guilty.

20  Count 10, Attempted Sexual Exploitation of a
21  Child, July 16, 2012.  How do you find the defendant?

22  The jury's unanimous verdict is guilty.

23  Count 11, Attempted Sexual Exploitation of a
24  Child, July 22, 2012.  How do you find the defendant?

25  The jury's unanimous verdict is guilty.

Proceedings

1224

1     Count 12, Attempted Sexual Exploitation of a
2  Child, September 6, 2012.  How do you find the defendant?
3     The jury's unanimous verdict is guilty.
4     Count 13, Attempted Sexual Exploitation of a
5  Child, September 27, 2012.  How do you find the defendant?
6     The jury's unanimous verdict is guilty.
7     Count 14, Sexual Exploitation of a Child.  How
8  do you find the defendant?
9     The jury's unanimous verdict is guilty.
10     Count 15, Possession of Child Pornography.  How
11  do you find the defendant?
12     The jury's unanimous verdict is guilty.
13     THE COURT:  Members of the jury, is that your
14  verdict, your unanimous verdict, so say you all.
15     THE JURY:  Yes.
16     THE COURT:  I'll poll the jury.
17     Juror 1, is that your verdict?
18     JUROR 1:  Yes.
19     THE COURT: Juror 2, is that your verdict?
20     JUROR 2:  Yes.
21     THE COURT:  Juror 3, is that your verdict?
22     JUROR 3:  Yes.
23     THE COURT:  Juror 4, is that your verdict?
24     JUROR 4:  Yes.
25     THE COURT:  Juror 5, is that your verdict?

Proceedings

1225

1     JUROR 5:  Yes.
2     THE COURT:  Juror 6, is that your verdict?
3     JUROR 6:  Yes.
4     THE COURT:  Juror 7, is that your verdict?
5     JUROR 7:  Yes.
6     THE COURT:  Juror 8, is that your verdict?
7     JUROR 8:  Yes.
8     THE COURT:  Juror 9, is that your verdict?
9     JUROR 9:  Yes.
10     THE COURT:  Juror 10, is that your verdict?
11     JUROR 10:  Yes.
12     THE COURT:  Juror 11, is that your verdict?
13     JUROR 11:  Yes.
14     THE COURT:  Juror 12, is that your verdict?
15     JUROR 12:  Yes.
16     THE COURT:  I'll have the have the attorneys
17  approach sidebar.
18     (Whereupon, at this time the following took
19  place at the sidebar.)
20     (Continued.)
21
22
23
24
25

Proceedings

1226

1     THE COURT:  I'll have the lawyers inspect the
2  verdict sheet.
3     MR. KABRAWALA:  So inspected.  Thank you.
4     THE COURT:  So in terms of the forfeiture phase,
5  shall we proceed?
6     MR. LATO:  Yes, your Honor.
7     THE COURT:  I'll tell the jury that it will be
8  very brief.
9     MR. LATO:  Five minutes.  I'll explain this what
10  the Government is seeking.
11     MR. LAPINTA:  This is part of the jury
12  instruction.
13     THE COURT:  Yes.  Just so what the issue is.
14     MR. LAPINTA:  Yes.
15     THE COURT:  Okay.
16     MR. KABRAWALA:  Thank you, your Honor.
17     (End of sidebar conference.)
18     (Continued.)
19
20
21
22
23
24
25

Proceedings

1227

1     THE COURT:  Members of the jury now that you've
2  returned a verdict as to each count of the indictment,
3  there is one additional issue that you'll need to decide
4  and that is the issue of forfeiture.  Let me explain
5  to you.
6     Property may be subject to forfeiture whether or
7  not the property has been seized by the United States.  In
8  this case the Government seeks forfeiture of specific
9  property that is subject to forfeiture as property that
10  contains visual depictions of the sexual exploitation of
11  children and is property used or intended to use to commit
12  or provoke the commission of sexual exploitation of
13  children.  The property includes the Government is seeking
14  forfeiture of, (A) One premier desk top computer serial
15  number P 80003011134.
16     (B) a one-4 gigabyte SD card, no serial number.
17     (C) the real property and premises located at
18  3 High Gate Drive, Smithtown, New York 11787, together
19  with its respective buildings, appurtenances,
20  improvements, fixtures, attachments, easements and
21  furnishings designated as district 473400, section 50,
22  block 5 and lot 23 on the Suffolk County tax map.
23     So the Government in connection with these
24  crimes of conviction is seeking forfeiture of that
25  property.

Summations - Kabrawala

1228

1 The way we'll proceed with respect to that is
2 neither side has any additional evidence to present on
3 that. So just as we did with the trial, I'll give the
4 lawyers an opportunity to make closing arguments to you
5 with respect to this forfeiture issue. They've advised me
6 they both intend to be very brief and I'll give you ten or
7 15 minutes of instructions on the law with respect to
8 forfeiture that I'll give you and you'll return to the
9 jury room to commence your deliberations on the
10 forfeiture.
11 So the Government will go first.
12 MR. KABRAWALA: Thank you again, ladies and
13 gentlemen for your services for paying close attention
14 during the guilt phase of this trial.
15 Your service is nearly complete and I'll be very
16 brief. There is one more part that is left and that is a
17 very short portion but it is also very important.
18 Soon the judge will instruct you that the
19 Government is entitled to seek forfeiture of property that
20 was used to facilitate the crimes for which the defendant
21 has been found guilty.
22 Basically forfeiture means that the Government
23 is entitled to take the property used to commit the crime.
24 There's three properties, as the judge
25 mentioned, that the Government is seeking. The first one

Summations - Kabrawala

1229

1 is is the computer that you heard about, this computer,
2 Government's Exhibit 400.
3 The second one is the SD, Samsung memory card on
4 which the pictures of ▆▆▆▆ were found.
5 The third is the residence, 3 High Gate Drive in
6 Smithtown, New York, that you've heard a lot about during
7 this trial.
8 Now, you've heard that the videos, the
9 pornographic videos of ▆▆▆▆, the Ukrainian toddler, were
10 located on a computer, that computer, Government's
11 Exhibit 400, that is, the pornographic pictures of ▆▆▆▆
12 that were located on an SD card. Both of those items were
13 found in the defendant's home at 3 High Gate Drive. The
14 defendant doesn't get those properties back. He used them
15 to commit the crime.
16 I don't need to go into what was on the
17 computer; you've seen the images and read the e-mail. I
18 don't need to go into what was on the SD card; you've seen
19 the images and heard the testimony.
20 The house, that is where the defendant used his
21 computer to communicate with Kalichenko. That's where the
22 computer was found. That's where all the evidence was
23 found. That's also where the stage was found, the hidden
24 cameras were found. That's where the Samsung digital
25 video camera was found in the basement, in the ceiling

Summations - Kabrawala

1230

1 hidden. It was all in the defendant's home, including the
2 outfits and the hidden cameras.
3 Now, for that reason, for those reasons, that's
4 why the Government seeks forfeiture of the three
5 properties that we've described.
6 They were used to facilitate the crime. They
7 were used in commission of the crime, and the Government
8 gets to forfeit them.
9 The judge will instruct you about the law on
10 forfeiture and the burden of proof. It is different. The
11 burden of proof is referred to as a preponderance of the
12 evidence. What that means, as the judge will instruct you
13 and you should follow the judge's instructions, a
14 preponderance of the evidence is simply that it was more
15 likely than not that the items, the three property items
16 described were used to commit the crime. That it is more
17 likely than not that the defendant used those properties
18 to facilitate the crime.
19 Because the evidence amply demonstrates that
20 those three property items were used to facility the
21 crime, the Government seeks forfeiture of those items and
22 we ask that you return a verdict of forfeiture.
23 Thank you.
24 THE COURT: You'll now hear the arguments of the
25 defense.

Summations - Lato

1231

1 MR. LATO: Thirty seconds, your Honor.
2 THE COURT: Sure.
3 (Counsel confer.)
4 MR. LATO: Good afternoon, ladies and gentlemen.
5 This will be about three minutes.
6 As Judge Bianco will instruct you, the question
7 on forfeiture is whether the property was used to commit
8 the crime. Don't even waste your time on the Dell desktop
9 or on the memory card. We concede that. The only thing
10 we object to here is the house, and here's why.
11 The Government's forfeiture allegation is
12 overbroad and at the same time insufficient, and here's
13 why. The Government for some reason wants that little
14 memory card from the Samsung camcorder which is for all
15 practical purposes worthless but they are not even seeking
16 to forfeit the camcorder. Had they done so we could
17 concede that too because based upon your verdict the
18 camcorder would be forfeitable because that was used to
19 make child pornography.
20 The Dell desktop computer is obviously
21 forfeitable because based on your verdict the inbox on
22 that computer was child pornography. But the Government
23 is not seeking to get the camcorder which based upon your
24 verdict was used to make child pornography. It is also
25 not seeking the stage or the couch in the house or in the

**Summations - Lato**

**1232**

1  basement which if that were before you we would concede
2  based upon your verdict would be forfeitable.  But the
3  house itself was not used to make child pornography.  In
4  other words, the upstairs wasn't used; the backyard wasn't
5  used; there were discrete items in the house that were
6  used.
7       By way of example, if this house were on a
8  100-acre farm, the Government might be here asking you to
9  forfeit the whole 100-acre farm.  The allegation of
10  forfeiture is too broad.  So, computer, forfeited; memory
11  card forfeited.
12       Had the Government asked for the camcorder, had
13  they asked for the stage, any cameras in the house, all
14  forfeited.
15       The house itself, no.  It was not an
16  instrumentality of the crime.  It was not used to commit
17  the crime.
18       Thank you.
19       THE COURT:  Okay.  The Government is entitled to
20  a brief rebuttal on summation.
21       (Continued.)
22
23
24
25

**Rebuttal - Kabrawala**

**1233**

1       MR. KABRAWALA:  Thank you, Judge.
2       The reason the Government wants the computer and
3  the SD card is because we want to destroy them.  The
4  Government wants to destroy the child pornography images
5  and all traces of them that were on those two items.
6       You have heard evidence that the house itself
7  was used in the commission of the crime.  It served as a
8  backdrop.  You saw pictures of it, countless pictures of
9  the basement, the furniture.  The Government is not
10  seeking forfeiture of the furniture; don't let defense
11  counsel distract you.  This is a case about two children
12  who were sexually exploited on video for the defendant and
13  now he has been found guilty.
14       The house was used to create images of one of
15  those children, ████.  The basement was used as a
16  backdrop for the sexually explicit pictures of ████ and
17  upstairs on the second floor is where the defendant used
18  that computer and stored on the SD card to store images of
19  child pornography and communicate with his co-conspirator
20  Kalichenko.
21       Thank you very much again for your services.
22       THE COURT:  Do the lawyers wish to speak to me
23  before my instructions?
24       MR. KABRAWALA:  No, your Honor.
25       MR. LAPINTA:  No, your Honor.

**Jury Charge**

**1234**

1       THE COURT:  About 15 minutes.  And if you want a
2  copy of my instructions you can request it during your
3  deliberations.
4       We'll mark a copy of this as Court Exhibit E.
5       MR. BODE:  We used E for the indictment and  --
6  we use G.
7       THE COURT:  G.
8       Ladies and gentlemen of the jury.  I know you
9  have labored long and hard.  In view of your verdict the
10  defendant Joseph Valerio is guilty of the offenses charged
11  in the indictment.
12       You have one more task to perform before you are
13  discharged.
14       In a case of this nature, the Government has a
15  right to seek forfeiture of certain property that is
16  alleged to be related in certain ways to the offenses of
17  which you have found the defendant guilty.
18       Accordingly, you must render special verdicts
19  concerning certain property that the Government has
20  alleged is subject to forfeiture to the United States.
21       In your consideration of the forfeiture
22  allegation in the indictment you are instructed that your
23  previous determination that the defendant is guilty of
24  having committed the offenses alleged in the indictment is
25  final and conclusive.  You must not seek to discuss or

**Jury Charge**

**1235**

1  determine anew the guilt or innocence of the defendant.
2  All the previous instructions regarding direct and
3  circumstantial evidence, credibility of witnesses and duty
4  to deliberate apply with respect to your verdicts
5  regarding forfeiture.
6       Let me explain to you the law of forfeiture.
7  Pursuant to Title 18 U.S. Code Section 2253 subsection
8  (a), any person who is convicted of sexual exploitation of
9  a child is required to forfeit to the United States, (A)
10  any visual depiction described in section 2251, 2251(a),
11  2252, 2252(a), 2252(b), or 2260 of Title 18 U.S. Code in
12  any book, magazine, periodical, film, video tape or other
13  matter which contains any such visual depiction which was
14  produced transported, mailed, shipped and received in
15  violation of the offense of conviction.
16       B.  Any property, real and personal,
17  constituting or traceable to gross profits or other
18  proceeds obtained from such offense, and;
19       Three  -- excuse me, C.  Any property real and
20  personal used or intended to be used to commit or to
21  promote the commission of such offense or property
22  traceable to such property.
23       The purpose of the forfeiture law is to prevent
24  any person from persuading, inducing, enticing or coercing
25  any minor to engage in any sexually explicit conduct and

Jury Charge

**1236**

1  to prevent any person from assisting any other person to
2  engage in any type of sexually explicit behavior for
3  purposes of producing, transporting or distributing any
4  such images or visual depictions of such behavior.
5      I'm now going to give you a definition of
6  "property subject to forfeiture."
7          Property may be subject to forfeiture whether or
8  not the property has been seized by the United States.  In
9  this case the Government seeks forfeiture of specific
10  property that is subject to forfeiture as property that
11  contains visual depictions of the sexual exploitations of
12  children and as property used or intended to be used to
13  commit or promote the commission of sexual exploitations
14  of children.
15          May I see the lawyers for a moment at sidebar.
16      (Whereupon, at this time the following took
17  place at the sidebar.)
18      (Continued.)
19
20
21
22
23
24
25

Jury Charge

**1237**

1      THE COURT:  I have just noticed in here it says
2  furnishing.  The Government stated in its summation you
3  are not seeking the couch and the stage.  The jury may be
4  confused.
5      MR. KABRAWALA:  Not specifically the couch or
6  the stage.
7      MR. BODE:  There's an error on the part of the
8  Government.
9      THE COURT:  So you are seeking the furnishings?
10      MR. BODE:  We are.
11      THE COURT:  Other than the couch and stage.
12      MR. BODE:  It was just a slip of the tongue.
13      MR. KABRAWALA:  Meant to say we are not
14  specifically seeking.
15      MR. BODE:  I guess everything in there, actually
16  would be entitled not to.
17          They've been removed from the house at this
18  point.  There are things still in the house but not the
19  things here.
20      MR. LATO:  Your Honor, if the Government
21  misspoke in its summations, I think it should be pointed
22  out to the jury to avoid confusion.
23      THE COURT:  You are not seeking the couch and
24  the stage then.  The other furnishings?
25      MR. KABRAWALA:  Just one moment, Judge.

Jury Charge

**1238**

1      (Counsel confer.)
2      MR. BODE:  Why don't we just strike it, Judge.
3  That's fine.
4      (End of sidebar conference.)
5      (Continued.)
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Jury Charge

**1239**

1      THE COURT:  The property includes A, 1b Premier
2  Desktop computer with the serial number mentioned before.
3  One 4 gigabyte SZ card, no serial number.  And C, the real
4  property and premises located at 3 High Gate Drive,
5  Smithtown, New York, 11787, together with its respective
6  buildings, appurtenances, improvements, fixtures,
7  attachments and easement designated as district 473400
8  section 50, block 5, lot 23 on the Suffolk County tax map.
9  Earlier I said furnishings, but I wanted to confirm with
10  the Government and the Government conferred at sidebar.
11  They are not seeking furnishings within the home as part
12  of the forfeiture.
13          I will instruct you regarding the burden of
14  proof.  It's the Government's burden to establish what
15  property contains visual depictions of the sexual
16  exploitation of children as previously defined in the
17  offenses for which the defendant stands convicted and what
18  property was used or intended to be used to commit or to
19  promote the commission of the defendant's offenses.
20          You should find that the Government has met its
21  burden if it has established the forfeitability of the
22  defendant's property by a preponderance of the evidence.
23  This is different from the standard that applied to the
24  guilt or innocence of the defendant.
25          At that stage of the case the Government was

## Jury Charge

### 1240

1 required to meet its burden beyond a reasonable doubt at
2 the forfeiture stage, however, the Government need only
3 establish the nexus and forfeitability of the property by
4 a preponderance of the evidence and not beyond a
5 reasonable doubt.
6       What does a preponderance of the evidence mean?
7       To establish a fact by a preponderance of the
8 evidence means to prove that the fact was more likely true
9 than not true.
10       A preponderance of the evidence means the
11 greater weight of the evidence and it refers to the
12 quality and persuasiveness of the evidence, not to the
13 number of witnesses or documents.
14       In determining whether a claim has been proved
15 by a preponderance of the evidence, you may consider the
16 relevant testimony of all witnesses, regardless of who may
17 have called them and all the relevant exhibits received in
18 evidence regardless of who may have produced them.
19       If you find that the weight of the evidence on
20 an issue tips however slightly in favor of the Government,
21 then you must decide that issue in favor of the
22 Government.  On the other hand, if you find that the
23 weight of the evidence on an issue tips in favor of the
24 defendant or that the weight of evidence is evenly divided
25 between the parties, then you must decide that issue in

## Jury Charge

### 1242

1 not be indetectible for the commission of the illegal
2 activity nor does the property have been used by the
3 defendant exclusively for this behavior to be forfeited
4       Property that was used the vast majority of the
5 time for legitimate purposes may nevertheless be forfeited
6 if it is facilitating a criminal offense.  The
7 facilitation of even a single felony offense is sufficient
8 to justify forfeiture.
9       The forfeiture statute provides all real
10 property used or intended to be used to commit or to
11 facilitate the commission of an offense, of which the
12 defendant has been convicted of, is forfeitable.
13       Thus, even when only a part of the property is
14 used illegally, the statute calls for the forfeiture of
15 the entire property.
16       In reaching your determination whether any part
17 of the property was used illegally, you should not
18 consider whether forfeiture of the entire property would
19 be excessive or otherwise disproportionate to the criminal
20 activity that the property was used to facilitate.
21       I further instruct you that in reaching your
22 decision on forfeiture you should not be concerned, you
23 should not be considered about what might happen to any
24 property that you find to be forfeitable.
25       In this connection, you should disregard any

## Jury Charge

### 1241

1 favor of the defendant.
2       In other words, if the Government proves to you
3 that it is more likely than not that it's view of the
4 evidence on any particular issue is proved, then you
5 resolve that issue in favor of the Government.  If the
6 Government does not make the proof tip in its favor, you
7 must decide that issue in favor of the defendant.
8       The requirements to prove beyond a reasonable
9 doubt which I instructed you about in connection with the
10 guilt phase of the case does not apply during the
11 forfeiture phase of the case and you should put those
12 instructions out of your mind.
13       I'll give you an instruction regarding
14 facilitating property.
15       Facilitating property which is subject to
16 forfeiture is any property used or intended to be used to
17 facilitate the commission of the offense to intentionally
18 employ, use, persuade, induce, entice and coerce a minor,
19 including but not limited to sexual exploitation of a
20 child and the possession of child pornography of which you
21 have convicted the defendant.
22       Facilitating property is that property that
23 makes the crime easier to commit or harder to depict.  If
24 the use of the property made the property harder to
25 detect, it is subject to forfeiture.  The property need

## Jury Charge

### 1243

1 claims of any other persons or businesses, whether family,
2 friends, business associates, banks or victims may have
3 for the property.  Those interests will be addressed at a
4 later time.
5       Similarly, you are not to consider whether the
6 forfeiture may excessive or otherwise disproportionate to
7 the crimes for which you convicted the defendant.
8       In that regard you should not give
9 consideration -- you should not give consideration to any
10 property of the defendant that has already been seized.
11 This matter is one entrusted solely to the Court and if
12 appropriate will be addressed at a later time.
13       Your verdict of the alleged property subject to
14 forfeiture must be unanimous.  That is, everyone must
15 agree the evidence presented proves by a preponderance of
16 the evidence that the property in question contains visual
17 depictions of sexual exploitation of children as
18 previously defined in the offenses for which the defendant
19 stands convicted and/or was used or intended to be used to
20 commit or promote the commission of the defendant's
21 offenses or constitutes property traceable thereto.
22       This specific instructions I gave you earlier
23 concerning the counts of the indictment continue to apply.
24 You are further admonished with one exception regarding
25 the burden of proof about which I've already instructed

Jury Charge

**1244**

1 you, all the instructions previously given to you
2 concerning your consideration of evidence, credibility of
3 witnesses and duty to deliberate together, all continue to
4 apply during your supplemental deliberations concerning
5 the forfeiture allegations in the indictment.
6       Also, while deliberating on these forfeiture
7 matters you may consider any evidence offered by the
8 parties during the guilt phase and the forfeiture phase of
9 the trial.
10       As I said before there was no additional
11 evidence during the forfeiture phase. You just heard
12 argument.
13       I'll hand the clerk for delivery, I'll hand to
14 Michelle for delivery, a copy of the special verdict form
15 and in a moment I'll ask that you retire again to the jury
16 room and deliberate with respect to that special verdict
17 form.
18       So mark the special verdict form as Court
19 Exhibit H. With the lawyers consent I'll cross out
20 "furnishings" on the verdict form.
21       MR. KABRAWALA: Yes, Judge.
22       MR. LATO: Yes, your Honor.
23       I've crossed that out, and I've marked that as
24 Court Exhibit 8. Hand that to Ms. Raymond and I'll ask
25 the jury to retire to the jury room to deliberate on

Jury Charge

**1245**

1 forfeiture.
2       Thank you.
3       (Whereupon, the jury commence deliberations at
4 2:58 p.m..)
5       THE COURT: If everybody can be seated.
6       I want to place one case on the record with
7 respect to a rule I referred to before the verdict came
8 in. This is regarding the other information contained in
9 e-mails.
10       There was an objection by Mr. Lato to at least
11 one of the e-mails, but I specifically remember one about
12 language that was used in describing the relationship
13 between Ms. Kalichenko and Mr. Valerio and it is the
14 Court's ruling that the substance of the e-mails that
15 deals with their relationship with each other, their
16 interaction with each other, whether it be sexual
17 interactions or others with respect to visas, travel, the
18 whole substance of the nature of their relationship is
19 inextricably intertwined with the evidence regarding the
20 charged offenses and was necessary to complete the story
21 of the crime on trial and it is clear, including U.S. v.
22 Carboni, 204 F.3d 39, page 44, Second Circuit 2000, that
23 when it is offered for such purposes, it is not 404(b)
24 evidence, it is part of the charged criminal activity and
25 just as it relates to the facts of this case, the issue of

Jury Charge

**1246**

1 who received and sent the child pornography was something
2 that was placed in issue in the opening statement. It was
3 reference to the fact that because of the Government's
4 investigation, who received it, who was requesting it and
5 who was obtaining it, based upon that issue being placed
6 in dispute in terms of the identity of the person who was
7 sending it and also on the critical issue with respect to
8 the sexual exploitation charge whether or not the videos
9 were preexisting prior to Mr. Valerio's request for the
10 videos to be made or whether or not they were made in
11 response to his request, the nature of the relationship
12 between Ms. Kalichenko and Mr. Valerio what was being
13 requested, the circumstances under which it was being
14 requested, all become critical, highly probative on the
15 issue of the identity of the person who was making the
16 request and receiving it as well as the images themselves
17 and the circumstances surrounding them and whether or not
18 she was making them new for Mr. Valerio or she had them in
19 the Ukraine previously.
20       So I view this as being highly probative on the
21 central issue in the case and with respect to certain
22 counts. If you look at the e-mails there really is no way
23 to even redact them because they are so interspersed
24 between the request for the child pornography, it would be
25 impossible to understand the context of the request

Jury Charge

**1247**

1 because of the nature of the e-mails and how it goes back
2 and forth between their relationship with each other and
3 their request for the child pornography.
4       So I don't think it is a close question. In my
5 discretion, I obviously considered 403 and given the
6 highly probative nature of the other information and the
7 e-mails to understand the central issues in the case, that
8 the probative value is not substantially outweighed by the
9 danger of unfair prejudice to Mr. Valerio, given the
10 nature of the charge in this case involving sexual
11 exploitation.
12       There are two different children, including a
13 toddler, the racy nature of the e-mail exchanges and the
14 sexual content. The back and forth of their relationship
15 was certainly not of a different nature or of a worse
16 nature than the charges that are at issue in this case in
17 terms of the conduct so I don't think that there is any
18 danger of unfair prejudice or any confusion by the jury
19 that he's on trial because of his relationship with
20 Ms. Kalichenko.
21       It was very clear that this case was about the
22 children and not their relationship with each other. So
23 for those reasons I allowed those e-mails in over the
24 defense objection.
25       For the same reasons I allowed the stage and the

**1248**

1  camera in.
2        In my pretrial ruling, that evidence was
3  inextricably intertwined who had control over the SD card
4  and camera that contained the images of ▮▮▮▮▮ and in fact
5  the central defense argument in the case that it was
6  Ms. Kalichenko that made those images and certainly the
7  other aspects of the basement area demonstrate the nature
8  of that area and who has control over that area rather
9  than a one-time use of the camera was certainly highly
10 probative on that issue and not substantially outweighed
11 by prejudice under 403.
12       They are inextricably intertwined with the child
13 pornography in the basement and the question of the
14 identity of the person who did that.
15       So that is the reason for that ruling.
16       So we'll wait for the jury's verdict on the
17 forfeiture.
18       Thank you.
19       (Recess taken.)
20
21
22
23
24
25

**1249**

1        THE COURT:  We have had a note marked Court
2  Exhibit 4.  This should be marked as Court Exhibit G, the
3  forfeiture instructions.  The word "furnishings" has been
4  crossed out.  Both sides agree this should go back?
5        MR. KABRAWALA:  Yes, your Honor.
6        MR. LATO:  Yes, your Honor.
7        (Whereupon, a recess was taken.)
8        (Jury note.)
9        THE COURT:  We've received a note marked Court
10 Exhibit 5.  We've come to a verdict on forfeiture.
11       So bring in the jury for that verdict.
12       (Jury enters at 3:35 p.m.)
13       THE COURT:  Be seated.  We've come to a verdict
14 on forfeiture.
15       Has the foreperson come to a unanimous verdict
16 on forfeiture?
17       THE FOREPERSON:  Yes.
18       THE COURT:  May I see the verdict form so I can
19 inspect it?
20       Madam Foreperson, as to the premier desk top
21 serial number P80003011134, do you find this property
22 subject to forfeiture?
23       Is the jury's unanimous verdict yes or no?
24       THE FOREPEERSON:  Yes.
25       THE COURT:  As to the 4 gigabyte SD card, no

**1250**

1  serial number, do you find this property subject to
2  forfeiture?
3        Is the jury's unanimous on this yes or no?
4        THE FOREPEERSON:  Yes.
5        THE COURT:  As to the premises located at 3 High
6  Gate Drive, Smithtown, New York, 11787, together with its
7  respective buildings, appurtenances, improvements,
8  fixtures, attachments, easements designated as district
9  473400, designated as District 473400, Section 50, Block 5
10 and Lot 23 on the Suffolk County tax map and all proceeds
11 traceable thereto.
12       Do you find this property is subject to
13 forfeiture?
14       Is the jury's unanimous verdict yes or no?
15       THE FOREPERSON:  Yes.
16       THE COURT:  Please listen to the verdict as
17 recorded by the Court as to Premier desktop computer,
18 serial number P800003011134, do you find this property
19 subject to forfeiture?
20       The jury's unanimous verdict is yes.
21       As to the four gigabyte SD card, no serial
22 number.
23       Do you find this property subject to forfeiture?
24       The jury's unanimous verdict, yes.
25       As to the premises located at 3 High Gate Drive,

**1251**

1  Smithtown, New York, 11787, together with its respective
2  buildings, appurtenances, improvements, fixtures,
3  attachments, easements designated as district 473400,
4  designated as District 473400, Section 50, Block 5 and Lot
5  23 on the Suffolk County tax map and all proceeds
6  traceable thereto.
7        The jury's unanimous verdict is yes.
8        Members of the jury is, is that your unanimous
9  verdict as to forfeiture.  So say you all?
10       THE JURY:  Yes.
11       THE COURT:  Again I'll poll the jury.
12       Juror 1, is that your verdict?
13       JUROR 1:  Yes.
14       THE COURT:  Juror 2, is that your verdict?
15       JUROR 2:  Yes.
16       THE COURT:  Juror 3, is that your verdict?
17       JUROR 3:  Yes.
18       THE COURT:  Juror 4, is that your verdict?
19       JUROR 4:  Yes.
20       THE COURT:  Juror 5, is that your verdict?
21       JUROR 5:  Yes.
22       THE COURT:  Juror 6, is that your verdict?
23       JUROR 6:  Yes.
24       THE COURT:  Juror 7, is that your verdict?
25       JUROR 7:  Yes.

1252

1  THE COURT:  Juror 8, is that your verdict?
2  JUROR 8:  Yes.
3  THE COURT:  Juror 9, is that your verdict?
4  JUROR 9:  Yes.
5  THE COURT:  Juror 10, is that your verdict?
6  JUROR 10:  Yes.
7  THE COURT:  Juror 11, is that your verdict?
8  JUROR 11:  Yes.
9  THE COURT:  Juror 12, is that your verdict?
10  JUROR 12:  Yes.
11  THE COURT:  The jury has been polled and the
12  jury's verdict is unanimous.
13  I'll speak to the lawyers at sidebar.

1253

1  (Side bar.)
2  THE COURT:  I'm giving the lawyers a chance to
3  inspect the verdict sheet.  Is there anything for before I
4  dismiss the jury?
5  MR. KABRAWALA:  No, your Honor.
6  MR. LAPINTA:  No, your Honor.
7  (End of sidebar conference.)
8  (Continued.)

1254

1  THE COURT:  Members of the jury, your jury
2  service is complete.  I would like to give you my deepest
3  thanks for your jury service in this case.  Although I did
4  not as you know conduct the jury selection in this case, I
5  do a lot of jury selections and often I ask people if
6  there is a reason they can't serve, a long line forms,
7  sometimes out the door of people who don't want to serve.
8  People have compelling reasons not to serve:
9  Illness, jobs, child care issues but there are a lot of
10  people that get up and it's clear to me that they don't
11  want to be bothered and don't want to serve.
12  When each of you are called in to serve on a
13  jury and you are given an opportunity to stand on that
14  line and try to get out of jury service, each of you were
15  willing to step up to the plate and perform your
16  obligations as a citizen of the United States to serve as
17  a juror.  You should be proud of the fact you are willing
18  to do that.
19  As both lawyers noted in their summations, this
20  was a particularly difficult case to be a juror in because
21  of the nature of the charges, the images in evidence that
22  you had to view and consider.
23  I wanted to note that it's also clear to me that
24  you were conscientious in your deliberations in how you
25  conducted yourself as jurors and you should be proud of

1255

1  that fact.  Our system won't work unless people like you
2  come in and perform this very important civic duty.
3  I've given this instruction so many times about
4  not discussing the case with anyone, but that doesn't
5  apply now.  You can discuss the case with anyone you wish
6  or no one at all.  It's up to you.  It's a personal
7  decision, but you can discuss the case with everyone you
8  wish.
9  It is important to me that everyone interacts
10  with the Court, especially this courtroom, whether it be
11  the lawyers, the litigants.  The jurors are treated with
12  professionalism and respect as they leave the courthouse
13  with a positive view of the interaction with the Court
14  system.  So if there is anything that we could be doing
15  better to make your jury service or other service in the
16  future, just pass it along to Michelle and she'll talk
17  about it to me.  I'm talking about anything about your
18  jury service.
19  I don't know if you know this, but federal
20  judges are appointed by the government for life, so if I'm
21  doing something wrong I'd rather know it now rather than a
22  long time for now.
23  So just pass those along to Michelle so I can
24  make that better.
25  (Whereupon, at this time the jury was

1  dismissed.)

2         THE COURT:  My deputy told me you selected a

3  date for sentencing, May 15th.

4         MR. KABRAWALA:  Yes, sir.

5         THE COURT:  At 1:30 p.m.

6         I don't know if the defense know whether they

7  anticipate making any posttrial motions or you don't know

8  yet?

9         MR. LATO:  Probably your Honor we'll make a Rule

10  29(c).  I understand the basis of your Honor's ruling but

11  I'll confer with the Government on a schedule.  Certainly

12  within two weeks from today I'll let you know whether I'll

13  require more time to make those motions.

14         THE COURT:  Just make sure you make the request

15  for more time within the time frame of the rule which is

16  14 days, as you know.

17         Thank you.

18         MR. KABRAWALA:  Thank you, your Honor.

19         (Proceedings concluded.)

20

21

22

23

24

25

**#**

**#1** [7] - 1082:10, 13, 15; 1102:3; 1104:16; 1113:3; 1116:15

**$**

**$1,000** [1] - 1211:22
**$100** [1] - 1210:15
**$1200** [1] - 1212:1

**0**

**0094** [1] - 1079:3

**1**

**1** [39] - 1082:5, 18; 1084:3, 9; 1086:16; 1093:6, 10-11, 16; 1094:25; 1100:3, 10; 1104:12, 14, 16, 18-19, 24; 1105:16; 1111:3, 5, 7, 13; 1113:5, 13; 1116:17, 23; 1210:18; 1212:23; 1219:10; 1222:17; 1224:17; 1251:12
**10** [11] - 1085:1; 1099:23; 1101:13; 1210:22; 1211:13; 1221:5; 1223:20; 1225:10; 1252:5
**100** [2] - 1079:13, 21
**100-acre** [2] - 1232:8
**10th** [2] - 1215:14, 19
**11** [11] - 1099:23; 1101:14; 1211:3, 13, 18; 1221:11; 1223:23; 1225:12; 1252:7
**11722** [2] - 1079:14, 22
**11787** [4] - 1227:18; 1239:5; 1250:6; 1251:1
**11788** [1] - 1079:18
**11:23** [3] - 1138:3; 1168:3; 1198:3
**12** [27] - 1099:23; 1101:15; 1129:3; 1135:21, 25; 1136:10, 20-21; 1159:3; 1165:21, 25; 1166:10, 20-21; 1189:3; 1195:21, 25; 1196:10, 20-21; 1211:20; 1221:17; 1224:1; 1225:14; 1252:9
**12:08** [3] - 1138:18; 1168:18; 1198:18
**12:15** [3] - 1137:16;

1167:16; 1197:16
**12:27** [3] - 1147:7; 1177:7; 1207:7
**13** [9] - 1079:7; 1099:24; 1100:1; 1101:2, 16-17; 1211:25; 1221:23; 1224:4
**14** [6] - 1079:3; 1086:18; 1088:8; 1222:4; 1224:7; 1256:16
**140** [1] - 1213:16
**15** [29] - 1082:3; 1122:23-25; 1123:16; 1126:5, 18; 1127:8; 1152:23-25; 1153:16; 1156:5, 18; 1157:8; 1182:23-25; 1183:16; 1186:5, 18; 1187:8; 1222:9; 1224:10; 1228:7; 1234:1
**15th** [1] - 1256:3
**16** [4] - 1101:13; 1210:22; 1221:6; 1223:21
**168** [1] - 1214:10
**169** [1] - 1213:16
**16th** [3] - 1211:5, 13, 15
**18** [33] - 1085:19; 1086:19; 1087:15, 18; 1094:3; 1095:1; 1097:5; 1099:20; 1100:20; 1101:18, 20; 1105:15, 17, 20; 1113:18; 1117:7; 1120:16, 21; 1123:18; 1126:25; 1127:5; 1150:16, 21; 1153:18; 1156:25; 1157:5; 1180:16, 21; 1183:18; 1186:25; 1187:5; 1235:7, 11
**19** [1] - 1085:2
**1980** [1] - 1216:4
**1981** [1] - 1214:23
**1999** [2] - 1213:17; 1214:10
**1:30** [1] - 1256:5
**1b** [1] - 1239:1

**2**

**2** [25] - 1082:20; 1085:6; 1086:18; 1087:22; 1088:5; 1089:16; 1096:20, 25; 1138:22; 1143:25; 1144:4; 1168:22; 1173:25; 1174:4;

1198:22; 1203:25; 1204:4; 1212:15, 18; 1219:15; 1222:20; 1224:19; 1251:14
**2(a** [2] - 1097:5; 1099:20
**2(a)** [1] - 1099:22
**2-B** [6] - 1143:25; 1144:4; 1173:25; 1174:4; 1203:25; 1204:4
**2-D** [9] - 1143:25; 1144:4; 1173:25; 1174:4; 1203:25; 1204:4
**2-E** [3] - 1143:25; 1173:25; 1203:25
**200** [1] - 1079:18
**2000** [1] - 1245:22
**2002** [1] - 1213:5
**2005** [1] - 1217:16
**2008** [1] - 1212:23
**2010** [1] - 1085:1
**2011** [1] - 1085:2
**2012** [42] - 1082:18; 1084:3; 1093:10; 1100:6; 1101:10-16; 1104:18; 1113:5; 1116:17; 1209:5, 11; 1210:13, 18, 22; 1211:3, 20; 1220:8, 13, 18, 24; 1221:6, 12, 18, 24; 1223:8, 11, 14, 17, 21, 24; 1224:2, 5
**2013)** [1] - 1208:14
**2014** [4] - 1079:7; 1123:3; 1153:3; 1183:3
**203** [3] - 1144:4; 1174:4; 1204:4
**204** [1] - 1245:22
**205** [5] - 1144:5; 1174:5; 1204:5; 1210:22; 1211:3
**205-A** [3] - 1144:5; 1174:5; 1204:5
**206** [4] - 1144:5; 1174:5; 1204:5; 1211:25
**208** [3] - 1144:5; 1174:5; 1204:5
**209** [3] - 1144:5; 1174:5; 1204:5
**210** [3] - 1144:5; 1174:5; 1204:5
**211** [3] - 1144:5; 1174:5; 1204:5
**211-A** [4] - 1144:5; 1174:5; 1204:5; 1210:13
**212** [3] - 1144:5; 1174:5; 1204:5

**213** [3] - 1144:5; 1174:5; 1204:5
**214** [3] - 1144:5; 1174:5; 1204:5
**215** [3] - 1144:6; 1174:6; 1204:6
**216** [3] - 1144:6; 1174:6; 1204:6
**217** [3] - 1144:6; 1174:6; 1204:6
**218** [3] - 1144:6; 1174:6; 1204:6
**219** [3] - 1144:6; 1174:6; 1204:6
**21st** [1] - 1211:8
**22** [4] - 1101:14; 1211:3; 1221:12; 1223:24
**220** [3] - 1144:6; 1174:6; 1204:6
**221** [3] - 1144:6; 1174:6; 1204:6
**222** [3] - 1144:6; 1174:6; 1204:6
**223** [3] - 1144:6; 1174:6; 1204:6
**224** [3] - 1144:6; 1174:6; 1204:6
**225** [3] - 1144:6; 1174:6; 1204:6
**2251** [1] - 1235:10
**2251(a** [6] - 1085:19; 1100:25; 1101:21; 1105:15, 20; 1235:10
**2251(c** [1] - 1094:3
**2251(e** [2] - 1101:18; 1105:17
**2252** [1] - 1235:11
**2252(a** [1] - 1235:11
**2252(a)(1** [1] - 1113:18
**2252(a)(2** [1] - 1117:7
**2252(a)(4)(B** [3] - 1123:18; 1153:18; 1183:18
**2252(b** [1] - 1235:11
**2253** [1] - 1235:7
**226** [3] - 1144:7; 1174:7; 1204:7
**2260** [1] - 1235:11
**227** [3] - 1144:7; 1174:7; 1204:7
**228** [3] - 1144:7; 1174:7; 1204:7
**229** [4] - 1144:7; 1174:7; 1204:7; 1211:20

1

**229-A** [3] - 1144:7; 1174:7; 1204:7

**22nd** [3] - 1211:4, 14, 18

**23** [9] - 1100:6; 1209:5; 1210:5; 1220:8; 1223:8; 1227:22; 1239:8; 1250:10; 1251:5

**230** [3] - 1144:7; 1174:7; 1204:7

**231** [3] - 1144:7; 1174:7; 1204:7

**235** [3] - 1144:7; 1174:7; 1204:7

**238** [3] - 1144:7; 1174:7; 1204:7

**238-A** [3] - 1144:7; 1174:7; 1204:7

**23rd** [1] - 1209:19

**24** [4] - 1101:10; 1209:11; 1220:13; 1223:11

**243** [3] - 1144:7; 1174:7; 1204:7

**244** [3] - 1144:8; 1174:8; 1204:8

**245** [3] - 1144:8; 1174:8; 1204:8

**245-A** [3] - 1144:8; 1174:8; 1204:8

**245-B** [3] - 1144:8; 1174:8; 1204:8

**246** [3] - 1144:8; 1174:8; 1204:8

**247** [3] - 1144:8; 1174:8; 1204:8

**24th** [1] - 1210:9

**27** [3] - 1101:16; 1221:24; 1224:5

**28** [7] - 1101:11; 1123:3; 1153:3; 1183:3; 1210:13; 1220:18; 1223:14

**282** [1] - 1213:5

**287** [1] - 1213:5

**29** [3] - 1208:6, 9; 1215:11

**29(c)** [1] - 1256:10

**2:30** [1] - 1219:3

**2:58** [1] - 1245:4

**2d** [3] - 1212:23; 1214:10; 1216:4

**2nd** [1] - 1208:14

## 3

**3** [24] - 1093:3, 5, 8; 1094:2; 1096:1, 6, 11, 20, 25; 1212:17; 1218:15; 1219:5, 20; 1222:23; 1224:21; 1227:18; 1229:5, 13; 1239:4; 1250:5, 25; 1251:16

**303** [3] - 1144:8; 1174:8; 1204:8

**303-A** [3] - 1144:8; 1174:8; 1204:8

**304** [1] - 1212:22

**323** [1] - 1217:16

**35** [1] - 1079:18

**356** [1] - 1217:16

**39** [1] - 1245:22

**3:35** [1] - 1249:12

## 4

**4** [20] - 1096:21; 1097:1; 1101:12; 1112:24; 1113:1, 3, 17; 1116:9; 1210:18; 1219:24; 1220:24; 1223:1, 17; 1224:23; 1239:3; 1249:2, 25; 1251:18

**400** [2] - 1229:2, 11

**403** [2] - 1247:5; 1248:11

**404(b** [1] - 1245:23

**44** [1] - 1245:22

**473400** [6] - 1227:21; 1239:7; 1250:9; 1251:3

**49** [1] - 1214:10

## 5

**5** [23] - 1096:23; 1097:1; 1116:12, 16; 1117:6; 1143:25; 1144:4; 1173:25; 1174:4; 1203:25; 1204:4; 1220:3; 1223:4; 1224:25; 1225:1; 1227:22; 1239:8; 1249:10; 1250:9; 1251:4, 20

**5-A** [3] - 1144:4; 1174:4; 1204:4

**50** [4] - 1227:21; 1239:8; 1250:9; 1251:4

**501-D** [3] - 1144:8; 1174:8; 1204:8

**502-A** [3] - 1144:9; 1174:9; 1204:9

**503-G** [3] - 1144:9;

**1094:2; 1096:1, 6, 11** (continued)

**504-E** [3] - 1144:9; 1174:9; 1204:9

**528** [1] - 1208:14

**551** [3] - 1144:9; 1174:9; 1204:9

**552** [3] - 1144:9; 1174:9; 1204:9

**552-A** [3] - 1144:9; 1174:9; 1204:9

**553** [3] - 1144:9; 1174:9; 1204:9

**554** [3] - 1144:9; 1174:9; 1204:9

**554-A** [3] - 1144:10; 1174:10; 1204:10

**554-B** [3] - 1144:10; 1174:10; 1204:10

**554-C** [3] - 1144:10; 1174:10; 1204:10

**556** [3] - 1144:10; 1174:10; 1204:10

**557** [3] - 1144:10; 1174:10; 1204:10

**558** [4] - 1144:10; 1174:10; 1204:10; 1209:4

**559** [4] - 1144:10; 1174:10; 1204:10; 1209:11

**559-A** [3] - 1144:10; 1174:10; 1204:10

**560** [4] - 1144:10; 1174:10; 1204:10; 1210:18

**561** [3] - 1144:10; 1174:10; 1204:10

**562** [3] - 1144:11; 1174:11; 1204:11

**564** [3] - 1144:11; 1174:11; 1204:11

**567** [3] - 1144:11; 1174:11; 1204:11

**567-A** [3] - 1144:11; 1174:11; 1204:11

**568** [3] - 1144:11; 1174:11; 1204:11

## 6

**6** [18] - 1099:23; 1100:1, 4; 1101:2, 15, 17; 1209:4, 15-16; 1211:20; 1220:7; 1221:18; 1223:7; 1224:2; 1225:2; 1251:22

**631** [1] - 1079:22

**637** [1] - 1216:4

**650** [1] - 1214:23

## 7                    2

**7** [13] - 1099:23; 1101:2, 10; 1209:11, 15-16; 1210:9; 1220:12; 1223:10; 1225:4; 1251:24

**712-6105** [1] - 1079:22

**79** [1] - 1208:14

## 8

**8** [10] - 1099:23; 1101:11; 1210:13; 1220:17; 1223:13; 1225:6; 1244:24; 1252:1

**80003011134** [1] - 1227:15

## 9

**9** [8] - 1099:23; 1101:12; 1220:23; 1223:16; 1225:8; 1252:3

**95** [1] - 1216:4

**9:30** [1] - 1079:7

**9th** [1] - 1215:15

## A

**a.m** [4] - 1079:7; 1138:3; 1168:3; 1198:3

**Abdallah** [1] - 1208:14

**abet** [1] - 1098:7

**abets** [2] - 1097:8, 23

**abetted** [12] - 1088:6; 1095:19; 1096:3, 19; 1097:13, 15; 1098:4; 1099:6; 1116:11; 1118:22; 1148:22; 1178:22

**abetter** [1] - 1098:19

**abetting** [7] - 1089:15; 1096:14; 1097:3, 18, 25; 1098:19

**abettor** [3] - 1099:15, 20, 22

**absence** [2] - 1098:22; 1112:11

**abundance** [3] - 1140:21; 1170:21; 1200:21

**abuse** [1] - 1089:22

**acceptable** [2] - 1080:13, 15

**acceptance** [3] - 1119:8; 1149:8; 1179:8

**accesses** [3] - 1123:22; 1153:22; 1183:22

**accident** [13] - 1115:6; 1119:15; 1121:8; 1122:11; 1127:16; 1149:15; 1151:8; 1152:11; 1157:16; 1179:15; 1181:8; 1182:11; 1187:16

**accomplish** [6] - 1102:9; 1106:4; 1107:4, 18; 1108:5; 1111:19

**accomplished** [1] - 1107:12

**accomplishment** [1] - 1110:20

**according** [3] - 1134:14; 1164:14; 1194:14

**Accordingly** [1] - 1111:22

**accordingly** [6] - 1097:10; 1122:16; 1152:16; 1182:16; 1214:16; 1234:18

**account** [1] - 1091:4

**accounts** [1] - 1215:7

**accusation** [5] - 1081:17; 1083:9; 1135:5; 1165:5; 1195:5

**achieve** [1] - 1106:25

**achieving** [1] - 1106:12

**acquiescence** [2] - 1098:16; 1110:11

**acquittal** [3] - 1131:6; 1161:6; 1191:6

**act** [29] - 1097:11; 1098:2; 1106:4; 1107:18; 1108:5; 1109:21; 1115:5; 1119:13; 1121:6, 13; 1122:11; 1127:14; 1131:13; 1149:13; 1151:6, 13; 1152:11; 1157:14; 1161:13; 1179:13; 1181:6, 13; 1182:11; 1187:14; 1191:13; 1208:18

**acted** [13] - 1089:13; 1091:8, 12; 1108:14; 1120:24; 1122:5, 7; 1150:24; 1152:5, 7; 1180:24; 1182:5, 7

**acting** [1] - 1103:11

**action** [5] - 1088:18; 1098:13; 1102:8, 14; 1210:11

**actions** [11] - 1099:12; 1102:16; 1107:1, 25; 1108:2, 10; 1122:15; 1152:15; 1182:15; 1213:2

**activities** [2] - 1104:4; 1109:8

**activity** [5] - 1090:13, 21; 1242:2, 20; 1245:24

**acts** [49] - 1087:15, 19; 1088:5; 1095:1; 1096:2, 18-19; 1099:2; 1102:24; 1103:1; 1108:25; 1109:17; 1110:12; 1111:9, 22, 25; 1112:2, 6, 10, 13, 15; 1116:10; 1118:21; 1122:8, 12, 14, 18; 1148:21; 1152:8, 12, 14, 18; 1178:21; 1182:8, 12, 14, 18; 1209:6, 12, 24; 1210:14, 24; 1211:22; 1212:5, 19; 1213:10

**actual** [30] - 1089:18; 1102:19; 1115:11; 1120:21; 1121:13, 18; 1125:13, 16; 1126:21; 1127:4, 20, 25; 1150:21; 1151:13, 18; 1155:13, 16; 1156:21; 1157:4, 20, 25; 1180:21; 1181:13, 18; 1185:13, 16; 1186:21; 1187:4, 20, 25

**adage** [3] - 1122:15; 1152:15; 1182:15

**addition** [4] - 1107:13; 1145:12; 1175:12; 1205:12

**additional** [5] - 1211:14; 1212:9; 1227:3; 1228:2; 1244:10

**additionally** [1] - 1092:17

**addressed** [2] - 1243:3, 12

**addresses** [1] - 1216:2

**addressing** [4] - 1083:13; 1142:11; 1172:11; 1202:11

**adjust** [1] - 1214:15

**admissible** [1] - 1216:17

**admitted** [1] - 1111:8

**admonished** [1] - 1243:24

**advertising** [1] - 1089:2

**advised** [2] - 1110:23; 1228:5

**affect** [1] - 1083:3

**affecting** [62] - 1084:14, 17, 22; 1085:11, 17; 1086:4, 7, 9; 1087:2, 5, 8; 1091:21, 25; 1092:2, 5; 1100:16, 19, 24; 1103:23; 1104:1, 5; 1105:5, 8, 14; 1113:11, 22; 1117:1, 14, 19; 1118:9; 1119:18, 22-23; 1120:5; 1123:7; 1124:1, 18; 1126:8, 10, 14; 1148:9; 1149:18, 22-23; 1150:5; 1153:7; 1154:1, 18; 1156:8, 10, 14; 1178:9; 1179:18, 22-23; 1180:5; 1183:7; 1184:1, 18; 1186:8, 10, 14

**affirmed** [1] - 1208:18

**afternoon** [1] - 1231:4

**age** [31] - 1086:19; 1087:12, 15; 1090:16; 1091:4; 1095:1; 1115:16; 1120:16, 19, 21; 1121:18; 1126:25; 1127:2, 5, 25; 1150:16, 19, 21; 1151:18; 1156:25; 1157:2, 5, 25; 1180:16, 19, 21; 1181:18; 1186:25; 1187:2, 5, 25

**agent** [1] - 1111:20

**aggravate** [1] - 1213:1

**aggregate** [1] - 1213:9

**ago** [1] - 1208:13

**agree** [20] - 1129:3; 1133:18; 1138:12; 1143:11, 19; 1145:19; 1159:3; 1163:18; 1168:12; 1173:11, 19; 1175:19; 1189:3; 1193:18; 1198:12; 1203:11, 19; 1205:19; 1243:15; 1249:4

**agreed** [3] - 1143:23; 1173:23; 1203:23

**agreement** [13] - 1106:3, 21; 1107:3, 8; 1108:2, 13; 1111:1;

**3**

1139:6; 1145:12; 1169:6; 1175:12; 1199:6; 1205:12

**aid** [7] - 1098:7; 1132:3, 5; 1162:3, 5; 1192:3, 5

**aided** [12] - 1088:6; 1095:19; 1096:2, 18; 1097:13, 15; 1098:4; 1099:5; 1116:10; 1118:22; 1148:22; 1178:22

**aider** [4] - 1098:19; 1099:15, 20, 22

**aiding** [8] - 1089:15; 1096:14; 1097:3, 18, 25; 1098:18; 1110:19

**aids** [2] - 1097:7, 23

**aims** [1] - 1108:13

**allegation** [3] - 1231:11; 1232:9; 1234:22

**allegations** [1] - 1244:5

**allege** [1] - 1083:17

**alleged** [13] - 1087:16, 19; 1095:1; 1101:7; 1107:6, 9; 1109:1; 1110:4; 1111:3; 1234:16, 20, 24; 1243:13

**alleges** [6] - 1119:25; 1126:9; 1149:25; 1156:9; 1179:25; 1186:9

**alleging** [2] - 1212:19; 1213:10

**ALLEN** [1] - 1079:15

**allow** [3] - 1130:13; 1160:13; 1190:13

**allowed** [3] - 1214:1; 1247:23, 25

**allowing** [1] - 1111:14

**alone** [6] - 1125:22; 1130:23; 1155:22; 1160:23; 1185:22; 1190:23

**alternate** [6] - 1136:2, 25; 1166:2, 25; 1196:2, 25

**alternates** [13] - 1080:9; 1136:17, 21-22; 1137:21; 1166:17, 21-22; 1196:17, 21-22; 1197:21

**ambit** [1] - 1109:22

**AMEET** [1] - 1079:14

**AMERICA** [1] - 1079:3

**amount** [3] - 1102:11, 24; 1215:2

**amounted** [1] - 1102:17

**amply** [1] - 1230:19

**anal** [2] - 1089:20

**anal-genital** [1] - 1089:20

**analogous** [1] - 1208:23

**analysis** [2] - 1216:11, 14

**anew** [1] - 1235:1

**Anson** [1] - 1212:22

**answer** [2] - 1099:14, 18

**ANTHONY** [1] - 1079:17

**anticipate** [1] - 1256:7

**apart** [2] - 1209:15; 1210:10

**appearances** [1] - 1080:2

**APPEARANCES** [1] - 1079:11

**applied** [1] - 1239:23

**applies** [15] - 1083:11; 1099:25; 1116:6; 1118:7; 1119:5; 1122:16, 21; 1148:7; 1149:5; 1152:16, 21; 1178:7; 1179:5; 1182:16, 21

**apply** [19] - 1081:24; 1102:6; 1105:25; 1114:10, 19; 1125:9; 1127:7; 1128:24; 1155:9; 1157:7; 1158:24; 1185:9; 1187:7; 1188:24; 1235:4; 1241:10; 1243:23; 1244:4; 1255:5

**appointed** [1] - 1255:20

**apprised** [1] - 1109:8

**approach** [1] - 1225:17

**appropriate** [7] - 1142:24; 1172:24; 1202:24; 1214:12, 14; 1215:5; 1243:12

**approximate** [7] - 1084:4; 1085:2; 1093:11; 1101:7; 1104:19; 1113:6; 1116:18

**appurtenances** [4] - 1227:19; 1239:6; 1250:7; 1251:2

**appx** [1] - 1208:14

**April** [9] - 1084:3; 1093:10; 1101:12; 1104:18; 1113:5; 1116:17; 1210:18; 1220:24; 1223:17

**area** [8] - 1089:23; 1090:2, 4, 8-9; 1248:7

**argument** [3] - 1212:16; 1244:12; 1248:5

**arguments** [8] - 1129:22; 1159:22; 1189:22; 1228:4; 1230:24

**Arkay** [1] - 1079:18

**arranging** [1] - 1102:22

**arrive** [6] - 1129:17; 1131:4; 1159:17; 1161:4; 1189:17; 1191:4

**arriving** [3] - 1137:15; 1167:15; 1197:15

**articulated** [1] - 1217:6

**aside** [3] - 1141:5; 1171:5; 1201:5

**aspects** [1] - 1248:7

**assert** [1] - 1213:17

**assist** [2] - 1094:8; 1095:8

**Assistants** [1] - 1079:15

**assisted** [2] - 1079:24; 1110:23

**assisting** [1] - 1236:1

**associate** [2] - 1098:9; 1099:10

**associated** [1] - 1090:12

**associates** [1] - 1243:2

**association** [1] - 1110:6

**assume** [15] - 1138:10; 1139:13, 15; 1142:19; 1143:14; 1168:10; 1169:13, 15; 1172:19; 1173:14; 1198:10; 1199:13, 15; 1202:19; 1203:14

**attached** [3] - 1143:8; 1173:8; 1203:8

**attachment** [3] - 1143:2; 1173:2; 1203:2

**attachments** [13]

1143:2, 4, 11; 1173:2, 4, 11; 1203:2, 4, 11; 1227:20; 1239:7; 1250:8; 1251:3

**attempt** [23] - 1100:9; 1102:11, 23-24; 1103:1, 10; 1132:25; 1162:25; 1192:25; 1208:10, 13; 1210:5, 17, 21; 1211:2, 15, 18, 24; 1212:14; 1214:20, 25; 1215:1

**Attempted** [16] - 1220:7, 12, 17, 23; 1221:5, 11, 17, 23; 1223:7, 10, 13, 16, 20, 23; 1224:1, 4

**attempted** [9] - 1082:17; 1099:24; 1100:2; 1101:3, 23; 1103:16; 1208:15; 1215:7

**attempting** [1] - 1103:6

**attempts** [4] - 1101:20; 1209:1; 1212:9; 1214:4

**attend** [3] - 1135:17; 1165:17; 1195:17

**attention** [4] - 1134:17; 1164:17; 1194:17; 1228:13

**attire** [1] - 1090:15

**Attorney** [2] - 1079:13, 15

**attorneys** [1] - 1225:16

**attract** [1] - 1090:1

**authority** [1] - 1088:23

**automatically** [1] - 1110:7

**available** [1] - 1107:21

**avoid** [1] - 1237:22

**avoids** [1] - 1215:8

**aware** [8] - 1098:24; 1115:25; 1122:1; 1128:8; 1152:1; 1158:8; 1182:1; 1188:8

**awareness** [23] - 1108:12; 1115:9, 18, 23-24; 1121:11, 19, 24; 1127:18; 1128:2, 7; 1151:11, 19, 24; 1157:18; 1158:2, 7; 1181:11, 19, 24; 1187:18; 1188:2, 7

**B**

**backdrop** [2] - 1233:8, 16

**4**

**backyard** [1] - 1232:4

**banks** [1] - 1243:2

**bar** [1] - 1253:1

**base** [3] - 1132:15; 1162:15; 1192:15

**based** [13] - 1082:25; 1091:3; 1129:19; 1159:19; 1189:19; 1210:4; 1212:7; 1215:4; 1231:17, 21, 23; 1232:2; 1246:5

**basement** [6] - 1229:25; 1232:1; 1233:9, 15; 1248:7, 13

**basic** [1] - 1108:13

**basis** [8] - 1130:12, 25; 1160:12, 25; 1190:12, 25; 1210:12; 1256:10

**bear** [3] - 1130:1; 1160:1; 1190:1

**bearing** [2] - 1083:8; 1109:15

**became** [2] - 1106:23; 1108:8

**become** [5] - 1109:5; 1139:10; 1169:10; 1199:10; 1246:14

**becomes** [8] - 1110:25; 1111:19; 1132:21; 1139:10; 1162:21; 1169:10; 1192:21; 1199:10

**bed** [1] - 1209:25

**BEFORE** [1] - 1079:8

**begin** [7] - 1080:20; 1131:12; 1137:25; 1161:12; 1167:25; 1191:12; 1197:25

**beginning** [4] - 1083:12; 1138:6; 1168:6; 1198:6

**behavior** [3] - 1236:2, 4; 1242:3

**belief** [7] - 1116:2; 1122:2; 1128:10; 1152:2; 1158:10; 1182:2; 1188:10

**bench** [3] - 1144:21; 1174:21; 1204:21

**bestiality** [1] - 1089:22

**better** [5] - 1144:2;

**5**

1174:2; 1204:2;
1255:15, 24
**between** [20] - 1084:3;
1085:1; 1089:21;
1092:8; 1093:10;
1102:18; 1104:18;
1106:3; 1107:17;
1113:5; 1116:17;
1132:11; 1162:11;
1192:11; 1212:11;
1240:25; 1245:13;
1246:12, 24; 1247:2
**beyond** [75] - 1081:11,
20; 1086:14; 1087:14,
17, 23; 1088:8;
1091:19; 1092:12;
1094:22; 1096:6, 10;
1097:13; 1098:5;
1101:24; 1102:12;
1106:19; 1108:8;
1111:4; 1112:4; 1114:6;
1118:3; 1119:2, 20;
1120:10; 1121:1;
1122:6; 1124:11;
1125:6; 1126:6, 15, 19;
1127:9; 1130:3, 12, 22;
1131:9; 1148:3; 1149:2,
20; 1150:10; 1151:1;
1152:6; 1154:11;
1155:6; 1156:6, 15, 19;
1157:9; 1160:3, 12, 22;
1161:9; 1178:3; 1179:2,
20; 1180:10; 1181:1;
1182:6; 1184:11;
1185:6; 1186:6, 15, 19;
1187:9; 1190:3, 12, 22;
1191:9; 1240:1, 4;
1241:8
**Bianco** [1] - 1231:6
**BIANCO** [1] - 1079:9
**bias** [3] - 1131:2;
1161:2; 1191:2
**binder** [51] - 1138:24;
1139:13, 15, 19, 22;
1141:4, 7, 13, 24;
1142:4, 22; 1144:15;
1145:22; 1146:5, 8-9;
1168:24; 1169:13, 15,
19, 22; 1171:4, 7, 13,
24; 1172:4, 22;
1174:15; 1175:22;
1176:5, 8-9; 1198:24;
1199:13, 15, 19, 22;
1201:4, 7, 13, 24;
1202:4, 22; 1204:15;
1205:22; 1206:5, 8
**blank** [2] - 1218:17, 22
**Block** [2] - 1250:9;
1251:4

**block** [2] - 1227:22;
1239:8
**BODE** [50] - 1079:15;
1137:9; 1139:3, 23;
1140:6, 9; 1141:1, 14;
1142:25; 1143:6, 14,
19, 25; 1144:3;
1146:24; 1167:9;
1169:3, 23; 1170:6, 9;
1171:1, 14; 1172:25;
1173:6, 14, 19, 25;
1174:3; 1176:24;
1197:9; 1199:3, 23;
1200:6, 9; 1201:1, 14;
1202:25; 1203:6, 14,
19, 25; 1204:3;
1206:24; 1218:7;
1234:5; 1237:7, 10, 12,
15; 1238:2
**book** [4] - 1144:2;
1174:2; 1204:2; 1235:12
**books** [3] - 1123:22;
1153:22; 1183:22
**border** [1] - 1104:11
**bothered** [1] - 1254:11
**break** [15] - 1080:25;
1081:1; 1135:24;
1137:18; 1144:19;
1147:6; 1165:24;
1167:18; 1174:19;
1177:6; 1195:24;
1197:18; 1204:19;
1207:6
**brief** [4] - 1226:8;
1228:6, 16; 1232:20
**briefly** [1] - 1209:3
**bring** [21] - 1080:8;
1088:18; 1099:9;
1102:8; 1133:21, 25;
1139:25; 1142:7, 16;
1163:21, 25; 1169:25;
1172:7, 16; 1193:21,
25; 1199:25; 1202:7,
16; 1218:24; 1249:11
**brings** [1] - 1090:1
**broad** [1] - 1232:10
**brought** [1] - 1081:17
**buildings** [4] -
1227:19; 1239:6;
1250:7; 1251:2
**bunch** [1] - 1217:17
**burden** [27] - 1088:4;
1096:1, 17; 1097:21;
1116:9; 1118:20;
1124:12; 1130:2, 4;
1131:8; 1148:20;
1154:12; 1160:2, 4;
1161:8; 1178:20;

1184:12; 1190:2, 4;
1191:8; 1230:10;
1239:13, 21; 1240:1;
1243:25
**business** [10] -
1134:20; 1164:20;
1194:20; 1216:7, 17,
22; 1217:5, 13, 19;
1243:2
**businesses** [1] -
1243:1
**buy** [1] - 1208:16

---

**C**

**Cablevision** [3] -
1216:1, 19, 24
**cafeteria** [3] -
1138:9; 1168:9; 1198:9
**cam** [1] - 1089:9
**camcorder** [5] -
1231:14, 16, 18, 23;
1232:12
**camera** [6] - 1092:19;
1229:25; 1248:1, 4, 9
**cameras** [7] - 1084:19;
1085:13; 1100:21;
1105:10; 1229:24;
1230:2; 1232:13
**cannot** [7] - 1130:13;
1141:10; 1160:13;
1171:10; 1190:13;
1201:10; 1218:4
**capable** [4] - 1089:6;
1126:20; 1176:20;
1206:20
**Carboni** [1] - 1245:22
**card** [16] - 1216:3, 6,
16; 1227:16; 1229:3,
12, 18; 1231:9, 14;
1232:11; 1233:3, 18;
1239:3; 1248:3;
1249:25; 1250:21
**cards** [1] - 1085:13
**care** [1] - 1254:9
**careful** [3] - 1134:17;
1164:17; 1194:17
**carriages** [1] - 1082:5
**carry** [1] - 1096:3
**carrying** [2] -
1096:19; 1111:20
**Case** [1] - 1080:1
**case** [113] - 1080:11;
1082:3; 1089:16;
1106:22; 1107:23;
1108:16; 1115:8;
1121:10; 1127:17;
1128:22; 1129:8, 20;

1130:10, 19; 1132:19;
1133:3; 1134:14;
1136:3, 5, 7-8, 14, 18;
1141:13; 1142:1;
1146:9; 1151:10;
1157:17; 1158:22;
1159:8, 20; 1160:10,
19; 1162:19; 1163:3;
1164:14; 1166:3, 5,
7-8, 14, 18; 1171:13;
1172:1; 1176:9;
1181:10; 1187:17;
1188:22; 1189:8, 20;
1190:10, 19; 1192:19;
1193:3; 1194:14;
1196:3, 5, 7-8, 14, 18;
1201:13; 1202:1;
1206:9; 1208:14;
1212:13, 22, 25;
1213:1, 22, 24; 1214:1,
9, 11, 13, 23; 1215:14,
20; 1216:2, 5, 10;
1217:15, 17; 1227:8;
1233:11; 1234:14;
1236:9; 1239:25;
1241:10; 1245:6, 25;
1246:21; 1247:7, 10,
16, 21; 1248:5; 1254:3,
20; 1255:4, 7
**cases** [5] - 1107:25;
1208:8; 1215:11, 24;
1217:17
**cash** [1] - 1211:1
**category** [3] - 1146:1;
1176:1; 1206:1
**caution** [6] - 1083:20;
1110:3, 10; 1140:21;
1170:21; 1200:21
**CD** [3] - 1139:20;
1169:20; 1199:20
**CDs** [9] - 1141:9, 13,
16; 1171:9, 13, 16;
1201:9, 13, 16
**ceiling** [1] - 1229:25
**cell** [5] - 1138:8;
1168:8; 1198:8; 1210:2;
1212:3
**Central** [3] - 1079:5,
14, 22
**central** [3] - 1246:21;
1247:7; 1248:5
**certain** [10] - 1083:16;
1096:15; 1209:24;
1212:6; 1218:11;
1234:15, 19; 1246:21
**certainly** [17] -
1146:19; 1176:19;
1206:19; 1209:9;
1210:4; 1211:14, 23;

1213:5, 24; 1214:17,
19; 1216:21; 1217:12;
1247:15; 1248:6, 9;
1256:11

**chacko** [1] - 1213:16

**chance** [1] - 1253:2

**change** [4] - 1129:14;
1159:14; 1189:14;
1216:11

**character** [1] -
1110:22

**characterized** [1] -
1107:20

**charge** [29] - 1081:7,
25; 1082:9, 16;
1083:16, 24; 1085:18;
1096:7, 12; 1101:17;
1103:6; 1106:2;
1112:23; 1128:21;
1129:2; 1131:1; 1137:6;
1158:21; 1159:2;
1161:1; 1167:6;
1188:21; 1189:2;
1191:1; 1197:6;
1212:20; 1213:9;
1246:8; 1247:10

**charged** [33] - 1081:4,
9, 11, 14; 1083:3;
1088:5; 1096:2, 18, 20;
1097:21; 1098:5;
1099:6, 8, 16; 1102:14;
1106:21; 1108:5, 9;
1111:12; 1112:5;
1116:10; 1118:21;
1130:25; 1148:21;
1160:25; 1178:21;
1190:25; 1212:17;
1213:3, 9; 1234:10;
1245:20, 24

**charges** [30] - 1081:17,
23; 1082:4, 11, 14, 19,
22; 1083:6, 14; 1093:5;
1094:2; 1100:2; 1101:3;
1104:14; 1105:16;
1111:11; 1113:1, 17;
1116:13; 1117:6;
1122:24; 1123:17;
1152:24; 1153:17;
1182:24; 1183:17;
1208:15; 1213:1;
1247:16; 1254:21

**charging** [4] -
1096:20, 22-23; 1212:17

**child** [99] - 1082:6,
10, 12, 15, 17, 20, 23;
1083:23, 25; 1086:13;
1087:11, 21; 1090:14,
16-17; 1091:17, 19;
1093:4, 6; 1094:21;

1096:21, 24; 1099:24;
1100:3; 1101:4, 9, 24;
1102:2, 5; 1103:17;
1104:13, 15; 1105:24;
1106:16, 22; 1107:8,
14, 19; 1111:4;
1112:19, 24; 1113:2;
1114:5; 1116:11, 14;
1118:2, 22, 24;
1119:17; 1120:7, 23;
1122:23, 25; 1124:10;
1141:15; 1143:3, 5;
1148:2, 22, 24;
1149:17; 1150:7, 23;
1152:23, 25; 1154:10;
1171:15; 1173:3, 5;
1178:2, 22, 24;
1179:17; 1180:7, 23;
1182:23, 25; 1184:10;
1201:15; 1203:3, 5;
1212:25; 1213:7;
1231:19, 22, 24;
1232:3; 1233:4, 19;
1235:9; 1241:20;
1246:1, 24; 1247:3;
1248:12; 1254:9

**Child** [30] - 1219:11,
16, 21, 25; 1220:3, 8,
13, 18, 24; 1221:6, 12,
18, 24; 1222:5, 9, 17,
20, 23; 1223:1, 4, 8,
11, 14, 17, 21, 24;
1224:2, 5, 7, 10

**child's** [1] - 1090:8

**children** [11] -
1090:2; 1227:11, 13;
1233:11, 15; 1236:12,
14; 1239:16; 1243:17;
1247:12, 22

**Cir** [4] - 1208:14;
1212:23; 1214:10;
1216:4

**circuit** [1] - 1216:5

**Circuit** [13] - 1208:17;
1213:5, 16; 1214:11,
23; 1215:4, 14, 19-20,
23; 1216:2, 9; 1245:22

**circuits** [1] - 1213:23

**circumstances** [18] -
1103:8, 14; 1107:23;
1108:16; 1115:25;
1121:25; 1122:18;
1128:8; 1151:25;
1152:18; 1158:8;
1181:25; 1182:18;
1188:8; 1208:20, 23;
1246:13, 17

**circumstantial** [8] -
1115:21; 1121:22;

1128:5; 1151:22;
1158:5; 1181:22;
1188:5; 1235:3

**citing** [1] - 1213:4

**citizen** [1] - 1254:16

**civic** [1] - 1255:2

**claim** [1] - 1240:14

**claims** [1] - 1243:1

**clarify** [3] - 1142:5;
1172:5; 1202:5

**clear** [28] - 1131:1;
1139:9; 1141:1;
1142:22; 1145:20, 25;
1161:1; 1169:9; 1171:1;
1172:22; 1175:20, 25;
1191:1; 1199:9; 1201:1;
1202:22; 1205:20, 25;
1212:7, 23; 1214:24;
1216:5, 9; 1217:8;
1245:21; 1247:21;
1254:10, 23

**clearly** [4] - 1103:1;
1122:15; 1152:15;
1182:15

**Clerk** [1] - 1218:19

**clerk** [4] - 1135:12;
1165:12; 1195:12;
1244:13

**close** [5] - 1134:17;
1164:17; 1194:17;
1228:13; 1247:4

**closing** [7] - 1128:16;
1129:22; 1158:16;
1159:22; 1188:16;
1189:22; 1228:4

**clothed** [1] - 1090:18

**co** [5] - 1109:1;
1111:12, 20; 1112:13;
1233:19

**co-conspirator** [2] -
1112:13; 1233:19

**co-conspirators** [3] -
1109:1; 1111:12, 20

**Code** [14] - 1085:20;
1094:4; 1097:5;
1100:25; 1101:19;
1105:15, 18; 1113:19;
1117:8; 1123:19;
1153:19; 1183:19;
1235:7, 11

**coerce** [7] - 1084:8;
1085:6; 1088:22;
1093:15; 1100:10;
1104:23; 1241:18

**coerced** [4] - 1086:22;
1087:25; 1088:10;
1095:5

**coerces** [2] - 1085:23;

1094:7

**coercing** [1] - 1235:24

**combination** [1] -
1107:3

**commands** [1] - 1097:8

**commence** [3] -
1084:15; 1228:9; 1245:3

**comment** [3] - 1140:12;
1170:12; 1200:12

**comments** [1] - 1212:6

**commerce** [106] -
1084:14, 18, 22-23;
1085:12, 16-17; 1086:4,
7, 10; 1087:3, 6, 9;
1091:17, 21-22, 25;
1092:3, 6, 11, 22, 24;
1093:22, 25; 1094:15,
18; 1095:18, 22;
1100:15, 19, 23, 25;
1103:23; 1104:1, 5, 8;
1105:5, 9, 13-14;
1113:11, 22-23;
1114:12, 14, 19;
1116:24; 1117:2, 12,
14, 19; 1118:10;
1119:18, 22, 24;
1120:2, 4, 6; 1123:7,
10; 1124:1, 19, 21;
1126:8, 11-12, 15;
1148:10; 1149:18, 22,
24; 1150:2, 4, 6;
1153:7, 10; 1154:1, 19,
21; 1156:8, 11-12, 15;
1178:10; 1179:18, 22,
24; 1180:2, 4, 6;
1183:7, 10; 1184:1, 19,
21; 1186:8, 11-12, 15

**commission** [21] -
1097:9, 16; 1098:4;
1099:6; 1102:15, 17,
23; 1103:4, 12; 1106:7;
1208:21; 1227:12;
1230:7; 1233:7;
1235:21; 1236:13;
1239:19; 1241:17;
1242:1, 11; 1243:20

**commit** [22] - 1097:23;
1098:7; 1102:1, 10, 13,
25; 1103:2, 6, 11;
1214:20; 1227:11;
1228:23; 1229:15;
1230:16; 1231:7;
1232:16; 1235:20;
1236:13; 1239:18;
1241:23; 1242:10;
1243:20

**commits** [1] - 1097:7

**committed** [15] -
1097:12, 17, 20, 25;

1098:6, 15-16; 1099:17; 1103:7; 1106:8, 16; 1107:14; 1111:10; 1114:15; 1234:24

**common** [5] - 1088:14; 1106:4; 1108:4; 1111:24

**communicate** [14] - 1132:18, 22, 25; 1133:1; 1162:18, 22, 25; 1163:1; 1192:18, 22, 25; 1193:1; 1229:21; 1233:19

**communications** [3] - 1131:15; 1161:15; 1191:15

**compare** [3] - 1132:6; 1162:6; 1192:6

**compel** [1] - 1088:22

**compelling** [1] - 1254:8

**complete** [7] - 1132:10; 1162:10; 1192:10; 1208:6; 1228:15; 1245:20; 1254:2

**completed** [3] - 1214:20, 25; 1215:1

**completely** [1] - 1215:23

**computer** [25] - 1079:24; 1085:13; 1086:8; 1089:5; 1100:21; 1113:24; 1117:16; 1124:4; 1154:4; 1184:4; 1227:14; 1229:1, 10, 17, 21-22; 1231:20, 22; 1232:10; 1233:2, 18; 1239:2; 1250:17

**computer-assisted** [1] - 1079:24

**concede** [4] - 1214:18; 1231:9, 17; 1232:1

**concern** [3] - 1130:7; 1160:7; 1190:7

**concerned** [1] - 1242:22

**concerning** [7] - 1089:11; 1091:10; 1097:3; 1234:19; 1243:23; 1244:2, 4

**concluded** [3] - 1210:4; 1214:3; 1256:19

**concludes** [3] - 1134:16; 1164:16; 1194:16

**conclusive** [1] - 1234:25

**conduct** [150] - 1084:9, 11; 1085:8, 24-25; 1086:1, 23, 25; 1087:21; 1088:1, 11-12; 1089:12, 15, 18; 1091:10, 13-14; 1092:18, 25; 1093:16, 19; 1094:9, 11; 1095:6, 9, 12; 1098:17; 1100:11; 1103:3, 13, 19; 1104:25; 1105:2; 1107:23; 1108:15; 1112:21; 1113:14, 16; 1114:1, 23-24; 1115:2, 12, 20; 1116:23; 1117:4, 22-23; 1118:13, 17-18; 1120:8, 12, 14, 17, 22; 1121:4, 14, 21; 1123:14; 1124:6, 24-25; 1125:3; 1126:21, 23, 25; 1127:6, 12-13, 21; 1128:3; 1148:13, 17-18; 1150:8, 12, 14, 17, 22; 1151:4, 14, 21; 1153:14; 1154:6, 24-25; 1155:3; 1156:21, 23, 25; 1157:6, 12-13, 21; 1158:3; 1178:13, 17-18; 1180:8, 12, 14, 17, 22; 1181:4, 14, 21; 1183:14; 1184:6, 24-25; 1185:3; 1186:21, 23, 25; 1187:6, 12-13, 21; 1188:3; 1235:25; 1247:17; 1254:4

**conducted** [1] - 1254:25

**confederates** [1] - 1111:11

**confer** [15] - 1140:14, 15; 1144:23; 1145:2; 1170:11, 15; 1174:23; 1175:2; 1200:11, 15; 1204:23; 1205:2; 1231:3; 1238:1; 1256:11

**conference** [3] - 1226:17; 1238:4; 1253:7

**conferred** [1] - 1239:10

**conferring** [3] - 1144:22; 1174:22; 1204:22

**confirm** [7] - 1141:20; 1171:20; 1201:20; 1239:9

**confused** [4] - 1146:7; 1176:7; 1206:7; 1237:4

**confusion** [2] - 1237:22; 1247:18

**connected** [1] - 1209:2

**connection** [4] - 1109:4; 1227:23; 1241:9; 1242:25

**conscientious** [1] - 1254:24

**conscientiously** [3] - 1129:13; 1159:13; 1189:13

**conscious** [3] - 1122:9; 1152:9; 1182:9

**consent** [3] - 1112:19, 22; 1244:19

**consented** [1] - 1112:20

**consider** [25] - 1080:24; 1082:24; 1083:20; 1089:11; 1090:5; 1091:10; 1098:21; 1108:2; 1120:19; 1127:2; 1129:4; 1135:11; 1150:19; 1157:2; 1159:4; 1165:11; 1180:19; 1187:2; 1189:4; 1195:11; 1240:15; 1242:18; 1243:5; 1244:7; 1254:22

**consideration** [10] - 1096:4, 9; 1099:21; 1130:14; 1160:14; 1190:14; 1234:21; 1243:9; 1244:2

**considered** [5] - 1081:18; 1112:9, 14; 1242:23; 1247:5

**considering** [4] - 1090:15; 1129:10; 1159:10; 1189:10

**consist** [1] - 1102:21

**consistent** [6] - 1146:2; 1176:2; 1206:2; 1212:2; 1215:23; 1216:20

**Conspiracy** [2] - 1219:10; 1222:17

**conspiracy** [48] - 1082:5; 1104:12, 15; 1106:2, 6, 8-9, 11, 14-15, 18, 24-25; 1107:3, 7, 20, 22, 25; 1108:9, 12, 18, 21, 24; 1109:5, 7, 10, 22; 1110:2, 5, 7, 14-15, 19, 22; 1111:4, 12, 16, 18, 21, 24-25; 1112:2, 5, 7, 9, 17

**conspiracy's** [1] -

1109:13

**conspirator** [3] - 1111:1; 1112:13; 1233:19

**conspirators** [5] - 1107:9; 1109:1, 18; 1111:12, 20

**conspire** [1] - 1104:22

**conspires** [1] - 1105:19

**constitute** [7] - 1102:25; 1103:13; 1208:10; 1210:17, 21; 1211:2, 23

**constituted** [1] - 1208:19

**constitutes** [6] - 1090:5; 1092:10; 1126:14; 1156:14; 1186:14; 1243:21

**constituting** [2] - 1097:11; 1235:17

**consult** [3] - 1133:23; 1163:23; 1193:23

**consultation** [3] - 1142:11; 1172:11; 1202:11

**contain** [4] - 1123:24; 1153:24; 1183:24; 1216:8

**contained** [12] - 1115:19; 1121:20; 1128:2; 1146:23; 1151:20; 1158:2; 1176:23; 1181:20; 1188:2; 1206:23; 1245:8; 1248:4

**containing** [18] - 1123:5; 1138:24; 1139:14; 1142:22; 1145:22; 1146:8; 1153:5; 1168:24; 1169:14; 1172:22; 1175:22; 1176:8; 1183:5; 1198:24; 1199:14; 1202:22; 1205:22; 1206:8

**contains** [10] - 1082:3; 1117:14; 1141:5; 1171:5; 1201:5; 1227:10; 1235:13; 1236:11; 1239:15; 1243:16

**content** [2] - 1091:4; 1247:14

**contents** [15] - 1115:14, 24; 1121:16, 25; 1127:23; 1128:7;

7

1151:16, 25; 1157:23; 1158:7; 1181:16, 25; 1187:23; 1188:7

**context** [6] - 1081:13; 1088:25; 1107:25; 1211:1, 8; 1246:25

**continue** [16] - 1080:10, 19; 1136:10-12; 1137:17; 1166:10-12; 1167:17; 1196:10-12; 1197:17; 1243:23; 1244:3

**Continued** [7] - 1117:24; 1225:20; 1226:18; 1232:21; 1236:18; 1238:5; 1253:4

**contrary** [3] - 1081:19; 1100:25; 1105:14

**control** [14] - 1125:12, 15, 18, 25; 1155:12, 15, 18, 25; 1185:12, 15, 18, 25; 1248:3, 8

**controls** [3] - 1129:25; 1159:25; 1189:25

**conversion** [1] - 1089:6

**convey** [1] - 1088:16

**convict** [2] - 1098:3; 1102:11

**convicted** [10] - 1130:15; 1160:15; 1190:15; 1214:24; 1235:8; 1239:17; 1241:21; 1242:12; 1243:7, 19

**conviction** [8] - 1129:16; 1159:16; 1189:16; 1214:19; 1215:2, 6; 1227:24; 1235:15

**convinced** [6] - 1129:15; 1130:2; 1159:15; 1160:2; 1189:15; 1190:2

**cooperate** [1] - 1107:17

**copies** [1] - 1218:19

**copy** [11] - 1135:1, 6; 1165:1, 6; 1195:1, 6; 1216:21; 1218:22; 1234:2, 4; 1244:14

**correct** [11] - 1142:14; 1143:20; 1145:1; 1172:14; 1173:20; 1175:1; 1202:14; 1203:20; 1205:1;

1214:17; 1215:22

**correctly** [3] - 1146:22; 1176:22; 1206:22

**corresponds** [1] - 1101:6

**couch** [5] - 1231:25; 1237:3, 5, 11, 23

**Counsel** [1] - 1238:1

**counsel** [17] - 1129:23; 1138:12; 1140:15; 1145:2; 1159:23; 1168:12; 1170:15; 1175:2; 1189:23; 1198:12; 1200:15; 1205:2; 1231:3; 1233:11

**counsels** [1] - 1097:8

**Count** [63] - 1082:5, 11; 1083:19; 1084:1; 1086:16, 18; 1087:13, 16, 22; 1088:5, 8; 1089:16; 1093:3; 1096:1, 6, 11, 21, 23; 1101:2; 1104:12, 14; 1105:16; 1111:3, 5, 7, 13; 1112:24; 1113:1, 3, 17; 1116:9; 1123:17; 1153:17; 1183:17; 1209:4, 15-16; 1210:9, 18; 1211:13, 18, 20, 25; 1212:15, 17-18; 1219:10, 15, 20, 24; 1220:3, 7, 12; 1222:17, 20, 23; 1223:1, 4, 7, 10; 1224:4

**count** [107] - 1082:14, 16, 19, 22, 24; 1083:1, 4, 7, 21; 1084:24; 1093:5, 8; 1094:2; 1100:4; 1101:3, 6-7, 10-16; 1104:16; 1116:5, 12-13, 16; 1117:6; 1118:20; 1119:1, 19; 1120:9, 25; 1122:23-25; 1123:16; 1126:5, 18; 1127:8; 1129:4-6; 1135:3, 10-11; 1148:20; 1149:1, 19; 1150:9, 25; 1152:23-25; 1153:16; 1156:5, 18; 1157:8; 1159:4-6; 1165:3, 10-11; 1178:20; 1179:1, 19; 1180:9, 25; 1182:23-25; 1183:16; 1186:5, 18; 1187:8; 1189:4-6; 1195:3, 10-11; 1209:11; 1210:13, 22; 1211:3; 1212:15, 21, 25;

1219:6; 1220:17, 23; 1221:5, 11, 17; 1222:4, 9; 1223:13, 16, 20, 23; 1224:1, 7, 10; 1227:2

**countless** [1] - 1233:8

**country** [3] - 1092:8; 1093:2; 1217:18

**counts** [33] - 1082:3, 9; 1083:5, 12, 16, 24; 1085:18; 1096:15, 20; 1101:2, 5, 17; 1102:6; 1116:6; 1122:22; 1134:5; 1152:22; 1164:5; 1182:22; 1194:5; 1212:10, 14, 24; 1214:5, 15, 19; 1215:7; 1243:23; 1246:22

**Counts** [7] - 1083:13, 22; 1096:20, 25; 1097:1; 1099:23; 1100:1

**County** [5] - 1221:23; 1227:22; 1239:8; 1250:10; 1251:5

**couple** [4] - 1135:19; 1165:19; 1195:19; 1208:7

**coupled** [1] - 1098:15

**course** [8] - 1090:24; 1103:3; 1131:17; 1141:10; 1161:17; 1171:10; 1191:17; 1201:10

**COURT** [190] - 1079:1; 1080:3, 8, 18; 1135:19; 1137:1, 6, 11, 15, 24; 1138:4, 13, 19; 1139:5, 13, 21, 25; 1140:3, 8, 14, 24; 1141:3, 12, 20; 1142:14, 16, 20; 1143:4, 10, 13, 16, 23; 1144:1, 13, 19, 25; 1145:8, 19; 1147:1; 1165:19; 1167:1, 6, 11, 15, 24; 1168:4, 13, 19; 1169:5, 13, 21, 25; 1170:3, 8, 14, 24; 1171:3, 12, 20; 1172:14, 16, 20; 1173:4, 10, 13, 16, 23; 1174:1, 13, 19, 25; 1175:8, 19; 1177:1; 1195:19; 1197:1, 6, 11, 15, 24; 1198:4, 13, 19; 1199:5, 13, 21, 25; 1200:3, 8, 14, 24; 1201:3, 12, 20; 1202:14, 16, 20; 1203:4, 10, 13, 16, 23;

1204:1, 13, 19, 25; 1205:8, 19; 1207:1; 1208:3; 1215:16, 19; 1218:10, 14, 21; 1219:4, 8, 15, 20, 24; 1220:3, 7, 12, 17, 23; 1221:5, 11, 17, 23; 1222:4, 9, 14; 1223:16; 1224:13, 16, 19, 21, 23, 25; 1225:2, 4, 6, 8, 10, 12, 14, 16; 1226:1, 4, 7, 13, 15; 1227:1; 1230:24; 1231:2; 1232:19; 1233:22; 1234:1, 7; 1237:1, 9, 11, 23; 1239:1; 1245:5; 1249:1, 9, 13, 18, 25; 1250:5, 16; 1251:11, 14, 16, 18, 20, 22, 24; 1252:1, 3, 5, 7, 9, 11; 1253:2; 1254:1; 1256:2, 5, 14

**court** [46] - 1081:2; 1131:16, 22, 24; 1132:13, 23; 1133:4, 23; 1134:15; 1135:14, 17, 24; 1136:18; 1137:14; 1161:16, 22, 24; 1162:13, 23; 1163:4, 23; 1164:15; 1165:14, 17, 24; 1166:18; 1167:14; 1191:16, 22, 24; 1192:13, 23; 1193:4, 23; 1194:15; 1195:14, 17, 24; 1196:18; 1197:14; 1213:18, 20; 1219:4

**Court** [46] - 1079:20; 1129:21; 1130:10; 1131:15; 1133:4; 1134:25; 1135:7; 1138:22; 1139:1; 1142:11; 1144:16; 1159:21; 1160:10; 1161:15; 1163:4; 1164:25; 1165:7; 1168:22; 1169:1; 1172:11; 1174:16; 1189:21; 1190:10; 1191:15; 1193:4; 1194:25; 1195:7; 1198:22; 1199:1; 1202:11; 1204:16; 1217:16; 1218:13, 15; 1222:16; 1234:4; 1243:11; 1244:18, 24; 1249:1, 9; 1250:17; 1255:10, 13

**Court's** [2] - 1215:10;

8

1245:14
**Courthouse** [1] - 1079:4
**courthouse** [1] - 1255:12
**courtroom** [15] - 1080:17; 1131:23; 1138:3, 7; 1141:11; 1161:23; 1168:3, 7; 1171:11; 1191:23; 1198:3, 7; 1201:11; 1219:2; 1255:10
**coyness** [1] - 1090:21
**CR** [1] - 1079:3
**create** [4] - 1211:15; 1214:21; 1233:14
**created** [1] - 1211:19
**creating** [1] - 1213:7
**credibility** [2] - 1235:3; 1244:2
**crime** [63] - 1086:2; 1094:19; 1097:16, 20; 1098:6, 8, 11, 14, 16; 1099:4, 6, 8, 16, 21; 1101:21; 1102:2, 9-10, 13, 15, 18, 25; 1103:2, 4, 6, 11-12, 14; 1105:21; 1106:10, 12-14, 17; 1107:11; 1110:4; 1111:3, 16-17; 1114:3; 1117:23; 1124:8; 1154:8; 1184:8; 1214:20, 25; 1228:23; 1229:15; 1230:6, 16, 18, 21; 1231:8; 1232:16; 1233:7; 1241:23; 1245:21
**crimes** [13] - 1081:5, 8, 10, 14; 1098:4; 1130:25; 1160:25; 1190:25; 1212:25; 1215:6; 1227:24; 1228:20; 1243:7
**criminal** [16] - 1098:9, 12, 17, 20; 1099:10, 12; 1102:20; 1106:10, 24; 1107:1; 1110:9; 1213:1; 1242:6, 19; 1245:24
**critical** [2] - 1246:7, 14
**cross** [2] - 1217:9; 1244:19
**cross-examination** [1] - 1217:9
**crossed** [2] - 1244:23; 1249:4
**crosses** [1] - 1092:21

**crucial** [3] - 1130:2; 1160:20; 1190:20
**culminate** [1] - 1103:4
**culpability** [1] - 1103:11

**D**

**danger** [2] - 1247:9, 18
**dark** [1] - 1209:22
**data** [1] - 1089:5
**date** [8] - 1100:4; 1101:4, 6-7; 1134:7; 1164:7; 1194:7; 1256:3
**dated** [3] - 1134:21; 1164:21; 1194:21
**dates** [8] - 1082:18; 1083:18; 1084:4; 1085:2; 1093:11; 1104:19; 1113:6; 1116:18
**daughter** [2] - 1210:3; 1212:4
**David** [3] - 1144:17; 1174:17; 1204:17
**days** [1] - 1256:16
**deal** [2] - 1214:9; 1215:8
**dealings** [1] - 1208:20
**deals** [1] - 1245:15
**decide** [17] - 1091:5; 1128:20; 1129:9; 1130:23; 1137:19; 1158:20; 1159:9; 1160:23; 1167:19; 1188:20; 1189:9; 1190:23; 1197:19; 1227:3; 1240:21, 25; 1241:7
**deciding** [2] - 1089:12; 1091:7
**decision** [9] - 1129:1; 1134:6; 1159:1; 1164:6; 1189:1; 1194:6; 1215:4; 1242:22; 1255:7
**declarations** [2] - 1111:23; 1112:3
**deed** [1] - 1102:20
**deemed** [3] - 1108:21; 1111:25; 1112:2
**deepest** [1] - 1254:2
**defects** [1] - 1213:15
**DEFENDANT** [3] - 1142:15; 1172:15; 1202:15
**Defendant** [2] - 1079:6, 17

**defendant** [260] - 1081:19; 1082:5, 9, 11, 14, 16, 19, 22; 1083:2, 10, 17, 25; 1084:6; 1085:4, 19; 1086:12, 21; 1087:3, 24; 1088:5, 9; 1089:13; 1091:8, 23; 1092:14; 1093:5, 13; 1094:2, 20; 1095:3, 11, 14, 18; 1096:1, 7, 12, 17, 21-23; 1097:10, 15, 19; 1098:3, 8, 11, 14, 17; 1099:5, 15, 19; 1100:2, 7; 1101:3, 18, 23; 1102:1, 7, 12-13; 1103:8, 16, 24; 1104:2, 6, 14, 21; 1105:16; 1106:13, 23; 1107:13; 1108:8, 11, 14, 17, 21; 1109:6, 9, 12, 21, 23; 1110:8, 12, 15, 17, 21; 1111:5, 7, 9, 12, 15; 1112:5, 9; 1113:1, 8, 17; 1114:4, 7, 25; 1115:13, 15, 17-18; 1116:9, 13, 20; 1117:6; 1118:1, 5, 15, 21; 1119:3, 12; 1120:24; 1121:2, 15, 17, 19; 1122:5, 7, 24; 1123:4, 17; 1124:9, 14; 1125:1, 6, 16; 1126:2; 1127:10, 22, 24; 1128:1; 1130:7, 11, 15, 22, 24; 1133:8; 1140:15; 1148:1, 5, 15, 21; 1149:3, 12; 1150:24; 1151:2, 15, 17, 19; 1152:5, 7, 24; 1153:4, 17; 1154:9, 14; 1155:1, 6, 16; 1156:2; 1157:10, 22, 24; 1158:1; 1160:7, 11, 15, 22, 24; 1163:8; 1170:15; 1178:1, 5, 15, 21; 1179:3, 12; 1180:24; 1181:2, 15, 17, 19; 1182:5, 7, 24; 1183:4, 17; 1184:9, 14; 1185:1, 6, 16; 1186:2; 1187:10, 22, 24; 1188:1; 1190:7, 11, 15, 22, 24; 1193:8; 1200:15; 1208:15; 1214:24; 1219:12, 17, 21, 25; 1220:4, 9, 14, 19, 25; 1221:7, 13, 19, 25; 1222:5, 10, 18, 21, 24; 1223:2, 5, 8, 11, 14, 18, 21, 24; 1224:2, 5, 8, 11; 1228:20;

**defendant's** [48] - 1089:12; 1102:16; 1104:4; 1108:15, 23; 1109:3, 14, 16; 1110:3; 1112:11, 14; 1115:22; 1116:2; 1121:23; 1122:2, 8-9; 1125:15; 1128:6, 10; 1130:3; 1131:6, 8; 1151:23; 1152:2, 8-9; 1155:15; 1158:6, 10; 1160:3; 1161:6, 8; 1181:23; 1182:2, 8-9; 1185:15; 1188:6, 10; 1190:3; 1191:6, 8; 1229:13; 1230:1; 1239:19, 22; 1243:20
**defense** [15] - 1103:5; 1112:19, 23; 1140:15; 1145:2; 1170:15; 1175:2; 1200:15; 1205:2; 1218:1; 1230:25; 1233:10; 1247:24; 1248:5; 1256:6
**defense's** [3] - 1142:21; 1172:21; 1202:21
**defined** [16] - 1092:18; 1095:7, 13, 23; 1103:19; 1118:6; 1125:8; 1127:6; 1148:6; 1155:8; 1157:6; 1178:6; 1185:8; 1187:6; 1239:16; 1243:18
**definition** [9] - 1089:17; 1116:5; 1122:21; 1127:7; 1152:21; 1157:7; 1182:21; 1187:7; 1236:5
**definitions** [3] - 1125:9; 1155:9; 1185:9
**degree** [1] - 1109:25
**deliberate** [13] - 1134:19; 1135:21; 1137:17; 1164:19; 1165:21; 1167:17; 1194:19; 1195:21; 1197:17; 1235:4; 1244:3, 16, 25
**deliberately** [3] - 1122:7; 1152:7; 1182:7
**deliberating** [2] - 1208:3; 1244:6

**deliberations** [51] - 1080:20; 1081:22; 1082:1; 1083:7; 1128:15; 1130:8, 16; 1131:13, 17, 24; 1132:7, 19, 21; 1133:5, 10; 1136:10, 13; 1138:1; 1158:15; 1160:8, 16; 1161:13, 17, 24; 1162:7, 19, 21; 1163:5, 10; 1166:10, 13; 1168:1; 1188:15; 1190:8, 16; 1191:13, 17, 24; 1192:7, 19, 21; 1193:5, 10; 1196:10, 13; 1198:1; 1228:9; 1234:3; 1244:4; 1245:3; 1254:24

**delivery** [2] - 1244:13

**Dell** [2] - 1231:8, 20

**demonstrate** [1] - 1248:7

**demonstrates** [1] - 1230:19

**department** [3] - 1136:8; 1166:8; 1196:8

**depict** [1] - 1241:23

**depicted** [4] - 1115:16; 1121:18; 1151:18; 1181:18

**depicting** [6] - 1082:13, 15; 1113:3, 13; 1116:15, 22

**depiction** [184] - 1085:24; 1086:1, 3, 5, 8, 24; 1087:1, 4, 7, 21; 1088:2, 12; 1089:3, 8, 14; 1090:1, 8, 10, 20, 22, 24; 1091:3, 9, 12, 14, 20, 24; 1092:1, 7, 12, 15, 17, 25; 1094:11, 15; 1095:12, 15, 20; 1103:18, 22, 25; 1104:6; 1113:24; 1114:2, 8, 10-11, 13, 18, 22; 1115:1, 19; 1117:11, 17, 21-22; 1118:6, 8, 12, 16; 1119:3, 5, 7, 9, 13, 21, 25; 1120:3, 8, 11, 16, 20; 1121:3, 12, 20; 1123:24; 1124:5, 7, 15, 17, 19, 23; 1125:2, 7, 9, 14, 17, 25; 1126:3, 7, 16, 20, 24; 1127:3, 11; 1128:2; 1148:6, 8, 12, 16; 1149:3, 5, 7, 9, 13, 21, 25; 1150:3, 8, 11, 16, 20; 1151:3,

12, 20; 1153:24; 1154:5, 7, 15, 17, 19, 23; 1155:2, 7, 9, 14, 17, 25; 1156:3, 7, 16, 20, 24; 1157:3, 11; 1158:2; 1178:6, 8, 12, 16; 1179:3, 5, 7, 9, 13, 21, 25; 1180:3, 8, 11, 16, 20; 1181:3, 12, 20; 1183:24; 1184:5, 7, 15, 17, 19, 23; 1185:2, 7, 9, 14, 17, 25; 1186:3, 7, 16, 20, 24; 1187:3, 11; 1188:2; 1235:10, 13

**depiction's** [1] - 1104:4

**depictions** [50] - 1084:10, 12, 15, 20; 1085:9, 14; 1086:19; 1093:18, 23; 1100:12, 17, 22; 1105:1, 3, 6, 11; 1113:12, 14, 16; 1115:10; 1116:22, 25; 1117:2, 4; 1123:6, 8, 12, 14; 1126:9; 1127:19; 1153:6, 8, 12, 14; 1156:9; 1157:19; 1183:6, 8, 12, 14; 1186:9; 1187:19; 1227:10; 1236:4, 11; 1239:15; 1243:17

**depicts** [7] - 1116:1; 1122:2; 1128:9; 1152:2; 1158:9; 1182:2; 1188:9

**deputy** [1] - 1256:2

**described** [3] - 1230:5, 16; 1235:10

**describing** [1] - 1245:12

**design** [1] - 1108:4

**designated** [6] - 1227:21; 1239:7; 1250:8; 1251:3

**designed** [1] - 1090:23

**desire** [2] - 1088:24; 1098:10

**desk** [2] - 1227:14; 1249:20

**Desktop** [1] - 1239:2

**desktop** [3] - 1231:8, 20; 1250:17

**destroy** [1] - 1233:3

**detail** [6] - 1081:24; 1087:10; 1088:3; 1095:25; 1107:11; 1214:11

**details** [2] - 1109:10;

1209:3

**detect** [1] - 1241:25

**determination** [6] - 1098:23; 1132:16; 1162:16; 1192:16; 1234:23; 1242:16

**determine** [7] - 1091:2; 1099:5; 1112:15; 1130:11; 1160:11; 1190:11; 1235:1

**determining** [9] - 1102:16; 1108:1; 1120:20; 1127:4; 1150:20; 1157:4; 1180:20; 1187:4; 1240:14

**devastating** [6] - 1145:13; 1146:15; 1175:13; 1176:15; 1205:13; 1206:15

**device** [5] - 1092:19; 1093:1; 1104:7

**devising** [1] - 1102:22

**DHL** [3] - 1139:24; 1169:24; 1199:24

**difference** [3] - 1132:11; 1162:11; 1192:11

**different** [14] - 1083:18; 1109:18; 1146:13, 25; 1176:13, 25; 1206:13, 25; 1216:14; 1230:10; 1239:23; 1247:12, 15

**differs** [3] - 1129:24; 1159:24; 1189:24

**difficult** [1] - 1254:20

**digital** [17] - 1084:19; 1085:13; 1089:20; 1092:19-21; 1100:20; 1104:7, 9; 1105:10; 1123:6; 1153:6; 1183:6; 1229:24

**digital-genital** [1] - 1089:20

**direct** [9] - 1107:21; 1115:21; 1121:22; 1128:4; 1151:22; 1158:4; 1181:22; 1188:4; 1235:2

**directing** [1] - 1089:1

**direction** [1] - 1210:14

**directions** [1] - 1211:11

**directly** [1] - 1099:2

**discharge** [3] - 1136:2; 1166:2; 1196:2

**discharged** [4] - 1133:9; 1163:9; 1193:9; 1234:13

**disclose** [6] - 1133:5; 1163:5; 1193:5

**discrete** [2] - 1213:3; 1232:5

**discretion** [1] - 1247:5

**discuss** [11] - 1080:11; 1083:15; 1129:7; 1136:5; 1159:7; 1166:5; 1189:7; 1196:5; 1234:25; 1255:5, 7

**discussed** [2] - 1212:12; 1217:15

**discusses** [1] - 1214:11

**discussing** [5] - 1129:11; 1159:11; 1189:11; 1208:10; 1255:4

**discussion** [3] - 1209:5, 10, 24

**disk** [5] - 1089:5; 1092:20; 1104:7, 9

**disks** [3] - 1084:19; 1100:21; 1105:11

**dismiss** [1] - 1253:4

**dismissed** [1] - 1256:1

**displayed** [1] - 1090:14

**displays** [1] - 1090:1

**disproportionate** [2] - 1242:19; 1243:6

**dispute** [1] - 1246:6

**disregard** [1] - 1242:25

**distinct** [8] - 1109:17; 1145:4; 1146:1; 1175:4; 1176:1; 1205:4; 1206:1; 1212:24

**distinguish** [1] - 1102:18

**distract** [1] - 1233:11

**distributes** [2] - 1117:11; 1218:19

**distributing** [1] - 1236:3

**district** [6] - 1213:17, 20; 1227:21; 1239:7; 1250:8; 1251:3

**District** [14] - 1079:21; 1084:5; 1085:3; 1093:12;

**10**

1100:7; 1104:20;
1113:7; 1116:19;
1123:4; 1153:4; 1183:4;
1217:15; 1250:9; 1251:4
**DISTRICT** [2] - 1079:1
**distrubution** [1] -
1117:17
**divided** [2] - 1080:23;
1240:24
**document** [9] -
1134:25; 1141:13;
1146:23; 1164:25;
1171:13; 1176:23;
1194:25; 1201:13;
1206:23
**documentary** [9] -
1141:14, 25; 1142:4;
1171:14, 25; 1172:4;
1201:14, 25; 1202:4
**documents** [20] -
1134:24; 1135:13;
1142:2, 9; 1146:24;
1164:24; 1165:13;
1172:2, 9; 1176:24;
1194:24; 1195:13;
1202:2, 9; 1206:24;
1217:12; 1240:13
**Doe** [22] - 1082:6, 10,
13, 15, 18, 20; 1084:9;
1085:6; 1086:16, 18;
1093:6, 16; 1094:25;
1100:3, 10; 1102:3;
1104:16, 24; 1113:3,
13; 1116:15, 22
**dog** [3] - 1144:9;
1174:9; 1204:9
**done** [31] - 1112:6, 10;
1115:5; 1119:13;
1121:6; 1122:11;
1127:14; 1133:13;
1149:13; 1151:6;
1152:11; 1157:14;
1163:13; 1179:13;
1181:6; 1182:11;
1187:14; 1193:13;
1210:12; 1217:9;
1231:16
**door** [1] - 1254:7
**double** [4] - 1213:18;
1214:21; 1215:2, 8
**doubt** [79] - 1081:12,
20; 1086:14; 1087:14,
18, 23; 1088:9;
1091:20; 1092:12;
1094:23; 1096:6, 11;
1097:13; 1098:5;
1101:25; 1102:13;
1106:19; 1108:8;
1111:5; 1112:4; 1114:6;

1118:4; 1119:2, 20;
1120:10; 1121:1;
1122:7; 1124:11, 13;
1125:6; 1126:6, 16, 19;
1127:9; 1130:3, 12, 22;
1131:5, 9; 1148:4;
1149:2, 20; 1150:10;
1151:1; 1152:7;
1154:11, 13; 1155:6;
1156:6, 16, 19; 1157:9;
1160:3, 12, 22; 1161:5,
9; 1178:4; 1179:2, 20;
1180:10; 1181:1;
1182:7; 1184:11, 13;
1185:6; 1186:6, 16, 19;
1187:9; 1190:3, 12, 22;
1191:5, 9; 1214:22;
1240:1, 5; 1241:9
**down** [6] - 1131:23;
1138:8; 1161:23;
1168:8; 1191:23; 1198:8
**downloading** [3] -
1119:10; 1149:10;
1179:10
**draw** [1] - 1109:21
**drawn** [4] - 1109:2;
1122:20; 1152:20;
1182:20
**Drive** [7] - 1079:18;
1227:18; 1229:5, 13;
1239:4; 1250:6, 25
**driver's** [1] - 1216:13
**dual** [1] - 1215:2
**duplicitous** [2] -
1212:24; 1213:12
**duration** [1] - 1109:14
**during** [39] - 1081:22;
1082:7; 1112:16;
1128:23; 1131:16, 19,
23; 1132:1, 21;
1133:10; 1146:2;
1158:23; 1161:16, 19,
23; 1162:1, 21;
1163:10; 1176:2;
1188:23; 1191:16, 19,
23; 1192:1, 21;
1193:10; 1206:2;
1212:20; 1213:11;
1228:14; 1229:6;
1234:2; 1241:10;
1244:4, 8, 11
**duty** [12] - 1129:7;
1130:9; 1134:12;
1159:7; 1160:9;
1164:12; 1189:7;
1190:9; 1194:12;
1235:3; 1244:3; 1255:2

## E

**e-mail** [13] - 1208:10;
1209:5, 19, 22, 25;
1211:8, 10, 23; 1212:7;
1218:12; 1229:17;
1247:13
**e-mails** [13] - 1208:25;
1209:16; 1210:5;
1211:2; 1212:2; 1218:7;
1245:9, 11, 14;
1246:22; 1247:1, 7, 23
**easement** [1] - 1239:7
**easements** [3] -
1227:20; 1250:8; 1251:3
**easier** [1] - 1241:23
**Eastern** [10] - 1084:5;
1085:3; 1093:12;
1100:6; 1104:20;
1113:7; 1116:19;
1123:4; 1153:4; 1183:4
**EASTERN** [1] - 1079:1
**easy** [3] - 1133:14;
1163:14; 1193:14
**eat** [6] - 1137:18;
1167:18; 1197:18
**Edward** [3] - 1135:1;
1165:1; 1195:1
**effect** [5] - 1088:16;
1091:17; 1129:17;
1159:17; 1189:17
**effort** [1] - 1102:8
**Eighth** [1] - 1214:23
**either** [7] - 1093:1;
1095:4; 1096:17;
1107:16; 1125:16;
1155:16; 1185:16
**elect** [3] - 1134:20;
1164:20; 1194:20
**electronic** [1] -
1089:6
**element** [57] - 1087:11,
13, 20, 22; 1091:16,
18; 1092:22, 24;
1107:2, 6; 1108:7;
1111:6; 1118:24;
1119:1, 17, 19; 1120:7,
9, 23, 25; 1125:5;
1126:5, 18; 1127:8;
1129:2, 4, 6; 1148:24;
1149:1, 17, 19; 1150:7,
9, 23, 25; 1155:5;
1156:5, 18; 1157:8;
1159:2, 4, 6; 1178:24;
1179:1, 17, 19; 1180:7,
9, 23, 25; 1185:5;
1186:5, 18; 1187:8;
1189:2, 4, 6

**elements** [23] -
1081:4, 8, 10; 1086:11,
14; 1087:9; 1094:22;
1096:6, 10; 1101:25;
1102:4; 1105:23;
1106:17, 19; 1111:3;
1114:6; 1118:3;
1124:13; 1148:3;
1154:13; 1178:3;
1184:13; 1215:1
**elicit** [1] - 1090:23
**elsewhere** [7] -
1084:6; 1085:4;
1093:13; 1100:7;
1104:21; 1113:8;
1116:20
**email** [42] - 1138:24;
1139:10, 14; 1141:7;
1142:23; 1143:3, 7, 9,
15; 1145:7, 23, 25;
1146:13; 1168:24;
1169:10, 14; 1171:7;
1172:23; 1173:3, 7, 9,
15; 1175:7, 23, 25;
1176:13; 1198:24;
1199:10, 14; 1201:7;
1202:23; 1203:3, 7, 9,
15; 1205:7, 23, 25;
1206:13
**emails** [54] - 1139:5,
11; 1140:7, 18, 22;
1141:5; 1142:1, 5, 8,
13, 17; 1143:1, 14;
1146:4, 6, 11, 18;
1169:5, 11; 1170:7, 18,
22; 1171:5; 1172:1, 5,
8, 13, 17; 1173:1, 14;
1176:4, 6, 11, 18;
1199:5, 11; 1200:7, 18,
22; 1201:5; 1202:1, 5,
8, 13, 17; 1203:1, 14;
1206:4, 6, 11, 18
**emphasize** [4] -
1116:4; 1133:20;
1163:20; 1193:20
**employ** [6] - 1084:7;
1085:5; 1093:14;
1100:9; 1104:23;
1241:18
**employed** [5] -
1086:21; 1087:24;
1088:9, 13; 1095:4
**employee** [1] - 1216:15
**employs** [2] - 1085:22;
1094:6
**End** [3] - 1226:17;
1238:4; 1253:7
**end** [19] - 1086:10;
1097:9; 1101:1, 22;

**11**

1105:15, 22; 1111:19;
1114:3; 1117:5;
1123:15; 1124:8;
1139:8; 1153:15;
1154:8; 1169:8;
1183:15; 1184:8;
1199:8; 1213:24

**ends** [4] - 1110:20;
1128:12; 1158:12;
1188:12

**engage** [13] - 1084:9;
1085:7, 23; 1090:21;
1093:16; 1094:7;
1095:5, 9; 1100:10;
1104:25; 1235:25;
1236:2

**engaged** [42] - 1110:23;
1113:13; 1114:24;
1115:3, 11; 1116:23;
1118:13, 17-18;
1120:14; 1121:4, 13;
1124:24; 1125:4;
1126:21, 23; 1127:12,
20; 1148:13, 17-18;
1150:14; 1151:4, 13;
1154:24; 1155:4;
1156:21, 23; 1157:12,
20; 1178:13, 17-18;
1180:14; 1181:4, 13;
1184:24; 1185:4;
1186:21, 23; 1187:12,
20

**engages** [1] - 1103:13

**engaging** [50] -
1112:20; 1113:15;
1114:1, 22; 1115:2, 20;
1117:3, 21; 1118:12;
1120:12, 17, 21;
1121:3, 21; 1123:13;
1124:6, 23; 1125:3;
1126:25; 1127:5, 11;
1128:3; 1148:12;
1150:12, 17, 21;
1151:3, 21; 1153:13;
1154:6, 23; 1155:3;
1156:25; 1157:5, 11;
1158:3; 1178:12;
1180:12, 17, 21;
1181:3, 21; 1183:13;
1184:6, 23; 1185:3;
1186:25; 1187:5, 11;
1188:3

**enter** [7] - 1111:18;
1130:8, 16; 1160:8, 16;
1190:8, 16

**entered** [2] - 1106:20;
1107:7

**enters** [3] - 1080:16;
1219:1; 1249:12

**entice** [7] - 1084:8;
1085:5; 1088:16;
1093:15; 1100:10;
1104:23; 1241:18

**enticed** [4] - 1086:22;
1087:25; 1088:10;
1095:5

**entices** [2] - 1085:22;
1094:7

**enticing** [1] - 1235:24

**entire** [5] - 1139:19;
1169:19; 1199:19;
1242:15, 18

**entirely** [3] -
1128:19; 1158:19;
1188:19

**entitled** [7] -
1131:18; 1161:18;
1191:18; 1228:19, 23;
1232:19; 1237:16

**entrusted** [1] -
1243:11

**equal** [1] - 1109:19

**equally** [11] - 1099:1;
1102:6; 1105:25;
1114:10, 19; 1118:7;
1119:6; 1148:7; 1149:6;
1178:7; 1179:6

**equipment** [1] -
1085:14

**error** [1] - 1237:7

**escort** [3] - 1136:19;
1166:19; 1196:19

**especially** [5] -
1147:3; 1177:3; 1207:3;
1211:1; 1255:10

**ESQ** [4] - 1079:14, 17

**essence** [2] - 1097:25;
1106:2

**essentially** [1] -
1213:19

**establish** [7] -
1098:18; 1124:11;
1154:11; 1184:11;
1239:14; 1240:3, 7

**established** [5] -
1108:24; 1122:17;
1152:17; 1182:17;
1239:21

**establishing** [1] -
1217:20

**estimating** [1] -
1080:24

**estimation** [3] -
1140:16; 1170:16;
1200:16

**etc** [1] - 1088:18

**etcetera** [1] - 1211:12

**evenly** [1] - 1240:24

**event** [1] - 1217:4

**events** [3] - 1122:19;
1152:19; 1182:19

**evidence** [140] -
1081:16, 18; 1082:25;
1083:9; 1089:11;
1091:10; 1096:5, 9;
1108:25; 1111:8, 14;
1115:21; 1120:20;
1121:22; 1124:10;
1127:3; 1128:5, 23, 25;
1129:10, 17, 20, 23;
1130:10, 13, 19, 21,
25; 1132:9; 1134:14;
1138:24; 1139:14, 23;
1141:25; 1142:1, 4, 22;
1145:13, 23, 25;
1146:1, 8, 10; 1150:20;
1151:22; 1154:10;
1157:3; 1158:5, 23, 25;
1159:10, 17, 20, 23;
1160:10, 13, 19, 21,
25; 1162:9; 1164:14;
1168:24; 1169:14, 23;
1171:25; 1172:1, 4, 22;
1175:13, 23, 25;
1176:1, 8, 10; 1180:20;
1181:22; 1184:10;
1187:3; 1188:5, 23, 25;
1189:10, 17, 20, 23;
1190:10, 13, 19, 21,
25; 1192:9; 1194:14;
1198:24; 1199:14, 23;
1201:25; 1202:1, 4, 22;
1205:13, 23, 25;
1206:1, 8, 10; 1214:2,
7; 1217:25; 1228:2;
1229:22; 1230:12, 14,
19; 1233:6; 1235:3;
1239:22; 1240:4, 6, 8,
10-12, 15, 18-19,
23-24; 1241:4; 1243:15;
1244:2, 7, 11; 1245:19,
24; 1248:2; 1254:21

**evidentiary** [3] -
1139:24; 1169:24;
1199:24

**exact** [7] - 1083:8;
1120:19; 1127:2;
1150:19; 1157:2;
1180:19; 1187:2

**exactly** [2] - 1218:1

**examination** [1] -
1217:9

**examining** [1] -
1216:12

**example** [2] - 1090:11;

1232:7

**except** [4] - 1101:3;
1132:25; 1162:25;
1192:25

**exception** [6] -
1132:20; 1162:20;
1192:20; 1213:18;
1216:7; 1243:24

**excessive** [2] -
1242:19; 1243:6

**exchanges** [1] -
1247:13

**excite** [1] - 1090:3

**exclusive** [1] - 1091:1

**exclusively** [4] -
1130:9; 1160:9; 1190:9;
1242:3

**excuse** [3] - 1115:17;
1212:18; 1235:19

**excused** [3] - 1136:25;
1166:25; 1196:25

**exercise** [6] -
1125:18, 24; 1155:18,
24; 1185:18, 24

**exhaustive** [1] -
1091:2

**exhibit** [15] - 1140:4;
1141:14; 1143:21;
1144:23; 1170:4;
1171:14; 1173:21;
1174:23; 1200:4;
1201:14; 1203:21;
1204:23

**Exhibit** [33] - 1134:25;
1135:8; 1138:22;
1139:1; 1144:17;
1164:25; 1165:8;
1168:22; 1169:1;
1174:17; 1194:25;
1195:8; 1198:22;
1199:1; 1204:17;
1209:4, 11; 1210:13,
18, 22; 1211:3, 20, 25;
1218:15; 1219:5;
1229:2, 11; 1234:4;
1244:19, 24; 1249:2, 10

**exhibition** [3] -
1089:23, 25; 1090:5

**exhibits** [31] -
1133:11, 16; 1138:10;
1139:6; 1141:5, 7-8;
1143:20; 1144:15, 25;
1163:11, 16; 1168:10;
1169:6; 1171:5, 7-8;
1173:20; 1174:15, 25;
1193:11, 16; 1198:10;
1199:6; 1201:5, 7-8;
1203:20; 1204:15, 25;
1240:17

**12**

existed [3] - 1108:2, 4; 1109:23
existence [2] - 1107:22; 1112:16
exists [1] - 1106:11
exits [3] - 1138:3; 1168:3; 1198:3
expert [1] - 1215:13
explain [10] - 1083:11; 1087:9; 1088:3; 1095:24; 1097:2; 1099:25; 1115:4; 1226:9; 1227:4; 1235:6
explained [13] - 1114:23; 1120:13; 1124:15; 1126:22; 1145:6; 1150:13; 1154:15; 1156:22; 1175:6; 1180:13; 1184:15; 1186:22; 1205:6
explanatory [3] - 1135:9; 1165:9; 1195:9
explicit [102] - 1084:9; 1085:8, 23; 1086:23; 1087:21; 1088:1, 11; 1089:15, 17-18; 1091:9, 13; 1092:18, 25; 1093:16; 1094:9; 1095:5, 9; 1100:11; 1103:18; 1104:25; 1112:21; 1113:13, 15; 1114:1, 23; 1115:2, 9, 11, 20; 1116:23; 1117:4, 22; 1118:13, 17; 1120:8, 12, 17, 22; 1121:4, 11, 14, 21; 1123:14; 1124:6, 24; 1125:3; 1126:21, 25; 1127:5, 7, 12, 18, 20; 1128:3; 1148:13, 17; 1150:8, 12, 17, 22; 1151:4, 11, 14, 21; 1153:14; 1154:6, 24; 1155:3; 1156:21, 25; 1157:5, 7, 12, 18, 20; 1158:3; 1178:13, 17; 1180:8, 12, 17, 22; 1181:4, 11, 14, 21; 1183:14; 1184:6, 24; 1185:3; 1186:21, 25; 1187:5, 7, 12, 18, 20; 1188:3; 1233:16; 1235:25; 1236:2
Exploit [2] - 1219:10; 1222:17
exploit [10] - 1082:6; 1088:7; 1101:22, 24;

1103:17; 1104:13, 15; 1105:21; 1107:8; 1111:4
exploitation [38] - 1082:10, 17, 20; 1083:23, 25; 1087:11, 20; 1091:16, 18; 1093:3, 6; 1096:21; 1099:24; 1100:3; 1101:4, 8; 1102:2, 5; 1105:24; 1106:15, 22; 1107:14, 19; 1112:19; 1212:15, 20; 1213:8, 11; 1214:5, 19; 1227:10, 12; 1235:8; 1239:16; 1241:19; 1243:17; 1246:8; 1247:11
Exploitation [22] - 1219:15, 20; 1220:8, 13, 18, 24; 1221:6, 12, 18, 24; 1222:4, 20, 23; 1223:7, 10, 13, 17, 20, 23; 1224:1, 4, 7
exploitations [2] - 1236:11, 13
exploited [1] - 1233:12
exploiting [2] - 1086:13; 1094:21
exposure [1] - 1090:4
express [1] - 1107:7
extent [3] - 1109:14, 24; 1215:22
eyewitness [4] - 1115:22; 1128:5; 1158:5; 1188:5
eyewitnesses [3] - 1121:23; 1151:23; 1181:23

F

F.2d [2] - 1214:23; 1216:4
F.34d [1] - 1213:5
F.3d [3] - 1213:16; 1214:10; 1245:22
F.Supp.2d [1] - 1217:16
facilitate [6] - 1228:20; 1230:6, 18; 1241:17; 1242:11, 20
facilitating [5] - 1098:25; 1241:14, 22; 1242:6
facilitation [1] - 1242:7
facility [26] -

1084:13, 21; 1085:15; 1091:22; 1093:21, 25; 1094:14, 17; 1095:17, 22; 1100:14, 23; 1105:4, 12; 1113:10, 21; 1116:24; 1117:12, 18; 1123:9, 25; 1153:9, 25; 1183:9, 25; 1230:20
fact [20] - 1109:20; 1110:12; 1115:11; 1121:12; 1127:20; 1132:8; 1151:12; 1157:20; 1162:8; 1181:12; 1187:20; 1192:8; 1209:14; 1217:10; 1240:7; 1246:3; 1248:4; 1254:17; 1255:1
factors [3] - 1090:25; 1091:1, 6
facts [21] - 1108:15; 1109:4; 1122:17; 1128:22, 24; 1129:24; 1132:16; 1152:17; 1158:22, 24; 1159:24; 1162:16; 1182:17; 1188:22, 24; 1189:24; 1192:16; 1245:25
factual [3] - 1103:5, 7, 14
fail [1] - 1106:11
failed [1] - 1096:10
fails [1] - 1111:6
fall [1] - 1216:6
family [1] - 1243:1
farm [2] - 1232:8
favor [10] - 1134:13; 1164:13; 1194:13; 1240:20, 23; 1241:1, 5
favorable [1] - 1208:11
fear [6] - 1131:2; 1134:13; 1161:2; 1164:13; 1191:2; 1194:13
Fed [1] - 1208:14
Fed.Appx [1] - 1212:23
federal [1] - 1255:19
Federal [2] - 1079:13, 21
fellow [6] - 1129:11; 1132:2; 1159:11; 1162:2; 1189:11; 1192:2
felony [1] - 1242:7
few [8] - 1088:3; 1128:16; 1138:5; 1158:16; 1168:5; 1188:16; 1198:5;

1208:13
Fifteen [1] - 1082:22
files [3] - 1123:7; 1153:7; 1183:7
filled [1] - 1216:16
filling [1] - 1216:5
film [3] - 1089:4; 1235:12
films [3] - 1123:23; 1153:23; 1183:23
final [2] - 1212:12; 1234:25
finally [8] - 1081:25; 1128:16; 1130:1; 1158:16; 1160:1; 1188:16; 1190:1; 1211:25
financial [2] - 1098:21
fine [1] - 1238:3
first [46] - 1082:2; 1086:15; 1087:11, 13; 1094:24; 1098:5; 1102:1; 1106:20; 1107:2; 1112:15; 1114:7; 1118:5, 24; 1119:1; 1124:14; 1125:5; 1131:13; 1134:20, 25; 1135:20; 1138:19; 1148:5, 24; 1149:1; 1154:14; 1155:5; 1161:13; 1164:20, 25; 1165:20; 1168:19; 1178:5, 24; 1179:1; 1184:14; 1185:5; 1191:13; 1194:20, 25; 1195:20; 1198:19; 1213:14, 25; 1215:25; 1228:11, 25
five [17] - 1118:20; 1119:1, 19; 1120:9, 25; 1148:20; 1149:1, 19; 1150:9, 25; 1178:20; 1179:1, 19; 1180:9, 25; 1211:5; 1226:9
Five [1] - 1082:14
fixtures [4] - 1227:20; 1239:6; 1250:8; 1251:2
floor [1] - 1233:17
focal [2] - 1090:7, 9
follow [12] - 1094:22; 1136:11, 14; 1166:11, 14; 1196:11, 14; 1209:8; 1211:11; 1218:18, 22; 1230:13
following [25] - 1086:14; 1090:6;

1101:25; 1106:19;
1114:6; 1118:3; 1137:4,
13; 1138:18; 1141:23;
1145:21; 1148:3;
1167:4, 13; 1168:18;
1171:23; 1175:21;
1178:3; 1197:4, 13;
1198:18; 1201:23;
1205:21; 1225:18;
1236:16
**follows** [10] - 1084:1,
25; 1093:8; 1100:5;
1104:16; 1113:4;
1116:16; 1123:1;
1153:1; 1183:1
**force** [1] - 1088:22
**foreign** [100] -
1084:13, 15, 17, 22-23;
1085:12, 16-17; 1086:4,
7, 10; 1087:3, 6, 9;
1091:21, 25; 1092:3, 5,
24; 1093:2, 22, 25;
1094:14, 18; 1095:18,
22; 1100:15, 19, 23-24;
1104:1, 8; 1105:5, 9,
13-14; 1113:10, 22-23;
1114:12, 14, 19;
1116:24; 1117:1, 12,
14, 18-19; 1118:9;
1119:18, 22, 24;
1120:1, 4, 6; 1123:7,
10; 1124:1, 18, 21;
1126:8, 10, 12; 1148:9;
1149:18, 22, 24;
1150:1, 4, 6; 1153:7,
10; 1154:1, 18, 21;
1156:8, 10, 12; 1178:9;
1179:18, 22, 24;
1180:1, 4, 6; 1183:7,
10; 1184:1, 18, 21;
1186:8, 10, 12
**FOREPEERSON** [3] -
1219:14; 1249:24;
1250:4
**Foreperson** [1] -
1249:20
**foreperson** [22] -
1131:14; 1132:23;
1134:7, 20, 22;
1138:20; 1161:14;
1162:23; 1164:7, 20,
22; 1168:20; 1191:14;
1192:23; 1194:7, 20,
22; 1198:20; 1249:15
**FOREPERSON** [17] -
1219:7, 19, 23; 1220:2,
6, 11, 16, 22; 1221:4,
10, 16, 22; 1222:3, 8,
13; 1249:17; 1250:15

**foreseeable** [3] -
1104:3; 1111:22; 1112:6
**forfeit** [4] - 1230:8;
1231:16; 1232:9; 1235:9
**forfeitability** [2] -
1239:21; 1240:3
**forfeitable** [5] -
1231:18, 21; 1232:2;
1242:12, 24
**forfeited** [5] -
1232:10, 14; 1242:3, 5
**forfeiture** [58] -
1226:4; 1227:4, 6, 8-9,
14, 24; 1228:5, 8, 10,
19, 22; 1230:4, 10,
21-22; 1231:7, 11;
1232:10; 1233:10;
1234:15, 20-21; 1235:5,
23; 1236:6, 9-10;
1239:12; 1240:2;
1241:11, 16, 25;
1242:8, 14, 18, 22;
1243:6, 14; 1244:5, 8,
11; 1245:1; 1248:17;
1249:3, 10, 14, 16, 22;
1250:2, 13, 19, 23;
1251:9
**form** [35] - 1134:7;
1135:6, 9; 1138:24;
1139:10, 14; 1142:23;
1145:23, 25; 1164:7;
1165:6, 9; 1168:24;
1169:10, 14; 1172:23;
1175:23, 25; 1194:7;
1195:6, 9; 1198:24;
1199:10, 14; 1202:23;
1205:23, 25; 1218:14,
17-18, 20; 1249:18
**formal** [1] - 1107:8
**formation** [1] - 1106:9
**forms** [2] - 1218:20;
1254:6
**forth** [2] - 1247:2, 14
**foundation** [1] -
1215:18
**Four** [1] - 1082:11
**four** [5] - 1094:22;
1118:3; 1148:3; 1178:3;
1250:21
**Fourteen** [8] -
1082:19; 1083:13, 19,
22, 24; 1084:24;
1085:18; 1087:17
**fourth** [17] - 1095:14;
1114:25; 1118:15;
1120:23, 25; 1125:1;
1127:8; 1148:15;

1150:23, 25; 1155:1;
1157:8; 1170:15;
1180:23, 25; 1185:1;
1187:8
**frame** [1] - 1256:15
**fraud** [2] - 1208:15, 22
**frequently** [3] -
1122:13; 1152:13;
1182:13
**Friday** [1] - 1209:21
**friendly** [1] - 1110:8
**friends** [1] - 1243:2
**fully** [5] - 1090:17;
1098:24; 1129:11;
1159:11; 1189:11
**function** [3] -
1130:10; 1160:10;
1190:10
**furnishing** [1] -
1237:2
**furnishings** [7] -
1227:21; 1237:9, 24;
1239:9, 11; 1244:20;
1249:3
**furniture** [2] - 1233:9
**furtherance** [3] -
1111:24; 1112:7, 16
**furthering** [4] -
1098:2, 12; 1108:20;
1110:24
**furthermore** [9] -
1092:23; 1109:12;
1116:1; 1122:2; 1128:9;
1152:2; 1158:9; 1182:2;
1188:9
**future** [2] - 1210:11;
1255:16

**G**

**Gate** [6] - 1227:18;
1229:5, 13; 1239:4;
1250:6, 25
**general** [7] - 1115:14;
1121:16; 1122:23;
1151:16; 1157:23;
1181:16; 1187:23
**generally** [1] -
1090:12
**genital** [6] - 1089:19;
1090:4
**genital-genital** [1] -
1089:19
**genitals** [3] -
1089:23; 1090:2, 8
**gentlemen** [5] -
1228:13; 1231:4; 1234:8
**gigabyte** [4] -

1227:16; 1239:3;
1249:25; 1250:21
**given** [33] - 1091:5;
1116:4, 6; 1128:24;
1129:21; 1134:3, 14;
1135:2; 1138:21;
1145:17; 1158:24;
1159:21; 1164:3, 14;
1165:2; 1168:21;
1175:17; 1188:24;
1189:21; 1194:3, 14;
1195:2; 1198:21;
1205:17; 1212:1;
1244:1; 1247:5, 9;
1254:13; 1255:3
**goal** [2] - 1106:24;
1108:10
**goals** [3] - 1106:25;
1107:1; 1108:10
**government** [69] -
1111:2, 11; 1118:2, 19;
1119:2, 12, 20;
1120:10, 18; 1121:1,
15; 1124:12; 1125:5,
19; 1126:6, 19; 1127:1,
9, 22; 1130:1, 21, 24;
1131:8; 1141:24;
1148:2, 19; 1149:2, 12,
20; 1150:10, 18;
1151:1, 15; 1154:12;
1155:5, 19; 1156:6, 19;
1157:1, 9, 22; 1160:1,
21, 24; 1161:8;
1171:24; 1178:2, 19;
1179:2, 12, 20;
1180:10, 18; 1181:1,
15; 1184:12; 1185:5,
19; 1186:6, 19; 1187:1,
9, 22; 1190:1, 21, 24;
1191:8; 1201:24;
1255:20
**Government** [78] -
1079:12; 1081:11;
1086:13; 1087:14, 17,
23; 1088:4, 8; 1089:13;
1091:7, 11, 14, 19;
1094:21; 1095:25;
1096:5, 9, 16; 1097:4,
12, 19, 21; 1101:24;
1103:17, 21, 24;
1106:18; 1107:5, 13,
15; 1108:7; 1111:6;
1114:5; 1115:13;
1116:8; 1208:11;
1212:19; 1213:10;
1214:1, 18; 1217:25;
1218:5; 1226:10;
1227:8, 13, 23;
1228:11, 19, 22, 25;
1230:4, 7, 21; 1231:13,

22; 1232:8, 12, 19; 1233:2, 4, 9; 1234:14, 19; 1236:9; 1237:2, 8, 20; 1239:10, 20, 25; 1240:2, 20, 22; 1241:2, 5-6; 1256:11

**government's** [6] - 1140:24; 1147:3; 1170:24; 1177:3; 1200:24; 1207:3

**Government's** [7] - 1213:6, 24; 1229:2, 10; 1231:11; 1239:14; 1246:3

**grand** [2] - 1085:7; 1104:25

**greater** [7] - 1088:3; 1095:25; 1099:3; 1131:18; 1161:18; 1191:18; 1240:11

**gross** [1] - 1235:17

**ground** [1] - 1098:3

**guess** [1] - 1237:15

**guest** [4] - 1216:3, 6, 15

**guided** [3] - 1130:19; 1160:19; 1190:19

**guilt** [25] - 1081:12, 18; 1097:17; 1109:16; 1112:14; 1130:3, 22; 1131:6, 9; 1133:8; 1160:3, 22; 1161:6, 9; 1163:8; 1190:3, 22; 1191:6, 9; 1193:8; 1228:14; 1235:1; 1239:24; 1241:10; 1244:8

**Guilty** [8] - 1219:23; 1220:2, 6, 11, 16, 22; 1221:10; 1222:13

**guilty** [101] - 1081:20; 1083:2; 1086:1, 12; 1094:18, 20; 1096:7, 12; 1097:24; 1098:18; 1099:1, 16, 21; 1101:22; 1103:10; 1105:21; 1106:13; 1111:5, 7; 1114:2, 4; 1117:23; 1118:1; 1124:7; 1130:4, 11, 24; 1131:11; 1148:1; 1154:7; 1160:4, 11, 24; 1161:11; 1178:1; 1184:7; 1190:4, 11, 24; 1191:11; 1219:13, 18-19, 22; 1220:1, 5, 9-10, 14-15, 20-21; 1221:1, 4, 8-9, 14-16, 20-22; 1222:1-3, 6-8,

H

**half** [1] - 1080:25

**hand** [13] - 1096:8; 1099:18; 1102:19; 1131:7; 1135:16; 1161:7; 1165:16; 1191:7; 1195:16; 1240:22; 1244:13, 24

**handed** [1] - 1218:13

**handing** [6] - 1131:16; 1143:19; 1161:16; 1173:19; 1191:16; 1203:19

**hang** [3] - 1138:5; 1168:5; 1198:5

**happy** [3] - 1128:12; 1158:12; 1188:12

**hard** [1] - 1234:9

**harder** [2] - 1241:23

**HARRY** [1] - 1079:20

**Hauppauge** [1] - 1079:18

**headers** [3] - 1143:14; 1173:14; 1203:14

**hear** [5] - 1083:15; 1137:20; 1167:20; 1197:20; 1230:24

**heard** [6] - 1229:1, 6, 8, 19; 1233:6; 1244:11

**hearsay** [1] - 1216:8

**held** [4] - 1139:14; 1169:14; 1199:14; 1213:23

**help** [2] - 1106:25; 1108:10

**herself** [1] - 1110:9

**hesitate** [6] - 1129:13; 1131:9; 1159:13; 1161:9; 1189:13; 1191:9

**hidden** [3] - 1229:23; 1230:1

**High** [6] - 1227:18; 1229:5, 13; 1239:4; 1250:5, 25

**highly** [4] - 1246:14, 20; 1247:6; 1248:9

**himself** [14] - 1088:6; 1096:2, 18; 1097:20, 25; 1098:9; 1099:10,

17; 1110:9; 1116:10; 1118:21; 1148:21; 1178:21; 1216:16

**hold** [3] - 1125:13; 1155:13; 1185:13

**holding** [3] - 1146:11; 1176:11; 1206:11

**home** [4] - 1080:10; 1229:13; 1230:1; 1239:11

**honest** [3] - 1129:16; 1159:16; 1189:16

**Honor** [80] - 1080:7, 14-15; 1137:7; 1139:3, 7, 17, 20; 1140:2, 16, 21; 1141:9, 15, 18-19; 1142:10, 13, 15, 18; 1143:12; 1144:21; 1145:3, 10; 1167:7; 1169:3, 7, 17, 20; 1170:2, 16, 21; 1171:9, 15, 18-19; 1172:10, 13, 15, 18; 1173:12; 1174:21; 1175:3, 10; 1197:7; 1199:3, 7, 17, 20; 1200:2, 16, 21; 1201:9, 15, 18-19; 1202:10, 13, 15, 18; 1203:12; 1204:21; 1205:3, 10; 1219:7; 1226:6, 16; 1231:1; 1233:24; 1237:20; 1244:22; 1249:5; 1253:5; 1256:9, 18

**Honor's** [1] - 1256:10

**HONORABLE** [1] - 1079:9

**hotel** [2] - 1216:3, 6

**hour** [2] - 1080:25; 1210:1

**hour-and-a-half** [1] - 1080:25

**house** [14] - 1217:2; 1218:9; 1229:20; 1231:10, 25; 1232:3, 5, 7, 13, 15; 1233:6, 14; 1237:17

I

**idea** [1] - 1088:16

**identical** [1] - 1101:2

**identification** [5] - 1216:11, 13, 22-23; 1217:4

**identified** [6] - 1082:7, 21; 1086:16, 18; 1094:25; 1102:3

**identifying** [6] - 1134:21; 1138:20;

1164:21; 1168:20; 1194:21; 1198:20

**identities** [1] - 1109:6

**identity** [19] - 1085:7; 1104:24; 1115:16; 1120:18; 1121:18; 1127:1, 25; 1150:18; 1151:18; 1157:1, 25; 1180:18; 1181:18; 1187:1, 25; 1217:13; 1246:6, 15; 1248:14

**illegal** [3] - 1099:2; 1110:24; 1242:1

**illegality** [7] - 1116:2; 1122:3; 1128:10; 1152:3; 1158:10; 1182:3; 1188:10

**illegally** [2] - 1242:14, 17

**illness** [1] - 1254:9

**image** [1] - 1089:7

**images** [27] - 1082:12, 15; 1089:8; 1113:2, 12; 1116:14, 22; 1123:6; 1141:16; 1153:6; 1171:16; 1183:6; 1201:16; 1229:17, 19; 1233:4, 14, 18; 1236:4; 1246:16; 1248:4, 6; 1254:21

**immediately** [3] - 1133:22; 1163:22; 1193:22

**important** [13] - 1108:23; 1129:12; 1132:17; 1136:1; 1159:12; 1162:17; 1166:1; 1189:12; 1192:17; 1196:1; 1228:17; 1255:2, 9

**imposed** [3] - 1130:14; 1160:14; 1190:14

**imposing** [3] - 1130:9; 1160:9; 1190:9

**impossibility** [1] - 1103:5

**impossible** [1] - 1246:25

**improper** [1] - 1212:16

**improvements** [4] - 1227:20; 1239:6; 1250:7; 1251:2

**inaccurate** [3] - 1132:10; 1162:10; 1192:10

**16**

**inappropriate** [1] - 1090:15

**inbox** [1] - 1231:21

**include** [6] - 1140:7; 1143:11; 1170:7; 1173:11; 1200:7; 1203:11

**included** [1] - 1215:1

**includes** [16] - 1089:3, 8; 1119:8; 1141:15; 1142:1; 1149:8; 1171:15; 1172:1; 1179:8; 1201:15; 1202:1; 1227:13; 1239:1

**including** [23] - 1086:8; 1089:4, 19; 1094:13, 17; 1095:16, 21; 1100:20; 1113:23; 1117:16; 1124:4; 1127:3; 1143:1; 1154:4; 1157:3; 1173:1; 1184:4; 1187:3; 1203:1; 1230:1; 1241:19; 1245:21; 1247:12

**inclusive** [6] - 1084:5; 1085:3; 1093:12; 1104:20; 1113:7; 1116:19

**indeed** [1] - 1109:16

**independent** [5] - 1108:24; 1146:14; 1176:14; 1206:14; 1217:25

**indetectible** [1] - 1242:1

**indicate** [1] - 1103:1

**indicated** [2] - 1081:7; 1208:24

**indicates** [1] - 1218:16

**indicating** [3] - 1141:6; 1171:6; 1201:6

**indictment** [85] - 1081:9, 15, 21, 25; 1082:2; 1083:5, 8-9, 12, 14, 24; 1084:1, 24; 1085:18; 1086:17; 1087:16, 19; 1093:5, 8-9; 1094:2, 25; 1095:2; 1096:16; 1100:1, 4; 1101:8, 17; 1104:14, 16-17; 1105:16; 1106:21; 1112:6; 1113:1, 3, 17; 1116:13, 16; 1117:6; 1119:25; 1122:22, 24; 1123:1, 17; 1126:8; 1129:2, 5; 1134:5;

1135:1; 1149:25; 1152:22, 24; 1153:1, 17; 1156:8; 1159:2, 5; 1164:5; 1165:1; 1179:25; 1182:22, 24; 1183:1, 17; 1186:8; 1189:2, 5; 1194:5; 1195:1; 1213:16; 1227:2; 1234:5, 11, 22, 24; 1243:23; 1244:5

**individual** [13] - 1085:6; 1086:15, 17; 1088:23; 1094:24; 1101:20; 1102:3; 1104:24; 1105:19; 1132:5; 1162:5; 1192:5; 1213:2

**individuals** [3] - 1122:14; 1152:14; 1182:14

**induce** [8] - 1084:8; 1085:5; 1088:15, 20; 1093:15; 1100:9; 1104:23; 1241:18

**induced** [4] - 1086:22; 1087:25; 1088:10; 1095:4

**induces** [3] - 1085:22; 1094:7; 1097:8

**inducing** [1] - 1235:24

**inextricably** [3] - 1245:19; 1248:3, 12

**infer** [1] - 1107:22

**inference** [9] - 1109:4, 11; 1115:25; 1121:25; 1128:8; 1151:25; 1158:8; 1181:25; 1188:8

**inferences** [4] - 1109:2; 1122:20; 1152:20; 1182:20

**influence** [7] - 1088:17; 1130:8, 15; 1160:8, 15; 1190:8, 15

**influenced** [3] - 1132:8; 1162:8; 1192:8

**information** [4] - 1216:1, 6; 1245:8; 1247:6

**informed** [1] - 1109:9

**initials** [5] - 1082:7, 21; 1086:15, 17; 1094:24

**innocence** [5] - 1133:8; 1163:8; 1193:8; 1235:1; 1239:24

**innocent** [11] - 1081:20; 1115:7;

1119:16; 1121:8; 1127:16; 1149:16; 1151:8; 1157:16; 1179:16; 1181:8; 1187:16

**inquiry** [4] - 1139:18; 1169:18; 1199:18; 1211:4

**inspect** [3] - 1226:1; 1249:19; 1253:3

**inspected** [1] - 1226:3

**instead** [1] - 1091:2

**instruct** [20] - 1081:8, 10, 23; 1088:14; 1092:9; 1096:16; 1097:1; 1109:5; 1129:1, 4; 1159:1, 4; 1189:1, 4; 1228:18; 1230:9, 12; 1231:6; 1239:13; 1242:21

**instructed** [20] - 1096:25; 1102:4; 1105:23; 1114:9, 17; 1119:4; 1120:2, 15; 1132:4; 1149:4; 1150:2, 15; 1162:4; 1179:4; 1180:2, 15; 1192:4; 1234:22; 1241:9; 1243:25

**instruction** [15] - 1096:13; 1112:18; 1116:5; 1119:5; 1136:14; 1149:5; 1166:14; 1179:5; 1196:14; 1211:11; 1217:22; 1218:3; 1226:12; 1241:13; 1255:3

**instructions** [39] - 1080:5, 19; 1081:13; 1102:6; 1105:25; 1114:10; 1125:10; 1128:18; 1134:16; 1136:3, 11; 1138:23, 25; 1144:16; 1155:10; 1158:18; 1164:16; 1166:3, 11; 1168:23, 25; 1174:16; 1185:10; 1188:18; 1194:16; 1196:3, 11; 1198:23, 25; 1204:16; 1228:7; 1230:13; 1233:23; 1234:2; 1235:2; 1241:12; 1243:22; 1244:1; 1249:3

**instrument** [1] - 1081:16

**instrumentality** [1] -

1232:16

**insufficient** [1] - 1231:12

**intend** [1] - 1228:6

**intended** [17] - 1090:22; 1095:14; 1102:1, 13; 1103:24; 1104:6; 1108:10; 1128:18; 1158:18; 1188:18; 1227:11; 1235:20; 1236:12; 1239:18; 1241:16; 1242:10; 1243:19

**intending** [2] - 1093:19; 1094:11

**intends** [1] - 1102:25

**intent** [13] - 1098:12; 1103:2; 1106:25; 1108:19; 1122:11, 17; 1123:22; 1152:11, 17; 1153:22; 1182:11, 17; 1183:22

**intention** [11] - 1102:10; 1110:19; 1125:17, 24; 1126:3; 1155:17, 24; 1156:3; 1185:17, 24; 1186:3

**intentional** [3] - 1122:21; 1152:21; 1182:21

**intentionally** [33] - 1084:7; 1085:5; 1093:14; 1098:1; 1100:9; 1103:13; 1104:22; 1110:23; 1113:9; 1115:6; 1116:21; 1119:14; 1121:7; 1122:6; 1123:5; 1125:7; 1127:15; 1149:14; 1151:7; 1152:6; 1153:5; 1155:7; 1157:15; 1179:14; 1181:7; 1182:6; 1183:5; 1185:7; 1187:15; 1241:17

**intentions** [3] - 1122:14; 1152:14; 1182:14

**interaction** [2] - 1245:16; 1255:13

**interactions** [1] - 1245:17

**interacts** [1] - 1255:9

**intercourse** [1] - 1089:19

**interest** [3] - 1098:20, 22

**interests** [1] - 1243:3

**interfere** [3] - 1131:3; 1161:3; 1191:3

**interim** [1] - 1211:17

**intermediary** [1] - 1208:19

**international** [1] - 1104:11

**internet** [14] - 1092:10, 14, 16; 1119:11; 1126:14, 17; 1149:11; 1156:14, 17; 1179:11; 1186:14, 17; 1209:20; 1210:1

**interpret** [1] - 1088:14

**interpretation** [3] - 1142:25; 1172:25; 1202:25

**interpreting** [9] - 1140:1; 1142:7; 1143:1; 1170:1; 1172:7; 1173:1; 1200:1; 1202:7; 1203:1

**interspersed** [1] - 1246:23

**interstate** [107] - 1084:13, 17, 21, 23; 1085:12, 16-17; 1086:4, 7, 10; 1087:3, 6, 8; 1091:17, 21-22, 25; 1092:3, 5, 11, 22, 24; 1093:22, 25; 1094:14, 18; 1095:17, 22; 1100:15, 19, 23-24; 1103:23; 1104:1, 5, 8; 1105:4, 6, 9, 13-14; 1113:10, 22-23; 1114:12, 14, 19; 1116:24; 1117:1, 12, 14, 18-19; 1118:9; 1119:18, 22, 24; 1120:1, 4-5; 1123:7, 9; 1124:1, 18, 20; 1126:8, 10, 12, 15; 1148:9; 1149:18, 22, 24; 1150:1, 4-5; 1153:7, 9; 1154:1, 18, 20; 1156:8, 10, 12, 15; 1178:9; 1179:18, 22, 24; 1180:1, 4-5; 1183:7, 9; 1184:1, 18, 20; 1186:8, 10, 12, 15

**intertwined** [3] - 1245:19; 1248:3, 12

**intimidation** [1] - 1088:23

**investigation** [1] - 1246:4

**invited** [3] - 1146:5; 1176:5; 1206:5

**involved** [33] - 1107:24; 1113:15; 1114:22; 1115:1; 1117:3, 21; 1118:12, 16; 1120:11; 1121:3; 1123:13; 1124:23; 1125:2; 1126:20; 1127:11; 1148:12, 16; 1150:11; 1151:3; 1153:13; 1154:23; 1155:2; 1156:20; 1157:11; 1178:12, 16; 1180:11; 1181:3; 1183:13; 1184:23; 1185:2; 1186:20; 1187:11

**involves** [4] - 1113:25; 1124:5; 1154:5; 1184:5

**involving** [2] - 1213:8; 1247:10

**irrelevant** [8] - 1112:21; 1116:3; 1122:4; 1128:11; 1152:4; 1158:11; 1182:4; 1188:11

**Islip** [3] - 1079:5, 14, 22

**isolated** [3] - 1133:25; 1163:25; 1193:25

**issue** [30] - 1109:15; 1142:21; 1172:21; 1202:21; 1209:14; 1212:12; 1213:25; 1214:14; 1215:17, 21; 1216:2; 1226:13; 1227:3; 1228:5; 1240:20, 23, 25; 1241:4, 7; 1245:25; 1246:2, 5, 7, 15, 21; 1247:16; 1248:10

**issues** [8] - 1134:14; 1137:6; 1164:14; 1167:6; 1194:14; 1197:6; 1247:7; 1254:9

**issuing** [1] - 1089:1

**items** [13] - 1139:24; 1140:22; 1169:24; 1170:22; 1199:24; 1200:22; 1229:12; 1230:15, 20-21; 1232:5; 1233:5

**itself** [12] - 1090:18; 1106:10; 1110:5; 1122:12; 1152:12; 1182:12; 1208:12; 1216:8, 24; 1232:3, 15; 1233:6

## J

**Jane** [22] - 1082:6, 10, 13, 15, 18, 20; 1084:8; 1085:6; 1086:16, 18; 1093:6, 15; 1094:25; 1100:3, 10; 1102:3; 1104:15, 24; 1113:3, 13; 1116:15, 22

**January** [14] - 1085:2; 1100:6; 1101:10; 1123:3; 1153:3; 1183:3; 1209:5, 11, 19; 1210:5; 1220:8, 13; 1223:8, 11

**jeopardy** [4] - 1213:18; 1214:21; 1215:3, 8

**jobs** [1] - 1254:9

**joeval5@optonline.net** [1] - 1211:8

**join** [1] - 1212:24

**joined** [2] - 1108:11; 1109:12

**joint** [6] - 1125:22, 25; 1155:22, 25; 1185:22, 25

**jointly** [3] - 1126:4; 1156:4; 1186:4

**JOSEPH** [2] - 1079:5, 9

**Joseph** [11] - 1084:6; 1085:4; 1093:13; 1100:7; 1104:21; 1113:8; 1116:20; 1123:4; 1153:4; 1183:4; 1234:10

**Judge** [12] - 1080:6; 1141:1; 1143:1; 1171:1; 1173:1; 1201:1; 1203:1; 1231:6; 1233:1; 1237:25; 1238:2; 1244:21

**judge** [7] - 1128:22; 1158:22; 1188:22; 1228:18, 24; 1230:9, 12

**judge's** [1] - 1230:13

**Judge's** [3] - 1138:23; 1168:23; 1198:23

**judges** [1] - 1255:20

**July** [15] - 1101:13; 1210:22; 1211:3-5, 8, 13-15, 18; 1221:6, 12; 1223:21, 24

**jurisdiction** [1] - 1114:16

**JUROR** [24] - 1224:18, 20, 22, 24; 1225:1, 3, 5, 7, 9, 11, 13, 15; 1251:13, 15, 17, 19, 21, 23, 25; 1252:2, 4, 6, 8, 10

**juror** [28] - 1131:18; 1132:3; 1135:13; 1161:18; 1162:3; 1165:13; 1191:18; 1192:3; 1195:13; 1224:17, 21, 23, 25; 1225:2, 4, 6, 8, 12; 1251:12, 16, 18, 20, 22, 24; 1252:1, 3; 1254:17, 20

**Juror** [7] - 1224:19; 1225:10, 14; 1251:14; 1252:5, 7, 9

**juror's** [9] - 1132:11, 15; 1162:11, 15; 1192:11, 15

**jurors** [42] - 1080:4; 1129:11; 1130:13, 17; 1132:2, 6-8; 1135:23, 25; 1136:2, 10, 18, 25; 1159:11; 1160:13, 17; 1162:2, 6-8; 1165:23, 25; 1166:2, 10, 18, 25; 1189:11; 1190:13, 17; 1192:2, 6-8; 1195:23, 25; 1196:2, 10, 18, 25; 1254:25; 1255:11

**Jury** [2] - 1218:13; 1249:8

**jury** [129] - 1079:10; 1080:16, 18; 1085:7; 1104:25; 1130:7; 1131:12; 1132:15, 18, 24; 1133:2, 6, 11; 1134:18, 23; 1135:18, 20; 1136:8, 19, 22; 1137:24; 1138:3; 1140:18, 20, 22; 1142:3; 1143:22; 1144:16; 1145:5, 14; 1160:7; 1161:12; 1162:15, 18, 24; 1163:2, 6, 11; 1164:18, 23; 1165:18, 20; 1166:8, 19, 22; 1167:24; 1168:3; 1170:18, 20, 22; 1172:3; 1173:22; 1174:16; 1175:5, 14; 1190:7; 1191:12; 1192:15, 18, 24; 1193:2, 6, 11; 1194:18, 23; 1195:18, 20; 1196:8, 19, 22; 1197:24; 1198:3; 1200:18, 20, 22; 1202:3; 1203:22; 1204:16; 1205:5, 14;

**17**

1208:3; 1210:4;
1211:14; 1212:7;
1213:22; 1214:3;
1217:22; 1218:3, 16,
24; 1219:1, 5-6;
1224:13, 16; 1226:7,
11; 1227:1; 1228:9;
1234:8; 1237:3, 22;
1244:15, 25; 1245:3;
1247:18; 1249:11;
1251:8, 11; 1252:11;
1253:4; 1254:1, 3-5,
13-14; 1255:15, 18, 25
**JURY** [2] - 1224:15;
1251:10
**jury's** [38] - 1219:12,
17, 21; 1220:1, 5, 9,
14, 20; 1221:1, 8, 14,
20; 1222:1, 6, 11, 18,
22, 24; 1223:2, 5, 9,
12, 15, 19, 22, 25;
1224:3, 6, 9, 12;
1248:16; 1249:23;
1250:3, 14, 20, 24;
1251:7; 1252:12
**justify** [2] - 1109:10;
1242:8

### K

**Kabrawala** [6] -
1146:3, 10; 1176:3, 10;
1206:3, 10
**KABRAWALA** [20] -
1079:14; 1080:6, 13;
1138:11; 1168:11;
1198:11; 1218:17;
1226:3, 16; 1228:12;
1233:1, 24; 1237:5, 13,
25; 1244:21; 1249:5;
1253:5; 1256:4, 18
**Kalichenko** [10] -
1210:6, 20; 1211:5;
1214:3; 1229:21;
1233:20; 1245:13;
1246:12; 1247:20;
1248:6
**keep** [6] - 1128:17;
1140:10; 1158:17;
1170:10; 1188:17;
1200:10
**key** [1] - 1108:11
**kind** [1] - 1103:11
**knowing** [8] - 1084:11;
1098:1; 1100:12;
1105:2; 1110:25;
1119:8; 1149:8; 1179:8
**knowingly** [61] -
1084:7; 1085:4;

1093:14; 1097:15;
1098:9; 1099:11;
1100:8; 1104:22;
1108:14; 1109:24;
1113:9, 20; 1114:8;
1115:5, 8; 1116:6, 21;
1117:10, 17; 1119:3,
13-14; 1120:24; 1121:6,
10; 1123:5, 21;
1124:14; 1125:6, 8;
1127:14, 17; 1149:3,
13-14; 1150:24; 1151:6,
10; 1153:5, 21;
1154:14; 1155:6, 8;
1157:14, 17; 1179:3,
13-14; 1180:24; 1181:6,
10; 1183:5, 21;
1184:14; 1185:6, 8;
1187:14, 17
**knowledge** [50] -
1098:15, 18; 1106:24;
1108:9, 18; 1109:3, 11;
1110:10, 13, 17;
1112:12; 1115:10,
14-15, 17-18, 20;
1121:12, 16-17, 19, 21;
1122:16; 1127:19,
23-24; 1128:1, 4;
1151:12, 16-17, 19, 21;
1152:16; 1157:19,
23-24; 1158:1, 4;
1181:12, 16-17, 19, 21;
1182:16; 1187:19,
23-24; 1188:1, 4
**known** [3] - 1085:7;
1104:24; 1109:6
**knows** [1] - 1086:2

### L

**labored** [1] - 1234:9
**lack** [1] - 1091:5
**ladies** [3] - 1228:12;
1231:4; 1234:8
**language** [3] - 1101:5;
1218:12; 1245:12
**LAPINTA** [7] - 1080:7;
1215:15, 18; 1226:11,
14; 1233:25; 1253:6
**LaPinta** [35] - 1079:17;
1137:8, 10; 1142:11;
1143:24; 1144:4, 14,
18, 24; 1145:4, 6, 12;
1167:8, 10; 1172:11;
1173:24; 1174:4, 14,
18, 24; 1175:4, 6, 12;
1197:8, 10; 1202:11;
1203:24; 1204:4, 14,
18, 24; 1205:4, 6, 12;

1215:13
**lascivious** [6] -
1089:23, 25; 1090:5,
19, 25; 1091:3
**Lato** [5] - 1140:9;
1170:9; 1200:9;
1214:17; 1245:10
**LATO** [58] - 1079:17;
1080:15; 1137:7;
1139:4, 7, 17; 1140:2,
11, 16; 1141:9, 19;
1142:10, 18; 1143:12;
1144:21; 1145:1, 3, 10;
1167:7; 1169:4, 7, 17;
1170:2, 11, 16; 1171:9,
19; 1172:10, 18;
1173:12; 1174:21;
1175:1, 3, 10; 1197:7;
1199:4, 7, 17; 1200:2,
11, 16; 1201:9, 19;
1202:10, 18; 1203:12;
1204:21; 1205:1, 3, 10;
1226:6, 9; 1231:1, 4;
1237:20; 1244:22;
1249:6; 1256:9
**Lato's** [1] - 1213:13
**latter** [1] - 1099:3
**laundering** [1] -
1214:13
**law** [30] - 1080:20;
1081:24; 1083:11;
1097:3; 1099:1, 25;
1109:20; 1110:16;
1111:25; 1121:25;
1128:24; 1129:20;
1131:1; 1135:12;
1155:21; 1158:24;
1159:20; 1161:1;
1165:12; 1185:21;
1188:24; 1189:20;
1191:1; 1195:12;
1212:13; 1215:20;
1228:7; 1230:9; 1235:6,
23
**laws** [3] - 1134:15;
1164:15; 1194:15
**lawyers** [20] - 1133:23;
1137:1; 1141:23;
1163:23; 1167:1;
1171:23; 1193:23;
1197:1; 1201:23;
1208:4; 1218:15;
1226:1; 1228:4;
1233:22; 1236:15;
1244:19; 1252:13;
1253:2; 1254:19;
1255:11
**leading** [1] - 1088:17
**least** [9] - 1108:12;

1110:18; 1140:17;
1141:20; 1170:17;
1171:20; 1200:17;
1201:20; 1245:10
**leave** [3] - 1209:22;
1255:12
**leaves** [3] - 1144:21;
1174:21; 1204:21
**left** [4] - 1136:23;
1166:23; 1196:23;
1228:16
**legal** [5] - 1081:4, 8;
1103:5, 8, 14
**legality** [7] - 1116:2;
1122:3; 1128:10;
1152:3; 1158:10;
1182:3; 1188:10
**legitimate** [1] -
1242:5
**LEONARD** [1] - 1079:17
**less** [2] - 1087:15, 18
**level** [2] - 1213:18, 20
**license** [1] - 1216:13
**Lieberman** [2] -
1216:4; 1217:6
**life** [1] - 1255:20
**light** [2] - 1208:11, 20
**likely** [4] - 1230:15,
17; 1240:8; 1241:3
**limited** [1] - 1241:19
**limiting** [1] - 1217:21
**line** [3] - 1217:10;
1254:6, 14
**lines** [1] - 1104:11
**list** [1] - 1091:1
**listen** [8] - 1136:6;
1141:10; 1166:6;
1171:10; 1196:6;
1201:10; 1222:15;
1250:16
**listening** [3] -
1129:10; 1159:10;
1189:10
**litigants** [1] -
1255:11
**live** [2] - 1085:25;
1089:9
**lives** [4] - 1080:10;
1136:16; 1166:16;
1196:16
**locate** [6] - 1133:14,
18; 1163:14, 18;
1193:14, 18
**located** [6] - 1227:17;
1229:10, 12; 1239:4;
1250:5, 25
**location** [2] -

1216:25; 1217:2

**look** [3] - 1209:15; 1215:20; 1246:22

**looked** [1] - 1215:20

**LORETTA** [1] - 1079:12

**louder** [4] - 1107:25; 1122:16; 1152:16; 1182:16

**lunch** [12] - 1137:18; 1144:19; 1147:6; 1167:18; 1174:19; 1177:6; 1197:18; 1204:19; 1207:6

**luncheon** [3] - 1147:7; 1177:7; 1207:7

**lunches** [3] - 1137:15; 1167:15; 1197:15

**lustfulness** [1] - 1090:3

**LYNCH** [1] - 1079:12

---

**M**

**madam** [1] - 1249:20

**magazine** [1] - 1235:12

**magazines** [3] - 1123:22; 1153:22; 1183:22

**mail** [19] - 1093:22; 1094:1, 15, 18; 1095:17, 21; 1208:10; 1209:5, 19, 22, 25; 1211:8, 10, 23; 1212:7; 1218:12; 1229:17; 1247:13

**mailed** [34] - 1084:16; 1085:11; 1086:4, 6, 10; 1087:1, 5, 8; 1091:24; 1092:2; 1100:18; 1105:8; 1116:25; 1117:13, 15; 1119:21; 1123:8, 11, 24; 1124:3; 1126:7; 1149:21; 1153:8, 11, 24; 1154:3; 1156:7; 1179:21; 1183:8, 11, 24; 1184:3; 1186:7; 1235:14

**mails** [15] - 1113:24; 1117:20; 1208:25; 1209:16; 1210:5; 1211:2; 1212:2; 1218:7; 1245:9, 11, 14; 1246:22; 1247:1, 7, 23

**maintain** [1] - 1216:21

**major** [2] - 1099:3; 1109:18

**majority** [1] - 1242:4

**Maloney** [1] - 1213:4

---

**managed** [1] - 1218:6

**mandatory** [1] - 1091:1

**manufacturing** [1] - 1089:1

**map** [4] - 1227:22; 1239:8; 1250:10; 1251:5

**March** [4] - 1101:11; 1210:13; 1220:18; 1223:14

**maritime** [1] - 1114:15

**mark** [9] - 1134:25; 1135:7; 1164:25; 1165:7; 1194:25; 1195:7; 1218:14; 1234:4; 1244:18

**marked** [7] - 1139:1; 1169:1; 1199:1; 1244:23; 1249:1, 9

**marshal** [6] - 1134:8, 19; 1164:8, 19; 1194:8, 19

**masochistic** [1] - 1089:22

**masturbation** [1] - 1089:22

**material** [46] - 1109:25; 1115:9, 15, 19, 23; 1116:1, 3; 1121:11, 17, 20, 24; 1122:1-3; 1127:18, 24; 1128:2, 6, 9, 11; 1151:11, 17, 20, 24; 1152:1-3; 1157:18, 24; 1158:2, 6, 9, 11; 1181:11, 17, 20, 24; 1182:1-3; 1187:18, 24; 1188:2, 6, 9, 11

**materials** [29] - 1084:16; 1085:10; 1086:6; 1087:7; 1092:1, 6; 1095:7; 1100:17; 1105:7; 1114:13; 1117:15; 1119:23; 1120:4; 1123:11; 1124:3, 20; 1126:11; 1149:23; 1150:4; 1153:11; 1154:3, 20; 1156:11; 1179:23; 1180:4; 1183:11; 1184:3, 20; 1186:11

**matter** [9] - 1109:3; 1123:5, 23; 1153:5, 23; 1183:5, 23; 1235:13; 1243:11

**matters** [1] - 1244:7

**mean** [10] - 1125:12; 1133:22; 1145:8; 1155:12; 1163:22;

---

1175:8; 1185:12; 1193:22; 1205:8; 1240:6

**meaning** [4] - 1114:9; 1119:4; 1149:4; 1179:4

**means** [77] - 1084:13, 21; 1085:12, 15; 1086:7; 1088:20, 22, 25; 1089:6, 18, 25; 1092:6, 10, 13; 1093:21, 25; 1094:13, 17; 1095:16, 21-22; 1097:14; 1100:14, 19, 23; 1102:23; 1105:4, 9, 12; 1107:11; 1113:10, 21, 23; 1114:17; 1116:23; 1117:11, 16, 18; 1119:7, 10; 1120:2; 1123:9, 25; 1124:4; 1125:11; 1126:13, 17; 1132:10; 1149:7, 10; 1150:2; 1153:9, 25; 1154:4; 1155:11; 1156:13, 17; 1162:10; 1179:7, 10; 1180:2; 1183:9, 25; 1184:4; 1185:11; 1186:13, 17; 1192:10; 1218:5; 1228:22; 1230:12; 1240:8, 10

**meant** [1] - 1237:13

**mechanical** [1] - 1079:23

**media** [7] - 1084:19; 1092:20; 1100:21; 1104:7, 9; 1105:11

**meet** [8] - 1088:4; 1095:25; 1096:16; 1116:8; 1118:19; 1148:19; 1178:19; 1240:1

**member** [18] - 1106:23; 1108:9; 1109:5, 7, 16; 1110:1, 5, 8, 15; 1111:19, 23; 1112:5; 1132:24; 1133:2; 1162:24; 1163:2; 1192:24; 1193:2

**members** [19] - 1080:18; 1107:6; 1110:7; 1112:1, 8; 1132:24; 1134:18; 1137:24; 1162:24; 1164:18; 1167:24; 1192:24; 1194:18; 1197:24; 1224:13; 1227:1; 1251:8; 1254:1

**memo** [1] - 1211:5

**memory** [14] - 1085:13; 1132:3, 5; 1146:22; 1162:3, 5; 1176:22;

---

1192:3, 5; 1206:22; 1229:3; 1231:9, 14; 1232:10

**mentioned** [3] - 1095:24; 1228:25; 1239:2

**mere** [8] - 1098:14, 16; 1102:10, 18, 21; 1110:3, 6, 10

**merely** [5] - 1083:9; 1110:13; 1135:5; 1165:5; 1195:5

**merge** [1] - 1209:2

**merits** [3] - 1133:2; 1163:2; 1193:2

**message** [3] - 1146:21; 1176:21; 1206:21

**messages** [36] - 1145:5, 7, 11, 13, 17; 1146:13, 17, 19, 21, 23; 1147:3; 1175:5, 7, 11, 13, 17; 1176:13, 17, 19, 21, 23; 1177:3; 1205:5, 7, 11, 13, 17; 1206:13, 17, 19, 21, 23; 1207:3

**met** [8] - 1107:7; 1130:5; 1131:8; 1160:5; 1161:8; 1190:5; 1191:8; 1239:20

**Michelle** [9] - 1136:7; 1138:8; 1166:7; 1168:8; 1196:7; 1198:8; 1244:14; 1255:16, 23

**might** [6] - 1133:14; 1163:14; 1193:14; 1214:18; 1232:8; 1242:23

**mind** [9] - 1083:8; 1088:18; 1128:17; 1130:1; 1158:17; 1160:1; 1188:17; 1190:1; 1241:12

**minor** [102] - 1084:8; 1085:6, 23; 1087:12; 1091:4; 1093:15; 1094:7; 1100:10; 1101:22; 1104:23; 1105:21; 1109:19; 1112:20, 22; 1113:15; 1114:1, 22, 24; 1115:2, 11, 16, 19; 1117:21; 1118:12, 17-18; 1120:12, 14, 19; 1121:3, 13, 18, 20; 1124:6, 23-24; 1125:3; 1126:21, 23; 1127:2, 11-12; 1128:3; 1148:12, 17-18; 1150:12, 14, 19;

1151:3, 13, 18, 20;
1154:6, 23-24; 1155:3;
1156:21, 23; 1157:2,
11-12; 1158:3; 1178:12,
17-18; 1180:12, 14, 19;
1181:3, 13, 18, 20;
1184:6, 23-24; 1185:3;
1186:21, 23; 1187:2,
11-12; 1188:3; 1235:25;
1241:18

**minors** [7] - 1117:3;
1123:13; 1127:20;
1153:13; 1157:20;
1183:13; 1187:20

**minus** [3] - 1141:9;
1171:9; 1201:9

**minutes** [10] - 1128:13;
1138:5; 1158:13;
1168:5; 1188:13;
1198:5; 1226:9; 1228:7;
1231:5; 1234:1

**misspoke** [1] - 1237:21

**mistake** [13] - 1115:6;
1119:15; 1121:8;
1122:10; 1127:16;
1149:15; 1151:8;
1152:10; 1157:16;
1179:15; 1181:8;
1182:10; 1187:16

**mobile** [3] - 1084:18;
1100:20; 1105:10

**moment** [18] - 1083:15;
1097:1; 1115:4; 1134:3,
18; 1137:2; 1140:11;
1164:3, 18; 1167:2;
1170:11; 1194:3, 18;
1197:2; 1200:11;
1236:15; 1237:25;
1244:15

**momentarily** [1] -
1095:25

**moments** [1] - 1088:4

**Monday** [2] - 1209:16,
20

**money** [9] - 1209:7, 13;
1210:15, 25; 1214:13;
1217:11, 21, 23

**moreover** [2] - 1109:8,
25

**morning** [3] - 1080:3,
18; 1212:3

**Moscow** [1] - 1210:20

**most** [1] - 1208:11

**motion** [2] - 1213:21;
1215:11

**motions** [2] - 1256:7,
13

**move** [1] - 1086:11

**moved** [1] - 1092:7

**moving** [5] - 1088:17;
1093:3; 1099:23;
1104:12; 1112:24

**MR** [147] - 1080:6, 13,
15; 1137:7-10; 1138:11;
1139:3, 7, 17, 23;
1140:2, 6, 9, 11, 16;
1141:1, 9, 14, 19;
1142:10, 18, 25;
1143:6, 12, 14, 19,
24-25; 1144:3, 18, 21;
1145:1, 3, 10; 1146:24;
1167:7-10; 1168:11;
1169:3, 7, 17, 23;
1170:2, 6, 9, 11, 16;
1171:1, 9, 14, 19;
1172:10, 18, 25;
1173:6, 12, 14, 19,
24-25; 1174:3, 18, 21;
1175:1, 3, 10; 1176:24;
1197:7-10; 1198:11;
1199:3, 7, 17, 23;
1200:2, 6, 9, 11, 16;
1201:1, 9, 14, 19;
1202:10, 18, 25;
1203:6, 12, 14, 19,
24-25; 1204:3, 18, 21;
1205:1, 3, 10; 1206:24;
1215:15, 18; 1218:7,
17; 1226:3, 6, 9, 11,
14, 16; 1228:12;
1231:1, 4; 1233:1,
24-25; 1234:5; 1237:5,
7, 10, 12-13, 15, 20,
25; 1238:2; 1244:21;
1249:5; 1253:5; 1256:4,
9, 18

**MTCN** [2] - 1209:13;
1218:8

**multiday** [1] - 1210:12

**multiple** [5] -
1212:17, 19; 1213:2, 7,
10

**multiplicitas** [4] -
1212:11, 14; 1214:14

**multiplicity** [1] -
1213:14

**must** [141] - 1081:11;
1082:24; 1083:4, 20;
1086:13; 1087:14, 17,
23; 1088:8; 1091:2, 11,
19; 1092:11; 1094:21;
1098:5, 11, 19;
1099:20; 1101:24;
1102:12; 1106:18;
1107:15; 1108:7, 22;
1110:17, 22; 1111:6;
1112:15; 1114:5;

1115:13, 17-18; 1118:2;
1119:2, 12, 20;
1120:10, 16; 1121:1,
15, 19; 1122:6, 8;
1125:5, 13; 1126:6, 15,
19, 24; 1127:9, 22;
1128:1; 1129:2, 6, 9,
19; 1130:2, 5, 20;
1131:1, 6; 1132:15;
1134:10; 1135:10;
1148:2; 1149:2, 12, 20;
1150:10, 16; 1151:1,
15, 19; 1152:6, 8;
1155:5, 13; 1156:6, 15,
19, 24; 1157:9, 22;
1158:1; 1159:2, 6, 9,
19; 1160:2, 5, 20;
1161:1, 6; 1162:15;
1164:10; 1165:10;
1178:2; 1179:2, 12, 20;
1180:10, 16; 1181:1,
15, 19; 1182:6, 8;
1185:5, 13; 1186:6, 15,
19, 24; 1187:9, 22;
1188:1; 1189:2, 6, 9,
19; 1190:2, 5, 20;
1191:1, 6; 1192:15;
1194:10; 1195:10;
1234:18, 25; 1240:21,
25; 1241:7; 1243:14

**mutual** [1] - 1107:16

## N

**N.Y** [1] - 1079:5

**name** [5] - 1217:10, 14,
20, 24

**namely** [12] - 1082:6,
10, 12, 15, 17, 20;
1093:6; 1100:3; 1102:2;
1104:15; 1113:2;
1116:14

**names** [1] - 1218:4

**nature** [28] - 1107:20;
1111:15; 1115:9, 14;
1121:11, 16; 1127:18,
23; 1151:11, 16;
1157:18, 23; 1181:11,
16; 1187:18, 23;
1216:23; 1234:14;
1245:18; 1246:11;
1247:1, 6, 10, 13,
15-16; 1248:7; 1254:21

**nearly** [1] - 1228:15

**necessarily** [4] -
1125:12; 1155:12;
1185:12; 1213:21

**necessary** [18] -
1097:19; 1098:8;

1102:18; 1110:16;
1115:23; 1121:24;
1124:10; 1128:6;
1132:21; 1151:24;
1154:10; 1158:6;
1162:21; 1181:24;
1184:10; 1188:6;
1192:21; 1245:20

**need** [33] - 1080:25;
1090:25; 1098:20;
1103:17; 1107:6, 9, 13;
1109:6, 9, 12; 1115:15;
1121:17; 1127:24;
1131:22; 1135:23;
1136:2; 1151:17;
1157:24; 1161:22;
1165:23; 1166:2;
1181:17; 1187:24;
1191:22; 1195:23;
1196:2; 1217:2; 1227:3;
1229:16, 18; 1240:2;
1241:25

**never** [3] - 1133:1;
1163:1; 1193:1

**nevertheless** [1] -
1242:5

**new** [1] - 1246:18

**NEW** [1] - 1079:1

**New** [19] - 1079:14, 18,
22; 1084:5; 1085:3;
1093:2, 12; 1100:7;
1104:20; 1113:7;
1116:19; 1123:4;
1153:4; 1183:4;
1227:18; 1229:6;
1239:5; 1250:6; 1251:1

**next** [3] - 1136:2;
1166:2; 1196:2

**nexus** [1] - 1240:3

**night** [2] - 1209:25;
1212:3

**nonhearsay** [1] -
1217:19

**normal** [3] - 1136:16;
1166:16; 1196:16

**note** [81] - 1108:23;
1128:12; 1132:22;
1133:21, 23; 1134:8,
21; 1138:22; 1139:9;
1140:1; 1141:1, 6;
1142:8, 19, 22; 1145:9,
15, 21, 25; 1146:15,
17, 20; 1147:2;
1158:12; 1162:22;
1163:21, 23; 1164:8,
21; 1168:22; 1169:9;
1170:1; 1171:1, 6;
1172:8, 19, 22; 1175:9,
15, 21, 25; 1176:15,

17, 20; 1177:2;
1188:12; 1192:22;
1193:21, 23; 1194:8,
21; 1198:22; 1199:9;
1200:1; 1201:1, 6;
1202:8, 19, 22; 1205:9,
15, 21, 25; 1206:15,
17, 20; 1207:2;
1218:13-15; 1219:4;
1249:1, 8-9; 1254:23
**noted** [4] - 1080:2;
1214:1; 1219:3; 1254:19
**notes** [45] - 1131:19,
21; 1132:1, 3-4, 6-7,
9, 12, 15; 1133:4;
1138:6, 19; 1161:19,
21; 1162:1, 3-4, 6-7,
9, 12, 15; 1163:4;
1168:6, 19; 1191:19,
21; 1192:1, 3-4, 6-7,
9, 12, 15; 1193:4;
1198:6, 19
**nothing** [8] - 1128:17;
1135:5; 1158:17;
1165:5; 1188:17;
1195:5; 1212:1, 16
**notice** [1] - 1090:2
**noticed** [1] - 1237:1
**notify** [3] - 1134:8;
1164:8; 1194:8
**November** [6] - 1079:7;
1084:4; 1093:11;
1104:19; 1113:6;
1116:18
**nude** [1] - 1090:18
**nudity** [1] - 1090:18
**number** [16] - 1135:13;
1138:8; 1165:13;
1168:8; 1195:13;
1198:8; 1209:13;
1227:15; 1239:2;
1240:13; 1249:21;
1250:1, 18, 22
**numbers** [13] - 1140:4;
1143:21; 1144:23;
1170:4; 1173:21;
1174:23; 1200:4;
1203:21; 1204:23;
1218:8
**numerically** [3] -
1133:7; 1163:7; 1193:7

---

**O**

**oath** [12] - 1130:13,
17; 1134:12; 1135:14;
1160:13, 17; 1164:12;
1165:14; 1190:13, 17;
1194:12; 1195:14

**object** [4] - 1106:15;
1107:10, 12; 1231:10
**objection** [11] -
1139:2; 1141:2; 1169:2;
1171:2; 1199:2; 1201:2;
1213:13; 1215:22;
1218:10; 1245:10;
1247:24
**objections** [1] -
1215:25
**objective** [5] -
1106:5; 1108:20;
1122:10; 1152:10;
1182:10
**objectives** [3] -
1109:13; 1110:14, 18
**obligations** [1] -
1254:16
**obtain** [1] - 1211:16
**obtained** [2] -
1216:15; 1235:18
**obtaining** [2] -
1102:22; 1246:5
**obviously** [30] -
1080:23; 1124:11;
1136:15; 1137:17;
1138:25; 1139:19;
1141:16; 1143:3, 8;
1146:18; 1154:11;
1166:15; 1167:17;
1168:25; 1169:19;
1171:16; 1173:3, 8;
1176:18; 1184:11;
1196:15; 1197:17;
1198:25; 1199:19;
1201:16; 1203:3, 8;
1206:18; 1231:20;
1247:5
**occur** [1] - 1104:3
**occurred** [4] -
1083:18; 1122:19;
1152:19; 1182:19
**occurrence** [4] -
1088:21; 1122:13;
1152:13; 1182:13
**occurring** [1] - 1093:7
**occurs** [1] - 1215:9
**OF** [3] - 1079:1, 3, 6
**offense** [24] - 1083:2;
1086:11; 1097:7, 11-12,
14, 24; 1098:12;
1102:5, 22; 1105:24;
1106:7; 1114:15;
1215:2; 1235:15, 18,
21; 1241:17; 1242:6, 11
**offenses** [10] -
1082:4; 1213:3;
1234:10, 16, 24;

**1239:17, 19; 1243:18,
21; 1245:20**
**offered** [3] - 1217:23;
1244:7; 1245:23
**officer** [18] - 1131:16;
1132:23; 1135:15, 17,
24; 1136:19; 1161:16;
1162:23; 1165:15, 17,
24; 1166:19; 1191:16;
1192:23; 1195:15, 17,
24; 1196:19
**often** [6] - 1107:25;
1111:16; 1122:12;
1152:12; 1182:12;
1254:5
**old** [1] - 1087:18
**omissions** [2] -
1111:23; 1112:3
**once** [6] - 1128:21;
1131:2; 1158:21;
1161:2; 1188:21; 1191:2
**One** [1] - 1227:14
**one** [95] - 1080:21;
1083:2; 1084:10, 18;
1085:8, 12; 1092:7, 21;
1093:18; 1096:10;
1098:21, 24; 1100:12,
20; 1102:19; 1105:1, 9;
1110:6; 1111:6;
1113:12; 1116:21;
1117:3; 1123:6, 13, 22;
1124:4; 1125:22, 24;
1130:18; 1131:13;
1132:20, 24; 1135:13;
1136:9; 1138:20;
1145:24; 1146:23;
1153:6, 13, 22; 1154:4;
1155:22, 24; 1160:18;
1161:13; 1162:20, 24;
1165:13; 1166:9;
1168:20; 1175:24;
1176:23; 1183:6, 13,
22; 1184:4; 1185:22,
24; 1190:18; 1191:13;
1192:20, 24; 1195:13;
1196:9; 1198:20;
1205:24; 1206:23;
1208:15; 1209:14, 23;
1210:1, 23; 1212:1, 9,
20; 1213:6; 1214:2;
1215:25; 1218:6;
1227:3; 1228:16, 25;
1229:3; 1233:14;
1234:12; 1237:25;
1239:3; 1243:11, 24;
1245:6, 11; 1248:9;
1255:6
**one-4** [1] - 1227:16
**one-time** [1] - 1248:9

**ones** [3] - 1138:12;
1168:12; 1198:12
**ongoing** [1] - 1212:8
**open** [6] - 1133:3;
1137:14; 1163:3;
1167:14; 1193:3;
1197:14
**opening** [5] - 1129:21;
1159:21; 1189:21;
1218:11; 1246:2
**opinion** [4] - 1145:4;
1175:4; 1205:4; 1216:20
**opinions** [3] -
1129:14; 1159:14;
1189:14
**opportunity** [2] -
1228:4; 1254:13
**opposed** [3] - 1140:18;
1170:18; 1200:18
**opposite** [1] - 1089:21
**oral** [2] - 1089:20
**oral-anal** [1] -
1089:20
**oral-genital** [1] -
1089:20
**orally** [3] - 1133:3;
1163:3; 1193:3
**order** [23] - 1081:13;
1086:12; 1090:2, 24;
1094:20; 1097:21;
1098:7; 1101:23;
1102:11; 1107:5;
1109:10; 1114:4;
1118:1; 1124:9;
1134:20; 1148:1;
1154:9; 1164:20;
1178:1; 1184:9;
1194:20; 1208:16, 19
**ordinarily** [1] -
1214:12
**otherwise** [8] -
1103:12; 1133:7;
1163:7; 1193:7; 1213:2;
1217:1; 1242:19; 1243:6
**outcome** [1] - 1108:22
**outfits** [1] - 1230:2
**outset** [1] - 1081:12
**outside** [13] - 1093:1,
4, 7, 16; 1094:9;
1095:6, 9; 1132:18;
1135:25; 1162:18;
1165:25; 1192:18;
1195:25
**outweighed** [2] -
1247:8; 1248:10
**overall** [1] - 1091:3
**overbroad** [1] -

**21**

1231:12

**overlap** [1] - 1212:15
**overview** [1] - 1083:6
**OWEN** [1] - 1079:20
**own** [5] - 1107:1;
1108:25; 1132:5;
1162:5; 1192:5

**P**

**p.m** [9] - 1138:18;
1147:7; 1168:18;
1177:7; 1198:18;
1207:7; 1219:3;
1249:12; 1256:5
**p.m.** [1] - 1245:4
**P800003011134** [1] -
1250:18
**P80003011134** [1] -
1249:21
**page** [1] - 1245:22
**paging** [3] - 1146:18;
1176:18; 1206:18
**paren** [3] - 1145:23;
1175:23; 1205:23
**parenthetical** [6] -
1139:8, 10; 1169:8, 10;
1199:8, 10
**part** [44] - 1080:21;
1081:4, 6; 1085:21;
1086:23; 1087:25;
1088:10; 1094:4;
1098:13; 1099:3;
1101:20; 1105:18;
1108:5; 1109:11;
1113:20; 1117:9;
1123:19; 1128:12, 15;
1143:8, 15; 1153:19;
1158:12, 15; 1173:8,
15; 1183:19; 1188:12,
15; 1203:8, 15; 1213:4,
15; 1226:11; 1228:16;
1237:7; 1239:11;
1242:13, 16; 1245:24
**partially** [1] -
1090:17
**participant** [2] -
1108:21; 1110:25
**participants** [1] -
1108:4
**participate** [2] -
1098:10; 1099:8
**participated** [3] -
1108:18; 1109:24;
1110:17
**participation** [6] -
1098:1; 1108:23;
1109:15, 25; 1110:11;

1112:22

**particular** [9] -
1100:4; 1126:9; 1132:3;
1156:9; 1162:3; 1186:9;
1192:3; 1216:25; 1241:4
**particularly** [1] -
1254:20
**parties** [6] - 1107:24;
1146:7; 1176:7; 1206:7;
1240:25; 1244:8
**partnership** [2] -
1106:9; 1111:17
**partnerships** [1] -
1111:18
**parts** [2] - 1080:23;
1109:19
**pass** [2] - 1255:16, 23
**patient** [3] - 1133:17;
1163:17; 1193:17
**pause** [6] - 1137:22;
1143:17; 1167:22;
1173:17; 1197:22;
1203:17
**paying** [1] - 1228:13
**people** [7] - 1107:17;
1111:18; 1254:5, 7-8,
10; 1255:1
**perfect** [1] - 1210:23
**perfectly** [3] -
1145:20; 1175:20;
1205:20
**perform** [5] - 1109:16;
1234:12; 1254:15;
1255:2
**performer** [3] -
1128:1; 1158:1; 1188:1
**performs** [1] - 1099:2
**period** [2] - 1212:20;
1213:11
**periodical** [1] -
1235:12
**periodicals** [3] -
1123:23; 1153:23;
1183:23
**permanently** [1] -
1089:10
**permitted** [3] -
1131:19; 1161:19;
1191:19
**permitting** [1] -
1081:21
**person** [65] - 1085:21;
1086:2; 1088:7;
1089:16, 24; 1094:8;
1095:4, 8, 19; 1096:3,
19; 1097:16, 23;
1098:6; 1099:2;

1102:25; 1103:10;
1110:1, 8; 1113:20;
1116:11; 1117:10;
1118:22; 1120:16, 21;
1121:21; 1125:13, 22,
24; 1126:4, 24; 1127:5;
1134:13; 1148:22;
1150:16, 21; 1153:21;
1155:13, 22, 24;
1156:4, 24; 1157:5;
1164:13; 1178:22;
1180:16, 21; 1183:21;
1185:13, 22, 24;
1186:4, 24; 1187:5;
1194:13; 1216:10;
1217:14; 1218:1;
1235:8, 24; 1236:1;
1246:6, 15; 1248:14
**person's** [3] -
1125:12; 1155:12;
1185:12
**personal** [3] -
1235:16, 20; 1255:6
**personally** [2] -
1097:11, 17
**persons** [10] - 1089:21;
1094:6; 1095:8; 1106:4,
20; 1107:4; 1108:5;
1111:10; 1112:8; 1243:1
**persuade** [7] - 1084:8;
1085:5; 1088:15;
1093:15; 1100:9;
1104:23; 1241:18
**persuaded** [4] -
1086:22; 1087:25;
1088:10; 1095:4
**persuades** [2] -
1085:22; 1094:6
**persuading** [1] -
1235:24
**persuasion** [1] -
1088:17
**persuasiveness** [1] -
1240:12
**phase** [7] - 1226:4;
1228:14; 1241:10;
1244:8, 11
**phone** [5] - 1138:8;
1168:8; 1198:8; 1210:2;
1212:3
**photograph** [4] -
1089:3; 1119:10;
1149:10; 1179:10
**photographs** [7] -
1092:9; 1126:13;
1141:17; 1156:13;
1171:17; 1186:13;
1201:17
**photos** [3] - 1139:23;

1169:23; 1199:23

**phrase** [1] - 1092:4
**physical** [3] -
1125:19; 1155:19;
1185:19
**physically** [4] -
1097:20; 1125:13;
1155:13; 1185:13
**picking** [1] - 1209:13
**picture** [4] - 1089:4;
1143:8; 1173:8; 1203:8
**pictures** [9] - 1140:6;
1170:6; 1200:6;
1210:19; 1229:4, 11;
1233:8, 16
**place** [21] - 1081:13;
1090:12; 1122:19;
1137:5, 14; 1138:18;
1152:19; 1167:5, 14;
1168:18; 1182:19;
1197:5, 14; 1198:18;
1208:6, 19; 1209:20;
1215:11; 1225:19;
1236:17; 1245:6
**placed** [2] - 1246:2, 5
**placing** [1] - 1208:16
**plan** [1] - 1110:11
**planned** [1] - 1103:3
**planning** [1] - 1102:21
**plate** [1] - 1254:15
**play** [2] - 1109:18
**played** [1] - 1099:3
**plays** [1] - 1098:25
**Plaza** [2] - 1079:13, 21
**point** [12] - 1080:25;
1090:7; 1132:2;
1133:20; 1145:21;
1162:2; 1163:20;
1175:21; 1192:2;
1193:20; 1205:21;
1237:18
**pointed** [4] - 1131:21;
1161:21; 1191:21;
1237:21
**poll** [2] - 1224:16;
1251:11
**polled** [1] - 1252:11
**pool** [2] - 1211:7, 12
**popped** [1] - 1209:10
**pornographic** [2] -
1229:9, 11
**Pornography** [6] -
1219:25; 1220:4;
1222:10; 1223:2, 4;
1224:10
**pornography** [60] -
1082:12, 15, 23;

1096:23; 1112:25;
1113:2; 1114:5;
1116:11, 14; 1118:2,
23, 25; 1119:17;
1120:7, 23; 1122:23,
25; 1124:10; 1141:16;
1143:3, 5; 1148:2, 23,
25; 1149:17; 1150:7,
23; 1152:23, 25;
1154:10; 1171:16;
1173:3, 5; 1178:2, 23,
25; 1179:17; 1180:7,
23; 1182:23, 25;
1184:10; 1201:16;
1203:3, 5; 1213:1, 7;
1231:19, 22, 24;
1232:3; 1233:4, 19;
1241:20; 1246:1, 24;
1247:3; 1248:13

**portion** [7] - 1131:25;
1133:25; 1161:25;
1163:25; 1191:25;
1193:25; 1228:17

**portions** [3] -
1133:16; 1163:16;
1193:16

**portrayed** [22] -
1115:2; 1118:13, 17;
1120:21; 1121:4;
1125:3; 1127:4, 12;
1148:13, 17; 1150:21;
1151:4; 1155:3; 1157:4,
12; 1178:13, 17;
1180:21; 1181:4;
1185:3; 1187:4, 12

**portrays** [10] -
1114:24; 1120:13;
1124:24; 1126:22;
1150:13; 1154:24;
1156:22; 1180:13;
1184:24; 1186:22

**pose** [2] - 1090:12, 15

**position** [18] -
1140:13, 20, 24;
1145:4, 15-16; 1170:13,
20, 24; 1175:4, 15-16;
1200:13, 20, 24;
1205:4, 15

**positive** [1] - 1255:13

**possess** [6] - 1123:5;
1125:11; 1153:5;
1155:11; 1183:5;
1185:11

**possessed** [15] -
1124:9, 14; 1125:7;
1126:3; 1154:9, 14;
1155:7; 1156:3; 1184:9,
14; 1185:7; 1186:3

**possesses** [9] -

1123:21; 1125:15, 22;
1153:21; 1155:15, 22;
1183:21; 1185:15, 22

**possession** [32] -
1082:23; 1119:8;
1122:23, 25; 1125:14,
16, 19-21, 23; 1126:1;
1149:8; 1152:23, 25;
1155:14, 16, 19-21, 23;
1156:1; 1179:8;
1182:23, 25; 1185:14,
16, 19-21, 23; 1186:1;
1241:20

**Possession** [2] -
1222:9; 1224:10

**possessions** [10] -
1093:17, 21, 24;
1094:10, 13, 16;
1095:7, 10, 16, 21

**possible** [6] -
1125:23; 1130:6;
1155:23; 1160:6;
1185:23; 1190:6

**possibly** [3] -
1133:15; 1163:15;
1193:15

**posttrial** [1] - 1256:7

**power** [9] - 1125:17,
24; 1126:2; 1155:17,
24; 1156:2; 1185:17,
24; 1186:2

**PowerPoint** [6] -
1141:15; 1146:4;
1171:15; 1176:4;
1201:15; 1206:4

**practical** [1] -
1231:15

**practice** [2] - 1080:9;
1216:22

**precise** [1] - 1107:11

**preexisting** [1] -
1246:9

**prejudice** [6] -
1131:2; 1161:2; 1191:2;
1247:9, 18; 1248:11

**premier** [2] - 1227:14;
1249:20

**Premier** [2] - 1239:1;
1250:17

**premises** [4] -
1227:17; 1239:4;
1250:5, 25

**preparation** [3] -
1099:4; 1102:19, 21

**preparations** [1] -
1102:24

**prepared** [3] - 1134:2;
1164:2; 1194:2

**preponderance** [9] -
1230:11, 14; 1239:22;
1240:4, 6-7, 10, 15;
1243:15

**presence** [3] -
1098:14, 21; 1110:4

**present** [9] - 1090:25;
1135:21; 1136:1;
1165:21; 1166:1;
1195:21; 1196:1;
1208:5; 1228:2

**presented** [4] -
1128:23; 1158:23;
1188:23; 1243:15

**presumed** [1] - 1081:19

**pretrial** [2] -
1213:21; 1248:2

**prevent** [2] - 1235:23;
1236:1

**previous** [2] -
1234:23; 1235:2

**previously** [8] -
1092:7; 1119:9; 1149:9;
1179:9; 1239:16;
1243:18; 1244:1;
1246:19

**principal** [1] - 1097:9

**probative** [5] -
1246:14, 20; 1247:6, 8;
1248:10

**problem** [6] - 1139:12;
1169:12; 1199:12;
1214:21; 1215:8; 1217:8

**proceed** [6] - 1080:4;
1136:22; 1166:22;
1196:22; 1226:5; 1228:1

**proceedings** [7] -
1137:23; 1143:18;
1167:23; 1173:18;
1197:23; 1203:18;
1256:19

**Proceedings** [1] -
1079:23

**proceeds** [3] -
1235:18; 1250:10;
1251:5

**procures** [1] - 1097:8

**produce** [3] - 1088:19;
1092:6; 1104:6

**produced** [33] -
1079:24; 1084:15;
1085:10; 1086:5;
1087:7; 1091:15;
1092:1; 1100:17;
1103:20; 1104:9;
1105:7; 1114:13;
1119:22; 1120:4;
1123:10; 1124:2, 19;

1126:11; 1149:22;
1150:4; 1153:10;
1154:2, 19; 1156:11;
1179:22; 1180:4;
1183:10; 1184:2, 19;
1186:11; 1212:1;
1235:14; 1240:18

**producing** [22] -
1084:10; 1085:8, 24;
1086:24; 1088:1, 11,
25; 1089:1, 14; 1091:8,
12; 1093:18; 1094:10;
1095:12; 1100:11;
1105:1; 1113:25;
1117:20; 1124:5;
1154:5; 1184:5; 1236:3

**product** [6] - 1122:9;
1152:9; 1182:9

**production** [31] -
1113:14; 1114:21;
1115:1; 1117:2;
1118:11, 16; 1120:11;
1121:2; 1123:12;
1124:22; 1125:2;
1126:20; 1127:10;
1148:11, 16; 1150:11;
1151:2; 1153:12;
1154:22; 1155:2;
1156:20; 1157:10;
1178:11, 16; 1180:11;
1181:2; 1183:12;
1184:22; 1185:2;
1186:20; 1187:10

**professionalism** [1] -
1255:12

**profits** [1] - 1235:17

**prohibited** [1] -
1099:1

**promote** [4] - 1235:21;
1236:13; 1239:19;
1243:20

**proof** [22] - 1088:4;
1096:1, 17; 1097:22;
1107:21; 1108:4;
1116:9; 1118:20;
1124:12; 1130:2;
1148:20; 1154:12;
1160:2; 1178:20;
1184:12; 1190:2;
1213:6; 1230:10;
1239:14; 1241:6;
1243:25

**properties** [4] -
1228:24; 1229:14;
1230:5, 17

**property** [58] -
1227:6, 9, 11, 13, 17,
25; 1228:19, 23;
1230:15, 20; 1231:7;

1234:15, 19; 1235:16, 19, 21-22; 1236:6-8, 10, 12; 1239:1, 4, 15, 18, 22; 1240:3; 1241:14-16, 22, 24-25; 1242:2, 4, 10, 13, 15, 17-18, 20, 24; 1243:3, 10, 13, 16, 21; 1249:21; 1250:1, 12, 18, 23

**prosecution** [6] - 1138:23; 1145:22; 1168:23; 1175:22; 1198:23; 1205:22

**proud** [2] - 1254:17, 25

**prove** [80] - 1081:11; 1086:12; 1087:14, 17, 23; 1088:8; 1091:11, 14, 19; 1094:20; 1096:10; 1101:23; 1103:16, 18, 21, 24; 1106:18; 1107:13, 15; 1108:7; 1111:6; 1114:4; 1115:23; 1118:1; 1119:2, 12, 20; 1120:10, 18; 1121:1, 24; 1124:9; 1125:5; 1126:6, 19; 1127:1, 9; 1128:7; 1148:1; 1149:2, 12, 20; 1150:10, 18; 1151:1, 24; 1154:9; 1155:5; 1156:6, 19; 1157:1, 9; 1158:7; 1178:1; 1179:2, 12, 20; 1180:10, 18; 1181:1, 24; 1184:9; 1185:5; 1186:6, 19; 1187:1, 9; 1188:7; 1216:10; 1217:25; 1218:5; 1240:8; 1241:8

**proved** [4] - 1096:5; 1109:4; 1240:14; 1241:4

**proven** [14] - 1081:20; 1089:13; 1091:7; 1108:15; 1111:2; 1125:20; 1130:21, 24; 1155:20; 1160:21, 24; 1185:20; 1190:21, 24

**proves** [3] - 1097:13; 1241:2; 1243:15

**provide** [1] - 1216:10

**provided** [4] - 1209:14; 1211:23; 1216:25; 1218:21

**provides** [11] - 1085:20; 1094:4; 1097:6; 1101:19; 1105:18; 1113:19; 1117:8; 1123:19;

1153:19; 1183:19; 1242:9

**providing** [1] - 1217:3

**proving** [17] - 1088:5; 1096:1, 17-18; 1116:9; 1118:20; 1131:8; 1148:20; 1161:8; 1178:20; 1191:8

**provoke** [1] - 1227:12

**pubic** [4] - 1089:23; 1090:2, 4, 8

**publishing** [1] - 1089:1

**pull** [3] - 1140:6; 1170:6; 1200:6

**pulling** [3] - 1140:10; 1170:10; 1200:10

**punishable** [2] - 1097:9; 1106:12

**punishment** [6] - 1130:6, 14; 1160:6, 14; 1190:6, 14

**purpose** [32] - 1084:10; 1085:8, 24-25; 1086:23; 1088:1, 11; 1089:14; 1091:8, 12; 1093:18; 1094:10; 1095:11; 1100:11; 1105:1; 1106:12; 1107:4, 11-12; 1108:6, 19; 1110:13, 24; 1111:24; 1129:8; 1135:4; 1159:8; 1165:4; 1189:8; 1195:4; 1217:19; 1235:23

**purposefully** [3] - 1122:8; 1152:8; 1182:8

**purposes** [7] - 1106:10; 1108:13; 1110:18; 1231:15; 1236:3; 1242:5; 1245:23

**pursuant** [2] - 1106:8; 1235:7

**put** [13] - 1134:7; 1139:9; 1140:7; 1164:7; 1169:9; 1170:7; 1194:7; 1199:9; 1200:7; 1212:13; 1217:10, 20; 1241:11

**putting** [1] - 1217:24

---

## Q

**qualified** [1] - 1216:17

**quality** [1] - 1240:12

**questions** [4] - 1090:6; 1099:7, 14, 19

**quote** [17] - 1086:10;

1097:9; 1101:1, 22; 1105:15, 22; 1114:3; 1117:5; 1123:3, 15; 1124:8; 1153:3, 15; 1154:8; 1183:3, 15; 1184:8

**quoting** [9] - 1085:21; 1094:5; 1104:17; 1105:19; 1116:17; 1117:9; 1123:20; 1153:20; 1183:20

---

## R

**racy** [2] - 1210:2; 1247:13

**raise** [4] - 1135:16; 1165:16; 1195:16; 1213:19

**raised** [1] - 1213:15

**RAPAPORT** [1] - 1079:20

**rather** [10] - 1081:16; 1122:10; 1132:14; 1152:10; 1162:14; 1182:10; 1192:14; 1248:8; 1255:21

**rationalize** [1] - 1212:8

**Raymond** [7] - 1138:20; 1168:20; 1198:20; 1219:5, 8; 1222:14; 1244:24

**reach** [9] - 1129:1, 12; 1134:10; 1159:1, 12; 1164:10; 1189:1, 12; 1194:10

**reached** [15] - 1133:9; 1134:4, 6, 8; 1163:9; 1164:4, 6, 8; 1193:9; 1194:4, 6, 8; 1218:16; 1219:5

**reaching** [5] - 1129:8; 1159:8; 1189:8; 1242:16, 21

**read** [25] - 1080:11; 1101:5; 1131:24; 1132:13; 1133:13; 1136:6; 1143:20; 1144:1, 15; 1161:24; 1162:13; 1163:13; 1166:6; 1173:20; 1174:1, 15; 1191:24; 1192:13; 1193:13; 1196:6; 1203:20; 1204:1, 15; 1218:6; 1229:17

**readback** [9] - 1133:17, 21; 1134:1; 1163:17, 21; 1164:1;

1193:17, 21; 1194:1

**reading** [5] - 1084:2; 1093:9; 1097:6; 1113:20; 1219:9

**24**

**reads** [10] - 1084:1, 24; 1093:8; 1100:4; 1104:16; 1113:3; 1116:16; 1123:1; 1153:1; 1183:1

**ready** [4] - 1080:4; 1138:10; 1168:10; 1198:10

**real** [12] - 1107:24; 1120:16; 1126:24; 1150:16; 1156:24; 1180:16; 1186:24; 1227:17; 1235:16, 19; 1239:3; 1242:9

**really** [2] - 1210:2; 1246:22

**reason** [37] - 1084:11; 1086:2; 1087:4; 1091:23; 1092:14; 1100:13; 1104:2; 1105:2; 1111:14; 1115:7; 1119:16; 1121:9; 1127:17; 1131:10; 1136:9; 1140:17; 1149:16; 1151:9; 1157:17; 1161:10; 1166:9; 1170:17; 1179:16; 1181:9; 1187:17; 1191:10; 1196:9; 1200:17; 1216:15; 1230:3; 1231:13; 1233:2; 1248:15; 1254:6

**reasonable** [82] - 1081:12, 20; 1086:14; 1087:14, 17, 23; 1088:9; 1091:19; 1092:12; 1094:22; 1096:6, 11; 1097:13; 1098:5; 1101:25; 1102:12; 1106:19; 1108:8; 1109:1; 1111:4; 1112:4; 1114:6; 1118:3; 1119:2, 20; 1120:10; 1121:1; 1122:6, 19; 1124:11; 1125:6; 1126:6, 16, 19; 1127:9; 1130:3, 12, 22; 1131:5, 9; 1148:3; 1149:2, 20; 1150:10; 1151:1; 1152:6, 19; 1154:11; 1155:6; 1156:6, 16, 19; 1157:9; 1160:3, 12, 22; 1161:5, 9; 1178:2; 1179:2, 20; 1180:10; 1181:1; 1182:6, 19;

1184:11; 1185:6; 1186:6, 16, 19; 1187:9; 1190:3, 12, 22; 1191:5, 9; 1240:1, 5; 1241:8

**reasonably** [3] - 1104:3; 1111:22; 1112:6

**reasons** [5] - 1208:24; 1230:3; 1247:23, 25; 1254:8

**rebuttal** [1] - 1232:20

**Receipt** [2] - 1220:3; 1223:4

**receipt** [16] - 1082:14; 1096:24; 1116:12, 14; 1118:24; 1119:17; 1120:7, 23; 1148:24; 1149:17; 1150:7, 23; 1178:24; 1179:17; 1180:7, 23

**receipts** [3] - 1139:24; 1169:24; 1199:24

**receive** [11] - 1116:21; 1118:22; 1119:7; 1138:19; 1148:22; 1149:7; 1168:19; 1178:22; 1179:7; 1198:19; 1211:18

**received** [18] - 1111:15; 1118:5; 1119:3, 13; 1148:5; 1149:3, 13; 1178:5; 1179:3, 13; 1210:6; 1211:17; 1219:4; 1235:14; 1240:17; 1246:1, 4; 1249:9

**receives** [1] - 1117:10

**receiving** [10] - 1118:2, 25; 1119:9; 1148:2, 25; 1149:9; 1178:2, 25; 1179:9; 1246:16

**recess** [7] - 1138:16; 1147:7; 1168:16; 1177:7; 1198:16; 1207:7; 1249:7

**Recess** [1] - 1248:19

**reciting** [3] - 1144:23; 1174:23; 1204:23

**recognizes** [3] - 1125:21; 1155:21; 1185:21

**recollection** [9] - 1129:24; 1132:12; 1159:24; 1162:12; 1189:24; 1192:12

**reconsider** [3] -

1129:14; 1159:14; 1189:14

**record** [32] - 1132:14; 1134:4; 1135:7; 1140:3, 7; 1143:21; 1144:14; 1145:20; 1162:14; 1164:4; 1165:7; 1170:3, 7; 1173:21; 1174:14; 1175:20; 1192:14; 1194:4; 1195:7; 1200:3, 7; 1203:21; 1204:14; 1205:20; 1208:4; 1212:13; 1215:12; 1216:8, 17; 1217:19; 1245:6

**recorded** [4] - 1079:23; 1092:25; 1222:15; 1250:17

**recording** [5] - 1092:19; 1132:10; 1162:10; 1192:10

**records** [9] - 1216:7, 19; 1217:5, 7, 13-14; 1218:3, 8

**redact** [1] - 1246:23

**redacted** [3] - 1141:17; 1171:17; 1201:17

**refer** [4] - 1083:7; 1145:11; 1175:11; 1205:11

**reference** [15] - 1081:22; 1135:3; 1146:4; 1165:3; 1176:4; 1195:3; 1206:4; 1209:18; 1210:2, 14, 18-19, 25; 1216:12; 1246:3

**referenced** [3] - 1209:6; 1210:1, 22

**references** [5] - 1209:12; 1210:24; 1211:7; 1212:4

**referencing** [4] - 1210:11; 1211:5, 25

**referred** [9] - 1111:16; 1122:22; 1146:11; 1152:22; 1176:11; 1182:22; 1206:11; 1230:11; 1245:7

**referring** [3] - 1139:16; 1169:16; 1199:16

**refers** [11] - 1115:8; 1121:10; 1127:17; 1145:21; 1151:10; 1157:17; 1175:21; 1181:10; 1187:17;

1205:21; 1240:11

**reflect** [4] - 1144:14; 1174:14; 1204:14; 1208:4

**reflected** [2] - 1217:14; 1218:8

**regard** [7] - 1088:23; 1108:1, 20; 1136:7; 1166:7; 1196:7; 1243:8

**regarding** [13] - 1096:13; 1112:18; 1116:5; 1128:15; 1158:15; 1188:15; 1235:2, 5; 1239:13; 1241:13; 1243:24; 1245:8, 19

**regardless** [2] - 1240:16, 18

**reiterate** [6] - 1120:17; 1134:10; 1150:17; 1164:10; 1180:17; 1194:10

**related** [1] - 1234:16

**relates** [2] - 1083:1; 1245:25

**relationship** [8] - 1245:12, 15, 18; 1246:11; 1247:2, 14, 19, 22

**relevant** [14] - 1085:21; 1091:6; 1094:4; 1101:20; 1103:7, 14; 1105:18; 1113:19; 1117:8; 1123:19; 1153:19; 1183:19; 1240:16

**reliable** [1] - 1217:1

**relying** [1] - 1097:4

**remain** [4] - 1136:20; 1166:20; 1196:20; 1219:8

**remand** [1] - 1214:15

**remarks** [3] - 1128:16; 1158:16; 1188:16

**remedy** [3] - 1214:12, 15; 1215:5

**remember** [7] - 1129:19; 1133:13; 1159:19; 1163:13; 1189:19; 1193:13; 1245:11

**remind** [4] - 1116:8; 1118:19; 1148:19; 1178:19

**reminder** [3] - 1128:21; 1158:21; 1188:21

**removed** [1] - 1237:17

**render** [4] - 1131:10; 1161:10; 1191:10; 1234:18

**rendered** [1] - 1213:22

**repeat** [1] - 1106:1

**Reporter** [1] - 1079:20

**reporter** [10] - 1081:2; 1131:22, 24; 1132:13; 1161:22, 24; 1162:13; 1191:22, 24; 1192:13

**reporters** [3] - 1133:24; 1163:24; 1193:24

**reproduces** [1] - 1117:17

**request** [28] - 1133:12, 17; 1141:23; 1142:12, 21; 1145:18; 1163:12, 17; 1171:23; 1172:12, 21; 1175:18; 1193:12, 17; 1201:23; 1202:12, 21; 1205:18; 1212:2; 1217:4; 1234:2; 1246:9, 11, 16, 24-25; 1247:3; 1256:14

**requested** [9] - 1119:9; 1149:9; 1179:9; 1211:22; 1212:8; 1218:2, 19; 1246:13

**requesting** [16] - 1133:15, 21, 24; 1142:8; 1146:16; 1163:15, 21, 24; 1172:8; 1176:16; 1193:15, 21, 24; 1202:8; 1206:16; 1246:4

**requests** [8] - 1138:22; 1145:14; 1168:22; 1175:14; 1198:22; 1205:14; 1210:9, 24

**require** [2] - 1216:22; 1256:13

**required** [10] - 1091:13; 1103:12; 1110:1, 15; 1133:19; 1163:19; 1193:19; 1216:10; 1235:9; 1240:1

**requirement** [1] - 1217:5

**requirements** [1] - 1241:8

**requires** [1] - 1109:20

**residence** [1] - 1229:5

**resolve** [1] - 1241:5

**respect** [29] - 1082:1; 1083:19; 1087:16;

1096:15; 1101:8;
1136:4; 1139:5; 1166:4;
1169:5; 1196:4; 1199:5;
1208:8, 12, 16;
1214:13; 1215:10;
1216:19; 1218:11;
1228:1, 5, 7; 1235:4;
1244:16; 1245:7, 17;
1246:7, 21; 1255:12
**respective** [4] -
1227:19; 1239:5;
1250:7; 1251:1
**response** [11] -
1090:23; 1142:24;
1146:14; 1147:3;
1172:24; 1176:14;
1177:3; 1202:24;
1206:14; 1207:3;
1246:11
**responsibility** [3] -
1128:22; 1158:22;
1188:22
**responsible** [4] -
1112:2; 1131:15;
1161:15; 1191:15
**responsive** [6] -
1146:17; 1147:2;
1176:17; 1177:2;
1206:17; 1207:2
**rest** [1] - 1211:9
**restroom** [3] -
1135:22; 1165:22;
1195:22
**rests** [3] - 1130:9;
1160:9; 1190:9
**result** [1] - 1104:4
**retire** [11] - 1129:7;
1134:19; 1137:25;
1159:7; 1164:19;
1167:25; 1189:7;
1194:19; 1197:25;
1244:15, 25
**return** [9] - 1082:25;
1130:3, 5; 1160:3, 5;
1190:3, 5; 1228:8;
1230:22
**returned** [1] - 1227:2
**review** [3] - 1146:6;
1176:6; 1206:6
**risk** [3] - 1131:3;
1161:3; 1191:3
**role** [2] - 1098:25;
1109:20
**roles** [1] - 1109:18
**room** [27] - 1131:12;
1132:18; 1133:11;
1134:23; 1135:20;
1136:20, 22; 1137:25;

1161:12; 1162:18;
1163:11; 1164:23;
1165:20; 1166:20, 22;
1167:25; 1191:12;
1192:18; 1193:11;
1194:23; 1195:20;
1196:20, 22; 1197:25;
1228:9; 1244:16, 25
**rule** [5] - 1132:20;
1162:20; 1192:20;
1245:7; 1256:15
**Rule** [4] - 1208:6, 9;
1215:11; 1256:9
**ruled** [1] - 1208:17
**rules** [4] - 1082:1;
1128:15; 1158:15;
1188:15
**ruling** [7] - 1208:6, 9;
1215:10; 1245:14;
1248:2, 15; 1256:10
**rulings** [4] - 1208:7;
1215:21
**Rust** [1] - 1214:22

**S**

**S.D.N.Y** [1] - 1217:16
**S.K** [2] - 1095:5, 8
**sadistic** [1] - 1089:22
**sale** [1] - 1208:17
**Samsung** [3] - 1229:3,
24; 1231:14
**satisfied** [3] -
1122:6; 1152:6; 1182:6
**satisfy** [3] - 1092:22;
1107:5
**saw** [1] - 1233:8
**scene** [4] - 1110:4;
1141:18; 1171:18;
1201:18
**schedule** [1] - 1256:11
**scheme** [4] - 1107:10;
1109:19; 1213:4, 7
**scope** [1] - 1109:10
**script** [1] - 1210:24
**SD** [9] - 1227:16;
1229:3, 12, 18; 1233:3,
18; 1248:3; 1249:25;
1250:21
**search** [3] - 1141:18;
1171:18; 1201:18
**seated** [6] - 1138:4;
1168:4; 1198:4;
1222:14; 1245:5;
1249:13
**second** [29] - 1081:6;
1086:21; 1087:20, 22;
1095:3; 1102:7;

1106:23; 1108:7;
1114:11; 1118:8;
1119:17, 19; 1124:17;
1126:5; 1138:22;
1148:8; 1149:17, 19;
1154:17; 1156:5;
1168:22; 1178:8;
1179:17, 19; 1184:17;
1186:5; 1198:22;
1229:3; 1233:17
**Second** [10] - 1208:17;
1213:5, 16; 1214:11;
1215:4, 20, 23; 1216:2,
9; 1245:22
**seconds** [1] - 1231:1
**secrecy** [1] - 1107:21
**section** [22] - 1085:19;
1094:3; 1097:5;
1099:20, 22; 1101:18;
1105:17, 20; 1113:18;
1117:7; 1123:19;
1153:19; 1183:19;
1227:21; 1235:10;
1239:8
**Section** [9] - 1100:25;
1101:21; 1105:15;
1123:18; 1153:18;
1183:18; 1235:7;
1250:9; 1251:4
**security** [18] -
1131:16; 1132:23;
1135:14, 17, 24;
1136:19; 1161:16;
1162:23; 1165:14, 17,
24; 1166:19; 1191:16;
1192:23; 1195:14, 17,
24; 1196:19
**see** [13] - 1133:10;
1140:20; 1146:18;
1163:10; 1170:20;
1176:18; 1193:10;
1200:20; 1206:18;
1212:5; 1216:15;
1236:15; 1249:18
**seek** [4] - 1099:12;
1228:19; 1234:15, 25
**seeking** [14] - 1210:19;
1226:10; 1227:13, 24;
1228:25; 1231:15, 23,
25; 1233:10; 1237:3, 9,
14, 23; 1239:11
**seeks** [4] - 1227:8;
1230:4, 21; 1236:9
**seized** [3] - 1227:7;
1236:8; 1243:10
**select** [3] - 1131:13;
1161:13; 1191:13
**selected** [1] - 1256:2
**selection** [1] - 1254:4

**selections** [1] -
1254:5
**self** [3] - 1135:9;
1165:9; 1195:9
**self-explanatory** [3]
- 1135:9; 1165:9;
1195:9
**send** [32] - 1132:22;
1133:4, 20; 1134:21;
1141:6; 1142:17;
1146:16; 1147:2;
1162:22; 1163:4, 20;
1164:21; 1171:6;
1172:17; 1176:16;
1177:2; 1192:22;
1193:4, 20; 1194:21;
1201:6; 1202:17;
1206:16; 1207:2;
1209:7, 22; 1210:15;
1211:6, 9, 20; 1212:3
**sending** [3] - 1209:7;
1210:20; 1246:7
**sense** [9] - 1088:15;
1107:24; 1130:8, 16;
1160:8, 16; 1190:8, 16;
1216:25
**sent** [9] - 1133:11;
1163:11; 1193:11;
1210:8, 23; 1217:21,
24; 1218:5; 1246:1
**sentence** [4] - 1130:9;
1160:9; 1190:9; 1214:16
**sentenced** [1] -
1214:21
**sentencing** [1] -
1256:3
**separate** [9] - 1082:3;
1101:4; 1106:7;
1109:17; 1208:10;
1209:1; 1210:17, 21;
1211:24
**separately** [8] -
1082:24; 1083:21;
1129:5; 1135:11;
1159:5; 1165:11;
1189:5; 1195:11
**September** [8] -
1085:1; 1101:15;
1211:20; 1221:18, 24;
1224:2, 5
**serial** [8] - 1227:14,
16; 1239:2; 1249:21;
1250:1, 18, 21
**series** [3] - 1122:12;
1152:12; 1182:12
**serve** [6] - 1254:6-8,
11-12, 16
**served** [1] - 1233:7

**26**

**serves** [3] - 1146:22; 1176:22; 1206:22

**service** [12] - 1136:18; 1166:18; 1196:18; 1216:24; 1217:3; 1228:15; 1254:2, 14; 1255:15, 18

**services** [2] - 1228:13; 1233:21

**setting** [1] - 1090:10

**settled** [3] - 1132:12; 1162:12; 1192:12

**sex** [6] - 1089:21; 1209:6, 12; 1210:14, 24; 1211:22

**Sexual** [22] - 1219:15, 20; 1220:7, 12, 17, 23; 1221:5, 11, 17, 23; 1222:4, 20, 23; 1223:7, 10, 13, 16, 20, 23; 1224:1, 4, 7

**sexual** [50] - 1082:10, 17, 19; 1083:23, 25; 1087:11, 20; 1089:18; 1090:3, 12, 20-21, 23; 1091:16, 18; 1093:3, 6; 1096:21; 1099:24; 1100:2; 1101:4, 8; 1102:2, 5; 1105:24; 1106:15, 22; 1107:14, 18; 1112:19; 1212:5, 15, 19; 1213:8, 10; 1214:5, 19; 1227:10, 12; 1235:8; 1236:11, 13; 1239:15; 1241:19; 1243:17; 1245:16; 1246:8; 1247:10, 14

**sexually** [113] - 1082:6; 1084:9; 1085:7, 23; 1086:13, 23; 1087:21; 1088:1, 7, 11; 1089:15, 17; 1090:11; 1091:9, 13; 1092:17, 25; 1093:16; 1094:9, 21; 1095:5, 9; 1100:11; 1101:21; 1103:17; 1104:13, 15, 25; 1105:21; 1107:8; 1112:21; 1113:13, 15; 1114:1, 22; 1115:2, 9, 11, 20; 1116:23; 1117:4, 21; 1118:12, 17; 1120:8, 12, 17, 22; 1121:3, 11, 13, 21; 1123:14; 1124:6, 23; 1125:3; 1126:21, 25; 1127:5, 11, 18, 22; 1128:3; 1148:12, 17; 1150:8, 12, 17, 22;

1151:3, 11, 13, 21; 1153:14; 1154:6, 23; 1155:3; 1156:21, 25; 1157:5, 11, 18, 20; 1158:3; 1178:12, 17; 1180:8, 12, 17, 22; 1181:3, 11, 13, 21; 1183:14; 1184:6, 23; 1185:3; 1186:21, 25; 1187:5, 11, 18, 20; 1188:3; 1233:12, 16; 1235:25; 1236:2

**Sexually** [2] - 1219:10; 1222:17

**shall** [10] - 1086:1; 1094:18; 1101:22; 1105:21; 1114:2; 1117:23; 1124:7; 1154:7; 1184:7; 1226:5

**sheet** [11] - 1134:2; 1135:4; 1164:2; 1165:4; 1194:2; 1195:4; 1226:2; 1253:3

**shelf** [1] - 1210:7

**ship** [1] - 1113:9

**shipped** [22] - 1084:16; 1085:11; 1086:6; 1092:2; 1100:18; 1105:8; 1116:25; 1117:13, 15; 1123:8, 11, 25; 1124:3; 1153:8, 11, 25; 1154:3; 1183:8, 11, 25; 1184:3; 1235:14

**ships** [1] - 1113:21

**short** [1] - 1228:17

**shorter** [3] - 1128:13; 1158:13; 1188:13

**show** [10] - 1097:19; 1112:14; 1115:13; 1121:15; 1127:22; 1151:15; 1157:22; 1181:15; 1187:22; 1218:15

**shower** [1] - 1211:12

**showing** [3] - 1146:5; 1176:5; 1206:5

**shown** [14] - 1115:21; 1121:22; 1122:12; 1128:4; 1145:16; 1151:22; 1152:12; 1158:4; 1175:16; 1181:22; 1182:12; 1188:4; 1205:16; 1216:23

**SI** [5] - 1082:21; 1086:17, 22; 1087:18; 1088:10

**Side** [1] - 1253:1

**side** [4] - 1130:18; 1160:18; 1190:18; 1228:2

**sidebar** [16] - 1137:2, 5; 1167:2, 5; 1197:2, 5; 1215:13; 1225:17, 19; 1226:17; 1236:15, 17; 1238:4; 1239:10; 1252:13; 1253:7

**sides** [5] - 1138:21; 1168:21; 1198:21; 1218:21; 1249:4

**sift** [3] - 1130:20; 1160:20; 1190:20

**sign** [3] - 1134:7; 1164:7; 1194:7

**signed** [6] - 1132:23; 1133:1; 1162:23; 1163:1; 1192:23; 1193:1

**significant** [1] - 1098:25

**signing** [3] - 1131:15; 1161:15; 1191:15

**similarly** [3] - 1107:8; 1110:6; 1243:5

**simply** [11] - 1081:16; 1083:6; 1092:4; 1129:17; 1132:3; 1159:17; 1162:3; 1189:17; 1192:3; 1217:23; 1230:14

**simulated** [1] - 1089:19

**single** [5] - 1109:20; 1212:25; 1213:4, 7; 1242:7

**sit** [3] - 1136:15; 1166:15; 1196:15

**situation** [2] - 1211:16; 1214:13

**situations** [3] - 1145:24; 1175:24; 1205:24

**six** [1] - 1090:25

**Six** [1] - 1082:16

**SK** [7] - 1082:8; 1086:15, 22; 1087:14, 25; 1088:7; 1094:24

**slightly** [1] - 1240:20

**slip** [1] - 1237:12

**Smithtown** [5] - 1227:18; 1229:6; 1239:5; 1250:6; 1251:1

**smoke** [3] - 1135:24; 1165:24; 1195:24

**smokers** [3] - 1135:23; 1165:23; 1195:23

███████ [11] - 1209:6, 12, 25; 1210:19; 1211:9, 21; 1213:8; 1214:6; 1229:9; 1233:15

**sole** [6] - 1125:22; 1155:22; 1185:22

**solely** [14] - 1081:21; 1129:20; 1130:12, 19, 25; 1159:20; 1160:12, 19, 25; 1189:20; 1190:12, 19, 25; 1243:11

**solicitation** [1] - 1208:12

**someone** [9] - 1135:22; 1165:22; 1195:22; 1208:18; 1214:21; 1216:5; 1217:10, 24

**sometime** [3] - 1137:16; 1167:16; 1197:16

**sometimes** [4] - 1135:22; 1165:22; 1195:22; 1254:7

**somewhere** [1] - 1104:9

**soon** [4] - 1133:24; 1163:24; 1193:24; 1228:18

**sorry** [3] - 1145:16; 1175:16; 1205:16

**Southern** [1] - 1217:15

**speaking** [3] - 1142:12; 1172:12; 1202:12

**special** [5] - 1114:15; 1234:18; 1244:14, 16, 18

**specific** [34] - 1081:10; 1082:18; 1083:1; 1092:12; 1098:12; 1102:10; 1108:19; 1115:15; 1121:17; 1126:16; 1127:24; 1133:15, 19; 1145:17; 1151:17; 1156:16; 1157:24; 1163:15, 19; 1175:17; 1181:17; 1186:16; 1187:24; 1193:15, 19; 1205:17; 1209:6, 12; 1210:14, 24; 1211:22; 1227:8; 1236:9; 1243:22

**specifically** [10] - 1107:18; 1133:5; 1145:14; 1163:5; 1175:14; 1193:5; 1205:14; 1237:5, 14; 1245:11

**spoken** [1] - 1107:16

**stage** [10] - 1229:23; 1231:25; 1232:13; 1237:3, 6, 11, 24; 1239:25; 1240:2; 1247:25

**stake** [1] - 1108:22

**stand** [1] - 1254:13

**standard** [1] - 1239:23

**standing** [1] - 1219:8

**stands** [5] - 1133:7; 1163:7; 1193:7; 1239:17; 1243:19

**start** [8] - 1081:14; 1083:22; 1107:2; 1110:2; 1146:18; 1176:18; 1206:18; 1209:21

**State** [1] - 1093:2

**state** [5] - 1088:18; 1092:7, 21; 1104:9, 11

**statement** [3] - 1216:18; 1218:11; 1246:2

**statements** [19] - 1108:3, 25; 1111:9, 23; 1112:3, 7, 11, 13, 15; 1122:13; 1129:22; 1152:13; 1159:22; 1182:13; 1189:22

**STATES** [2] - 1079:1, 3

**States** [39] - 1079:13, 21; 1085:20; 1092:8; 1093:4, 7, 17, 20, 24; 1094:4, 9, 12, 16; 1095:6, 10, 15, 20; 1097:5, 7; 1101:19; 1105:15, 18; 1113:19; 1114:16; 1117:8; 1123:19; 1134:15; 1153:19; 1164:15; 1183:19; 1194:15; 1212:22; 1216:4; 1217:15; 1227:7; 1234:20; 1235:9; 1236:8; 1254:16

**statute** [13] - 1083:17; 1085:21; 1094:5; 1097:6, 18; 1105:19; 1113:20; 1117:9; 1123:20; 1153:20; 1183:20; 1242:9, 14

**stay** [3] - 1138:7; 1168:7; 1198:7

**stenography** [1] - 1079:23

**step** [6] - 1102:8, 15, 17; 1103:3; 1208:21;

1254:15

**steps** [1] - 1209:8

**still** [2] - 1106:12; 1237:18

**stimulate** [1] - 1088:20

**stimulation** [1] - 1090:3

**stock** [1] - 1208:17

**stop** [4] - 1081:1; 1135:25; 1165:25; 1195:25

**store** [1] - 1233:18

**stored** [5] - 1089:5, 10; 1092:18; 1093:1; 1233:18

**story** [1] - 1245:20

**strike** [1] - 1238:2

**stuff** [3] - 1136:20; 1166:20; 1196:20

**subject** [20] - 1131:1; 1133:2; 1161:1; 1163:2; 1191:1; 1193:2; 1227:6, 9; 1234:20; 1236:6, 10; 1241:15, 25; 1243:13; 1249:22; 1250:1, 12, 19, 23

**submitted** [6] - 1141:25; 1142:2; 1171:25; 1172:2; 1201:25; 1202:2

**subscriber** [2] - 1215:16; 1216:1

**subsection** [1] - 1235:7

**substance** [3] - 1210:5; 1245:14, 18

**substantial** [5] - 1102:8, 15, 17; 1103:3; 1208:21

**substantially** [2] - 1247:8; 1248:10

**substantive** [4] - 1106:14; 1212:21; 1213:25; 1215:6

**succeed** [3] - 1098:11; 1099:13; 1108:11

**sufficient** [12] - 1092:22; 1098:18; 1103:23; 1109:21; 1110:12; 1142:19; 1172:19; 1202:19; 1209:9; 1217:5; 1242:7

**Suffolk** [4] - 1227:22; 1239:8; 1250:10; 1251:5

**suggest** [3] - 1128:18; 1158:18; 1188:18

**suggested** [3] - 1146:8; 1176:8; 1206:8

**suggestive** [1] - 1090:11

**suggests** [1] - 1090:20

**Suite** [1] - 1079:18

**sum** [1] - 1110:21

**summarized** [1] - 1083:5

**summarizing** [1] - 1081:23

**summary** [2] - 1081:14; 1082:2

**summation** [11] - 1139:15; 1146:3; 1147:4; 1169:15; 1176:3; 1177:4; 1199:15; 1206:3; 1207:4; 1232:20; 1237:2

**summations** [5] - 1146:3; 1176:3; 1206:3; 1237:21; 1254:19

**sums** [3] - 1134:12; 1164:12; 1194:12

**superseding** [3] - 1135:1; 1165:1; 1195:1

**supplement** [2] - 1208:7, 9

**supplemental** [1] - 1244:4

**support** [2] - 1213:6; 1214:2

**supports** [1] - 1214:7

**surrender** [3] - 1129:16; 1159:16; 1189:16

**surrounding** [6] - 1108:16; 1122:17; 1152:17; 1182:17; 1208:21; 1246:17

**sustain** [1] - 1097:21

**swayed** [3] - 1130:18; 1160:18; 1190:18

**swear** [3] - 1134:19; 1164:19; 1194:19

**sweet** [1] - 1211:21

**sworn** [3] - 1135:17; 1165:17; 1195:17

**■■■■** [4] - 1229:4, 11; 1233:16; 1248:4

**sympathy** [9] - 1130:18; 1131:2, 10; 1160:18; 1161:2, 10; 1190:18; 1191:2, 10

**synonyms** [1] - 1088:16

**system** [2] - 1255:1, 14

**SZ** [1] - 1239:3

T

**tape** [1] - 1235:12

**task** [1] - 1234:12   **28**

**tax** [4] - 1227:22; 1239:8; 1250:10; 1251:5

**telephone** [3] - 1136:15; 1166:15; 1196:15

**telephones** [3] - 1084:19; 1100:20; 1105:10

**ten** [4] - 1128:13; 1158:13; 1188:13; 1228:6

**tending** [1] - 1112:14

**term** [31] - 1089:25; 1092:18; 1095:13; 1114:9, 23; 1115:8; 1116:7; 1118:6; 1119:5; 1120:13; 1121:10; 1124:15; 1126:22; 1127:6, 17; 1148:6; 1149:5; 1150:13; 1151:10; 1154:15; 1156:22; 1157:6, 17; 1178:6; 1179:5; 1180:13; 1181:10; 1184:15; 1186:22; 1187:6, 17

**terms** [13] - 1095:23; 1103:19; 1125:8; 1142:25; 1155:8; 1172:25; 1185:8; 1202:25; 1213:13; 1214:9; 1226:4; 1246:6; 1247:17

**territorial** [1] - 1114:16

**territories** [10] - 1093:17, 21, 24; 1094:10, 13, 16; 1095:6, 10, 16, 20

**testimony** [28] - 1115:22; 1121:23; 1128:5; 1132:11; 1133:12, 16-17, 19, 21; 1151:23; 1158:5; 1162:11; 1163:12, 16-17, 19, 21; 1181:23; 1188:5; 1192:11; 1193:12, 16-17, 19, 21; 1216:20; 1229:19; 1240:16

**text** [34] - 1083:8; 1145:5, 7, 11, 13, 17; 1146:13, 16, 19, 21, 23; 1147:2; 1175:5, 7, 11, 13, 17; 1176:13,

**29**

16, 19, 21, 23; 1177:2;
1205:5, 7, 11, 13, 17;
1206:13, 16, 19, 21,
23; 1207:2

**texts** [3] - 1146:25;
1176:25; 1206:25

**THE** [214] - 1080:3, 8,
18; 1135:19; 1137:1, 6,
11, 15, 24; 1138:4, 13,
19; 1139:5, 13, 21, 25;
1140:3, 8, 14, 24;
1141:3, 12, 20;
1142:14-16, 20; 1143:4,
10, 13, 16, 23; 1144:1,
13, 19, 25; 1145:8, 19;
1147:1; 1165:19;
1167:1, 6, 11, 15, 24;
1168:4, 13, 19; 1169:5,
13, 21, 25; 1170:3, 8,
14, 24; 1171:3, 12, 20;
1172:14-16, 20; 1173:4,
10, 13, 16, 23; 1174:1,
13, 19, 25; 1175:8, 19;
1177:1; 1195:19;
1197:1, 6, 11, 15, 24;
1198:4, 13, 19; 1199:5,
13, 21, 25; 1200:3, 8,
14, 24; 1201:3, 12, 20;
1202:14-16, 20; 1203:4,
10, 13, 16, 23; 1204:1,
13, 19, 25; 1205:8, 19;
1207:1; 1208:3;
1215:16, 19; 1218:10,
14, 21; 1219:4, 7-8,
14-15, 19-20, 23-24;
1220:2, 6-7, 11-12,
16-17, 22-23; 1221:4,
10-11, 16-17, 22-23;
1222:3, 8-9, 13-14;
1223:16; 1224:13,
15-16, 19, 21, 23, 25;
1225:2, 4, 6, 8, 10,
12, 14, 16; 1226:1, 4,
7, 13, 15; 1227:1;
1230:24; 1231:2;
1232:19; 1233:22;
1234:1, 7; 1237:1, 9,
11, 23; 1239:1; 1245:5;
1249:1, 9, 13, 17-18,
24-25; 1250:4, 15-16;
1251:10, 14, 16, 18,
20, 22, 24; 1252:1, 3,
5, 7, 9, 11; 1253:2;
1254:1; 1256:2, 5, 14

**themselves** [3] -
1103:1; 1209:1; 1246:16

**theories** [2] - 1214:1,
8

**theory** [1] - 1214:2

**thereby** [1] - 1110:24

**therefore** [3] -
1099:16; 1107:22;
1213:8

**thereto** [3] - 1243:21;
1250:11; 1251:6

**they've** [2] - 1228:5;
1237:17

**thinking** [3] - 1131:3;
1161:3; 1191:3

**third** [21] - 1087:1;
1091:16, 18; 1095:11;
1114:21; 1118:11;
1120:7, 9; 1124:22;
1126:18; 1148:11;
1150:7, 9; 1154:22;
1156:18; 1178:11;
1180:7, 9; 1184:22;
1186:18; 1229:5

**Thirteen** [1] - 1082:16

**thirty** [1] - 1231:1

**three** [12] - 1086:14;
1128:13, 15; 1158:13,
15; 1188:13, 15;
1228:24; 1230:4, 15,
20; 1231:5

**Three** [2] - 1082:9;
1235:19

**timed** [3] - 1134:21;
1164:21; 1194:21

**tip** [1] - 1241:6

**tips** [2] - 1240:20, 23

**Title** [14] - 1085:19;
1094:3; 1097:5;
1100:25; 1101:18;
1105:15, 17; 1113:18;
1117:7; 1123:18;
1153:18; 1183:18;
1235:7, 11

**today** [3] - 1209:7;
1211:6; 1256:12

**toddler** [2] - 1229:9;
1247:13

**together** [19] -
1080:24; 1083:16;
1084:6; 1087:24;
1093:13; 1095:3;
1100:8; 1104:21;
1106:4; 1107:7; 1108:5;
1113:8; 1114:7;
1116:20; 1227:18;
1239:5; 1244:3; 1250:6;
1251:1

**tomorrow** [1] - 1210:25

**tongue** [1] - 1237:12

**tonight** [1] - 1210:3

**took** [10] - 1102:7, 14;
1122:19; 1137:4;
1152:19; 1167:4;

1182:19; 1197:4;
1225:18; 1236:16

**tool** [3] - 1132:5;
1162:5; 1192:5

**top** [2] - 1227:14;
1249:20

**touching** [6] -
1132:19; 1133:2;
1162:19; 1163:2;
1192:19; 1193:2

**toward** [3] - 1102:15,
17; 1208:21

**traceable** [5] -
1235:17, 22; 1243:21;
1250:11; 1251:6

**traces** [1] - 1233:5

**transaction** [1] -
1099:1

**TRANSCRIPT** [1] -
1079:6

**transcript** [7] -
1079:24; 1131:25;
1132:14; 1161:25;
1162:14; 1191:25;
1192:14

**transcription** [1] -
1079:24

**transmission** [5] -
1104:2, 5; 1126:13;
1156:13; 1186:13

**transmissions** [1] -
1092:9

**transmitted** [30] -
1084:12, 16, 21;
1085:10, 15; 1086:3, 5,
9; 1087:2, 5; 1089:9;
1091:21; 1092:5, 13,
15; 1093:20, 23;
1100:14, 17, 22;
1103:20, 22, 25;
1105:4, 7, 12; 1126:17;
1156:17; 1186:17

**transmitting** [6] -
1085:25; 1086:24;
1088:2, 12; 1089:14;
1091:9

**transport** [3] -
1095:18; 1113:9;
1116:11

**Transportation** [2] -
1219:24; 1223:1

**transportation** [5] -
1082:12; 1092:11;
1096:22; 1112:24;
1113:2

**transported** [83] -
1084:12, 17, 20;
1085:11, 15; 1086:3, 6,

9; 1087:2, 5, 8;
1091:20, 24; 1092:2, 4;
1093:23; 1094:12;
1095:15; 1100:14, 18,
22; 1103:22, 25;
1104:10; 1105:3, 8, 12;
1114:8, 12, 14, 18;
1117:1, 13, 16; 1118:9;
1119:21, 23; 1120:1, 3,
5; 1123:9, 12, 25;
1124:4, 18, 20; 1126:7,
10, 12, 14; 1148:9;
1149:21, 23; 1150:1, 3,
5; 1153:9, 12, 25;
1154:4, 18, 20; 1156:7,
10, 12, 14; 1178:9;
1179:21, 23; 1180:1, 3,
5; 1183:9, 12, 25;
1184:4, 18, 20; 1186:7,
10, 12, 14; 1235:14

**transporting** [4] -
1094:15; 1095:19;
1114:5; 1236:3

**transports** [1] -
1113:21

**travel** [1] - 1245:17

**traveled** [1] - 1104:7

**treated** [1] - 1255:11

**trial** [22] - 1082:7,
21; 1128:23; 1131:19;
1132:2, 11; 1158:23;
1161:19; 1162:2, 11;
1188:23; 1191:19;
1192:2, 11; 1208:13;
1213:15; 1228:3, 14;
1229:7; 1244:9;
1245:21; 1247:19

**TRIAL** [1] - 1079:6

**true** [5] - 1131:4;
1161:4; 1191:4; 1240:8

**truly** [3] - 1134:13;
1164:13; 1194:13

**truth** [4] - 1216:18;
1217:13, 23; 1218:4

**try** [4] - 1134:13;
1164:13; 1194:13;
1254:14

**Tuesday** [2] - 1209:17

**Turkey** [1] - 1210:20

**turn** [1] - 1081:6

**two** [47] - 1080:22;
1081:4; 1101:25;
1106:3, 17, 19-20;
1107:3, 17; 1111:3;
1124:6; 1128:12;
1134:24; 1135:12;
1136:21; 1138:19;
1146:24; 1154:6;
1158:12; 1164:24;

1165:12; 1166:21;
1168:19; 1176:24;
1184:6; 1188:12;
1194:24; 1195:12;
1196:21; 1198:19;
1206:24; 1212:24;
1215:25; 1233:5, 11;
1247:12; 1256:12

**Two** [8] - 1082:9;
1083:13, 22, 24;
1084:1; 1085:18;
1086:16; 1087:13

**type** [2] - 1092:19;
1236:2

**types** [4] - 1111:17;
1146:25; 1176:25;
1206:25

## U

**U.S** [9] - 1079:4, 15;
1100:25; 1213:4;
1214:10, 22; 1235:7,
11; 1245:21

**U.S.C** [2] - 1101:21;
1105:20

**U.S.D.J** [1] - 1079:9

**Ukraine** [1] - 1246:19

**Ukrainian** [1] - 1229:9

**unanimous** [57] -
1083:4; 1129:3, 6;
1133:9; 1134:11;
1135:10; 1159:3, 6;
1163:9; 1164:11;
1165:10; 1189:3, 6;
1193:9; 1194:11;
1195:10; 1219:13, 18,
22; 1220:1, 5, 9, 14,
20; 1221:1, 8, 14, 20;
1222:1, 6, 11, 18, 22,
24; 1223:3, 5, 9, 12,
15, 19, 22, 25; 1224:3,
6, 9, 12, 14; 1243:14;
1249:15, 23; 1250:3,
14, 20, 24; 1251:7;
1252:12

**unclear** [3] - 1139:11;
1169:11; 1199:11

**under** [30] - 1086:19;
1095:1; 1097:5, 18;
1099:20-22; 1110:16;
1111:25; 1120:16, 21;
1126:25; 1127:5;
1130:13, 17; 1150:16,
21; 1156:25; 1157:5;
1160:13, 17; 1180:16,
21; 1186:25; 1187:5;
1190:13, 17; 1217:11;
1246:13; 1248:11

**underage** [3] -
1127:25; 1157:25;
1187:25

**undertaking** [1] -
1110:24

**undeveloped** [1] -
1089:4

**unfair** [2] - 1247:9, 18

**Union** [3] - 1217:7, 12;
1218:3

**UNITED** [2] - 1079:1, 3

**United** [39] - 1079:13,
21; 1085:20; 1092:8;
1093:4, 7, 17, 20, 24;
1094:3, 9, 12, 16;
1095:6, 9, 15, 20;
1097:5, 7; 1101:19;
1105:15, 17; 1113:19;
1114:16; 1117:8;
1123:18; 1134:15;
1153:18; 1164:15;
1183:18; 1194:15;
1212:22; 1216:3;
1217:15; 1227:7;
1234:20; 1235:9;
1236:8; 1254:16

**unlawful** [14] -
1098:2; 1106:5, 21;
1107:4, 18; 1108:6, 13,
19; 1109:13; 1110:11,
20, 22, 25; 1111:19

**unless** [4] - 1145:14;
1175:14; 1205:14;
1255:1

**unnatural** [1] -
1090:15

**unreliable** [1] -
1216:8

**unspoken** [1] - 1107:16

**up** [26] - 1080:23;
1134:12; 1136:12;
1137:19; 1139:14;
1143:19; 1164:12;
1166:12; 1167:19;
1194:14; 1173:19;
1194:12; 1196:12;
1197:19; 1199:14;
1203:19; 1208:16, 18;
1209:10, 13; 1212:4;
1215:13, 20; 1254:10,
15; 1255:6

**upstairs** [2] - 1232:4;
1233:17

**US** [1] - 1213:16

**usage** [1] - 1088:14

**USC** [1] - 1099:20

**uses** [5] - 1085:22;
1094:6; 1135:22;

1165:22; 1195:22

**usual** [1] - 1211:21

## V

**vacate** [1] - 1215:7

**VALERIO** [1] - 1079:5

**Valerio** [43] - 1084:6;
1085:4; 1093:13;
1100:8; 1104:21;
1113:8; 1116:20;
1123:4; 1140:12;
1141:20, 22; 1142:12,
14; 1144:22; 1145:6,
14; 1146:15; 1153:4;
1170:12; 1171:20, 22;
1172:12, 14; 1174:22;
1175:6, 14; 1176:15;
1183:4; 1200:12;
1201:20, 22; 1202:12,
14; 1204:22; 1205:6,
14; 1206:15; 1208:4;
1234:10; 1245:13;
1246:12, 18; 1247:9

**Valerio's** [10] -
1140:19; 1143:7;
1145:3; 1170:19;
1173:7; 1175:3;
1200:19; 1203:7;
1205:3; 1246:9

**value** [1] - 1247:8

**vast** [1] - 1242:4

**venture** [4] - 1098:10,
20; 1099:11, 13

**verdict** [176] -
1082:25; 1083:3;
1128:19; 1129:6, 8, 12,
18-19; 1130:4, 15;
1131:4, 6, 11; 1132:16;
1133:9; 1134:2-5, 7,
9-10; 1135:4, 6-7,
9-10; 1158:19; 1159:6,
8, 12, 18-19; 1160:4,
15; 1161:4, 6, 11;
1162:16; 1163:9;
1164:2-5, 7, 9-10;
1165:4, 6-7, 9-10;
1188:19; 1189:6, 8, 12,
18-19; 1190:4, 15;
1191:4, 6, 11; 1192:16;
1193:9; 1194:2-5, 7,
9-10; 1195:4, 6-7,
9-10; 1213:22; 1218:16,
19, 22-23, 25; 1219:5,
9, 13, 18, 22; 1220:1,
5, 9, 14, 20; 1221:1,
8, 14, 20; 1222:1, 6,
11, 19, 22, 24; 1223:3,
6, 9, 12, 15, 19, 22,

25; 1224:3, 6, 9, 12,
14, 17, 19, 21, 23, 25;
1225:2, 4, 6, 8, 10,
12, 14; 1226:2; 1227:2;
1230:22; 1231:17, 21,
24; 1232:2; 1234:9;
1243:13; 1244:14, 16,
18, 20; 1245:7;
1248:16; 1249:10, 13,
15, 18, 23; 1250:14,
16, 20, 24; 1251:7, 9,
12, 14, 16, 18, 20, 22,
24; 1252:1, 3, 5, 7, 9,
12; 1253:3

**verdicts** [3] -
1222:15; 1234:18;
1235:4

**verification** [2] -
1216:14; 1217:9

**verify** [2] - 1216:12;
1217:2

**versus** [1] - 1212:22

**via** [1] - 1089:9

**victims** [2] - 1083:20;
1243:2

**video** [13] - 1089:4;
1092:10; 1119:10;
1126:13; 1149:10;
1156:13; 1179:10;
1186:13; 1211:15;
1212:3; 1229:25;
1233:12; 1235:12

**videos** [23] - 1089:8;
1209:5; 1210:3, 7-8,
23; 1211:6, 9, 16-17,
19, 21; 1212:8; 1213:7;
1214:4; 1229:8; 1246:8,
10

**videotape** [1] - 1089:5

**videotapes** [3] -
1123:23; 1153:23;
1183:23

**view** [9] - 1090:1;
1123:22; 1153:22;
1183:22; 1234:9;
1241:3; 1246:20;
1254:22; 1255:13

**viewer** [2] - 1090:3, 23

**viewing** [10] - 1115:22;
1121:23; 1127:3;
1128:6; 1151:23;
1157:3; 1158:6;
1181:23; 1187:3; 1188:6

**views** [3] - 1129:11;
1159:11; 1189:11

**violate** [2] - 1101:20;
1105:20

**violating** [6] -

30

1085:19; 1094:3;
1101:18; 1105:17;
1113:18; 1117:7

**violation** [2] -
1083:18; 1235:15

**violations** [1] -
1083:17

**visas** [1] - 1245:17

**visual** [209] - 1084:10,
12, 15, 20; 1085:9, 14,
24; 1086:1, 3, 5, 8,
19, 24; 1087:1, 4, 6,
21; 1088:2, 12; 1089:3,
7-8, 14; 1090:7, 10,
20, 22, 24; 1091:3, 9,
12, 14, 20, 24; 1092:1,
7, 15, 17, 24; 1093:18,
22; 1094:11, 15;
1095:12, 15, 20;
1100:12, 16, 21;
1103:18, 22, 25;
1104:6; 1105:1, 3, 6,
11; 1113:12, 14, 16,
24-25; 1114:2, 8-9, 11,
13, 18, 21; 1115:1, 10,
19; 1116:22, 25;
1117:2, 4, 11, 17, 20,
22; 1118:5, 8, 11, 16;
1119:3, 5, 7, 21, 25;
1120:3, 8, 11, 15;
1121:2, 12, 20; 1123:6,
8, 12, 14, 24; 1124:5,
7, 15, 17, 19, 22;
1125:2, 7, 9, 14, 25;
1126:7, 9, 20, 24;
1127:10, 19; 1128:2;
1148:5, 8, 11, 16;
1149:3, 5, 7, 21, 25;
1150:3, 8, 11, 15;
1151:2, 12, 20; 1153:6,
8, 12, 14, 24; 1154:5,
7, 15, 17, 19, 22;
1155:2, 7, 9, 14, 25;
1156:7, 9, 20, 24;
1157:10, 19; 1158:2;
1178:5, 8, 11, 16;
1179:3, 5, 7, 21, 25;
1180:3, 8, 11, 15;
1181:2, 12, 20; 1183:6,
8, 12, 14, 24; 1184:5,
7, 15, 17, 19, 22;
1185:2, 7, 9, 14, 25;
1186:7, 9, 20, 24;
1187:10, 19; 1188:2;
1227:10; 1235:10, 13;
1236:4, 11; 1239:15;
1243:16

**volition** [1] - 1088:24

**voluntarily** [10] -
1115:5; 1119:14;

1121:7; 1127:15;
1149:14; 1151:7;
1157:15; 1179:14;
1181:7; 1187:15

**voluntary** [1] -
1112:22

**vote** [3] - 1131:17;
1161:17; 1191:17

---

W

**wait** [4] - 1137:20;
1167:20; 1197:20;
1248:16

**waived** [4] - 1213:14,
20, 23, 25

**waking** [1] - 1212:4

**wants** [6] - 1140:18;
1170:18; 1200:18;
1231:13; 1233:2, 4

**warrant** [8] - 1081:12;
1115:25; 1121:25;
1128:8; 1151:25;
1158:8; 1181:25; 1188:8

**waste** [1] - 1231:8

**ways** [1] - 1234:16

**web** [1] - 1089:9

**Wednesday** [3] -
1209:13, 18, 21

**weeks** [1] - 1256:12

**weigh** [3] - 1130:10;
1160:10; 1190:10

**weight** [12] - 1091:5;
1129:17; 1131:18;
1159:17; 1161:18;
1189:17; 1191:18;
1240:11, 19, 23

**Western** [3] - 1217:7,
12; 1218:3

**whatsoever** [1] -
1217:9

**whole** [4] - 1080:24;
1217:17; 1232:9;
1245:18

**WICKER** [1] - 1079:20

**willfully** [7] -
1097:15; 1098:8;
1099:11; 1102:7;
1103:2; 1108:14;
1109:24

**willing** [6] - 1110:25;
1142:20; 1172:20;
1202:20; 1254:15, 17

**willingness** [1] -
1090:21

**wire** [2] - 1208:15;
1211:1

**wired** [1] - 1217:11

**wish** [12] - 1137:18;
1144:20; 1146:6;
1167:18; 1174:20;
1176:6; 1197:18;
1204:20; 1206:6;
1233:22; 1255:5, 8

**wished** [4] - 1099:9;
1131:20; 1161:20;
1191:20

**wit** [12] - 1084:8, 18;
1085:6; 1093:15;
1100:10; 1104:24;
1105:9; 1113:12;
1116:22; 1123:6;
1153:6; 1183:6

**witness** [1] - 1217:1

**witnesses** [4] -
1235:3; 1240:13, 16;
1244:3

**word** [6] - 1088:20, 22,
25; 1209:20; 1249:3

**word-for-word** [1] -
1209:20

**words** [16] -
1088:13-15; 1098:24;
1103:10; 1107:10;
1108:1; 1122:15;
1152:15; 1182:15;
1232:4; 1241:2

**worse** [1] - 1247:15

**worthless** [1] -
1231:15

**write** [3] - 1146:20;
1176:20; 1206:20

**writing** [10] - 1107:10;
1133:1, 3; 1138:23;
1163:1, 3; 1168:23;
1193:1, 3; 1198:23

**written** [3] - 1133:12;
1163:12; 1193:12

---

Y

**years** [4] - 1087:15,
18; 1095:1; 1208:13

**yesterday** [2] -
1080:22

**YORK** [1] - 1079:1

**York** [19] - 1079:14,
18, 22; 1084:5; 1085:3;
1093:2, 12; 1100:7;
1104:20; 1113:7;
1116:19; 1123:4;
1153:4; 1183:4;
1227:18; 1229:6;
1239:5; 1250:6; 1251:1

**yourself** [4] - 1129:9;
1159:9; 1189:9; 1254:25

**yourselves** [5] -
1099:7; 1108:17;
1130:20; 1160:20;
1190:20

---

31

Z

**zapata** [1] - 1217:16

**Zvi** [2] - 1214:10;
1215:4