UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK                          (For Online Publication Only)
---------------------------------------------------------------------X
UNITED STATES OF AMERICA,

                                                              **MEMORANDUM & ORDER**
                                                              14-cr-94 (JMA)

                                                              **FILED**
                                                              **CLERK**

                    -against-
                                                              2:00 pm, May 09, 2024

JOSEPH VALERIO,
                                                              **U.S. DISTRICT COURT**
                                                              **EASTERN DISTRICT OF NEW YORK**
                                       Defendant.             **LONG ISLAND OFFICE**
---------------------------------------------------------------------X

**AZRACK, United States District Judge:**

Joseph Valerio petitions this Court for the issuance of a writ of habeas corpus pursuant to

28 U.S.C. § 2255, claiming ineffective assistance of trial counsel.  (ECF No. 164 ("Valerio Pet."))

For the below reasons, the Court denies Valerio's petition without need for an evidentiary hearing.

## I.      BACKGROUND[1]

### A.      Criminal Conduct Proven at Trial[2]

Joseph Valerio ("Valerio") met his co-conspirator Olena Kalichenko ("Kalichenko") in the

summer of 2011 through a website called "UkrainianDate.com."  (GX 562; PSR ¶¶ 20, 28.)  Then

---

[1]      Unless otherwise indicated, citations to docketed items refer to those materials that appear on ECF in Valerio's criminal case, United States v. Valerio, No. 14-cr-94 (JMA) (ARL) ("Valerio Crim.").  However, the Court also cites to Valerio's direct appeal to the Second Circuit, United States v. Valerio, No. 17-2371-cr, 765 F. App'x 562 (2d Cir. 2019) ("Valerio Appeal"), Valerio's appellant brief (Valerio Appeal, ECF No. 37 ("Valerio Appeal Br.")), the government's appellee brief (Valerio Appeal, ECF No. 62 ("Gov't Appeal Opp.")), Valerio's appellate appendix (Valerio Appeal, ECF Nos. 35–36 ("A")), Valerio's special appellate appendix (Valerio Appeal, ECF No. 37 ("SPA")), and the government's appellate appendix (Valerio Appeal, ECF No. 62 ("GA")).  Additionally, the Court considers Valerio's petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2255 (ECF No. 164 ("Valerio Pet."), Valerio's memorandum of law in support of his petition (ECF No. 164 ("Valerio Mem.")), the government's memorandum of law in opposition to Valerio's petition (ECF No. 170 ("Gov't Valerio Opp.")), and Valerio's reply memorandum of law in support of his petition (ECF No. 177 ("Valerio Rep.")), as well as the declarations and exhibits attached thereto.

[2]      The facts are drawn from Valerio's trial transcript (Valerio Crim., ECF No. 148-1 ("Trial Tr.")), the presentence report (Valerio Crim., ECF No. 110 ("PSR")), the addendum to the PSR (Valerio Crim., ECF No. 114 ("Addendum")), the initial recommendations of the Probation Department (Valerio Crim., ECF No. 110-1 ("Initial Recommendation")), the revised recommendations of the Probation Department (Valerio Crim., ECF No. 117 ("Revised Recommendation")), the statement of reasons accompanying the judgment (Valerio Crim., ECF No. 151

the two began corresponding via email.  (See id.)  Kalichenko visited Valerio on Long Island in

the summer of 2011 and then returned to Ukraine.  (GX 11–19, 562; PSR ¶¶ 20, 28.)  Between

2011 and 2013, Valerio sent money to Kalichenko in exchange for videos of Kalichenko engaging

in sexually explicit activity with her two-year-old daughter (Jane Doe #1).  (Trial Tr. 427–28; GX

2-E, 10-A, 203, 206, 322; PSR ¶¶ 21, 23.)  During this time, Valerio asked for and received about

46 videos containing child pornography of Jane Doe #1 from Kalichenko.  (GX 500; Trial Tr. 745;

PSR ¶¶ 21; Addendum 1.)  In exchange, Valerio wired Kalichenko a total of $12,350.  (GX 322,

10-A; Trial Tr. 366–68.)

Several email and text communications between Valerio and Kalichenko were introduced

at trial and then referenced in the PSR.  In these communications, Valerio specifically instructed

Kalichenko how she should sexually abuse Jane Doe #1 to create his child pornography, Valerio

discussed payments for the child pornography, and Valerio threatened to financially cut Kalichenko

off should she stop making videos for him.  (GX 2, 2B, 2D, 2E, 203, 205, 206, 208–31, 233, 235,

243, 247, 270, 501D, 504F, 555–61; PSR ¶¶ 28, 32.)

For example, on January 24, 2012, Valerio sent Kalichenko an email in which he told

Kalichenko she had done a "Great Job!" and instructed her to resend several videos from the prior

day because they contained "too much memory at once to handle for the phone."  (GX 559-A;

PSR ¶ 29.)  He further instructed Kalichenko to entice Jane Doe #1:

> ... keep[ing] her between your legs SAFELY" with your legs up around her,
> putting her toys "DOWN BY YOUR SWEET PUSSY" (from your belly
> down to your pussy).  With you and her securely on the couch, bed or floor"
> YOU can use the cell phone camera with one hand grabbing your TITS with
> the other and from your EYE view down to your sweet pussy ... you will be

---

("SOR")), the government's appellee brief (Valerio Appeal, ECF No. 62 ("Gov't Appeal Opp.")), and the
government's appellate appendix (Valerio Appeal, ECF No. 62 ("GA")).  The Court also draws facts from the
government's trial exhibits, which the government provided to the Court upon request.  ("GX").  All factual inferences
are drawn in favor of the government.  See Reddy v. Coombe, 846 F.2d 866, 869 (2d Cir. 1988) (A court "must credit
every inference that could have been drawn in the state's favor ... whether the evidence being reviewed is direct or
circumstantial.").

recording [Jane Doe #1] playing by your sweetness below! .... AS SHE TOUCHES AND EXPLORES YOU! ... AS YOU CONTINUE TO INSERT THE TOYS BETWEEN YOUR LEGS!!.[3]

(Id.)

Valerio then wrote the following in an email to Kalichenko on July 17, 2012:

The videos you sent by cell phone camera are PERFECT" and there is NO need for the expense of another camera, when you have done a terrific job with the cell phone camera. I have a new cell phone which allows me to transfer your video to my email and the screen is bigger to view. Plus you can have endless video time per session with a cell phone camera. As far as the SCRIPT" ... do the same with our little [Jane Doe #1]'s DELICIOUS LITTLE PUSSY" - you know in the tub!

[T]he way you would eat her so sweet ... of course PANTYHOSE AND TIGHTS .... AS you two dance. Place toys inside your PUSSY" and have our little [Jane Doe #1] pull them out of your wet PUSSY ... EMMM"!

Tell me how you loved when you eat her little pussy and how WET your PUSSY was - CORRECT?.

I told you how I cant wait to make hard luv to you ... as you eat our little [Jane Doe #1] delicious little pussy.

(GX 303-A; PSR ¶ 30.)

Five days later, Valerio emailed Kalichenko to discuss having her and Jane Doe #1 live in New York "BECAUSE YOU AND [Jane Doe #1] OFFER ME "SOMETHING DIFFERENT" ... that my other girls dont have or can't supply to me NOW" - So its [Jane Doe #1]" and you that fits that equations ... GOT IT?!" (GX 205; PSR ¶ 31.) Valerio requested that Kalichenko sign a document giving him partial custody of Jane Doe #1. (See id.) Valerio also stated that "I have a generous figure in mind to send you tomorrow early" when of course I receive that scan signed agreement regarding [Jane Doe #1]... I will send the cash EARLY"." (Id.)

---

[3]     Here, and throughout this Order, spelling and punctuation are presented as in the original communications.

When Kalichenko did not perform as Valerio expected in September 2012, Valerio reacted as follows:

> Hey you listen now or this will be the last time ever!! ... WHERE" the fuck are you writting mails at 9:30PM when your daughter is suppose to be sick??!  are you starting to be that sneaky bitch again?! .... if SO, I will drop you on your ASS"! "BETTER FUCKING EXPLAIN"!.  First off I just gave you $1,200 for your family and your going to fucking "WORK FOR IT"! not sit anywhere ALL FUCKING DAY! SENDING OUT EMAILS! ... Im asking YOU" now what the fuck do you do ALL DAY"? and you have PRODUCED NOTHING FOR ME!!!

> I want an explaination for ALL of this NOW! ... Each morning and night you will send me a CELL PHONE VIDEO OF YOU WAKING UP WITH YOUR DAUGHTER, WITH YOUR TITS IN HER MOUTH BEFORE YOU GO TO SLEEP AND WAKE UP! .... IF I DONT SEE THIS EACH DAY" I WILL DROP YOU ON YOUR ASS!!! YOU BEITER MAKE SURE YOU HAVE AN EXPLAINATION FOR THIS AND I NEED TWO FUCKING MODELS" TO SIGN THOSE APPLICATIONS READY FOR INTERVIEWS BY NEXT WEEK OR ELSE YOU WILL BE SORRY! ... YOU BETER WORK BITCH! AND YOU TELL THEM THAT THEY CAN GET PAID FOR THEIR WORK IN YOUR FUCKING COUNTRY .... THEN HERE IN THE USA!!! BETTER USE YOUR FUCKING IMAGINATION WHEN YOU SPEAK TO THESE BITHCES TO SIGN THEM UP AND GET THEIR PUSSYS HERE!! .... GOT IT?!!!!

> Lastly ... which may be the case for you! YOU GET ME THOSE PURCHASE RECEIPTS FOR ALL THOSE APPLIANCES AND FURNITURE AND YOU MAKE FUCKING SURE" I SEE THE SERIAL NUMBERS THAT MATCH ON EACH APPLIANCE PURCHASED ON A RECEIPT WITH THE COMPANY NAME!! - MOTHER FUCKER!! ..... GET TO WORK!!!

(GX 2E.)

In November 2013, Kalichenko contacted the FBI in Kiev, Ukraine.  There, Kalichenko reported that she created sexually explicit videos involving her daughter and sent them to Valerio in the United States.  (Trial Tr. 261, 270–72.)  Kalichenko provided the FBI with emails from Valerio and a disk containing explicit videos of Kalichenko and Jane Doe #1 that she sent him.

(See id.)  This information precipitated the execution of a search warrant at Valerio's residence in January 2014.[4]  (PSR ¶ 22.)

The search of Valerio's residence led to the recovery of communications and videos concerning Jane Doe #1, as well as the discovery of digital devices.  A computer forensic examination of the digital devices revealed child pornography images of Valerio's niece (Jane Doe #2)—approximately age six—in fetish outfits and in various stages of undress.  Such images focused on her genitals, which appeared red and inflamed, and depicted her in sexually suggestive positions.  (GX 508–11, 515–16, 519–26, 528, 530, 532–39; PSR ¶¶ 25–26.)  Agents recognized the background of these images as Valerio's basement, and afterward obtained a second warrant to search his residence.   (Trial Tr. 436–38; PSR ¶ 26.)

Valerio was arrested in February 2014 and charged via a complaint with the sexual exploitation of Jane Doe #2.   (Trial Tr. 438–39.)   When informed agents discovered the pornographic pictures of his niece, Valerio stated: "I no longer have a family.  I want to kill myself." (Trial Tr. 440–41.)

On February 25, 2014, agents conducted a second search of Valerio's residence.  (PSR ¶ 27.)  During the search, agents recovered a digital camera hidden in drop ceiling tiles in his basement.  They also found two other cameras—one hidden in a clock and the other within a homemade platform that appeared to be used as a stage, pointed upward to capture images of anyone standing on it.  (Trial Tr. 463–70, 472–75; GX 311, 323–24, 404; PSR ¶ 27.)  Agents also recovered costumes worn by Jane Doe #2 in the images—including fishnet stockings, a

---

[4]     Indeed, agents recovered messages sent via VIBER in the search of Valerio's residence.  Such messages show that in December 2013—after Kalichenko had reported Valerio to the FBI—Kalichenko told Valerio that he should have negotiated with her, that she was sending the videos she made for him with her daughter to the FBI, and that he should "negotiate" with her before she sent the rest to the authorities.  (Trial Tr. 811–13, 861–62; GX 555.)

cheerleading outfit with a blonde wig, and several packages of pantyhose and stockings in children's sizes.  (Trial Tr. 450; GX 312, 335, 336, 338, 342, 343, 347; PSR ¶ 27.)

Valerio's sister, Bernadette Imperiale ("Imperiale")—the mother of Jane Doe #2—testified at trial.  Imperiale testified that in 2010 to 2011, when Jane Doe #2 was around six years old, Valerio asked if Jane Doe #2 could model to make money.  (Trial Tr. 615.)  Imperiale said "yes." (Trial Tr. 616.)  Jane Doe #2's modeling entailed dressing in costumes and took place in Valerio's basement.  (Trial Tr. 616–19.)  "[A] couple of times," the modeling took place in the basement outside of Imperiale's presence.  (Trial Tr. 619.)   Imperiale identified Jane Doe #2 and the costumes/items in images recovered from Valerio's computer equipment.  (Trial Transcript 620–23, 626–27.)  Imperiale was unaware of the hidden cameras recovered from Valerio's basement. (Trial Tr. 625–26.)  At trial, Imperiale claimed—for the first time—that one time a few summers earlier, Kalichenko had been present and had been left alone taking pictures of Jane Doe #2 in the basement.[5]  (Trial Tr. 631–34.)

On November 13, 2014, Valerio was convicted by a jury on ten counts relating to the sexual exploitation of two minor children and the transportation, receipt, and possession of child pornography.  (ECF No. 95.)

---

[5]      At trial, Valerio's mother—Frances Valerio—also claimed Kalichenko had been alone in Valerio's basement taking pictures of Jane Doe #2 on one occasion in 2011, for 15–20 minutes.  (Trial Tr. 936–38.)  However, the evidence showed the child pornography images of Jane Doe #2 had been created months earlier on September 10, 2010, and January 19, 2011 (i.e., before Valerio even met Kalichenko.)  (Trial Tr. 770–89; GX 11–19, 507–10, 513, 515, 518–20, 562; PSR ¶ 39.)

**B.**     **Sentencing**

    **1.**    **The PSR, Addendum, and Recommendations**

        a)    *The PSR and Initial Recommendation*

In October 2015, the United States Probation Department ("Probation") issued the PSR and Initial Recommendation. Probation concluded Valerio's total offense level to be 47—considering Jane Doe #1 and Jane Doe #2's sexual exploitation pursuant to U.S.S.G. § 2G2.1, plus an enhancement for a pattern of activity involving prohibited sexual contact with a minor (pursuant to § 4B1.5(b)(1)). (PSR ¶¶ 46–68.) Probation assessed Valerio one criminal history point based on his conviction for attempted forcible touching, and it found him to be in criminal history category ("CHC") I. (PSR ¶¶ 70, 74–76.) Considering the total offense level of 47 and CHC I, Probation concluded the advisory Guideline imprisonment term was life.[6] (PSR ¶ 118.)

Valerio told Probation that his father physically and sexually abused him between the ages of five and eleven years old. Valerio stated that his father attempted to anally penetrate him and sexually abuse his sister, the latter of which was corroborated by his sister. (PSR ¶¶ 83, 89.)

Probation's Initial Recommendation suggested concurrent sentences totaling 30 years on Counts One through Three, Six through Fourteen, and Counts Four & Five—plus a consecutive five-year term on Count Fifteen for a total of 35 years. (See Initial Recommendation.)

        b)    *The PSR Addendum and Revised Recommendation*

In January 2016, Valerio's mother provided law enforcement officers with a plastic bag that had been hidden inside a drum set in Valerio's residence. The bag contained a laptop computer, 19 VHS tapes, a covert digital video recorder, an alarm clock containing a hidden camera, and another surveillance camera. A forensic examination of the laptop revealed about 16 newly

---

[6]    Because none of the counts of conviction carried a statutory maximum sentence of life imprisonment, Judge Bianco later found that the advisory Guideline sentence would be the combined maximum statutory sentences for all the counts, to run consecutively, under U.S.S.G. § 5G1.1(c)(1). (GA 68–70.)

discovered videos of Jane Doe #1 from April through November 2012—the period during which Valerio had scripted and received child pornography from Kalichenko.  The VHS tapes contained what appeared to be surreptitious recordings from Valerio's home depicting several women using the bathroom, dressing and undressing, and engaging in various other activities.  The women were seemingly unaware that Valerio was recording them.  (Addendum 1.)

On March 4, 2016, Probation issued an Addendum to the PSR and a Revised Recommendation.  The Addendum described the recovery of the laptop containing additional videos of Jane Doe #1, the hidden cameras, and the covertly created VHS tapes.  (Addendum 1.)

Additionally, Probation's Addendum noted the government had provided details about Valerio's conduct related to two other women: (1) A.D. (listed as "Jane Doe #3") and (2) Lucy Down (listed as "Jane Doe #4").  These details included violent rapes of A.D. and Valerio's attempt to lure Lucy Down to the United States on the false pretense that he was hiring her as an au pair.[7] (Addendum 1–4.)

Considering this additional criminal conduct, Probation issued a Revised Recommendation of a 60-year sentence.  (See Revised Recommendation.)

**2.      Valerio's Request for a Fatico Hearing**

At a pre-sentencing status conference in May 2016, defense counsel stated Valerio denied the allegations in the Addendum relating to A.D. and Lucy Down.  (GA 17–18.)   As a result, defense counsel requested a Fatico hearing as to those allegations.  (See id.)

Judge Bianco informed the parties that—in the context of Kalichenko's case—he was aware of Kalichenko's allegations that Valerio raped and been violent towards her and their similarities to A.D's allegations.  (GA 19.)  Defense counsel confirmed that Valerio disputed

---

[7]      The government proffered this information following Valerio's false claims in the PSR that he had a "very good relationship" with A.D. and that she had left the United States solely due to a visa overstay.  (PSR ¶ 87.)

Kalichenko's allegations as well.  (GA 20–21.)  Judge Bianco then directed the government to reach out to Kalichenko's counsel and inform them that the district court was inviting her to testify about the allegations of Valerio's abuse.  (GA 21.)

### 3.    The <u>Fatico</u> Hearing

On July 25, 2016, September 26, 2016, and March 6, 2017, Judge Bianco held a <u>Fatico</u> hearing concerning: (1) the allegations of Valerio's conduct towards Lucy Down, Kalichenko and A.D.; and (2) psychological testimony proffered by Valerio.

#### a)    *Lucy Down*

On July 25, 2016, Lucy Down ("Down") and Jolene Leonardo ("Leonardo") testified at the <u>Fatico</u> hearing.  Down, who Valerio hired as au pair, was 22 years old and living in the United Kingdom at the time of her testimony.  Jolene Leonardo was a former employee of the au pair company.  Down testified that—after finishing college at 18 years old—she applied to an au pair agency in the United States in 2012.  (A 189–90.)  Valerio contacted Down through the company's database to interview her for an au pair position.  (A 190.)  In September 2012, Valerio interviewed Down remotely via Skype.  During the interview, Valerio told Down her responsibility would be caring for his eight-year-old daughter, Sylvia.  (A 190–91.)

In October 2012, Down traveled to the United States to work for Valerio.  (A 191.)  After an orientation and training program, Valerio picked Down up in his car.  (A 191–92.)  During the drive to Valerio's residence, he informed Down that Sylvia was not his child.  When Down inquired why Valerio needed an au pair, he said he would explain later.  (A 192.)  Valerio also told her that he planned to take her to a Halloween party and that he preferred if she wore a costume comprised of pantyhose and nothing else.  (<u>Id.</u>)

Following a meal, Valerio took Down to his home on Long Island.  After Valerio showed Down her bedroom, he asked if she would like a drink.  (<u>Id.</u>)  While Down was sitting in Valerio's

media room with a drink, he entered wearing boxers and a tank top.  (Id.)  Valerio sat next to Down for a few minutes and touched her hand, after which Down went upstairs to go to sleep in her room.  (A 192–93.)  She woke up around 4 a.m. and contacted her father via email.  They then spoke over Skype and Down explained what happened with Valerio.  Down's father contacted the au pair agency, which contacted Down and told her someone would pick her up.  (A 193.)

After that conversation, Valerio entered Down's room and noticed she had been crying. (Id.)  Down told Valerio that she was homesick, and he left.  Down collected her belongings, went downstairs, and informed Valerio that she was leaving.  Valerio expressed shock and told Down to "grow up," adding too that he could offer her a lot of money.  (Id.)  Down felt intimidated by Valerio's behavior.  (Id.)  After about 20 minutes, Leonardo arrived at Valerio's home to collect Down.  (A 193–94.)  Valerio refused to answer Leonardo's questions about what had happened and closed the door to the house.  Down stayed at Leonardo's house for about a week and then returned to the United Kingdom.  (A 194.)

Additionally, Leonardo testified she had interviewed Valerio in 2012 at his home after he applied to employ an au pair.  Valerio told her that he and his wife shared joint custody of Valerio's daughter Sylvia, who he said was in school at the time of the interview.  (A 202–03.)

> b)  *Kalichenko*

Kalichenko testified at the Fatico hearing on July 25, 2016.  She first met Valerio through a website called UkranianDate.com, a website which matches couples seeking a marriage.  She was looking for a husband and someone who could be a father to her daughter.  (A 211.)

Kalichenko testified that she met Valerio for the first time in June 2011 when she traveled to Long Island.  Valerio picked her up at the airport and paid for her flight from Dallas, Texas. (Id.)  Kalichenko met Valerio's son and stayed at Valerio's house for about 10 days.  (A 212.)

Kalichenko returned to Ukraine in July 2011.  (Id.)  Valerio bought her plane ticket and communicated with her while she was in Ukraine, and he also sent Kalichenko money.  (A 212–13.)  Kalichenko returned to the United States on September 2, 2011, to continue her relationship with Valerio, whom she was determined to marry.  She stayed in the United States for about two months and spent part of that time at Valerio's house on Long Island.  (A 213.)

After about three weeks, Kalichenko left Valerio's home because he had physically and sexually abused her.  (A 214.)  During the first instance of abuse, Valerio unexpectedly told Kalichenko that she had to leave his house.  When she did not do so, Valerio forcibly removed Kalichenko's clothes, demanded her to crawl on the floor, and called her insulting names.  (Id.)  Valerio also repeatedly slapped and penetrated Kalichenko with his hand and pulled her hair, forced her to perform oral sex on him after she refused to do so, and forced her to engage in sexual intercourse.  (A 214–15, 216.)

As a result, Kalichenko traveled to Seattle to stay with someone she barely knew.  (A 216.)  She returned to Valerio's home in October after he contacted her via email and asked her to come back to Long Island.  (Id.)  Kalichenko opted to give Valerio a second chance and stayed with him for a few weeks.  (Id.)  Valerio paid for her flight from Seattle and told her he would pick her up in Central Park in New York City.  (A 217–18.)  Valerio also instructed Kalichenko to wear a mini skirt and pantyhose without any underwear.  (Id.)  After dressing as directed, Valerio picked Kalichenko up in Central Park and drove her to Long Island.  (A 218.)  After a few hours in the car, Valerio pulled to the side of the road and sexually assaulted Kalichenko.  (A 218–19.)  He tore her clothes and caused Kalichenko physical pain.  (Id.)  After Valerio finished, he told Kalichenko that he was sorry.  She did not contact the police because she hoped Valerio would prove to be a good father to her daughter.  (A 219.)

11

In October 2011—near the end of her stay with Valerio—Kalichenko signed a written agreement that Valerio drafted.  In part, this agreement purported to bind Kalichenko into a "multiple partner relationship" with Valerio.  (A 220.)  The agreement also stated that Kalichenko promised to obey Valerio's commands.  (Id.)  The agreement further stipulated that Valerio would be gentle to her when he was not engaging in rough consensual sexual intercourse with her.  (Id.)  Notwithstanding the agreement, Kalichenko believed that Valerio's prior sexual assaults against her were nonconsensual.  (Id.)

The agreement also contemplated that Kalichenko would never mention the word "police" in Valerio's home.  (A 220.)  Kalichenko understood Valerio to include this language because he feared she would contact law enforcement about his assaults.  (Id.)  Valerio also sent Kalichenko emails asking for her help to adopt a child from Ukraine.  (A 221.)  In return for a commission, Valerio would pay Kalichenko to pose with him as a couple.  (Id.)  Kalichenko did not assist Valerio, and she sent his correspondence to the American consulate to ensure that he could not adopt a child from Ukraine or any other country.  (Id.)

c)    *A.D.*

A.D. testified on September 26, 2016.   She was born and raised in South Africa.  She has a son and a daughter.  She has traveled to the United States several times—from February to May 2008, June to October or November 2008, and December 2008 to March 2010.  During those trips, A.D. stayed on Long Island and lived in houses that Valerio owned.  (A 229.)

A.D. met Valerio through a dating website called christiansingles.com in July or August 2007 while she was pregnant with her son.  (A 230.)  Valerio paid for her February 2008 flight to the United States, and she brought her son with her.  (Id.)  Valerio picked her up from the airport, gave her gifts, and treated her well at first blush.  (Id.)  Eventually, Valerio began losing his temper.  One time, Valerio threw A.D. to the kitchen floor, choked her, and hit her while she screamed.  (Id.)

Valerio also began to make A.D. feel as if her son was a "burden" that he "didn't want . . . around." (Id.)  A.D. returned to South Africa in May 2008 partly because she missed her mother.  (A 231.) Valerio also asked that A.D. participate in a fashion show during which she would wear nothing but pantyhose.  (Id.)  This made her uncomfortable, so she ultimately left the United States.  (Id.)

When A.D. returned to the United States in June 2008, Valerio picked her up at the airport. (Id.)  Another man helped A.D. carry her bags from the plane to the airport exit, and when Valerio saw the man assist her, he became angry and grabbed the luggage away from him.  (Id.)  After Valerio and A.D. arrived at Valerio's home, Valerio grabbed A.D. and forced her onto a couch.  (A 232.)  He pushed her face down into a pillow and ripped her clothes off, telling her that he was in charge.  (Id.)  This occurrence left A.D. in tears.  (Id.)  During this second visit, Valerio impregnated A.D. in or around July 2008.  (A 232–33.)  She returned to South Africa a few months later to see her mother.  (Id.)

After A.D. came back to the United States for a third time, she gave birth to their daughter in April 2009.  (A 233.)  Then Valerio refused to let A.D. leave the country again, despite her visa expiring.  (Id.)  Although A.D. brought her son on this third visit, she eventually asked her mother to come to America and bring him back to South Africa.  (Id.)  That is because A.D. believed her son was not safe in Valerio's home.  (Id.)  While A.D. was pregnant with their daughter, Valerio's abuse worsened.  For example, Valerio told her that she should get an abortion or fall down the stairs and die.  Valerio also slapped A.D. one time when she would not have sex with him, causing her to fall and split her lip.  (Id.)  He also tried to force her to have sexual intercourse on another occasion, choking and hitting A.D. while she begged him to stop.  (Id.)  He eventually did.  (Id.)

After the birth of their daughter, Valerio's abuse of A.D. continued.  On another occasion, Valerio tried to rape A.D. and banged her head against a headboard while she held their daughter in her arms.  (Id.)  Further, the sight of A.D. breastfeeding their daughter made Valerio angry.  (A

233–34.)  For example, he once threw a soda can at her head when he witnessed her so doing.  (Id.)  After an argument during the summer of 2009, A.D. called the police.  When two officers arrived and A.D. explained what had happened, one of the officers told her she had probably provoked Valerio.  (A 234.)  This stunned A.D. and led her to believe that Valerio was correct when he told her that no one would help her if she reported his abuse, so she declined to complete a formal police statement.  (A 234, 242–43.)  Valerio also told A.D. that she could not leave the United States, and that if she did, he would send someone after her.  (Id.)  While A.D. lived with Valerio, he strictly monitored her interactions with other people and refused to let her socialize outside the home.  (A 235–36.)  He did, however, eventually buy her a cell phone to use.  (Id.)  But when Valerio left the house, he would lock A.D. inside and close the blinds.  (A 236.)

Also during the summer of 2009, Valerio physically assaulted A.D. while he was driving her to an evening out.  (A 234.)  After hitting her, Valerio stopped the car in a dark parking lot and told A.D. that she would die.  (A 234–35.)  She then jumped out of the car.  (Id.)  A.D. screamed for help, but Valerio grabbed her, put his hand over her mouth, and forced her back into the vehicle.  (A 235.)  Because of these repeated incidents of abuse, A.D. left Valerio's home and went to a women's shelter called Brighter Tomorrows.  (Id.)  But because the shelter was not comfortable and because Valerio convinced A.D. that conditions would improve if she returned, A.D. went back to live with Valerio.  (Id.)

Two subsequent physical assaults caused A.D. to leave the United States for a third time.  (A 236.)  The first incident occurred after Valerio and A.D. were pulled over by two police officers for driving the wrong way on a one-way street.  This angered Valerio (who was driving); after the police left, he drove A.D. to a beach, smashed her head against the car's dashboard, pulled her hair out, and screamed insults at her.  (Id.)  He also ripped A.D.'s dress and raped her, after which he drove her back to his house.  (Id.)  The second incident—which occurred around November

14

2009— happened when A.D. entered Valerio's home office.  (<u>Id.</u>)  After becoming angry, Valerio choked and punched A.D., causing her to lose consciousness.  (A 237.)  When A.D. woke up, she realized that her mouth was bloody and that Valerio had knocked some of her teeth loose.  (<u>Id.</u>)  Valerio allowed her to go to a dentist but told A.D. he would kill her if she told anyone about the assault. (<u>Id.</u>)  The dentist referred A.D. to a surgeon.  (<u>Id.</u>)  But despite an ensuing operation that Valerio paid for, A.D.'s teeth have never returned to normal.  (<u>Id.</u>)

Before A.D. returned to South Africa, she filed for custody of their daughter in a family court on Long Island.  (<u>Id.</u>)  Her custody petition documented Valerio's abusive behavior.  (<u>Id.</u>)  Around March 2010—after filing for custody and after promising Valerio she would eventually return—A.D. left the United States with their daughter.  (A 237–38.)  Eventually, A.D. agreed to come back to the United States because she was scared that Valerio would send someone to retrieve her or hurt her family if she did not return.  (A 238.)  Around October 2010, Valerio e-mailed A.D. saying that he planned to travel to South Africa and forcibly take her daughter from her.  (<u>Id.</u>)  This convinced A.D. that she must return to the United States to protect her daughter from Valerio.  (<u>Id.</u>)  She returned to the United States for a fourth time in January 2016.  (<u>Id.</u>)

When A.D. arrived in the United States, FBI Special Agent Steven Troyd met her at the airport.  A.D. spoke with Agent Troyd and provided him with several emails and other records documenting, among other things, her visits to the dentist and the oral surgeon.  (A 238–39.)

### d)   *Psychological Testimony*

On March 6, 2017, defense counsel presented testimony from Valerio's retained forensic psychiatrist, Dr. Alexander Bardey ("Dr. Bardey") (A 261–316) and from a social worker named Maura Gordon ("Gordon") (A 317–25.)  Dr. Bardey opined that Valerio's childhood sexual abuse, as well as his drug use, had led him to an interest in improper sexual acts.  (A 268–86.)  Dr. Bardey further opined that Valerio remained a "moderate" risk of reoffending.  (A 286–87.)  Dr. Bardey

15

also found that Valerio had an interest in sadomasochistic and violent internet pornography which, if Valerio viewed again, would increase his risk of recidivism.  (A 300.)

As Dr. Bardey conceded, however, his conclusion that Valerio was a "moderate" risk of dangerousness did not factor in the sex crimes that the government proved at the <u>Fatico</u> hearing. (A 305–08.)  Specifically, Dr. Bardey did not account for Valerio's repeated, violent rapes of A.D. and Kalichenko.  (A 307–08.)  Dr. Bardey indeed acknowledged on cross-examination that if this conduct were included, Valerio would be at a higher risk of recidivism.  (A 316.)  Notably, as Dr. Bardey admitted, Valerio had already recidivated when he committed the instant offenses, despite receiving sex offender therapy following an August 2006 conviction.  (A 299–300.)  Although Dr. Bardey acknowledged Valerio's history of thyroid cancer, he testified there was no connection between the cancer and Valerio's diagnosis & evaluation.  (A 316.)

Gordon testified about an interview of Valerio's sister (Bernadette Imperiale), who corroborated Valerio's claim of childhood abuse, as well as her own abuse by their father.  (A 318–25.)

### 4.    Judge Bianco's <u>Fatico</u> Decision

By written decision dated June 1, 2017, Judge Bianco found—having evaluated the demeanor and credibility of the witnesses at the <u>Fatico</u> hearing—that:

> [T]he government has proven, by a preponderance of the evidence, that (1) the defendant physically and sexually assaulted Olena Kalichenko during the course of his relationship with her; (2) the defendant physically and sexually assaulted A.D. during his relationship with her; and (3) the defendant deceived another woman into believing that she was coming to his house from England to be an au pair, even though there was no child in his house.

(SPA 12; ECF No. 146 at 2.)

As for the assaults and rapes of Kalichenko and A.D., Judge Bianco explained that he would consider this conduct "in connection with the Section 3553(a) factors—namely, the

defendant's history of extremely dangerous and violent behavior towards other individuals, and the need to protect the public from further crimes by the defendant." (SPA 12–13; ECF No. 146 at 2.) As for Valerio's luring of Down to the United States, Judge Bianco stated that he would consider the non-violent conduct as it "corroborat[ed] the testimony of Ms. Kalichenko and A.D. regarding the deceptive and manipulative conduct by the defendant during their respective relationships with him," but that, "[i]n any event, even if the Court did not consider the interactions with the au pair at all, it would reach the ... same conclusions with respect to Ms. Kalichenko and A.D." (SPA 13 n.3; ECF No. 146 at 3 n.3.)

### 5.    The Sentencing Proceeding

On June 6, 2017, the parties appeared for sentencing. As to the Guidelines calculation, the parties agreed that Valerio had an offense level of 47 and Criminal History Category of I. (GA 66 –67.) As Judge Bianco noted, this would carry an advisory range of life. Yet because no count of conviction carried a life sentence, the advisory range became the sum of the statutory maximums of all the counts together. (GA 68–69.) Judge Bianco agreed with defense counsel that sentencing Valerio on Counts Nine through Thirteen would present a double jeopardy problem and dismissed those counts without prejudice on consent of the government. (GA 69–70.) Judge Bianco then adopted Valerio's position that the advisory Guidelines was the sum of the remaining counts—260 years. (GA 70.) Neither party objected to the PSR as amended and Judge Bianco adopted the information in the PSR as factual findings of the court together with its Fatico findings. (Id.)

Defense counsel argued for a non-Guidelines sentence that would allow Valerio to be released at some point, citing Valerio's childhood abuse, the evaluation by Dr. Bardey, and the support of his family. (GA 71–77.) Defense counsel argued that based on Valerio's life expectancy, any sentence over 34 years would be a de facto life sentence. (GA 78.) Counsel further argued

17

that, in terms of general deterrence, if such sentences for child pornography production become prevalent, an offender may decide to kill a victim instead.  (GA 79.)

The government acknowledged that a 60-year sentence was very significant but argued it was appropriate; Valerio was dangerous, and his conduct was deliberate.  (GA 86.)  The government argued that Valerio had deliberately assaulted a woman in 2005 at Splish Splash water park on Long Island, and while on probation, he had been found with videotapes where he had secretly taped nannies and caretakers in his home.  (GA 86–87.)  Valerio had also deliberately sexually exploited two victims: (1) the instant two-year-old victim by convincing Kalichenko to make him videos and (2) his six-year-old niece by convincing the family he was taking legitimate modeling photographs.  (GA 87.)  The government argued that Valerio was deliberate in his victimization of A.D. by repeatedly raping her, breaking her teeth, and knocking her unconscious. (Id.) The government also argued that Valerio's conduct was deliberate when he sexually assaulted and repeatedly raped Kalichenko as well as when he tried to adopt a child from Ukraine even after they broke up.  (Id.)  Moreover, Valerio had tricked an 18-year-old au pair and her employer agency, convincing them that he had a daughter needing care; he then tried to get the au pair to wear a fetish outfit to a party.  (GA 87–88.)  Finally, the government argued that Valerio had already been given a second chance when he received probation following the sexual assault at Splish Splash, and "[h]e ha[d] demonstrated since that time that he cannot be trusted, that he will manipulate others, and that he is a danger to our community."  (GA 89.)

Judge Bianco then imposed a below-Guidelines sentence of 720 months, stating that he had "carefully gone through and considered all the factors set forth by Congress in Section 3553(a)."  (GA 89–90.)  Judge Bianco explained that he imposed that sentence "with great thought and pause and having reconsidered it several times."  (GA 90.)

Judge Bianco noted that the offenses of conviction "showed the defendant to be a compelling danger to the community, especially to children." (Id.)  He remarked that "the level of danger is only further confirmed by" Valerio's history and characteristics.  (GA 91.)  Specifically, Valerio's "history and characteristics show that he is not only a danger to children, but he's a danger to women as well."  (GA 92.)

Judge Bianco found that the evidence of Valerio's "extreme dangerousness was further corroborated at the Fatico hearing."  (Id.)  He found the women who testified "completely credible," commenting, "I listened to them testify.  I could hear it in their voice.  I could see it in their eyes.  There was no question that those events happened as they articulated."  (Id.)  In concluding his analysis of the offense conduct and Valerio's history and characteristics, Judge Bianco remarked:

> So the counts of conviction and this history of violence show him to be,
> which is clear to me he is an extremely dangerous individual, that this court
> needs to protect society from for the rest of his life.  I don't believe there
> are any limits on what he would do to satisfy his sexual desires to women
> or to children.  So society needs to be protected.  I don't believe his level of
> dangerousness will diminish over time.  I think his risk of recidivism is
> extremely high.
>
> * * * *
>
> All that led me to conclude that 60 years imprisonment, which is effectively
> a life sentence is warranted, sufficient and no greater than is necessary to
> reflect all of the factors.

(GA 93–94.)

Judge Bianco then reviewed Valerio's mitigation arguments.  He acknowledged that the defense had made "significant submissions," which he had considered, but that he did not "believe that a sentence less than the one [he was] imposing would properly balance all the factors."  (GA 94.)   Finally, Judge Bianco acknowledged that he was "sensitive to" the defense argument that "sentences of life or the equivalent of life are usually reserved for murder."  (GA 98.)  Yet Judge Bianco explained:

19

> I have never sentenced anyone to this amount of time that did not involve a murder, but I believe this is the extraordinary case, given the combination of factors and all the evidence before me, that an effective sentence of life is necessary to, among other things, protect the public from the dangerousness that I believe the defendant poses to the community, notwithstanding his words today.

(GA 98–99.)

Following imposition of the sentence, Judge Bianco affirmed that—if there were any issue with Counts Four, Five or Fifteen—he would have considered consecutive sentences as to the counts involving both victims to accomplish the same 60-year sentence. (GA 105.) Judge Bianco specifically addressed this stating:

> . . . I know the guidelines is [260] years,[8] the advisory range, but my sentence is not driven by the guidelines in this case. Regardless of what the guidelines were, that number is not influencing me.
>
> It's based upon what I have seen in this case and reviewed during the trial, during the hearings.  So this is not a case—I know there are Second Circuit cases that talk about the guidelines sometimes for child pornography can be too severe for certain situations. I don't believe that this is a case where this guideline number is driving the sentence.
>
> But, yes, the answer to your question is yes, the sentence would be the same even in the absence of those counts.

(GA 105–06.)

### 6.    The Written Judgment & Statement of Reasons

The SOR accompanying Judge Bianco's written judgment adopted the Guidelines calculation agreed to by the parties at sentencing, finding an advisory Guidelines sentence of 3,120 months (260 years).  (SOR 1.)  In the SOR, Judge Bianco noted the 60-year sentence was a below-Guidelines sentence and provided the following rider regarding his reasons for the sentence:

> Based upon the defendant's conduct in this case, and his history and characteristics, the Court does not believe that the defendant's

---

[8]      The sentencing transcript incorrectly reads "216," rather than "260," as was discussed at the outset of the sentencing proceeding.

> dangerousness will dissipate over time and concludes that an effective life sentence (of 60 years) is necessary to protect the public from the defendant. The Court concludes, for reasons set forth in detail on the record, that the defendant's risk of recidivism is extremely high.  Given the nature of his conduct and the harm that the defendant has caused by his conduct in this case, this sentence is also necessary to reflect the seriousness of the offense, to promote respect for the law, and to provide a just punishment for the offense.

(SOR 3, 5.)  Judge Bianco ultimately indicated that the sentence was intended to be an effective life sentence given the "extremely serious nature of the offenses" and "extreme level of danger" posed by Valerio's history and characteristics.  (SOR 5.)

## C.    Direct Appeal to the Second Circuit

Valerio appealed Judge Bianco's judgment sentencing him to 60 years' imprisonment on ten counts of conviction relating to the sexual exploitation of two minor children and the transportation, receipt, and possession of child pornography.  Valerio challenged the denial of his motion to suppress inculpatory statements made during the execution of a search warrant at his home, raised procedural and substantive reasonableness challenges to his de facto life sentence, and contended that several of his convictions violated the constitutional prohibition against double jeopardy.  See United States v. Valerio, 765 F. App'x 562, 564 (2d Cir. 2019).

On March 22, 2019, the Second Circuit affirmed Judge Bianco's judgment.  The Second Circuit held, among other things, that Judge Bianco properly (1) denied suppression; (2) relied on testimony of Valerio's uncharged conduct related to his pattern of deceptive and violent conduct towards adult women, including violent rapes, to sentence him; and (3) imposed a 60-year sentence, which was procedurally and substantively reasonable.  See Valerio, 765 F. App'x at 564. Relevant to this motion, the Second Circuit also upheld Judge Bianco's sua sponte decision to hear from Kalichenko at the Fatico hearing.  See id. at 566–67.

21

## II.     DISCUSSION

At all stages relevant to his petition, Valerio was represented by Anthony LaPinta and Leonard Lato ("trial counsel").  Valerio raises eighteen grounds for relief, arguing that he was denied his right to effective assistance of his trial counsel pre-trial, during trial, and post-trial.

Pre-trial, Valerio argues that:

- (1)  Trial counsel was constitutionally ineffective in failing to obtain a signed, updated letter of engagement from Valerio after Leonard Lato was hired, Valerio Mem. at 28–30; and

- (2)  Trial counsel was constitutionally ineffective—in the aggregate—because they refused his requests (1) to hire a private investigator to investigate Kalichenko; and (2) to discover or subpoena several documents relating to Kalichenko, id. at 32–34.

During trial, Valerio argues that:

- (3)  Trial counsel was constitutionally ineffective when they failed to adequately cross-examine various witnesses as part of his defense, Valerio Mem. at 35–39;

- (4)  Trial counsel was constitutionally ineffective when they obtained, and then called to testify at trial, an unqualified and incredible digital forensics expert witness, id. at 34–35, 40–44; and

- (5)  Trial counsel was constitutionally ineffective when they failed to object to the verdict and request express jury findings to preserve a double jeopardy objection, id. at 44.

Post-trial, Valerio argues that:

- (6)  Trial counsel was constitutionally ineffective when they failed to object to the PSR Addendum and the need for a Fatico hearing, Valerio Mem. at 45;

- (7)  Trial counsel was constitutionally ineffective when they failed to object to the allegations made by A.D. and Down on the grounds that they did not constitute relevant conduct, id. at 46–48;

- (8)  Trial counsel was constitutionally ineffective when they failed to object to Judge Bianco's sua sponte invitation to Kalichenko to testify at the Fatico hearing, id. at 47, 53.

22

- (9)  Trial counsel was constitutionally ineffective when they failed to object to the government's exhibits at the <u>Fatico</u> hearing, <u>id.</u> at 23, 54;

- (10)  Trial counsel was constitutionally ineffective at the <u>Fatico</u> hearing when they failed to use exhibits that were either in their possession or somehow attainable, <u>id.</u> at 49;

- (11)  Trial counsel was constitutionally ineffective at the <u>Fatico</u> hearing because their examination of the witnesses fell below the standard of competence afforded to cross-examination, <u>id.</u> at 45, 56;

- (12)  Trial counsel was constitutionally ineffective because no defense witnesses were called to testify during the <u>Fatico</u> hearing, despite Valerio's request for his mother to testify, <u>id.</u> at 56;

- (13)  Trial counsel was constitutionally ineffective when they failed to refer to the link between his thyroid cancer and his psychiatric functions in their sentencing submissions, <u>id.</u> at 63;

- (14)  Trial counsel was constitutionally ineffective when they failed to obtain his medical records before sentencing, despite his repeated requests, <u>id.</u> at 62–63;

- (15)  Trial counsel was constitutionally ineffective when they failed to investigate relevant mitigating evidence that was reasonably available to them, <u>id.</u> at 64;

- (16)  Trial counsel was constitutionally ineffective in preparing for sentencing because: (i) their arguments addressed in Valerio's first sentencing submission were "neither persuasive nor effective;" (ii) their supplemental sentencing submission failed to address Judge Bianco's decision about the <u>Fatico</u> hearing; and (iii) their supplemental sentencing submission made no additional arguments in support of their initial sentencing submission, <u>id.</u> at 66–72;

- (17)  Trial counsel was constitutionally ineffective because they failed to advocate for him competently at sentencing, <u>id.</u> at 73–74; and

- (18)  Trial counsel was constitutionally ineffective when they failed to inform the Court about the "complete breakdown" in the attorney-client relationship, <u>id.</u> at 57–61.

The Court begins with a brief discussion of relevant legal principles before addressing each of Valerio's claims in turn.

23

A.   **Applicable Legal Principles**

1.   **Considerations for § 2255 Motions**

A petitioner may collaterally attack his conviction and sentence by "mov[ing] the court which imposed the sentence to vacate, set aside or correct the sentence." 28 U.S.C. § 2255(a). Relief under Section 2255 is generally available "only for a constitutional error, a lack of jurisdiction in the sentencing court, or an error of law or fact that constitutes a fundamental defect which inherently results in a complete miscarriage of justice." United States v. Bokun, 73 F.3d 8, 12 (2d Cir. 1995) (internal quotation marks omitted). "Because collateral challenges are in tension with society's strong interest in the finality of criminal convictions, the courts have established rules that make it more difficult for a defendant to upset a conviction by collateral, as opposed to direct, attack." Yick Man Mui v. United States, 614 F.3d 50, 53 (2d Cir. 2010) (internal quotation marks omitted).

One such rule is the "mandate rule," which prevents a petitioner from collaterally attacking his sentence when he has already tried and failed to attack it on the same grounds on direct appeal. See Yick Man Mui, 614 F.3d at 53; United States v. Sanin, 252 F.3d 79, 83 (2d Cir. 2001) (per curiam). "The mandate rule prevents re-litigation in the district court not only of matters expressly decided by the appellate court, but also precludes re-litigation of issues impliedly resolved by the appellate court's mandate." Id. In other words, "a Section 2255 petitioner may not relitigate questions which were raised and considered on direct appeal." Id. at 55 (internal quotation marks omitted). The mandate rule thus "bars the raising in a habeas proceeding of a claim when the events underlying the claim were the same as those underlying a claim raised and decided on the merits on direct appeal." Id. at 56. A habeas petitioner may not avoid this bar merely by offering "a slightly altered rearticulation of a claim that was rejected on his direct appeal." United States v. Pitcher, 559 F.3d 120, 124 (2d Cir. 2009) (per curiam) (internal quotation marks omitted).

Separately, if a habeas petitioner could have brought a claim on direct appeal, but failed to do so, the claim is barred as procedurally defaulted.  See, e.g., United States v. Thorn, 659 F.3d 227, 231 (2d Cir. 2011).  There are limited exceptions to this "procedural default" rule.  The petitioner may premise a collateral attack on an argument he failed to raise on appeal if he "establishes (1) cause for the procedural default and ensuing prejudice or (2) actual innocence." Id. at 231; see also Bousley v. United States, 523 U.S. 614, 622 (1998).  One such form of "cause" that can overcome a procedural bar is constitutionally ineffective assistance of counsel.  See Yick Man Mui, 614 F.3d at 55 (citing Massaro v. United States, 538 U.S. 500, 508–09 (2003)).  So a petitioner may—as here—raise a claim of ineffective assistance of counsel for the first time in a § 2255 petition.  See Massaro, 538 U.S. at 504.

## 2.    Ineffective Assistance of Counsel

The Sixth Amendment to the United States Constitution guarantees a criminal defendant's right to the assistance of counsel, see U.S. CONST. amend. VI, which the Supreme Court has held encompasses the right to effective assistance of counsel, see generally Strickland v. Washington, 466 U.S. 668 (1984).  When challenging the effectiveness of counsel's assistance, a petitioner must show that (1) counsel's representation "fell below an objective standard of reasonableness" measured against "prevailing professional norms," and (2) this "deficient performance prejudiced the defense" in the sense that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  Strickland v. Washington, 466 U.S. 668, 687–88, 694 (1984).  A court must reject a petitioner's ineffective assistance of counsel claim if it fails to meet either prong.  See Gonzalez v. United States, 722 F.3d 118, 130 (2d Cir. 2013) (citing Strickland, 466 U.S. at 697).

As for Strickland's performance component, "judicial scrutiny of counsel's performance must be highly deferential."  Strickland, 466 U.S. at 689.  To meet the high bar for proving deficient

25

performance, a habeas petitioner must show "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." Id.  This Court applies a "'strong presumption' that counsel's conduct falls within the wide range of reasonable professional assistance because it is all too easy to conclude that a particular act or omission of counsel was unreasonable in the harsh light of hindsight." Bell v. Cone, 535 U.S. 685, 702 (2002) (quoting Strickland, 466 U.S. at 689).  For example, "[a]ctions and/or omissions taken by counsel for strategic purposes generally do not constitute ineffective assistance of counsel." Gibbons v. Savage, 555 F.3d 112, 122 (2d Cir. 2009) (citing Strickland, 466 U.S. at 690–91).  And "in case after case, [Second Circuit courts] have declined to deem counsel ineffective notwithstanding a course of action (or inaction) that seems risky, unorthodox or downright ill-advised." Tippins v. Walker, 77 F.3d 682, 686 (2d Cir. 1996).

Constitutionally inadequate performance may, however, be established if a habeas petitioner "shows that counsel omitted significant and obvious issues while pursuing issues that were clearly and significantly weaker." Clark v. Stinson, 214 F.3d 315, 322 (2d Cir. 2000).  But nonetheless, "[t]he failure to include a meritless argument does not fall outside the wide range of professionally competent assistance to which [a] [p]etitioner [i]s entitled." Aparicio v. Artuz, 269 F.3d 78, 99 (2d Cir. 2001) (internal quotation marks and citations omitted).  Simple disagreement with counsel's trial strategy is not enough on its own to support an ineffective assistance of counsel claim. See United States v. Sanchez, 790 F.2d 245, 253 (2d Cir. 1986) ("A defendant ... may not claim ineffective assistance of counsel merely because ... he thinks counsel's trial strategy was inadequate.").

As for Strickland's prejudice component, an "error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." Henry v. Poole, 409 F.3d 48, 63 (2d Cir. 2005) (quoting Strickland,

466 U.S. at 691).  Rather, a petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694.  While this prejudice component "does not require a showing that counsel's actions more likely than not altered the outcome," it does require a petitioner to show that "[t]he likelihood of a different result [was] substantial, not just conceivable."  Harrington v. Richter, 562 U.S. 86, 111–12 (2011) (internal quotation marks omitted); see also Garner v. Lee, 908 F.3d 845, 849, 862 (2d Cir. 2018); Waiters v. Lee, 857 F.3d 466, 469 (2d Cir. 2017); United States v. McCormick, 727 F. App'x 729, 731 (2d Cir. 2018); Perlaj v. United States, 2020 WL 3884443, at *4 (S.D.N.Y. Jul. 9, 2020) (Sullivan, J.).  In assessing prejudice, this Court reviews the record to determine the impact of the alleged ineffectiveness within the context of the entire case.  See Berghuis v. Thompkins, 560 U.S. 370, 389 (2010) ("In assessing prejudice, courts 'must consider the totality of the evidence before the judge or jury.'") (quoting Strickland, 466 U.S. at 695).

Moreover, "[t]he prejudice inquiry is ... ineluctably tied to the strength of the prosecution's evidence."  Garner, 908 F.3d at 862.  "[A] verdict or conclusion with ample record support is less likely to have been affected by the errors of counsel than 'a verdict or conclusion only weakly supported by the record.'"  Id. (quoting Waiters, 857 at 480). "As a result, '[e]ven serious errors by counsel do not warrant granting habeas relief where the conviction is supported by overwhelming evidence of guilt.'"  Id. (quoting Lindstadt v. Keane, 239 F.3d 191, 204 (2d Cir. 2001)).  Ultimately, "the Constitution does not entitle a petitioner to perfect representation." Terry v. Collado, 2023 WL 4086345, at *3 (E.D.N.Y. June 20, 2023) (citing United States v. Lane, 474 U.S. 438, 445 (1986) ("[T]aking into account the reality of the human fallibility of the participants, there can be no such thing as an error-free, perfect trial, and ... the Constitution does not guarantee such a trial." (citation omitted))).

B.   **Application to Valerio's Claims**

Valerio argues that his trial counsel was constitutionally ineffective by failing to make reasoned and informed decisions about his defense pre-trial, during trial, and post-trial.[9]  (Valerio Mem. at 77.)  The Court disagrees.  All of Valerio's claims either fail the Strickland test or are foreclosed by the mandate rule.  Accordingly, for the below reasons, the Court denies Valerio's motion to vacate under 28 U.S.C. § 2255, without need for a hearing.

1.   **No Evidentiary Hearing**

To begin, the Court must first decide whether it can decide Valerio's petition based on the submitted record, or whether the Court must conduct an evidentiary hearing first.  "In ruling on a motion under § 2255, the district court is required to hold a hearing '[u]nless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief.'"  Gonzalez, 722 F.3d at 130 (quoting 28 U.S.C. § 2255).  But "the filing of a motion pursuant to § 2255 does not automatically entitle the movant to a hearing; that section does not imply that there must be a hearing where the allegations are 'vague, conclusory, or palpably incredible.'"  Id. at 130–31 (quoting Machibroda v. United States, 368 U.S. 487, 495 (1962)).  A hearing is necessary only where the petition "set[s] forth specific facts supported by competent evidence, raising detailed and controverted issues of fact that, if proved at a hearing, would entitle [the movant] to relief." Id. at 131.

Even if a hearing is warranted, "[i]t is within the district court's discretion to determine the scope and nature of a hearing."  Raysor v. United States, 647 F.3d 491, 494 (2d Cir. 2011) (citing Chang v. United States, 250 F.3d 79, 85–86 (2d Cir. 2001)).  Courts need not hold a full testimonial hearing where "the testimony of [petitioner] and his trial counsel would add little or nothing to the

---

[9]      Valerio petitions this Court to vacate his conviction and order a new trial, or in the alternative, vacate his judgment and order resentencing.  (Valerio Mem. at 78.)  Neither a new trial nor resentencing is warranted here.  In any event, only two classes of Valerio's claims—if found to have merit—would warrant a new trial: that his attorneys were ineffective in preparing for trial, and that his attorneys were ineffective during trial.

written submissions." <u>Chang</u>, 250 F.3d at 86.  Courts often "consider the 'trial record, letters, documents, exhibits, affidavits and written interrogatories' and may adopt a 'middle road' approach, declining to hold a hearing and 'deciding disputed facts on the basis of written submissions.'" <u>Rosario v. United States</u>, 2019 WL 5260784, at *3 (S.D.N.Y. Oct. 17, 2019) (quoting <u>Pham v. United States</u>, 317 F.3d 178, 184 (2d Cir. 2003)).

Neither party addresses this threshold question.  In this Court's view, the submitted record—including the trial transcript, the <u>Fatico</u> transcripts, the sentencing transcript, as well as the declarations and exhibits attached thereto—is sufficient for the Court to decide the issues raised in Valerio's petition.  As a result, the Court finds that a testimonial evidentiary hearing would add "little or nothing" to the Court's adjudication of Valerio's habeas claims.

For the first time in reply to his habeas petition, however, Valerio argues the Court should conduct an evidentiary hearing on an issue related to sentencing: whether there is a theory of causation between Valerio's thyroid removal and his mood/behavior.  (Valerio Rep. at 3, 18–19.)

To begin with, Valerio did not make this argument in his opening memorandum in support of his petition.  Generally, courts do not consider arguments raised for the first time in a reply brief, and this rule applies in the context of habeas petitions.  <u>See</u> <u>Tardif v. City of N.Y.</u>, 991 F.3d 394, 404 n.7 (2d Cir. 2021) ("[I]ssues raised for the first time in a reply brief are generally deemed waived."); <u>see also</u> <u>Lallave v. Martinez</u>, 609 F. Supp. 3d 164, 182 (E.D.N.Y. 2022) (declining to consider claims raised for the first time in reply to a habeas petition); <u>Roberts v. United States</u>, 2018 WL 1582288, at *2 (E.D.N.Y. Mar. 30, 2018) (same); <u>Melo v. United States</u>, 825 F. Supp. 2d 457, 464 (S.D.N.Y. 2011) (same).  Such a rule is meant to "deter[ ] the practice of raising new arguments on reply that the opposing party is unable to respond to."  <u>Royal Park Investments SA/NV v. U.S. Bank Nat'l Ass'n</u>, 324 F. Supp. 3d 387, 395 (S.D.N.Y. 2018).  Thus, the Court deems Valerio's request for an evidentiary hearing to be waived.

Regardless, to the extent Valerio argues that he is entitled to his requested evidentiary hearing, the Court finds that argument unpersuasive.  As discussed below, there are no disputed material facts surrounding sentencing that need to be resolved to determine that Valerio is not entitled to habeas relief.  See Santone v. Fischer, 689 F.3d 138, 155–56 (2d Cir. 2012).  Put differently, "even with the benefit of an evidentiary hearing, [Valerio] could not develop a factual record that would entitle him to habeas relief."  Schriro v. Landrigan, 550 U.S. 465, 475 (2007).  Accordingly, the Court need not grant Valerio's request for an evidentiary hearing because it is not necessary to resolve the petition.

### 2.  Pre-Trial Grounds for Relief

Citing two grounds for relief, Valerio argues he was denied his Sixth Amendment right to effective assistance of counsel pre-trial.  (Valerio Mem. at 28–35.)  The Court disagrees.

### a)  *Ground 1*

Valerio first argues that Anthony LaPinta ("LaPinta") was constitutionally ineffective when he hired Leonard Lato ("Lato") in March 2014 without obtaining a signed, updated letter of engagement.  (Valerio Mem. at 28–30.)  The Court disagrees and finds that Valerio has failed to meet either component of the Strickland test with respect to this argument.

To begin with, Valerio fails to articulate how LaPinta's conduct "fell below an objective standard of reasonableness."  Strickland, 466 U.S. at 688.  Valerio does not cite—and this Court cannot locate—any legal authority supporting his argument that failure to obtain a signed and updated retainer agreement rises to the level of constitutional ineffective assistance of counsel.  (Valerio Mem. at 28–30.)  In any event, Valerio does not show that LaPinta deciding to bring on Lato as co-counsel was anything but a trial strategy choice, which the Court will not second-guess.  See Mayo v. Henderson, 13 F.3d 528, 533 (2d Cir. 1994) (holding that a court "must judge [counsel's] conduct on the basis of the facts of the particular case, 'viewed as of the time of

counsel's conduct,' and may not use hindsight to second-guess his strategy choices") (quoting Strickland, 466 U.S. at 690).  So Valerio has not rebutted the strong presumption that LaPinta's actions were reasonable strategic decisions to prepare for trial.

Even if LaPinta's actions were somehow unreasonable, which they were not, Valerio fails to show prejudice.  Valerio's petition does show any probability, let alone a "reasonable probability," that obtaining a signed, updated retainer agreement after hiring Lato would have affected the outcome of the case.  Strickland, 466 U.S. at 694.  That dooms his claim, as there is no basis to conclude that Valerio has established a "substantial" likelihood of a different result. Garner, 908 F.3d at 871 (quoting Harrington, 562 U.S. at 112).

b)    *Ground 2*

Valerio next argues that his trial counsel was constitutionally ineffective—in the aggregate—because they refused his requests (1) to hire a private investigator to investigate Kalichenko and (2) to discover or subpoena several documents relating to Kalichenko.  (Valerio Mem. at 32–34.)  Even assuming Valerio made such requests, and his trial counsel ignored them, Valerio makes no showing that the outcome at trial and sentencing would have been different had counsel obtained the materials.  Accordingly, the Court finds that Valerio fails to satisfy the Strickland test with respect to these arguments.

i.    Request to Hire a Private Investigator

First, Valerio argues the "most perplexing failure" by his counsel pre-trial was their refusal to hire a private investigator to investigate Kalichenko.  (Valerio Mem. at 33.)  This claim fails the Strickland test.  Valerio's claim that trial counsel acted unreasonably in this regard is an example of a Strickland claim more readily resolved on its prejudice component.

Valerio alleges he requested that his trial counsel hire a private investigator to investigate Kalichenko and that they failed to do so.  (Id. at 11.)  Rather than assess the relative credibility of

Valerio's allegation, the Court will simply assume, "without deciding and without casting any aspersions on [his trial counsel]," see United States v. Gali, 2023 WL 8886606, at *6 (E.D.N.Y. Dec. 26, 2023), that Valerio's account of the facts is correct and that his trial counsel refused his request to hire a private investigator, see Garner, 908 F.3d at 861 (assuming "without deciding ... that there was no strategic rationale" for defense counsel's conduct and proceeding to consider whether prejudice resulted from the alleged mistake).[10]

Even making that assumption, Valerio cannot show prejudice.  The government set forth overwhelming evidence of Valerio's guilt at trial, which bars Valerio from meeting the second component of the Strickland test here.  The evidence consisted of, among other things, pictures and videos of child pornography recovered from Valerio's possession, text messages and emails where Valerio scripted and demanded child pornography, and costumes recovered from Valerio's

---

[10]     It bears mentioning that while of course "counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary," counsel need not "investigate comprehensively every lead or possible defense." Yannai v. United States, 346 F. Supp. 3d 336, 347 (E.D.N.Y 2018) (citing Strickland, 466 U.S. at 691).  A reasonable decision to forego investigation may be based on, for example, "a reasoned judgment that such investigation would be fruitless, wasteful, or even counterproductive." Espinal v. Bennett, 588 F. Supp. 2d 388, 399 (E.D.N.Y. 2008), aff'd, 342 F. App'x 711 (2d Cir. 2009) (citation omitted).  Specifically, reasonable decisions not to pursue an avenue of investigation encompass cases "where counsel ... cease[d] further investigation as a result of having discovered ... evidence ... to suggest that challenging the prosecution's ... evidence would have been counterproductive, or that further investigation would have been fruitless," or where counsel has "good reason to think further investigation would be a waste." Gersten v. Senkowski, 426 F.3d 588, 610 (2d Cir. 2005) (internal citations and quotation marks omitted).  Relevant here, the duty to reasonably investigate does not "compel counsel … to scour the globe on the off-chance something will turn up." Greiner v. Wells, 417 F.3d 305, 321 (2d Cir. 2005) (internal citations and quotation marks omitted)).  Thus, "[p]ost-hoc complaints about the strategy or tactics employed by trial counsel, or complaints that trial counsel did not conduct a sufficiently vigorous pretrial investigation, are typically found to be insufficient to satisfy Strickland." LaMarco v. United States, 336 F. Supp. 3d 152, 168 (E.D.N.Y. 2018).  Moreover, "a court reviewing a claim for ineffective assistance of counsel is not permitted to 'use hindsight to second guess [counsel's] strategy choices.'" Baran v. United States, 160 F. Supp. 3d 591, 596 (S.D.N.Y. 2016) (quoting Mayo, 13 F.3d at 533).

    One can argue that Valerio's attacks on his counsel's representation amount to complaints of his counsel's pre-trial investigation and strategy.  Indeed, Valerio speculates that hiring a private investigator may have uncovered information to support his defense theory, but trial counsel may have had good reason to think such investigation would be either a "waste," "fruitless," or "counterproductive" considering their preparation for trial. Gersten, 426 F.3d at 610 (citations and quotation marks omitted).  The Court need not resolve this issue, however, because Valerio cannot show prejudice.

house.  Thus, the record "well-supported the jury's verdict."  <u>Burke v. United States</u>, 2022 WL 175488, at *1 (2d Cir. Jan. 20, 2022).

In any event, Valerio has not demonstrated a "reasonable probability" that hiring a private investigator—assuming trial counsel refused his request to hire one—would have exculpated or helped his case to the point of causing a different result.  <u>Strickland</u>, 466 U.S. at 694.  Valerio broadly contends that a private investigator "would <u>likely</u> have produced information relevant to the defense theory that [Kalichenko] had created videos in advance of meeting Mr. Valerio and not at his request." (Valerio Mem. at 33 (emphasis added)).  But there are two problems with this argument.

First, "likely" is not the standard.  Where, as here, "allegations of ineffective assistance are conclusory and give no indication as to what exculpatory evidence may have been revealed by an investigation, a Sixth Amendment ineffective assistance claim based on failure to investigate is doomed."  <u>Petrucelli v. United States</u>, 2009 WL 4858081, at *10 (S.D.N.Y. Dec. 15, 2009).  Valerio, therefore, must do more than make vague, conclusory, or speculative claims about what evidence could have been produced by further investigation.  <u>See</u> <u>Polanco v. United States</u>, 2000 WL 1072303, at *10 (S.D.N.Y. Aug. 3, 2000) ("Such undetailed and unsubstantiated assertions that counsel failed to conduct a proper investigation have consistently been held insufficient to satisfy either <u>Strickland</u> prong.") (collecting cases).

Second, and more importantly, Valerio articulates no argument his trial counsel could have made with such "relevant information" that would have caused the jury to look past (1) the several text messages and emails where Valerio scripted and demanded child pornography of Jane Doe #1 from Kalichenko; and (2) the fact that Kalichenko was not in the United States when the photographs of Jane Doe #2 were taken.  Fatal to his claim, there is no basis to conclude that

Valerio has established a "substantial" likelihood of a different result, even if his counsel hired a private investigator before trial.  Garner, 908 F.3d at 871 (quoting Harrington, 562 U.S. at 112).

Trying another tack, Valerio argues that the decision not to investigate Kalichenko "limited the tools [his attorneys] had at their disposal during the cross-examination of law enforcement witnesses or Ms. Kalichenko." (Valerio Mem. at 33.)  But Kalichenko did not testify at trial, and there is no reason to believe she would have testified had she been investigated.  Nor does Valerio identify any useful information about Kalichenko that would have provided fodder for cross-examination of law enforcement witnesses.

ii.     Request for Documents

Next, Valerio claims that his trial counsel failed to request discovery or subpoena several documents relating to Kalichenko.  (Valerio Mem. at 33.)  Even assuming Valerio made such requests, and his trial counsel ignored them, these habeas claims too are unavailing because they fail the Strickland test.

**Flight Records**: First, Valerio attacks his counsel's alleged failure to obtain Kalichenko's flight data records from 2009 to 2011.  (Id. at 10.)  Valerio suggests that this data would have shown Kalichenko's travel in the United States before meeting him and therefore would support a defense theory that she was producing child pornography for other individuals.  (Id.)

Valerio's claim that his trial counsel acted unreasonably is another example of a Strickland claim more readily resolved on the prejudice component.  As mentioned, Valerio alleges he requested that his trial counsel obtain the flight data records and that they failed to do so.  (Id. at 10–11.)  Rather than assess the relative credibility of Valerio's allegation, the Court will simply assume, "without deciding and without casting any aspersions on [his trial counsel]," see Gali, 2023 WL 8886606, at *6, that Valerio's account of the facts is correct and that his trial counsel refused his request to obtain the flight data records from 2009 to 2011, see Garner, 908 F.3d at 861

34

(assuming "without deciding ... that there was no strategic rationale" for defense counsel's conduct and proceeding to consider whether prejudice resulted from the alleged mistake).[11]

Even if the Court assumed trial counsel failed to obtain the flight data records, Valerio cannot demonstrate prejudice.  As described above, the government set forth an overwhelming amount of evidence of Valerio's guilt at trial, which bars him from meeting the second component of the Strickland test here too.  And Valerio has not demonstrated a "reasonable probability" that the flight data records he requested—assuming Valerio's speculation about them is even correct— would have exculpated or helped his case to the point of causing a different result.  Strickland, 466 U.S. at 694.  Again, Valerio articulates no argument his trial counsel could have made—with more complete flight data records—that would have caused the jury to ignore (1) the text messages and emails where Valerio scripted and demanded child pornography of Jane Doe #1 from Kalichenko; and (2) the fact that Kalichenko was not in the United States when the photographs of Jane Doe

---

[11]    The Court is mindful that one can argue Valerio's Strickland performance claim is largely belied by the record.  For example, Kalichenko's flight data from the Treasury Enforcement Communication System ("TECS")— which shows Kalichenko's arrival date and her flights into and out of the United States—was admitted at trial.  (Trial Tr. 379.)  So it may not follow that Valerio's trial counsel acted unreasonably by failing to obtain what was eventually admitted by the government.

To circumvent this, Valerio argues (for the first time in reply to his petition) that his trial counsel acted unreasonably because "it is unknown whether the records admitted at trial were the complete records of Kalichenko's flight data from 2009 to 2011."  (Valerio Rep. at 5.)  In support, Valerio cites (1) the government's concession in its opposition that a flight record was missing from its exhibit during witness Deep Chopra's testimony; and (2) Kalichenko's fall of 2011 round-trip flight from New York to Seattle—referenced during her testimony at the Fatico hearing—that was also not admitted at trial.  (Id.)  From this, Valerio infers "there were other flights taken by [] Kalichenko not obtained by the Government, not produced as discovery[,] and not admitted at trial;" thus, his trial counsel acted unreasonably by failing to investigate further and obtain all relevant data.  (Id.)  One may view Valerio's argument as unpersuasive for two reasons.  To begin with, he waived this argument by raising it for the first time in reply to his habeas petition.  See Lallave, 609 F. Supp. 3d at 182; see also Tardif, 991 F.3d at 404 n.7.  But in any event, Valerio's argument fails to show what non-speculative exculpatory evidence would have been uncovered that would have supported his defense theory that Kalichenko was producing child pornography for others.  Petitioners like Valerio "must do more than make vague, conclusory, or speculative claims as to what evidence could have been produced by further investigation" to successfully assert an ineffective assistance of counsel claim based on a failure to investigate.  United States v. Peterson, 896 F. Supp. 305, 316 (S.D.N.Y. 2012) (Chin, J.); see also Blackledge v. Allison, 431 U.S. 63, 74 (1977) (holding that "[t]he subsequent presentation of conclusory allegations unsupported by specifics is subject to summary dismissal").  And although one might conclude that Valerio does not do so here, the Court need not resolve the issue because Valerio cannot demonstrate prejudice.

#2 were taken.[12]  Fatal to Valerio's claim, there is no basis here to conclude that he has established a "substantial" likelihood of a different result.  Garner, 908 F.3d at 871 (quoting Harrington, 562 U.S. at 112).

*Other Records*: Second, Valerio attacks his counsel's failure (1) to obtain business records from UkrainianDate.com to show chats between Kalichenko and Valerio; (2) to obtain VIBER records of text messages between Kalichenko and Valerio; (3) to obtain Kalichenko's Facebook

---

[12]     Comparing Kalichenko's flight record timeline and the offense conduct timeline bears out this conclusion:

- February 23, 2010:  Kalichenko arrived in the United States for the first time.  (Trial Tr. 383.)

- March 14, 2010: Kalichenko departed the United States.  (Id.)

- September 2010 & January 2011:  As explained in more detail below, while Kalichenko was outside of the United States, the images of Jane Doe #2 (Valerio's niece) were created twice.  (Id.)  At this point, Kalichenko and Valerio had not even begun to correspond via the "UkrainianDate.com" website (summer of 2011).  (GX 562; PSR ¶¶ 20, 28.)  Thus, the child pornography images of Jane Doe #2 were created before Valerio even met Kalichenko.

- June 4, 2011:  Kalichenko again arrives in the United States.  (Trial Tr. 384.)

- July 7, 2011: Kalichenko subsequently departed the United States.  (Id.)

- August 15, 2011 & September 2, 2011:  Kalichenko again arrived in the United States on August 15, 2011, as well as on September 2, 2011.  There was, however, no departure from the United States recorded between August and September 2011.  Although witness Deep Chopra testified that a flight record was not recorded by the system if it was not in one of the records exhibited, it is apparent that Kalichenko did depart the United States during this period because she re-entered the country on September 2, 2011. (Id. at 385– 86.)  (Id. at 379, 385.)

- October 26, 2011:  Kalichenko departed the United States.

- April 1, 2012—November 1, 2012:  As to Jane Doe #1 (Kalichenko's daughter), the indictment charges Valerio with conspiracy to produce and transport visual depictions of child pornography between April and November 2012.  Clear from the images and videos, Jane Doe #1 was at least one year old at the time the images and videos were created.  Jane Doe #1 was not born until October 19, 2010.  As such, Kalichenko could not have produced the child pornography with Jane Doe #1 before the end of 2011, at the earliest.

- July 11, 2014:  After almost three years, Kalichenko returned to the United States, after which she was arrested and charges under the sexual exploitation statutes.  (Trial Tr. 379, 389.)

records; and (4) to obtain Kalichenko's email address records for kalichenkoes@mail.ru and brighthelena68@gmail.com. (Valerio Mem. at 10–11.) Valerio contends these records would have impeached Kalichenko, showed her motive to extort him, and supported his defense that Kalichenko was producing child pornography for other individuals in the United States. (Id.)

This too is another example of a Strickland claim more readily resolved based on the prejudice component. As mentioned, Valerio alleges he requested that his trial counsel obtain these records and that they failed to do so. (Id.) Rather than assess the relative credibility of Valerio's allegation, the Court will simply assume, "without deciding and without casting any aspersions on [his trial counsel]," see Gali, 2023 WL 8886606, at *6, that Valerio's account of the facts is correct and that his trial counsel refused his request to subpoena the records, see Garner, 908 F.3d at 861 (assuming "without deciding ... that there was no strategic rationale" for defense counsel's conduct and proceeding to consider whether prejudice resulted from the alleged mistake).[13]

Even assuming trial counsel failed to investigate these other records, Valerio cannot demonstrate prejudice. As mentioned above, the government set forth an overwhelming amount of evidence of Valerio's guilt at trial, which bars Valerio from meeting the second component of the Strickland test here. And again, Valerio has not demonstrated a "reasonable probability" that the records he requested—assuming Valerio's speculation about what they could uncover is

---

[13]    That said, it bears mentioning Valerio fails to show that the records were obtainable, that they were favorable towards him, or even that any of these records existed at that time for his counsel to obtain. To this day, Valerio has not obtained any of these records, nor has he offered any evidence of what the records allegedly contained. He merely speculates that they would have impeached Kalichenko and showed her motive to extort him. Usually, a petitioner must do more to successfully assert an ineffective assistance of counsel claim based on a failure to investigate. See Peterson, 896 F. Supp. at 316 (S.D.N.Y. 2012); see also Blackledge, 431 U.S. at 74. Valerio further speculates that the records mentioned above would "likely have led to the identification of defense witnesses." (Valerio Mem. at 34.) Here too, Valerio fails to identify who these witnesses would have been, what testimony they would have offered, and how they would have been helpful to his defense. This speculation is usually not enough to show that his counsel acted unreasonably. See, e.g., Broxmeyer v. United States, 661 F. App'x 744, 748 (2d Cir. 2016) ("Here, Broxmeyer does not name any witnesses his attorney should have called or explain what testimony they might have offered. The closest he comes is asserting that counsel should have cross-examined A.W. about her visits to Broxmeyer in jail after his arrest, but Broxmeyer has not rebutted the presumption that this failure was a reasonable strategic decision"). But the Court need not resolve this issue either because, again, Valerio cannot demonstrate prejudice.

correct—would have exculpated or helped his case to the point of causing a different result.[14]

Strickland, 466 U.S. at 694.  For example, Valerio articulates no argument his trial counsel could have made—with the records in hand—that would have caused the jury to ignore (1) the several text messages and emails where Valerio scripted and demanded child pornography of Jane Doe #1 from Kalichenko; and (2) the fact that Kalichenko was not in the United States when the photographs of Jane Doe #2 were taken.  Fatal to Valerio's claim, there is no basis to conclude that he has established a "substantial" likelihood of a different result.  Garner, 908 F.3d at 871 (quoting Harrington, 562 U.S. at 112).

\*     \*     \*

Accordingly, the Court concludes that both of Valerio's pre-trial habeas claims fail the Strickland test.

### 3.      During Trial Grounds for Relief

Citing three grounds for relief, Valerio next argues he was denied his Sixth Amendment right to effective assistance of counsel during trial.  (Valerio Mem. at 35–44.)  The Court disagrees again.

### a)      *Ground 3*

Valerio's third ground for relief is that his trial counsel was constitutionally ineffective when they failed to adequately cross-examine various witnesses as part of his defense at trial.  (Id.

---

[14]      Confirming this point, VIBER messages between Valerio and Kalichenko were introduced at trial.  These messages showed that (1) Kalichenko indeed told Valerio he should have negotiated with her; that (2) Kalichenko sent the videos she made for Valerio (with Jane Doe # 1) to the FBI; and that (3) Kalichenko requested Valerio to "negotiate" again before she sent the rest of the videos to the authorities.  (Trial Tr. 811–13, 861–62; GX 555.)  The jury heard about these messages and was free to consider the messages as extortion—as trial counsel argued during closing.  (Id. at 996–999, 1005.)  Nevertheless, in the face of overwhelming evidence of Valerio's guilt, the jury returned a guilty verdict.  This, of course, makes sense.  Regardless of Kalichenko's actions in extorting Valerio after the criminal conduct occurred, Valerio had already conspired to script, produce, transport, and possess child pornography.

at 35–39.) The Court disagrees, finding that Valerio has failed to satisfy the <u>Strickland</u> test with respect to this argument.

**FBI Special Agents Peter Angelini and Steven Troyd**: Valerio argues his trial counsel— in two ways —failed to effectively cross-examine Special Agents Peter Angelini and Steven Troyd.

First, he argues his trial counsel failed to examine why Kalichenko was not investigated in Ukraine. (<u>Id.</u> at 35–36.) Valerio claims that if his trial counsel asked why certain investigative steps were not taken, exculpatory evidence would have been uncovered that would have supported his defense theory that Kalichenko was producing child pornography for others. (<u>Id.</u> at 37.) This argument easily fails to meet <u>Strickland</u>'s performance component.

The Court must accord "significant deference" to the decision of trial counsel as to "how to conduct cross examination." <u>Eze v. Senkowski</u>, 321 F.3d 110, 132 (2d Cir. 2003). Such decisions are quintessentially "strategic in nature and generally will not support an ineffective assistance claim." <u>Dunham v. Travis</u>, 313 F.3d 724, 732 (2d Cir. 2002) (cleaned up); <u>see</u> <u>also</u> <u>United States v. Luciano</u>, 158 F.3d 665, 660 (2d Cir. 1998) ("[T]he conduct of examination and cross-examination is entrusted to the judgment of the lawyer..."). Here, Valerio has not demonstrated that his trial counsel's performance in cross-examining the agents was in any way deficient. The trial proof establishes a benign explanation why certain investigative steps were not taken in Ukraine: Kalichenko herself was a subject of the investigation, and the agents did not want to alert her to it. (Trial Tr. 278–281, 403–405.) Moreover, Valerio's trial counsel <u>did</u> in fact establish during cross-examination that the agents did not take any steps to search Kalichenko's person, cell phone, or residence. (<u>Id.</u> at 275.) And when the government sought to establish that alerting Kalichenko might mean she would never be prosecuted because there was no extradition agreement with Ukraine, trial counsel even successfully objected and kept that fact from the jury. (<u>Id.</u> at 405.)

Second, Valerio argues the "existence of certain facts regarding Ms. Kalichenko" should have been pursued on cross-examination to impeach the agents or Kalichenko "if she testified at trial." (Valerio Mem. at 12.)  These "facts" included that Kalichenko had arrived in the United States 18 months before the date referenced by the government, that Kalichenko had been involved in a Ponzi scheme, and that Kalichenko had financial motives to report Valerio to law enforcement authorities.  (Id. at 12–13.)  But Valerio cites no evidence corroborating these "facts."

Given these uncorroborated allegations, Valerio's argument is another quintessential example of a habeas claim more readily resolved on Strickland's prejudice component.  Rather than assess the relative credibility of Valerio's "facts," the Court will simply assume, "without deciding and without casting any aspersions on [his trial counsel]," see Gali, 2023 WL 8886606, at *6, that Valerio's account of the facts is correct and that his trial counsel did not use them to impeach the agents at trial, see Garner, 908 F.3d at 861 (assuming "without deciding ... that there was no strategic rationale" for defense counsel's conduct and proceeding to consider whether prejudice resulted from the alleged mistake).

But even making that assumption, Valerio cannot show prejudice.  If Valerio's trial counsel had sought to question the agents about, for example, Kalichenko's involvement in an unrelated Ponzi scheme, the government would have successfully objected on hearsay, relevance, and unfair prejudice grounds.  And, as mentioned above, the government set forth an overwhelming amount of evidence of Valerio's guilt at trial.  Valerio does not demonstrate any probability, let alone a "reasonable probability," that impeaching the agents with these "facts" (assuming they could even be corroborated) would have exculpated or helped his case to the point of causing a different result.  Strickland, 466 U.S. at 694.  Here too, Valerio fails to articulate how any impeachment of the agents could have caused the jury to ignore (1) the several text messages and emails where Valerio scripted and demanded child pornography of Jane Doe #1 from Kalichenko; and (2) the fact that

40

Kalichenko was not in the United States when the photographs of Jane Doe #2 were taken.  That dooms his claim, as there is no basis to conclude that Valerio has established a "substantial" likelihood of a different result.  Garner, 908 F.3d at 871 (quoting Harrington, 562 U.S. at 112).

*Bernadette Imperiale*:  Valerio further argues that his trial counsel failed to effectively cross-examine his sister, Bernadette Imperiale. (Valerio Mem. at 37–38.)  Valerio asserts it is "incomprehensible" that Mr. Lato did not question Imperiale about the details of her meeting Kalichenko, considering his defense to sexually exploiting his niece was that Kalichenko had the opportunity and means to take the photos of his niece when she visited in July 2011.  (Id. at 38.)  The Court again finds that Valerio's argument fails to satisfy Strickland's performance component.

As mentioned, the Court must accord "significant deference" to the decision of trial counsel as to "how to conduct cross examination." Eze, 321 F.3d at 132.  Such decisions are quintessentially "strategic in nature and generally will not support an ineffective assistance claim." Dunham, 313 F.3d at 732 (2d Cir. 2002); see also Luciano, 158 F.3d at 660.  Measured against these standards, Valerio's argument is easily put aside.  During cross-examination, Lato asked Imperiale two questions: (1) "Had you ever seen Olena Kalichenko in your life?" and (2) "Did you see her in Mr. Valerio's house?"  (Trial Tr. 631.)  Imperiale responded, (1) "just once" and (2) "one time," respectively.  (Id.)  His decision not to ask any more questions was clearly a trial strategy.  As is evident from the trial record, Imperiale's story was plainly made-up.  When the images of Valerio's niece were created in September 2010 and January 2011, Kalichenko was not in the United States, and the unimpeached computer records introduced at trial showed that Kalichenko and Valerio had not even begun to correspond via "UkrainianDate.com" until months later in the summer of 2011.  (Id. at 378–383; GX 562; PSR ¶¶ 20, 28.)  Had Lato continued to question Imperiale about the specific details about her purported meeting of Kalichenko, Valerio's defense would have been damaged.  Doing so would have drawn out potentially inconsistent testimony

from Imperiale and her mother (Frances Valerio), who also testified about the supposed meeting with Kalichenko. Additionally, Kalichenko's flight records and the forensic data reflecting the dates of when the sexually explicit pictures of Jane Doe #2 were taken both failed to corroborate this story. Thus, by only asking two questions, Lato got useful answers he needed from Imperiale supporting Valerio's defense theory; the jury was free to infer as they wished. Simply put, Lato was light-years from being ineffective.

      b)    *Ground 4*

Valerio next argues that his trial counsel was constitutionally ineffective both when they obtained Scott Gibbs ("Gibbs") as a digital forensics expert witness and when they called him to testify at trial. (Valerio Mem. at 34–35, 40–44.) Trial counsel retained Gibbs as an expert to testify that the timestamp created by a Samsung camcorder (which contained the sexually explicit photographs of Valerio's niece) could have been manipulated. (Id. at 40.) Valerio wanted this testimony to support his defense theory that Kalichenko—and not him—had been the one who created the charged child pornography using Jane Doe # 2. (Id.) Valerio's ground for relief fails both components of the Strickland test.

As for Valerio's claim that trial counsel acted unreasonably, the Supreme Court cautions that courts on collateral review should not "launch ... into examination of the relative qualifications of experts hired and experts that might have been hired." Hinton v. Alabama, 571 U.S. 263, 274–75 (2014) (per curiam). Such decisions are paradigmatic strategic choices traditionally reserved to trial counsel, where courts "must indulge a strong presumption that counsel's conduct [fell] within the wide range of reasonable professional assistance." Strickland, 466 U.S. at 689. The burden of rebutting this presumption "rests squarely on the defendant," and "[i]t should go without saying that the absence of evidence cannot overcome [it]." Burt v. Titlow, 571 U.S. 12, 22–23 (2013). To carry this burden, Valerio contends "[t]here can be no conceivable strategic reason" for

retaining Gibbs and calling him to testify because he neither graduated college nor ever testified as an expert at a criminal trial before.  (Valerio Mem. at 41–42.)  To the extent Valerio argues that some other unspecified expert would have found, and then testified to, a more favorable opinion than Gibbs, he has proffered no evidence to support such speculation.

While there is little dispute that Gibbs's testimony did not carry the day at trial, the Sixth Amendment does not directly incorporate a right to effective witnesses; it guarantees only effective assistance of counsel.  See Alcantara v. Artus, 2014 WL 415954, at *5 (E.D.N.Y. Feb. 4, 2014) ("The question is … whether counsel reasonably decided to select [the] particular expert based on his … qualifications, not based on whether, after the fact, the expert's testimony in fact was favorable or not.").  After conducting a holistic review of Gibbs's qualifications, the Court finds that trial counsel's decision to engage him did not fall outside "the wide range of reasonable professional assistance."  Strickland, 466 U.S. at 689.  During trial, Gibbs testified he was the director of digital forensics at WeRecoverData.com, a data recovery services firm.  (Trial Tr. 879.)  And though Gibbs did not graduate from college, he held a highly regarded digital forensics certification, which he used to do work for a large law firm, apparently without incident.  (Id. at 880.)  Accordingly, the record shows that trial counsel's actions do not rise to the level of constitutional inadequacy.

In any event, Valerio cannot meet the prejudice component of Strickland either.  Gibbs testified to the same facts as Rory Forrestal, the government's expert witness.  Both testified it was possible that the entry date on the camera could have been manipulated, but they both also confirmed the days the relevant files were created were September 10, 2010, and January 19, 2011, respectively.  (Trial Tr. 788, 904.)  Judge Bianco confirmed the witnesses testified analogously when the government sought to establish on cross-examination (1) that Gibbs implanted PDF malware in the forensics report given to the government and (2) that he had a criminal history.  In

43

denying the government's cross-examination, Judge Bianco stated that "everything [Gibbs] testified to, [the government's] expert said the same exact thing," and that there was no "material difference" between either expert's testimony.  (Id. at 897, 913.)  In the end, the jury never heard about Gibbs's criminal history or use of malware.  Just because Gibbs's testimony did not carry the day does not mean it was wrong or that some other better testimony was available; indeed, Valerio has not set forth any evidence showing the forensic information on the camcorder was altered.  Thus, Valerio has not demonstrated a "reasonable probability"—or any probability, really—that hiring some other unspecified expert would have exculpated or helped his case to the point of causing a different result.  Strickland, 466 U.S. at 694.  That dooms his claim; there is no basis to conclude that Valerio has established a "substantial" likelihood of a different result at trial.  Garner, 908 F.3d at 871 (quoting Harrington, 562 U.S. at 112).

c)   *Ground 5*

Valerio next argues that his trial counsel was constitutionally ineffective because they did not object to the verdict or request express jury findings to preserve a double jeopardy objection.  (Valerio Mem. at 44.)  Specifically, he claims that the charges of both possession of child pornography (Count Fifteen) and receipt of child pornography (Count Five) could have been based on the same images.  (Id.)  Valerio's argument is unpersuasive.

For one, Valerio's argument was previously considered and rejected by the Second Circuit on direct appeal, Valerio, 765 F. App'x at 569–70, and accordingly, is foreclosed by the mandate rule, Yick Man Mui, 614 F.3d at 53.  In relevant part, the Second Circuit held:

> Valerio contends … that his conviction for possession of child pornography in violation of 18 U.S.C. § 2252(a)(4)(B) (Count Fifteen) violates the Fifth Amendment because it is a lesser-included offense of his conviction for receipt of child pornography in violation of 18 U.S.C. § 2252(a)(2) (Count Five).  This argument fails.  We have repeatedly declined to find plain error when the factual record demonstrates that the jury could have based its possession and receipt convictions on separate images.  See United States

44

v. Irving, 554 F.3d 64, 78–79 (2d Cir. 2009); United States v. Polouizzi, 564 F.3d 142, 158–59 (2d Cir. 2009). In this case, the factual record supports a jury finding that Valerio received illicit videos of Jane Doe #1 from Kalichenko through a means or facility of interstate or foreign commerce, satisfying the receipt charge, § 2252(a)(2), and that Valerio possessed images of Jane Doe #2 that were produced in his basement but never "received" from anyone, satisfying the possession charge, § 2252(a)(4). Because Valerio did not object to the verdict or request express jury findings that the receipt and possession convictions be based on different images or videos, we identify no plain double jeopardy error as to these counts.

Valerio, 765 F. App'x at 569–70 (emphasis added).

In so doing, the Second Circuit impliedly ruled that the charges of both possession of child pornography and receipt of child pornography were based on the different images. Thus, the mandate rule bars this Court from granting habeas relief on Valerio's theory because "[t]he mandate rule prevents re-litigation in the district court not only of matters expressly decided by the appellate court, but also precludes re-litigation of issues impliedly resolved by the appellate court's mandate." Yick Man Mui, 614 F.3d at 53 (emphasis added). Valerio may not avoid this bar merely by offering, as here, "a slightly altered rearticulation of a claim that was rejected on his direct appeal." Pitcher, 559 F.3d at 124 (internal quotation marks omitted).

To the extent Valerio's ground for relief is not barred by the mandate rule, it fails to satisfy Strickland's prejudice component. Where a defendant is convicted of separate counts for the receipt and possession of child pornography, there is no double jeopardy violation where each count is based on different files or images. See, e.g., Irving, 554 at 79 ("If the jury's verdict on [receipt] and [possession] were based on different images, there was no double jeopardy violation in the entry of judgment on both counts."); United States v. Bowman, 523 F. App'x 767, 769 (2d Cir. 2013) ("There is no double jeopardy problem where the receipt and possession counts of a conviction were based upon different files.") At trial, the government established just that.

To begin, the government established that the images of both Jane Doe #1 and Jane Doe #2 were recovered from Valerio's possession.  (Gov't Appeal Opp. at 81.)  Only the images of Jane Doe #1, however, were received in interstate commerce.  (Id.)  The images of Jane Doe #2 that were produced in Valerio's basement violated the possession statute because they were made using equipment that had travelled in interstate commerce.  (Id.)  The government presented this possession theory in both their opening and closing argument, as well as throughout the trial.  (Id.)  For instance, in opening, the government directly linked the possession count to the images of Jane Doe #2, stating: "[f]or the defendant's actions involving his niece here in Smithtown, he is charged with sexually exploiting a child.  And the defendant is also charged with possessing child pornography."  (GA 25.)

The government then presented evidence that Valerio possessed the SD Card in the computer's hard drive ("SD Card") on January 28, 2014, that it contained images of Jane Doe #2 and, significantly, that the SD Card had been manufactured outside the United States (establishing the jurisdictional basis for the possession count, as to these images).  (GA 36–42.)  In denying Valerio's Rule 29 motion, Judge Bianco noted that it was "sufficient if the jury credits that evidence for the jury to rationally find that the defendant possessed child pornography on his computer and on the SD card and that they were his." (GA 47.)  Thus, Valerio cannot show he was prejudiced by his attorneys' failure to object to the verdict or request express jury findings because the possession and receipt convictions did not violate the Fifth Amendment's Double Jeopardy Clause.

\*       \*       \*

Accordingly, the Court concludes that Valerio's during-trial-claims also provide no basis for habeas relief.

### 4.      Post-Trial Grounds for Relief

Citing thirteen grounds for relief, Valerio argues that he was denied his Sixth Amendment right to effective assistance of counsel post-trial.  (Valerio Mem. at 45–77.)  The Court disagrees once more.

#### a)      *Ground 6*

As for his sixth ground for relief, Valerio argues that his trial counsel was constitutionally ineffective when they failed to object to the PSR Addendum and the need for a <u>Fatico</u> hearing.  (<u>Id.</u> at 45–46.)  Specifically, Valerio claims that his trial counsel "did not file any objection with the Probation Department and they similarly did not object in writing."  (<u>Id.</u>)  Valerio's claim easily fails to satisfy <u>Strickland</u>'s performance component for two reasons.

First, Valerio cites no authority requiring trial counsel to file a written objection to a PSR, and the Court is aware of none.  (<u>Id.</u>)  Second, Valerio misunderstands the meaning and the purpose of a <u>Fatico</u> hearing, which is to allow the district court to determine whether <u>disputed</u> allegations should be considered at sentencing.  <u>See</u> <u>United States v. Lohan</u>, 945 F.2d 1214, 1216 (2d Cir. 1991) (citing <u>United States v. Fatico</u>, 603 F.2d 1053 (2d Cir. 1979)).  Here, a <u>Fatico</u> hearing was necessary precisely <u>because</u> Valerio denied the Addendum's allegations relating to A.D. and Lucy Down at a sentencing status conference in May 2016.[15]  (GA 17–18.)  Thus, it does not follow that trial counsel acted deficiently in failing to object to a hearing that was precipitated <u>by their own disputation</u> of the Addendum's allegations.  <u>See</u> <u>Cullen v. Pinholster</u>, 563 U.S. 170, 189 (2011) ("Recognizing the 'tempt[ation] for a defendant to second-guess counsel's assistance after conviction or adverse sentence,' ... counsel should be 'strongly presumed to have rendered

---

[15]      LaPinta explained this in a detailed email to Valerio, stating among other things that "[t]he 'purpose' of the court-ordered <u>Fatico</u> hearing (there was one hearing that took two days to complete, no[t] two "hearings") was to determine if there are aggravating factors that could potentially impact your sentence.  There clearly are."  (Ex. 1 at 16, ECF No. 170-1.)

adequate assistance and made all significant decisions in the exercise of reasonable professional judgment.'" (first alteration in original) (quoting Strickland, 466 U.S. at 690)).  Accordingly, the Court finds that Valerio's claim lacks merit.

b)   *Ground 7*

Valerio next argues that his trial counsel was constitutionally ineffective when they failed to limit the scope of the Fatico hearing by objecting to the allegations made by A.D. and Down on the grounds that they did not constitute relevant conduct.  (Valerio Mem. at 46–48.)  Valerio's argument is unpersuasive.

For one, Valerio's argument was previously considered and rejected by the Second Circuit on direct appeal, Valerio, 765 F. App'x at 567, and accordingly, is foreclosed by the mandate rule, Yick Man Mui, 614 F.3d at 53.  In relevant part, the Second Circuit held:

> The testimony adduced by the government at the Fatico hearing—which concerned a pattern of deceptive and violent conduct towards adult women, including violent rapes—was plainly relevant to the District Court's evaluation of Valerio's "background, character, and conduct," and its balancing of the sentencing factors identified in 18 U.S.C. §3353(a). Valerio does not contend that any of the District Court's factual findings following the Fatico hearing was erroneous, much less clearly erroneous. Accordingly, we discern no procedural error in the District Court's consideration of uncharged conduct.

Valerio, 765 F. App'x at 567.

In so doing, the Second Circuit impliedly rejected the claim that Valerio posits in his petition now.  Thus, the mandate rule bars this Court from granting habeas relief on Valerio's theory because "[t]he mandate rule prevents re-litigation in the district court not only of matters expressly decided by the appellate court, but also precludes re-litigation of issues impliedly resolved by the appellate court's mandate."  Yick Man Mui, 614 F.3d at 53 (emphasis added).  Valerio may not avoid this bar merely by offering, as here, "a slightly altered rearticulation of a claim that was rejected on his direct appeal."  Pitcher, 559 F.3d at 124 (internal quotation marks omitted).

To the extent Valerio's ground for relief is not barred by the mandate rule, it fails to satisfy Strickland's prejudice component.  Federal sentencing law provides that "[n]o limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence," 18 U.S.C. § 3661.  Judge Bianco properly found that Valerio's treatment of these women was relevant to the Section 3553(a) factors—"namely, the defendant's history of extremely dangerous and violent behavior towards other individuals, and the need to protect the public from further crimes by the defendant" and Valerio's "deceptive and manipulative conduct."  (SPA 12–13.)  Thus, even if it were unreasonable for trial counsel not to object to A.D. and Down's allegations, there can be no showing of prejudice here.

c)   *Ground 8*

Valerio's eighth argument is that trial counsel was constitutionally ineffective when they failed to object to Judge Bianco's sua sponte invitation to Kalichenko to testify at the Fatico hearing.  (Valerio Mem. at 46–47, 53.)  This argument is unpersuasive too, for the same reasons as his last ground for relief.

Again, Valerio's argument was previously considered and rejected by the Second Circuit on direct appeal, Valerio, 765 F. App'x at 567, and accordingly, is foreclosed by the mandate rule, Yick Man Mui, 614 F.3d at 53.  The Second Circuit found no error in Judge Bianco's invitation for Kalichenko to testify at the Fatico hearing.  See Valerio, 765 F. App'x at 566–67.  In so doing, the Second Circuit rejected the claim that Valerio now posits in his petition.  Thus, the mandate rule bars the Court from granting habeas relief on Valerio's theory because "[t]he mandate rule prevents re-litigation in the district court … of matters expressly decided by the appellate court."  Yick Man Mui, 614 F.3d at 53.  Valerio may not avoid this bar merely by offering a "rearticulation of a claim

49

[in a habeas petition] that was rejected on his direct appeal." Pitcher, 559 F.3d at 124 (internal quotation marks omitted).

To the extent Valerio's ground for relief is not barred by the mandate rule, it fails to satisfy Strickland's prejudice component. Judge Bianco invited Kalichenko to testify at the Fatico hearing given her allegations—in the context of her own case—that Valerio raped and had been violent towards her. (GA 19.) District court judges enjoy "broad discretion" in deciding what procedures to employ to resolve disputed facts at sentencing. United States v. Duverge Perez, 295 F.3d 249, 254 (2d Cir. 2002) (citing United States v. Slevin, 106 F.3d 1086, 1091 (2d Cir. 1996)). Even assuming it was unreasonable for trial counsel not to object to Kalichenko's invitation, Judge Bianco properly excised his considerable discretion to consider Kalichenko's allegations at the Fatico hearing. Therefore, Valerio cannot demonstrate a "reasonable probability" that—had trial counsel objected—Kalichenko would not have testified, and that the outcome at sentencing would have been different. See United States v. Delacruz, 862 F.3d 163, 175–76 (2d Cir. 2017) (district court properly sua sponte ordered evidentiary hearing relating to past drug dealing and robbery conspiracy alleged in PSR and disputed by defendant); see also Strickland, 466 U.S. at 694. That dooms Valerio's claim, as there is no basis to conclude that he has established a "substantial" likelihood of a different result. Garner, 908 F.3d at 871 (quoting Harrington, 562 U.S. at 112)

<dd>d)</dd>   *Ground 9*

Valerio next argues his trial counsel was constitutionally ineffective in failing to object to the government's exhibits at the Fatico hearing. (Valerio Mem. at 23, 54.) This claim lacks merit.

For one, it fails the performance component of the Strickland test. In its opposition brief, the government notes that Valerio's petition does not identify what objections should have been

made and to what exhibits.[16]  (Gov't Valerio Opp. at 42.)  In response, for the first time in reply to

his petition, Valerio argues that trial counsel should have objected to the government introducing

the following exhibits into evidence: (1) an exhibit introducing emails Valerio sent Kalichenko

asking for her help to adopt a child from Ukraine;[17] and (2) an exhibit introducing emails that A.D.

saved on her computer.  (Valerio Rep. Mem. at 11.)  There are two problems with his argument.

First, Valerio waived it by raising it for the first time in reply to his habeas petition.  See Lallave,

609 F. Supp. 3d at 182; see also Tardif, 991 F.3d at 404 n.7.  Second, even if the Court overlooked

waiver, Valerio's reply also fails to identify what objections his trial counsel could have been made

to the exhibits.  Thus, Valerio cannot show trial counsel's representation "fell below an objective

standard of reasonableness" without explaining the grounds on which they should have objected.

Strickland, 466 U.S. at 688.

  Even if Valerio could explain specific objections to the government's exhibits, Valerio's

argument also fails Strickland's prejudice component.  Any stated objection to these exhibits would

have been futile.  See United States v. Weisser, 417 F.3d 336, 346 (2d Cir. 2005) (holding that

where the stated objection "would have been futile," "[c]ounsel's failure to object was not error").

For one, the Federal Rules of Evidence are inapplicable to sentencing proceedings before a district

judge.  See United States v. Fell, 360 F.3d 135, 144 (2d Cir. 2004) (citing FED. R. EVID. 1101(d)).

Additionally, federal sentencing law provides that "[n]o limitation shall be placed on the

information concerning the background, character, and conduct of a person convicted of an offense

which a court of the United States may receive and consider for the purpose of imposing an

---

[16]  Accordingly, without any explanation about what objections should have been made and to what exhibits, there can be no doubt that Valerio fails to show his trial counsel acted unreasonably.  See Reese v. United States, 2006 WL 2711610, at *3 (E.D.N.Y. Sept. 21, 2006) ("Conclusory allegations of counsel's deficient performance will not sustain a § 2255 petition.").

[17]  In these emails, Valerio asked to pay Kalichenko a commission to pose with him as a couple.  (A 221.)

appropriate sentence," 18 U.S.C. § 3661, and these exhibits were relevant to the Section 3553(a) factors—namely, Valerio's "deceptive and manipulative conduct."  (SPA 13; ECF No. 146 at 3.) Even if the above exhibits were irrelevant (and they were relevant), a thorough read of the record demonstrates that Judge Bianco relied on other evidence introduced at the <u>Fatico</u> hearing to conclude the testimony of three women witnesses were credible.[18]  (SPA 13–14, 18; ECF No. 146 at 4, 8.)  Thus, Valerio cannot show he was prejudice by trial counsel's failure to object to the government's exhibits.

e)   *Ground 10*

As for his tenth ground for relief, Valerio argues that his trial counsel was constitutionally ineffective at the <u>Fatico</u> hearing when they failed to use exhibits that were either in their possession or somehow attainable.  (Valerio Mem. at 49.)  This claim also lacks merit for similar reasons as his ninth ground for relief.

Again, Valerio's claim fails to meet <u>Strickland</u>'s performance component.  In its opposition brief, the government notes Valerio's petition does not identify what the supposed exhibits were or should have been.[19]  (Gov't Valerio Opp. at 42.)  In response, for the first time in reply to his petition, Valerio argues that trial counsel should have used the following as impeachment material:

- (1) Government Exhibit 231, where Valerio wrote: "Helena I will give you another chance to confess on what you have done. I will give you my word and promise to hold off any investigation that will ultimately Helena lead to your arrest;"

- (2) A letter written by A.D. on Valerio's behalf; and

---

[18]   For example, Judge Bianco relied on testimony describing (1) Valerio's physical and sexual assaults of Kalichenko during his relationship with her; (2) Valerio's physical and sexual assaults of A.D. during his relationship with her; and (3) Valerio's deception of Down in making her believe that she was coming to his house from England to be an au pair, even though there was no child in his house.  (SPA 12; ECF No. 146 at 2.)

[19]   Accordingly, without any explanation about what the supposed exhibits were or should have been, there can be no doubt that Valerio fails to show his trial counsel acted unreasonably.  <u>See Reese</u>, 2006 WL 2711610, at *3 ("Conclusory allegations of counsel's deficient performance will not sustain a § 2255 petition.").

- (3) Emails between A.D. and Valerio (i) that detailed updates on A.D.'s two children; (ii) that showed A.D. inquiring how Valerio was doing and wishing him well; and (iii) that informed Valerio that A.D. was planning to visit the United States either in late 2015 or early 2016 and was even considering maybe moving to New York with the children later.

(Valerio Rep. Mem. at 12.)

There are two problems with Valerio's argument.  First, he waived it by raising it for the first time in reply to his habeas petition.  See Lallave, 609 F. Supp. 3d at 182; see also Tardif, 991 F.3d at 404 n.7.  Second, even if the Court overlooked waiver, the Fatico record demonstrates that trial counsel's decision not to use these exhibits was motivated by strategy.  At the hearing, trial counsel presented testimony from Valerio's retained forensic psychiatrist, Dr. Bardey, who opined that Valerio's childhood sexual abuse, as well as his drug use, had led him to an interest in improper sexual acts.  (A 268–86.)  Trial counsel also presented testimony from a social worker named Maura Gordon, who discussed her interview of Valerio's sister, Bernadette Imperiale, wherein Imperiale corroborated Valerio's claim of childhood abuse, as well as Imperiale's own abuse by their father.  (A 318–25.)  As demonstrated by the record, trial counsel's Fatico strategy was to show that Valerio was mentally ill and therefore not responsible for his actions.  This reasonable strategy would have been impeded, rather than aided, by introducing the exhibits Valerio now identifies.  Such exhibits would have failed to impeach the testimony Judge Bianco heard about the assaults and rapes of Kalichenko and A.D, so it was entirely reasonable for trial counsel to maintain focus on their theory to persuade Judge Bianco to adopt their position.  (SPA 12–13; ECF No. 146 at 2.)  Thus, Valerio cannot show that trial counsel's representation "fell below an objective standard of reasonableness."  Strickland, 466 U.S. at 688.

Even if trial counsel somehow acted unreasonably in failing to use these exhibits as impeachment material, Valerio's argument also fails to meet Strickland's prejudice component.  A

thorough read of the <u>Fatico</u> record demonstrates that these exhibits—even if used for impeachment purposes—would not have altered Judge Bianco's decision to consider the assaults and rapes of Kalichenko and A.D. "in connection with the Section 3553(a) factors—namely, the defendant's history of extremely dangerous and violent behavior towards other individuals, and the need to protect the public from further crimes by the defendant."[20]   (SPA 12–13; ECF No. 146 at 2.) Simply put, none of the exhibits that Valerio identifies even pertain to Judge Bianco's conclusion that Valerio has a "history of extremely dangerous and violent behavior towards other individuals." (SPA 18.)  So it does not follow that they could have altered his conclusion.  Thus, Valerio cannot show he was prejudice by trial counsel's failure to introduce the exhibits.

> f)   *Ground 11*

Valerio next argues that trial counsel was constitutionally ineffective at the <u>Fatico</u> hearing because their examination of the witnesses fell below the standard of competence afforded to cross-examination.  (Valerio Mem. at 45, 56.)   Specifically, Valerio contends Lato was "far more effective at presenting negative testimony" about Valerio, rather than impeaching A.D.  (<u>Id.</u> at 55.) This argument fails to satisfy either component of the <u>Strickland</u> test.

As for <u>Strickland</u>'s performance component, the Court must accord "significant deference" to the decision of counsel as to "how to conduct cross examination."  <u>Eze</u>, 321 F.3d at 132.  As "[d]ecisions about 'whether to engage in cross-examination, and if so to what extent and in what manner, are ... strategic in nature,'" they "generally will not support an ineffective assistance claim."  <u>Dunham</u>, 313 F.3d at 732 (quoting <u>United States v. Nersesian</u>, 824 F.2d 1294, 1321 (2d Cir. 1987)).  Courts are also "reluctant to find unreasonable conduct in defense counsel's cross-

---

[20]       Having evaluated the demeanor and credibility of the witnesses at the <u>Fatico</u> hearing, Judge Bianco concluded:  "[T]he government has proven, by a preponderance of the evidence, that (1) the defendant physically and sexually assaulted Olena Kalichenko during the course of his relationship with her; (2) the defendant physically and sexually assaulted A.D. during his relationship with her; and (3) the defendant deceived another woman into believing that she was coming to his house from England to be an au pair, even though there was no child in his house." (SPA 12; ECF No. 146 at 2.)

examination strategy absent grave error falling below the required professional standard." <u>Salcedo v. Artuz</u>, 107 F. Supp. 2d 405, 417–18 (S.D.N.Y. 2000).  During A.D.'s cross-examination, Lato questioned her about Valerio being "good and suddenly bad," and "go[ing] back and forth between good Joe and bad Joe."  (A 241.)  Evident from the record, Lato's line of questioning strived to deflect responsibility by showing that Valerio was mentally ill and therefore not responsible for his actions towards A.D.  As LaPinta stated in an email to Valerio after the hearing, the "good Joe, bad Joe" examples were used to lay a foundation for Dr. Bardey to show later that Valerio is bipolar.[21]  (Ex. 1 at 16, ECF No. 170-1.)  Lato attempted to set forth mitigating factors for Valerio's sentencing, as any competent attorney would have done.  As a result, the Court cannot say that Lato's strategy was tainted by grave error or otherwise "fell below an objective standard of reasonableness."  <u>Strickland</u>, 466 U.S. at 688.

Even if Lato's actions were unreasonable, which they are not, Valerio cannot demonstrate prejudice.  As mentioned above, there was overwhelming evidence, not only of Valerio's guilt at trial, but of Valerio's abusive behavior towards women, as demonstrated at <u>Fatico</u> hearing.  The evidence included pictures and videos of child pornography possessed by Valerio, text messages and emails where Valerio scripted and demanded child pornography, costumes recovered from Valerio's house, and testimony from three women about Valerio's repeated abusive behavior.  Nor does Valerio demonstrate any probability, let alone a "reasonable probability," that any other cross-examination of A.D. (or the other witnesses) would have helped his case to the point of causing a different result.  <u>Strickland</u>, 466 U.S. at 694.  That dooms Valerio's claim, as there is no basis to

---

[21]    In reply to his petition, Valerio contends the "good joe/bad joe" line of questioning could not have been a strategic decision to assist with sentencing "if it did not [end up aligning] with the diagnosis provided by their own expert witness." (Valerio Rep. 14.)  There are three problems with this argument.  First, Valerio cites no authority to support this proposition, and the Court cannot locate any.  Second, Valerio's argument seems belied by the record; Dr. Bardey's Forensic-Psychiatric Examination indeed diagnoses Valerio with "Bipolar I Disorder." (A 342.)  And third, it was certainly reasonable for Lato, during cross-examination, to lay a foundation for Dr. Bardey to show Valerio was mentally ill in some capacity.

conclude that he has established a "substantial" likelihood of a different sentence.  Garner, 908 F.3d at 871 (quoting Harrington, 562 U.S. at 112); see also Lindstadt, 239 F.3d at 204 (finding errors by counsel do not warrant granting habeas relief where the conviction is supported by overwhelming evidence of guilt).

> g)   *Ground 12*

Valerio next argues that his trial counsel was constitutionally ineffective when they called no defense witness to testify at the Fatico hearing, despite Valerio's request for his mother to testify. (Valerio Mem. at 56.)  The Court disagrees and finds that Valerio fails to meet either component of the Strickland test with respect to this argument.

As for Strickland's performance component, "[t]he decision whether to call any witnesses on behalf of the defendant, and if so which witnesses to call, is a tactical decision of the sort engaged in by defense attorneys in almost every [case]."  United States v. Smith, 198 F.3d 377 (2d Cir. 1999) (quoting United States v. Eisen, 974 F.2d 246, 265 (2d Cir. 1992) ("[D]ecisions that fall squarely within the ambit of trial strategy ... if reasonably made," such as counsel's decision about which witness to call, "cannot support an ineffective assistance claim")).  There is no showing that it was unreasonable for trial counsel not to call Frances Valerio to testify during the Fatico hearing. It is clear from the trial record that her testimony was not credited by the jury.  So calling her at sentencing would have posed a risk that the Judge Bianco would find her unworthy of belief.

Even if it were somehow unreasonable not to call his mother to testify, Valerio cannot demonstrate prejudice.  Valerio argues that his mother Frances would have testified to Valerio's relationship with A.D., to the money he wired her via Western Union, to the travel expenses he paid on her behalf, and to fact the two were trying to retain an immigration attorney so that A.D. could move to New York permanently.  (Valerio Mem. at 56.)  Even so, none of this suggested testimony would have undermined the overwhelming evidence against Valerio that Judge Bianco

credited.  Frances Valerio's alleged testimony would not have negated the instances of emotional and physical abuse A.D. suffered at Valerio's hands—including the above-described incidents when Valerio violently raped her, and the incident when Valerio knocked some of her teeth loose (corroborated by dental records).  (See supra pp. 12–15.)  The same is true for Kalichenko's testimony of physical and sexual abuse.  (See supra pp. 10–12.)

> h)    *Ground 13*

Valerio's thirteenth ground for relief concerns his trial counsel's sentencing submissions. Specifically, Valerio argues that trial counsel was constitutionally ineffective when they failed to refer to the link between his thyroid cancer and his psychiatric functions in their sentencing papers to Judge Bianco.  (Valerio Mem. at 63.)  This argument fails to satisfy both components of Strickland's test.

 As for Strickland's performance component, the Court again "indulge[s] a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance."  Harrington v. United States, 689 F.3d 124, 129 (2d Cir. 2012) (quoting Strickland, 466 U.S. at 689).  As mentioned, "[a]ctions and/or omissions taken by counsel for strategic purposes generally do not constitute ineffective assistance of counsel."  Gibbons, 555 F.3d at 122 (citing Strickland, 466 U.S. at 690–91).  Here, Valerio has not rebutted the strong presumption that trial counsel's actions were reasonable strategic decisions.  On February 17, 2017, Lato e-mailed Valerio explaining, among other things, that:

> If there is a causal link between your cancer and your addictions, that link will be brought out in the sentencing memo. But there must be credible evidence of your past afflictions, and there must be a credible basis to connect them to the behavior that brought you to this point.[22]

---

[22]    It is undisputed that Valerio had thyroid cancer and now has "half a thyroid gland."  (Valerio Mem. at 63.) The PSR discussed Valerio's thyroid condition in detail, including: (1) his 2003 cancer diagnosis; (2) his right-side-of-thyroid removal at Stony Brook University Hospital; (3) his depression and anxiety post-diagnosis; and (4) his heavy drinking post-diagnosis.  (PSR ¶¶ 90–105.)  In addition, Lato stated Valerio was a cancer survivor during the sentencing proceeding.  (A 364.)

(Ex. 1 at 26, ECF No. 170.)  In response to Lato's email, Valerio explained his thyroid cancer surgery was documented, that the documentation would "be used to formulate the link," and that "whether it's [a] believable one or not is irrelevant for these are facts that took place in my life. We have documentation to link a parallel."  (Id. at 25.)  Lato properly responded, correcting Valerio, explaining that it would be counterproductive to assert something that is not believable, and doing so would have "a spillover effect and render what would otherwise be believable not believable."  (Id.)  As Lato told Valerio, if there was a link, it would be in his sentencing memorandum, supported by credible evidence.  But, as is clear from the record, there was no link, and trial counsel acted reasonably in not mentioning one.  That's because trial counsel consulted Dr. Bardey, who testified at the Fatico hearing that there was no link between thyroid cancer and Valerio's crimes.  (A 316.)  Against these facts, the Court cannot conclude that trial counsel's performance fell below an objective standard of reasonableness.  Even if the Court assumed a link exists, Valerio sets forth no credible evidence showing so now.  Without any explanation as to what the link between Valerio's thyroid cancer and his psychiatric functions is, there can be no doubt that Valerio fails to show his trial counsel acted unreasonably when their sentencing papers did not refer to such a "link" to justify Valerio's behavior.  See Reese, 2006 WL 2711610, at *3 ("Conclusory allegations of counsel's deficient performance will not sustain a § 2255 petition.").

Even if such a link existed and even if trial counsel acted unreasonably in failing to mention it in their sentencing submissions, Valerio fails to show prejudice.  Valerio demonstrates no probability, much less a "reasonable probability," that this "link" (again, assuming it even exists) would have would have mitigated his mens rea or otherwise swayed Judge Bianco's decision making to the point of causing a lesser sentence.  Strickland, 466 U.S. at 694.  The likelihood of a different result must be "substantial."  Harrington, 562 U.S. at 112.  Fatal to Valerio's claim, "there is simply no basis here for concluding that he has established anything close to a substantial

58

likelihood of a different result." Garner, 908 F.3d at 871 (citing Harrington, 562 U.S. at 112) (emphasis in original).

      i)    *Ground 14*

Related to his previous ground for relief, Valerio next claims that his trial counsel was constitutionally ineffective when they failed to obtain his medical records of his thyroid surgery before sentencing, despite his repeated requests that they do so. (Valerio Mem. at 62–63.) Specifically, he argues trial counsel's actions were objectively unreasonable and prejudicial because "Dr. Bardey was not able to review the medical records or consult with an appropriate [endocrinologist] specialist regarding any connection between the thyroid [cancer] and [Valerio's] psychiatric conditions." (Id. at 63.) The Court finds that Valerio fails to meet either component of the Strickland test with respect to this argument.

As for Strickland's performance component, Valerio argues his trial counsel was obligated "to seek the consultation of an appropriate specialist to determine whether Mr. Valerio's thyroid cancer and any possible psychiatric effects of his surgery could be used as a mitigating circumstance for sentencing." (Id. at 66.) To support his argument, he cites the Second Circuit's decision in Lindstadt v. Keane, 239 F.3d 191 (2d Cir. 2001). But Valerio's reliance on Lindstadt is misplaced. In that case, defense counsel made no effective challenge to the only physical evidence of the defendant's sexual abuse of his daughter. See Lindstadt, 239 F.3d at 194. There, the prosecution's expert witness testified that his observations of the child's private parts confirmed that she was abused. See id. at 194. This testimony was based on an unnamed study that was (1) not requested by defense counsel, (2) not produced by the prosecution, (3) never produced or usefully identified since, (4) essentially unchallenged at trial, and (5) controverted by other easily available, published studies unearthed by defendant's appellate counsel that casted doubt on any link between the scarring and the sexual abuse. See id. Further, defense counsel failed to consult

an expert or conduct any research about the study.  See id. at 202.  The Second Circuit held that such failures, among other ones, amounted to ineffective assistance of counsel in the aggregate, warranting habeas relief.  See id. at 194.

This case is readily distinguishable from Lindstadt.  Unlike defense counsel in Lindstadt, 239 F.3d at 201, Valerio's trial counsel did consult an expert (Dr. Bardey), who testified there is no link between thyroid cancer and Valerio's crimes.[23]  (A 316.)  Additionally, unlike appellate counsel in Lindstadt, 239 F.3d at 201, Valerio's current counsel has not provided any contemporaneous study accepted for publication at the time of sentencing that discusses whether there is a link between Valerio's thyroid cancer and Valerio's long running criminal history.  Instead, Valerio points to a list of studies on the correlation between "thyroid cancer and mood" (i.e., not criminal activity or responsibility for crime) without further explanation.  (Valerio Mem. at 64–65.)  But Valerio's criminal history of rape, assault, sexual abuse, and child sexual exploitation is not a "mood."  (Id.)  Further, to this day, Valerio has provided no showing by an "appropriate specialist" that there is a link between Valerio's thyroid cancer and his crimes.  (Id. at 66.)  Accordingly, applying the "'strong presumption' that counsel's conduct falls within the wide range of reasonable professional assistance because it is all too easy to conclude that a particular act or omission of counsel was unreasonable in the harsh light of hindsight," this Court

---

[23]    Dr. Bardey testified at the Fatico hearing as follows:

- MR. LATO: Did Mr. Valerio divulge to you that at some point in his life he had thyroid cancer?

- DR. BARDEY: Yes.

- MR. LATO: Is there any connection between his having had cancer to anything else that you did with respect to your diagnosis and evaluation?

- DR. BARDEY: No.

(A 316.)

finds that Valerio fails to show his trial counsel's conduct fell below an objective standard of reasonableness.  Bell, 535 U.S. at 702 (quoting Strickland, 466 U.S. at 689).

Even if the Court assumed trial counsel acted unreasonably, which they did not, Valerio cannot demonstrate prejudice.  As mentioned, Valerio must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  Strickland, 466 U.S. at 694.  "The likelihood of a different result must be 'substantial.'"  Garner, 908 F.3d at 871 (quoting Harrington, 562 U.S. at 112).  Here, even if trial counsel provided Dr. Bardey with the above medical records and even if Valerio consulted an endocrinologist, "there is simply no basis [to conclude] that he has established anything close to a substantial likelihood of a different result."  Id. (emphasis in original).

For example, Valerio has provided no showing—by way of a study, an "appropriate specialist," or otherwise—that (1) there is a link between Valerio's thyroid cancer and his crimes (2) that would have mitigated his mens rea or otherwise swayed Judge Bianco's decision making to the point of causing a lesser sentence.  (Valerio Mem. at 66.)  This is not a case (like Lindstadt) where there is little physical evidence that could have been undermined by contemporaneous medical literature and informed expert testimony.  See Lindstadt, 239 F.3d at 204–05.  Here, there is substantial record support for Judge Bianco's lengthy, but below Guidelines sentence.  As mentioned above, there was overwhelming evidence, not only of Valerio's guilt at trial, but of Valerio's abusive behavior towards women, as demonstrated at Fatico hearing.  The evidence included pictures and videos of child pornography possessed by Valerio, text messages and emails where Valerio scripted and demanded child pornography, costumes recovered from Valerio's house, and testimony from three women about Valerio's repeated abusive behavior.  Even if the Court assumed trial counsel somehow acted unreasonably, and even if the Court assumed a link exists between Valerio's thyroid cancer and his crimes, Valerio does not demonstrate that Judge

Bianco would have given him a lesser sentence.  Accordingly, the Court cannot find that counsel's "errors" prejudiced Valerio so much so that they "undermine confidence in the outcome" of Judge Bianco's sentence.  Strickland, 466 U.S. at 694.

j)   <em>Ground 15</em>

Valerio's fifteenth ground for relief is that his trial counsel did not adequately prepare for sentencing because they failed to investigate relevant mitigating evidence that was reasonably available to them.  (Valerio Mem. at 64.)  This claim lacks merit.

To begin with, the government notes in its opposition brief that Valerio's petition does not "identify what this alleged mitigating evidence was."  (Gov't Valerio Opp. at 47.)  The government further argues that "[i]f such mitigating evidence was reasonably available to Mr. Lato and Mr. LaPinta, there can be no plausible reason why this evidence has still not been presented in Valerio's petition."[24]   (Id.)   In response, for the first time in reply to his petition, Valerio argues "the mitigating evidence in question is the correlation between thyroid surgery and mood/behavior." (Valerio Rep. Mem. at 19 n.18.)  Thus, Valerio waived the argument by raising it for the first time in reply to his habeas petition.  See Lallave, 609 F. Supp. 3d at 182; see also Tardif, 991 F.3d at 404 n.7.

Even if the Court overlooked waiver and assumed (without deciding) that trial counsel's conduct fell below an objective standard of reasonableness, Valerio fails to satisfy Strickland's prejudice component.  As discussed above, Valerio points to a list of studies available at the time of sentencing that describe a correlation between "thyroid cancer and mood" without further explanation.  (Valerio Mem. at 64–65.)  But these articles do nothing to explain how thyroid cancer

---

[24]      Accordingly, without any explanation about what the reasonably attainable mitigating evidence was, there can be no doubt that Valerio fails to show his trial counsel acted unreasonably in failing to investigate it.  See Reese, 2006 WL 2711610, at *3 ("Conclusory allegations of counsel's deficient performance will not sustain a § 2255 petition.").

contributes to criminal activity or responsibility for crime.  (Id.)  It bears repeating: Valerio's criminal history of rape, assault, sexual abuse, and child sexual exploitation is not a "mood."  (Id.) Thus, Valerio demonstrates no probability, much less a "reasonable probability," that establishing a link "between thyroid surgery and mood/behavior" would have mitigated his <u>mens rea</u> or otherwise swayed Judge Bianco's decision making to the point of causing a lesser sentence. <u>Strickland</u>, 466 U.S. at 694.  That dooms Valerio's claim, as there is no basis to conclude that he has established a "substantial" likelihood of a different result.  <u>Garner</u>, 908 F.3d at 871 (quoting <u>Harrington</u>, 562 U.S. at 112).

k)      <em>Ground 16</em>

Valerio next argues that his trial counsel was constitutionally ineffective in preparing for sentencing because: (1) their arguments addressed in Valerio's first sentencing submission were "neither persuasive nor effective;" (2) their supplemental sentencing submission failed to address Judge Bianco's decision about the <u>Fatico</u> hearing; and (3) their supplemental sentencing submission made no additional arguments in support of their initial sentencing submission. (Valerio Mem. at 66–72.)  This Court disagrees and finds that Valerio fails to satisfy either component of the <u>Strickland</u> test with respect to these arguments.

***Initial Sentencing Submission***:  Valerio contends that the arguments trial counsel put forward in their first sentencing submission were "neither persuasive nor effective."  (<u>Id.</u> at 62.) But "persuasive and effective" is not the applicable standard.  To find trial counsel constitutionally ineffective, Valerio must show (1) counsel's representation "fell below an objective standard of reasonableness" measured against "prevailing professional norms," and (2) the "deficient performance prejudiced the defense" in the sense that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." <u>Strickland</u>, 466 U.S. at 687–88, 694.  Valerio does not satisfy <u>Strickland</u>'s test.

For one, trial counsel's initial sentencing submission was far from falling "below an objective standard of reasonableness."   Id. at 688.   Indeed, trial counsel submitted a comprehensive, 43-page memorandum on Valerio's behalf.  (ECF No. 142.)  In the submission, trial counsel requested that Judge Bianco sentence Valerio to fifteen years' imprisonment (the statutory mandatory minimum) and to a lifetime of supervised release—well below Probation's recommendation of (what was then) 40 years.  (Id. at 2, 36.)  Counsel spent nearly twenty pages addressing the credibility and the ulterior motives of the three women witnesses who testified at the Fatico hearing.  (Id. at 2–23.)  Then, trial counsel focused eight pages on Dr. Bardey's forensic psychiatric evaluation and his Fatico testimony.  (Id. at 24–32.)  They specifically highlighted Dr. Bardey's opinion that (1) Valerio is not a pedophile and (2) that the Court should "consider [Valerio's] difficult early life and specifically the years of brutal sexual abuse he suffered as a child during important formative years as mitigating factors in meting out an appropriate sentence."[25] (Id. at 29–31, 32.)  Trial counsel then discussed Maura Gordon's evaluation of Valerio's sister, which corroborated Valerio's claim of childhood abuse.  (Id. at 32–33.)  Next, they addressed the Section 3553(a) factors at length, highlighting among other things (1) Valerio's history and characteristics; (2) Dr. Bardey's assessment of his moderate risks of dangerousness and re-offending; (3) Dr. Bardey's assessment of his capacity to sustain an intimate relationship with his family members (including his kids); and (4) the need to avoid unwanted sentencing disparities among other defendants with similar records.  (Id. at 34–41.)

Even if the Court assumed trial counsel's initial sentencing memorandum fell below what is objectively reasonable (it does not), Valerio fails to meet Strickland's prejudice component.  At sentencing, Judge Bianco acknowledged that trial counsel made "significant submissions," which

---

[25]      Trial counsel also underscored Dr. Bardey's opinion that "[Valerio's] free will was influenced by his early experiences and should warrant consideration by the Court at sentencing."  (Id. at 32.)

he had pored over.  (GA 94.)  But despite his careful consideration, Judge Bianco did not "believe that a sentence less than the one [he was] imposing would properly balance all the [Section 3553(a)] factors."  (Id.)

***Supplemental Sentencing Submission***: Additionally, Valerio also argues trial counsel's supplemental sentencing submission was constitutionally ineffective sentencing preparation, for two reasons: (1) because it failed to address Judge Bianco's decision about the Fatico hearing— specifically, "the use of the uncharged conduct in connection with the Section 3553(a) factors;" and (2) because it made no additional arguments in support of the initial sentencing submission. (Valerio Mem. at 72.)  Here too, Valerio's arguments do not satisfy Strickland's test.

For one, trial counsel's supplemental sentencing submission was also far from falling "below an objective standard of reasonableness."  Strickland, 466 U.S. at 688.  At the time of sentencing, Judge Bianco had ordered a Fatico hearing, conducted a hearing, and made findings. So the only thing trial counsel could have presumably done in its supplemental sentencing submission was move to reconsider Judge Bianco's Fatico findings.  But Valerio does not demonstrate (or even argue) that any basis for such a motion exists, and "[t]he failure to include a meritless argument does not fall outside the wide range of professionally competent assistance to which [a] [p]etitioner [i]s entitled."  Aparicio, 269 F.3d at 99 (internal quotation marks omitted). Valerio also claims he wanted "additional arguments" in his supplemental sentencing submission, but his petition fails to set forth what these added arguments were.[26]  (Valerio Mem. at 72.)  In an email to LaPinta before sentencing, Valerio listed things that he believed were left out of his sentencing memorandum: his medical history, his "letters, good deeds, certificates, [his] Mother's

---

[26]     Without any explanation what these additional arguments were, there can be no doubt that Valerio fails to show his trial counsel acted unreasonably when they failed to make them in the supplemental sentencing memorandum.  See Reese, 2006 WL 2711610, at *3 ("Conclusory allegations of counsel's deficient performance will not sustain a § 2255 petition.").

portrait," his sentencing letter to the Judge, and a recommendation for drug and offender programs. (Ex. 1 at 28, ECF No. 170-1.)  Assuming these are the "additional arguments" Valerio wanted in his supplemental submission, LaPinta told Valerio in an email why they would not be included:

> "Leonard and I have told you over and over again that there are very good reasons why certain items have been left out of the memo. It comes down once again to you letting us help you by using our expertise and knowledge. You are either being guided by a jailhouse lawyer or by your own misguided beliefs. You and your mother have exhausted every tiny bit of patien[ce] from us. The both of you have been, by far, the most difficult part of representing you. We are not putting forward fraudulent letters on your behalf or making unfounded arguments for you. If you decide to disregard our advise and guidance, you can send the court whatever you want and tell the court whatever you want. That is your choice. Please do not respond with another threatening email. I kindly request that you be patient and allow us help you as best we can because, you have made it very clear to us[] that you do not have any ability to help yourself."

(Ex. 1 at 28, ECF No. 170-1.)

Although LaPinta's response was blunt—specifically regarding Valerio and his mother—LaPinta was not wrong.  This email does not demonstrate that LaPinta's representation fell "below an objective standard of reasonableness." Strickland, 466 U.S. at 688.  Rather, this email shows that LaPinta and Lato were—as the government points out—"exercising sound judgment as attorneys to effectively represent Valerio within ethical and legal bounds."  (Gov't Valerio Opp. at 49.)  The record reveals they were not going to make frivolous arguments like Valerio was requesting and threatening them to make. "The failure," as here, "to include a meritless argument does not fall outside the wide range of professionally competent assistance to which [a] [p]etitioner [i]s entitled." Aparicio, 269 F.3d at 99 (internal quotation marks omitted).

Finally, Valerio chides trial counsel's decision to concede "that a 15-year sentence is unobtainable," considering Judge Bianco's "subsequent findings at the Fatico hearing."  (ECF No. 147, at 2.)  As is clear from the record, this was a reasonable strategic decision for sentencing. Considering the overwhelming evidence, not only of Valerio's guilt at trial, but of Valerio's abusive

66

behavior towards women as demonstrated at <u>Fatico</u> hearing, trial counsel concluded it would be unwise to argue for the statutory minimum sentence.  Instead, trial counsel focused its advocacy on attacking—among other things—the government's "made up number" of sixty years imprisonment and that sentence's deterrent value.  (ECF No. 147, at 2–3.)  Simply put, Valerio has not rebutted the "'strong presumption' that counsel's conduct [fell] within the wide range of reasonable professional assistance" at sentencing.  <u>Bell</u>, 535 U.S. at 702 (quoting <u>Strickland</u>, 466 U.S. at 689).  Indeed, "[a]ctions and/or omissions taken by counsel for strategic purposes generally do not constitute ineffective assistance of counsel."  <u>Gibbons</u>, 555 F.3d at 122 (citing <u>Strickland</u>, 466 U.S. at 690–91).  "[I]n case after case, [Second Circuit courts] have declined to deem counsel ineffective notwithstanding a course of action (or inaction) that seems risky, unorthodox or downright ill-advised," so the Court does the same here.  <u>Tippins</u>, 77 F.3d at 686.

Even if the Court assumed trial counsel's supplemental sentencing memorandum fell "below an objective standard of reasonableness," which it does not, Valerio fails to meet <u>Strickland</u>'s prejudice component.  <u>Strickland</u>, 466 U.S. at 688.  At sentencing, Judge Bianco acknowledged that trial counsel made "significant submissions," which he had pored over.  (GA 94.)  But despite that careful consideration, Judge Bianco did not "believe that a sentence less than the one [he was] imposing would properly balance all the [Section 3553(a)] factors."  (<u>Id.</u>)  Valerio demonstrates no probability, much less a "reasonable probability," that the above arguments (if made in the supplemental sentencing memorandum) would have would have swayed Judge Bianco's decision making to the point of causing a lesser sentence.  <u>Strickland</u>, 466 U.S. at 694.  The likelihood of a different result must be "substantial."  <u>Harrington</u>, 562 U.S. at 112.  Fatal to Valerio's claim, "there is simply no basis here for concluding that he has established anything close to a <u>substantial likelihood</u> of a different result."  <u>Garner</u>, 908 F.3d at 871 (citing <u>Harrington</u>, 562 U.S. at 112) (emphasis in original).

l)    *Ground 17*

Valerio next argues that his trial counsel was constitutionally ineffective because they failed to advocate for him competently at the sentencing.  (Valerio Mem. at 72–74, 76.)  Specifically, Valerio claims that trial counsel failed to advocate for him (1) because they "bash[ed]" him by "present[ing] a picture of Mr. Valerio that was more about the aggravators than the mitigators;" and (2) because they only emphasized the "disgusting" nature of his crimes.  (Id. at 72.)  Valerio fails to satisfy either component of the <u>Strickland</u> test with respect to these arguments.

As for Valerio's claim that trial counsel acted unreasonably, he first argues that his counsel "bash[ed]" him at sentencing.  (Id.)  But he cherry-picks from the sentencing proceeding record to make this argument.  For example, Valerio states that Lato "presented a picture of Mr. Valerio that was more about the aggravators than the mitigators" and quotes Lato stating the following:

> "And I will tell you firsthand that in the hours and hours that we have spent with Mr. Valerio at the MDC, I can tell you that he's come to terms with who he is and what he is. He understands the nature of his crimes being of disgusting, despicable acts. He understands the destruction that he's caused to not only the children involved here but his family as well. While no one will argue that the heavy hand of the law must [not] come down today, your Honor, we argue that that heavy hand does not crush and destroy the rest of Mr. Valerio's life."

(Id.) (quoting A 365.)  But Valerio conveniently failed to include the next sentence, where Lato addressed the mitigating factors:

> "We ask that you consider Dr. Barday's report, the unique family circumstances that existed in the Valerio household and understand that as mitigating factors and how someone could be developed into the person that would conduct this conduct."

(A 365–66.)  Valerio also omits what Lato argued earlier at sentencing, where he pushed back against a de facto life sentence:

> "Under the framework of the facts of this case, it may be difficult to understand that the redeeming qualities of this man as deserv[ing] freedom

one day in his life. But we believe he does. We believe he does deserve to come home from jail and to spend the rest of his life with his family...."

(A 364–65.)   Valerio also quotes Lato stating:

"I don't envy your position in trying to come up with an appropriate sentence in a case like this because anyone that would know the facts and circumstances here would instinctively want to incarcerate this man for the rest of his life."

(Valerio Mem. at 72) (quoting A 366.)  But again, Valerio conveniently omitted the next sentence:

"But I ask that you not do so, and that you understand that there is good in Mr. Valerio and allow him to continue to come back to society one day and hopefully live his life then and there as a productive member of society."

(A 366.)

Valerio's additional claim that his counsel failed to advocate for him because they only emphasized the "disgusting" nature of the crimes misreads the record.  (Valerio Mem. at 72.)  As is clear from the sentencing transcript, Valerio's counsel strategically focused on the nature of Valerio's crime—highlighting the abusive relationship and acts of domestic violence that Valerio experienced by his father—in a reasonable (but ultimately unsuccessful) attempt to get sympathy for Valerio from Judge Bianco.  Further undercutting Valerio's claim, his counsel focused on his positive contributions during the sentencing proceeding.  Specifically, trial counsel highlighted Valerio graduating high school, attending college, working in his family's business, and being involved in real estate.  (A 362–63.)  Trial counsel also stated that Valerio was a "committed, loving son, brother and nephew." (A 362.)

To support his argument that trial counsel acted unreasonably, Valerio cites the Second Circuit's decision in Gonzalez v. United States, 722 F.3d 118 (2d Cir. 2013)—where the Circuit vacated an order denying a 28 U.S.C. § 2255 petition and remanded the case for resentencing.  But Valerio cannot rely on Gonzalez.  The defense attorney in that case—who was disbarred from New York State and was serving a prison term of 25 years-to-life for murdering his wife—failed to act

as an advocate during the sentencing proceedings.  See Gonzalez, 722 F.3d at 135.   The defense attorney, among other things, (1) did not see the defendant for 10 months and only met with the defendant on the day of sentencing for 15 minutes; (2) did not file a sentencing memorandum and did not respond to the government's sentencing memorandum; (3) sought no sentencing leniency based on the defendant's attempts to cooperate with the government; (4)  failed to challenge the imposition of an aggravating role enhancement; and (5) failed to seek a downward departure.  See id.  In the end, the defense attorney "did little more than simply attend Gonzalez's sentencing hearing." Id. at 136.

Such inaction is a far cry from the representation Valerio received from his trial counsel here.  Unlike the defense attorney in Gonzalez: (1) Lato and LaPinta met with Valerio 25 to 30 times while he was incarcerated at the MDC; (2) they spent several hours going over the initial PSR, the addendum, the recommendations, and Judge Bianco's opinion from the Fatico hearing; (3) they answered Valerio's questions and emails; (4) they explained in detail the factual assertions contained in each document; and (5) they gave their opinion on the significance and meaning of each document.  (A 353–54.) Additionally, on Valerio's behalf, trial counsel filed a comprehensive initial sentencing memorandum and a supplemental sentencing memorandum.  (ECF Nos. 142, 147.)  And at the sentencing proceeding, trial counsel ably argued for a non-Guidelines sentence that would allow Valerio to be released at some point, citing Valerio's childhood abuse, the evaluation by Dr. Bardey, and the support of his family. (GA 71–77.)  Valerio's counsel also argued that based on Valerio's life expectancy, any sentence over 34 years would be a de facto life sentence.  (GA 78.)  He also argued that in terms of general deterrence, if such sentences for child pornography production become prevalent an offender may decide to kill a victim instead.  (GA 79.)  Considering all these efforts, the Court cannot conclude that LaPinta and Lato's performance

fell "below an objective standard of reasonableness" at the sentencing proceeding.  Strickland, 466 U.S. at 688.

Even if the Court assumed that trial counsel's conduct fell below an objective standard of reasonableness, which it did not, Valerio fails to satisfy Strickland's prejudice component.  Judge Bianco imposed a below-Guidelines sentence of 720 months, stating that he had "carefully gone through and considered all the factors set forth by Congress in Section 3553(a)."  (GA 89–90.)  He explained that he imposed that sentence "with great thought and pause and having reconsidered it several times."  (GA 90.)  Further, Judge Bianco noted that the offenses of conviction "showed the defendant to be a compelling danger to the community, especially to children."  (Id.)  He remarked that "the level of danger is only further confirmed by" Valerio's history and characteristics.  (GA 91.)  Specifically, Valerio's "history and characteristics show that he is not only a danger to children, but he's a danger to women as well."  (GA 92.)

Judge Bianco found that the evidence of Valerio's "extreme dangerousness was further corroborated at the Fatico hearing."  (Id.)  He found the women who testified "completely credible," commenting, "I listened to them testify.  I could hear it in their voice.  I could see it in their eyes.  There was no question that those events happened as they articulated."  (Id.)  In concluding his analysis of the offense conduct and Valerio's history and characteristics, Judge Bianco remarked:

> So the counts of conviction and this history of violence show him to be, which is clear to me is an extremely dangerous individual, that this court needs to protect society from for the rest of his life.  I don't believe there are any limits on what he would do to satisfy his sexual desires to women or to children.  So society needs to be protected.  I don't believe his level of dangerousness will diminish over time.  I think his risk of recidivism is extremely high.
>
> * * * *
>
> All that led me to conclude that 60 years imprisonment, which is effectively a life sentence is warranted, sufficient and no greater than is necessary to reflect all of the factors.

(GA 93–94.)

Judge Bianco then reviewed Valerio's mitigation arguments.  He acknowledged that the defense had made "significant submissions," which he had considered, but that he did not "believe that a sentence less than the one [he was] imposing would properly balance all the factors."  (GA 94.)   Finally, Judge Bianco acknowledged that he was "sensitive to" the defense argument that "sentences of life or the equivalent of life are usually reserved for murder."  (GA 98.)  Yet Judge Bianco explained:

> I have never sentenced anyone to this amount of time that did not involve a murder, but I believe this is the extraordinary case, given the combination of factors and all the evidence before me, that an effective sentence of life is necessary to, among other things, protect the public from the dangerousness that I believe the defendant poses to the community, notwithstanding his words today.

(GA 98–99.) The SOR accompanying Judge Bianco's written judgment noted the 60-year sentence was a below-Guidelines sentence and provided the following rider regarding his reasons for the sentence:

> Based upon the defendant's conduct in this case, and his history and characteristics, the Court does not believe that the defendant's dangerousness will dissipate over time and concludes that an effective life sentence (of 60 years) is necessary to protect the public from the defendant. The Court concludes, for reasons set forth in detail on the record, that the defendant's risk of recidivism is extremely high.  Given the nature of his conduct and the harm that the defendant has caused by his conduct in this case, this sentence is also necessary to reflect the seriousness of the offense, to promote respect for the law, and to provide a just punishment for the offense.

(SOR 3, 5.)  Judge Bianco ultimately indicated that the sentence was intended to be an effective life sentence given the "extremely serious nature of the offenses" and "extreme level of danger" posed by Valerio's history and characteristics.  (SOR 5.)

Here, Valerio demonstrates no probability, much less a "reasonable probability," that his trial counsel would have swayed any part of Judge Bianco's above-described decision making had they pursued a different argument strategy at the sentencing.  Strickland, 466 U.S. at 694.  That dooms Valerio's claim, as there is no basis to conclude that he has established a "substantial" likelihood of a lesser sentence.  Garner, 908 F.3d at 871 (quoting Harrington, 562 U.S. at 112).

m)    *Ground 18*

In his final ground for relief, Valerio argues that his trial counsel was constitutionally ineffective because they failed to inform Judge Bianco about the "complete breakdown" in the attorney-client relationship that allegedly began in October 2016 after the Fatico hearing.  (Valerio Mem. at 57–61.)  But a full and fair review of the record—including the emails exchanged between trial counsel and Valerio—reveals there was no such breakdown.  As such, the Court finds that Valerio's argument lacks merit.

At the sentencing proceeding, LaPinta detailed the nature of his and Lato's interactions with Valerio throughout their representation.  (A 353–54.)  LaPinta described that (1) trial counsel met with Valerio 25 to 30 times while he was incarcerated at the MDC; (2) trial counsel spent several hours going over the initial PSR, the addendum, the recommendations, and Judge Bianco's opinion from the Fatico hearing; (3) trial counsel answered Valerio's questions and emails; (4) trial counsel explained in detail the factual assertions contained in each document; and (5) trial counsel gave their opinion on the significance and meaning of each document.  Immediately after LaPinta put this on the record, Judge Bianco asked Valerio: "Mr. Valerio, has Mr. La Pinta accurately described the nature of his interactions and Mr. Lato's interactions with you as relates to their representation of you, is that accurate?"  (A 354.)  In no uncertain terms, Valerio responded: "Yes, your Honor."  (A 355.)  The Court takes Valerio's affirmation of his trial counsel's representation for its truth because "[s]olemn declarations in open court carry a strong presumption of verity."

Gonzalez, 722 F.3d at 131 (quoting Blackledge v. Allison, 431 U.S. 63, 74 (1977)).  Indeed, Valerio had several opportunities in open court where he could have spoken up if the attorney-client relationship was not as represented, but he did not do so.  That's because his attorneys were doing their jobs effectively all along.

To circumvent this reality, Valerio cherry-picks self-serving emails between him and trial counsel to conjure up support for his argument that "the attorney-client relationship" broke down around October 2016 after the Fatico hearing began and then "ceased to exist" by December 2016.[27]  (Valerio Mem. at 57–61.)  Valerio's argument is unavailing.

For one, Valerio does not cite (and this Court cannot locate) any legal authority establishing that counsel acts ineffectively when—absent a conflict of interest or an irreconcilable difference—they refrain from raising strategic disagreements with their client to the court.  The applicable law is in fact the opposite: simple disagreement with counsel's trial strategy is not enough on its own to support an ineffective assistance of counsel claim.  See Sanchez, 790 F.2d at 253 ("A defendant ... [may] not claim ineffective assistance of counsel merely because ... he thinks counsel's trial strategy was inadequate.").  In Valerio's view, however, beginning in December 2016, trial counsel was required to move the Court to terminate their representation because they were violating Rule 1.1(c)(1) of the New York Rules of Professional Conduct in preparing for sentencing.[28]  (Valerio Mem. at 60) (citing N.Y. Rules of Prof. Con. 1.1.)  Valerio contends his trial

---

[27]    Before the Fatico hearing began, however, Valerio lauded his trial counsel's efforts.  For example, following his conviction, Valerio wrote to LaPinta—in a September 26, 2015 email—that he "never doubted [LaPinta] to the end.  I know it's the system and it's works that can press the life out of someone in here...."  (Ex. 1 at 1, ECF No. 170-1.)  In another email to both Lato and LaPinta—dated January 17, 2016—Valerio stated that he had "complete confidence in both [their] dynamic abilities to go the distance leaving this both in your hands and the hands of God."  (Id. at 5.)  Additionally, Valerio emailed Lato on January 27, 2016, to tell him he recommended Lato to another inmate for legal assistance.  (Id. at 9.)  Lato clearly did something right for Valerio to recommend him to another person.

[28]    In relevant part, the lack-of-competency rule states: "A lawyer shall not intentionally: (1) fail to seek the objectives of the client through reasonably available means permitted by law and these Rules."  N.Y. Rules of Prof. Con. 1.1(c)(1).

counsel was violating New York's lack-of-competency rule because they were "intentionally … fail[ing] to seek the objectives of the[ir] client through reasonably available means permitted by law and these Rules."  N.Y. Rules of Prof. Con. 1.1(c)(1).  But this claim is belied by a fulsome review of the record (including all the emails); trial counsel's actions were far from incompetent in preparing for sentencing.  As described above, trial counsel participated actively in all stages of sentencing.  (See supra p. 70.)  And at each turn, they represented Valerio effectively, gave him sound legal advice in the face of overwhelming evidence, and were completely honest (to the point of being blunt) in their opinion as to how the case was progressing.

One set of emails in particular underscores the reality of Valerio's instant petition: he planned to act against his attorneys when all else failed.  In February 2016 (before sentencing), Valerio sent Lato an email discussing the PSR.  Therein, Valerio stated: "My other questions are: can they deny our notice of appeal and if so what would our other options be when all else fails?" (Ex. 1 at 11, ECF No. 170-1.)  Lato responded, among other things, "It is your right to appeal.  If the Court of Appeals affirms the conviction and the sentence, absent extraordinary circumstances, that's the end of the road."  (Id.)  Valerio's fitting response was:

> What exactly do you mean by writing "the end of the road"? I didn't battle my trial myself.  Once again I will say this Leonard, if you and Tony feel there is no chance at me turning over my conviction or sentence base on both your abilities let me know now.  Me or my family will not tolerate any long prison time after all those meetings with my family there will be more.  Tell me now Leonard what should I do?

(Id.)

It is clear Valerio has hit the end of the road.  He received a de facto life sentence which the Second Circuit affirmed on appeal.  As Valerio said back in 2016, he will not tolerate any long prison term, such as 60 years.  Therefore, his only remaining option is to make numerous and spurious claims against his dedicated trial counsel—one of whom is deceased and cannot defend

his reputation or conduct.  In this Court's view, however, their performance was far from being ineffective.  Simply put, the across-the-board guilty verdict as to Valerio and his resulting de facto life sentence reflected not any lapse by trial counsel, but overwhelming evidence, not only of his guilt at trial, but also of his abusive behavior towards women as demonstrated at <u>Fatico</u> hearing. For that separate reason, even if trial counsel's overall performance were open to valid critique, which it is not, there was no conceivable prejudice to Valerio.

*     *     *

Accordingly, the Court concludes that Valerio's post-trial claims provide no basis for habeas relief either.

### III.    CONCLUSION

For all these reasons, the Court DENIES Valerio's motion to vacate under 28 U.S.C. § 2255.  No evidentiary hearing is necessary because the files and records of the case establish that Valerio is not entitled to relief.  <u>See</u> 28 U.S.C. § 2255(b); <u>see also</u> <u>Puglisi v. United States</u>, 586 F.3d 209, 213–14 (2d Cir. 2009); <u>Williams v. United States</u>, 2022 WL 685497, at *4 (S.D.N.Y. Mar. 8, 2022).  Since Valerio has not made a substantial showing of the denial of a constitutional right, a certificate of appealability will not issue.  <u>See</u> 28 U.S.C. § 2253; <u>see also</u> <u>Hoffler v. Bezio</u>, 726 F.3d 144, 154 (2d Cir. 2013); <u>Tankleff v. Senkowski</u>, 135 F.3d 235, 241 (2d Cir. 1998).  The Court certifies under 28 U.S.C. § 1915(a)(3) that any appeal from this Order would not be taken in good faith, and therefore, <u>in forma pauperis</u> status is denied for the purpose of an appeal. <u>See</u> <u>Coppedge v. United States</u>, 369 U.S. 438, 444–45 (1962) (holding that an appellant demonstrates good faith when he seeks review of a nonfrivolous issue).

The Clerk of Court is respectfully directed to terminate the motion pending at 14-cr-94, ECF No. 164, to close Case No. 14-cr-94, and to close Case No. 20-cv-02751.

**SO ORDERED.**

Dated:   May 9, 2024
        Central Islip, New York

                                           /s/ JMA
                                     JOAN M. AZRACK
                                     UNITED STATES DISTRICT JUDGE